L.B. Cozzens
Cozzens, Harman, Warren, Harris & Odegaard, P.L.L.P.
550 North 31st Street, Suite 250
Billings, Montana 59101
Tel:    (406) 294-2000
Fax:    (406) 294-2010

Thomas C. Mielenhausen
Paul A. Banker
Christopher L. Lynch
Lindquist & Vennum P.L.L.P.
4200 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Tel:    (612) 371-3211
Fax:    (612) 371-3207

Attorneys for Defendants

FILED
BILLINGS DIV.

2006 MAR 23 PM 4 50

PATRICK E. DUFFY, CLERK
BY _____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | | |
|---|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, | ) ) ) | Cause No.  CV-04-29-BLG-SRT |
| Plaintiff, | ) ) ) | |
| and | ) ) | |
| CONTINENTAL INSURANCE COMPANY, | ) ) ) | **DEFENDANTS' MOTION IN LIMINE # 3, REGARDING DESIGNATED EXPERTS MORRISON, DALE, AND ALVEY** |
| Plaintiff Intervenor, | ) ) | |
| v. | ) ) | |
| SOCO WEST, INC., BRILLIANT NATIONAL SERVICES, INC., STINNES CORPORATION, and BRENNTAG (HOLDING) N.V., | ) ) ) ) ) | |
| Defendants. | ) ) | |

## I.   **INTRODUCTION**

Defendants move the Court *in limine* to prohibit Plaintiff United States Fidelity and Guaranty Company ("USF&G") and Plaintiff-Intervenor Continental Insurance Company ("Continental") (collectively "the Insurers") from offering the following:

1.   Any opinions or bases for opinions that are not disclosed in the Rule 26 reports of Robert Morrison, Bruce Dale and Peter Alvey.

2.   Testimony from Dale and Alvey regarding the purported effect a spill of perc might have on the asphalt at the Dyce facility.

## II.   **ARGUMENT**

### A.   **The Insurers' Designated Experts Morrison, Dale, and Alvey Should Be Precluded from Testifying As to Opinions or Bases for Opinions That Are Not Disclosed in Their Expert Reports.**

The Insurers have offered Rule 26(a)(2)(B) reports and rebuttal reports from three purported experts: Robert Morrison, Peter Alvey, and Bruce Dale. The Insurers' experts offer certain opinions on the issue of whether groundwater contamination under and near the Dyce Site arose out of a sudden and accidental spill of 250 to 1,000 gallons of perc in the mid-1970's, including certain opinions in rebuttal to those expressed in the Rule 26(a)(2)(B) Report of Defendants' expert, Dr. Robert Harris.  (See Harris Report at 12/30/05 Lynch Aff., Ex. 1 [Dkt. # 144].)  At their depositions, though, the Insurers' experts alluded to the possibility that, at trial, they might try to offer additional, undisclosed opinions and bases.  Such attempts to conceal expert opinions and bases for opinions would contravene the requirements of the rules of civil procedure and this Court's Scheduling Order.

Fed. R. Civ. P. 26(a)(2)(B) provides that an expert report "shall contain a complete statement of all opinions to be expressed and the basis and reasons therefore; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a

summary of or support for the opinion." In its 1/4/05 Scheduling Order, this Court explicitly noted that expert reports must be complete, comprehensive, accurate, tailored to the issues on which the expert is expected to testify, and must satisfy the specific requirements of Rule 26(a)(2)(B). The Scheduling Order also states, **"An inadequate report or disclosure may result in exclusion of the expert's opinions at trial even though the expert has been deposed."** (emphasis in original).

Fed. R. Civ. P. 37(c)(1) "gives teeth" to the 26(a) disclosure requirements by forbidding the use at trial of any information not properly disclosed. Yeti By Molly, Ltd. v. Deckers Outdoor Corp., 259 F.3d 1101, 1106 (9th Cir. 2001). Rule 37(c)(1) provides that a party who, without substantial justification, fails to disclose information required by Rule 26(a) or 26 (e)(1), or to amend a prior response to discovery as required by 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at trial any information not so disclosed. The rule is a self-executing, automatic sanction to provide a strong inducement for disclosure of material a party expects to use as evidence. Yeti, 259 F.3d at 1106; Fed. R. Civ. P. 37(c) Advisory Committee's Notes 1993.

