# H

United States Fidelity, et al. vs SOCO West, Inc., et al. 1/04/06

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, ) ) ) | Cause No. CV-04-29-BLG-RFC |
| Plaintiffs, ) ) | DEPOSITION OF |
| and ) ) | ROBERT D. MORRISON |
| CONTINENTAL INSURANCE COMPANY, ) ) | |
| Plaintiff Intervenor. ) ) | COPY |
| v. ) ) | |
| SOCO WEST, INC., BRILLIANT NATIONAL SERVICES, INC., STINNES CORPORATION, AND BRENNTAG (HOLDING) N.V., ) ) ) ) ) | |
| Defendants. ) ) | |

TAKEN ON: Wednesday, January 4, 2006

TAKEN AT: 550 West C Street, Suite 1440
San Diego, California

REPORTED BY: CYNTHIA DEPWEG
CSR NO. 3280
RPR, CRR

Pat Carl & Associates (763) 591-0535 or (800) 591-9PCA (722)

DEFENDANTS' 3/23/06 MOTION IN LIMINE # 3
**ATTACHMENT H**

United States Fidelity, et al. vs SOCO West, Inc., et al. 1/04/06

Page 22

1  this case, correct?
2      A. Yes.
3      Q. Do these reports contain a complete statement
4  of all the opinions that you expect to testify to at the
5  trial of this case and the basis and reasons for those
6  opinions?
7          MR. GROSSBART: Objection to the form of the
8  question.
9          THE WITNESS: Yes, with the caveat that there
10 are opinions subsumed within opinions cited in these two
11 reports which I have formed and/or relied upon in this
12 matter.
13         MR. GROSSBART: And I would also -- on behalf
14 of USF&G, we fully reserve the right to seek to elicit
15 testimony that might be broader, arguably broader, than
16 those opinions, depending on what Mr. Harris says.
17         So if you would rephrase your question as to
18 something along the lines of "as things currently stand,"
19 et cetera, et cetera, I think it would be a fair
20 question, but it's objectionable as phrased.
21 BY MR. LYNCH:
22     Q. As things currently stand then and assuming
23 there's no new testimony from Dr. Harris or from the
24 defendants in this matter, do these reports contain a
25 complete statement of all the opinions you expect to

Page 23

1  testify to at the trial of this case and the basis and
2  reasons for those opinions?
3          MR. GROSSBART: Again, "the basis and reasons"
4  part of your question, I object to. He's already
5  testified that -- or Mr. Davis has said that other
6  documents have surfaced since the reports were done. To
7  the extent those other documents provide, quote, unquote
8  "basis or reasons," again, I think the question is a
9  little bit of a trap for the unwary, and that's my
10 concern.
11         MR. LYNCH: Counsel, I would appreciate it if
12 you don't make speaking objections. You can object to
13 the form of the question.
14         MR. GROSSBART: I'm going to object how I
15 always object. So that was certainly a proper objection.
16         MR. LYNCH: We can agree to disagree on that.
17 Can you read the question back to the witness,
18 please.
19         (The last question was read back.)
20         MR. GROSSBART: I renew my objections as
21 previously stated.
22         THE WITNESS: Exhibits 2500 and 2501 accurately
23 reflects my opinions and the evidence relied upon for
24 those points in time. Subsequent to the submittal of the
25 October 19, 2005, report, additional information which I

Page 24

1  have relied upon and have considered include my site
2  visit on November 11, 2005, and documents produced by
3  Unifield Engineering of Billings, deposition testimony
4  and exhibits of Bruce Dale, and the deposition and
5  exhibits of Charles Bender, which have been updated and
6  are reflected in a document list that supersede the
7  Attachment A document list attached to this September 6,
8  2005, report.
9  BY MR. LYNCH:
10     Q. Did I hear you correctly that you have a
11 supplemental list of the documents you've considered?
12     A. Yes.
13     Q. That contains everything you've considered up
14 to this date in connection with forming the opinions in
15 this matter?
16     A. Yes, with the exception of photographs and my
17 site visit of November 11, 2005.
18     Q. And is that the supplemental list of documents
19 you've considered?
20     A. Yes.
21     Q. Could we mark this as Exhibit 2502? And if you
22 need to have a copy made, we can probably do that because
23 the originals will stay with the court reporter of the
24 exhibits.
25         MR. DAVIS: Well, he can obviously generate

