I

United States Fidelity, et al. vs SOCO West, Inc., et al. 12/13/05

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION


UNITED STATES FIDELITY &

GUARANTY COMPANY,

         Plaintiff,

   and                  Cause No. CV-04-29-BLG-RFC

CONTINENTAL INSURANCE COMPANY,

         Plaintiff Intervenor,

   vs.

SOCO WEST, INC., BRILLIANT

NATIONAL SERVICES, INC.,

STINNES CORPORATION, and

BRENNTAG (HOLDING) N.V.,

         Defendants.

_____


The Deposition of BRUCE E. DALE, Ph.D.,

Taken at 120 North Washington Square,

Lansing, Michigan,

Commencing at 9:05 a.m.,

Tuesday, December 13, 2005,

Before Kelli L. Werner, CSR-6610, RPR.

DEFENDANTS' 3/23/06 MOTION IN LIMINE # 3
**ATTACHMENT I**

United States Fidelity, et al. vs SOCO West, Inc., et al. 12/13/05

Page 6

1   If you need a break at any time, just ask
2   and I will accommodate you. Before we take a break I
3   will ask that you just answer the question if there is
4   one pending before we break.
5   A. Fine.
6       MR. LYNCH: And, for the record, there is
7   an agreement among counsel in this case that we will
8   not be asking questions about drafts of opinions or
9   communications with counsel. Is that --
10      MR. DAVIS: Right.
11      MR. GROSSBART: Right. I would like to
12  reflect the stipulation we discussed before the start
13  of the deposition that an objection by any lawyer on
14  this side of the table will count as the objection of
15  the other. So the objections, I should say, on behalf
16  of any plaintiff or intervening plaintiff is the
17  objection of the other.
18      MR. LYNCH: Yes. We have agreed to that.
19      MARKED BY THE REPORTER:
20      DEPOSITION EXHIBIT NUMBER 2000
21      9:08 a.m.
22  BY MR. LYNCH:
23  Q. Mr. Dale, I have just handed you a document that's
24  been marked as Deposition Exhibit 2000 in this matter.
25  Is that a copy of the expert report you filed on

Page 7

1   behalf of the plaintiffs?
2       MR. DAVIS: I will object to the term
3   filed.
4   BY MR. LYNCH:
5   Q. You prepared on behalf of the plaintiffs.
6   A. Yes.
7   Q. Am I correct that this is a report that you offered to
8   rebut the expert report that was prepared by one of
9   the experts that the defendants retained -- Dr. Robert
10  Harris?
11  A. Yes.
12  Q. Does this report contain a complete statement of all
13  the opinions that you expect to testify at the trial
14  of this case and the basis for those opinions?
15  A. Yes.
16      MR. DAVIS: Let me interject. Without
17  going into our discussions yesterday, Dr. Dale
18  subsequent to issuing his report did do about two
19  sheets of calculations to supplement -- I guess would
20  be the correct term --
21      THE WITNESS: It reflects the evaporation
22  rate which I testified in my report that perc
23  evaporates very rapidly.
24  BY MR. LYNCH:
25  Q. That's work you prepared after filing or after

Page 8

1   preparing -- submitting this report?
2   A. Yes.
3   Q. Why hadn't you done this work prior to submitting the
4   report?
5   A. Just didn't have the time. I thought about it later.
6   Q. Other than the calculations involving the evaporation
7   of perchloroethylene, have you formed any opinions
8   that you expect to testify about at trial or in any
9   affidavits that are not contained in this report?
10  A. No.
11  Q. If you look at the report, I notice that there are
12  numerous documents cited in the footnotes of the
13  report. In connection with forming the opinions that
14  are set forth in this report did you consider or
15  review any documents that are not identified in the
16  report?
17  A. Yes.
18  Q. You did?
19  A. Yes.
20  Q. So it's accurate to say that this report does not
21  identify all the materials you considered in
22  connection with forming your opinions?
23  A. That's correct.
24  Q. Why didn't you list out the materials you considered
25  in connection with forming your opinions in the

Page 9

1   report?
2   A. They weren't relevant, didn't impact my opinions.
3   Q. What additional documents other than those that are
4   identified in this report did you consider?
5   A. We sent approximately two boxes of documents that
6   contained site investigation reports, hydrogeology
7   types of things. I can't tell you in detail what they
8   are. There are several boxes.
9   Q. Anything else other than site investigation reports?
10  A. I believe there were a couple of depositions that I
11  didn't find anything relevant in.
12  Q. Do you recall whose depositions those were?
13  A. No, I can't.
14  Q. Other than site investigation reports and a couple of
15  deposition transcripts do you recall any documents
16  that you considered in connection with forming your
17  report that are not identified in the report?
18  A. Not that I recall.
19      MR. LYNCH: At this point I just want to go
20  on the record that pursuant to Rule 26 the expert is
21  required to identify all documents they consider in
22  connection with providing their expert report. We're
23  going to object to that not having been done in this
24  report and hold the deposition open pending our
25  receipt of a complete list of those documents.

3 (Pages 6 to 9)

United States Fidelity, et al. vs SOCO West, Inc., et al. 12/13/05

Page 10

1    MR. DAVIS: Well, put it on the record.
2    Your objection is noted.
3        MR. GROSSBART: I'm not sure that's an
4    exact correct statement of what an expert is supposed
5    to do in light of the foundation testimony you
6    elicited.
7        MR. DAVIS: On that note I think -- I'm not
8    sure what you are referencing in terms of what's
9    listed in this report. He obviously footnoted many
10   documents that are part of the file which he did rely
11   on and formed the basis of his opinion.
12       MR. LYNCH: I understand that. He just
13   testified he did consider additional documents in
14   forming his opinion. I don't have it in front of me,
15   but I think the rule says considered.
16       MR. GROSSBART: I think he says he looked
17   at other documents and decided they were not relevant
18   to his opinion and, therefore, that is why they are
19   not listed. He could have listed the Detroit Free
20   Press, too. That probably wouldn't have been relevant
21   to his opinion.
22   BY MR. LYNCH:
23   Q. Did you consider additional documents in connection
24   with forming your opinion that are not listed in your
25   report?

Page 11

1    A. I read or scanned additional documents that are not
2    referenced here. None of them impacted my opinion.
3    Q. I see that you have brought several file folders'
4    worth of documents with you today. Could you tell me
5    what those documents are?
6    A. They are depositions, record of decision,
7    correspondence. They a.'e essentially everything
8    that's footnoted here -- referred to in the footnotes.
9    Q. Any of these documents not identified in the footnotes
10   of your report?
11   A. I don't believe so.
12   Q. And maybe at a break we can just confirm that or not.
13   That's what we can do.
14       Since filing your expert report have you
15   reviewed or considered any additional documents
16   relating to your opinion?
17   A. Yes.
18   Q. What documents are those?
19   A. It's the document that underlies the calculation that
20   I did. It's this document.
21       MR. LYNCH: Can we mark this? Do we need
22   to make a copy first?
23       MR. DAVIS: Probably need to make a copy.
4        MR. LYNCH: Let's take a quick break and
5    we'll make a copy.

Page 12

1        (Off the record at 9:17 a.m.)
2        (Back on the record at 9:26 a.m.)
3        MARKED BY THE REPORTER:
4        DEPOSITION EXHIBIT NUMBERS 2001-2004
5        9:26 a.m.
6    BY MR. LYNCH:
7    Q. Mr. Dale, you have in front of you the additional
8    documents that have been marked as exhibits in this
9    matter -- Exhibits 2001, 2002, 2003, 2004.
10       Am I correct that these are the documents
11   you relied on subsequent to submitting your expert
12   report in this matter to reach a conclusion as to the
13   evaporation rates of perchloroethylene?
14   A. Yes.
15   Q. If we look at Exhibit 2004, could you identify that
16   document for me?
17   A. These are calculations I did regarding the rate of
18   evaporation of perchloroethylene.
19   Q. What are the assumptions that you have made in
20   connection with these calculations?
21   A. The assumption is a spill -- instantaneous spill on
22   level concrete of 250 gallons of perc. The ground
23   temperature is assumed to be 77 degrees Fahrenheit
24   which is the air temperature.
25   Q. I'm sorry. What was the temperature?

Page 13

1    A. 77 degrees Fahrenheit. And a wind speed of
2    approximately -- I think it was 9.1 miles per hour.
3    Q. If you look at your report, can you identify the
4    portion of the report that these calculations pertain
5    to, if any?
6    A. Yes. It's opinion B(a). Also I would say B(c).
7    Q. And opinion B(a) says, perc evaporates much more
8    rapidly than it permeates intact concrete. Under
9    conditions favoring maximum permeation of perc it will
10   still evaporate about 1000 times more rapidly than it
11   will permeate concrete.
12       Did I read that correctly?
13   A. Yes.
14   Q. Can you explain how these calculations relate to that
15   opinion?
16   A. Well, it's a calculation of the evaporation rate of
17   perc. This perc will evaporate -- a 250-gallon spill
18   of perc under these conditions will evaporate in less
19   than 20 minutes. See page 3-3.
20   Q. So under these conditions it's your conclusion that a
21   250-gallon spill of perc would completely evaporate in
22   20 minutes?
23   A. Yes.
24   Q. Would there be any residue left on the concrete?
25   A. No.

4 (Pages 10 to 13)

United States Fidelity, et al. vs SOCO West, Inc., et al. 12/13/05

Page 34

1   opinion?
2   A.  Yes.
3   Q.  Am I correct that you identify in that paragraph two
4       bases for that opinion?  First, such a large spill of
5       perc would have damaged or discolored a large area of
6       asphalt; second, such a large spill of perc would have
7       produced a strong odor over a large area and would
8       almost certainly have been noted by Dyce employees or
9       Dyce neighbors.
10  A.  That's correct.
11  Q.  Anywhere in that paragraph do you discuss the distance
12      that the perc would have to travel being a relevant
13      factor as to why it is highly unlikely that such a
14      perc spill actually occurred?
15  A.  No.
16  Q.  So that's a new opinion you formed?
17  A.  No, it's not.
18  Q.  Where is that opinion expressed in your expert report?
19  A.  It's the evaporation rate of perc in B(a).
20  Q.  B(a) states, perc evaporates much more rapidly than it
21      permeates intact concrete.  Under conditions favoring
22      maximum permeation of perc, it will still evaporate
23      about 1000 times more rapidly than it will permeate
24      concrete.
25  A.  And B(b).

