L.B. Cozzens
Cozzens Law Office
1643 24th Street West, Suite 104
Billings, MT 59102
Tel:   (406) 294-2050
Fax:   (406) 294-2052

Thomas C. Mielenhausen
Christopher L. Lynch
Paul A. Banker
Lindquist & Vennum P.L.L.P.
4200 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Tel:   (612) 371-3211
Fax:   (612) 371-3207

*Attorneys for Soco West, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | | |
|---|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, | ) ) ) | Cause No.  CV-04-29-BLG-RFC<br>Cause No.  CV-08-29-BLG-RFC |
| Plaintiff, | ) | |
| and | ) ) | **SOCO'S MOTION IN LIMINE TO PRECLUDE CERTAIN OPINION TESTIMONY OF BRUCE E. DALE** |
| CONTINENTAL INSURANCE COMPANY, | ) ) ) | |
| Plaintiff Intervenor, | ) ) | **(November 3, 2009)** |
| v. | ) ) | |
| SOCO WEST, INC., | ) ) | |
| Defendant. | ) ) | |

Doc# 3114001\1

Soco West, Inc. ("Soco") moves the Court *in limine* to prohibit United States Fidelity and Guaranty Company and Continental Insurance Company (collectively "the Insurers") from offering certain opinions proffered by their purported expert witness, Bruce E. Dale, Ph.D.[1]  Specifically, Soco requests the Court order that Dale not be permitted to testify as to:

1.  The amount of spreading of perc that would occur from the 250 to 1,000 gallon perc spill asserted by Soco in this litigation.

2.  The length of time asphalt pavement would remain a "sticky" "tarry mass" if the 250 to 1,000 gallon spill asserted by Soco had occurred on an asphalt-paved surface.

3.  The area and length of time over which someone would have been able to detect the odor from the 250 to 1,000 gallon perc spill asserted by Soco in this action.

Dale's testimony is intended to refute Soco's assertion of a large spill of perc at the Dyce site in the mid-1970s as a cause of groundwater contamination found under and near the Dyce site.  Because it is unsupported by any scientific methodology and unconnected to the "disputed material facts" at issue in this case, Dale's opinion testimony will not assist the jury and will only serve to unfairly prejudice Soco.  Dale's testimony should therefore be excluded.

## BACKGROUND

On June 1, 2009, the Insurers served Soco with a revised expert report of Bruce E. Dale, a chemical engineer from Michigan State University.  In his revised

---

[1] In accordance with LR 7.1(c)(1), Soco has requested that the Insurers agree to the relief requested in this motion.  The Insurers declined to do so.

*USF&G, et al., v. Soco West, Inc.*
**Defendants' Motion *in Limine* to Preclude Certain Testimony of  Bruce E. Dale – Page 2**
Doc# 3114001\1

report, Dale proffered opinions as to the type and extent of physical evidence that would result "from any large release of perc at Dyce Chemical like that alleged in this litigation."  (<u>See</u> Excerpts from Dale's 6/1/2009 Expert Report (attached hereto as Exhibit A) at 1, Opinion 1.).  Dale described the spill at issue in this litigation as follows: "some time during the period 1975-1977, approximately 250-1000 gallons of perc were released in the loading and unloading area of the Dyce facility."  (<u>Id.</u>)

Among other opinions, Dale proposes to testify to the following:

- A release of 250 to 1,000 gallons "would result in substantial spreading of perc over the ground surface."  (Ex. A at 1, Opinion 2(a).)  At his deposition, Dale quantified "substantial" as meaning "tens of feet."  (<u>See</u> Excerpts from transcript of Dale's 10/5/2009 deposition (attached hereto as Exhibit B) at 71:12-71:25.)

- "When perc dissolves asphalt, the resulting mixture will remain as a tarry mass for a long period of time."  (Ex. A at 3, Opinion 2(g).)  At his deposition, Dale asserted that, in part, this meant the asphalt pavement would remain "sticky" for at least a day.  (Ex. B at 108:17-112:2.)

- "The smell caused by a release of 250-1000 gallons of perc would be noticeable over a large area."  (Ex. A at 3, Opinion 2(h).)

