JoAnn Corson Bacheller
Registered Diplomate Reporter
Certified Realtime Reporter
P. O. Box 1424
Billings, Montana 59103-1424
406/247-4477 office
406/247-7008 fax
joann_bacheller@mtd.uscourts.gov

United States Court Reporter

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MONTANA
### BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES FIDELITY AND GUARANTY COMPANY, ) ) ) | |
| Plaintiff,) | Nos. CV-04-29-BLG-RFC CV-08-29-BLG-RFC |
| and ) | |
| ) | **VOLUME 1** |
| THE CONTINENTAL INSURANCE ) COMPANY, ) | **TRANSCRIPT OF JURY TRIAL** |
| Plaintiff Intervenor,) | |
| vs. ) ) | |
| SOCO WEST, INC., ) | |
| Defendant.) | |

**BEFORE THE HONORABLE RICHARD F. CEBULL**
**CHIEF UNITED STATES DISTRICT COURT JUDGE**
**FOR THE DISTRICT OF MONTANA**

James F. Battin United States Courthouse
316 North 26th Street
Billings, Montana 59101
Monday, March 8, 2010
08:37:41 to 16:48:56

Proceedings recorded by machine shorthand
Transcript produced by computer-assisted transcription

1                        **APPEARANCES**

2   For the Plaintiff:          MR. ROBERT C. JOHNSON
                                MR. JOHN I. GROSSBART
3                               MS. WENDY N. ENERSON
                                Attorneys at Law
4                               8000 Sears Tower
                                233 South Wacker Drive
5                               Chicago, Illinois 60606

6                               MR. MARSHAL L. MICKELSON
                                Attorney at Law
7                               P. O. Box 509
                                Butte, Montana 59703
8
    For the Plaintiff           MR. BRIAN W. WALSH
9   Intervenor:                 Attorney at Law
                                Suite 330
10                              555 Mission Street
                                San Francisco, California 94105
11
                                MR. STEVEN M. CRANE
12                              Attorney at Law
                                Suite 1500
13                              515 South Figueroa Street
                                Los Angeles, California 90017
14
                                MR. MAXON R. DAVIS
15                              Attorney at Law
                                P. O. Box 2103
16                              Great Falls, Montana 59403

17  For the Defendant:          MR. CHRISTOPHER L. LYNCH
                                MR. PAUL A. BANKER
18                              Attorneys at Law
                                4200 IDS Center
19                              80 South Eighth Street
                                Minneapolis, Minnesota 55402
20
                                MR. LAWRENCE B. COZZENS
21                              Attorney at Law
                                Suite 104
22                              1643 24th Street West
                                Billings, Montana 59102
23
    Also present for            MS. JULIANNE ROHM
24  graphics display:           MR. NEIL BAILEY

25

                                2

1                                **CONTENTS**

                                                          **Volume/Page**
2

**Volume 1 Proceedings** ................................  1/   16
*Voir Dire* Examination
     By the Court .....................................  1/   43
     By Mr. Cozzens ...................................  1/  101
     By Mr. Mickelson .................................  1/  114
     By Mr. Davis .....................................  1/  131
Selection of Jury ....................................  1/  147
Instructions to Jury .................................  1/  150
Opening Statement by Mr. Cozzens ....................  1/  160
Opening Statement by Mr. Johnson ....................  1/  185
Opening Statement by Mr. Davis ......................  1/  200
Volume 1 Reporter's Certificate .....................  1/  251

**Volume 2 Proceedings** ................................  2/  267
Volume 2 Reporter's Certificate .....................  2/  554

**Volume 3 Proceedings** ................................  3/  570
Volume 3 Reporter's Certificate .....................  3/  829

**Volume 4 Proceedings** ................................  4/  845
Volume 4 Reporter's Certificate .....................  4/ 1101

**Volume 5 Proceedings** ................................  5/ 1117
Defendant Rests ......................................  5/ 1334
Plaintiffs' Motion for Judgment .....................  5/ 1334
Order of Court Reserved ..............................  5/ 1337
Volume 5 Reporter's Certificate .....................  5/ 1339

**Volume 6 Proceedings** ................................  6/ 1355
Volume 6 Reporter's Certificate .....................  6/ 1610

**Volume 7 Proceedings** ................................  7/ 1626
Order of Court re: Plaintiffs' Motion for Judgment ..  7/ 1870
Volume 7 Reporter's Certificate .....................  7/ 1879

**Volume 8 Proceedings** ................................  8/ 1895
Plaintiffs Rest ......................................  8/ 1904
Defendant's Motion for Judgment .....................  8/ 2010
Order of Court re: Defendant's Motion for Judgment ..  8/ 2018
Plaintiffs' Motion for Judgment Renewed .............  8/ 2018
Order of Court re: Plaintiffs' Motion for Judgment ..  8/ 2018
Settlement of Instructions ..........................  8/ 2019
Volume 8 Reporter's Certificate .....................  8/ 2072

**CONTENTS  (Continued)**

Volume/Page

**Volume 9 Proceedings** ................................. 9/ 2088
Instructions to Jury ................................. 9/ 2092
Closing Argument by Mr. Banker ...................... 9/ 2105
Closing Argument by Mr. Johnson ..................... 9/ 2137
Closing Argument by Mr. Davis ....................... 9/ 2159
Rebuttal Closing Argument by Mr. Banker ............. 9/ 2171
Jury Verdict ........................................ 9/ 2186
Volume 9 Reporter's Certificate ..................... 9/ 2190

        REPORTER'S NOTE:  "Uh-huh" and "Um-hmm" indicate
affirmative responses.  "Huh-uh" and "Hm-umm" indicate
negative responses.

1                                    **WITNESSES**

2   **For the Defendant:**                                    **Volume/Page**

3   Mr. Dennis Allen St. George
        Direct Examination by Mr. Banker ................ 1/  211
4       Cross-Examination by Mr. Johnson ............... 1/  239
        Cross-Examination by Mr. Davis ................. 1/  248
5       Redirect Examination by Mr. Banker ............. 1/  249

6   Mr. James Sullivan
        Direct Examination by Mr. Lynch ................ 2/  276
7       Cross-Examination by Mr. Grossbart ............. 2/  316
        Redirect Examination by Mr. Lynch .............. 2/  358
8
    Mr. Richard Allen Colver
9       Direct Examination by Mr. Cozzens .............. 2/  367
        Cross-Examination by Mr. Johnson ............... 2/  403
10      Redirect Examination by Mr. Cozzens ............ 2/  484

11  Mr. Rodney Hallsten
        Direct Examination by Mr. Banker ............... 2/  490
12      Cross-Examination by Mr. Grossbart ............. 2/  514
        Cross-Examination by Mr. Davis ................. 2/  551
13      Redirect Examination by Mr. Banker ............. 2/  552

14  Mr. Monte I. Naff
        Direct Examination by Mr. Cozzens .............. 3/  570
15      Cross-Examination by Mr. Johnson ............... 3/  610
        Cross-Examination by Mr. Davis ................. 3/  702
16      Redirect Examination by Mr. Cozzens ............ 3/  718

17  Mr. Charles Bender (deposition)
        Examination .................................... 3/  738
18
    Mr. Desmond Slater (deposition)
19      Examination .................................... 3/  763

20  Mr. Larry Nelson (deposition)
        Examination .................................... 3/  802
21
    Mr. Marvin Johnson
22      Direct Examination by Mr. Cozzens .............. 4/  846
        Cross-Examination by Mr. Johnson ............... 4/  863
23
    Mr. Douglas Johnston
24      Direct Examination by Mr. Banker ............... 4/  867
        Cross-Examination by Mr. Grossbart ............. 4/  898
25      Cross-Examination by Mr Davis .................. 4/  921
        Redirect Examination by Mr. Banker ............. 4/  924

1                            **WITNESSES (Continued)**

2    **For the Defendant:**                                  Volume/Page

3    Mr. David Warne
          Direct Examination by Mr. Banker ................  4/  925
4         Cross-Examination by Mr. Davis ..................  4/  953
          Redirect Examination by Mr. Banker ..............  4/  987
5
     Ms. Suzanne Miller
6         Direct Examination by Mr. Cozzens ...............  4/  992
          Cross-Examination by Mr. Crane ..................  4/ 1030
7         Redirect Examination by Mr. Cozzens .............  4/ 1067

8    Robert Leslie Powell, Ph.D.
          Direct Examination by Mr. Lynch .................  4/ 1068
9         Direct Examination (Continued) by Mr. Lynch .....  5/ 1118
          Cross-Examination by Mr. Grossbart ..............  5/ 1213
10        Cross-Examination by Mr. Davis ..................  5/ 1301
          Redirect Examination by Mr. Lynch ...............  5/ 1319
11
     **For the Plaintiffs:**
12
     Mr. Marvin Johnson (deposition)
13        Examination ....................................  6/ 1356

14   Mr. Ken Kjos (deposition)
          Examination ....................................  6/ 1471
15
     Ms. Kristen Kohler Stout
16        Direct Examination by Mr. Johnson ...............  6/ 1537
          Cross-Examination by Mr. Lynch ..................  6/ 1593
17        Redirect Examination by Mr. Johnson .............  6/ 1607

18   Peter Shanahan, Ph.D.
          Direct Examination by Mr. Grossbart .............  7/ 1626
19        Cross-Examination by Mr. Lynch ..................  7/ 1704
          Redirect Examination by Mr. Grossbart ...........  7/ 1721
20
     Mr. Richard Brill (deposition)
21        Examination ....................................  7/ 1728

22   Yaron M. Sternberg, Ph.D.
          Direct Examination by Mr. Crane .................  7/ 1774
23        Cross-Examination by Mr. Lynch ..................  7/ 1805
          Redirect Examination by Crane ...................  7/ 1826
24

25

                                      6

1                          **WITNESSES (Continued)**

2      **For the Plaintiffs:**                            **Volume/Page**

3      Bruce Edwin Dale, Ph.D.

         Direct Examination by Mr. Davis ................  7/ 1831
4        Cross-Examination by Mr. Lynch .................  7/ 1862
         Redirect Examination by Mr. Davis ..............  7/ 1866
5

6      **For the Defendant in Rebuttal:**

7      Wayne Martin Grip

         Direct Examination by Mr. Lynch ................  8/ 1905
         Cross-Examination by Mr. Johnson ...............  8/ 1954
8        Redirect Examination by Mr. Lynch ..............  8/ 1995
9      Robert Leslie Powell, Ph.D.

         Direct Examination by Mr. Lynch ................  8/ 1999
10       Cross-Examination by Mr. Crane .................  8/ 2005
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                **EXHIBITS**

2     **Exhibit No.**                              **Received Volume/Page**

3     5      09/05/89 Letter to Hol from Johnson ........ FPT/   56

4     30     09/11/85 Memo to Managers of All Plants from
             Q. Dyce  ................................. FPT/   56
5
      72     11/04/75 Daily sales report to Bender,
6            Hallsten, Don, Grady, and Naff from Q. Dyce.  2/  536

7     90     05/29/86 Sales report ....................  3/  697

8     143    02/26/82 Continental General Liability
             Survey Report form ........................ FPT/   23
9
      231    06/15/00 Letter to USF&G from Whalen ....... FPT/   24
10
      234    09/25/00 Letter to Downing from
11           Mielenhausen ............................. FPT/   24

12    352    04/08/74 Memo to Bender from Whaley ........ FPT/   28

13    353    09/27/72 Memo to Murray from Q. Dyce ....... FPT/   57

14    359    09/11/85 Memo from Q. Dyce ............... FPT/   28

15    362    09/13/89 Memo to Q. Dyce from Naff ......  FPT/ 28, 57

16    366    Warning label for perchloroethylene and
             instructions on empty container handling
17           and reuse ................................. FPT/   57

18    382    11/05/92 Montana Department of Health Field
             Investigation Report ......................  4/  975
19
      383    07/23/00 Letter to Rowe from Miller ........ FPT/   29
20
      429    06/09/98 E-mail between Warne and Naff .....  3/  668
21
      433    12/16/99 Letter to G. Staarjes from USEPA .. FPT/   58
22
      436    01/06/99 E-mail between Miller and Warne ... FPT/   58
23
      442    08/06/96-08/09/00 Containment pit runoff
24           water sampling ............................  4/ 1059

25    445    03/16/73 USF&G Advertising ................ FPT/   30

1                          **EXHIBITS (Continued)**

2      **Exhibit No.**                              **Received Volume/Page**

3      499     11/04/75 Aerial photograph ................. FPT/   31

4      505     02/23/82 Continental General Liability Survey
               Report .................................... FPT/   31

5
       784     08/21/95 Handwritten notes ................. FPT/   58
6
       785     08/18/95 Memo to Naff, Hilton, Biondo,
7              Gilbert, Akers and Liebling from Simko ..... FPT/   58

8      856A    09/25/89 Versar Inc. Environmental Risk
               Assessment Survey ...................... FPT/ 32, 58
9
       859     07/24/89 Draft letter to Hol from Johnson .. FPT/   59
10
       1104    09/08/05 Letter to O'Reilly from Terp ...... FPT/   32
11
       2532    11/1975 Aerial photograph .................. FPT/   32
12
       2533    11/04/75 Aerial photograph ................. FPT/   32
13
       2545    12/30/05 Bulk Handling and Properties of PPG
14             Chlorinated Solvents:  Perchloroethylene,
               Trichloroethylene, Tri-Ethane .............. FPT/   59
15
       2558    04/07/04 Letter to O'Reily from Sullivan ...   2/  293
16
       3004    08/23/00 Letter to Rowe from Miller ........ FPT/   32
17
       3006    08/27/72 Aerial photograph ................. FPT/   32
18
       3015    07/1995 HCI Dyce site plan ................. FPT/   32
19
       3017    01/1983 Dyce personnel manual ............. FPT/   33
20
       3024    10/29/85 Company policy re: hoses .........   4/  888
21
       3025    07/02/87 Memo to Dick, Russ, Bob, Kevin,
22             Ivan, John and File from Roger ............ FPT/   36

23     3029    1986-2001 Dyce manager's monthly report ....   8/ 1896

24     3043    11/29/99 Lockheed Martin Final Report ......   1/   37

25

1                              **EXHIBITS (Continued)**

2      **Exhibit No.**                                   **Received Volume/Page**

3      3044    12/16/99 USEPA First Request for Information
               Pursuant to 104(e) ........................ FPT/    37
4
       3045    03/01/00 Dyce Response to First 104(e)
5              Request .................................. FPT/    37

6      3047    08/23/00 Letter to Naff from Risner &
               Kercher .................................. FPT/    37
7
       3048    08/23/00 Dyce Supplemental Response to
8              USEPA's Second 104(e) Request ............. FPT/    37

9      3049    10/03/00 Maxim Technologies Inc. Site
               Investigation Report ...................... FPT/    38
10
       3050    06/2003 Tetra Tech EM Inc. Remedial
11             Investigation Report for MDEQ ............. FPT/    39

12     3051    07/07/04 Tetra Tech Final Feasibility Study
               Report for MDEQ ........................... FPT/    39
13
       3052    11/2004 MDEQ/USEPA Proposed Remedial Action
14             Plan for Lockwood Groundwater Solvent
               Plume Site ................................ FPT/    39
15
       3058    12/2003 Tetra Tech Addendum 01 to the Final
16             Remedial Investigation Report for MDEQ ..... FPT/    39

17     3059    08/2005 MDEQ/USEPA Record of Decision for
               Lockwood Solvent Groundwater Plume Site .... FPT/    39
18
       3060    02/28/06 Letter to Terp from Risner &
19             Kercher .................................. FPT/    40

20     3102    09/16/85 Memo to Colver ................... FPT/    41

21     3115    11/25/92 Letter and permit application to
               Lincoln from Diede ........................ FPT/    42
22
       3174    06/09/00 Letter to Webster from Miller ..... FPT/    43
23
       3175    06/12/00 Letter to Miller from Webster ..... FPT/    43
24
       3178    07/25/00 Fax to Stevenson from Miller ...... FPT/    43
25

1                         **EXHIBITS (Continued)**

2     **Exhibit No.**                          **Received Volume/Page**

3     3191    11/13/03 ATC Associates Inc. Soil and
              Groundwater Data Remedial Design Investigation
4             Report ................................... FPT/    43

5     3200    Compilation:  USF&G Policy No. SMP326188 ... FPT/    44

6     3201    Compilation:  USF&G Policy No. 1CC599480 ... FPT/    44

7     3202    Compilation:  USF&G Policy No. SMP406309 ... FPT/    44

8     3203    Compilation:  USF&G Policy No. 1CC944574 ... FPT/    44

9     3204    Compilation:  USF&G Policy No. CEP64280 .... FPT/    44

10    3205    Compilation:  USF&G Policy No. 1CC945882 ... FPT/    44

11    3206    Compilation:  USF&G Policy No. CEP64348 .... FPT/    44

12    3207    Compilation:  USF&G Policy No. SMP535107 ... FPT/    44

13    3208    Compilation:  USF&G Policy No. SMP576121 ... FPT/    44

14    3209    Compilation:  USF&G Policy No. 1CCA31253 ... FPT/    44

15    3210    Compilation:  USF&G Policy No. CEP84958 .... FPT/    44

16    3211    Compilation:  USF&G Policy No. SMP594660 ... FPT/    44

17    3213    Compilation:  USF&G Policy No. CEP104806 ... FPT/    44

18    3214    Compilation:  USF&G Policy No. SMP654057 ... FPT/    44

19    3216    Compilation:  USF&G Policy No. CEP114516 ... FPT/    44

20    3217    Compilation:  USF&G Policy No. SMP772986 ... FPT/    44

21    3219    Compilation:  USF&G Policy No. CEP114641 ... FPT/    44

22    3220    03/03/06 Stipulation as to Existence and
              Content of USF&G Insurance Policies ........ FPT/    44
23
      3287    02/28/05 Letter to Terp from Risner &
24            Kercher .................................... FPT/    48

25

1                        **EXHIBITS (Continued)**

2    **Exhibit No.**                        **Received Volume/Page**

3    3321    03/03/06 Stipulation as to Existence and
             Content of Continental Insurance Policies
4            and Exhibits ............................... FPT/   49

5    3363    09/29/89 Agreement to Purchase Real
             Property ..................................   8/ 1903
6
     3407    1971 Chemical Safety Data Sheet for
7            perchloroethylene ...................... FPT/ 49, 61

8    3408    1972 Hooker Chemical MSDS for
             trichloroethylene ........................ FPT/   49
9
     3410    1980 PPG manual .......................... FPT/   50
10
     3420    05/25/00 Second Request for Information
11           Pursuant to Section 104 of CERCLA for the
             Lockwood Solvent Site Billings .............   3/  676
12
     3433    1983 Dyce brochure ....................... FPT/   50
13
     3436    11/1979 Ledger sheet ......................   3/  622
14
     3438    04/1971 Perchloroethylene brochure ......  FPT/ 50, 61
15
     3471    08/05/85 Sales report .....................   3/  591
16
     3475    02/06/84 Dyce policies re: DOT ............ FPT/   50
17
     3476    06/02/79 Expense Report ...................   3/  585
18
     3483    Aerial photograph ........................ FPT/   51
19
     3484    Aerial photograph ........................ FPT/   51
20
     3485    Aerial photograph ........................ FPT/   51
21
     3486    Aerial photograph ........................ FPT/   51
22
     3487    Aerial photograph ........................ FPT/   51
23
     3488    Aerial photograph ........................ FPT/   51
24
     3490    1972 Aerial photograph ................... FPT/   51
25

1                          **EXHIBITS (Continued)**

2     **Exhibit No.**                        **Received Volume/Page**

3     3491    1981 Aerial photograph ..................... FPT/    51

4     3492    1987 Aerial photograph ..................... FPT/    51

5     3660    09/09/09 Dale photographs .................    2/   318

6     3674    Site photographs taken by Hargis ...........   8/  2040

7     3800    05/27/57 Aerial photograph ................. FPT/    52

8     3801    06/26/66 Aerial photograph ................. FPT/    52

9     3802    05/22/69 Aerial photograph ................. FPT/    52

10    3803    08/18/71 Aerial photograph ................. FPT/    52

11    3804    04/23/72 Aerial photograph ................. FPT/    52

12    3805    Circa 1973 Aerial photograph ............... FPT/    52

13    3806    06/18/74 Aerial photograph ................. FPT/    52

14    3807    11/04/75 Aerial photograph ................. FPT/    52

15    3808    06/23/77 Aerial photograph ................. FPT/    52

16    3809    09/06/77 Aerial photograph ................. FPT/    52

17    3810    05/03/79 Aerial photograph ................. FPT/    52

18    3811    05/14/79 Aerial photograph ................. FPT/    52

19    3812    07/31/79 Aerial photograph ................. FPT/    52

20    3813    03/13/81 Aerial photograph ................. FPT/    52

21    3814    06/02/81 Aerial photograph ................. FPT/    52

22    3815    08/24/81 Aerial photograph ................. FPT/    52

23    3816    05/27/83 Aerial photograph ................. FPT/    52

24    3817    07/27/83 Aerial photograph ................. FPT/    52

25    3818    04/30/87 Aerial photograph ................. FPT/    52

1                          **EXHIBITS (Continued)**

2    **Exhibit No.**                        **Received Volume/Page**

3    3826    08/08/05 Response to 06/24/05 CERCLA 104(e). FPT/    53

4    3827    02/14/05 Letter to Moskowitz from
             Mielenhausen ............................. FPT/    53
5
     3828    02/15/05 Letter to Walsh from Mielenhausen . FPT/    53
6
     3886    06/15/00 Letter to Continental from Whalen . FPT/    55
7
     3887    09/25/00 Letter to Giblin from Mielenhausen. FPT/    55
8
     3888    01/08/07 Second stipulation as to existence
9            and content of USF&G insurance policies .... FPT/    55

10   4027    Aerial photograph (D032604) ...............    4/   848

11   4032    10/10/00 Communication to Gilbert from
             Simko ......................................    3/   691
12
     4039    09/13/89 Memo to Q. Dyce from Hallsten .....    8/  1903
13
     4044    07/1976 Location Survey of Dyce site ....... FPT/    62
14
     4087    01/06/99 E-mail to Warne from Hallsten .....    2/   547
15
     4089    02/29/00 E-mail to Naff from Warne .........    4/  1066
16
     4143    Aerial photograph .........................    6/  1485
17
     4320    1980 Bulk Handling and Properties of PPG
18           Chlorinated Solvents ...................... FPT/    63

19   4400    01/14/05 Fax to LeCours from Sullivan ......    2/   335

20   4516    09/12/02 Letter to EPA from Sullivan .......    2/   354

21   4721    08/18/03 Fax to MDEQ from Sullivan .........    2/   308

22   4757    08/03/04 Letter to Sullivan from MDEQ ......    2/   313

23   4811    04/28/03 Letter to Ross from Sullivan ......    2/   342

24   4822    07/20/00 E-mail to Miller from Naff ........ FPT/    64

25

1                          **EXHIBITS (Continued)**

2    **Exhibit No.**                              **Received Volume/Page**

3    4831      Exhibit 5017 aerial photograph with Colver
               notations ...................................  2/   483
4
     4832      Exhibit 5019 aerial photograph with Colver
5              notations ...................................  2/   483

6    4833      Exhibit 5024 aerial photograph with Colver
               notations ...................................  2/   483
7
     4834      Exhibit 5028 aerial photograph with Colver
8              notations ...................................  2/   483

9    4835      04/30/86 General manager's monthly report ..  4/   899

10   5000-
     5064      Historical photographs .....................  2/   267
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1

2      (In chambers.)

3          THE COURT:  All right.  I'm looking -- I see we're

4   unable to arrive at a preliminary statement.  I hope that is

5   not indicative of how this case is going to go.

6          MR. MICKELSON:  I don't think so, Your Honor.

7          THE COURT:  It looks to me like Soco, in many

8   respects, followed what I read the last time.  Who prepared

9   this for Soco?

10         MR. COZZENS:  I did.

11         THE COURT:  Did you follow --

12         MR. COZZENS:  Yes.  Tried.  Some of it.

13         THE COURT:  Except on the four issues, five issues

14  that are at page 5.

15         MR. MICKELSON:  There's a few critical, I think,

16  critical things they left out and a few things they added that

17  are still in dispute or haven't been ruled on or weren't given

18  in the last trial.

19         THE COURT:  Tell me what that is.

20         MR. MICKELSON:  They left out the paragraph where

21  you say, "You don't need to worry about whether the cleanup is

22  going to be done."

23         MR. COZZENS:  Let me just say I don't mind that

24  being in there.

25         THE COURT:  I don't care whether you do or not.  I

1    already penciled it in.

2              MR. MICKELSON:  Okay.

3              MR. COZZENS:  That's fine.

4              THE COURT:  Wait a minute.  I have to make sure.

5              MR. MICKELSON:  We actually worked on a -- on one

6    last night which I did bring with us that has what we added

7    and what we didn't like of theirs.  But they also talk about,

8    Your Honor, the --

9              THE COURT:  Let's go back to the -- I mean, the

10   paragraph -- it says here that the agencies and Soco are

11   currently determining the most appropriate way to remedy the

12   groundwater damage.  Did I say something besides that?

13             MR. COZZENS:  Yes, Your Honor.

14             THE COURT:  All right.  Let me look to see where I

15   penned it in here.

16             I penciled in here on page 3 of Soco's statement,

17   "You will not determine whether the pollution should be

18   cleaned up.  It will be cleaned, regardless."

19             MR. MICKELSON:  And --

20             THE COURT:  Do you have the transcript?

21             MR. MICKELSON:  I do.  I was just looking to see --

22             MR. BANKER:  The paragraph that I read --

23             THE COURT:  Do you need me to hold it so you can see

24   it?

25             MR. MICKELSON:  No, Your Honor.

1          THE COURT:  We're all having to get longer arms,

2     aren't we, the older we get?

3          MR. BANKER:  I think the paragraph you read last

4     time said, "You're not going to decide whether the pollution

5     or contamination should be cleaned up.  That issue is of no

6     concern to you in this trial.  To the extent it is necessary,

7     the Lockwood solvent Superfund site, including Soco's

8     facility, will be cleaned up regardless of the outcome of this

9     case.  This should not affect your determination as to Soco's

10    or USF&G's contractual rights under the insurance policies."

11         MR. MICKELSON:  And that's the paragraph we used,

12    for the most part, in our submission, on page 2, the last

13    paragraph.

14         THE COURT:  I'm looking in the transcript.

15       (Pause.)

16         THE COURT:  I don't see it in the transcript.

17         MR. BANKER:  Do you have the transcript there?  What

18    page is it?

19         MR. MICKELSON:  Page 38 is where it starts.  And

20    maybe it was just in the instruction.  I don't see it here.

21    The instructions that you gave.  That was in the introductory

22    part.

23         THE COURT:  Yeah, it isn't in the, it is not in

24    the --

25         MR. MICKELSON:  It was part of the instructions that

18

1   were read to the jury.

2           THE COURT:  I'm not going to worry about that, but I

3   will include this sentence in Soco's.

4           Now what else are you claiming they left out or

5   included that is in error?

6           MR. MICKELSON:  Not so much left out but included.

7   The issue involving the notice and the prejudice, last time

8   when you instructed the jury, you did not include a prejudice

9   instruction, and this preliminary statement indicates that

10  there is a prejudice requirement with respect to the notice

11  issue.

12          THE COURT:  I will take that out for the time being.

13          MR. BANKER:  If I might speak to that, Judge, there

14  was a case you decided in the last year, the *Patrol Helicopter*

15  case, and I believe there was a slip opinion, dealing with

16  whether the Montana Supreme Court would apply the notice rule.

17  You affirmed what the magistrate judge had done.

18          THE COURT:  I am going to take it out of the

19  preliminary.  I will worry about that in the instructions.

20          MR. BANKER:  Okay.

21          MR. MICKELSON:  And other than that, we just thought

22  it was a little wordier than ours.  It includes all of the

23  insurance language versus kind of just a statement of what the

24  case is about.

25          MR. JOHNSON:  Does it have -- it's got in what you

1   have to do when you give notice?

2           MR. MICKELSON:  It does, which is not exactly what

3   the instruction was that you gave before.

4           MR. JOHNSON:  And they left out stuff that you have

5   to do when you give notice.  They just said you have to

6   identify, you have to --

7           MR. MICKELSON:  Right.

8           THE COURT:  Where are you looking?

9           MR. COZZENS:  It says you have to identify the

10  injured party.

11          MR. JOHNSON:  But there's more to the notice

12  provision than that.  There's a lot more language in it.  If

13  you're going to read it -- we didn't think you needed to read

14  everything in it.

15          MR. COZZENS:  Unless you're going to read it in the

16  instructions --

17          THE COURT:  "Required to give the insurance company

18  notice of, among other things" --

19          MR. MICKELSON:  And if you look at ours, we followed

20  what the instruction was last time as far as written notice on

21  page 3.  Well, I'm sorry.  Actually it was in our proposed --

22          MR. JOHNSON:  Here it is.  Your Honor, with regard

23  to this, they say the policies also contain the condition that

24  you give the names and addresses of the injured party, but

25  actually the notice provision says that in the event, after

1    occurrence, you have to provide written notice containing

2    reasonably obtainable information with respect to time, place,

3    and circumstances and the names and addresses of the injured

4    or available witnesses, not just --

5              THE COURT:  I am just going to --

6              MR. JOHNSON:  I don't know that you need all that

7    stuff.

8              THE COURT:  I am going to cross off -- I am just

9    going to read, "Dyce was required to give the insurance

10   company written notice," period.

11             MR. JOHNSON:  Good.

12             THE COURT:  I'll worry about it later.

13             MR. JOHNSON:  I agree.

14             THE COURT:  "Policies excluded from coverage" . . .

15             What did you guys think of the issues in their

16   statement?  I guess the one that, No. 3, whether that

17   contamination was occurring on or before the end of calendar

18   year 1978.  I thought this term was '75, '76, or '77.

19             MR. COZZENS:  Your Honor, there were policies

20   throughout all of those years.  What we've done is waived any

21   claim for coverage prior to the calendar year policy that

22   starts January 1 of '78.

23             THE COURT:  Yeah, I saw that.  What's the purpose of

24   that?

25             MR. COZZENS:  Make it easier to try the case so we

1   don't get hung up on the years or the testimony of the

2   witnesses about the inventory discrepancy.  There are some

3   differences in time frames, and so our assertion is that the

4   damage was occurring at least sometime during calendar year

5   1978.

6           THE COURT:  On or before the end of calendar year

7   1978.

8           MR. COZZENS:  Right.

9           MR. MICKELSON:  What we would propose, rather than

10  saying before 1978, that the jury be instructed to determine

11  when groundwater contamination near the Dyce facility took

12  place, not before the end of the calendar year 1978, from the

13  sudden and accidental discharge without getting into the dates

14  at this point in time.

15          MR. COZZENS:  The only claim we're asserting is that

16  we have insurance coverage commencing in 1978.

17          THE COURT:  No, but you have to prove that the

18  pollution exclusion applies because of a sudden and accidental

19  release.

20          MR. COZZENS:  That's true.

21          THE COURT:  And that has to have occurred during

22  '75, '76, or '77, right?

23          MR. COZZENS:  Or early in '78, yes.

24          THE COURT:  You guys agree with that?

25          MR. MICKELSON:  Agree with --

1          MR. JOHNSON:  Well, Your Honor, what they did is --

2          THE COURT:  Whether the contamination arose out of a

3  sudden and accidental release of a chemical known as perc

4  during '75, '76, '77, early '78.

5          MR. JOHNSON:  Well, their interrogatory answers says

6  '75, '76, or '77.  We haven't heard that they, with regard to

7  the alleged event, the spill, we haven't heard ever that it's

8  in 1978.

9          MR. COZZENS:  We're not suggesting that it is,

10 but --

11         MR. JOHNSON:  There's two things.  No. 1, you talk

12 about when the event occurred, but then the other issue is

13 when the property damage occurs, and the property damage

14 doesn't occur until you get down into the groundwater, which

15 is several months later.

16         MR. COZZENS:  Right.

17         THE COURT:  What I'm going to do is read No. 2,

18 whether the contamination arose out of a sudden and accidental

19 release of a chemical known as perchloroethylene --

20         Is that how you pronounce it?

21         MR. JOHNSON:  Yeah, that's good.

22         THE COURT:  -- perchloroethylene during '75, '76,

23 '77, and '78 and, No. 3, whether the contamination was

24 occurring on or before the end of the calendar year '78.  And

25 then I'll say, No. 4, whether Soco's notice was given within a

23

1  reasonable time after the property damage claim.  I'm not

2  going to read No. 5.

3            MR. JOHNSON:  Which one was 5?

4            MR. MICKELSON:  The prejudice.

5            THE COURT:  The prejudice.

6            MR. JOHNSON:  What does it say, reasonable notice

7  after the claim?

8            THE COURT:  After a property damage claim was made

9  against Soco.

10            MR. JOHNSON:  That's not the law.

11            THE COURT:  I am going to say whether --

12            MR. JOHNSON:  Can't you just say whether it was

13  reasonable notice of the occurrence?

14            THE COURT:  "Whether Soco gave notice to the

15  insurers" --

16            MR. JOHNSON:  As soon as possible.

17            THE COURT:  -- "under the policy."

18            MR. JOHNSON:  That's good.

19            THE COURT:  We'll worry about the specifics later.

20            Okay.  You got any other problems?

21            MR. MICKELSON:  I think that'll take care of it.

22            MR. JOHNSON:  We have a couple other housekeeping

23  issues.

24            THE COURT:  Oh, I bet you do.

25            MR. JOHNSON:  They're easy, though.  These are easy

1    ones.

2              THE COURT:  Go ahead.

3              MR. JOHNSON:  The reading or the playing of

4    deposition excerpts, in the last trial, we read the transcript

5    front to back no matter who designated it so that there would

6    be context.  With regard to the counter-designations, they

7    would be read in the context of the direct designations.  We

8    actually had an agreement with Mr. Lynch, we thought, that we

9    would do the same thing this time around, but we were informed

10   over the weekend that they were not going to show theirs that

11   way.  They were going to show theirs with all of their

12   designations and then they would take, out of context,

13   whatever counter-designations we had and stick them at the

14   end.  Doesn't make any sense.

15             THE COURT:  Why are you doing that?

16             MR. COZZENS:  Simple, Judge.  I didn't have

17   involvement with it last time.  I think we're entitled to show

18   what evidence we think is important as opposed to the other

19   hour that they throw in that we don't think is relevant to any

20   issue.

21             THE COURT:  So you're going to take out bits and

22   pieces, and then these guys have got to come back and -- or

23   you're going to replay it?  I mean, I assume you have control

24   of the depositions and videos you want to play.

25             MR. COZZENS:  We do.  And we'll either cut them for

1    them or they can cut whatever they want to show, in addition

2    to that to be shown to the jury, "This is what we think is the

3    relevant evidence."  We shouldn't be tagged with an hour's

4    worth of video deposition that has nothing to do with

5    anything.

6          THE COURT:  Can't we explain to the jury that I am

7    requiring that you run them so that we can stop and say, "Now

8    this is a portion that's being played at the request of the

9    insurance companies"?

10         MR. COZZENS:  Maybe we could even do it simpler than

11   that.  If we just did it the way we did it last time and say,

12   you know, "Of this, the plaintiffs have determined that 34

13   minutes of it" -- or something.

14         MR. JOHNSON:  That's fine.

15         THE COURT:  Well, I'd be glad to tell the jury,

16   "Look, just to expedite matters, I've required the parties,

17   when they play a video deposition, to even play parts that

18   they don't necessarily want to play during their case in

19   chief, but it is part of the defendant's cross-examination,

20   and, to expedite matters, I want it to go in."  I'll be glad

21   to stop and explain that to them.

22         MR. COZZENS:  Okay.  And we would like that

23   explanation.  It would probably be difficult for you to do it

24   each time and say, "This is the plaintiffs' and this is the

25   defendant's," because of the way it's broken up.

1          MR. GROSSBART:  There will be times where, on the

2     same page, the plaintiffs or Soco might have lines 10

3     through 15 and we'll have 11 through 18 and then they'll pick

4     up at line 19.  It would get -- on the same page, that would

5     be nuts.

6          THE COURT:  What I figure is going to happen is I'm

7     going to give them one little explanation as to what I've

8     required, and it's just to save time without having to go back

9     and forth.  "There are, there are parts of testimony I'm

10    requiring the plaintiffs to put in."  I'm assuming that you

11    guys are going to play some depositions they want to play some

12    stuff in.

13         MR. JOHNSON:  Absolutely.  It goes both ways.

14         THE COURT:  Yeah.  And if you want me to, I will --

15    you can stop the deposition every time and I can say -- and it

16    would be a real pain.

17         MR. JOHNSON:  It would be kind of a pain.

18         MR. COZZENS:  Worse than that, everybody would lose

19    track of what was going on in the deposition, so that wouldn't

20    be helpful.

21         MR. JOHNSON:  They'd think we're all nuts.

22         THE COURT:  What would happen?  You guys went and

23    took depositions.  Did you video every -- even a discovery

24    deposition?

25         MR. JOHNSON:  Most of them.

1          MR. DAVIS:  Some.

2          MR. COZZENS:  Some.  In our case, we're talking

3    about three.  Relatively short.

4          THE COURT:  Were they videoed to perpetuate the

5    testimony for trial, or was it, in essence, a discovery

6    deposition where you were taking them for the first time?

7          MR. GROSSBART:  The latter.

8          MR. DAVIS:  They were all discovery depositions.

9          THE COURT:  I can say, "Look."  I can explain to the

10   jury, "When both sides give notice of people they think know

11   something about the case, then they noticed up depositions,

12   one side or the other did, and whoever noticed it, they start

13   first asking questions, and then the other side, when they're

14   done, has a right to cross-examine.  And they have a right to

15   put these video -- or these depositions in evidence.  They can

16   be used for any purpose, and they're entitled to go through

17   and pick out certain parts that they want to offer into their

18   case in chief as evidence."  That, "I've instructed both

19   sides, if Soco wants to play certain parts and the defendants

20   would bring up other parts in their examination, rather than

21   take things or have the potential of taking things out of

22   context, we're just -- I've just required the deposition

23   videos to run."  And if you guys want me to say something

24   else, think it up.

