JoAnn Corson Bacheller
Registered Diplomate Reporter
Certified Realtime Reporter
P. O. Box 1424
Billings, Montana 59103-1424
406/247-4477 office
406/247-7008 fax
joann_bacheller@mtd.uscourts.gov

United States Court Reporter

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MONTANA
### BILLINGS DIVISION

```
UNITED STATES FIDELITY        )
AND GUARANTY COMPANY,         )
                              )   Nos. CV-04-29-BLG-RFC
                Plaintiff,)         CV-08-29-BLG-RFC
     and                      )
                              )   VOLUME 2
THE CONTINENTAL INSURANCE     )   TRANSCRIPT OF JURY TRIAL
COMPANY,                      )
          Plaintiff Intervenor,)
     vs.                      )
                              )
SOCO WEST, INC.,              )
                Defendant.)
_____)
```

### BEFORE THE HONORABLE RICHARD F. CEBULL
### CHIEF UNITED STATES DISTRICT COURT JUDGE
### FOR THE DISTRICT OF MONTANA

James F. Battin United States Courthouse
316 North 26th Street
Billings, Montana 59101
Tuesday, March 9, 2010
08:25:15 to 16:47:05

Proceedings recorded by machine shorthand
Transcript produced by computer-assisted transcription

1                              **APPEARANCES**

2    For the Plaintiff:              MR. ROBERT C. JOHNSON
                                     MR. JOHN I. GROSSBART
3                                    MS. WENDY N. ENERSON
                                     Attorneys at Law
4                                    8000 Sears Tower
                                     233 South Wacker Drive
5                                    Chicago, Illinois 60606

6                                    MR. MARSHAL L. MICKELSON
                                     Attorney at Law
7                                    P. O. Box 509
                                     Butte, Montana 59703
8
     For the Plaintiff               MR. BRIAN W. WALSH
9    Intervenor:                     Attorney at Law
                                     Suite 330
10                                   555 Mission Street
                                     San Francisco, California 94105
11
                                     MR. STEVEN M. CRANE
12                                   Attorney at Law
                                     Suite 1500
13                                   515 South Figueroa Street
                                     Los Angeles, California 90017
14
                                     MR. MAXON R. DAVIS
15                                   Attorney at Law
                                     P. O. Box 2103
16                                   Great Falls, Montana 59403

17   For the Defendant:              MR. CHRISTOPHER L. LYNCH
                                     MR. PAUL A. BANKER
18                                   Attorneys at Law
                                     4200 IDS Center
19                                   80 South Eighth Street
                                     Minneapolis, Minnesota 55402
20
                                     MR. LAWRENCE B. COZZENS
21                                   Attorney at Law
                                     Suite 104
22                                   1643 24th Street West
                                     Billings, Montana 59102
23
     Also present for               MS. JULIANNE ROHM
24   graphics display:              MR. NEIL BAILEY

25

1

**CONTENTS**

                                                    Volume/Page

2

**Volume 1 Proceedings** ............................... 1/   16
*Voir Dire* Examination
     By the Court ................................... 1/   43
     By Mr. Cozzens ................................ 1/  101
     By Mr. Mickelson .............................. 1/  114
     By Mr. Davis .................................. 1/  131
Selection of Jury ................................... 1/  147
Instructions to Jury ................................ 1/  150
Opening Statement by Mr. Cozzens .................... 1/  160
Opening Statement by Mr. Johnson .................... 1/  185
Opening Statement by Mr. Davis ...................... 1/  200
Volume 1 Reporter's Certificate ..................... 1/  251

**Volume 2 Proceedings** ............................... 2/  267
Volume 2 Reporter's Certificate ..................... 2/  554

**Volume 3 Proceedings** ............................... 3/  570
Volume 3 Reporter's Certificate ..................... 3/  829

**Volume 4 Proceedings** ............................... 4/  845
Volume 4 Reporter's Certificate ..................... 4/ 1101

**Volume 5 Proceedings** ............................... 5/ 1117
Defendant Rests ..................................... 5/ 1334
Plaintiffs' Motion for Judgment ..................... 5/ 1334
Order of Court Reserved ............................. 5/ 1337
Volume 5 Reporter's Certificate ..................... 5/ 1339

**Volume 6 Proceedings** ............................... 6/ 1355
Volume 6 Reporter's Certificate ..................... 6/ 1610

**Volume 7 Proceedings** ............................... 7/ 1626
Order of Court re: Plaintiffs' Motion for Judgment .. 7/ 1870
Volume 7 Reporter's Certificate ..................... 7/ 1879

**Volume 8 Proceedings** ............................... 8/ 1895
Plaintiffs Rest ..................................... 8/ 1904
Defendant's Motion for Judgment ..................... 8/ 2010
Order of Court re: Defendant's Motion for Judgment .. 8/ 2018
Plaintiffs' Motion for Judgment Renewed ............. 8/ 2018
Order of Court re: Plaintiffs' Motion for Judgment .. 8/ 2018
Settlement of Instructions .......................... 8/ 2019
Volume 8 Reporter's Certificate ..................... 8/ 2072

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CONTENTS  (Continued)

Volume/Page

**Volume 9 Proceedings** ................................. 9/ 2088
Instructions to Jury ................................. 9/ 2092
Closing Argument by Mr. Banker ...................... 9/ 2105
Closing Argument by Mr. Johnson ..................... 9/ 2137
Closing Argument by Mr. Davis ....................... 9/ 2159
Rebuttal Closing Argument by Mr. Banker ............. 9/ 2171
Jury Verdict ........................................ 9/ 2186
Volume 9 Reporter's Certificate ..................... 9/ 2190

        REPORTER'S NOTE:  "Uh-huh" and "Um-hmm" indicate
affirmative responses.  "Huh-uh" and "Hm-umm" indicate
negative responses.

1                                **WITNESSES**

2  **For the Defendant:**                                   **Volume/Page**

3  Mr. Dennis Allen St. George
        Direct Examination by Mr. Banker ................  1/  211
4       Cross-Examination by Mr. Johnson ................  1/  239
        Cross-Examination by Mr. Davis ..................  1/  248
5       Redirect Examination by Mr. Banker ..............  1/  249

6  Mr. James Sullivan
        Direct Examination by Mr. Lynch .................  2/  276
7       Cross-Examination by Mr. Grossbart ..............  2/  316
        Redirect Examination by Mr. Lynch ...............  2/  358
8
   Mr. Richard Allen Colver
9       Direct Examination by Mr. Cozzens ...............  2/  367
        Cross-Examination by Mr. Johnson ................  2/  403
10      Redirect Examination by Mr. Cozzens .............  2/  484

11 Mr. Rodney Hallsten
        Direct Examination by Mr. Banker ................  2/  490
12      Cross-Examination by Mr. Grossbart ..............  2/  514
        Cross-Examination by Mr. Davis ..................  2/  551
13      Redirect Examination by Mr. Banker ..............  2/  552

14 Mr. Monte I. Naff
        Direct Examination by Mr. Cozzens ...............  3/  570
15      Cross-Examination by Mr. Johnson ................  3/  610
        Cross-Examination by Mr. Davis ..................  3/  702
16      Redirect Examination by Mr. Cozzens .............  3/  718

17 Mr. Charles Bender (deposition)
        Examination .....................................  3/  738
18
   Mr. Desmond Slater (deposition)
19      Examination .....................................  3/  763

20 Mr. Larry Nelson (deposition)
        Examination .....................................  3/  802
21
   Mr. Marvin Johnson
22      Direct Examination by Mr. Cozzens ...............  4/  846
        Cross-Examination by Mr. Johnson ................  4/  863
23
   Mr. Douglas Johnston
24      Direct Examination by Mr. Banker ................  4/  867
        Cross-Examination by Mr. Grossbart ..............  4/  898
25      Cross-Examination by Mr Davis ...................  4/  921
        Redirect Examination by Mr. Banker ..............  4/  924

1

**WITNESSES (Continued)**

2

**For the Defendant:**                                                    **Volume/Page**

3

Mr. David Warne
        Direct Examination by Mr. Banker ................  4/  925
4      Cross-Examination by Mr. Davis .................  4/  953
        Redirect Examination by Mr. Banker ............  4/  987

5

Ms. Suzanne Miller
6      Direct Examination by Mr. Cozzens ..............  4/  992
        Cross-Examination by Mr. Crane .................  4/ 1030
7      Redirect Examination by Mr. Cozzens ...........  4/ 1067

8

Robert Leslie Powell, Ph.D.
        Direct Examination by Mr. Lynch ................  4/ 1068
9      Direct Examination (Continued) by Mr. Lynch .....  5/ 1118
        Cross-Examination by Mr. Grossbart .............  5/ 1213
10     Cross-Examination by Mr. Davis .................  5/ 1301
        Redirect Examination by Mr. Lynch ..............  5/ 1319

11

**For the Plaintiffs:**

12

Mr. Marvin Johnson (deposition)
13     Examination ....................................  6/ 1356

14

Mr. Ken Kjos (deposition)
        Examination ....................................  6/ 1471

15

Ms. Kristen Kohler Stout
16     Direct Examination by Mr. Johnson ..............  6/ 1537
        Cross-Examination by Mr. Lynch .................  6/ 1593
17     Redirect Examination by Mr. Johnson ...........  6/ 1607

18

Peter Shanahan, Ph.D.
        Direct Examination by Mr. Grossbart ............  7/ 1626
19     Cross-Examination by Mr. Lynch .................  7/ 1704
        Redirect Examination by Mr. Grossbart ..........  7/ 1721

20

Mr. Richard Brill (deposition)
21     Examination ....................................  7/ 1728

22

Yaron M. Sternberg, Ph.D.
        Direct Examination by Mr. Crane ................  7/ 1774
23     Cross-Examination by Mr. Lynch .................  7/ 1805
        Redirect Examination by Crane ..................  7/ 1826

24

25

1                    **WITNESSES (Continued)**

2    **For the Plaintiffs:**                          **Volume/Page**

3    Bruce Edwin Dale, Ph.D.
           Direct Examination by Mr. Davis ................ 7/ 1831
4          Cross-Examination by Mr. Lynch ................ 7/ 1862
           Redirect Examination by Mr. Davis ............. 7/ 1866
5
6    **For the Defendant in Rebuttal:**

     Wayne Martin Grip
7          Direct Examination by Mr. Lynch ............... 8/ 1905
           Cross-Examination by Mr. Johnson .............. 8/ 1954
8          Redirect Examination by Mr. Lynch ............. 8/ 1995

9    Robert Leslie Powell, Ph.D.
           Direct Examination by Mr. Lynch ............... 8/ 1999
10         Cross-Examination by Mr. Crane ................ 8/ 2005

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **EXHIBITS**

2  **Exhibit No.**                            **Received Volume/Page**

3  5      09/05/89 Letter to Hol from Johnson ........ FPT/    56

4  30     09/11/85 Memo to Managers of All Plants from
          Q. Dyce  ................................. FPT/    56
5
   72     11/04/75 Daily sales report to Bender,
6         Hallsten, Don, Grady, and Naff from Q. Dyce.   2/   536

7  90     05/29/86 Sales report .....................   3/   697

8  143    02/26/82 Continental General Liability
          Survey Report form ........................ FPT/    23
9
   231    06/15/00 Letter to USF&G from Whalen ....... FPT/    24
10
   234    09/25/00 Letter to Downing from
11        Mielenhausen .............................. FPT/    24

12  352    04/08/74 Memo to Bender from Whaley ........ FPT/    28

13  353    09/27/72 Memo to Murray from Q. Dyce ....... FPT/    57

14  359    09/11/85 Memo from Q. Dyce ............... FPT/    28

15  362    09/13/89 Memo to Q. Dyce from Naff ......  FPT/ 28, 57

16  366    Warning label for perchloroethylene and
          instructions on empty container handling
17        and reuse ................................. FPT/    57

18  382    11/05/92 Montana Department of Health Field
          Investigation Report ......................   4/   975
19
   383    07/23/00 Letter to Rowe from Miller ........ FPT/    29
20
   429    06/09/98 E-mail between Warne and Naff .....   3/   668
21
   433    12/16/99 Letter to G. Staarjes from USEPA .. FPT/    58
22
   436    01/06/99 E-mail between Miller and Warne ... FPT/    58
23
   442    08/06/96-08/09/00 Containment pit runoff
24        water sampling ............................   4/ 1059

25  445    03/16/73 USF&G Advertising ................ FPT/    30

1              **EXHIBITS** (Continued)

2  **Exhibit No.**                        **Received Volume/Page**

3  499      11/04/75 Aerial photograph ................ FPT/    31

4  505      02/23/82 Continental General Liability Survey
           Report .................................. FPT/    31

5

6  784      08/21/95 Handwritten notes ................ FPT/    58

7  785      08/18/95 Memo to Naff, Hilton, Biondo,
           Gilbert, Akers and Liebling from Simko ..... FPT/    58

8  856A     09/25/89 Versar Inc. Environmental Risk
           Assessment Survey ......................  FPT/ 32, 58

9

10  859      07/24/89 Draft letter to Hol from Johnson .. FPT/    59

11  1104     09/08/05 Letter to O'Reilly from Terp ...... FPT/    32

12  2532     11/1975 Aerial photograph ................. FPT/    32

13  2533     11/04/75 Aerial photograph ................ FPT/    32

14  2545     12/30/05 Bulk Handling and Properties of PPG
           Chlorinated Solvents:  Perchloroethylene,
           Trichloroethylene, Tri-Ethane ............. FPT/    59

15

16  2558     04/07/04 Letter to O'Reily from Sullivan ...    2/   293

17  3004     08/23/00 Letter to Rowe from Miller ........ FPT/    32

18  3006     08/27/72 Aerial photograph ................ FPT/    32

19  3015     07/1995 HCI Dyce site plan ................ FPT/    32

20  3017     01/1983 Dyce personnel manual ............. FPT/    33

21  3024     10/29/85 Company policy re: hoses .........    4/   888

22  3025     07/02/87 Memo to Dick, Russ, Bob, Kevin,
           Ivan, John and File from Roger ............ FPT/    36

23  3029     1986-2001 Dyce manager's monthly report ....    8/  1896

24  3043     11/29/99 Lockheed Martin Final Report ......    1/    37

25

1              **EXHIBITS (Continued)**

2    **Exhibit No.**                         **Received Volume/Page**

3    3044    12/16/99 USEPA First Request for Information
             Pursuant to 104(e) ......................... FPT/    37
4
     3045    03/01/00 Dyce Response to First 104(e)
5            Request .................................... FPT/    37

6    3047    08/23/00 Letter to Naff from Risner &
             Kercher .................................... FPT/    37
7
     3048    08/23/00 Dyce Supplemental Response to
8            USEPA's Second 104(e) Request .............. FPT/    37

9    3049    10/03/00 Maxim Technologies Inc. Site
             Investigation Report ....................... FPT/    38
10
     3050    06/2003 Tetra Tech EM Inc. Remedial
11           Investigation Report for MDEQ .............. FPT/    39

12   3051    07/07/04 Tetra Tech Final Feasibility Study
             Report for MDEQ ............................ FPT/    39
13
     3052    11/2004 MDEQ/USEPA Proposed Remedial Action
14           Plan for Lockwood Groundwater Solvent
             Plume Site ................................. FPT/    39
15
     3058    12/2003 Tetra Tech Addendum 01 to the Final
16           Remedial Investigation Report for MDEQ ..... FPT/    39

17   3059    08/2005 MDEQ/USEPA Record of Decision for
             Lockwood Solvent Groundwater Plume Site .... FPT/    39
18
     3060    02/28/06 Letter to Terp from Risner &
19           Kercher .................................... FPT/    40

20   3102    09/16/85 Memo to Colver ................... FPT/    41

21   3115    11/25/92 Letter and permit application to
             Lincoln from Diede ......................... FPT/    42
22
     3174    06/09/00 Letter to Webster from Miller ..... FPT/    43
23
     3175    06/12/00 Letter to Miller from Webster ..... FPT/    43
24
     3178    07/25/00 Fax to Stevenson from Miller ...... FPT/    43
25

1                           **EXHIBITS (Continued)**

2       **Exhibit No.**                            **Received Volume/Page**

3       3191    11/13/03 ATC Associates Inc. Soil and
                Groundwater Data Remedial Design Investigation
4               Report ................................... FPT/    43

5       3200    Compilation:  USF&G Policy No. SMP326188 ... FPT/    44

6       3201    Compilation:  USF&G Policy No. 1CC599480 ... FPT/    44

7       3202    Compilation:  USF&G Policy No. SMP406309 ... FPT/    44

8       3203    Compilation:  USF&G Policy No. 1CC944574 ... FPT/    44

9       3204    Compilation:  USF&G Policy No. CEP64280 .... FPT/    44

10      3205    Compilation:  USF&G Policy No. 1CC945882 ... FPT/    44

11      3206    Compilation:  USF&G Policy No. CEP64348 .... FPT/    44

12      3207    Compilation:  USF&G Policy No. SMP535107 ... FPT/    44

13      3208    Compilation:  USF&G Policy No. SMP576121 ... FPT/    44

14      3209    Compilation:  USF&G Policy No. 1CCA31253 ... FPT/    44

15      3210    Compilation:  USF&G Policy No. CEP84958 .... FPT/    44

16      3211    Compilation:  USF&G Policy No. SMP594660 ... FPT/    44

17      3213    Compilation:  USF&G Policy No. CEP104806 ... FPT/    44

18      3214    Compilation:  USF&G Policy No. SMP654057 ... FPT/    44

19      3216    Compilation:  USF&G Policy No. CEP114516 ... FPT/    44

20      3217    Compilation:  USF&G Policy No. SMP772986 ... FPT/    44

21      3219    Compilation:  USF&G Policy No. CEP114641 ... FPT/    44

22      3220    03/03/06 Stipulation as to Existence and
                Content of USF&G Insurance Policies ........ FPT/    44
23
        3287    02/28/05 Letter to Terp from Risner &
24              Kercher ................................... FPT/    48

25

1

**EXHIBITS (Continued)**

2

**Exhibit No.**                                    **Received Volume/Page**

3   3321    03/03/06 Stipulation as to Existence and
            Content of Continental Insurance Policies
4           and Exhibits ............................... FPT/   49

5   3363    09/29/89 Agreement to Purchase Real
            Property .................................   8/ 1903
6
    3407    1971 Chemical Safety Data Sheet for
7           perchloroethylene ......................  FPT/ 49, 61

8   3408    1972 Hooker Chemical MSDS for
            trichloroethylene ........................ FPT/   49
9
    3410    1980 PPG manual .......................... FPT/   50
10
    3420    05/25/00 Second Request for Information
11          Pursuant to Section 104 of CERCLA for the
            Lockwood Solvent Site Billings .............   3/   676
12
    3433    1983 Dyce brochure ....................... FPT/   50
13
    3436    11/1979 Ledger sheet .....................   3/   622
14
    3438    04/1971 Perchloroethylene brochure ......  FPT/ 50, 61
15
    3471    08/05/85 Sales report ....................   3/   591
16
    3475    02/06/84 Dyce policies re: DOT ............ FPT/   50
17
    3476    06/02/79 Expense Report ..................   3/   585
18
    3483    Aerial photograph ........................ FPT/   51
19
    3484    Aerial photograph ........................ FPT/   51
20
    3485    Aerial photograph ........................ FPT/   51
21
    3486    Aerial photograph ........................ FPT/   51
22
    3487    Aerial photograph ........................ FPT/   51
23
    3488    Aerial photograph ........................ FPT/   51
24
    3490    1972 Aerial photograph ................... FPT/   51
25

1                          **EXHIBITS (Continued)**

2    **Exhibit No.**                        **Received Volume/Page**

3    3491    1981 Aerial photograph ..................... FPT/   51

4    3492    1987 Aerial photograph ..................... FPT/   51

5    3660    09/09/09 Dale photographs .................   2/  318

6    3674    Site photographs taken by Hargis ...........   8/ 2040

7    3800    05/27/57 Aerial photograph ................. FPT/   52

8    3801    06/26/66 Aerial photograph ................. FPT/   52

9    3802    05/22/69 Aerial photograph ................. FPT/   52

10   3803    08/18/71 Aerial photograph ................. FPT/   52

11   3804    04/23/72 Aerial photograph ................. FPT/   52

12   3805    Circa 1973 Aerial photograph ............... FPT/   52

13   3806    06/18/74 Aerial photograph ................. FPT/   52

14   3807    11/04/75 Aerial photograph ................. FPT/   52

15   3808    06/23/77 Aerial photograph ................. FPT/   52

16   3809    09/06/77 Aerial photograph ................. FPT/   52

17   3810    05/03/79 Aerial photograph ................. FPT/   52

18   3811    05/14/79 Aerial photograph ................. FPT/   52

19   3812    07/31/79 Aerial photograph ................. FPT/   52

20   3813    03/13/81 Aerial photograph ................. FPT/   52

21   3814    06/02/81 Aerial photograph ................. FPT/   52

22   3815    08/24/81 Aerial photograph ................. FPT/   52

23   3816    05/27/83 Aerial photograph ................. FPT/   52

24   3817    07/27/83 Aerial photograph ................. FPT/   52

25   3818    04/30/87 Aerial photograph ................. FPT/   52

1                         **EXHIBITS (Continued)**

2    **Exhibit No.**                      **Received Volume/Page**

3    3826    08/08/05 Response to 06/24/05 CERCLA 104(e). FPT/   53

4    3827    02/14/05 Letter to Moskowitz from
             Mielenhausen ............................. FPT/   53
5
     3828    02/15/05 Letter to Walsh from Mielenhausen . FPT/   53
6
     3886    06/15/00 Letter to Continental from Whalen . FPT/   55
7
     3887    09/25/00 Letter to Giblin from Mielenhausen. FPT/   55
8
     3888    01/08/07 Second stipulation as to existence
9            and content of USF&G insurance policies .... FPT/   55

10   4027    Aerial photograph (D032604) ...............   4/   848

11   4032    10/10/00 Communication to Gilbert from
             Simko ...................................   3/   691
12
     4039    09/13/89 Memo to Q. Dyce from Hallsten .....   8/ 1903
13
     4044    07/1976 Location Survey of Dyce site ....... FPT/   62
14
     4087    01/06/99 E-mail to Warne from Hallsten .....   2/   547
15
     4089    02/29/00 E-mail to Naff from Warne .........   4/ 1066
16
     4143    Aerial photograph .........................   6/ 1485
17
     4320    1980 Bulk Handling and Properties of PPG
18           Chlorinated Solvents ...................... FPT/   63

19   4400    01/14/05 Fax to LeCours from Sullivan ......   2/   335

20   4516    09/12/02 Letter to EPA from Sullivan .......   2/   354

21   4721    08/18/03 Fax to MDEQ from Sullivan .........   2/   308

22   4757    08/03/04 Letter to Sullivan from MDEQ ......   2/   313

23   4811    04/28/03 Letter to Ross from Sullivan ......   2/   342

24   4822    07/20/00 E-mail to Miller from Naff ........ FPT/   64

25

1

**EXHIBITS (Continued)**

2

**Exhibit No.**                                    **Received Volume/Page**

3   4831   Exhibit 5017 aerial photograph with Colver
           notations .................................   2/   483
4

    4832   Exhibit 5019 aerial photograph with Colver
5          notations .................................   2/   483

6   4833   Exhibit 5024 aerial photograph with Colver
           notations .................................   2/   483
7

    4834   Exhibit 5028 aerial photograph with Colver
8          notations .................................   2/   483

9   4835   04/30/86 General manager's monthly report ..   4/   899

10  5000-
    5064   Historical photographs ....................   2/   267
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                          PROCEEDINGS
2         (Open court.)
3         (Jury not present.)
4              THE COURT:  Please be seated.
5              MR. JOHNSON:  Your Honor, a couple of housekeeping
6    matters, if that's okay?
7              THE COURT:  Shoot.  That's why I'm here.  I'm here
8    for you.
9              MR. JOHNSON:  Appreciate it.
10             There's a debate between us as to whether Exhibits
11   5000 to 5064 are actually in evidence.  They're the historical
12   photos that we both agreed on, and we're both using them, and
13   we want to make sure that they've been admitted.  I say that
14   on the record.
15             THE CLERK:  I don't have a list that shows them.
16             THE COURT:  What numbers are they?
17             MR. JOHNSON:  5000 to 5064.
18             THE COURT:  5000 to 5064.  Are there 64 of them?
19             MR. JOHNSON:  I believe that there are.
20             THE COURT:  They're admitted without objection.
21        (Exhibits 5000 through 5064 were received in evidence.)
22             MS. ENERSON:  There are a few of them missing.
23             MR. JOHNSON:  There are a few of them missing, Your
24   Honor.
25             THE COURT:  They're admitted without objection.
```

1          MR. JOHNSON:  Secondly, I noted that Mr. St. George

2    mentioned yesterday while testifying that he had -- he

3    mentioned that he testified at the prior trial, which violates

4    the agreement that we had that we would tell our witnesses not

5    to mention the prior trial.  They can mention they testified

6    in this case but not at a particular trial.  So I guess I

7    would just say that we should both be forewarned about that.

8          THE COURT:  Yeah.  Let's keep that out of this

9    trial.

10         MR. JOHNSON:  Thank you, Your Honor.

11         THE COURT:  We don't want to have that as a basis to

12   have to do it again, do we?

13         MR. LYNCH:  We do not, Your Honor.

14         MR. JOHNSON:  No.

15         THE COURT:  Yeah.  Try and do better.

16         MR. BANKER:  A couple of housekeeping issues from

17   Soco's perspective.

18         Last night we saw on the ECF system Docket Entry 497

19   which was a record of our pretrial status conference

20   yesterday, and at the end of that entry, it said that the

21   Court had denied Soco's motion on the duty to defend and

22   referenced Docket No. 454.

23         I wondered whether that was an error based on our

24   discussion, because to my recollection the only motion that

25   the Court ruled on was the Lockheed Martin report which was

1    Docket No. 479.

2           THE CLERK:  Okay.  I'll correct it.

3           THE COURT:  There are occasions when I delegate the

4    rulings on these motions to the court reporter.

5           Just kidding.  Just kidding.

6           THE CLERK:  I'll correct it.

7           THE COURT:  Yeah.  And to the deputy clerk of court.

8    I'm sorry.

9           Cheri just told me that she would reverse herself.

10          MR. DAVIS:  Well, she doesn't have to grant the

11   motion.  It's just it was deferred.  I think I mentioned that

12   I wanted to have a couple minutes of argument on it, and you

13   recognized that there was no hurry.

14          THE COURT:  I did not, I did not rule on it.  And,

15   you know, that kind of thing you don't need to worry about.

16   Before the clerk rules, she's going to talk to me, I'm sure.

17          THE CLERK:  Thank you.

18          THE COURT:  If it's a binding ruling.

19          Now we have a problem.  It's a problem that's easy

20   for me to solve.  The gentleman that was in the back row that

21   raised his hand that I thought wanted to ask a question, Cheri

22   has told me that when we were bringing in the jury later in

23   the afternoon during a recess, or after a recess, the reason

24   we had to wait is he had to run back to the bathroom and

25   vomit.  Apparently he's in the hotel room sick, and he can't

1   leave, right?

2           THE CLERK:  Yes.

3           THE COURT:  Under Rule 47, I can excuse a juror for

4   just cause.

5           Cheri, for the record, did he call you this morning?

6           THE CLERK:  Yes, he did.

7           THE COURT:  Tell counsel what he told you.

8           THE CLERK:  He told me he had been sick all night

9   and that he really couldn't come in, but he would try to

10  later.  And he, he said, "I realize you can't go on without me

11  because you don't have an alternate," but he -- I told him not

12  to worry about it, I would call him back and tell him the

13  status.

14          THE COURT:  Well, let's discuss it, but my

15  inclination is, under Rule 47, to excuse him for just cause,

16  and I am hopeful that his presence yesterday isn't going to

17  cause other jurors to become sick.  I'm willing to listen to

18  alternatives.

19          MR. COZZENS:  We have no objection to excusing him.

20          MR. JOHNSON:  Can we discuss it, Your Honor, for a

21  second?

22          THE COURT:  Yeah.

23      (Discussion off the record at counsel table.)

24          THE COURT:  While you're discussing, keep in mind

25  that the options are limited.

270

1          (Discussion off the record at counsel table.)

2                MR. DAVIS:  When did you speak with him, Cheri?

3                THE CLERK:  It was about 40 minutes ago.

4                MR. DAVIS:  I guess we hate to lose the juror.  I

5     don't know if it's worth a second call to see if he's feeling

6     any better, and I understand that certainly if it may be

7     contagious or something, we'd lose more.

8                MR. JOHNSON:  I wonder if we could take the morning

9     off, Your Honor, just to see if he gets better.  We hate to

10    lose the juror.

11               THE COURT:  I can't afford to take the morning off.

12    I told you when this case has to be done, and, the way it

13    started, it's going to be pushing it.

14               This case basically is whether there was a sudden

15    and accidental spill of perc during '75, '76, '77, I guess the

16    early part of '78.  Pretty much that's the issue in the case.

17    Now I know there's an issue of notice.  I don't think the

18    notice issue is near as serious as the insurers do, but that's

19    just me talking now.  But basically what else are we talking

20    about?

21               MR. BANKER:  There is another housekeeping issue

22    that Soco would like to talk about and at least have a

23    conversation about this morning before we call witnesses, and

24    here is my concern.

25               THE COURT:  Well, either stand up or lean into the

271

1    microphone.

2         MR. BANKER:  Sure.

3         The concern that Soco has and what I would call this

4    is a motion *in limine*.  We heard yesterday in opening argument

5    a lot of talk about Mr. Mielenhausen and a changing story, and

6    this case isn't about Mr. Mielenhausen.  Mr. Mielenhausen

7    isn't going to be a witness in this case.  I think -- you

8    know, Soco moves under 402, 403, to limit really very

9    carefully any reference to Mr. Mielenhausen.

10        Today we're going to have Mr. Hallsten testify on

11   the stand under oath, and he will unequivocally say this is

12   his recollection.  They're entitled to cross-examine him about

13   that.  If they want to suggest, you know, ask him if he's

14   lying, they can do that.  If they want to argue in closing and

15   tell the jury they think he's lying, they're entitled to do

16   that.  And if they go the next step -- and they didn't say it

17   yesterday, but I heard clear innuendo their suggestion that

18   Mr. Mielenhausen is suborning perjury.

19        THE COURT:  Well, I don't -- I'm going to stop you.

20   I remember the last trial.  The same thing happened the last

21   trial, and I think the point of the insurers during that part

22   of the cross-examination was, as I recall, he didn't have any

23   recollection of this until after he'd talked with

24   Mr. Mielenhausen.  Isn't that what --

25        MR. GROSSBART:  That is exactly correct, and it did

1  come up at the first trial.

2          THE COURT:  Yeah, I don't think it's a suggestion of

3  them, them asserting some kind of a claim that

4  Mr. Mielenhausen suborned perjury.  It's just they're entitled

5  to bring out when his memory was when it came to fruition.

6          MR. BANKER:  Yeah, I don't disagree with that.  They

7  are entitled to inquire when he first told anyone, when he had

8  that recollection, but I think we need to be cautious of going

9  that next step.  And what I heard yesterday and then what I

10  saw in cross-examination of Mr. Johnson's exam of

11  Mr. St. George was, again, this Mr. Mielenhausen thing.

12          I guess, as to that, all I'd ask is I'd want to

13  alert the Court that this is an issue that we're concerned

14  about and say that if they are going to make that argument,

15  then I think that we need to have an offer of proof, and I

16  think we need to *voir dire* the witness outside the presence --

17          THE COURT:  If they're going to make what argument?

18          MR. BANKER:  That there's some subornation of

19  perjury here.

20          THE COURT:  I don't remember that ever occurring

21  during the last trial.  I don't want to hear it this trial.

22          MR. GROSSBART:  It didn't happen in the last trial.

23          THE COURT:  No.

24          MR. GROSSBART:  We've not accused him of that.

25          THE COURT:  No.

273

1          MR. GROSSBART:  Had we done that, it would not be

2    hard to figure out.  We haven't done that.

3          THE COURT:  No.  I don't recall that even being an

4    issue in the last trial.  On cross-examination, it's fair game

5    to talk to somebody about when their first recollection of an

6    event was and how it came about.

7          MR. BANKER:  There is no disagreement about that.  I

8    just --

9          THE COURT:  And if Mr. Mielenhausen happened to be

10   there, too bad.

11         MR. BANKER:  There's no disagreement about that.  I

12   just --

13         THE COURT:  That's good.

14         MR. BANKER:  -- there's a line that I think we need

15   to adhere to.

16         THE COURT:  We don't want to be looking for

17   boogeymen under every rock.

18         MR. BANKER:  That's Soco's concern, Your Honor.

19         THE COURT:  Okay.  Well, we need to see if we have

20   the jury here.

21         THE CLERK:  (Complied with request.)

22         MR. DAVIS:  So I take it that you're going to

23   proceed right now and dismiss the other juror?

24         THE COURT:  Oh.  Come back here.

25         THE CLERK:  (Complied with request.)

1          THE COURT:  That's right.

2          Yeah, under Rule 47(c), I'm going to find just cause

3    that Mr. Hartman is sick.  Obviously he's sick.  He can't show

4    up.  I can't afford to burn the morning.  And we'll have seven

5    jurors left.  Under the rules, we're only required to have

6    six, so we'll keep our fingers crossed that no one else has a

7    problem.

8          Go in and check.

9          THE CLERK:  Okay.

10          THE COURT:  And I'll tell you what.  Let's take a

11    quick recess.  You check, and then you call, you call

12    Mr. Hartman and tell him what I've done and tell him thanks.

13          THE CLERK:  Okay.

14          THE LAW CLERK:  All rise.

15    (Recess taken from 08:37:23 to 08:46:33.)

16    (Open court.)

17    (Jury present.)

18          THE COURT:  Please be seated.

19          Now, ladies and gentlemen, as you can tell, you are

20    one fewer in number.  Mr. Hartman apparently, when he was

21    raising his hand, was trying to tell me he was sick, and so I

22    have excused Mr. Hartman from the jury, so this jury now will

23    consist of you seven.

24          You may proceed.

25          MR. LYNCH:  Soco calls James Sullivan to the stand.

275

1          THE COURT:  You can proceed.  I already had the

2    witness summary.  Go ahead.

3          WHEREUPON,

4                    MR. JAMES SULLIVAN,

5    called for examination by counsel for defendant, after having

6    been first duly sworn to testify the truth, the whole truth,

7    and nothing but the truth, testified as follows:

8                    DIRECT EXAMINATION

9    BY MR. LYNCH:

10   Q    Good morning, Mr. Sullivan.

11   A    Good morning.

12   Q    How are you today?

13   A    Fine, thank you.

14   Q    Mr. Sullivan, do you live here in Billings?

15   A    Yes, I do.

16   Q    Are you originally from here?

17   A    Yes.

18   Q    Lived here your whole life?

19   A    Except to go to school.

20   Q    Where did you go to school?

21   A    At Montana Tech in Butte.

22   Q    Okay.  And where do you work?

23   A    At ATC Associates here in town.

24   Q    What is ATC Associates?

25   A    It's an environmental consulting company.

1   Q    And what generally does an environmental consulting

2   company do?

3   A    Our primary focus is soil and groundwater cleanup.

4   Q    And what's your position at ATC?

5   A    I'm a regional manager.

6   Q    What's a regional manager do?

7   A    I manage staff in Montana and Wyoming.

8   Q    Are you also an environmental engineer?

9   A    Yes.

10  Q    Is most of the work that you do here in the Billings

11  area?

12  A    Montana and Wyoming.  A lot in Billings.

13  Q    Are you familiar with the Lockwood solvent groundwater

14  plume site?

15  A    Yes.

16  Q    Have you done any work in connection with that Lockwood

17  solvent site?

18  A    Yes.

19  Q    As an environmental engineer?

20  A    Yes.

21  Q    In your position at ATC?

22  A    And at Secor.

23  Q    And what is Secor?

24  A    Secor was the previous consulting company that I was at

25  until March of 2003.  Same position.  Same staff.  Same work

1  on the project.

2  Q    Okay.  So eventually you left Secor and went to ATC?

3  A    That's correct.

4  Q    And I take it the work that you were doing in connection

5  with the Lockwood solvent site followed you there?

6  A    That's correct.

7  Q    Who hired you to do that work in connection with the

8  Lockwood solvent site?

9  A    The Brown Law Firm.

10 Q    Okay.  And they're a firm here in Billings?

11 A    Yes.

12 Q    Was it on behalf of a particular client of theirs?

13 A    Yes.  Brenntag.

14 Q    Do you understand that Brenntag has since changed its

15 name to Soco West?

16 A    Yes.

17 Q    So I might refer to them as -- I'll try to be consistent.

18 I'll try to refer to them as Soco.

19 A    Okay.

20 Q    And they're the entity that had purchased the old Dyce

21 Chemical site in Lockwood; is that correct?

22 A    Yes.

23 Q    When were you hired by the Brown firm?

24 A    July of 2001.

25 Q    Have you, in connection with your work, have you

1   personally been out to the Dyce Chemical property in Lockwood?

2   A    Many times.

3   Q    And in connection with that work, have you taken soil or

4   groundwater samples from that property?

5   A    Yes.

6   Q    Are you still working on behalf of Soco in connection

7   with the Lockwood solvent site and the Dyce Chemical property?

8   A    Yes.

9   Q    What are your current responsibilities?

10   A    We're working with EPA and MDEQ to facilitate the

11   cleanup, and we're also running a remediation system.

12   Q    Do you have any involvement in this insurance coverage

13   case?

14   A    No.

15   Q    Have you done anything in connection with this case?

16   A    I've produced documents.  I took expert witnesses from

17   both the insurance company and Soco on tours of the site.

18   Q    Have you been retained as an expert witness in this case?

19   A    No.

20   Q    Have you been asked to give any scientific opinions in

21   connection with this case?

22   A    No.

23   Q    Are you being compensated for your time here today?

24   A    Yes.

25   Q    And what's the rate?

1    A    $125 an hour.

2    Q    Now is that the same rate that you would get if you were

3    back at your office instead of having to be here with us

4    today?

5    A    It's the same rate my company would get, not me.

6         THE COURT:  Do you want me to make them take a

7    breath, JoAnn?

8         THE REPORTER:  I think we're okay.

9         THE COURT:  Okay.

10        MR. LYNCH:  I'll try and slow down.

11        THE COURT:  Yeah.

12   BY MR. LYNCH:

13   Q    Mr. Sullivan, when you were hired by the Brown firm in

14   July of 2001, had the EPA already identified the Dyce

15   Chemical -- Soco as a potential responsible party for the

16   cleanup at the Lockwood solvent site?

17   A    Yes.

18   Q    As of July 2001, had Soco conducted any sampling on the

19   Dyce Chemical property?

20   A    Yes, they had.

21   Q    And who had conducted that sampling?

22   A    Another consulting company called Maxim.

23        MR. LYNCH:  Can you please pull up, Julianne,

24   Admitted Exhibit 3049?

25        DOCUMENT TECHNICIAN:  (Complied with request.)

1   BY MR. LYNCH:

2   Q    Mr. Sullivan, do you recognize that document?

3   A    Yes.

4   Q    And what is it?

5   A    That looks like the cover sheet from the Maxim report.

6          MR. LYNCH:  And if you'd go to page 2 of that

7   exhibit, please, Julianne?

8          DOCUMENT TECHNICIAN:  (Complied with request.)

9   BY MR. LYNCH:

10  Q    The date on this report, Mr. Sullivan, is October 3,

11  2000; is that correct?

12  A    Yes.

13  Q    Is this a report that you reviewed when you first were

14  hired by the Brown firm?

15  A    Yes.

16  Q    And at that time, as of July 2001, was it the most

17  current sampling that had been done at the Dyce Chemical

18  property?

19  A    It was.

20  Q    Did Maxim find contamination on the Dyce Chemical

21  property?

22          MR. GROSSBART:  Objection, Your Honor.  If he wants

23  to publish the report, that's fine, but now he's asking the

24  witness to interpret it.

25          THE COURT:  Well, I'm going to overrule it.

281

1          Go ahead.

2          THE WITNESS:  It did.

3          MR. LYNCH:  And, Julianne, if you could please pull

4    up page 23 of that report?

5          DOCUMENT TECHNICIAN:  (Complied with request.)

6    BY MR. LYNCH:

7    Q    Mr. Sullivan, this is a figure from the Maxim report,

8    page 23.  Is that a figure depicting the locations where Maxim

9    had sampled on the Dyce Chemical property?

10   A    Yes, it is.

11   Q    Was Maxim still working -- you can take it off, Julianne.

12         DOCUMENT TECHNICIAN:  (Complied with request.)

13   BY MR. LYNCH:

14   Q    Was Maxim still working for Soco when ATC was hired?

15   A    No, I don't believe they were.

16   Q    Do you know why not?

17   A    Between the time they did the work and the time we were

18   hired, the site was named to the national priorities list, the

19   Superfund site, and I believe they were conflicted out.

20   Q    What was ATC hired to do?

21   A    We were hired, kind of a two-pronged approach.  We were

22   hired to review environmental documents and identify potential

23   sources on the Lockwood solvent site as a whole, and we were

24   also hired to review environmental documents, identify

25   potential sources, and propose and conduct remediation at the

1   Dyce facility.

2   Q    I'd like to discuss a little bit your remediation efforts

3   on the Dyce Chemical facility.

4        First of all, what is remediation?

5   A    It's cleanup of soil or groundwater or both.

6   Q    And was ATC hired to develop a plan to clean up the

7   entire 580-acre Lockwood solvent site?

8   A    No.  Just the Dyce facility.

9   Q    Did you ever work on a plan to clean up areas expanding

10  beyond the Dyce facility?

11  A    No.

12  Q    Did you ever, ATC, on behalf of Soco West, ever offer to

13  conduct a broader remedial investigation of the site?

14  A    Yes, yes.

15  Q    And was that offer accepted?

16  A    No.  We offered several times, and it was denied by EPA

17  and MDEQ.

18  Q    Who actually conducted the remedial investigation of the

19  Lockwood site?

20  A    A company called Tetra Tech.

21  Q    And were they working on behalf of MDEQ?

22  A    Yes.

23  Q    Did ATC nevertheless continue to develop a plan to clean

24  up the contamination that had been found at the Dyce Chemical

25  property itself?

1    A     Yes.

2    Q     And did you start putting that plan into place in 2001

3    when you were first hired?

4    A     Yes.  We put together a work plan and put in some

5    monitoring wells.

6    Q     Okay.  And just can you generally elaborate on what did

7    you do first?

8    A     We produced a work plan.

9          MR. GROSSBART:  Your Honor, can we approach?  This

10   is totally irrelevant.  I can explain at sidebar.

11         THE COURT:  Let's have a little sidebar.

12      (Discussion on the record at sidebar.)

13         MR. GROSSBART:  As you said in your remarks, this

14   case is about a single and accidental spill.  They're going to

15   have this man go through his remediation efforts over the

16   course of years.  It is necessarily going to put him in the

17   role of an expert witness.  Here is his report of the

18   remediation, at least the last one we have.  I can't

19   cross-examine him about that without getting into all of the

20   expert types of things that he's not on the witness stand to

21   say, so he's going to say, "Yeah, I did this report, and I did

22   this remediation."  He's going to give the bottom-line

23   conclusion.

24         THE COURT:  What's the bottom-line conclusion?  What

25   is it?

1          MR. LYNCH:  He's going to testify, Your Honor, that

2    he did conduct remediation efforts on the site from 2001

3    through the present and just basically explain what types of

4    things he did.

5          THE COURT:  Why?

6          MR. LYNCH:  Because this goes to refute their

7    argument yesterday -- we heard it in opening and we heard it

8    with Mr. St. George -- that Dyce was not assuming

9    responsibility for the contamination on this site.  They were

10   shifting it to others.  They were trying to blame others.

11   We're offering him as we did at the last trial to show that,

12   from day one, even when we didn't know the source of that --

13         THE COURT:  Are we going to go into every minute

14   detail?

15         MR. LYNCH:  No.  I'll have him explain generally

16   what the system is and where samples were taken.

17         MR. GROSSBART:  Why the samples were taken, why they

18   did it there, the types of remediation is highly technical.

19   They're going to quantify it.  What perc were they sucking out

20   of the ground?  The spilled perc?  Other perc?  It's highly

21   technical stuff.  They had two chances to make this guy an

22   expert, the first trial and now.  For some reason, they

23   haven't.  I just don't -- it's the subject of a motion

24   *in limine* that you ruled on once already, and that's where

25   we're headed.

1          THE COURT:  What did I rule on it?

2          MR. GROSSBART:  You ruled he can testify about what

3    he did in some broad sense but not that he can get into this

4    kind of technicality.

5          THE COURT:  You make objections.  I'll rule.  I'm

6    not going to give a broad ruling.

7          (Open court.)

8          (Jury present.)

9          THE COURT:  The objection is overruled for the time

10   being.

11   BY MR. LYNCH:

12   Q    Mr. Sullivan, can you just generally tell me what you did

13   first to implement a cleanup plan for the Dyce Chemical

14   property?

15   A    We prepared a work plan.  We installed four wells along

16   the downgradient boundary of the site.  That's the downstream

17   side where the groundwater flows.  We installed those wells.

18   First we invited MDEQ to come down and oversee that or

19   participate with that drilling.  We put those wells in.

20         MR. LYNCH:  Julianne, can you please pull up

21   Proposed Exhibit 4817?

22         DOCUMENT TECHNICIAN:  (Complied with request.)

23   BY MR. LYNCH:

24   Q    Mr. Sullivan, without getting into the specifics of this

25   document, can you tell what this exhibit, what this document

1  is?

2  A    This is an initial report of the investigative activities

3  that we conducted.

4  Q    And this is -- is this a report that you shared with

5  MDEQ?

6  A    Yes, it is.

7            MR. LYNCH:  We move its admission, Your Honor.

8            MR. GROSSBART:  I don't know what it's relevant to.

9  If their experts want to talk about it, I suppose that's fine,

10  but I don't understand what its relevance would be to the

11  issues.

12            THE COURT:  Do you have an expert who is going to

13  talk about it?

14            MR. LYNCH:  Not this specific report, Your Honor.

15  The report is just going in to show where he put those borings

16  in.

17            MR. GROSSBART:  I don't think that's relevant,

18  either.

19            THE COURT:  How many pages is it?

20            MR. LYNCH:  I think the report itself is 25.  I'm

21  only going to be showing him one page of it.

22            THE COURT:  This just shows where he put the wells?

23            MR. LYNCH:  Yes, Your Honor.  That's what we're

24  using it for.  We won't have him go into detail.

25            MR. GROSSBART:  There is a stipulation in this case

1    to the locations of all of the wells drilled by all of the

2    consultants.  It's photographed.

3              THE COURT:  It's sustained.

4    BY MR. LYNCH:

5    Q    The four borings that you referred to, Mr. Sullivan, did

6    you drill those borings in the area that MDEQ subsequently

7    identified as the northwest corner source area of the site?

8    A    Yes.

9    Q    Had that area previously been tested by Maxim or EPA or

10   DEQ?

11   A    No.  We were the first ones to find it.

12   Q    Okay.  And just generally what were the results of your

13   samples?

14   A    One of the wells, particularly PT-2, had very high levels

15   of perc, considerably higher than anything ever found before

16   at the site.

17   Q    Is it fair to say that ATC was the one that discovered

18   the perc contamination in the northwest corner?

19   A    Yeah, we did.  We were Secor at that point, but yes.

20   Q    And I believe you said you had shared the results of your

21   sampling with DEQ?

22   A    Yeah.  In fact, the project manager, Catherine LeCours,

23   who is still the project manager, was there on site when I put

24   that well in, so we found it together.

25   Q    Mr. Sullivan, did you need DEQ or EPA permission or

1   approval to take samples from the Dyce Chemical -- on the Dyce

2   Chemical property itself?

3   A    No.

4   Q    Were you under any obligation to share the results of

5   your sampling with the DEQ?

6   A    I don't believe so.

7   Q    Why did you do so?

8   A    We worked collaboratively with them.  We were also trying

9   to save costs.  We knew it was going to be an expensive

10  proposition, and, by sharing our data, it was data they

11  weren't going to have to collect later.

12  Q    After you did this initial pilot testing -- let me go

13  back.

14       When was this initial pilot test wells, when were they

15  done?

16  A    The first four wells were installed December 2001.

17  Q    Okay.  And after that pilot testing that found the perc

18  contamination in the northwest corner, did you continue to

19  work on any cleanup plan for the Dyce Chemical property?

20  A    Yes, we did.

21  Q    What did you do next?

22  A    We installed several more wells to further delineate what

23  we had found.

24  Q    Okay.  And did that also find perc -- well, were those

25  wells also in the northwest corner area?

1   A     Yes, they were.

2   Q     And what were the results of those samples?

3   A     One well, PT-6, which was just near PT-2, had even higher

4   levels than PT-2, of perc.

5   Q     Did you actually ever implement any cleanup activities on

6   the site; in particular, in the northwest corner area?

7   A     Yes, we did.

8   Q     And when did you implement those activities?

9   A     We pilot-tested a system in April 2002, an air

10  sparge/soil vapor extraction system.

11  Q     Just generally can you tell us what an air sparge/soil

12  vapor extraction system is?

13  A     It's a way to remove volatile chemicals from the

14  groundwater.  You pump compressed air down into the ground,

15  and, as it bubbles up, it volatilizes the volatiles.  And then

16  you have a vacuum pump at the top through piping, and you suck

17  that out of the soil.

18          MR. GROSSBART:  Your Honor, this sounds like expert

19  testimony.

20          THE COURT:  No, I think he's telling what he did.

21          MR. GROSSBART:  But what he did was expert work.

22          THE COURT:  Overruled.

23  BY MR. LYNCH:

24  Q     At this point, Mr. Sullivan, was Soco under any

25  obligation or order to be performing these cleanup activities

1    on the Dyce Chemical site?

2    A    No.

3    Q    But that, nevertheless, that had been one of the tasks

4    that was assigned to you when you were first hired?

5    A    That's correct.

6    Q    After the air sparging test, did you perform any

7    additional cleanup activities on the site?

8    A    We did.  We then piloted a similar but slightly different

9    system called an ozone sparge/soil vapor extraction system.

10   Q    Can you just generally tell us what an ozone sparge

11   system is?

12   A    The system we implemented had two primary differences.

13   One of them was we used a mixture of ozone and air as the

14   sparge gas.  Ozone is a real strong chemical oxidant, and that

15   improved the performance, but the primary change was we

16   installed trenches that we put slotted pipe in for the vacuum

17   system because we weren't getting enough air recovered with

18   our vacuum pump, so by putting those trenches in, and pea

19   gravel, we were able to greatly improve the vacuum recovery.

20   Q    And when did you test this system?

21   A    I believe that was in the fall of 2002, maybe December.

22   Q    In connection with the ozone sparging, did you take any

23   additional soil or groundwater samples in the northwest corner

24   area?

25   A    We did.

1    Q     Did you measure any effect on the groundwater levels in

2    the northwest corner as a result of that, that testing?

3    A     Yeah.  We saw tremendous declines in the concentrations

4    of perc in groundwater.

5    Q     Did you measure any effect on the levels of perc in the

6    soils in the northwest corner as a result of that testing?

7    A     At one point we went back and collected a couple samples,

8    one sample I can recall near PT-2, where we attempted to

9    duplicate a sample that was collected during the initial

10   installation of those wells.

11   Q     What were the results of that sample?

12   A     I believe that sample was about 10 percent lower in

13   concentration of perc than the original sample.

14   Q     Okay.  During these activities, did you detect any

15   increase in perc levels in the soil of the northwest corner as

16   a result of your activities?

17   A     I don't believe so.

18   Q     After you ran this, the pilot ozone sparge test, did you

19   continue cleanup efforts on the site?

20   A     We did.  The test was so successful that we just

21   continued to run it.  I think within -- the test ran for

22   something like six weeks, and we had 97 percent removal in the

23   groundwater 24 feet away.  We continued to run it.  In fact,

24   some form of that system continues to run today.

25   Q     Did you ever propose to EPA or DEQ that you wanted to

1    expand that system?

2    A    We did.

3    Q    Okay.  And what was their response?

4    A    They sent us a request for additional information

5    initially.

6              MR. LYNCH:  I'd like to pull up Proposed

7    Exhibit 2558.

8    BY MR. LYNCH:

9    Q    Mr. Sullivan, without going into detail as to what's in

10   this document, can you please identify it?

11   A    This is our response to EPA's request for additional

12   information about the system.

13             MR. LYNCH:  And if you would turn to page 4 of that

14   exhibit, please, Julianne?

15             DOCUMENT TECHNICIAN:  (Complied with request.)

16   BY MR. LYNCH:

17   Q    Mr. Sullivan, is this a document that -- are these

18   responses to the EPA's 104(e) request responses that you

19   actually signed on behalf of Soco West?

20   A    That's correct.

21             MR. LYNCH:  We'd move its admission, Your Honor.

22             MR. GROSSBART:  I have no objection, Your Honor.

23             THE COURT:  2558 is admitted.

24        (Exhibit 2558 was received in evidence.)

25             MR. LYNCH:  Julianne, would you please turn to

1   page 5 of this exhibit?  Actually let's go back to page 4 for

2   a second, please.

3             DOCUMENT TECHNICIAN:  (Complied with request.)

4   BY MR. LYNCH:

5   Q    Mr. Sullivan, on page 4 of this exhibit, is that your

6   signature on the page?

7   A    It is.

8   Q    And did you understand that in answering these responses

9   to the EPA's question, you were answering them under oath?

10  A    Yes, I did.

11  Q    And at the time you answered them, do you believe you had

12  made a complete and thorough review of all documents,

13  information, and sources that were relevant to these requests?

14  A    Yes.

15  Q    And did you believe your responses to be true, accurate,

16  and complete to the best of your knowledge and information at

17  that time?

18  A    Yes.

19            MR. LYNCH:  Now turn to page 5, please.

20            DOCUMENT TECHNICIAN:  (Complied with request.)

21  BY MR. LYNCH:

22  Q    What is this portion of the responses, Mr. Sullivan?

23  A    This is the work plan portion of the response where we

24  laid out the details to EPA and MDEQ of what we were proposing

25  for the system that we were calling the boundary control

1    system.

2            MR. LYNCH:  You can take it down.

3            DOCUMENT TECHNICIAN:   (Complied with request.)

4    BY MR. LYNCH:

5    Q    Mr. Sullivan, did you end up implementing that full-scale

6    ozone sparging system?

7    A    We got a partial installation in, and then we received

8    another request for information from EPA.

9    Q    Did EPA ever advise you that they had any concerns as to

10   you implementing that system?

11   A    Yes.

12   Q    And what were their concerns that they told you?

13   A    In the second letter, they asked us to stop the

14   implementation.  They didn't want us to run it, and they were

15   afraid that it might spread contamination outside the

16   boundaries of the current --

17   Q    Do you know when that letter was sent?

18   A    It was in the summer or spring of April -- or summer or

19   spring of 2003.

20   Q    After they requested that you stop the full-scale ozone

21   sparge test, did you have any further discussions with them

22   regarding your plans to clean up the Dyce site?

23   A    We did.  We went up and met with EPA and DEQ and their

24   consultant in Helena to try to alleviate their concerns.

25   Q    And did they ever give you permission to implement any

1   part of the remediation plan?

2   A    They did.  They sent us a letter after the meeting that

3   said we could implement the soil vapor extraction portion.

4   Q    Okay.  And can you just generally tell us what the

5   difference was between the soil vapor extraction portion or --

6   and the full-scale plan you proposed?

7   A    Yeah.  As we talked about, the ozone sparging portion of

8   it, that blows those bubbles up through the soil, and they

9   were afraid it was going to mound the groundwater, and that

10  could possibly tend to move contamination away from where

11  you're doing it.  So the vapor extraction system won't do

12  that, so that was the, I guess, the uncontested portion

13  between ourselves and EPA, so they allowed us to install and

14  operate that.

15          MR. LYNCH:  Julianne, would you please pull up

16  Admitted Exhibit 3826?

17          Actually I can give you a paper copy of this one.

18          May I approach, Your Honor?

19          THE COURT:  Yes.

20  BY MR. LYNCH:

21  Q    Mr. Sullivan, can you identify that document, please?

22  A    This was our responses to the second 104(e) request that

23  we had received.

24  Q    And that was a request for information from the EPA?

25  A    That's correct.

1          MR. LYNCH:  Turn to page 3 of this document, please.

2          DOCUMENT TECHNICIAN:  (Complied with request.)

3  BY MR. LYNCH:

4  Q    Mr. Sullivan, did you again respond to these requests and

5  sign these answers to the requests on behalf of Soco?

6  A    Yes, I did.

7  Q    And again, you understood you were answering them under

8  oath?

9  A    Yes.

10 Q    And at the time, did you believe these responses to be

11 true, accurate, and complete to the best of the information

12 you had at that time?

13 A    Yes.

14         MR. LYNCH:  Please turn to page 9 of this exhibit.

15 And could you highlight the paragraph starting with 4.A?

16         DOCUMENT TECHNICIAN:  (Complied with request.)

17 BY MR. LYNCH:

18 Q    Mr. Sullivan, I don't know if yours has exhibit numbers;

19 it's D140468.

20 A    Yes.

21         MR. GROSSBART:  Your Honor, this goes squarely to

22 what I was talking about at sidebar.  I think if you look at

23 the language of this document and its attempt to quantify --

24         THE COURT:  Sustained.

25 ///

1    BY MR. LYNCH:

2    Q    Mr. Sullivan, did you -- what was the EPA's response to

3    this 104(e) request?

4    A    To our answers?

5         MR. GROSSBART:  Your Honor, excuse me.  If he's

6    going to repeat the document that you just sustained the

7    objection on, that's improper.

8         MR. LYNCH:  No, he's not.

9         THE COURT:  No.  It's overruled.  Go ahead.

10   BY MR. LYNCH:

11   Q    What was the EPA's response -- strike that.

12        After submitting this, these responses to the EPA, did

13   you continue to operate the soil vapor extraction system?

14   A    Yes.

15   Q    And does that cleanup effort still continue?

16   A    Yes.

17   Q    And is it continuing to remove contamination from the

18   soils in the northwest corner area?

19   A    Yes.

20   Q    And have you taken soil or groundwater samples in

21   connection with that soil vapor extraction system?

22   A    We did with the installation of it.

23   Q    And did that sampling show any increase in the amount of

24   soil contamination in the soils in the northwest corner area

25   as a result of this system?

1    A    No.

2    Q    Did it show any effect on the soils in the northwest

3    corner area as a result of the operation of the system?

4    A    Just the only sampling that I can recall is the sampling

5    that we talked about earlier, the PT-2, where we saw a

6    reduction of about 10 percent.

7    Q    Did you take any measurements of amounts of contamination

8    that were being removed by the system?

9    A    Yes, we did.

10   Q    And how much contamination did you measure was being

11   removed?

12          MR. GROSSBART:  Excuse me, Your Honor.  That was

13   what was repeated in the exhibit you just sustained.

14          THE COURT:  Overruled.

15          THE WITNESS:  As of last Friday, I think we'd

16   removed about 109 pounds of perc.

17   BY MR. LYNCH:

18   Q    109 pounds?

19   A    Or 109 gallons, excuse me.

20   Q    And that's from the northwest corner area soils?

21   A    Yes.  Those are vadose zone soils.

22          MR. GROSSBART:  Leading, and, again, it's expert

23   testimony.

24          THE COURT:  Overruled.

25   ///

1    BY MR. LYNCH:

2    Q    What are vadose zone soils?

3    A    Those are the unsaturated soils, so the soils that are

4    above the water table.

5    Q    And how deep does that go in the northwest corner?

6    A    The water table varies seasonally, so it averages about

7    5 feet.

8    Q    Okay.  Is the system, is the system you're implementing,

9    has it removed any perc contamination from the soils -- in the

10   soils below the water table in the northwest corner?

11   A    Theoretically it will, but probably not a measurable

12   amount.

13   Q    So 109 gallons just from the first 5 feet of soil?

14   A    Yes.

15   Q    Mr. Sullivan, you've taken quite a number of soil and

16   groundwater samples specifically from the northwest corner

17   area of the Brenntag -- or the Dyce Chemical property,

18   correct?

19   A    Yes.

20   Q    And the cleanup efforts you've just described have all

21   been devoted to the contamination in that area, correct?

22   A    That's correct.

23   Q    Why are you focusing so much on that area of

24   contamination at the Dyce Chemical property?

25   A    That's the primary source of the plume that goes

1    downgradient.  We looked at it initially and estimated, based

2    on some modeling, that it was about 97 percent of the plume.

3    Q    I'd like to change topics a little bit now, Mr. Sullivan.

4         I believe you indicated earlier when you were first hired

5    by the Brown firm, it was a two-pronged approach?

6    A    Yes.

7    Q    And one of the prongs was conducting a site-wide

8    investigation for potential source areas?

9    A    That's correct.

10   Q    And why were you looking at other possible source areas?

11   A    We wanted to make sure that all of the sources were

12   understood and defined, and we knew the nature and extent,

13   because if you implement a cleanup without identifying all of

14   the sources and don't implement it on some unknown sources,

15   the cleanup won't be effective.  And the second reason was we

16   didn't want to pay to clean up somebody else's spills.

17   Q    And can you tell me, what did your investigation consist

18   of?

19   A    Interviews, air photos, searches, historic documents.  We

20   initially reviewed all of the documents that were available

21   throughout the site.

22   Q    Did you actually interview any Dyce Chemical employees in

23   connection with your investigation?

24   A    Yes.

25   Q    And who did you interview?

1  A    The two primary ones -- well, three primary ones, really:

2  Dave Warne, who was the branch manager.  He was a long-time

3  Dyce employee.  Craig Guelff.  And Suzanne Miller.

4  Q    Did you interview any former historic employees of Dyce

5  Chemical?

6  A    Yes, a couple.

7  Q    Do you know who they were?

8  A    I don't recall.

9  Q    Did you ask, during these interviews of the Dyce Chemical

10 employees, did you ask them about whether they had seen any

11 perc spills?

12 A    Yes, absolutely.

13 Q    And did anyone recall any?

14 A    No.

15 Q    Did you ask them about whether they knew of any inventory

16 discrepancies in perc?

17 A    Yes.

18 Q    And did anyone recall any?

19 A    No.

20 Q    In connection with your investigation, Mr. Sullivan, did

21 you ever interview a man named Monte Naff?

22 A    No.

23 Q    Have you ever met Monte Naff?

24 A    I haven't.

25 Q    Did you ever interview a man named Rod Hallsten?

1   A    No.

2   Q    Have you ever met Mr. Hallsten?

3   A    No.

4   Q    I believe one of the other things you said you did was

5   review aerial photographs in connection with your

6   investigation; is that correct?

7   A    That's correct.

8   Q    And did you obtain any aerial photographs of the Lockwood

9   site?

10  A    We did.

11  Q    Where did you obtain those from?

12  A    We went to the usual places we get aerial photos.  We

13  went to Montana Department of Transportation.  They typically

14  have a large catalog.  We went to Morrison-Maierle, who

15  maintains a large catalog here in town.  We went to USDA, I

16  believe, out of Salt Lake.

17  Q    And have you reviewed your collection of photos that you

18  obtained prior to coming to testify today?

19  A    Yes.

20  Q    Did you obtain any photos from the time period 1975 to

21  1980?

22  A    Yes.

23  Q    And what were the dates and sources of those photographs?

24  A    We had a 1974 photo from Montana Department of

25  Transportation, we had a photo that was labeled 1978 from

1    Morrison-Maierle, and we had a 1979 photo from USDA.

2                    MR. LYNCH:  Julianne, could I have you please pull

3    up Admitted Exhibit 5017, which the parties have stipulated is

4    a 1974 photo from the Montana Department of Transportation?

5                    DOCUMENT TECHNICIAN:  (Complied with request.)

6    BY MR. LYNCH:

7    Q    Mr. Sullivan, is that the same photograph you obtained,

8    the 1974 photograph you were referring to?

9    A    Yes, I believe so.

10   Q    You also indicated, I believe, that you obtained a

11   photograph from Morrison-Maierle labeled 1978?

12   A    Yes.

13   Q    Was that photograph actually taken in 1978?

14   A    No.  It must have been taken sometime previous to that.

15                   MR. LYNCH:  Julianne, could you please pull up

16   Admitted Exhibit 5015?

17                   DOCUMENT TECHNICIAN:  (Complied with request.)

18   BY MR. LYNCH:

19   Q    And, Mr. Sullivan, this is an exhibit the parties have

20   stipulated is a circa 1973 photo from Morrison.  Is this the

21   same as the photograph that you had received from them labeled

22   1978?

23   A    Yes, it is.

24   Q    How can you tell this wasn't taken in 1978?

25   A    Because the tank farm is not present on this photo, and,

1    on the '74 photo, the tank farm is in place.

2    Q    Okay.  And can you circle on this photo the area where

3    the tank farm would later appear?

4    A    In there.  Not where the building is, but like right in

5    that area.

6              MR. LYNCH:  Okay.  You can take the photo down.

7              DOCUMENT TECHNICIAN:  (Complied with request.)

8    BY MR. LYNCH:

9    Q    And the last photo you referred to from this time frame

10   was a 9/15/79 photo from USDA?

11   A    That's correct.

12             MR. LYNCH:  Julianne, can you please pull up

13   Admitted Exhibit 5030?

14             DOCUMENT TECHNICIAN:  (Complied with request.)

15   BY MR. LYNCH:

16   Q    Mr. Sullivan, is that identical to the paragraph you

17   obtained from USDA?

18   A    Yes, it is.

19   Q    And during your investigation of the Lockwood site, did

20   you obtain any other photographs from that time frame, 1975 to

21   1980?

22   A    No.

23             MR. LYNCH:  You can take that photo down.

24             DOCUMENT TECHNICIAN:  (Complied with request.)

25             MR. LYNCH:  Can you please pull up Admitted

1    Exhibit 2553?

2              DOCUMENT TECHNICIAN:   (Complied with request.)

3         (Discussion off the record at counsel table.)

4              MR. LYNCH:   I'm sorry; 2533.

5              MR. GROSSBART:   I'm sorry, Mr. Lynch; would you

6    repeat the number, please?

7              MR. LYNCH:   2533.

8    BY MR. LYNCH:

9    Q    Mr. Sullivan, this is a November 4, 1975 photo the

10   parties have stipulated was produced to Soco by USF&G in 2005.

11   Did you have this photograph in your possession at any time

12   during your investigation of the Dyce Chemical facility in the

13   Lockwood solvent site?

14   A    No, I did not.

15   Q    Okay.  When was the first time you saw this photograph?

16   A    I believe about two years ago.

17   Q    You can see in the photograph between the rail spur and

18   the tank farm, there's a green line, and there's another green

19   line labeled "ditch," and I'll try and trace it on the

20   photograph.  That area generally.  Did you see where I was

21   referring to?

22   A    I did.

23   Q    On any of the photographs you obtained in connection with

24   your investigation, had you seen that ditch depicted east of

25   the rail spur and west of the tank farm berm?

1    A    No.

2    Q    Mr. Sullivan, did you ever tell DEQ or EPA that they

3    should investigate someone other than Dyce Chemical as a

4    possible source for the perc contamination that you had found

5    in the northwest corner area of the site?

6    A    We asked for additional investigation.

7    Q    And did you ask of a particular, different property?

8    A    Yeah.  The northwest corner impacts are right on the

9    property boundary with Keller Trucking.

10   Q    Keller Trucking, where is Keller Trucking located?

11   A    Just to the west.

12          MR. LYNCH:  Please pull up Proposed Exhibit 4721,

13   and go to the second page, please.

14          DOCUMENT TECHNICIAN:  (Complied with request.)

15   BY MR. LYNCH:

16   Q    Mr. Sullivan, can you identify what this document is?

17   And if it helps, I can give you a paper copy.

18          May I approach, Your Honor?

19          THE COURT:  Yes.

20   BY MR. LYNCH:

21   Q    (Handing.)

22   A    Yes.  After we asked for additional investigation of that

23   area, of the northwest area, both our property and Kuck, EPA

24   or the MDEQ, actually, at that time agreed and produced a work

25   plan, and these are our comments on that work plan.

1           MR. LYNCH:  Okay.  We'd move its admission, Your

2    Honor.

3           MR. GROSSBART:  I have no objection.

4           THE COURT:  What is the number?  Forty-seven --

5           MR. LYNCH:  4721.

6           THE COURT:  4721 is admitted.

7       (Exhibit 4721 was received in evidence.)

8    BY MR. LYNCH:

9    Q    I direct your attention, Mr. Sullivan, to page 2 of this

10   document, the page that's currently on the screen.

11          And, Julianne, if you could please pull out the paragraph

12   that starts with "Numerous data" and go down to the paragraph

13   that ends just before "geoprobe investigation data"?

14          DOCUMENT TECHNICIAN:  (Complied with request.)

15   BY MR. LYNCH:

16   Q    Mr. Sullivan, this portion of the document lists various

17   data that you reviewed in connection with your investigation;

18   is that correct?

19   A    Excuse me?  I was reading this.

20   Q    I'm sorry.  This portion of the document lists some of

21   the various data that you reviewed in connection with this

22   document.

23   A    That's correct.

24   Q    And that's listed there.  We won't read it.

25          The final sentence says, "In summary, the RI has not

1    adequately investigated potential sources, particularly Keller

2    Transport and Kuck Trucking."

3        So is this one of the documents, Mr. Sullivan, in which

4    you're asking EPA -- asking DEQ to investigate Keller as a

5    potential source of the northwest corner?

6    A    Yes.

7            MR. LYNCH:  Would you go to the next page, please,

8    and pull out the paragraph that begins with "Soil analytical

9    data"?

10           DOCUMENT TECHNICIAN:  (Complied with request.)

11   BY MR. LYNCH:

12   Q    Mr. Sullivan, in this paragraph, are you providing the

13   DEQ with the basis for asking them to investigate Keller?

14   A    Yes.

15   Q    I won't have you read the whole paragraph, but can you

16   just tell me, what was the basis for your request to EPA to

17   investigate Keller as a potential source of the northwest

18   corner?

19   A    We couldn't find how that PCE got to be in that area.  It

20   was much different than anything we'd seen in the chemical

21   storage and handling area, the operational area, so we were

22   giving them some technical data to support our request for

23   additional investigation.

24           MR. GROSSBART:  Your Honor, this is now expert

25   testimony.  The exhibit is in.  They can publish it, but it's

309

1  his explanation of it is expert testimony.

2         THE COURT:  Well, probably is, except I'd rather

3  have him give a short explanation than read every sentence in

4  there, which he'd be entitled to do since it's in evidence.

5  So it's overruled.

6         MR. LYNCH:  Okay.

7  BY MR. LYNCH:

8  Q    Mr. Sullivan, can you just summarize what the reasons

9  were you were telling EPA to investigate Keller?

10 A    It didn't match the chemical signature of the chemical

11 storage and handling area.

12 Q    What didn't match?

13 A    The perc that we found in the northwest area.

14 Q    What was the difference in the chemical signature?

15 A    The chemicals that had been found in the tank farm area

16 were much different, different families of chemicals in

17 addition to the chlorinated solvents.  They included a lot of

18 BTEX, which is benzene, toluene, ethylbenzene, and xylenes,

19 which is sometimes referred to as a distributor's profile, a

20 chemical distributor profile.  We didn't see that same profile

21 at all down in the northwest area, and the concentrations of

22 PCE in the northwest area were orders of magnitude above what

23 we saw in the tank farm area.

24         MR. LYNCH:  You can close out of that document,

25 Julianne.

1          DOCUMENT TECHNICIAN:  (Complied with request.)

2  BY MR. LYNCH:

3  Q    Mr. Sullivan, in connection with your work on the

4  Lockwood solvent site, did you ever tell EPA or the *Weiss*

5  action plaintiffs that you couldn't attribute the northwest

6  corner contamination that you found to Dyce Chemical's

7  operations?

8  A    Yes.

9          MR. LYNCH:  Can we go back to Admitted Exhibit 2558,

10 please?

11         DOCUMENT TECHNICIAN:  (Complied with request.)

12 BY MR. LYNCH:

13 Q    And, Mr. Sullivan, showing you 2558, which, again, is

14 responses you'd answered under oath to an EPA request for

15 information -- turn to page 19 of that exhibit, please,

16 Julianne.  Pull out the second paragraph.

17         DOCUMENT TECHNICIAN:  (Complied with request.)

18 BY MR. LYNCH:

19 Q    The final two sentences of that paragraph, Mr. Sullivan,

20 state, "The impacts near the Keller/Brenntag property boundary

21 do not exhibit significant concentrations of aromatic

22 constituents.  Thus, is it reasonable to conclude that the

23 impacts in the chemical handling area are from a distinctly

24 different source than the impacts near the Keller/Brenntag

25 property boundary."

1      Again, is that the basis for you telling EPA that you

2  couldn't attribute the northwest corner contamination to Dyce

3  Chemical's operations?

4          MR. GROSSBART:  Leading and expert testimony again.

5          THE COURT:  I will overrule the leading.  Sustained

6  on the second.

7  BY MR. LYNCH:

8  Q    Mr. Sullivan, did the EPA respond to your requests for

9  additional investigation on the Keller property as a potential

10 source of the northwest corner contamination?

11 A    They did.

12 Q    And what did they do?

13 A    They said, "We're not going to do any more investigation.

14 It's time to move to the cleanup phase."

15         MR. LYNCH:  Can you just pull up Proposed

16 Exhibit 4757?

17         DOCUMENT TECHNICIAN:  (Complied with request.)

18 BY MR. LYNCH:

19 Q    Mr. Sullivan, can you identify this document?

20 A    I believe that's our comments to the DEQ's remedial

21 investigation report.

22 Q    Could you look at it?  Maybe I can give you a paper copy.

23 A    Yeah.  I can't see it very clearly on here.

24         MR. LYNCH:  May I approach, Your Honor?

25         THE COURT:  Yes.

1    BY MR. LYNCH:

2    Q    (Handing.)

3    A    Really couldn't see clearly.

4         This is their, MDEQ's, response to our comments on the RI

5    report.

6              MR. LYNCH:  We'd move its admission, Your Honor.

7              MR. GROSSBART:  No objection.

8              THE COURT:  4757 is admitted.

9         (Exhibit 4757 was received in evidence.)

10   BY MR. LYNCH:

11   Q    Mr. Sullivan, what's the date of this letter from MDEQ to

12   you?

13   A    August 3, 2004.

14             MR. LYNCH:  Julianne, could you please turn to

15   page 2 of the exhibit?  And please pull out the paragraph that

16   begins with, "Keller Transport."

17             DOCUMENT TECHNICIAN:  (Complied with request.)

18   BY MR. LYNCH:

19   Q    The final two sentences of the paragraph, Mr. Sullivan,

20   read, "Monitoring wells installed during the RI historical

21   direct push results, including those of 2003, and soil and

22   groundwater data from Brenntag's own investigations indicate

23   the highest contaminant concentrations are on Brenntag's

24   property and does not identify a source of contamination on

25   the Keller property."

1      Was this the DEQ's final word to you on Keller as being a

2  potential source for the northwest corner contamination?

3  A    I believe it was.

4  Q    So once the DEQ told you that the northwest corner

5  contamination was definitely coming from Dyce Chemical, did

6  you go back and do any further investigation to see what you

7  might have missed, where was this coming from?

8  A    No.

9  Q    And that was in mid 2004.  Since then, have you been

10 asked to do any further investigation into a potential source

11 for the northwest corner contamination that you discovered --

12 A    No.

13 Q    -- or northwest corner contamination?

14 A    No.

15 Q    I believe you earlier testified that you wouldn't need

16 permission to conduct sampling on the Dyce Chemical property

17 itself; is that correct?

18 A    That's correct.

19 Q    Is that still the case?

20 A    Yes.

21 Q    Has Soco asked you to conduct any additional sampling on

22 that site?

23 A    No.

24 Q    To your knowledge, has either of the insurance companies

25 asked that additional sampling be conducted on that site?

1  A      No.

2  Q      Mr. Sullivan, throughout your work on the Lockwood

3  solvent site, you fully cooperated with the DEQ and EPA?

4  A      Yes.

5  Q      Have you answered their requests for information

6  truthfully and accurately and to the best of your knowledge,

7  given the information you had at that time?

8  A      Yes.

9  Q      Did you also share your reports and information regarding

10 your assessments and conclusions as to the contamination on

11 the Dyce Chemical property with Dyce Chemical's insurance --

12 with Soco's insurance companies?

13 A      We did.

14 Q      Are you continuing to work with the DEQ and EPA on the

15 cleanup of the Dyce Chemical property?

16 A      Yes, we are.

17 Q      And has that been a consistent goal of yours since you

18 were first hired in 2001?

19 A      Yes.

20 Q      And does that specifically include cleanup of the

21 northwest corner contamination?

22 A      Yes.

23 Q      And was that a principal focus of your work even when you

24 were questioning whether Dyce Chemical was the source of that

25 contamination?

1    A    Yes.  We were doing pilot testing and remediation even

2    when we didn't know what the source was.

3           MR. LYNCH:  I have no further questions.

4           THE COURT:  You may cross.

5                        CROSS-EXAMINATION

6    BY MR. GROSSBART:

7    Q    I want to -- we met before, I believe, did we not,

8    Mr. Sullivan --

9    A    We did.

10   Q    -- out at the site?

11        Good morning.

12        Can we go to Admitted 5051, please?

13           DOCUMENT TECHNICIAN:  (Complied with request.)

14   BY MR. GROSSBART:

15   Q    You recognize this photo, do you not, Mr. Sullivan, as a

16   May 2004 aerial photograph of the Dyce plant as of that time?

17   A    Yes.

18   Q    And in 2004, you'd already been hired, and you might have

19   even been there on this very day.  Certainly you were there in

20   that period of time, right?

21   A    That's correct.

22   Q    I want to try to understand a little bit about how this,

23   this site is laid out.  And would you agree with me that at

24   least on this photo, the loading and unloading area, as it's

25   been commonly referred, is roughly in through there?  I'll put

316

1    my -- try to put my finger on it.  Is that a fair statement?

2    A    Yeah.  I think, yeah.  Right -- can I do that a little

3    bit?

4    Q    Thank you very much.

5    A    Right in that breezeway area?

6    Q    Yeah.  I mean, I had to compensate for where it's good.

7         All right.  Now why don't we take and put up, Neil, if

8    you would, 3674, page 1.  I believe that's also admitted.

9              DOCUMENT TECHNICIAN:  (Complied with request.)

10   BY MR. GROSSBART:

11   Q    Now this is a photo even more current than the one we saw

12   before, isn't it?

13   A    Yes, it is.

14   Q    Have you seen these photos before?

15   A    No, I have not.

16   Q    You recognize that as what has been commonly referred to

17   as the lower warehouse?

18   A    Yes.

19             MR. GROSSBART:  All right.  Neil, just toggle back

20   to 5051, if you would, the photo.

21             DOCUMENT TECHNICIAN:  (Complied with request.)

22   BY MR. GROSSBART:

23   Q    That's right there, isn't it?  That's that building,

24   isn't it?

25   A    Yes.

1          MR. GROSSBART:  All right.  Neil, back to the photo,

2    please.

3          DOCUMENT TECHNICIAN:  (Complied with request.)

4    BY MR. GROSSBART:

5    Q    And you see here that in front of the lower warehouse,

6    it's concrete, at least at the time of this photo, which is

7    from last year?

8    A    Yes.

9    Q    All right.  I think that's stipulated to.

10         But you understand historically, based upon your work,

11   that many years ago that was asphalt, correct?

12   A    Yes.

13         MR. GROSSBART:  All right.  This has not been

14   admitted yet, Your Honor.

15         Put up page 17, Neil, of Exhibit 3660.

16         And I would move its admission.  It's a photo taken

17   on one of our visits.  I don't know if there's any objection

18   to it.

19         MR. LYNCH:  No objection.

20         MR. GROSSBART:  All right.  Just this page.

21         THE COURT:  3660 is admitted.

22      (Exhibit 3660 was received in evidence.)

23   BY MR. GROSSBART:

24   Q    And again, you see the lower warehouse in this photo but

25   a farther-away view?

1   A     Yes.

2   Q     All right.  And all this in here, that's asphalt,

3   correct?

4   A     I believe so.  It's kind of gravelly.  There's some

5   gravel areas and some asphalt.  I can't -- it looks like

6   asphalt, but I'm not positive.

7   Q     Okay.  All of the times you've been out there, you don't

8   know if it's asphalt?

9   A     Well, I don't know where, exactly where this picture is

10  taken.  I know there's some gravel areas right immediately

11  adjacent.

12  Q     Well, let me ask you this.  Do you know that the concrete

13  transitions to asphalt right there?

14  A     Yes.

15  Q     Okay.  Fair enough.

16        And now would you put up, please, Neil, page 26 of 3674?

17             DOCUMENT TECHNICIAN:  (Complied with request.)

18             THE COURT:  Is that admitted?

19             MR. GROSSBART:  That is admitted, Your Honor.

20  Page 26 of 3674.

21             DOCUMENT TECHNICIAN:  (Complied with request.)

22  BY MR. GROSSBART:

23  Q     And you recognize this, sir, as the back of the lower

24  warehouse that we've just been talking about?

25  A     Yes.

319

1    Q    Right?

2    A    Yes.

3    Q    And this little alleyway that's featured on this photo

4    would be to its immediate north?

5    A    Yeah.  It's north and west of the breezeway area.

6    Q    I'm sorry, sir?

7    A    Yes, north and west of the breezeway area.  Is that what

8    your question is?

9    Q    Well, this wall of the warehouse is best described, if

10   you only have four directions to choose from, that would be

11   the north wall?

12   A    Yes.

13          MR. GROSSBART:  Okay.  And if you go back to

14   Exhibit, toggle back to Exhibit 5051, Neil, please.

15          DOCUMENT TECHNICIAN:  (Complied with request.)

16   BY MR. GROSSBART:

17   Q    What we're seeing there, and I don't know if it's going

18   to come out, but we're seeing in through there.  And I'm going

19   to take that off.  But that's where we were looking just now,

20   right?

21   A    Generally, yes.

22   Q    And you can see, on this photo, a railroad track or spur,

23   and it even looks like there's a tanker car on the tracks?

24   Fair statement?

25   A    Yes.

1  Q     All right.  So going back to page 26, Neil, of 3674,

2  that's, in fact, the railroad tracks --

3  A     Yes.

4  Q     -- that I just pointed out.

5        And you said you saw a photo for the first time.

6  Mr. Lynch put it up.  It was Exhibit 2553, which had a ditch

7  delineated on it.  Do you recall that testimony?

8  A     I do.

9  Q     All right.  I don't need that.  Why don't we go back --

10  thank you.

11        And if I was to transpose that ditch onto this

12  photograph, we'd be talking about something just immediately

13  east of that railroad spur, right?

14  A     Can I look at that photo again?

15  Q     Sure.

16  A     I haven't looked at it that closely.

17           MR. GROSSBART:  2553, if you would put that on.

18  It's the 1975 photo, 2553.

19           MR. BANKER:  2533.

20           MR. GROSSBART:  I'm sorry.  2533.  Thank you, Paul.

21           DOCUMENT TECHNICIAN:  (Complied with request.)

22  BY MR. GROSSBART:

23  Q     The ditch depicted on that particular photo that was

24  commented upon in your earlier testimony is immediately east

25  of the railroad spur, correct?

1    A    Yeah.  I don't -- let's go back to that picture.

2    Q    Sure.  That would be page 26 of 3674.  It may even be

3    under that sidewalk area.

4    A    The sidewalk or even possibly that building on the left.

5    Q    Well, the lower warehouse hasn't moved since 1975, has

6    it?

7    A    No, but I don't believe that that building was in the

8    previous photo, was it?

9    Q    We can look at it.

10        Go back to it.

11             DOCUMENT TECHNICIAN:  (Complied with request.)

12             THE WITNESS:  See, what I did is I looked at those

13   white-type tanks, and I'm guessing the diameter of those are

14   10 or 12 feet so I just quickly --

15   BY MR. GROSSBART:

16   Q    All right.

17   A    -- looked over there and thought it's 8 to 10 feet,

18   probably, east of that rail track, just guessing.

19   Q    Just guessing?  All right.

20        Let's go back to page 26.

21             DOCUMENT TECHNICIAN:  (Complied with request.)

22   BY MR. GROSSBART:

23   Q    So somewhere either next to the tracks, immediately

24   beyond them, or under the sidewalk, or perhaps under this shed

25   is the ditch you saw in the prior photo, right?

1   A      Yes.

2   Q      And this plant is deserted now, right?   There's nothing

3   going on out at the old Dyce facility?

4   A      That's correct.

5   Q      And that's been the case now for, what, two or three

6   years?

7   A      Yeah.

8   Q      All right.   There's nothing going on in that little shed

9   now, is there?

10  A      No.

11  Q      All right.   Have you been inside there before?

12  A      Probably.   I don't -- I haven't been in the buildings

13  that much, but probably.

14  Q      All right.   So maybe it has a concrete floor.   Maybe it

15  doesn't?

16  A      Yeah.

17  Q      It wouldn't be hard to knock out what's ever on that

18  floor surface and look underneath, would it --

19  A      No.

20  Q      -- as far as you know?

21  A      No.   You could sample underneath there.

22  Q      All right.   Let's, let's go to the next -- by the way,

23  let me ask you this.   You, first with Secor and then with ATC,

24  dropped wells or made sampling locations all over the Dyce

25  property.   You weren't just looking in the northwest corner,

1  right?

2  A    No, we primarily looked in the northwest corner.

3  Q    Okay.  But I didn't ask you that.

4       Didn't you take samples from the operational area of the

5  plant itself?

6  A    The only ones that I can recall are a couple that we

7  collected, because they were talking about changing the

8  configuration of their tank farm area, and so we collected

9  some for their operational group.

10 Q    Just a couple?

11 A    Four or five.

12 Q    And -- okay.  Are you sure about that?

13 A    No, I'm not.

14 Q    What kind of samples were those?

15 A    We tested the concrete, and we tested the soils

16 immediately under the concrete.

17 Q    All right.  We'll come back to that.

18 A    Is that the set you're talking about?

19 Q    It may be.

20 A    Okay.

21 Q    It may be.

22      Maxim, your predecessor, you talked about the Maxim

23 report.

24 A    Yes.

25 Q    They were Dyce's consultants before you were hired?

1   A    Yes.

2   Q    And they sampled in the operational area?

3   A    Yes.

4   Q    All right.  And isn't it a fact that between Maxim,

5   before you, and then you, first with Secor and ATC, that

6   Soco's consultants took samples from 70 or 80 different spots,

7   some multiple times, but 70 or 80 different spots alone on the

8   Dyce property?  You wouldn't dispute that, would you?

9   A    I guess that's probably in the ballpark.

10  Q    Okay.  And no one, as of whatever it is, March 2010, has

11  looked in what may have been or is believed to be this ditch

12  area for what's in the soil there or in the groundwater

13  immediately below that, as far as you know?

14  A    Well, just to the left in this photo, there's been quite

15  a bit of sampling, three, four, five points, five between the

16  DEQ and Maxim.  So not in this specific corner, no, but in

17  that area, there's been.

18  Q    I'm talking about on the ditch that you looked at in

19  Exhibit 2533.  Has anyone dropped a sampling mechanism of any

20  kind on that ditch line, to your knowledge?

21  A    I believe there's two that were close to a Maxim sample

22  point and a well by MDEQ.

23  Q    Which ones?

24  A    Do you have a map showing the locations?  They're down

25  next to the -- they're probably in the range of 40 feet to the

1    left, down the ditch from here.

2    Q    All right.  Let's go back to 2533.

3         Tell me, tell me what the locations are, putting aside

4    what the name of the actual number is, where you believe there

5    was ditch testing.

6    A    There -- well, no.  I didn't say there was ditch testing.

7    I said there were samples collected along the line of where

8    you're showing me this ditch.

9    Q    All right.  Okay.

10   A    My recollection is there was sampling -- it's not showing

11   up in the right spot.  You have to draw offset.

12        Okay.  About where that third line is, somewhere in

13   there, my recollection is there's two sample points somewhere

14   in that vicinity.

15   Q    And do they -- and do you recall what they show?

16   A    I believe there were impacts in both of them, yes.

17   Q    Okay.  And you would need to see a plot of the wells in

18   order to tell me what the name of those sampling points are?

19   A    Yes.

20        MR. GROSSBART:  All right.  Can we put up -- bear

21   with me.

22        (Discussion off the record at counsel table.)

23        MR. GROSSBART:  Can you put up stipulated

24   Exhibit 5061?

25        DOCUMENT TECHNICIAN:  (Complied with request.)

1  BY MR. GROSSBART:

2  Q    Do you see -- I know this is a complicated document.  Do

3  you see, do you see the two, I guess, sampling locations you

4  were referring to on this stipulated exhibit?

5  A    Can you have him zoom in on that area?

6         MR. GROSSBART:  Sure.  Neil, would you zoom in --

7  I'm going to just draw it, Neil.  Right in through here.  Zoom

8  in.  Let me get rid of that.

9         DOCUMENT TECHNICIAN:  (Complied with request.)

10        THE WITNESS:  Yeah, I think I was referring probably

11 to BHI and MP-106.

12     (Discussion off the record.)

13 BY MR. GROSSBART:

14 Q    All right.  Now this is a picture, this is the 1975

15 photo.  We've highlighted those --

16        MR. LYNCH:  John, I think this is '77.

17        MR. GROSSBART:  All right.  Fair enough.

18 BY MR. GROSSBART:

19 Q    This is the '77 photo on which these well plots are

20 displayed.  Do you have that in front of you?

21 A    Yes.

22 Q    I've highlighted the ones you've just mentioned, right?

23 A    Yes.

24 Q    All right.  And on this photo, you recognize both of

25 those as the other side of the berm that existed at that time?

1    A    (No response.)

2    Q    The containment berm?

3    A    To the east of what looks to be a berm?

4    Q    Right.  And the ditch you were talking about on

5    Exhibit 2533 was to the west of what looks to be a berm,

6    right?

7    A    I believe so.

8    Q    Okay.  And that's as close, then, as anyone got to

9    testing the ditch depicted on 2533 based upon your going on

10   ten years working on this project?

11   A    Yes.

12          MR. GROSSBART:  Okay.  All right.  Please remove

13   that.

14          DOCUMENT TECHNICIAN:  (Complied with request.)

15          MR. GROSSBART:  Let's go back to page 41 of

16   Exhibit 3674, please.

17          DOCUMENT TECHNICIAN:  (Complied with request.)

18          MR. GROSSBART:  All right.  Now let's go back to 28

19   so we have some continuity here, page 28.

20          DOCUMENT TECHNICIAN:  (Complied with request.)

21   BY MR. GROSSBART:

22   Q    This is looking back towards the lower warehouse, uprail,

23   if you will, on the railroad spur.

24   A    Sure.

25   Q    You recognize that, right?

1    A    Yes, I do.

2    Q    And these tracks, as they existed in this photo, are in

3    exactly the same place they were in the 1975 photo?  You know

4    they haven't been moved laterally, correct?

5    A    Yeah.  I think they've only been extended.

6    Q    They've been extended, but where we're looking now is not

7    the extension part.  These are circa 1970 tracks we're looking

8    at?

9    A    Yes.

10          MR. GROSSBART:  Okay.  And if you'd go to page 73,

11   Neil?

12          DOCUMENT TECHNICIAN:  (Complied with request.)

13   BY MR. GROSSBART:

14   Q    You recognize this as the northwest corner --

15   A    Yes.

16   Q    -- right?

17       And we're looking sort of southwest, are we not?

18   A    We are.

19   Q    And you see sort of a broken-down, chain-link fence?

20   That's the western boundary of the property demarcated by that

21   fence, right?

22   A    Yes.

23   Q    And the other side of the fence is Keller Truck.  You

24   talked about Keller Truck earlier today.  Those are all Keller

25   Truck trucks, or at least on their property?

1    A     Yes.

2              MR. GROSSBART:  Okay.  Now let's go to page 51,

3    please, Neil.

4              DOCUMENT TECHNICIAN:  (Complied with request.)

5    BY MR. GROSSBART:

6    Q     This is a continuation of the tracks from where we left

7    off two pictures ago, isn't it?

8    A     Yes.

9    Q     And you mentioned that the tracks were extended at some

10   later point in time.

11   A     Yes.

12   Q     And what we're seeing here is at least a portion of that

13   extension, are we not?

14   A     That's correct.

15   Q     And generally the ground slopes generally in this area,

16   naturally slopes from the southeast towards the northwest.

17   A     Yes.

18   Q     Okay.  And, indeed, these tracks are sort of going from

19   the southeast to the northwest, broadly and roughly speaking;

20   isn't that a fair statement?

21   A     I think they might be going more north.

22             MR. GROSSBART:  All right.  Well, why don't you put,

23   Neil, put up Exhibit 3059, page 121.

24             DOCUMENT TECHNICIAN:  (Complied with request.)

25   ///

330

1   BY MR. GROSSBART:

2   Q    We saw this -- well, these people here in the courtroom

3   saw this yesterday.  And what I meant to say is, and I don't

4   mean to quibble with you, but basically going --

5   A    No, you're right.

6   Q    -- in the direction of the lay of the land.

7   A    Yes.

8         MR. GROSSBART:  Okay.  So let's go back to the

9   previous photo, Neil.

10        DOCUMENT TECHNICIAN:  (Complied with request.)

11  BY MR. GROSSBART:

12  Q    This is the extension of the tracks going out towards the

13  northwest, and in order to extend the tracks, in later years

14  the company had to add fill because the land was otherwise

15  sloping?

16  A    Right.

17  Q    So in order to make the extension of the railroad spur

18  level, fill had to be added, in fact?

19  A    Yes.

20  Q    And that's what we're seeing here, broken concrete, dirt,

21  whatever, but some sort of fill material or combination of

22  fill materials were added to level off the land so you could

23  add tracks, right?

24  A    Yes.

25  Q    And so whatever ditches or whatever else that used to be

331

1  alongside and underneath that area has sort of been entombed

2  by this fill.  That's a fair statement, isn't it?

3  A    Entombed or destroyed during construction.

4  Q    Well, no one had to dig anything up?  Fill was added

5  here?  Nobody was excavating.

6        MR. LYNCH:  Objection.  The witness wasn't there

7  during that time frame.

8  BY MR. GROSSBART:

9  Q    You can tell that from the photos, can't you, sir?

10 A    Excuse me?

11 Q    You can tell that from the photos, can't you?

12 A    Tell what?

13 Q    That we're not looking at excavation.  We're looking at

14 earth being added, not earth being removed?

15 A    I've been around a lot of earth moving, and you don't

16 just drop it on the surface.  You push it in with Cats.  I

17 don't know.  I can't tell you how it was put there.

18 Q    Yeah.  So all of this fill here was very carefully laid

19 down so you could add the railroad tracks?  Isn't stuff just

20 dumped there in order to build up the tracks?  Isn't that just

21 logical?

22 A    I bet it was pushed in and compacted.

23        MR. GROSSBART:  Okay.  Would you go back to the

24 photo on page 73, Neil?

25        DOCUMENT TECHNICIAN:  (Complied with request.)

1    BY MR. GROSSBART:

2    Q    Is that one of the testing spots?

3    A    That's what we refer to as a stilling well.  It's a piece

4    of plastic that goes down into one of those trenches that I

5    described earlier.

6    Q    For the soil vapor extraction?

7    A    Yes.

8    Q    Those trenches are 11 feet deep, are they not?

9    A    Yes.

10   Q    And the line between the saturated soil and the

11   unsaturated soil out there is, you said, 5 feet, right?

12   A    I said it varied seasonally.

13   Q    Well, varied from what to what?

14   A    Well, I think over time it's varied quite a bit.  When we

15   first got involved here, they said that that area was

16   historically swampy, and when we moved in a drill rig to drill

17   MW-2, it was still fairly swampy.  I think it's varied from

18   near the surface to probably 6 feet, just off the top of my

19   head.

20   Q    All right.  Well, it wasn't, it wasn't 11 feet?  There

21   wasn't water tables of 11 --

22   A    No.

23   Q    -- and 12 feet like you see in the main part of the

24   plant, right?

25   A    No.

1    Q     All right.  So your trenches for your soil vapor

2    extraction went well into the saturated soils?

3    A     Yeah.  They went to the bottom of the fine grain section.

4    Q     Down 11 feet, right?

5    A     Yes.

6    Q     At a time when it's fair to broadly describe the water

7    table at about 5 feet?

8    A     Yes.

9    Q     And it's your testimony that what you were pulling out of

10   those trenches was just in the upper 5 feet?

11   A     Yes.

12   Q     That's not what you told the EPA, though, is it?

13   A     I believe it is.  What I said earlier was that

14   theoretically it's going to pull slight amounts but probably

15   not measurable from below the water table.

16   Q     Didn't you tell the EPA, quote, that volatilization -- at

17   least when the project started and most of the mass was being

18   removed, that quote, "Volatilization of dissolved constituents

19   contributed to the high mass removal rate observed at

20   startup"?  You said that?  Those are your words.  You remember

21   saying that, don't you?

22             MR. LYNCH:  Objection, foundation.  Can we have the

23   document?

24             THE WITNESS:  I said that regarding --

25             THE COURT:  What document are you referring to?

1          MR. GROSSBART:  All right.  Put up Admitted

2    Exhibit 44, page 40, please.

3          THE WITNESS:  I said that in regard to the air

4    sparge or ozone sparge/soil vapor extraction.  This system

5    here that we're looking at, the picture, has never been

6    operated during sparging, so it's apples and oranges.

7          MR. GROSSBART:  Would you put up Exhibit 44 under

8    it, page 40, please?  Why don't we start with the first page

9    of Exhibit 4400.  And go past the cover sheets to, bear with

10   me, page 30.

11         DOCUMENT TECHNICIAN:  (Complied with request.)

12         MR. LYNCH:  Your Honor, I don't show that this

13   exhibit has been admitted.

14         MR. GROSSBART:  Exhibit 4400.  I thought it was

15   admitted.

16         MR. LYNCH:  We have no objection.

17         MR. GROSSBART:  All right.

18         THE COURT:  Then if it hasn't been, it is now.

19      (Exhibit 4400 was received in evidence.)

20         MR. GROSSBART:  All right.

21   BY MR. GROSSBART:

22   Q    So now it's Admitted Exhibit 4400.  This is a report

23   based upon your soil vapor extraction project only, not your

24   sparging project, but your soil vapor extraction, right?

25   A    Okay.

335

1    Q    And this was done in January of 2005?

2    A    (No response.)

3              MR. GROSSBART:  Go to the next page, please, Neil --

4              THE WITNESS:  Yes.

5              MR. GROSSBART:  -- when the report was done.

6              DOCUMENT TECHNICIAN:  (Complied with request.)

7    BY MR. GROSSBART:

8    Q    All right.  And this is the reports of your nonsparging

9    work?

10   A    Yes.

11   Q    All right.  Now I'll go back to my question.

12        Put up page 40, please.

13             DOCUMENT TECHNICIAN:  (Complied with request.)

14             MR. GROSSBART:  And, Neil, we're at the bottom of

15   the page about six lines up, "It is believed."  And highlight

16   beginning with, "It is believed."  That sentence to right

17   before, "because."  Actually just stop right there.

18             DOCUMENT TECHNICIAN:  (Complied with request.)

19   BY MR. GROSSBART:

20   Q    "It is believed that initially volatilization of

21   dissolved constituents contributed to the high mass removal

22   rate observed at startup."  That's what you said, correct,

23   sir?

24   A    Yes.

25   Q    And dissolved constituents are -- you're referring to

336

1   contamination in the saturated zone?  That's what you mean by

2   the reference to "dissolved constituents"?

3   A    That's correct.

4          MR. GROSSBART:  All right.  You can take it down.

5          DOCUMENT TECHNICIAN:  (Complied with request.)

6   BY MR. GROSSBART:

7   Q    That's perc from the saturated zone?  That's what you're

8   talking about there, right?  Not the vadose zone, the

9   saturated zone.

10  A    Yeah.  Just the top thin layer.  When you start up a

11  remediation system, typically you see a kick, a high removal

12  rate.

13  Q    Right.  Well, whatever.  But it's from the saturated

14  zone, not the vadose zone?  That's just true, isn't it?

15  A    It's true for the top section, yes, a thin section.

16  Q    Well, if it's not from the vadose zone, it's from the

17  saturated zone.  I'm not asking if it's from the top of the

18  saturated zone --

19  A    Okay.

20  Q    -- or the middle of the saturated zone, or the bottom of

21  the saturated zone.  It's from the saturated zone.  Under the

22  water table.  Right?

23  A    It's the top of the water table, yes.

24          MR. GROSSBART:  Okay.  Now would you go back to

25  5051, the 2004 photo?  And, Neil, would you please highlight

337

1    or make this bigger?  I'm interested in asking about that

2    area.  Get rid of that.  A little more, if you could, please.

3            DOCUMENT TECHNICIAN:  (Complied with request.)

4    BY MR. GROSSBART:

5    Q    All right.  On this photo, this is the main area of

6    tanks.  You're with me on that?

7    A    Yes.

8    Q    And then immediately beyond those, here, here, and

9    here -- let me get rid of these.  I know these are annoying

10   little marks.  But now let me get rid of those -- there appear

11   to be basins of some sort?

12   A    I think those basins you're talking about are just to the

13   north.  Those three lines you drew across, that's that road

14   just to the north.

15   Q    Well, I was trying not to draw on the basin --

16   A    Okay.

17   Q    -- but basin, basin, basin.

18   A    Correct.

19   Q    That's what I'm talking about.

20   A    All right.

21   Q    Those are some sort of basin, right?

22   A    Yeah, they're the stormwater collection areas for those

23   tank farms.

24   Q    All right.  Those basins collect surface runoff from

25   storms, waterfalls in the tank farm, picks up whatever it's

1    going to pick up?  Collects in the basin?

2    A    That's correct.

3         MR. GROSSBART:  Okay.  And, Neil, if you put the

4    admitted photo from 1987, which I believe is 5042, please?

5    Enlarge the same area, please, right in here.

6         DOCUMENT TECHNICIAN:  (Complied with request.)

7    BY MR. GROSSBART:

8    Q    Sort of a better view, but those are the same basins, are

9    they not?

10   A    I believe so.  They look to be.

11   Q    So those basins go back to at least 1987?  Fair

12   statement, right?

13   A    I believe so.  There's some little things sticking out

14   here that I don't recall, so they may or may not be, but it

15   looks like they're similar.

16   Q    Well, do you have any reason to believe the basins

17   changed between 1987 and 2004, given all of your work?

18   A    I have no information either way on changes, no.

19   Q    Okay.  Let's go back to the 2004 photo, then, and talk

20   about the basins.

21        Neil, could you enlarge on the basins, please?

22        DOCUMENT TECHNICIAN:  (Complied with request.)

23        MR. GROSSBART:  Perfect.

24   BY MR. GROSSBART:

25   Q    How deep are they?

339

1   A     Below the ground surface.

2   Q     Okay.  Can you --

3   A     As compared to what?

4   Q     Well, if I stood on the edge and jumped in, how far down

5   would I go?

6   A     The concrete is about a foot above the surface, and I

7   would guess you would probably go down maybe 3 feet from the

8   top of the concrete, so 2 to 3 feet deep.

9   Q     Okay.  And you went into this basin.  I assume you took

10  the water out and then jacked up the concrete floor to that

11  basin and looked underneath?

12  A     We cut a hole in it and drilled in there.

13  Q     You went through 6 inches of concrete and took a sample,

14  right?

15  A     We did.

16  Q     And you found, on the underside of the concrete, you

17  found perc?

18  A     Yes.

19  Q     Fairly high concentration of perc, too?

20  A     Similar to what Maxim and the DEQ had found in that area.

21  Q     And, well --

22         THE COURT:  Is this a place where we can take a

23  recess?

24         MR. GROSSBART:  This would be fine.  I need a drink

25  of water.

340

1              THE COURT:  Yeah, let's take a brief recess.

2              THE LAW CLERK:  All rise.

3         (Recess taken from 10:08:35 to 10:26:47.)

4         (Open court.)

5         (Jury present.)

6              THE COURT:  Please be seated.

7              Mr. Grossbart, you may continue.

8              MR. GROSSBART:  Thank you, Your Honor.

9              Would you put the 2004 photo, 5051, back up and get

10   everybody squared away here?

11             DOCUMENT TECHNICIAN:  (Complied with request.)

12   BY MR. GROSSBART:

13   Q    We were talking before the break, Mr. Sullivan, about

14   these basins and testing work you had done there.

15        And, Neil, would you expand on this, please, at the basin

16   area?

17             DOCUMENT TECHNICIAN:  (Complied with request.)

18   BY MR. GROSSBART:

19   Q    And the basin where you went in and dug up the concrete,

20   do you recall which of the three it was?

21   A    Yes.  It was the one in the northeast corner.

22   Q    All right.  And you had a report that you did of this

23   work.  I believe it's Admitted Exhibit 4811.  Let's just

24   toggle to that for a minute.

25             MR. LYNCH:  It's not admitted, but there's no

1    objection.

2              MR. GROSSBART:  I apologize.

3              THE COURT:  4811 is admitted.

4         (Exhibit 4811 was received in evidence.)

5    BY MR. GROSSBART:

6    Q    All right.  And that is at least the cover page of the

7    report that describes, among other things, you looking

8    underneath that basin floor; is that correct?

9    A    Yes.

10   Q    Okay.  Let's go back to the photo.  And your report

11   has -- it's a poor copy.

12             Actually, I'm sorry, go back to the report, Neil;

13   specifically, page 6 of the report.  4811-6.

14             DOCUMENT TECHNICIAN:  (Complied with request.)

15   BY MR. GROSSBART:

16   Q    You have -- you recognize this as a very poor Xerox of

17   the plant and where you sampled?

18   A    Yes.

19             MR. GROSSBART:  Okay.  Now if we go back to the

20   photo, 5051, Neil, would you put up our Demonstrative

21   Exhibit 469, page 1?

22             DOCUMENT TECHNICIAN:  (Complied with request.)

23   BY MR. GROSSBART:

24   Q    And would you agree with me that that demonstrative, on

25   the photo, depicts where you sampled?

1    A    I believe it does.

2    Q    All right.  And one of the dots on this photo is red, and

3    that's where you did the sample where you went to the bottom

4    of that basin and dug it up, right?  That's the basin we're

5    talking about?

6    A    Right.  We cut the concrete and drilled through it.

7    Q    Right.  And that is not one of the -- that red dot, that

8    sample, is not within one of the source areas that we've seen

9    on other figures in this trial, is it, that the EPA found?

10   A    (No response.)

11   Q    I'll make it easy for you.

12       Why don't you put up page 2 of this demonstrative.

13       DOCUMENT TECHNICIAN:  (Complied with request.)

14   BY MR. GROSSBART:

15   Q    You see here, right here we've added a dotted line

16   signifying -- Neil, put what's toggled as 3059, page 121.

17       DOCUMENT TECHNICIAN:  (Complied with request.)

18   BY MR. GROSSBART:

19   Q    That area here which we've seen before, let's go --

20   whoops.  Lost my -- the machine has crashed.

21       You see, you recognize this figure from the record of

22   decision?

23   A    Yes.

24       MR. GROSSBART:  And, Your Honor, we're having

25   technical problems here.

343

1          (Discussion off the record.)

2     BY MR. GROSSBART:

3     Q    All right.  You recognize this, Mr. Sullivan, as a figure

4     that the EPA put in, both in its record of decision and, I

5     think, even going back to 2004?  The same figure is in the

6     feasibility study that they did?  You recognize that, right?

7     A    I do.

8     Q    And there are four green areas depicted on this?

9     A    Yes.

10    Q    And the one on the lower right is the main tank farm

11    area?  We're all good so far, right?

12    A    Yes.

13             MR. GROSSBART:  All right.  So, Neil, go to 469,

14    page 2.

15             DOCUMENT TECHNICIAN:   (Complied with request.)

16    BY MR. GROSSBART:

17    Q    And that same green area, you would agree with me, would

18    you not, is, if not exactly, certainly approximately where we

19    have the green dotted area here?

20    A    Yes.

21    Q    Right?

22    A    Yes.

23    Q    Okay.  And the basin where the red dot is is outside that

24    area?

25    A    That's correct.

1  Q    All right.  You drilled down, drained the water.  You
2  chopped up the concrete, which was 6 inches thick at that
3  point, took a soil sample, and it registered for perc --
4  A    Yes.
5  Q    -- right?
6       And was that saturated soil or unsaturated soil at that
7  point?
8  A    Likely unsaturated.
9  Q    Do you know?
10 A    Well, conceivably it could be saturated if it was
11 leaking.  I believe it was unsaturated.
12 Q    Okay.
13 A    It's definitely above the water table.
14 Q    Well, you do believe that that basin was leaking perc
15 into the area immediately below it, don't you?
16 A    There was perc underneath that concrete, yes.
17 Q    And when you dug up the concrete in this basin, which
18 appears for the first time in 1987 -- we saw that photo --
19 there was no liner underneath that concrete, was there?
20 A    No, there wasn't.
21 Q    All right.  And concrete is not going to hold back water
22 forever in a little wastewater swimming pool like this, is it?
23 A    No.
24 Q    The water is going to go through it?
25 A    Yes.

345

1    Q    There's going to be cracks, *et cetera*?  That's just to be

2    expected?

3    A    It happens.

4    Q    Expected and intended, you might say, right?

5    A    It happens.

6             MR. LYNCH:  Objection.  Calls for legal conclusion.

7             THE COURT:  Sustained.

8    BY MR. GROSSBART:

9    Q    Did you report Exhibit 4811, although I'm sure it wasn't

10   called that then, your April 28, 2003 report -- why don't you

11   put that back on, Neil.

12            DOCUMENT TECHNICIAN:  (Complied with request.)

13   BY MR. GROSSBART:

14   Q    Did you give this to the EPA or the Montana DEQ?

15   A    I don't know if it ever was -- I didn't ever give it to

16   them, no.

17   Q    You did not?

18   A    No.

19   Q    Isn't it a fact that -- don't you understand, as an

20   engineer -- by the way, are you a licensed engineer?

21   A    A P.E., no.

22   Q    Do you have any licensure from the State of Montana?

23   A    No, I don't.

24   Q    All right.  Well, do you understand -- so you say you're

25   an engineer.  That's because you say so, or what makes you an

346

1    engineer?

2    A    I have a degree in engineering.  That's why.

3    Q    Okay.  But not a license?

4    A    Correct.

5    Q    Okay.  Do you understand that -- well, you certainly

6    understood in 2003 that this was a Superfund site, correct?

7    A    That's correct.

8    Q    And aren't you, as a matter of state and federal law, at

9    least as you understand it, obligated to turn sampling results

10   such as these over to EPA and/or the Montana Department of

11   Environmental Quality?

12   A    No.

13           MR. LYNCH:  Calls for legal conclusion.  Objection.

14           MR. GROSSBART:  I'm just asking for his

15   understanding, Your Honor.

16           THE COURT:  I didn't hear.  Was there some

17   objection?

18           MR. LYNCH:  My objection is it calls for legal

19   conclusion.

20           THE COURT:  Overruled.

21   BY MR. GROSSBART:

22   Q    You don't?  You're not obligated to turn over results

23   to --

24   A    I don't believe so.

25   Q    Right.  And didn't you testify on direct examination that

347

1  you turned over all of your results?

2  A    These samples were collected for a construction project,

3  or a proposed construction project, not as part of the

4  environmental investigation.

5  Q    Well, whatever the reason for taking the samples, you

6  took them during the time when there was an ongoing EPA and

7  MDEQ investigation, correct?

8  A    Correct.

9  Q    And there was an ongoing EPA/MDEQ investigation into,

10  among other things, perchloroethylene contamination?  You knew

11  that, too, right?

12  A    That's correct.

13  Q    And you found perchloroethylene contamination?

14  A    Yes.

15  Q    Right.  You didn't think that might be a little bit

16  relevant to the EPA or the MDEQ?

17  A    It was consistent with what had been seen there before,

18  and it was for a whole different purpose.

19  Q    Well --

20  A    What we were looking for was to see how we would be able

21  to dispose of the soils if they expanded the tank farm.

22  Q    I understand that, but did you not, did you not at least

23  consider the fact that your discovery of perchloroethylene

24  outside an area that had been or ultimately would be

25  delineated by the EPA as a source area might be relevant to

348

1   them in finalizing their work?  That did not occur to you?

2   A    It was within the contaminated area, and it was

3   consistent, so --

4   Q    All right.  So that area is contaminated, too?

5   A    Correct.

6   Q    So actually what you're telling me -- would you put the

7   ROD figure back up there, Neil?  It's Exhibit 3059-121.

8           DOCUMENT TECHNICIAN:  (Complied with request.)

9   BY MR. GROSSBART:

10  Q    So really, then, what you're telling me is, at least in

11  the main tank farm, this figure, as it delineates in green,

12  understates the contamination?

13          MR. LYNCH:  Objection.  Calls for expert opinion.

14          THE COURT:  Well, I am going to overrule it.

15  BY MR. GROSSBART:

16  Q    Does it understate the area of source in the main tank

17  farm, in your -- based upon your work?  I know you're not an

18  expert.  Based upon your work?

19  A    Yes.

20  Q    It's understated?  There's more there than the EPA

21  depicted in this photo or diagram?

22  A    Possibly, yes.  Probably, yes.

23  Q    All right.  Among other things, confirmed by, if nothing

24  else, the report you did not give to the EPA or the MDEQ?

25  A    Sure.

1   Q    Now you talked about some photos that you had over the

2   course of time when you did your work, and you made it a point

3   on direct examination to tell us that you did not have

4   Exhibit 2533, the 1975 photo that somebody had labeled with a

5   ditch.  Right?

6   A    Yes.

7   Q    Isn't it a fact that at least by early 2003, you had

8   photos from 1959, 1969, 1971, 1974, 1973, 1972, and 1978; and

9   beyond, but I'll focus on those.  That's all true, isn't it?

10  A    We had one that was labeled -- all the rest, yes.  The

11  '78 one was labeled '78, but it turned out not to be '78.

12  Q    It turned out.  Okay.  And that was the '73 photo, so

13  I've got them all right except 1978?  I amend that to read

14  1973.

15  A    I believe so.

16  Q    You had all those photos?

17  A    I believe so.

18  Q    Right.

19  A    Without looking at the list, that sounds right.

20  Q    And you had known all along about the natural slope of

21  the property from southeast to northwest because you told me

22  that a few minutes ago, right?

23  A    Yes.

24  Q    And so for you, the clincher was 2533?  Is that what

25  you're telling the ladies and gentlemen of the jury?

1    A    The clincher for what?

2    Q    Understanding -- let me withdraw the question.

3        Did Exhibit 2533, did you mean to tell us in direct

4    examination that Exhibit 2533 told you something you did not

5    already know?

6    A    Yes.

7    Q    And whatever that is, you, with all your training, you

8    couldn't glean that from all of the interviews you had done

9    and all of the photos you already had and what you knew about

10   the topography; is that right?

11   A    That's correct.  There was never a photo that showed a

12   pathway that we could see to get from that area down to the

13   northwest corner.

14   Q    So you couldn't see that pathway in any of those other

15   photos?

16   A    That's correct.

17   Q    And all of the old, long-time employees who had been

18   working there back in the '70s who you had spoken with,

19   basically their own backyard, did not give you that

20   information, either?

21   A    I only spoke with a couple of them, and none of them

22   reported a ditch there, no.

23   Q    One of them was Mr. Colver, though, right?

24   A    I believe it might have been.

25   Q    As a matter of fact, you know he was deposed in the *Weiss*

351

1  case.  You read his deposition?

2  A    Oh, I've read several depositions.  I read more

3  depositions than I interviewed folks.

4  Q    All right.  I'm glad you mentioned that.  Because in the

5  *Weiss* case, which was another lawsuit, you did a report that

6  was provided by the lawyers at the time representing Soco or

7  Brenntag.  You did a report for them that they provided to the

8  other side to defend Brenntag in that case --

9  A    Yes.

10 Q    -- do you recall that?

11      That was March of 2003.

12 A    Yes.

13 Q    And by that time, in order to do that work, you prepared

14 yourself for doing that work by reading a lot of depositions.

15 A    Yes.

16 Q    And a lot of depositions were taken in that case over

17 2001 and 2002.  They were given to you, and you scoured them?

18 A    I read them, yes.

19 Q    And you had the photos, and you had all that testimony.

20 A    Yes.

21 Q    As of 2003, right?

22 A    That's correct.

23 Q    Isn't it a fact that, in your report in that case, you

24 opined, in a way that you expected to testify to in court,

25 that had there been any kind of spill or release in the

1  loading and unloading area of the plant, it would have flowed

2  to the catch pond?

3         MR. LYNCH:  Objection.  Foundation.  Show the

4  witness the document.

5         THE COURT:  Overruled.

6  BY MR. GROSSBART:

7  Q    Didn't you say that?

8  A    Every air photo that I had reviewed --

9  Q    Sir, I just asked you if you said that in your report.

10 A    Oh.  Yes, I did say that.

11 Q    Now you testified in direct about how you worked closely

12 with the EPA and weren't trying to hold anything back and so

13 forth.  Do you remember that?

14 A    Yes.

15 Q    All right.  Well, putting aside Exhibit 4811, which you

16 didn't give them, isn't it a fact that on several occasions

17 you expressed in writing to the EPA that you believed that

18 they were being biased and unfair towards Soco?

19 A    I don't think I ever used any words like "biased" or

20 "unfair," no.

21        MR. GROSSBART:  Exhibit 4516.  Any objection?

22        MR. LYNCH:  Can I see it?

23        MR. GROSSBART:  Would you put up 4516, please?

24        DOCUMENT TECHNICIAN:  (Complied with request.)

25        MR. GROSSBART:  I think there's no objection to this

353

1  written down, but --

2           THE CLERK:  Is it admitted?

3           MR. GROSSBART:  It's not admitted, but before I

4  display it to the witness, I want to be sure we have --

5           MR. JOHNSON:  There's no objection.

6           MR. MICKELSON:  There's no objection.

7           MR. LYNCH:  We don't have objection, Your Honor.

8           THE COURT:  4516 is admitted.

9       (Exhibit 4516 was received in evidence.)

10          MR. GROSSBART:  All right.  Neil, please put up

11  page 3, third full paragraph.  Please yellow the first

12  sentence only.

13          DOCUMENT TECHNICIAN:  (Complied with request.)

14  BY MR. GROSSBART:

15  Q   I'll paraphrase it to save time:  The RI is not focused

16  on identifying additional sources at the site but, rather,

17  appears to be biased and incomplete, focusing primarily on

18  Brenntag and Beall.  That's what you said.

19  A   I think we're using "biased" in two different contexts.

20  Q   All right.  Well, maybe so, but you said "biased"?

21  Right?

22  A   I used "bias" in a completely different context than what

23  you're using it as.

24  Q   All right.  In your *Weiss* report that you did in that

25  case, you said that the MDEQ's investigations were flawed.  Do

354

1    you recall saying that?

2    A    I do.

3    Q    Okay.  Does that mean the same as "biased," or is that a

4    little hotter --

5    A    No.

6    Q    -- if you will?

7    A    "Biased," here the discussion was where the sampling

8    ports are.  It's a spatial description.  "Flawed" is

9    completely different.

10   Q    "Flawed" is worse?

11   A    Yeah.

12   Q    Okay.  Now you, I think, testified on direct that

13   sometime around 2003, you, on behalf of Soco, proposed to the

14   regulatory agencies that Soco be allowed to commence what you

15   refer to as a full-scale ozone sparge/soil vapor extraction

16   project.

17   A    Yes.

18   Q    And they told you no, right, the EPA, the regulatory

19   agencies?

20   A    Yes, they did.

21   Q    And they told you no because they thought that would make

22   things worse or more difficult to control, right?

23   A    They said that there was a concern that it could cause

24   spreading of contamination.

25   Q    That's their technical way of saying it could make things

1   worse rather than better for the area in question, right?  You

2   understood that?

3   A    That was a technical disagreement between us and the EPA.

4   Q    Yeah, I understand it was an agreement.  And you thought

5   it would make things better, and the EPA and the Montana

6   Department of Environmental Quality thought, on balance, it

7   would make things worse, correct?

8   A    Yes.

9   Q    Okay.  And then you did your soil-vapor-extraction-only

10  project on the Dyce property, or Soco property.  Right?

11  A    Yes.

12  Q    And that's where you, through almost a vacuuming-like

13  process, sucked vapor out of these 11-feet-deep trenches that

14  were cut into the ground at the facility?

15  A    No.

16  Q    Well, it involves 11-foot-deep trenches cut into the

17  ground?

18  A    It involves it, yes.

19  Q    And there's piping put in those trenches?

20  A    At the top of those trenches, yes.

21  Q    And the piping is designed to collect vapor?

22  A    That's correct.

23  Q    And through a mechanical process, I don't want to get too

24  complicated here, the vapor is collected, and contaminants are

25  removed via this piping?

1    A    Yes.

2    Q    Okay.  And while the EPA and MDEQ allowed that to go

3    forward, isn't it a fact that they never approved it?  They

4    never put their seal of approval on that, right?

5    A    They didn't seal-approve anything all over the site.

6    They sent out a letter right at the beginning of the project,

7    of it becoming -- I don't even believe it was a Superfund site

8    yet.  It may have been.  It was right at probably 2000, 2001.

9    It said they'll review work plans, but they would not approve

10   anything, and that applied to everybody across the site, not

11   Brenntag or Beall, anybody who did assessment.

12   Q    And late in the game, in 2004, they gave you a letter to

13   that effect, specifically with regard to your soil vapor

14   extraction project only.  Do you recall that?

15   A    That's correct.

16   Q    They said, "Do what you want, but we're not approving

17   it"?

18   A    Yes.

19   Q    I think you testified earlier on direct examination that

20   you understood, based upon your communications with EPA and

21   Montana DEQ, that within the boundaries of Soco's property

22   proper, you were free, as ATC and then Secor before that, to

23   sample wherever you wanted?

24   A    That's correct.

25   Q    And had you wanted to drill a sample location on wherever

357

1    it is you thought this ditch was, nothing by way of the EPA or

2    Montana Department of Environmental Quality prevented that

3    from happening, correct?

4    A    Correct.

5         MR. GROSSBART:  I have nothing further.

6         THE COURT:  Any redirect?

7         MR. LYNCH:  Yes, Your Honor, briefly.

8                    REDIRECT EXAMINATION

9    BY MR. LYNCH:

10   Q    Mr. Sullivan, I believe on your direct examination you

11   testified that during the course of your work connected with

12   the Dyce Chemical site, you had been in communication with and

13   sharing information with Soco's insurance companies; is that

14   correct?

15   A    That's correct.

16   Q    And for how many years have you been doing that?

17   A    Since before we even started.  We shared what we had

18   found before we started drilling, information from interviews,

19   so that would have been from late 2001.  Or, no, even before

20   that.  Mid 2001.

21   Q    And, more recently, you even showed their experts around

22   the Dyce Chemical site; is that correct?

23   A    That's correct.

24   Q    In all those years, has anyone from the insurance company

25   requested that any additional sampling be conducted on the

1    Dyce Chemical site?

2    A     No.

3    Q     I direct your attention to, admitted now, Exhibit 4440.

4          Pull that up please, Julianne.

5             DOCUMENT TECHNICIAN:  (Complied with request.)

6             MR. LYNCH:  I'm sorry.  4400.

7             DOCUMENT TECHNICIAN:  (Complied with request.)

8    BY MR. LYNCH:

9    Q     Mr. Sullivan, this, again, is the comments to MDEQ that

10   attached your soil vapor extraction plan.

11         I want to direct your attention -- would you go to

12   page 40 of that exhibit, please?  And pull out paragraph 3.4.

13            DOCUMENT TECHNICIAN:  (Complied with request.)

14   BY MR. LYNCH:

15   Q     Mr. Sullivan, this is the paragraph Mr. Grossbart just

16   showed you, suggesting that the system was pulling VOCs from

17   the saturated zone.  I direct your attention to the sentence

18   in the middle where it states, "It is believed that initially

19   volatilization of dissolved constituents contributed to the

20   high mass removal rate observed at startup."

21         Why the qualification using the term "initially"?

22   A     Because only at startup do you see that effect.  When you

23   first dig these trenches and put these pipes in, you're

24   exposing the fresh groundwater surface at the full

25   concentration of the dissolved phase.  As soon as you start

1   that up, you start transferring mass from that very top level,

2   and you see that in your, in your off-gas.  But the mass

3   transfer rate between -- what we call the mass transfer rate,

4   but really it's the rate that CVOCs will transfer from being

5   dissolved to bubble, to come out of solution, is really low,

6   so it's only a short period of time, and it only affects the

7   very top of the water table.

8   Q    Okay.  I direct your attention to page 19 of that same

9   exhibit.

10       And could you enlarge the chart on that, please,

11  Julianne?

12           DOCUMENT TECHNICIAN:  (Complied with request.)

13  BY MR. LYNCH:

14  Q    And, Mr. Sullivan, that chart is labeled, "Comparison of

15  Remedial Alternatives for the Brenntag Operation Unit."  Is

16  that a comparison of what DEQ was proposing at the time and

17  what you were proposing?

18  A    Yes, it is.

19  Q    In the row for northwest corner source area, you're

20  proposing SVE trenches for vadose zone and something else for

21  the saturated zone; is that correct?

22  A    That's correct.

23  Q    And in the tank farm source area, both you and DEQ are

24  proposing soil vapor extraction for the vadose zone but

25  something different for the saturated zone; is that correct?

1  A     That's correct.

2  Q     Is that because soil vapor extraction is not a viable

3  method to remove chlorinated solvents from the saturated zone?

4  A     Not by itself.

5         MR. GROSSBART:  That's clearly asking for an expert

6  opinion.

7         THE COURT:  Overruled, but I'm having a hard time

8  seeing the exact relevance of this.

9         MR. LYNCH:  Go to page 49 of this exhibit, please.

10        DOCUMENT TECHNICIAN:  (Complied with request.)

11 BY MR. LYNCH:

12 Q     Mr. Sullivan, Mr. Grossbart was asking you about what was

13 removed during the soil vapor extraction.  Is this a chart

14 indicating the mass of chlorinated solvents that you had

15 removed via that system?

16 A     Yes, it is.

17 Q     And how did you measure those amounts?

18        MR. GROSSBART:  Objection.  Irrelevant and expert

19 opinion, and I did not go into this.

20        THE COURT:  Sustained.

21 BY MR. LYNCH:

22 Q     Mr. Sullivan, Mr. Grossbart asked you about a few

23 statements you had made in your expert report in the *Weiss*

24 action.

25        And, Julianne, could you please pull up that report?  But

1    let's not show it to the jury.  I'm sorry; it's 2551.

2             DOCUMENT TECHNICIAN:  (Complied with request.)

3    BY MR. LYNCH:

4    Q    And although Mr. Grossbart --

5             THE CLERK:  Don't want it.

6    BY MR. LYNCH:

7    Q    -- didn't show you this report during the direct, is this

8    the expert report --

9             THE CLERK:  We don't want it.

10            THE REPORTER:  I'm sorry; hang on just a minute.

11            THE CLERK:  We don't want it to the jury.

12            THE REPORTER:  Your question again?

13   BY MR. LYNCH:

14   Q    Okay.  Although Mr. Grossbart didn't show you your actual

15   report during the direct, is this the report that you were

16   speaking about?

17   A    (No response.)

18            MR. LYNCH:  Go to page 2, please, Julianne.

19            MR. GROSSBART:  Your Honor, this was objected to.

20   They objected to this coming into evidence.  I impeached him

21   with it.  Now he's --

22            MR. LYNCH:  -- rehabilitating him at the same time.

23            MR. GROSSBART:  Well, is it being shown?  Is it in

24   or is it out?

25            MR. LYNCH:  No, we don't want it shown to the jury.

1   This is just so he has it.

2            (Discussion off the record at counsel table.)

3            MR. GROSSBART:  I still don't think it's proper.  If

4   he wants to refresh his recollection with the exhibit, that's

5   one thing, but --

6            THE COURT:  Well, I don't -- did you use it?

7            MR. GROSSBART:  I used it.  I used it in the sense

8   that, "Isn't it a fact that you said in the *Weiss* case" -- X,

9   Y, Z.

10           THE COURT:  Impeached, or at least that's what the

11  purpose was.

12           MR. GROSSBART:  Correct.  Yes, Your Honor.

13           THE COURT:  I'll allow it.  You're going to try and,

14  if there was impeachment, rehabilitate him?

15           MR. LYNCH:  Yes, Your Honor.

16           THE COURT:  Go ahead.

17           MR. LYNCH:  Go to page 21 of the exhibit, please,

18  Julianne.

19           DOCUMENT TECHNICIAN:  (Complied with request.)

20  BY MR. LYNCH:

21  Q   Mr. Sullivan, Mr. Grossbart asked you generally whether,

22  in your report, you stated that all releases and spills from

23  the site would flow to the catch pond.  I direct your

24  attention to the first bullet point on that page under the

25  heading "Other Potential Sources."  Do you see where I'm

1   referring to?

2   A    Yes.

3   Q    Isn't it a fact that what you actually said was the

4   former catch pond located in the northwestern portion, or

5   where rinseate from spills and leaks at the tank farm and

6   unloading and drumming areas was routed --

7            MR. GROSSBART:  Your Honor, he's not allowed to do

8   it that way, by leading him, by reading it.

9            THE COURT:  Sustained.

10           Show it.  Have him read it and ask him if it

11  refreshes his recollection.

12  BY MR. LYNCH:

13  Q    Does this refresh your recollection as to what you

14  actually said?

15           THE WITNESS:  Yeah.  Can you zoom that?  I can't see

16  it here very good on here.  Please.

17           DOCUMENT TECHNICIAN:  (Complied with request.)

18           THE WITNESS:  Yes, it does.

19  BY MR. LYNCH:

20  Q    Okay.  And did you say that, throughout the entire

21  history of this site, spills and releases would flow to the

22  catch pond?

23           MR. GROSSBART:  That's just what you sustained.

24           THE COURT:  Well, have the witness testify.

25  ///

1   BY MR. LYNCH:

2   Q    What did you actually say about releases going to the

3   catch pond?

4   A    That from all of the air photos that we had, we couldn't

5   see a pathway that anything released in that area would get

6   past the catch pond.

7   Q    Okay.  And you cite two sources for the statement on the

8   first bullet point of this; isn't that correct?

9   A    Yes.

10  Q    And what were the sources?

11  A    Two depositions.  One was Marvin Johnson, and one was, I

12  think, Richard, was his first name, Brill.

13  Q    And are those employees that worked at the Dyce site

14  during the '70s?

15  A    Yes.

16  Q    The '70s?

17  A    I believe so, yes.

18  Q    Okay.  The record . . .

19       Directing your attention to Exhibit 4811 -- may I

20  approach the witness and give him a hard copy?

21          THE COURT:  Yes.

22  BY MR. LYNCH:

23  Q    (Handing.)  Mr. Sullivan, this is the letter with the

24  reports of the sampling you conducted in the tank farm area of

25  the Dyce site that Mr. Grossbart showed you; is that correct?

1   A     That's correct.

2   Q     And the soil samples you took were near and beneath the

3   concrete tank farm; is that correct?

4   A     That's correct.

5   Q     And, again, one of the samples you took was of the

6   concrete at the very bottom of the tank farm containment; is

7   that correct?

8   A     That's correct.

9   Q     And this was a walled structure that captured water

10  spills and runoff from the operations area?

11  A     Yes.

12  Q     And at the times you were out at the site, had you

13  observed whether it contained water?

14  A     I believe, every time I ever saw it, it had water in it.

15  Q     So, in essence, this was a concrete catch pond; is that

16  correct?

17  A     This was their catch pond for stormwater and drips and

18  spills.

19  Q     Okay.  And the test you took was from the very bottom of

20  that catch pond?

21  A     That's correct.

22  Q     And what were the results of that test?

23  A     The sample that was underneath that first soil right

24  underneath was typical of what had been seen in that area

25  before, the distributor's profile.  It had a bunch of BTEX and

1    some perc and, I believe, some TCE.

2    Q    And what about the sample of the concrete itself?

3    A    Yes.  It had perc and, I believe, the rest of the

4    distributor profile.

5    Q    So the sample you took from the bottom of this catch pond

6    contained all of those constituents?  It wasn't just

7    pure-phase perc?

8    A    Oh, no.

9    Q    So it was not the same as the contamination you found in

10   the northwest corner; is that correct?

11   A    Substantially different.  It's consistent with what's in

12   that area.

13              MR. LYNCH:  No further questions.

14              THE COURT:  Okay.  He can step down.

15              Call your next witness.

16              MR. COZZENS:  Soco will next call Richard Colver,

17   Your Honor.

18              WHEREUPON,

19                    MR. RICHARD ALLEN COLVER,

20   called for examination by counsel for defendant, after having

21   been first duly sworn to testify the truth, the whole truth,

22   and nothing but the truth, testified as follows:

23                        DIRECT EXAMINATION

24   BY MR. COZZENS:

25   Q    Good morning, Mr. Colver.  Would you state your full name

                                367

1   and address for the record, please?

2   A    Pardon?  I couldn't hear you.

3   Q    I'll try to speak up and more directly into the

4   microphone.

5        Would you state your full name and address for the

6   record, please?

7   A    Richard Allen Colver, and I live at Boyd, Montana.

8   Q    Are you nervous?

9   A    Yes.

10  Q    Okay.  I'll try to go slow and make sure you can hear me,

11  and soon you won't be, okay?

12       Where did you grow up?

13  A    Around Bozeman, Manhattan and Bozeman.

14  Q    Have you lived in Montana primarily all of your life?

15  A    All but ten years of my life.

16  Q    Okay.  Were you ever employed out at Dyce Chemical?

17  A    Yes, sir.

18  Q    How did you get that job?

19  A    Well, I was out of work, and I knew Mr. Dyce previously,

20  and I saw him one day and asked if he had a job out there, and

21  he hired me.

22  Q    How did you know Mr. Dyce?

23  A    Through our church.

24  Q    When did you first go to work out at Dyce?

25  A    In October of 1974.

1   Q    And what was your first position?

2   A    Working in the warehouse.

3   Q    Had you ever worked for a company that distributed

4   chemicals prior to October of '74?

5   A    No.

6   Q    Was there a training program when you first went to work

7   at Dyce?

8   A    Yes.  We were to work with an experienced employee from

9   three to six months, depending on the individual.

10  Q    Do you recall how long you were supervised or in that

11  training period?

12  A    Probably closer to the six months.

13       MR. COZZENS:  All right.  Could we pull up Admitted

14  Exhibit 5017, please?

15       DOCUMENT TECHNICIAN:  (Complied with request.)

16  BY MR. COZZENS:

17  Q    Can you see that exhibit okay, Mr. Colver?

18  A    Yes, sir.

19  Q    Okay.  This is an aerial photograph of the -- well, let

20  me ask you.  What does this show?

21  A    It shows the Dyce Chemical location.

22  Q    As of June 18 of 1974?

23  A    Yes.

24  Q    Is that basically what it looked like when you first went

25  to work in October?

1    A    Yes.

2            MR. COZZENS:  Could you blow up the area from south

3    of the lower warehouse through the top of the berm, please?

4            DOCUMENT TECHNICIAN:  (Complied with request.)

5            THE WITNESS:  South of the lower warehouse --

6    BY MR. COZZENS:

7    Q    I've asked Julianne to blow that up so we can see it

8    better.

9         Okay.  Are you touching the screen?

10   A    Yes.

11   Q    Okay.  That's why those marks are coming on there.

12   A    Oh.

13   Q    I may ask you to do that, but let's wait until we've got

14   something to be identified.

15   A    Okay.

16   Q    Can you locate on that photograph now the lower

17   warehouse?

18   A    It would be right here.

19   Q    Okay.  And you actually put a mark that's somewhat east

20   of the building itself; is that correct?

21   A    Yes.

22   Q    Okay.  If I circled this area here, is that the lower

23   warehouse?

24   A    Yes.

25   Q    Okay.  And can you see the cement apron that goes east of

1    the lower warehouse?

2    A    Right here.

3    Q    Okay.  Was that apron still in existence when you went to

4    work in October of '74?

5    A    Yes.

6    Q    Did that apron continue to be there in the same

7    configuration, at least through 1987?

8    A    Yes.

9    Q    I should have asked this before.  How long did you work

10   out at Dyce?

11   A    For 20 and a half years.

12   Q    Okay.  When did you retire?

13   A    April 30, 1995.

14   Q    Did your positions or your job duties change during those

15   20 years?

16   A    Yes.

17   Q    What happened?

18   A    They advanced me to maintenance man instead of a straight

19   warehouse.

20   Q    And when did that occur?

21   A    Probably about 1976 or '77.

22   Q    Okay.  And what were your duties as the maintenance man?

23   A    To keep things in repair.

24   Q    Would that include keeping the tank farm in repair?

25   A    Yes.

1    Q     The exterior of the lower warehouse?

2    A     Yes.

3    Q     Can you describe for the jury how fluids would drain on

4    that apron that you've seen on the east side of the lower

5    warehouse?

6    A     They have that on the map, too.  It drained down the

7    northeast corner, and it comes down around the warehouse and

8    goes down the ditch and clear out on the northwest corner of

9    the property.

10   Q     Okay.  In this photo that we're looking at in 1974, can

11   you tell whether the berm that ultimately existed around the,

12   around the tank farm, was that completed at that time in 1974?

13   A     I believe it was.

14   Q     You think it was?  Okay.

15         Now let me do this, because I want to make sure I get

16   this in the record.  So you're saying that fluids would drain

17   northeast and then come down and then go along the north side

18   of the lower warehouse?  Is that correct?

19   A     Yes.

20            MR. COZZENS:  Can we switch, then, to Exhibit 5019?

21            DOCUMENT TECHNICIAN:  (Complied with request.)

22   BY MR. COZZENS:

23   Q     Can you tell us what 5019 depicts, please?

24   A     There again, the Dyce facilities.

25   Q     All right.  Do you see, on that photograph, what was

1    known as the drumming shed?

2    A    Yes.

3    Q    Can you locate that for us, please?

4    A    Right here.

5    Q    Okay.

6    A    I get to shaking.

7    Q    That's okay.  There's a -- you put a mark that's

8    immediately south and east of a building.  Is the building the

9    drumming shed?

10   A    Yes.

11   Q    All right.  Was that drumming shed completed when you

12   first went to work?

13   A    No.

14   Q    Did you have any involvement in building that drumming

15   shed?

16   A    Yes.

17   Q    What was your involvement?

18   A    I helped build it.

19   Q    Okay.  Was the -- tell me about the construction.  What

20   was the floor in the drumming shed?

21   A    It was cement.

22   Q    What was the purpose of the drumming shed?

23   A    To give us shelter when we were drumming.

24   Q    Okay.  And what does "drumming" mean?

25   A    When we were filling drums with product.

1    Q      How did that occur in 1975 and 1976?

2    A      Repeat the question again.

3    Q      How did you accomplish drumming in 1975 and 1976?

4    A      We'd have to hook up a pump from our tanks and hoses, and

5    then you had a valve right at the drum, or on the end of the

6    hose, and we'd fill the drum on a scale.

7    Q      Okay.  And can you tell us how the cement floor in the

8    drumming shed drained?

9    A      It drained off to the west.

10   Q      Okay.  So where would it actually exit the drumming shed

11   if there was moisture or fluids of any kind on the floor?

12   A      On this west end.

13          I really draw pictures.

14   Q      You're saying it came out the west end?

15   A      Yes.

16   Q      How did it do that?  Was there a wall on the drumming

17   shed?

18   A      The wall didn't come clear down to the cement on the west

19   end so that there was a drainage area underneath the wall.

20   Q      Okay.  So there was a -- the floor of the drumming shed

21   sloped so that fluids would drain right underneath that space

22   that was left in the west wall?

23   A      Yes.

24   Q      Am I marking correctly the west wall?

25   A      Yes.

1    Q     Okay.  What was immediately west of the drumming shed?

2    What was the ground like there?

3    A     It was dirt and gravel.

4    Q     Okay.  It wasn't asphalt there?

5    A     No.

6    Q     Was the berm that went around the tank farm, did that --

7    how far did that extend on the south side?

8              MR. JOHNSON:  What period of time?

9              MR. COZZENS:  In this picture, 1975.

10             THE WITNESS:  They went clear behind the drumming

11   shed.

12   BY MR. COZZENS:

13   Q     Okay.

14   A     On the north side of the drumming shed.

15   Q     Can you locate on this picture the loading and unloading

16   area?

17   A     It would be right in here.

18   Q     All right.  And what was the surface of the loading and

19   unloading area made of?

20   A     It was asphalted in about 1976, I believe it was.

21   Q     Well, why don't you take --

22   A     Or 1975.

23   Q     Why don't you take a close look at this photo, which is

24   dated November 4, 1975.  Can you see the area that Dyce

25   asphalted at the site?

1   A      Yes.

2   Q      Okay.  Can you kind of roughly show the outlines of the

3   asphalt that they put down?

4   A      They came in here and around, and they're down -- whoops.

5   Down around in front of the drumming shed.

6   Q      Okay.

7   A      Clear to the lower warehouse.

8   Q      All right.  So the dark areas that you can see on this

9   photograph were new asphalt that Dyce had laid after they

10  bought the premises, correct?

11  A      Yes.

12  Q      Okay.  And that included the loading and unloading area?

13  A      Yes.

14  Q      Did you ever -- were you aware of anything where they

15  would do, I'll call it, mass drumming and, therefore, they

16  didn't do it inside the drumming shed?

17  A      I don't remember on that.

18  Q      Okay.  And did that new asphalt that was laid, did that

19  go up to the cement apron that you looked at in the last

20  photograph?

21  A      Yes.

22  Q      Now, then, as of November 4 of 1975, I would like, if you

23  would, please, to tell, in general, how or where fluids that

24  were inside the berm, inside the containment berm, would go,

25  how it would drain.

1  A     From inside?

2  Q     From inside the containment berm, yes.

3  A     They would go down inside the berm, clear down to the

4  northwest corner.

5  Q     Of the --

6  A     Of the --

7  Q     Of the berm area.

8  A     Of the berm area, yes.

9  Q     And what was in that northwest corner of the berm area?

10  A     A catch pond.

11  Q     Okay.  Where would fluids that found their way into the

12  drumming shed or west of the drumming shed or into the loading

13  and unloading area, where would those drain to?

14  A     They would drain out to the north of the lower warehouse,

15  down along the railroad tracks and out into the northwest

16  corner of the property.

17          MR. COZZENS:  Okay.  Can you blow up that area

18  that's just immediately south and west of the tank farm,

19  please?  And include the tank farm, too.

20          DOCUMENT TECHNICIAN:  (Complied with request.)

21  BY MR. COZZENS:

22  Q     Okay.  Can you see in this photograph that has now been

23  blown up the drainage ditch that would drain materials from

24  the loading and unloading area and from the drumming shed?

25  A     Yes.  That would be this ditch here.  It come down from

1  the drumming shed here.

2  Q    Okay.  Thank you.

3       Now did Dyce have a bulk tank for perc?

4  A    When, Larry?

5  Q    When did they first have a bulk tank for perc that you

6  can recall?

7  A    About 1975.

8  Q    Okay.  Do you know whether you can locate where that bulk

9  perc tank is on this photograph?

10 A    I'm not sure, but I think it's one of these here.

11 Q    Are you talking about one of these tanks that I've

12 circled now?

13 A    Yes.

14 Q    All right.  Thank you.

15      And those are what appear to be horizontal tanks east of

16 the six vertical tanks; is that correct?

17 A    Yes.

18           MR. COZZENS:  All right.  Could you go back to the

19 full photograph?  Can we go to Admitted Exhibit 5024, please?

20           DOCUMENT TECHNICIAN:  (Complied with request.)

21 BY MR. COZZENS:

22 Q    This is an aerial photograph of the site as it existed in

23 September of 1977.  Can you locate on that photograph the perc

24 bulk storage tank?

25 A    It was these three here, the one on the far left.

378

1   Q     All right.  Let me just do this.  Can you describe it in

2   words, where it's located, in relation to the drumming shed?

3   A     It's located just north of the drumming shed.

4   Q     Are you referring, sir, to these three tanks that I've

5   just delineated with my markings?

6   A     Yes.

7   Q     It's one of those three?

8   A     Yes.

9   Q     Do you recall how big the perc tank was?

10  A     1,500 gallons.

11  Q     Can you locate the catch pond on that photograph?

12  A     The catch pond would be right down in here.

13  Q     Okay.  You've pointed to it.  Thank you.

14        And that's in the northwest corner of the containment

15  area, right?

16  A     Yes.

17  Q     Was the catch pond lined?

18  A     Yes.

19  Q     Do you know how it was constructed?

20  A     It had a dirt berm around it, and then --

21  Q     I'm sorry; it had a what, sir?

22  A     It had a dirt berm, and then they put a plastic liner in

23  it.  I believe, over top of the liner, that they had put

24  bentonite down.

25  Q     Okay.  Can you tell the jury what bentonite is?

1    A    Bentonite is a type of soil that repels water.

2    Q    Okay.  Did you ever actually see the lining of the catch

3    pond as it was configured in 1975 and 1977?

4    A    Yes.  The wind and rain would wash some of the dirt down

5    off the bank, and you could see the liner there.

6    Q    Okay.  What, if anything, did Dyce do about the exposure

7    of that tarp?

8    A    They had gunnite sprayed on it.

9         MR. JOHNSON:  Objection, Your Honor.  He used the

10   word "tarp," and the witness has said "plastic liner."  I

11   think it misstates the testimony.

12        MR. COZZENS:  I'll change it, Judge.

13        THE COURT:  Yeah.  Is it plastic or is it --

14        MR. COZZENS:  I think, I think it's a plastic tarp,

15   but I'll let him tell us.

16        THE COURT:  Go ahead.

17   BY MR. COZZENS:

18   Q    Go ahead and tell us what the liner was, to the best of

19   your knowledge.

20   A    A plastic tarp.

21   Q    Thank you.

22        And did Dyce do anything about the exposure of that tarp?

23   A    Yes.

24   Q    What did they do?

25   A    They sprayed gunnite on it, and gunnite is a mixture of

1    cement.

2    Q    Okay.  And this is going to be hard to do, but I'm going

3    to ask if we can go back to 5021, which is a '76 photo, and

4    blow that up.

5              DOCUMENT TECHNICIAN:  (Complied with request.)

6    BY MR. COZZENS:

7    Q    Now we're looking at a picture in September 1976, and

8    this is a pretty fuzzy photograph.  But can you locate the

9    perc bulk tank in basically the same location it was in the

10   1977 photo that we saw?

11   A    Yes.

12             MR. COZZENS:  Okay.  Let's go back, then, to the

13   1977 photograph.

14             MR. LYNCH:  What's the number for that, Larry?

15             MR. COZZENS:  It's 5019?  No, I'm wrong.  It's 5024.

16   I'm sorry.

17             DOCUMENT TECHNICIAN:  (Complied with request.)

18   BY MR. COZZENS:

19   Q    How would Dyce get perc into the bulk tank in 1976 and

20   1977?

21   A    They used a portable pump, and from the truck to the

22   pump, they used a hose, and then from the pump to the tank,

23   another hose, and they would pump it from the truck into the

24   tank.

25   Q    Okay.  And where would the truck be located?

381

1   A    In the area just south of the drumming shed.

2   Q    So that would be this area right here?

3   A    Yes.

4   Q    Okay.  And that was, in fact, referred to as the loading

5   and unloading area, correct?

6   A    Yes.

7   Q    All right.  Did you have to take any special precautions

8   in handling perc?

9   A    Well, just to be very careful not to have any spills.

10   Q    Okay.  Did you have to use any special equipment?

11   A    We had special hoses for that.

12   Q    Do you now recall what was different about those perc

13   hoses?

14   A    They had a different lining inside of the hose.

15   Q    Why was that?

16   A    Perc, like rubber, would eat the rubber up.

17   Q    Okay.

18   A    And they had a Teflon or a Guylon lining in the hose.

19   Q    Did you use those hoses to load or unload any other

20   chemical out at the Dyce site?

21   A    No.

22   Q    So those were dedicated solely to use in perc?

23   A    Yes.

24   Q    Okay.  Now during this time period when you were loading

25   or unloading a truck, what would you do when the truck was

1  full or, you were done with it, the tank was full?  What would

2  you do with the materials that were still in the hose?

3  A    We would empty it into a bucket and pour that bucket into

4  a drum.

5  Q    Okay.  And how did you empty it?

6  A    By walking the hose out.

7  Q    Can you tell the jury what it means to "walk" the hose?

8  A    To lift one end of the hose up, and then the other end is

9  in the bucket, and you walk down the hose, keeping it high, so

10 that the fluid drains into the bucket.

11 Q    Okay.  Was there, after you had walked the hoses that

12 were used, what did you do with them?

13 A    The hoses were stored on a rack inside of the drumming

14 shed.

15 Q    Okay.  And was there any way for people to know that

16 these were hoses that were only to be used for perc?

17 A    The ends, the fittings on the ends were painted, if I

18 remember right, blue, and there was a chart posted in the

19 drumming shed, showing what the blue hoses were to be used

20 for.

21 Q    And what did that chart say about blue hoses?

22 A    Pardon?

23 Q    What did the chart say about hoses that were painted

24 blue?

25 A    They were to be used only with perc.

1    Q      And did you have different colors for other chemicals?

2    A      Yes.

3    Q      Who was in charge of making sure that those things, that

4    those hoses were painted?

5    A      I was.

6    Q      Okay.  Can you -- well, no.  I won't do that.  Let me

7    move on.

8           When you were loading or unloading material from the tank

9    when you were using a portable pump, was there any material

10   left in the pump?

11   A      Maybe a cupful.

12   Q      And what did you do with that?

13   A      That would also have been poured into a drum.

14   Q      Okay.  Did you ever actually observe rainwater draining

15   from the loading and unloading area during 1975 through 1980?

16   A      Yes.

17   Q      And what and where did it go?

18   A      It went down north of the lower warehouse and turned and

19   went down clear out into the northwest corner of the property.

20   Q      Okay.  Now if I draw the circle here, would you describe

21   that as the northwest corner of the property?

22   A      Yes.

23   Q      Okay.  Did Dyce own any of this property just north of

24   that?

25   A      Yes.

1  Q     And do you know how people started calling this the

2  northwest corner?

3  A     No.

4  Q     But you just know that that's what it's referred to as?

5  A     It had been referred, probably called that because it was

6  the northwest corner of the property.

7  Q     Well, that would be why it would be called that.  I was

8  just trying to point out that, in fact, Dyce also owned some

9  property north of the, quote, northwest corner, right?

10 A     Yes.

11 Q     All right.  But you don't know why that was called

12 northwest corner?

13 A     No.

14 Q     Thanks.

15       In the time that you worked out at Dyce -- well, first of

16 all, I should have asked you to describe; how did you hook up

17 these hoses that were used to load and unload materials?

18 A     They had what is known as a quick coupler on the end of

19 the hose, and it fit in over top of a companion fitting, and

20 there was two arms that you closed on to lock the fitting

21 together.

22 Q     Okay.  In the time you worked out at Dyce, did you ever

23 see one of those quick couplers fail?

24 A     No.

25 Q     Did you ever see any of them come loose at all?

1  A      If they got worn, they could have, but it was also my job

2  to make sure that they didn't get that worn.

3  Q      Okay.  So if you saw one fail, that was your problem,

4  right?

5  A      Right.

6  Q      Okay.  Did you ever see any of the hoses leak that were

7  used to load or unload materials?

8  A      Yes.

9  Q      Tell me what you saw.

10  A      Just a small drip.  Then the fellow unloading had a

11  bucket there to catch it.

12  Q      Okay.  And that's something I should have asked you

13  before.  What was the policy at Dyce for trying to make sure

14  that there weren't drips or small leaks that would hit the

15  ground when you were loading and unloading materials?

16          MR. JOHNSON:  Your Honor, lacks foundation as to the

17  time period.  He worked there for a long time.

18          THE COURT:  Yes.

19  BY MR. COZZENS:

20  Q    All right.  Let's start with the period from 1975 to

21  1980.  What was the policy?

22  A      The policy was to have drip buckets under the fittings so

23  that if there was any leakage, it did not get to the ground.

24  Q      Okay.  Did that policy change during any of the 20 years

25  that you worked out at Dyce?

1  A     No.

2  Q     Okay.  What was a drip bucket?  Explain what that was.

3  A     It was just a metal bucket to catch any drips that might

4  happen.

5  Q     And what did you do with any fluids that found their way

6  to the drip bucket?

7  A     That would have been poured into a drum.

8  Q     All right.  Were you ever involved in actually loading

9  and unloading -- let me be more precise.

10      Were you ever involved in the process of unloading

11 product that was delivered to the Dyce site in a tanker truck?

12 A     Yes.

13 Q     Okay.  Did you observe that many times during the years

14 that you worked there?

15 A     Yes.

16 Q     Did the truck drivers always hang around while their

17 truck was being unloaded?

18 A     No.

19 Q     What would they do?

20 A     They'd usually go up to the coffee room and have coffee.

21 Q     Okay.  So it was more frequent than not that the truck

22 driver wouldn't hang around?

23 A     Yes.

24          MR. DAVIS:  I object.  He's leading, Judge.

25          THE COURT:  Well, you know, it is leading, but I'm

1    going to allow you guys on your case to do a little leading,

2    too.  It expedites things.

3              MR. COZZENS:  Thank you, Judge.

4              THE COURT:  When it's insignificant, I'll let it get

5    moving, so it's overruled.

6              MR. COZZENS:  Thank you.

7    BY MR. COZZENS:

8    Q    Was it typical for truck drivers to leave the area while

9    their truck was being unloaded at the Dyce site?

10   A    Yes.

11   Q    All right.  Did Dyce have a policy about whether a truck

12   could be either loaded or unloaded without a Dyce employee

13   being present?

14   A    The Dyce employee was supposed to always be present.

15   Q    And when did you first learn that policy?

16   A    When I first went to work out there.

17   Q    And did that policy remain the same during the entire

18   time that you worked out at Dyce?

19   A    Yes.

20   Q    Okay.  Did you ever see a time when somebody at Dyce

21   wasn't following that policy?

22   A    Yes.

23   Q    Would you tell us what happened, please?

24   A    I forget the fellow's name, but he hooked up a hose for

25   hydrochloric acid and used the wrong type of hose, and it ate

1    a hole in the fitting.  And I happened to be walking by at the

2    time, and I ran in and shut the valves off on the truck and

3    the plumbing up to the drumming shed.

4    Q    Okay.  Now was hydrochloric acid leaking from the hose or

5    the coupling?

6    A    From the coupling.

7    Q    Okay.  Can you tell me at what rate?

8              MR. JOHNSON:  Objection.  Relevance, Your Honor.

9              THE COURT:  Sustained.

10             MR. COZZENS:  All right.

11   BY MR. COZZENS:

12   Q    You're the one that had to stop that spill because there

13   wasn't a Dyce employee around; is that correct?

14             MR. JOHNSON:  Objection, Your Honor.  Relevance.

15             THE COURT:  Sustained.

16             MR. COZZENS:  Your Honor, may I be heard on that?

17             THE COURT:  No.  It's irrelevant.

18             MR. COZZENS:  Okay.

19   BY MR. COZZENS:

20   Q    Okay.  How did Dyce sell perc to its customers?

21   A    When I first went to work out there, it was all in drums.

22   And in later years, we had a small bulk tank that we delivered

23   to tanks at their facilities.

24   Q    Okay.  Where was the tote stored?

25   A    Pardon?

1    Q     Where was the tote?  Did you say they had a small tote

2    that they delivered in?

3    A     Yes.

4    Q     Where was it stored?

5    A     In -- there's a shed along the upper warehouse.  You can

6    see it right here.

7    Q     Uh-huh.

8    A     It was stored in there.

9    Q     And was it stored empty or full?

10   A     Full.

11          MR. COZZENS:  Okay.  Could you pull up Exhibit 5028,

12   please?

13          DOCUMENT TECHNICIAN:  (Complied with request.)

14   BY MR. COZZENS:

15   Q     This is a photograph dated May 14 of 1979.

16          And could you enlarge the tank farm area that includes

17   the lower warehouse, please?

18          DOCUMENT TECHNICIAN:  (Complied with request.)

19   BY MR. COZZENS:

20   Q     Can you locate the perc tank that exists, the bulk perc

21   tank as it exists in this photo?

22   A     Yes.  It's right here.

23   Q     All right.  Is that the same bulk perc tank that we

24   looked at in the 1977 photo?

25   A     No.

1    Q    What's the difference?

2    A    It's a larger tank.

3    Q    And do you recall how large this tank was?

4    A    4,000-gallon tank.

5    Q    When they bought or changed to the 4,000-gallon tank, did

6    they change anything else about the configuration of perc

7    storage?

8    A    Unless it would be that we plumbed in a pump solid for

9    just that purpose.

10   Q    Okay.  Tell the jury what you did.

11   A    We pumped -- plumbed the -- excuse me.

12        THE COURT:  That's quite all right.

13        THE WITNESS:  We run plumbing from the tank to the

14   pump, and then from the pump out to the drumming shed where we

15   could hook a hose direct from the truck to the drumming shed.

16   BY MR. COZZENS:

17   Q    Okay.  Then once you had done that, quote, plumbing, end

18   quote, was that pump used for anything other than perc?

19   A    No.

20   Q    So now you have plumbed-in lines and a dedicated pump; is

21   that correct?

22   A    Yes.

23   Q    And who did that work?

24   A    I did.

25   Q    Where was the pump located?

1   A    On the north side of the drumming shed.  Right in here.

2   Q    Was the pump inside the drumming shed or outside?

3   A    Yeah, outside.

4   Q    Okay.  So we're talking, then, about this area?  Is that

5   where it was located?

6   A    Yes.

7   Q    And was part of the containment berm located in that

8   area, too?

9   A    Yes.  The pump sat right on top of the containment berm.

10  Q    Okay.  And then from the pump, where did the plumbing go?

11  A    It went into the drumming shed, and there was a valve and

12  a fitting in the drumming shed that we could hook a hose to,

13  to the truck.

14  Q    Do you remember the pumping capacity of the dedicated

15  perc --

16  A    Sixty gallons per minute.

17  Q    Okay.  I was going to say "dedicated perc pump," but I

18  was too slow, and now it's 60 gallons per minute.

19       Would you call up Admitted Exhibit 5031, please?

20       Wait a minute.  Don't do that.  I don't know why that's

21  listed here.  What I would like to go to is 5033, please.

22           DOCUMENT TECHNICIAN:  (Complied with request.)

23           MR. COZZENS:  Would you blow up, in particular, the

24  area that would include all of the containment berm, please,

25  and the tank farm and the warehouses?

1              DOCUMENT TECHNICIAN:  (Complied with request.)

2              MR. COZZENS:  Thank you.

3     BY MR. COZZENS:

4     Q    I'm showing you a photograph that's dated June 2, 1981

5     that's been admitted into evidence, and this is of the Dyce

6     site.  Can you tell the jury what's different about the site

7     now than that that existed in the 1979 photo that we looked

8     at?

9     A    The containment berm was enlarged to enclose a larger

10    area.

11    Q    Okay.  What was the area that it now enclosed?

12    A    How do you mean on that?

13    Q    Well, how was it enlarged?

14    A    Well, they enlarged it to go around, clear around here.

15         Whoops.  We've got all kinds of --

16    Q    Okay.  Let me see if I can undo some of this.  I'm not

17    sure I know how.

18         (Discussion off the record.)

19    BY MR. COZZENS:

20    Q    You're drawing along this berm area here; is that

21    correct?

22    A    Yes.

23    Q    Okay.

24    A    And then it went on over here and up here.

25    Q    All right.  Did the previous berm go on the west side of

393

1  the railroad spur?

2  A     No.

3  Q     And this one does?

4  A     It went to the end of the railroad spur.

5  Q     The previous berm was to the east, on the east side of

6  the railroad spur?

7  A     Yes.

8  Q     Okay.  What I'm trying to get to is do you still see the

9  ditch where fluids used to drain from the loading and

10 unloading area and from the drumming shed?  Can you still see

11 that in this photo?

12 A     That would be along here.

13 Q     Right.  Now where do those fluids go?

14 A     It would still go down the same ditch, but it goes into a

15 larger containment area.

16 Q     To the catch pond that we see up in this area; is that

17 correct?

18 A     Correct.

19 Q     Okay.  And do you see another ditch leading to the new

20 enlarged catch pond?

21 A     Yes.  It runs through here and down into the catch pond

22 down here.

23 Q     Okay.  So as opposed to how it existed prior to the

24 reconfiguration in 1980, now we've got all of the fluids that

25 would come from the loading/unloading area, virtually all of

1   the asphalt, and all around the tank farm, all of that is

2   going into the new enlarged catch pond?

3          MR. JOHNSON:  Objection.  Lacks foundation, and it's

4   leading, Your Honor.

5          THE COURT:  And it's repetitious.  Sustained.  We

6   already heard it.

7          MR. COZZENS:  I didn't hear what you said, Judge.

8          THE COURT:  It's repetitious, too.  You've already

9   been over it.

10          MR. COZZENS:  All right.  We'll let the photo speak

11   for itself.

12   BY MR. COZZENS:

13   Q    Do you know why they enlarged the catch pond at that

14   time?

15   A    To keep, contain anything that came off of the loading

16   area and parking lot.

17   Q    Okay.  During the period from 1975 to 1980, how many

18   workers were typically out at the Dyce site?

19   A    Three in the warehouse.

20   Q    Were there ever any times when there would only be one

21   employee available to load or unload a truck?

22   A    Yes.

23   Q    How could that occur?

24   A    If two employees happened to be out on deliveries at the

25   same time.

395

1    Q    Okay.  Did Dyce ever load or unload trucks after hours?

2    A    Yes.

3    Q    How would that occur?

4    A    One of us would be called out to do the work.

5    Q    And that would be another circumstance where only one

6    person was on the premises?

7    A    Yeah, one Dyce employee and a truck driver.

8    Q    All right.  Okay.

9         Did you ever witness something occur out at Dyce that

10   should have been reported to management but was not?

11             MR. JOHNSON:  Objection.  Lacks foundation, Your

12   Honor.

13             THE COURT:  Well, I'm going to give him a chance to.

14   Go ahead.

15   BY MR. COZZENS:

16   Q    Go ahead.  Did you?

17   A    Yes.

18   Q    Tell us what you saw.

19   A    Somebody run over the sideboards for a truck.

20             MR. JOHNSON:  Objection, Your Honor.  Relevance.

21             THE COURT:  Yeah, what is the relevance?

22             MR. COZZENS:  You know, they made a big deal about

23   what the management knows, and we're trying to say that things

24   can happen out there that management didn't get told about,

25   and here is an example of it.

1              THE COURT:  Overruled.

2    BY MR. COZZENS:

3    Q     What happened?

4    A     Someone run over sideboards of a truck with a forklift.

5    Q     And how do you know that management wasn't told about

6    that?

7    A     Because they came out and asked me if I had done it.

8    Q     Okay.  And you didn't do it?

9    A     No.

10   Q     All right.

11         I hesitate, Your Honor, because I have a bunch of

12   exhibits and I'm trying to figure out a way to avoid using

13   them.  If you give me just a second, maybe I'll be able to do

14   that, okay?

15             THE COURT:  Um-hmm.  You got it.

16             MR. COZZENS:  Okay.  I thought that would meet your

17   approval.

18   BY MR. COZZENS:

19   Q     Let me just ask you in a general way.  Were there changes

20   in the policies and procedures out at Dyce during the 20 years

21   that you worked there?

22   A     I can't hear you, Larry.

23   Q     I'm sorry; I'll try to do better.

24         Were there changes in the policies and procedures out at

25   Dyce during the years that you worked there?

1  A    They would have gotten stricter, if anything.

2         MR. DAVIS:  I'm going to object.  It's vague.

3         THE COURT:  Well, it is, but I'm going to see where

4  he's going.

5         MR. COZZENS:  Okay.  I can tell you, Your Honor,

6  instead of pulling out a series of written policies and having

7  him read them and say, "Was that the same as it was in 1974?"

8  I was trying to do this in a general way.

9         THE COURT:  Yeah, and I want you to keep doing it,

10  and then they can object, and I'll rule.

11         MR. COZZENS:  Okay.

12  BY MR. COZZENS:

13  Q    You said that they got stricter?

14  A    Yes.

15  Q    Specifically were there policies and procedures relating

16  to loading and unloading tank cars in place during the entire

17  time that you worked out at Dyce?

18  A    Yes.

19  Q    Were there policies and procedures regarding safety --

20  A    Yes.

21  Q    -- during the entire time that you worked out at Dyce?

22  A    Yes.

23  Q    Were there policies and procedures or discussions about

24  complying with EPA standards and requirements?

25  A    Yes.

1   Q    And was that true from the time you first went to work,

2   for the whole 20 years that you worked out there?

3   A    From the time the EPA was initiated, anyway.

4   Q    Okay.  And you don't --

5   A    And even before.

6   Q    All right.  Did there come a time when those policies and

7   procedures were reduced to writing?

8   A    Yes.

9   Q    Do you recall when that occurred?

10  A    In the early 1980s.

11  Q    All right.  Were there -- was there safety gear that

12  employees were required to wear on the site?

13  A    Yes.

14  Q    Was that true the entire time that you worked out there?

15  A    Yes.

16  Q    Were there -- was there an opportunity for employees to

17  discuss safety concerns with management?

18  A    Yes.

19  Q    And was that true during the entire time that you worked

20  out there?

21  A    Yes.

22  Q    Were you ever advised that one of the important

23  policies -- one of the policies at Dyce was to make sure that

24  its work didn't contaminate the environment?

25  A    Yes.

1   Q    And when were you first advised that?

2   A    When I first went to work out there.

3   Q    And did that change during the entire time that you

4   worked there?

5   A    No.

6   Q    Were there policies about what was to be done if there

7   was a spill or leak of chemicals?

8   A    Yes.

9   Q    And was that true during the entire time that you worked

10  out there?

11  A    Yes.

12  Q    Did Dyce hire temporary help?

13  A    When I first went to work out there, they did, yes.

14  Q    And when they had temporary help out there, did they

15  allow that help to handle hazardous materials without

16  supervision?

17  A    No.

18  Q    You talked about you were trained.  Did that training

19  program for new employees by old employees, did that continue

20  throughout the time that you worked out there?

21  A    Yes.

22            MR. COZZENS:  Would you pull up Admitted

23  Exhibit 505, please?

24            DOCUMENT TECHNICIAN:  (Complied with request.)

25  ///

1    BY MR. COZZENS:

2    Q    This is a really bad copy of a document, and it's going

3    to be hard to read.  But this is admitted into evidence, and

4    it's called a general liability survey report prepared by

5    Continental Insurance Company, dated February 23, 1982.  And I

6    don't suppose you've ever seen this document?  You didn't see

7    this while you worked out there, did you?

8    A    No.

9    Q    Did you know that the insurance companies would come out

10   from time to time to inspect the operations to see if they

11   wanted to continue to insure them?

12   A    No.

13   Q    Okay.  I'll just go ahead and read from the middle

14   paragraph on that first page because it's so hard to read.  It

15   says, and I quote, "Hazards inherent with some of the

16   chemicals are well protected."  And this is a 1982 document.

17   Was that true throughout the time that you worked there?

18   A    Yes.

19   Q    The last sentence says, "Premises are kept clean.  Any

20   chemical spills are immediately cleaned up and disposed of in

21   accordance with EPA regulations."

22   A    Yes.

23   Q    Was that true during the time that you worked out at

24   Dyce?

25   A    Yes.

1   Q    Okay.  We've already talked about the training programs

2   and the daily meetings.  Okay.

3        How did you find Quentin Dyce to be, to work for?

4   A    He was the best boss I ever had.

5   Q    That's maybe why you worked for him for 20 years, right?

6   A    Right.

7   Q    Okay.  And did he -- was he the kind of guy who cut

8   corners to save costs?

9   A    No.

10  Q    Was he the kind of guy that wouldn't take the time to

11  listen to your concerns about safety or environmental things?

12  A    He always listened.

13            MR. COZZENS:  Okay.  That's all I have, Your Honor.

14            THE COURT:  All right.  Mr. Colver, you're going to

15  get to come back after lunch.  I'll bet you're excited, aren't

16  you?

17            THE WITNESS:  Yeah.

18            THE COURT:  We're going to take a recess until 1:15.

19            I give you the usual admonition, ladies and

20  gentlemen.

21            We'll be in recess until 1:15.

22       (Recess taken from 11:53:07 to 13:18:27.)

23       (Open court.)

24       (Jury not present.)

25            THE COURT:  Please rise.

1           MR. JOHNSON:  Preliminary matter?

2           THE COURT:  What's the matter?

3           MR. JOHNSON:  We have an exhibit that I'd like to

4    use in cross-examination which is an actual piece of equipment

5    that has been objected to.  It is a coupling on a hose.  It's

6    Exhibit No. 4315.  This coupling is exactly the coupling that

7    the witness testified to, and we want to show it to him so

8    that he can identify it and we can show it to the jury.

9    They've objected.

10          THE COURT:  Fine with me.  It's illustrative.

11          MR. JOHNSON:  Thank you, Your Honor.

12      (Jury present.)

13          THE COURT:  Welcome back, Mr. Colver.

14          THE WITNESS:  Thank you.

15          THE COURT:  Sure.  You may begin your cross,

16   Mr. Johnson.

17          MR. JOHNSON:  Thank you.

18                    CROSS-EXAMINATION

19   BY MR. JOHNSON:

20   Q    Good afternoon, Mr. Colver.

21   A    Good afternoon.

22   Q    My name is Robert Johnson, and I represent the United

23   States Fidelity and Guaranty Company in this case.  I'll be

24   asking you a few questions, okay?

25   A    Okay.

1    Q    You were asked on your direct examination whether you

2    enjoyed working for Mr. Dyce, Quentin Dyce, and you said that

3    you did.  He taught you, didn't he, that perc was dangerous to

4    the environment?

5    A    Yes.

6    Q    And Mr. Dyce actually was an engineer by training, wasn't

7    he?

8    A    Yes.

9    Q    If you had a problem at work, the entire time you were

10   there working at Dyce for 21 years, you always felt that you

11   could talk to Mr. Dyce about it, correct?

12   A    Yes.

13   Q    You felt you could approach him with any problem you had

14   at work, correct?

15   A    Correct.

16   Q    And if you had spilled something there and it was a large

17   spill, you felt that you could go and tell him about it,

18   correct?

19   A    Yes.

20   Q    Now you worked 21 years at Dyce.  In the 21 years you

21   were at Dyce, from 1974 until -- when did you retire?

22   A    1995.

23   Q    -- until 1995, you, yourself, never saw a spill of about

24   250 to 1,000 gallons of perc, correct?

25   A    No, I never did.

1    Q    Okay.  And you never saw a spill even of 87 1/2 gallons

2    of perc?

3    A    No.

4    Q    And you worked with two other guys in the 1970s who

5    worked for Dyce and worked out in the area of the

6    loading/unloading area, right?

7    A    Pardon?  I didn't hear.

8    Q    You worked with two other people at Dyce in the loading

9    and unloading area?

10   A    Yes.

11   Q    And their names were Mr. Hutchinson and Mr. Bender; is

12   that correct?

13   A    Yes.

14   Q    All right.  And they unloaded -- sometimes you loaded and

15   unloaded perc or other chemicals, and sometimes they did,

16   right?

17   A    Yes.

18   Q    And often you worked together, correct?

19   A    Yes.

20   Q    And they never, ever told you that they had seen a spill

21   of 250 to 1,000 gallons of perc, did they?

22   A    No.

23   Q    In fact, nobody else that you worked with the entire time

24   that you worked at Dyce for 21 years ever told you that they

25   had seen a spill of 250 to 1,000 gallons of perc; isn't that

1  correct?

2  A    No, they never did.

3  Q    Now you received memorandums from the management at Dyce

4  on a somewhat regular basis, correct?

5  A    Yes.

6  Q    All right.  And, indeed, Mr. Dyce himself would, in the

7  1970s, send you and everybody who worked at Dyce memorandum

8  about different issues or different problems at the site,

9  correct?

10  A    I think it was in the '80s instead of the '70s.

11  Q    All right.  Who did you receive memorandum from in the

12  1970s from management at Dyce?

13  A    That would be Mr. Dyce, but it would be verbal instead of

14  written.

15  Q    Okay.  So he would give you verbal instructions in the

16  '70s, and then in the '80s he started doing memorandum; is

17  that correct?

18  A    Yes.

19  Q    All right.  And Mr. Dyce obviously never told you about a

20  spill of perc, correct?

21  A    No.

22  Q    All right.  And you never received a memorandum from

23  Mr. Dyce, or anybody else in management at Dyce Chemical,

24  about a spill, a large spill of perc, correct?

25  A    No, I never did.

1    Q    Now you're aware, sir, aren't you, that the Lockwood

2    solvent site is polluted with perc?

3    A    Excuse me?

4    Q    You're aware that the groundwater under the Dyce facility

5    is polluted with perc?

6    A    That's what I've been told.

7    Q    And you're aware that the Lockwood solvent site, which is

8    part of where Dyce is, is on the national priorities list of

9    polluted sites, aren't you?

10   A    No.

11   Q    Do you know that the EPA has determined that the site

12   must be cleaned up?

13   A    No.

14   Q    Let me show you Exhibit 3059, page 121.

15        Do you see this on your screen?

16   A    Pardon?

17   Q    You see this on your screen, correct?

18   A    Yes.

19   Q    And do you recognize from the buildings that are drawn on

20   this figure the outline of Dyce as it appeared in the later

21   years?

22   A    Yes.

23   Q    Okay.  And do you see that yellow area emanating towards

24   the northwest?

25   A    Yes.

1  Q    That's the plume of perchloroethylene in the groundwater

2  under the Dyce site; is that correct?

3  A    I don't know that, sir.

4        MR. COZZENS:  Your Honor, I'm going to object.  He's

5  said several times he doesn't know anything about this.

6        THE COURT:  Well, I think he can ask him if he

7  knows.  If he doesn't know --

8  BY MR. JOHNSON:

9  Q    Let me show you -- let me ask a question about the

10 document.  I understand you've never seen the document before,

11 but this document shows, I can tell you -- the record is

12 clear -- this shows a plume of perc emanating from, in the

13 groundwater, from the Dyce operational area out to the

14 northwest corner and beyond, all the way to the Yellowstone

15 River.

16       And the question I guess I have for you, sir, is it's

17 true, isn't it, that you don't have any idea at all as to how

18 the groundwater got contaminated at the Dyce site?  Isn't that

19 correct?

20 A    Yes.

21       MR. JOHNSON:  Put up 3058, page 50.

22       DOCUMENT TECHNICIAN:  (Complied with request.)

23 BY MR. JOHNSON:

24 Q    This is another figure from the EPA, and this one shows,

25 in this area here, this is -- you also recognize this as being

1  a figure of Dyce, correct?

2  A    Yes.

3  Q    Okay.  And that figure there shows, according to this, it

4  says, "Approximate area of petroleum soil contamination."

5  A    You'll have to repeat that.  I couldn't hear it.

6  Q    All right.  That area that's in blue with the

7  cross-hatching, it says here that that's an approximate area

8  of petroleum oil contamination.  Do you see that?

9         MR. COZZENS:  Your Honor, I'll object.

10         THE WITNESS:  Yes.

11         MR. COZZENS:  I think he first needs to establish

12  that there's some foundation to ask this witness about this

13  document.

14         THE COURT:  Well, I haven't heard the question yet.

15  BY MR. JOHNSON:

16  Q    Well, my question is this.  If that area is contaminated

17  with petroleum, do you have any idea how that area of the Dyce

18  facility got contaminated with petroleum?

19         MR. COZZENS:  Same objection.

20         THE WITNESS:  No.

21         THE COURT:  Overruled.

22  BY MR. JOHNSON:

23  Q    The answer is no, correct?

24  A    Correct.

25  Q    Thank you.

409

1    Now, Mr. Colver, you've had your deposition taken in this
2  case, have you not?
3  A    Pardon?
4  Q    You had your deposition taken in this particular case,
5  correct?
6  A    Yes.
7  Q    Okay.  And your lawyer -- you had a lawyer at that
8  deposition, and his name was Tom Mielenhausen, correct?
9  A    Yes.
10 Q    And he represented you at your deposition that was taken
11 here in Billings several years ago; isn't that right?
12 A    Yes.
13 Q    Okay.  And before you testified today, I presume you met
14 Mr. Cozzens here, correct?
15 A    Yes.
16 Q    How many times did you meet with Mr. Cozzens to go over
17 your testimony today?
18 A    Three, I believe it was.
19 Q    All right.  When did you first meet with Mr. Cozzens to
20 go over your testimony today?
21 A    In February, but I can't remember the date.
22 Q    Okay.  And how long did that meeting last?
23 A    A couple hours.
24 Q    Okay.  And when was your next meeting with Mr. Cozzens?
25 A    About a week later.

1   Q    All right.  And how long did that meeting last?

2   A    About an hour and a half --

3   Q    All right.

4   A    -- two hours.

5   Q    And when was the last time you met with Mr. Cozzens to go

6   over your testimony?

7   A    Last night.

8   Q    And how long did that meeting last?

9   A    About an hour and a half.

10  Q    Now the events you've testified about on direct happened

11  in the 1970s and the 1980s, correct?

12  A    Pardon?

13  Q    The events that you testified about happened in the 1970s

14  and the 1980s?

15  A    I don't remember.

16  Q    All right.  And let me ask you this question.  You

17  started at Dyce in 1974, correct?

18  A    Yes.

19  Q    How old were you when you started at Dyce?

20  A    Oh, now I've got to get a pencil and paper.

21  Q    Do you have any idea how old you were?

22  A    Let's see.  I must have been about 31.

23  Q    About 31 years old?

24  A    Thirty-one, 32.

25  Q    And how old are you today?

1    A      Seventy-six.

2    Q      All right.

3               THE COURT:  You're still a kid.

4               THE WITNESS:  Yeah.

5               THE COURT:  That's right.

6               MR. JOHNSON:  We were all much younger back in the

7    '70s, Your Honor.

8    BY MR. JOHNSON:

9    Q      Let me show you Exhibit 5017, which is one of these

10   aerial photographs that you've seen.

11          5017 is the aerial photo that was taken of the Dyce

12   facility on June 18, 1974.  And I think that this is one that

13   you were shown on your direct examination by Mr. Cozzens, and

14   you identified this as being approximately what it looked

15   like, the Dyce facility, what it looked like when you started.

16          I'm going to ask you to identify certain things within

17   this photograph, okay?

18   A      Okay.

19   Q      All right.  There are several large cylinders, cylinder

20   tanks in the tank farm, correct?

21   A      Yes.

22   Q      All right.  Can you circle those?

23   A      (Complied with request.)

24   Q      All right.  And next to them on the east side, on the

25   east -- you know where the east side is, right?

1    A    Yes.

2    Q    All right.  You were out there for a long time, so you

3    know where the east side is, I presume.

4         Next to them on the east side, do you see a tanker truck?

5    A    Yes.

6    Q    Okay.  And that tanker truck is one of those tanker

7    trucks, what they call a tandem truck, right?  Do you see

8    that?  It's got --

9    A    That's truck and trailer.

10   Q    It's a truck and trailer.

11   A    Yes.

12   Q    All right.  And the truck and trailer is -- yeah, can you

13   blow this area up?

14              DOCUMENT TECHNICIAN:  (Complied with request.)

15              MR. JOHNSON:  Blow it up even more so we can get a

16   much better picture.

17              DOCUMENT TECHNICIAN:  (Complied with request.)

18   BY MR. JOHNSON:

19   Q    All right.  And the truck and trailer, I'm circling right

20   now, is this, correct?

21   A    Yes.

22   Q    All right.

23        And, Your Honor, I'd like to have him mark these things

24   so that we have a record of this, because every time somebody

25   identifies something and draws a circle around it, it

413

1  evaporates when we push a button.  So I've got a photo of

2  this, and it will belabor it a little bit, but there are a few

3  things I'd like him to mark, okay?

4          THE COURT:  Go ahead.

5  BY MR. JOHNSON:

6  Q    I'm going to hand you -- I'll give you a copy of this.

7          (Discussion off the record at counsel table.)

8          MR. JOHNSON:  May I approach?

9          THE COURT:  Yes, you may.

10 BY MR. JOHNSON:

11 Q    I'm going to give you the same document.  I've marked it

12 as Exhibit 4831, and I'm going to give you a Sharpie, okay?

13 And if I could, sir, I'd like you to draw a circle around that

14 tandem truck, or that truck and the trailer that you just

15 testified to, and then if you would -- I'll do the first one

16 for you.  Let's mark that, so the record is clear, mark that

17 with an A and then circle it, and then draw it all the way up,

18 and actually I could use a different color for the circle.

19     Let's draw the leader, the leader to this with yellow so

20 that -- well, that doesn't work very well, does it?  All

21 right.  The black is better because you can see it.

22 A    Um-hmm.

23 Q    So draw a circle around the truck, and then draw a leader

24 to it.  Well, I'll do the first one.  You tell me if I'm doing

25 it right or not, okay?

414

1    A    Yes.

2    Q    Okay.  And then circle it down there.  So that is

3    basically what we just did, and that's an A, and let me put

4    your name on here.  Why don't you just put your name on here

5    so the record is clear.

6         MR. COZZENS:  Can you speak up, Mr. Johnson?  I am

7    not hearing you.

8         MR. JOHNSON:  Yeah.

9         THE COURT:  Get back to the podium.

10        THE CLERK:  Do you want a different color?

11        MR. JOHNSON:  No, I think black is fine.  Thank you.

12        THE CLERK:  Okay.

13   BY MR. JOHNSON:

14   Q    Okay.  I appreciate that, Mr. Colver.

15        The truck in that picture there has pulled up close to

16   the tanks in the back, correct?

17   A    Yes.

18   Q    All right.  And it's pulled up close to the tanks in the

19   back because it was there to unload chemicals into those

20   tanks, correct?

21   A    I would presume so.

22   Q    Right.  And in 1974 when you started, tanks and tanker

23   trucks could come right in next to the various different tanks

24   that were in the tank farm, and you could empty -- you could

25   fill up those tanks on the tank farm from those tanker trucks,

1   correct?

2   A    Yes.

3   Q    Now there's another, there's another -- I'm going to draw

4   another one.  There appears to be another truck here.  Would

5   you agree with me that that appears to be a truck?

6   A    Where is that at?

7   Q    I just marked it with -- hopefully it's on yours, too.

8   A    I still don't see it.

9          THE COURT:  Do you see it right here?  Does it

10  appear on your screen?

11         THE WITNESS:  Oh.

12         THE COURT:  Yeah.

13         MR. JOHNSON:  Right there.

14         THE WITNESS:  Right here.

15  BY MR. JOHNSON:

16  Q    Is that another truck?

17  A    Yes.

18  Q    All right.  Why don't you circle that, and drop a B on

19  that one.

20  A    (Complied with request.)

21  Q    How long were those trucks back in the '70s?

22  A    The trailer that we just drew --

23  Q    Yeah.

24  A    -- is probably a 40- to 45-foot --

25  Q    Okay.

1    A    -- trailer.

2    Q    The trailer itself is 40 to 45 feet?

3    A    Yes, and the tractors can vary in length.

4    Q    All right.  And the tractors, for those of us who

5    aren't --

6    A    Pardon?

7    Q    The tractors, for those of us who don't work in the

8    industry, that's the part that they drive, right, the tractor

9    part?

10    A    Yes.

11    Q    And let me ask you about this picture all over again.

12         Do you see the perc tank in this picture, 1974?

13    A    I'm not sure where it's at in this picture, sir.

14    Q    All right.  You said that --

15    A    I think it might be one of these down here, but I can't

16    say for sure.

17    Q    All right.  Why don't you, as opposed to writing on that

18    picture, tell us, using the telestrator, sir, the telestrator

19    on the TV -- don't mark the TV screen with your Sharpie.  Mark

20    it with your finger, okay?

21         THE COURT:  Yeah.  You'd be cleaning it off.  That

22    would not be good.

23         MR. JOHNSON:  Yeah.  And you'd be watching, I'm

24    sure.

25         THE WITNESS:  I think it's one of these tanks here,

417

1   but I cannot say for sure.

2   BY MR. JOHNSON:

3   Q    Okay.  You don't know, sitting here today, you don't have

4   any recollection as to the year, even, in which the perc tank

5   showed up there, correct --

6   A    At?

7   Q    -- at the Dyce facility in Lockwood?

8   A    I think probably in 1975.

9   Q    Okay.  So you don't think there was a perc tank there in

10  1974?

11  A    No.

12  Q    In fact, when you started in 1974, there was a perc tank

13  that was in a railroad car without wheels on it at Dyce's

14  downtown facility; isn't that correct?

15  A    I don't know, sir.  I was never there.

16  Q    Okay.  In 1974 when you started, they handled -- Dyce

17  sold perc, right?

18  A    Yes.

19  Q    And they sold it in 55-gallon drums?

20  A    Yes.

21  Q    All right.  And when you started, they weren't filling it

22  from a bulk tank?  Those 55-gallon drums weren't being filled

23  by a bulk tank in the Dyce facility in Lockwood; isn't that

24  correct?

25  A    Correct.

1  Q    All right.  They were getting those 55-gallon drums full

2  of perc from somewhere, but you have no idea where?

3  A    I have no idea where.

4  Q    All right.  And when the perc tank got delivered, to your

5  best recollection, in 1975, were you there when it got

6  delivered?

7  A    I don't remember it being delivered, but that's when it

8  was brought in --

9  Q    All right.

10  A    -- or installed, I should say.

11  Q    Okay.  And we'll get to the '75 photo in a second.

12       Now I think, as you testified, there's no drumming shed

13  on this date in this photo, correct?

14  A    No, there's not.

15  Q    So how did you drum product in 1974?

16  A    It was drummed -- when I went to work there, the scale

17  was set up to fill drums on.

18  Q    Okay.

19  A    But there was no shed over top of it.

20  Q    Okay.  And where, where was the scale that you used to

21  fill drums on this photo?  If you just touch that area, I

22  think it will mark.

23  A    Yeah.  I've got to get it located.

24  Q    Would it be helpful if I'd turn the screen a little bit?

25            THE COURT:  I don't think you can.

1              THE WITNESS:  This one seems pretty solid.

2              THE COURT:  Yeah, it's solid.

3     BY MR. JOHNSON:

4     Q    All right.

5     A    Let's see.  It would be right in here.  And I like my

6     straight lines.

7     Q    All right.  And that scale that you just drew that was

8     right in there, that's eventually where you put the drumming

9     shed, correct?

10    A    Yes.

11    Q    All right.  And what did the scale sit on?

12    A    Pardon?

13    Q    What did the scale sit on in 1974?

14    A    Cement.

15    Q    All right.  And was there cement poured right there where

16    you just touched?

17    A    It was poured when I went to work out there.

18    Q    All right.  And how big was that cement that the scale

19    sat on?

20    A    It was probably 6 feet wide and 20 feet long.

21    Q    Okay.  And was that the same concrete that you then put

22    the configuration that sat over the drumming shed?

23    A    Pardon?  I don't understand.

24    Q    The concrete that was poured, the 6 feet by 20 feet that

25    you just said, was that, in effect, the drumming shed and then

1  you covered it with -- you covered it in a subsequent year?

2  A    Yes.

3  Q    Okay.  And that drumming shed had a scale, and it was a

4  digital scale; is that correct?

5  A    No, it wasn't digital.  It had a needle.

6  Q    All right.  It had a needle.  And it only weighed one

7  drum at a time; isn't that correct?

8  A    Yes.

9  Q    All right.  And how would you get the drum up on the

10  scale?

11  A    They had a set of rollers that you could roll a full drum

12  off and an empty one onto the scale.

13  Q    All right.  And where were the rollers?  Were they in the

14  concrete?

15  A    Yes.  They sat in a trough in the concrete.

16  Q    All right.  And the rollers, where would you roll the

17  drum off to?  Would you roll it to one end or the other, or

18  did you roll it off to the side?

19  A    We rolled it off to the west.

20  Q    All right.  And when you rolled them off to the west,

21  then what would happen to the drums?

22  A    We'd pick them up with the drum cart and set them over

23  onto a pallet.

24  Q    Okay.  And when you used pallets, there were basically

25  four drums to a pallet, correct?

1    A    Yes.

2    Q    And then you'd pick the pallet up with a forklift and

3    take the drums to wherever you were going to store them,

4    correct?

5    A    Yes.

6    Q    Where would they be stored in '74?

7    A    I think in the lower warehouse.

8    Q    All right.  And the lower warehouse is that bigger

9    warehouse down at the bottom of the picture, correct?

10   A    The one down here.

11   Q    And the upper warehouse is the little warehouse, correct?

12   A    The lower warehouse is the little one.

13   Q    Oh, I'm sorry.  I'm sorry.  I had warehouse dyslexia

14   there for a second.

15        The upper warehouse -- the lower warehouse is the smaller

16   one, correct?

17   A    Yes.

18   Q    Yeah.  Okay.  And so you would store the drums in that

19   smaller warehouse?

20   A    Yes.

21   Q    Okay.  And to store the drums in the lower warehouse, you

22   would take the forklift with the pallet on it, and you would

23   drive it up into a garage door that opened on the lower

24   warehouse, correct?

25   A    Yes.

1   Q    All right.  There was a big overhead garage door on the

2   lower warehouse, correct?

3   A    Yes.

4   Q    All right.  And I think you testified that there was a

5   concrete pad in 1974.

6   A    Yes.

7   Q    All right.  And that concrete pad was on an incline up

8   into the lower warehouse; isn't that correct?

9   A    Yes.

10  Q    The lower warehouse was basically about 4, at least

11  4 inches above -- the floor of the lower warehouse was at

12  least 4 inches above the surrounding property, correct?

13  A    Yes.

14  Q    And so there would be a steady incline in the concrete up

15  into the door of the lower warehouse, correct?

16  A    Yes.

17  Q    Now did that concrete, did that concrete pad that sloped

18  up into the lower warehouse, did that go across the whole

19  front of the lower warehouse, or did it only go up to the

20  door?

21  A    It went across -- I'll try to remember now.  Pretty much

22  as I remember, it went to the lower warehouse.

23  Q    Okay.  So it went from one end of the lower, one end of

24  the lower warehouse, which I'll mark it right here, from --

25  whoops.  To the extent I can mark it, from right there to

1  right here, it went all the way across, correct?

2  A    I believe so.

3  Q    Okay.  And it started to slope up, and I think you can

4  actually see it starting to slope up here on this thing.  It

5  starts to slope up about there; isn't that correct?

6  A    Yes.

7  Q    Okay.  Why don't you mark that with a C.  Mark that line

8  of the concrete apron, if I can call it an apron, that leads

9  up into the, up into the lower warehouse.  Would you just

10 please draw that just like I've drawn it here except a little

11 nicer than I've drawn it, and mark that with a C?

12 A    (Complied with request.)  Like so?

13 Q    I'll see.

14     All right.  Well, let me ask you a question about that,

15 okay?

16 A    Okay.

17 Q    What you just circled was less than the whole front of

18 the lower warehouse, and the question I guess I have for you,

19 is you just testified that the concrete went from one end of

20 the lower warehouse all the way to the other, but you just

21 circled a smaller portion of it.  Why did you do that?

22 A    I think my memory was wrong on the first question, where

23 it went --

24 Q    All right.  So --

25 A    -- the full width.

1   Q     Say that again?

2   A     Where it went the full width.  I think my memory was

3   wrong on that.

4   Q     Okay.  So you don't think it was the whole width?

5   A     Not after I looked at the picture here.

6   Q     All right.  And when you looked at the picture, you

7   circled the smaller area, which is this area right here, and

8   that's what you think that the -- where the concrete apron

9   was; is that correct?

10  A     Yes.

11  Q     All right.  And that led up into the door and to the

12  lower warehouse, correct?

13  A     Yes.

14  Q     All right.  Now let me go back to the -- let me refer you

15  to another area of the -- let me ask you about the berm that

16  you were asked about on direct, in 1974.

17      The berm, in 1974, was not, in this picture, was not

18  completed; is that correct?

19  A     It don't look like it was completed right up by the lower

20  warehouse.

21  Q     Say that again?

22  A     It don't look like it was completed by the lower

23  warehouse.

24          MR. JOHNSON:  All right.  Can you blow up that

25  portion of this that -- this area?  Get it down.  A little bit

425

1   higher.

2          DOCUMENT TECHNICIAN:   (Complied with request.)

3          MR. JOHNSON:   Okay.   Good.

4   BY MR. JOHNSON:

5   Q     The berm appears to be -- it's obviously open in the

6   southeast side, correct, because the trucks are coming in

7   there?

8   A     Pardon?

9   Q     It's open right through here because the trucks are

10  coming in, correct?

11  A     There was an opening there, yes.

12  Q     Okay.   And it started about here and went up here and

13  went around here and then went down this side, correct?

14  A     Yes.

15  Q     All right.   But it wasn't completed all the way around

16  the bottom of the tank farm, correct, in 1974?

17  A     It looks like it went up to about there.

18  Q     Okay.   It went down to about here, but it wasn't

19  completed on the south side of the tank farm, correct?

20  A     It don't look like it in the picture here.

21  Q     Do you remember that you testified earlier in this case

22  that you thought that the berm, in 1974, went all the way

23  across the bottom of the tank farm?

24  A     How do you mean?   Which do you mean, the "bottom"?

25  Q     Say that again?

426

1    A    Which do you mean is the bottom of the warehouse?

2    Q    I'm sorry.  I don't mean the bottom of the warehouse.

3    The bottom of the tank farm.

4    A    Down here?

5    Q    Down here.

6    A    Okay.

7    Q    It doesn't -- the berm is not there in 1974, right?

8    A    It don't look like it.

9    Q    Okay.  Now the catch pond is in the upper, upper corner

10   up here, which is right here, right?

11   A    Yes.

12   Q    All right.  And will you draw the catch pond, where it

13   exists, and mark it with a G, with whatever the next letter

14   is, a D, I think it is, on your picture?

15   A    Pardon?  I don't understand your question.

16   Q    All right.

17   A    My hearing is a little bad, and I missed something there.

18   Q    I appreciate that, and I will go as slow as I can, and

19   I'll try to speak as loudly as I can and into the microphone

20   so you can hear me.

21        I just circled -- let me back up.

22        As opposed to my doing it, why don't you circle where the

23   catch pond is in this 1974 photo.

24   A    (Complied with request.)

25   Q    Now over in this area, do you see it's a little darker

427

1    through here, where I'm drawing my line?  Do you see that?

2    A    Yes.

3    Q    That shows wetness, does it not, in that area?  The dirt

4    is wet there, isn't it, in this photo?

5    A    I don't really know.

6    Q    All right.  Because -- the reason I ask that is because

7    that's the same color as the catch pond on this photo,

8    correct?

9    A    Yes.

10   Q    Okay.  And the slope of this whole area was towards the

11   catch pond, correct?

12   A    Yes.

13   Q    All right.  But the catch pond, in 1974, we call it a

14   pond, but it's just a low-lying area back there next to the

15   berm, correct?

16   A    It had a small berm around it, anyway.

17   Q    Okay.  It had a small berm to the north and to the west,

18   correct?

19   A    Yes.

20   Q    All right.  It didn't really have a berm to the east, did

21   it?

22   A    I don't remember right now.

23   Q    All right.  Let me get rid of all of the markings.

24        You don't see a berm there to the east of that catch pond

25   where you drew before, correct?

1    A    No.

2    Q    So it's not like a swimming pool or anything?  It's just

3    the low-lying area back in the back where rinsewater and

4    rainwater can run back to, correct?

5    A    Yes.

6    Q    All right.  And in 1974, there was not a liner in that

7    catch pond, was there?

8    A    I don't know.  I wasn't there when they put it in.

9    Q    Okay.  You weren't there when they put it in, and so the

10   catch pond was there when you started in 1974, but you didn't

11   see a liner in the catch pond, correct?

12   A    Not at that time.

13   Q    All right.  And you don't even know -- you don't have any

14   idea when they put the liner in, do you?

15   A    No.

16   Q    Okay.  Now the purpose of the catch pond is exactly what

17   its name implies?  It was there to catch any chemical spills

18   in the tank farm and the loading and unloading area; isn't

19   that correct?

20   A    Yes.

21   Q    And that's because the slope of the property was back to

22   the catch pond, and whatever was spilled in the daily

23   splishing and splashing of chemicals onto the ground got

24   rinsed off and went back to the catch pond, and that was the

25   purpose of it, correct?

1    A    Yes.

2    Q    And that's how it got its name, the "catch" pond; it

3    caught chemicals, correct?

4    A    That would be my guess.

5    Q    Okay.  Now let me show you the 19 -- the 11/4/75 photo.

6         (Discussion off the record at counsel table.)

7              MR. JOHNSON:  5019.

8    BY MR. JOHNSON:

9    Q    All right.  I'm showing you another photo here that's

10   dated 11/4/75.  That's November 4, 1975.  Do you see that?

11   A    Yes.

12   Q    All right.  And this is Exhibit 5019, and it's in

13   evidence.

14        Can you blow up the catch pond area?

15             DOCUMENT TECHNICIAN:  (Complied with request.)

16   BY MR. JOHNSON:

17   Q    Now this is over a little more than a year later from the

18   prior photograph.  Here, the catch pond has some liquid in it.

19   Do you see that?

20   A    Yes.

21   Q    All right.  And right next to that -- and why don't you

22   circle that on your -- not with the pen.

23   A    (Complied with request.)

24   Q    All right.  And the question I have for you is whether

25   you know whether there was a liner in the catch pond at that

1   point in time.

2   A    As far as I know.

3   Q    All right.  But you don't know when they put the liner

4   in, correct?

5   A    No.

6   Q    And you don't see a liner in the catch pond in this

7   picture, right?

8   A    No.

9   Q    Now do you see the tank that's right next to the catch

10  pond?  And I'll circle that one.  What's -- do you know what

11  that tank is for?

12  A    No, I don't.

13  Q    Now the berm in this picture, in 1975, is still not

14  completed on the east side, is it?

15  A    Yes, it was completed then.  You look up by the drumming

16  shed, and you can see it coming in there.

17  Q    All right.  I just asked you about the east side, though,

18  Mr. Colver.

19  A    The east side.  It came only to there.

20  Q    Okay.  So I'll just draw here.  It goes up here, starts

21  about there, comes around here, and goes down here, correct?

22  A    Yeah, yes.

23  Q    All right.  And then the question is, gee, all of a

24  sudden, you can't see in the shadow there, correct?

25  A    Correct.

1    Q    So you don't know whether, in this particular photo,

2    there's a berm in that shadow portion, do you, that connects

3    all the way across the south side?

4    A    You can see just the end of it over by the drumming shed.

5    Q    All right.  And so you see right here, between the

6    shadows, you see a little berm, correct?

7    A    Yes.

8    Q    All right.  Do you recall, directly north of that,

9    directly north of that -- well, strike that.

10       All right.  And why don't you draw where you think the

11   berm was in nineteen-seventy- -- well, you know what?  That's

12   all right.  We'll come back to that.

13       Okay.  Let me ask another question.  The perc tank, you

14   told us, was this -- was in that area right there, is that

15   correct, in this 1975 photo?

16   A    I believe that it was, yes.

17   Q    All right.  Do you recognize -- you're looking at the

18   1975 photo like the rest of us.  That's a big white blob.  Do

19   you recognize that, or a portion of that, as being the perc

20   tank?

21   A    I believe it would be just on the west side.  There's

22   actually three tanks there.

23   Q    All right.  Well, you just drew stuff way down in the

24   shadow; is that correct?

25   A    Pardon?

1   Q    You just drew way down in the shadow, next to the upper

2   warehouse; is that correct?

3   A    I didn't mean to.

4   Q    Oh, okay.  That's fine.  Let's get rid of what's on

5   there.

6        All right.  Let's start that all over again.

7        Would you circle, for the jury, what you believe is the

8   perc tank in 1975?

9   A    Whoops.  I'm getting lots of lines I didn't want.

10  Q    All right.  Well -- all right.  So that --

11  A    I'm trying to keep from shaking.

12  Q    All right.  Well, you're doing a good job.

13       That's what you testified to when Mr. Cozzens asked you

14  what the perc tank was, correct?

15  A    I believe so.

16  Q    Okay.  And why do you think that that's the perc tank?

17  Do you have a recollection about that, or did somebody refresh

18  your recollection as to what it was?

19  A    I think at this time they were stored over there.  There

20  was three tanks that always set together, and I think they

21  were stored there during construction of the drumming shed.

22  Q    All right.  And earlier in this case you testified, did

23  you not, that the perc tank was actually right here?  Do you

24  recall that testimony?  Where I just outlined?

25  A    It sat over a little more to the east, as I recall.

1   Q    All right.  But a little over more to the east, at a

2   subsequent date?

3   A    Out there.

4   Q    At a subsequent date, though, correct?

5   A    Pardon?

6   Q    At a subsequent date?

7   A    I don't understand.

8   Q    At a date after the date of this picture.

9   A    Yes.

10  Q    All right.  But on the date of this picture, November 4,

11  1975, you believe that the perc tanks are these tanks that I'm

12  now drawing a circle around again, right?

13  A    One of them was.

14  Q    Okay.  And you think that there were three tanks there?

15  A    Yes.

16  Q    All right.  Can you do -- let me hand you what's been

17  marked as 4832.  Okay.  And if you could, sir, draw a circle

18  around the perc -- the three tanks that you just testified to,

19  and mark that with an A.

20          MR. COZZENS:  Can I have one of those?

21          MR. JOHNSON:   (Handing.)

22          MR. COZZENS:  Thanks.

23  BY MR. JOHNSON:

24  Q    Did you do that, sir?

25  A    Yes.

434

1    Q    Now in the 1974 photo -- trucks, at this point in time,

2    in November of 1975, could drive right in through the opening

3    here and drive up right next to the perc tank, right, and fill

4    that perc tank, correct?

5    A    Yes.

6    Q    And that's how it was done back in -- when this was taken

7    in November of 1975; isn't that correct?

8    A    I believe so.

9         MR. JOHNSON:  All right.  Take it out a little bit.

10        DOCUMENT TECHNICIAN:  (Complied with request.)

11   BY MR. JOHNSON:

12   Q    Indeed, as you look at this picture, you circled before,

13   I think, what was the asphalt.  The asphalt was put in after

14   1974, and this is now 1975, and there's asphalt there,

15   correct?

16   A    Yes.

17   Q    All right.  And part of the asphalt, and I'll try to

18   do -- well, I really don't like those plusses.  I'm going to

19   circle the asphalt a little bit as it relates to this area.

20   The asphalt goes through here, *et cetera*.

21        You can see truck markings, truck tire marks right

22   through here going to that area, correct, on this picture?

23   A    Yes.

24   Q    Okay.  Now the drumming shed is shown in this picture.

25   Why don't you circle that yourself.

435

1   A      On this?

2   Q      Circle it on the picture and mark it with a B.

3   A      (Complied with request.)

4   Q      Oh, it's red now.

5   A      Yeah, that surprised me, too.

6   Q      So that's the, that's the drumming shed, and you said, on

7   direct, that you constructed that overhead?

8   A      Yes.

9   Q      Okay.  And did anybody help you in that work?

10  A      Mr. Bender and Mr. Hutchinson.

11  Q      All right.  They were the other two guys that worked in

12  the yard with you, correct?

13  A      Yes.

14  Q      And at the time that you -- it was open in the front and

15  in the back and on the sides, correct?

16  A      Pardon?

17  Q      The drumming shed was open on each side; is that not

18  correct?

19  A      Just in the front.

20  Q      Just in the front.  So the back was closed off?

21  A      Yes.

22  Q      And the sides were closed off?

23  A      Yes, the ends.

24  Q      The ends were closed off.  And the only thing that was

25  open was the front?

1    A     Yes.

2    Q     Now when you rolled drums -- you rolled drums in and out

3    of there, right?

4    A     Yes.

5    Q     All right.  And you rolled them out the front because

6    that's the only place that was open, correct?

7    A     Yes.

8    Q     And there was a drain in that drumming shed, was there

9    not?

10   A     The trough formed a drain.

11   Q     Say that again?

12   A     The trough that the rollers and the scale set in formed a

13   drain out to the west.

14   Q     All right.  And I'll come back to that in a second, but

15   you drummed chemical products, yourself, in there, correct?

16   A     Yes.

17   Q     And Mr. Hutchinson and Mr. Bender also did that, as well?

18   A     Yes.

19   Q     And when did you become the maintenance guy at Dyce?

20   A     Probably in about 1977.

21   Q     After you became the maintenance --

22   A     I kind of fell into it slowly.

23   Q     All right.  Because you were good at fixing things,

24   right?

25   A     Yes.

1  Q    All right.  And so to a certain extent, they probably

2  drummed more product than you did because you were off doing

3  maintenance; is that correct?

4  A    Yes.

5  Q    The inside of the drumming shed, it had an electrical

6  outlet, did it not?

7  A    There was electricity in there.  There's a 220 outlet.  I

8  remember that.

9  Q    All right.  What was the 220 outlet used for?

10  A    The operator -- or portable pump.

11  Q    Okay.  Because the pumps you had were electric, right?

12  A    Yes.

13  Q    All right.  And you stored the pumps at this point in

14  time, in 1975, in the drumming shed?

15  A    They were stored in the lower warehouse.

16  Q    Okay.  And when you needed the pump, when you needed a

17  pump, you would take it out.  To drum product, you would take

18  it out, and you'd take it over to the drumming shed and plug

19  it in and set it up, correct?

20  A    Yes.

21  Q    And it would set up on the concrete, correct?

22  A    Yes.

23  Q    All right.  How much did the -- there was one pump that

24  was used for perc?

25  A    Yes.

1   Q   And how much did that pump weigh?

2   A   Probably about 80 pounds.

3   Q   Boy.  That's a lot.

4   A   They were pretty good-sized pumps.

5   Q   Yeah.  And you'd have to -- was it on wheels?

6   A   No.  It just sat on a platform, and we used a two-wheel

7   cart to haul it around with.

8   Q   Oh, I see.  Okay.

9       Now the drain that we talked about that was in the

10  drumming shed, it collected any chemicals that were spilled

11  during the drumming process, correct?

12  A   Yes.

13  Q   And when you drummed product in the daily drumming of

14  product, I mean, it would spill chemicals from time to time in

15  connection with the drumming of the product, correct?

16  A   Possibly, yes.

17  Q   Okay.  Because when you drum product, you're hooking up a

18  hose to a pump, correct?

19  A   Yes.

20  Q   And then you're taking one end of the hose -- I'm sorry.

21      One end of the hose is attached to, is it, when you're

22  drumming products with the perc tank way back in the back

23  here, in 1975, would you have a hose that ran all the way from

24  that perc tank all the way to the drumming shed?

25  A   It ran to the pump, and then we had a short pump that we

1   used to do the drumming with.  And on the end of that short

2   pump, there was a valve and a short piece of pipe that would

3   fit down into the drum.

4   Q    Okay.  And so when you drummed perc back in 1975, you'd

5   run a hose all the way back from that perc tank, all the way

6   to the back side of the drumming shed?

7   A    Yes.

8   Q    And then how would you get the hose around into the front

9   of the drumming shed?

10  A    There was an opening that we brought the hose through.

11  Q    And how many -- how long were the hoses?  They were only

12  20 feet, weren't they?

13  A    They could have been most any length.  That one would

14  have probably been about 20 feet, yes.

15  Q    How far was it from the back of the perc tank -- strike

16  that.

17       How far was it, in 1975, from the perc tank to the back

18  of the drumming shed?

19  A    I never measured it.

20  Q    It's a lot longer than 20 feet, isn't it?

21  A    No, it really -- I don't believe it was.

22  Q    Okay.  And you would take a hose all the way from that

23  perc tank and take it in through the back of the drumming

24  shed, and that, you're telling us, is less than 20 feet?

25  A    Um-hmm.

1   Q    And then when it got in the perc -- it got in the

2   drumming shed, you'd attach it to a pump?

3   A    Pardon?

4   Q    I think you mentioned that there were two pumps when you

5   took it out of the perc tank, so where is the second -- where

6   were the two pumps located?

7   A    Just one pump.

8   Q    Oh, just one pump.

9   A    Yes.

10  Q    And that pump would be in the drumming shed itself?

11  A    Yes.

12  Q    And then you would attach that end of the hose to the

13  pump in the back of the drumming shed, on the floor of the

14  drumming shed, correct?

15  A    Yes.

16  Q    And then you would run from that pump to the drum, what,

17  another hose, did you say?

18  A    We had another short hose for that.

19  Q    All right.  And so you'd have to take that short hose,

20  and you'd have to put it into the drum, right?

21  A    Yes.

22  Q    Okay.  And the drums were 55 gallons, correct?

23  A    Yes.

24  Q    And your pump pumped 60 gallons a minute, correct?

25  A    Yes.

1    Q    All right.  So that means you would fill up a drum, and

2    even though the drums were 55 gallons, you only filled them to

3    about 50 gallons, correct?  You didn't fill them all the way

4    to the top?

5    A    I think they were 55, and the drum would actually hold

6    about 60 gallons.

7    Q    Okay.  So you would fill it up with 55 gallons of perc?

8    A    Yes.

9    Q    All right.  And if you're pumping at 60 gallons a minute,

10   that takes less than a minute to fill up the perc tank, right?

11   A    Yes.

12   Q    I'm sorry; the drum, correct?

13   A    Yes.

14   Q    All right.  And then you would take those drums, and you

15   would weigh them, and when they got to a certain amount, you

16   knew that you had 55 gallons, correct?

17   A    Yes.

18   Q    And then you'd turn the pump off?

19   A    We'd shut the valve off on -- we had a valve on the end

20   of the short hose.  We shut that valve off.

21   Q    Okay.  And then you'd take it out --

22   A    (Nodded head affirmatively.)

23   Q    -- of that, and then you'd pull up another drum, and

24   you'd do it all over again; is that correct?

25   A    Yes.

442

1    Q    And in the time that you would take that perc, the hose

2    out of the drum and move it around and get it -- move that

3    drum out and put another drum in, you would spill a little

4    perc, wouldn't you, typically?

5    A    Very little.

6    Q    All right.  But you would spill some, right?

7    A    Maybe a few drops.

8    Q    All right.  And you didn't collect those drops in any

9    bucket or anything, did you?

10   A    No.

11   Q    Now coming out of the back side of this drumming shed,

12   you can see some water on the ground, right, right in that

13   location?

14        Why don't you make that larger.

15        DOCUMENT TECHNICIAN:  (Complied with request.)

16   BY MR. JOHNSON:

17   Q    Okay.  You see that, in 1975?  You see water coming out

18   of the back of the drumming shed, correct, in this area right

19   here?

20   A    I see the area, but I can't tell for sure that it's

21   water.

22   Q    All right.  And it could be liquid of some sort, correct?

23   A    Could be.

24   Q    Okay.  Isn't it a fact, sir, that the drain that you had

25   in the drumming shed went out the back of the drumming shed

                              443

1   and into the tank farm?

2   A    Pardon?

3   Q    Isn't it a fact that the drain that you had in the

4   drumming shed, in the concrete platform of the drumming shed,

5   went out the back of the drumming shed and into the tank farm

6   and down into the catch pond?

7   A    Yes.

8   Q    And so whatever was spilled in 1975 in there went through

9   that drain, which came out the back, and went down into --

10  eventually, if there was enough of it, it went down to the

11  catch pond, correct?

12  A    I believe that it went around this, by the lower

13  warehouse, and down this way into the catch pond.

14  Q    All right.  It didn't, it didn't go, you're saying it

15  didn't go out the back and down to the catch pond?

16  A    No, because the drain was in this corner here.

17  Q    All right.  Did it, did the drain -- if the drain was in

18  that corner there, didn't it drain out into the tank farm and

19  then down to the catch pond?

20  A    Yes.

21  Q    It did, correct?

22  A    I believe so.

23  Q    Okay.  Indeed, that's what you've testified to before in

24  this case, correct?

25  A    Pardon?

1  Q    You've told us that before in this case, haven't you,

2  that it drained down into the catch pond?

3  A    I believe so.

4  Q    Now the Dyce policy was that when you drum, you're

5  supposed to drum with two guys, right?

6  A    Supposed to, but it didn't always happen that way.

7  Q    The three of you guys were pretty busy all the time,

8  weren't you?

9  A    Pardon?

10 Q    The three of you guys were pretty busy, weren't you?

11 A    We got that way once in a while.

12 Q    All right.  And so there were times, were there not, when

13 you drummed by yourself?

14 A    Yes.

15 Q    All right.  Even though it was supposed to be a two-man

16 job, correct?

17 A    Yes.

18 Q    All right.  And you drummed by -- and it was a lot harder

19 to drum by yourself than it was to have two guys there, right?

20 A    Yes.

21 Q    Because you've got to -- I mean, you've explained to us.

22 It's really a two-man job, but if one person does it, it's

23 just not as easy to do it with one person?

24 A    Right.

25 Q    And when one person did it, you were probably much more

445

1  likely to spill more than a few drops of perc; isn't that

2  correct?

3  A    Not necessarily.

4  Q    All right.  But if you were doing it by yourself, there

5  were times when you spilled more than a few drops of perc;

6  isn't that correct?

7  A    Probably correct, yes.

8  Q    Now when you were -- when the trucks would come in here

9  in 1975 and come in to load one of these perc tanks, the perc

10 tank that is one of these three tanks back there, okay, that

11 perc tank that you had was 1,500 gallons, correct?

12 A    Yes.

13 Q    All right.  And it would be pumped from the truck through

14 the same perc pump, correct?

15 A    Yes.

16 Q    And that perc pump pumped, again, 60 gallons a minute,

17 correct?

18 A    Yes.

19 Q    All right.  So it would take you about 25 minutes to fill

20 up a 1,500-gallon tank, correct?

21 A    Somewhere in there.

22 Q    All right.  And obviously if there was stuff already in

23 there, if there was perc already in there, it would take you

24 less time than 25 minutes?

25 A    Yes.

1   Q    All right.  And it was the policy of Dyce that you had to

2   stay there the whole time, right, while that operation was

3   going on?

4   A    You were supposed to.

5   Q    Okay.  And you, when you did it, you always stayed there,

6   right --

7   A    Yes.

8   Q    -- because that was your job?

9   A    Yes.

10  Q    Correct?  Because if anything happened, you wanted to be

11  there in order to turn the pump off right away, correct?

12  A    Correct.

13  Q    And that was Dyce's policy?

14  A    Yes.

15  Q    The whole time you were there?

16  A    Yes.

17  Q    And I think you testified on your direct testimony that

18  if a little pinhole appeared in a hose, you would see it

19  because you're right there pumping the product, correct?

20  A    Yes.

21  Q    And it was up to you, then, if there was a pinhole in a

22  hose, it was up to you to try to fix it, correct?

23  A    It was up to me to fix it.

24  Q    All right.  And if you couldn't fix it, you'd have to get

25  a new hose?

447

1    A    Yes.

2    Q    Do you ever recall getting a new perc hose?

3    A    Yes.

4    Q    When?

5    A    Oh, probably once a year.

6    Q    Okay.  And you said that the perc hoses were always

7    painted with blue?

8    A    I think they were blue.

9    Q    All right.  What were the other colors that were used for

10   other hoses?

11   A    We used black, green, yellow, red.

12   Q    What was the yellow for?

13   A    Caustic soda, I believe.

14   Q    All right.  What was the black for?

15   A    Black, I can't remember.

16   Q    All right.  What about green?

17   A    The green would have been a glycol house.

18   Q    All right.  What about red?

19   A    It would have been alcohol.

20   Q    And the whole time you were there, the perc hoses were

21   always with blue?

22   A    They were the same color.

23   Q    All right.  But you're not sure if they were blue or not,

24   right?

25   A    They could have been a different color.  It's hard to

1    remember now.

2    Q    It was a long time ago, isn't it?

3    A    It is, for short memory.

4    Q    Yeah.  And when you had hoses, perc hoses, did you have

5    two of them or one?

6    A    Two.

7    Q    All right.

8    A    Two to three.

9    Q    Two to three at a time.

10   A    Yes.

11   Q    And those hoses were about 20 feet long, correct?

12   A    There was one that was only about 10 feet long.

13   Q    All right.  So you had one that was 10, and the others

14   were how long?

15   A    Probably 20-foot.

16   Q    And they had 2-inch diameters, correct?

17   A    Yes.

18   Q    They were made with reinforced construction; isn't that

19   correct?

20   A    Reinforced construction, did you say?

21   Q    Yes, sir.

22   A    Yes.

23   Q    In other words, they weren't like your typical garden

24   hose, right?

25   A    No.

1    Q    No.  They had stuff in them that would keep them from

2    bursting open, correct?

3    A    Yes.

4    Q    Okay.  Now you mentioned that the hoses had couplers at

5    the end of them?

6    A    Yes.

7         MR. JOHNSON:  All right.  Let me show you one, okay?

8         (Discussion off the record at counsel table.)

9    BY MR. JOHNSON:

10   Q    This, I will represent to you, sir, this is Exhibit 4315,

11   okay?  And this, sir, I'm not -- this is not -- I'm not

12   representing to you that this is one of the perc hoses, but

13   this does have a coupler on it.  Do you see that?

14   A    Yes.

15        MR. JOHNSON:  All right.  Let me approach.  If I

16   may, Your Honor?

17        THE COURT:  You may.

18        And, ladies and gentlemen, I've admitted it for

19   illustrative purposes.  That means it can be used at any time

20   during the trial, but it's not an exhibit that you'll take

21   into the jury room with you.

22        Go ahead.

23   BY MR. JOHNSON:

24   Q    All right.  Now you've testified that this -- I'll keep

25   my voice up as much as I can here.  Let me put the microphone

1   over here.

2       You've testified about a quick coupler that was on the

3   perc hoses, correct?

4   A    Yes.

5   Q    And this is, indeed, such a coupler, is it not?

6   A    Yes.

7   Q    And to undo it, you just take these things off, and it

8   comes right apart, right?

9   A    Yes.

10  Q    And that's probably why they call it a quick coupler,

11  right?

12  A    Yes.

13  Q    It couples very quickly, and, when you couple it, you

14  couple it quickly, correct?

15  A    Yes.

16  Q    And it's firm, isn't it?

17  A    Yes.

18  Q    You can't pull.  Why don't you pull it.

19  A    (Complied with request.)

20  Q    You can't pull it apart, right?

21  A    No.

22  Q    Doesn't pull apart.  And even if one of these things

23  comes undone --

24  A    You still can't.

25  Q    -- you still can't do it?

451

1   A     There's one gasket in there, too, if you can see it.

2   Q     Okay.  All right.  And those were exactly the types of

3   quick couplers that you used, right?

4   A     Yes.

5   Q     And did they have, on the pumps, the same type of

6   connection with the quick coupler?

7   A     Yes.

8   Q     And what about on the tank?  Did the tank have the same

9   connection with the quick coupler?

10  A     Same type.

11  Q     Okay.  So all of the connections, when you made those

12  connections, the hose to the tank and the tank to the pump and

13  the pump to the drumming shed, I mean, all of those things,

14  they were all connected with a quick coupler, correct?

15  A     Yes.

16  Q     Now when you pumped perc into a perc tank, you stood

17  about, oh, 10 feet or so away from the pump, correct?

18  A     Yes.

19  Q     All right.  And if a problem developed, you could turn

20  off the pump in a matter of a few seconds, correct?

21  A     Yes.

22  Q     And you stood there so that you could turn it off, right?

23  A     Yes.

24  Q     Now on direct examination, you said that truck drivers

25  that would come in to unload, I think you said, more often

1  than not or typically walked away?

2  A    Yes.

3  Q    And where did they go?

4  A    They went up in the coffee room and drank coffee.

5  Q    Now you testified in this case before, did you not?

6  A    Pardon?

7  Q    You testified in this case before, correct?

8  A    Yes.

9  Q    And you swore to God to tell the truth when you testified

10  in this case, correct?

11  A    Yes.

12  Q    Have you ever seen a transcript of your testimony?

13  A    Pardon?

14  Q    Have you ever seen a transcript of your testimony in this

15  case?

16  A    No.

17          MR. JOHNSON:  All right.  Let me -- may I approach,

18  Your Honor?

19          THE COURT:  Yes.

20  BY MR. JOHNSON:

21  Q    Let me refer you, sir, to page 755.  Do you see that?

22  There's four pages on a page there.

23  A    Yeah.

24  Q    Do you see where page 755 is?

25  A    Yes.

1    Q    All right.  Let me read to you, sir, from your prior

2    testimony.  You can tell me whether this is what you testified

3    to, okay?

4         I'm reading from line 22.  The question that was asked of

5    you, sir, is, "Typically did the truck driver stay by his

6    truck when you're running a hose off his tank?"

7         And your answer is, "Yes."

8         That was your testimony that day, wasn't it?

9    A    I didn't find where you were reading, sir.

10             MR. JOHNSON:  It's -- can I approach?

11             THE COURT:  Yes.

12   BY MR. JOHNSON:

13   Q    This is page 755.

14   A    Yeah.

15   Q    This is the question, line 22.

16   A    Oh, there it is.

17   Q    Okay?

18   A    There's where I lost you.  I misunderstood the number.

19   Q    Well, let me help you, okay?

20        You were asked this question:  "Typically did the truck

21   driver stay by his truck when you're running a hose off his

22   tank?"

23        And your answer was, "Yes."

24        You gave that answer, correct?

25   A    Evidently.  It says, "Yes."

1   Q    All right.  Thank you.

2        Now if there were a spill of perc in the area where it's

3   asphalted, around here -- that was asphalt in 1975, correct?

4   A    Yes.

5   Q    All right.  That perc would eat up the asphalt, wouldn't

6   it?

7   A    It works on it, yes.

8   Q    All right.  And perc spilled on asphalt would work on the

9   asphalt and cause it to disintegrate, correct?

10  A    In time, yes.

11  Q    Okay.  And perc actually would eat -- it's a solvent.  It

12  actually would, if there was a truck there and there had been

13  a spill and perc got on a truck tire, it would work on the

14  truck tire, as well, right, the rubber truck tire?

15  A    I would think so.

16  Q    Okay.  But you never, the whole time you worked at Dyce,

17  you never saw that asphalt area impacted at all by a spill of

18  perc or other chlorinated solvents; isn't that correct?

19  A    Correct.

20  Q    And, in fact, not only in the loading and unloading area,

21  but everywhere else.  You didn't see any perc or chlorinated

22  solvent have any impact on the asphalt; isn't that correct?

23  A    I saw one area.  I dropped a drum and poked a hole in the

24  side of it one day.

25  Q    Okay.  Where was that?

455

1    A    That was out --

2              MR. JOHNSON:  Take it out further.

3              DOCUMENT TECHNICIAN:  (Complied with request.)

4    BY MR. JOHNSON:

5    Q    Okay.  Go ahead.

6    A    I've got to -- just about in this area here.

7    Q    All right.  So that's, that's the asphalted area where

8    you saw tire tracks.  You dropped a drum of what?

9    A    Perc.

10   Q    All right.  And the perc spilled on the asphalt?

11   A    Yes.

12   Q    How much perc spilled on the asphalt?

13   A    Less than a gallon.

14   Q    All right.  But there was a gallon of perc on the asphalt

15   there, and you saw it react with the asphalt, correct?

16   A    Pardon?

17   Q    You saw the perc react with the asphalt and break it

18   down?

19   A    It started to, yes, and I got it cleaned up right away.

20   Q    All right.  But did it leave a mark on the asphalt?

21   A    It left it a little bit rough.

22   Q    Okay.

23   A    And maybe a little bit lighter colored.

24   Q    All right.  Because what happens when perc falls on

25   asphalt is it disintegrates the binder between the rocks that

456

1   are in the asphalt, correct?

2   A    Yes.

3   Q    And that's exactly what happened that day when you

4   spilled the perc tank, right?

5   A    Yes.

6   Q    Okay.  Thank you.

7        Now you talked about the concrete apron being outside

8   that warehouse, that upper warehouse or the lower warehouse.

9   I don't know why I'm getting confused on this.  Can I call it

10  the garage?

11  A    Pardon?

12  Q    Let's call this thing the garage.  Is that okay?

13  A    Okay.

14  Q    That's easier to do it.  I think it's less confusing to

15  me, certainly.  Hopefully it will be less confusing to the

16  jury.

17       So you said that there was a concrete apron outside the

18  garage the whole time that you were at Dyce, correct?

19  A    Yes.

20  Q    All right.  And it was the same concrete apron the whole

21  time?

22  A    Yes.

23  Q    It never -- they never changed it?

24  A    Not the apron.  Not that one itself.

25  Q    But you can't see the concrete apron on this particular

1  picture, can you, because it's in the shadow, right?

2  A    It's in the shadow.

3  Q    Let me show you what's -- let's take this one down and

4  let's show you 4044, which is in evidence.

5       Now this, if you can make this -- well, let me start.

6       This, sir, is in evidence.  It's a survey of the Dyce

7  site, and it's dated in July of 1976, okay?  And let's make it

8  a little bit bigger so that we can hone in on that, okay?

9  Let's make it even bigger around the warehouses, okay?

10          DOCUMENT TECHNICIAN:  (Complied with request.)

11 BY MR. JOHNSON:

12 Q    This shows, does it not, where the asphalt is?  It's

13 marked "Asphalt," correct?

14 A    Yes.

15 Q    Do you see that?

16      And that's your recollection of where the asphalt was at

17 the time?

18 A    Yes.

19          MR. JOHNSON:  Can we have just a second, Your Honor?

20          THE COURT:  Yes.

21          MR. COZZENS:  That apparently is not in evidence.

22          MR. JOHNSON:  Your Honor, take it down from the

23 jury.

24          THE COURT:  It is.

25          MR. JOHNSON:  Your Honor, I would move it into

                              458

1   evidence at this time.  Apparently I was mistaken.

2           MR. COZZENS:  Your Honor, we need some foundation

3   for it, certainly some foundation if we're going to ask this

4   witness something about a drawing that somebody else made.

5           MR. JOHNSON:  Well, Your Honor --

6           THE COURT:  What's the foundation?

7           MR. JOHNSON:  Well, the foundation is, Your Honor,

8   it's a certified plat of survey, and it's a representation as

9   to what it looked like at the time, and I'm going to ask him

10  questions about it.

11          MR. COZZENS:  Your Honor --

12          THE COURT:  Lay the foundation through him.  Ask him

13  if it accurately represents the area.

14          MR. JOHNSON:  Okay.  Thank you.

15          Put it back up so that just --

16          MR. GROSSBART:  Your Honor, we have it down as

17  admitted last Thursday.

18          MR. JOHNSON:  It is admitted.  That's what I

19  thought.

20          THE COURT:  Is it admitted?

21          MR. GROSSBART:  4044?

22          THE CLERK:  Is it yours?

23          MR. GROSSBART:  Yes.

24          THE CLERK:  Yes, it's in.

25          MR. COZZENS:  I'm sorry, Judge.  They're right.  It

1    is in.

2            MR. JOHNSON:  Thank you.

3            MR. COZZENS:  I still object to asking this witness

4    questions unless they lay some foundation about what it shows

5    and what --

6            MR. JOHNSON:  Well, I was just about to do that.

7            THE COURT:  Well, yeah.  Just go ahead and do it.

8    BY MR. JOHNSON:

9    Q    All right.  Now this shows the two warehouses that Dyce

10   had in 1976, correct?

11   A    Yes.

12   Q    All right.  And it shows the asphalt that you testified

13   about before, correct?

14   A    Yes.

15   Q    And it shows -- right here it says "Wash area."  That, I

16   presume, is pointing to the drumming shed, correct?

17   A    Yes.

18   Q    And behind it is a chain link fence.  Do you see that?

19   A    I can't tell that it's a fence.

20   Q    Well, it says on this drawing that there's a fence.  And

21   the question I guess I have for you, sir, is --

22   A    I see it now.

23   Q    Do you remember there being a fence right there behind

24   the warehouse and north of the garage?

25   A    No.

1   Q    You don't remember a fence at all?

2   A    No.

3   Q    All right.  And what about the fence on the east side?

4   Do you recall there being a chain link fence on the east side;

5   that is, right through here?

6   A    I don't recall one there, either.

7   Q    All right.  Was there ever a fence that you recall in

8   that area?

9   A    Not in the area you have marked.

10  Q    Okay.  And right here is something that connects the

11  garage to the other warehouse.  Do you see that?

12  A    Yes.

13  Q    All right.  And that says "CNOC walk."  Do you see that?

14  A    Yes.  That was just a walk-through between the two

15  buildings.

16  Q    All right.  And that was concrete, correct?

17  A    Concrete floor.

18  Q    Okay.  And -- but this does not show a concrete pad in

19  front of the warehouse.  Do you see that?

20  A    I see that it don't.

21  Q    All right.  Does that refresh your recollection as to

22  whether there was, at some point in time, not a concrete pad

23  in front of the warehouse?

24  A    It was long before I went to work there in February, if

25  there wasn't.

461

1    Q    All right.  But this is a representation from 1976, so in

2    1976, despite the fact that they don't show a concrete pad in

3    front of the warehouse here, you think that there was one?

4    That's your recollection?

5    A    Yes.

6              MR. JOHNSON:  All right.  You can take that down.

7              DOCUMENT TECHNICIAN:  (Complied with request.)

8              MR. JOHNSON:  Put up 5024.

9              DOCUMENT TECHNICIAN:  (Complied with request.)

10   BY MR. JOHNSON:

11   Q    I'm going to show you a photo, sir, that was taken by an

12   airplane flying overhead on September 6, 1977.

13        It's in evidence, 5024.

14        Now you recognize this.  I think you were shown this on

15   your direct examination.

16        Why don't you pull in to the operational area.

17              DOCUMENT TECHNICIAN:  (Complied with request.)

18              MR. JOHNSON:  Excellent.

19   BY MR. JOHNSON:

20   Q    And you see the drumming shed in this photo, correct?

21   A    Yes.

22   Q    All right.  Now directly to the south of the drumming

23   shed, right in this area, right there, you can see that the

24   pavement is darker.  Do you see that?

25   A    Yes.

462

1          MR. JOHNSON:  Get that larger for me.

2          DOCUMENT TECHNICIAN:  (Complied with request.)

3    BY MR. JOHNSON:

4    Q    All right.  And that's liquid coming out the front of the

5    drumming shed, isn't it?

6    A    I don't know, sir.

7    Q    All right.  Well, do you know that it isn't liquid?

8    A    No, I don't know that it isn't.

9    Q    Okay.  So you just don't know what it is.

10   A    I don't know what it is.

11   Q    All right.  But I presume that when you were drumming

12   product, in a drumming shed that was open on the front, that

13   it would get wet in front of that drumming shed from time to

14   time, would it not?

15   A    No, not necessarily.

16   Q    All right.  But did you ever see it wet in front of the

17   drumming shed?

18   A    From rainwater.

19   Q    All right.  Did you ever see it wet in front of the

20   drumming shed from liquid that came from the drumming shed?

21   A    No.

22   Q    Okay.  And if it was rainwater there in front of the

23   drumming shed, that rainwater would pool in that area that I

24   just circled here, right?

25   A    (No response.)

1  Q    Rainwater would pool right there, correct?

2  A    That should drain off around the end of the drumming

3  shed.

4  Q    All right.  Do you recall that happening, or do you

5  recall the fact that there was pooling there from time to

6  time?

7  A    Repeat the question, please.

8  Q    Well, wasn't there pooling there from time to time of

9  rainwater and other liquid, right in front of the drumming

10  shed?

11  A    Not that I remember.

12  Q    All right.  Now between the drumming shed and what I've

13  now referred to as the garage is an area that is something

14  that I'm going to circle.  Do you see that?

15  A    Yes.

16  Q    What is that?

17  A    I can't tell.

18  Q    You don't know what that is, right?

19  A    No.

20  Q    And you have no recollection of something -- because

21  we've seen this in several photos.  You have no recollection

22  of what would be sitting there between the drumming shed and

23  the garage?

24  A    No.

25  Q    Now you testified, I believe, on direct that the perc

1  tank at this point is behind the drumming shed; is that

2  correct?

3  A    Yes.

4  Q    All right.  It appears that there are three horizontal

5  tanks behind -- that come right out of that shadow behind the

6  drumming shed.  Do you see those?

7  A    Yes.

8  Q    Which one is the perc tank?

9  A    The one on the left.

10 Q    All right.  The left as we look at it, or the left if you

11 were standing, if you were looking at the back of the drumming

12 shed?

13 A    Right there.

14 Q    Okay.  The left as we look at it.

15 A    Yes.

16 Q    All right.  And when you would pump product -- I mean,

17 this is a lot closer to the drumming shed now than the one

18 before, correct?

19 A    Yes.

20 Q    All right.  And at this point in time -- why don't you

21 back out a little bit.

22       DOCUMENT TECHNICIAN:  (Complied with request.)

23 BY MR. JOHNSON:

24 Q    All rigiht.  At this point in time -- let me stop right

25 there.

1      You know how I asked you if there was a fence before?

2   A   Yes.

3   Q   Isn't this the fenceline right here, that black thing

4   right there?

5   A   No.  That would be the top of the berm --

6   Q   Well, isn't --

7   A   -- looks like.

8   Q   Isn't the top of the berm right to the left of that?

9   A   I don't ever remember a fence in there.

10  Q   Okay.

11  A   The fence came along here.

12  Q   All right.  But you don't ever recall a fence in the

13  drumming -- in the tank farm area, correct?

14  A   No.

15  Q   Okay.  Now on the date of this photo, which is in 1977,

16  the berm, on the east side, has been completed, correct?  It

17  comes down here?

18  A   Yes.

19  Q   All right.  And so truck traffic can't get into the back

20  through here like they used to do, right?

21  A   No.

22  Q   All right.  And so trucks used to pull, at this point in

23  time, when that was closed off, they used to pull into the

24  loading and unloading area, in this area, correct?

25  A   Yes.

1  Q    All right.  And with regard to the perc tank, if you

2  wanted to fill the perc tank, a truck would pull in, and you

3  would -- and it would be in that loading and unloading area,

4  and it would fill up the perc tank, correct?

5  A    Yes.

6  Q    All right.  And to fill up the perc tank at that point in

7  time, you used two separate hoses, correct?

8  A    Yes.

9  Q    All right.  And you would have -- one hose would be

10  attached to the tanker truck, correct?

11  A    Yes.

12  Q    With that quick coupler that I showed you a little while

13  ago, and then the next one would be attached to the perc

14  tank -- to the pump that would be in the drumming shed,

15  correct?

16  A    Yes.

17  Q    All right.  And then the hose would go out the back end

18  of the drumming shed to the perc tank, correct?

19  A    Yes.

20  Q    And it would -- that second hose would attach to the top

21  of the perc tank?

22  A    It would connect to the -- actually be the bottom of the

23  perc hose where the valve come out of the tank -- or excuse

24  me.

25      The piping and the valve came out of the tank.  Instead

1    of running over, filling through the top, they filled through

2    the bottom.

3    Q    All right.  And so there would be a valve at the bottom

4    of the tank?

5    A    Yes.

6    Q    All right.  But you would attach the perc hose to that

7    valve on the bottom of the tank; is that correct?

8    A    Yes.

9    Q    And then once all those connections were made, you would

10   turn on the pump?

11   A    Yes.

12   Q    And unload the perc from the perc -- from the truck

13   through the drumming shed into the perc tank, correct?

14   A    Yes.

15   Q    All right.  And when you were done with that procedure,

16   turned the pump off, would there be perc left in the hoses?

17   A    There would be a little, and the hose from the truck,

18   we'd pick it up, the end up, and walk it down to the pump, and

19   then the pump would pump it into the tank.  And then the hose

20   from the pump to the tank, we'd have to drain into a bucket,

21   and then we poured that into the tank from the top.

22   Q    All right.  So I understand this and get this clear in my

23   mind and the jury understands, you unhook, first of all, in

24   this procedure, you would unhook the hose that was attached to

25   the tanker truck?

1   A     Yes.

2   Q     That was the first thing you did?

3   A     Yes.

4   Q     All right.  And you would pick that end of the hose up --

5   it's a heavy hose, right?

6   A     They're pretty heavy.

7   Q     Yeah, because it's full of perc, and perc is twice as

8   heavy as water, right?

9   A     It would be about twice as heavy.

10   Q     Okay.  And so a gallon of perc weighs about 13 1/2

11   pounds; isn't that correct?

12   A     I don't remember the weight anymore per pound -- or per

13   gallon.

14   Q     All right.  But you would have a heavy -- you would have

15   a 20-foot hose?

16   A     Yes.

17   Q     All right.  So you would have a 20-foot hose that was

18   full of perc, and you'd pick that hose up, and you'd walk it

19   back to the pump.

20   A     Yes.

21   Q     And you'd get back to the pump in the drumming shed, and

22   it would spill back into the pump; is that correct?

23   A     Yes.  It would feed down into the pump.

24   Q     It would feed down into the pump, and then what would

25   happen to it?

1   A    The pump would pump it into the tank.

2   Q    Okay.  So you'd take whatever was in the hose and you'd

3   put it into the tank?  It would go right into the tank, then?

4   A    Yes.

5   Q    It would go from the pump into the tank?

6   A    Yes.

7   Q    And then when you were done with that procedure, you

8   would -- then what would happen to that hose?  You'd take that

9   hose off the pump?

10   A    Take it off and put it away.

11   Q    All right.  And there was obviously some drops of perc

12   left in that hose, right?

13   A    Yeah.  We put caps on it.

14   Q    Okay.  You would put caps on it to try to keep the perc

15   from hitting the ground; is that right?

16   A    Yes.

17   Q    All right.  And then you would -- and then what would you

18   do next?  You'd go directly to the perc tank?  You would go

19   directly to the perc tank, then?

20   A    Then we would have the hose from the pump that went to

21   the tank --

22   Q    Yeah.

23   A    -- and drain it back into a bucket --

24   Q    All right.

25   A    -- so that you'd empty that hose, because the pump will

1    not pump a hose dry in that way.

2    Q    Okay.  So you would unhook the perc hose at the pump in

3    the drumming shed.

4    A    Yes.

5    Q    All right.  And it was full of perc all the way from the

6    drumming shed all the way back to this perc tank, correct?

7    A    Yes.

8    Q    So that's 7 1/2, 8 gallons of perc at least, correct?

9    A    It wouldn't be that much.

10   Q    Why not?

11   A    Because the hose was only a 2-inch hose.

12   Q    All right.  It was a 2-inch hose, so that's a 2-inch

13   diameter of a hose?

14   A    Yes.

15   Q    But it's 20 feet long, is it not?

16   A    Yes.

17   Q    So how many gallons would be in that hose?

18   A    I can't tell you.

19   Q    All right.  How big --

20   A    I never figured it out or measured it.

21   Q    Okay.  And how, how big -- what kind of pail did you dump

22   it into?

23   A    Into a metal pail.

24   Q    All right.  How big was the metal pail?

25   A    Five-gallon pail.

1    Q      How tall is a 5-gallon pail?

2    A      About 16 inches.

3    Q      Okay.  And wouldn't, in putting that -- let me back up.

4           So you'd have to -- what would happen to the end of the

5    hose that you took off the perc tank?  Would you hold it up in

6    the air?

7    A      Yes.

8    Q      All right.  And then what would you do with it?

9    A      We'd drain it into a bucket.

10   Q      So then you'd turn it over, and you'd drain it into a

11   bucket?

12   A      Um-hmm.

13   Q      All right.  But -- and you'd hold the end of the hose in

14   the bucket?

15   A      Yes.

16   Q      All right.  And how would you -- did all of the perc get

17   out of the hose when you drained it that way?  Because, as I

18   understand it, on the perc tank, the hose isn't on the top of

19   the perc tank.  It's on the bottom of the perc tank.

20   A      Right.

21   Q      So when you're talking gravity, you're talking about

22   something that's down low, right?

23   A      Yes.

24   Q      And so how did you drain it, if, indeed, the end of the

25   hose was down at the bottom of the perc tank?

1   A    You set a bucket under that fitting and slowly open your

2   quick couplers and drain it into the bucket under the fitting,

3   right by the tank.

4   Q    All right.  So you'd have to drain, you'd have to drain

5   it from both ends.

6   A    Yes, now, basically.  And the easiest way to walk one of

7   those big heavy hoses is to roll it.

8   Q    Is to roll it.

9   A    Um-hmm.

10  Q    So when you say "roll" it --

11  A    You make a big loop in it.

12  Q    All right.  So you would loop it up.  How would you loop

13  it?

14  A    It would be just a big loop around.

15  Q    Okay.

16  A    And that keeps you from having to pick up so much weight.

17  Q    All right.

18  A    And it still keeps the hose up high.

19  Q    All right.  And did you, which end did you -- the first

20  end that you unhooked was in the perc -- was in the drumming

21  shed, correct?

22  A    Yes.

23  Q    Because you took the pump away, and actually when you

24  took the pump away, there was some perc left in the pump, too,

25  right?

1    A     Maybe a cupful.

2    Q     All right.  And you'd have to, you'd have to -- what

3    would you do with the perc that was in the drum -- that was in

4    the pump?  Excuse me.

5    A     We'd drain that into a bucket --

6    Q     All right.

7    A     -- and then pour it back into, pour it into the bulk

8    tank.

9    Q     All right.  And then you would walk the hose back to the

10   perc tank?

11   A     Yes.

12   Q     All right.  And then you'd undo the hose at the perc tank

13   down at the bottom?

14   A     You loosened the hose first, but you didn't uncouple it

15   completely.

16   Q     Why not?

17   A     You don't want that thing coming completely apart with a

18   hose full of perc.

19   Q     It did, though?  Once in a while, that would happen,

20   right?

21   A     It never did with me because I was careful with it.

22   Q     All right.  And you don't know whether that happened with

23   others or not, do you?

24   A     No, I do not.

25              MR. JOHNSON:  Now let me -- focus in on the garage

474

1    here.

2            DOCUMENT TECHNICIAN:  (Complied with request.)

3    BY MR. JOHNSON:

4    Q    Do you see a concrete apron in front of the garage at

5    this time?

6    A    Pardon?

7    Q    Do you see a concrete apron in front of the garage at

8    this point in time?

9    A    I can't tell in this picture, sir.

10           MR. JOHNSON:  Okay.  Let's focus in on the catch

11   pond.

12           DOCUMENT TECHNICIAN:  (Complied with request.)

13           MR. JOHNSON:  Focus in on it more.

14           DOCUMENT TECHNICIAN:  (Complied with request.)

15   BY MR. JOHNSON:

16   Q    The catch pond, as of the date of this photo, 1977,

17   appears dry; is that correct?

18   A    It appears that way, yes.

19   Q    All right.  And there is an item that's a cross there.

20   Do you see that?

21   A    Yes, I see it.

22   Q    Do you know what it is?

23   A    No, sir.

24   Q    Do you know whether it's metal or wood?

25   A    No.

475

1   Q    You don't have any recollection of it at all; is that

2   correct?

3   A    No.

4   Q    All right.  And there is, in this picture, right next to

5   the cross, a black area right here.  Right on the edge of the

6   berm.  Do you see that?  I tried to put my finger right on it.

7   It's right there.

8   A    Um-hmm.

9   Q    Do you know what that is?

10  A    No, I don't.

11  Q    All right.  And there is, over here, a cut.  Do you see

12  that?

13  A    There's a what?

14  Q    Right there.

15  A    I see your mark.

16  Q    Okay.  And that, and that, you see that cut right there,

17  correct, that black mark?

18  A    Yes.

19  Q    That was a man-made cut in the outside surface of the

20  berm, isn't it?

21  A    No.  The surface of the berm would be over to the right

22  of that --

23  Q    All right.

24  A    -- or the berm would be.  The berm is over here.

25  Q    Okay.  But that cut is outside the berm, correct?

1   A    Yes.

2   Q    All right.  Do you recall that cut?

3   A    No.

4   Q    Isn't it a fact that Dyce employees would empty the --

5   empty the catch pond from time to time by throwing a hose over

6   the top of that berm and draining it out into that man-made

7   cut?

8   A    Not that I ever saw.

9   Q    All right.  You never did it, correct?

10  A    No.

11  Q    All right.  But you don't know whether others did, right?

12  A    They could have done it when I wasn't there.

13          MR. JOHNSON:  Now take it out a little bit.

14          DOCUMENT TECHNICIAN:  (Complied with request.)

15          MR. JOHNSON:  I wanted to show the northwest.

16          DOCUMENT TECHNICIAN:  (Complied with request.)

17  BY MR. JOHNSON:

18  Q    Let me ask you, sir, about this area.  I'm going to

19  circle it.  Do you see where I have marked the thing that I

20  just talked about which is that darker area?  Then, as you go

21  to the northwest, there's an area that's devegetated which I

22  just circled.  Do you see that?

23  A    Yes.

24  Q    All right.  Let me have you circle that on here.

25          I am giving him, Your Honor, 4833.

1    And I ask you, sir, to circle that area and mark it with

2    an A and put your name on it, please.  I think you need to put

3    your name on this one, too, the 4832.

4    A    (Complied with request.)

5    Q    Let me take a look and make sure we're on the same page

6    here.

7    A    Pardon?

8    Q    Let me take a look.

9         (Pause.)

10   BY MR. JOHNSON:

11   Q    All right.  So for the record, you've just circled the

12   area that I've circled on the computer screen and marked it

13   with an A, and I guess the question I have for you, sir, is,

14   isn't it a fact that that devegetation in that area that's in

15   the circle is caused by chemical runoff from the Dyce

16   facility?

17   A    I can't say it was that cause.  I don't know.

18   Q    You have no idea what caused that devegetation; is that

19   what you're saying?

20   A    No.

21   Q    Pardon me?

22   A    No.

23   Q    You don't have any idea at all?

24   A    No.

25            MR. JOHNSON:  Pull up 5028.

```
 1                DOCUMENT TECHNICIAN:  (Complied with request.)

 2   BY MR. JOHNSON:

 3   Q    I'm showing you what's been marked and admitted into

 4   evidence as 5028, which is a photograph that was taken from

 5   the air on May 14, 1979.  Do you see that?

 6   A    Yes.

 7   Q    All right.  And you recognize the Dyce facility.  I think

 8   this was shown to you on your direct.  You recognize the Dyce

 9   facility in this picture, correct, this photograph?

10   A    Yes.

11   Q    All right.  Now we just got -- let me give you another

12   one.  I'm going to circle here an area and ask you, sir, on

13   Exhibit 4834, for the record, to circle that as well.  Put

14   your name on this one and circle that area and mark it with an

15   A, please.

16   A    Mark it with an A?

17   Q    Yeah, mark it with an A, please.  Put your name on it.

18   A    (Complied with request.)

19   Q    Let me take a look.

20        (Pause.)

21             MR. JOHNSON:  Very nicely done.

22   BY MR. JOHNSON:

23   Q    Now that area that you just circled on that exhibit and

24   marked it with an A, that's an even larger area of

25   devegetation than we saw in the picture from two years ago,
```

1  right?

2  A     Yes.

3  Q     All right.  And this larger area of devegetation was

4  caused, wasn't it, by chemicals coming out of the Dyce site

5  and killing the grass and weeds in that area?

6  A     I can't say that it was -- I don't know that it was

7  chemicals.

8  Q     All right.  But you do recall the fact that that area got

9  devegetated in the late '70s, do you not?

10  A     Yes.

11  Q     You recall that, correct?

12  A     Yes.

13         MR. JOHNSON:  That, you know, that, focus in on the

14  perc tank -- I mean, I'm sorry, on the catch pond.

15         DOCUMENT TECHNICIAN:  (Complied with request.)

16  BY MR. JOHNSON:

17  Q     The cross is still there.  You don't have any idea what

18  that cross is?

19  A     No.

20  Q     All right.  And there's some other things near the catch

21  pond or in the catch pond which are those things.  Can you

22  tell us what those are?

23  A     No, I can't, sir.

24  Q     You don't know what those are?

25  A     No.

1    Q    And you can even see, at the end of the cross, this black

2    thing over here.  This picture is more pronounced, but you

3    don't know what that is either, I take it?

4    A    No.

5              THE COURT:  That's what he says.

6              MR. JOHNSON:  Pardon me?

7              THE COURT:  That's what he said before.

8              MR. JOHNSON:  Well, yeah, he said that with regard

9    to the prior picture.  I was just wondering whether --

10             THE COURT:  Yeah.  Hopefully we won't go through

11   every picture.

12   BY MR. JOHNSON:

13   Q    Well, some of the tanks have been relocated in the tank

14   farm.

15        Can you take it out?

16             DOCUMENT TECHNICIAN:  (Complied with request.)

17   BY MR. JOHNSON:

18   Q    And the perc tank here, I think you said on direct, is

19   the one that's behind, this long one that's behind the

20   drumming shed, correct?

21   A    Yes.

22   Q    All right.  Why don't you circle that on this thing.

23   A    (Complied with request.)

24   Q    There you go.  Right there.

25        And that's a 4,000-gallon tank as opposed to the

481

1  1,500-gallon tank that they had before?

2  A     Yes.

3  Q     All right.  At this point in time -- why did you get a

4  bigger perc tank?

5  A     Because usually the perc came in greater quantities than

6  1,500, and we'd have to finish drumming off the excess when we

7  filled the 1,500-gallon tank.

8  Q     All right.  And when you drummed off the excess from the

9  1,500-gallon tank, where would you drum it off to?

10  A     Drum it right off the truck.

11  Q     All right.  And you would drum it in the loading and

12  unloading area, correct?

13  A     Yes.

14  Q     You'd put down pallets of drums and drum it right off the

15  perc tank?

16  A     Yes.  We drummed it right off -- excuse me.  Drummed it

17  right off of the truck.

18  Q     All right.  And you would drum it into the drumming shed

19  or just on the pavement?

20  A     We'd use the drumming shed and the scale.

21  Q     Okay.

22             THE COURT:  Let's take an afternoon recess.

23             MR. JOHNSON:  Thank you, Your Honor.

24             THE LAW CLERK:  All rise.

25         (Recess taken from 14:58:15 to 15:17:36.)

482

1          (Open court.)

2          (Jury present.)

3              THE COURT:  Please be seated.

4              You may continue.

5              MR. JOHNSON:  I think everybody will be happy to

6    hear, especially Mr. Colver, that I have no further questions

7    for him, but I would like to move for the admission of

8    Plaintiffs' Exhibits 4831, 4832, 4833, and 4834, which were

9    the photographs that he personally marked up.

10             THE COURT:  They're admitted.

11             MR. JOHNSON:  Thank you, Your Honor.

12             MR. COZZENS:  As exhibits or just for illustrative

13   purposes, Your Honor?

14             MR. JOHNSON:  Well, they contain his testimony.

15             THE COURT:  I'll admit them for all purposes.  I

16   don't care.

17         (Exhibits 4831, 4832, 4833, and 4834 were received in

18          evidence.)

19             MR. JOHNSON:  Thank you, Your Honor.

20             Thank you, Mr. Colver.

21             THE WITNESS:  Thank you.

22             THE COURT:  Redirect.

23             MR. COZZENS:  Yes, Your Honor.

24             Would you pull up 5019, please?

25             DOCUMENT TECHNICIAN:  (Complied with request.)

REDIRECT EXAMINATION

1

2  BY MR. COZZENS:

3  Q    Hi, again, Mr. Colver.

4  A    Hello, again.

5         THE COURT:  As soon as he's done, you're over.  I'm

6  going to let you go as soon as he's done, all right?

7         THE WITNESS:  Make him get through it quick.

8         MR. COZZENS:  I was waiting for an exhibit.

9       (Discussion off the record.)

10        DOCUMENT TECHNICIAN:  (Complied with request.)

11        MR. COZZENS:  This is Admitted Exhibit 5019.

12        Could you circle or put it in so you've got just the

13 tank farm going to the bottom of the lower warehouse, please?

14        DOCUMENT TECHNICIAN:  (Complied with request.)

15        MR. COZZENS:  I want less than that, so let's -- I

16 want to just go to the top of the tank farm.

17        DOCUMENT TECHNICIAN:  (Complied with request.)

18 BY MR. COZZENS:

19 Q    On cross-examination, you were asked where fluids that

20 were in the drumming shed would come out, and did you say that

21 it would be here at the back of the west side of the drumming

22 shed?

23 A    Yes.

24 Q    And you were also asked, then, where those fluids would

25 go and whether they would go out to the catch pond, and I

484

1   think you said yes to that.  So would you draw where they

2   would go as far as you could see it on this picture, please?

3   A     (Complied with request.)

4             MR. COZZENS:  Very good.  Now can we take it and

5   show them the whole catch pond and where that ditch actually

6   goes?

7             DOCUMENT TECHNICIAN:  (Complied with request.)

8   BY MR. COZZENS:

9   Q     In fact, in 1975, that ditch didn't go into the catch

10  pond, did it?

11  A     My mistake.

12  Q     Okay.  Don't worry about it.  I just need to make sure

13  that we straighten it out.

14        You also located on this map what you thought were the

15  three horizontal tanks, one of which was the perc tank, that

16  are just to the east of the six vertical tanks in the tank

17  farm, correct?  Do you see that on this photo?

18  A     Yes.

19  Q     Do you know how long they were in that position?

20  A     I don't remember.

21  Q     Do you know why they were there instead of right behind

22  the drumming shed?

23  A     Not for sure.

24  Q     Okay.  Fair enough.

25        Okay.  You were asked about hoses that had pinholes.  As

1   the maintenance person, I think you've already told us it was

2   your job to keep hoses in good repair; is that correct?

3   A   Yes.

4   Q   Did you ever see hoses that ruptured in ways that

5   couldn't be called a pinhole?

6   A   Yes.

7   Q   What did you see?

8   A   Just a very fine stream of material coming out of the

9   hose.

10  Q   My question was, Did you ever see hoses that ruptured in

11  a way that could not be called a pinhole?

12  A   Excuse me.  No, I didn't.

13  Q   You never saw any hose ever have a hole in it where the

14  fluids came out bigger than a pinhole?

15  A   Can I ask a question here?

16  Q   Sure.

17  A   Are you talking about perc hoses?

18  Q   I'm talking about any hose.

19  A   Any hose.  Any hose, yes.

20  Q   What did you see?

21  A   A hydrochloric acid hose fitting.

22  Q   Now when you say "fitting," was that the hose itself or

23  was it a quick coupler?

24  A   That was the quick coupler.

25  Q   Okay.  Did you ever see a hose that had a rupture because

1  it had been run over by something?

2  A    No, because if it had been run over by something, I took

3  care of it.

4  Q    So you never saw anything bigger than a pinhole as a hole

5  in a hose?

6  A    Not larger than a pinhole, no.

7  Q    Okay.  You talked about a time when you spilled less than

8  a gallon of perc on the asphalt.

9  A    Yes.

10  Q    You said you got it off there as quickly as you could.

11  How long was that perc on the asphalt?

12  A    A maximum of 15 minutes.

13        MR. COZZENS:  Okay.  If -- can we go back -- well,

14  actually, let's go to 5024.

15        DOCUMENT TECHNICIAN:  (Complied with request.)

16        MR. COZZENS:  And let's just put it around the tank

17  farm in the lower warehouse so we can focus in on the loading

18  and unloading area, please.

19        DOCUMENT TECHNICIAN:  (Complied with request.)

20        MR. COZZENS:  Let's make it bigger than that.  That

21  makes it too fuzzy to see what we're seeing.

22        DOCUMENT TECHNICIAN:  (Complied with request.)

23        MR. COZZENS:  Bigger than that, even.

24        DOCUMENT TECHNICIAN:  (Complied with request.)

25        MR. COZZENS:  There we go.  That will work.  Thanks.

1   BY MR. COZZENS:

2   Q    Okay.  And we previously identified the loading and

3   unloading zone as right in here; is that correct?

4   A    Yes.

5   Q    If there was a significant spill of any product,

6   including perc, in that area from 1975 to 1980, where would it

7   go?  And I don't want you to go clear out to the end, but

8   would it stay on the asphalt for a significant period of time?

9   A    Not very long.

10  Q    Okay.  And if there was such a spill, was there any way

11  to clean that off of the asphalt in that area?

12  A    Just rinse it off with water.

13  Q    Was there a hose somewhere in that area that you could

14  use to accomplish that?

15  A    Yes.  There was a hose in the drumming shed.

16  Q    Okay.  How long would it take to hose fluid off of the

17  front of the drumming shed and down into the ditches?

18          MR. JOHNSON:  Objection.  Calls for speculation,

19  Your Honor.

20          THE COURT:  If he knows.

21          MR. JOHNSON:  It speculates that there was a spill

22  which he said he hasn't seen.

23          THE COURT:  If he knows.

24          MR. DAVIS:  Well, it's also vague in terms of the

25  size of the spill.

488

1              THE COURT:  If he knows.

2              Go ahead.  Do you know?

3    BY MR. COZZENS:

4    Q    Go ahead.  Do you know?  How long would it take?

5    A    I don't really know.

6              MR. COZZENS:  Okay.

7              Can you pull up -- and I don't have the number here,

8    but it's the 1975 photo, again, 5019.

9              DOCUMENT TECHNICIAN:  (Complied with request.)

10             MR. COZZENS:  And now I want to focus on the catch

11   pond area and the area immediately to the west of that.

12             DOCUMENT TECHNICIAN:  (Complied with request.)

13             MR. COZZENS:  Got to be bigger than that so we don't

14   lose the resolution, please.

15             DOCUMENT TECHNICIAN:  (Complied with request.)

16   BY MR. COZZENS:

17   Q    Okay.  You were asked some questions about the '77 and

18   the '79 photos that showed what somebody said was and what I

19   think Mr. Johnson called a cut.  Do you see that same, quote,

20   cut, end quote, in this 1975 photo?

21   A    Unless it would be right here.

22   Q    Okay.  And in this photo, you can see that that cut

23   doesn't go clear to the berm for the catch pond; isn't that

24   true?

25   A    True.

489

1    Q     Do you know what caused whatever it is that we're seeing

2    on these photos?

3    A     No, I don't.

4    Q     Were there any cow trails or any other animal trails out

5    there in that area?

6    A     Not that I can remember.

7             MR. COZZENS:  Okay.  I have no further questions,

8    Your Honor.

9             THE COURT:  You, sir, can step down, and you're

10   excused.

11            THE WITNESS:  Thank you.

12            THE COURT:  Call your next witness.

13            MR. BANKER:  Soco calls Rod Hallsten, please.

14            WHEREUPON,

15                      MR. RODNEY HALLSTEN,

16   called for examination by counsel for defendant, after having

17   been first duly sworn to testify the truth, the whole truth,

18   and nothing but the truth, testified as follows:

19                      DIRECT EXAMINATION

20   BY MR. BANKER:

21   Q     Good afternoon, Mr. Hallsten.

22   A     Good afternoon.

23   Q     Would you state your full name for the record?

24   A     Rodney Hallsten.

25   Q     It might actually work better if you got the microphone.

1          THE COURT:  Yeah.  Pull that over there.  It will go

2     wherever you want it.

3          THE WITNESS:  Rodney Hallsten.

4     BY MR. BANKER:

5     Q    Great.  Thank you.

6          Did you ever work at the Dyce facility?

7     A    I did.

8     Q    When was that?

9     A    I was in Billings from November of '74 through January --

10    or December of '79.

11    Q    How long did you -- what did you do for Dyce there?

12    A    I started on the order desk there in November of '74.

13    Q    How long were you on the order desk?

14    A    Until the summer of -- June.  Well, it was June of '78.

15    Q    So from November of 1974 to June of '78 you were on the

16    order desk?

17    A    Yes.

18    Q    What did you do in your job on the order desk?

19    A    I was doing the ordering of the incoming products, doing

20    the written work for the receiving of the products to put them

21    onto inventory cards, and I took the orders and actually typed

22    the orders out back then and brought them to the warehouse

23    guys to ship the material we would sell.

24    Q    Could you describe the sort of paperwork that you worked

25    with doing that job?

1    A    Yeah.  We had a three-part purchase order, one that the

2    original was mailed to the customer -- or to the supplier,

3    rather.  We retained a master copy.  And then the other one

4    was held in a file to be attached to the invoice when we

5    received it.

6         And then we had a seven-part bill of lading that had the

7    different parts for the piece you left with the customer, the

8    control copies you kept in the warehouse, and I think there

9    was a couple extra copies in there.

10   Q    And are all those materials things that you used in sort

11   of your recordkeeping function on the order desk?

12   A    Yes.

13            MR. BANKER:  Would you pull up Exhibit 5024, please?

14            DOCUMENT TECHNICIAN:  (Complied with request.)

15   BY MR. BANKER:

16   Q    I show you Admitted Exhibit 5024.  Do you recognize what

17   this photo shows?

18   A    Yeah.  That's the facility.

19   Q    Do you know what time frame it deals with?

20   A    I'm not certain, but it's probably somewhere in that '74

21   to '78 time frame.

22   Q    I'll represent to you that it's a September -- the date

23   of the photo is a September 6, 1977 photograph.

24   A    Okay.

25   Q    Does that look like the way that the facility looked in

1    1977 to you?

2    A    Yes.

3    Q    I'd like to ask you about a couple features of the site.

4         And if you could zoom in to the catch pond to loading

5    area?

6              DOCUMENT TECHNICIAN:  (Complied with request.)

7              MR. BANKER:  Let's maybe back out a little bit.

8              DOCUMENT TECHNICIAN:  (Complied with request.)

9              MR. BANKER:  There we go.

10   BY MR. BANKER:

11   Q    Did you have occasion to go out into the loading and

12   unloading area?

13   A    Yes.

14   Q    Could you point it out on the picture here by touching

15   the screen?

16   A    (Complied with request.)

17   Q    And are you also familiar with the berm?

18   A    Yes.

19   Q    Could you outline the berm as it existed in 1977?

20   A    (Complied with request.)

21   Q    Thank you.

22        Are you able to locate the perc tank in 1977 on this

23   photograph?

24   A    Not specifically, but it was -- I think there was three

25   tanks here.  It would have been one of those.

1   Q     Behind the drumming shed?

2   A     Yes.

3   Q     Do you know which of the three tanks it was?

4   A     I do not.

5   Q     Okay.  In the 1977 time frame, how was the perc -- do you

6   know how the perc tank was filled?

7   A     The delivering carrier would usually come in with his

8   tank truck and pump directly into the tank.

9   Q     From the loading and unloading area?

10  A     Yes.

11  Q     And in that process, was there any piping that was used

12  to transfer the perc into the bulk perc tank off of the

13  supplier truck?

14  A     Yes.

15  Q     Where was that?

16  A     Well, there was a quick coupler on the truck where they

17  would hook up the hose to a line that led to the perc tank

18  that was being filled.

19  Q     And where did that line rest?

20  A     It went over the berm and through the drumming shed.

21  Q     I'd like to talk to you a little bit -- are you familiar

22  with the distribution that Dyce did of perc in the 1977 time

23  frame?

24  A     Yes.

25  Q     Because it was something that you handled on the order

494

1  desk?

2  A    Yes, we would take orders.

3  Q    How often would you receive a bulk shipment of perc from

4  a supplier?

5  A    Well, it was probably on the -- a tank truck per quarter.

6  Q    And how large a delivery would you take from a supplier

7  per quarter?

8  A    About 45,000 pounds.

9  Q    How many gallons would that translate into?

10  A    Roughly 4,000.

11  Q    4,000 gallons once a quarter, roughly speaking?

12  A    Yes.

13  Q    In that time frame?

14  A    Yes.

15  Q    Are you able -- are you familiar with the volume of the

16  other products that Dyce was dealing, say, in the '75 to '77

17  time frame?

18  A    Yes.

19  Q    Could you compare the -- how much -- what was the volume

20  of perc compared to the volume of, say, acids that Dyce

21  handled?

22  A    It was a much lower volume.

23  Q    How about compared to, say -- do you know what BTEX is?

24  A    No.

25  Q    Do you know what --

1 A  Oh, B-T-E-X?

2 Q  B-T-E-X.

3 A  Yeah.  It's toluene, xylene, and b- --

4 Q  Compared to toluene and xylene?

5 A  Yeah.

6 Q  The way you said it.

7 A  Yeah, yeah.  But it was -- we sold more xylene than we

8 did perc.

9 Q  Okay.  Would it be fair to say that perc was a relatively

10 low-volume product?

11 A  Yes.

12 Q  Do you know how much perc cost in the 1975 to '77 time

13 frame?

14 A  I think it was in the range of 12 to 15 cents a pound.

15 Q  How would that translate into a per-gallon cost?

16 A  $2.30, $2.50 a gallon, I believe.

17 Q  Could you compare that to, say, a gallon of hydrochloric

18 acid?

19 A  Yeah.  You mean pricewise?

20 Q  Pricewise.

21 A  Back then, hydrochloric was probably 60 bucks a ton, so

22 3 cents a pound.

23 Q  So perc was much more expensive?

24 A  Yes.

25 Q  Do you recall a problem while you were on the order desk

1  with perc inventory?

2  A    Yes.

3  Q    Could you tell us about that?

4  A    We were doing our inventory, and during the course of the

5  inventory, we determined that we had a discrepancy in our bulk

6  tank of perchloroethylene.

7  Q    Let's take that one step at a time.

8  A    Okay.  Yep.

9  Q    What kind of inventory were you doing?

10  A    It was a quarterly inventory.

11  Q    And what is a quarterly inventory in the Dyce facility in

12  the '75 to '77 time frame?

13  A    Basically the guys in the warehouse were given a list of

14  the products to count and/or physically measure.  Bring it in.

15  It would be compared against the physical records that we

16  kept.

17  Q    Roughly how many products was Dyce handling in the '75 to

18  '77 time frame?

19  A    Oh, routinely, probably 30 to 40.

20  Q    Different products?

21  A    Yes.

22  Q    And would a quarterly inventory encompass all of those

23  products?

24  A    Yes, yes.

25  Q    What was the purpose of doing a quarterly inventory?

1    A    To make sure that we were -- that we had what we believed

2    we had, according to our hand-, at that time, early on, the

3    handwritten cards.

4    Q    So it served an accounting purpose?

5    A    Yes.

6    Q    Cost control purpose?

7    A    Yes.

8    Q    When you started to talk about the inventory discrepancy,

9    you said it was in the bulk tank.  What do you mean by that?

10   A    Well, we also had -- we also inventoried drums of

11   perchloroethylene on the site, and the issue was with the

12   volume of perc that we had in the bulk tank.  The drums were

13   in agreement with our inventory records.

14   Q    Okay.  Were you able to determine, at least initially,

15   the amount of the inventory discrepancy?

16   A    Yes.

17   Q    How much was it?

18   A    Well, to the best of my recollection, it was greater than

19   250 gallons and under 1,000.

20   Q    250 to 1,000 gallons of perc was missing from your

21   inventory?

22   A    Yes.

23   Q    When, to the best of your ability, did you discover this

24   inventory discrepancy?

25   A    My recollection was in the spring of -- in that time

1    frame, and I don't -- I'm sorry, I can't, I don't remember the

2    specific year, but in that '74 to '78 time frame.

3    Q    Well, and let's walk through that, because I want to

4    understand what you're saying.

5         When you say the "spring," and we're talking about a

6    quarterly inventory, when would you do your spring inventory

7    at the Dyce facility?

8    A    Well, it would be April 30 -- or March 30, rather.

9    Q    So somewhere in the vicinity of March 30?

10   A    Yes.

11   Q    And you said from 1974 to 1978?

12   A    Yes.

13   Q    What makes you, what makes you identify that time frame?

14   A    Well, because that's when I was on the order desk, and I

15   was involved with the inventories.

16   Q    And you have a clear recollection that this was while you

17   were on the order desk, I take it?

18   A    Yes.

19   Q    1974, you started on the order desk in November?

20   A    Yes.

21   Q    Did you undergo any training when you first started?

22   A    Yes.

23   Q    What kind of training?

24   A    Well, I worked with Monte, who was temporarily filling in

25   that position, learning the functions and the duties of that

1    job.

2    Q    Who is Monte?

3    A    Monte Naff at that time was our salesman that was working

4    in the office to cover the vacant position.

5    Q    So you came in in November of 1974 onto the order desk;

6    for a period of time, worked with Monte.  How long did you

7    work with Monte?

8    A    Oh, it was probably, off and on, over the first six

9    months.

10   Q    Do you recall whether this inventory discrepancy happened

11   during the time that you were working with Monte?

12   A    Yeah.  I do not believe it did.

13   Q    So does that enable you to rule out 1974 as a candidate?

14   A    Yes.

15   Q    Okay.  So let's focus on '75, '76, and '77.  Is there

16   anything else that you recall that could help us with that

17   date to be more specific?

18   A    No.

19   Q    Do you recall whether Dyce had a bulk tank in 1975 for

20   perc?

21   A    I do not.

22   Q    Do you recall whether they had one in '76?

23   A    Yes.

24   Q    How about '77?

25   A    Yes.

1  Q    So at least from '76 on, your recollection is that there

2  was a bulk perc tank?

3  A    Yes.

4  Q    Does that rule out 1975 as a candidate?

5  A    Yes.

6  Q    So we're down to 1976 and '77.

7       Is there anything else that we can point to or turn to

8  that would help us narrow in on a date?

9  A    Not that I recall.

10  Q    Was there -- well, strike that.

11       Once you had identified this inventory discrepancy of

12  250 gallons to 1,000 gallons, what was your reaction?

13  A    I was nervous.

14  Q    Why were you nervous?

15  A    Well, it was a large loss, dollar value, and being new on

16  the job, I didn't know what to expect, I guess.

17  Q    Well, and, you know, I think you said that perc was like

18  $2.50 a gallon?

19  A    Yes.

20  Q    And so on the low end, at 250 gallons, what are we

21  talking about in terms of dollars?

22  A    Five or 600 bucks.

23  Q    So on the low end, 500 or 600 bucks.  On the high end,

24  $2,000 or $2,200?

25  A    Right.  Yeah, yes.  Yes.

1    Q    Okay.  What were you concerned about?  Why did that

2    concern you?

3    A    Well, I was responsible for maintaining those levels and

4    checking them, and I was concerned for myself.  I wasn't doing

5    a good job.

6    Q    So if there's 250 to 1,000 gallons missing from

7    inventory, that doesn't reflect well on you?

8    A    No.

9    Q    But you weren't out in the warehouse area.

10   A    No.

11   Q    So in what -- I'm trying to just understand how would it

12   reflect badly upon you.

13   A    Well, usually when we had the inventory discrepancies, we

14   would find them and resolve them, but this was one of my first

15   instances that I had where we actually had a write-off.

16   Q    Okay.  Before you got to the write-off stage, did you do

17   anything to investigate what the cause of this inventory

18   discrepancy was?  I think you mentioned that you checked some

19   paperwork.

20   A    Yes.

21   Q    And you ruled out a paperwork error.

22   A    Yes.

23   Q    Was there anything else that you did?

24   A    Well, yeah.  We, you know, checked our records, our

25   physical records that we had to make sure there wasn't any

1   errors in there.  We measured the tank again to ensure that we

2   had gotten a good reading on our physical inventory of the

3   bulk perc.

4   Q    How does someone measure that?  You said "measure" the

5   tank.  How does someone do that?

6   A    Back then, back then it was a manual operation of taking

7   a stick or a measured stick and dipping it into the tank

8   looking for the liquid level of the tank.

9   Q    So are we talking about an unpainted piece of wood?

10  A    Yes.

11  Q    And that's long enough to go from the top of the tank to

12  the bottom of the tank?

13  A    Yes.

14  Q    And then how do you use that to determine -- what is that

15  telling you?  When you pull it out of the tank, I take it it's

16  wet?

17  A    Yeah.  It tells you the number of inches, and then the

18  tanks are calibrated, and you interpret the inch reading to

19  volume.

20  Q    Was that an accurate way to measure liquid in the tank?

21  A    Fairly accurate, yes.

22  Q    Would it -- I mean, was the stick calibrated at all?

23  A    Yes.

24  Q    Like a yardstick?

25  A    Yes.  Well, yes.  It wasn't a yardstick, but it was

1  calibrated.

2  Q    So you could see, and based on the measurement that you

3  took off of the stick, you could calculate the volume of

4  liquid in the tank?

5  A    Yes.

6  Q    And you did that here after you discovered the inventory

7  discrepancy?

8  A    Yes.

9  Q    And what did you find?

10 A    That we were -- again, that the inventory was off.

11 Q    Okay.  Was it still off by the same amount, or did the

12 amount change over time?

13 A    No.

14 Q    So it was still, to the best of your recollection, 250 to

15 1,000 gallons?

16 A    Yes.

17 Q    Did you do anything else to try and understand why you

18 were off?

19 A    Yeah.  Well, we, you know, checked all of the receiver

20 reports that are made to make sure that it coincides with what

21 we were billed, so that we determined what was received and it

22 was done properly, and that was it.

23 Q    Okay.  Had you had other inventory discrepancies with any

24 kind of chemical --

25 A    Yes.

504

1    Q    -- while you were on the order desk?

2    A    Yes.

3    Q    And compared to the volume, this 250 to 1,000 gallons of

4    perc, how does that compare to these other inventory

5    discrepancies that you had experience with?

6    A    Most others were smaller volume.

7    Q    How many gallons?

8    A    Fifteen, ten, you know, 20 gallons here.

9    Q    So was this an unusual discrepancy for inventory?

10   A    Yes.

11   Q    What did you do after you checked the paperwork,

12   resticked the tank?  What happened next?

13   A    When Mr. Dyce returned to the office, I went to him with

14   the findings of the inventory and gave it to him.

15   Q    Now you said when Mr. Dyce "returned."  Returned from

16   where?

17   A    Arizona.

18   Q    When would he go to Arizona?

19   A    Usually in the fall.

20   Q    Did he have a house down there?

21   A    Yes.

22   Q    And how long would he stay down there once he went down

23   there in the fall?

24   A    He would go for four or five months.

25   Q    So November to April, March?

1    A    Yes.

2    Q    And so is that -- is Quentin Dyce coming back what you're

3    using to --

4    A    Yes, yeah.  Yes.  He would -- the time that this

5    happened, he was coming back from Arizona when I presented him

6    the findings of our inventory discrepancy.

7    Q    Okay.  We've talked about trying to narrow in and get the

8    best recollection that you have of a date.  Does Quentin Dyce

9    coming back from Arizona help us to rule out either '76 or '77

10   as a date?

11   A    No, not to my knowledge.

12   Q    Okay.  Did Quentin Dyce have any reaction when you gave

13   him this information?

14   A    Yeah.  He was extremely upset.

15   Q    Why?

16   A    That we had a loss, and that he made the comment that

17   we're going to get out of the perc business if we can't handle

18   it.

19   Q    At that point in time, did you -- you had no explanation,

20   I take it, as to what the inventory discrepancy was caused by?

21   A    No.

22   Q    Did you ever develop an explanation?

23   A    No.

24   Q    Did you ever hear anything more about where the

25   investigation went?

1   A      No.

2   Q      So what did you do with this inventory that you're

3   holding on your books that you don't have any product for out

4   in the yard?

5   A      After Quentin reviewed it, the product was written off.

6   Q      Did you give any consideration -- do you need some water?

7   A      Yeah.

8   Q      Did you give any consideration in your investigation to

9   whether the perc had been stolen?

10  A      Yes.

11  Q      What did you conclude?

12  A      Well, it was -- perc had a limited sale audience, I guess

13  is the word there.  There wasn't many customers.  It was

14  heavy, and it was hard to handle.  A drum would weigh

15  700 pounds, so it would have been very difficult for someone

16  to have, you know, thrown it on a pickup and hauled it away.

17  Q      So when you say a drum would weigh 700 pounds, are we

18  talking about a standard 55-gallon drum?

19  A      Yes.

20  Q      And if that's filled with 55 gallons of perc, it weighs

21  700 pounds?

22  A      Yes.

23  Q      So how do you even move a 700-pound drum of perc?

24  A      A forklift.

25  Q      A forklift can handle that?

1  A    Yes.

2  Q    So you've got to have a forklift to move it.  Can you put

3  a 700-pound barrel into the back of a pickup truck, or do you

4  have to go with something heavier?

5  A    No, I don't think it's possible for one person to put a

6  700-pound drum in a pickup.

7  Q    Okay.  So had there been any other episodes where

8  chemical had been stolen at the Dyce facility?

9  A    No.

10 Q    Was there ever, in your experience --

11 A    No.

12 Q    -- any incident of that?

13 A    No.

14 Q    Did you consider whether there had been a spill of perc?

15 A    I'm sure we did.  I don't recall asking.

16 Q    So it wasn't part of what you did as part of your

17 investigation?

18 A    No.

19 Q    Were there problems, generally speaking, with the perc

20 inventory?

21 A    Not generally, but, I mean, deviations of, you know, a

22 few gallons, but not to the level that this one was.

23 Q    What would you attribute those deviations in the perc

24 inventory to?

25 A    Evaporation sometimes.

1   Q    Was perc a chemical that had a high volatility so that it

2   would evaporate easily?

3   A    Yes.

4   Q    And was the tank, you know, the tank that you described

5   on the exhibit here, was that open to the air?

6   A    It would have been vented.

7   Q    And why is that?

8   A    Well, when you're either filling into or taking out of

9   the tank, you can't -- you have to have a vent to allow the

10  product to flow in or out of the tank.

11  Q    Other than this inventory discrepancy of perc in, I think

12  we've narrowed it down to, the '76 to '77 time frame, were

13  there any other significant inventory discrepancies of perc

14  while you were on the order desk?

15  A    No, not that I -- no.

16  Q    Did you ever hear of any significant inventory

17  discrepancies of perc?

18  A    No.

19  Q    Now you're aware, as you sit here today, of the claim

20  that the EPA has made for the Lockwood site?

21  A    Yes.

22  Q    And were you aware that that was happening back in the

23  year 2000?

24  A    Yes, I believe I was.

25  Q    After you left the order desk in 1978, did you continue

1  to work for the Dyce company?

2  A    Yes.  I moved out of state to North Dakota.

3  Q    Okay.  And what did you do in North Dakota?

4  A    I initially went over there as a salesman and ran the

5  warehouse.  Did the order-taking.  Did the delivering.  Was a,

6  I guess, chief cook and bottle-washer.

7  Q    Okay.  How long were you in North Dakota?

8  A    Ten years.

9  Q    And what did you do after that?

10  A    I moved to Ogden, Utah.

11  Q    Still working for Dyce?

12  A    At that time, it was HCI.  We were bought, I believe, in

13  '88.

14  Q    But still, still, when you moved to Utah, working for the

15  same company, essentially?

16  A    Yes.

17  Q    And what were you doing in Utah?

18  A    I was the branch manager there.

19  Q    Okay.  So from, you know, '78 up through -- what year in

20  Utah were you working?

21  A    '78, you said?

22  Q    Well, you left the order desk in '78 in Billings?

23  A    Yes.

24  Q    And working in Utah takes us up through what year?

25  A    Yeah.  Oh, to the present.

510

1    Q    To the present.

2    A    Yes.

3    Q    So that's where you currently are now?

4    A    Yes.

5    Q    And so in the 2000 time frame, when you learned that

6    there was an EPA issue with the Lockwood site, you were in

7    Utah?

8    A    Yes.

9    Q    As the branch manager out there?

10   A    Yes.

11   Q    And what involvement did you -- were you contacted about

12   that, or how did you find out about that?

13   A    No.  I received an e-mail, I believe, but that was it.

14   Q    And did anyone ask you anything more about it, or what

15   did you learn about it at that point?

16   A    No one asked any more, and I had heard that we had a

17   problem at the site and there was perc.

18   Q    Okay.  But I take it no one interviewed you or talked to

19   you as part of the EPA investigation?

20   A    No.

21   Q    When was the first time that you told anybody about this

22   inventory discrepancy?

23   A    It would have been December of 2004.

24   Q    And what was the occasion for talking about the inventory

25   discrepancy?

1   A    I had been -- I came to Billings for a Christmas party,

2   and Dave Warne asked me to meet with Tom Mielenhausen on

3   Sunday morning for breakfast.

4   Q    Okay.  And I take it you did that?

5   A    I did.

6   Q    And what did you tell him?

7   A    I -- he asked if I was -- knew of any problems with

8   inventory of any kind at all, and I said yeah.  I related the

9   story that I just presented here.

10  Q    And I take it what you've told us here today is

11  essentially what you told Mr. Mielenhausen about the inventory

12  discrepancy?

13  A    Yes.

14  Q    Has anyone ever -- that, I take it, is your recollection

15  of an inventory discrepancy?

16  A    It is.

17  Q    And not something Mr. Mielenhausen suggested to you?

18  A    Not at all.

19          MR. GROSSBART:  Objection.  Leading.

20          THE COURT:  Yeah, it was.

21  BY MR. BANKER:

22  Q    Can you explain why it was that the first time you told

23  someone about the inventory discrepancy was 2004 when you knew

24  that the EPA was interested in the Lockwood site for a problem

25  with perc back in 2000?

1   A    I don't have a good explanation other than it just went

2   over my head.  I didn't think about it.

3   Q    Had you had occasion to be involved in the operations in

4   the Billings facility at Dyce at any point after you left in

5   1978?

6   A    No.

7   Q    Did you know that they continued to handle perc or not?

8   A    Yes, they did.

9   Q    But you didn't know what, what the history of the

10  operations had been from 1978 on?

11  A    No.

12          MR. GROSSBART:  Your Honor, the leading is just

13  getting out of hand, I think.

14          THE COURT:  You know, it is, but I'm going to give

15  you some leeway.  Throttle it back a little bit.  Say, "Can

16  you tell us whether or not," or something like that.

17          MR. BANKER:  Sure.

18  BY MR. BANKER:

19  Q    But I take it -- well, since then, have you spoken with

20  anyone else about the inventory discrepancy?

21  A    Nothing more than what has been involved in this trial.

22          MR. BANKER:  Okay.  I have nothing further.  Thank

23  you.

24          THE COURT:  Mr. Grossbart, you may cross.

25          MR. GROSSBART:  Thank you, Your Honor.

```
 1                      CROSS-EXAMINATION
 2   BY MR. GROSSBART:
 3   Q    Now at the beginning of your direct examination, you
 4   explained a little bit about what a perc tank was on a 1977
 5   photo.
 6   A    Yes.
 7   Q    All right.  Now you started in November of '74, however,
 8   right?
 9   A    Yes.
10          MR. GROSSBART:  Could you put up Exhibit 5019,
11   please?
12          DOCUMENT TECHNICIAN:  (Complied with request.)
13   BY MR. GROSSBART:
14   Q    This is a photo from 1975.
15       And let's blow up -- yeah.  Let's just get -- there you
16   go.
17          DOCUMENT TECHNICIAN:  (Complied with request.)
18   BY MR. GROSSBART:
19   Q    Where is the perc tank in that photo?
20   A    (No response.)
21   Q    You're on the order desk at this time, right?
22   A    Yeah.  I don't see one.  I don't see one.
23   Q    You don't see one?
24   A    No.
25   Q    Where is the loading and unloading area in this photo?
```

514

1    A    (No response.)

2    Q    Where is the loading and unloading area on this photo for

3    the tanks right by -- for these tanks?  Where do you load and

4    unload for those tanks at this point in time?

5    A    It would have been in that same area.

6    Q    Down where you draw your mark?

7    A    Oh, let's see.

8    Q    I'm sorry, sir?

9    A    Pardon?

10   Q    Where do the trucks who are servicing these tanks load

11   and unload their product in 1975, the date of this photo?

12   A    To the best of my knowledge, it was right in here.

13   Q    All right.  And did you ever see any trucks going up in

14   here to service any one or more of those tanks?

15   A    I did not.

16   Q    You never saw that.

17   A    No.

18   Q    Did you ever actually see the loading or unloading of --

19   let me rephrase that.

20        Did you ever actually see a perc delivery while you were

21   on the order desk?

22   A    Yes.

23   Q    All right.  How many times?

24   A    Oh, I don't know.  Maybe a couple.  Twice.

25   Q    Do you recall giving your deposition in this case a few

1  years back?

2  A     Yes, yes.

3  Q     It was out in Ogden, Utah, right?

4  A     Yes.

5  Q     Do you remember me?

6  A     Yes.

7  Q     Okay.  And we sat around a table, and you swore to tell

8  the truth?

9  A     Yes.

10  Q     All right.

11       (Discussion off the record at counsel table.)

12  BY MR. GROSSBART:

13  Q     I'm going to hand you -- by the way, you were given an

14  opportunity to read and sign this deposition, too, weren't

15  you?

16  A     Yeah.  Yeah.  Yes.

17  Q     Do you remember?

18  A     I don't remember signing one.

19  Q     That wasn't 30 years ago, but you don't remember -- okay.

20  A     Yeah.

21  Q     Well, in any event, Mr. Mielenhausen was there defending

22  you, right?

23  A     Yes.

24  Q     And you don't recall if he asked you to read and sign

25  your deposition?

1   A    Yes, I do.

2   Q    He did ask you to do that, or he didn't ask you to do

3   that?

4   A    I don't remember.

5   Q    All right.  So have you seen the transcript of your

6   deposition before?

7   A    Yes.

8   Q    And putting aside whether you read and signed it, do you

9   recall seeing anything wrong or incorrect about it?

10  A    No.

11           MR. GROSSBART:  Okay.  May I approach?

12           THE COURT:  Yes.

13  BY MR. GROSSBART:

14  Q    (Handing.)  Do you recall being asked this question and

15  giving this answer, beginning on line 20 of page 33?

16       Question, "During 1974 to 1980, did you have any

17  understanding of any of the chemical handling practices and

18  procedures that were in place at the Dyce Billings facility?"

19       Answer, "Bare minimum.  I mean, I -- I wasn't out there,

20  and that was operations, and I was busy in the office."

21       Do you recall --

22  A    Yes.

23  Q    -- hearing that question and giving that answer?

24  A    Yes.

25  Q    And then on page 41, beginning at line 14, do you recall

1    hearing this question and giving this answer?

2        "Okay.  Did you personally ever observe, with respect to

3    any three of those chemicals, did you personally ever observe

4    the transfer of chemical from a delivery truck to either the

5    big tank or 55-gallon drums during 1974 to '80?"

6        And you said you don't remember.  Do you see that?

7    A    Yeah.  That says, "It's possible."

8    Q    I understand it's possible, but you didn't remember at

9    the time?  That's what you said, right?

10   A    Yes.

11   Q    And now you do?

12   A    Yes.

13   Q    What refreshed your recollection as to that?

14   A    Well --

15   Q    I'll withdraw the question.

16       You said perc was delivered, on average, quarterly.  Did

17   I hear that right?

18   A    Yes.

19   Q    And you said the average quarterly delivery was

20   4,000 pounds?

21   A    Gallons.

22   Q    Excuse me.  4,000 gallons.

23   A    Yeah.

24   Q    Are you sure about that?

25   A    Well, it was 45,000 pounds.  I think it's 12 pounds to

1   the gallon, so it would have been around 4,000.

2   Q    All right.  You only had a 1,500-gallon perc tank at that

3   time; isn't that right?

4   A    Yes.  Yes.

5   Q    Assuming the perc tank was bone dry, where did the other

6   2,500 gallons go that you took delivery of?

7   A    It would be drummed.

8   Q    How many drums is that?

9   A    Fifty-five divided by 2,500 -- I mean 55 into 2,500, so

10   about every thousand gallons is 20 drums.

11   Q    So about 50 drums?

12   A    Yeah, 25 would have been -- 40 -- yeah.  Yes.

13   Q    All right.  Bear with me, please.

14        Same place, Ogden, Utah.  Same deposition.  You were

15   asked this question.  We were talking -- this is on page 118,

16   beginning at line 15, following a question about the perc

17   tank.

18        Question, "Do you have any knowledge as to its size?"

19   And if you want to just get yourself oriented, the question is

20   about the size of the perc tank while you were on the order

21   desk.

22        Answer, "It was less than 3,000 gallons."

23        Question, "Because that was a truckload?"

24        "Yes, and it would not hold a full load."

25        So has something triggered your recollection --

1    A    Well, my math is better.

2    Q    Hang on.

3         -- that the quarterly deliveries were 4,000 gallons as

4    opposed to 3,000 gallons?

5    A    It was one truckload quarterly.

6    Q    Well, you testified before that a truckload was

7    3,000 gallons.  I'm just trying to understand what has

8    caused -- what has refreshed your recollection differently

9    than what you testified to previously.

10   A    It has to be my math.  I'm sorry.

11   Q    So it was just a mathematical error?

12   A    Yes, because it was a truckload a quarter, and if I said

13   it was 3,000, I was wrong.

14   Q    I'm going to hand you another transcript, because you had

15   a subsequent opportunity after your deposition to testify

16   again in this case.  Do you recall that?

17   A    Yes.

18   Q    You took the same oath to tell the truth, right?

19   A    Yes.

20   Q    If you go to the transcript that I've handed you on

21   page 611, you were asked this question and gave this answer,

22   beginning at line 14 of page 611:

23        "How much perc was delivered in the mid '70s in a

24   quarterly delivery?"

25        Answer, "Probably 3,000 gallons."

1        So you were wrong on that date, too?

2   A    Apparently.

3   Q    You were on the order desk until June of '78.

4   A    Yes.

5   Q    And you believe that the discrepancy that you discovered,

6   this 250- to 1,000-gallon discrepancy, was discovered on the

7   heels of a first-quarter inventory?

8   A    Yes.

9   Q    I take it by that, you're telling us that the

10  discrepancy, whatever caused the discrepancy, had to happen

11  between January 1 and March 31 of some calendar year?

12  A    Yes.

13  Q    So it could have happened in the first quarter of '78 as

14  well as '77 or '76 or '75, right?

15  A    It's possible, yes.

16  Q    You were still on the order desk?

17  A    Yes.

18  Q    Okay.  As a matter of fact, the only reason you're

19  picking these years is because that's the entire period you

20  were on the order desk where you were there for a spring

21  quarter.

22  A    Yes.

23  Q    Right?

24       You have told us that you approximate the timing of this

25  inventory discrepancy that's limited only by the number of

1    first quarters you happened to be working at Dyce Billings,

2    right?

3    A    Yes.

4    Q    All right.  Now the 250 to 1,000, is that -- that's a

5    memory that has stuck with you all these years?  Is that

6    something that you've sort of deduced going back and thinking

7    about this?

8    A    I think it was through a process of deduction.

9    Q    All right.  So you don't really -- so you don't have a

10   memory of that?  That's something you deduced later?

11   A    Pardon me?

12   Q    You don't have memory of a 250- to 1,000-gallon inventory

13   shortage?  You've pieced it together since then?

14   A    No, I do have a memory that we had an inventory shortage.

15   Q    No, my focus is the 250 to 1,000, though.  That's

16   something you've sort of deduced and put together?

17   A    Yes.

18   Q    And that's a series of deductions and the thinking about

19   this that you've done since the 2004 Christmas party, right?

20   A    Yes.

21   Q    All right.  So when you sat down with Mr. Mielenhausen on

22   a Sunday morning after this Christmas party, 250 to 1,000

23   wasn't in your head at that time, was it?

24   A    No.  We never talked about it.

25   Q    All right.  That's something that came later?

1   A    Yes.

2   Q    You simply responded, then, to a question that

3   Mr. Mielenhausen asked you about, "Was there ever an

4   inventory" -- well, let me strike that.

5        Exactly what question did Mr. Mielenhausen ask you that

6   stimulated your answer?  Why don't we start with that.  As

7   best you recall, what words did he say to you?

8   A    He just told me he was interviewing people that worked

9   back in that era to see if there was any information about

10  anything with any perc losses.

11  Q    Are those the words Mr. Mielenhausen used?

12  A    Not exactly, I'm sure.

13  Q    Well, as best you can recall.  I know it's a long time

14  ago, and it's tough to remember back that far, to 2004, but

15  I'd like to know as best you can recall what words he said.

16  A    I don't recall specifically.

17  Q    All right.  Did he use the word "inventory"?

18  A    No.

19  Q    And what did you say to him?  "I remember an inventory

20  shortage," or, "I remember an inventory shortage" plus

21  something else?

22  A    Well, I remembered, I told him I remembered that Quentin

23  Dyce said we were going to, as a result of having an inventory

24  issue, that we were going to get out of the perc business.

25  That part was indelibly in my mind.

1  Q    Who else -- was that something Mr. Dyce said just to you,

2  privately?

3  A    Yes.

4  Q    You know he's said that since, don't you?  You've seen

5  documentation, have you not?

6  A    Yes, yes.

7  Q    Ten years later, Mr. Dyce announced to several people,

8  apparently with some degree of frustration or consternation,

9  that the company was going to get out of the perc business.

10 You know that, right?

11 A    Yes.

12 Q    So this was really the first time that happened, and it

13 happened again ten years later, Mr. Dyce announced, making

14 that announcement?

15 A    Yes.

16 Q    And obviously Dyce did not get out of the perc business

17 in the mid '70s.

18 A    No.

19 Q    Did not get out of the perc business in the mid '80s,

20 either?

21 A    No.

22 Q    Now you said you were nervous when this thing arose?

23 A    Yes.

24 Q    You were not -- you were not afraid of Mr. Dyce, were

25 you?

1    A     No.

2    Q     And if this happened later in your period of employment

3    on the order desk, you weren't even a new employee when it

4    happened?

5    A     Correct.

6    Q     '77, '78, you had been there at least a couple years.

7    A     (Nodded head affirmatively.)

8    Q     You told us on direct -- that was, I take it, a yes?

9    A     Yes.

10   Q     You were nodding.

11   A     Yeah.

12   Q     I don't know if -- all right.

13         You said that after you saw or recognized that there was

14   an inventory discrepancy, you resticked, I think was the word,

15   the perc tank?

16   A     Yes.  Not me personally.

17   Q     Who did that?

18   A     Someone in the warehouse would have done that.

19   Q     Okay.  Who?

20   A     It would either have been Dick Bender, Delmer Hutchinson,

21   or Dick Colver.

22   Q     Well, did you tell somebody, "Go restick the perc tank"?

23   A     Yes.  Typically it would have been Dick Bender.

24   Q     Did you go with him?

25   A     No.

1   Q    Have you ever seen the perc tank sticked?

2   A    I don't recall that I had.

3   Q    All right.  But you understand it's putting a dip stick

4   in the top of the perc tank?

5   A    Yes.

6   Q    Is that the hole where you actually filled the perc tank

7   from deliveries coming in?

8   A    No, no.

9   Q    What's that, through the vent?

10  A    It would have been another opening in the tank.

11  Q    All right.  And when that didn't answer any questions,

12  you, I think you testified under direct, you looked at, in

13  fact, purchase records, meaning purchase records from your

14  suppliers?

15  A    Yes.

16  Q    And sales records, meaning paperwork having to do with

17  sales to customers --

18  A    Yes.

19  Q    -- local drycleaners, what-have-you?

20  A    Yes, yes.

21  Q    How much perc was supposed to be on hand when you did

22  this inventory?

23  A    I don't recall.

24  Q    You have no idea?

25  A    (No response.)

1  Q     Do you understand my question?

2  A     You're asking what the records had indicated would have

3  been on there.

4  Q     Well, in order for you to realize you have an inventory

5  shortage, you have to have a record that leads you to believe

6  that you have, just to pick a number, 750 gallons -- well, I

7  have to pick a bigger number -- 1,500 gallons on hand.

8  Somebody takes an inventory, and what's actually out in the

9  yard is 500 gallons.  You say, "Oh, my God.  I have a

10 1,000-gallon shortage."  That's kind of how it works, right?

11 A     Yes.

12 Q     How many gallons did your records, at the time of the

13 shortage, based on the records, show that you had?

14 A     I don't recall.

15 Q     Well, did you have any perc at the time of this

16 discrepancy, or were you totally out of it?

17 A     We had product.

18 Q     I beg your pardon?

19 A     We had some product.

20 Q     How much?

21 A     I don't recall.

22 Q     Do you have any -- can you even approximate it with a

23 range comparable to the range of 250 to 1,000 that you deduced

24 for your shortage?  Can you do the same kind of deductions for

25 me on that?

527

1   A      No.

2   Q      But you had some?

3   A      Yes.

4   Q      That's all you can say?

5   A      Yes, because I know we had to remeasure the tank.

6   Q      Beg your pardon?

7   A      Because they had to stick the tank again, which would

8   lead me to believe there was something in there.

9   Q      Well, you could stick the tank and the stick could come

10  out dry to tell you the tank's empty, couldn't you?

11  A      Yes.

12  Q      All right.  The tank wasn't empty?

13  A      To the best of my knowledge, it wasn't.

14  Q      All right.  What happened the next day, and the day

15  after, and the day after, when people ordered, customers

16  ordered perc that you didn't have?  Did you miss any orders?

17  Did any customers have to go without perc?

18  A      Not to my knowledge.

19  Q      Well, if you're getting 3,000 gallons every quarter and

20  it's now towards the end of the quarter, or is the end of the

21  quarter, and you've lost as much as 1,000 gallons, how could

22  you service your normal customers without going out and buying

23  a replacement batch of perc?

24  A      Well, I'm sure we did order more, and we had product in

25  the tank, and we could have delivered them drums to get by.

1    Q    Do you recall calling one of your suppliers and saying,

2    "Oh, my God.  We've got -- I'll figure this out later, but

3    I've got to get perc on hand"?  Did that happen?

4    A    No, I don't recall that.

5    Q    All right.  So when you say, "I'm sure that's what I

6    would have done," well, you don't really have a recollection

7    of actually doing that?

8    A    No.

9    Q    And you don't have a recollection of telling any customer

10   they have to wait a few extra days because you're out of perc

11   unexpectedly or anything like that?

12   A    No.

13   Q    Now you said you explained to Mr. Dyce, when he came back

14   from Arizona, that you were aware of a shortage, and you sort

15   of kind of laid it out for him; is that right?

16   A    Yes.

17   Q    Now when Mr. Dyce -- well, let me ask you this.  What

18   work had you done to try to get to the bottom of things before

19   Mr. Dyce came back from Arizona?

20   A    As I stated earlier, we took all the receiver reports for

21   that quarter against our inventory records to make sure that

22   they were received properly.

23   Q    When you say "we," who do you mean?

24   A    Figure of speech.  Me.  I.

25   Q    Yeah.  And didn't Mrs. Dyce help you in that very

1    exercise?

2    A     She was involved in the inventory.

3    Q     Well, so she doesn't go to Arizona with Mr. Dyce?

4    A     Yes, she did.

5    Q     Well, so how could --

6    A     Later.

7    Q     -- she be helping --

8    A     After.  After.  She came back when the reconciliation was

9    being verified.

10   Q     Now do you remember that, or are you just sort of kind

11   of --

12   A     No, I remember --

13   Q     -- telling us now?

14   A     No, I remember that both she and Jeanette were involved

15   in our quarterly inventory reviews.

16   Q     And that was Jeanette Whaley, the wife of the other

17   then-partner in the business, correct?

18   A     Yes.

19   Q     Well, how long a period of time went by between you

20   discovering the discrepancy and Mr. Dyce, presumably with

21   Mrs. Dyce, coming back from Arizona?

22   A     It was probably a matter of a few days, the first part of

23   April.

24   Q     All right.  And his reaction was, "I'll have my wife help

25   you figure it out"?

1   A    No.

2   Q    Well, that's all that happened.  You sat down with

3   Mrs. Dyce and Mrs. Whaley and went through paperwork.

4   A    I gave it to Quentin Dyce.  Told him what we had did to

5   verify the discrepancy, and he had, as he would have, someone

6   verify that what I had done is right.  I mean, I'm not

7   infallible.

8   Q    No, I understand.  That was Mrs. Dyce and Mrs. Whaley?

9   A    Yes.

10  Q    Did he ask you about any -- well, let me ask you this.

11  Did you do any other investigatory steps besides look at the

12  purchase records and the customer sales records between the

13  time you discovered the discrepancy and Mr. and Mrs. Dyce came

14  back from Arizona?

15  A    No.

16  Q    All right.  But you were upset, yourself, during this

17  period of time, right?

18  A    I was concerned, yes.

19  Q    Were you panicked?

20  A    No.

21  Q    No.  You were okay.

22       Did you go out and say, "Hey, Bender, Hutchinson, Colver,

23  Mr. Dyce is going to be back in a couple days.  We've got to

24  try to figure this out.  Let's work together.  Let's try to

25  figure this out."  Did you do anything even remotely like

1    that?

2    A    We reviewed the amounts of the material.

3    Q    Mr. Colver came in and helped you with the paperwork?

4    A    I don't recall him specifically.

5    Q    Well, who do you -- you just told me --

6    A    Dick Bender.

7    Q    Dick Bender helped you look at the paperwork?

8    A    Which paperwork are you talking about, referring to?

9    Q    The customer records for sales.

10   A    Oh, no.  No.

11   Q    All right.  So did you interview, for example, Mr. Colver

12   to see if he had any information that would shed some light on

13   what happened, perhaps to get to the bottom of it before you

14   had to break the bad news to Mr. Dyce and Mrs. Dyce?

15   A    No, no.

16   Q    No.  And you didn't interview Dick Bender, either, did

17   you?

18   A    No.

19   Q    And you didn't talk to Monte Naff about it, either, did

20   you?

21   A    No.

22   Q    And you didn't talk to Mr. Hutchinson about it, either,

23   did you?

24   A    No.

25   Q    So there was this momentous inventory shortage,

532

1    unprecedented in your time at Dyce, never before, never since.

2    The clock is ticking.  Mr. Dyce is coming back from Arizona.

3    So you looked at the sales records in and the sales records

4    out and threw up your hands and said, "That's all I can do.

5    I'll wait until Mr. Dyce comes home, and I'll tell him,"

6    right?

7    A    Yes.

8    Q    And he got mad.  Fair statement?

9    A    Yes.

10   Q    And he took the project over, along with Mrs. Whaley and

11   Mrs. Dyce?

12   A    They reviewed the paperwork that I had gave them.

13   Q    Did you help them?  Did you sit in a conference room or

14   an office with them and go through things?

15   A    I don't recall.

16   Q    Do you recall having any discussions with Mrs. Dyce while

17   she was going through the records about how her husband was

18   taking things?

19   A    I don't recall it, no.

20   Q    Do you recall -- can you visualize, in your head,

21   Mrs. Dyce leafing through paperwork in some office in the main

22   building, trying to get to the bottom of this?

23   A    No.

24   Q    Did Mr. Dyce ever have a followup conversation with you

25   regarding the work that either he did or others did besides

1    yourself in trying to get to the bottom of things?

2    A     No.

3    Q     And you continued on the order desk, taking orders,

4    buying supply, obviously, and he never said another word about

5    this to you at all ever?

6    A     Not that I recall.  Just that initial, "We'll get out of

7    the business," comment.

8    Q     Well, you knew that was just a sort of remark in anger

9    and frustration?  "Well, we're going to get out of the

10   business," and he stormed off, right?

11   A     I didn't know that that was -- that was the first time in

12   my experience.  I wasn't aware that this was a regular thing

13   for him.

14   Q     Well, you had worked with the man.  If you're right in

15   all these deductions you've made about timing and so forth,

16   you had been there a couple years.  You had a feel for

17   Mr. Dyce.  He was a full-time employee at his own place back

18   then, wasn't he?

19   A     Yes.

20   Q     All right.  Well, did you think he was serious or not?

21   A     Yes, I took him serious.

22   Q     All right.  About getting out of the business?

23   A     Yes.

24   Q     But other than that, he never got back to you with any

25   point of view or result regarding whatever looking into the

1    matter he did?

2              MR. BANKER:  Objection, Your Honor.  I think we've

3    heard this about five or seven times.

4              THE COURT:  Right.  Sustained.

5    BY MR. GROSSBART:

6    Q    Now there had been other situations when product was lost

7    and Mr. Dyce, it was his standard procedure to write memos to

8    that effect, wasn't it?

9    A    Occasionally.

10   Q    Well, this was the biggest loss ever, right?  Well, let's

11   put up -- sorry.

12   A    In my experience.

13             MR. GROSSBART:  Yeah.  So let's put up Exhibit 72.

14   It's not objected to, 72.

15             DOCUMENT TECHNICIAN:  (Complied with request.)

16             MR. GROSSBART:  This is a memo dated --

17             THE COURT:  Is it admitted?

18             MR. GROSSBART:  I beg your pardon?

19             THE COURT:  Is it admitted?

20             MR. GROSSBART:  I thought he said no objection.

21             MR. MICKELSON:  It's may-call.

22             MR. GROSSBART:  It's may-call, no objection, on our

23   list.

24             MR. BANKER:  No objection.

25             MR. GROSSBART:  No objection.  All right.

1              THE COURT:  Seventy-two is admitted.

2         (Exhibit 72 was received in evidence.)

3    BY MR. GROSSBART:

4    Q    Seventy-two.  This is a memo dated November 4, 1975, sir.

5    Do you see that?

6    A    Yes.

7    Q    You are among the people who have been copied on the

8    memo.  It says "Rod" on the left side there, does it not?

9    A    Yes.

10             MR. GROSSBART:  Would you highlight that, Neil?

11             DOCUMENT TECHNICIAN:  (Complied with request.)

12   BY MR. GROSSBART:

13   Q    And next to the "Rod," you crossed that out and put your

14   initials to signify that you read the memo?

15   A    Correct.

16   Q    All right.  And in this memo, Mr. Dyce is expressing, I

17   think it's fair to say, concern about lost propylene glycol in

18   the amount of $130 and change, something called caustic in the

19   neighborhood of $891, *et cetera*.

20        And he concludes -- and, Neil, why don't you highlight

21   the last sentence.

22             DOCUMENT TECHNICIAN:  (Complied with request.)

23   BY MR. GROSSBART:

24   Q    -- "If this continues, it will not be tolerated,"

25   *et cetera*.  Do you see that?

1    A     Yes, yes.

2    Q     And he's talking about less value than perc involved in

3    your inventory shortage, is he not?

4    A     Well, in the low-end scenario, yes.

5    Q     In the low-end scenario.

6    A     Or, excuse me, the high-end.

7    Q     There is no memo like this with your shortage, right?

8    A     No.

9            MR. GROSSBART:  All right.  If you'd go to

10   Exhibit 353?  I believe it's not admitted.  I believe there's

11   no objection.  However, it's 353.

12           MR. MICKELSON:  I have it as admitted.

13           MS. ENERSON:  Admitted.

14           MR. MICKELSON:  It's on there.

15           MR. GROSSBART:  I stand corrected.

16   BY MR. GROSSBART:

17   Q    Let's look.  And this is -- now you weren't, you weren't

18   working in 1972 for Dyce, but this is a memo admitted into

19   evidence, and here Mr. Dyce is talking about losing 180 bags

20   of sodium fluoride.  Do you see that?

21           MR. BANKER:  Objection, Your Honor.  Relevance.

22           THE COURT:  Sustained.  Getting kind of cumulative,

23   too.

24   BY MR. GROSSBART:

25   Q    How did you calculate -- you told us earlier that after

537

1  you had the conversation with Mr. Mielenhausen, you calculated

2  the 250 or deduced the 250- to 1,000-gallon range.  Do you

3  recall that testimony a few moments ago?

4  A    Yes.

5  Q    Could you describe the process you went through to come

6  up with that range?

7  A    Well, he asked me if I specifically remembered the

8  amount, and I said, "No, I do not specifically."  And I

9  believe in the deposition is where the actual gallons came

10 out.

11 Q    Well, it did come out, but you had formed that deduction

12 before you sat down for your deposition, had you not?

13 A    I thought about it.

14 Q    And actually, as you think about it, and have thought

15 about it since, it actually could be less than 250 gallons,

16 could it not?

17 A    No.

18 Q    No?  And do you have the second transcript that I gave

19 you in front of you?

20 A    Yes.

21 Q    Page 604.  Excuse me, 603, line 25.  Are you with me,

22 sir?

23 A    Yes.

24 Q    You, do you recall, after being sworn to tell the truth,

25 being asked this question and giving this answer:

1   Question, "All right.  And could it have been, based upon

2 the quality of your memory, as small as 25 or 50 gallons?"

3   "No."

4   "Could it have been a hundred?"

5   "Yes."

6   "All right.  Could it have been 75?"

7   "No."

8   "All right.  How about 87 1/2?"

9   "Could have been, yes."

10   Do you recall hearing those questions and giving those

11 answers?

12 A  Yes.

13 Q  And do you now reject that prior testimony?

14 A  Yes.

15 Q  Okay.  And you've thought about it yet some more, and --

16 A  I don't -- after having read the thing you're talking

17 about here, I had no idea where that came from.  I get

18 nervous.  I don't know.

19 Q  All right.  You were just nervous when you said that?

20 A  Yes.

21 Q  There was a fairly, I don't want to call it complicated,

22 but involved procedure for the delivery of perc to the Dyce

23 site in the 1970s where the trucks are weighed and reweighed

24 and so forth.  Do you recall that generally?

25 A  Yes.

1  Q    And when a delivery truck from a perc manufacturer, one

2  of your suppliers, was due to make a delivery, they would show

3  up on site in Billings, right?

4  A    Yes.

5  Q    And they were then told to go to a truck weigh station

6  about a mile and a half away to have their truck weighed --

7  A    Yes.

8  Q    -- right?

9       And then they would come back with a weigh ticket that

10 says how much the truck and everything in it weighs?

11 A    Yes.

12 Q    Some very large amount of weight, obviously, right?

13 A    Yes.

14 Q    And then perc would be offloaded into either the bulk

15 tank or barrels or both?

16 A    Yes.

17 Q    And then the truck would be sent back to this weigh

18 station, right?

19 A    Yes.

20 Q    They would get another ticket?  Right?

21 A    Yes.

22 Q    Come back to Dyce Billings?

23 A    Yes.

24 Q    And you would have a before and after weigh ticket that

25 you could do simple math, come up with the amount of pounds

1   difference between those two tickets, and, from that, figure

2   out how much perc was, in fact, purchased.

3   A    Yes.

4   Q    All right.  And perc weighs about 13 1/2 pounds a gallon.

5   It was actually priced by the pound, so you multiply the

6   pounds times the price, and you have it, right?

7   A    Yes.

8   Q    So if something happened in the offloading of a truck by

9   way of some catastrophic release, not only would that make the

10  truck lighter, but the truck driver would still have to go to

11  the weigh station, come back, and then come back to Dyce with

12  the later weight ticket while the perc had just spilled a

13  minute ago, basically.

14       Do you understand what I'm saying?

15  A    Yes.

16  Q    That sounds preposterous to you, doesn't it?

17  A    (No response.)

18  Q    I'll withdraw it.

19       Did you look at these weigh tickets and do any

20  reconciliation work?

21  A    Yes.

22  Q    That was part of the work you did?

23  A    Yes.

24  Q    And you saw no irregularities there?

25  A    No.

1  Q    Well, you normally bought 3,000 or 4,000 gallons at a

2  time, right?

3  A    Yes.

4  Q    If a weigh ticket came back with a 5,000 -- excuse me, a

5  5,000-gallon difference, or that much in poundage difference,

6  it would stand out, wouldn't it?  You'd say, "Wait a second.

7  I get 3,000 gallons every quarter.  That weighs 13.5 pounds,

8  so that's about, you know, 39, 40,000 pounds.  How could you

9  come back here with a weigh ticket that says, 'Oh,

10 50,000 pounds?'"  It would stand out right there on that day,

11 wouldn't it?

12         MR. BANKER:  Objection, Your Honor.  Is there a

13 question here?

14         MR. GROSSBART:  That's the question.

15 BY MR. GROSSBART:

16 Q    It would stand out on that day.

17         THE COURT:  It's argumentative, I think.

18         MR. BANKER:  And argumentative.

19         THE COURT:  Sustained.

20 BY MR. GROSSBART:

21 Q    You're used to a standard amount of poundage every

22 quarter because you have a routine, quarterly delivery system.

23 A    Yes.

24 Q    All right.  And had you seen a weight difference between

25 two tickets that was out of the ordinary, you would expect, in

1    the ordinary course, that somebody would have noticed it that

2    day?

3    A    Yes.

4    Q    And during the quarter in question, whatever quarter that

5    may be, I take it no one did -- no one noticed such an oddity?

6    A    No.

7    Q    Who is the person who would look at the weigh tickets,

8    the before and after weigh tickets?  Whose job was that?

9    A    Dick Bender would get the before and after.  He would do

10   the receive and report paperwork.  Submit it.  And I had it.

11   I would get it, and then I would hold that until the bill came

12   to approve the payment of the invoice.

13   Q    And when you did your reconciliation work, you said you

14   looked at all these weigh tickets?

15   A    Yes.

16   Q    And none of them stood out as out of the ordinary?

17   A    No.

18   Q    Pretty much the same every quarter, right?

19   A    Yes.

20   Q    Now I think you said on direct examination that you

21   looked into the issue of whether perc had been stolen, and you

22   ruled it out, or what did you do about checking into theft?

23   A    We considered it, but we ruled it out just because the

24   forklifts are inside.  I mean, I don't know a guy that could

25   put a 700-pound drum into a pickup, but there may be some.

1   Q     Well, you keep saying "we."  Who considered it?

2   A     I did.

3   Q     By yourself?

4   A     Yes.

5   Q     All right.  Do you have the transcript in front of you,

6   the first, the earlier-dated transcript dated May 17, 2005?

7   A     Okay.

8   Q     Almost five years ago.

9   A     Okay.

10  Q     On page 99, do you recall, beginning at line 8, being

11  asked this question and giving this answer:

12        Question, "Okay.  Was any investigation done back in 1975

13  or 1976 with respect to the discrepancy into whether perc had

14  been stolen from the premises?"

15        Answer, "Not that I know of."

16        Do you recall hearing that question and giving that

17  answer?

18  A     Yes.

19  Q     Did you consider whether, in keeping track of things,

20  that -- did you consider whether there had been some

21  intercompany transfer or sale that was missed in the

22  paperwork, if I can phrase it that way?

23  A     Yes.  We had -- all of our sales were tracked by

24  paperwork that we had file copies of to make sure we got all

25  of the bills back that were sent out.

544

1   Q     And by "intercompany transfers," what I mean is -- did

2   you understand my question?

3   A     No.  I'm sorry.

4   Q     No.  Okay.

5         Did you consider whether or not there was an

6   unaccounted-for intercompany transfer that could account for

7   the shortage?  And by "intercompany transfer," I mean a

8   transfer from Dyce Billings to another Dyce plant someplace

9   else?  Dyce had other plants, right?

10  A     Not at that time, but I opened the plant in North Dakota

11  in 1980.

12  Q     What town was that in?

13  A     Dickinson.

14  Q     Wasn't there a plant in Williston, North Dakota as early

15  as 1974?

16  A     That was a bulk tank farm only.  It had no warehouse.

17  Q     No perc there?

18  A     No.

19  Q     All right.  So there was no issue of intercompany

20  transfers at this given point in time?

21  A     No.

22  Q     Now you said on direct that you were aware that the EPA

23  and the Montana Department of Environmental Quality were doing

24  an investigation that included the possibility of

25  contamination emanating from Dyce's plant.  Do you recall that

                                    545

1   generally?

2   A     Yes.

3   Q     And your best friend at the time, at least within the

4   company, was Dave Warne; is that right?

5   A     Yes.

6   Q     And he was in Billings --

7   A     Yes.

8   Q     -- at that time, right?

9         And he was one of the senior management people on site?

10  A     Yes.

11  Q     And Mr. Warne, given your personal friendship, was an

12  individual who you spoke with not infrequently; isn't that

13  right?

14  A     Correct.

15  Q     And you had conversations with him about the EPA's

16  investigation from time to time; isn't that right?

17  A     Limited number of times.

18  Q     Well, and you also exchanged e-mails with him from time

19  to time; isn't that right?

20  A     Yes.

21  Q     And same thing with Suzanne Miller, who was also in

22  management at the time; isn't that right?

23  A     Same thing in what?

24  Q     I'm sorry.  You also had communications with Suzanne

25  Miller about the EPA investigation; isn't that right?

1   A    I don't recall it specifically.

2          MR. GROSSBART:  All right.  Is 4087 in evidence?  I

3   would like you to put that up, and we'll check to see if it's

4   been admitted.

5          MS. ENERSON:  Not admitted, but no objection.

6          MR. GROSSBART:  It's not been admitted, but there's

7   been no objection, Your Honor.

8          MR. BANKER:  No objection.

9          THE COURT:  4087 is admitted.

10         (Exhibit 4087 was received in evidence.).

11  BY MR. GROSSBART:

12  Q    All right.  Do you have 4087 in front of you,

13  Mr. Hallsten?

14  A    Yes.

15  Q    And this is an e-mail from you to Dave Warne dated --

16  it's really tough to read, but if you go -- Neil, scroll back

17  up.

18         DOCUMENT TECHNICIAN:  (Complied with request.)

19         MR. GROSSBART:  Hang on.  Would you highlight the

20  to, the from, the date line?

21         DOCUMENT TECHNICIAN:  (Complied with request.)

22  BY MR. GROSSBART:

23  Q    And that says it's from you to Dave Warne.  Subject

24  matter, Montana DEQ visit January 6, 1999, right?

25  A    Yes.

1  Q    And that followed a conversation, a period of time in

2  which you were communicating with Mr. Warne about the MDEQ and

3  EPA investigation, right?

4  A    Yes.

5  Q    And you're specifically talking about chlorinated

6  solvents in the text of the e-mail, right?

7  A    Yes.

8        MR. BANKER:  Objection, Your Honor.  I'm not sure

9  what the relevance is of asking this witness about this

10  document.

11        MR. GROSSBART:  Your Honor, he talked about, on

12  direct, his involvement in EPA investigations.

13        THE COURT:  It's overruled.  Go ahead.

14  BY MR. GROSSBART:

15  Q    In any event, your e-mail says it doesn't appear -- why

16  don't you just highlight the whole e-mail, Neil.

17        DOCUMENT TECHNICIAN:  (Complied with request.)

18  BY MR. GROSSBART:

19  Q    You say, "The only recollection I have of chlorinated

20  solvents in Lockwood is Beall Tankers, the Exxon Refinery,"

21  and nowhere do you discuss your recollection of a perc

22  inventory shortage.

23  A    Well, he was asking about who else in the area would have

24  had the inventory.

25  Q    All right.  Perc is a chlorinated solvent, right?

1   A     Yes.

2   Q     All right.  Well, and you also tell Mr. Warne in this

3   e-mail that you don't, quote, "I don't know that we would want

4   to volunteer much information," *et cetera*.  Do you see that?

5   A     Yes.

6   Q     And what were you advising Mr. Warne not to volunteer?

7   A     I was concerned that he would get our customers in

8   trouble.

9   Q     Well --

10  A     Stupid.

11  Q     An investigation is a search for the truth.  I mean, so

12  you thought -- you were telling Mr. Warne not to rat out the

13  customers?  I don't quite understand what you're saying.

14  A     Yeah.  I was concerned that they would get into trouble,

15  but . . .

16  Q     Now I think in response to a question on direct -- you

17  can take that down.

18          DOCUMENT TECHNICIAN:  (Complied with request.)

19  BY MR. GROSSBART:

20  Q     On direct examination, you ruled out '75 because you

21  don't think there was a perc tank, a bulk perc tank in 1975?

22  A     Yes.

23  Q     Are you certain of that or --

24  A     No.

25  Q     So if there was a bulk tank for perc, 1,500 gallons or

549

1    thereabouts, in 1975, you'd have to switch the date back and

2    pick up that earlier time period, would you not?

3    A     Apparently.

4    Q     As a possibility?

5    A     Yes.

6    Q     How big a truck was the perc tank that typically

7    delivered in the '70s?  How long?

8    A     Forty-foot trailer.

9    Q     Forty-foot trailer.  Add, on top of that, the tractor?

10   A     Yes.

11   Q     So you might be looking at 50 feet altogether, a little

12   bit more, perhaps?

13   A     Yeah.  Yes.

14   Q     You, I believe, told us on direct that you had no

15   information of any sort that in any way associates the

16   inventory discrepancy that we've heard about this afternoon to

17   any spill or release of perc, correct?

18   A     Yes.

19   Q     And you have no documents that anyplace chronicle or

20   refer or memorialize in any respect the inventory shortage,

21   right?

22   A     That is correct.

23   Q     Nothing exists?

24   A     No.

25            MR. GROSSBART:  I have nothing further.

1          THE COURT:  Do you have some?

2          MR. DAVIS:  I do, actually.  Briefly?

3          THE COURT:  Briefly.  I don't want any old ground

4    plowed, replowed.

5          MR. DAVIS:  Well, I am just -- from just one other

6    angle.

7                      CROSS-EXAMINATION

8    BY MR. DAVIS:

9    Q    Mr. Hallsten, you testified you discovered this 250- to

10   1,000-gallon shortage of perc, and you took it -- the one

11   person you took it to in the company was the boss, correct?

12   A    Yes.

13   Q    Quentin Dyce.  You were concerned, were you not?

14   A    Yes.

15   Q    All right.  You told him about it.  The only thing you

16   recall, after you took this to him, was him saying, "We're

17   going to have to get out of the perc business"?

18   A    Yes.

19   Q    And you never followed up, yourself, again, on it, did

20   you?

21   A    No.

22   Q    Weren't you the least bit curious about this huge goof-up

23   that happened on your watch?

24   A    I did everything that I knew I could do.

25   Q    That wasn't my question, sir.  Weren't you the least bit

1    curious about this big goof-up?

2    A     Yes, I was concerned.

3    Q     But you didn't talk to anyone else about it ever again?

4    A     Not that I recall.

5          THE COURT:  Do you have some redirect?

6          MR. BANKER:  Very briefly.

7                      REDIRECT EXAMINATION

8    BY MR. BANKER:

9    Q    Mr. Grossbart has asked you some questions about other

10   testimony that you've given, and we talked about, you know,

11   the 87 1/2-gallon estimate you gave at one point.

12        What is your best recollection, as you sit here today, of

13   the amount of perc that was involved in the inventory

14   discrepancy?

15   A    It was greater than 250 gallons, less than 1,000.

16   Q    Okay.  And what is your best recollection, as you sit

17   here today, as to the time frame of that inventory

18   discrepancy?

19   A    It was the '75 to '78 time frame.

20          MR. BANKER:  Thank you.

21          THE COURT:  All right.  You can step down.

22          Ladies and gentlemen, we're going to take an evening

23   recess.

24          I give you the usual admonition.  Don't talk amongst

25   yourselves.  Don't talk to anybody about the case.  Keep an

1    open mind until you've got this in the jury room for

2    deliberation.

3          We'll be in recess until 5 -- we're going to start

4    early.

5          We'll be in recess until 8:30 in the morning.

6          THE LAW CLERK:  All rise.

7       (Proceedings were recessed at 16:47:05.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    VOLUME 2 REPORTER'S CERTIFICATE

2              I, JoAnn Corson Bacheller, a Registered Diplomate

3    Reporter and Certified Realtime Reporter, certify that the

4    foregoing transcript is a true and correct record of the

5    proceedings given at the time and place hereinbefore

6    mentioned; that the proceedings were reported by me in machine

7    shorthand and thereafter reduced to typewriting using

8    computer-assisted transcription; that after being reduced to

9    typewriting, a certified copy of this transcript will be filed

10   electronically with the Court.

11             I further certify that I am not attorney for, nor

12   employed by, nor related to any of the parties or attorneys to

13   this action, nor financially interested in this action.

14             IN WITNESS WHEREOF, I have set my hand at Billings,

15   Montana this 27th day of April, 2010.

16

17                              /s/ JoAnn Corson Bacheller
                                _____
18                              JoAnn Corson Bacheller
                                United States Court Reporter
19

20

21

22

23

24

25