Through the rules of federal procedure and this Court's Scheduling Order, all parties to this action were put on notice that inadequate expert disclosures will result in the exclusion of the expert's opinion. Allowing any of the Insurers' experts to testify to opinions and bases not disclosed in the expert's reports would reward the Insurers' lack of compliance with this Court's rules and Order. To the substantial prejudice of Defendants, the Insurers would effectively be able to engage in the very type of trial by ambush that the this Court's rules and Order are intended to eliminate. Accordingly, Defendants request that the Insurers' experts be precluded

from testifying as to any opinions and any bases for any opinions not disclosed in their expert reports.

Specific issues that may arise as to each of the Insurers' experts are detailed below.

### 1.    Expected or Intended.

The first opinion Defendants' expert Robert Harris expresses in his expert report is that:

> Chemical handling practices associated with [perc] and other chlorinated solvents at the Dyce Site were state-of-the-practice from 1973 to the present and were in substantial compliance with applicable federal and state regulations. There is no indication that Dyce expected or intended the groundwater damage and injury claimed by the USEPA and MDEQ.

(12/30/05 Lynch Aff., Ex. 1., p. 5. [Dkt. # 144.])   None of the reports, rebuttal reports or supplemental reports of the Insurers' experts disclose any rebuttal to Harris' opinion regarding the expected or intended issue.  Instead, their reports set forth only certain opinions regarding the issue of the 250 to 1,000 gallon perc spill in the mid-1970s.  At trial, the Insurers' experts should therefore be precluded from offering any opinions or bases rebutting Harris's opinion regarding the expected or intended issue, including the state-of-practice for chemical handling from 1973 to present.

### 2.    Morrison.

Soco seeks to exclude Morrison from testifying at trial about any opinions or bases that he did not disclose in his expert reports, including any opinions or bases regarding:  (a) the evaporation rate of perc (*e.g.,* whether all or part of a 250 to 1,000 gallon perc spill would have evaporated before it flowed to the site's northwest corner); (b) the effect, if any, of perc on asphalt; (c) the nature and effect, if any, of perc fumes from the subject spill; and (d) "scientific" evidence as to whether drainage ditches existed along the Dyce Site railroad spur during the 1970s.

Morrison did not include an opinion on any of the above topics in either his 9/6/05 Report (Attachment ("Att.") A hereto) or his 10/19/05 Rebuttal Report. (Att. B.) And at his 1/4/06 deposition Morrison testified that his reports contain a complete statement of all opinions to which he expects to testify at trial and the bases and reasons for those opinions. (Att. H, p. 22.) Morrison specifically acknowledged that the evaporation rate of perc was not a subject about which the Insurers had asked him to provide expert testimony at trial. (Id., pp. 60-61.) Morrison also stated that he had not been asked to perform an analysis of any effect perc might have on asphalt, nor had he been asked to testify at trial on this subject. (Id., pp. 116-17.) When asked if he had formed an opinion and expected to testify at trial regarding the effect of perc fumes on a person in close proximity to a spill, Morrison was non-responsive, and merely stated that if he were asked that question at trial he would provide an answer. (Id., p. 120.) Upon further questioning, Morrison acknowledged that neither his Report nor his Rebuttal Report expressed an opinion on that topic. (Id.)

Although Morrison's Rebuttal Report disputes the existence of the drain patterns and ditches identified in Harris' expert report, the only "basis" Morrison identifies in his reports for that opinion are one of the answers contained in Dyce's responses to the USEPA's 104(e) requests for information.[1] (Att. B, pp. 6-7.) At his deposition, Morrison conceded that in offering his rebuttal opinion he did not conduct any scientific analysis or scientific examination of aerial photographs to determine where the site's drainage pathways might have been or whether the ditches discussed by Harris and several witnesses existed. (Att. H, p. 156.) Therefore, Morrison should be precluded from offering any such analysis or examination at trial,

---

[1]     At his deposition, Morrison also indicated he based this opinion in part on deposition testimony of lay-witness Monte Naff. (Att. H, p. 156.)

and should be limited to identifying only those bases that were disclosed in his Rule 26 Report and Rebuttal Report.

### 3.   Dale.

On October 21, 2005, Continental served Defendants with Dale's Rule 26 Rebuttal Report, in response to Harris' Expert Report.  (Att. C.)  At trial, Dale should be precluded from testifying regarding any opinions or bases that were not set forth in his report, including any opinions or bases regarding:  (a) the cause of any of the soil or groundwater contamination at the Dyce site; and (b) whether the 250 to 1,000 gallon perc spill would have evaporated before reaching the northwest corner of the Dyce site.  At his 12/13/05 deposition, Dale testified that his Rebuttal Report contains a complete statement of all the opinions he expects to testify about at trial and the bases for those opinions.  (Att. I, p. 7.)  Dale's Rebuttal Report contains no opinions on the issues listed above.  (Att. C.)