Page 25

1  another copy back at the office. If we need more copies
2  today for questioning, that's another issue.
3          MR. LYNCH: Can you please mark that as
4  Exhibit 2502.
5          (Exhibit 2502 was marked.)
6  BY MR. LYNCH:
7      Q. Mr. Morrison, could you please identify
8  Exhibit 2502 for the record?
9      A. Yes.
10     Q. And what is it?
11     A. It's an updated document list.
12     Q. And am I correct that, just for clarification,
13 that document contains all of the documents you've
14 reviewed in connection with forming your expert opinions
15 in this matter with the exception of the photographs from
16 your site visit on November 11, 2005?
17     A. As of this point in time, that's correct; and I
18 would also include not only the photographs but
19 information and observations made during the November 11,
20 2005, site visit.
21     Q. May I see the exhibit.
22         And just so there's no uncertainty, am I
23 correct that in addition to the documents identified on
24 this list, you've reviewed the documents that were
25 produced by Unifield in this matter? I just don't see

7 (Pages 22 to 25)

Pat Carl & Associates (763) 591-0535 or (800) 591-9PCA (722)

Page 58

1  A. I would characterize it as site and event
2  specific.
3  Q. Why is that?
4  A. Site specific relative to whether the air —
5  and the air temperature is stagnant as opposed to, for
6  example, forced air within a building, relative to
7  temperature, the flux in temperature during the time of
8  evaporative loss.
9     Obviously, the temperature by itself is very
10 significant but needs to be considered with all the other
11 variables associated with the incident.
12 Q. All other things being equal, if you have percs
13 build when the air temperature is 32 degrees as compared
14 to the same quantity of percs build in the same location
15 when the air temperature is 80 degrees, how significant
16 of a difference will there be in the evaporation of those
17 products?
18 A. In your hypothetical with all other impacting
19 variables being the same, one would expect a higher
20 temperature to result in greater evaporative flux or
21 loss.
22 Q. Any idea how much greater?
23 A. No.
24 Q. What would you need to know to calculate that?
25 A. One would need at a minimum, if such

Page 59

1  information is available, quantification of some of the
2  variables which I listed in my earlier testimony.
3  Q. All other things being equal, can an air
4  temperature variance of 40 degrees have a significant
5  impact on the evaporation rate to perc?
6     MR. DAVIS: Object as to vague.
7     THE WITNESS: Can you repeat the question,
8  please.
9     (The last question was read back.)
10    THE WITNESS: In your hypothetical, an increase
11 in temperature would have some impact or expected
12 increase in the evaporative loss, all other known
13 parameters being equal.
14 BY MR. LYNCH:
15 Q. Can that effect be significant, or is it
16 generally minimal?
17    MR. DAVIS: Same objection. Vague. What do
18 you mean by "minimal"? What do you mean by
19 "significant"?
20 BY MR. LYNCH:
21 Q. Assume you have this build of 100 gallons of
22 perc, all other variables being equal. What would you
23 expect the difference in evaporation to be if the air
24 temperature is 30 degrees as opposed to 80 degrees
25 Fahrenheit?

Page 60

1  A. In your hypothetical, I'd need a lot more
2  information to be able to answer that question.
3  Q. What type of information?
4  A. It would include the information provided
5  earlier in your hypothetical, and the starting point
6  beyond that information would be the mathematical
7  equations or constructs in order to do that type of
8  estimate.
9     And one would find that information, for
10 example, in the textbook by John Crank entitled
11 Mathematics of Diffusion, which can be used for that
12 purpose and would list the variables needed.
13 Q. In connection with forming the expert opinions
14 you've expressed in your reports, your original Expert
15 Report and your Rebuttal Expert Report, have you
16 performed any calculations as to the rate or extent to
17 which a 250- to 1,000-gallon spill of perc in the Dyce
18 Chemical loading-unloading area would evaporate?
19 A. Relative to the hypothetical release of perc in
20 the loading and unloading area, I have not performed that
21 calculation.
22 Q. Am I correct that that's not a subject on which
23 you will be providing expert testimony at the trial of
24 this matter?
25 A. I have not been asked to provide that