Page 35

1   Q.  And that discusses -- perc is a good solvent for
2       hydrocarbon compounds such as asphalt and will
3       dissolve the hydrocarbon portion of asphalt.  If
4       spilled on asphalt, perc would slowly dissolve some of the
5       asphalt and then would slowly evaporate from the
6       resulting asphalt/perc mixture.
7           Where in either of those paragraphs do you
8       mention the distance that the perc would have to
9       travel?
10  A.  I do not.
11  Q.  If it's your opinion that that is a basis for
12      rebutting Dr. Harris's opinion as to how the
13      contamination got to the northwest corner why isn't
14      that in your report?
15  A.  I disagree with your characterization of my testimony.
16  Q.  How so?
17  A.  I testified now a number of times that perc evaporates
18      very, very rapidly.
19  Q.  Mm-hmm.
20  A.  A perc spill does not magically travel 350 feet
21      without evaporating at the same time.  It just does
22      not happen.  It's physically impossible.
23  Q.  Where is that statement contained in your expert
4       report that a perc spill cannot travel 350 feet
5       without evaporating?

Page 36

1   A.  It does not.
2   Q.  Do you intend to testify as to that fact at trial or
3       that opinion at trial?
4   A.  If I'm asked.
5   Q.  But you would agree that your report does not contain
6       a statement as to that opinion?
7           MR. GROSSBART:  Objection to the form of
8       the question.
9           MR. DAVIS:  That mischaracterizes his
10      testimony and it's argumentative at this point.
11  A.  It certainly mischaracterizes my testimony.
12  BY MR. LYNCH:
13  Q.  This photograph, in your opinion, supports that
14      testimony?
15  A.  Supports what testimony?
16  Q.  Supports your --
17          MR. DAVIS:  Supports his --
18  BY MR. LYNCH:
19  Q.  Supports your opinion as to the likelihood of a perc
20      spill in the loading/unloading area resulting in
21      contamination in the northwest corner.
22  A.  That's correct.
23  Q.  Showing you a compilation of additional documents that
24      you brought with you here today.  Can you identify
25      those documents?

Page 37

1   A.  These are summaries of contamination of soil and
2       groundwater at different places or points on the Dyce
3       property.
4   Q.  Okay.  Did you consider those documents in connection
5       with forming the expert report set forth in your
6       report?
7   A.  I considered them.  They did not impact my opinions.
8   Q.  Those documents that you're looking at, is it true
9       that they contain information showing where the
10      various sampling locations were taken from at the Dyce
11      site and also contained information showing what the
12      amounts of contamination, if any, were at each of the
13      samples?
14  A.  That's correct.
15  Q.  Is that information that you considered in connection
16      with forming the opinions expressed in your report?
17  A.  I answered yes, that I considered it.
18  Q.  But the -- are you saying -- is it your testimony that
19      the location of the samples on the Dyce site and the
20      amount of contamination found in the samples, that
21      information had no impact on the opinions expressed in
22      your expert report?
23  A.  I don't understand your question.
24  Q.  In your report you discuss potential sources for
25      contamination found at the Dyce facility near

10  (Pages 34 to 37)

United States Fidelity, et al. vs SOCO West, Inc., et al. 12/13/05

## Page 38

1    Billings, Montana. Is that correct?
2  A.  I think that mischaracterizes my testimony. I
3      identify ways -- a number of ways in which perc was
4      routinely released, spilled, cleaned from equipment at
5      the facility.
6  Q.  In part C of your report -- part C(c) it states, perc
7      that's protected from evaporation could remain for
8      years at the bottom of ponds and could eventually
9      permeate through concrete over long periods of time.
10     Perc would attack and eventually dissolve most plastic
11     liners thereby escaping to the underlying soil.
12 A.  That's correct.
13 Q.  Is it your opinion that that is the cause of the perc
14     contamination at the Dyce site?
15 A.  That's beyond my -- I don't know.
16 Q.  You have no opinion as to the cause of the
17     contamination at the Dyce facility?
18 A.  That's beyond the scope of my assignment here.
19 Q.  Is that correct? You do not have an opinion as to --
20 A.  That's beyond the scope of my opinion here -- beyond
21     the scope of my assignment.
22 Q.  Do you have an opinion as to the source of any of the
23     contamination at the Dyce facility in Billings,
24     Montana?
25 A.  That's not my expertise. I have no opinion.

## Page 39

1  Q.  You have no opinion on that. You won't be offering
2      opinion on that at trial? You don't intend to offer
3      an opinion on that at trial?
4  A.  No.
5  Q.  I'm sorry. To clarify for the record, no, you will
6      not be testifying to that at trial?
7  A.  No. That's not my expertise. That's not what I do.
8  Q.  Okay. How did -- if they did -- the information
9      relating to the locations of the samples and the
10     amount of contamination found in those locations --
11     how did that information affect any of the opinions
12     expressed in your expert report?
13 A.  Well, apparently the largest source of contamination
14     is that spot in the northwest corner that, again, is
15     about 350 feet from where perc was handled on the site
16     and where any spill of perc would probably have
17     occurred. That's a very long distance for a spill to
18     travel.
19 Q.  So am I correct that information relating to the
20     location of the samples taken at the Dyce facility and
21     the amount of contamination found in those locations
22     is information that you considered and relied on in
23     forming the opinions formed in your expert report?
`24 A.  Well, particularly the distance from the spill
`25     location to the contamination.

## Page 40

1  Q.  What documents did you rely on to ascertain that
2      distance?
3  A.  There are photographs of the site with a scale that I
4      used someplace.
5  Q.  Are those documents identified in your expert report?
6  A.  I believe so.
7  Q.  Can you tell me where in your expert report those
8      photographs -- you have your expert report in front of
9      you. Can you tell me where in your expert report you
10     identify those photographs?
11 A.  I don't recall.
12 Q.  Well, look through your report.
13 A.  Well, I didn't identify any photographs in my expert
14     report.
15 Q.  Well, there are documents you relied on that are not
16     identified in your expert report.
17 A.  You mischaracterized my testimony.
18 Q.  How so?
19 A.  Suzanne Miller's response to second EPA request for
20     information under CERCLA I believe has that -- that
21     kind of information. I suspect that some of the other
22     depositions do also.
23         The site investigation report, footnote
24     number 23, I believe has scale information. Suzanne
25     Miller's notarized response to the first EPA request

## Page 41

1      under CERCLA I believe has that type of scale
2      information.
3  Q.  Do any of those documents contain information showing
4      where the samples were taken from or the amount of
5      contamination that was found in those samples?
6  A.  I believe so.
7  Q.  Which ones?
8  A.  I don't recall.
9  Q.  I'm showing you another document. Is that a document
10     -- can you identify that document?
11 A.  No, I can't. There are no Bates numbers. I'm not
12     sure where it came from.
13 Q.  Is that a document you considered in connection with
14     forming the opinions expressed in your expert report?
15 A.  I considered it.
16 Q.  Is any of the information in that document -- did you
17     find it to be relevant to the opinions you expressed
18     in your expert report?
19 A.  No.
20 Q.  Completely irrelevant?
21         MR. GROSSBART: Objection to the form of
22     the question. You have gone from considered to
23     relied to relevant. And in context I think the
24     question is vague as to what you mean by relevant.
25         Under Rule 26 under the federal rules of

Pat Carl & Associates (763) 591-0535 or (800) 591-9PCA (722)

United States Fidelity, et al. vs SOCO West, Inc., et al. 12/13/05

## Page 54

1 on?
2 A. Yes.
3 Q. Was Mr. Adams an expert witness?
4 A. Yes.
5 Q. Was he retained by the same counsel as you?
6 A. I don't recall if he was or not. I don't know if he
7 was on the opposite side or not.
8 Q. And what testimony does Mr. Adams give that you feel
9 supports the opinions expressed in your expert report?
10 MR. GROSSBART: Object to the form of the
11 question in light of his prior testimony about what he
12 said supports his opinion or not.
13 BY MR. LYNCH:
14 Q. Do any statements -- let me back up.
15 In your report you cite the deposition
16 testimony of Franklin Agardy, correct?
17 A. Correct.
18 Q. Is it your belief that the deposition testimony of
19 Mr. Adams is essentially substantively the same with
20 respect to the information that was provided by Mr.
21 Agardy in his deposition?
22 A. For that particular point, yes.
23 Q. What point is that?
24 A. The point is the reaction of perc -- that perc will
25 dissolve asphalt.

## Page 55

1 Q. And what does Mr. Adams say about that?
2 A. Page 52, he says the perc will dissolve asphalt.
3 Q. Under what conditions is he referring to?
4 A. He doesn't give specific conditions.
5 Q. I'm sorry. What page is that?
6 A. Actually pages 51 through 53.
7 Q. I'm going to ask you on page 51 starting at line
8 seven. Question: Okay. Other than that do you have
9 any basis for your answer that it would be weeks or
10 months before perc would actually noticeably begin to
11 dissolve asphalt.
12 Well, I think the answer is no. Let me --
13 let me just add that I think the weeks or months --
14 that it could be quicker, could be longer. It depends
15 on again the rate of application, the consistency of
16 contact, the thickness of the asphalt, you know,
17 various things.
18 I will ask you to read that.
19 A. I think you read it fine.
20 Q. Okay. Would you agree with Mr. Adams that the rate --
21 actually, let me --
22 Would you agree with Mr. Adams that the
23 time it would take for perc to noticeably begin to
24 dissolve asphalt depends on several factors -- the
25 rate of application, consistency of contact, thickness

## Page 56

1 of the asphalt and that it could be weeks or months,
2 could be quicker, could be longer? Would you agree
3 with that statement?
4 A. I think it could be any time from essentially
5 instantaneous to fairly long depending on how much
6 perc and what the temperature was, the things he cites
7 here.
8 Q. What other variables would come into play that would
9 affect how soon perc might noticeably begin to
10 dissolve asphalt?
11 A. Temperature, wind speed, how much perc -- how thick
12 the puddle of perc was, attempts to clean it up.
13 Those are probably the major variables.
14 Q. Would the composition of the asphalt have any effect
15 on it?
16 A. Very little, I would think.
17 Q. Why do you say that?
18 A. Asphalt composition does not vary that much.
19 Q. Would it make a difference if the asphalt was wet or
20 dry at the time of the spill?
21 MR. DAVIS: Object as to the form of the
22 question. Wet or dry with what? Do you mean water?
23 MR. LYNCH: Rainwater. I'm sorry. With
24 water.
25 A. Unless it was a standing puddle of water, probably

## Page 57

1 not.
2 BY MR. LYNCH:
3 Q. What if the asphalt was covered in dirt or snow or
4 ice?
5 MR. DAVIS: Object as to compound. I think
6 you are asking two different or maybe a combination --
7 I'm not sure, Chris, what you are asking. Dirt, snow
8 and ice or dirt, snow --
9 BY MR. LYNCH:
10 Q. What if the asphalt was covered in dirt?
11 MR. GROSSBART: Do you mean buried?
12 BY MR. LYNCH:
13 Q. A layer of dirt that -- just compacted dirt that had
14 been -- you know, from semis driving over it.
15 A. How thick a layer of dirt?
16 Q. Does that make a difference?
17 A. Sure.
18 Q. What if it's a dusting of dirt that has been compacted
19 into the pores of the asphalt from semi traffic?
20 A. Dirt that got into the pores of the asphalt I don't
21 think would have any effect. A layer -- a thick layer
22 of dirt would probably dilute the perc a bit, maybe
23 reduce its effect. But your question has way too many
24 variables for me to answer.
25 Q. I will show you what's Deposition Exhibit Number 2009.