*USF&G, et al., v. Soco West, Inc.*
**Defendants' Motion** *in Limine* **to Preclude Certain Testimony of  Bruce E. Dale – Page 3**
Doc# 3114001\1

It is evident from Dale's report and the concessions made at his deposition that he has no first-hand experience from which to opine as to the physical evidence that would result from a large spill of perc on asphalt pavement.  It is also clear that the purportedly "scientific" basis for Dale's opinions – a series of mathematical calculations – assume certain facts inconsistent with conditions that indisputably existed at the Dyce site in the mid-1970s, and therefore are not applicable to the spill asserted by Soco in this action.  Dale's opinions thus fail to meet the base requirements for admissibility set forth in <u>Daubert</u> and its progeny.

## ARGUMENT

To be admissible, expert testimony must reflect specialized or scientific knowledge and must assist the trier of fact.  Fed. R. Evid. 702; <u>see</u> <u>also</u> <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 592 (1993).  Courts must be on guard to prevent testimony that is nothing more than speculation and conjecture cloaked in the aura of a scientific Ph.D.  In all instances, "the court must satisfy itself that the expert will adhere to the same standard of 'intellectual rigor' in testifying as he would follow when dealing with the same subject matter outside of the courtroom."  <u>U.S. v. Grace</u>, 455 F.Supp.2d 1181, 1187 (D. Mont. 2006).

A purported expert's "bald assurance of validity is not enough."  <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 43 F.3d 1311, 1316 (9th Cir. 1995).  Instead, "[a]n expert's testimony must be grounded in the methods and procedures of

*USF&G, et al., v. Soco West, Inc.*
**Defendants' Motion** *in Limine* **to Preclude Certain Testimony of  Bruce E. Dale – Page 4**
Doc# 3114001\1

science, and must be more than unsupported speculation or subjective belief."

Grace, 455 F.Supp.2d at 1187 (applying Daubert criteria).  The factors that inform

the Court's gatekeeping determination of reliability, include:

- Whether a "theory of technique can be (and has been) tested";

- Whether it "has been subjected to peer review and publication";

- Whether, in respect to a particular technique, there is a "known or
  potential rate of error" and whether there are "standards controlling the
  technique's operation"; and

- Whether the theory or technique enjoys "general acceptance" within a
  "relevant scientific community."

Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 at 149-150 (1999) (quoting

Daubert, 509 U.S. at 592-94).

The court must also ensure that there is a "fit" between the expert's opinion

and the facts of the case.  Daubert, 509 U.S. at 591.  In doing so, the court must

assess "whether it is proper for the jury to apply an expert's reasoning or

methodology to the disputed material facts in a case."  Grace, 455 F.Supp.2d at

1187.  If the expert's testimony lacks "a valid scientific connection to the disputed

material facts in a case," it should be excluded.  Id. at 1188.

As a chemical engineer, Dale may have specialized knowledge to testify as

to the chemical properties of perc and as to what chemical reactions might occur if

*USF&G, et al., v. Soco West, Inc.*
**Defendants' Motion** *in Limine* **to Preclude Certain Testimony of  Bruce E. Dale – Page 5**
Doc# 3114001\1

perc were to come into contact with asphalt pavement under certain conditions.

But the opinions Dale purports to offer in this litigation go beyond explaining what

type of chemical reactions *might* possibly result if a perc spill occurred on asphalt

pavement.  Instead, Dale performs calculations assuming certain conditions that

indisputably did not exist at the Dyce site in the mid-1970s and, based on those

sterile-condition calculations, offers categorical opinions as to the extent of

damage, discoloration, and odor that would result from the spill at issue in this

case.  In other words, contrary to <u>Daubert</u>, Dale's opinions lack the requisite "fit"

to any facts in dispute in this case.

**A.    Dale's Opinion of "Substantial" / "Tens of Feet" Spreading is Based on Assumptions that Have No Connection to Facts in Dispute.**

Many of Dale's opinions regarding the extent of damage and discoloration

that might result if Soco's asserted perc spill occurred on asphalt pavement rely on

his foundational opinion that such a spill "would result in a substantial spreading of

perc over the ground surface."  (Ex. A at 2, Opinion 2(a).)  At his deposition, Dale

explained that by "substantial" he meant the perc spill would spread "tens of feet"

under any reasonable conditions.  (Ex. B at 70:21-71:25.)