25         MR. JOHNSON:  That's good.  That's fine.

1              THE COURT:  I don't want to dink around with that.

2         What other thing?

3              MR. JOHNSON:  Next, let me do this one first.  We

4    had two demonstratives that we wanted to show during opening

5    statements, Your Honor.  That's an overlay of -- this is a

6    photo, historical photo with an overlay of --

7              THE COURT:  What's the exhibit number, do you know?

8              MR. GROSSBART:  That would be 614-8 or page 8.

9              THE COURT:  Illustrative.

10             MR. JOHNSON:  Demonstrative only.

11             THE COURT:  Illustrative only, probably.

12             MR. JOHNSON:  Illustrative only.  And it actually

13   takes two documents that are in evidence, which, one document

14   being the picture that the EPA, the figure that EPA had of the

15   plume, along with the green areas which were the concentrated

16   DNAPL areas where the perc went into the groundwater, and we

17   sent it to them yesterday and they objected to it, but their

18   objection is ironic in light of the fact that they have a

19   demonstrative which is almost virtually identical.

20             THE COURT:  And what is this?  This is Soco's

21   demonstrative or illustrative, No. 103?

22             MR. JOHNSON:  Right.

23             THE COURT:  Is there any objection about the

24   foundation for either one?

25             MR. LYNCH:  Your Honor, as Mr. Johnson said, the

1    document is two documents admitted.  Theirs is two documents

2    in evidence superimposed over each other.  We have no problem

3    if an expert on the stand refers to that document, but we do

4    have a problem in the opening.  When you look at it, it

5    suggests that the figures in the record of decision, what the

6    EPA has done, is over a photo they allege is a date of the

7    examination.

8              MR. JOHNSON:  I'll tell them exactly what we did.

9              THE COURT:  Wait a minute.

10             MR. JOHNSON:  They're identical.

11             THE COURT:  It looks like both are the same except

12   the insurers, it looks like the picture was taken a little

13   higher up.

14             MR. JOHNSON:  It's a little bit, the picture is a

15   little bit --

16             THE COURT:  Broader.

17             MR. JOHNSON:  Theirs is a little bit more of a

18   closeup, but it's the same picture, same green blobs.

19             MR. LYNCH:  And, Your Honor, we have no intention of

20   using ours in opening.  That's the objection, using it in

21   opening.  If they want to have an expert testify about what it

22   is --

23             THE COURT:  Are you going to have one?

24             MR. JOHNSON:  Yes.

25             THE COURT:  I can't imagine there will be an

1   objection as to foundation for this.  It's the same.  The

2   insurers is the same as Soco's Demonstrative 103.  Will you

3   agree they can use 103 if they want to?

4            MR. LYNCH:  I'm sorry; what was the question?

5            THE COURT:  Will you agree they can use your

6   illustrative or Demonstrative 103?

7            MR. LYNCH:  In the opening?  Again, we just think in

8   the opening it's prejudicial without having an expert testify

9   as to what it is.

10            THE COURT:  But I'll allow you all to do that, too.

11   It just may help explain to the jury.

12            MR. JOHNSON:  It explains it.

13            THE COURT:  I don't care which one you use.

14            MR. JOHNSON:  We'll use our own, Your Honor.  I just

15   wanted you to see we're not trying to pull a fast one.

16   They're exactly the same.

17            THE COURT:  Yeah.  I don't want you making, I don't

18   want you making a closing argument.  I mean, this is an

19   opening statement.

20            MR. LYNCH:  And, Your Honor, maybe that -- what are

21   they going to use that for?  Are they arguing that this is

22   what the EPA shows existed in '81?  That's our concern

23   without --

24            THE COURT:  Well, what do they show?  This says June

25   '81.  I'm assuming this was about --

1              MR. JOHNSON:  June '81.  Same date.

2              THE COURT:  June '81, too.

3              MR. GROSSBART:  I'll address it.  The green blobs

4    come out of a figure in the record of decision, and the green

5    blobs that you see on those, as they exist in the record of

6    decision, are in a drawn figure, not a photograph.  We've

7    agreed that that's in evidence, that drawn figure.  We've also

8    agreed that the photographs, each of which are the same, are

9    in evidence.  Both parties have, with a lot of work and

10   technical help, have tried to put those green blobs on top of

11   the photo for several years.  You will see the same thing in

12   '75, '77, '79, '81, *et cetera*, to give the jury some

13   perspective.

14             THE COURT:  You're going to get up and say, "We

15   expect the evidence will show this and this and this."  You're

16   not going to go into a lot of detail?

17             MR. JOHNSON:  Right.

18             THE COURT:  Yeah.  That's fine with me, as long as

19   you keep it in opening statement.

20             MR. JOHNSON:  Thank you.

21             MR. DAVIS:  One more.  Same deal.  A time line.

22   Soco has objected to it now, one of the objections.  Again,

23   this is simply for opening, Judge.

24             THE COURT:  This is a little different.

25             MR. DAVIS:  Oh, it is different, but it's

32

1    illustrative, and it references matters that are going to be

2    heard as evidence.  The Versar report they did when they sold

3    the business in '89, the response to the EPA, and then, of

4    course, the testimony of Mr. Naff and Mr. Hallsten.

5              THE COURT:  Will there be testimony of the *Weiss*

6    case?

7              MR. DAVIS:  That the *Weiss* case was filed, yes.

8              MR. WALSH:  All of the references, Your Honor, are

9    actually to exhibits that we believe were admitted last time.

10             MR. DAVIS:  There was one we took out last night

11   that we think they objected to, a report by Mr. Sullivan that

12   has been admitted.  When they sent this to Soco, they

13   indicated that it referenced something that wasn't going to go

14   in, that they didn't anticipate, so we just omitted that.  But

15   again, I can stand up and write dates on a tablet, but I

16   thought if we can just show this to the jury, it saves --

17             THE COURT:  Stand up and write dates on a tablet.

18   You'll be able to use this in the closing.

19             What else?

20             MR. JOHNSON:  They have specified a witness for

21   Wednesday by the name of Douglas Johnston.  He is a former

22   Soco employee.  He was not ever within their Rule 26

23   disclosures, and nobody took his deposition because of that.

24   We never thought he had any relevant evidence.  Lo and behold,

25   he is showing up.  We had objected to him on the witness list,

1    their may-call list.  I think he was on their may-call list,

2    and we objected to it on the grounds he had not been disclosed

3    by Soco.  As I say, we never took his deposition because they

4    never told us he had any relevant evidence.

5          THE COURT:  What's his name?

6          MR. JOHNSON:  Douglas Johnston.

7          THE COURT:  Douglas Johnston.  He's on their

8    may-call.  Now you're going to call him?

9          MR. BANKER:  Yes, Judge, and he was disclosed on

10   Continental's 26(a) disclosure as having relevant evidence,

11   and it turns out he does.

12         THE COURT:  Well, has there been -- what kind of

13   evidence does he have?

14         MR. BANKER:  He will be a witness that will be

15   called to talk about the insurers' theory that there was a

16   pipe in the catch pond.

17         THE COURT:  I don't remember that, to be honest with

18   you.

19         MR. JOHNSON:  There's a witness, Marvin Johnson,

20   Your Honor, who has testified to that by way of video last

21   time.  He's the guy that lives here who has throat cancer.

22         THE COURT:  Has throat cancer.

23         MR. JOHNSON:  And they're calling him on Wednesday.

24         MR. DAVIS:  Calling Mr. Johnston right after to

25   impeach their own witness, it looks like.

1           THE COURT:  I'm not going to rule on it right now.

2    I'll have to -- did you guys brief this?

3           MR. DAVIS:  No.

4           MR. JOHNSON:  No.

5           THE COURT:  Or did it just come up?

6           MR. JOHNSON:  Just came up.  He was on their

7    may-call list so we weren't even sure they were going to call

8    him.

9           THE COURT:  John Ross is not going to be -- I mean,

10   he's the lawyer, isn't he?

11          MR. COZZENS:  Yes, he is.

12          MR. BANKER:  Yes.

13          THE COURT:  He's not going to be relevant any more

14   than he was last time, will he?  Did he testify the last time?

15          MR. COZZENS:  No.

16          MR. BANKER:  No.

17          THE COURT:  So old Doug has moved over here to your

18   will-call, huh?

19          MR. BANKER:  That's correct.

20          THE COURT:  Okay.

21          MR. JOHNSON:  They're taking some people off the

22   bench.  Dennis St. George, on their may-call --

23          MR. BANKER:  This time he was on our will-call list.

24          MR. JOHNSON:  Oh, okay.

25          THE COURT:  Yeah, he's on the will-call.  Well, I'll

1    worry about it later on.

2            Do you think that jury -- is that jury done?

3            THE CLERK:  I will go check.

4            MR. DAVIS:  Judge, in the context of "worry about it

5    later," I did call your chambers Friday and spoke with Ryan.

6    We were somewhat somnolent on Thursday going through all of

7    the exhibits, and we forgot we wanted to have five or ten

8    minutes of argument on the duty-to-defend motion that's still

9    pending, and I think that can be done at some later point in

10   this two weeks.

11           THE COURT:  That's a good point.  That's why I

12   haven't ruled on it yet.

13           MR. DAVIS:  All right.

14           THE COURT:  I am not that worried about it yet.  As

15   a matter of fact, I can wait until after the trial.

16           MR. DAVIS:  I agree.  We just wanted to have a

17   couple minutes in light of the reply brief.

18           MR. JOHNSON:  I think the only other pending motion

19   is the one that had to do with the government report, and part

20   of it we objected to on the grounds it wasn't reliable.

21           THE LAW CLERK:  Do you want that?  It's out on the

22   bench.  I'll get it for you.

23           THE COURT:  Yeah.  As soon as I see it, I'll

24   remember it.

25           Off the record for a minute.

1          (Discussion off the record.)

2               THE COURT:  Oh, yeah, this is the one.  You didn't

3     object last time.  Now you object to four sentences.  It's

4     Document or Exhibit 3043, right?

5               MR. GROSSBART:  3043.  I think it may be more than

6     four sentences, but one discrete section within the document.

7               THE COURT:  I think it's trustworthy as far as it

8     goes.  Your motion is denied.  I am going to let the whole

9     thing in.  That takes care of that.

10         (Exhibit 3043 was received in evidence.)

11              THE COURT:  Are they ready?

12              THE CLERK:  Yes.

13              MR. BANKER:  Just, just two more quick things.  One,

14    at the last trial, we read a stipulation regarding the 1975

15    photo.  If we were to use that, would you want to read that

16    stipulation again before we used it, or at what point would we

17    talk about that?  The best way to do it, if I want to use it,

18    I'll say, "We have a stipulation regarding this photo," read

19    the stipulation we read last time, and ask if counsel agrees?

20              THE COURT:  What does the stipulation do?  Just

21    admit it into evidence or explain it?

22              MR. COZZENS:  It explains how we got it.  The

23    stipulation says effectively this is a marked-up photograph of

24    the Dyce site November 4, 1975 that was provided to Soco by

25    USF&G in May 2005.

1              THE COURT:  Give me the stipulation.

2              MR. COZZENS:  It's already been admitted as an

3    exhibit.  It just has marks on it, and it came from Soco.

4              THE COURT:  Give it to me and I will read it when

5    the time comes.  Whenever you want me to.  Get it to me and

6    I'll read it.

7              MR. BANKER:  The only other thing I wondered about,

8    do you plan to read any preliminary instructions?

9              THE COURT:  Yeah.

10        (Discussion off the record.)

11             THE COURT:  I'm glad you mentioned that.

12             THE CLERK:  Page 158.

13             THE COURT:  Actually 160.  I gave an admonition

14   instruction because we were breaking for lunch.  And then

15   after lunch -- and the admonition instruction is going to be

16   different.  It's going to be that new one where I tell them

17   they can't Twitter, they can't go to the internet.  It's a

18   great big long thing.

19             MR. COZZENS:  I think that's "can't tweet," Judge.

20             THE COURT:  I don't know.  How the hell would I

21   know?

22             MR. COZZENS:  I only know that because my son is

23   home for a while.

24             THE COURT:  I have no idea, but it tells them they

25   can't do any of those things.

38

1          And then I'm going to give, out of the *Ninth Circuit*
2    *Manual*, 1.1, 1.3, 1.4, 1.5, 1.6, 1.7, 1.8, 1.9, 1.10, 1.11,
3    1.12, 1.13, 2.2, and 1.9 is the admonition instruction but
4    it's different.  I'm going to amend it.  And none of you had
5    any objections, I don't think.

6          MR. BANKER:  No.  I just think we would like those
7    to be read again.

8          THE COURT:  They will be.

9          MR. COZZENS:  I just have a question.  How many
10   jurors are you going to seat for *voir dire*?

11         THE COURT:  Well, we'll have four chairs in front of
12   the box.  Fill up the box with 14, so there will be 18.  That
13   will give you each five, each side five peremptories.

14         MR. COZZENS:  Okay.

15         THE COURT:  What do we have, about 40 in there?

16         THE CLERK:  Um-hmm.

17         THE COURT:  You know, if it gets to the point where
18   it's tight, then you guys are going to end up with four apiece
19   and we'll still seat eight.

20         MR. COZZENS:  And just so that I remember this
21   correctly, we don't say we pass the jury for cause?  You'll
22   ask when you're all done?

23         THE COURT:  Yeah.  When you guys are all done, I'll
24   ask you if you pass the jury for cause, and if there is
25   somebody that you think I should have booted off for cause

1    that I didn't, tell me you want a sidebar and we'll handle it

2    at sidebar.  State your objection for cause, and I'll rule.

3    And if I think you're right, I'll boot them off and we'll put

4    somebody else in there.

5            MR. COZZENS:  Okay.

6            THE COURT:  The problem is, if the number of

7    prospective jurors is real minimal, the requirement for cause

8    tends to go up.

9            MR. JOHNSON:  It's a sliding scale?

10           THE COURT:  Although I hate to say that on the

11   record, but we have to temper these things with

12   practicalities.

13           MR. JOHNSON:  Okay.

14           THE COURT:  Okay.

15       (Recess taken from 09:20:03 to 09:23:50.)

16       (Open court.)

17       (Prospective jurors present.)

18           THE COURT:  Please be seated.

19           THE CLERK:  This is the time set by the Court for a

20   civil jury trial in CV-04-29 and 08-29, *United States Fidelity*

21   *and Guaranty Company and Continental Insurance Company,*

22   *plaintiffs, v. Soco West, defendant.*

23           THE COURT:  Good morning, ladies and gentlemen.

24   Would you all rise and be sworn as the prospective trial jury

25   in this case?

1          (Oath administered to prospective jurors.)

2                  THE COURT:  Thank you.  Please be seated.

3          (Discussion off the record.)

4                  THE COURT:  Ladies and gentlemen, all of your names

5    have been placed in this wooden wheel up here.  It looks like

6    a lottery wheel.  We will begin a random selection of

7    prospective jurors.  If your name is drawn, you don't win a

8    new car or $50,000.  The only thing you get is perhaps the

9    privilege of serving on a trial jury.

10                 Now when your name is called, come up here and take

11   a seat in the jury box.  You will notice, when you come

12   through those swinging doors, there's a sign there that says,

13   "Watch Your Step."  The reason there is is because when we

14   installed all of the miracles of modern technology in this

15   courtroom, they had to elevate the floor to run all of the

16   wires, and so it elevates coming up, and it goes down going

17   out.  Watch your step.

18                 If your name is called, come up and take a seat in

19   the jury box.  We're going to seat 18 prospective jurors.

20   From those 18 prospective jurors, we will select eight people

21   who will be the trial jury in this, in this civil case.  If

22   your name is called, Chair No. 1 is to my left in the back row

23   of the jury box.  There are numbers in the seats.  It goes 1

24   through 7, 7 through 14, and there are four chairs in front of

25   the jury box, 15 through 18.

1            Once we get 18 people up here, I will start a

2    process called *voir dire*, and I'll tell you briefly what the

3    purpose of that process is once you get up here.

4            Let's start.

5            THE CLERK:  Kelly Stevenson.

6            Misty Hale.

7            Curtis Hartman.

8            Eddy Nelson.

9            Sharman Lee Eckhardt.

10           Karen Elizabeth Pierce.

11           Glenwood Kerestes.

12           If I mispronounce your name, please let me know.

13           Monte Steffan.

14           Lisa Michelle Braley.  Is it "Braley" or "Braley"?

15           PROSPECTIVE JUROR BRALEY:  It's "Braley."

16           THE CLERK:  "Braley."  Thank you.

17           Sherri Braunstadter.

18           Kenneth Benjamin.

19           Susan Bailey.

20           Kody Porter.

21           Jeniffer Jensen.

22           Beverly Rath.

23           Anna Lee Kuhr.

24           Shannon Behounek.

25           And Janice Cox.

1          THE COURT:  Now, ladies and gentlemen, I'm going to

2     start this process called *voir dire*.  I have given all -- I'll

3     ask a number of questions.  I've given the attorneys for each

4     side time to ask you questions when I'm done.

5          Ryan, I need the proposed questions from the

6     attorneys.  It must be on my desk.  I thought they were up

7     here.

8          THE LAW CLERK:  (Nodded head affirmatively.)

9          THE COURT:  In any case, I gave the attorneys

10    opportunities to submit proposed questions that they wanted me

11    to ask you, also.

12          Now the purpose of this process is not to pry into

13    your private affairs at all, although it might seem that way

14    on occasion.  This is a civil case.  The sole purpose behind

15    the process of me asking questions, the attorneys asking

16    questions --

17          THE LAW CLERK:  (Handing.)

18          THE COURT:  Thanks.

19          -- is we want to seat a trial jury of eight people

20    that can be fair and impartial in reaching a verdict in this

21    case.

22          The main purpose or the main goal, at least, behind

23    this process is, the process of asking questions, is for me to

24    determine, for us to determine whether or not you have some

25    bias or prejudice that would prevent you from being fair and

1    impartial.  I don't mean some bad bias or prejudice.  I just

2    mean as we go through life, as we get older, I have found as

3    the hair gets lighter in color, we all form opinions, and the

4    older we get, on occasion, some of those opinions become

5    firmly held beliefs.

6          We need to know if you have some opinion, you hold

7    some opinion or belief, or you have some knowledge that would

8    prevent you from being fair and impartial as a trial juror.

9          Now if I or one of the attorneys asks a question

10   that you don't want to answer in front of the other

11   prospective jurors, tell me you want a sidebar.  If you want a

12   sidebar, if you tell me that, the court reporter and I and the

13   lawyers, hopefully not all of them, will come off here to the

14   side of the bench and you can tell us the answer privately to

15   the question.

16         If there's more than one person who wants to answer

17   that same question at sidebar, just form a line right there at

18   the podium.  When we're done, when I'm done asking somebody at

19   sidebar a question, I'll look over here.  If there's somebody

20   standing by the podium, we'll just call you over.

21         Now those of you in the back that aren't up here in

22   the first 18 chairs, we need you to listen closely to the

23   questions that are being asked.  What will happen is if I

24   excuse somebody from the first 18 folks that have been called

25   up here, if I excuse them for cause, the clerk of court's hand

44

1    will go back into this lottery wheel, another random selection

2    will be made, and it could very well be you.  If you're called

3    up here, you will be put in the vacant seat.

4           The first question I'm going to ask is, "Have you

5    heard all of the questions that have been asked to now?"

6           The second question I'm going to ask is, "Would you

7    have responded to any of them?"

8           Now if you come up here in the first 15 or 20

9    minutes and I ask you those questions and the first one I say,

10   "Have you heard the questions that have been asked up to now?"

11   and you say, "No," it won't be a big problem.

12          After an hour or so, if you say, "You know, I

13   haven't heard them," we have a problem, and the problem mainly

14   will be due to the fact that I probably won't remember all of

15   the questions I've asked.  So it is important to listen,

16   because those are the things I'm going to want to know once

17   you get up here.

18          Once we go -- I'll ask questions, and then I've

19   given each side a certain amount of time to ask you questions.

20   Once those -- everybody is done asking questions, and once the

21   jury is passed for cause, at that time, if you haven't been

22   brought up here in the first 18 chairs, I'll be able to turn

23   you loose so you can go about your business.  But until that

24   time, until that time, even though we'll probably take a brief

25   break here in a while, until that time I need -- I'm going to

1    need those of you who aren't in the first 18 chairs paying

2    attention and, more importantly, staying here.

3            Now before I go any further, let me introduce the

4    court staff.

5            My court reporter is JoAnn Bacheller.  Right in

6    front of me is deputy clerk of court Amanda Carrillo.  Next to

7    her is deputy clerk of court Cheri Anderson.  And that young

8    man to my right is one of my law clerks; his name is Ryan

9    Huewinkel.

10           Now, first, before I tell you exactly what this

11   civil case is about, the attorneys have explained to me that

12   this case is going to take ten working days to try.  That's

13   two weeks.  I've told them that I can't be here March 19, so

14   at most this case is going to take nine days to try.  The

15   reason I'm telling you is this.  Despite what the summons

16   said, that employment is not an excuse, I excuse people from

17   jury service for what I call significant hardship.  I don't

18   have a standard definition as to what "significant hardship"

19   is.

20           If you think, if you end up serving as a trial juror

21   on this case for the next, primarily, two weeks, if you think

22   that will cause you a significant hardship, you raise your

23   hand and tell me what your problem is, and I'll tell you if I

24   think it's significant enough.

25           (Show of hands.)

1          THE COURT:  All right.  We're going to start in the

2     back.

3          Is it Ms. Hale?

4          PROSPECTIVE JUROR HALE:  Yes, that's correct.

5          THE COURT:  Where is the mike?

6          THE LAW CLERK:  (Handing.)

7          THE COURT:  This is a big courtroom.  In order for

8     the people in the back to hear, we're just going to pass this

9     microphone around.  Don't touch -- there's a button on the

10    bottom.  I shouldn't tell people this, but there's a button on

11    the bottom and a button on the side.  Do not touch the

12    buttons.  I swear I'm going to duct-tape that microphone every

13    trial, and then I don't.  Don't touch the buttons, because I'm

14    not sure how they work, but if you, if you move one or the

15    other, then it seems like we've got to do some kind of magic

16    on it to get it working again.  Just pass it around.

17         All right.  Ms. Hale.

18         PROSPECTIVE JUROR HALE:  I'm a full-time college

19    student in the nursing program, so it's hard to miss any

20    courses.

21         THE COURT:  Yes.  I suppose nine, ten days would be

22    a lot.

23         PROSPECTIVE JUROR HALE:  It is, especially when you

24    have two-hour lectures one day a week, alone, to miss that one

25    class when it's only one day a week.

1          THE COURT:  Yeah, that's not, that's not good.  I

2    don't want to be -- are you getting good grades?

3          PROSPECTIVE JUROR HALE:  I am.

4          THE COURT:  I ask that because I was thinking,

5    "Well, heck.  I could keep her here.  She probably would at

6    least get by with Cs," but I'm not going to do that.  I don't

7    want to be, in any way, responsible for you not getting good

8    grades, so you're excused.  I assume this is the spring

9    quarter, right?

10         PROSPECTIVE JUROR HALE:  It is, yeah.  We just got

11   off spring break, actually, today.

12         THE COURT:  You're on spring break?

13         PROSPECTIVE JUROR HALE:  No.  No, we just got done

14   with it today.

15         THE COURT:  Oh.  I almost told you to sit back down

16   there.

17         THE REPORTER:  Leave your number, please.

18         PROSPECTIVE JUROR HALE:  Oh.

19         THE COURT:  Leave that seat, and leave the mike.

20   Leave it right up there with the jurors.

21         THE CLERK:  Thank you.

22         Florence Diede.

23         THE COURT:  Ms. Diede, have you heard the question

24   I've asked, or the questions I've asked so far?

25         PROSPECTIVE JUROR DIEDE:  Yes, I have.

48

```
 1              THE COURT:  Would you have responded to the last
 2    question?
 3         (No response.)
 4              THE COURT:  Would you have responded to the last
 5    question, and that is --
 6              PROSPECTIVE JUROR DIEDE:  No, I probably would not.
 7              THE COURT:  -- significant hardship if it goes nine
 8    days?
 9              PROSPECTIVE JUROR DIEDE:  No, I probably would not.
10              THE COURT:  Okay.  Now who else in the back row
11    would have a significant hardship?
12              PROSPECTIVE JUROR EDDY NELSON:  (Indicating.)
13              THE COURT:  Pass that microphone back there to
14    Mr. Eddy Nelson.
15              PROSPECTIVE JUROR EDDY NELSON:  I am also a
16    full-time business student.  I'm a senior, so I don't think I
17    would be able to afford to miss more than a week.
18              THE COURT:  As I recall, when you're a senior, it's
19    just kind of a coast.
20              PROSPECTIVE JUROR EDDY NELSON:  I wish.
21              THE COURT:  How are your grades?
22              PROSPECTIVE JUROR EDDY NELSON:  Good.  So far.
23              THE COURT:  This might be a traumatic experience if
24    I kept you here as far as your grades are concerned.  You're
25    excused.
```

1              PROSPECTIVE JUROR EDDY NELSON:  All right.

2              THE CLERK:  Christopher Goulet.

3              THE COURT:  Do you have the microphone, Mr. Goulet?

4              PROSPECTIVE JUROR GOULET:  I'll grab it.

5              THE COURT:  Yeah, grab it.

6              Will serving on this jury cause you a significant

7    hardship?

8              PROSPECTIVE JUROR GOULET:  No, but it may cause my

9    patients a significant hardship.  I'm a full-time physician.

10   I have a full week.  Actually the only day I was able to

11   rebook was today.

12             THE COURT:  That's not good.  You're excused.

13             THE CLERK:  Brenda Dunham.

14             THE COURT:  Once you're excused, you can take off,

15   but you can stay if you want.

16             PROSPECTIVE JUROR GOULET:  That's all right.  I

17   didn't want to cause any problems.

18             THE COURT:  Ms. Dunham --

19             PROSPECTIVE JUROR DUNHAM:  Yes.

20             THE COURT:  -- will this cause you a significant

21   hardship if you serve on this jury for nine days?

22             PROSPECTIVE JUROR DUNHAM:  No, sir.

23             THE COURT:  All right.  Who else in the back row?

24        (No response.)

25             THE COURT:  Pass it up here to the next row.  Did I

1    see anybody in the next row?

2              PROSPECTIVE JUROR JENSEN:  (Indicating.)

3              THE COURT:  Yes, down at the end, Ms. Jensen.

4              PROSPECTIVE JUROR JENSEN:  I run an after-school

5    program in Circle.  I'm the director of it and have just one

6    assistant to help me, and she doesn't have the lesson plans

7    and everything.  I have to take care of all of that.

8              Plus, I have a diabetic child at home.

9              THE COURT:  You're excused.

10             PROSPECTIVE JUROR JENSEN:  What's that?

11             THE COURT:  You are excused, ma'am.

12             PROSPECTIVE JUROR JENSEN:  Thank you.

13             THE COURT:  Thank you.

14             THE CLERK:  Richard Lee Miller.

15             THE COURT:  Mr. Miller, have you heard the questions

16   I've asked?

17             PROSPECTIVE JUROR MILLER:  Yes, sir.

18             THE COURT:  Would you -- would it cause you a

19   significant hardship to serve on this jury for --

20             PROSPECTIVE JUROR MILLER:  No.

21             THE COURT:  All right.  Who else in the second row?

22             PROSPECTIVE JUROR STEFFAN:  (Indicating.)

23             THE COURT:  Down here to Mr. Steffan.

24             PROSPECTIVE JUROR STEFFAN:  Can I have a sidebar?

25             THE COURT:  You can have a sidebar.

1          (Discussion on the record at sidebar.)

2               THE COURT:  Shoot.

3               PROSPECTIVE JUROR STEFFAN:  I have prostate cancer,

4     and I can't sit for very long without going to the bathroom,

5     and I have an artificial hip, another reason I can't sit very

6     long.  I should have wrote that on the original list, but I

7     didn't.

8               THE COURT:  Yeah, and if you have to sit for an hour

9     and a half at a time, it's probably tough?

10              PROSPECTIVE JUROR STEFFAN:  It's pretty tough.

11              THE COURT:  I'm going to excuse you.

12              PROSPECTIVE JUROR STEFFAN:  Thank you.

13              THE COURT:  Thank you.

14         (Open court.)

15         (Prospective jurors present.)

16              THE CLERK:  Robert Ross.

17              THE COURT:  Mr. Ross, do you have the mike?

18              PROSPECTIVE JUROR ROSS:  Yes, I do.

19              THE COURT:  Would you suffer a significant hardship

20    if you end up serving as a juror on this case?

21              PROSPECTIVE JUROR ROSS:  I believe so, Your Honor.

22    I have been wearing this cast for six weeks.  I'm scheduled to

23    have it removed early next week and have physical therapy.  If

24    the trial does not interfere with that, I'm fine with being

25    here.

1          THE COURT:  Are you scheduled to start physical

2   therapy on the same day you have it off?

3          PROSPECTIVE JUROR ROSS:  On the same day, yes, on

4   Wednesday afternoon.

5          THE COURT:  I can take it off, but I can't do the

6   physical therapy.

7          PROSPECTIVE JUROR ROSS:  If you could take it off

8   today, I would be happy.

9          THE COURT:  Ah, yeah, it's not going to be done

10  Wednesday.

11         I intend to do all I can to push this case along,

12  but there is just so much I can do.  There are some things I

13  can't do, and I can't say it will be done Wednesday, and I

14  better excuse you.

15         PROSPECTIVE JUROR ROSS:  Very good.  Thank you.

16         THE CLERK:  Ruth Michaels Eyre.  Or is it "Eyre"?

17         PROSPECTIVE JUROR EYRE:  It's "Eyre."

18         THE CLERK:  "Eyre."  Thank you.

19         THE COURT:  Ms. Eyre, would you suffer a significant

20  hardship if you end up serving as a trial juror in this case?

21         PROSPECTIVE JUROR EYRE:  I didn't hear the word;

22  could I have a side, whatever it was called?

23         THE COURT:  Oh, sidebar?

24         PROSPECTIVE JUROR EYRE:  Sidebar?

25         THE COURT:  Yes, you may.

1    (Discussion on the record at sidebar.)

2         PROSPECTIVE JUROR EYRE:  This is a little

3    embarrassing, but I have this problem.  I'm on a natural

4    medication that you take for cholesterol.

5         THE COURT:  You don't need to explain all of the

6    side effects, but are there some side effects that will affect

7    your ability to be a trial juror?

8         PROSPECTIVE JUROR EYRE:  Yeah.  I might not be able

9    to sit for a long time.

10        THE COURT:  Yeah.  Well, we go an hour and a half or

11   so, an hour and 45 minutes between breaks.  Would it be a

12   problem?  Could be?

13        PROSPECTIVE JUROR EYRE:  When it hits, yeah.

14        THE COURT:  Yeah.  You're excused.

15        PROSPECTIVE JUROR EYRE:  Thank you.

16    (Open court.)

17    (Prospective jurors present.)

18        THE CLERK:  You need a sidebar, also?

19        PROSPECTIVE JUROR PORTER:  I wasn't fast enough.

20   I'm sorry.

21    (Discussion on the record at sidebar.)

22        THE COURT:  Right here, please.

23        PROSPECTIVE JUROR PORTER:  I'm on medical leave from

24   work due to an injury, so I don't know how -- the medication

25   I'm on makes me drowsy.

1              THE COURT:  An analgesic or pain medicine?

2              PROSPECTIVE JUROR PORTER:  Pain medicine, muscle

3    relaxant.

4              THE COURT:  And what would your employer say if you

5    were on medical leave and you're sitting here?

6              PROSPECTIVE JUROR PORTER:  I don't know.  I don't

7    think it would be very good.

8              THE COURT:  Who is your employer?

9              PROSPECTIVE JUROR PORTER:  Alternatives.

10             THE COURT:  Yeah, I'll excuse you.

11             PROSPECTIVE JUROR PORTER:  Okay.

12       (Prospective Juror Porter exited sidebar.)

13       (Prospective Juror Benjamin entered sidebar.)

14             THE COURT:  Come right over here.

15             PROSPECTIVE JUROR BENJAMIN:  I just can't hear well

16   enough.  It's a real problem.

17             THE COURT:  Yeah.  You have to hear.  Even with

18   those things, you can't hear?

19             PROSPECTIVE JUROR BENJAMIN:  Even with those.

20             THE COURT:  Okay.  That's all right.  You're

21   excused.

22             PROSPECTIVE JUROR BENJAMIN:  Thank you, sir.

23       (Open court.)

24       (Prospective jurors present.)

25             THE CLERK:  Rocky Nelson, fill Chair No. 8, please.

1              Brenda Hittmeier, Chair No. 13.

2              And Daniel Currey, Chair No. 11.

3              THE COURT:  Mr. Nelson, do you happen to have that

4    microphone?

5              PROSPECTIVE JUROR ROCKY NELSON:  I do.

6              THE COURT:  I've gotten through one question so far.

7    Now I have to say that the others are not near this tough.

8    But there could be.

9              Would this cause you a significant hardship if you

10   ended up sitting on this case for two weeks?

11             PROSPECTIVE JUROR ROCKY NELSON:  I believe it would.

12   I have a small construction business, and I have three

13   full-time employees, and when I'm not there, they're not

14   working, and in the construction business, one day behind is

15   three days behind, so --

16             THE COURT:  You're excused.

17             THE CLERK:  Thomas Lehman.

18             THE COURT:  Mr. Lehman, how would you respond to

19   that question?

20             PROSPECTIVE JUROR LEHMAN:  I believe it would cause

21   me a hardship.  I work for an electric company.  We are

22   preparing for an off-site audit.  We have to have a

23   significant amount of information submitted to the regulator

24   by March 19, and we're currently three days behind.  I'm the

25   only one that's on the project full-time.  There are three

1    other part-timers.  We've already been working nights and

2    weekends, and time is getting pretty precious.

3              THE COURT:  You're excused.

4              THE CLERK:  Angie Beck.

5              THE COURT:  Ms. Beck, how would you respond to that

6    question?

7              PROSPECTIVE JUROR BECK:  I believe it would, Your

8    Honor.  I have been a diabetic for 35 years and on insulin.  I

9    have neuropathy in my feet and legs severely, and I can't sit

10   for long periods of time.

11             THE COURT:  You're excused.

12             THE CLERK:  Rebecca Anderson.

13             THE COURT:  Ms. Anderson, that Chair No. 8 has got a

14   curse.

15             PROSPECTIVE JUROR ANDERSON:  I'm sorry.

16             THE COURT:  Is it going to continue?

17             PROSPECTIVE JUROR ANDERSON:  I'm a stay-at-home mom

18   of two girls, a 4-year-old and 22-month-old.  My mom is

19   watching them today, but I can't guarantee she could watch

20   them for two weeks.

21             THE COURT:  You're excused.

22             THE CLERK:  Jean Taylor.

23             MR. DAVIS:  What's the name?

24             THE CLERK:  She's an add-on on your list.

25             MR. DAVIS:  Okay.  Thank you.

1          THE COURT:  Ms. Taylor, how would you respond to

2    that last question?

3          PROSPECTIVE JUROR TAYLOR:  Well, I work at the

4    middle school.  We are a base kitchen.  I work in the kitchen.

5    I do all of the meat slicing, and I have to serve breakfast in

6    three lunch lines.  There are nine of us that work there, but

7    we each have our own duties, so when I'm gone, someone else

8    has to fill in and do mine.

9          THE COURT:  Well, will they be able to do it, or

10   will somebody go hungry?

11         PROSPECTIVE JUROR TAYLOR:  No, they won't.  They'll

12   get it done.  It just puts a hardship on all of them.

13         THE COURT:  The question I have, if you end up

14   serving on this jury, will you be able to concentrate on the

15   evidence that's coming to you through the trial, or will you

16   be sitting here worried about the people that are having to

17   pick up your duties?

18         PROSPECTIVE JUROR TAYLOR:  I think I could

19   concentrate on the trial.

20         THE COURT:  Now will these folks that have to pick

21   up your duties, will they be upset with you or upset with me?

22   I can take it, because I don't work there and don't depend on

23   them to serve me dinner.

24         PROSPECTIVE JUROR TAYLOR:  Well, my supervisor knows

25   that, you know, that if we're called to jury duty, that they

1    have to let us go, you know, for it, but it does cause a

2    hardship on the rest of the crew and her.

3            THE COURT:  Do you think that it's going to cause

4    some problem with your employer if you end up on this jury?

5            PROSPECTIVE JUROR TAYLOR:  No, I don't think it

6    would cause a problem as far as a problem, other than getting

7    the work done.  We serve about 2,500 kids a day.  We make

8    lunches for, you know, 2,500 kids a day.  We send lunches out

9    to nine different schools besides our middle school, and so

10   it's a very fast pace of work.  You know, you just have to

11   work as fast as you can.

12           THE COURT:  Will they be able to do it?

13           PROSPECTIVE JUROR TAYLOR:  Well, whenever there's

14   been someone sick, they, you know, fill in, and we get the job

15   done.  But over a two-week time, I don't know, you know,

16   whether they would maybe have to call a substitute in or

17   whatever.  I don't know.

18           THE COURT:  Well, right now I'm just going to, I'm

19   going to -- it sounds like they'll be able to function if I

20   don't let you go, but what I'm going to do is not excuse you

21   at this time.  I'm just going to see how things go here.

22           PROSPECTIVE JUROR TAYLOR:  Okay.

23           THE COURT:  All right?

24           Now I have to talk with Ms. Hittmeier.  Is it going

25   to cause you a problem?

1          PROSPECTIVE JUROR HITTMEIER:  No, sir.

2          THE COURT:  All right.  Pass it down to No. 11,

3    Mr. Currey.

4          PROSPECTIVE JUROR CURREY:  No, Your Honor.  I can

5    serve.

6          THE COURT:  I don't want to be selfish, but those

7    are the kinds of responses that I like.

8          Anybody I haven't talked to?  I haven't talked to

9    anybody in the front row here.