During his deposition, Dale repeatedly stated that he had "no opinion" as to the cause of any of the perc contamination at the Dyce site, that the issue was "beyond the scope" of his assignment, that he had no expertise on that issue, and that he would not offer an opinion on that issue at trial.  (Att. I, pp. 38-39; 113; 203; 209-10; 220.)  Based on those admissions, Defendants request that Dale be prohibited from offering any testimony at trial as to how the contamination under and near the Dyce site arose.

In his Rebuttal Report, Dale discusses the evaporation rate of perc, but his opinions on that issue are limited.  Dale opines simply that: "Perc evaporates much more rapidly than it permeates intact concrete."  (Att. C, Par. B. (a).)  At his deposition Dale offered a calculation of how fast a pool of perc on concrete would evaporate under certain "ideal" conditions.  (Id., pp. 12-13.)  While Dale made an off-the-cuff remark at his deposition that a spill of perc released

under pressure at the site's unloading area would likely evaporate before it traveled to the northwest corner, Dale conceded that nowhere in his Rebuttal Report did he discuss that issue or disclose such an opinion. (Id. pp. 34-36.). Likewise, nowhere in his Rebuttal Report, at his deposition, or in any supplemental report, did Dale ever provide any scientific analysis or calculations that would serve as a basis for such an expert opinion.

### 4.    Alvey.

USF&G served Alvey's Rule 26 Report (Att. D) on September 6, 2005, his Rebuttal Report (Att. E) on October 21, 2005, and his "Supplemental" Report (Att. F) on January 1, 2006. Alvey should be precluded from testifying at trial as to any opinions or bases not disclosed in those reports, including opinions or bases regarding: (a) the evaporation rate of perc; (b) fumes, if any, from the subject spill; (c) the likely cause of the contamination found in the northwest corner of the Dyce site; and (5) the age of the perc contamination under and near the Dyce site.

Alvey acknowledged at his deposition that he did not expect to testify to any opinions not expressed or contained in his reports. (Att. J, p. 9.) Nowhere in his reports does Alvey discuss the evaporation rate of perc or offer any opinion that a spill of 250 to 1,000 gallons of perc in the site's loading/unloading area would evaporate before it reached the site's northwest corner. Likewise, Alvey never discusses perc fumes or offers any opinion as to how noticeable the odor from a spill of 250 to 1,000 gallons of perc might be.

At his deposition Alvey conceded that he has not attempted to form any opinion, with any degree of scientific certainty, as to the likely cause of the contamination found in the northwest corner of the Dyce site. (Id., p. 193.) Instead, Alvey explained that be merely asserted possible alternatives that might have caused some of the contamination. (Id., pp. 125-26; 145; 149-51.) At Alvey's deposition, USF&G's counsel likewise stated that Alvey was not "here to give you an

opinion as to what caused the contamination in the northwest corner." (Id., p. 144).  Based on this testimony and concession, Alvey should be precluded from offering any testimony at trial regarding the likely cause of the contamination in the northwest corner of the Dyce site.

In his report, Alvey states that the age of the perc contamination under and near the Dyce site cannot be determined. (Att. E, p 5.)  Yet, at his deposition, Alvey made a remark that the perc was "relatively new." (Att. J, p. 161.)  When pressed on the issue, Alvey conceded that he had not analyzed the sampling information to attempt to determine the age of the perc release, that many variables come into play in trying to age a release, and that he did not expect to offer any opinion at trial as to when the perc contamination found in the Dyce site's northwest corner likely got into the subsurface.  (Id., pp. 161-62.)  Therefore, Alvey should be precluded from offering any opinion regarding the age of the perc contamination under and near the Dyce site.

**B.**     **Dale and Alvey's Opinions Regarding The Purported Effect a Perc Spill Might Have on the Asphalt at the Dyce Facility are Unreliable and Should Be Excluded.**

Federal Rule of Evidence 702, which governs expert testimony provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience training or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods and (3) the witness has applied the principles and methods to the facts of the case.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), The Supreme Court charged courts with the responsibility to act as the gatekeepers to ensure that any and all scientific testimony or evidence administered is not only relevant, but reliable.  The court's obligation to determine the relevance and reliability of an expert's testimony is vital to ensure accurate decision-making by the trier of fact.  Mukhtar v. Cal. State Univ., Hayward, 299 F.3d

1053, 1063 (9th Cir. 2002) (citations omitted).  The relevance and reliability requirements ensure that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999).  Maintaining the standards required under Rule 702 is important given the aura of authority experts often create leading juries to give great weight to their testimony.  Mukhtar, 299 F.3d at 1063.