Page 61

1  testimony, although I have provided that type of
2  testimony in other cases dealing with PCE and chlorinated
3  solvents, and I am familiar with the process of
4  performing that calculation.
5  Q. You read Mr. Dale's deposition transcript and
6  reviewed his exhibits in connection with forming your
7  opinions in this case, correct?
8     MR. DAVIS: Object to the form of the question.
9  His opinions had been formed obviously before
10 Professor Dale was deposed. So other than that, I mean,
11 I think your syntax is a little off, Counsel, but --
12 BY MR. LYNCH:
13 Q. Have you reviewed Mr. Dale's deposition
14 testimony and exhibits?
15 A. Yes.
16 Q. Did you review his calculations concerning the
17 evaporation of perc?
18 A. I haven't had an opportunity to look at those
19 calculations in detail.
20 Q. Is perc soluble in water?
21 A. Yes.
22 Q. If perc is in the presence of water, what
23 variables would influence how much of the perc is
24 dissolved in water and the rate at which it would
25 dissolve?

United States Fidelity, et al. vs SOCO West, Inc., et al. 1/04/06

Page 114

1  "reported," I'm referring to the regulatory requirements,
2  reporting requirements, whether to -- this is Montana or
3  the federal government -- as opposed and contrasted to
4  the presence of PCE in the subsurface at the Dyce
5  facility is a clear indication that -- or clear
6  documentation, if you will, that a release has occurred.
7     Q. In connection with issuing your initial and
8  rebuttal reports, did you review any testimony or
9  documents concerning a one-time discrepancy in the
10 inventory of perc in the range of 250 to 1,000 gallons
11 that occurred in 1975, 1976, or 1977?
12    MR. GROSSBART: Objection to the form of the
13 question. Have such documents been produced in this
14 case?
15    I guess we're not going to get an answer to
16 that either.
17    THE WITNESS: Can you provide me with the
18 document that you're referring to?
19 BY MR. LYNCH:
20    Q. I'm just wondering if you reviewed -- let's go
21 with the witness testimony.
22    Did you review any witness testimony of such
23 discrepancy in forming your opinion?
24    A. There was information concerning inventory
25 discrepancies of PCE in some of the deposition testimony.

Page 115

1     Q. Do you know whose deposition testimony?
2     A. I believe the Hallsten deposition on Page 44
3  mentioned a PCE discrepancy in their inventory.
4     Q. Did you review that testimony in connection
5  with forming the opinions expressed in your initial
6  report or your rebuttal report?
7     A. I became aware of the Hallsten deposition
8  relative to my review of the Bruce -- Dr. Bruce Dale
9  transcript.
10    Q. Prior to that, you hadn't reviewed the Hallsten
11 deposition?
12    A. Correct.
13    Q. Did you consider evidence -- strike that.
14    Do you consider testimony of a 250-to-1000
15 gallon discrepancy in perc inventory that occurred in
16 1975, 1976, or 1977 relevant to trying to determine when
17 a release of perc might have occurred that could result
18 in the contamination found at and downgradient to the
19 Dyce site?
20    A. Two groups of evidence relative to your
21 question: One is that I reviewed the information made
22 available to me regarding the inventory reconciliation
23 relevant to the Hallsten deposition. And based on that
24 review, it was my understanding that, one, there was
25 never any resolution, whether a discrepancy actually