15 (Pages 54 to 57)

United States Fidelity, et al. vs SOCO West, Inc., et al. 12/13/05

Page 78

1  Q.  So someone trained as an environmental engineer would
2      likely have significant knowledge of chemistry?
3              MR. DAVIS:  Objection.  Calls for
4      speculation.
5  A.  Depends on the program.  They may or may not, but they
6      should.
7  BY MR. LYNCH:
8  Q.  What did you write your master's thesis on?
9  A.  Kinetic and mass transfer characteristics of
10     immobilized pancreatic ribonuclease.
11 Q.  For those of us who don't have a master's in chemical
12     engineering could you describe what that is in
13     laymen's terms?
14 A.  The intention was to study how fast a reaction between
15     a particular enzyme and a compound called ribonucleic
16     acid would occur when the enzyme which is called
17     ribonuclease was physically attached to a porous solid
18     material.
19 Q.  Does that topic have anything to do with chlorinated
20     solvents?
21 A.  Anything to do?  It deals with chemical reactions.  It
22     deals with mass transfer.  So, yes, it does.
23 Q.  Specifically of chlorinated solvents?
24 A.  Yes.  Specifically applied to chlorinated solvents,
25     sure.

Page 79

1              MR. DAVIS:  Don't ask him how.
2              THE WITNESS:  It's his deposition.  If he
3      wants to --
4              MR. DAVIS:  I understand.
5  BY MR. LYNCH:
6  Q.  After receiving your master's from University of
7      Arizona did you then go on to receive a doctorate?
8  A.  Yes.
9  Q.  Where was that from?
10 A.  At Purdue in 1979.
11 Q.  And 1979 is when you received --
12 A.  My doctorate.
13 Q.  You went directly from getting your master's to the
14     doctorate after that?
15 A.  Yes.
16 Q.  Was this also in chemical engineering -- your
17     doctorate?
18 A.  Yes.
19 Q.  Any particular emphasis or focus of your study or
20     research at that point?
21 A.  That's the point at which I started calling myself a
22     biochemical engineer.  I started dealing with
23     biochemistry and microbiology.
24 Q.  What was the topic of your Ph.D. dissertation?
25 A.  It was the thermodynamic characteristics of dissolving

Page 80

1      cellulose in inorganic solvents.
2  Q.  Since earning your Ph.D. at Purdue have you received
3      any other degrees from any other post-secondary
4      educational institution?
5  A.  Ph.D. is the terminal degree in my field.  There is
6      nothing higher.
7              (Discussion off the record at 11:31 a.m.)
8              (Back on the record at 11:32 a.m.)
9  BY MR. LYNCH:
10 Q.  I would like you to focus on the years from 1974 to
11     '79 -- or '68 to '79 -- the years in college.
12 A.  Sure.
13 Q.  Can you describe for me any coursework you had or
14     research you conducted at that time that concerned
15     chemical contamination in soils or groundwater?
16 A.  Sure.  Starting with my first class -- well, starting
17     with my basic chemistry and physics courses I was a
18     freshman student.  I started with my calculus course
19     to understand, mathematically, contamination.
20              Going on to my sophomore year, in chemical
21     engineering we started studying mass balances and
22     energy balances.  Allows you to keep track of
23     chemicals -- where they exist in processes.
24     Thermodynamics course deals with things like vapor
25     pressure and evaporation rates.

Page 81

1              Junior level courses, I would have to say
2      that, you know, two-thirds to three-quarters of my
3      courses deal -- are directly applicable to these
4      issues here.
5  Q.  Regardless of whether they are directly applicable --
6      the principles of the classes -- did those courses
7      deal specifically with soil or groundwater pollution?
8  A.  By specifically, what do you mean?
9  Q.  Was the focus of those courses specifically chemical
10     contamination of soil or groundwater?
11 A.  No, not for the most part.
12 Q.  I just want to understand your testimony.  Your
13     testimony is that the courses you took you acquired
14     information that's applicable to that topic?
15 A.  That's right.
16 Q.  Again, focusing on years 1968 to '79 did you take any
17     coursework or conduct any research that concerned
18     make-up or properties of asphalt or concrete?
19 A.  Concrete class, probably so in a couple of my civil
20     engineering classes.  I don't recall about asphalt.
21 Q.  And the concrete class you said would have been a
22     civil engineering class?
23 A.  Yes.
24 Q.  The study of concrete and asphalt --
25 A.  The study of materials among which concrete -- I think

21 (Pages 78 to 81)

United States Fidelity, et al. vs SOCO West, Inc., et al. 12/13/05

Page 82

1    I recall the concrete portion of that class.
2  Q. Can you describe for me what coursework or research
3    you did -- conducted that dealt with industry
4    practices for handling storage or disposing of
5    chlorinated solvents?
6  A. Industry practices for handling storage and disposing
7    of --
8  Q. Or disposal of chlorinated solvents.
9  A. Well, the industry practices for handling dealt with
10   things like pumping, mixing. It was applicable to all
11   solvents -- all liquid chemicals including chlorinated
12   solvents.
13 Q. What about any coursework that specifically focused on
14   the industry standards or practices for storing or
15   disposing of chlorinated solvents?
16 A. I don't believe such courses existed. I'm not sure
17   they exist now. So the answer is no.
18 Q. I'd like you to take a look back at your expert
19   report. Turn to page one of the report, please.
20   First paragraph, second to the last sentence states,
21   in addition during the past ten years I have made an
22   intensive focused study of spills, leaks and other
23   discharges of perc and perc-containing waste.
24        Did I read that correctly?
25 A. Yes, you did.

Page 83

1  Q. Can you describe for me what that intensive focused
2    study consisted of?
3  A. It consisted of preparation for and participation in
4    approximately 14 different -- 13 or 14 different cases
5    involving perc contamination.
6  Q. Has all of your study of perc contamination been in
7    connection with litigation matters in which you have
8    been retained as an expert witness?
9        MR. DAVIS: I object to the form of the
10   question simply -- I think you started out with
11   talking about that second to last sentence of
12   paragraph one of his report which is focused on the
13   last ten years. I don't know if he could -- you know,
14   your last question was nonrestrictive.
15       MR. LYNCH: I will restrict it to time.
16 BY MR. LYNCH:
17 Q. In the past ten years has all of your study of spills,
18   leaks and other discharges of perc and perc-containing
19   wastes been performed in connection with testifying as
20   an expert witness in litigation matters?
21 A. Yes, I believe so.
22 Q. What caused you to first begin to study that topic?
23 A. I was approached by an attorney with a Houston law
`24   firm -- the firm was Boswell & Hallmark -- to provide
`5   expert testimony to them regarding an evaporation rate

Page 84

1    of perc during a fire. It just went on from there.
2  Q. Have you taken any courses other than -- you know,
3    since receiving your Ph.D. in connection with this
4    intensive study of spills of perc and perc
5    contamination?
6  A. Yeah. I took a short course. It's called groundwater
7    course or the Princeton groundwater course.
8  Q. When was that?
9  A. Probably the summer of 1996 probably.
10       MR. LYNCH: Can we mark this next exhibit?
11       MARKED BY THE REPORTER:
12       DEPOSITION EXHIBIT NUMBER 2040
13       11:40 a.m.
14 BY MR. LYNCH:
15 Q. Showing you what's been marked as Exhibit 2040.
16   That's a -- I believe it's a copy of your complete
17   resume. Is that correct?
18 A. Yes.
19 Q. From January 2005?
20 A. Mm-hmm.
21 Q. I will direct your attention to page four under the
22   topic additional formal training.
23 A. Right.
24 Q. Are either of those the short course you were just
25   referring to?

Page 85

1  A. It's the second one called the Princeton course.
2  Q. Okay. Except for that course have you had any other
3    training -- formal training on the topic of
4    groundwater pollution and hydrology?
5  A. No.
6  Q. There is another short course identified in that
7    exhibit right above that -- the short course offered
8    by the International Network For Environmental
9    Training. What did that short course concern or deal
10   with?
11 A. Dealt with bioremediation -- using microbes or enzymes
12   to remove environmental contamination.
13 Q. Anything in that course deal specifically with
14   contamination by chlorinated solvents?
15 A. I don't recall.
16 Q. Have you published any books or articles on the topic
17   of perchloroethylene contamination or spills?
18 A. No.
19 Q. Have you published any articles -- let me make sure I
20   get the correct words here.
21       Have you published any articles that deal
22   with spills, leaks or other discharges of perc or
23   perc-containing wastes?
24 A. No.
25 Q. Have you given any lectures or speeches on topics

22 (Pages 82 to 85)

United States Fidelity, et al. vs SOCO West, Inc., et al. 12/13/05

**Page 102**

1    15 and number 16 and probably number 17 also.
2  Q. Do you recall which of those cases involved asphalt as
3    opposed to concrete?
4  A. These were all inside locations, so it would have been
5    concrete, I think.
6  Q. Aside from the instant case have you ever been asked
7    to or have you ever given an expert opinion as to the
8    effect of perchloroethylene when it comes into contact
9    with asphalt?
10 A. I might have been asked about that in the first case
11    -- case number one, but I don't recall very well.
12 Q. Do you know what the substance of your opinion on that
13    issue was?
14 A. That perc will react with asphalt.
15 Q. Did you give any opinion as to the rate at which that
16    reaction will occur?
17 A. No -- I don't recall.
18 Q. Did any of the cases in which you provided expert
19    testimony involve allegations that the perc
20    contamination had resulted from a sudden and
21    accidental spill of perc as opposed to continuous
22    leakage from the machines?
23 A. Yes.
24 Q. Which ones were those?
25 A. Case number one was certainly that. It was released