Dale's opinion is not based on personal experience or specialized

knowledge.  Dale has never seen chemicals being unloaded from a bulk tanker

truck.  (Ex. B at 43:9-43:11.)  He has never witnessed a perc spill onto asphalt

*USF&G, et al., v. Soco West, Inc.*
**Defendants' Motion** *in Limine* **to Preclude Certain Testimony of  Bruce E. Dale – Page 6**
Doc# 3114001\1

pavement.  (Id. at 40:23-43:8.)[2]  The only experiences Dale has with perc and asphalt are the several occasions he has submerged small chunks of asphalt of unknown composition into mason jars containing perc in his garage.  (Id.; see also Video Demonstration offered by Dale, filed conventionally [Dkt. 412] .)

To compensate for his lack of first-hand knowledge or experience with perc spills on asphalt pavement, Dale purports to base his opinion on a mathematical calculation.  (Ex. B at 13:6-15:5.)  Dale prefaces his opinion of "substantial" spreading by referring to the results of that calculation, stating that a spill of 250 gallons of perc would "spread to a circle about 48 feet in diameter" and a spill of 1,000 gallons of perc "would spread to encompass a circle about 97 feet in diameter."  (Ex. A at 2, Opinion 2(a).)[3]

But Dale's spread calculation assumes certain facts and conditions that indisputably did not exist at the Dyce site in the mid-1970s.  His calculation assumes a spill occurring on a perfectly level surface, static conditions, and that the spill of 250 or 1,000 gallons of perc somehow all hit the ground instantaneously. (See Ex. B at 60:14-61:16; Ex. C at 2004-0001.)

---

[2] The only evidence of a perc spill on asphalt pavement that Dale has ever seen is a photograph taken by a friend following a release of approximately 10 gallons of perc at a dry-cleaning facility.  (Id.)  Those photographs were not listed on Dale's report and have not been produced in this litigation.

[3] Notably, the actual calculation Dale conducted is not included in his report. Dale's notes reflecting his calculation is attached hereto as Exhibit C.

*USF&G, et al., v. Soco West, Inc.*
**Defendants' Motion** *in Limine* **to Preclude Certain Testimony of  Bruce E. Dale – Page 7**
Doc# 3114001\1

The notion of 250 or 1,000 gallons of perc hitting the ground instantaneously is a physical impossibility.  And while there is some dispute as to the degree of the slope of the loading/unloading area surface, all of the evidence on that topic indicates that the surface of the area was sloped to shed rainwater away from the working area.  (See, e.g., Excerpts from Monte Naff trial testimony (attached hereto as Exhibit D) at 875:16-879:8.)  Indeed, Dale acknowledged that he believed the Dyce site loading/unloading area would have been sloped to shed water.  (Ex. B at 104:3-104:15)  And, although the entire thrust of Dale's opinion is the possible effect of a perc spill on asphalt pavement (see id. at 25:15-25:19), his calculation inexplicably assumes a spill on a different (i.e., concrete) surface with which perc does not interact.

When asked why he did not at least perform his spread calculation assuming an asphalt pavement surface – which is the subject of his entire opinion – Dale conceded:

> A.    There's not sufficient information to be able to calculate how far that would spill, that would spread.
>
> Q.    Is there sufficient information to approximate?
>
> A.    No, I don't believe so.

(Ex. B at 61:9-61:22.)  Despite this admission, Dale persisted in opining that the amount of spreading that would occur from the mid-1970's spill at issue in this

*USF&G, et al., v. Soco West, Inc.*
**Defendants' Motion *in Limine* to Preclude Certain Testimony of  Bruce E. Dale – Page 8**
Doc# 3114001\1

litigation would necessarily be "substantial" and quantified that as "tens of feet." (Id. at 61:23-61:24; 70:21-71:25; 86:2-87:8; 88:24-89:14.)

Dale conceded that the amount of spreading of a large perc spill would be subject to a variety of site-specific factors, including the nature of the release, the slope of the surface, the composition and nature of the surface, wind speed, temperature, velocity and direction of discharge, etc.  (Ex. A at 2, Opinion 2(a); Ex. B at 70:3-70:20, 72:6-72:14).  Dale acknowledged that without accounting for all of the variables he could not tell the direction of any spreading that might occur (Ex. B at 86:9-87:25, 89:15-89:17), whether the spill would spread "tens of feet" in every direction (id. at 77:10-78:3, 80:5-82:3), what the minimum surface area of asphalt pavement covered by the spill would be (id. at 78:5-78:13), or how much of the spill would have simply flowed off of any asphalt pavement (id. at 89:18-89:25, 90:10-91:2.)  Indeed, when asked to opine as to the nature of the spreading assuming certain variables that might have existed at the Dyce site at the time of the asserted spill, Dale's repeated mantra was that "[t]here are far too many variables to be able to give" any such an estimate or approximation.  (Id. at 73:25-74:18; 77:10-78:13; 82:16-83:3.)