10          PROSPECTIVE JUROR BEHOUNEK:  (Indicating.)

11          THE COURT:  Ma'am.  How do you pronounce your last

12    name?

13          PROSPECTIVE JUROR BEHOUNEK:  It's "Behounek."

14          THE COURT:  Okay.  "Behounek."  Go ahead.

15          PROSPECTIVE JUROR BEHOUNEK:  I own my own business,

16    and I'm the only one there during the day.  I can serve if I

17    have to.  My son and my husband will just have to fill in

18    during the day as necessary.

19          THE COURT:  Well, if you don't go, I mean, will you

20    lose the business or will it --

21          PROSPECTIVE JUROR BEHOUNEK:  I'd have to close the

22    doors if no one could take my place.

23          THE COURT:  That's not good.  The business doesn't

24    go very well, then, does it?

25          PROSPECTIVE JUROR BEHOUNEK:  Not really, no.

1           THE COURT:  If I kept you here, would you be, during

2    the trial, worried about whether the doors were open or not?

3           PROSPECTIVE JUROR BEHOUNEK:  I could be present

4    here, so, no, I wouldn't be totally worried about it.

5           THE COURT:  Well, if you would be a little worried

6    about it -- and I wouldn't blame you if you were.  If you're

7    the only one running the business, I wouldn't blame you.  You

8    have to focus 100 percent of your attention on the evidence

9    that's coming in during the trial.  Is that going to be a

10   little difficult?

11          PROSPECTIVE JUROR BEHOUNEK:  If I'm selected for the

12   jury, I'll be here 100 percent.

13          THE COURT:  What kind of business is it?

14          PROSPECTIVE JUROR BEHOUNEK:  It's a fitness club.

15          THE COURT:  And your husband and son are available?

16          PROSPECTIVE JUROR BEHOUNEK:  When they're not

17   working.  My son is off today so he's working for me, and my

18   husband comes in -- he can come in in the afternoon after he

19   gets off work.

20          THE COURT:  For how long do they have to come in

21   for?  I mean, how long is the business open?

22          PROSPECTIVE JUROR BEHOUNEK:  The business has been

23   open for three years.

24          THE COURT:  No, I'm talking about during the day.

25   What hours is the business open?

1           PROSPECTIVE JUROR BEHOUNEK:  It's open from 6 a.m.

2    until 8 p.m., and I'm generally there from 6 a.m. until 4:30

3    during the day.

4           THE COURT:  Is it a place where people come and work

5    out, or can come and work out?

6           PROSPECTIVE JUROR BEHOUNEK:  Yes.

7           THE COURT:  Oh.  And if your son or husband aren't

8    available, the doors are shut?

9           PROSPECTIVE JUROR BEHOUNEK:  They would have to be,

10   yeah.

11          THE COURT:  Would you be worried that that would

12   happen, or could happen in the next two weeks?

13          PROSPECTIVE JUROR BEHOUNEK:  Well, yes.

14          THE COURT:  What do the clients do when the doors

15   are shut?

16          PROSPECTIVE JUROR BEHOUNEK:  Well, they can't work

17   out.

18          THE COURT:  Do they -- I assume they get a little

19   upset.

20          PROSPECTIVE JUROR BEHOUNEK:  I would assume that

21   they would.

22          THE COURT:  I'm going to excuse you.

23          PROSPECTIVE JUROR BEHOUNEK:  Okay.

24          THE CLERK:  Sara Love.

25          THE COURT:  Ms. Love, have you heard the questions?

1          PROSPECTIVE JUROR LOVE:  Yes, sir.

2          THE COURT:  Would this cause you a significant

3     hardship?

4          PROSPECTIVE JUROR LOVE:  No, sir.

5          THE COURT:  Thank you.

6          Now anybody else down here in this row?

7       (No response.)

8          THE COURT:  All right.  Before I introduce the

9     attorneys to you, I am going to read you a preliminary

10    statement of the case to give you an idea of what this civil

11    case is about.

12         This case involves a dispute over whether there's

13    insurance coverage for liabilities resulting from groundwater

14    contamination being caused by chemicals in the ground at the

15    old Dyce Chemical plant in the Lockwood area.  Soco West,

16    Inc., or Soco, now owns that site, and it contends that there

17    is insurance coverage for that liability under a series of

18    insurance policies that Dyce Chemical bought from United

19    States Fidelity and Guaranty Company, USF&G, and the

20    Continental Insurance Company, Continental, from 1978 to 1985.

21         USF&G and Continental started the lawsuit, and,

22    therefore, they're referred to as the plaintiffs, and Soco is

23    referred to as the defendant.  However, because it's Soco that

24    contends there is insurance coverage, Soco is the party who

25    has the burden of establishing that it's more likely than not

1   that the events that caused the groundwater contamination fall

2   within the coverages afforded by the USF&G and Continental

3   policies.

4          Dyce Chemical, Inc., formerly known as Dyce Sales

5   and Engineering Service Company, began operating in the

6   Billings area in 1957.  Dyce sold and distributed a variety of

7   chemical products to refineries, mines, drycleaners, and other

8   businesses.  In 1973, Dyce began operating at the site in

9   Lockwood.

10          In 1989, Dyce was acquired by a company called HCI.

11          In 2001, Dyce was acquired by a company called

12   Brenntag West, which changed its name to Soco in 2005.

13          Because Soco is the successor to Dyce and owns the

14   Lockwood site, it's liable for damages resulting from the

15   costs of cleaning up the groundwater contamination.

16          You will not determine in this case whether the

17   pollution should be cleaned up.  It will be cleaned up

18   regardless.

19          At the same time, Soco is also entitled to any

20   insurance coverage for those liabilities and costs that are

21   provided by the policies sold to Dyce by USF&G and

22   Continental.

23          In 2000, the United States Environmental Protection

24   Agency, the EPA, and the Montana Department of Environmental

25   Quality, the DEQ, claimed that Dyce was liable for damages in

1    the amount of the cost of cleaning up the groundwater

2    contamination at the Dyce site in Lockwood.

3           In addition, several Lockwood area residents sought

4    damages from Dyce because of the groundwater contamination.

5    Soco settled the claims of the Lockwood residents and is

6    currently working with the EPA and DEQ to determine the most

7    appropriate way to remedy the groundwater contamination.

8           In the insurance policies issued by USF&G and

9    Continental, they agreed to pay all sums that Dyce becomes

10   legally obligated to pay as damages, because of property

11   damage to which the insurance applies, caused by an

12   occurrence.  The policies define "property damage" to include

13   physical injury to or destruction of tangible property.  There

14   is really not a dispute that the groundwater contamination of

15   the Lockwood site constitutes property damage.

16          The policies define "occurrence" to mean an

17   accident, including continuous or repeated exposure to

18   conditions which results in property damage neither expected

19   nor intended from the standpoint of Dyce.  The policies

20   contain a condition that, when there was an occurrence, Dyce

21   was required to give the insurance company written notice.

22          Now the policies excluded from coverage liability

23   for property damage arising out of the discharge, dispersal,

24   release, or escape of chemicals, contaminants, or pollutants

25   into or upon the land, or into any water course or body of

1    water.   However, the policies also say that the exclusion that

2    I just read, which is the pollution exclusion, doesn't apply

3    if such discharge, dispersal, release, or escape was sudden

4    and accidental.

5         In this case, Soco contends that USF&G and

6    Continental have a duty to pay cleanup costs and other damages

7    claimed by the governmental agencies and the Lockwood area

8    residents because the groundwater damages claimed by the

9    agencies and the residents occurred during the years that were

10   covered by insurance policies that USF&G and Continental sold

11   to Dyce, and, also, those damages were caused by events that

12   fall within the definition of "covered event" as set forth in

13   the policies.

14        USF&G and Continental, on the other hand, contend

15   that Soco cannot meet its burden of proof on these issues and

16   so there is no coverage.

17        In the case -- and this is just preliminary.  I am

18   telling you these things so you'll have an idea of what the

19   issues are that you will be, in an overall sense, deciding.

20        It will be these factual issues:

21        One, whether there was groundwater contamination at

22   or near the Soco facility caused by an occurrence;

23        Two, whether that contamination arose out of a

24   sudden and accidental release of a chemical known as

25   perchloroethylene during -- and it's commonly referred to as

1    "perc" -- during 1975, '76, '77, or early 1978;

2         Three, whether that contamination was occurring on

3    or before the end of calendar year 1978;

4         And whether Soco gave notice to the insurers under

5    the policy.

6         Now who, on this jury, has either read or heard

7    about this problem in Lockwood with the groundwater?

8       (Show of hands.)

9         THE COURT:  Where is the microphone?

10        PROSPECTIVE JUROR KUHR:  I have it.

11        THE COURT:  All right.  We'll start with you.

12        PROSPECTIVE JUROR KUHR:  I have heard about it from

13   a friend of mine who lives in Lockwood.

14        THE COURT:  And does this friend assert or claim

15   that their groundwater is affected by this perc?

16        PROSPECTIVE JUROR KUHR:  Yes.  That's correct.

17        THE COURT:  Other than the friend telling you about

18   this, do you think you know anything else about it?

19        PROSPECTIVE JUROR KUHR:  No, but I would -- I

20   think -- I don't know that I would be unbiased.

21        THE COURT:  Who do you think you might be biased

22   towards?

23        PROSPECTIVE JUROR KUHR:  Well --

24        THE COURT:  It's going to be -- the EPA and the

25   governmental agencies are cleaning it up.  It's going to be

67

1   cleaned up one way or the other.

2          PROSPECTIVE JUROR KUHR:  I know.  Yes.  I guess my

3   problem would be that it happened at all and that I would

4   question the speed at which the government would take care of

5   this.

6          THE COURT:  You would question the what?

7          PROSPECTIVE JUROR KUHR:  The speed.  I mean, it

8   looks like it's been there a long time.

9          THE COURT:  And to be honest with you, I can't

10  remember or tell you when it was discovered.  There will be,

11  I'm sure, evidence in this case.

12         Do you think, because of your friend being involved,

13  that you're going to be unable to sit as a fair and impartial

14  juror to listen to the facts and make the determinations that

15  I was talking about in general terms?

16         PROSPECTIVE JUROR KUHR:  I'm afraid I would not be

17  unprejudiced.  I would be prejudiced, yes.

18         THE COURT:  Would you be prejudiced against Soco,

19  the successor company to Dyce, or to the insurance companies,

20  or everybody?

21         PROSPECTIVE JUROR KUHR:  Probably the whole

22  situation, but --

23         THE COURT:  You know, if the prejudices are equal,

24  that's fine.

25         PROSPECTIVE JUROR KUHR:  That's true.  That's true.

1              I just would have problems with this, the

2    groundwater and that sort of thing.  I just don't know.

3              THE COURT:  You're excused.

4              THE CLERK:  Melisa Warner.

5              THE COURT:  Ms. Warner, have you heard the questions

6    I've asked to now?

7              PROSPECTIVE JUROR WARNER:  I have.

8              THE COURT:  Would you have responded to any of them?

9              PROSPECTIVE JUROR WARNER:  To the hardship one.

10             THE COURT:  Tell me.

11             PROSPECTIVE JUROR WARNER:  My husband has recently

12   been cut back from a full-time position at his job to about a

13   day or two a week, whenever they need him.  We have a

14   3-year-old and one on the way, and I am the only person

15   bringing in any income, basically, to pay our bills.

16             THE COURT:  You're excused.

17             PROSPECTIVE JUROR WARNER:  Thank you.

18             THE CLERK:  Rebecca Dickerson.

19             THE COURT:  Ms. Dickerson, have you heard the

20   questions?

21             PROSPECTIVE JUROR DICKERSON:  Yes.

22             THE COURT:  Would you have responded to any?

23             PROSPECTIVE JUROR DICKERSON:  No.

24             THE COURT:  Thank you.

25             Now who else had their hand up about the --

1          PROSPECTIVE JUROR STEVENSON:  (Indicating.)

2          THE COURT:  Yes, Ms. Stevenson.  Pass it back there

3     to No. 1.

4          PROSPECTIVE JUROR STEVENSON:  I had heard a little

5     bit about it from my sister, who also lived in Lockwood.

6          THE COURT:  What have -- I mean, I don't need to

7     know the specifics of what you've heard.  I assume you've

8     heard -- perhaps she claims that her groundwater is --

9          PROSPECTIVE JUROR STEVENSON:  Actually, no, she

10    didn't claim that.  Just a little bit about it, you know, this

11    and that, that it was contaminated, that there was

12    contamination out there.

13         THE COURT:  All right.

14         PROSPECTIVE JUROR STEVENSON:  But nothing that I

15    would be biased about.

16         THE COURT:  Okay.  Is there anything about that that

17    would affect your ability to be fair and impartial?

18         PROSPECTIVE JUROR STEVENSON:  No, I don't believe

19    so.

20         THE COURT:  And one of the rules, if you end up

21    serving as a trial juror on a case, one of the rules that you

22    have to follow, all trial jurors have to follow, is that you

23    can't talk to other people about the case during the time the

24    trial is on.  Once you've reached a verdict and you are

25    otherwise discharged as a juror, then you can talk to whoever

1   you want, but during the trial, you can't talk to other people

2   about the case, about the testimony that's coming in.  You

3   can't even talk amongst yourselves as jurors until you get in

4   the jury room to deliberate the case.  You can't talk about

5   the case.

6          Would you have any problem following that kind of

7   admonition?

8          PROSPECTIVE JUROR STEVENSON:  No.  She no longer

9   lives in Lockwood --

10          THE COURT:  Okay.

11          PROSPECTIVE JUROR STEVENSON:  -- so it's not

12   something we discuss.

13          THE COURT:  Okay.  Was there somebody else in the

14   back row?  In the front row or back row?

15          PROSPECTIVE JUROR BAILEY:  (Indicating.)

16          THE COURT:  Ms. Bailey.

17          PROSPECTIVE JUROR BAILEY:  My knowledge is limited

18   to reading in the newspaper and stuff.  I just wanted to say I

19   had heard of the case, but I don't have any predisposition on

20   this particular issue.

21          THE COURT:  Well, whatever you think you've read or

22   that you've heard, would you be able to forget and just base a

23   verdict on the evidence that comes before you here during the

24   trial?

25          PROSPECTIVE JUROR BAILEY:  Yes.

1          THE COURT:  Thank you.

2          Any of you live in Lockwood?

3          PROSPECTIVE JUROR DIEDE:  (Indicating.)

4          THE COURT:  Ms. Diede.  I thought that was a

5    familiar name.  Go ahead.

6          PROSPECTIVE JUROR DIEDE:  Yes, I do live in

7    Lockwood.  I live on Johnson Lane, which is not terribly far

8    from the area.

9          THE COURT:  Do you have a problem with the

10   groundwater, or do you use the groundwater at all?

11         PROSPECTIVE JUROR DIEDE:  No.

12         THE COURT:  The fact that you live in Lockwood,

13   would that prevent you from being fair and impartial to one

14   side or the other in this case?

15         PROSPECTIVE JUROR DIEDE:  I don't believe so.

16         THE COURT:  You've lived there a long time, haven't

17   you?

18         PROSPECTIVE JUROR DIEDE:  We have lived there a long

19   time.

20         THE COURT:  Anything about what you think you know

21   about the case that would affect your ability in any way to be

22   fair and impartial?

23         PROSPECTIVE JUROR DIEDE:  I don't believe so.

24         THE COURT:  Anybody else live in Lockwood?

25      (No response.)

1          THE COURT:  Anybody else think you've heard or know

2   something about the case?

3       (No response.)

4          THE COURT:  I need to introduce the attorneys.

5          First, Soco, who, in essence, has the burden of

6   proof in this case because they're claiming coverage, even

7   though the insurance companies brought the action as a

8   declaratory action, Soco is represented locally by Mr. Larry

9   Cozzens, and I think Mr. Banker and Mr. Lynch, but you go

10  ahead, Mr. Cozzens, and introduce your cocounsel who will be

11  also significantly involved in the trial of the case.

12         MR. COZZENS:  Yes, Your Honor.

13         I'm Larry Cozzens from Billings.  With me is Paul

14  Banker and Chris Lynch, and they will be cocounsel with me in

15  this case.

16         THE COURT:  Now Mr. Banker and Mr. Lynch are from

17  Minneapolis, so I probably should ask this, but do any of you

18  know either one of them?

19      (No response.)

20         THE COURT:  I think, in some of the proposed

21  attorney questions, they proposed that I ask if you have had

22  anything to do with all of these lawyers.  It would be a waste

23  of time.

24         Let me focus on Mr. Cozzens.  Any of you know

25  Mr. Cozzens?  He's here in Billings, an attorney.

1          (No response.)

2                THE COURT:  All right.  The insurers are

3     represented; USF&G is represented by a Montana attorney from

4     Butte, Mr. Marshal Mickelson, and Mr. John Grossbart and

5     Robert Johnson are here representing USF&G.  They're from

6     Chicago.  I am not going to ask you about their firm or them.

7                Mr. Mickelson, please introduce your cocounsel.

8                MR. MICKELSON:  Thank you, Your Honor.

9                I'm Marshal Mickelson from Butte with the firm of

10    Corette, Pohlman and Kebe.  I've got Rob Johnson here and John

11    Grossbart, and Wendy Enerson is also here as part of our

12    group, and this is our client, Dave Nanzig, from USF&G.

13               THE COURT:  Thank you.

14               You know, there was a time when I started practicing

15    law years ago when this -- say, this (indicating) -- this

16    group represented almost the whole Yellowstone County bar,

17    there were that few.

18               Any of you know Mr. Mickelson or his firm in Butte?

19               PROSPECTIVE JUROR DUNHAM:  (Indicating.)

20               THE COURT:  Ms. Dunham.

21               PROSPECTIVE JUROR DUNHAM:  Yes.

22               THE COURT:  Go ahead.

23               PROSPECTIVE JUROR DUNHAM:  I know Mr. Mickelson

24    because my older sister went to school with he and his wife

25    and were friends for some time.

74

1          THE COURT:  Now would that affect your ability to be

2   fair and impartial as a trial juror in this case?

3          PROSPECTIVE JUROR DUNHAM:  I don't believe so.

4          THE COURT:  If, during your deliberations, if the

5   evidence that you believed or the jury believed warranted a

6   finding against Mr. Mickelson's client, would you be worried

7   that your family would be upset because you, perhaps, arrived

8   at a verdict that was against one of their friends?

9          PROSPECTIVE JUROR DUNHAM:  No, sir.

10          THE COURT:  Thank you.

11          And you wouldn't vote in favor of his client just

12   because they happened to be friends?

13          PROSPECTIVE JUROR DUNHAM:  No, sir.

14          THE COURT:  Do you know him at all?

15          PROSPECTIVE JUROR DUNHAM:  I remember him vaguely

16   from high school.  He was two years ahead of me.

17          THE COURT:  That's a long time ago.

18          PROSPECTIVE JUROR DUNHAM:  Hey.

19      (Laughter.)

20          THE COURT:  I guess you got me there.  I was taking

21   a shot at him and inadvertently got you.

22          MR. MICKELSON:  She was the younger sister.

23          THE COURT:  No, I was going to say that you were

24   probably in high school or in grade school when you remembered

25   him, or kindergarten, perhaps.

1              All right.  Anybody else know Mr. Mickelson?

2         (No response.)

3              THE COURT:  And I do agree that he's a lot younger

4    than me, so that helps.

5              See, I'm in this hole, and I'm trying to dig out of

6    it.

7              All right.  Continental is represented by

8    Great Falls attorney Mr. Max Davis and Mr. Steven Crane from

9    Los Angeles and Brian Walsh from San Francisco.

10             Introduce those gentlemen.

11             MR. DAVIS:  I'm Max Davis from Great Falls.  The

12   name of the firm up there is Davis, Hatley, Haffeman & Tighe.

13   Mr. Crane is next to me, and Mr. Walsh is next to him.

14             And our client, I should say, is -- the judge

15   indicated Continental Insurance Company which has since been

16   acquired by CNA Insurance, and from Chicago, the environmental

17   department of CNA, Brian Frankl is our client.

18             THE COURT:  Thank you.

19        (Discussion off the record.)

20             THE COURT:  Do any of you know Mr. Davis?

21        (No response.)

22             THE COURT:  Or the members of his firm in

23   Great Falls?

24        (No response.)

25             THE COURT:  Do I need to ask if you know any of the

1  lawyers from out of state?

2       (No response.)

3       THE COURT:  Have any of you ever been in the area of

4  what is the old Dyce Chemical plant out there in Lockwood, now

5  the business owned by Soco?

6       (No response.)

7       THE COURT:  Have any of you or members of your

8  family ever have any education, training, or job-related

9  experience in environmental chemical handling or distribution,

10  insurance claims, insurance claim law, contracts or insurance?

11      (Show of hands.)

12      THE COURT:  All right.  Ms. Bailey.

13      PROSPECTIVE JUROR BAILEY:  Directly out of college

14  in the '80s, early '80s, I worked in Energy Laboratories, an

15  environmental testing company, for a year and a half.  I

16  worked predominantly in the oil and gas department.

17      THE COURT:  Is that the company that's down here off

18  of -- was it here in Billings?

19      PROSPECTIVE JUROR BAILEY:  Yes, it's the one on

20  South 27th.

21      THE COURT:  Right.  And what kind of work did you do

22  in that laboratory predominantly in the oil and gas area?

23      PROSPECTIVE JUROR BAILEY:  It was basically

24  analyzing test samples for chemical components, searching out

25  for specific chemicals in the water or, in my case, quality of

1    the oil and gas samples provided.

2              THE COURT:  What is your occupation?

3              PROSPECTIVE JUROR BAILEY:  Currently I work at the

4    Yellowstone County Council on Aging, working with seniors, so

5    I have gone very far afield from that very early period.

6              THE COURT:  What kind of education do you have that

7    puts you in that job with Energy Laboratories?

8              PROSPECTIVE JUROR BAILEY:  I graduated in 1979 with

9    a fish and wildlife degree.

10             THE COURT:  Anything about your past employment and

11   experience with Energy Laboratories in the 1980s that would

12   affect your ability in any way to be a fair and impartial

13   trial juror in this case?

14             PROSPECTIVE JUROR BAILEY:  I don't believe so.

15             THE COURT:  Have you had any other employment since

16   the '80s somewhat in the environmental business, since then?

17             PROSPECTIVE JUROR BAILEY:  No.

18             THE COURT:  Thank you.

19             Who else had their hand up?

20             PROSPECTIVE JUROR KERESTES:  (Indicating.)

21             THE COURT:  Back there in the corner, Mr. Kerestes.

22             PROSPECTIVE JUROR KERESTES:  "Kerestes."

23             THE COURT:  "Kerestes."  Just like it's spelled

24   here.  "Kerestes."  Okay.  Go ahead.

25             PROSPECTIVE JUROR KERESTES:  I've been involved

1    quite a bit with CERCLA and RCRA in regard to Superfund sites,

2    water quality from that, mining, cyanide problems.

3              THE COURT:  What's your occupation?

4              PROSPECTIVE JUROR KERESTES:  I'm a mining engineer.

5              THE COURT:  Do you live here?

6              PROSPECTIVE JUROR KERESTES:  Yes, I do.

7              THE COURT:  Who do you work for?

8              PROSPECTIVE JUROR KERESTES:  I work for the Bureau

9    of Land Management.

10             THE COURT:  Okay.  What kind of involvement have you

11   had with CERCLA?

12             PROSPECTIVE JUROR KERESTES:  It was more on the

13   technical idea of the mining, and I come from the mining and

14   mining waste aspect of it, and basically just working with

15   people.  I'm not a hydrologist.

16             THE COURT:  Do you think, with your background, you

17   would be able to sit here as a trial juror and listen to the

18   evidence and base a verdict solely on the evidence that you

19   hear from the witness stand or see through exhibits that are

20   introduced?

21             PROSPECTIVE JUROR KERESTES:  No, I wouldn't have any

22   problem.

23             THE COURT:  Okay.  Anything about your occupation

24   now and your training and your past experience that would

25   affect your ability to be fair and impartial as a trial juror

1    to either side in this case?

2              PROSPECTIVE JUROR KERESTES:  No, sir.

3              THE COURT:  Thank you.

4              Who else has experience in this kind of thing?

5         (No response.)

6              THE COURT:  Have any of you, or members of your

7    family, ever worked for or with the EPA or the Montana

8    Department of Environmental Quality, DEQ?

9         (No response.)

10             THE COURT:  Have any of you ever had the EPA or DEQ

11   investigating you or your property in some way or another?

12        (No response.)

13             THE COURT:  Did I see a hand?

14        (No response.)

15             THE COURT:  You were just scratching.

16             PROSPECTIVE JUROR PIERCE:  Yes.

17             THE COURT:  I guess that's one of the things about

18   being a prospective juror.  You're sitting around like

19   somebody at an auction, and you don't want to move or you

20   might buy something.

21             Have any of you or members of your immediate family

22   been injured through chemical or toxic exposure of some type?

23             PROSPECTIVE JUROR STEVENSON:  (Indicating.)

24             THE COURT:  Yes.  Pass it on down to Ms. Stevenson,

25   No. 1.

1          PROSPECTIVE JUROR STEVENSON:  I have, through

2     groundwater.  I contracted cancer through groundwater that

3     was, I guess, bad.

4          THE COURT:  Where were you living at the time?

5     Where you're living now?

6          PROSPECTIVE JUROR STEVENSON:  No.  No, I relocated.

7          THE COURT:  Where were you living?

8          PROSPECTIVE JUROR STEVENSON:  I was living in

9     Ashland, still.

10          THE COURT:  Okay.  And I have to ask, how was it

11     determined that groundwater caused cancer?

12          PROSPECTIVE JUROR STEVENSON:  Actually it was never

13     determined.  They just suspected that that was the reason that

14     I got it.

15          THE COURT:  What kind of contamination was there in

16     the groundwater that that's what they suspected was the cause

17     of your cancer?

18          PROSPECTIVE JUROR STEVENSON:  I don't know.  It was

19     some type of chemical that wasn't supposed to be there.  I

20     don't remember a lot about that time.

21          THE COURT:  How long ago?  How many years ago?

22          PROSPECTIVE JUROR STEVENSON:  2001.

23          THE COURT:  2001.

24          Do you think that, because of that fact, that that

25     would prevent you from being a fair and impartial trial juror

1    in this case?

2              PROSPECTIVE JUROR STEVENSON:  It might.  It could, I

3    guess.

4              THE COURT:  What do you think?

5              PROSPECTIVE JUROR STEVENSON:  I'd hate to say no,

6    because I, you know, I thought I had moved on from a lot of

7    that, but in the earlier years there was a lot of blame.  So

8    I'd hate to say no, that I wouldn't.

9              THE COURT:  Now this is not a suit involving some

10   party claiming that they were, at least in this case,

11   personally injured as a result of consumption of this

12   groundwater that is contaminated with perc, which is a

13   drycleaning solvent using in the drycleaning business.

14             PROSPECTIVE JUROR STEVENSON:  Um-hmm.

15             THE COURT:  Was there ever talk about you filing a

16   claim against somebody for this alleged contaminated

17   groundwater?

18             PROSPECTIVE JUROR STEVENSON:  We didn't concentrate

19   on that, because I, I wasn't expected to live.  We didn't

20   concentrate on that at all.  We concentrated on other things

21   that had happened at that point.

22             THE COURT:  And you apparently were treated.

23             PROSPECTIVE JUROR STEVENSON:  (Nodded head

24   affirmatively.)

25             THE COURT:  And is it in remission?

82

1          PROSPECTIVE JUROR STEVENSON:  Yeah.  Yep.

2          THE COURT:  How long have you been cancer-free?

3          PROSPECTIVE JUROR STEVENSON:  Since 2004.

4          THE COURT:  So you're past the five-year mark.

5          PROSPECTIVE JUROR STEVENSON:  Um-hmm.

6          THE COURT:  That's good.

7          PROSPECTIVE JUROR STEVENSON:  Yeah.  It was in the

8    last stage, too.

9          THE COURT:  Well, you tell me.  Do you think, do you

10   think that just having a cursory view of what this case is

11   about, and your own experience, do you think that your

12   judgment would prejudice you against Soco or the insurers or

13   both?

14         PROSPECTIVE JUROR STEVENSON:  I really don't think

15   so.  I think I could stay impartial, you know.

16         THE COURT:  All right.  Thank you.

17         Who else?  Anybody else?

18      (No response.)

19         THE COURT:  I'll tell you what we're going to do.

20   People are getting a little nervous, a little antsy.  So am I.

21   We're going to take about a ten-minute break.

22         Those of you in the back yet who haven't been

23   called, I need you to come back.  Those of you up here in the

24   14 chairs, take a seat in the same chair you're in.  This is

25   going to be about a ten-minute break.  Thank you.

1          THE LAW CLERK:  All rise.

2      (Recess taken from 10:43:30 to 11:04:16.)

3      (Open court.)

4      (Prospective jurors present.)

5          THE COURT:  Please be seated.

6          I didn't mean for that recess to take that long.  I

7  got in there and got a call from a fellow judge, and I am

8  reminded, as the chief judge, my job is like herding cats.

9          All right.  Any of you ever worked in the

10 drycleaning business?

11     (No response.)

12         THE COURT:  Have any of you ever worked for an

13 insurance company?

14     (No response.)

15         THE COURT:  Any of you ever worked for a chemical

16 company?

17     (No response.)

18         THE COURT:  Were any of you ever employed by Dyce or

19 its successor companies, Brenntag West or . . .

20     (No response.)

21         THE COURT:  Any of you ever worked with the chemical

22 PCE or perc, used in the drycleaning business?

23     (No response.)

24         THE COURT:  Used, I think, in other things, too.

25         Any of you aware of -- and I don't know if I asked

                              84

1    this or not, or somehow involved in any insurance claim for

2    groundwater contamination or any other kinds of claims?

3         (No response.)

4              THE COURT:  Any of you ever made claims to insurance

5    companies where the claims were denied?

6              PROSPECTIVE JUROR CURREY:  (Indicating.)

7              THE COURT:  Where is the mike?

8              PROSPECTIVE JUROR STEVENSON:  (Handing.)

9              THE COURT:  Mr. Currey, I think.

10             PROSPECTIVE JUROR CURREY:  Yes.  It was just a water

11   leak under a dishwasher.

12             THE COURT:  Was it denied?

13             PROSPECTIVE JUROR CURREY:  Yes.

14             THE COURT:  Did that upset you?

15             PROSPECTIVE JUROR CURREY:  Certainly.

16             THE COURT:  And would you hold it against these

17   insurance companies?

18             PROSPECTIVE JUROR CURREY:  No.  No, I wouldn't hold

19   it against them.

20             THE COURT:  The fact that you had one, had a claim

21   denied, do you think that would affect your ability to be fair

22   and impartial --

23             PROSPECTIVE JUROR CURREY:  No.

24             THE COURT:  -- to the insurance companies?

25             PROSPECTIVE JUROR CURREY:  No.

1          THE COURT:  Or to Soco?

2          PROSPECTIVE JUROR CURREY:  No.

3          THE COURT:  Anybody else ever had a claim denied

4   where you thought it was wrong?

5     (No response.)

6          THE COURT:  Do any of you have membership in or

7   belong to environmental groups like the Sierra Club, the

8   Nature Conservancy, Northern Plains Resource Council, things

9   like that?

10          PROSPECTIVE JUROR BAILEY:  (Indicating.)

11          THE COURT:  Yes, Ms. Bailey.

12          PROSPECTIVE JUROR BAILEY:  I contribute to the

13   Montana Nature Conservancy.

14          THE COURT:  Anything about your membership there

15   that would affect your ability to be fair and impartial as a

16   trial juror in this case, do you think?

17          PROSPECTIVE JUROR BAILEY:  No.

18          THE COURT:  Thank you.

19          Anybody else?

20     (No response.)

21          THE COURT:  Now have any of you ever been a

22   plaintiff in a civil case before?

23     (No response.)

24          THE COURT:  Any of you ever been sued, been a

25   defendant in a civil case before?

1          PROSPECTIVE JUROR STEVENSON:  I have been a

2     plaintiff, not a defendant.

3          THE COURT:  Okay.  Where is the mike?

4          PROSPECTIVE JUROR BAILEY:  (Handing.)

5          THE COURT:  Ms. Stevenson, what kind of case were

6     you a plaintiff in?

7          PROSPECTIVE JUROR STEVENSON:  I was actually acting

8     on behalf of my son who was stuck by a needle from a teacher.

9          THE COURT:  I see.  And did you have a lawyer?

10         PROSPECTIVE JUROR STEVENSON:  Yes.

11         THE COURT:  Did the suit go to trial or was it

12    settled?  Or what happened to it?

13         PROSPECTIVE JUROR STEVENSON:  We went to trial -- or

14    went to court once.  They stuck my son with a needle that was

15    hep- -- a guy had hepatitis C and then stuck members of his

16    class.  And we went into court, and I think they settled out

17    of court right before it started, is what it was.

18         THE COURT:  Were you satisfied with the outcome of

19    the case?

20         PROSPECTIVE JUROR STEVENSON:  We were thankful that

21    it didn't go to court, because I didn't want to expose my

22    child to what would have happened.

23         THE COURT:  Anything about your experience as a

24    plaintiff in that case that would impact or affect your

25    ability to be fair and impartial as a juror in this case?

1              PROSPECTIVE JUROR STEVENSON:  No.

2              THE COURT:  Any of the rest of you been, either been

3    sued or brought an action?

4              PROSPECTIVE JUROR LOVE:  (Indicating.)

5              THE COURT:  Yes.  Go ahead.

6              PROSPECTIVE JUROR LOVE:  I had a wrongful

7    termination sexual harassment suit.

8              THE COURT:  What was the outcome?

9              PROSPECTIVE JUROR LOVE:  It was settled.

10             THE COURT:  Okay.  To your satisfaction?

11             PROSPECTIVE JUROR LOVE:  Yeah.

12             THE COURT:  You were the plaintiff?

13             PROSPECTIVE JUROR LOVE:  I was.  Yes, I was the

14   plaintiff.

15             THE COURT:  Anything about your experience in that

16   case that would affect your ability to be fair and impartial

17   in this one as a juror?

18             PROSPECTIVE JUROR LOVE:  No, sir.

19             THE COURT:  Thank you.

20             Anybody else?

21             PROSPECTIVE JUROR KERESTES:  (Indicating.)

22             THE COURT:  Yes, pass it back there to Mr. Kerestes,

23   No. 7 down there.

24             PROSPECTIVE JUROR LOVE:  (Complied with request.)

25             PROSPECTIVE JUROR KERESTES:  I was involved in a

1    plane crash years ago, and they filed a lawsuit on that, and

2    it was settled before it went to court.

3            THE COURT:  Who filed a lawsuit?  I mean, I don't

4    need names.

5            PROSPECTIVE JUROR KERESTES:  Those of us that were

6    in the plane, the group.

7            THE COURT:  Oh, okay.  Okay.  Was it settled to your

8    satisfaction?

9            PROSPECTIVE JUROR KERESTES:  It was at the time, for

10   sure.

11           THE COURT:  Anything about your experience in that

12   case as a plaintiff that would affect your ability to be fair

13   and impartial here?

14           PROSPECTIVE JUROR KERESTES:  No, Your Honor.

15           THE COURT:  Thank you.

16           Anybody else?

17           PROSPECTIVE JUROR BRAUNSTADTER:  (Indicating.)

18           THE COURT:  Oh, down here.

19           PROSPECTIVE JUROR BRAUNSTADTER:  I was in two

20   separate car accidents and filed medical, and they settled

21   with me both times.

22           THE COURT:  Okay.  Did you have attorneys?

23           PROSPECTIVE JUROR BRAUNSTADTER:  No.

24           THE COURT:  Oh.  Okay.  Anything about -- so was

25   there a lawsuit?  Did you file a lawsuit without an attorney,

1   or did you have to go so far as to file a lawsuit?

2           PROSPECTIVE JUROR BRAUNSTADTER:  No.

3           THE COURT:  Okay.  Anything about your experience in

4   that case as a claimant that would affect your ability to be

5   fair and impartial in this case?

6           PROSPECTIVE JUROR BRAUNSTADTER:  I don't believe so.

7           THE COURT:  Thank you.

8           Anybody else that I haven't talked to?

9     (No response.)

10          THE COURT:  Now have any of you ever served on a

11   jury before?

12     (Show of hands.)

13          THE COURT:  Where is the mike?

14          PROSPECTIVE JUROR BRAUNSTADTER:  (Indicating.)

15          THE COURT:  Pass it right down here to Ms. Taylor.

16          PROSPECTIVE JUROR BRAUNSTADTER:  (Complied with

17   request.)

18          THE COURT:   Go ahead.

19          PROSPECTIVE JUROR TAYLOR:  I served for the county.

20          THE COURT:  What kind of a case?

21          PROSPECTIVE JUROR TAYLOR:  I served on two cases.

22   One was a land, to determine how much this land should be sold

23   for.

24          THE COURT:  A condemnation of some kind?

25          PROSPECTIVE JUROR TAYLOR:  Well, it was land that

1   the city wanted to buy for a park, and the individuals owned

2   it, and they wanted a lot of money for it, and they had bought

3   the land years before.

4           THE COURT:  Do you remember who the verdict was for?

5           PROSPECTIVE JUROR TAYLOR:  The verdict was in favor

6   of the city buying the land.

7           THE COURT:  Okay.

8           PROSPECTIVE JUROR TAYLOR:  We kind of had to set a

9   price for the sale of the land.

10          THE COURT:  Sure.  How about the other suit?

11          PROSPECTIVE JUROR TAYLOR:  The other suit was a

12  murder case, and I was an alternate on that.

13          THE COURT:  So you eventually did not deliberate?

14          PROSPECTIVE JUROR TAYLOR:  No.  I had to sit in on

15  it all, but I couldn't --

16          THE COURT:  Yeah.

17          PROSPECTIVE JUROR TAYLOR:  -- do anything, you know,

18  say anything, have any say in it.

19          THE COURT:  Anything about your experience as a

20  trial juror in either that criminal case or the civil case

21  that would affect your ability to be fair and impartial in

22  this one?