To satisfy the reliability requirement under Rule 702, the expert must be qualified to render the opinion at issue and must support the opinion with valid methodology.  Daubert, 509 U.S. at 589-90.  Proposed testimony must be supported by "good grounds" based on what is known.  Id. at 590.  It is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support.  See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

### 1.    Dale.

Dale, a chemical engineer, opines that it is unlikely there was a perc spill of 250 to 1,000 gallons at the Dyce site's loading/unloading area in the 1970s because such a spill "would have damaged or discolored a large area of asphalt."  (See Att. C, Par. B. (c.).)  But Dale's report fails to identify any scientific analysis or calculation for this conclusory opinion.  (Id.)  And Dale's deposition testimony reveals that his opinion is not based on any scientific analysis or methodology.

In his report Dale does not cite, and at his deposition Dale could not identify, a single scientific study, publication or authority discussing perc as a solvent for dissolving asphalt.  (Att. I, p. 138.)  When asked whether he knew of any such authorities, Dale said he "thought" but "was not sure" that the ASTM Standards for extracting bitumen from asphalt used either

trichloroethylene or perc as a solvent.  (Id., p. 139.)  The standards use TCE but not perc to dissolve asphalt bitumen under strict laboratory conditions.  (Att. G, p. 1, par. 3.1.)  Dale conceded that he did not know what testing conditions were utilized in the ASTM standard tests or whether the rate at which TCE (the solvent used in the standard tests) reacts with asphalt differs from the rate at which perc reacts with asphalt.  (Id., p. 141.) Dale also admitted that has received no education and has conducted no research concerning the make-up or properties of asphalt.  (Id., p. 81.)  Further questioning revealed that Dale lacks knowledge of the typical composition or makeup of asphalt or how variations in those factors might affect the rate at which perc would react with the asphalt.  (Id., pp. 135-37; 140-41.)

The only documents Dale cited in support of his opinion that perc dissolves asphalt are lay-witness testimony from this action, and the deposition testimony of Richard B. Adams, who served as an expert witness in an unrelated action. .  Tellingly, and contrary to Dale's conclusion, Mr. Adams testified that it would take "weeks or months" of contact before perc would have visible affects on asphalt and that "it could be quicker, could be longer.  It depends on again the rate of application, the consistency of contact, the thickness of the asphalt, you know, various things."  (Id., pp. 54-55.)

Dale admitted that all of his experience studying spills, leaks, and other discharges of perc has been in connection with testifying as an expert witness in cases involving dry cleaners. But Dale was able to identify only one case in which he "might have" given an opinion that "perc will react with asphalt."  Dale conceded that he did not recall that case very well and could not recall whether he gave any opinion as to the rate at which perc will dissolve asphalt.  (Id., pp. 81; 102.)

The only instance in which Dale ever observed perc react with asphalt was an impromptu "experiment" conducted at his home. In that experiment Dale submerged a quarter-sized piece of asphalt (of unknown composition) from his driveway in a container of perc, "swished the beaker around a little bit," and watched the asphalt dissolve. (Id., pp. 138-39; 143-44; 158.) At his deposition, Dale agreed that the time it would take for perc to noticeably begin to dissolve asphalt "could be any time from essentially instantaneous to fairly long" depending on such factors as the amount of perc involved, the temperature, the rate of application, the consistency of contact, the thickness of the pool of perc, the thickness of the asphalt, and attempts to clean the perc. (Id., pp. 55-56, 151-53.) Because the conditions of Dale's "experiment" differed so dramatically from the conditions that would have existed during a spill of perc during a loading or unloading procedure at the Dyce site in the 1970s, Dale's experiment provides no legitimate basis for him to offer a conclusory opinion that the a spill of perc would have resulted in noticeable damage or discoloration to the asphalt at the Dyce site.

2.    **Alvey.**

Alvey opines in his  reports that a spill of 250 to 1,000 gallons of perc at the Dyce Site's loading and unloading area would have resulted in "severe, readily noticeable deterioration of the asphalt surface." (Att. D, p. 8.) At his deposition, Alvey opined that such deterioration would have occurred even if the perc had been in contact with the asphalt for as little as four minutes. (Att. J, p. 111.) But, like Dale, Alvey has failed to offer any legitimate basis for his conclusory assertion.