Page 116

1  occurred; that is, whether it was a paper error, whether
2  there was an actual spill, or if there was theft of the
3  product.
4     Bruce Dale also made an excellent point in
5  terms of my understanding that the inventory
6  reconciliation was performed on a quarterly basis and
7  that the Hallsten deposition dealt with a springtime
8  quarterly reconciliation, whereas Bruce -- whereas
9  Desmond Slater's description of the release was on a hot
10 summer day at lunch in the summertime, which isn't
11 consistent with the Hallsten deposition.
12    The second group of information is that there
13 was no other information relative to a report made to
14 Dyce Chemical of such a release, issues regarding
15 pavement deterioration, issues regarding the absence of
16 odor, issues regarding other deponent testimony,
17 specifically Dick Bender, who, according to Desmond
18 Slater, was washing down the spill, or the hypothetical
19 spill. Had no memory of such an incident.
20    And the entire hypothetical scenario that one
21 could wash down a release of this volume with a hose
22 without succumbing is an unrealistic hypothetical.
23    So all of those groups of evidence and a
24 significant amount of deposition testimony is
25 inconsistent with the scenario that the release of PCE

Page 117

1  occurred in the mid '70s based upon the inventory
2  reconciliation evidence.
3     Q. I will go through some of the points you just
4  raised. You talked about evidence regarding
5  deterioration or potential deterioration of asphalt from
6  a release. Is that an issue that's addressed in either
7  your Expert Report or Rebuttal Expert Report?
8     A. The asphalt deterioration was not specifically
9  cited in either of my Expert Witness Reports, although I
10 would note, relative to Footnote 15 of the September 6,
11 2005, report, which is cited, there is text on Page 3
12 relating to the interview of the 19 employees concerning
13 spills.
14    It's, quote, "Many of the individuals
15 speculated that if there had been any spill of TCE or PCE
16 during the unloading process, that it would have reacted
17 with the asphalt. None of the individuals recall any
18 breakdown of asphalt in the loading area. From that,
19 they concluded that there likely had not been any spills
20 in the area."
21    So I certainly considered that information when
22 I wrote the September 2005 Expert Witness Report.
23    Q. Have you formed an opinion that you expect to
24 testify to at trial as to the rate or amount of
25 deterioration of the asphalt that would have resulted

United States Fidelity, et al. vs SOCO West, Inc., et al. 1/04/06

Page 118

1 from a 250-to-1000-gallon spill of perc in the unloading
2 area in the 1970s?
3    A. I have not been asked to perform that analysis.
4    Q. Do you expect to testify on that issue at
5 trial?
6    A. Not unless asked to.
7    Q. That issue is also not addressed in your
8 Rebuttal Report. Is that correct?
9    A. Correct.
10    Q. You also just discussed some -- or summarized
11 some testimony concerning odor perc, and I believe you
12 indicated that it's an unrealistic hypothetical that
13 someone could attempt to clean up a spill of 250 to 1,000
14 gallons of perc without succumbing to the fumes.
15      Is that an opinion that's expressed anywhere in
16 either your Expert Report or Expert Rebuttal Report?
17    A. Not specifically stated in either report
18 although I did review deposition testimony and evidence
19 relative to that matter which I considered relevant to my
20 opinions, which would include, for example, the Naff
21 deposition and my reading of the Dr. Bruce Dale
22 testimony, which is consistent with my experience and
23 understanding of the PCE fumes emanating from this size
24 of a spill and under these particular conditions.
25    Q. Am I correct that you didn't review either the

Page 119

1 Naff deposition or the Bruce Dale deposition until after
2 you submitted both your Expert Witness Report and your
3 Rebuttal Report?
4      MR. DAVIS: Well, one didn't exist.
5      THE WITNESS: That's correct relative to the
6 Bruce Dale transcript. It's incorrect relative to the
7 Naff deposition.
8 BY MR. LYNCH:
9    Q. If you can turn to Attachment A to your Expert
10 Report, can you tell me where in there it indicates that
11 you reviewed the Naff deposition?
12    A. It's listed on Page 8 on Exhibit 2502.
13    Q. Am I correct that Exhibit 2502 is a document
14 that was created after you submitted your Rebuttal
15 Report?
16    A. That's correct.
17    Q. Is the Naff deposition cited in either your
18 Expert Report or your Rebuttal Report?
19    A. No.
20    Q. Did you review it prior to submitting either
21 your Rebuttal or your Expert Report?
22    A. My recollection is that I reviewed it before
23 the supplemental report and that it was not added to the
24 document list 2502 until yesterday evening.
25    Q. And it's also not cited in the text or