**Page 103**

1    during a fire. I think case number 15 involves it
2    also, as does 16. I don't recall -- number 17 --
3    whether it was an allegation of a sudden large spill
4    or not.
5  Q. What was the alleged spill in number 15?
6  A. Well, it's been a while since I reviewed that, but I
7    think it was a delivery spill. A delivery of perc to
8    the dry cleaner was alleged to cause the
9    contamination.
10 Q. And in providing an expert opinion in that matter did
11    you offer an opinion as to the validity or accuracy of
12    that allegation?
13 A. A spill on intact concrete -- particularly in Texas --
14    is going to evaporate very rapidly.
15 Q. And number 16, you said, also dealt with allegations
16    of the sudden accidental spill?
17 A. I can't remember on that one for sure.
18 Q. Okay. Any other ones other than one and 15 that you
19    do recall?
20 A. No, not that I recall.
21 Q. Have you ever been asked to offer an opinion as an
22    expert as to whether a business entity should have
23    expected or intended damage to soil or groundwater as
4    a result of their actions?
5      MR. GROSSBART: Objection to the form of

**Page 104**

1    the question and the undefined nature of the terms you
2    are using which obviously have legal significance in
3    this context.
4  A. That sounds like a legal opinion, not really my
5    expertise.
6  BY MR. LYNCH:
7  Q. I'm just asking if you have ever been asked to give an
8    opinion on those issues.
9  A. No.
10 Q. How many times have you been qualified by a court to
11    provide expert testimony at trial?
12 A. First case and the second case -- it's actually the
13    same court, I think -- Harris County District Court.
14      MR. DAVIS: That counts twice.
15      THE WITNESS: Then there's two.
16 BY MR. LYNCH:
17 Q. Would it be the cases that indicate on here trial
18    testimony?
19 A. Yeah.
20 Q. That would be the complete list of all the cases?
21 A. Yeah.
22 Q. Has a court ever refused or has a court ever ruled
23    that you were not qualified to provide expert
24    testimony in a matter?
25 A. No.

**Page 105**

1  Q. Has a court ever struck any portion of your expert
2    report or testimony?
3  A. No, I don't think so.
4  Q. Okay. I will refer you back to your report. Again,
5    the first page, second paragraph we have talked about
6    a little bit before.
7      It states, Dr. Harris claims that a single
8    large release in 1976 is responsible for the observed
9    perc contamination at this site and gives no credence
10    to any other possible causes of perc contamination.
11    The facts of the case indicate otherwise as I outline
12    below.
13      Did I read that correctly?
14 A. Yes.
15 Q. In reviewing your report the only opinion I saw that
16    suggested a possible alternative source for the
17    contamination found at the Dyce site would be in part
18    C, opinion C of the report.
19      MR. GROSSBART: Where?
20      MR. LYNCH: Opinion C, part C.
21 BY MR. LYNCH:
22 Q. It states perc thus evaporated from evaporation could
23    remain for years at the bottom of ponds and could
24    eventually permeate through concrete over long periods
25    of time. Perc would attack and eventually dissolve

27 (Pages 102 to 105)

United States Fidellty, et al. vs SOCO West, Inc., et al. 12/13/05

Page 110

1          MR. LYNCH: Page five.
2    BY MR. LYNCH:
3    Q. Opinion number two and three.
4    A. Which page are you on?
5    Q. Page five, opinions two and three.
6    A. All right.
7    Q. Can you read those opinions?
8    A. The site --
9    Q. No, no. Just to yourself is fine.
10   A. Okay. Sure. Yes. I have read them.
11   Q. Are those the two opinions to which you offer rebuttal
12       testimony?
13          MR. GROSSBART: Objection to the form of
14       the question.
15   A. I would also rebut four. I believe I rebut five. I
16       would say two through five.
17   BY MR. LYNCH:
18   Q. Two through five?
19   A. Mm-hmm.
20   Q. Not one?
21   A. I'm not a student of the regulations, so I wouldn't
22       really deal with that issue.
23   Q. What about state of the practice, standards in the
24       industry?
25   A. State of the practice means as bad as everybody else.

Page 111

1        I don't know. No. I don't know what the state of the
2        practice was. It's not my expertise.
3    Q. Let's look a little bit more closely at number four.
4        I will direct your -- let me look for it. We can
5        short-circuit this.
6            In your report, you don't discuss or make
7        mention of any allegations of there being overflows or
8        intentional discharges from any containment system at
9        the Dyce facility. Is that correct?
10   A. Overflows or discharges -- potential discharges from
11       containment -- no. I don't believe I reference that.
12   Q. Am I correct that since it is not discussed in your
13       report you haven't formed an opinion as to whether
14       such events occurred?
15   A. I don't know one way or the other.
16   Q. Okay. And am I correct that you haven't formed an
17       opinion as to whether those events, if they occurred,
18       might have contributed to any of the contamination
19       found at the Dyce site?
20   A. Just based on the physical properties of perc, an
21       overflow of a containment pond would be almost
22       certainly an overflow of water. Wouldn't be any
23       dissolved perc in that. I find that probably not a
24       significance source.
25   Q. I don't know if we covered this in the last question,

Page 112

1        but I also notice in your report you don't make
2        mention of any intentional discharges from any of the
3        containment systems at the Dyce facility.
4            MR. GROSSBART: Objection to the form of
5        the question.
6    BY MR. LYNCH:
7    Q. Is that correct?
8            MR. GROSSBART: Objection to the form of
9        the question.
10   A. That's right. I don't.
11   BY MR. LYNCH:
12   Q. Okay. Am I correct that since it is not mentioned in
13       your report you have not formed an opinion as to
14       whether such discharges may or may not have occurred?
15   A. Well, there was -- I know that there was discharges.
16       They talk about running the oue containment pond when
17       it got too full. They talked about draining that out
18       into the pasture. What was the content of that
19       drainage, I have no idea.
20   Q. Have you formed an opinion as to whether or not that's
21       a source of the contamination at the Dyce site?
22   A. No.
23   Q. I also notice in your report that you don't discuss
24       any allegations concerning the dumping of liquid from
25       drums that were returned to the site.

Page 113

1            Is it true that you don't discuss those
2        allegations in your report?
3    A. I think they are contained within my opinion about the
4        normal practices for cleaning barrels and, you know,
5        cleaning other vessels.
6    Q. How about with respect to the dumping of liquid from
7        drums that were being picked up by a barrel
8        reconditioner?
9    A. Again, as much as that's the normal expected practice
10       for handling vessels that contain perc, I think it's
11       contained within my opinions.
12   Q. Have you formed an opinion as to whether if that
13       practice had occurred -- if that practice occurred if
14       it was a source of any of the contamination found at
15       the Dyce site?
16   A. I'm not really dealing with contamination. I don't
17       think I offer a single opinion regarding actually how
18       the contamination occurred. My opinions -- my report,
19       as I have said before, is a rebuttal of Dr. Harris's
20       report.
21   Q. Based on your review of the evidence cited in your
22       report what do you understand to be the practice of
23       Dyce Chemical with respect to handling drums that were
24       returned to be picked up by a barrel reconditioner?
25   A. Well, the barrels were washed, reused if they could

29 (Pages 110 to 113)

United States Fidelity, et al. vs SOCO West, Inc., et al. 12/13/05

**Page 134**

BY MR. LYNCH:

2  Q. From what you are telling me, I take it, if someone
3     spilled perc onto concrete at Dyce or an asphalt
4     surface at Dyce they would have no reason to expect
5     that the spill would permeate through the asphalt or
6     concrete and reach the soil.
7  A. That's right. As long as it is intact, no big holes
8     in it.
9  Q. That's another variable that would have to be
10    considered -- whether the asphalt or concrete was
11    intact?
12 A. Yes.
13 Q. The presence of joints in the asphalt or concrete,
14    would that make a difference?
15 A. This is getting somewhat outside my expertise, but I
16    understand most joints for concrete do not go all the
17    way through. They go an inch or two into the depth of
18    the concrete.
19       MR. DAVIS: I don't think you have joints
20    with asphalt.
21       THE WITNESS: No, you don't.
22       MR. DAVIS: It's a continuous pour.
23       THE WITNESS: It's a continuous pour.
24 BY MR. LYNCH:
25 Q. Any other variables that might affect the evaporation

**Page 135**

1     rates of perc?
2  A. I believe I have just stated all that.
3  Q. Opinion capital B, part B states perc is a good
4     solvent for hydrocarbon compounds such as asphalt and
5     will dissolve the hydrocarbon portion of the asphalt.
6       What do you mean perc is a good solvent?
7  A. It means it will dissolve, bring to solution
8     hydrocarbon compounds like asphalt. Water is a poor
9     solvent for asphalt. Perc is a good solvent.
10 Q. Do you have an understanding as to the make-up or the
11    constituents of what makes up asphalt pavement?
12 A. Yes.
13 Q. A paved area of asphalt, is that all hydrocarbon
14    compounds?
15 A. No.
16 Q. What else is there?
17 A. Rock, gravel. It's called the aggregate part of it.
18 Q. How much of the actual asphalt pavement is made up of
19    the aggregate?
20 A. I don't know.
21 Q. Any idea of a range?
22 A. Probably about half of it by mass. I would say more
23    than half by mass is rock.
24 Q. Are these different -- depending on what the asphalt
25    is used for, are there different compression levels to

**Page 136**

1     the asphalt -- different amounts of air space within
2     the asphalt?
3  A. Not that I know of.
4  Q. Do you know whether there are different types of
5     asphalt binder that are used to bind this asphalt
6     together -- bind the aggregate together?
7  A. I don't know.
8  Q. Do you know if there is any binders used to create
9     pavement that might have a different chemical make-up?
10 A. I don't know.
11 Q. Do you know whether or not the type of binder that's
12    used to bind the aggregate might have an effect on how
13    rapidly perc may or may not react with the asphalt?
14 A. Well, if the binder is itself a hydrocarbon then it
15    probably will be attacked and dissolved by perc also.
16       If it's not a hydrocarbon, it's probably
17    inert. It probably would not affect perc's action on
18    the asphalt.
19 Q. If it is a hydrocarbon do hydrocarbons all react
20    uniformly in the presence of perchloroethylene?
21 A. No.
22 Q. So if a certain hydrocarbon had one chemical
23    composition and another hydrocarbon had a different
24    chemical composition, they could dissolve at different
25    rates?