That is precisely the problem with Dale's opinion.  Dale proposes to testify as to the necessary physical impacts of the spill at issue to a reasonable degree of scientific certainty.  But his opinion that any spreading of the spill on asphalt

*USF&G, et al., v. Soco West, Inc.*
**Defendants' Motion *in Limine* to Preclude Certain Testimony of  Bruce E. Dale – Page 9**
Doc# 3114001\1

pavement would necessarily be "substantial"/"tens of feet" is unsupported by any reliable scientific methodology. The sole basis for Dale's opinion is a calculation assuming certain conditions that did not exist at the Dyce site in the mid-1970s. Dale makes no effort to ascertain or estimate how much any of the "real-world" conditions that actually existed at the Dyce site might affect the amount of spreading that would, in fact, occur as a result of the spill asserted by Soco in this action.

The paucity of Dale's basis for his opinion is confirmed by the concessions of the Insurers' own counsel at Dale's deposition. Continental's counsel offered, "[Dale's] calculations don't refer to this hypothetical situation, we all agree with that." (Ex. B at 88:17-88:18). USF&G's counsel was even more emphatic:

> [Dale] took a sterile condition and did a measurement. I mean, and you keep – you're improperly juxtaposing in an argumentative way a calculation made in a sterile or neutral condition to give an order of magnitude and trying to say that's the spill in your case. … His calculation does not – is not your hypothetical spill. It's what it says it is."

(Id. at 83:22-84:7). The Insurers' counsels' speaking objections exemplify the fundamental shortcoming in Dale's opinion – his calculation is not reflective of what existed at the Dyce site at the time of Soco's asserted spill.

Yesterday, on the eve of the stipulated motion deadline – November 3, 2009 –the Insurers served Soco with supplemental expert reports of Dale as well as

*USF&G, et al., v. Soco West, Inc.*
**Defendants' Motion** *in Limine* **to Preclude Certain Testimony of Bruce E. Dale – Page 10**
Doc# 3114001\1

supplemental reports of two of their other proffered experts, Kristen Stout and

Peter Shanahan.  Dale's revised report opines that certain additional opinions

asserted by Stout, a photogramatrist, as to the slope of the loading/unloading area

in the 1970s supports his testimony as to the amount of spreading that would occur.

Having just received Stout's and Dale's revised reports the day before the motion

deadline, Soco and its counsel's experts have not had the opportunity to

substantively review their new opinions and exhibits.[4]  Notably, however, Ms.

Stout's new opinions seem to assert that the loading/unloading area of the Dyce

facility in 1975 was <u>not</u> the level, concrete surface assumed by Dale in his

calculations.

Dale's sterile-condition spread calculation – the only scientific basis he has

provided for his opinion of "substantial"/"tens of feet" spreading – cannot be

juxtaposed onto the conditions existing at the Dyce site at the time of the mid-

1970s perc spill at issue in this litigation.  Simply put, there is no "fit" between

Dale's calculation and the facts of this case, and Dale's opinion as to the degree of

spreading is precisely the type of "bald assurance of validity" by a scientist that the

<u>Daubert</u> standards are intended to exclude.  <u>See</u> <u>Daubert</u>, 43 F.3d at 1316; <u>Grace</u>,

455 F.Supp.2d at 1187.

---

[4]  Because the supplemental reports of Stout, Dale and Shanahan were not served
within Court-ordered deadlines and were delivered to Soco on the day before the
motion deadline, Soco reserves the right to bring motions *in limine* regarding those
supplemental opinions.

*USF&G, et al., v. Soco West, Inc.*
**Defendants' Motion** *in Limine* **to Preclude Certain Testimony of  Bruce E. Dale – Page 11**
Doc# 3114001\1

B.    **Dale's Opinion that the Asphalt Pavement Would Necessarily Remain a "Sticky" "Tarry Mass" for Days Is Not Based on Reliable Scientific Methodology.**

In his report, Dale also opines that "[w]hen perc dissolves asphalt, the resulting mixture will remain as a tarry mass for a long period of time." (Ex. A at 2, Opinion 2(g).)  At his deposition, Dale explained that, in part, this meant the asphalt pavement would remain "sticky" for at least a day.  (Ex. B at 108:20-112:2.)  Dale's opinion is not based on any reliable scientific methodology.