23          PROSPECTIVE JUROR TAYLOR:  Well, in that particular

24  case, this murder happened right at the end of my street, so I

25  sort of knew some of the circumstances around it, and I was a

91

1   little disgruntled at what they would allow in the case.

2   Said, you know, the fellow was killed; his wife shot him.  And

3   they would allow things in her defense but they didn't allow

4   things in his defense, and I –– this was when they lived in

5   California, kind of things that would maybe bring up to the

6   point where she did what she did or he did what he did, you

7   know.  They would allow things kind of for her, but they

8   didn't allow the same type of things for him in defense, and

9   it kind of ––

10          THE COURT:  The rules are somewhat different in a

11  criminal case as opposed to a case like this, a civil case.

12          PROSPECTIVE JUROR TAYLOR:  Right.  I understand

13  that.

14          THE COURT:  Well, do you think that that experience

15  would affect your ability to be fair and impartial as a trial

16  juror in this case?

17          PROSPECTIVE JUROR TAYLOR:  I don't believe so.

18          THE COURT:  All right.

19          Who else served on a jury?

20      (Show of hands.)

21          THE COURT:  Pass it right down here to Ms. Rath.

22          PROSPECTIVE JUROR TAYLOR:  (Complied with request.)

23          THE COURT:  Go ahead.

24          PROSPECTIVE JUROR RATH:  It's been 25 years ago.

25          THE COURT:  What kind of case?

1          PROSPECTIVE JUROR RATH:  It was a DUI.

2          THE COURT:  Criminal case.

3          PROSPECTIVE JUROR RATH:  (Nodded head

4    affirmatively.)

5          THE COURT:  Do you remember if the verdict was

6    guilty or not guilty?

7          PROSPECTIVE JUROR RATH:  I don't remember what it

8    was.

9          THE COURT:  I don't blame you for that, 25 years

10   ago.

11         Anything about your experience that would have any

12   effect at all on your ability to be fair and impartial in this

13   case?

14         PROSPECTIVE JUROR RATH:  No, sir.

15         THE COURT:  Thank you.

16         Who else?

17      (Show of hands.)

18         THE COURT:  Pass it back there to Ms. Diede.

19         PROSPECTIVE JUROR RATH:  (Complied with request.)

20         THE COURT:  Go ahead.

21         PROSPECTIVE JUROR DIEDE:  I was on two different

22   criminal cases in the county.

23         THE COURT:  Do you remember what the charges were?

24         PROSPECTIVE JUROR DIEDE:  I do.  One was rape, and

25   the other one was murder.  And they were found guilty in both

1    cases.

2              THE COURT:  Do you understand the burden of proof on

3    the prosecutor, which is the side asserting the affirmative of

4    the issue, in essence, the burden of proof in a criminal case

5    on the prosecutor or the plaintiff is significantly higher

6    than it is on the party asserting the affirmative of an issue

7    in a civil case?

8         (No response.)

9              THE COURT:  Do you understand, in a criminal case,

10   the burden of proof is a lot higher?  It's beyond a reasonable

11   doubt as opposed to, in this civil case, preponderance of the

12   evidence.  Do you understand that?

13             PROSPECTIVE JUROR DIEDE:  I do.

14             THE COURT:  Okay.

15             Anything about your experience as a trial juror in

16   those cases that would affect your ability to be fair and

17   impartial?

18             PROSPECTIVE JUROR DIEDE:  I don't believe so.

19             THE COURT:  Thank you.

20             Who else down there in the back row?

21             PROSPECTIVE JUROR KERESTES:  (Indicating.)

22             THE COURT:  Down to Mr. Kerestes.

23             PROSPECTIVE JUROR DIEDE:  (Complied with request.)

24             PROSPECTIVE JUROR KERESTES:  I have been involved in

25   three trials.  I'm trying to think of the order.  The first

1    one was a franchise infringement case.  The second one was a

2    DUI, felony DUI.  And the third one was an auto accident.

3              THE COURT:  Okay.  So you had two civil cases and a

4    criminal case?

5              PROSPECTIVE JUROR KERESTES:  Yes.

6              THE COURT:  Okay.  So you've participated in cases

7    where you understand the difference between the burden of

8    proof on the government in a criminal case versus the burden

9    of proof in a civil case?

10             PROSPECTIVE JUROR KERESTES:  Yes, I do.

11             THE COURT:  Anything about your experience in those

12   cases that would affect your ability to be fair and impartial

13   in this case?

14             PROSPECTIVE JUROR KERESTES:  No, Your Honor.

15             THE COURT:  Thank you.

16             Who else?

17             PROSPECTIVE JUROR MILLER:  (Indicating.)

18             THE COURT:  Mr. Miller.

19             PROSPECTIVE JUROR MILLER:  Sexual harassment case

20   about five years ago.

21             THE COURT:  Anything about your experience in that

22   case that would affect your ability to be fair and impartial

23   here?

24             PROSPECTIVE JUROR MILLER:  No.

25             THE COURT:  Do you remember if the verdict was for

1   the plaintiff or the defendant?

2                 PROSPECTIVE JUROR MILLER:  The plaintiff.

3                 THE COURT:  Okay.  Anybody else?

4         (No response.)

5                 THE COURT:  Now I was mentioning the burden of

6   proof.  In a civil case such as this, when the trial starts,

7   if you can visualize the scales of justice, the scales are

8   evenly balanced.

9                 In a criminal case, if I were to have you visualize

10  the scales of justice when the case starts, the scales of

11  justice aren't evenly balanced because the defendant is

12  entitled to the presumption of innocence, so there is a lot of

13  weight on the side of the scale in the defendant's favor.

14                In a civil case, the scales are evenly balanced.

15  The side that is entitled to win is the side that produces the

16  preponderance of the evidence, the probabilities of the

17  evidence.  If you determine, in the verdict, that it's more

18  likely than not that Soco's right, they're entitled to the

19  verdict.  If you determine, in your deliberations, that the

20  insurers are more likely than not correct, they're entitled to

21  the verdict.  It's just a balancing of the probabilities.

22  Whoever tips it in their favor is entitled to your verdict.

23                Anybody on this prospective jury who is going to be,

24  for some reason or another, unable to apply that burden of

25  proof to this case?

```
1          (No response.)

2               THE COURT:  Do any of you have insurance policies

3   with Continental, St. Paul, Travelers, USF&G, CNA?

4          (No response.)

5               THE COURT:  Any of you insured by them?

6          (No response.)

7               THE COURT:  Well, Counsel, I know you've both

8   included potential witnesses in your proposed questions, but I

9   am not about to go through all of these names.

10         (Discussion off the record.)

11              THE COURT:  All right.  I am going to read you the

12  names of some people who might be called as witnesses.  If you

13  recognize the names, let me know.

14              Some people will be called by deposition.  That

15  means during the course of this litigation, parties have had

16  opportunities to take depositions of people who may know

17  something about the case.  When the deposition is taken, they

18  go into the witness -- the attorneys are there.  They have a

19  court reporter there, and everything that's asked and all of

20  the answers are taken down.  It's sworn testimony in a

21  deposition.  Those depositions can be used for any purpose

22  during the trial.

23              These names:  Charles Bender.  Richard Colver.

24  Wayne Grip.  Kenneth Grzybowski.  Craig -- is it "Guelff"?

25              MR. COZZENS:  "Guelff."
```

```
 1              THE COURT:  Guelff.  Rodney Hallsten.  Donald
 2   Hargis.  Delmer Hutchinson.  Suzanne Miller.  Monte Naff.
 3   Larry Nelson.  Robert Powell.  Desmond Slater.  Dennis
 4   St. George.  James Sullivan.  David Warne.  Richard Brill.
 5   Dr. Bruce E. Dale.  Marvin Johnson.  Kenneth Kjos.  Dr. Peter
 6   Shanahan.  Jeffrey Simko.  Dr. Yaron Sternberg.  And
 7   Kristen K. Stout.
 8              Does anybody recognize any of those names?
 9              PROSPECTIVE JUROR ECKHARDT:  (Nodded head
10   affirmatively.)
11              PROSPECTIVE JUROR COX:  Yes.
12              THE COURT:  In the back, Ms. Eckhardt.
13              PROSPECTIVE JUROR ECKHARDT:  I think I know
14   Dr. Marvin Johnson.  Is that the name?
15              THE COURT:  Well, no, he's not -- is he a doctor?
16              MR. DAVIS:  No.
17              THE COURT:  No.
18              PROSPECTIVE JUROR ECKHARDT:  Oh, he's not a doctor.
19   I don't know him.
20              THE COURT:  Okay.  Pass it on down here to Ms. Cox.
21              PROSPECTIVE JUROR ECKHARDT:  (Complied with
22   request.)
23              PROSPECTIVE JUROR COX:  About four of them.
24              THE COURT:  Shoot.
25              PROSPECTIVE JUROR COX:  Miller, St. John, Johnson.
```

1    They're patients of mine.

2          THE COURT:  And what do you do?

3          PROSPECTIVE JUROR COX:  I'm a nurse.

4          THE COURT:  Where?

5          PROSPECTIVE JUROR COX:  Billings Clinic.

6          THE COURT:  When they've been in as patients, have

7    they talked about this case, do you know?

8          PROSPECTIVE JUROR COX:  No.  It's usually short and

9    abrupt, to the point, why they're here.

10          THE COURT:  Okay.  If they get on the stand live or

11   by deposition -- when I say get on the stand by deposition,

12   the parties can read depositions.  It's just as if they're

13   testifying from the witness chair -- and they are your

14   patients, these ones that you've named, would you tend to give

15   their testimony more credibility just because they're your

16   patients as opposed to somebody who is not your patient?

17          PROSPECTIVE JUROR COX:  No.

18          THE COURT:  Thank you.

19          Oh.  Yeah, I see here somebody that was pointed out

20   to me, James Diede.  Do you know him?

21          PROSPECTIVE JUROR DIEDE:  The first name again?

22          THE COURT:  James Diede.

23          PROSPECTIVE JUROR DIEDE:  Depends on how old he is,

24   but, yes, I do know several, several James or Jim Diedes.

25          THE COURT:  How old is he?

1              MR. LYNCH:  Sixties?

2              MR. MICKELSON:  He lives in Missoula now.

3              MR. LYNCH:  Mid 60s?

4              MR. MICKELSON:  Yeah, I'd say mid 60s.

5              PROSPECTIVE JUROR DIEDE:  He's my husband's cousin.

6              THE COURT:  Okay.  If he comes to testify, either in

7    person or by deposition, would you give his testimony more

8    weight and credibility because he's your husband's cousin than

9    somebody who isn't your husband's cousin?

10             PROSPECTIVE JUROR DIEDE:  I know him to be an

11   honorable man.  I would hope everyone else called would also

12   be honorable.

13             THE COURT:  Well, you know, that's not a bad thing,

14   assuming that everybody is honorable and going to be honest,

15   really.  And I, to be honest with you, I don't know what he's

16   going to testify to.  I think he may -- it would be a

17   deposition that was taken, and so it would be testimony that

18   he had given at some other time, although it's like he had

19   given it at trial.

20             Is he going to be here?

21             MR. LYNCH:  No.  By deposition, Your Honor.

22             THE COURT:  Yeah.

23             Okay.  Would you agree to sit and listen to what his

24   testimony is and not give it any more credibility just because

25   of the relationship?

1            PROSPECTIVE JUROR DIEDE:  Yes.

2            THE COURT:  I think that's all we can ask.

3            Now were there other people that recognized some of

4    these names I haven't talked to?

5        (No response.)

6            THE COURT:  Here are some more, and I'm not saying

7    they're going to be:  Judi Childs.  John Cleveland.  Tracy

8    Downing.  Steven Dyce.  Seymour Everett.  Frank Hartman.  Don

9    Henderson.  Rudy Hernandez.  David Jirik.  Marvin Johnson,

10   again.  Douglas Johnston.  David Pillatzke.  Paula Rose.

11   Thomas Terp.  Brent Fowler.  David Nanzig.  Elden Dickinson.

12           Do any of you recognize any of those names?

13           PROSPECTIVE JUROR CURREY:  Is Frank Hartman from

14   Miles City?

15           MR. LYNCH:  I don't believe so.  I believe he's from

16   Billings.

17           PROSPECTIVE JUROR CURREY:  Okay.

18           THE COURT:  Any of you recognize any of those names?

19       (No response.)

20           THE COURT:  You know, I am going to quit asking.

21           You may ask questions, Mr. Banker or Mr. Lynch or

22   Mr. Cozzens.  You may *voir dire* the jury.  And the podium will

23   turn.

24           MR. COZZENS:  Thank you, Your Honor.

25           Good morning again.  My name is Larry Cozzens.  I'm

1    here with Paul Banker and Chris Lynch representing Soco West,

2    and I have some questions.

3           How well do you know, Ms. Diede, how well do you

4    know James Diede, your husband's cousin?

5           PROSPECTIVE JUROR DIEDE:  Well, I've gone to his

6    children's weddings and that sort of thing, but we've not sat

7    across the table and played cards or that sort of thing.  Been

8    at family reunions.  That sort of thing.

9           MR. COZZENS:  Do you know where he was employed

10   during his worklife?

11          PROSPECTIVE JUROR DIEDE:  I'm assuming that it was

12   at Dyce, but I don't know that.

13          MR. COZZENS:  Okay.  You also raised your hands, I

14   think, when the judge asked if you had ever been to the Dyce

15   site.  You have been to the Dyce site?

16          PROSPECTIVE JUROR DIEDE:  If it's where I think it

17   is, almost daily I drive by there, now that there's so many

18   road detours in Lockwood.  I drove by there this morning on my

19   way to get here.

20          MR. COZZENS:  Okay.  Have you ever been actually on

21   the site itself doing any kind of business?

22          PROSPECTIVE JUROR DIEDE:  I haven't.

23          MR. COZZENS:  Have you ever had any conversations

24   with James Diede about his employment?

25          PROSPECTIVE JUROR DIEDE:  No.

1              MR. COZZENS:  Okay.  And you don't even know for

2    sure that he worked at Dyce Chemical?

3              PROSPECTIVE JUROR DIEDE:  I don't.  I feel bad I

4    don't.

5              THE COURT:  That's okay.

6              MR. COZZENS:  It is okay.

7              And you live in Lockwood?

8              PROSPECTIVE JUROR DIEDE:  I do.

9              MR. COZZENS:  Has that been true throughout the '70s

10   and the '80s?

11             PROSPECTIVE JUROR DIEDE:  Yes.

12             MR. COZZENS:  I think you said you had never talked

13   to anybody who had complained about groundwater out there.  Is

14   that true?

15             PROSPECTIVE JUROR DIEDE:  I just --

16             MR. COZZENS:  I could be wrong.

17             PROSPECTIVE JUROR DIEDE:  I think I've had a paper

18   bag over my head or something.

19             MR. COZZENS:  That's okay, too.

20             PROSPECTIVE JUROR DIEDE:  I know that they have come

21   to our property and asked about a well out in the bottom of a

22   coulee that isn't active and that sort of thing, checking for

23   groundwater, but I guess I didn't ask enough to know why other

24   than they were checking the area.

25             MR. COZZENS:  I want to reiterate to all of you now

1    that the only purpose of this is for us to try to find a jury,

2    and, in particular, obviously I'm here representing Soco, and

3    we want to make sure that we have a jury that's fair to Soco.

4          Soco acquired Dyce Chemical in -- I think Brenntag

5    acquired it in 2001 and then changed its name to Soco.  The

6    events that caused the contamination in this case, by

7    everybody's estimation, occurred many, many years before that.

8          My first question is, Is there anybody who just has

9    even an inkling that something called a chemical company must

10   be a pollutant?

11        (No response.)

12        MR. COZZENS:  Ms. Bailey, when you were doing

13   testing on chemicals, did you form any opinion about the

14   people who were using those chemicals?

15        PROSPECTIVE JUROR BAILEY:  No.  My job was just

16   doing statistical information for those companies so that they

17   would therefore -- some of it was for EPA work, meeting

18   regulations and stuff, but, you know, our customers were often

19   chemical companies, oil companies, and there was not a good or

20   bad thing to it.  It was just someone has to run the

21   information they need to do their job.

22        MR. COZZENS:  Okay.  And in that job, did you become

23   aware of EPA regulations regarding the use and storage of

24   chemicals?

25        PROSPECTIVE JUROR BAILEY:  Not in a greater scheme.

1   I knew how we had to store our samples on location, but I

2   don't have any idea of any of the federal laws or anything

3   like that.

4          MR. COZZENS:  Okay.  And your job, then, never got

5   you in a position of having to even know what the regulations

6   were for storing chemicals out on a chemical company site?

7          PROSPECTIVE JUROR BAILEY:  No.

8          MR. COZZENS:  Okay.  There's nobody here who just

9   has in the back of their mind from television or anything else

10  that something called a chemical company is probably a

11  polluter?

12      (No response.)

13          MR. COZZENS:  Okay.  In this case, Dyce Chemical

14  didn't actually manufacture chemicals.  They would buy it,

15  store it in bulk, distribute it to other businesses in the

16  area.  And one of the principal chemicals that they -- not one

17  of the principal chemicals that they stored -- let me slow it

18  down here.  I know that clock is ticking.

19          One of the principal -- the principal problem in

20  this case is because of perchloroethylene or perc.  Now the

21  judge has told you that's used at drycleaners.  In fact, when

22  you go to drycleaners, if you recognize that drycleaner smell,

23  that's what you're smelling, is perc.  It's used also by

24  refiners and a number of other things, but it really wasn't a

25  big percentage of the chemicals that were handled by Dyce

 1   Chemical and sold to other people.

 2          Does anybody have any experience at all in the

 3   storing or distribution of chemicals to other businesses?

 4       (No response.)

 5          MR. COZZENS:  Is there anybody here that, before

 6   today, had even heard of perchloroethylene?

 7       (No response.)

 8          PROSPECTIVE JUROR KERESTES:  I know what it is.

 9   That's all.

10          MR. COZZENS:  You know you did?

11          PROSPECTIVE JUROR KERESTES:  Yeah.

12          MR. COZZENS:  But you don't know any more about

13   that?

14          PROSPECTIVE JUROR KERESTES:  Other than what it's

15   primarily used for.

16          MR. COZZENS:  Okay.  Can you get the mike to Mr. --

17          PROSPECTIVE JUROR BAILEY:  (Complied with request.)

18          MR. COZZENS:  I heard you say it.  "Kerestes"?

19   Close?  "Kerestes"?

20          PROSPECTIVE JUROR KERESTES:  "Kerestes."

21          MR. COZZENS:  "Kerestes."  Thank you.

22          You also answered a question from Judge Cebull

23   saying that you had been involved in Superfund sites?

24          PROSPECTIVE JUROR KERESTES:  Yes, the ARCO Superfund

25   site over at Butte.

106

1           MR. COZZENS:  Okay.

2           PROSPECTIVE JUROR KERESTES:  I was involved in that.

3           MR. COZZENS:  And what was your involvement?

4           PROSPECTIVE JUROR KERESTES:  It started out

5    primarily with the history of the mining claims and whether

6    those claims -- who ended up owning those claims 120 years

7    later and who was responsible.

8           MR. COZZENS:  I'm sorry; could you speak more

9    directly into the mike?

10          PROSPECTIVE JUROR KERESTES:  It started off with the

11   ownership of the claims from a hundred years ago and how that

12   changed and rattled through and who would have been the

13   responsible party, depending on the changes of title along the

14   way, between ARCO and the federal government.

15          MR. COZZENS:  And did your involvement change in

16   that Superfund site?

17          PROSPECTIVE JUROR KERESTES:  I don't think I

18   understand you.

19          MR. COZZENS:  I thought you said it started out

20   looking like that.

21          PROSPECTIVE JUROR KERESTES:  Well, okay.

22          MR. COZZENS:  Did it end up doing that, too?

23          PROSPECTIVE JUROR KERESTES:  I was involved in it

24   off and on all the way through that stage and mostly meeting

25   with the attorneys and from the technical end of it.  The

107

1    groundwater questions were just peripheral to primarily the

2    ownership.

3            MR. COZZENS:  Okay.  Was the ownership necessary to

4    determine who was responsible for the cost of the cleanup, do

5    you know?

6            PROSPECTIVE JUROR KERESTES:  I don't know for sure.

7            MR. COZZENS:  Okay.  Let's define, if we could, the

8    Superfund site that you're talking about.  Are we talking

9    about the area along the Clark Fork River between Butte and

10   Deer Lodge?

11           PROSPECTIVE JUROR KERESTES:  It was principally the

12   area around the Butte hill itself and out as far as, well, in

13   that basin, the Silver Bow Basin down to -- I can't remember

14   the name of it.

15           MR. COZZENS:  Okay.  So it wasn't the Superfund site

16   that has to do with the Anaconda Copper Company and the

17   chemicals that went down the Clark Fork River?

18           PROSPECTIVE JUROR KERESTES:  Not from the smelter

19   site, no.

20           MR. COZZENS:  Okay.  In the course of doing that

21   work, did you form any opinions about companies that use

22   chemicals?

23           PROSPECTIVE JUROR KERESTES:  No, I didn't.

24           MR. COZZENS:  You have no opinions about how

25   chemicals can somehow be released into the environment?

1          PROSPECTIVE JUROR KERESTES:  No.

2          MR. COZZENS:  Did you learn anything about EPA

3   regulations concerning the handling and use of chemicals?

4          PROSPECTIVE JUROR KERESTES:  A little bit.

5          MR. COZZENS:  When was it that you were involved

6   with this site?

7          PROSPECTIVE JUROR KERESTES:  That was primarily in

8   probably the late '80s to the mid '90s.

9          MR. COZZENS:  Okay.  Did you have any knowledge of

10  those EPA regulations or whether they existed at all back in

11  the mid '70s?

12         PROSPECTIVE JUROR KERESTES:  Repeat that.

13         MR. COZZENS:  Did you know whether these EPA

14  regulations that you became somewhat aware of, did you know

15  whether they even existed back in the mid '70s?

16         PROSPECTIVE JUROR KERESTES:  Yes, I do know they

17  existed from just --

18         MR. COZZENS:  Are you saying --

19         PROSPECTIVE JUROR KERESTES:  -- my background in

20  engineering.

21         MR. COZZENS:  I'm sorry; I talked over you, and I

22  will try not to do that.  Could you finish that answer,

23  please?

24         PROSPECTIVE JUROR KERESTES:  I was aware of some of

25  the regulations just primarily because that's part of

1    engineering and working with mines.

2              MR. COZZENS:  Okay.  And has it been part of your

3    job to stay current on the status of EPA regulations?

4              PROSPECTIVE JUROR KERESTES:  No, it hasn't.

5              MR. COZZENS:  Mrs. Stevenson -- can we pass her the

6    mike, please?

7              PROSPECTIVE JUROR KERESTES:  (Complied with

8    request.)

9              MR. COZZENS:  First of all, I was really sorry to

10   hear that you got cancer and that you believe that that was

11   caused by some groundwater contamination.

12             PROSPECTIVE JUROR STEVENSON:  Thank you.

13             MR. COZZENS:  Do you know how that groundwater got

14   contaminated?

15             PROSPECTIVE JUROR STEVENSON:  I do not.

16             MR. COZZENS:  Do you know what the chemical was?

17             PROSPECTIVE JUROR STEVENSON:  I don't recall what it

18   was.  I don't remember a lot about that time.

19             MR. COZZENS:  And so I take it you never knew who

20   was responsible for putting the chemical into the ground?

21             PROSPECTIVE JUROR STEVENSON:  No, sir.

22             MR. COZZENS:  You told me that, for a long time, you

23   had blame?  That's understandable.

24             PROSPECTIVE JUROR STEVENSON:  I did.

25             MR. COZZENS:  You don't have to apologize for that.

1          Are you sure you're over that blame now?

2          PROSPECTIVE JUROR STEVENSON:  I'd like to think that

3    I am.

4          MR. COZZENS:  Put yourself, if you would, in my

5    shoes for just a second, where I have an important case to try

6    for Soco West, who is the successor to Dyce Chemical.  If you

7    were up here and I were sitting where you're sitting with your

8    experience, would you want me on your jury?

9          PROSPECTIVE JUROR STEVENSON:  Probably not.

10         MR. COZZENS:  Okay.  And why not?

11         PROSPECTIVE JUROR STEVENSON:  Because I would think

12   that if you were in my position, that you would have an

13   opinion formed already.

14         MR. COZZENS:  Okay.

15         THE COURT:  Do you?

16         PROSPECTIVE JUROR STEVENSON:  I really don't.  Well,

17   you know, I actually never believed that it was the chemical.

18   I always thought it was the power, the power, because we had

19   power poles right next to where I spent most of my time, and I

20   never believed it was the chemicals.  I always thought it was

21   the power.

22         THE COURT:  Well, when Mr. Cozzens asked you the

23   question, if you were standing where he's standing, would you

24   want a juror in your frame of mind, you said no.  That's not

25   good.  You probably know that.

1          PROSPECTIVE JUROR STEVENSON:  Yeah.

2          THE COURT:  If somebody from the insurers got up

3    there and said, "Come up here and stand where we are.  Would

4    you like to have a juror in your frame of mind sitting in

5    judgment on us?" would you say the same thing?

6          PROSPECTIVE JUROR STEVENSON:  I would say the same

7    thing.

8          THE COURT:  Are you indicating that you wouldn't

9    want a juror in your frame of mind sitting on the case

10   regardless of what side you're talking about in this case,

11   either Soco or the insurers?

12         PROSPECTIVE JUROR STEVENSON:  I am.

13         THE COURT:  Well, then, the question is, How will

14   that or how could that prejudice your verdict?

15         PROSPECTIVE JUROR STEVENSON:  I, you know, I can't

16   say that it will.  I think, you know, I don't have hard

17   feelings towards -- you know, as you can see, I laugh about

18   it, thinking, you know, who I think was responsible.  But if I

19   were in their shoes, I guess, and having someone sitting on

20   the jury that has -- that they said was, you know, from the

21   chemicals and stuff, I, you know, it would be a concern of

22   mine.

23         THE COURT:  Sure.  But do you think you can put that

24   aside, as you're sitting here, and decide who, if either side,

25   has met their burden of proving their case --

1          PROSPECTIVE JUROR STEVENSON:  Sure, I could.

2          THE COURT:  -- and render a verdict, without letting

3    the fact that you thought you had cancer caused by power poles

4    and then somebody told you it was water?  Do you think you can

5    do that?

6          PROSPECTIVE JUROR STEVENSON:  Sure, I can.

7          THE COURT:  Good enough for me.

8          MR. COZZENS:  Okay.

9          Well, let me ask that same question of everybody on

10   the panel, which would be, Put yourself in my position up

11   here.  Let me be in each of those places.  I'm not quite that

12   big, but I move around a lot.  And tell me whether there's

13   anything about your opinions or your background or your work

14   experiences, anything at all, that would make you be concerned

15   about having me sit on a jury if you were out here

16   representing Soco.

17      (No response.)

18          MR. COZZENS:  Has anybody on this jury ever met

19   Quentin Dyce or Lois Dyce?

20      (No response.)

21          MR. COZZENS:  There was only one person here who --

22   let me put it this way.

23          The judge asked you if you were members of some of

24   the conservation societies.  Is there anybody here who

25   considers themself to be a conservationist or an environmental

1    advocate?

2          (No response.)

3          MR. COZZENS:  Nobody has ever had a job -- let me

4    put it this way.

5          Has anybody on the panel ever had a job where you

6    were in charge of storing or distributing chemicals?

7          (No response.)

8          MR. COZZENS:  I'm actually going to make the judge's

9    day and tell him that I have no further questions at this

10   time.

11         THE COURT:  Now if we keep this up for the next nine

12   days, it will make my day.

13         MR. COZZENS:  The 18th.

14         THE COURT:  But that's a good start.  That's a good

15   start.

16         MR. COZZENS:  Thank you.

17         Mr. Mickelson, or whoever is doing it for the

18   insurance companies.

19         MR. MICKELSON:  Thank you, Your Honor.

20         Good morning, ladies and gentlemen.

21         (Prospective jurors respond.)

22         MR. MICKELSON:  My name is Marshal Mickelson, and I

23   am now from Butte although, as you heard, I grew up here in

24   Billings.

25         Mrs. Diede, where did you teach school?

1            PROSPECTIVE JUROR DIEDE:  Oh, no.  Are you a former

2      student I didn't recognize?

3            MR. MICKELSON:  I'm not sure.

4            PROSPECTIVE JUROR DIEDE:  I worked at 17 different

5      schools.

6            MR. MICKELSON:  Okay.  So you've worked --

7            PROSPECTIVE JUROR DIEDE:  In Billings.

8            MR. MICKELSON:  -- in Billings in a lot of different

9      schools.  Somewhere in my past, I seem to remember you.  I

10     went to West High and had family teach at Senior High, too,

11     but the name was familiar.

12            Mrs. Diede, what we're trying to do, as USF&G, is

13     make sure, just as Mr. Cozzens said, that we have a jury

14     that's fair to both sides; that doesn't come into this

15     courtroom, thinking that one side -- Judge Cebull used the

16     example of the scales on the burden of proof, and I like that

17     example on a jury sitting here today, that neither side, the

18     insurance companies or Dyce Chemical/Soco, that they're not

19     tipped in favor or against one side.

20            And in your particular case, you, of course, know a

21     witness who is going to testify in this case and are related

22     by marriage to that witness; is that correct?

23            PROSPECTIVE JUROR DIEDE:  That's correct.

24            MR. MICKELSON:  And there's going to be testimony in

25     this case, you will find, that witnesses contradict each

1    other.   That's sometimes what witnesses do.   You know, if

2    Mr. Diede comes in here and testifies to X and Mr. Jones comes

3    in here and testifies to Y, does Mr. Diede start those scales

4    of justice a little higher than Mr. Jones because you know him

5    and, as you say, believe he's a good man?

6                PROSPECTIVE JUROR DIEDE:  Yes, he does.

7                MR. MICKELSON:  And --

8                PROSPECTIVE JUROR DIEDE:  I would like to think not,

9    but yes.

10               MR. MICKELSON:  And there's nothing wrong with that.

11   I mean, we're humans.   There's nothing wrong with you know

12   this person, you trust him, and you believe in him.   But for

13   my client, just as Mr. Cozzens said, if we were reversed and

14   you were trying to decide whether you would be a good juror on

15   that case, do you think that witness comes in with those

16   scales tipped a little bit against the witness that may say

17   he's not telling the truth?

18               PROSPECTIVE JUROR DIEDE:  Well, I do think it would

19   be tipped.

20               MR. MICKELSON:  It would be hard for you.

21               PROSPECTIVE JUROR DIEDE:  It would be very difficult

22   for me.   I guess I have never found him to be in a situation

23   where he wasn't honorable.

24               MR. MICKELSON:  And because it would be hard for

25   you, it might affect your ability to sit as a fair juror in

1    this case because that person has that little head start?

2         PROSPECTIVE JUROR DIEDE:  That's probably true.

3         MR. MICKELSON:  Okay.  Thank you.

4         Mr. Kerestes -- is that correct?

5         PROSPECTIVE JUROR KERESTES:  Yes.

6         MR. MICKELSON:  Okay.  You've -- did you graduate

7    from Montana Tech?

8         PROSPECTIVE JUROR KERESTES:  Yes, I did.

9         MR. MICKELSON:  Okay.  And you've been in the Butte

10   mining scene for a period of time and saw some of the

11   environmental problems that that has caused.  So have I.

12        Do you believe that that would, in any way, affect

13   your ability to make any judgments about the environmental

14   evidence that comes in in this case?

15        PROSPECTIVE JUROR KERESTES:  No.

16        MR. MICKELSON:  Do you feel that you would be able

17   to sit and make a fair determination about the evidence that

18   comes into this case, not what you may have learned in your

19   historical search through the Butte mining claims?

20        PROSPECTIVE JUROR KERESTES:  I would hope so.

21        MR. MICKELSON:  Okay.  Of course, I represent an

22   insurance company, and insurance companies aren't always the

23   best company, in some people's eyes, because people have

24   insurance claims.  Sometimes those claims are denied.

25   Sometimes people have fights with insurance companies.

1              Ms. Cox, you work in the medical community.

2              PROSPECTIVE JUROR COX:  Yes.

3              MR. MICKELSON:  Do you have any preconceived notions

4      about insurance companies?

5              PROSPECTIVE JUROR COX:  They're not good.

6              MR. MICKELSON:  And what we're trying to find here

7      is someone who can put aside whatever your personal feelings

8      are about an insurance company and say, "Yeah, I can be fair."

9      Do you think you can do that?

10             PROSPECTIVE JUROR COX:  No.

11             MR. MICKELSON:  Okay.

12             PROSPECTIVE JUROR COX:  I'm being honest.

13             MR. MICKELSON:  Well, we appreciate your honesty.

14             And does anyone else have that same feeling, that

15     because of --

16             THE COURT:  Let's just bring a stop to this.

17             MR. MICKELSON:  Okay.

18             THE COURT:  You're excused, ma'am.

19             PROSPECTIVE JUROR COX:  Sorry.

20             MR. MICKELSON:  No, no problem.  I appreciate your

21     honesty.  I really do.  That's what we're here to find out.

22             THE CLERK:  Kevin Michael Schott.

23             THE COURT:  You were that close.

24             PROSPECTIVE JUROR SCHOTT:  I was watching.

25             THE COURT:  Have you heard the questions I've asked?

1               PROSPECTIVE JUROR SCHOTT:  Yeah.

2               THE COURT:  Would you have responded to some of

3      them?

4               PROSPECTIVE JUROR SCHOTT:  Yeah.

5               THE COURT:  Tell me which ones.

6               PROSPECTIVE JUROR SCHOTT:  Quite a few.

7               THE COURT:  How about the first one?

8               PROSPECTIVE JUROR SCHOTT:  The first one, my wife

9      does at-home daycare, which is kind of slow, and I've got a

10     full-time job, which, I support everything.  Pay the mortgage

11     and everything.  Two weeks is a lot to miss out on.

12              THE COURT:  Will you be penalized?

13              PROSPECTIVE JUROR SCHOTT:  I don't know.

14              THE COURT:  Who do you work for?

15              PROSPECTIVE JUROR SCHOTT:  Ullman Lumber in

16     Big Timber.  That, and my kid's birthday is this week, too,

17     like that has to do with anything.

18              THE COURT:  You don't know if they're going to pay

19     you or if you have to just --

20              PROSPECTIVE JUROR SCHOTT:  I might have to take

21     vacation or something.  I don't know.

22              THE COURT:  I'll excuse you.

23              PROSPECTIVE JUROR SCHOTT:  Thank you.

24              THE CLERK:  Cynthia Weiss.

25              THE COURT:  Is it "Weiss" or "Weiss," ma'am?

1              PROSPECTIVE JUROR WEISS:  "Weiss."

2              THE COURT:  Ms. Weiss, have you heard the questions

3    that have been asked?

4              PROSPECTIVE JUROR WEISS:  Yes, I have.

5              THE COURT:  Would you have responded to any of them?

6              PROSPECTIVE JUROR WEISS:  No.

7              THE COURT:  All right.  You may proceed.

8              MR. MICKELSON:  Thank you, Your Honor.

9              And I appreciate the honesty.  Does anyone else have

10   a strong feeling one way or the other about insurance

11   companies?

12        (No response.)

13             MR. MICKELSON:  Mr. Currey, you had a small claim,

14   it sounds like, that was denied by your insurance company.

15             PROSPECTIVE JUROR CURREY:  That's correct.

16             MR. MICKELSON:  Okay.  That didn't cause you any

17   particular animosity to insurance companies?

18             PROSPECTIVE JUROR CURREY:  No, it didn't.  I've had

19   lots of good experiences with them, so it all balances out.

20             MR. MICKELSON:  Okay.  And you understand that an

21   insurance policy is a contract, and insurance policies cover

22   certain items, and they may not cover other certain items?

23             PROSPECTIVE JUROR CURREY:  (Nodded head

24   affirmatively.)

25             MR. MICKELSON:  And that's what we're here today to

1    find out about.

2              Is there anyone who has any particular experience

3    with insurance contracts through their work?

4              PROSPECTIVE JUROR HITTMEIER:  (Indicating.)

5              MR. MICKELSON:  Yes, ma'am.  Ms. Hittmeier?

6              PROSPECTIVE JUROR HITTMEIER:  Yes.

7              MR. MICKELSON:  Yes, ma'am.

8              PROSPECTIVE JUROR HITTMEIER:  It's not property and

9    casualty, but life insurance.

10             MR. MICKELSON:  Life insurance.  Because you're a

11   financial counselor?

12             PROSPECTIVE JUROR HITTMEIER:  Correct.

13             MR. MICKELSON:  Okay.  And so you give your clients

14   advice about life insurance options as part of their financial

15   planning?

16             PROSPECTIVE JUROR HITTMEIER:  Correct.

17             MR. MICKELSON:  And insurance is an important part

18   of that financial plan?

19             PROSPECTIVE JUROR HITTMEIER:  One component.

20             MR. MICKELSON:  One of the components.  And there's

21   nothing in that that would either make you feel more favorable

22   to an insurance company or less favorable to an insurance

23   company?

24             PROSPECTIVE JUROR HITTMEIER:  No.  It makes sense

25   sometimes, and sometimes not.

1          MR. MICKELSON:  Okay.

2          Ms. -- "Braunstadter," is it?

3          PROSPECTIVE JUROR BRAUNSTADTER:  (Nodded head

4    affirmatively.)

5          MR. MICKELSON:  You said you had a couple of car

6    accidents where you had a claim against insurance companies,

7    correct?

8          PROSPECTIVE JUROR BRAUNSTADTER:  Yes.

9          MR. MICKELSON:  And you didn't have to hire an

10   attorney to prosecute your claim?

11         PROSPECTIVE JUROR BRAUNSTADTER:  I did not.

12         MR. MICKELSON:  You were able to work with the

13   insurance company to get that resolved?

14         PROSPECTIVE JUROR BRAUNSTADTER:  Yes.

15         MR. MICKELSON:  Did you feel that they were fair in

16   that situation?