In his Report, Alvey states the basis for this opinion is that "chlorinated solvents are typically used in testing of asphalt material to extract the bitumen from the paving material and they are also known to have an adverse effect if spilled on asphalt paving." (Att. D, p. 9.) But,

at his deposition, Alvey conceded that he "didn't do any scientific calculations" to support his opinion. (Id., p. 111.)  And Alvey admitted that he has never personally observed a perc spill, and could not recall a specific instance when he has ever observed asphalt after perc had been spilled on it. (Att. J, pp. 111-12.)

In fact, Alvey's only purported "scientific" bases for his opinion regarding perc's affect on asphalt are: (a) a lone statement in a brochure distributed by a chemical manufacturer that "[s]pills of chlorinated solvent can quickly damage asphalt surfaces, and should be promptly cleaned up"; and (b) the ASTM Standard Test Methods for Quantitative Extraction of Bitumen from Bituminous Paving Mixtures ("ASTM Standards"). (Id., pp. 104-05; 111; 122.)  But the general statement in the product brochure provides no scientifically defensible basis for Alvey to conclude that the spill at issue here would have noticeably deteriorated the asphalt surface of Dyce's loading/unloading area within four minutes.  Further, the ASTM standards cited by Alvey deal with extracting bitumen from small samples of asphalt using TCE and other chlorinated solvents under strict laboratory conditions. (Att. G.)  Alvey acknowledged that the ASTM Standards use TCE, not perc-. (Att. J, p. 105.)  Alvey is not aware of any standard tests involving perc, does not know the length of contact time between TCE and asphalt utilized in the ASTM Standard tests, and does not know specifically whether the rate at which perc deteriorates asphalt may be any different than TCE. (Id., pp. 105; 120-21.)  Finally, although Alvey concedes that "multiple variables" affect the rate and extent to which perc reacts with asphalt (id., pp. 107-08; 112-13), nowhere in his report does Alvey account for the drastic differences between the laboratory conditions employed in the ASTM standards and the conditions that likely existed at the time of the subject spill.

As chemical engineers, Dale and Alvey may have general knowledge about chemicals. But that general knowledge does not provide a scientifically supportable methodology, basis, or the requisite "good grounds" to support their conclusion that the spill at issue in this case would have necessarily resulted in readily noticeable damaged or discoloration to the asphalt. Neither Dale nor Alvey has personal experience with such spills, neither cites to any scientific authorities that discuss the affect of perc on asphalt, and neither sets forth any analysis, methodology, or calculations supporting his opinions. Dale and Alvey's conclusory testimony is therefore unreliable and no help to the trier of fact and should excluded pursuant to Rule 702.

## III.  CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to exclude trial testimony from: (a) the Insurers' designated experts Morrison, Dale, and Alvey regarding any opinions or any bases for any opinions that are not disclosed in their expert reports; and (b) Dale and Alvey regarding the effect, if any, a perc spill would have on asphalt at the Dyce site.

DATED:  March 23, 2006

COZZENS, HARMAN, WARREN, HARRIS & ODEGAARD, P.L.L.P.


BY: _____
     L.B. COZZENS
     55 North 31st Street, Suite 250
     Billings, MT  59101

Thomas C. Mielenhausen
Lindquist & Vennum P.L.L.P.
4200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of March 2006, a copy of the foregoing was personally served upon the following counsel of record:

*Counsel for Plaintiff*
**UNITED STATES FIDELITY AND GUARANTY COMPANY**

M. Keith Moskowitz, Esq.
John I. Grossbart, Esq.
Robert C. Johnson, Esq.
Mary B. Anderson, Esq.
Sonnenschein Nath & Rosenthal
8000 Sears Tower
233 South Wacker Drive
Chicago, IL  60606

Marshal M. Mickelson, Esq.
Corette Pohlman & Kebe
129 West Park Street
P.O. Box 509
Butte, MT  59703

*Counsel for Plaintiff Intervenor*
**CONTINENTAL INSURANCE COMPANY**

Brian W. Walsh, Esq.
Monica M. Slakey, Esq.
Colliau Elenius Murphy Carluccio Keener & Morrow
Foundry Square II
405 Howard Street, Suite 600
San Francisco, CA  94105

Maxon R. Davis, Esq.
Dennis J. Tighe, Esq.
Davis, Hatley, Haffeman & Tighe, PC
Milwaukee Station
3rd Floor
100 River Drive North
Great Falls, MT  59405

L.B. COZZENS