Page 120

1 footnotes of your Rebuttal Report. Is that correct?
2    A. Yes.
3    Q. Yes, that's correct, or, yes, it was cited?
4    A. The former.
5    Q. In connection -- Have you formed an opinion of
6 what you expect to testify to at trial regarding whether
7 or not someone attempting to clean up a spill of 250 to
8 1,000 gallons of perc in an unloading area of the Dyce
9 site in the period of 1975 to 1977 would have succumbed
10 to the odor of the perc?
11    A. If asked that question, I will provide an
12 answer.
13    Q. Is that an opinion that you've expressed in
14 either your Rebuttal Report or your Expert Report?
15    A. No.
16    Q. Page 3 of your report, Expert Report --
17      MR. DAVIS: Which one?
18      MR. LYNCH: His original Expert Report. Sorry.
19 His October -- or September 6, 2005.
20    Q. One of the documents you cite to in the first
21 paragraph is a certified copy of the defendants' Spill
22 Prevention, Control and Countermeasures submitted to
23 USEPA in 1995. Do you see where I'm reading from?
24    A. Yes.
25    Q. You state that Brenntag certified that the

Page 121

1 facility had not experienced a release reportable under
2 40 CFR Part 100 in the history of the operation of the
3 facility. Do you have the SPCC report with you today?
4      MR. DAVIS: Did you answer the question?
5      THE WITNESS: Yes.
6 BY MR. LYNCH:
7    Q. And that might be one that we need to mark as
8 an exhibit. Can we mark that as the next exhibit?
9      MR. DAVIS: I think he wants you to take it out
10 of your binder and give it --
11      THE WITNESS: Oh, I'm sorry.
12      (Exhibit 2510 was marked.)
13 BY MR. LYNCH:
14    Q. Okay. That document marked as Exhibit 2510, is
15 that the copy of the SPCC report to which you are
16 referring in your expert report?
17    A. Yes.
18    Q. I ask you to turn to Page 11 of that document,
19 Page 11 of 24. And, actually, in the section of that
20 that I believe you have highlighted on your copy, am I
21 correct that it states the Dyce Chemical, Billings,
22 Montana facility has not experienced a spill reportable
23 under 40 CFR Part 110 in the history of Dyce's operation
24 at the facility?
25    A. That's correct, and I've noticed that on Page 3

31 (Pages 118 to 121)

Pat Carl & Associates (763) 591-0535 or (800) 591-9PCA (722)

United States Fidelity, et al. vs SOCO West, Inc., et al. 1/04/06

Page 154

1  bottom of the catch pond into the underlying groundwater
2  or soil?
3  A. Both explanations are consistent with the
4  evidence; that is, the low pH of soil samples like to the
5  four or five -- 4 inches below the ground surface are
6  consistent with acidic waste or liquids coming in contact
7  with the soil. That's one possibility.
8      That's not to exclude that leakage from the
9  pond, from the historic catch pond, leaked out low level
10 pH waters, which may have contained chlorinated solvents,
11 which also migrated into the northwest corner of the Dyce
12 facility.
13 Q. I just want to clarify. Are you -- is it your
14 opinion that any leakage from -- through the bottom of
15 the historic catch pond caused any of the DNAPL
16 contamination found in the northwest corner source area?
17 A. Again, my opinion regarding that is on --
18 described on Page 5 of the September 6 report, that the
19 most likely source of the suspected scattered PCE-DNAPL
20 source in the northwest corner is due to drum rinse --
21 drum and/or skid rinsing.
22 Q. And I understand that that's your opinion. I
23 just want to clarify. Is it your opinion then that it's
24 not likely that any leakage or seepage of fluid from the
25 bottom of the historic catch pond caused the DNAPL