**Page 137**

1  A. They could.
2  Q. Do you know what types of aggregate were used to
3     create pavement in the 1970s?
4  A. No.
5  Q. Would the type of aggregate have any effect on how
6     rapidly perc might react with the asphalt?
7  A. As long as the aggregate L rock or gravel, probably
8     not.
9  Q. What if the aggregate was more densely packed?
10 A. Do you mean less hydrocarbon and more asphalt -- I'm
11    sorry -- more asphalt and less --
12       MR. DAVIS: Aggregate.
13 BY MR. LYNCH:
14 Q. More aggregate --
15 A. More aggregate and less asphalt -- more aggregate and
16    less hydrocarbon?
17 Q. Mm-hmm.
18 A. Well, if that's the case, then for the same size spill
19    of perc under the same conditions you would see more
20    of the aggregate exposed to a spill because the perc
21    would dissolve proportionally more of it.
22 Q. Are you aware of any studies, publications or
23    authorities that discuss the use of perc as a solvent
24    for dissolving asphalt?
25 A. I believe the ASTM standards for testing of asphalt

35 (Pages 134 to 137)

Page 138

1    actually involve either perc or perchloroethylene --
2    I'm sorry -- perc or TCE, its chemical cousin. But
3    I'm not sure on that.
4  Q. Any other studies, publications or authorities that
5    might discuss perc as a solvent for dissolving
6    asphalt?
7  A. Not that I recall.
8  Q. Have you ever used perc as a solvent for dissolving
9    asphalt?
10 A. Yes.
11 Q. Describe that situation.
12 A. I have a small bottle of perc at home. And I have
13   just dissolved bits of asphalt in it to satisfy myself
14   that it actually happens.
15 Q. How much perc is in that bottle?
16 A. I have a gallon of perc. I probably used a couple
17   ounces in it in this test.
18 Q. How big was the piece of asphalt?
19 A. Oh, about the size of a quarter in diameter.
20 Q. Did you conduct this test in connection with forming
21   the opinions expressed in your report?
22 A. No.
23 Q. When did you conduct this test?
24 A. About three years ago.
25 Q. How did you go about dissolving perc in the asphalt --

Page 139

1    or the asphalt in perc?
2  A. Put the perc in a small beaker and dropped the chunk
3    of asphalt into it, swished it around a little bit.
4    It dissolves.
5  Q. How long did that take?
6  A. Well, I started to see some of the color -- perc is
7    clear. But as soon as I dropped the asphalt in it, it
8    started to turn dark.
9  Q. Mm-hmm.
10 A. I would say all of the aggregate was exposed and loose
11   as gravel within a period of a minute or two.
12 Q. Was the asphalt completely surrounded by the perc?
13 A. Yes.
14 Q. Submerged in the perc?
15 A. Almost completely.
16 Q. Any other instance where you have ever witnessed perc
17   reacting with asphalt?
18 A. No.
19 Q. Would the porosity or permeability of the asphalt have
20   any effect on the rate or degree to which perc might
21   react with the asphalt?
22 A. Yes.
23 Q. How so?
4  A. The more porous or more permeable, the easier it would
.5   be for the perc to get at the asphalt. The more

Page 140

1    surface area exposed, the faster it would dissolve.
2  Q. Do you know if the composition of asphalt changes at
3    all as the asphalt ages?
4  A. Yes, it does.
5  Q. What happens?
6  A. The so-called lighter hydrocarbons -- the ones that
7    are more volatile -- tend to disappear, evaporate.
8  Q. Would the age of the asphalt have any effect on how
9    rapidly it might dissolve in perc?
10 A. Some probably.
11 Q. How so?
12 A. Well, the older asphalt would have more of the high
13   molecular weight. Less volatile compounds would tend
14   to be the ones that were less soluble also.
15 Q. The test you conducted with the piece of asphalt,
16   where did you obtain that asphalt?
17 A. Side of the road by my house.
18 Q. Do you know whether in the '70s any additives were
19   added to asphalt -- things like anti-stripping
20   additives, things of that nature?
21 A. No.
22 Q. Do you have any knowledge as to what type of additives
23   might be added to asphalt at any time as a matter of
24   industry practice?
25 A. Maybe we can finish this line. I have no knowledge of

Page 141

1    what additives there are or ever have been or ever
2    will be in asphalt.
3  Q. So I take it you also have no knowledge as to whether
4    any additives that might have been added to asphalt
5    might affect the rate at which asphalt reacts with
6    perc?
7  A. I think I answered that question with regard to
8    whether there was a hydrocarbon additive or something
9    was not a hydrocarbon additive. That's the substance
10   of my testimony.
11 Q. Okay. Do you have any knowledge as to whether perc's
12   reaction with asphalt is -- or perc reacts with
13   asphalt more quickly than TCE would react with
14   asphalt?
15 A. I don't know.
16 Q. Okay. Do you have any knowledge as to what the
17   typical extraction times might be using TCE to extract
18   vitamin from asphalt?
19 A. No.
20 Q. Any knowledge as to what temperatures and what those
21   tests might be conducted at routinely?
22 A. No.
23 Q. Would the temperature make a difference --
24 A. Sure.
25 Q. -- as to how quickly perc reacts with asphalt?

36 (Pages 138 to 141)

United States Fidelity, et al. vs SOCO West, Inc., et al. 12/13/05

Page 142

1   A.  Of course.
2   Q.  How so?
3   A.  Well, in general, compounds are more soluble as
4       temperature increases.  So the warmer it is, the more
5       asphalt we could dissolve in perc.
6           Also, the mass transfer coefficient --
7       which is the rate of dissolution -- would tend to
8       increase as you increase temperature.
9   Q.  Do other solvents such as BTEX compounds -- do you
10      know what I mean by BTEX compounds?
11  A.  Yes.
12  Q.  Do they also dissolve the hydrocarbons in asphalt?
13  A.  Yes.
14  Q.  Are those better solvents than perc when it comes to
15      dissolving asphalt?
16  A.  I don't know.
17  Q.  You don't have any knowledge one way or another as to
18      whether the reaction would be quicker with --
19  A.  I don't know.
20  Q.  Opinion B(b) again.  If spilled on asphalt perc would
21      dissolve some of the asphalt and then would slowly
22      evaporate from the resulting asphalt/perc mixture.
23          How quickly -- first, would any of the perc
24      evaporate before it dissolved into the asphalt?
25  A.  Yes.

Page 143

1   Q.  What portion or percentage?
2   A.  I don't know.  Depend on the conditions.
3   Q.  No way of answering that without knowing the
4       particular conditions?
5   A.  I think that's true.
6   Q.  Then you state it would evaporate slowly from the
7       resulting asphalt/perc mixture.  How quickly would
8       that evaporation occur?
9   A.  For a large spill it would be probably a matter of
10      hours rather than minutes for perc on concrete.
11  Q.  I'm sorry.  Concrete or asphalt?
12  A.  Perc spilled on concrete will evaporate in minutes or
13      less -- even a large spill.  Perc spilled on asphalt
14      will evaporate, I believe, over a matter of hours
15      rather than minutes.  It's much slower -- at least ten
16      times slower.
17  Q.  When perc evaporates from the asphalt/perc mixture
18      what's left over?
19  A.  The asphalt.
20  Q.  In appearance, how is that asphalt different than it
21      was before the perc came in contact with it?
22  A.  It looked shinier.  It was -- you know, in the
23      experiment I did it looked shinier and it was a
24      homogenous mass rather than more heterogeneous.
25  Q.  Is that opinion based solely on the experiment you

Page 144

1       did?
2   A.  Yes.
3   Q.  You have no other knowledge as to how the asphalt
4       that's remaining after the perc evaporates might look?
5   A.  No.  I disagree.
6   Q.  What other bases do you have?
7   A.  Just my understanding of what -- when you evaporate a
8       liquid out of something you have dissolved, the
9       remaining material that's left behind does have a
10      uniform, you know, appearance.  That's what happens.
11  Q.  Opinion B, part C, talking about the alleged large
12      spill of 250 or more gallons of perc on asphalt, Dyce
13      Chemical, 1976.
14          You state that it's highly unlikely such a
15      spill actually occurred and then you identify two
16      bases for that statement.  I think we talked about
17      this before.  Are those the only bases you have for
18      this statement?
19  A.  No.
20  Q.  What other bases do you have?
21  A.  It was never reported.
22  Q.  Anything else?
23  A.  I have to look at one of my exhibits.
24  Q.  Which?
25  A.  It's in my file.

Page 145

1           MR. DAVIS:  Your summary?
2           THE WITNESS:  The summary.
3           MR. DAVIS:  The thing you prepared on
4       Saturday?
5           THE WITNESS:  I would like to take a break
6       while we find that.
7           (Off the record at 2:05 p.m.)
8           (Back on the record at 2:14 p.m.)
9   BY MR. LYNCH:
10  Q.  Dr. Dale, I'm showing you what was previously marked
11      as Exhibit 2031 in this case.  Is that the document
12      you were referring to that listed some additional
13      bases for your opinion that it is highly unlikely that
14      such a perc spill actually occurred?
15  A.  Right.
16  Q.  Direct your attention to the next sheet, item number
17      one, second CERCLA request.  Part A states no incident
18      reports, logs prior to the 1992 -- prior to 1992 of
19      leaks or spills.
20          Do you have an opinion as to whether any
21      leaks or spills occurred prior to 1992 of perc?
22  A.  I'm sure they did.
23  Q.  Okay.  So the mere absence of logs or reports doesn't
24      preclude the fact that perc may have been spilled
25      prior to that date?

37  (Pages 142 to 145)

United States Fidelity, et al. vs SOCO West, Inc., et al. 12/13/05

## Page 150

1  BY MR. LYNCH:
2  Q.  You are here today testifying as an expert witness.
3  A.  Correct.
4  Q.  I'm just wondering if there is anything in your --
5     could a layperson -- is a layperson equally capable of
6     reading Mr. Hallsten's deposition testimony and
7     concluding whether or not it either supports or
8     contradicts the existence of a spill of perc in about
9     1976?
10  A.  I don't know what the layperson would conclude. I do
11     know that if the only large spill of which there is
12     deposition testimony occurred in the summer and the
13     quarterly reconciliation discrepancy is in the spring
14     that you can't get those two together.
15  Q.  Okay. And that's, again, based --
16  A.  There is no --
17  Q.  That's based upon common sense, not an expert --
18  A.  Yeah.
19        MR. GROSSBART: Object to the form of the
20     question.
21  BY MR. LYNCH:
22  Q.  Down to number seven, the Johnson deposition you cite.
23     Did Mr. Johnson work at Dyce in the 1970s?
24  A.  I think -- I don't recall. I think he said he started
25     in the early '80s, but I don't recall.