Dale admitted he has done no calculations that would serve as the basis for his opinion.  The only basis for his estimation of time was the video demonstration he conducted in connection with his report.  (Ex. B at 112:3-113:13; see also id. 12:16-13:5.)  That demonstration lacks any semblance of scientific method.

Dale's demonstration did not involve pouring any amount of perc onto asphalt pavement and recording the physical impact to that pavement.  Rather, the demonstration involved placing two small chunks of asphalt pavement into mason jars and then submerging those chunks of asphalt in perc (or perc and water) on a card table in Dale's garage.  (See Ex. B at 137:12-138:2, 138:22-139:12; see also Dkt. 412.)  The purported purpose of the demonstration was to show that perc that comes into contact with asphalt will turn dark and that perc containing dissolved asphalt may leave residue on surfaces it came into contact with.  (Ex. B at 132:17-132:23.)

*USF&G, et al., v. Soco West, Inc.*
**Defendants' Motion** *in Limine* **to Preclude Certain Testimony of  Bruce E. Dale – Page 12**
Doc# 3114001\1

Dale concedes his video does not demonstrate his opinion of a "tarry mass" and does not show what the chunks of asphalt pavement looked like as a result of coming into contact with perc.  (Ex. B at 132:13-132:23; 142:18-144:1, 152:1-152:21.)  Yet at his deposition, Dale asserted that following the video-taped portion of the demonstration, he let the two small asphalt pavement chunks sit submerged in the jars of perc for several hours until the asphalt portion of the pavement was completely dissolved.  (Id. 138:22-139:12.)  He stated that he then poured the perc/asphalt solution into a baking dish containing some dirt, gravel, and pieces of concrete he had collected, and allowed that mixture to sit in his garage.  (Id. at 144:2-147:20.)  Dale alleges that the resulting mixture was sticky for "about 10 days."  (Id. at 147:16-147:20.)

Tellingly, and in contravention of the requirements of Rule 26, none of Dale's purported observations as to the "tarry mass" that supposedly resulted from his demonstration are depicted in his video or disclosed in his report.  And even if Dale's unsubstantiated allegations as to the length of time the perc, soil, asphalt mixture remained "sticky" were true, his methodology is not scientifically valid and the results are not applicable to this case.

The "experiment" that serves as the sole basis for Dale's opinion meets none of the Daubert indicia of reliability: it is not capable of being tested or subjected to peer review and publication and it lacks any controls or standards that would make

*USF&G, et al., v. Soco West, Inc.*
**Defendants' Motion *in Limine* to Preclude Certain Testimony of  Bruce E. Dale – Page 13**
Doc# 3114001\1

it generally accepted within any scientific community.  See Daubert 509 U.S. at 592-594.  Dale exercised no scientific methodology or controls whatsoever to ensure his supposed observations as to the "tarry mass" are accurate or in any way indicative of the conditions that might have resulted from Soco's asserted spill.  He did not weigh or measure the perc or the asphalt chunks used in the demonstration. (Ex. B at 138:22-138:25; 140:17-140:23).  He has no idea of the makeup or age of the asphalt.  (Id. at 137:12-138:2.)  He made no records of his methodology or his purported observations regarding the "tarry mass" that supposedly sat in his garage (or at least has not produced any such records in this litigation).  Dale simply dissolved an unknown quantity of an unknown type of asphalt pavement into an unknown amount of perc in mason jars over the course of several hours, allegedly dumped that solution into some dirt and gravel in a baking dish, and allegedly let the mixture sit in his garage for several days.  (138:25-139:12, 146:9-147:20.) That alleged but hidden "experiment" in no way supports any conclusions as to what physical impacts may have resulted from the perc spill asserted by Soco in this action.

Dale's opinion as to the length of time that an asphalt-pavement surface would remain a "sticky" "tarry mass" is pure speculation, unsupported by any scientifically reliable or defensible methodology.

**C.    Dale's Opinion That The Odor from a Large Perc Spill Would Be Detectible Over a "Large" Area Is Based on Assumptions Having No**

*USF&G, et al., v. Soco West, Inc.*
**Defendants' Motion** *in Limine* **to Preclude Certain Testimony of  Bruce E. Dale – Page 14**
Doc# 3114001\1

**Connection to the Facts of this Case and Is Not Based on Reliable Scientific Methodology.**

In his report, Dale opines that the "smell caused by a release of 250-1,000 gallons of perc would have been noticeable over a large area." (Ex. A at 3, Opinion 2(h).) At his deposition, Dale testified that the basis for this opinion was an additional mathematical calculation. (Ex. A at 114:16-115:15, 117:10-119:2.) Again, the calculations he performed are not scientifically reliable and have no applicability to the facts of this case.