17         PROSPECTIVE JUROR BRAUNSTADTER:  Not at all.

18         MR. MICKELSON:  Not at all.

19         PROSPECTIVE JUROR BRAUNSTADTER:  Not at all.

20         MR. MICKELSON:  Okay.  What was it about that

21   relationship that caused you to feel that you weren't being

22   treated fairly?

23         PROSPECTIVE JUROR BRAUNSTADTER:  I guess because

24   nobody -- everybody looked at the moment and not where I would

25   be in 20 years.

 1          MR. MICKELSON:  Okay.  Did you feel like they were

 2    trying to take advantage of you, then?  Is that what --

 3          PROSPECTIVE JUROR BRAUNSTADTER:  They were trying to

 4    save money.  That's their business.

 5          MR. MICKELSON:  Okay.  And that experience on your

 6    part, as we walk into this courtroom, does that tip the scales

 7    a little bit in favor of someone who is making a claim on

 8    their insurance policy against the insurance company?

 9          PROSPECTIVE JUROR BRAUNSTADTER:  I don't believe so,

10    because this, from what I understand, is covered by a contract

11    between two parties, and the law should uphold one of those

12    contracts.

13          MR. MICKELSON:  Okay.  And so in this case, you

14    would be willing to listen to the evidence, listen to the

15    instructions the judge gives you, and decide whether or not

16    there is insurance coverage in this particular case versus in

17    your case --

18          PROSPECTIVE JUROR BRAUNSTADTER:  Yes.

19          MR. MICKELSON:  -- the difference.

20          Do you feel if you were out here representing the

21    insurance company, knowing what you know about yourself, do

22    you feel that you could be a fair and impartial juror, and, in

23    this case, the company that's making the claim on the

24    insurance policy, they don't have a head start?

25          PROSPECTIVE JUROR BRAUNSTADTER:  If I were an

1    insurance company, certainly I would be worried.

2              MR. MICKELSON:  You would be worried about you.

3              PROSPECTIVE JUROR BRAUNSTADTER:  I would be worried

4    about everyone on the jury.

5              MR. MICKELSON:  Well, I appreciate that honesty, and

6    that's what we're trying to find out.  We're trying to find

7    out if anyone has any preconceived notions about insurance

8    companies.

9              PROSPECTIVE JUROR BAILEY:  (Indicating.)

10             MR. MICKELSON:  I'll get right to you.

11             But the question for you, Mrs. Braunstadter, is, If

12   you were the insurance company, would you want you sitting in

13   judgment of this lawsuit?

14             PROSPECTIVE JUROR BRAUNSTADTER:  I don't know who

15   they would want sitting here.

16             MR. MICKELSON:  Well, knowing you and your

17   experience with an insurance company, would you --

18             PROSPECTIVE JUROR BRAUNSTADTER:  Probably not.

19             MR. MICKELSON:  Okay.  And do you feel that, because

20   of that, the company making the claim against the insurance

21   policy in this case has a little bit of a head start?

22             PROSPECTIVE JUROR BRAUNSTADTER:  I think the whole

23   point of a jury is to have different opinions.

24             MR. MICKELSON:  I appreciate that.  But in your

25   particular case, with your opinion, do you believe they'd have

1  a little bit of a head start?

2          PROSPECTIVE JUROR BRAUNSTADTER:  No, not unless

3  you're going to eliminate everyone who has an opinion.

4          MR. MICKELSON:  Okay.  And I'm not trying to

5  eliminate people that have opinions.  I'm trying to understand

6  the people that may have an opinion that would affect your

7  judgment and give one side a head start.  Do you understand

8  that difference?

9          PROSPECTIVE JUROR BRAUNSTADTER:  I do, but until you

10 hear the evidence, you don't know who is -- what they're

11 contending.  You don't know what the issue is.

12         MR. MICKELSON:  That's correct.  But we know that

13 one issue here is that Soco is trying to get insurance

14 coverage from the insurance companies in this case, just like

15 you were trying to get settlement of your claim.  And because

16 of your bad feeling in that relationship, do you think that

17 you, sitting as a juror in this case, would have a little bit

18 of a head start for Soco?

19         PROSPECTIVE JUROR BRAUNSTADTER:  I don't, but you

20 seem to.

21         MR. MICKELSON:  No, no.  Not at all.  I only want to

22 make sure that I understand what your position is, okay?

23         Thank you.

24         Yes, Ms. Bailey.

25         PROSPECTIVE JUROR BAILEY:  When you asked previously

125

1   about does anyone work with insurance in their business, at

2   the Yellowstone County Council On Aging, I am a shift

3   counselor, and I do assist seniors in understanding Medicare

4   and its supplemental insurances, Medicare Advantages and

5   Medicare prescription drug plans.

6           MR. MICKELSON:  Okay.  And in doing that work with

7   Medicare, has that made you form any particular opinions about

8   the Medicare supplemental coverages and insurers and those

9   sorts of folks?

10          PROSPECTIVE JUROR BAILEY:  No.  You know, it's just

11  part of a need for my clients, and so our point is mostly

12  informational.  We don't actually advise for one insurance

13  over another.  Actually we're specifically --

14          MR. MICKELSON:  Prohibited.

15          PROSPECTIVE JUROR BAILEY:  -- denied from doing

16  that.  We're just supposed to be informational.

17          MR. MICKELSON:  Okay.  I appreciate that.

18          PROSPECTIVE JUROR DICKERSON:  (Indicating.)

19          MR. MICKELSON:  Yes, ma'am.

20          PROSPECTIVE JUROR DICKERSON:  I do have a limited

21  lines insurance license.

22          MR. MICKELSON:  Okay.  So you've sold some

23  insurance?  You work for the credit union in Laurel?

24          PROSPECTIVE JUROR DICKERSON:  Yes.

25          MR. MICKELSON:  Congratulations, by the way, on the

1    victory in Butte Saturday night.

2              PROSPECTIVE JUROR DICKERSON:  Thank you.

3              MR. MICKELSON:  Would that relationship have any

4    difficulty for you with sitting in judgment in this case?

5              PROSPECTIVE JUROR DICKERSON:  No.

6              MR. MICKELSON:  Mrs. Weiss.  Right there.  Yep.

7              PROSPECTIVE JUROR WEISS:  It's "Weiss."

8              MR. MICKELSON:  "Weiss."  I'm sorry.  Someone said

9    "Weiss."  I knew it was "Weiss."

10             There was a lawsuit called the *Weiss* lawsuit arising

11   out of this Lockwood spill.  Are you related to any of those

12   folks?

13             PROSPECTIVE JUROR WEISS:  Not that I know of.

14             MR. MICKELSON:  No.  And you're from Glendive,

15   correct?

16             PROSPECTIVE JUROR WEISS:  Correct.

17             MR. MICKELSON:  And so you're not from Billings?

18             PROSPECTIVE JUROR WEISS:  No.

19             MR. MICKELSON:  The Court has given us, and we're

20   trying to stick to that schedule, about 15 minutes for each

21   side, and so my time, my 15 minutes, is about up.  But is

22   there anyone else who would have any difficulty with that

23   question of, "If I was representing the insurance company,

24   would I feel comfortable with myself sitting in judgment of

25   that insurance company's position?"

```
 1        (No response.)

 2              MR. MICKELSON:  All right.  Thank you very much.

 3              THE COURT:  Let's have a sidebar.

 4        (Discussion on the record at sidebar.)

 5              THE COURT:  Does Soco pass the jury for cause or

 6   not?

 7              MR. COZZENS:  We do.

 8              THE COURT:  Do you have some challenges for cause?

 9              MR. COZZENS:  No.

10              THE COURT:  How about the insurers?

11              MR. DAVIS:  I haven't done my bit yet.

12              THE COURT:  Oh, geez.  Sorry about that.  You don't

13   get to.

14              Do you have any?

15              MR. JOHNSON:  For cause?  I would challenge Diede,

16   Your Honor, who was related to one of the witnesses in the

17   case.

18              THE COURT:  And who else?

19              MR. MICKELSON:  Mrs. Braunstadter, right, who said

20   she would have difficulty.

21              THE COURT:  That's denied.  He rehabilitated her.

22   I'm going to throw Diede off there --

23              MR. JOHNSON:  Okay.

24              THE COURT:  -- unfortunately.

25              MR. DAVIS:  Do I still get my 15 minutes?
```

1           THE COURT:  I can't imagine you'll take 15 minutes.

2           MR. DAVIS:  Fourteen?

3           THE COURT:  What can you do?

4           MR. DAVIS:  Very little.  I want to ask some of the

5   ones who haven't said anything.  Fair game?

6           THE COURT:  All right.  We'll get up there, and I'll

7   remove Diede, so that's granted.  The other one is denied.

8           MR. DAVIS:  Okay.

9       (Open court.)

10      (Prospective jurors present.)

11          THE COURT:  Ms. Diede, you're excused, Ms. Diede.

12          PROSPECTIVE JUROR DIEDE:  Thank you.

13          THE CLERK:  Matthew Dunbar.

14          THE COURT:  Mr. Dunbar, have you heard the questions

15  that have been asked to now?

16          PROSPECTIVE JUROR DUNBAR:  Yes, I have.

17          THE COURT:  Where is that microphone?

18          PROSPECTIVE JUROR WEISS:  (Handing.)

19          THE COURT:  Would you have responded to any of them?

20          PROSPECTIVE JUROR DUNBAR:  Yes, I would have.  It

21  would have been to the hardship one.  I'm a full-time college

22  student.

23          THE COURT:  Are you missing classes right now?

24          PROSPECTIVE JUROR DUNBAR:  I am.

25          THE COURT:  What are you taking?

129

1          PROSPECTIVE JUROR DUNBAR:  Automotive technician.

2          THE COURT:  How are your grades?

3          PROSPECTIVE JUROR DUNBAR:  They're good.

4          THE COURT:  Two weeks would be a killer, probably,

5     huh?

6          PROSPECTIVE JUROR DUNBAR:  It would.

7          THE COURT:  You're excused.

8          THE CLERK:  Robert Engle.

9          THE COURT:  Mr. Engle, have you heard the questions

10    that have been asked?

11         PROSPECTIVE JUROR ENGLE:  Yes, I have.

12         THE COURT:  Why are you smiling?

13         PROSPECTIVE JUROR ENGLE:  Well, I've listened to a

14    lot, a lot of questions.

15         THE COURT:  Would you have responded to some of

16    them?

17         PROSPECTIVE JUROR ENGLE:  Yes, No. 1.  I am a public

18    school teacher in a small rural school, and two weeks away

19    from my students would be very detrimental to their education.

20    It's very difficult to get substitutes for that period of

21    time.

22         THE COURT:  Where is the school?

23         PROSPECTIVE JUROR ENGLE:  Forsyth Public Schools.

24         THE COURT:  I'll excuse you.

25         What do we have, one left?

```
 1              THE CLERK:  This is the last one.

 2              THE COURT:  All right.  That's all right.

 3              THE CLERK:  Betty Rothwell.

 4              THE COURT:  Ms. Rothwell, have you heard the

 5   questions that have been asked?

 6              PROSPECTIVE JUROR ROTHWELL:  Yes, I have.

 7              THE COURT:  Would you have responded to any of them?

 8              PROSPECTIVE JUROR ROTHWELL:  No. 1.

 9              THE COURT:  Tell me.

10              PROSPECTIVE JUROR ROTHWELL:  I have a husband at

11   home that depends on me, and I have a stress test to take on

12   Thursday.

13              THE COURT:  You're excused.  We'll leave it vacant.

14              Mr. Davis, you may voir dire.

15              MR. DAVIS:  Thank you, Judge.

16              THE COURT:  You may voir dire the jury.

17              And your number of peremptories has gone down,

18   gentlemen.

19              MR. DAVIS:  I take it both sides.

20              THE COURT:  Both sides.

21              MR. DAVIS:  Okay.

22              THE COURT:  Yeah.

23              MR. DAVIS:  All right.  Again, ladies and gentlemen,

24   my name is Max Davis.  I'm a lawyer from Great Falls.  So does

25   that put me at a disadvantage, or does it put my client at a
```

1    disadvantage?  I hope not.

2         (No response.)

3         MR. DAVIS:  And then I have two cocounsel from

4    California representing, with me, an insurance company.  Any

5    greater disadvantage there?

6         (No response.)

7         MR. DAVIS:  All right.

8         I just want to spend some of the time picking on

9    some of you who haven't had the microphone in your hand a lot.

10        Mr. Hartman, you would be one of them.

11        PROSPECTIVE JUROR HARTMAN:  Yes.

12        MR. DAVIS:  And you live in Livingston?

13        PROSPECTIVE JUROR HARTMAN:  Yes.

14        MR. DAVIS:  Tell me about your Greater Yellowstone

15   Woodworks.  What kind of business is that?

16        PROSPECTIVE JUROR HARTMAN:  It's a cabinetry

17   business.  I'm self-employed.

18        MR. DAVIS:  Okay.  And you would be willing to give

19   us two weeks?

20        PROSPECTIVE JUROR HARTMAN:  It's not going to be

21   easy for me, but I don't have a lot of work lined up.

22        MR. DAVIS:  Okay.

23        PROSPECTIVE JUROR HARTMAN:  So as long as I can

24   manage to afford gas to get down here, I'll be all right.

25        MR. DAVIS:  All right.  How long have you lived in

1   Livingston, sir?

2            PROSPECTIVE JUROR HARTMAN:  I moved there right

3   after high school.  It was '84.  I moved around the state, and

4   I've been living there continuously since mid '90s.

5            MR. DAVIS:  No one is going to argue with your

6   choice of town to live in.  It's a beautiful spot, isn't it?

7            PROSPECTIVE JUROR HARTMAN:  Yes.

8            MR. DAVIS:  All right.  And do you have insurance

9   for your business?

10            PROSPECTIVE JUROR HARTMAN:  No, I don't.

11            MR. DAVIS:  All right.  Do you have car insurance?

12            PROSPECTIVE JUROR HARTMAN:  Yes.

13            MR. DAVIS:  Okay.  Been in a car accident, ever?

14            PROSPECTIVE JUROR HARTMAN:  No.

15            MR. DAVIS:  All right.

16            PROSPECTIVE JUROR HARTMAN:  Well, when I was 16.

17            MR. DAVIS:  All right.  I take it, your folks' car?

18            PROSPECTIVE JUROR HARTMAN:  Yeah.

19            MR. DAVIS:  Okay.  And that was taken care of?

20   Nobody hurt?

21            PROSPECTIVE JUROR HARTMAN:  That's right.

22            MR. DAVIS:  All right.  Thank you, sir.

23            Ms. Eckhardt, what department of the clinic do you

24   work in?

25            PROSPECTIVE JUROR ECKHARDT:  I am a clinic nurse, so

1    I'm in seven different clinic areas.

2              MR. DAVIS:  Can you run them off?

3              PROSPECTIVE JUROR ECKHARDT:  What?

4              MR. DAVIS:  What departments do you work in?

5              PROSPECTIVE JUROR ECKHARDT:  Well, I work in

6    neurology, urology.  I'm just -- I haven't been there for very

7    long, so I haven't been in all of the areas yet, but I'm

8    working for the general surgeons.  I work for the cardiac

9    surgeons, neurosurgery, ophthalmology.

10             MR. DAVIS:  Where did you work before you went to

11   work at the clinic?

12             PROSPECTIVE JUROR ECKHARDT:  The women's prison.

13             MR. DAVIS:  Oh, down the street here.

14             PROSPECTIVE JUROR ECKHARDT:  Um-hmm.

15             MR. DAVIS:  How long -- did you work as a nurse at

16   the women's prison?

17             PROSPECTIVE JUROR ECKHARDT:  Yes.

18             MR. DAVIS:  All right.  I take it, a different kind

19   of patient base, or is it the same?  Do you have a --

20             PROSPECTIVE JUROR ECKHARDT:  It's kind of surprising

21   how much of it can be the same --

22             MR. DAVIS:  All right.

23             PROSPECTIVE JUROR ECKHARDT:  -- but, yeah, it's

24   different down there.

25             MR. DAVIS:  I mean, the important part, as a

1   healthcare practitioner, is to get an accurate history, isn't

2   it, from your patient?

3          PROSPECTIVE JUROR ECKHARDT:  Um-hmm.

4          MR. DAVIS:  And you'd sometimes have trouble with

5   the stories you were getting at the prison?

6          PROSPECTIVE JUROR ECKHARDT:  Yes.

7          MR. DAVIS:  All right.

8          Ms. Pierce, you work for a dairy farm?

9          PROSPECTIVE JUROR PIERCE:  Yes.  I milk cows.

10         MR. DAVIS:  You milk cows.

11         PROSPECTIVE JUROR PIERCE:  Yes.

12         MR. DAVIS:  Are you going to milk the cows and then

13  come in here from -- I think you're, what, working south of

14  town?

15         PROSPECTIVE JUROR PIERCE:  Belfry.

16         MR. DAVIS:  Okay.

17         PROSPECTIVE JUROR PIERCE:  South of Belfry,

18  actually.  It's in Clark, Wyoming.

19         MR. DAVIS:  How long have you been working on a

20  dairy farm?

21         PROSPECTIVE JUROR PIERCE:  Oh, I've probably worked

22  there about 12 years.

23         MR. DAVIS:  Okay.  How did you get into that line of

24  work?

25         PROSPECTIVE JUROR PIERCE:  Just wanted to raise my

1    kids where it was safe --

2            MR. DAVIS:  Uh-huh.

3            PROSPECTIVE JUROR PIERCE:  -- and that just happened

4    to be a job, and that came with a house.

5            MR. DAVIS:  Do you live out of Belfry, then?

6            PROSPECTIVE JUROR PIERCE:  In Belfry, yeah.

7            MR. DAVIS:  All right.  And where did you live

8    before Belfry, ma'am?

9            PROSPECTIVE JUROR PIERCE:  Wright, Wyoming.

10           MR. DAVIS:  Okay.  You just came north a little bit?

11           PROSPECTIVE JUROR PIERCE:  Yeah.

12           MR. DAVIS:  Enjoy the work?

13           PROSPECTIVE JUROR PIERCE:  Oh, yeah.

14           MR. DAVIS:  Okay.

15           PROSPECTIVE JUROR PIERCE:  It doesn't bother me.

16           MR. DAVIS:  All right.

17           Ms. Hittmeier, I realize you have talked, but I'll

18   pick on you a little.  I'm curious; your husband, on the

19   questionnaire, you said your husband was a manager.

20           PROSPECTIVE JUROR HITTMEIER:  Yes.

21           MR. DAVIS:  What does he manage?

22           PROSPECTIVE JUROR HITTMEIER:  Kampgrounds of

23   America, Inc.

24           MR. DAVIS:  Okay.  KOA?

25           PROSPECTIVE JUROR HITTMEIER:  Um-hmm.

1              MR. DAVIS:  Here in Billings?

2              PROSPECTIVE JUROR HITTMEIER:  Correct.

3              MR. DAVIS:  How long have you worked for Davidson?

4              PROSPECTIVE JUROR HITTMEIER:  Eight years.

5              MR. DAVIS:  Eight years?  And what did you do before

6     that?

7              PROSPECTIVE JUROR HITTMEIER:  Before that, I was

8     home with our kids for a decade.

9              MR. DAVIS:  Okay.

10             PROSPECTIVE JUROR HITTMEIER:  Prior to that, I

11    worked at Billings Clinic as an IT consultant.

12             MR. DAVIS:  All right.  Thank you.

13             Mr. Miller, you worked for the postal service?

14             PROSPECTIVE JUROR MILLER:  I retired in 2008.

15             MR. DAVIS:  How long did you work for the postal

16    service?

17             PROSPECTIVE JUROR MILLER:  Twenty-eight years.

18             MR. DAVIS:  Okay.  And did you have a route?

19             PROSPECTIVE JUROR MILLER:  Yes.

20             MR. DAVIS:  Whereabouts?  Here in town?

21             PROSPECTIVE JUROR MILLER:  Yeah.

22             MR. DAVIS:  Okay.  So you pounded, you wore out a

23    lot of leather, I take it?

24             PROSPECTIVE JUROR MILLER:  Too much.

25             MR. DAVIS:  Okay.  Thank you.

137

1              Mr. Currey.

2              PROSPECTIVE JUROR CURREY:  Yes.

3              MR. DAVIS:  You indicated you were in law

4    enforcement in Miles City?

5              PROSPECTIVE JUROR CURREY:  I was.

6              MR. DAVIS:  How long were you a police officer?

7              PROSPECTIVE JUROR CURREY:  Twenty years.

8              MR. DAVIS:  Heard a lot of stories, I take it, over

9    the years?

10              PROSPECTIVE JUROR CURREY:  Oh, lots.

11              MR. DAVIS:  Yeah.  And so you understand, when you

12   came to investigate things, what you heard at first glance may

13   not always have been the truth?

14              PROSPECTIVE JUROR CURREY:  Absolutely.

15              MR. DAVIS:  All right.  Let me ask you about your

16   insurance claim, briefly.  You said you had a leak under the

17   sink?

18              PROSPECTIVE JUROR CURREY:  Right.  That's correct.

19              MR. DAVIS:  Okay.  How, how soon did you -- how long

20   had it been leaking before you figured it out?

21              PROSPECTIVE JUROR CURREY:  That was the problem.

22              MR. DAVIS:  Uh-huh.

23              PROSPECTIVE JUROR CURREY:  I called as soon as I

24   found out, but they said it was a continuous problem.  That's

25   why they wouldn't cover it.

1          MR. DAVIS:  Okay.  So how long do you, how long do

2     you --

3          PROSPECTIVE JUROR CURREY:  I have no idea.

4          MR. DAVIS:  You had no idea how long it had been

5     leaking?

6          PROSPECTIVE JUROR CURREY:  No.

7          MR. DAVIS:  All right.  But as soon as you found

8     out, you notified your insurance company?

9          PROSPECTIVE JUROR CURREY:  Right.

10         MR. DAVIS:  And you understood that you better tell

11    the insurance company right away when you knew something was

12    wrong?

13         PROSPECTIVE JUROR CURREY:  Sure.

14         MR. DAVIS:  All right.  You didn't wait a week, did

15    you?

16         PROSPECTIVE JUROR CURREY:  No.

17         MR. DAVIS:  You didn't wait --

18         PROSPECTIVE JUROR CURREY:  I took the dishwasher out

19    and put it in the garage and called --

20         MR. DAVIS:  Okay.  Right away.

21         PROSPECTIVE JUROR CURREY:  -- my State Farm agent.

22         MR. DAVIS:  All right.  You didn't think you ought

23    to wait 28 days?

24         PROSPECTIVE JUROR CURREY:  No.

25         MR. DAVIS:  You wouldn't wait 28 years, would you?

1              PROSPECTIVE JUROR CURREY:  No.

2              MR. DAVIS:  Ms. Braley.

3              PROSPECTIVE JUROR BRALEY:  Yes.

4              MR. DAVIS:  It says -- you said on the questionnaire

5    your spouse is a Sub E tech/electrician?

6              PROSPECTIVE JUROR BRALEY:  He's an E&I tech.

7              MR. DAVIS:  E&I?

8              PROSPECTIVE JUROR BRALEY:  Yeah.

9              MR. DAVIS:  What's that?

10             PROSPECTIVE JUROR BRALEY:  Electrical and

11   instrumentation.

12             MR. DAVIS:  What's that mean?

13             PROSPECTIVE JUROR BRALEY:  He works in a mine in

14   Alaska.

15             MR. DAVIS:  Okay.

16             PROSPECTIVE JUROR BRALEY:  And he's their head

17   electrician there for their electrical department, and they --

18   he does instrumentation on all their heavy equipment.

19             MR. DAVIS:  All right.  And have you worked?  Was

20   there a period of time -- you said you're a homemaker now.

21   Was there a period of time that you worked outside the home?

22             PROSPECTIVE JUROR BRALEY:  Yes.

23             MR. DAVIS:  And what did you do before you were a

24   full-time mom?

25             PROSPECTIVE JUROR BRALEY:  I worked in the banking

                                140

1    industry.  I was, at one time, before my husband -- I, gosh,

2    did a lot of things.  Worked in hotels.

3              MR. DAVIS:  Lots of things?

4              PROSPECTIVE JUROR BRALEY:  Yeah.

5              MR. DAVIS:  Okay.

6              PROSPECTIVE JUROR BRALEY:  Lots of different things.

7              MR. DAVIS:  Very good.

8              Ms. Rath?

9              PROSPECTIVE JUROR RATH:  Yes.

10             MR. DAVIS:  You work out in Baker.

11             PROSPECTIVE JUROR RATH:  Yes.

12             MR. DAVIS:  That's a long way away.  How long have

13   you lived in Baker, ma'am?

14             PROSPECTIVE JUROR RATH:  Forty years.

15             MR. DAVIS:  Okay.  And your husband, is he an

16   independent?  You indicated he's a truck driver?

17             PROSPECTIVE JUROR RATH:  He's a truck driver.

18             MR. DAVIS:  Is he independent, or does he work --

19             PROSPECTIVE JUROR RATH:  He works for Prairie Fuels.

20             MR. DAVIS:  Prairie Fuels?

21             PROSPECTIVE JUROR RATH:  Right.

22             MR. DAVIS:  And that's a wholesaler of what?

23             PROSPECTIVE JUROR RATH:  Gas, diesel fuel, propane.

24             MR. DAVIS:  So he, I take it, delivers to farms and

25   ranches in eastern Montana?

141

1              PROSPECTIVE JUROR RATH:  That's right.

2              MR. DAVIS:  And Dakota?

3              PROSPECTIVE JUROR RATH:  Yes.

4              MR. DAVIS:  How long has he done that?

5              PROSPECTIVE JUROR RATH:  Approximately 35, 40 years.

6              MR. DAVIS:  Has he been involved in any kind of

7    spills, fuel spills, of any kind over the years, loading or

8    unloading?

9              PROSPECTIVE JUROR RATH:  No, he has not.

10             MR. DAVIS:  Okay.

11             Ms. Love, what, what is an esthetician?

12             PROSPECTIVE JUROR LOVE:  "Esthetician."

13             MR. DAVIS:  "Esthetician."

14             PROSPECTIVE JUROR LOVE:  Skin care.

15             MR. DAVIS:  Skin care.  Primarily for women, I take

16   it?

17             PROSPECTIVE JUROR LOVE:  Oh, no.  We can service men

18   as well.  You have skin --

19             MR. DAVIS:  Yeah.  I do have skin.

20             PROSPECTIVE JUROR LOVE:  -- and wrinkles.

21        (Laughter.)

22             PROSPECTIVE JUROR LOVE:  Not that "you" have

23   wrinkles.

24             MR. DAVIS:  Well, thank you.  We pass her for cause.

25        (Laughter.)

1           MR. DAVIS:  How long have you done that?

2           PROSPECTIVE JUROR LOVE:  Almost a year.

3           MR. DAVIS:  Okay.  What did you do before that?

4           PROSPECTIVE JUROR LOVE:  I owned an air brush

5    tanning business.

6           MR. DAVIS:  Okay.  Tanning beds?

7           PROSPECTIVE JUROR LOVE:  No.  Spray tanning.  Air

8    brush.

9           MR. DAVIS:  Okay.  How long did you do that?

10          PROSPECTIVE JUROR LOVE:  Three and a half years.

11          MR. DAVIS:  And before that?

12          PROSPECTIVE JUROR LOVE:  I don't remember.

13          MR. DAVIS:  Okay.

14          PROSPECTIVE JUROR LOVE:  Oh.  I worked for a credit

15   card processing company.

16          MR. DAVIS:  Here in Billings?

17          PROSPECTIVE JUROR LOVE:  Yeah, as a sales rep.

18          MR. DAVIS:  Okay.  And you said you were about -- in

19   a prior civil lawsuit.  I don't want to go into the details of

20   your private business, even though, I guess, when you're in

21   court, it isn't so private, is it?

22          PROSPECTIVE JUROR LOVE:  Not so much.

23          MR. DAVIS:  All right.  Who was your attorney

24   representing you?

25          PROSPECTIVE JUROR LOVE:  His name was Jeff Lynch.

143

1          MR. DAVIS:  Okay.

2          PROSPECTIVE JUROR LOVE:  It was in Great Falls.

3          MR. DAVIS:  In Great Falls.  Did you live in

4    Great Falls --

5          PROSPECTIVE JUROR LOVE:  I did.

6          MR. DAVIS:  -- at the time?  Okay.

7          And do you think simply because somebody has come

8    into court here and is making a claim, in this case, Soco,

9    that they're entitled to insurance coverage?  There must be

10   some truth to that simply because they're here?

11         PROSPECTIVE JUROR LOVE:  You know, I'd just base my

12   opinion on facts --

13         MR. DAVIS:  Okay.

14         PROSPECTIVE JUROR LOVE:  -- and I don't know the

15   facts right now, so --

16         MR. DAVIS:  Fair enough.  Okay.

17         Anything about your involvement with Mr. Lynch --

18   and I knew Mr. Lynch -- that causes you any concern about the

19   way the justice system works?

20         PROSPECTIVE JUROR LOVE:  Absolutely not.

21         MR. DAVIS:  Okay.

22         And Ms. Weiss.

23         PROSPECTIVE JUROR WEISS:  Yes.

24         MR. DAVIS:  Last question.

25         Your husband is a contractor?

144

1             PROSPECTIVE JUROR WEISS:  Yes, but he's retired.

2             MR. DAVIS:  Retired.  What kind of contracting did

3    he do?

4             PROSPECTIVE JUROR WEISS:  Home building.

5             MR. DAVIS:  Okay.  Any involvement with spills or

6    chemical problems in his work?

7             PROSPECTIVE JUROR WEISS:  No.

8             MR. DAVIS:  Okay.  Thank you, Judge.

9             THE COURT:  You get a gold star, also.

10            MR. DAVIS:  Thank you.

11            All right.  Ladies and gentlemen, we're going to

12   take a quick break.  These attorneys are going to exercise

13   their peremptory challenges.  We'll come back in here.  The

14   clerk of court will read the names of the eight people who

15   have been selected as trial jurors in this case.  We'll swear

16   you in.  If your name is read, you stay here.  If your name

17   isn't read, at that time you're free to go.  Once we get the

18   jury empaneled, I'll read one cautionary instruction, and

19   we'll break for lunch.

20            We'll be in recess.

21            I might as well just do it in here with all of you.

22   So you, counsel, you let me know when you're ready to proceed.

23   You're going to have four peremptories apiece now, and you let

24   me know when you're ready to proceed.  I'll come in here.

25            You folks will be out there so you don't know when.

1    When they exercise -- "they," counsel -- exercise peremptory

2    challenges, they don't have to give any reasons.  They just

3    say a name and the name is stricken, and the first eight

4    people that are left on this panel that are not stricken will

5    be the trial jurors in this case.

6              So you let me know when you're ready.  After they

7    exercise peremptories, you'll be brought in here, and we'll

8    get moving.

9              THE CLERK:  Judge, did they all pass for cause?

10             THE COURT:  Oh.  Wait a minute.  I didn't have

11   you --

12             MR. DAVIS:  I'll make a record.

13             THE COURT:  Do you pass for cause?

14             MR. DAVIS:  I'm okay with it, Judge.

15             THE COURT:  We can take a sidebar.

16             MR. DAVIS:  Why don't you just let the jurors go

17   out, and we'll be okay.

18             THE COURT:  Okay.  Get going.

19        (Prospective jurors not present.)

20             THE COURT:  Be seated, please.

21             All right.  Go ahead.

22             MR. DAVIS:  Continental passes the jury for cause.

23             THE COURT:  And I denied -- we have one extra juror

24   with four peremptories, right?

25             THE CLERK:  Yes.

146

1           (Counsel respond affirmatively.)

2                 THE COURT:  To be on the safe side, I am going to

3     reverse myself.  I am booting Juror No. 10.  How do you

4     pronounce her name?

5                 MR. MICKELSON:  "Braunstadter."

6                 THE COURT:  "Braunstadter."  I've reversed myself,

7     and I'm granting that challenge for cause.  There's not going

8     to be any extra.

9                 Let me know when you're ready.

10                MR. JOHNSON:  Thank you, Your Honor.

11                MR. COZZENS:  Thank you, Judge.

12          (Recess taken from 12:23:13 to 12:35:16.)

13          (Open court.)

14          (Prospective jurors not present.)

15                THE COURT:  Please be seated.

16                All right.  Soco's first challenge.

17                MR. COZZENS:  Kelly Stevenson, No. 1.

18                THE COURT:  Insurers' first.

19                MR. MICKELSON:  Sara Love, No. 10.

20                THE COURT:  No, Sara Love was 17.

21                THE CLERK:  Seventeen.

22                MR. MICKELSON:  Excuse me.  Seventeen.

23                THE COURT:  Soco's second.

24                MR. COZZENS:  Brenda Dunham, No. 4.

25                THE COURT:  Insurers' second.

147

1              MR. MICKELSON:  Karen Pierce, No. 6.

2              THE COURT:  Soco's third.

3              MR. COZZENS:  Jean Taylor, No. 8.  We're determined

4    not to fill that seat, Judge.

5              THE COURT:  You know, that's a gut cinch, huh?  That

6    was a cursed seat.

7              Okay.  And insurers' third.

8              MR. MICKELSON:  Ms. Eckhardt, No. 5.

9              THE COURT:  Soco's fourth and last.

10             MR. COZZENS:  Just a second, Judge.

11        (Discussion off the record at counsel table.)

12             THE COURT:  Sure.

13             MR. COZZENS:  Lisa Braley, Juror No. 9.

14             THE COURT:  Insurers' fourth and last.

15             MR. JOHNSON:  Just a second, Your Honor.

16             THE COURT:  Sure.

17        (Discussion off the record at counsel table.)

18             MR. MICKELSON:  No. 15, Beverly Rath.

19             THE COURT:  All right.  Would the clerk read the

20   names of the eight trial jurors that have been selected for

21   this case?

22             THE CLERK:  Curtis Hartman, Glen Kerestes, Dan

23   Currey, Susan Bailey, Brenda Hittmeier, Richard Miller,

24   Rebecca Dickerson, and Cynthia Weiss.

25             THE COURT:  Mr. Cozzens, do you agree those are the

1   correct jurors?

2          MR. COZZENS:  I do, Your Honor.

3          THE COURT:  Mr. Mickelson, on behalf of the

4   insurers?

5          MR. MICKELSON:  Yes, Your Honor.

6          THE COURT:  Let's get the jury in here.  I'm going

7   to read them the admonition instruction, and we're going to

8   break for lunch.

9       (Prospective jurors present.)

10         THE COURT:  Please be seated.

11         All right, ladies and gentlemen.  The clerk of court

12  is going to read the names of the eight persons who have been

13  selected as the trial jurors in this case.  If you hear your

14  name, go back and take a seat in the jury box.  You're going

15  to have a selection of seats.  If you don't hear your name,

16  you're free to go, and thank you very much for being here.  As

17  soon as this happens, we swear the jury, I'm going to read one

18  cautionary instruction, and then we'll break for lunch.

19         Would the clerk of court please read the names of

20  the eight trial jurors?

21         THE CLERK:  Curtis Hartman, Glen Kerestes, Daniel

22  Currey, Susan Bailey, Brenda Hittmeier, Richard Miller,

23  Rebecca Dickerson, and Cynthia Weiss.

24         THE COURT:  If your name was not called, you are

25  free to go.

1          If your name was called, back in the jury box,

2     please.

3          Ladies and gentlemen, would you stand and be sworn

4     as the trial jury in this case?

5       (Oath administered to jurors.)

6          THE COURT:  Thank you.  Please be seated.

7          I am now going to say a few words about your conduct

8     as jurors during this trial.

9          After we take our noon break, I'll read some

10    additional preliminary instructions.

11         First, until this trial is completed and you have

12    been excused from your jury service, you are not to discuss

13    this case with anyone, including your fellow jurors, members

14    of your family, people involved in the trial, or anyone else,

15    nor are you allowed to permit others to discuss the case with

16    you.  This prohibition extends to all forms of communication,

17    whether in person, written, or through any electronic device

18    or media, such as the telephone, a cell or a smart phone,

19    BlackBerry, PDA, computer, the internet, any internet service,

20    any text or instant messaging service, and any internet

21    chatroom, blog, or website such as Facebook, MySpace, YouTube,

22    and Twitter.  If anyone approaches you and tries to talk to

23    you about the case, let me know about it immediately.

24         Basically what you can tell your family when you go

25    home or call home tonight is tell them you're on a civil trial

1  in federal court, and you'll be able to tell them all about

2  the case when it's done.  Other than that, that's about all

3  you can say.

4          This instruction has been amended here recently

5  because of, in other states, people using, during trials, PDAs

6  and BlackBerrys and all those kinds of things to communicate

7  with people.  Jurors communicating with people during the

8  trial, we can't have that.

9          Second, during the trial, while you are in the

10  courthouse and after you leave for the day, don't provide any

11  information to anyone by any means about the case using the

12  same media devices and instruments that I reiterated just

13  moments ago.

14          Third, do not read any news stories or articles or

15  listen to any radio or television reports about the case or

16  about anyone who has anything to do with it.

17          Fourth, do not do any research, such as consulting

18  dictionaries, researching online using Google, Yahoo, Bing, or

19  any other internet search engine or using other reference

20  materials, and do not make any investigation about the case on

21  your own.

22          And that reminds me.  If there are newspaper

23  articles about the case, don't read them.  And to be on the

24  safe side, don't bring the newspaper in with you into the jury

25  room in the morning.  Then I don't have to worry about a

1    problem arising where, if there was a story about this case

2    appearing in it and you're not supposed to be reading it and

3    somebody has it in the jury room, then I'd have to get you all

4    out here and make sure that none of you had read it.  We don't

5    want to do that.  Don't read it at home, either, if there are

6    articles about this case.

7           Fifth, if you need to communicate with me, simply

8    give a signed note to the bailiff or to the courtroom deputy

9    clerk to give to me.

10           And, sixth, do not make up your mind about what the

11    verdict should be until after you've gone to the jury room to

12    decide the case and you and your fellow jurors have discussed

13    the evidence.  Keep an open mind until then.