Page 155

1  contamination found in the northwest corner source area?
2  A. My opinion is that I can't exclusively rule
3  that out as a possibility, but that my review of the
4  evidence indicates to me that the more consistent and
5  plausible explanation is the release of DNAPL-PCE from
6  the drum rinsing and/or skid rinsing that historically
7  had been performed at the Dyce facility since 1974.
8      MR. DAVIS: Shall we take a break pretty quick?
9      MR. LYNCH: Yeah, we can take a break.
10     (A recess was taken from 3:28 p.m. to 3:38 p.m.)
11 BY MR. LYNCH:
12 Q. Before I forget, Mr. Morrison, showing you
13 again a document Bates labeled PA 00005, it's the Dyce
14 Facility November 4th, 1975, aerial photograph. Do you
15 see on that photograph where there are two green lines
16 identified as Ditch running from -- generally from the
17 operational areas of the Dyce site to the northwest of
18 the portion -- or the location that's labeled Catch Pond
19 on the photograph, those two green lines?
20 A. Well, they run to an area that looks like west
21 of the catch pond.
22 Q. Do you have any reason to believe that in fact
23 ditches as indicated by those two green lines did not
24 exist as of November 4, 1975?
25     Are you looking for a particular document?

Page 156

1  A. Yes.
2      I've not performed an independent analysis
3  relative to whether the green lines on the November 4,
4  1975, aerial photograph are accurate representations of
5  drainage patterns.
6      I did look at that issue, however, relative to
7  drainage patterns on the site in general in 1975 and
8  found that in the second CERCLA request, 104(e) request
9  of a July 2002, that there was a statement that between
10 1972 and 1985, a large spill would have drained into the
11 tank farm cement containment area. Monte Naff also
12 provided testimony that any releases would have flowed
13 toward northwest towards the catch pond.
14 Q. Do you have an understanding as to whether,
15 prior to 1985, there was a cement tank farm containment
16 area at the Dyce site?
17 A. Based on the Monte Naff deposition testimony on
18 Pages 23 and 24, Mr. Naff describes the tank farm as
19 being a gravel base and a berm between the railroad and
20 the tanks.
21 Q. Does that indicate that there was no concrete
22 tank farm in 1975 or whatever time Mr. Naff is referring
23 to?
24 A. Mr. Naff was referring to how the tank farm was
25 constructed in 1975.

Page 157

1  Q. So does that indicate that there was no cement
2  tank farm in 1975?
3  A. He describes a gravel base with a tank sitting
4  on gravel and a berm between the railroad and the tanks.
5  Q. Do you know when a cement tank farm was first
6  constructed on the site?
7  A. I don't recall.
8  Q. In addition to releases from the historic catch
9  pond as testified to by the allegations made by Marvin
10 Johnson in your report, you also discuss releases from
11 subsequent containment units at the site as being a
12 potential contributing cause to the contamination found
13 in the northwest corner source area. Is that correct?
14 A. Yes.
15 Q. Do you have your report in front of you?
16     MR. DAVIS: Which one?
17 BY MR. LYNCH:
18 Q. Your original September 6 report, and then also
19 we'll need to have your Rebuttal one as well. So keep it
20 handy.
21     Page 4 of your September 6 report, the last
22 sentence on the last paragraph of the page indicates that
23 water from these evaporation pits was discharged to the
24 pasture in the northwest portion of this site. There's
25 not a citation for that sentence.

United States Fidelity, et al. vs SOCO West, Inc., et al. 1/04/06

Page 202

1  STATE OF CALIFORNIA    )
2                         :SS
3  COUNTY OF SAN DIEGO    )
4
5       I, Cynthia Depweg, CSR NO. 3280, RPR, CRR, in
6  and for the State of California, do hereby certify that:
7       That, prior to being examined the witness named
8  in the foregoing deposition was by me first duly placed
9  under oath to testify to the truth, the whole truth, and
10 nothing but the truth;
11      That said deposition was taken down by me in
12 shorthand at the time and place therein named, and was
13 thereafter reduced to typewriting under my direction, and
14 the same is a true, correct, and complete transcript of
15 said proceedings;
16      I further certify that I am not interested in
17 the event of the action.
18      Witness my hand this_____day of
19 _____, 200____.
20
21
22
23      CYNTHIA DEPWEG
        CSR NO. 3280, RPR, CRR
24
25

Pat Carl & Associates (763) 591-0535 or (800) 591-9PCA (722)