## Page 151

1  Q.  Except for the items that are cited in your expert
2     report and the additional items that are cited in this
3     document, Exhibit 2031, do you have any other factual
4     or evidentiary basis on which you base your conclusion
5     that it is highly unlikely that such a perc spill
6     actually occurred?
7  A.  No.
8  Q.  Next sentence in that same portion of your report,
9     opinion B(c), you state first such a large spill of
10     perc would have damaged or discolored a large area of
11     asphalt. You are assuming here a spill of 250 gallons
12     of perc?
13  A.  Yes.
14  Q.  How much damage would it have caused?
15  A.  A significant amount of damage.
16  Q.  What do you mean by significant?
17  A.  It would have washed away the aggregate -- the asphalt
18     of a significant patch of aggregate -- several square
19     feet at least. It would have been noticeable.
20  Q.  Would the extent of the damage caused by such a spill
21     have depended on any variables?
22  A.  Of course.
23  Q.  Such as?
4  A.  How fast the perc was released.
5  Q.  What difference does that make?

## Page 152

1  A.  Well, if it's released very, very slowly then it may
2     cause comparatively little damage to the asphalt. It
3     may evaporate faster than it dissolves the asphalt.
4        If it is released essentially
5     instantaneously then it will be like -- perc is very
6     heavy, very dense -- 1.6 times heavier than water. If
7     it's released quickly it's going to act like a blast
8     of solvent and just remove a large quantity of asphalt
9     from the -- large quality of hydrocarbon from the
10     asphalt.
11  Q.  Have you ever observed that happening --
12  A.  No.
13  Q.  -- perc being released quickly onto asphalt -- a large
14     quantity?
15  A.  No.
16  Q.  What's the basis for that?
17  A.  Physics and chemistry.
18  Q.  Any other variables other than how fast the perc is
19     released?
20  A.  The temperature, obviously clean-up attempts. I have
21     testified to that before. I believe I'm repeating
22     testimony at this point.
23  Q.  What did you assume the temperature was as the basis
24     for this opinion that such a large spill would have
25     damaged or discolored asphalt?

## Page 153

1  A.  Yeah. Any temperature between close to freezing and
2     about 70 to 80 degrees Fahrenheit.
3  Q.  What about below freezing?
4  A.  The perc would not have been below freezing. The
5     asphalt may have been, but the perc would not have
6     been.
7  Q.  If the asphalt was below freezing?
8  A.  Maybe slower reaction, less damage.
9  Q.  How much slower?
10  A.  I don't know.
11  Q.  How much less damage?
12  A.  I don't know.
13  Q.  We talked a little bit about how fast the perc is
14     released. Would it also make a difference as to what
15     angle the perc is released at?
16        MR. GROSSBART: Objection.
17        MR. DAVIS: Objection. Vague. I don't
18     know what you mean by angle. Do you?
19        THE WITNESS: No.
20  BY MR. LYNCH:
21  Q.  If the perc was sprayed from a hose directly onto the
22     concrete as opposed to being sprayed out and then
23     falling onto the concrete -- I'm sorry -- asphalt.
24     Would that make a difference?
25  A.  I think the most important variable there is how high

United States Fidelity, et al. vs SOCO West, Inc., et al. 12/13/05

## Page 158

1  Q. Any realistic conditions.
2  A. No.
3  Q. Have you ever seen asphalt that's been dissolved by
4     perc except for the experiment you conducted?
5        MR. DAVIS: Asked and answered.
6  A. No.
7  BY MR. LYNCH:
8  Q. Part B(c), second basis states such a large spill of
9     perc would have produced a strong odor over a very
10    large area and would have been noticed by Dyce
11    employees or Dyce neighbors.
12       Did I read that correctly?
13 A. I didn't have very large area. You said very large.
14 Q. I'm sorry.
15 A. I just said large. Otherwise yes. Otherwise correct.
16 Q. Have you ever been present when a spill of 250 to
17    1,000 gallons of perc occurred?
18 A. Been present at a spill of about a half gallon of
19    perc.
20 Q. How close were you?
21 A. Three, four feet away.
22 Q. Indoors or outdoors?
23 A. Indoors.
24 Q. How large of an area would the strong odor have been
25    noticeable in?

## Page 159

1  A. Probably depends on wind direction and actually how
2     fast it got spilled, but certainly over the entire
3     Dyce complex.
4        If that spill took place in the loading
5     dock area the people in the main building — office
6     building would certainly have known about it.
7  Q. What is the basis for that opinion?
8  A. Because perc at about 100 parts per million —
9     one-tenth of one percent — makes your eyes water. At
10    about 300 parts per million — makes your eyes water,
11    your nose stream, you have a real difficult time. 200
12    to 300 parts per million you have difficulty
13    breathing. 500 parts per million you become
14    intoxicated and die. People would have remembered
15    that spill.
16       By the way, that's why I know that the
17    spill that Mr. Slater witnessed was not a perc spill.
18       MR. GROSSBART: I'm sorry. I didn't hear
19    the last —
20       THE WITNESS: That's why I know that the
21    spill that Mr. Slater witnessed in the summer of 1976
22    couldn't have been a perc spill.
23 BY MR. LYNCH:
24 Q. Why is that?
25 A. Because Mr. Bender didn't testify that Mr. Bender was

## Page 160

1     cleaning it up with protective gear and he didn't
2     smell it. He would have smelled it.
3  Q. Did he say he didn't smell it or did he say he didn't
4     recall?
5  A. He doesn't testify to having smelled it.
6  Q. Do you know if he testified whether he recalls whether
7     or not perc had any smell?
8  A. I don't know.
9        MR. GROSSBART: The "he" in your question
10    is Bender —
11       MR. LYNCH: Mr. Slater. I'm sorry.
12       THE WITNESS: I don't know what Mr. Slater
13    knows about perc smell.
14       Well, take that back. He put his head in
15    those barrels. I'm recalling his testimony. Yeah.
16    He said it made his eyes run, choking, gasping.
17 BY MR. LYNCH:
18 Q. You indicated that it would certainly have been
19    smelled by anyone in the Dyce warehouse or office. Is
20    that correct?
21 A. That's right.
22 Q. Does it make a difference if the wind was blowing the
23    opposite direction and the windows were closed?
24 A. Opposite direction of —
25 Q. Blowing away from the office.

## Page 161

1  A. Where that spill — the places where the perc could
2     have spilled were right next to the office and the
3     warehouse. No, I don't think so. Particularly since
4     perc spreads out as it spills.
5  Q. Going back to the 1975 photo — if we can find it.
6  A. Mm-hmm.
7  Q. Using that photo can you show me where the office is?
8  A. Right in this area.
9  Q. Okay. Do you know, is the — strike that.
10       And your understanding of where the perc
11    spill occurred is —
12 A. Well, I don't believe there was a perc spill, but
13    where it was alleged to have spilled would be in this
14    area.
15 Q. TouchT.
16       MR. DAVIS: That's one of his sneaky trick
17    questions.
18       THE WITNESS: I have five kids.
19 BY MR. LYNCH:
20 Q. On that diagram can you indicate how large of an area
21    the perc spill would have been noticeable over?
22       MR. DAVIS: Assuming for the sake of
23    argument that there was a perc spill.
24 A. I don't know the scale, but I'm assuming it's about
25    one inch equals 50 feet. It's about right — the perc

41 (Pages 158 to 161)

United States Fidelity, et al. vs SOCO West, Inc., et al. 12/13/05

Page 162

1    spill would have covered about this area here between
2    the end of the warehouse and --
3  BY MR. LYNCH:
4  Q.  Is there --
5  A.  Let me add to my response of a previous question.
6        Prevailing winds in Billings are from the
7    northwest -- this direction. A spill here would have
8    taken the odor directly toward the office based on
9    prevailing winds.
10 Q.  Those are prevailing winds throughout the year?
11 A.  Pretty much.
12 Q.  Do you have an understanding as to whether this area
13    that's labeled PCE handling in 1975 to 1980 -- was
14    that sloped in any direction?
15 A.  I don't know about the slope.
16 Q.  Would it have made a difference if the perc was
17    flowing off of that area -- away from that area?
18    Would that have any difference on your opinion?
19        MR. DAVIS:  The opinion on --
20        MR. LYNCH:  On the area covered by the area
21    -- strong odor of perc.
22 A.  No.
23 BY MR. LYNCH:
24 Q.  Why not?
25 A.  If the wind comes from this direction or just this

Page 163

1    area, it's going to spread out. The vapor cloud from
2    the perc will evaporate and then will start to spread
3    out. It'll just tend to cover this whole area. And
4    it will be smeared in this direction toward the
5    warehouse, toward the offices, smeared toward the
6    southeast from the northwest by the winds.
7  Q.  What's the basis for your testimony as to the
8    direction of the prevailing winds in Billings?
9  A.  Personal knowledge of having lived at the foot of
10    mountains in Colorado and also the general direction
11    of winds. It may be that it's on this weather report
12    also. Not here, so no.
13 Q.  Do you have any understanding or knowledge as to how
14    much of an odor was created during routine unloading
15    -- the routine loading or unloading or drumming of
16    perc in that area?
17 A.  I believe that one or more of the witnesses recalls --
18    does speak about odors from perc. But I don't recall
19    whether it's from the drumming or not.
20 Q.  I know you characterized or you have opined that a
21    large spill of perc would have produced a strong odor.
22        How strong of an odor would that be as
23    compared to an odor produced during a normal drumming
24    or unloading operation?
25 A.  Well, it's -- if you dropped a quart during the

Page 164

1    drumming operation the odor would be 1,000 times as
2    great -- 250 gallon spill versus one quart.
3        I'd like to add to my testimony.
4    Mr. Naff's deposition, page 131 says 100 gallons of
5    perc on asphalt would have been noticed -- he refers
6    to odor. But no one came to him saying they knew
7    about the spill. It is not only my opinion regarding
8    the strong odor but also Mr. Naff's.
9  Q.  You indicate that Dyce's neighbors would have noticed
10    the odor.
11        MR. GROSSBART:  Objection to the form of
12    the question.
13 BY MR. LYNCH:
14 Q.  Is that correct?
15 A.  Anybody -- yes. Anybody downwind of it would have
16    noticed.
17 Q.  How far downwind?
18 A.  I don't know.
19 Q.  Do you know how far their nearest neighbor is?
20 A.  There was another company up here -- I don't know
21    where they are, not for sure.
22 Q.  Part C of your report states perc discharged to ponds
23    or basins where water is present will evaporate very
24    slowly or not at all.
25 A.  That's correct. It does say that.