Dale's estimate as to the area over which Soco's asserted perc spill would be noticeable is based on a calculation of the size of a mythical uniform hemisphere that could be filled with an average of 50 parts-per-million of perc assuming 500 gallons of perc evaporated instantaneously under sterile atmospheric conditions – *i.e.,* no wind or atmospheric variability – at the center of the hemisphere. (Ex. A at 114:16-115:15, 117:10-119:6; see also excerpts from trial testimony of Bruce Dale (attached hereto as Exhibit E) at 1410:9-1412:15, 1429:5-1429:24.) Dale determined that a release of perc vapors under such conditions would fill a mythical hemisphere 1,000 feet in diameter. (Id.) Again, Dale's calculation is not a scientifically valid or defensible means to predict the area that might be affected by vapors emitted from a chemical spill under any real world conditions.

The science of determining how chemical vapors might diffuse in the air following a release is known as atmospheric dispersion modeling or air modeling.

*USF&G, et al., v. Soco West, Inc.*
**Defendants' Motion** *in Limine* **to Preclude Certain Testimony of Bruce E. Dale – Page 15**
Doc# 3114001\1

Dale admits he performed no air modeling to support his opinion as to the extent of the odor that would result from Soco's asserted perc spill.  (Ex. B at 131:18-131:20.)  Nor does Dale cite any authority to suggest his rudimentary calculation is a scientifically valid or reliable means of predicting the distance or duration of any odor resulting from a chemical spill.  In short, Dale offers no indication that his calculation meets any of the <u>Daubert</u> criteria of reliability.  <u>See</u> <u>Daubert</u> 509 U.S. at 592-594.

The unreliability and illegitimacy of Dale's calculation is borne out by the numerous internal inconsistencies in Dale's calculation.  Dale acknowledged that the area the purported odor would cover and the length of time it would persist are, to a large extent, dependent on the evaporation rate of the spill and the rate the vaporized perc molecules will diffuse into the atmosphere after they evaporate. (Ex. B at 126:2-126:13, 130:4-130:22.)

For his odor calculation – presumably to maximize the area of his mythical hemisphere – Dale assumes an entire 500-gallon perc spill evaporated instantaneously.  (Ex. B at 119:4-119:6.)  But in a separate calculation to estimate the rate of evaporation of a 250-gallon perc spill, Dale concluded that it would take nearly 20 minutes for that smaller spill to evaporate off level concrete at 77 degrees.  And at his deposition, Dale conceded that, under the conditions asserted by Soco, the spill at issue in this case would have taken at least an hour to

*USF&G, et al., v. Soco West, Inc.*
**Defendants' Motion** *in Limine* **to Preclude Certain Testimony of  Bruce E. Dale – Page 16**
Doc# 3114001\1

evaporate.  (Id. 128:17-129:17.)  Dale also acknowledged that the more slowly the spill evaporated, the less of an area the odor would cover.  (Id. at 119:7-119:18.) Still, the only calculation Dale performed in support of his odor conclusions assumes an evaporation rate that even Dale agrees is inconsistent with the spill at issue.

Similarly, Dale conceded that the distance and time over which the odor of a perc spill would be detectible were dependant on wind speed and direction.  (Ex. B at 119:19-119:25, 126:2-126:13.)  Again, this estimate is not based on any conditions that might have existed in the real world.  Indeed, in his separate evaporation calculation Dale assumed a wind speed of 9.1 m.p.h.  (Ex. C at 2004-0003.)  Yet, to maximize the size of his mythical hemisphere, Dale's odor calculation assumes no atmospheric variability and a wind speed of zero m.p.h. (See Ex. A at 120:5-120:24.)

The shifting calculation that serves as the supposed "scientific" basis for Dale's opinion regarding odor over a "large" area dos not comport with sound scientific methodology and is not applicable the "disputed material facts" at issue in this case.  Dale's opinion should therefore be stricken under Daubert.