14           Now, ladies and gentlemen, we're going to be in

15    recess until 2 o'clock.

16           The clerk of court will take you into the jury room.

17    It's through that door.  It's behind me.  That's where you'll

18    gather every morning, after lunch, at every recess.

19           And this is not an endurance contest for jurors.

20    You people are the most important people in this room.  You're

21    the ones who are going to find the facts, apply the facts to

22    the law as I give it to you, and arrive at a verdict.

23           When I say this is not an endurance contest, you

24    will see a cooler back there.  It's got all kinds of things in

25    it.  It's got bottled water.  We have pitchers sitting around

1    here with water in it.  You can bring bottled water in here

2    and drink it in here.  They have screw tops for closures.

3           Those identification cards that you have that you

4    got downstairs, when you get back there, the clerk of court

5    will -- you will sign for a juror badge.  Wear that juror

6    badge at all times when you're in the courthouse.  If you

7    leave, for instance, for lunch, leave the courthouse for

8    lunch, take it off but keep it with you.  Take it home at

9    night because it will expedite you getting through security,

10   No. 1.

11          No. 2, I am suggesting that you take it off because

12   there's no sense in wearing a juror badge and then having

13   somebody stop you on the street to say, "Oh, you're a juror.

14   What kind of a case?"  Then you have to report to me that

15   somebody has been communicating with you.  So don't do that.

16          The clerks of court will have snacks, goodies.  I

17   can tell you that they are not calorie-free, the goodies that

18   they usually bring in.

19          We'll be in recess until 2 o'clock.  Thank you.

20          THE LAW CLERK:  All rise.

21     (Recess taken from 12:47:17 to 14:00:25.)

22     (Open court.)

23     (Jury not present.)

24          THE COURT:  Please be seated.

25          Who is speaking?

153

1          MR. DAVIS:  I guess I asked for your time.

2          I just want to report to the Court that I was

3    getting a cup of coffee on the third floor cafeteria, and one

4    of the jurors was in there, Mr. Currey, and came up and tried

5    to talk to me.  And I told him I couldn't talk to him, but

6    I -- it was fairly innocuous.  He said, "You're from

7    Great Falls?"  I said, "I can't talk to you."  And so be

8    aware.

9          MR. JOHNSON:  It would be helpful, Your Honor, I

10   think, if you just told the jurors that we're not being

11   off-putting but we just can't talk to them.

12         THE COURT:  As soon as they get in here, that will

13   be probably the first thing I tell them.

14         MR. JOHNSON:  Secondly, Your Honor, David Nanzig is

15   our corporate representative.  He is on our may-call list, and

16   we also want to move to exclude witnesses, but since he's a

17   corporate representative, may he remain?

18         THE COURT:  Yeah.  I doubt if there's any objection.

19         MR. COZZENS:  I think that's the rule, Judge.

20         THE COURT:  Yeah, it is.

21         MR. JOHNSON:  Thank you, Your Honor.

22         THE COURT:  Please rise for the jury.

23      (Jury present.)

24         THE COURT:  Please be seated.

25         All right, ladies and gentlemen.  Before I get

154

1   started, a lawyer had to report to me that he was approached

2   by a juror down in the third floor cafeteria.  Even though you

3   may want to just chat about the weather, I have told the

4   lawyers they can't talk to jurors, even about the weather.  So

5   don't try and talk to them.  And the lawyers on all sides,

6   when they're trying to avoid you, don't take it personal at

7   all.  I have told them they can't talk to you, and because of

8   that instruction, they may appear unfriendly.  They're a

9   friendly bunch.  I know.  I spend a lot of time with them, but

10  you don't get to see just how friendly they are, because

11  they're the lawyers representing the parties in this case.

12         Now that you're the jury, I am going to take a few

13  minutes to give you these preliminary instructions.  At the

14  end of the case, I will give you more detailed instructions.

15  Those are the instructions that will control your

16  deliberations.

17         You should not take anything I may say or do during

18  the trial as indicating what I think the verdict should be.

19         The evidence you are to consider in deciding what

20  the facts are consists of:

21         No. 1, the sworn testimony of any witness;

22         No. 2, the exhibits which are to be received into

23  evidence; and

24         No. 3, any facts to which the lawyers stipulate.

25         The following things are not evidence, and you must

1  not consider them as evidence in deciding the facts in this

2  case:

3                No. 1, statements and arguments of the attorneys;

4                No. 2, questions and objections of the attorneys;

5                No. 3, testimony that I instruct you to disregard;

6  and

7                No. 4, anything you may see or hear when the court

8  is not in session, even if what you see or hear is done or

9  said by one of the parties or by one of the witnesses.

10               Some evidence may be admitted for a limited purpose

11  only.  If and when I instruct you that an item of evidence has

12  been admitted for a limited purpose, you must consider it only

13  for that limited purpose and for no other.

14               Evidence may be direct or circumstantial.  Direct

15  evidence is direct proof of a fact, such as testimony by a

16  witness about what that witness personally saw or heard or

17  did.  Circumstantial evidence is proof of one or more facts

18  from which you can find another fact.  You should consider

19  both kinds of evidence.  The law makes no distinction between

20  the weight to be given to either direct or circumstantial

21  evidence.  It is for you to decide how much weight to give to

22  any evidence.

23               There are rules of evidence that control what can be

24  received into evidence.  When a lawyer asks a question or

25  offers an exhibit into evidence and the lawyer on the other

156

1  side thinks that it is not permitted by the rules of evidence,

2  that lawyer may object.  If I overrule the objection, the

3  question may be answered or the exhibit received.  If I

4  sustain the objection, the question cannot be answered and the

5  exhibit cannot be received.  Whenever I sustain an objection

6  to a question, you must ignore the question and must not guess

7  what the answer might have been.

8         Sometimes I may order that evidence be stricken from

9  the record and that you disregard or ignore the evidence.

10  That means that when you are deciding the case, you must not

11  consider the evidence that I told you to disregard.

12         In deciding the facts in this case, you may have to

13  decide which testimony to believe and which testimony not to

14  believe.  You may believe everything a witness says, or part

15  of it, or none of it.  In considering the testimony of any

16  witness, you may take into account:

17         No. 1, the opportunity and ability of the witness to

18  see or hear or know the things testified to;

19         No. 2, the witness's memory;

20         No. 3, the witness's manner while testifying;

21         No. 4, the witness's interest in the outcome of the

22  case and any bias or prejudice;

23         No. 5, whether other evidence contradicted the

24  witness's testimony;

25         No. 6, the reasonableness of the witness's testimony

1   in light of all of the evidence; and

2             No. 7, any other factors that bear on believability.

3             The weight of the evidence as to a fact does not

4   necessarily depend on the number of witnesses who testify.

5             At the end of the trial, you will have to make a

6   decision based on what you recall of the evidence.  You will

7   not have a transcript of the trial.  I urge you to pay close

8   attention to the testimony as it is given.

9             If you wish, you may take notes to help you remember

10  what witnesses said.  If you do take notes, please keep them

11  to yourself until you and your fellow jurors go to the jury

12  room to decide the case.  Do not let note-taking distract you

13  so that you do not hear other answers by witnesses.  When you

14  leave, your notes should be left in the jury room.

15            Whether or not you take notes, you should rely on

16  your own memory of what was said.  Notes are only to assist

17  your memory.  You should not be overly influenced by the

18  notes.

19            When a party has the burden of proof on any claim by

20  a preponderance of the evidence, it means you must be

21  persuaded by the evidence that the claim is more probably true

22  than not true.  You should base your decision on all of the

23  evidence regardless of which party presented it.

24            From time to time during the trial, it may become

25  necessary for me to talk with the attorneys out of the hearing

158

1    of the jury, either by having a conference at the bench when

2    the jury is present in the courtroom or by calling a recess.

3    Please understand that while you are waiting, we are working.

4    The purpose of these conferences is not to keep relevant

5    information from you but to decide how certain evidence is to

6    be treated under the rules of evidence and to avoid confusion

7    and error.

8            It's my habit to come in the courtroom after a

9    recess, ahead of the jury.  If the recess happens to last

10   longer than what I said it was going to, most of the time it

11   will be due to the fact that when I came in here ahead of you,

12   one of the attorneys made me aware that I had to rule on

13   something before we started again.  So that will be an

14   explanation if the recesses last longer.

15           We will, of course, do what we can to keep the

16   number and length of these conferences to a minimum.  I may

17   not always grant an attorney's request for a conference or a

18   sidebar.  Do not consider my granting or denying a request for

19   a conference as any indication of my opinion of the case or

20   what your verdict should be.

21           The next phase of the trial will now begin.  First,

22   each side may make an opening statement.  An opening statement

23   is not evidence.  It is simply an outline to help you

24   understand what that party expects the evidence will show.  A

25   party is not required to make an opening statement.

1          Soco will then present evidence, and counsel for the

2     insurers may cross-examine.  Then the insurers may present

3     evidence, and counsel for Soco may cross-examine.

4          After the evidence has been presented, I'll instruct

5     you on the law that applies to the case, and the attorneys

6     will make closing arguments.

7          After that, you will go to the jury room to

8     deliberate on your verdict.

9          Soco, whoever is doing it, make your opening

10    statement.

11         MR. COZZENS:  Ready, Your Honor.

12         May it please the Court, counsel, ladies and

13    gentlemen of the jury.

14         You know by now that my name is Larry Cozzens.  I'm

15    an attorney here in Billings.  I'm here with Paul Banker and

16    Chris Lynch, and together we're cocounsel for the defendant in

17    this case, Soco West.

18         The person that you haven't met so far is Soco's

19    representative, Mr. Dennis St. Clair, sitting back there, and

20    he'll be here throughout the trial representing Soco.

21         The issue in this case is whether there's insurance

22    coverage for the groundwater contamination caused by the

23    chemical perc, which you heard about earlier today, finding

24    its way to the northwest corner of the Dyce site out in

25    Lockwood.  You heard that perc is a chemical used by

1   drycleaners.  It is what creates the drycleaner smell.  It is

2   also used by refiners and refineries and other businesses

3   around town.

4          Before I get any further down the road, I want to

5   talk to you about some things that this case is not about, and

6   the judge has mentioned at least one of those already.

7          The first thing it's not about is it's not whether

8   Dyce Chemical caused the groundwater contamination.  The EPA

9   determined that it did, and we don't dispute that.

10         The second thing it's not about is whether that

11   groundwater contamination will be cleaned.  It will.  Soco is

12   working with the EPA to determine the best way to do that.

13   They've spent millions of dollars to clean it in that process.

14   They will spend millions more.  The bottom line is that they

15   have a legal obligation to pay for the cost of cleaning up

16   that groundwater, and they will meet that obligation, but it's

17   not an obligation that arises because of anything that Soco

18   did.

19         The third thing the case is not about is whether

20   Soco caused this groundwater contamination.  It didn't.  The

21   evidence is going to be undisputed.  Soco had nothing to do

22   with this site until years and years after whatever you

23   determine caused that contamination had occurred.  Soco has a

24   legal obligation to pay for the cleanup and to have paid for

25   the claims from the neighboring landowners because it's the

1   successor to Dyce and because it now owns the site.  So

2   nothing that happens in this case is going to have any impact

3   at all on whether that gets cleaned up.  It will be cleaned

4   up.

5            Julianne, could you call up Admitted Exhibit 5019,

6   please?

7            DOCUMENT TECHNICIAN:  (Complied with request.)

8            THE COURT:  Are your screens on?

9       (Jurors responded affirmatively.)

10           MR. GROSSBART:  Yes.

11           THE COURT:  Ladies and gentlemen, let me tell you

12  this.  During the trial, if there are exhibits that haven't

13  been admitted but they're being offered, your screens will be

14  off.  If I allow the exhibit in, I will turn your screen on.

15  If I don't allow it in, I won't turn it on.  If I forget and I

16  admit some piece of evidence and it doesn't appear on your

17  screen, let me know.

18           Go ahead.  Sorry.

19           MR. COZZENS:  Okay.  What I'm going to try to do,

20  this is an aerial photograph of the Lockwood site as it

21  existed on November 4 of 1975.  And I'll just tell you the

22  last time I tried to use this machine, I think the machine was

23  broke, or maybe I was broke.  It didn't work very well.  But

24  what I want to do now is just try to orient you to some of the

25  things you'll be hearing about in this trial to know where

1    they are at the site and what's going on.

2            The first thing I want to show you is the northwest

3    corner.  That's the northwest corner.  Now that's not actually

4    the northwest corner of the Dyce site.  Dyce owned the

5    property up in here, too.  But when the EPA came in and

6    determined what caused the groundwater contamination, they

7    determined that it was because perc had gotten to that, what

8    they called the northwest corner, because it was the northwest

9    corner of the operations area, and they determined that there

10   was a, a large amount.  They put a gallon figure on it, and

11   one of the things that will be at issue during this trial is

12   exactly how much it was, but it was a lot of perc.  It was

13   hundreds of gallons, perhaps.

14           As you can see from this site map, the northwest

15   corner is a place where there were no operations by Dyce, and

16   that remains true during the entire relevant time when this

17   perc spill could have occurred and when the groundwater

18   contamination could have first happened.  There had never been

19   any work or any operations that were conducted in that

20   northwest corner.

21           Okay.  The second thing I want you to look at is

22   this area right here where all of the white tanks are.  That's

23   called the tank farm.  What that was is the area where they

24   stored these big storage tanks, and they would buy chemical

25   materials, chemicals, by bulk.  Some of them would come in on

1    the railroad spur that you can see just to the west of the

2    tank farm, and they would store them in those tanks until they

3    would take them out and deliver them to their customers.  That

4    was Dyce's business in 1975.

5            You can see, just to the west of the tank farm, a

6    berm that goes around here.  That's a containment berm.  That

7    was put in by Dyce after they moved onto the property in 1973.

8    And the purpose of it was to catch fluids around the tank farm

9    and take them down to the catch pond that you can see in the

10   northwest corner of the berm area so that it contained

11   anything that was there.

12           That catch pond was lined, and the idea was that

13   anything that was in, got in the catch pond would evaporate

14   into the air, and it wouldn't contaminate the groundwater.

15           This building right here is known as the lower

16   warehouse.

17           This little building right there was built in 1974

18   and early 1975.  It's called the drumming shed.  When they had

19   product that they had to take from their bulk tanks and

20   deliver it to their customers in drums, that's where they

21   would fill the drums.

22           You can see all the way around here.  And I don't

23   know why I'm not getting a good line, but you can see where

24   they put asphalt in.  That also was done by Dyce after they

25   bought the site, and it was put in in '74 or actually in '75.

164

1    And that, you can't see it because of the shadows here, but

2    the evidence will be that that asphalt continued up into this

3    area.

4            This area where I've just drawn a line -- and I

5    don't know why that other one is up there.  Let me see if I

6    can get rid of one of them.

7            This is called the loading and the unloading area.

8    When a tanker truck full of chemicals would come to the Dyce

9    site, they would pull in there.  They would unload the

10   materials either to drums in the drumming shed or into the

11   bulk tanks, and this is where that would be handled.  The

12   testimony in this case is going to be that the only time perc

13   was handled outside of the containment area was right here in

14   the loading and unloading area.

15           You can also see the railroad spur that runs in a

16   northwesterly direction just to the west of the tank farm, and

17   between that and the berm that I pointed out to you, you can

18   see, although it's a little hard to see -- can you blow up

19   that area just a little bit more, Julianne?

20           DOCUMENT TECHNICIAN:  (Complied with request.)

21           MR. COZZENS:  Okay.  Now you can see it better.

22           This is the railroad spur right along here.  This is

23   the berm right along here.  And in between the two is a ditch,

24   and the testimony in this case will establish that fluids from

25   the loading and unloading area would come down by the drum

1    shed right through this little ditch here.  There is also a

2    berm that goes along the south side there to this ditch.  Goes

3    on out to the ditch and on out to the northwest corner.

4           What's important about this ditch -- several things,

5    but the starting point is that that only existed from 1975

6    until sometime in 1980.  They then reconfigured it, and later

7    I'll show you a map that shows you the reconfiguration.  So

8    there was a relatively short period of time when a spill that

9    occurred in the loading and unloading zone area could have

10   escaped to the northwest corner.  In 1980, like I said, they

11   changed the containment so that anything that spilled there

12   would have also ended up in the catch pond.

13          Now I want to talk to you briefly about the factual

14   issues that the Court, in very general terms, told you that

15   you would be dealing with.  And I'm not going to take them in

16   the order that he told you about them, but I want to talk

17   about two that I don't think are going to be all that

18   difficult for you.

19          The first is the issue of whether there was an

20   occurrence as defined by the policies that were sold by USF&G

21   and Continental to Dyce Chemical.  In those policies,

22   "occurrence" is defined to be an accident, including

23   continuous or repeated exposure to conditions which result in

24   property damage.

25          It's undisputed in this case that the groundwater

1   contamination in the northwest corner is property damage.  The

2   question about whether -- and I didn't read the rest of it.

3   Let me finish:  an accident, including continuous or repeated

4   exposure to conditions which resulted in property damage that

5   was either expected or intended, from the standpoint of Dyce

6   Chemical.

7           Okay.  We know -- it's undisputed -- that the

8   groundwater contamination was property damage, so this really

9   boils down to, Did Dyce intend to cause that damage?  Did they

10  expect or intend to cause the groundwater contamination that

11  the EPA found in the northwest corner some 15 years later?

12          And the answer is that in this case, there is no

13  evidence anywhere, anytime, that Dyce ever intended to cause

14  groundwater contamination, that they ever expected to do that,

15  that they ever intended to cause any property damage to third

16  parties at all.

17          In fact, the contrary is true.  You will hear a lot

18  of evidence about Dyce and their operating procedures and the

19  safeguards that they had in place to stop spills from

20  occurring, what they did when spills did occur, but the bottom

21  line is that Dyce made money by storing chemicals and selling

22  them to their customers, and they couldn't make money if they

23  were spilling that, and they surely couldn't make it if they

24  were just willy-nilly dumping it out into the prairie.

25          And so I don't think it's going to be very difficult

1    for you to determine that there was an occurrence because

2    there's going to be no evidence that there was ever any

3    property damage expected or intended.

4            The second one is whether there was timely notice.

5    Now it's important to note this distinction.  Dyce was

6    required to give the insurance companies notice of an

7    occurrence.  Not notice of a spill.  Not notice of some

8    accident out on the place.  Notice of an occurrence.  I just

9    told you that the occurrence means that there had to have been

10   property damage.  In this case, the property damage is the

11   groundwater contamination.

12           So the notice that they had to give was notice from

13   the time that they discovered that there was groundwater

14   contamination.  During the course of this trial, you will hear

15   about when we were first told that we might be -- not "we" --

16   that Dyce was told that it might be the cause of groundwater

17   contamination and when they gave notice to the insurance

18   companies, and what you'll find is that every time it was at

19   least within a reasonable time (indicating quotes).

20           So those two issues I'm not going to spend much more

21   time on.  The other two issues are a little more difficult.

22           The first of those issues is whether it was more

23   likely than not that the groundwater contamination in the

24   northwest corner was the result of a sudden and accidental

25   spill of perc.

1          And then the fourth issue is when did that

2    groundwater contamination occur?  Was it occurring before the

3    end of calendar year 1978?  And the reason that that's harder

4    to determine in this case is primarily because it's 2010.

5          Everybody in this case agrees that the groundwater

6    contamination had to have occurred before 1987.  We'll take

7    you through the evidence that we believe establishes that it

8    had to have occurred before 1978.  The first notice they have

9    that even identified Dyce as being a possible source of that

10   contamination was in 1999.

11         And things happen in decades.  When you look at

12   something, trying to look back and prove something that

13   occurred 30 years ago or 32 or whatever it is, you find that

14   certainly witnesses don't remember things as well as they

15   would have if this -- if they'd had this notice earlier.

16   Witnesses die.  Quentin Dyce died in 1995.  It was his

17   company.  He knew more about it than anybody else.  Documents

18   that used to exist no longer exist, because nobody knew that

19   they were going to need that document 20 or 30 years from now.

20         So it is more difficult to prove those things, but

21   not impossible.  And there are two things that the judge has

22   already talked to you about that make it possible, and the

23   first is that there is no distinction to be made between

24   circumstantial and direct evidence.  We will have a

25   circumstantial evidence case.  Don't let anybody come in and

1   tell you that that's less valuable evidence or less important

2   evidence.  The judge has told you that that's not true.  But

3   because of the time frames and because of the loss of memories

4   and documents, we're going to show you circumstances from

5   which you can determine whether it's more likely than not that

6   the groundwater contamination was caused by a sudden and

7   accidental spill and when that groundwater contamination

8   occurred.

9          A little background on Dyce.  Started out as a mom

10  and pop operation by Quentin and Lois Dyce and other family

11  members in 1957.  They started their operations in downtown

12  Billings.  In fact, in the early days, it was known as Dyce

13  Sales and Engineering Services.  As they got more and more

14  involved in the chemical distribution business, they changed

15  their name to Dyce Chemical.

16         In 1973, they purchased the Dyce site that I just

17  showed you and started improving it and making changes so that

18  they could run their operations out there.

19         At this point, I would like you to pull up Admitted

20  Exhibit 5033.

21         DOCUMENT TECHNICIAN:  (Complied with request.)

22         MR. COZZENS:  This, as you can see, is an aerial

23  photograph of the Dyce facility out in Lockwood as of June 2,

24  1981.  We have another photograph that's actually in March of

25  '81 that's not as clear as this, so I didn't bother using it,

1   but it will show you basically the same configuration exists.

2   And what's important about this is that you can see the

3   changes they've made from what you saw in 1975.

4          First and most important is that they've moved this

5   berm.  It used to go kind of like that.  Now it goes up clear

6   to the north fence and across.  It used to come down here.

7   Now it's bigger, and you can see a larger catch pond there.

8          What they did -- can you blow up the area around the

9   tank farm and just to the west of it, please?

10         DOCUMENT TECHNICIAN:  (Complied with request.)

11         MR. COZZENS:  You can see now this Dyce runs to the

12   west side of the railroad tracks.  Remember, you can still see

13   the old dike or the old berm.  It's still there, right in

14   there.  And this is where the ditch used to be, and there's

15   still a ditch there, but now the berm is bigger, steeper, and

16   it goes out here to the west.

17         And what they accomplished with that reconfiguration

18   was that now not only materials or not only fluids from the

19   tank farm would flow into the catch pond, now everything from

20   the operations area, the loading and unloading, from the

21   rooftops of all of these buildings, all of that now went --

22   still went down here, but now they caught this ditch and went

23   up into the catch pond.  There was no longer a pathway to the

24   northwest corner.

25         Obviously when you find a large amount of perc in

171

1    the northwest corner, the first thing you try to figure out

2    is, well, how could it have gotten there?  The only place that

3    they handled perc was in this loading and unloading area, and

4    now, as of 1980, there was no longer a pathway that would have

5    allowed that to get there.  So we think that narrows the time

6    down from 1975 to 1980 when they reconfigured this.

7            Just to show you, even this configuration only

8    lasted for a short period of time.

9            Could you pull up Exhibit 5042, admitted exhibit?

10           DOCUMENT TECHNICIAN:  (Complied with request.)

11           MR. COZZENS:  Okay.  Exhibit 5042 is the Dyce site

12   as it looked on April 30 of 1987.  1985, 1986, somewhere in

13   that range, they did away with the catch pond altogether.

14   They cemented around the tank farm.  They moved it from being

15   something that went up here to the one that you see on this

16   photograph.  They made a lot of changes.

17           Again, at this point, there is no pathway for a

18   spill from the loading and unloading area to ever get out to

19   the northwest corner.  It just doesn't exist.  And while there

20   were some other changes to the configuration, that fact never

21   changed.

22           Now I want to talk to you about what the evidence is

23   going to tell you about handling perc.

24           First, the evidence is going to tell you that there

25   will be evidence from which you will learn that Dyce sold perc

1   both in bulk form and in drums.  In the early days, back in

2   the mid '70s, they had a 1,500-gallon bulk tank that sat

3   inside the containment area.  When a truck would come in, they

4   would back it in or drive into -- whether they backed in or

5   not, I don't know.  They would come into the loading and

6   unloading area.  They would hook a hose from the bulk tank to

7   a pump.  They always used their own pump, and I'll tell you

8   why in a minute, and then another hose from the other end of

9   the pump to the truck, and they would pump the perc into their

10  bulk tank.  It was only a 1,500-gallon tank, and they

11  typically purchased perc in 3,000-gallon lots.

12        So they'd fill up the bulk tank, and then they'd

13  take the rest of it and run it into the drumming shed, which

14  isn't shown on this one because they had done away with it by

15  1987, but they would run it into that drumming shed and they

16  would fill drums, or, you know, different sized drums,

17  30 gallons or 55 gallons or whatever.

18        Perc was one of the more expensive chemicals that

19  Dyce sold.  It's heavier than water, and it doesn't mix with

20  water, so if you were to get perc and water in the same area,

21  what you would find, in some indentation, you would find the

22  water on top of the perc and the perc on the bottom.

23        They delivered perc to their clients from the bulk

24  tank by filling what's called a tote or a skid tank.  It was

25  about 150 gallons.  They'd fill it full of perc, lift it with

173

1    a forklift, and put it on the back of a flatbed, take it to

2    the customer's place, and unload it from the tote to the

3    customer's own storage or whatever that was.

4         In drums, they would typically take a drum out to

5    the customer.  When the customer needed more perc, they would

6    bring another drum out, and it may or may not be important in

7    this case, but the policy was always what you would expect it

8    to be.  You'd go pick up a drum, and there's a little bit of

9    perc left in it.  That's not our perc.  Somebody else has

10   already paid for it.  You get them to get you a bucket, and

11   you pour the rest of that perc out so that the drums came back

12   empty.

13        The perc has a different impact on certain materials

14   than other chemicals do, so from the very beginning, they

15   always had dedicated hoses to load and unload the tank, and

16   that means they only used these hoses for perc.  They did it

17   because if they used the wrong kind of hose, perc could

18   destroy the hose itself, and they didn't want

19   cross-contamination.  Perc is -- it's important that perc be

20   in its pure form, and so they didn't want little bits of other

21   kinds of materials in it or even water in it.

22        In 1979, they changed the 1,500-gallon tank to a

23   4,000-gallon tank, and when they did that, you will hear

24   testimony from Dick Colver, who was in charge of all of

25   that -- he was the maintenance guy out there -- he plumbed a

1  direct line from the 4,000-gallon tank to a hose coupling

2  inside the drumming shed, and so now when a truck would pull

3  into the loading and unloading area, they would only have two

4  connections.  They'd have one in the drumming shed and one to

5  the truck because they had a dedicated pump.  That's the only

6  thing that pump did, was unload trucks with perc or load perc.

7       Those pumps that they used pumped at the rate of

8  60 gallons per minute, so it wouldn't take long, if something

9  happened, to pump out 100 to 200 gallons.  In two minutes,

10 you'd have 120 gallons.  You can do the math.

11      You'll hear evidence about Dyce in general, about

12 how they ran their company.  You will hear that the

13 employees -- and we've tried to find everybody that we could

14 find that worked there that had any recollection that was of

15 any value in this case, and you'll hear a number of them.  We

16 called the ones that we found.  They said that Dyce was a good

17 company.  That Quentin Dyce was a good guy.  That they cared

18 about safety.  That they cared about the environment.  It was

19 clean.  That they did the things that they were supposed to

20 do.  If there was a mistake -- nobody's perfect.  There were

21 mistakes -- that they would clean them up in the way that EPA

22 required at the time.

23      They'll tell you that as Dyce grew from the mom and

24 pop operation that started out in the late '50s to this bigger

25 operation as you've seen in this 1987 photograph, that those

175

1    procedures and policies became more stringent.  As they became

2    aware of more problems, they had more of them.  That in the

3    early days, the way people learned about the procedures and

4    policies was a new employee going to work at Dyce had to work

5    with another guy for a probation period, three months, six

6    months, whatever it was, to teach him everything that he

7    needed to do so he knew which pipe or which hose to use to

8    pump perc and which hose to use to pump an acid, and he knew

9    how to clean those hoses so that they didn't drip product down

10   on the ground.

11           And starting in the early '80s, they started putting

12   these procedures in writing so that there was a personnel

13   manual that told them how to do these things and so that there

14   was a better chance that they get done right.

15           But it wasn't -- it isn't only loyal employees who

16   will tell you that.  During the time period that all of these

17   things are going on, as you know now, Dyce was purchasing

18   insurance from USF&G and Continental.  They had what they call

19   a loss audit where insurance companies go out and they'll look

20   at their insured's place of business and they'll look to see,

21   is there something going on out here that's more likely to

22   cause us a loss that we're going to have to pay because we're

23   writing the insurance?  I can't tell you exactly how often

24   that was done.  We have only been able to find one of those

25   documents, and that's a loss audit that was done by

1    Continental in 1982.

2              Could you pull up Admitted Exhibit 505, please?

3              DOCUMENT TECHNICIAN:   (Complied with request.)

4              MR. COZZENS:   Can you blow that up a little bit

5    bigger?

6              DOCUMENT TECHNICIAN:   (Complied with request.)

7              MR. COZZENS:   Okay.   Somebody, Continental, who

8    supposedly knew something about how chemical operations should

9    go, went out to look at the Dyce operation in 1982, and they

10   determined, and I'll see if I can find it here -- well, one of

11   the things they found, and you can see at the bottom of that

12   paragraph, "The premises are kept clean.   Any chemical spills

13   are immediately cleaned up and disposed of in accordance with

14   EPA regulations."   That's not a Dyce employee telling you

15   that.   That's Continental Insurance Company saying that

16   happened in 1982.

17             They also, in that document, and I won't bother to

18   look for it right now, but it said that the hazards were,

19   regarding chemicals, were well protected.   They noted that at

20   that point in time, Dyce was having daily safety meetings so

21   that their employees knew what to do, and that there was a

22   training program for new employees, and that the employees, in

23   general, out there were experienced.   Okay.   So Dyce was

24   careful.

25             The other thing you'll learn is that Quentin Dyce

1   cared about the bottom line.  That's why he was a good

2   businessman, and he cared about spilling even small amounts of

3   product, both because of the impact it had on the environment

4   and because of the impact it had on the bottom line.

5          But it wasn't perfect.  You're also going to hear

6   about spills.  You're going to hear about times when a hose

7   ruptured and a whole bunch of product got sprayed around.

8   You're going to -- in general what you're going to find out is

9   that while they tried to do it right, they didn't always do it

10  perfectly.

11         Well, now I'd like to outline, if I could, the

12  evidence that we think is going to allow you to determine that

13  it's more likely than not that the groundwater contamination

14  in the northwest corner occurred as a result of a sudden and

15  accidental spill in the operations area that made its way down

16  the ditch that you've seen and out to the northwest corner.

17         First is that EPA determined, and we agree, that the

18  contamination was a result of a surface release.  That means

19  that it came out on top of the ground and then it worked its

20  way down.  Now it's undisputed that doing that within a few

21  months, you would start contaminating the groundwater.  I

22  think within six months is what the expert will say.  But it's

23  important that it was a surface release, because there was

24  only a short period of time when perc could have gotten from

25  the operations area to the northwest corner, and that time

1    period was 1975 to 1980.

2            The second important fact is the analysis of the

3    product that's found in the northwest corner.  It's pure perc.

4    There may be minuscule amounts of other types of products, and

5    there may be some products that are the byproduct of perc as

6    it breaks down.  When it breaks down and starts to

7    deteriorate, it turns into different kinds of chemicals, but

8    it's clear that that signature, the chemical signature, is of

9    pure perc.  So the only thing that got out in that northwest

10   corner is perc.

11           You will hear evidence of other places, especially

12   around the operations area, where there were what I'll call

13   the alphabet soup mixture of all of the chemicals that they

14   worked out there.  There's a little bit of this and a little

15   bit of that and a little bit of that.  That isn't the subject

16   of this lawsuit.  We're not asking for coverage for those

17   areas.  We're asking about coverage for the northwest corner

18   where it is only perc that got there.

19           You'll hear, as I've told you, that the only place

20   that perc was ever handled outside of containment, and

21   "outside of containment" means so that it could have gotten

22   anywhere except to the catch pond, was in that loading and

23   unloading area.

24           You've already seen the preconfiguration, the

25   pre-1980 configuration.  It shows you the exact path that perc

1   that was spilled in the loading and unloading area would have

2   traveled to get to the northwest corner, and know that that

3   couldn't have happened after 1980.

4          You heard that they pumped perc at 60 gallons per

5   minute, so it didn't take very long to have a mistake of

6   serious proportions.

7          You'll hear enough about their operations to know

8   that any significantly large spill of perc on that, in the

9   loading and unloading area or anywhere else, had to have been

10  accidental.  They were not in the business of dumping hundreds

11  of gallons of perc, or any other chemical, anywhere else.

12         When you put all of that together, you're going to

13  be able to infer from that that it's more likely than not that

14  there was a sudden and accidental spill of perc in the loading

15  and unloading area prior to 1980 that found its way to the

16  northwest corner.

17         One other bit of evidence that came to the people

18  who were investigating this kind of late in the process, and

19  that is during the entire time that Dyce operated at that

20  site, they can only remember one time when there was a

21  significant inventory shortage of perc.  Now again, memories

22  fail, and you will hear two people talk about that inventory

23  shortage.  One of them is Mr. Hallsten, and he'll tell you

24  that it was in excess of 250 gallons, the difference, the

25  discrepancy in inventory.  He tends to remember that it

1    occurred in the fourth quarter -- or the first quarter of the

2    calendar year when they were doing the inventory in the first

3    quarter, and he'll tell you why he came up with that date.

4    But he can't tell you if it was '75, '76, or '77.  He knows it

5    was sometime in that time frame.

6            The other fellow is Monte Naff, a fellow who started

7    out on the order desk, became a salesman, and ended up in

8    management at Dyce, and he also remembers the discrepancy.  He

9    remembers how incredibly angry Quentin was about losing that

10   much of this expensive product, and he remembers specifically

11   telling Rod Hallsten, "Look, Rod.  Just settle down."  Because

12   Rod thought he was going to lose his job, you know, and he

13   wasn't the guy that handled the perc.  He was just the guy

14   that did the inventories for them.  He thought he was going to

15   lose his job.  He was relatively new at the time.

16           And he said, "Look.  Quentin is home from his home

17   in Arizona, where he winters, for a short period of time, and

18   he's going to go back to Arizona.  When he comes back, he will

19   have forgotten about it, so don't worry about it.  You're not

20   going to lose your job."  As it turns out, that's, in fact,

21   what happened, but because of that, he determines that it was

22   the Christmas vacation, and so he puts it in the last quarter

23   of the year, of the year instead of the first quarter.  And we

24   don't know whether it was the last quarter or the first

25   quarter.

1          We know that it was in time.  Remember, it's

2     undisputed that once whatever happened that got that perc to

3     the northwest corner, within six months the groundwater

4     contamination would occur, and so we know it had to have been

5     occurring by sometime during the calendar year 1978, and

6     that's what we'll ask you to find in this case based upon

7     those facts.

8          Now the insurance companies have come up with a

9     series of alternative theories about how this may have

10    occurred.  I'm not going to speak for them.  They've got

11    plenty of lawyers there that know how to say exactly what they

12    want to say about that.

13         What I am going to do is ask you to listen very

14    carefully and see if their theories comport with what the

15    people who actually worked there on the ground have to say

16    about what was going on, with the pictures that you see, and

17    all of the other evidence that's there.  We don't think it

18    does.

19         Another thing that they will talk to you about, I'm

20    sure, because I've already seen exhibits about it, is they're

21    going to try to convince you that after, in 2000 or 2001, when

22    the EPA finally said, "You know, you guys, it's your fault.

23    You did it," that an investigation was done and that Dyce --

24    at that point it was Soco that owned Dyce, or actually I think

25    it was called Brenntag at the time -- tried to lie their way

182

1    out of it.  They said first to the EPA people, "We didn't do

2    it."  And the person who did that investigation and made those

3    reports is Suzanne Miller.  She'll be here, and you'll get to

4    meet her.  The first thing I'll do is just ask you to listen

5    very carefully to her testimony and look at her in the eye and

6    see if you think she's the kind of person who would lie to a

7    governmental entity under penalty of perjury.

8           And then listen to the sequence of events that

9    occurred that led to them discovering the things that we now

10   know.  One thing that's important -- and I would like, Judge,

11   if you would, at this point, to read the stipulation that we

12   discussed in chambers.

13          What I have here is the transcript of what you read

14   previously.

15          Then I would like you to call up Admitted

16   Exhibit 2533.

17          THE COURT:  Ladies and gentlemen, I'm going to read

18   to you a fact that the parties have stipulated to.  It has

19   been stipulated between the parties, and I quote, USF&G

20   produced Exhibit 2533, a marked-up 1975 aerial photograph, to

21   Soco in of May 2005.

22          MR. COZZENS:  Thank you, Your Honor.

23          Could you blow up the area around, again, the spur

24   and showing the ditch and the tank farm, please?

25       (Pause.)

183

1              MR. LYNCH:  It's not blowing up.

2              MR. COZZENS:  It's not working?  It won't blow up?

3         Well, if you look really, really carefully, you can

4    see a green line going down the ditch.  That, the first time

5    anybody at Soco or Dyce had seen that photograph was when it

6    was given to them by USF&G in May of 2005, after they had

7    already responded to the EPA's request for information, and

8    that's the first time they saw the pathway that existed to the

9    northwest corner.  Prior to that time, the denials were based

10   upon the fact that, "We never handled it anywhere but the

11   loading and unloading area, and there was never any way to get

12   there."  Well, people just didn't remember, in 2003 and 2004,

13   the configuration that existed for that short period of time

14   in the 1970s.

15        When this is all said and done, then we're going to

16   ask you, ladies and gentlemen, to find that it's more likely

17   than not that the ground contamination in the northwest corner

18   was caused by a sudden and accidental spill of perc in the

19   loading and unloading area that flowed right down that pathway

20   that USF&G had identified in this photograph and went to the

21   northwest corner, and, within a few months after that, it

22   started to create groundwater contamination, and that that

23   contamination occurred at least by the end of 1978.