Page 165

1  Q.  Is that just a general principle based on your
2    knowledge of chemistry?
3  A.  Yes.
4  Q.  Do you have any opinion as to how quickly any of the
5    -- any perc that might have been discharged into a
6    containment unit on the Dyce facility would have
7    evaporated?
8  A.  If it was covered with water it would never evaporate.
9    As long as it stays covered with water it would never
10    evaporate.
11 Q.  Would any portion of the perc become dissolved into
12    the water?
13 A.  Very small amount.
14 Q.  Would the dissolved portion evaporate?
15 A.  It could.
16 Q.  If there were BTEX compounds in the water would they
17    tend to dissolve any perc that may be there?
18 A.  I'm sorry?
19 Q.  If there were any BTEX compounds in the water would
20    that dissolve any perc that might be in there?
21 A.  It would depend on the relative amounts. If there
22    were a lot more BTEX than perc then, yeah, it would
23    dissolve the perc. If not it would be the other way
24    around. The perc would dissolve the BTEX.
25 Q.  Would it make a difference as to whether the perc

42 (Pages 162 to 165)

United States Fidelity, et al. vs SOCO West, Inc., et al. 12/13/05

Page 202

1   moves in the subsurface once it permeates the surface
2   of the ground?
3   A. It's complicated. It's denser than water, so it
4   sinks. It sinks until it reaches an impervious layer.
5   It then may migrate along that impervious layer. It
6   may spread out. It's complicated.
7   Q. Is it your opinion that the information as to the
8   location and nature of the contamination found at the
9   Dyce site indicates that the contamination was more
10  likely to have been caused by the subsurface migration
11  of DNAPL perc from a historic containment area than
12  from a spill in the loading/unloading area that flowed
13  above ground to the northwest corner?
14       MR. GROSSBART: Objection to the form of
15  the question.
16  A. That's quite a complex question. I have told you
17  before that the scope of my assignment here is really
18  to deal with the rebuttal of Dr. Harris's report.
19       But I will tell you that from what I do
20  understand it looks as if this was a surface release
21  up here. There are higher concentrations near the
22  surface in this area of the northwest corner -- the
23  extreme northwest corner whereas if it had been
24  released from the bottom of a containment pond and
25  migrated in the subsurface that would be less likely

Page 203

1   to be the source -- the containment pond.
2   BY MR. LYNCH:
3   Q. I just want to clarify because I'm a little confused
4   with your testimony.
5        Do you have an opinion as to what the cause
6   of the contamination found in the so-called hot spot
7   area is in the northwest corner of the Dyce site?
8        MR. GROSSBART: Objection to the form of
9   the question.
10  A. Again, you are outside of my area of expertise. Given
11  the fact that this former pond area was drained into
12  by running a hose out into this northwest corner --
13  this pasture area -- it's quite likely that the hose
14  drained perc from the bottom of this pond area and
15  discharged it to the surface. That's an alternative
16  mechanism. Another mechanism is escape from the
17  bottom. Again, that's outside of my area of
18  expertise.
19  BY MR. LYNCH:
20  Q. That's what I wanted to clarify. That's not an
21  opinion you've addressed in your expert report?
22  A. That's correct.
23  Q. And I believe we testified earlier as to whether you
4   had an opinion as to whether any discharges or
.5  releases from containment units did, in fact, occur

Page 204

1   and whether they could be a cause of contamination?
2        MR. DAVIS: What was --
3        MR. LYNCH: Strike that. Bad question.
4   BY MR. LYNCH:
5   Q. Are you intending to offer an opinion at trial or in
6   any affidavit in connection with this matter that the
7   source of the contamination found in the northwest
8   corner of the Dyce site -- what we have been calling
9   the hot spot -- resulted from a discharge of water
10  from containment as opposed to water permeating
11  through the bottom of the containment structure?
12       MR. DAVIS: Object to the form of your
13  question. You are talking about discharge of water.
14  I don't think discharge of water caused any problems
15  other than --
16       MR. LYNCH: Discharge of liquids.
17  A. Maybe I can recap. I was asked to rebut the opinions
18  of Dr. Harris. Dr. Harris's offered explanation for
19  the contamination here in the far northwest corner of
20  the site was that there was a surface spill of 250
21  gallons or more of perc down here near the warehouse
22  and dock and that somehow that 250-gallon spill
23  migrated over land leaving little or no trace and
24  discharged here at the surface in the northwest
25  corner.

Page 205

1        I believe, again, that's a very, very
2   unlikely scenario. That was the extent of my opinion.
3   That's what I have been asked to rebut.
4   BY MR. LYNCH:
5   Q. I understand that, Mr. Dale. I am not intending to --
6   I just want to ascertain the limits of what you will
7   be opining at trial of this matter.
8   A. Those are contained in my expert report.
9   Q. Okay. So nothing that's not in your expert report
10  will be --
11  A. I am not a hydrogeologist. I am not a perc
12  connotation migration -- perc contamination expert.
13  That's not my expertise and specifically it's not what
14  I was asked to do here, so no.
15  Q. So am I correct that you do not have an expert opinion
16  as to what caused the contamination that's been found
17  in the northwest corner of the site?
18       MR. DAVIS: That's a different question.
19  You asked him what he was asked to do. He may have an
20  opinion.
21  BY MR. LYNCH:
22  Q. Do you have an expert opinion as to what caused the
23  contamination in the northwest corner area of the
24  site?
25  A. As an expert or as a technical person who understands

Pat Carl & Associates (763) 591-0535 or (800) 591-9PCA (722)

United States Fidelity, et al. vs SOCO West, Inc., et al. 12/13/05

Page 206

1  these things? As an expert hired to address a
2  particular set of issues or as a guy who has a brain
3  and has been around this for ten years? Which is it?
4  Q. We'll go with the expert first. Firstly as an expert.
5  A. My expert report details my expert opinions.
6      My technical expertise using my whole brain
7  says that there was perc at the bottom of this pond
8  area or wherever the pond area that they discharged
9  perc. If you drop a hose into that and run the hose
10 out to discharge it in the pasture up here that's
11 where they got the perc. That's where you got a large
12 surface area of perc. You had it in a hose. It
13 didn't magically get 350 feet over land and drop in
14 there.
15 Q. What's the basis for your belief that water was
16 discharged from --
17     MR. GROSSBART: You know, he --
18 BY MR. LYNCH:
19 Q. -- the former pond area?
20 A. There is deposition testimony to that effect.
21 Q. Whose deposition testimony?
22 A. We can find it if you want.
23 Q. But it is not cited in your report, so that's why I'm
24 wondering.
25     MR. GROSSBART: He just told you that it's

Page 207

1  beyond what he's going to be testifying to. Then you
2  say you want an answer in any event. He gives you the
3  answer and then you complain that it's not in his
4  report. You can't have it both ways.
5      If you want to go fishing for his view, ask
6  him who he thinks should, you know, run for senator,
7  too. But that's not in the report. That's not what
8  he will be testifying to. That's the problem with the
9  questions.
10     You can't ask for an off-the-cuff opinion
11 and then impeach him with the fact that it's not in
12 his report when he tells you that's not what he's here
13 to testify about as an expert retained in this case as
14 opposed to somebody who is an expert in the field and
15 has a brain, as he said.
16     That's just harassing the witness at this
17 point.
18     MR. LYNCH: Is that your objection?
19     MR. GROSSBART: Yes, it is. Anything you
20 didn't understand about it? Because I will repeat it
21 if you want.
22     MR. LYNCH: I'm sure you will.
23     THE WITNESS: The senator, by the way,
4  should be Keith Butler.
.5     MR. DAVIS: Who's Keith Butler?

Page 208

1      MR. GROSSBART: Are you going to testify to
2  that at trial in Montana?
3      THE WITNESS: The court reporter may have a
4  different opinion.
5  BY MR. LYNCH:
6  Q. If we look at Exhibit 2045, you see two other areas on
7  that exhibit that are marked with green -- marked in
8  green. Is that correct?
9  A. Yes.
10 Q. Do you have an understanding as to what those areas
11 are?
12 A. They are additional -- well, let's see. This is
13 estimated extent of contaminated Vadose soil above
14 remediation goals. Estimated extent of source area --
15 geez, this is small print -- of source area saturated
16 zone soil. There is surface contamination apparently.
17 Q. Do you know whether Dr. Harris offered an opinion as
18 to what the likely source of the contamination found
19 in those areas was?
20     MR. GROSSBART: Objection to the form of
21 the question.
22 A. I believe he indicated these were surface spills,
23 loading and unloading. But I don't recall for sure.
24 BY MR. LYNCH:
25 Q. Do you dispute -- well, let's look at the report.

Page 209

1      MR. DAVIS: It's an exhibit.
2  BY MR. LYNCH:
3  Q. This one. Page five, opinion five on that states
4  investigative data, deposition testimony, aerial
5  photographs and other historical evidence indicate
6  that contamination found in other areas of the Dyce
7  site most likely arose from infrequent accidental
8  releases and relatively small quantities of chemical
9  product nearly all of which occurred in the 1970s or
10 early 1980s.
11 A. Yes. You read it correctly.
12 Q. In your report have you taken issue with or rebutted
13 that opinion expressed by Dr. Harris?
14     MR. GROSSBART: Objection to the form of
15 the question.
16 A. No. My rebuttal is the single large spill of 250
17 gallons or more, not the small quantities.
18 BY MR. LYNCH:
19 Q. In your report have you expressed any opinion as to
20 how the contamination in these two other additional
21 areas occurred?
22     MR. GROSSBART: Asked and answered.
23     MR. DAVIS: I will object as to foundation.
24 He's already indicated he rebutted the 250-gallon spill.
25 He hasn't addressed that. So how his report would

53 (Pages 206 to 209)

Pat Carl & Associates (763) 591-0535 or (800) 591-9PCA (722)

United States Fidelity, et al. vs SOCO West, Inc., et al. 12/13/05

Page 210

1    address something it didn't address is --
2             MR. LYNCH: Does his report --
3             MR. GROSSBART: Asked and answered.
4    A. No, it doesn't.
5    BY MR. LYNCH:
6    Q. Do you have any -- are you aware of any facts or
7       evidence that would call into question the validity of
8       the opinion expressed in part five of Dr. Harris's
9       report that I just read?
10            MR. GROSSBART: Objection to the form of
11      the question.
12            He just said that's beyond what his
13      rebuttal is. It is an improper question to ask him
14      that. It's beyond his expertise for purposes of this
15      case.
16   A. No. I didn't address that.
17   BY MR. LYNCH:
18   Q. Okay. And the reason I ask is because -- and the
19      record will bear this out, but I believe you indicated
20      earlier that that is one of the opinions you rebutted
21      in your report. I just want to make sure it is not
22      one of the opinions you rebutted in your report.
23            MR. DAVIS: Paragraph five of page five of
24      Harris's report?
25            MR. LYNCH: Yes.