## CONCLUSION

For the above reasons, Soco requests that the Court order that Dale be prohibited from testifying as to the following opinions at trial:

*USF&G, et al., v. Soco West, Inc.*
**Defendants' Motion** *in Limine* **to Preclude Certain Testimony of  Bruce E. Dale – Page 17**
Doc# 3114001\1

1.     The amount of spreading of perc that would occur from the 250 to 1,000 gallon perc spill asserted by Soco in this litigation.

2.     The length of time asphalt pavement would remain a "sticky" "tarry mass" if the 250 to 1,000 gallon spill asserted by Soco had occurred on an asphalt-paved surface.

3.     The area and length of time over which someone would have been able to detect the odor from the 250 to 1,000 gallon perc spill asserted by Soco in this action.

DATED:  11/3/2009                BY:   /s/ Christopher L. Lynch
                                       Christopher L. Lynch
                                       LINDQUIST & VENNUM P.L.L.P.
                                       *Attorneys for Soco West, Inc.*

*USF&G, et al., v. Soco West, Inc.*
**Defendants' Motion** *in Limine* **to Preclude Certain Testimony of  Bruce E. Dale – Page 18**
Doc# 3114001\1

## CERTIFICATE OF SERVICE
### L.R. 5.2(b)

*****

I hereby certify that, on November 3, 2009, a copy of the foregoing document was served on the following persons by the following means:

| | |
|---|---|
| <u>1, 2, 3, 6</u> | CM/ECF |
| _____ | Hand Delivery |
| <u>4, 5, 7</u> | U.S. Mail |
| _____ | Overnight Delivery Service |
| _____ | Fax |
| _____ | E-Mail |

1.    Clerk, U.S. District Court

2.    Robert C. Johnson, Esq.
      John I. Grossbart, Esq.
      Mary B. Anderson, Esq.
      Sonnenschein Nath & Rosenthal
      8000 Sears Tower
      233 South Wacker Drive
      Chicago, Illinois  60606

3.    Marshal L. Mickelson, Esq.
      Corette Pohlman & Kebe
      129 West Park Street
      PO Box 509
      Butte, MT  59703

4.    M. Keith Moskowitz, Esq.
      Sonnenschein Nath & Rosenthal
      8000 Sears Tower
      233 South Wacker Drive
      Chicago, Illinois  60606

*Attorneys for Plaintiff United States Fidelity & Guaranty Company*

*USF&G, et al., v. Soco West, Inc.*
**Defendants' Motion** *in Limine* **to Preclude Certain Testimony of  Bruce E. Dale – Page 19**
Doc# 3114001\1

5.   Brian W. Walsh, Esq.
     Colliau Elenius Murphy Carluccio Keener & Morrow
     Foundry Square II
     405 Howard Street, Suite 600
     San Francisco, CA  94105

     *Attorneys for Continental Insurance Company*

6.   Maxon R. Davis, Esq.
     Dennis J. Tighe, Esq.
     Davis, Hatley, Haffeman & Tighe, PC
     Milwaukee Station
     3rd Floor
     100 River Drive North
     Great Falls, MT  59405

7.   Steven M. Crane
     Berkes Crane Robinson & Seal
     515 South Figueroa Street
     Suite 1500
     Los Angeles, CA  90017

     *Attorneys for Continental Insurance Company*

                                        /s/ Christopher L. Lynch
                                        Christopher L. Lynch
                                        Lindquist & Vennum P.L.L.P.
                                        *Attorney for Soco West, Inc.*

*USF&G, et al., v. Soco West, Inc.*
**Defendants' Motion** *in Limine* **to Preclude Certain Testimony of  Bruce E. Dale – Page 20**
Doc# 3114001\1

## CERTIFICATE OF COMPLIANCE PURSUANT TO UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MONTANA L.R. 7.1(d)(2)

The undersigned, and attorney, hereby certifies that the foregoing Motion

submitted by Soco West, Inc. complies with the word limits of L.R. 7.1(d)(2).  The

memorandum contains 3992 total words (excluding caption and certificates of

service and compliance).  In determining this total, the under signed has relied on

the word count feature of the software used to prepare the Motion (Microsoft

Word).

November 3, 2009

/s/ Christopher L. Lynch
Christopher L. Lynch
Lindquist & Vennum, P.L.L.P.
*Attorney for Soco West, Inc.*

*USF&G, et al., v. Soco West, Inc.*
**Defendants' Motion** *in Limine* **to Preclude Certain Testimony of  Bruce E. Dale – Page 21**
Doc# 3114001\1