24        Thank you very much.

25             THE COURT:  Thank you.

184

1          Mr. Johnson, you may make your opening statement on

2    behalf of the insurers.

3          Any of the jurors need a recess yet?

4       (No response.)

5          THE COURT:  We'll keep going.

6          MR. JOHNSON:  Thank you, Your Honor.

7          Good afternoon, ladies and gentlemen.

8          My name is Rob Johnson.  I am going to speak this

9    afternoon on behalf of United States Fidelity and Guaranty

10   Company, which is called USF&G for short, about what the

11   evidence will show in this case, what you'll be hearing and

12   seeing and what you will not be hearing and seeing.

13         My colleague, Max Davis, sitting over there in the

14   corner, will be speaking to you.  We're cutting our

15   presentation in half, and he will be speaking to you in a few

16   minutes on behalf of Continental.

17         Now, ladies and gentlemen, I want you to please

18   listen very, very, very closely during the course of this case

19   to hear if anyone, anyone at all, testifies that he or she

20   actually saw the alleged spill of perc that Mr. Cozzens

21   talked, just talked about today.

22         You will not hear anyone from that witness stand

23   testify that he or she saw the spill that they're alleging in

24   this case.  You will not hear anyone from that witness stand

25   testify that they saw where this spill allegedly drained to.

185

1          In fact, you will not hear anyone testify that he or

2     she observed, with any of their senses, any of their senses,

3     the spill that's alleged in this case.  No one saw it.  No one

4     heard it or heard the shouts of anybody that had seen it at

5     the time.  And no one smelled it, even though the evidence

6     will be uncontradicted that perc has a very, very strong,

7     distinctive odor.

8          This is the case, ladies and gentlemen, even though

9     the location, this loading and unloading area, where the spill

10    originally supposedly emanated from, is right behind the main

11    warehouse, right behind where Dyce -- right in the middle of

12    where Dyce employees were working all the time.

13         The evidence will show that if a spill of hundreds

14    of gallons of perc had happened, as Soco claims, it would have

15    been a catastrophic event.  550 gallons, which is one of the

16    estimates they have with regard to how much this spill must

17    have been, 550 gallons of perc weighs three and a half tons.

18    But it is telling that no one, no one at all, saw any evidence

19    of the spill that allegedly occurred.  No one saw the asphalt

20    pavement on which this spill allegedly occurred affected in

21    any way whatsoever, even though perc is a solvent and reacts

22    with and eats into asphalt paving.

23         I also want you to look, during the course of this

24    case, very closely at the exhibits that Soco will show you,

25    because you will not see one document, not a single piece of

186

1    paper, that refers to this alleged catastrophic spill of perc.

2    There is not one report.  There is not one memorandum that any

3    of Dyce's employees wrote that even mentions, that even

4    mentions the alleged spill.

5          In short, there is no evidence, there is no direct

6    evidence at all that the alleged spill actually happened.  In

7    fact, each and every former Dyce officer and employee who will

8    testify from that witness stand in this case will say he never

9    saw a spill of perc.  Never saw a significant spill of perc of

10   the type that they're alleging in this case.

11         Now what's the basis for this claim that there was

12   this large, catastrophic spill?  What's the basis?

13         The basis is the purported inventory shortage that

14   Mr. Cozzens just told you about.  Only two people recall this

15   inventory shortage.  Both are long-time Dyce management

16   personnel.  The two people are Rodney Hallsten and Monte Naff.

17   But you will hear them testify that neither of them have any

18   idea why there was a discrepancy of perc in a quarterly

19   inventory more than three decades ago.

20         Also, neither Mr. Hallsten nor Mr. Naff will testify

21   that this inventory shortage indeed was caused by a spill.

22   Both of them will testify that they don't know, just like

23   everybody else, both of them will testify that they don't know

24   of any spills of perc of this type of size at Dyce while they

25   worked there.  And both Mr. Hallsten and Mr. Naff will tell

1   you, from the witness stand, that they have no idea, they have

2   no idea at all whether it was ever determined what caused this

3   alleged inventory shortage.  They simply don't know whether

4   the inventory shortage could have simply been some paperwork

5   mixup.

6          In fact, Hallsten will say he turned the matter of

7   trying to determine what caused the inventory shortage over to

8   Quentin Dyce, who was one of the owners of the company, and

9   then he never heard about it again.  Nor did Mr. Naff.  They

10  never heard about it again.

11         If Mr. Dyce ever determined what caused this alleged

12  discrepancy, if it actually was a discrepancy, we'll never

13  know, because, as you heard, Mr. Dyce passed away, and there

14  are no documents, none whatsoever, that explain what, if

15  anything, he did to determine the cause of the alleged

16  shortage.

17         In fact, there are no documents that exist that even

18  show the alleged inventory shortage even occurred.  The only

19  evidence as to it is the recollection of these two long-time

20  Dyce managers, a recollection of something that allegedly

21  occurred 30 years ago.

22         But these two managers don't even agree on the facts

23  as to this supposed inventory shortage.  As you just heard

24  Mr. Cozzens say, Hallsten says it happened in the first

25  quarter, that is, January, February, March, of any of three

1  years, 1975, 1976, or 1977.

2           Well, Naff doesn't agree with that.  You'll hear him

3  testify in this case that it happened in the last quarter,

4  that is, October, November, or December, of 1975.  That's four

5  possible quarters over a period of three years.

6           Hallsten and Naff also don't agree on the amount of

7  the inventory shortage.  Hallsten has testified that it

8  actually could have been anywhere from 250 gallons to

9  1,000 gallons.  Mr. Naff, on the other hand, testified that it

10  was about ten or 12 drums.  Ten or 12 drums equals 500 to

11  600 gallons.  So they don't even agree on the amount.

12           The evidence will also show, and this is

13  significant, that inventory discrepancies were not a rare

14  event at Dyce.  In fact, Dyce had repeated problems with

15  inventory discrepancies, including, most particularly,

16  inventory discrepancies with regard to perc.

17           In a 1985 memo to his management employees, Quentin

18  Dyce threatened to get out of the business of selling perc

19  altogether if the company could not fix its missing inventory

20  problems.  Mr. Dyce's memo refers to a number of the potential

21  causes of these recurrent inventory problems, including

22  possibly theft or, as he said it in his memo, as he termed it,

23  the perc going out the back door.

24           Now both Monte Naff, who was one of the inventory

25  discrepancy guys, and David Warne, who was another Dyce

189

1    manager, long-time manager who will testify in the case, have

2    stated that even in the 1980s and the 1990s, there were

3    discussions among Dyce employees about the loss of perc and

4    that there were suspicions that the product would be

5    evaporating or that employees could just simply be taking it

6    to be sold or given away.

7          So if perc contamination, if perc contamination at

8    the Dyce facility was not caused by a one-time catastrophic,

9    sudden and accidental spill, what caused it?

10         Well, what the evidence will show in this case is

11   that the entire Dyce facility, not just the northwest corner,

12   but the entire Dyce facility is contaminated with all kinds of

13   chemicals, chemicals that were splashed and spilled on a

14   weekly, almost a daily basis in the routine unloading of

15   chemicals that were delivered to Dyce and then the pumping of

16   chemicals into drums and delivery tanks for delivery to Dyce's

17   customers.

18         Could you please put up Exhibit 3059, page 121,

19   which is in evidence?

20         DOCUMENT TECHNICIAN:  (Complied with request.)

21         MR. JOHNSON:  This, ladies and gentlemen, is a

22   figure from an EPA report that depicts the Dyce facility and

23   the chlorinated solvent contamination there; that is, the perc

24   contamination.

25         The yellow figure, which goes around here, kind of

190

1   cut it off there, the yellow figure is what they call the

2   plume.  That's the underground plume of chlorinated solvents.

3            As you can see the plume -- I kind of cut it off

4   here.  Let me do that again.  The plume goes all the way

5   around here.  Okay.  Hopefully you can see it on your screen

6   better than I can on mine.

7            The plume starts, as you'll see, right in the

8   loading and unloading area, and it emanates out, and it goes

9   from the rest of the Dyce facility all the way out until it

10   gets to the Yellowstone River.

11            JUROR HARTMAN:  (Raising hand.)

12            MR. JOHNSON:  I'm sorry; I can't answer your

13   question.

14            There are four green spots here, okay?  The four

15   green spots are very significant, because the green spots are

16   source areas for the perc.  That is where the perc was

17   concentrated in the soil and entered into the groundwater.

18            Those four areas are, one, right here in the loading

19   and unloading area.  The evidence will show that the perc

20   there was caused by routine splashing and spillage of perc

21   while it was pumped and drained into drums and delivery tanks

22   over the course of a quarter of a century.

23            There is another perc source area right here.  Boy.

24   This -- I'm doing the best I can.  There is another perc

25   source area right there.  Let me get rid of it and try it

1    again.  I just -- and that perc source area is what is in,

2    that you heard Mr. Cozzens refer to as, the catch pond, okay?

3              Now the function of the catch pond is exactly what

4    its name implies.  It was constructed to catch the runoff of

5    chemical spillage from Dyce's daily operations.  In the 1970s

6    and the 1980s, the catch pond caught routine spillage of

7    chemicals which were washed down from the loading and

8    unloading area, where the other green blob is, down to the

9    catch pond, and they sat in the catch pond.  Okay.

10             Now you will hear about the contamination of the

11   Dyce facility from one of our witnesses, Dr. Peter Shanahan.

12   Dr. Shanahan teaches at MIT out in Cambridge, Massachusetts,

13   and he'll be with us throughout the trial.  In fact, he's here

14   today.  Dr. Shanahan is raising his hand back there.

15             Dr. Shanahan is an expert in evaluating historical

16   environmental contamination.  He will testify that based on

17   his review of the extensive environmental testing that was

18   done at the Dyce facility and the historical aerial

19   photographs taken of the Dyce facility over the years, it is

20   his opinion that the soil and groundwater contamination is

21   widespread throughout the Dyce facility.

22             Significantly, Dr. Shanahan will also testify that

23   the likely source of the two green areas to the northwest of

24   the catch pond, as depicted on the EPA figure here, is surface

25   and/or subsurface drainage from the catch pond itself.

1          Dr. Shanahan will tell you that after accumulating

2    in the catch pond, perc likely traveled to the northwest

3    corner through discharges into ditches outside the catch pond

4    and/or through the bottom of the pond itself.

5          Now the two areas, the two other green areas here,

6    one is here.  It's a smaller one.  And then there is the

7    bigger one which is -- which Mr. Cozzens referred to as the

8    northwest corner.  So we've got four separate areas of perc

9    contamination where perc entered into the groundwater.

10         Now Marvin Johnson, who will be a witness in the

11   case, he's a former Dyce employee, principally in the 1980s,

12   he will testify that he was routinely instructed by his bosses

13   to drain the catch pond, when it filled with chemical runoff

14   and rain, in order to keep it from overflowing the berm that

15   Mr. Cozzens talked about that surrounded the catch pond.

16         Johnson will tell you that he did this, or saw it

17   being done by others, some 30 times while he worked at Dyce,

18   draining hundreds, perhaps thousands of gallons of liquid that

19   ran off to the northwest corner.

20         Now, finally, Dr. Shanahan will explain that the

21   ditch, which Mr. Cozzens talked about, from the loading and

22   unloading area, through which the perc supposedly would have

23   flowed under Soco's one-time spill theory, does not show

24   contamination concentrations supporting that theory.  That is,

25   it doesn't have concentrations in it until the ditch gets to

1   the area where there is drainage from the catch pond itself.

2          Now Dr. Shanahan will tell you that further testing

3   of the area where that ditch was would reveal such

4   contamination if the one-time spill that Soco alleged here

5   actually happened.  As the evidence will show, Soco has taken

6   over 70 different samples from different locations on its

7   property, but it has deliberately decided not to do any

8   testing of the ditch through which the one-time spill of perc

9   allegedly traveled.

10          We will also call three additional experts to help

11   you understand how the Dyce facility became contaminated and

12   why Soco's one-time spill theory makes no sense.

13          Dr. Yaron Sternberg is a professor at the University

14   of Maryland.  He will testify that the total volume of perc

15   and its byproducts at or downgradient from the northwest

16   corner is less than 80 gallons, far less than their expert

17   will tell you is out there.  Their expert estimates that there

18   were 320 gallons out there.  The volume that Dr. Sternberg has

19   calculated is consistent with discharges over the years from

20   the catch pond and wholly inconsistent with Soco's one-time,

21   sudden and accidental spill theory.

22          Now Dr. Sternberg is also an expert in fluid

23   mechanics, and he will explain that it is simply implausible

24   that a coupling or a hose could have failed in the middle of

25   the pumping operation of 60 gallons a minute and caused the

1    type of one-time spill of hundreds of gallons of perc that

2    Soco theorizes in this case.  If there had been a pinhole leak

3    or another small problem, you can actually -- with the

4    connections of these pumps and hoses, it would have been seen

5    right away.  It wouldn't have gone on for minutes.  And he

6    will testify to that.

7            Another expert that you will hear from is Dr. Bruce

8    Dale, a professor from Michigan State University.  Dr. Dale

9    will testify that if a catastrophic spill of hundreds of

10   gallons of perc had happened as Soco theorizes, it would have

11   caused obvious, obvious discoloration and deterioration of the

12   asphalt pavement in Dyce's loading and unloading area, but

13   there is no evidence at all, none, of any such discoloration

14   or deterioration of the asphalt in the loading and unloading

15   area.

16           Finally, you will hear from Kristin Stout, an expert

17   in the analysis of aerial photography.  Ms. Stout is also back

18   there.  She's waving at you.

19           Ms. Stout will help you evaluate the historical

20   photos that were taken of Dyce and the Dyce facility over the

21   1970s and the 1980s.  Ms. Stout will testify that the

22   historical photographs are wholly consistent with the

23   contamination of the northwest corner having originated in the

24   catch pond.

25           Now Dr. Shanahan will tell you that, over time,

1    chemical migration from the catch pond killed the grass and

2    weeds along the path from the catch pond to the northwest

3    corner, all of which you can plainly see from a few aerial

4    photographs that I'm going to show you right now.

5              Can you bring up Exhibit 5017?

6              DOCUMENT TECHNICIAN:  (Complied with request.)

7              MR. JOHNSON:  Now this is -- and can you -- this is

8    a photograph that was taken in June of 1974.

9              Could you please enlarge the section that's crucial?

10             DOCUMENT TECHNICIAN:  (Complied with request.)

11             MR. JOHNSON:  This is a photograph.  This area right

12   here, obviously, is the catch pond, and as you can see, the

13   northwest corner is out here, and as you can see, there is

14   healthy grass, or at least healthy weeds, between the catch

15   pond here and the northwest corner over there.

16             Give me 5024.

17             DOCUMENT TECHNICIAN:  (Complied with request.)

18             MR. JOHNSON:  Now that was 1974.

19             THE COURT:  If you're splitting your time with

20   Mr. Davis, you've got a couple of minutes left.

21             MR. JOHNSON:  All right.  Thank you, Your Honor.

22   I'm almost done.

23             This is Exhibit 5024.  It's a photograph taken in

24   September of 1977.  As you can see -- would you pull this one

25   up a little more?

1          DOCUMENT TECHNICIAN:  (Complied with request.)

2          MR. JOHNSON:  As you can see, here is the catch pond

3    again.  The northwest corner is out here, and you can clearly

4    see, if I can do this correctly, you can clearly see

5    devegetation leading from here to the northwest corner.

6          Pull up 5028, which is two years later.

7          DOCUMENT TECHNICIAN:  (Complied with request.)

8          MR. JOHNSON:  All right.  And make it bigger.

9          DOCUMENT TECHNICIAN:  (Complied with request.)

10          MR. JOHNSON:  As you can see here, the devegetation

11    has gotten even bigger.  This is May 1979.  Here is the catch

12    pond.  Here is the northwest corner.  You can see that the

13    northwest corner itself is getting devegetated, as well as the

14    pathway to the northwest corner, along here, as well as some

15    stuff that's going up here.  Okay.

16          Pull up the next photo, which is 5033.

17          DOCUMENT TECHNICIAN:  (Complied with request.)

18          MR. JOHNSON:  This is one from June 1981.  As you

19    can -- this is after the reconfiguration of the catch pond.

20    The catch pond was made bigger.  Why was it made bigger?

21    Apparently because it was overflowing.  But as you can see,

22    the devegetation has gotten even worse, even worse over time,

23    directly from the catch pond.

24          And pull up 5036, two years later.

25          DOCUMENT TECHNICIAN:  (Complied with request.)

1          MR. JOHNSON:  And make this area bigger.

2          DOCUMENT TECHNICIAN:  (Complied with request.)

3          MR. JOHNSON:  All right.  This is July of 1983.  As

4    you can see, here is the catch pond.  Here is the northwest

5    corner.  There is incredible devegetation all the way through

6    here.

7          Finally, if you can, pull up Demonstrative

8    Exhibit 614, page 8.

9          DOCUMENT TECHNICIAN:  (Complied with request.)

10         MR. JOHNSON:  All right.  This is a -- these are two

11   exhibits that are in evidence.  We've added one and overlaid

12   it with another.  The overlay here are these green areas.

13   You'll recall these green areas from the EPA figure that you

14   saw before.  This, we've overlaid them here on the June 1981

15   figure.  As you can see, the perc -- and the green figures

16   we've circled to make them a little bit easier to see with

17   regard to a dotted line.  The dotted line isn't part of that

18   perc infiltration area.  It's the green area.

19         As you can see, in 1981, where is the infiltration?

20   Right over the loading and unloading area.  Another one right

21   in the catch pond.  Right here.  Another one at the edge of

22   that devegetated area that I showed you before, and another

23   one in the northwest corner.

24         As the saying goes -- thank you.

25         As the saying goes, a picture is worth a thousand

1    words.   These photographs, we believe, speak volumes about the

2    source of the contamination in the northwest corner of the

3    Dyce facility being the catch pond.

4            Thank you for listening.  I'll turn it over to Max

5    Davis.

6            THE COURT:  We're going to take a recess.  Let's

7    take a recess.

8            Who raised their hand for a question of some kind?

9            MR. HARTMAN:  (Indicating.)

10           THE COURT:  Let me explain this.  You can't ask

11   questions, and you had no reason to know that.  You can't ask

12   questions.  The only time you can ask questions is after the

13   jury begins to deliberate, and I'll be explaining the

14   procedure to you, but if you do ask questions, it has to be in

15   writing.  I have to get the attorneys together and then state

16   what the question is and then either answer it or not.  So in

17   this trial, there will not be anybody being allowed,

18   especially jurors, to ask questions or answer.  At least those

19   are the rules.

20           All right.  Let's take a quick recess, and then

21   we'll finish yours.

22           THE LAW CLERK:  All rise.

23       (Recess taken from 15:18:06 to 15:35:04.)

24       (Open court.)

25       (Jury present.)

1          THE COURT:  Please be seated.

2          Mr. Davis, you may make your opening statement to

3     the jury.

4          MR. DAVIS:  Thank you, Judge, Counsel.

5          Aren't these screens something else?  High tech.

6     Well, there's high tech, there's low tech, and now you're

7     going to see no tech.

8          What I've done is I've -- Judge, if you want to

9     look?

10         THE COURT:  Yeah.

11         MR. DAVIS:  -- I've created my own little time line

12    here, because I think it's important to put matters into

13    perspective, particularly the evidence you're going to hear

14    over the next several days.

15         As Mr. Cozzens -- you heard Mr. Cozzens tell you

16    about 45 minutes ago that his client, Soco, doesn't dispute

17    that there is perchloroethylene contaminating the Lockwood

18    area, as Mr. Johnson showed you on that EPA diagram, emanating

19    from the operations area of the former Dyce facility northward

20    and northwestward to the Yellowstone River.  Mr. Cozzens said

21    that's not in dispute.

22         What you're going to find out is that's this week's

23    version of what Soco has to say.

24         That's why this time line is of some importance to

25    you.  I think you heard that they're claiming that there was

1  this sudden and accidental -- those are the words the

2  insurance policies describe -- spill of perchloroethylene in

3  the 1975-1976 time frame that could be discerned because

4  Mr. Hallsten and then Mr. Naff, two former management

5  employees of Dyce, remembered this inventory shortage.

6          What you'll see as evidence in this case is, as

7  Mr. Johnson indicated to you, you'll see, from '75, '76

8  forward, into the 1980s, you'll see memos from Quentin Dyce

9  indicating problems with PCE inventory.

10         But more importantly, what you'll find out is 1989

11 was an important year in the history of Dyce Chemical Company.

12 That's when the Dyce family sold the business to a company

13 that became -- you'll hear the initials HCI.  Eventually it's

14 the initials of Holland Chemical, Incorporated.  And you'll

15 find out Holland Chemical, not surprisingly for transactions

16 of this nature, if they're buying a -- someone who's been

17 operating a chemical wholesale distribution facility with

18 tanks and drums and bags of chemicals being handled, said, "We

19 want to make sure we're not buying a pig in a poke."

20         So Dyce commissioned a study, an environmental study

21 from an outfit called Versar.  And you'll see the Versar

22 report as an exhibit in this case, and that report indicates,

23 as they were trying to sell the business, consistent with what

24 they told my insurance company on the piece of paper that

25 Larry Cozzens showed you a couple minutes ago, "Oh, there are

1   no perc spills.  There are no chlorinated solvent spills at

2   the Lockwood facilities."  That's what they tell the buyer in

3   1989.

4           The company changes hands a couple times, and now

5   Soco owns it.  And what happens, ten years later, in 1999, the

6   EPA contacts this company, says, "The groundwater -- we've

7   been testing wells in Lockwood.  The groundwater is

8   contaminated with perchloroethylene.  Now you guys are

9   wholesalers of perchloroethylene.  What do you know about

10  this?"

11          What happens is in December of 1999, the EPA sends

12  to this company what's called a 104(e) request.  "You tell us

13  everything you know, and you talk to everybody in this company

14  about everyone who handled perchloroethylene, and find out

15  what you can about why there is perchloroethylene

16  contaminating the groundwater in Lockwood, Montana."

17          Dyce responds to the EPA on March 1, 2000 and says,

18  "There are no perc spills or releases.  We've got a catch pond

19  that was unlined."

20          On May 25 of 2000, on May 25 the EPA says, "We want

21  some more information from you."  And Dyce responds to the EPA

22  on July 21, 2000 under oath.  Ms. Miller is the one.  The

23  attorney involved in gathering the information -- as

24  Mr. Cozzens said, I guess we'll hear from Ms. Miller at this

25  trial.  Ms. Miller goes and talks to everyone she thinks she

1   needs to talk to to respond on behalf of this company and

2   tells the federal government, in response to followup

3   questions from the EPA, "We've not identified any perc spills

4   or releases.  If a perc -- if a spill had occurred in the

5   loading or unloading area, it would have drained to the

6   containment area.  Dyce would have known of any spill of perc

7   in the loading or unloading area because physical damage" --

8   and this is important -- "to the asphalt would have resulted,

9   and nobody saw that."

10          She indicates, Dyce indicates, or Soco indicates to

11   the federal government, "We've interviewed 19 current and

12   former employees, including Monte Naff, who all report there

13   have never been any perc spills here, even though we've got

14   this plume of perc contaminating the groundwater, and there

15   are no inventory losses in the 1970s identified or associated

16   with contamination."  That's what they tell the federal

17   government.

18          We find out that in 2002, meantime, they're sued by

19   some of the neighboring property owners out in Lockwood, and

20   they respond on January 23, 2002, in court papers filed in the

21   suit filed by the landowners, and say, "We don't -- "there

22   have not been any releases of perchloroethylene.  We don't

23   know where this stuff came from."  In March 2004, that case

24   settles.

25          And then this case starts.  And what you'll find

1    that's interesting -- you've heard the names of Mr. Hallsten

2    and Mr. Naff.  Mr. Hallsten, back in the 1970s, was working on

3    the order desk at the Dyce facility out in Lockwood.  He was

4    the guy in charge of inventory, as Mr. Cozzens indicated.

5              In 2004, in fact, right after a Christmas party in

6    2004, Mr. Hallsten is apparently at this Christmas party.  The

7    current manager at the Dyce operations out of Lockwood tells

8    Mr. Hallsten, "I'd like you to meet -- you need to go meet

9    with a lawyer named Tom Mielenhausen from Minneapolis," a

10   partner of Mr. Banker and Mr. Lynch.

11             And out of this meeting between Mr. Mielenhausen and

12   Mr. Hallsten, Mr. Hallsten now remembers, Christmas 2004, 28

13   or 29 years ago, after meeting with the lawyer, comes out of

14   the meeting and says, "I remember an inventory shortage back

15   in 1975 or 1976 of 250 to 1,000 gallons."  As has been

16   indicated, the guy in charge of inventory passes this off to

17   Quentin Dyce, the owner of the business, and never hears about

18   it again.  That's the testimony you're going to hear in this

19   courtroom.

20             But Mr. Naff, who has been involved in answering

21   questions from the EPA, he only then recalls what he thinks is

22   about a 550-gallon shortage of perc in about 1976 after seeing

23   Mr. Hallsten's testimony given in a deposition in this case.

24             That's the inventory shortages we're talking about:

25   Mr. Hallsten recalling a 250- to 1,000-gallon inventory

1   shortage after meeting with the lawyer involved in insurance

2   coverage dispute and then Mr. Naff, seeing what Mr. Hallsten

3   says about it, again, now 29, 28 years after the fact, they

4   have these epiphanies and recall an inventory shortage.

5          And it's that inventory shortage that, as

6   Mr. Cozzens indicates, they want you to say is circumstantial

7   evidence of a spill of some magnitude which creates pure-phase

8   perc out in the northwest corner of the Dyce facility.

9          And again, what you'll hear, as Mr. Johnson

10  indicates, you will not hear a single witness who ever

11  witnessed such a spill.  You will not hear a witness who heard

12  discussions in the 1970s about such a spill.  You will not

13  hear a witness testify about rumors of a spill of

14  perchloroethylene at the Dyce facility in the mid 1970s.

15         As Mr. Johnson indicated, there's perchloroethylene

16  in a lot of different locations on the Dyce facility.  Most

17  notably, there's a hot spot out at the catch pond, and, again,

18  he's indicated what Professor Shanahan -- how he will explain

19  that and how the aerial photographs of the site, we think,

20  serve as conclusive evidence that there's been drainage coming

21  out of the catch pond and why drainage out of that catch pond

22  could lead to the specific chemical footprint that has been

23  tested and found out in the northwest corner, as well as other

24  places in the facility.

25         The one other piece that's missing from the

1    circumstantial case that Mr. Cozzens told you about, the

2    missing pieces here, is you won't hear anybody explain to you

3    if there was a spill of 250 to 1,000 gallons, or 500 to 600

4    gallons as Mr. Naff would have it when he recalled the

5    inventory shortage, how that spill occurred in the normal

6    operation of Dyce.  Again, there won't be any evidence that --

7    you heard that there was a 1,500-gallon storage tank.  There

8    will be no evidence that that tank suddenly failed.

9         Mr. Cozzens alluded to the fact that perc came into

10   the Dyce facility in bulk quantities in tanker trucks,

11   semitanker trucks, pulling into the operations area.  One of

12   the things Ms. Stout will tell you, in analyzing the aerial

13   photographs, is the operations area is generally -- it's

14   level.  It's not flat as a table, but it's generally level.

15   So how could this 250- to 1,000-gallon inventory shortage, how

16   did it really become the spill that they want to tell you

17   happened when they're going to present?  You're not going to

18   hear any evidence of such a spill.

19        Mr. Cozzens alluded to the fact that the perc was

20   offloaded via pump that pumped at 60 gallons a minute.  No one

21   is going to dispute that.

22        What you need to do is understand, and, again, the

23   evidence will be, it's come in on a tanker truck.  Tanker

24   trucks don't drive by themselves.  There is a truck driver.

25   Somebody has got to hook the pump up, the hose to the tanker

1    truck.   That's a Dyce person's job.   So there are at least two

2    people there for any kind of perc transfer from a bulk loading

3    that came in in bulk.   You'll also hear about drumming that

4    could be done by one person where they're filling a 55-gallon

5    drum with a hose.

6              None of the people who did that, and you will hear a

7    number of them testify in this case, will say, "I never

8    spilled -- you know, 250 gallons, that's basically five full

9    drums."   And if you think 250 gallons to 1,000 gallons at

10   60 gallons a minute, Mr. Cozzens -- I guess it's kind of the

11   glass half empty or the glass half full.   To us, it's the

12   glass half full.   250 gallons at 60 gallons a minute, that's

13   four minutes that this is -- that perc is spewing out in the

14   loading area with the truck driver, with an operations person

15   there, yet no one seems to remember this happening.

16             You want to make it 500 to 600 gallons?   Just

17   increase it.   We're nine to ten minutes.   A thousand gallons,

18   how many minutes at 60 gallons a minute?   No one knows about

19   it.   No one sees it.   No one hears it.   No one notices it.

20             It didn't happen.   The evidence will point to the

21   fact there was no such event.   And as Mr. Johnson indicated,

22   the insurers are going to bring in a number of expert

23   witnesses.   He mentioned Professor Yaron Sternberg or Ron

24   Sternberg from the University of Maryland.   One of the things

25   Professor Sternberg did is compute some -- try to calculate

1   how much perc is really in the ground.

2          One of the other things he did, he's a professor who

3   is an expert on fluid dynamics, and he will tell you that when

4   you're offloading, using industrial-type hoses of the type

5   that Dyce uses with the quick couple, with ears that you pull

6   down to lock that hose into place, if there's a malfunction

7   with that hose that you don't have it clamped on right at one

8   end or the other and you did turn that pump on, that spill

9   will manifest itself instantaneously.  So the minute someone

10  flips the switch on the pump, perc would be seen spewing out

11  at 60 gallons a minute.  It didn't, but what did Professor

12  Sternberg say?  The idea that someone would do that and not

13  see it happen doesn't make any sense.

14         And the same thing is if the hose would fail not at

15  the coupling but midline in that hose, those 2-inch industrial

16  hoses will typically fail as a pinprick, so if things are not

17  going to come out at 60 gallons a minute, it's going to be

18  noticed.  Again, no evidence.  You're not going to hear anyone

19  on this witness stand say, "I saw that happen in 1975 or '76."

20         So again, what is the evidence of the mechanism, the

21  event that causes a 250- to 1,000-gallon spill?  You listen

22  very closely.  See if you hear any evidence of anyone saying

23  anything of that nature occurring back in 1975 or 1976.

24         Lastly, as Mr. Johnson indicated, we're going to

25  have Professor Bruce Dale come and testify to you.  Professor

208

1    Dale is a professor of chemical engineering at Michigan State

2    University.  He's an expert on the properties of

3    perchloroethylene.  And what Professor Dale will tell you, and

4    a number of the Dyce witnesses are going to agree anecdotally

5    with Professor Dale, even though they don't have his

6    education, is that perchloroethylene is a solvent.  And if you

7    spill it -- can you pull up Exhibit -- what was the number?

8    I'm sorry.  5028 again.

9            If you spill perc, and spill perc in that loading

10   area, right there -- I'm on the drumming shed, but just to the

11   north of the drumming shed, that's a lot of trouble.  That's

12   asphalt.  Professor Dale will tell you if there were a spill

13   of 250 gallons to 1,000 gallons, even 250, he will tell you,

14   would basically consume that entire loading area if it spilled

15   off a truck.

16           And when perc hits asphalt, perc is a clear liquid.

17   It looks like water.  It's much heavier than water, and it has

18   chemical -- but it has chemical properties.  It immediately

19   turns black when it hits asphalt because it's dissolving the

20   hydrocarbons in the asphalt.  Professor Dale will tell you

21   even a spill of 250 gallons in that loading area would have,

22   in effect, left a bathtub ring, would have eaten up the

23   asphalt, would have been soft and gooey, and there would have

24   been a black bathtub ring on the buildings.  No evidence.

25   Nobody ever saw that.

1     There was no sudden and accidental spill of

2     perchloroethylene in the area.

3     And the other thing Professor Dale will tell you,

4     and those of you who, again, have been in a drycleaning

5     establishment will know, it has a very pungent odor.  And

6     again, if you had a spill of simply 250 gallons of

7     perchloroethylene in that loading area in some fashion that

8     they're not going to tell you, not simply the truck driver,

9     not simply the guy working out in the loading area, but

10    everybody at that Dyce facility would have smelled it, smelled

11    it very clearly, that something was greatly amiss.  And again,

12    you're not going to hear a single witness in this courtroom

13    say that anything like that ever, ever, ever happened at Dyce

14    Chemical in the 1970s.

15    So at the end of the day, the insurers, Mr. Johnson

16    and I, or someone, one of our other colleagues will come up

17    here and tell you, there was -- there is no evidence of a

18    sudden and accidental event at the Dyce Chemical facility in

19    Lockwood, Montana in 1975 or 1976 that serves to trigger

20    insurance coverage for something that Mr. Naff and

21    Mr. Hallsten only remembered in 2004.

22    Thank you.

23    THE COURT:  Thank you.

24    Counsel, call your first witness.

25    Get your, get your low-tech stuff, Mr. Davis.

1          MR. DAVIS:  Oh.  No tech.

2          THE COURT:  No tech.

3          MR. BANKER:  Your Honor, Soco calls Dennis

4   St. George to the stand.

5          WHEREUPON,

6                    MR. DENNIS ALLEN ST. GEORGE,

7   called for examination by counsel for defendant, after having

8   been first duly sworn to testify the truth, the whole truth,

9   and nothing but the truth, testified as follows:

10                       DIRECT EXAMINATION

11   BY MR. BANKER:

12   Q    Good afternoon, Mr. St. George.

13   A    Good afternoon.

14   Q    Could you state your full name for the record, please?

15   A    Dennis Allen St. George.

16   Q    And who do you work for?

17   A    Soco West.

18   Q    How long have you worked for Soco West?

19   A    I was a vice-president of Soco West from February of 2004

20   until December of 2007.  Following that, I've been a

21   consultant to Soco West, performing some of the functions that

22   I performed when I was an officer.  From 2002 until 2004, I

23   was with the legal department of one of the parent companies

24   of Soco West.

25   Q    Are you an attorney, Mr. St. George?

1   A      I am.

2   Q      And were you working as an attorney for Soco?

3   A      When I was in the legal department of the parent company,

4   yes.

5   Q      Tell us what you do as a consultant for Soco.

6   A      Well, it depends.  A lot of what I do is on an *ad hoc*

7   basis.  I work with defense attorneys in connection with

8   claims, liaise with insurance companies, make sure that cases

9   are tendered and that we communicate with insurance companies.

10  Q      Have you been personally involved in the dispute between

11  Soco and its insurers, USF&G and Continental, with respect to

12  the Lockwood site?

13  A      Yes, I have.

14  Q      How have you been involved in that?

15  A      I was involved with the in-house legal department of the

16  parent, one of the parents of Soco West, and they were

17  involved in dealing with the response to the dec action

18  brought by the insurance companies.

19         I've also been involved with providing evidence in

20  connection with that, with that case.  I did some searches for

21  documents.  I was present as the corporate representative at

22  the last trial.

23  Q      Let me shift your attention to talking about the Dyce

24  Chemical business in Lockwood.  Are you familiar with that

25  business?

1  A     By secondhand, yes.

2  Q     And have you visited the site out there at Lockwood?

3  A     Yes, I have.

4  Q     Tell us about the physical location out at Lockwood.

5  A     It's a --

6         MR. JOHNSON:  Objection, Your Honor.  Lack of

7  foundation.  He said he didn't work there.

8         THE COURT:  I'm going to overrule it for the time

9  being.

10        THE WITNESS:  It's an industrial facility currently

11  inside a fence, a cyclone fence.  A parking lot, several

12  warehouses, an office.  Some pole barns.  There used to be a

13  tank farm there, and then there's additional pasture land

14  outside of the fence area.  I think it's about -- anywhere

15  from 12 to 15 acres.  I'm not exactly sure.

16  BY MR. BANKER:

17  Q   Could you explain the chemical distribution business that

18  was ongoing out there?

19        THE COURT:  Are you going to object?

20        MR. JOHNSON:  I'm objecting, yes, for sure.

21        THE COURT:  Have you ever worked there?

22        THE WITNESS:  I didn't work there, no.

23        THE COURT:  Aren't there going to be a number of

24  witnesses that are going to describe this who worked there and

25  know what they're talking about?

1          MR. BANKER:  There are, Your Honor.  I'm just

2    briefly having him explain the context of the dispute.

3          THE COURT:  I'll overrule it.

4          THE WITNESS:  In general, Dyce Chemical was a

5    chemical distribution operation.  They would purchase

6    chemicals in bulk from producers and then repackage it and

7    sell it to end users.

8    BY MR. BANKER:

9    Q    And was one of the chemicals that Dyce was involved in

10   distributing a chemical that we've heard referred to here as

11   perc?

12   A    Yes, it was.

13   Q    And what's your understanding of what perc was used for?

14   A    Primarily as drycleaning fluid.

15   Q    I'd like to talk now about the ownership of the Dyce

16   facility in Lockwood.  I take it Soco owns it now?

17   A    Yes, it does.

18   Q    Who owned it before Soco?

19   A    Dyce Chemical.  I think at one time it was called Dyce

20   Sales and Engineering.  Before that, it belonged to a company

21   called Trekker.  There may have been another owner.  And then

22   prior to, say, about 1970, Dow owned it.

23   Q    At some point did Dyce, did Dyce -- was Dyce sold to

24   another company?

25   A    Dyce Chemical became part of a worldwide chemical

214

1   distribution business called HCI, Holland Chemical

2   International, in 1989, and so the shares of Dyce Chemical

3   became part of that conglomerate.

4        Then in 2000, HCI was acquired by another worldwide

5   chemical distribution enterprise called Brenntag.

6   Q    And then did it remain part of Brenntag?

7   A    Up until, up until 2000, the end of February 2004.  Then

8   it, then the Brenntag group was divested by its ultimate

9   parent company but Soco remained behind.