Page 211

1    BY MR. LYNCH:
.2   Q. The area -- the larger of the two green areas other
3       than the hot spot area marked towards the -- what you
4       believe is in --
5    A. The warehouse?
6    Q. -- the warehouse area of it, do you have an
7       understanding as to what the surface of that area was?
8       Was it paved, dirt? Was it --
9    A. Well, when?
10   Q. In 1975.
11   A. I believe it was gravel at that point. At least part
12      of it was gravel.
13   Q. Do you know which part?
14   A. I don't. Also part of -- the tanks were on concrete,
15      but the area around the concrete I understand was
16      gravel.
17   Q. Do you know if or when that area was paved with either
18      asphalt or concrete?
19   A. I don't recall the dates.
20            MR. LYNCH: Let me mark this 2019 Exhibit
21      -- I'm sorry. 2019B.
22            MARKED BY THE REPORTER:
23            DEPOSITION EXHIBIT NUMBER 2019B
`4            :4:06 p.m.
_5   BY MR. LYNCH:

Page 212

1    Q. I'm showing you 2019B, it looks to be the same
2       document --
3             MR. GROSSBART: Is that the same as this?
4             MR. LYNCH: I believe it's from a different
5       report.
6    BY MR. LYNCH:
7    Q. Figure 4.2 of Brenntag source area, soil remediation
8       areas. It's -- looks like it was produced by Tetra
9       Tech. I assume it was one of the exhibits to their
10      investigative reports.
11            MR. GROSSBART: They sure look alike.
12            THE WITNESS: They do.
13   BY MR. LYNCH:
14   Q. This one Exhibit 2019 might be a little easier to
15      read.
16            Referring again to the source area closer
17      to the warehouse, do you have an understanding as to
18      when that area was paved with either asphalt or
19      concrete?
20            MR. GROSSBART: Asked and answered.
21   A. I told you I don't know. That was my last answer to
22      you.
23   BY MR. LYNCH:
24   Q. Given --
25   A. I should say I don't recall.

Page 213

1    Q. Given your -- the opinion expressed in your report --
2       given your opinion B expressed in your report that
3       spills and leaks of perc on concrete or asphalt at
4       Dyce Chemical are very unlikely to have permeated
5       through to the soil -- strike that.
6             Do you have an understanding as to whether
7       that area that's designated in green -- the source
8       area closest to the warehouse -- whether that area was
9       ever paved with either asphalt or concrete?
10   A. I don't recall.
11   Q. You have opined that the alleged spill of 250 or more
12      gallons of perc occurred on asphalt according to your
13      testimony. Is that correct? Or in an area that was
14      covered with asphalt. Is that correct?
15   A. I don't believe the spill ever occurred. I have told
16      you that again and again.
17   Q. Well, no. There is an alleged large spill of 250
18      gallons or more of perc on asphalt at the Dyce
19      Chemical facility in about 1976 and is part B(c) of
20      your report, correct?
21   A. An alleged spill, yes.
22   Q. Can you identify where using Exhibit 4.2 -- or I'm
23      sorry -- Exhibit 2019B where that spill occurred?
24            MR. DAVIS: Objection to the form of the
25      question.

Pat Carl & Associates (763) 591-0535 or (800) 591-9PCA (722)

United States Fidelity, et al. vs SOCO West, Inc., et al. 12/13/05

Page 218

1  Q.  The first other purported cause identified by Dr.
2     Harris is other large spills and releases.
3          Do you have an opinion as to whether or not
4     any other large spills or releases occurred that
5     caused the contamination in the northwest corner?
6          MR. GROSSBART: Objection to the form of
7     the question. He's testified that he doesn't believe
8     any spills -- not any other ones, but any.
9          MR. DAVIS: Large.
10         MR. LYNCH: He just testified that he is
11    rebutting --
12         MR. GROSSBART: Any large spills.
13         MR. LYNCH: He's rebutting this opinion
14    expressed by Dr. Harris. I want to find out which --
15         MR. GROSSBART: The problem with number
16    four is that on page five it says -- after saying in
17    number two and number three that there was a
18    250-gallon spill he then says in number four -- he
19    kind of flips it around and approaches the same thing
20    from the other direction and says there is no other
21    explanation but for what I say in number two and
22    three.
23         So necessarily the witness is rebutting
24    four by virtue of the fact that he's rebutting two and
25    three. Definitionally that's the case.

Page 219

1          That's the problem and, I think, the
2     confusing nature of your question. If you rebut two
3     and three you are definitionally rebutting four.
4          MR. LYNCH: I just want to clarify.
5     BY MR. LYNCH:
6     Q.  On page 38 of Dr. Harris's opinion it refers to leaks,
7        overflows or discharges from the containment area.
8          On page 40 he refers to dumping of drums by
9        barrel reconditioners. I just want to clarify -- I
10       understand you are rebutting Harris's opinion number
11       four.
12         In so rebutting Harris's opinion number
13       four are you offering any opinion that any of these
14       events occurred or that they are, in fact, the source
15       -- probable source of the contamination found in the
16       northwest corner?
17         MR. GROSSBART: Objection to the form of
18       the question.
19         MR. DAVIS: Same objection. It's compound
20       and it's vague. You are referring to various pages of
21       testimony --
22         MR. GROSSBART: He's already testified --
23         MR. DAVIS: -- or report.
24         MR. GROSSBART: -- that he is not -- that
25       it's beyond his retention to pin down why the

Page 220

1          northwest corner is polluted; that he's been retained
2          to say that however that may have happened it wasn't
3          because of the 250-gallon spill that Harris relies on.
4               THE WITNESS: That's correct. I'm not
5          sure. And I have not studied how that contamination
6          may have occurred.
7     BY MR. LYNCH:
8     Q.  Okay.
9     A.  That's not my assignment.
10              MR. LYNCH: I have no further questions.
11              MR. GROSSBART: Just a couple questions --
12              THE WITNESS: Is the Brill question
13         withdrawn then?
14              MR. LYNCH: We'll withdraw the Brill
15         question.
16              MR. GROSSBART: For the record, to the
17         extent we have any time left in the seven hours we
18         reserve the right to hold the deposition open.
19              MR. DAVIS: We'll give you six or seven
20         minutes, Chris.
21              EXAMINATION
22    BY MR. DAVIS:
23    Q.  Professor Dale, earlier -- much earlier this morning
24       in talking about one of your fundamental opinions
25       about the evaporative qualities of free-form perc you

Page 221

1          had referenced relying upon deposition testimony from
2          a Mr. Cannon, a Mr. Agardy and I think you brought
3          some other depositions.
4               Let me ask you this: Apart from those
5          depositions, has the education that you have reviewed
6          with Mr. Lynch today and your work experience as a
7          professor of chemical engineering -- do those matters
8          in your background in your education and work
9          experience allow you without taking into account the
10         deposition testimony you have referenced today from
11         these other witnesses and other cases allow you to
12         opine about the evaporative qualities of free-form
13         perc?
14    A.  Yes.
15    Q.  All right. And does your education and training as a
16       professor of chemical engineering allow you to -- what
17       is your -- are your opinions any different?
18    A.  No. I knew that perc evaporated very, very fast
19       before I ran the numbers and before I heard anybody's
20       deposition testimony.
21    Q.  All right. You don't need their depositions to opine
22       as you have about how quickly perc evaporates?
23    A.  No, I don't.
24    Q.  All right. And then the same question I have about
25       the nature of the odor or what someone would notice

56 (Pages 218 to 221)

United States Fidelity, et al. vs SOCO West, Inc., et al. 12/13/05

## Page 226

```
 1              CERTIFICATE OF NOTARY
 2    STATE OF MICHIGAN    )
 3                 ) SS
 4    COUNTY OF INGHAM     )
 5
 6         I, Kelli L. Werner, a Notary Public in and
 7    for the above county and state, do hereby certify that
 8    the above deposition was taken before me at the time
 9    and place hereinbefore set forth; that the witness was
10    by me first duly sworn to testify to the truth, and
11    nothing but the truth; that the foregoing questions
12    asked and answers made by the witness were duly
13    recorded by me stenographically and reduced to
14    computer transcription; that this is a true, full and
15    correct transcript of my stenographic notes so taken;
16    and that I am not related to, nor of counsel to either
17    party nor interested in the event of this cause.
18
19
20
21         _____
22              Kelli L. Werner, CSR-6610, RPR
23              Notary Public,
24              Ingham County, Michigan
25    My Commission expires: 02/01/2008
```

## Page 227

```
 1            INDEX TO EXAMINATIONS
 2
 3    Witness              Page
 4    BRUCE E. DALE, Ph.D.
 5
 6    EXAMINATION
 7    BY MR. LYNCH:              3
 8    EXAMINATION
 9    BY MR. DAVIS:            220
10    EXAMINATION
11    BY MR. GROSSBART:          222
12
13            INDEX TO EXHIBITS
14
15    Exhibit               Page
16    (Exhibits attached to transcript.)
17
18    DEPOSITION EXHIBIT NUMBER 2000       6
19    DEPOSITION EXHIBIT NUMBERS 2001-2004    12
20    DEPOSITION EXHIBIT NUMBER 2005       43
21    DEPOSITION EXHIBIT NUMBERS 2006-2039   48
22    DEPOSITION EXHIBIT NUMBER 2040       84
23    DEPOSITION EXHIBIT NUMBER 2041      109
24    DEPOSITION EXHIBIT NUMBER 2042      114
25    DEPOSITION EXHIBIT NUMBER 2043      131
```

## Page 228

```
 1    DEPOSITION EXHIBIT NUMBER 2044       167
 2    DEPOSITION EXHIBIT NUMBER 2045       180
 3    DEPOSITION EXHIBIT NUMBER 2046       182
 4    DEPOSITION EXHIBIT NUMBERS 2047-2048   185
 5    DEPOSITION EXHIBIT NUMBER 2049       195
 6    DEPOSITION EXHIBIT NUMBER 2019A      198
 7    DEPOSITION EXHIBIT NUMBER 2019B      211
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

58 (Pages 226 to 228)