10  Q    And continued to own the Dyce facility?

11  A    Yes.

12  Q    I'd like to shift your attention to the historical

13  insurance that Dyce Chemical had.  Have you become familiar

14  with that in your capacity as a consultant for Soco?

15  A    Yes, I had.

16  Q    How were you involved in the insurance issues related to

17  the Dyce property?

18  A    Well, I was aware that there was an ongoing effort to

19  find policies associated with the Dyce property.  I was also

20  involved with keeping, to some degree, with keeping the

21  insurers informed about the EPA action and the neighbors'

22  lawsuit against Soco.  In addition, I've worked with you and

23  your firm in connection with the dispute over insurance.

24  Q    What I'd like to do now is direct you to a series of

25  admitted exhibits.  And if it would help you to look at the

1   hard copies, those are available to you there.  What I'd like

2   to do is show you several of them in a sequence before I ask

3   you a question about them.

4        I'd like to first have you look at Admitted Exhibit 3210.

5   And if you could just look up when you're ready for the next

6   one?

7   A    (Nodded head affirmatively.)

8        Okay.

9   Q    And 3211?

10  A    Yes.

11  Q    And 3212?  Or, I'm sorry, 3213?

12  A    Okay.

13  Q    And 3214?

14  A    Okay.

15  Q    And 1316?

16  A    Okay.

17  Q    3217?

18  A    Okay.

19         THE COURT:  Counsel, if you'll reach up on that

20  screen and erase those marks?

21         MR. BANKER:  (Complied with request.)

22         THE COURT:  There you go.  Thank you.

23  BY MR. BANKER:

24  Q    And 3219.

25  A    Yes.

1   Q     Those seven documents that we've just looked at, can you

2   tell me what those are?

3   A     Yes.  They appear to be copies of insurance policies

4   issued to Dyce by USF&G.

5   Q     From when to when?

6   A     About 1978 to 1981.

7   Q     Okay.  I'd like you to turn to Admitted Exhibit 3321.

8   A     Yes.

9   Q     Have you seen this document before?

10  A     Yes, I have.

11  Q     What is it?

12  A     It's a stipulation between Soco and Continental as to the

13  existence and the contents of Continental Insurance policies

14  issued to Dyce.

15  Q     And what time period do those insurance policies cover?

16  A     1981 to 1985.

17  Q     In fact, I believe it's 1982 to 1985.

18  A     Yes.  Yes, that's correct.

19  Q     Now I'd like to turn away from looking at insurance

20  policies to focusing on the various claims that have been made

21  against Soco.

22        Have you been involved in the claims made against Soco?

23  A     Yes, I have.

24  Q     In what capacity?

25  A     As I was -- when I was in an in-house legal department, I

1    was part of the defense team from the client's point of view.

2    Then when I was an officer of the company, I was, you know, a

3    representative of the client.

4    Q    And could you define for us the universe of claims

5    against Soco based on the Dyce facility?

6              MR. JOHNSON:  Your Honor, I object to this as being

7    irrelevant to the Phase 1 issues in this case.

8              THE COURT:  Sustained.

9    BY MR. BANKER:

10   Q    Were there claims made against Soco by third parties?

11             MR. JOHNSON:  Objection, Your Honor.

12             THE COURT:  Sustained.  It's not relevant to the

13   issues in this case.

14             MR. BANKER:  Your Honor, could I be heard on that?

15             It goes to establishing a time line for his

16   involvement in the various sequences of events, and it

17   ultimately --

18             THE COURT:  Well, then the way to do it, we don't

19   need to hear about the claims.  As a result of the claims,

20   what did you do?

21             MR. BANKER:  Okay.

22   BY MR. BANKER:

23   Q    And it might help to show you some documents to put that

24   in context.

25             I'd like to show you Admitted Exhibit 3043.

1          THE CLERK:  It's not admitted.

2          THE COURT:  No, I reserved.

3          MR. BANKER:  I believe we had a conversation about

4    that in chambers this morning.

5          THE COURT:  That's the one I ruled on this morning,

6    wasn't it?

7          MR. JOHNSON:  Hang on, Your Honor.

8          THE COURT:  That was the one that involved four

9    lines?

10         MR. BANKER:  Yes, Your Honor.

11         MR. GROSSBART:  Yes, it is, Your Honor.

12         THE COURT:  It's admitted.  Go ahead.

13   BY MR. BANKER:

14   Q    Having you look at Exhibit 3043, do you recognize this

15   document?

16   A    Yes, I do.

17   Q    What is it?

18   A    It was a report prepared for the EPA by its consultants,

19   Lockheed Martin, at the end of 1999.

20   Q    And was this a document that Soco received?

21   A    Yes.

22         MR. JOHNSON:  Your Honor, objection.  Lack of

23   foundation.  He wasn't even there at the time.

24         THE COURT:  Well --

25         MR. JOHNSON:  He wasn't even hired until 2002.

1              THE COURT:  Well, I don't care.  But in my effort to

2    make sure that this case -- and I am talking to all sides now,

3    not just to Soco.  In an effort to keep this case moving, I'm

4    going to do everything I can to prevent witnesses from

5    repeating certain facts.  I'm assuming that Exhibit 3043 is

6    going to be talked about a lot by people who are qualified to

7    talk about it.

8              MR. BANKER:  And, Your Honor, I'm just merely using

9    it to establish a time line and a chronology.  This witness

10   won't be talking about it indepth.

11             THE COURT:  Not indepth at all.

12             MR. BANKER:  Not indepth at all.

13             THE COURT:  It's admitted.

14             And I am telling you this just so that we're all on

15   the same page.  This is for all of you, as I've said.  We

16   don't need, and the jury doesn't need, repetition.  So I'll

17   overrule it for the purposes of this time line, but we

18   shouldn't be talking about the contents and that sort of

19   thing, because I'm sure a lot of people will be talking about

20   a lot of these exhibits who understand technically what they

21   mean.

22             MR. BANKER:  Certainly.

23             THE COURT:  Go ahead.

24   BY MR. BANKER:

25   Q    For the purposes of our time line, the November 1999

1    Lockheed Martin report that we're looking at on Exhibit 3043,

2    what did Soco learn from this?

3    A    The most significant thing --

4            MR. JOHNSON:  Objection, Your Honor.  He wasn't

5    there at the time.  Foundation.  Lack of foundation as to what

6    Soco knew when they received this document back --

7            THE COURT:  I'll sustain it on foundation.  I mean,

8    how does he know what Soco learned at the time?

9            MR. BANKER:  Perhaps I could lay some foundation.

10   BY MR. BANKER:

11   Q    Mr. St. George, have you had an opportunity, as

12   consultant to Soco as well as an employee to Soco, to become

13   familiar with the claims that were made against Soco?

14   A    Yes, I have.

15   Q    And have you become familiar with the documents that are

16   related to those claims?

17   A    Yes, I have.

18   Q    Have you become familiar with the corporate knowledge

19   that Soco had about the various claims that were made against

20   it?

21   A    Yes.

22   Q    Have you participated in the defense of those claims?

23   A    Yes.

24   Q    And the investigation of those claims?

25   A    Yes.

1   Q    Are you able to -- did you ever have a chance to look at

2   the Lockheed Martin report as part of that process?

3   A    Yes, I did.

4   Q    And do you have a general awareness of what significance

5   it had to Soco?

6   A    A general awareness, yes.

7   Q    With that said, could you tell us what that is?

8            MR. JOHNSON:  Your Honor, same objection.

9            THE COURT:  It's overruled.

10           Go ahead.

11           THE WITNESS:  This is, this is where Dyce, at the

12  time, became aware that the EPA believed that there was a

13  groundwater contamination with perc in the area and that a

14  potential source of that groundwater contamination was the

15  Dyce facility.

16  BY MR. BANKER:

17  Q    And was there any awareness that Soco had at that point

18  of the amount of the spill?

19  A    It was indicated that there was 200 gallons that had

20  happened a minimum of ten to 15 years earlier, but I don't

21  know that it says anything more about it.

22           MR. BANKER:  Okay.  I'd like to turn to Proposed

23  Exhibit 3356.

24           MR. LYNCH:  Your Honor, do we pull it up on our

25  screens and then the jury can see it?

1          THE COURT:  I have got the jury's button turned off.

2          MR. LYNCH:  Okay.

3          THE COURT:  What is the relevance of 3356 and 3841?

4          MR. BANKER:  3356 and 3841 will go to the immediate

5    following exhibits, which are going to be tender exhibits that

6    go to the question of notice.

7          THE COURT:  Well, there isn't any dispute as to the

8    fact that there were claims that were made.  The class action

9    complaint and the complaint and demand for jury trial in

10   several cases is not relevant.

11         MR. BANKER:  Well, Your Honor, I believe the

12   insurers are making arguments about notice and timeliness of

13   notice.

14         THE COURT:  I know.  I know that.  But you don't

15   need to put the underlying documents into evidence of the

16   complaints that were filed on the notice issue.  It's

17   irrelevant to that.

18         MR. BANKER:  I take it --

19         THE COURT:  That will be 3356 and 3841.  I am going

20   to refuse their admission.  But I assume he's going to talk

21   about notice.  He can talk about notice all he wants.

22         MR. BANKER:  Okay.

23   BY MR. BANKER:

24   Q    Do you recall the *Weiss* complaint being served on Soco?

25   A    Yes.  I believe it was sometime around June of 2000.

1  Q     I'd like to show you Admitted Exhibit 3886.

2  A     Yes.

3  Q     Have you seen this document before?

4  A     Yes, I have.

5  Q     What is it?

6  A     It's a letter from HCI dated June 15, 2000 to Continental

7  Insurance, notifying them of the *Weiss* complaint and asking

8  them to defend and indemnify.

9  Q     Okay.  And turning to Admitted Exhibit 23 -- or 231, have

10 you seen this document before?

11 A     Yes, I have.

12 Q     And what is it?

13 A     It's a letter from HCI dated June 15, 2000 to USF&G

14 tendering the *Weiss* lawsuit.

15 Q     And what was the purpose of tendering the *Weiss* lawsuit

16 to Continental and USF&G, generally speaking?

17 A     The company wanted to put them on notice of the

18 proceeding and for them to defend us and pay any liabilities

19 under the insurance policies.

20 Q     Turning to Admitted Exhibit 3047, have you seen this

21 document before?

22 A     Yes, I have.

23 Q     What is it?

24 A     It's a letter dated August 23, I think it's 2000, from

25 the EPA to Dyce Chemical, notifying them that they were a

1   potentially responsible party for contamination in the

2   Lockwood site.

3   Q    Do you have a general understanding of what a

4   "potentially responsible party" means in the context of an EPA

5   letter like this?

6   A    Yes.  It's a party which might, under applicable

7   environmental laws, be held responsible for cleanup of a site.

8   Q    Turning to Admitted Exhibit 234, have you seen this

9   document before?

10  A    Yes, I have.

11  Q    What is it?

12  A    It's a letter from Lindquist & Vennum dated September 25,

13  2000 to USF&G.  Lindquist & Vennum was the insurance coverage

14  counsel for HCI and Soco and tendered the EPA proceeding to

15  USF&G for coverage.

16  Q    The potentially-responsible-party letter we looked at

17  just an exhibit ago?

18  A    That's correct.

19  Q    And turning to Exhibit 3887, have you seen this document

20  before?

21  A    I have.

22  Q    What is it?

23  A    It's a letter from Lindquist & Vennum dated September 25,

24  2000 to Continental, tendering the EPA PRP letter for

25  coverage.

1        MR. BANKER:  Okay.  I'd like to turn to Admitted

2   Exhibit 3050.

3        (Pause.)

4        MR. LYNCH:  Paul, the document isn't coming up.

5        MR. BANKER:  It's not coming up?

6        MR. LYNCH:  (Shook head negatively.)

7   BY MR. BANKER:

8   Q    I'll have you look at Exhibit 3050.

9   A    Okay.

10  Q    Have you seen Exhibit 3050 before?

11  A    Yes, I have.

12  Q    And what is it?

13  A    It was a remedial investigation report from June 2003 to

14  the Montana Department of Environmental Quality by its

15  environmental consultants, Tetra Tech.

16  Q    And what does a "remedial investigation" mean?

17  A    It's an investigation of a potentially contaminated site

18  to determine the extent and the type of contamination.

19  Q    (Document on screen.)  There we go.

20       When Soco received Exhibit 3050, the remedial

21  investigation report, in June of 2003, what did it contribute

22  to Soco's understanding of the problem?

23       MR. JOHNSON:  Objection, Your Honor.  Lacks

24  foundation.

25       THE COURT:  Yeah.  Sustained.

1  BY MR. BANKER:

2  Q    Mr. St. George --

3         THE COURT:  There are going to be experts

4  testifying, or people testifying about the particulars of

5  this, aren't there?

6         MR. BANKER:  And, Your Honor, he's not going to

7  testify about the particulars.  He's just testifying about the

8  corporate understanding at an executive level.

9         THE COURT:  Well, it sounded to me like you were

10  asking him, when you asked him what did it contribute to

11  Soco's understanding of the problem, that you were asking him

12  to tell us for first time, among probably several times, the

13  conclusion of the report.  I don't need that.  We'll hear it

14  from people who --

15        MR. BANKER:  Perhaps if I rephrase the question.

16        THE COURT:  Yes.

17  BY MR. BANKER:

18  Q    In the June 2003 time frame, did Soco have an

19  understanding of what the EPA was looking to in terms of

20  chemicals of concern?

21        MR. JOHNSON:  Objection, Your Honor.  Lacks

22  foundation.

23        THE COURT:  Overruled.

24        THE WITNESS:  Yes.  The EPA was primarily concerned

25  with chlorinated solvents, particularly perc.

227

1    BY MR. BANKER:

2    Q    And by the June 2003 time frame, had there been soil and

3    groundwater contamination identified?

4    A    Yes, there had.

5    Q    And had there been an identification of a source area?

6    A    Yes.

7    Q    And where was that, roughly?

8    A    There was a Brenntag source area.  I believe there was

9    one in the northwest corner.

10   Q    Well, and I think we're jumping out of sequence there,

11   but in terms of your corporate understanding as of June 2003,

12   Brenntag had been identified by the EPA as a source area?

13            MR. JOHNSON:  Objection.  Leading.

14            THE COURT:  Overruled.

15            THE WITNESS:  That's correct.

16   BY MR. BANKER:

17   Q    Okay.  Turning then to Admitted Exhibit 3058 --

18   A    Yes.

19   Q    -- have you seen that document before?

20   A    Yes, I have.

21   Q    What is it?

22   A    It was a final addendum to the final remedial

23   investigation report from December of 2003.

24   Q    And in the December 2003 time frame, had that source area

25   been further defined?

1   A    It had.

2   Q    In what way?

3   A    Specifically there was a perc contamination in the

4   northwest corner of the Dyce site.

5   Q    Turning to Admitted Exhibit 3050 -- it will be up on your

6   screen, actually.

7   A    Okay.

8   Q    Or, I'm sorry, 3051.

9        Have you seen this before?

10  A    Yes, I have.

11  Q    What is it?

12  A    It's the final feasibility study for the Lockwood solvent

13  groundwater plume site from July of 2004, prepared for the DEQ

14  by their consultant, Tetra Tech.

15  Q    And do you understand what a "feasibility study" means?

16  A    Yes.

17  Q    What?

18  A    It's an exploration of the various alternatives that are

19  available for cleaning up a site and discussing their

20  feasibility.

21  Q    Turning to Admitted Exhibit 3052, have you seen this

22  document before?

23  A    Yes.

24  Q    What is it?

25  A    It's a proposed remedial action plan.

1  Q    Do you know when this document came out?

2  A    2004.

3  Q    What was a -- do you understand what the purpose of the

4  proposed remedial action plan was?

5  A    Yes.  It's to put the community and the parties on notice

6  of what the EPA has decided to do with respect to cleaning up

7  a site.

8  Q    At some point in 2005, was there another property damage

9  claim made against Soco?

10  A    Yes, there was.

11  Q    What was that?

12  A    It's what we refer to as the *Burbank* claim.

13  Q    I'd like you to look at Admitted Exhibit 3827, please.

14  A    Yes.

15  Q    Have you seen that document before?

16  A    I have.

17  Q    And what is it?

18  A    It's a letter from Lindquist & Vennum dated February 14,

19  2005 to Keith Moskowitz of Sonnenschein, Nath & Rosenthal,

20  tendering the *Burbank* lawsuit to USF&G.

21  Q    And do you understand who the Sonnenschein, Nath &

22  Rosenthal firm was working with?

23  A    USF&G.

24  Q    Turning to Admitted Exhibit 3820, have you seen that

25  document before?

1   A     Yes, I have.

2   Q     What is it?

3   A     It's a letter from Lindquist & Vennum dated February 15,

4   2005 to Brian Walsh, an attorney for CNA, tendering the

5   *Burbank* matter to CNA.

6   Q     Okay.  I'd like you to turn to Admitted Exhibit 3059.

7   Have you seen this document before?

8   A     Yes.

9   Q     What is it?

10  A     It's the record of decision reached with respect to the

11  Lockwood solvent groundwater plume site by DEQ and EPA.

12  Q     What is the significance of the record of decision

13  document?

14  A     It memorializes the decision that the environmental

15  agencies have made about what's going to happen at the site.

16  Q     I'd like to turn to internal page 121, please.  Have you

17  seen this before?

18  A     Yes.

19  Q     Are you able to identify on that photograph the northwest

20  corner?

21  A     Yes, I am.

22  Q     Could you do that?  And this is your chance to play with

23  the computer screen.

24  A     Just touch it?

25  Q     Just touch it and outline it.

1    A    (Complied with request.)

2    Q    So you've marked the area to the far left, and it is the

3    largest green blob on the picture?

4    A    Yes.

5    Q    I'd like to turn to Admitted Exhibit 1104.  Have you seen

6    this document before?

7    A    I have.

8    Q    What is it?

9    A    It's a letter from Soco's national environmental counsel

10   to the EPA, September 8, 2005, providing supplemental answers

11   to their, EPA's, request for information.

12   Q    And what, in particular, does this letter disclose to the

13   EPA?

14   A    The existence of the contamination at the northwest

15   corner.

16   Q    And could I direct your attention to the last paragraph

17   on the page?

18   A    Yes.

19   Q    What does that paragraph talk about?

20   A    It informed the EPA that former Dyce employees had

21   testified to an inventory discrepancy of perc in the 1970s.

22   Q    Okay.  Now we've looked at a number of documents here to

23   sort of establish a time frame, and I want to go back and

24   touch on a couple of points.

25        With respect to the claims that were made against Soco by

1    the *Weiss* plaintiffs, the *Burbank* plaintiffs, and the EPA

2    itself, we've looked at some documents tendering those various

3    issues to the insurance companies.  Could you talk about the

4    process of tendering claims within Soco?

5              MR. JOHNSON:  Objection, Your Honor.  Relevance.

6              THE COURT:  Overruled.

7              THE WITNESS:  It is the policy of Soco to tender

8    claims as soon as practicable after we receive them.

9    BY MR. BANKER:

10   Q    And is that what happened here in terms of the documents

11   we've been looking at?

12             MR. JOHNSON:  Objection, Your Honor.  Calls for

13   legal conclusion.

14             THE COURT:  Sustained.

15   BY MR. BANKER:

16   Q    How much time passed between the receipt of the claims

17   against Soco and either *Weiss*, EPA, or *Burbank*, before Soco

18   tendered them?

19   A    No more than a few weeks.

20   Q    Now I want to focus on the EPA claim only for a moment.

21   Could you explain, generally speaking, as these documents were

22   coming in and you were having various communications with the

23   EPA, what was Soco doing in terms of investigating and

24   responding to the EPA?

25   A    Well, Soco retained counsel, and it also retained

1    environmental consultants to perform investigations and to

2    work with the environmental agencies.

3    Q     And has that process been ongoing since 2000?

4              MR. JOHNSON:  Your Honor, this is irrelevant to

5    Phase 1 issues.

6              THE COURT:  Yeah.

7              How is it?  This is a little outside the notice.

8              MR. BANKER:  I'm trying to just have him develop an

9    understanding in terms of the time line of how it is that Soco

10   was interacting with the agency in providing information and

11   investigating the claim.

12             MR. JOHNSON:  It's all irrelevant, Your Honor.

13             THE COURT:  I'll sustain it.

14             MR. JOHNSON:  Thank you.

15   BY MR. BANKER:

16   Q     With respect to the *Weiss* action, focusing on that for a

17   moment, what was Soco doing with respect to the *Weiss* action?

18             MR. JOHNSON:  Same objection, Your Honor.

19   Relevance.

20             THE COURT:  Sustained.

21   BY MR. BANKER:

22   Q     Well, after Soco received the *Weiss* complaint, did it

23   participate in that lawsuit?

24   A     Yes, it did.

25             MR. JOHNSON:  Same objection, Your Honor.

1          THE COURT:  Sustained.

2  BY MR. BANKER:

3  Q    I would like to focus back to the 1999 time frame and the

4  Lockheed Martin report.  You had mentioned, I believe, that

5  that was the first time that Soco knew that the EPA was even

6  looking at it, correct?

7  A    That appears to be the case.

8  Q    How did that awareness change over time?

9          MR. JOHNSON:  Your Honor, objection.  He wasn't even

10  there in 1999, so how could he testify?

11          THE COURT:  I have no idea.

12          When did you start working there?

13          THE WITNESS:  In-house legal department from 2002.

14  I was vice-president and secretary from '04 to '07.

15          THE COURT:  Sustained.

16          MR. JOHNSON:  Thank you, Your Honor.

17  BY MR. BANKER:

18  Q    Did the fact of the property damage lawsuit that was made

19  against Soco, was that something that Soco took seriously?

20  A    Yes.

21          MR. JOHNSON:  Objection, Your Honor.

22          THE COURT:  Overruled.

23  BY MR. BANKER:

24  Q    And why was that?

25  A    Because of the potential liability.

1    Q    And so what did you do to protect yourself against the

2    potential liability?

3    A    Well, we tendered it to insurance, and we retained

4    counsel and defended the case.

5    Q    And what does that mean, to "defend" a case?

6    A    Counsel answered, exchanged information with the other

7    parties.  We had a number of motions and other court

8    proceedings, and ultimately we settled the case.

9    Q    I'd like to just have you focus for a moment on the EPA

10   and where that currently stands.  Do you know what the current

11   status is of the EPA's investigation?

12              MR. JOHNSON:  Objection, Your Honor.  Relevance.

13              THE COURT:  Sustained.

14   BY MR. BANKER:

15   Q    You talked about the PRP letter that Soco received.

16   A    Yes.

17   Q    What is your understanding of Soco's potential liability

18   to the EPA?

19              MR. JOHNSON:  Objection.  Relevance.

20              THE COURT:  Sustained.

21   BY MR. BANKER:

22   Q    Who is Jim Sullivan?

23   A    Jim Sullivan is an environmental consultant retained by

24   Dyce and Soco to assist it at the site.

25   Q    How long has he been working for Soco on that?

1   A    Probably since 2000, maybe 2001.  I'm not entirely sure.

2   Q    I want to focus your attention on the comments that you

3   may have heard in the opening argument about a changing story.

4        Do you -- in what way do you believe that Soco has

5   changed its story?

6              MR. JOHNSON:  Objection.  Lacks foundation, Your

7   Honor.

8              THE COURT:  That is sustained.

9   BY MR. BANKER:

10  Q    Well, have you been involved in the dispute between USF&G

11  and Continental for a number of years?

12  A    Yes.

13  Q    Are you aware of the various positions that Soco has

14  taken over time?

15  A    Yes, I am.

16  Q    Are you aware of the positions as taken with respect to

17  responding to the EPA in the 104(e) responses?

18  A    Yes, I am.

19  Q    Are you aware of the position Soco has taken with respect

20  to discovery in the *Weiss* litigation?

21  A    Yes.

22  Q    How about in the *Burbank* litigation?

23  A    Yes.

24  Q    And do you believe that Soco has invented and fabricated

25  this story?

1              MR. JOHNSON:  Objection, Your Honor.

2              THE COURT:  I, you know, Counsel, that invades the

3    province of the jury, No. 1.

4              No. 2, his comments about that are irrelevant.

5              MR. BANKER:  Well, Your Honor --

6              THE COURT:  No.  It's irrelevant.  There are no

7    questions that you can ask that's going to make that better.

8              MR. BANKER:  Okay.

9    BY MR. BANKER:

10   Q    Has Soco's information about the Dyce site and the issues

11   with the EPA, has that changed over time?

12             MR. JOHNSON:  Objection, Your Honor.  Irrelevant,

13   and it lacks foundation.

14             THE COURT:  No, it is irrelevant.

15             MR. BANKER:  I'm sorry; did you say "irrelevant" or

16   "relevant"?

17             THE COURT:  It is irrelevant.  It's sustained.

18             MR. BANKER:  I have nothing further at this time.

19             THE COURT:  I think we're going to hear, during the

20   course of the trial, how information, there has been different

21   information coming in, so let's get to it.

22             MR. BANKER:  Okay.  Nothing further at this time.

23             THE COURT:  Do you have any cross?

24             MR. JOHNSON:  I have a little, Your Honor.

25   ///

CROSS-EXAMINATION

BY MR. JOHNSON:

Q    Good afternoon, Mr. St. George.

You've never actually been employed by Soco West, Inc. or its predecessor, Dyce Chemical Company; isn't that correct?

A    Not as an employee, no.

Q    Never been employed by them, correct?

A    I was not an employee.

Q    Okay.  And, in fact, you never even heard of Soco West or Dyce Chemical until you were hired as a lawyer by the Stinnes Corporation in 2002; isn't that right?

A    That's not right.

Q    When did you first hear about them?

A    I began to work as a consultant at the Stinnes Corporation in 2001.

Q    All right.  You began to work as a consultant, part-time consultant, right, at Stinnes in 2001?

A    I think it was full-time.  It may have been part-time in the beginning, and then it became full-time.

Q    All right.  And that, wasn't that in December of 2001 that you started work?

A    I began working as an employee of Stinnes, I think it was, early January of 2002.  I was a consultant to Stinnes from about June or July of 2001.

Q    All right.  And you worked -- at that time, Soco West was

1   an indirect subsidiary of Stinnes Corporation; is that

2   correct?

3   A    That's correct.

4   Q    And in 2004, your employment was transferred to a company

5   called Brilliant National Corporation?

6   A    Brilliant National Services, Inc.

7   Q    Okay.  And Brilliant National Services, Inc. was a

8   subsidiary of the Stinnes company?

9   A    Yes, it was.

10  Q    So starting in 2004, you were then working as a lawyer

11  for the Brilliant company, right?

12  A    I was vice-president and secretary of Brilliant.  Some of

13  the things I was doing may have been considered lawyerly.

14  Q    Who were you employed by?

15  A    Brilliant National Services, Inc.

16  Q    And then in 2004, Stinnes sold Brilliant; is that

17  correct?

18  A    No, it isn't.

19  Q    Did Stinnes sell the Brilliant company?

20  A    At some point, yes.

21  Q    When did they do that?

22  A    December of 2007.

23  Q    And were you employed from December -- until December of

24  2007 by the Brilliant company?

25  A    Was I employed?

1  Q    Yes, sir.

2  A    As an employee?  No.

3  Q    All right.  You became a consultant at some point for

4  Brilliant?

5  A    Yes.  December of 2007.

6  Q    All right.  But were you employed by Brilliant until

7  December of 2007?

8  A    Yes, I was.

9  Q    Okay.  And in December of 2007 when the Brilliant company

10 was sold, you were laid off as a full-time employee, correct?

11 A    That's correct.

12 Q    And thereafter, you became a consultant to that company?

13 A    Yes.

14 Q    And you since have been working as a consultant for the

15 Brilliant company, ever since?

16 A    Yes, I have.

17 Q    And have you worked as a consultant, also, for Soco West?

18 A    Yes.

19 Q    During that period of time?

20 A    Yes.

21 Q    Are you -- and you're paid, I take it, on an hourly

22 basis?

23 A    Yes, I am.

24 Q    So what are you being paid on an hourly basis as a

25 consultant?

1   A      $80.

2   Q      And are you earning that today as you sit on the stand,

3   $80 an hour, as a consultant?

4   A      I hope so.

5   Q      Now where is your office?

6   A      Tarrytown, New York.

7   Q      What's the address of your office?

8   A      120 White Plains Road, Sixth Floor, Tarrytown, New York,

9   10591.

10  Q      And whose offices are those?

11  A      That's the office of Stinnes Corporation.

12  Q      Now let me -- you were talking a little bit about Dyce

13  and Dyce's, Dyce's work and your knowledge of it.  Do you have

14  any idea how much perc was purchased by the Dyce facility from

15  1972 to 1981?

16  A      I do not.

17          MR. BANKER:  Objection.  No foundation.

18          THE COURT:  Yeah.  Well, I imagine there are lots of

19  questions you can ask him that he doesn't know the answer to.

20  I hope we're not going to go through all of them.

21          MR. JOHNSON:  We are not, Your Honor.

22          THE COURT:  Okay.

23  BY MR. JOHNSON:

24  Q      Now there was discussion about the EPA investigation.

25  Isn't it true at one point in time Soco attempted to convince

1   the EPA and the DEQ that it was not responsible for any of the

2   Lockwood contamination?

3   A    I don't believe that's the case.

4   Q    Was your deposition taken in this case?

5   A    Yes, it was.

6          MR. JOHNSON:  May I approach, Your Honor?

7          THE COURT:  Yes.

8   BY MR. JOHNSON:

9   Q    (Handing.)  Now your deposition was taken in this case,

10  was it not, on September 29, 2005?

11  A    I believe so.

12  Q    It was taken in the offices, in Minneapolis, of

13  Mr. Banker; is that correct?

14  A    Yes.

15  Q    All right.  And you're holding a copy of the transcript

16  of your deposition; isn't that right?

17  A    It appears to be, yes.

18  Q    And would you please turn to page 41?  I'm going to read

19  to you -- first of all, you swore under oath that you would

20  tell the truth at the time that you answered these questions

21  that were asked of you at the deposition; isn't that correct?

22  A    I sure did.

23  Q    And you answered the questions as a corporate

24  representative on behalf of Soco West; isn't that correct?

25  A    Yes.

1   Q     All right.  And let me ask you, referring you to page 41,

2   line 11, the question that was asked of you is, "At one point

3   in time, Soco West, either in that name or by predecessor

4   names, attempted to convince regulatory authorities that it

5   was not responsible for any of the Lockwood contamination; is

6   that not true?"

7         Answer, "I don't know if that's true."

8         Question, "If that's the case, it was before your time?"

9         Answer, "That's correct."

10        Did you give those answers to those questions at your

11  deposition?

12  A     Yes, I did.

13             MR. BANKER:  Objection, Your Honor.  That's not

14  impeachment.

15             THE COURT:  Well, that's overruled.  I am not here

16  to define fine lines.

17  BY MR. JOHNSON:

18  Q     Now let me turn, let me turn to page number -- I'm sorry,

19  to Exhibit 3043 which you were shown on your direct

20  examination and, in particular, page 0013.

21        Go back to the first page, No. 1.

22             DOCUMENT TECHNICIAN:  (Complied with request.)

23  BY MR. JOHNSON:

24  Q     This is -- can you tell what this document is, again?

25  A     It's the Lockheed report of 1999.

1    Q    Okay.  And you were, in particular -- and let me refer

2    you back to page 13.  And let me read to you from Section 3.3

3    here.

4              THE COURT:  Are you going to object?

5              MR. BANKER:  I am going to object, Your Honor.  I

6    don't believe he's laid foundation for it, and I don't

7    believe --

8              THE COURT:  Well, I had the same problem with you

9    having this witness read from a report that we're going to

10   hear about from a lot of people who know about it.

11             I have the same problem with you doing it as I did

12   with Mr. Banker doing it.

13             MR. JOHNSON:  The only reason I'm asking, Your

14   Honor, is because he was asked about it on direct.

15             THE COURT:  I don't remember going to this page.

16             MR. BANKER:  We didn't go to that page, Your Honor.

17             MR. JOHNSON:  To save time, Your Honor, I won't.

18             Pull up Exhibit 3059, page 121.

19             DOCUMENT TECHNICIAN:  (Complied with request.)

20   BY MR. JOHNSON:

21   Q    This one you testified to, and I think we all remember

22   that, and this is the contaminated plume.  It emanates from

23   the Dyce facility.  That's what you testified to, correct?

24   A    Yes.

25   Q    All right.  And you circled the area in the northwest

1  corner that is a source area; is that your understanding?

2  A     Yes.

3  Q     All right.  There also are other source areas on here

4  that the EPA identified; isn't that correct?

5  A     That's correct.

6  Q     They identified a source area in the loading and

7  unloading area which I'm circling right here, correct?

8  A     That's correct.

9  Q     All right.  And there's a source area right here.  You

10 recognize that as being in the -- where the former catch pond

11 was at the site?

12 A     The one that you just circled?

13 Q     Yes, sir.

14 A     I don't know that I recognize that.

15 Q     All right.  And this one out here on the edge, that one

16 right there, that's another source area, isn't it?

17 A     According to the legend of the chart, yes.

18 Q     All right.  And you don't consider that to be in the

19 northwest corner; is that correct?

20 A     I'm not certain if it's part of the northwest corner as

21 defined by the EPA, but my understanding of the northwest

22 corner is what I circled.

23 Q     All right.  And I take it since you weren't at Dyce at

24 any point in time as an employee of Dyce, you have no idea how

25 those -- how the contamination occurred at Dyce; is that

1    correct?

2    A    I do not.

3    Q    You don't have any knowledge about inventory shortages

4    that we heard about today at Dyce?

5    A    Personal knowledge?

6    Q    Yes.

7    A    No.

8    Q    And nobody ever told you that there was a spill of perc

9    at Dyce, correct?

10   A    Nobody ever told me that?

11   Q    That they had seen a spill of perc at Dyce?

12   A    No.

13   Q    Now with regard to Dyce -- you can take that off.

14        DOCUMENT TECHNICIAN:  (Complied with request.)

15   BY MR. JOHNSON:

16   Q    With regard to Dyce, you know that one of their former

17   employees is a man named Marvin Johnson; is that correct?

18   A    The name is familiar, yes.

19   Q    And you know that he testified at a deposition in the

20   *Weiss* case about his work at Dyce; isn't that correct?

21   A    He may have, yes.

22   Q    And isn't it true that Soco does not dispute any of

23   Marvin Johnson's testimony in that deposition?

24        MR. BANKER:  Objection, Your Honor.  Relevance.

25        THE COURT:  Sustained.

1          MR. JOHNSON:  Your Honor --

2          THE COURT:  Sustained.

3          MR. JOHNSON:  Just a second, Your Honor.

4      (Discussion off the record at counsel table.)

5          MR. JOHNSON:  I have no further questions, Your

6  Honor.

7          THE COURT:  Thank you.

8          MR. BANKER:  Just one, Your Honor.

9          MR. DAVIS:  May I, briefly?

10          THE COURT:  Yeah.

11          MR. DAVIS:  Thank you, Judge.  I will be very brief.

12                     CROSS-EXAMINATION

13  BY MR. DAVIS:

14  Q    Mr. St. George, in your answer to questions posed to you

15  by Mr. Banker, you identified Lindquist & Vennum as your

16  insurance coverage counsel, correct?

17  A    Yes.

18  Q    Lindquist & Vennum is the Minneapolis law firm that

19  Mr. Banker and Mr. Lynch are members of, correct?

20  A    Yes.

21  Q    Soco has hired lots of different law firms involved in

22  the various matters that you've testified?

23          MR. BANKER:  Objection.  Relevance.

24          THE COURT:  Sustained.

25  ///

1    BY MR. DAVIS:

2    Q    All right.  And Mr. Mielenhausen, that I mentioned in my

3    opening statement, he's a member of Lindquist & Vennum, your

4    insurance coverage counsel, is he not?

5    A    He is.

6            MR. DAVIS:  Thank you.  That's all I have.

7            THE COURT:  Okay.  Now, Mr. Banker.  One question,

8    you said.

9            MR. BANKER:  One question.

10           Could you pull up Admitted Exhibit 3059, page 121?

11           DOCUMENT TECHNICIAN:  (Complied with request.)

12                       REDIRECT EXAMINATION

13   BY MR. BANKER:

14   Q    Do you have that up on your screen?

15   A    Yes.

16   Q    That's not my question.

17        The other source areas other than the northwest corner

18   than Mr. Johnson pointed out --

19   A    Yes.

20   Q    -- is Soco claiming insurance coverage for those areas?

21   A    No.

22           MR. BANKER:  Thank you.

23           THE COURT:  All right.  You can step down.

24           Ladies and gentlemen, we are going to take an

25   evening recess.

1          I give you the usual admonition.  I am not going to

2    reread that admonition that I gave to you before we broke for

3    lunch.  When I say I'm giving you the usual admonition, that's

4    what I'm telling you.  You can't talk to anybody.  Can't talk

5    amongst yourselves.  You have to keep an open mind about the

6    case until you get into the jury room for deliberations,

7    amongst other things in that admonition.

8          We'll be in recess until 8:30 in the morning.

9          Thank you.

10         MR. JOHNSON:  Thank you, Your Honor.

11         THE LAW CLERK:  All rise.

12     (Proceedings were recessed at 16:48:56.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      VOLUME 1 REPORTER'S CERTIFICATE

2           I, JoAnn Corson Bacheller, a Registered Diplomate

3    Reporter and Certified Realtime Reporter, certify that the

4    foregoing transcript is a true and correct record of the

5    proceedings given at the time and place hereinbefore

6    mentioned; that the proceedings were reported by me in machine

7    shorthand and thereafter reduced to typewriting using

8    computer-assisted transcription; that after being reduced to

9    typewriting, a certified copy of this transcript will be filed

10   electronically with the Court.

11          I further certify that I am not attorney for, nor

12   employed by, nor related to any of the parties or attorneys to

13   this action, nor financially interested in this action.

14          IN WITNESS WHEREOF, I have set my hand at Billings,

15   Montana this 27th day of April, 2010.

16

17                              /s/ JoAnn Corson Bacheller

18                              _____
                                JoAnn Corson Bacheller
19                              United States Court Reporter

20

21

22

23

24

25