1  JoAnn Corson Bacheller
   Registered Diplomate Reporter
2  Certified Realtime Reporter
   P. O. Box 1424
3  Billings, Montana 59103-1424
   406/247-4477 office
4  406/247-7008 fax
   joann_bacheller@mtd.uscourts.gov
5
   United States Court Reporter
6

7

8           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MONTANA
9                  BILLINGS DIVISION

10
   UNITED STATES FIDELITY      )
11 AND GUARANTY COMPANY,       )
                               )  Nos. CV-04-29-BLG-RFC
12              Plaintiff,)         CV-08-29-BLG-RFC
       and                     )
13                             )  **VOLUME 3**
   THE CONTINENTAL INSURANCE   )  **TRANSCRIPT OF JURY TRIAL**
14 COMPANY,                    )
            Plaintiff Intervenor,)
15     vs.                     )
                               )
16 SOCO WEST, INC.,            )
                Defendant.)
17 _____)

18

19      **BEFORE THE HONORABLE RICHARD F. CEBULL**
       **CHIEF UNITED STATES DISTRICT COURT JUDGE**
20           **FOR THE DISTRICT OF MONTANA**

21        James F. Battin United States Courthouse
                316 North 26th Street
22              Billings, Montana 59101
             Wednesday, March 10, 2010
23              08:35:48 to 16:43:27

24
            Proceedings recorded by machine shorthand
25   Transcript produced by computer-assisted transcription

1                          **APPEARANCES**

2  For the Plaintiff:              MR. ROBERT C. JOHNSON
                                   MR. JOHN I. GROSSBART
3                                  MS. WENDY N. ENERSON
                                   Attorneys at Law
4                                  8000 Sears Tower
                                   233 South Wacker Drive
5                                  Chicago, Illinois 60606

6                                  MR. MARSHAL L. MICKELSON
                                   Attorney at Law
7                                  P. O. Box 509
                                   Butte, Montana 59703
8
   For the Plaintiff               MR. BRIAN W. WALSH
9  Intervenor:                     Attorney at Law
                                   Suite 330
10                                 555 Mission Street
                                   San Francisco, California 94105
11
                                   MR. STEVEN M. CRANE
12                                 Attorney at Law
                                   Suite 1500
13                                 515 South Figueroa Street
                                   Los Angeles, California 90017
14
                                   MR. MAXON R. DAVIS
15                                 Attorney at Law
                                   P. O. Box 2103
16                                 Great Falls, Montana 59403

17 For the Defendant:              MR. CHRISTOPHER L. LYNCH
                                   MR. PAUL A. BANKER
18                                 Attorneys at Law
                                   4200 IDS Center
19                                 80 South Eighth Street
                                   Minneapolis, Minnesota 55402
20
                                   MR. LAWRENCE B. COZZENS
21                                 Attorney at Law
                                   Suite 104
22                                 1643 24th Street West
                                   Billings, Montana 59102
23
   Also present for               MS. JULIANNE ROHM
24 graphics display:              MR. NEIL BAILEY

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## CONTENTS

Volume/Page

**Volume 1 Proceedings** ................................. 1/   16
*Voir Dire* Examination
     By the Court ...................................... 1/   43
     By Mr. Cozzens .................................... 1/  101
     By Mr. Mickelson .................................. 1/  114
     By Mr. Davis ...................................... 1/  131
Selection of Jury ..................................... 1/  147
Instructions to Jury .................................. 1/  150
Opening Statement by Mr. Cozzens ...................... 1/  160
Opening Statement by Mr. Johnson ...................... 1/  185
Opening Statement by Mr. Davis ........................ 1/  200
Volume 1 Reporter's Certificate ....................... 1/  251

**Volume 2 Proceedings** ................................. 2/  267
Volume 2 Reporter's Certificate ....................... 2/  554

**Volume 3 Proceedings** ................................. 3/  570
Volume 3 Reporter's Certificate ....................... 3/  829

**Volume 4 Proceedings** ................................. 4/  845
Volume 4 Reporter's Certificate ....................... 4/ 1101

**Volume 5 Proceedings** ................................. 5/ 1117
Defendant Rests ....................................... 5/ 1334
Plaintiffs' Motion for Judgment ....................... 5/ 1334
Order of Court Reserved ............................... 5/ 1337
Volume 5 Reporter's Certificate ....................... 5/ 1339

**Volume 6 Proceedings** ................................. 6/ 1355
Volume 6 Reporter's Certificate ....................... 6/ 1610

**Volume 7 Proceedings** ................................. 7/ 1626
Order of Court re: Plaintiffs' Motion for Judgment .. 7/ 1870
Volume 7 Reporter's Certificate ....................... 7/ 1879

**Volume 8 Proceedings** ................................. 8/ 1895
Plaintiffs Rest ....................................... 8/ 1904
Defendant's Motion for Judgment ....................... 8/ 2010
Order of Court re: Defendant's Motion for Judgment .. 8/ 2018
Plaintiffs' Motion for Judgment Renewed ............. 8/ 2018
Order of Court re: Plaintiffs' Motion for Judgment .. 8/ 2018
Settlement of Instructions ............................ 8/ 2019
Volume 8 Reporter's Certificate ....................... 8/ 2072

```
                        CONTENTS  (Continued)
```
                                                    Volume/Page

**Volume 9 Proceedings** ................................  9/ 2088
Instructions to Jury ................................  9/ 2092
Closing Argument by Mr. Banker ......................  9/ 2105
Closing Argument by Mr. Johnson .....................  9/ 2137
Closing Argument by Mr. Davis .......................  9/ 2159
Rebuttal Closing Argument by Mr. Banker .............  9/ 2171
Jury Verdict ........................................  9/ 2186
Volume 9 Reporter's Certificate .....................  9/ 2190

        REPORTER'S NOTE:  "Uh-huh" and "Um-hmm" indicate
affirmative responses.  "Huh-uh" and "Hm-umm" indicate
negative responses.

1                                **WITNESSES**

2     **For the Defendant:**                              Volume/Page

3     Mr. Dennis Allen St. George
            Direct Examination by Mr. Banker ................ 1/  211
4           Cross-Examination by Mr. Johnson ............... 1/  239
            Cross-Examination by Mr. Davis ................. 1/  248
5           Redirect Examination by Mr. Banker ............. 1/  249

6     Mr. James Sullivan
            Direct Examination by Mr. Lynch ................ 2/  276
7           Cross-Examination by Mr. Grossbart ............. 2/  316
            Redirect Examination by Mr. Lynch .............. 2/  358
8
      Mr. Richard Allen Colver
9           Direct Examination by Mr. Cozzens .............. 2/  367
            Cross-Examination by Mr. Johnson ............... 2/  403
10          Redirect Examination by Mr. Cozzens ............ 2/  484

11    Mr. Rodney Hallsten
            Direct Examination by Mr. Banker ............... 2/  490
12          Cross-Examination by Mr. Grossbart ............. 2/  514
            Cross-Examination by Mr. Davis ................. 2/  551
13          Redirect Examination by Mr. Banker ............. 2/  552

14    Mr. Monte I. Naff
            Direct Examination by Mr. Cozzens .............. 3/  570
15          Cross-Examination by Mr. Johnson ............... 3/  610
            Cross-Examination by Mr. Davis ................. 3/  702
16          Redirect Examination by Mr. Cozzens ............ 3/  718

17    Mr. Charles Bender (deposition)
            Examination .................................... 3/  738
18
      Mr. Desmond Slater (deposition)
19          Examination .................................... 3/  763

20    Mr. Larry Nelson (deposition)
            Examination .................................... 3/  802
21
      Mr. Marvin Johnson
22          Direct Examination by Mr. Cozzens .............. 4/  846
            Cross-Examination by Mr. Johnson ............... 4/  863
23
      Mr. Douglas Johnston
24          Direct Examination by Mr. Banker ............... 4/  867
            Cross-Examination by Mr. Grossbart ............. 4/  898
25          Cross-Examination by Mr Davis .................. 4/  921
            Redirect Examination by Mr. Banker ............. 4/  924

1                        **WITNESSES (Continued)**

2      **For the Defendant:**                              **Volume/Page**

3      Mr. David Warne
             Direct Examination by Mr. Banker ................  4/  925
4            Cross-Examination by Mr. Davis .................  4/  953
             Redirect Examination by Mr. Banker .............  4/  987
5
       Ms. Suzanne Miller
6            Direct Examination by Mr. Cozzens ..............  4/  992
             Cross-Examination by Mr. Crane .................  4/ 1030
7            Redirect Examination by Mr. Cozzens ............  4/ 1067

8      Robert Leslie Powell, Ph.D.
             Direct Examination by Mr. Lynch ................  4/ 1068
9            Direct Examination (Continued) by Mr. Lynch ....  5/ 1118
             Cross-Examination by Mr. Grossbart .............  5/ 1213
10           Cross-Examination by Mr. Davis .................  5/ 1301
             Redirect Examination by Mr. Lynch ..............  5/ 1319
11
       **For the Plaintiffs:**
12
       Mr. Marvin Johnson (deposition)
13           Examination ....................................  6/ 1356

14     Mr. Ken Kjos (deposition)
             Examination ....................................  6/ 1471
15
       Ms. Kristen Kohler Stout
16           Direct Examination by Mr. Johnson ..............  6/ 1537
             Cross-Examination by Mr. Lynch .................  6/ 1593
17           Redirect Examination by Mr. Johnson ............  6/ 1607

18     Peter Shanahan, Ph.D.
             Direct Examination by Mr. Grossbart ............  7/ 1626
19           Cross-Examination by Mr. Lynch .................  7/ 1704
             Redirect Examination by Mr. Grossbart ..........  7/ 1721
20
       Mr. Richard Brill (deposition)
21           Examination ....................................  7/ 1728

22     Yaron M. Sternberg, Ph.D.
             Direct Examination by Mr. Crane ................  7/ 1774
23           Cross-Examination by Mr. Lynch .................  7/ 1805
             Redirect Examination by Crane ..................  7/ 1826
24

25

1                    **WITNESSES (Continued)**

2    **For the Plaintiffs:**                           **Volume/Page**

3    Bruce Edwin Dale, Ph.D.
         Direct Examination by Mr. Davis ................ 7/ 1831
4        Cross-Examination by Mr. Lynch ................ 7/ 1862
         Redirect Examination by Mr. Davis ............. 7/ 1866
5
6    **For the Defendant in Rebuttal:**

7    Wayne Martin Grip
         Direct Examination by Mr. Lynch ................ 8/ 1905
         Cross-Examination by Mr. Johnson ............... 8/ 1954
8        Redirect Examination by Mr. Lynch ............. 8/ 1995

9    Robert Leslie Powell, Ph.D.
         Direct Examination by Mr. Lynch ................ 8/ 1999
10       Cross-Examination by Mr. Crane ................. 8/ 2005

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                  **EXHIBITS**

2    **Exhibit No.**                            **Received Volume/Page**

3    5      09/05/89 Letter to Hol from Johnson ........ FPT/   56

4    30     09/11/85 Memo to Managers of All Plants from
            Q. Dyce  .................................. FPT/   56
5
     72     11/04/75 Daily sales report to Bender,
6           Hallsten, Don, Grady, and Naff from Q. Dyce.  2/  536

7    90     05/29/86 Sales report .....................  3/  697

8    143    02/26/82 Continental General Liability
            Survey Report form ........................ FPT/   23
9
     231    06/15/00 Letter to USF&G from Whalen ....... FPT/   24
10
     234    09/25/00 Letter to Downing from
11          Mielenhausen .............................. FPT/   24

12   352    04/08/74 Memo to Bender from Whaley ........ FPT/   28

13   353    09/27/72 Memo to Murray from Q. Dyce ....... FPT/   57

14   359    09/11/85 Memo from Q. Dyce ............... FPT/   28

15   362    09/13/89 Memo to Q. Dyce from Naff ......  FPT/ 28, 57

16   366    Warning label for perchloroethylene and
            instructions on empty container handling
17          and reuse ................................. FPT/   57

18   382    11/05/92 Montana Department of Health Field
            Investigation Report ......................  4/  975
19
     383    07/23/00 Letter to Rowe from Miller ........ FPT/   29
20
     429    06/09/98 E-mail between Warne and Naff .....  3/  668
21
     433    12/16/99 Letter to G. Staarjes from USEPA .. FPT/   58
22
     436    01/06/99 E-mail between Miller and Warne ... FPT/   58
23
     442    08/06/96-08/09/00 Containment pit runoff
24          water sampling ............................  4/ 1059

25   445    03/16/73 USF&G Advertising ................. FPT/   30

1              **EXHIBITS (Continued)**

2    **Exhibit No.**                        **Received Volume/Page**

3    499      11/04/75 Aerial photograph ................. FPT/   31

4    505      02/23/82 Continental General Liability Survey
              Report ................................... FPT/   31
5
     784      08/21/95 Handwritten notes ................ FPT/   58
6
     785      08/18/95 Memo to Naff, Hilton, Biondo,
7             Gilbert, Akers and Liebling from Simko ..... FPT/   58

8    856A     09/25/89 Versar Inc. Environmental Risk
              Assessment Survey ...................... FPT/ 32, 58
9
     859      07/24/89 Draft letter to Hol from Johnson .. FPT/   59
10
     1104     09/08/05 Letter to O'Reilly from Terp ...... FPT/   32
11
     2532     11/1975 Aerial photograph ................. FPT/   32
12
     2533     11/04/75 Aerial photograph ................. FPT/   32
13
     2545     12/30/05 Bulk Handling and Properties of PPG
14            Chlorinated Solvents:  Perchloroethylene,
              Trichloroethylene, Tri-Ethane ............. FPT/   59
15
     2558     04/07/04 Letter to O'Reily from Sullivan ...   2/  293
16
     3004     08/23/00 Letter to Rowe from Miller ........ FPT/   32
17
     3006     08/27/72 Aerial photograph ................. FPT/   32
18
     3015     07/1995 HCI Dyce site plan ................ FPT/   32
19
     3017     01/1983 Dyce personnel manual ............. FPT/   33
20
     3024     10/29/85 Company policy re: hoses .........   4/  888
21
     3025     07/02/87 Memo to Dick, Russ, Bob, Kevin,
22            Ivan, John and File from Roger ............ FPT/   36

23   3029     1986-2001 Dyce manager's monthly report ....   8/ 1896

24   3043     11/29/99 Lockheed Martin Final Report ......   1/   37

25

1                          **EXHIBITS (Continued)**

2    **Exhibit No.**                              **Received Volume/Page**

3    3044    12/16/99 USEPA First Request for Information
             Pursuant to 104(e) ......................... FPT/    37
4
     3045    03/01/00 Dyce Response to First 104(e)
5            Request .................................... FPT/    37

6    3047    08/23/00 Letter to Naff from Risner &
             Kercher .................................... FPT/    37
7
     3048    08/23/00 Dyce Supplemental Response to
8            USEPA's Second 104(e) Request ............. FPT/    37

9    3049    10/03/00 Maxim Technologies Inc. Site
             Investigation Report ...................... FPT/    38
10
     3050    06/2003 Tetra Tech EM Inc. Remedial
11           Investigation Report for MDEQ ............. FPT/    39

12   3051    07/07/04 Tetra Tech Final Feasibility Study
             Report for MDEQ ........................... FPT/    39
13
     3052    11/2004 MDEQ/USEPA Proposed Remedial Action
14           Plan for Lockwood Groundwater Solvent
             Plume Site ................................ FPT/    39
15
     3058    12/2003 Tetra Tech Addendum 01 to the Final
16           Remedial Investigation Report for MDEQ ..... FPT/    39

17   3059    08/2005 MDEQ/USEPA Record of Decision for
             Lockwood Solvent Groundwater Plume Site .... FPT/    39
18
     3060    02/28/06 Letter to Terp from Risner &
19           Kercher .................................... FPT/    40

20   3102    09/16/85 Memo to Colver ................... FPT/    41

21   3115    11/25/92 Letter and permit application to
             Lincoln from Diede ........................ FPT/    42
22
     3174    06/09/00 Letter to Webster from Miller ..... FPT/    43
23
     3175    06/12/00 Letter to Miller from Webster ..... FPT/    43
24
     3178    07/25/00 Fax to Stevenson from Miller ...... FPT/    43
25

                                      564

1                        **EXHIBITS (Continued)**

2    **Exhibit No.**                          **Received Volume/Page**

3    3191    11/13/03 ATC Associates Inc. Soil and
             Groundwater Data Remedial Design Investigation
4            Report ................................... FPT/    43

5    3200    Compilation:  USF&G Policy No. SMP326188 ... FPT/    44

6    3201    Compilation:  USF&G Policy No. 1CC599480 ... FPT/    44

7    3202    Compilation:  USF&G Policy No. SMP406309 ... FPT/    44

8    3203    Compilation:  USF&G Policy No. 1CC944574 ... FPT/    44

9    3204    Compilation:  USF&G Policy No. CEP64280 .... FPT/    44

10   3205    Compilation:  USF&G Policy No. 1CC945882 ... FPT/    44

11   3206    Compilation:  USF&G Policy No. CEP64348 .... FPT/    44

12   3207    Compilation:  USF&G Policy No. SMP535107 ... FPT/    44

13   3208    Compilation:  USF&G Policy No. SMP576121 ... FPT/    44

14   3209    Compilation:  USF&G Policy No. 1CCA31253 ... FPT/    44

15   3210    Compilation:  USF&G Policy No. CEP84958 .... FPT/    44

16   3211    Compilation:  USF&G Policy No. SMP594660 ... FPT/    44

17   3213    Compilation:  USF&G Policy No. CEP104806 ... FPT/    44

18   3214    Compilation:  USF&G Policy No. SMP654057 ... FPT/    44

19   3216    Compilation:  USF&G Policy No. CEP114516 ... FPT/    44

20   3217    Compilation:  USF&G Policy No. SMP772986 ... FPT/    44

21   3219    Compilation:  USF&G Policy No. CEP114641 ... FPT/    44

22   3220    03/03/06 Stipulation as to Existence and
             Content of USF&G Insurance Policies ........ FPT/    44
23
     3287    02/28/05 Letter to Terp from Risner &
24           Kercher ................................... FPT/    48

25

                              565

1

**EXHIBITS (Continued)**

2

**Exhibit No.**                                    **Received Volume/Page**

3    3321    03/03/06 Stipulation as to Existence and
            Content of Continental Insurance Policies
4            and Exhibits ............................... FPT/   49

5    3363    09/29/89 Agreement to Purchase Real
            Property ..................................   8/ 1903
6
     3407    1971 Chemical Safety Data Sheet for
7            perchloroethylene ......................  FPT/ 49, 61

8    3408    1972 Hooker Chemical MSDS for
            trichloroethylene .......................... FPT/   49
9
     3410    1980 PPG manual ........................... FPT/   50
10
     3420    05/25/00 Second Request for Information
11           Pursuant to Section 104 of CERCLA for the
            Lockwood Solvent Site Billings .............   3/   676
12
     3433    1983 Dyce brochure ........................ FPT/   50
13
     3436    11/1979 Ledger sheet ......................   3/   622
14
     3438    04/1971 Perchloroethylene brochure ......  FPT/ 50, 61
15
     3471    08/05/85 Sales report .....................   3/   591
16
     3475    02/06/84 Dyce policies re: DOT ............ FPT/   50
17
     3476    06/02/79 Expense Report ...................   3/   585
18
     3483    Aerial photograph ......................... FPT/   51
19
     3484    Aerial photograph ......................... FPT/   51
20
     3485    Aerial photograph ......................... FPT/   51
21
     3486    Aerial photograph ......................... FPT/   51
22
     3487    Aerial photograph ......................... FPT/   51
23
     3488    Aerial photograph ......................... FPT/   51
24
     3490    1972 Aerial photograph ................... FPT/   51
25

1                          **EXHIBITS** (Continued)

2       **Exhibit No.**                    **Received Volume/Page**

3       3491    1981 Aerial photograph ..................... FPT/    51

4       3492    1987 Aerial photograph ..................... FPT/    51

5       3660    09/09/09 Dale photographs .................   2/   318

6       3674    Site photographs taken by Hargis ...........   8/ 2040

7       3800    05/27/57 Aerial photograph ................. FPT/    52

8       3801    06/26/66 Aerial photograph ................. FPT/    52

9       3802    05/22/69 Aerial photograph ................. FPT/    52

10      3803    08/18/71 Aerial photograph ................. FPT/    52

11      3804    04/23/72 Aerial photograph ................. FPT/    52

12      3805    Circa 1973 Aerial photograph ............... FPT/    52

13      3806    06/18/74 Aerial photograph ................. FPT/    52

14      3807    11/04/75 Aerial photograph ................. FPT/    52

15      3808    06/23/77 Aerial photograph ................. FPT/    52

16      3809    09/06/77 Aerial photograph ................. FPT/    52

17      3810    05/03/79 Aerial photograph ................. FPT/    52

18      3811    05/14/79 Aerial photograph ................. FPT/    52

19      3812    07/31/79 Aerial photograph ................. FPT/    52

20      3813    03/13/81 Aerial photograph ................. FPT/    52

21      3814    06/02/81 Aerial photograph ................. FPT/    52

22      3815    08/24/81 Aerial photograph ................. FPT/    52

23      3816    05/27/83 Aerial photograph ................. FPT/    52

24      3817    07/27/83 Aerial photograph ................. FPT/    52

25      3818    04/30/87 Aerial photograph ................. FPT/    52

1                        **EXHIBITS (Continued)**

2    **Exhibit No.**                          **Received Volume/Page**

3    3826    08/08/05 Response to 06/24/05 CERCLA 104(e). FPT/   53

4    3827    02/14/05 Letter to Moskowitz from
             Mielenhausen ............................. FPT/   53
5
     3828    02/15/05 Letter to Walsh from Mielenhausen . FPT/   53
6
     3886    06/15/00 Letter to Continental from Whalen . FPT/   55
7
     3887    09/25/00 Letter to Giblin from Mielenhausen. FPT/   55
8
     3888    01/08/07 Second stipulation as to existence
9            and content of USF&G insurance policies .... FPT/   55

10   4027    Aerial photograph (D032604) ...............   4/  848

11   4032    10/10/00 Communication to Gilbert from
             Simko .....................................   3/  691
12
     4039    09/13/89 Memo to Q. Dyce from Hallsten .....   8/ 1903
13
     4044    07/1976 Location Survey of Dyce site ....... FPT/   62
14
     4087    01/06/99 E-mail to Warne from Hallsten .....   2/  547
15
     4089    02/29/00 E-mail to Naff from Warne .........   4/ 1066
16
     4143    Aerial photograph .........................   6/ 1485
17
     4320    1980 Bulk Handling and Properties of PPG
18           Chlorinated Solvents ...................... FPT/   63

19   4400    01/14/05 Fax to LeCours from Sullivan ......   2/  335

20   4516    09/12/02 Letter to EPA from Sullivan .......   2/  354

21   4721    08/18/03 Fax to MDEQ from Sullivan .........   2/  308

22   4757    08/03/04 Letter to Sullivan from MDEQ ......   2/  313

23   4811    04/28/03 Letter to Ross from Sullivan ......   2/  342

24   4822    07/20/00 E-mail to Miller from Naff ........ FPT/   64

25

1            **EXHIBITS  (Continued)**

2    **Exhibit No.**                                **Received Volume/Page**

3    4831     Exhibit 5017 aerial photograph with Colver
              notations ...................................  2/   483
4
     4832     Exhibit 5019 aerial photograph with Colver
5             notations ...................................  2/   483

6    4833     Exhibit 5024 aerial photograph with Colver
              notations ...................................  2/   483
7
     4834     Exhibit 5028 aerial photograph with Colver
8             notations ...................................  2/   483

9    4835     04/30/86 General manager's monthly report ..  4/   899

10   5000-
     5064     Historical photographs .....................  2/   267
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          PROCEEDINGS

2          (Open court.)

3          (Jury present.)

4               THE COURT:  Please be seated.

5               Good morning, ladies and gentlemen.

6               All right, Mr. Cozzens.  You may call your next

7     witness.

8               MR. COZZENS:  Soco calls Monte Naff.

9               WHEREUPON,

10                      MR. MONTE I. NAFF,

11    called for examination by counsel for defendant, after having

12    been first duly sworn to testify the truth, the whole truth,

13    and nothing but the truth, testified as follows:

14                      DIRECT EXAMINATION

15    BY MR. COZZENS:

16    Q    Good morning, Mr. Naff.

17    A    Good morning.

18    Q    Would you state your full name and address for the

19    record?

20    A    It's Monte I. Naff.  I'm at 12405 North Nine Mile Road,

21    Nine Mile Falls, Washington 99026.

22    Q    Do you have any ongoing relationship with Soco?

23    A    No, I do not.

24    Q    Do you have any consulting agreement or anything like

25    that with them?

1    A    I have a consulting agreement from when I retired.

2    Q    Okay.  And are you being paid for your time here today?

3    A    Yes, I am.

4    Q    At what rate?

5    A    At -- I am not sure.  I don't have a change.  The last --

6    I have been paid at $78 an hour, and I think it's supposed to

7    go up this time.

8    Q    Okay.  To what?

9    A    To $150, I believe.

10   Q    Okay.  Will you tell the jury when you first became

11   employed by Dyce Chemical?

12   A    In July of 1972.

13   Q    Was that your first employment with a chemical

14   distributing company?

15   A    No.

16   Q    How had you been previously employed?

17   A    I was previously employed by a company called

18   Van Waters & Rogers.  Currently it's called Unibar.

19   Q    When you first went to work for Dyce, where were they

20   located?

21   A    They were located on First Avenue South, I believe, in

22   Billings.

23   Q    Did they move their facility sometime shortly after you

24   went to work for them?

25   A    Yes.  Shortly afterwards, they bought the Dow facility

1   out at Lockwood, and we moved out there the following year.

2   Q    What was your first job for Dyce?  What did you do?

3   A    I was a sales rep.

4   Q    What does that mean?

5   A    Well, I traveled all over Montana and North Dakota,

6   selling chemical.

7   Q    How long, altogether, did you work for Dyce?

8   A    Until 2001.

9   Q    Okay.  Can you outline -- did your job duties change from

10  '72 to 2001?

11  A    Yes.  From '72 to 1978, I was in sales, and in 1978 I

12  became vice-president, and then I was in the office more but I

13  still had sales responsibility.  I had some key account

14  responsibility.  Plus, I trained other salesmen that we hired

15  to start in.

16       And then in 2001 -- 2002, I was asked to go down to

17  Tulsa, Oklahoma for six months and help out HCI, which had

18  purchased Dyce Chemical.

19  Q    Did you tell me you retired in 2001?

20  A    Or -- yeah.  It was 1992 that I went down to Tulsa,

21  Oklahoma.

22  Q    Thank you.

23  A    I still was in Billings one week out of every month at

24  that time and retired then in 2001.  But in Tulsa, I was a

25  regional general manager, so I had from North Dakota to the

1    West Coast and everything except California from Texas north.

2    Q    Was there a time in the mid '70s when you were

3    responsible for the order desk at the Dyce facility out in

4    Lockwood?

5    A    Yes.  In 1974, the young fellow we had on the order desk

6    had quit, and so we did not have anybody on the order desk for

7    a while, so I came in off the road, ran the order desk until

8    we hired Rod Hallsten in the late summer of '74.  I trained

9    him for approximately a year and then went back out into sales

10   on the road.

11   Q    Okay.  And Mr. Hallsten has testified.  I think the jury

12   understands what was done on the order desk.

13        But during that time period, were you on site all the

14   time?

15   A    Pretty much all the time.

16   Q    Okay.  Were you familiar with the site that was purchased

17   by Dyce in 1973 before it was purchased?

18   A    Yes.  I had actually called on that Dow Chemical plant as

19   a sales representative from 1971 and '72.

20   Q    Okay.  And were you involved in the work that was

21   necessary to adapt that piece of property to become the Dyce

22   Chemical site?

23   A    No, not really.  I mean, Quentin Dyce pretty much took

24   care of that.

25              MR. COZZENS:  Okay.  Would you call up, please,

1    Exhibit 5017?

2            DOCUMENT TECHNICIAN:   (Complied with request.)

3            MR. COZZENS:   Is that as big as you can make it?

4    Get the whole photograph as big as you could, please.

5            DOCUMENT TECHNICIAN:   (Complied with request.)

6            MR. COZZENS:   Thank you.

7    BY MR. COZZENS:

8    Q    All right.   Do you recognize what's depicted on Admitted

9    Exhibit 5017?

10   A    Yes.   Yes, I do.

11   Q    What is that?

12   A    It's a picture of the Dyce Chemical operation shortly

13   after we moved out there, I guess a year later.

14   Q    Is that the configuration that they originally

15   constructed, or was the construction complete as of that time?

16   A    Well, it was always ongoing construction and changes.   At

17   that time, the only changes that had been made since we

18   purchased is we had added the office onto the building, and we

19   had moved the tank, the larger tanks you see there, from

20   inside that small warehouse to the northwest, out into what

21   eventually became the tank farm.

22   Q    Okay.   Calling your attention to this area right here --

23   A    Yes.

24   Q    -- what is that?

25   A    That's a defoliated area that had always been that way

574

1    from Dow Chemical.

2    Q    Is that a berm or a dike of any kind?

3    A    There is a berm started just inside that area.

4    Q    Okay.  And I wasn't very precise.  I was calling your

5    attention to the berm area.

6    A    Okay.

7    Q    My hand shook too much to get a good line.

8         Is that the way that that berm ultimately ended up in the

9    mid '70s?

10   A    It was pretty much -- when it ended up, when we completed

11   that construction, it was like a C.  I mean it went from --

12   well, you can see where it's like a C there, and then it

13   continued on around towards the small warehouse, and so it

14   almost completely encircled that area, other than an area for

15   trucks to drive in and out.

16        MR. COZZENS:  Okay.  Can you pull up and enlarge, a

17   little bit, the area that would include the tank farm and both

18   of the warehouses, please?

19        DOCUMENT TECHNICIAN:  (Complied with request.)

20        MR. COZZENS:  There you go.  Thank you.

21   BY MR. COZZENS:

22   Q    What is this building right here?

23   A    That's what we call the small warehouse.

24   Q    Okay.  What's this material that we see right on the east

25   side of that small warehouse?

1   A     There was an entry pad to that small warehouse, a

2   concrete entry pad.

3   Q     All right.  And did that concrete entry pad exist

4   throughout the '70s and '80s?

5   A     Yes, it did.

6   Q     It was never removed?

7   A     No.

8           MR. COZZENS:  Okay.  Would you call up Exhibit --

9   the November 4, 1975 photo, which, I'm not finding the number.

10          MR. LYNCH:  5019.

11          MR. COZZENS:  Thank you.

12          5019, and enlarge that, please.

13          DOCUMENT TECHNICIAN:  (Complied with request.)

14          MR. COZZENS:  Can we back off just a little more?  A

15  little more?

16          THE COURT:  It's on -- have you been running it?

17          THE CLERK:  This time, she is.  They switch.

18          THE COURT:  I'm looking at the button here, is all.

19          THE CLERK:  I'm switching it for them.

20          THE COURT:  I see.

21  BY MR. COZZENS:

22  Q     Okay.  Again I want to call your attention to the berm

23  that we see up at the top of that.

24      (Pause.)

25          MR. COZZENS:  Are we okay?

576

1          DOCUMENT TECHNICIAN:   That is not what I'm looking

2   at.

3       (Discussion off the record.)

4          THE CLERK:   Okay.   That's you?

5          MR. COZZENS:   Thank you.

6          THE COURT:   See, I was right.

7          MR. COZZENS:   Are we ready?

8          DOCUMENT TECHNICIAN:   We are.

9   BY MR. COZZENS:

10  Q    And I want to call your attention to this berm that went

11  along there.

12       The first question I have is, In the northwest corner of

13  that berm, how high was it?

14  A    The berm itself?

15  Q    Yeah.   How high was the berm from the ground level?

16  A    It was approximately 5 to 6-foot.   I don't remember if I

17  could see over it or not.

18  Q    Okay.   What was the purpose of the berm?

19  A    To catch any spills inside the tank farm that might

20  occur.

21  Q    Can you, using the telestrator, show the jury where the

22  berm -- how it was configured in November of 1975?

23  A    Well, we dug out down in that corner.   I mean, the closer

24  you got to the corner, the deeper it was.   It was kind of

25  slanted towards that northwest corner.

1    Q    Is that the area that you said you dug out?

2    A    Yes.

3    Q    Okay.

4    A    We dug that out and used a lot of that for the berm area,

5    a lot of the dirt that came out of there.

6    Q    Okay.

7    A    And then we took a large, very large oil field tarp.  We

8    laid bentonite down to smooth out the ground so we would not

9    get any holes in the tarp, and then we laid the tarp down

10   across the area, the catch pond area, and up over the berm.

11   And then we put dirt on top of the tarp to hold it in place.

12   Q    Okay.  What I'd like you to do, if you could, is to

13   put -- if you put your hand on the screen, you can mark it.

14   It's a telestrator.  So show us where the berm ran as depicted

15   in this 1975 photograph.

16   A    Well, by 1975 it was pretty well completed.  It started

17   here, went around, and it just made a big C through here.

18   This area was the truck entrance area over there to the, I

19   guess it would be, southeast.

20   Q    Did the berm run behind -- first I'll ask you this.  Can

21   you locate the drumming shed?

22   A    The drumming shed is right -- this small building right

23   here.

24   Q    Okay.  In November of 1975, did the berm run behind the

25   drumming shed?

1   A    Yes, it did.

2   Q    Okay.  Can you identify the loading and unloading area on

3   that map, or on that aerial photograph?

4   A    Yes.  The trucks would back into this area right here to

5   load or unload, or, I mean, that was the smaller products.

6   The larger products, I don't remember if we had the whole tank

7   farm.  I think we had everything manifolded then, so all the

8   trucks came in here.

9   Q    Okay.  Do you know how fluids would drain from the

10   loading and unloading area as the facility was configured in

11   November of 1974?

12   A    In 1974 --

13   Q    '75.  I'm sorry.

14   A    Okay.

15   Q    As it's shown on this.

16   A    In 1975 --

17   Q    Right.

18   A    -- I believe we had manifolded everything into --

19   Q    My question is, How do fluids drain?  If there were

20   fluids, rainwater, whatever on the loading and unloading

21   area --

22   A    Oh.

23   Q    -- where would that drain to?

24   A    The natural flow on this land, everything from this area

25   out in here, plus off the buildings, would come down through

1   here, up, and there was a ditch between the railroad tracks

2   and the berm, and that's what the flow was.

3   Q    All right.  Thank you.

4        Do you know -- forget that.

5        You were talking about how the catch pond was

6   constructed.  Was there any drain or any mechanism to remove

7   fluids from the catch pond as it was constructed in 1975?

8   A    No, there was not.

9   Q    During the time that you worked out at Dyce, did you ever

10  see anybody draining fluids out of any catch pond -- let me be

11  more precise -- prior to 1987?

12  A    No, I did not.

13  Q    Okay.  Let's talk just a little bit about the drumming

14  shed that you've already identified.  How was that

15  constructed?

16  A    Well, first we put a concrete floor in with approximately

17  a 3-foot-wide depression down the middle, or, I mean, it was

18  dropped about 4 to 6 inches in the middle where we had metal

19  rollers, and pretty much just put the concrete on top of the

20  ground and then had a depression in the middle so any spill

21  would go into that depression in the middle of the drumming

22  shed.  And then as you would roll a drum across the rollers,

23  we'd lift them up and put them on a scale and weigh the drum

24  as we filled it.

25  Q    Okay.  In this case, we've heard discussions about --

1   that's not a very good drawing, either.  Let me try to do

2   better.

3        This area kind of being the northwest corner, as we've

4   referred to it before for purposes of this case, were there

5   any operations that were conducted in the northwest corner?

6   A    No, there were not.

7   Q    Ever, at any time, from --

8   A    No.

9   Q    Why don't you let me finish the question.  I'll put a

10  date on it.

11       From the time that you first moved on there in '73

12  through at least past '87, were there ever any operations

13  conducted in the northwest corner?

14  A    Never.

15  Q    For that same time period, was that corner ever used for

16  the storage of chemicals or anything at all?

17  A    No.

18  Q    Okay.  Thank you.

19       Do you know whether Dyce Chemical had a bulk perc tank in

20  1975?

21  A    Yes, we did.

22  Q    Can you locate that on Exhibit 5019?

23  A    It was right, to my recollection, it was right behind the

24  drumming shed, probably towards the southwest, slightly.

25            MR. COZZENS:  Okay.  Can you zero in on the tank

1   farm area -- "zero" in.  Zoom in?

2            DOCUMENT TECHNICIAN:  (Complied with request.)

3   BY MR. COZZENS:

4   Q    Okay.  Now you're saying that it was eventually behind

5   the drumming shed?

6            MR. JOHNSON:  Objection, Your Honor, to the

7   question.  He said "eventually."  Let's get a time frame for

8   this.

9            MR. COZZENS:  Okay.

10           THE COURT:  I think that's fair.

11           MR. COZZENS:  I do think it's fair.

12  BY MR. COZZENS:

13  Q    Can you see, in this photograph, something that you

14  believe was the bulk perc tank in 1975?

15  A    No, I do not.

16  Q    Okay.  You know you had one; you just don't know where it

17  is?  Is that what you're telling us?

18  A    Well, I can assume, but I do not know where it is in this

19  particular photo.

20  Q    And that's not what I'm --

21  A    Yeah.

22  Q    What I'm asking you is do you know for a fact that there

23  was a bulk perc tank in 1975?

24  A    Yes.

25  Q    All right.  You just don't know where it is in this

1   photograph?

2   A     That's correct.

3   Q     Thank you.

4         Could we then pull up Admitted Exhibit 5033?

5         DOCUMENT TECHNICIAN:  (Complied with request.)

6   BY MR. COZZENS:

7   Q     This is an aerial photograph of the Dyce site dated

8   June 2 of 1981.  Do you notice any changes in the

9   configuration of the site in June of '81 from that which we

10  looked at in November of 1975?

11  A     Yes.  We had reconfigured most of the tank farm and the

12  dike area.

13  Q     Can you point out exactly what the changes were that were

14  made at that time?

15  A     The dike area started here, came around, and then

16  actually used the railroad tracks as the dike and then back

17  around through here.

18  Q     Okay.  Do you know why those changes were made?

19  A     To enlarge the whole area, as far as expanding the tank

20  farm, plus to catch all of the water off of the facility.

21  There's a tremendous amount of water that would come in here.

22  It would now go into the tank farm area -- or the dike area

23  rather than out along the railroad tracks.

24  Q     Okay.  Who designed this enlargement, do you know?

25  A     Quentin Dyce.

1    Q    Do you know whether he designed this enlargement with EPA

2    requirements in mind?

3    A    I believe so.

4         MR. COZZENS:  Could you pull up Admitted

5    Exhibit 3476?

6         DOCUMENT TECHNICIAN:  (Complied with request.)

7    BY MR. COZZENS:

8    Q    And would you turn to -- well, first of all, would you

9    tell the jury what this is?

10   A    This was an expense report that we did weekly for any

11   expenses we had that the company would reimburse us for.

12   Q    Okay.  And the report says this is Quentin Dyce's expense

13   report for the week of May 27 through June 2 of '79, correct?

14   A    Yes, it is.

15        MR. COZZENS:  Would you turn to page 3 of that

16   exhibit, please?

17        DOCUMENT TECHNICIAN:  (Complied with request.)

18   BY MR. COZZENS:

19   Q    Can you read to the jury the notation that's written down

20   in the lower left-hand corner?

21        MR. JOHNSON:  Your Honor, this document isn't in

22   evidence yet, but we don't object to it.

23        THE COURT:  Is that the exhibit number down at the

24   bottom?

25        MR. COZZENS:  It is, Judge.  It's 3476, and our

584

1    records show that it was, but if it isn't, I apologize.  I

2    didn't mean to do that.

3            THE COURT:  I will admit it if it isn't.

4            What do our records show, Cheri?

5            THE CLERK:  I don't show it.  Just a minute.

6            THE COURT:  It's admitted.

7        (Exhibit 3476 was received in evidence.)

8            MR. JOHNSON:  Thank you, Your Honor.

9            MR. COZZENS:  Thank you.  If I do that again, catch

10   me quick.

11           MR. JOHNSON:  I'll try.

12           MR. COZZENS:  All right.

13   BY MR. COZZENS:

14   Q    Anyway, now can you read that portion, please?

15   A    Yes.  It looks like he had lunch with a Sinclair and

16   Nelson concerning legal implications of expansion, expansion

17   and EPA.

18   Q    Okay.  Thank you.

19        Would you now call up 5024?

20           DOCUMENT TECHNICIAN:  (Complied with request.)

21   BY MR. COZZENS:

22   Q    All right.  This is an aerial photograph of the site as

23   it existed on September 6 of 1977, and all I want you to do is

24   tell me if you can locate the perc tank in that photograph.

25   A    It would have been one of these three small tanks you see

1    right in this area here.

2    Q    Okay.  Thank you.

3         Now if you'd go back to 5033, please?

4         DOCUMENT TECHNICIAN:  (Complied with request.)

5    BY MR. COZZENS:

6    Q    We talked about the lining in the pond that was

7    configured as of 1975.  Was this pond also lined?

8    A    Yes, it was.

9    Q    And what was the purpose of the lining?

10   A    To keep any liquids from going into the ground.

11   Q    Okay.  Was there any drain or pipe of any kind to remove

12   fluids from this pond?

13   A    No, there was not.

14   Q    And as of 1981, we still have no operations or storage

15   being conducted in the northwest corner?

16   A    No, we did not.

17   Q    If I asked this before, I apologize.  I don't remember.

18   Were you ever aware of anybody pumping any fluids out of the

19   catch pond at any time from when it was first constructed

20   until it was torn out in 1986?

21        MR. JOHNSON:  Objection.

22        THE WITNESS:  No.

23        MR. JOHNSON:  Repetitive, Your Honor.

24        THE COURT:  Overruled.

25        MR. COZZENS:  Thank you.

1   BY MR. COZZENS:

2   Q    And the answer was no?

3   A    Yes, it was no.

4        MR. COZZENS:  Would you pull up 5042, please?

5        DOCUMENT TECHNICIAN:  (Complied with request.)

6   BY MR. COZZENS:

7   Q    This is an aerial photograph of the site as it existed in

8   1987.  And would you outline the principal differences between

9   this configuration and that which existed in 1981?

10  A    We had added some concrete diking inside the tank farm to

11  capture any liquids, spills, whatever, and then we had put an

12  evaporation pond and catch pond outside the original fence

13  that you see out in this area here.

14  Q    Okay.  So the historic catch pond --

15  A    No longer existed.

16  Q    Okay.  And as this photo shows, there are still no

17  operations or storage in the northwest corner?

18  A    No.

19  Q    All right.  Let's move to a different subject.

20       You can take this down.

21       DOCUMENT TECHNICIAN:  (Complied with request.)

22  BY MR. COZZENS:

23  Q    Did you have any involvement in discussions at Dyce about

24  an inventory shortage of perc that occurred sometime in the

25  '70s?

1    A    Yes, I did.

2    Q    What do you recall about that?

3    A    I recall coming in from traveling, because we were going

4    to be doing inventory, and they had already started.  Rod

5    Hallsten was very upset because Quent Dyce was very upset over

6    an inventory shortage on perchloroethylene.

7    Q    What was the volume of the discrepancy?

8    A    It was approximately ten to 12 drums of product.  That's

9    how we referred to it, is just drums worth of product.

10   Q    How frequently did Dyce do an inventory of its products?

11   A    Every quarter.

12   Q    Did you have any involvement in trying to determine what

13   caused the discrepancy?

14   A    Yes.  I believe I went, actually went out in the tank

15   farm with someone and had them check the tank for like the

16   third time, besides going through some paperwork, trying to

17   help Rod reconcile if there was a paperwork discrepancy or, I

18   mean, we had no idea why the discrepancy occurred.  But, I

19   mean, we'd start going through customer records and all of our

20   paperwork, trying to figure out what happened with it.

21   Q    Was it unusual to have a discrepancy in the perc

22   inventory?

23   A    Not to this size.  We might have a small discrepancy due

24   to evaporation, but this size, no.  It was very, very unusual.

25   Q    Okay.  Can you tell us when this discrepancy occurred?

1    A    Going back over the time, I know Rod Hallsten had not

2    been on the order desk for a long time, but I had been back

3    out on the road, so his year was basically up.  So I kind of

4    came back and said it had to be like 1974 to '76, somewhere in

5    that time frame, because Rod had not been there that long.  I

6    figured it had to be the fourth-quarter inventory because

7    Quentin and Lois were back up from Arizona for Christmas and

8    year end, and that's why he was out at the office.  He was

9    just back up from Arizona.  So that told me that it was the

10   winter quarter, or the year-end-quarter inventory.

11   Q    Of which years?

12   A    Of 1975 or '74, '75, '76.

13   Q    Do you recall when Mr. Hallsten first went on the order

14   desk?

15   A    It was 1974.

16   Q    Okay.  All right.  What was Mr. Dyce's reaction to

17   discovering or to being told about this inventory shortage?

18   A    Well, he was very upset and said we were going to get out

19   of the perc business.  I mean, we weren't going to handle it

20   anymore.

21   Q    Okay.  And what was Mr. Hallsten's reaction to Mr. Dyce's

22   reaction?

23   A    Well, he was very nervous.  I mean, he thought he could

24   get fired over the situation.  And I tried to explain to him

25   it wasn't his fault.

1    Q    Okay.  Do you remember anything specifically that you

2    told Mr. Hallsten at the time?

3    A    I told him that Quentin would settle down, and after

4    Christmas, he would be headed back to Arizona, and by the time

5    he came back, April or May, I mean, he would have forgotten

6    about it.

7    Q    Did you ever find out what caused that discrepancy?

8    A    Never did.

9    Q    Do you know if anybody at Dyce ever did?

10   A    Not to my knowledge.

11   Q    During the entire time that you worked at Dyce or were

12   familiar with the operations there, was there ever a

13   significant spill of perc that you knew of?

14   A    No.

15   Q    Do you know whether officials from the EPA ever inspected

16   the Dyce premises?

17   A    Yes, there was an inspection.

18   Q    And do you recall approximately when that occurred?

19   A    I believe it was in the early '80s that I think there was

20   four of them altogether that came in.  I think two were

21   federal, and two were state.

22   Q    And you actually remember them coming in?

23   A    Yes, I do.

24        MR. COZZENS:  Could you call up Exhibit 3471,

25   please?

1                DOCUMENT TECHNICIAN:  (Complied with request.)

2                THE CLERK:  Is that in evidence?

3                MR. COZZENS:  I think so.  I thought so.

4                MR. LYNCH:  No, I think it's --

5                MR. COZZENS:  It's not.

6                MR. MICKELSON:  It's not.  3471, is that what you

7      said?

8                MR. COZZENS:  Yes.  3471 is a proposed exhibit, Your

9      Honor.

10               MR. JOHNSON:  I'm sorry.

11          (Discussion off the record at the podium.)

12     BY MR. COZZENS:

13     Q    Can you tell us what Exhibit 3471 is, Mr. Naff?

14     A    This was a report from Quent Dyce back to the managers as

15     to what the results of the EPA inspection were.

16     Q    Is that a document that was prepared in the ordinary

17     course of the Dyce business?

18     A    Yes, it was.

19               MR. COZZENS:  I would move admission of

20     Exhibit 3471.

21               MR. JOHNSON:  No objection.

22               THE COURT:  3471 is admitted.

23          (Exhibit 3471 was received in evidence.)

24               MR. COZZENS:  Okay.

25     ///

1    BY MR. COZZENS:

2    Q    Would you read for the jury the very last line on that

3    memo, please?

4    A    "I consider that this was a very good inspection for them

5    and for us.  We" -- I can't read that.

6    Q    Why don't I read it, okay?

7    A    Okay.  "We learned a lot about the rules, *et cetera*, and

8    they learned a lot about us."

9    Q    Okay.  Did you have any other involvement at all

10   concerning this EPA inspection in the mid '80s?

11   A    At a later date, I actually called the EPA in Denver, I

12   believe it was, to ask for a copy of the report.  They said

13   they would not send out a copy unless there were problems.

14   Q    Did you ever get a copy?

15   A    No, we did not.

16           MR. COZZENS:  Okay.  Would you call up what I'm sure

17   is Admitted Exhibit 143, please?

18           DOCUMENT TECHNICIAN:  (Complied with request.)

19   BY MR. COZZENS:

20   Q    It's a hard copy to read, but can you recognize what that

21   is?

22       And if you could kind of blow up the typing right there

23   in the middle, please?

24           DOCUMENT TECHNICIAN:  (Complied with request.)

25   ///

592

1  BY MR. COZZENS:

2  Q    Do you know what this is?

3  A    It looks like a report from our insurance agent

4  concerning the Dyce location.

5  Q    Okay.  And the insurance agent or the insurance company

6  is Continental Insurance?

7  A    Yes.

8  Q    And we have covered up, with the blownup part -- would

9  you take the top part down so we can get a date on that?

10         DOCUMENT TECHNICIAN:  (Complied with request.)

11         MR. COZZENS:  And that's, again, hard to read.  It's

12  right in the middle.  Right there.

13         DOCUMENT TECHNICIAN:  (Complied with request.)

14         MR. COZZENS:  There we go.

15  BY MR. COZZENS:

16  Q    Can you read the date on that?

17  A    February 23, 1982.

18  Q    Okay.  Were you aware of the fact that Dyce's insurers

19  would come out to the premises from time to time and inspect

20  it?

21  A    Yes.

22  Q    Do you know what the purpose of those inspections was?

23         MR. DAVIS:  Objection.  Calls for speculation.

24         THE COURT:  If he knows.  He was asked if he knows.

25  ///

593

1  BY MR. COZZENS:

2  Q    Do you know what the purpose of those inspections was?

3  A    Generally to check the condition of the facility.

4  Q    And what were they looking for?

5        MR. DAVIS:  Objection.  Calls for speculation.

6        MR. JOHNSON:  Objection.

7        THE COURT:  Yeah, unless he knows.

8        MR. COZZENS:  Right.

9  BY MR. COZZENS:

10 Q    Do you know what they were looking for?

11       MR. DAVIS:  Same objection.  Calls for hearsay.

12       THE COURT:  Overruled, if he knows specifically what

13 they were looking for.  Do you know?

14       THE WITNESS:  I know of no specifics.

15       THE COURT:  Then the objection is sustained.

16       MR. JOHNSON:  Thank you, Your Honor.

17 BY MR. COZZENS:

18 Q    Let me ask it this way.  What was your understanding of

19 the reasons for these inspections by the insurance company?

20       MR. DAVIS:  Objection.

21       MR. JOHNSON:  Objection, Your Honor.

22       MR. DAVIS:  Foundation, speculation.

23       THE COURT:  Sustained.

24 BY MR. COZZENS:

25 Q    Were you ever involved in any of these inspections?

1    A    I did walk out there with Quentin and two, two of them at

2    one time.

3    Q    Okay.  And what things did they look at?

4            MR. JOHNSON:  Your Honor, objection.  Lack of

5    foundation.

6            THE COURT:  No, it's overruled.

7            MR. JOHNSON:  No time frame.

8            MR. DAVIS:  Yeah, it's vague, too.

9            THE COURT:  When was it?

10   BY MR. COZZENS:

11   Q    Do you recall when that inspection occurred?

12   A    I believe it would have been like the late '70s or early

13   '80s.

14   Q    Okay.

15           THE COURT:  It's overruled.

16           Go ahead and answer, if you can.

17           THE WITNESS:  I mean, we did a complete tour of the

18   facility, and Quentin did most of the talking, explaining what

19   this was for, what that was for, the different products in

20   tanks.  They seemed satisfied with everything, and that's

21   about all I remember.

22   BY MR. COZZENS:

23   Q    Okay.  Returning back to Exhibit 143, the first -- or the

24   second line of the typing in the middle says, "Hazards

25   inherent with some of the chemicals were well protected."

1      Do you recall any discussions with these inspectors about

2  protecting hazards from the chemicals?

3  A    No, I don't recall that.

4  Q    Okay.  Did you agree with that conclusion?  Do you agree

5  with that conclusion?

6  A    Yes.  Yes, I do.

7  Q    The last sentence of that typing says, quote, "The

8  premises are kept clean.  Any chemical spills are immediately

9  cleaned up and disposed of in accordance with EPA

10 regulations," end quote.

11     Do you recall any discussions with those gentlemen about

12 that?

13 A    No, I don't.

14 Q    Do you agree with that statement?

15 A    Yes, I do.

16         MR. COZZENS:  Page 2, would you pull that up,

17 please?

18         DOCUMENT TECHNICIAN:  (Complied with request.)

19         MR. COZZENS:  Would you highlight the area that's

20 under "Safety and Loss Control Activities"?

21         DOCUMENT TECHNICIAN:  (Complied with request.)

22 BY MR. COZZENS:

23 Q    The report says, and I quote, "Warehousemen and drivers

24 have daily meetings."

25     Was that true back in 1982?

1  A    Yes.

2  Q    It says, and I quote, "There is a training program for

3  new employees because of the materials that are handled."

4       Was that true back in 1982?

5  A    Yes.

6  Q    How did that training program work, then?

7  A    Well, they were usually designated in an area with a

8  warehouseman or the warehouse manager, and supervised.  I

9  mean, some things they were allowed to do.  Some things, they

10 weren't, right away.

11 Q    Okay.

12 A    I mean, so they kind of progressed into the job.

13 Q    You talked earlier about you trained Mr. Hallsten --

14 A    Yes.

15 Q    -- at the sales desk, right?

16 A    Yes.

17 Q    Did the same kind of process occur for the people who

18 worked out in the warehouse and handled chemicals?

19 A    As --

20 Q    Having an experienced employee train a new employee?

21 A    Yes.

22 Q    The last line under "Safety and Loss Control Activities"

23 says, "No losses reported."

24      As of 1982, were you aware of any losses resulting from

25 lack of safety or those kinds of things out at Dyce?

1    A     Not that I recall.

2           MR. COZZENS:  Okay.  If you'd go down to the last

3    two lines of that page, please?

4           DOCUMENT TECHNICIAN:  (Complied with request.)

5           MR. COZZENS:  Can you move that up?

6           DOCUMENT TECHNICIAN:  (Complied with request.)

7           MR. COZZENS:  Thank you.

8    BY MR. COZZENS:

9    Q    I'm going to start reading kind of in the middle of the

10   top of those two lines and it says, and I quote, "Valves and

11   piping and tanks are clearly marked to prevent the running of

12   incompatible chemicals together."

13         Was that true in 1982?

14   A     Yes.

15   Q    Did that remain true at least through 1987?

16   A     Yes.

17   Q    And how was that accomplished?

18   A     We had separate lines, so -- and, you know, unless you

19   hooked the wrong product to the wrong -- or to a different

20   line.

21   Q    And how were they marked?

22   A     Well, the tanks were marked, for one thing, and then -- I

23   don't recall.  I think some pipes had actual stencils on them,

24   what the product was.  Inside the drumming area where the

25   loading was, each, there was a marking on the wall above each

1    pipe or nipple that came out of the wall as to what that

2    product line was.

3    Q    Okay.  And then the final sentence, "Employees are

4    experienced."

5         Was that true in 1982?

6    A    Yes, it was.

7    Q    Was that generally true throughout the time that you

8    worked at Dyce?

9    A    Yes.

10   Q    Dyce Chemical was sold in 1989; is that correct?

11   A    That's correct.

12   Q    Do you recall who it was that purchased that?

13   A    Holland Chemical International.

14   Q    Was anything done to determine whether there was any

15   groundwater contamination or other problems at the Dyce site

16   at that time?

17   A    Yes.  HCI hired a company to come in and do -- they

18   drilled quite a few holes, took water samples and did the

19   testing.

20   Q    What did they find?

21   A    As I recall, it was very little.

22        MR. COZZENS:  Okay.  Would you call up -- let me

23   make sure I know whether it's been admitted or not.

24   Exhibit 362 has been admitted, correct?

25        THE CLERK:  Yes.

1          MR. COZZENS:  Thank you.

2          Admitted Exhibit 362, would you blow up the typed

3   portion of that?

4          DOCUMENT TECHNICIAN:  (Complied with request.)

5   BY MR. COZZENS:

6   Q    This is a letter from you to Quentin Dyce dated

7   September 13, 1989.  Is that your signature on that document?

8   A    Yes, it is.

9   Q    And what was the purpose of this letter?

10  A    To just let Quentin know that I knew of no spills other

11  than a hydrochloric acid spill that we had that occurred while

12  I had worked there.

13  Q    Okay.  Was that done in connection with the sale of the

14  business to HCI?

15  A    Yes, it was.

16  Q    You do note that there was some problem with an HCl car.

17  First of all, what is HCl?

18  A    Hydrochloric acid.

19  Q    What was the problem?

20  A    We had a railcar on the rail siding that sprung a leak

21  about two-thirds of the way up the side of the car.

22  Q    What happened?

23  A    I think -- well, I mean, quite a bit of product escaped

24  before we could build a -- the only way you could unload a

25  hydrochloric acid car was with air, so you didn't want to put

1    air pressure on it to try to unload part of it because it

2    would have just made the leak worse.  So we actually made like

3    a Band-Aid out of rubber, I think a large chunk of rubber, you

4    know, like an inner tube, and some bands, some metal -- we had

5    metal banding material there, and we actually banded that to

6    the car so we could put some pressure on it and unload it.

7    Q    Did that have any lasting impact on the site?

8    A    Not really.  I mean, it went into the ground so fast.  I

9    mean, we did spread some lime along the railroad tracks there

10   just to neutralize what we could.

11   Q    The indication that there was a lower pH in wells, what

12   does that mean?

13   A    Well, that means some type of acid got into the

14   groundwater to lower the pH.  If it's acidic, it's lower pH.

15   Q    All right.  Let's discuss the policies and procedures out

16   at Dyce.  When you first went to work there, were there

17   specific policies and procedures in place regarding safety?

18   A    Not written.  I mean, new employees were shown how and

19   why they handled products in specific ways as far as drumming

20   or -- I mean, originally we had very few tanks so it was a

21   fairly simple operation.  But, no, people were shown and

22   taught the hazards.  I mean, we'd have manufacturer's

23   employees come in and give sessions on hazardous materials.

24   Q    Okay.  So you're saying there wasn't a written set of

25   policies and procedures?

1    A    That's correct.

2    Q    Were there specific policies and procedures, however,

3    that were to be followed for, for instance, loading and

4    unloading tanker trucks?

5    A    Yes.  I mean --

6    Q    And those were communicated to the employees by an

7    experienced employee teaching a newer employee; is that

8    correct?

9    A    Yes.

10   Q    Were there policies concerning environmental hazards from

11   the very beginning of your time at Dyce?

12   A    Yes, there were.

13   Q    Were those in writing?

14   A    No, they were not at the beginning.

15   Q    Did these policies and procedures evolve over the time

16   that you were employed at Dyce?

17   A    Yes.  As Dyce evolved and EPA and OSHA got more involved,

18   everything evolved into paperwork and specifics.  Everything

19   had to be in writing.

20   Q    So there came a time when all these policies and

21   procedures were reduced to writing; is that correct?

22   A    Yes.

23   Q    Okay.  Tell me a little bit about Quentin Dyce.  What

24   kind of an operation did he run out there?

25   A    Well, he was very concerned, you know, about the

1    business, about the operation.  He was willing to spend money,

2    as you can see, through the growth of the company to develop,

3    to be safer, to be more environmentally friendly, and, I mean,

4    he likes to hunt and fish, and he appreciated the environment.

5    Q    Okay.  Was he a guy who cut corners?

6    A    No.

7    Q    Was he a guy who would ignore legal requirements for his

8    business operations?

9    A    No.

10   Q    Did you ever see him do either of those things?

11   A    Pardon?

12   Q    Did you ever see him do either of those things?

13   A    No.

14   Q    When did Quentin pass away?

15   A    In, I believe it was, 1995.

16   Q    In the time that you worked out at Dyce, did you ever

17   see, other than the HCl spill that you've told us about, did

18   you see any other spills of product?

19   A    Not major spills, no.

20   Q    Spills of any quantity?

21   A    Yes.

22   Q    Okay.  Did you ever see, for instance, a hose rupture?

23   A    Yes.

24   Q    What did you see, and what happened?

25   A    Well, one of them I had very intimate contact with

1   because I was actually filling a skid tank.  But if a truck

2   driver didn't get the pump shut down fast enough and he shut,

3   shut the hose down where there was no more product could flow

4   through it, I mean, I witnessed twice a ruptured hose.

5   Q    Okay.  And how big was the rupture?

6   A    Well, I don't recall exactly how much split, but I know I

7   was soaking wet.

8   Q    What product was that?

9   A    That was diethanolamine.

10        MR. COZZENS:  Okay.  Could you pull up what I have

11   down as Admitted Exhibit 3047?

12        THE CLERK:  It's in.

13        MR. COZZENS:  Thank you.

14        DOCUMENT TECHNICIAN:  (Complied with request.)

15   BY MR. COZZENS:

16   Q    Mr. Naff, can you just tell me what that exhibit is?

17        Can you enlarge it, please?

18   A    Yes, if you could enlarge it, I would appreciate it.

19        DOCUMENT TECHNICIAN:  (Complied with request.)

20        THE WITNESS:  This looks like the first notification

21   that there was contamination on the Dyce property.

22   BY MR. COZZENS:

23   Q    This is addressed to you; is that correct?

24   A    Yes.

25   Q    At that time, your position was general manager of Dyce?

1   A     Yes, it was.

2   Q     And the first sentence says, and I quote, "This is to

3   notify HCI/Dyce Chemical of its potential liability under

4   Section 107 of the Comprehensive Environmental Response,

5   Compensation, and Liability Act."

6         Is that the first notice you had that the EPA was telling

7   Dyce you could be liable for this groundwater contamination?

8   A     Yes.

9   Q     What did you do in response to receiving this letter?

10  A     Well, I spoke with Suzanne Miller and, you know, we asked

11  a lot of people if they knew of a spill, if -- I mean, my

12  first reaction was it wasn't our problem.  It was created by

13  somebody else.

14  Q     Why was that?

15  A     Just because of the practices that we had, and never,

16  never remembering anything about a perc spill or -- I just

17  assumed it was from migration of perc from a company we had

18  sold product to across the interstate or something to that

19  effect, I mean.

20        And then I got to thinking that, well, 2,4-D, which

21  has -- is a chlorinated product, also, would break down into

22  those same products, and I was sure that was probably what it

23  was, but I did pursue that avenue with some chemists, and they

24  assured me it was not the case; it would not be product from

25  2,4-D.

605

1   Q     Okay.  Did Dyce conduct an investigation to determine if

2   that -- if they had caused that groundwater contamination?

3   A     We asked every employee we could get a hold of; I mean,

4   previous employee and current employee.

5   Q     Did Dyce respond to requests for information from the

6   EPA, if you know?

7   A     Not that I remember.

8   Q     Who was put in charge of responding to the EPA concerning

9   this investigation and their allegations?

10  A     Suzanne Miller.

11  Q     What was her position with the company?

12  A     Was our environmental, safety/environmental manager.

13  Q     And did Suzanne Miller talk to you, as an historical

14  employee of Dyce, about what you knew?

15  A     Yes, she did.

16  Q     Did you tell Suzanne Miller about the perc inventory

17  discrepancy that you've talked about here today?

18  A     No.

19  Q     Why not?

20  A     I didn't recall it at the time.

21        MR. COZZENS:  Okay.  One more document.  If you

22  could call up Exhibit 856A, which, again, my notes indicate

23  has been admitted?

24        THE CLERK:  Yes.

25        MR. COZZENS:  Thank you.

1              DOCUMENT TECHNICIAN:  (Complied with request.)

2              MR. COZZENS:  And I just want to turn -- first of

3    all, go to page 2, please.

4              DOCUMENT TECHNICIAN:  (Complied with request.)

5    BY MR. COZZENS:

6    Q    I should actually have done this earlier, but you made

7    mention of an investigation that was done for the sale in

8    1989, and do you recognize this Versar, Inc. report as being

9    that?

10   A    Yes.

11             MR. COZZENS:  Okay.  Would you turn to page 17?

12             DOCUMENT TECHNICIAN:  (Complied with request.)

13             MR. COZZENS:  I don't know if there's any way to get

14   the very bottom of 17 and the top of 18 all on one screen?

15             DOCUMENT TECHNICIAN:  No.

16             MR. COZZENS:  All right.  Then let's start with the

17   very bottom of page 17, and I'm going to read, "Only one

18   inspection has been," and now can you go to page 18?

19             DOCUMENT TECHNICIAN:  (Complied with request.)

20   BY MR. COZZENS:

21   Q    So again, it reads, "Only one inspection has been made by

22   the EPA and," it says, "the Wyoming Department of Health.  No

23   written report of the inspection was provided to Dyce.

24   Telephone interviews with Mr. Jim Harris of the EPA and

25   Mr. Roger Thovilson of the department of health, both of whom

607

1    participated in the inspection, indicated that no problems

2    were found during the inspection."

3         Was that also your understanding of that EPA inspection?

4    A    Yes, sir, it was.

5              MR. COZZENS:  I have no further questions, Your

6    Honor.

7              THE COURT:  You know, we're going to take a quick

8    recess.

9              MR. COZZENS:  Okay.

10             THE LAW CLERK:  All rise.

11        (Recess taken from 09:36:31 to 09:51:27.)

12        (Open court.)

13        (Jury not present.)

14             THE COURT:  I want to talk to you that Cheri and

15   JoAnn pointed out to me on the recess that a number of these

16   aerial photographs, during the pretrial conference, I admitted

17   them for illustrative purposes; for instance, 3483, 3484,

18   3485, 3486, 3487, 3488.  Not 3489; I refused that.  Those are

19   certified aerial photos of Dyce.  Cheri's record from the

20   pretrial conference shows they were admitted for illustrative

21   purposes, but I would think that the jury in this case is

22   going to want photographs.

23             MR. JOHNSON:  That's absolutely correct, Your Honor.

24             THE COURT:  And so I am going to admit them for all

25   purposes, not just for illustrative purposes.

1              MR. GROSSBART:  Your Honor, the 5000 series of

2    photos that have been principally used, absolutely admitted

3    for all purposes, absolutely can go to the jury room.  I don't

4    have those number in front of me, but I'm just concerned that

5    the particular 3000 series of numbers you read had labeling

6    that was added to the photos.

7              THE COURT:  Well, here is what we'll do.  You

8    parties discuss it.  If you can't come to agreement, I'll hear

9    some more discussion about it, and then I'll make a ruling.

10             MR. GROSSBART:  I think there is an agreement.  That

11   won't be a problem.

12             MR. COZZENS:  (Nodded head affirmatively.)

13             THE COURT:  Yeah, if there isn't -- I don't even

14   know if we've used these photos, but I just want you to

15   primarily be aware that there is this problem and I don't want

16   it to be a problem.

17             MR. GROSSBART:  Just so the Court is aware, the

18   unaltered photos as they come from the guy in the airplane, so

19   to speak, we all agree come in.  Various experts have done

20   demonstratives to add labeling and titles and this and that,

21   highlights, and those also we agree, also, are illustrative,

22   not evidence.

23             THE COURT:  Okay.

24             MR. COZZENS:  Judge, I have another quick thing.

25             In the pretrial conference, we talked about Marvin

1    Johnson with his throat cancer, and he wants to bring in his

2    own bag of water.

3              THE COURT:  Whatever we have to do for Marvin.

4              MR. COZZENS:  Somebody needs to tell the security

5    guards, because they don't know that.

6              THE COURT:  Well, yeah.

7              MR. COZZENS:  Okay?

8              THE COURT:  Yeah.  We're going to do whatever needs

9    to be done.

10             MR. COZZENS:  Okay.  He'll be coming in probably

11   early afternoon or maybe even late morning.

12             THE COURT:  Okay.

13        (Jury present.)

14             THE COURT:  Please be seated.

15             Mr. Johnson, you may cross.

16             MR. JOHNSON:  Thank you very much, Your Honor.

17                        CROSS-EXAMINATION

18   BY MR. JOHNSON:

19   Q    Good morning, Mr. Naff.  You may recall I've asked you

20   some questions before in this case.

21   A    Yes.

22   Q    Good morning again.

23        Now you worked for Dyce and HCI and Soco West for most of

24   your working career, right?

25   A    Not Soco West.

1   Q     Okay.  You worked for Dyce and HCI?

2   A     Yes.

3   Q     And you worked for them from 1992 to 2001?

4   A     1972.

5   Q     '72.  Excuse me.

6   A     To 2001.

7   Q     To 2001.

8   A     Yes.

9   Q     And that's 29 years?

10  A     Yes.

11  Q     All right.  And you're still a paid -- you're a

12  consultant and have been for the past nine years for them,

13  correct?

14  A     Yes.

15  Q     All right.  So totaling up 29 and another nine years,

16  you've been affiliated with them for about 38 years, correct?

17  A     Yes.

18  Q     And for a total of 17 of those years, you worked

19  basically for Dyce?

20  A     Yes.

21  Q     You became a vice-president of Dyce, in fact, in 1978?

22  A     Yes.

23  Q     And from 1978 until 1989, you pretty much ran the Dyce

24  operation at the Lockwood facility; isn't that correct?

25  A     Yes.

1          MR. JOHNSON:  Now can you pull up Exhibit 5009?

2          DOCUMENT TECHNICIAN:  (Complied with request.)

3    BY MR. JOHNSON:

4    Q    I'm showing you, Mr. Naff, what has been designated, or,

5    I'm sorry, marked as an exhibit, 5009.  It's an April 23, 1972

6    photo of the Dyce -- I'm sorry, of the Dyce property in 1972.

7         That's what it looked like at or about the time that it

8    was purchased by Dyce; is that correct?

9    A    Yes.

10   Q    There were just two warehouses, correct?

11   A    Yes.

12   Q    And the tanks that eventually went into the tank farm

13   were in the small warehouse at the time you bought this from

14   Dow?

15   A    The original six tanks, yeah.

16   Q    And you took those six tanks out of the small warehouse,

17   and you put them in the tank farm?

18   A    Yes.

19   Q    Okay.  The construction by Dyce on the property began in

20   the spring of 1973; isn't that correct?

21   A    Yes, I believe so.

22   Q    All right.  And Dyce moved into the facility in August of

23   1973, correct?

24   A    Yes.

25          MR. JOHNSON:  All right.  Pull up 5017.

612

1          DOCUMENT TECHNICIAN:  (Complied with request.)

2   BY MR. JOHNSON:

3   Q    Now this photo is from 1974, and I think -- I don't know

4   whether counsel showed it to you on direct or not, but this

5   shows the constructed tank farm north of the warehouse,

6   correct?

7   A    Yes.

8          MR. JOHNSON:  Can you pull up that area?

9          DOCUMENT TECHNICIAN:  (Complied with request.)

10  BY MR. JOHNSON:

11  Q    All right.  And Quentin Dyce was an engineer by training;

12  isn't that correct?

13  A    Yes.  He had a college degree.

14  Q    All right.  And he was the president and owner of the

15  company at the time, correct?

16  A    Yes.

17  Q    And he lived in Billings?

18  A    Yes.

19  Q    And he oversaw the construction of the tank farm,

20  correct?

21  A    Yes.

22  Q    There are large cylindrical tanks in the tank farm.

23  Those large cylinder tanks are the ones you took out of the

24  small warehouse and put back into the tank farm, correct?

25  A    Six of them, yes.

1    Q    Okay.  And next to those tanks, you would agree with me

2    that there is a tanker truck to the east?

3    A    Yes.

4    Q    All right.  And that tanker truck pulled in through the

5    opening in the berm at that point, correct?

6    A    Yes.

7    Q    And at that time in 1974 when this photo was taken, those

8    tanks would get filled pretty much the way it appears here,

9    with tanker trucks having pulled up directly next to the

10   tanks, correct?

11   A    Yes.

12   Q    Now at some point, Dyce purchased a 1,500-gallon tank

13   from Empire Tank for the Lockwood facility; isn't that

14   correct?

15   A    That's correct.

16   Q    All right.  And when did Dyce purchase that perc tank?

17   A    Shortly after we moved out there, because perc was one of

18   the only two tanks that we had at the downtown facility, and

19   we did not move that tank out to the Lockwood facility.

20   Q    So shortly after moving into the Lockwood facility, you

21   bought the perc tank; is that correct?

22   A    Yes.

23   Q    All right.  And that would have been in late 1973 or

24   early 1974?

25   A    Yes.

1  Q    Do you recall that your deposition was taken in this
2  case?
3  A    Yes.
4  Q    All right.  And your deposition was videotaped, wasn't
5  it?
6  A    I don't recall.
7  Q    All right.  And you swore to tell the truth at the time
8  of your deposition, just like you did this morning, didn't
9  you?
10 A    Yes.
11 Q    Now I'm going to play for you a clip from that
12 deposition, and I'm going to ask you whether you were asked
13 those questions and gave those answers.
14       Could you please play Clip 1?
15       DOCUMENT TECHNICIAN:  (Complied with request.)
16       "Okay.  The tanks that were in the tank farm, what
17 kind of chemicals were you handling in bulk -- and we'll start
18 in 1975 -- that would be in the tanks in the tank farm?
19       "Hydrochloric acid and methanol, probably xylene,
20 probably two glycols.
21       "Okay.  And how about perchloroethylene?  Did you --
22 was there a bulk tank for that?
23       "I don't know if there was in 1975.  I don't know if
24 that went in in 1975 or 1976.  I'm just -- I just don't know.
25       "Okay."

615

1   BY MR. JOHNSON:

2   Q    And at your deposition you gave, you gave those answers

3   to those questions; isn't that correct?

4   A    Yes.

5         MR. JOHNSON:  All right.  Now let me back up here

6   to -- put up Exhibit No. 5017 again.

7         DOCUMENT TECHNICIAN:  (Complied with request.)

8         MR. JOHNSON:  All right.  And hone in on the area.

9         DOCUMENT TECHNICIAN:  (Complied with request.)

10  BY MR. JOHNSON:

11  Q    All right.  Now this is a photo, the same photo dated

12  June 18, 1974.  You don't see a perc tank in this picture, do

13  you?

14  A    Not specifically.  I mean, I don't --

15  Q    You don't know?  I mean, it would be a guess --

16  A    Right.

17  Q    -- one way or another?

18  A    Right.

19  Q    Okay.  And you talked about a tarp going into the perc --

20  into the catch pond, correct?

21  A    Yes.

22  Q    Do you see a tarp in the catch pond here?

23  A    No.

24  Q    All right.  Do you know when you put the tarp into the

25  catch pond?

1    A    Before we put the dirt over the top of the tarp.  I mean,

2    it was --

3    Q    Well, the question is, When did you put the tarp into the

4    catch pond?

5    A    A date?

6    Q    Yes, sir.

7    A    Shortly after we dug out the catch pond.

8    Q    All right.  When did you dig out the catch pond?

9    A    I believe it was in 1974.

10   Q    All right.  And this -- is the catch pond in this picture

11   dug out?

12   A    Yes, it is.

13   Q    Do you see -- but you don't see the tarp in the catch

14   pond?

15   A    No.

16        MR. JOHNSON:  Now pull up the next photograph, 5019.

17        DOCUMENT TECHNICIAN:  (Complied with request.)

18   BY MR. JOHNSON:

19   Q    This is one that I know Mr. Cozzens showed you on your

20   direct examination.  This is a photo from November of 1975,

21   and in this photo -- can you hone in on the tank farm?

22        DOCUMENT TECHNICIAN:  (Complied with request.)

23   BY MR. JOHNSON:

24   Q    In this photo, there are, in this area in particular,

25   there are some tanks.  Do you know what those tanks are?

1   A    (No response.)

2   Q    Not the cylindrical ones, the original ones, but the ones

3   right here.

4   A    I believe those are three tanks that we moved out of the

5   way when we were putting the berm in that were behind the

6   drumming shed.

7   Q    All right.  So you believe that these tanks were behind

8   the drumming shed at some point?

9   A    Yes.

10  Q    And was one of them a perc tank?

11  A    I believe so.

12  Q    Were these -- was this perc tank in use at this time?

13  A    Not while it was -- probably not while it was put out in

14  that area.

15  Q    All right.  Do you recall one way or another, though,

16  whether it was in use or not?

17  A    No.

18  Q    Now when the perc tank was out here, it's not connected

19  by a pipe to anything, right --

20  A    No.

21  Q    -- in the location that it's currently in?

22  A    No, it wouldn't have been.

23  Q    And with regard to this photo, there's no perc tank --

24  strike that.

25        You've previously testified about a manifold --

1   A    Yes.

2   Q    -- from the perc tank, correct?

3   A    Yes.

4   Q    All right.  Did that manifold sit on the berm about 4 to

5   6 feet away to the west of the drumming shed?

6   A    As I recall when we first put the perc tank in, that's

7   where there was a pipe or a hose laid over the berm to connect

8   to that perc tank.

9   Q    All right.  But are you saying you don't know whether

10  there was a pipe or a hose?

11  A    Not specifically.

12  Q    All right.  And there was no manifold at that point in

13  time?

14  A    No.

15  Q    Connected to the perc tank by a pipe?

16  A    Originally, as I recall, there was no drumming shed.

17  Q    All right.  But I'm talking about 1975 here, and

18  particularly this photo in which there is a drumming shed.

19  A    Well, I don't know specifically when that was piped into

20  the drumming shed.  I mean, I don't recall whether it was

21  shortly after we built this drumming shed.  I would assume.

22  Q    All right.  And you gave your testimony in this case at a

23  different time, didn't you, about three years ago, correct?

24  A    Yes.

25           MR. JOHNSON:  All right.  Can I approach, Your

619

1    Honor?

2              THE COURT:  Yes.

3    BY MR. JOHNSON:

4    Q    (Handing.)  And when you gave your testimony about three

5    years ago, you swore to tell the truth, just like you have

6    today, correct?

7    A    Yes.

8    Q    Let me refer you to page No. 931 of the transcript.  And,

9    in particular, Mr. Naff, line 7 of page 931.  I am going to

10   read the questions and answers there.  You can follow along

11   with me.  Do you see where I'm talking about?

12   A    Yes.

13   Q    Okay.  The question, "All right.  There is -- you have --

14   there is what you have referred to in the past as a manifold."

15        Answer, "Right."

16        Question, "Okay.  Show us where the manifold is on here."

17        Answer, "It would have come -- the perc tank is right

18   here in the shadows."  And, parenthetically, you're referring

19   to this picture at the time.

20        And the question is, "Um-hmm."

21        And your answer goes on, "And it would have come -- the

22   berm is just right here.  It would have come up over the wall

23   of the perc tank containment and just laid on top of this berm

24   right here."  And this is -- you're referring to this

25   particular picture.

1      Were those questions and answers questions given and

2   answers given back three years ago by you?

3   A    Yes.

4   Q    All right.  And then referring you down to page 932,

5   right below that, specifically line 19, the question is, "All

6   right.  And so originally the only manifold was from the perc

7   tank, and you said it was on the berm; is that correct?"

8        Answer, "I think that was the first one."

9        Question, "And that, that manifold, in effect, was

10  directly south of where the perc tank was?"

11       And the answer is, "Yes."

12       And going on to 933, question, "All right.  And how close

13  to that manifold was that manifold to the drumming shed which

14  is to the east?"

15       And the answer was, "Probably 4 to 6 feet."

16       Were those questions asked of you, and those answers

17  given?

18  A    Yeah.

19  Q    All right.  Do you see the manifold in this photo?

20  A    No.

21  Q    And you don't see a perc tank in the shadow of this

22  photo, either, do you?

23  A    I can't see anything in the shadow.

24  Q    Now you had a, you had a dedicated pump once the perc

25  tank was purchased; is that true?

1    A    Yes.  I mean, I'm not sure if we had one originally or

2    not.

3    Q    And did you originally have a dedicated hose?

4    A    Yes.

5          MR. JOHNSON:  All right.  Will you pull up 3436?

6          DOCUMENT TECHNICIAN:  (Complied with request.)

7          MR. JOHNSON:  Don't show it to the jury yet.

8          I believe that there's no objection to this

9    document.  I would move for its admission.

10          MR. COZZENS:  There is no objection.

11          THE COURT:  3436 is admitted.

12       (Exhibit 3436 was received in evidence.)

13   BY MR. JOHNSON:

14   Q    All right.  And this document -- can you identify this

15   document?

16   A    (No response.)

17   Q    Can you read it?

18   A    Yes.

19   Q    Okay.  And is this -- this is a ledger sheet from Dyce,

20   isn't it?

21   A    Yes, it is.

22   Q    All right.  And you've seen ledger sheets like this

23   before, correct?

24   A    Yes.

25   Q    All right.  Let me refer you down to the date of 4/76,

1    which is about halfway down the page.  All right.  And 4/76

2    and 5/76 are the ones I'm going to ask you about.

3        Can you get those larger?

4            DOCUMENT TECHNICIAN:  (Complied with request.)

5            MR. JOHNSON:  All right.  This -- and, okay, blow

6    them up.

7            DOCUMENT TECHNICIAN:  (Complied with request.)

8    BY MR. JOHNSON:

9    Q    These two entries there are dated in April of -- the

10   first one is April of '76, and next to it it says, "Perc

11   Pump."  Does this refresh your recollection as to when the

12   perc tank was put in?

13   A    No.

14   Q    All right.  The one below that says 5/76, which is May of

15   '76, and it says, "Perc Hose."  Does this refresh your

16   recollection at all with regard to when the perc tank was put

17   in?

18   A    No.

19           MR. JOHNSON:  You can take that down.

20           DOCUMENT TECHNICIAN:  (Complied with request.)

21           MR. JOHNSON:  Put back up the Photo 5019.

22           DOCUMENT TECHNICIAN:  (Complied with request.)

23   BY MR. JOHNSON:

24   Q    Showing you this photo again, which is November of 1975,

25   there is, behind the drumming shed, a shadow, correct?

1  A    Yes.

2  Q    All right.  Coming out from the shadow, in this area

3  here, is what appears to be liquid.  Would you agree that

4  that's liquid?

5  A    I have no idea.

6  Q    Isn't it a fact that liquid would drain out of the back

7  of the drumming shed and into the tank farm?

8  A    I would imagine it did, yes, but there was a berm there,

9  so --

10  Q    Are you sure there was a berm there in 1975?

11  A    When this project was completed, yes, there was a berm

12  there.

13  Q    All right.  And when was the project completed?

14  A    I believe it was 1975.

15  Q    All right.  But the berm here isn't completed as of the

16  date of this picture, is it?

17  A    Well, I believe it is.  I believe you can see part of the

18  berm going out behind, right where there is no shadow.

19  Q    All right.  But there is no -- but the berm is open over

20  here, right?

21  A    Yes, it is.

22  Q    All right.  So it's not fully completed, correct?

23  A    No.  That stayed that way for trucks to get in and out.

24  Q    All right.  And in the shadow that comes off of the small

25  warehouse, you can't see in that shadow, can you, to see

624

1    whether there's a berm there or not, correct?

2    A    No, I cannot.

3    Q    And you can't see in the shadow behind the drumming shed

4    to see if there's a berm there or not, correct?

5    A    That's correct.

6    Q    All right.  And you testified on your direct examination

7    with regard to the drainage here, and you testified that in

8    this area, if there was water or spillage, chemical spillage

9    in that area, it would go, it would go down here, around here,

10   down here, and this way?  That's what you said, right?

11             MR. COZZENS:  I object.  Mischaracterization.

12             THE COURT:  No, it's overruled.  This is cross.

13             THE WITNESS:  Yes, most of it would.

14   BY MR. JOHNSON:

15   Q    All right.  It wouldn't go through the opening in the

16   berm all the way to the catch pond?

17   A    We kept that area a little higher so you didn't -- the

18   trucks went in and out of there so they would not get stuck in

19   mud or -- I mean, it was kept drier.  I believe we put bottom

20   ash or something from Montana Power in there just --

21   Q    When did you do that?

22   A    When we were constructing this area.

23   Q    All right.  So when you constructed this area -- first of

24   all, you didn't construct it, right?

25   A    No, I didn't.

1  Q    You didn't have any role at all in the construction of
2  this area, correct?
3  A    Right.
4  Q    And it was all done by Quentin Dyce, correct?
5  A    Yes.
6  Q    And he was an engineer?
7  A    Yes.
8  Q    And Quentin Dyce loved the environment.  That's what you
9  said, correct?
10 A    Yes, that's correct.
11 Q    He loved hunting and fishing?
12 A    Yes.
13 Q    And he constructed a facility that would have potential
14 chemicals from here, or the loading and unloading area, to go
15 this way and this way, and into the ditch, into the northwest
16 corner; is that what you're telling us?
17 A    Yes, if there was a major spill outside there.
18 Q    All right.  Well, what about, what about the day-to-day
19 spillage?  There can be day-to-day spillage in the loading and
20 unloading area, right, because that's where you were handling
21 chemicals?
22 A    Well, if it was a small amount, it would be cleaned up.
23 Q    Well, but what if it was washed down with a hose?
24 Spillages were washed down with hoses, weren't they,
25 sometimes?

626

1    A    Probably a film after a cleanup.

2    Q    All right.  And if it was washed down with a hose in that

3    area, you're saying it would go out to the ditch?  Is that

4    your testimony?

5    A    Yes.

6    Q    Now originally in the drumming shed, Dyce had a scale on

7    which you could only weigh one barrel at a time, correct?

8    A    Yes.

9    Q    And it wasn't until sometime in 1977, 1978, or 1979 that

10   Dyce bought a scale for the drumming shed on which a pallet

11   containing four drums could be weighed at one time, correct?

12   A    Yes.

13   Q    All right.  Now when Dyce only had the smaller scale,

14   pallets of drums were filled south of the drumming shed in the

15   loading and unloading area, correct?

16   A    Yes.

17   Q    All right.  And that area did not have a particular slope

18   or drainage direction that you were aware of, right?  That's

19   this area right here, the loading and unloading area?  Isn't

20   that correct?

21   A    It generally sloped to the north slightly.

22   Q    But it didn't have -- so it sloped to the north slightly,

23   and it didn't -- but it didn't have a particular slope or

24   drainage direction that you were aware of; is that correct?

25   A    That's correct.

1    Q    And when rain fell or water would fall in that area, it

2    would run off the asphalt in the loading and unloading area

3    and go to the north and northwest; isn't that correct?

4    A    No.  It would go -- well, yes, north, northwest.

5    Q    All right.  But on direct, you said it would also, then,

6    turn southwest, right?  Because north is north on this photo,

7    and, according to you, the drainage was to the southwest,

8    correct?  And then it takes a turn north, northwest, and then

9    it goes southwest again, right?

10   A    That's the only way it could go.

11   Q    All right.  Can you play -- I'm going to show you a clip,

12   another clip from your deposition.

13        Would you play Clip No. 2, please?

14            DOCUMENT TECHNICIAN:  (Complied with request.)

15            "And this area where you would fill the drums on the

16   asphalt, did it have a slope or a drainage direction?

17            "Not that I'm aware of.

18            "Okay.  When rainwater would fall, if you noticed,

19   do you know where it would run off this asphalt area?

20            "To my recollection, it was to the north and the

21   northwest."

22   BY MR. JOHNSON:

23   Q    All right.  Let me ask you another question.  You

24   testified that there was a berm.  You just testified that

25   there was a berm in 1975.  You believe there was a berm in

1  1975 along the south side of the tank farm, right?  Right

2  through here, correct?

3  A    Yes, yes.

4         MR. JOHNSON:  All right.

5         Can you play Clip No. 3?

6         "Okay.  And what was -- the terminal area, or the

7  manifold area, was that within what you called the tank farm

8  and within the berms or dikes of the tank farm?

9         "I don't believe there was a berm on that south

10  side."

11  BY MR. JOHNSON:

12  Q    You were asked that question and you gave that answer,

13  correct?

14  A    Yes, I did.

15  Q    Okay.  Now you never saw a rupture of a perc hose, have

16  you?

17  A    No.

18  Q    All right.  Have you ever seen a pinhole leak in a perc

19  hose?

20  A    No.

21  Q    And you've never seen a perc spill the entire time you

22  were there, right?

23  A    No.

24         MR. JOHNSON:  Show me Exhibit 4044.

25         DOCUMENT TECHNICIAN:  (Complied with request.)

1    BY MR. JOHNSON:

2    Q    All right.  This is this one we saw yesterday with

3    another witness.  This is -- keep it where it is right now.

4    This is a survey that's dated July 1976.  Did you -- have you

5    ever seen this survey before, sir?

6    A    I don't recall it.

7          MR. JOHNSON:  All right.  And pull it in.

8          DOCUMENT TECHNICIAN:  (Complied with request.)

9    BY MR. JOHNSON:

10   Q    You see, do you not, that this is a representation of the

11   Dyce facility, correct?

12   A    Yes.

13   Q    All right.  And, in particular, I have a couple of

14   questions for you.

15        No. 1 is you testified that there was a concrete apron in

16   front of the warehouse, but this survey doesn't show a

17   concrete apron in front of the warehouse, does it?

18   A    No.

19   Q    It does show, however, a concrete walk between the

20   smaller warehouse and the bigger warehouse, correct?

21   A    That was a covered walkway.

22   Q    Okay.  But there was concrete there.  It was a covered --

23   A    On the floor.

24   Q    -- concrete walkway, correct?

25   A    On the floor, yes.

1    Q    Okay.  And it also shows a chain-link fence directly

2    north of the warehouse along here.  Whoops.  Let's try that

3    again.

4         Right there and then going up here.  Was there a

5    chain-link fence there in 1976?

6    A    It did not go out to the north.  I don't know what year

7    they put the chain-link fence in, but it did -- I don't recall

8    it going off to the north.

9    Q    All right.  But there was a chain-link fence north of the

10   warehouse and right behind the drumming shed?

11   A    I believe so.  I'm not sure what year that got installed.

12   I mean, prior to that, it was barbed wire.

13   Q    All right.  So at some point there was barbed wire right

14   there?  Is that what you're telling us?

15   A    Yes.

16   Q    All right.  How would the -- how would somebody get

17   through that barbed wire or a chain-link fence subsequently to

18   go from the drumming area to the tank farm?

19   A    Well, I mean, you would walk over the berm or around the

20   berm.

21   Q    All right.  Well, where was the chain-link fence in

22   relationship to the berm?

23   A    Well, it was outside the berm.  I mean, I don't know

24   exactly where, I mean, where this is located, but as I

25   remember, it went clear, well, it went clear over to here, I

1    believe --

2    Q    What are you --

3    A    -- and out.  I can't see where the road is.

4    Q    What are you drawing?  Are you drawing the fence?

5    A    Correct.

6    Q    All right.  Well, you've drawn the fence pretty far north

7    of the warehouse and the drumming shed.

8    A    Well, that's where I'm not sure of.

9    Q    You just don't remember exactly; is that right?

10   A    Right.  No, I don't.

11        MR. JOHNSON:  Okay.  All right.  Let me show you

12   Exhibit 5024.

13        DOCUMENT TECHNICIAN:  (Complied with request.)

14   BY MR. JOHNSON:

15   Q    Now this is a photograph from September 6, 1977 of the

16   Dyce facility, and you see the drumming shed in this photo,

17   correct?

18        Why don't you pull in on that.

19   A    Yes.

20        DOCUMENT TECHNICIAN:  (Complied with request.)

21   BY MR. JOHNSON:

22   Q    Do you see that?

23   A    Yes.

24   Q    All right.  And the drumming shed -- I'm sorry.  Directly

25   south of the drumming shed -- pull in even more on the

1    drumming shed, would you?

2              DOCUMENT TECHNICIAN:   (Complied with request.)

3    BY MR. JOHNSON:

4    Q    All right.   Directly south of the drumming shed, you

5    would agree with me, wouldn't you, that in this area right

6    there, that's liquid in front of the drumming shed, isn't it?

7    A    I would assume.   I can't tell, but I'd assume so.

8    Q    Okay.   Because from time to time, liquid would -- I mean,

9    they're filling drums there, so from time to time liquid would

10   come out from the front of the drumming shed, correct?

11   A    Or water.   We kept a hose there constantly.

12   Q    Okay.   Or water, correct?

13   A    (No response.)

14   Q    And it seems to be puddled there; you would agree with

15   that, right?

16   A    Yes.   I don't know if that's a puddle or just residue.

17   Q    Okay.   But it appears as though it puddled there in order

18   to either -- that's either live water or residue, but, in any

19   event, it reflects a puddle right in front of the drumming

20   shed, does it not?

21             MR. COZZENS:   Objection.   Asked and answered.

22             THE WITNESS:   There is a dark area there, yes.

23   BY MR. JOHNSON:

24   Q    Pardon me?

25   A    There is a dark area there.

1    Q    And on this photograph, right behind the shadow behind

2    the drumming shed are three horizontal tanks.  Do you see

3    that?  I will circle them.

4    A    Yes.

5    Q    All right.  Now is one of those the perc tank?

6    A    I believe so.

7    Q    All right.  Now at the time -- this is 1977.  At the time

8    that the perc tank was there, was it connected by piping to a

9    manifold?

10   A    By 1997 -- or '77, yes, it would have been.

11   Q    By 1977, there was piping and a manifold?

12   A    I believe so.

13   Q    All right.  Do you see the piping and the manifold there?

14   A    No.  I don't see any pipes there.

15   Q    Okay.  But you believe in 1977 there were pipes there?

16   A    After we built the drumming shed, yes.  We piped in all

17   of the products, all of the bulk products.

18   Q    Isn't it true that the piping was done in 1979 and not

19   1977?

20   A    I think maybe it was redone, but I believe there was some

21   prior to that.

22   Q    And who did that piping?

23   A    Probably Dick Bender, and somebody, I'm sure, assisted

24   him.

25   Q    All right.  I'm not asking probables.  I'm asking --

1    A    Well, Dick Bender was our maintenance man.  He would have

2    been the one to do it.

3    Q    All right.  Wasn't Dick Colver your maintenance man?

4    A    Or Dick Colver, yes.  Excuse me.  Dick Colver.

5    Q    So if it had been done, Dick Colver would have done it,

6    correct?

7    A    Yes.

8    Q    Now on this date, too, there's a shadow behind the

9    drumming shed, correct?

10    A    Yes.

11    Q    So you can't actually see if there's a berm there, right?

12    A    No, but if -- no.

13    Q    Now if, if there is a berm there, to hook up the hose

14    from the perc tank -- you told us that one of these three

15    tanks is a perc tank, right?

16    A    Yes.

17    Q    All right.  If there was a hose and not plumbing, to hook

18    up the hose from a perc tank, would a Dyce employee have to go

19    from the shed to the tank?  Right?

20    A    Yes.

21    Q    All right.  And so that employee would have to walk

22    across a berm and apparently over a fence; is that your

23    testimony?

24    A    There was no fence there.

25    Q    There was no fence there in 1977?

1    A    No.  No.

2    Q    When did the fence go in?

3    A    It never did.

4    Q    I thought you said there was barbed wire.

5    A    That was clear out past the catch pond.

6    Q    All right.  So the fence that was shown in that plat of

7    survey from 1976, you're telling us that that fence in that

8    plat of survey did not exist there?

9    A    No.

10   Q    At any time?

11   A    No, not -- I don't believe it was there even in your 1972

12   photograph.

13   Q    Well, I don't think I asked you about the 1972 fence.

14   The plat of survey was 1976, and you're saying categorically

15   that plat of survey is wrong; is that what you're telling us?

16   A    Yes.

17          MR. JOHNSON:  Now go up to the catch pond up there.

18          DOCUMENT TECHNICIAN:  (Complied with request.)

19   BY MR. JOHNSON:

20   Q    The catch pond here hasn't changed from the last photo,

21   has it?

22   A    No.

23   Q    And right here there's no water in the catch pond, right?

24   A    That's correct.  What year is this?

25   Q    This is 1977, sir.

636

1    A    All right.

2    Q    All right.  And you can't see a liner in this catch pond,

3    either, on this date, can you?

4    A    No.

5    Q    All right.  And there's this thing here, which appears to

6    be a cross of some sort.  Do you see that on the ground?

7    A    Yes.

8    Q    What's that?

9    A    I have no idea.

10   Q    Now outside the berm, going to the northwest, is a

11   feature that I'm circling here that is a ditch.  You would

12   agree it's a ditch, right?

13   A    No, I would not.

14   Q    Well, what is it if it's not a ditch?

15   A    I'm not positive, but I think it's an old horse and

16   cattle trail.

17   Q    You think that that thing there running from the berm is

18   a horse and cattle trail?

19   A    That's what I think it is.

20   Q    And not, and not a man-made ditch?  Is that your

21   testimony?

22   A    That's correct.  That's correct.

23   Q    Why do you think it's a horse and cattle trail?

24   A    If you enlarge the photo, you can see it coming from way

25   out here through the pasture into there.  I mean, I think that

1    existed even before we put the berm in.

2             MR. JOHNSON:  All right.  Well, let's pull out a

3    little bit further.

4             DOCUMENT TECHNICIAN:  (Complied with request.)

5    BY MR. JOHNSON:

6    Q    All right.  What you see in this photo is another line

7    that runs to this devegetated area.  Do you see that?

8    A    Yes, I do.

9    Q    All right.  And that, that's not a drainage ditch?

10   A    I don't believe so.

11   Q    You think that that's a horse or cattle trail?

12   A    As I remember, that was just a horse trail.

13   Q    All right.  And did the horse or cattle eat all of the

14   grass and weeds that were in that area?

15   A    No.  I mean --

16   Q    That area got devegetated because of chemical runoff from

17   the Dyce plant, didn't it?

18   A    No, it did not.  Well, from the Dyce plant, yes, it did.

19   Q    Thank you.

20        Let me show you a photo dated May 14, 1979.

21        Do you have a number?

22             MR. GROSSBART:  5028.

23             MR. JOHNSON:  All right.  And this is a photo dated

24   May 14, 1979, and it's 5028.

25             DOCUMENT TECHNICIAN:  (Complied with request.)

1    BY MR. JOHNSON:

2    Q    And I think he showed you this one on your direct.  Some

3    of the tanks have been relocated in the tank farm as of this

4    date, correct?

5    A    Yes.

6    Q    And the perc tank is one -- is the one north of the

7    drumming shed; isn't that correct?

8    A    I believe so.

9         MR. JOHNSON:  All right.  Can you pull in on that

10   area, please, Neil?

11        DOCUMENT TECHNICIAN:  (Complied with request.)

12   BY MR. JOHNSON:

13   Q    And that perc tank is this one right here, right?

14   A    Yes.

15   Q    All right.  And it was placed in concrete in order to

16   contain spills that might come from the loading of that tank,

17   correct?

18   A    Yes.

19   Q    And this is the first concrete containment port to hold

20   the perc tank at the tank farm; isn't that right?

21   A    I believe so.

22   Q    So before this time, the perc tank was not contained in a

23   concrete basin, was it?

24   A    As I recall, the small one was, but that --

25   Q    But you're not sure about that, are you?

1    A    I'm not positive, after looking at some of the photos.

2    Q    All right.  You testified earlier in this case that when

3    you put the perc tank in originally, in 1973 or 1974, it was

4    put into a concrete encasement?

5    A    That's how I recollect it.

6    Q    All right.  But that recollection, based on your viewing

7    of the photos, is incorrect; isn't that correct?

8    A    Yes.

9    Q    Because the concrete wasn't really poured until 1979 in

10   this photo?

11   A    When we reconfigured and put the dike area in, I'm not

12   sure that wasn't taken out.

13   Q    So you're not sure whether that original perc tank, the

14   1,500-gallon perc tank, was in a concrete basin or not,

15   correct?

16   A    I'm not positive.

17   Q    All right.  The perc tank in this photo is a 4,000-gallon

18   perc tank, right?

19   A    Yes, it is.

20   Q    And you did away with the 1,500-gallon perc tank,

21   correct?

22   A    Yes.

23           MR. JOHNSON:  All right.  Let's go up to the, let's

24   go up to the catch pond.

25           DOCUMENT TECHNICIAN:  (Complied with request.)

1          MR. JOHNSON:  And blow that up, Neil.

2          DOCUMENT TECHNICIAN:  (Complied with request.)

3    BY MR. JOHNSON:

4    Q    Do you see a liner in the catch pond there?

5    A    No, I don't.

6          MR. JOHNSON:  Let's pull up the 1981 photo.

7          DOCUMENT TECHNICIAN:  (Complied with request.)

8    BY MR. JOHNSON:

9    Q    I'm showing you a photo that's, I'm showing you a

10   photo -- go back to the other one, 5032.

11         DOCUMENT TECHNICIAN:  (Complied with request.)

12   BY MR. JOHNSON:

13   Q    I'm showing you Photo 5032, which was taken on March 13,

14   1981.  And that's a picture of the Dyce facility, correct?

15   A    Yes.

16         MR. JOHNSON:  All right.  And hone in on the catch

17   pond area.

18         DOCUMENT TECHNICIAN:  (Complied with request.)

19         THE WITNESS:  Pardon?

20   BY MR. JOHNSON:

21   Q    I'm telling him.

22   A    Oh.

23   Q    That shows -- is that water in the catch pond there, that

24   whole dark area?

25   A    It looks like it.

1    Q    All right.  That's pretty full, isn't it?

2    A    Yes.

3    Q    And --

4    A    I mean, part of it is just probably moisture.

5    Q    All right.  But so there wasn't an actual lip there for

6    the catch pond, right?  I mean, it could fill up and start to

7    bank up towards the tanks, right?

8    A    That's correct.

9    Q    All right.  And when it filled up and came towards the

10   tanks, that wasn't a good thing, was it?

11   A    Well, it never got to the tanks.

12   Q    All right.  But if you had a heavy rainfall, it could

13   have gotten to the tanks, right?

14   A    It could have.

15   Q    All right.  And, therefore, from time to time you had to

16   drain the catch pond, right, in order to keep it from backing

17   up all the way into the tank farm?

18   A    We never had that problem.

19   Q    You never had that problem?

20   A    Never had that problem.

21   Q    And as far as you know, the catch pond was never drained

22   the whole time you were there?

23   A    That's correct.

24        MR. JOHNSON:  All right.  Go to the next picture.

25        DOCUMENT TECHNICIAN:  (Complied with request.)

642

1  BY MR. JOHNSON:

2  Q    Now this is dated June 2, 1981.  It's Exhibit 5033.  And

3  here the catch pond has been -- go to the catch pond area.

4           DOCUMENT TECHNICIAN:  (Complied with request.)

5  BY MR. JOHNSON:

6  Q    It's been expanded, hasn't it?

7  A    Yes, it has.

8  Q    All right.  And you dug it deeper, right?

9  A    I would imagine.

10 Q    All right.  But you don't recall -- well, I don't want

11 you imagining anything, okay?  Just so you understand, I don't

12 want you to imagine a thing.  I just want you to tell me what

13 you recall.

14 A    I don't recall if it was deepened or not.

15 Q    And you don't recall whether it was expanded or not,

16 correct?

17 A    Yes, it was expanded.

18 Q    All right.  And it was expanded over to the east?

19 A    Yes.

20 Q    Now that horse trail here that you testified to that was

21 coming from the northwest corner of the berm, which you

22 testified to is a horse trail or a cattle trail, it's not

23 there anymore, is it?

24 A    No.

25 Q    All right.  And what's there instead is it's built up

1    there, isn't it?

2    A    I can't tell.

3    Q    You don't know, do you?

4    A    No.

5    Q    All right.  And this is, again, 1981.  The perc tank has

6    been moved, hasn't it?

7    A    Yes, I guess it has.

8            MR. JOHNSON:  Okay.  Pull into the perc tank area.

9            DOCUMENT TECHNICIAN:  (Complied with request.)

10   BY MR. JOHNSON:

11   Q    Where is the perc tank?  Can you circle that for us?

12   A    I'm not sure if it's the one northwest or one of the ones

13   in that clump of tanks.

14   Q    All right.  Why don't you circle the one that --

15   A    I mean --

16   Q    Circle the two possible ones.

17   A    (Complied with request.)

18   Q    All right.  So you don't know which one of those is the

19   perc tank, then --

20   A    No, I don't.

21   Q    -- when this photo was taken in 1981, correct?

22   A    Correct.

23   Q    All right.  And this photo still has the drumming shed in

24   it, correct?

25   A    Yes.

1    Q    And this photo shows, like the other photo we saw, water

2    in front of the drumming shed, does it not, or liquid, I

3    should say, in front of the drumming shed?

4    A    Yes.

5    Q    And the liquid is pooled right there, isn't it?

6    A    It looks like it's wet there.

7    Q    Okay.  And it's wet there because there had been pooling

8    of the liquid that came from the drumming shed, correct?

9    A    Yes.

10   Q    Now in this photo, there's a -- well, I'll try to hit it

11   right.  I don't know why I did that.  Let me get rid of that.

12        There's a ditch.  Oh, I got it right on there.  There's a

13   ditch there, right?

14   A    Yes.

15   Q    All right.  And that ditch led to the catch pond,

16   correct, in 1981?

17   A    Yes.

18   Q    All right.  And there was a grate on that ditch in this

19   area, right?

20   A    Yes.

21   Q    All right.  And that grate was there so that trucks could

22   pull into the loading and unloading area, correct?

23   A    Yes.

24   Q    All right.  And if there was a spillage in that area, it

25   would run off to the catch pond, correct?

1    A    Yes.

2    Q    Through that ditch?

3    A    Yes.

4         MR. JOHNSON:  Now let me -- can you get rid of the

5    picture?

6         DOCUMENT TECHNICIAN:  (Complied with request.)

7    BY MR. JOHNSON:

8    Q    Let me turn to the inventory shortage issue.  In the mid

9    1970s, Dyce sold about 1,000 gallons a month of perc; isn't

10   that right?

11   A    Yeah.

12   Q    So Dyce had to fill -- and at the time, it had a

13   1,500-gallon perc tank, correct?

14   A    Yes.

15   Q    So Dyce had to fill that 1,500-gallon perc tank about

16   twice a quarter, right?

17   A    Yes.

18   Q    And if there was a discrepancy of about 500 gallons, that

19   would have been about half of what Dyce typically sold in a

20   month, right?

21   A    Yes.

22   Q    And you said that your recollection of the inventory

23   shortage was ten to 12 barrels, so that's approximately 500 to

24   600 gallons, correct?

25   A    Yes.

1   Q     But no customers ever complained during that time that

2   Dyce didn't have enough perc on hand for them to buy it,

3   correct?

4   A     Not that I recall.

5   Q     You don't recall any customers not getting their regular

6   perc deliveries, correct?

7   A     No, I do not recall that.

8   Q     And the perc deliveries of that type of perc were

9   principally made to drycleaners, correct?

10  A     Yes.

11  Q     And they have ongoing operations.  They need perc from

12  time to time, and none of them complained, that you can

13  recall, about not getting perc?

14  A     No.

15  Q     Quentin Dyce kept very, very close watch on cost items,

16  didn't he?

17  A     Yes.

18  Q     And he would write memos to the Dyce staff, complaining

19  when he saw errors that were made that caused unnecessary

20  costs?

21  A     I don't recall any.

22  Q     You don't recall memos like that from Quentin?

23  A     No.

24  Q     Let me show you Exhibit 72.  This was admitted

25  previously.

1           Don't show it to the jury yet.

2           Has this document --

3                MS. ENERSON:  It's admitted.

4                MR. JOHNSON:  I'm sorry.  Go ahead and show it to

5      the jury.

6                DOCUMENT TECHNICIAN:  (Complied with request.)

7      BY MR. JOHNSON:

8      Q    You recognize this as being a memo from Quentin Dyce to

9      you and others on the Dyce staff, don't you?

10     A    Yes.

11     Q    In fact, there's a routing slip along the left side

12     here --

13     A    Yes.

14     Q    -- and it has your name, "Monte," right there, doesn't

15     it?

16     A    Yes.  I recall it now.

17     Q    Okay.  Oh, you do recall this one?

18     A    Yeah.

19     Q    All right.  And this one is dated 11/4/75, just -- it's

20     serendipity but that's the same date as that photo that I was

21     showing you from 1975.  There was a plane flying overhead, and

22     Quentin was writing a memo on the same day, okay?

23          And you recall receiving this?

24     A    Yes.

25     Q    All right.  And you would -- Quentin would send a memo,

648

1  and he would route it around so that he would send the memo to

2  one person, and that one person -- this one first goes to Dick

3  Bender, and Dick Bender would have to sign it or at least

4  cross his name off, and then it would go on to the next person

5  and the next person, to Rod Hallsten, et cetera, and then it

6  would get to you, and you would read it and then you would

7  cross your name off, right, and send it on to the next person?

8  A    Yes.

9  Q    All right.  And, indeed, those are your initials there

10  right below your name, aren't they?

11  A    I think that's Quent Dyce.

12  Q    Oh, that's Quentin Dyce.  Okay.

13       And it's routed to -- now go into the text of the memo.

14            DOCUMENT TECHNICIAN:  (Complied with request.)

15  BY MR. JOHNSON:

16  Q    Now on the first paragraph of this memo, Mr. Dyce is

17  complaining about some Dyce employee putting the wrong product

18  in a drum that resulted in the loss of $130.77 worth of

19  product already in the drum; is that correct?

20  A    Yes.

21  Q    And then he goes on in this, and I won't belabor the

22  point, but he goes on to list other mistakes that cost other

23  amounts of money, correct?

24  A    Yes.

25  Q    And then he concludes -- highlight the last sentence,

649

1    please.

2           DOCUMENT TECHNICIAN:  (Complied with request.)

3    BY MR. JOHNSON:

4    Q    And then he concludes that, "If this continues, it will

5    not be tolerated."  Do you see that?

6    A    Yes.

7    Q    That was classic Quentin Dyce, wasn't it?

8    A    Yes.

9           MR. JOHNSON:  All right.  Show 353, which is

10   admitted.

11          DOCUMENT TECHNICIAN:  (Complied with request.)

12   BY MR. JOHNSON:

13   Q    Now here is an even earlier memo.  This memo is dated

14   March 27, 1972.  Have you ever seen this memo before?

15   A    Yes.

16   Q    All right.  And this memo has Mr. Dyce's signature at the

17   bottom, doesn't it?

18   A    Yeah.  I don't believe I have seen this before.

19   Q    Okay.  You don't think you've seen this one?

20   A    No, I don't think I had.

21   Q    Well, you were there in 1972, weren't you?

22   A    July 1.

23   Q    All right.  And this is March 27, 1972.  So you don't

24   think that you've seen this one?

25   A    I don't believe so, no.

650

1  Q    All right.  Does the fact that he's, Mr. Dyce, here, in

2  the last paragraph, is complaining about a product that got

3  mixed up and it cost all of about $40, that doesn't refresh

4  your recollection as to whether you knew about this incident?

5  A    No.

6          MR. JOHNSON:  Okay.  You can take it down.

7          DOCUMENT TECHNICIAN:  (Complied with request.)

8  BY MR. JOHNSON:

9  Q    Now your deposition in this case was taken in August of

10  2005; isn't that correct?

11  A    That could be.

12  Q    All right.  Well, I can refresh your recollection.  Let

13  me do that.

14      May I approach, Your Honor?

15          THE COURT:  Yes.

16  BY MR. JOHNSON:

17  Q    This is a transcript from your deposition.

18  A    Okay.

19  Q    And it shows a date.  Does that refresh your recollection

20  that your deposition in this case was taken on August 3, 2005?

21  A    Yes.

22  Q    And before your deposition was taken -- strike that.

23      You were represented at that deposition by Tom

24  Mielenhausen, correct?

25  A    Yes.

651

1  Q    All right.  And before that deposition, Mr. Mielenhausen

2  gave you a copy of Rodney Hallsten's deposition in this case;

3  isn't that correct?

4  A    Yeah.

5  Q    And you read Mr. Hallsten's deposition before you gave

6  your testimony; isn't that correct?

7  A    As I recall, yes.

8  Q    All right.  And you have read, in Mr. Hallsten's

9  testimony in his deposition, that he met with Mr. Mielenhausen

10 the day after the Dyce December 2004 Christmas party; isn't

11 that correct?

12 A    Yes.

13 Q    And you read, in Mr. Hallsten's deposition, that

14 Mr. Hallsten told Mr. Mielenhausen that he recalled an

15 inventory shortage of perc many, many years before, correct?

16 A    Yes.

17 Q    Now when you read Mr. Hallsten's testimony, you knew it

18 would help Soco in this case if you testified that you also

19 recalled a large inventory discrepancy of perc; isn't that the

20 fact?

21 A    That jogged my memory, yes.  I remembered the shortage.

22 Q    All right.  And you came to the conclusion that it would

23 help Soco in this case if you also testified that you recalled

24 a large inventory of perc, correct?

25 A    I, I don't recall one way or the other.  I mean, I never

652

1  worked for Soco.  I knew nobody from Soco.

2  Q    All right.  Well, so you didn't -- that didn't cross your

3  mind at all; is that right?

4  A    Not that I recall.

5  Q    All right.  But you, you're working here today as a paid

6  consultant; isn't that correct?

7  A    Yes.

8  Q    All right.  And you're making 150 bucks an hour today,

9  aren't you?

10  A    Yes.

11  Q    And you've worked several -- you've worked a lot on this

12  case over the years, right?

13  A    Yes.

14  Q    And you've been paid for all your work, right?

15  A    Yes.

16  Q    Now until you read that statement in Mr. Hallsten's

17  deposition, you had no recollection of this inventory shortage

18  from whenever it occurred back in the mid '70s until 2005;

19  isn't that correct?

20  A    That's correct.

21  Q    And then your deposition was taken on August 3, 2005,

22  correct?

23  A    Yes.

24  Q    And at that deposition, you testified, lo and behold, "I

25  remember this inventory shortage, too," correct?

1    A    Yes.

2    Q    And you hadn't, before that time, mentioned this

3    inventory shortage to anybody, correct?

4    A    That's correct.

5    Q    And you hadn't mentioned it the entire time that they

6    were investigating about the perc contamination at the Dyce

7    site; isn't that correct?

8    A    That's correct.

9    Q    Now you testified today, I believe, that you don't know

10   which year this alleged inventory shortage apparently

11   happened?

12   A    Not specifically.

13   Q    All right.  The only thing specifically that you recall

14   is that it happened in the last quarter of one of those years?

15   A    Yes.

16   Q    And your recollection that it happened in the last

17   quarter of one of those years is based upon the fact that

18   Quentin Dyce was coming back to Billings from Phoenix at that

19   point in time, correct?

20   A    He was back.

21   Q    All right.  He was back.  So the inventory shortage in

22   the last quarter of 1975 would have been done, right, what, on

23   New Year's Eve?

24   A    Whichever weekend before or after the quarter is

25   generally when we did our quarterly inventory.

654

1   Q     All right.  And your recollection is that Mr. Dyce was

2   home for the holidays?

3   A     Yes.

4   Q     Now in this case, you testified, did you not, that the

5   inventory shortage happened, you believe, in the last quarter

6   of 1975?

7   A     Or '76, possibly '74.

8   Q     All right.  You have your transcript right there from

9   your prior testimony in this case.  Let me refer you to

10  page 904, line 6.

11        Okay.  I'm going to read --

12  A     What was that, again?

13  Q     904, page 904 --

14        THE COURT:  Are you referring to the --

15        MR. JOHNSON:  I'm not referring to the deposition.

16  I'm referring to his other prior testimony.

17        THE COURT:  The other prior testimony.

18        MR. JOHNSON:  The one like this.  You got it?

19        THE WITNESS:  Yes.

20  BY MR. JOHNSON:

21  Q     Okay.  I'm going to read from line 6 on page 904.  Please

22  follow along.

23        Question, "Now, Mr. Naff, we were talking about a

24  quarterly inventory, and we were talking about generally about

25  the mid '70s.  Have you determined when this discrepancy

                                  655

1   happened?"

2       Answer, "To the best of my knowledge, I believe it was

3   19 -- would have been December of 1975."

4       Question, "Now what I'd like to ask you, Mr. Naff, is how

5   is it, in your mind, that you came to that determination?  Can

6   you explain how you were able to frame it into that time

7   period?"

8       Answer, "Going back through just time frames of when Rod

9   started, I remember that he was relatively new when this

10  happened."

11      Question, "When did Rod start?"

12      Answer, "At the end of 1974."

13      Question, "And how do you know that?"

14      Answer, "Because I was on the order desk, and I finally

15  got off, got to get off."

16      Question, "And so you know that you trained Rod in; is

17  that it?"

18      Answer, "Right, I trained Rod."

19      Question, "All right, and then what makes you say

20  December?  Did you say December of '75?"

21      Answer, "Right.  Well, as I recall, I mean, going back

22  through the history that Quentin and Lois Dyce were back from

23  Arizona, I believe, for the Christmas and year end, and so

24  that's how I kind of pinpointed it, that it must have been

25  that quarter inventory, December of 1975."

1    Question, "What's the significance of Quentin and Lois

2  being back from Arizona?  Why does that make a difference in

3  your mind?"

4    Answer, "Well, Quentin would have been there, then, and

5  he was going back to Arizona because I can -- specifically Rod

6  was very nervous about Quent's reaction, and I explained, I

7  said, you know, 'Don't worry.  Quent will go back to Phoenix,

8  and by the time he gets home in the spring, he'll, you know,

9  he'll be calmed down.'"

10    Question, "And so you have tried to pinpoint this time

11  based on the fact that Mr. Hallsten was relatively new on the

12  order desk?"

13    Answer, "Yes."

14    Question, "And also that Quentin and Lois Dyce were

15  heading back to Arizona?"

16    Answer, "Yes."

17    Question, "And why, why December?"

18    Answer, "Well, because they were going down to Arizona.

19  They were going -- I mean, they were just there a short time

20  and then headed back down to Arizona."

21    Question, "You mean that they were in Arizona before

22  December?"

23    Answer, "Right.  They had come back for, I think, I

24  believe, Christmas and year end --"

25    Question, "Okay."

657

1        Continuing with the answer, "-- and he happened to be out
2   there after inventory."
3        And then back to a question, "And so what months of the
4   year 1975 would this quarterly inventory have covered?"
5        And you say, the answer, "In December."
6        Were you asked those questions, and did you give those
7   answers in your prior testimony?
8   A    Yes, I did.
9            MR. COZZENS:  What page was that, the last one?
10           MR. JOHNSON:  906 was the last one.
11  BY MR. JOHNSON:
12  Q    Now despite that testimony three years ago, you also were
13  asked at your deposition, weren't you, about when the
14  inventory shortage occurred, correct?
15  A    Yes.
16           MR. JOHNSON:  Can you show Clip 4?
17           DOCUMENT TECHNICIAN:  (Complied with request.)
18           "Do you recall what year that shortage was detected?
19           "Not --
20           "Or at least a range?
21           "-- exactly.  It had to be '75, '76, '77, somewhere
22  after Rod Hallsten started and when Quent Dyce was going to
23  Phoenix.  I mean, somewhere in that time frame."
24  BY MR. JOHNSON:
25  Q    Okay.  And you answered; at that time in your deposition,

1   you gave those answers to that question, right?

2   A    Yes.

3   Q    All right.  Now you've testified in this case that the

4   inventory shortage you recall was about ten to 12 drums,

5   right?

6   A    Yes.

7   Q    And that's, we said, 500, 600 gallons, correct?

8   A    Yes.

9   Q    But you don't know -- strike that.

10       But you know, don't you, that Mr. Hallsten has testified

11  that his recollection of the inventory shortage is anywhere

12  between 250 to 1,000 gallons?

13  A    No, I'm not aware of that.

14  Q    You're not aware of that fact?

15  A    No.

16  Q    Could he be right and you wrong?

17  A    My estimate falls in his estimate.  I mean --

18  Q    Well, his estimate has a much broader range to it, does

19  it not?

20  A    Right.

21  Q    So his estimate could be right and yours could be wrong,

22  right?

23  A    Probably a little bit on the bottom end or top end.  I --

24  you know, it's 35 years ago.

25  Q    Right.  You're just guessing that it was ten to 12 drums,

1    aren't you?

2    A    Well --

3    Q    You don't have a real --

4    A    Well, I mean --

5            MR. COZZENS:  Your Honor?

6            THE COURT:  Hold it.  You can only talk one at a

7    time.

8            MR. JOHNSON:  Go ahead.

9            MR. COZZENS:  Would you let him answer the

10   questions?

11   BY MR. JOHNSON:

12   Q    Please.  Go ahead.

13   A    It would've had to be an amount that upset Quent --

14   Q    All right.

15   A    -- enough that -- and, I mean, that's, when I remembered

16   the inventory shortage, that's what came to mind.

17   Q    Well, Quent used to get upset about 50 bucks being lost,

18   right?

19   A    Right.

20   Q    Now inventory discrepancies were a continual problem at

21   Dyce, were they not, when you worked there?

22   A    At times.  I mean, there was always some discrepancies.

23           MR. JOHNSON:  All right.  Can you pull up

24   Exhibit 34?

25           DOCUMENT TECHNICIAN:  (Complied with request.)

1              THE CLERK:  That's not --

2    BY MR. JOHNSON:

3    Q    You've seen this before, haven't you?

4              THE CLERK:  This is not in, is it, 34?

5              MR. JOHNSON:  These are --

6              THE CLERK:  Thirty-four?

7              MR. JOHNSON:  Thirty-four.  This is in evidence.  Is

8    it not?

9              THE CLERK:  I don't believe it is.

10             MR. JOHNSON:  All right.  Well, it was admitted

11   before.  It's on our may-offer list, and there's no objection,

12   Your Honor.

13             THE COURT:  Well, I'll let you read it.  I'm not

14   going to put it in evidence, just like I don't put depositions

15   in evidence.

16             MR. JOHNSON:  All right.

17   BY MR. JOHNSON:

18   Q    Well, you've seen this document before, haven't you?

19   A    No, I haven't.

20   Q    All right.  Let me refer you to page 17 of this document,

21   which is page 17 of the document.

22             THE COURT:  And for your information, when I say

23   that, I'll allow it on the screen, but it's not admitted in

24   evidence.  It doesn't go to the jury room.

25             MR. JOHNSON:  That's fine, Your Honor.

661

1          And specifically can you blow up Request for

2     Admission No. 37?

3          DOCUMENT TECHNICIAN:   (Complied with request.)

4     BY MR. JOHNSON:

5     Q     And let me read that for the jury.

6          Request for Admission No. 37 says, "Admit that Dyce

7     Chemical has no evidence to dispute the testimony of Marvin

8     Johnson that management at the Dyce Chemical Billings facility

9     was constantly surprised with the lack of product, that is,

10    PCE, in the bulk storage tank."

11         PCE is perc, right?

12    A     (No response.)

13    Q     PCE is the same thing as perc, right?

14    A     Yes.

15    Q     All right.  And the answer is, "Discovery is in the

16    initial stages, and Dyce has been and continues to make

17    inquiries of witnesses that may have been informed -- that may

18    have information in this regard.  Due to the time frame of 15

19    to 20 years, the documents and many of the witnesses are not

20    readily available to enable Dyce to sufficiently respond."

21         And then it says, "Witnesses Dave Warne and Monte Naff

22    were not constantly surprised with the lack of product, PCE,

23    in the bulk storage tank."

24         Do you see that?

25    A     Yes.

1  Q    All right.  And then -- and that Monte Naff, that's you,

2  right?

3  A    Yes.

4  Q    All right.  And then it says, "From 1982 to present,

5  there were discussions among Dyce employees about loss of

6  product.  Some of the suspicions were that it could be due to

7  evaporation as the bulk tank did not have a pressure-relief

8  valve and that employees may have possibly taken product to be

9  sold or given away.  Further, Dyce was having problems with

10 the input of inventory information, shipment paperwork was

11 lost, and invoices were not written up and processed.  Based

12 on the available information and its belief, Dyce denies the

13 allegations contained in this request."

14      So -- you can take that down.

15           DOCUMENT TECHNICIAN:  (Complied with request.)

16           MR. JOHNSON:  Let me show you Exhibit 30.

17           This one is admitted, Your Honor.

18           THE CLERK:  It is.

19 BY MR. JOHNSON:

20 Q    This is a memo from Quentin Dyce dated September 11,

21 1985, correct?

22 A    Yes.

23 Q    All right.  And you saw this memo, did you not?

24      (Pause.)

25           THE WITNESS:  I don't recall it.

663

1    BY MR. JOHNSON:

2    Q    All right.  Wasn't this distributed to all of the

3    managers?  It says, "To managers of all plants of Dyce

4    Chemical, Inc."  Do you see that?

5    A    Yes.

6    Q    And in 1985, you were the manager of the Billings plant

7    of Dyce Chemical, Inc.; isn't that correct?

8    A    Yes.

9    Q    Quentin Dyce was the chairman of the board?

10   A    Yes.

11         MR. JOHNSON:  All right.  Can you go down?  Scroll

12   down.

13         DOCUMENT TECHNICIAN:   (Complied with request.)

14   BY MR. JOHNSON:

15   Q    All right.  Let me read to you from paragraph 3, numbered

16   3.  "Our history with chlorinated solvents tells us that we

17   will have evaporation and other factors that will not allow us

18   to keep exact books on chlorinated solvents in bulk and that

19   the inventory is consistently off.  Therefore, we must quit

20   handling these in bulk."

21         Do you see that?

22   A    Yes.

23   Q    Do you recall Quentin Dyce threatening to stop handling

24   perc?

25   A    Vaguely.

1          MR. JOHNSON:  Okay.  And paragraph 4, why don't you

2     highlight that one.

3          DOCUMENT TECHNICIAN:  (Complied with request.)

4     BY MR. JOHNSON:

5     Q    "Perchloroethylene in drums has been a hard" -- it's cut

6     off here.  What is the next word?

7          MR. DAVIS:  "Item."

8     BY MR. JOHNSON:

9     Q    -- "has been a hard item to balance on inventory.  Some

10    of this could have been due to the ready market for it if it

11    went out the back door.  However, we will try to handle the

12    perc and other chlorinated solvents for a while, but if the

13    inventories do not match, I will personally check these, and

14    most likely we will go out of the chlorinated solvents

15    business."

16         Do you see that?

17    A    Yes.

18    Q    Do you have any recollection of discussing with Quentin

19    Dyce the possibility of Dyce employees stealing drums of perc?

20    A    Minimal.

21    Q    "Minimal" meaning you had such conversations; you just

22    can't draw them up as you sit here all these many years later,

23    right?

24    A    Well, I can remember talking to him and saying how

25    unlikely because of the weight of a drum of perc.  I mean, it

665

1   was 750 pounds, as I remember.

2   Q    All right.  But he was of the view, was he not, as set

3   forth in this memo, that some of this could have been -- could

4   have been due to the ready market for it if it went out the

5   back door.  That means theft, right?

6   A    Yeah.

7            MR. JOHNSON:  Okay.  Get rid of that document.

8            DOCUMENT TECHNICIAN:  (Complied with request.)

9   BY MR. JOHNSON:

10  Q    Now a spill of 500 to 600 gallons of perc, which is the

11  ten to 12 drums that you talked about with regard to the

12  inventory shortage, if you had a spill of 500 to 600 gallons

13  of perc at Dyce in the 1970s, that would have been a big deal,

14  correct?

15  A    Yes.

16  Q    In fact, 500 gallons of perc weighs 2 1/2, 3 tons, right?

17  A    Yes.

18  Q    And the people in the plant would have known about it,

19  had it occurred; isn't that correct?

20  A    They should have.

21  Q    A spill of 550 gallons or so of perc would have a very

22  strong odor, would it not?

23  A    Yes.

24  Q    And it's not something that could happen with no one --

25  that no one could be aware of; isn't that correct?

1   A     That's correct.

2   Q     And perc will break down asphalt if it's spilled on

3   asphalt, won't it?

4   A     Yes.

5   Q     And you're unaware of any asphalt that was broken down by

6   a spillage of perc in the entire time you worked at Dyce;

7   isn't that right?

8   A     Yes.

9   Q     In fact, you're unaware of any spill of perc at all?

10  A     That's correct.

11          MR. JOHNSON:  Now let me pull up Exhibit No. 362.

12          DOCUMENT TECHNICIAN:  (Complied with request.)

13          MR. JOHNSON:  Hang on.  Is this one in evidence?

14          THE CLERK:  Yes.

15          THE COURT:  Yes.

16        (Discussion off the record at counsel table.)

17          MR. COZZENS:  We have no objection if it isn't.

18          MR. JOHNSON:  It is in evidence, but I'm going to

19  let it go.

20  BY MR. JOHNSON:

21  Q     Let me turn to the investigation by the Environmental

22  Protection Agency and the Montana Department of Environmental

23  Quality, the DEQ, into the pollution at the Dyce Lockwood

24  facility, okay?  I'm going to ask you a few questions about

25  that.

1        You became aware in 1998 that the DEQ was testing for

2   pollution under the Dyce property in Lockwood, correct?

3   A    Yes.

4             MR. JOHNSON:  Pull up 429.  Don't show it to the

5   jury.

6             Your Honor, there's been no objection to 429, and I

7   want to show it.  I want to move for its admission.

8             MR. COZZENS:  No objection.

9             THE COURT:  429 is admitted.

10       (Exhibit 429 was received in evidence.)

11            MR. JOHNSON:  All right.  You can.

12            DOCUMENT TECHNICIAN:  (Complied with request.)

13  BY MR. JOHNSON:

14  Q    429 are a couple of e-mails dated June 9, 1998; isn't

15  that correct?

16  A    Yes.

17  Q    All right.  And the way you read e-mails -- they're

18  printed out like this -- is that the one that's earlier in

19  time is the one on the bottom, correct?

20  A    Yes.

21  Q    All right.  And the one on the bottom was sent to Monte.

22  I think that's you, right?

23  A    Yes.

24  Q    All right.  And that was sent by Dave Warne, I believe,

25  correct?

668

1    A    Yes.

2    Q    All right.  And Dave Warne at the time was the general

3    manager of the Dyce facility in Lockwood, correct?

4    A    Yes.

5    Q    So in this e-mail, he's reporting to you, is he not, that

6    the DEQ will be in the facility to do testing for solvent and

7    gas plumes, correct?

8    A    Yes.

9    Q    And then you responded to him, correct?

10   A    I think I talked to Suzanne Miller over the phone.

11   Q    Okay.  All right.  And Suzanne Miller is the person -- an

12   environmental consultant for HCI at the time?

13   A    She was our employee.

14   Q    Okay.  And she was an employee, but her area was

15   environmental --

16   A    Safety and environmental, yes.

17   Q    And you talked to her about dealing with the DEQ, right?

18   A    Yes.

19   Q    Now let me show you -- let me just -- this one I don't

20   think is admitted yet, 4087, so don't show it to the jury.

21            THE COURT:  I won't.  Don't you worry.

22            THE CLERK:  It is admitted.

23            MR. JOHNSON:  It has been?

24            THE CLERK:  Yes.

25            DOCUMENT TECHNICIAN:  (Complied with request.)

669

1   BY MR. JOHNSON:

2   Q    And this is a document, 4087, which I'm showing you,

3   Mr. Naff.  It has been admitted into evidence.  This is a

4   January 6, 1999 e-mail from Mr. Warne to Ms. Miller with a

5   copy to you and to Rod Hallsten, correct?  Why don't you --

6   A    Yes.

7           MR. JOHNSON:  Okay.  And again, I think -- go back

8   up to the top.

9           DOCUMENT TECHNICIAN:  (Complied with request.)

10          MR. JOHNSON:  All right.  Go down to the bottom.

11          DOCUMENT TECHNICIAN:  (Complied with request.)

12  BY MR. JOHNSON:

13  Q    All right.  So this is a message from Mr. Warne to Suz --

14  Suz is Ms. Miller, correct?

15  A    Yes.

16  Q    -- and Monte and Rod.  We know who those people are.

17  A    Yes.

18  Q    And this reports that the DEQ was in yesterday, right?

19  A    Yes.

20  Q    Looking at the site, and they took samples from a septic

21  tank, *et cetera*?

22  A    Yeah.

23          MR. JOHNSON:  Okay.  Go to the second page.

24          DOCUMENT TECHNICIAN:  (Complied with request.)

25  ///

1    BY MR. JOHNSON:

2    Q    All right.  So you were still getting reports, and you

3    were involved with getting reports with regard to what was

4    going on with the DEQ out looking to see what had caused the

5    pollution in the area, correct?

6    A    Yes.

7              MR. JOHNSON:  Let's go to 3044.

8              DOCUMENT TECHNICIAN:  (Complied with request.)

9              MR. JOHNSON:  All right.  This has been previously

10   admitted.

11             THE CLERK:  Yes.

12   BY MR. JOHNSON:

13   Q    This is a December 16, 1999 letter from the EPA to Gary

14   Staarjes.  Do you know who Gary Staarjes is?

15   A    Yes.

16   Q    All right.  Who is Mr. Staarjes?

17   A    He is president -- or CEO, president and CEO of HCI.

18   Q    All right.  But this says he was present at Dyce

19   Chemical.

20   A    Yes.

21   Q    And this is a letter from the USEPA to Mr. Staarjes,

22   correct?

23   A    Yes.

24   Q    You've seen this letter before, correct?

25   A    I believe so.

671

1  Q     It's what's known as a 104(e) request for information,

2  correct?

3  A     Yes.

4  Q     And the EPA, in this letter, is requesting answers to be

5  given under oath by Dyce to certain questions regarding the

6  activities, materials, parties that may have contributed to

7  the contamination at the Lockwood solvent site, correct?

8  A     Yes.

9         MR. JOHNSON:  Okay.  Let me show you 3045 in

10 evidence.

11        DOCUMENT TECHNICIAN:  (Complied with request.)

12        MR. JOHNSON:  This is in evidence, right?

13        MR. GROSSBART:  Yes.

14        THE CLERK:  Yes.

15 BY MR. JOHNSON:

16 Q     This is Dyce's response to the 104(e) request, correct?

17 A     Yes.

18 Q     All right.  On the first page, it says Suzanne Miller

19 signs it, correct?

20 A     Yes.

21 Q     And she swore under oath, on behalf of the company, to

22 the truthfulness of the answers contained therein, correct?

23 A     Yes.

24 Q     All right.  And Suzanne Miller collected information to

25 put into this response; isn't that right?

672

1    A    Yes.

2    Q    And she interviewed a number of people at Dyce to put

3    information together to put into this response; isn't that

4    right?

5    A    Yes.

6    Q    And I think you testified on your direct examination that

7    she interviewed you, correct?

8    A    Yes.

9    Q    And you reviewed this report.  You were, in effect, her

10   boss?  You reviewed this report before it went to the EPA,

11   correct?

12   A    Yes.

13          MR. JOHNSON:  All right.  Let me show you -- let me

14   turn to page No. 5.

15          DOCUMENT TECHNICIAN:  (Complied with request.)

16          MR. JOHNSON:  All right.  And, in particular, I'd

17   like to highlight this area right here.

18          DOCUMENT TECHNICIAN:  (Complied with request.)

19   BY MR. JOHNSON:

20   Q    Now this, it talks about cement containment ponds for

21   holding storm and rinsewater.  Do you see that?

22   A    Yes.

23   Q    They were constructed in approximately 1988 or 1989?

24   A    Yes.

25   Q    And those ponds were just poured with concrete, right?

673

1  A    Not -- I mean, they were special construction for

2  chemical.

3  Q    But were they lined?

4  A    No.  They were, they were lined with a painted-on liner,

5  chemical liner.  I mean, it was not like a rubber liner.  It

6  was a painted-on liner.

7  Q    All right.  What was the name of that painted-on liner?

8  A    I do not recall.

9  Q    Did you have anything to do with the construction of

10 those containment ponds?

11 A    No.

12 Q    And she also goes on to say that, down here, where it

13 says, "This is the approximate location," she says, "This is

14 the approximate location of a historic storm and rinsewater

15 unlined pond."  Do you see that?

16 A    Yes.

17 Q    And she's referring to the historic catch pond that we

18 saw back in the photos from the 1970s; isn't that correct?

19 A    Yes.

20         MR. JOHNSON:  Now go to the next page, 7.

21         DOCUMENT TECHNICIAN:  (Complied with request.)

22         MR. JOHNSON:  At the bottom of the last paragraph,

23 highlight that paragraph.

24         DOCUMENT TECHNICIAN:  (Complied with request.)

25 ///

674

1    BY MR. JOHNSON:

2    Q    All right.  In the very last paragraph, in the first

3    line, she says, "Previously there were no dedicated hoses,

4    totes, and there were very few pumps, so rinsing was more

5    common."  She told the EPA that, right?

6    A    Yes.

7              MR. JOHNSON:  All right.  And you can take this

8    down.

9              DOCUMENT TECHNICIAN:  (Complied with request.)

10   BY MR. JOHNSON:

11   Q    Now the EPA got this from her and said, "You know what?

12   We've got a few more questions," right?

13   A    I don't recall that.

14             MR. JOHNSON:  3420 is admitted, right?

15             THE COURT:  The clerk will know if they're admitted

16   or not.

17             MR. JOHNSON:  Okay.  Thank you, Your Honor.

18             THE CLERK:  No.

19        (Discussion off the record.)

20             MR. JOHNSON:  I'm sorry.  3420, I'm told, is on

21   Soco's list.  I thought it was admitted.  3420?

22             THE CLERK:  (Shook head negatively.)

23             MR. JOHNSON:  No?

24             THE CLERK:  I've got a 3220, not a 3420.

25             MR. JOHNSON:  Why don't you pull it up just so I can

675

1    see it.

2              DOCUMENT TECHNICIAN:   (Complied with request.)

3              MR. JOHNSON:   This is the document.

4         (Discussion off the record.)

5              MR. JOHNSON:   Your Honor, I move for the admission

6    of this document.

7              MR. LYNCH:   No objection.

8              THE COURT:   3420 is admitted.

9         (Exhibit 3420 was received in evidence.)

10   BY MR. JOHNSON:

11   Q    All right.   In showing you and the jury what's been

12   marked as 3420, I ask you, sir, whether this is the EPA's

13   letter to Mr. Staarjes dated May 25, 2000 which responds to

14   the prior document that was Ms. Miller's response to the EPA.

15        (Pause.)

16   BY MR. JOHNSON:

17   Q    Did you hear the question?

18   A    No.   I don't have a question.

19   Q    I asked a question.   Let me ask it again.

20        The question I have, sir, is whether this is -- whether

21   you recognize this as being a second request for information

22   from the EPA that was sent to Mr. Staarjes.

23   A    Yes.

24   Q    All right.   And as a matter of fact, what happened is

25   that the EPA read the first report that Ms. Miller gave them

1   and then came back with a second request for further

2   information; isn't that correct?

3   A     I guess so.  I mean --

4   Q     And in connection with the second request -- well, let's

5   go to the next document.

6             DOCUMENT TECHNICIAN:  (Complied with request.)

7             MR. JOHNSON:  Just one down.

8             DOCUMENT TECHNICIAN:  (Complied with request.)

9   BY MR. JOHNSON:

10  Q     In connection with that request from the EPA, Dyce was

11  requested to go out and interview current and past senior

12  management owners and/or employees of the facility, of the

13  Dyce facility, to determine whether they had any recollection

14  of past spills, in particular, spills or releases of PCE or

15  TCE; is that correct?

16  A     Yes.

17  Q     All right.  And you were asked to interview a number of

18  former employees in response to that request, were you not?

19  A     Yes.

20  Q     And you indeed did that, didn't you?

21  A     Yes, I did.

22  Q     I think you interviewed eight former employees of Dyce,

23  correct?

24  A     That sounds right.

25  Q     All right.  And you were chosen to contact those former

677

1   employees of Dyce because, in effect, you had been their boss

2   and you had a relationship with them, so you decided --

3   somebody decided that you should call them, correct?

4   A    As I recall, they were having difficulty reaching them or

5   some of them didn't want to talk to attorneys.

6   Q    All right.  And the attorneys you're referring to is the

7   law firm of Holland & Hart, correct?

8   A    Yes.

9   Q    Because Dyce had retained Holland & Hart to interview

10  current employees, correct?

11  A    Yes.

12  Q    But when somebody gets called by a lawyer who is no

13  longer working there, they don't necessarily want to talk to

14  that lawyer, do they?

15  A    Probably not.

16  Q    All right.  And so you were asked to call those people,

17  correct?

18  A    Yes.

19  Q    All right.  And you recall having done that?

20  A    Yes.

21  Q    And you gave the information from the people that you

22  interviewed to Suzanne Miller, correct?

23  A    Yes.

24  Q    But you didn't take any notes of those interviews, did

25  you?

1  A     No.

2  Q     But what you asked those people was, "Hey, did you ever

3  see or hear about a perc spill at Dyce," correct?

4  A     That's correct.

5  Q     And all of them that you talked to, all these former

6  employees, said, "No, I never heard of a perc spill having

7  happened at Dyce," correct?

8  A     Yes.

9            MR. JOHNSON:  383.  Is that in?

10           THE CLERK:  Yes.

11           MR. JOHNSON:  Okay.

12 BY MR. JOHNSON:

13 Q     Let me show you 383, which is in evidence.  Now this is,

14 this is Suzanne Miller's response to the EPA, right?

15 A     Yes.

16 Q     And this is the response to the second request for

17 information, correct?

18 A     Yes.

19 Q     And she sent this out on or about the date it bears,

20 July 23, 2000, correct?

21 A     Yes.

22           MR. JOHNSON:  All right.  And go to the second

23 page.

24           DOCUMENT TECHNICIAN:  (Complied with request.)

25           MR. JOHNSON:  And the next page.

679

1          DOCUMENT TECHNICIAN:  (Complied with request.)

2    BY MR. JOHNSON:

3    Q    And in this response, she again swore under oath that

4    these -- that the information in this response was true and

5    correct, right?

6    A    Yes.

7    Q    And part of the information in here is the information

8    you gave her, correct?

9    A    Yes.

10   Q    And you reviewed this before she sent it off to the EPA,

11   didn't you?

12   A    Yes.

13          MR. JOHNSON:  Go to page -- scroll down a couple of

14   pages.

15          DOCUMENT TECHNICIAN:  (Complied with request.)

16          MR. JOHNSON:  Stop there, and focus on paragraph 7.

17          DOCUMENT TECHNICIAN:  (Complied with request.)

18          MR. JOHNSON:  All right.  And focus down to the

19   table, too.

20          DOCUMENT TECHNICIAN:  (Complied with request.)

21   BY MR. JOHNSON:

22   Q    This is table of individuals that were identified in this

23   response who were interviewed about whether or not there had

24   been -- whether they had any recollection at all of past

25   spills, and, in particular, spills or releases of perc or TCE,

1   correct?

2   A      Yes.

3   Q      And, indeed, your name, Irvin Monte Naff, is right there,

4   right?

5   A      Yes.

6   Q      So you were one of those that was interviewed?

7   A      Yes.

8   Q      And other people that you interviewed are set forth on

9   this list.

10         Go to the second page.

11         DOCUMENT TECHNICIAN:   (Complied with request.)

12  BY MR. JOHNSON:

13  Q      Correct?

14  A      Yes.

15  Q      And in the first line, right under this listing of

16  people, it says, this response says, "None of the individuals

17  interviewed" -- go ahead, that first line.  Highlight the

18  whole thing.

19         DOCUMENT TECHNICIAN:   (Complied with request.)

20  BY MR. JOHNSON:

21  Q      "None of the individuals interviewed had any knowledge of

22  any reportable quantity spill or release of PCE or TCE into

23  the environment," correct?

24  A      Yes.

25  Q      All right.  And --

681

1          MR. COZZENS:  Your Honor, this is just repetitious.

2     We've been through this several times by now.

3          THE COURT:  No, overruled.

4          MR. JOHNSON:  He hasn't seen the document.

5     BY MR. JOHNSON:

6     Q    And that's a statement that was made under oath to the

7     EPA, correct?

8     A    Yes.

9     Q    All right.  And it talks here -- go down a little bit.  I

10    see your name there.  It says, "Monte Naff."

11         DOCUMENT TECHNICIAN:  (Complied with request.)

12    BY MR. JOHNSON:

13    Q    Do you see that?

14    A    (No response.)

15    Q    Now that -- I won't belabor the point -- you said

16    apparently that you had recalled a spill in the mid 1970s that

17    occurred in the warehouse, right?

18    A    Yes.

19    Q    And it was either PCE or TCE?  You're not sure which?

20    A    Yes.

21    Q    And you saw somebody trying to stick something into a

22    barrel that shouldn't have been there, and it was overflowing

23    the barrel?

24    A    Correct.

25    Q    But that evaporated?  That fell on a concrete floor in a

682

1  warehouse, right?

2  A    Yes.

3  Q    And it evaporated right away, and it didn't need a

4  cleanup, and it didn't go off to the catch basin, correct?

5  A    Well, I think some of it got cleaned up, but, yeah,

6  basically it evaporated.

7  Q    So you had a recollection of a perc spill or a TCE spill?

8  They're both chlorinated solvents, right?

9  A    Yes.

10 Q    And you told them about that one, right?

11 A    Yes.

12 Q    But you didn't mention a thing, not a word about the

13 inventory shortage, correct?

14 A    No.

15        MR. JOHNSON:  Now go down to the next paragraph

16 where it says, "Many of the individuals speculated."

17        DOCUMENT TECHNICIAN:  (Complied with request.)

18        MR. JOHNSON:  Highlight that.

19        DOCUMENT TECHNICIAN:  (Complied with request.)

20 BY MR. JOHNSON:

21 Q    All right.  And it says -- in here Ms. Miller says, "Many

22 of the individuals speculated that if there had been any spill

23 of TCE or PCE during the unloading process, that it would have

24 reacted with the asphalt.  None of the individuals recall any

25 breakdown of asphalt in the loading area.  From that, they

683

1    concluded that there likely had not been any spills in that

2    area.  Two individuals, Brill and Colver, speculated that a

3    drop or two of PCE or TCE could have dripped from a hose

4    nozzle onto the asphalt or concrete during the unloading

5    procedure, but neither had specific knowledge of such a drip."

6         Do you see that?

7    A    Yes.

8    Q    PCE does react with asphalt, doesn't it?

9    A    Yes.

10             THE COURT:  That is repetitious.

11             MR. JOHNSON:  I'm done with that.  Thank you, Your

12   Honor.

13             All right.  Pull this document up again.

14             DOCUMENT TECHNICIAN:  (Complied with request.)

15             MR. JOHNSON:  Let's go to paragraph 8, and

16   particularly the part that begins, "Between."

17             DOCUMENT TECHNICIAN:  (Complied with request.)

18   BY MR. JOHNSON:

19   Q    And it says there, does it not, "Between 1972 to 1985,

20   any large quantity of spilled product likely would have

21   drained into the tank farm, cement containment area," correct?

22   A    Yes.

23   Q    And it says, "The slope of the area is such that drainage

24   goes into these containment areas," correct?

25   A    Yes.

684

1          MR. JOHNSON:  And let's go to the next paragraph,

2    10.

3          DOCUMENT TECHNICIAN:  (Complied with request.)

4    BY MR. JOHNSON:

5    Q    All right.  And this says, "Historically, hoses and pumps

6    were not dedicated and were rinsed with water."

7         "When did the practice of using dedicated hoses begin?"

8    Do you see that?

9    A    Yes.

10   Q    And the answer is, "Approximately 1992 to 1993," correct?

11   A    Yes.

12         MR. JOHNSON:  All right.  Go to paragraph 11.

13         DOCUMENT TECHNICIAN:  (Complied with request.)

14   BY MR. JOHNSON:

15   Q    All right.  The second paragraph reads, "It is believed

16   that the unlined pond did collect rinsewater from pumps and

17   hoses."

18        The unlined pond that they're referring to there is the

19   catch pond; isn't that correct?

20   A    I assume so.

21         MR. JOHNSON:  Okay.  Go to paragraph 12.

22         DOCUMENT TECHNICIAN:  (Complied with request.)

23         MR. JOHNSON:  All right.  And, in particular, the

24   paragraph that says, "To our knowledge."

25         DOCUMENT TECHNICIAN:  (Complied with request.)

685

1    BY MR. JOHNSON:

2    Q     In here, they're talking about the concrete containment

3    ponds that you said that you, that you were aware that had

4    been poured.  And you say -- and this says, "To our knowledge,

5    the ponds have not been tested for leakage.  The concrete

6    containment ponds are unlined."

7          Do you see that?

8    A     Yes.

9              MR. JOHNSON:  Okay.  Go to paragraph 13.

10             DOCUMENT TECHNICIAN:  (Complied with request.)

11   BY MR. JOHNSON:

12   Q     All right.  The second paragraph begins, "The natural

13   slope of the property is to the north and northwest.  The

14   operation working areas for loading and unloading have

15   drainage to the cement containment areas."

16         Those are the ones we just talked about, correct?

17   A     Yes.

18             MR. JOHNSON:  And go to the last sentence there, the

19   one that says, "Due."

20             DOCUMENT TECHNICIAN:  (Complied with request.)

21   BY MR. JOHNSON:

22   Q     "Due to the natural slope of the property, it is probable

23   that the historic unlined pond also collected stormwater."

24         Do you see that?

25   A     (No response.)

1  Q     It says that.

2  A     Yes.

3              MR. JOHNSON:  Go to 15.

4              DOCUMENT TECHNICIAN:  (Complied with request.)

5  BY MR. JOHNSON:

6  Q     All right.  In 15 it says that Dyce has been, since 1997,

7  discharging rinse and stormwater that was in those concrete

8  containment ponds that you testified about out into the field,

9  into the prairie north of the property; isn't that correct?

10 A     Yes.

11             MR. COZZENS:  Your Honor.  I object.  This is ten

12 years past the date when their expert says the contamination

13 occurred.

14             MR. JOHNSON:  Your Honor, it's a pattern of practice

15 of pumping stuff out into the north prairie.

16             THE COURT:  Well, ask him, and then I'll rule.

17 BY MR. JOHNSON:

18 Q     You pumped stuff out into the north prairie from those

19 concrete containment pits, right?

20 A     Yes, we did.

21 Q     Thank you.

22        Okay.  You can take this down.

23             DOCUMENT TECHNICIAN:  (Complied with request.)

24 BY MR. JOHNSON:

25 Q     You reviewed this before, before it was sent to the EPA,

687

```
 1  correct?
 2  A    I don't recall that one.  I don't believe I did, because
 3  I'd have argued it.
 4  Q    All right.  Well, let me show you another document.
 5       Let me show you -- 4822 is admitted, isn't it?
 6            MR. COZZENS:  What number?
 7            MR. JOHNSON:  4822.
 8            THE CLERK:  Yes.
 9  BY MR. JOHNSON:
10  Q    I'm showing you 4822, sir, which is admitted into
11  evidence.  There are two e-mails here.  Do you see that?
12  A    Yes.
13  Q    The one on the bottom is from Suzanne Miller.  That's the
14  woman that swore to the truth of those responses, correct?
15  A    Yes.
16  Q    And it's dated July 20, 2000?
17  A    Yes.
18  Q    Do you see that?  Correct?
19  A    Yes.
20  Q    And it's to an S. Mitchell at Holland & Hart.  Do you see
21  that?
22  A    Yes.
23  Q    And he's one of the lawyers -- he or she, I should say --
24  is one of the lawyers that was representing Dyce in connection
25  with the EPA investigation; isn't that correct?
```

688

1    A    Yes.

2    Q    And it's sent to a bunch of people.  Most significantly,

3    it's sent to you, right beneath that, "M. Naff."  That's you,

4    right?

5    A    Yes.

6    Q    And the subject is, "Second request for information,"

7    right?

8    A    Yes.

9    Q    And then there's some initials that say "AC."  You

10   recognize that as being attorney/client privilege information,

11   correct?

12   A    I guess so.

13   Q    All right.

14   A    I, I have no idea.

15   Q    There's no subject at all in this?  I mean, there's no

16   subject matter at all?  It's all been blanked out, correct?

17   A    Yes.

18   Q    And, indeed, this is a communication to a lawyer, so an

19   "AC," I would assume, means attorney/client privilege.  Do you

20   have any reason to doubt that?

21   A    No.

22   Q    All right.  And she says, "Thanks, Suzanne."  And you

23   don't have any recollection about what particularly was in

24   that other than the fact that this talks about the second

25   request for information, right?

1   A    Yes.

2   Q    All right.  And then your e-mail back to her is dated

3   July 20, 2000, and it also references "Second request for

4   information," right?

5   A    (No response.)

6   Q    Do you see that?

7   A    Yes.

8   Q    And it says, "Thank you.  I don't see any changes to be

9   made."

10      What you were telling her there is you reviewed the

11  response to the second request for information, and you didn't

12  see any changes to be made, and you were telling her to go

13  ahead.  Isn't that a fact?

14  A    I -- yes.

15          MR. JOHNSON:  Okay.  You can take it down.

16          DOCUMENT TECHNICIAN:  (Complied with request.)

17  BY MR. JOHNSON:

18  Q    And shortly after that second request for information,

19  you got what they refer to as a PRP letter, a letter from the

20  EPA, which says, "Gee, Dyce is potentially responsible for

21  this pollution"; isn't that correct?

22  A    Yes.

23  Q    Let me show you, let me put up -- this one is not in

24  evidence, 4032.  There's no objection to it.

25          MR. COZZENS:  No objection.

690

1                    THE CLERK:  No, it isn't.

2                    MR. JOHNSON:  No objection?

3                    MR. COZZENS:  Right.

4                    MR. JOHNSON:  Okay.  I move to admit it, Your Honor,

5        4032.

6                    MR. LYNCH:  We don't have it on our screen.

7                    DOCUMENT TECHNICIAN:  (Complied with request.)

8                    MR. COZZENS:  That's right.

9                    THE COURT:  Is there an objection?

10                   MR. LYNCH:  No.

11                   MR. COZZENS:  No.

12                   THE COURT:  4032 is admitted.

13           (Exhibit 4032 was received in evidence.)

14                   THE CLERK:  I can show it up here if you don't have

15       it loaded.

16                   MR. JOHNSON:  We have it.

17                   THE COURT:  It's loaded.

18       BY MR. JOHNSON:

19       Q    I'm showing you a document that's been admitted into

20       evidence, that's Exhibit 4032, and it's a document that says

21       it's from Jeff Simko.  He was the environmental manager for

22       Dyce at the time of this memo, October 2000, correct?

23       A    Environmental manager for HCI.

24       Q    Or HCI.  Excuse me.

25       A    Yes.

1    Q    HCI being the parent of Dyce at the time.

2    A    Yes.

3    Q    All right.  And this is about two months after Dyce

4    received the EPA's letter saying that the Dyce facility is

5    potentially -- that Dyce is potentially responsible for the

6    pollution at the facility, correct?

7    A    Yes.

8    Q    All right.  And turning to page 2, the second paragraph

9    under the heading of "Dyce Billings," let me read the second

10   sentence.  It says, "I was very surprised to see that the

11   meeting did not amount to anything but an effort to explain

12   the regulatory process."

13   A    And?

14   Q    So you, so you were being apprised at this time of the

15   regulatory process, correct?

16   A    Yes, but I think about this time I was taken out of the

17   loop.

18   Q    You were taken out of the loop?

19   A    Right.

20   Q    After the PRP letter?

21   A    Jeff Simko became Suzanne's boss.

22   Q    All right.  So you don't recall having seen this?

23   A    No.

24        MR. JOHNSON:  Well, keep going down.

25        DOCUMENT TECHNICIAN:  (Complied with request.)

692

1   BY MR. JOHNSON:

2   Q    Let me ask you about one question, one statement in here.

3        The sentence here that begins, "There is a relatively

4   small."

5            DOCUMENT TECHNICIAN:  (Complied with request.)

6   BY MR. JOHNSON:

7   Q    All right.  That sentence says, "There is a relatively

8   small area of contamination on Dyce property caused by what

9   appears to be an old evaporation pond, but sample analysis

10  shows that it is not connected to the off-site plume that was

11  identified by the EPA."

12       Do you recall at that point in time that there was

13  discussion at Dyce about the fact that the catch pond was the

14  culprit with regard to the pollution?

15  A    No, I don't.

16           MR. JOHNSON:  You can take it down.

17           DOCUMENT TECHNICIAN:  (Complied with request.)

18           MR. JOHNSON:  Put up 856A, which has been admitted,

19  and go to page 74.

20           DOCUMENT TECHNICIAN:  (Complied with request.)

21  BY MR. JOHNSON:

22  Q    This is attached to this document that's been admitted

23  into evidence.  This is a letter from Tim Pomeroy to Quentin

24  Dyce dated August 6, 1985.  Do you see that?

25  A    Yes.

693

1    Q    And Mr. Pomeroy was an employee of an environmental

2    consulting firm named Kaivos, correct?

3    A    Correct.

4    Q    And the Kaivos firm was retained in connection with the

5    sale of Dyce to HCI?

6    A    No.

7    Q    The Kaivos firm was not retained?

8    A    No.  Not to my knowledge.

9    Q    Okay.  Was Kaivos investigating the soil conditions at

10   the time --

11   A    Yes.

12   Q    -- 1985?

13        They were retained by whom?

14   A    Me.

15        MR. JOHNSON:  Okay.  Can I have a second, Your

16   Honor?

17        THE COURT:  Yes.

18   (Discussion off the record at counsel table.)

19   BY MR. JOHNSON:

20   Q    All right.  So Mr. Pomeroy was with the Kaivos firm, and

21   you retained him.

22        Why don't we just skip this one to save some time.

23        You can take that off.

24        DOCUMENT TECHNICIAN:  (Complied with request.)

25   ///

694

1  BY MR. JOHNSON:

2  Q    Now you decided, in the 19 -- in the mid 1980s, that you

3  needed to close the catch pond, correct?

4  A    Yes.

5  Q    And you needed, you thought, to replace it with a more

6  environmentally effective containment system, correct?

7  A    Yes.

8       MR. JOHNSON:  5042 I do not believe is in evidence,

9  but there's no objection to it.

10      THE CLERK:  All of the 5000s are in.

11      MR. JOHNSON:  I'm sorry.  Thank you.

12 BY MR. JOHNSON:

13 Q    So 5042 is a photo from 4/30/87, that is April 30, 1987,

14 correct?

15 A    Yes.

16 Q    All right.  And by this time, by the time of this photo,

17 you had covered the old catch pond with fly ash, right?

18 A    Yes.

19 Q    All right.  And you'd replaced it with the concrete pits

20 and the evaporation pond, right?

21 A    Yes.

22 Q    Now before Dyce covered up the catch pond -- and let me

23 back up.

24      That would have been in this area right here, right?

25 A    (No response.)

1   Q     That's where the --

2   A     Approximately, yes.

3   Q     That's where the old catch pond was.

4         And on this photo, there's containment stuff that's right

5   here.  There's three containment ponds there, correct?

6   A     That's a road.

7   Q     Well, that's because I messed up.

8         Right north of the tanks are some containment pits.

9   A     Right.  Those black, the darker areas you see.

10  Q     Right.  Exactly right.

11        And come out again.

12            DOCUMENT TECHNICIAN:  (Complied with request.)

13  BY MR. JOHNSON:

14  Q     And so you had those ponds, and then you also had this

15  evaporation pit, right?

16  A     Yes.

17  Q     And so you would pump out those ponds and pump it into

18  the evaporation pit, correct?

19  A     Yes.

20  Q     And when the evaporation pit got so full that it couldn't

21  handle the water anymore, it pumped out into the prairie,

22  right?

23  A     After we had it certified.

24  Q     Now the catch pond area, the historical catch pond area

25  was in this particular area right here, right?

1    A    Yes.

2    Q    All right.  And you covered it up in 1985 or 1986 with

3    fly ash, correct?

4    A    Yes.  We did the whole yard.

5    Q    You did the whole yard.  And part of your reconfiguration

6    of the site was to take out the old historical catch pond,

7    correct?

8    A    Yes.

9             MR. COZZENS:  Asked and answered.

10            MR. JOHNSON:  All right.

11            THE COURT:  True.

12   BY MR. JOHNSON:

13   Q    And you took the sludge that was on the bottom of the

14   catch pond and put it in the pasture north of the berm, didn't

15   you?

16   A    I don't recall.

17   Q    All right.  Let me show you -- this one is not admitted

18   into evidence, No. 90.

19            THE CLERK:  No, it is not.

20            MR. JOHNSON:  All right.  I move for the admission

21   of this document, Your Honor.

22        (Discussion off the record at counsel table.)

23            MR. COZZENS:  No objection.

24            THE COURT:  Ninety is admitted.

25        (Exhibit 90 was received in evidence.)

1    BY MR. JOHNSON:

2    Q    I'm showing you Exhibit 90 which has been admitted into

3    evidence, and this is a document that you've seen before,

4    correct?

5    A    I don't recall it.

6    Q    Well, but you recognize your little --

7    A    Yes.

8    Q    That's you, isn't it?

9    A    Yes, it is.

10    Q    That's what you write on memos, right, that little

11    insignia?

12    A    Yeah.

13    Q    All right.  Are those your initials or --

14    A    Yeah, it's like an initial.

15    Q    All right.  And so you wrote that?  This is your

16    handwriting, isn't it?

17    A    Yes.

18    Q    All right.  And it's dated May 29, 1986, correct?

19    A    Yes.

20    Q    All right.  And you sent this document.  Although it's

21    called a sales report, it obviously isn't.  You were just

22    writing a memo, correct?

23    A    Yes.

24    Q    All right.  And you sent it to a bunch of people at Dyce,

25    including Quent, who I assume, in the middle, that's Quentin

698

1    Dyce, correct?

2    A    Yes.

3    Q    All right.  And in this -- and you reference Kaivos,

4    which is the firm that you hired, correct?

5    A    Yeah.

6    Q    And Tim Pomeroy is the guy we just saw in the prior

7    document?

8    A    True.

9    Q    That's the guy who works for Kaivos, right?

10   A    Yes.

11   Q    And at the bottom of the memo -- scroll down.

12            DOCUMENT TECHNICIAN:  (Complied with request.)

13            MR. JOHNSON:  And highlight from here on.

14            DOCUMENT TECHNICIAN:  (Complied with request.)

15   BY MR. JOHNSON:

16   Q    All right.  It says there that Tim suggested, and that's

17   Tim, the guy, Tim Pomeroy, right?

18   A    Yes.

19   Q    "Tim suggests we roll the pond, adjust pH, and put the

20   slurry on pasture.  Most of slurry should be calcium sulfite."

21   And then I'll read the rest.

22        Highlight the rest.

23            DOCUMENT TECHNICIAN:  (Complied with request.)

24   BY MR. JOHNSON:

25   Q    "If we are going to fill in pond, we should not have

1   sludge there.  If we put sludge on pasture, we should irrigate

2   or do it before a heavy rain."

3       So what you're saying here is that you're going to take

4   the sludge at the bottom of the catch pond and excavate it and

5   put it out into the north pasture; isn't that correct?

6   A    After it was treated, yes.

7   Q    All right.  And was that done?

8   A    I assume so.

9   Q    You don't know whether it was done or not, do you?

10  A    I'm sure it was.  I can't positively tell you yes it was,

11  but that was the procedure that was supposed to happen.

12  Q    All right.  And you don't know exactly how it was

13  treated, do you?

14  A    (No response.)

15  Q    Because you weren't involved?  You wouldn't know if it

16  happened?

17  A    Well, as Tim suggested.

18  Q    Adjusting for pH, that's acid, right?

19  A    Yes.

20  Q    You didn't check it for perc, did you?

21  A    I believe Tim did.

22  Q    How do you know that?  You're just assuming that, aren't

23  you?

24  A    I think there are some analyses.

25  Q    You believe that there are analyses that exist with

1  regard to the slurry that was put on the earth?

2  A    I believe so.

3  Q    All right.  And was it checked for perc?

4  A    No.

5  Q    And before you put the sludge out in the north pasture,

6  you drained the pond to get to the sludge, right?

7  A    Or there was no water in it.  I have -- I don't recall.

8           THE COURT:  Let's break it here.  I've got a

9  conference call with other judges.

10          MR. JOHNSON:  Okay.

11          THE COURT:  We're going to be in recess until 1:15.

12          I give you the usual admonition.  Don't talk amongst

13  yourselves.  Don't talk to anybody about the case.  Keep an

14  open mind.

15          We'll be in recess until 1:15.

16          MR. JOHNSON:  Thank you, Your Honor.

17          THE LAW CLERK:  All rise.

18      (Recess taken from 11:46:36 to 13:19:29.)

19      (Open court.)

20      (Jury not present.)

21          MR. JOHNSON:  The first thing I will tell you is

22  that I'm done but Mr. Davis has a couple of questions.  But

23  I'm done with the cross-examination.

24          But I wanted to raise -- is Marvin Johnson going to

25  be the next witness?

1            MR. COZZENS:  Well, we're going to play the videos

2      first.

3            MR. JOHNSON:  You're going to play the videos first?

4            MR. COZZENS:  Right.

5            MR. DAVIS:  Well, we have something to take up about

6      Johnson.

7            MR. JOHNSON:  Well, let me just raise it right now.

8            Because last time with regard to Johnson, they tried

9      to elicit testimony that he had been fired, and Your Honor

10     sustained the objection.  We played his deposition last time,

11     the video deposition.

12           MR. COZZENS:  Not going there, Judge.

13           MR. JOHNSON:  Okay.  Fine.

14           MR. DAVIS:  Okay.  Good to go.

15           THE COURT:  Didn't figure you would.

16        (Jury present.)

17           MR. DAVIS:  May I, Judge?

18           THE COURT:  Yes, you may.

19           MR. DAVIS:  Thank you.

20                         CROSS-EXAMINATION

21     BY MR. DAVIS:

22     Q   Mr. Naff, again, my name is Max Davis.  I think you and I

23     met in Spokane --

24     A   Yes.

25     Q   -- several years ago when you gave a deposition and then

702

1    the last time you testified as well.

2    A    Yes.

3    Q    On both occasions, I think I had a smaller number of

4    questions to ask you, and that will hold true today.

5    A    Okay.

6    Q    So -- but I do want to back up.

7         You went to work for Dyce in 1972, correct?

8    A    Yes.

9    Q    You had been a salesman for a competitor of Dyce's,

10   hadn't you?

11   A    Prior to that.

12   Q    And the guy you replaced at the competitor was a guy

13   named Don Whaley who had gone into business with Quentin Dyce

14   at Dyce Chemical, right?

15   A    Yes.

16   Q    And Mr. Whaley, then, and Mr. Dyce lured you from the

17   competitor to Dyce Chemical in '72 or '73?

18   A    Basically.

19   Q    Okay.  And then Mr. Whaley left the business in, I

20   believe, '78?

21   A    Yes.

22   Q    And at that point, I think you've testified earlier

23   today -- of course, you became the -- a vice-president.  I

24   don't know; were you the vice-president?

25   A    No, I was a vice-president.

1   Q    A vice-president of Dyce Sales and Engineering at that

2   point in '78.

3   A    Yeah.

4   Q    And isn't it true that from 1978, for the next number of

5   years here in Billings at Dyce, you were basically the No. 2

6   guy?

7   A    Yes.

8   Q    All right.  And then when, I think you've testified and

9   the jury has heard, Mr. Dyce would go to Arizona for several

10  months -- Mr. and Mrs. Dyce would go to Arizona for several

11  months every winter?

12  A    Yes.

13  Q    And basically, I think you felt that for about six months

14  of the year, you were the man in charge at Dyce Chemical in

15  Billings -- or Lockwood?

16  A    Yes.

17  Q    All right.  And that would basically be for the winter

18  months.

19  A    Yes.

20         MR. DAVIS:  Can we see again Exhibit 143, please?

21         DOCUMENT TECHNICIAN:  (Complied with request.)

22  BY MR. DAVIS:

23  Q    This is the report form for my client, Continental

24  Insurance Company.  Do you recall looking at this this

25  morning?  It's on the screen, Mr. Naff.

1   A     Oh.  Okay.

2   Q     This is the loss -- or the liability survey report form.

3   A     Yes.

4   Q     Okay.  Do you recall, at that point in time, Dyce hadn't

5   been insured by Continental but was about to be?

6   A     Yes.

7   Q     Okay.  And let's look at the date.

8         Neil, can we find the date on this?

9             DOCUMENT TECHNICIAN:  (Complied with request.)

10            MR. DAVIS:  There we go.

11  BY MR. DAVIS:

12  Q     Can you see that?  He's highlighted the date there.

13  A     Yes.

14  Q     February of '82?

15  A     Right.

16  Q     And that would have been a period of time, we can assume,

17  that Mr. and Mrs. Dyce were in Arizona and Monte Naff was the

18  man in charge in Lockwood?

19  A     Yes.

20  Q     Okay.  So if there was a walk-through by representatives

21  of Continental Insurance Company to look at whether

22  Continental wanted to insure the facility at Lockwood, chances

23  are it was you who were taking them on the tour?

24  A     Chances are, yes.

25  Q     Okay.  And, again, you wouldn't have done anything to

1   misrepresent things at Dyce, would you?

2   A    No.

3         MR. DAVIS:  All right.  And let's go to page 2 of

4   this document again, Neil.

5         DOCUMENT TECHNICIAN:  (Complied with request.)

6         MR. DAVIS:  And in the middle there, the same thing

7   that I think Larry Cozzens highlighted, the last line.

8         DOCUMENT TECHNICIAN:  (Complied with request.)

9   BY MR. DAVIS:

10  Q    "No losses reported."  Do you see that?

11  A    Yes.

12  Q    Okay.  And certainly if someone would have asked you

13  about losses, you would have told them?

14  A    Yes.

15  Q    All right.  And you understood, did you not, as someone

16  managing a company like Dyce in 1982, that an insurance

17  company looking at whether they wanted to insure your business

18  would be interested in what kind of losses -- if you'd had

19  losses before they were going to step in?

20  A    Yes.  I mean, I was --

21  Q    Yeah.

22  A    -- very new to being involved with the insurance

23  companies at that time.

24  Q    Well, you'd bought insurance before then, yourself?

25  A    Right.  In fact -- yes.

706

1   Q    That's a pretty common thing that every insurer wants to

2   know.  "Have you guys had losses?"

3   A    Right.

4   Q    And you testified this morning about a -- there was a big

5   spill of one kind out at Dyce, wasn't there, back in the '80s?

6   A    Yes.

7   Q    The hydrochloric acid spill you've testified about?

8   A    Yes.

9   Q    That was a rail -- a tanker car on a railroad siding that

10  failed?

11  A    Right.

12  Q    And it was a big mess?

13  A    While it was going on, yes.

14  Q    Yeah.  And that wasn't anything you needed to have your

15  memory jogged about?  You remembered that?

16  A    Yes, I did.

17          MR. DAVIS:  In fact, if we could pull up, now, Neil,

18  Exhibit 362?

19          DOCUMENT TECHNICIAN:  (Complied with request.)

20  BY MR. DAVIS:

21  Q    And this is a memo that -- we'll talk about the context

22  of this memo in a minute, but this is a memo that you sent to

23  Quentin back in 1989, correct?

24  A    Yes.

25  Q    And you mentioned the hydrochloric acid spill; you say

1   there, eight or nine years ago, right?

2   A    Yes.

3   Q    And the reason you're writing the memo in 1989 is that

4   Quentin and his family were in the process of selling the

5   business to HCI.

6   A    That's correct.

7   Q    All right.  And one of the things they, HCI, just like

8   the insurance company, wanted to know, had there been any

9   losses or spills.

10       And when you look now, going back to 1982, when you

11   told -- and obviously you remembered, and, again, the point

12   is, you remembered the hydrochloric acid spill just in your

13   own mind because that was a very significant event in the

14   history of Dyce?

15  A    Yes.  Plus, I visually saw it myself.

16  Q    You saw it.  Okay.  And my point is, you wouldn't have

17   withheld, knowingly withheld that information from someone

18   coming from Continental, would you?

19  A    No.

20  Q    No.  So in all likelihood, you would agree with me, sir,

21   that rather than -- if we go back to Exhibit 143, page 2,

22   where Continental is being told there are no losses as of

23   March of '82, in all likelihood the hydrochloric acid spill

24   had to have been after Continental visited the Dyce facility

25   in '82?

1  A    It was not a loss to Dyce, product loss.

2  Q    But there's no mention of it here?

3  A    No, but our supplier covered the loss.

4  Q    I understood that, but it was an event that happened at

5  Dyce, wasn't it?

6  A    Right.

7  Q    And so in all likelihood, wouldn't you agree with me,

8  sir, that rather than this not being mentioned at all, this

9  tanker car failure on the siding at Dyce, not -- there's no

10  mention of it in this '82 loss report, that it probably

11  happened after, shortly after that period of time?

12  A    Very well could have.

13  Q    All right.  But the other thing, while we're focused on,

14  "No losses reported," let's talk about one of the things that

15  were lost, and that is based on your testimony this morning,

16  ten to 12 barrels of perc.  Right?

17  A    Okay.

18  Q    They were lost.

19  A    Yes.

20  Q    They're still lost.

21  A    Yes.

22  Q    All right.  But you, you didn't make any mention of them

23  to Continental in 1982, did you?

24  A    No.

25  Q    No.  And the reason is, I take it, based on the testimony

1  that we've heard, that while you remembered that event or that

2  series of events in the mid '70s, after Mr. Mielenhausen gave

3  you Mr. Hallsten's deposition in 2004 or 2005, I guess 2005,

4  back seven, six or seven years after those events may have

5  occurred in the mid '70s, in 1982 they had simply fallen off

6  your mental radar screen?

7          MR. COZZENS:  I object to that as being

8  argumentative, compound, and confusing.

9          THE COURT:  Yeah, I think it's compound.  I was

10  trying to track it, myself.

11          MR. DAVIS:  All right.

12  BY MR. DAVIS:

13  Q    Had you simply forgotten about the fact that you had lost

14  ten to 12 barrels of perc in 1982?

15  A    I don't remember.

16  Q    You'd agree that's a loss?

17  A    Yes.

18  Q    It's still a loss.

19       And if it was on your mind, you would have told the

20  insurance company, because you understood what a loss was?

21  A    Well, my understanding with insurance companies, it was

22  the reportable losses that they were after.

23  Q    Well, if a chemical company was in the habit of losing

24  500 to 600 gallons of a product for no explainable reason,

25  you'd think that's something that ought to be passed along,

710

1    don't you?

2    A     If I'd have thought about it.

3    Q     All right.  That's the point.

4    A     Yes.

5    Q     You apparently just didn't think about it.  You

6    weren't -- and I'm trying to help you here.  You weren't

7    trying to deliberately mislead my client?

8    A     No.

9    Q     And the only way they would know about something like

10   that, if there were losses or regular spills out there in

11   handling chemicals, is if someone, when they came out there to

12   Dyce, told them about it?

13   A     Yeah.

14   Q     And you'd agree that the fact that it's memorialized here

15   that no losses are reported means that nobody at Dyce told

16   Continental we have any problems in handling -- "We don't lose

17   chemicals that we handle here"?

18            MR. COZZENS:  I object, Your Honor.  It's

19   argumentative, again.  It's repetitive, and --

20            THE COURT:  Did you understand it?

21            THE WITNESS:  Well, kind of.  I'm not sure how to

22   answer it.  I mean, I just --

23            MR. DAVIS:  All right.

24            THE COURT:  Reask it.

25            MR. DAVIS:  All right.

1          THE COURT:  It may be repetitive, too.

2          MR. DAVIS:  Maybe I'll just move on, then.  We've

3    dwelled on it long enough.

4    BY MR. DAVIS:

5    Q    But by the same token -- if we could look at 856A, Neil?

6          DOCUMENT TECHNICIAN:  (Complied with request.)

7    BY MR. DAVIS:

8    Q    This was the report that was commissioned, I guess, for

9    HCI -- it says Holcomb there -- for the sale of the business.

10   If you want to look at the screen?

11   A    Well, Holcomb was a division like Dyce Chemical.

12   Q    Okay.

13   A    HCI was --

14   Q    All right.

15   A    -- the company.

16   Q    All right.  But what we're looking at here in '89, and

17   that's, I think, 12 days after the memo we've just looked at

18   from you to Mr. Dyce --

19   A    Right.  Okay.

20   Q    -- this is the environmental report that was being done.

21   And the reason, in 1989, the reason it was being done was that

22   the Dyce family was selling Dyce Chemical to HCI.

23   A    That's correct.

24   Q    And HCI wanted to know, "Are we buying any problems?"

25   A    Yeah.

712

1    Q    Okay.  And this report was commissioned, and you wrote

2    your memo that we looked at today, saying, "Hey, other than

3    that hydrochloric spill, there aren't any problems here in

4    Lockwood," correct?

5    A    That I was aware of, yes.

6    Q    Okay.

7    A    That's correct.

8    Q    All right.  And again, as you sit here today, you don't

9    know of any spills of perchloroethylene at any time during

10   your watch at Dyce Chemical, do you?

11   A    No, I do not.

12   Q    All right.  Frankly, you don't believe that one occurred,

13   certainly not one of 500 to 600 gallons, do you?

14   A    I, I cannot explain how the perc got out there.

15   Q    Okay.  Let me just go back and cover one other point.

16        And if we could look at the aerial photos?  Let's --

17   Neil, I want to look at the 1972 aerial, which is 5000 -- or,

18   no, the 5017, the '73 aerial.

19        All right.  And I think --

20             DOCUMENT TECHNICIAN:  (Complied with request.)

21   BY MR. DAVIS:

22   Q    Got 'er there, Mr. Naff?

23   A    Yes.

24   Q    And this represents pretty early on in Dyce Chemical's

25   operation of the Lockwood facility, does it not?

1    A     Yes.

2    Q     You'd moved the vertical storage tanks outside from the

3    small warehouse --

4              MR. COZZENS:  You said '73?  Is that what you were

5    looking for?

6              MR. DAVIS:  Yeah, '73.  I'm sorry.

7              MR. COZZENS:  You got '74.

8              THE WITNESS:  That's '74.

9              MR. DAVIS:  Can you pull up -- I wrote my notes

10   wrong.  Let's look at '74.  I think that works as well, and I

11   apologize to the jury and the Court for misspeaking.

12   BY MR. DAVIS:

13   Q     Again, that's about a year into Dyce's operations out at

14   what had been the former Dow Chemical facility?

15   A     Yes.

16   Q     And at this point in time, there's a bit of a berm,

17   correct?

18   A     Yes.

19   Q     But it hasn't really been extended, has it?

20   A     I'm not sure if we had completed the extension yet.

21   Q     But -- and the other thing is, there's no drumming shed,

22   is there?

23   A     No.

24   Q     And the area -- and we see trucks there, don't we?

25   A     Yes.

714

1   Q    And there's other materials stored, or there seems to be

2   evidence of other activity in what I think people have

3   referred to as the loading area --

4   A    Yes.

5   Q    -- that I've circled that became the loading and

6   unloading area for you guys?

7   A    Yes.

8        MR. DAVIS:  And if we could look now at -- let's

9   look at 5024, which I believe is '77.  Well, I'll leave my

10  circle there.

11       DOCUMENT TECHNICIAN:  (Complied with request.)

12  BY MR. DAVIS:

13  Q    By now, would you agree that one of the things we can

14  see, what Mr. Johnson asked you about, a wet mark in front of

15  the drumming shed?

16  A    Yes.

17  Q    All right.  But one of the things that's happened, isn't

18  it, is that Dyce has gone ahead and asphalted, has paved a

19  significant portion of the premises?

20  A    Yes.

21  Q    And part of the portion that they paved is as you came in

22  off of the street?  And the gateway is kind of to our north,

23  isn't it, to the bottom of the picture, to the main gate?

24  A    Right, to the southeast.

25  Q    Yeah.  And all that portion to the office portion here,

1  right?

2  A     Yes.

3  Q     And then around the side and into the loading area,

4  that's all been paved, hasn't it?

5  A     Yes, it has.

6  Q     And that's, that's a change that Dyce instituted shortly

7  after acquiring the property --

8  A     Yes.

9  Q     -- is that not correct?

10  A     That's correct.

11  Q     And the reason that you paved all the way into the

12  loading and unloading area is because you understood that was

13  an area that was going to see a high volume of truck traffic?

14  A     Yes.

15  Q     And you wanted to facilitate trucks coming in and out

16  easily into the loading and unloading area?

17  A     Yes.

18  Q     Because, isn't it true, that you contemplated the loading

19  and unloading area to be a place where chemicals would be

20  handled?

21  A     Yes.

22  Q     They'd be offloaded and onloaded there?

23  A     Correct.

24  Q     And you'd agree with me, sir, that if there's a place

25  that a spill could occur, it was more likely to occur when

716

1    chemicals are being -- the container in which chemicals are

2    being held is changed?  In other words, you're taking them off

3    a tanker truck and loading them onto, into another, into drums

4    or into a storage tank, that that process is more likely to

5    create a situation in which spills can occur than simply

6    nothing going on?

7    A    Yes.

8    Q    Okay.  And it's -- by 1977, we can see that the berm has

9    been extended, has it not?

10   A    Yes, it has.

11   Q    And so what we understand is that, and Mr. Johnson

12   indicated, asked you about this, Quentin Dyce was a trained

13   engineer.

14   A    Yes.

15   Q    And what the jury should understand is that Dyce

16   deliberately extended the berms, did they not, by this point

17   in time, correct?

18   A    And, also, back.

19   Q    You want me to point this way, too?

20   A    Right.

21   Q    All right.  That's fine.  But the point is that as of

22   1977, the two big things that Dyce had done out there was they

23   had paved the loading and unloading area where chemicals would

24   be handled and had designed a containment system to exclude

25   the loading and unloading area, correct?

1    A     Yes.

2    Q     So that the way the system was designed by Dyce Chemical

3    in the mid '70s was the one area that was most likely to have

4    chemical handling mishaps was designed to be outside of

5    containment?

6    A     That's not why we paved it.

7    Q     Well, you paved it so you could make trucks come in and

8    out of there?

9    A     Right.  It was a muddy mess.

10   Q     All right.  So you didn't want trucks to get stuck in the

11   loading and unloading area?

12   A     That's correct.

13   Q     And you wanted them to come in and out of that area

14   easily because that's where you were going to transfer

15   product.

16   A     Right.

17   Q     And that area was designed to be outside of containment,

18   wasn't it?

19   A     Yes.

20            MR. DAVIS:  That's all I have.  Thank you.

21            THE COURT:  Redirect.

22            MR. COZZENS:  I do, Your Honor.

23                      REDIRECT EXAMINATION

24   BY MR. COZZENS:

25   Q     Mr. Naff, some time ago this morning when I was asking

1    you questions, you talked about the liner that was in the

2    1975, 1976 catch pond.

3    A    Yes.

4    Q    And did I hear you correctly then that you said first you

5    put down bentonite and then a plastic tarp, and then you put

6    dirt on top of the plastic tarp?

7    A    Well, it was a heavy, rubber-type tarp.

8    Q    Okay.

9    A    And then we put dirt on top of that.

10   Q    Okay.  And then you were asked a series of questions by

11   Mr. Johnson about why you couldn't see that tarp in the photos

12   in '75, '77, and '79.  Can you explain why you couldn't see

13   the tarp?

14   A    We covered it with dirt --

15   Q    Okay.

16   A    -- so it would not slip off the dike area.

17            MR. COZZENS:  Okay.  Would you call up Exhibit 2533,

18   please?

19            DOCUMENT TECHNICIAN:  (Complied with request.)

20   BY MR. COZZENS:

21   Q    Okay.  We're looking at an aerial photograph that's been

22   stipulated that it was of the -- what we're seeing here is a

23   portion of that photograph that shows the Dyce facility as it

24   existed November 4 of 1975, and that this photograph was

25   marked up and given to us by USF&G.

1       One of the things that Mr. Johnson asked you about in

2  cross-examination was where fluids from the loading and

3  unloading area would flow, and he pointed out that you said,

4  in your deposition, that it would go north, northwest.  Do you

5  remember that?

6  A    Yes.

7  Q    Okay.  In fact, when you look at this picture, there's a

8  green line that shows exactly where it goes; isn't that

9  correct?

10 A    Yes.

11 Q    And that green line goes north and northwest, correct?

12 A    Yes.

13 Q    In your deposition, the part I don't think he did read

14 you -- and let me see if I can find that.

15      Do we have another copy of this to give to him?

16          MR. LYNCH:  (Handing.)

17          MR. COZZENS:  May I approach, Your Honor?

18          THE COURT:  Yes.

19 BY MR. COZZENS:

20 Q    (Handing.)  I'm going to show you what is a transcript of

21 the deposition that was taken of you on August 3, 2005.  And I

22 want to ask if you would turn to page 32, the bottom of 32 and

23 the top of 33.  Have you found that?

24 A    Yes.

25 Q    I'm going to read this as Mr. Johnson did, only I'm going

1   to read a little more of it, I think, and ask you if these
2   were questions asked of you and answers that you gave.
3   Starting with line 23 on page 32:
4       "Okay.  And this area where you would fill the drums on
5   the asphalt, did it have a slope or a drainage location?"
6       Answer, "Not that I'm aware of."
7       Moving down to line 1 on page 33, "Okay.  When rainwater
8   would fall, if you noticed, do you know where it would run off
9   this asphalt area?"
10      Answer, "To my recollection, it was to the north and
11  northwest."
12      Question, "Okay.  Similar to the slope of other
13  property?"
14      Answer, "Well, plus you had the warehouse to the south."
15      Now if you would turn to this Exhibit 2533, and, using
16  the telestrator, if you can, starting right here in front of
17  the drumming shed -- uh-oh.  That's black.  We need to hit
18  down in this corner to change that?
19          THE CLERK:  Bottom left to change the color.
20          MR. COZZENS:  I got it.
21  BY MR. COZZENS:
22  Q   Okay.  Now right here in front of the drum shed, would
23  you continue from where that plus is to just show the jury
24  again to make sure we have no confusion about where it flowed?
25  A   Well, it would flow along your red line to the north,

721

1    back to the south.  It would hit the berm here.  There was a

2    ditch through here, and then out this way.

3    Q    Okay.  And so that takes into account, as you testified

4    to, back in 2005, the warehouse to the south, correct?

5    A    Yes.

6    Q    All right.

7    A    Yes.

8            MR. COZZENS:  Would you pull up Exhibit 5033,

9    please?

10           DOCUMENT TECHNICIAN:  (Complied with request.)

11           MR. COZZENS:  Would you zero in on the tank farm

12   area and include both warehouses, please?

13           DOCUMENT TECHNICIAN:  (Complied with request.)

14           MR. COZZENS:  I don't know why I had you do that.

15   Would you take the whole picture and enlarge that, please?

16           DOCUMENT TECHNICIAN:  (Complied with request.)

17   BY MR. COZZENS:

18   Q    Now Mr. Johnson asked you on cross-examination and made a

19   point of having you point out that the containment pond or the

20   catch pond was quite a bit larger when they reconfigured the

21   Dyce site in 1980 as is disclosed on this exhibit, which is a

22   photo dated 1981; is that correct?

23   A    Yes.

24   Q    Can you explain why you thought you needed a larger catch

25   pond at that time?

722

1   A    We moved the dike on, it would be, the southwest portion

2   of the tank farm where the actual railroad bed would be the

3   dike so everything from in front of the office, the warehouse

4   dock, all of the area would flow into the catch pond.  So all

5   of the rainwater no longer went along the railroad tracks and

6   out.  It would go into the catch pond.

7   Q    Okay.  And, in fact, you also created a new ditch going

8   to the catch pond --

9   A    Yes.

10  Q    -- isn't that true?

11       And this ditch running along there?

12  A    Yes, it is.

13  Q    Okay.  So can you tell the jury what the purpose was of

14  the larger catch pond?

15  A    So nothing from out on the asphalt area or the area that

16  drained down through that area would go out into the pasture.

17  Would all go into the catch pond.

18  Q    Okay.  So a lot more water was going to go --

19  A    Right.  We needed a larger catch pond.

20  Q    Well, we've talked at some length about the inventory

21  discrepancy in the mid '70s.  The first question I have is,

22  What was it that caused you to remember that?

23  A    When I got into town and into the office, Rod was -- oh.

24  I mean --

25  Q    What was it that caused you to remember it?

723

1   A     Oh, to remember it?

2   Q     Yes.

3   A     It was seeing Rod's deposition.  It jogged my memory.

4   Q     Okay.  There's been some talk throughout this trial,

5   actually, but specifically in cross-examination of you, about

6   Quentin Dyce.  Was he a fellow who got really mad really

7   often?

8   A     No.  Seldom.

9   Q     You've told me that he was pretty upset about this

10  inventory discrepancy, correct?

11  A     Yes, he was.

12  Q     In all the time that you worked with Quentin, how many

13  times did you see him get that upset about anything?

14  A     Two that I'm sure of.  Maybe three.  Two or three times.

15  Q     So this was unusual?

16  A     Yes.

17        MR. COZZENS:  Would you pull up Exhibit 5024,

18  please?

19        DOCUMENT TECHNICIAN:  (Complied with request.)

20        MR. COZZENS:  That's good.

21  BY MR. COZZENS:

22  Q     You were asked some questions about areas that are

23  devegetated, mostly to the west of the Dyce site.  Do you

24  recall those?

25  A     Yes.

1   Q     You were asked, in fact, if wasn't it a fact that the

2   devegetation areas were caused by chemicals coming out of the

3   catch pond.  Do you recall that?

4   A     Yes.

5   Q     And you said no to that.  Do you know what did cause

6   devegetation out in the areas west of the Dyce site?

7   A     Yes, I do.  It was the 2,4-D from the old Dow Chemical

8   plant.

9   Q     Okay.  So we get this straight, Dyce purchased the site

10  from Dow Chemical, correct?

11  A     Yes.

12  Q     What did Dow Chemical do with it?

13  A     They made 2,4-D, weed killer.

14  Q     Okay.  And did you have any firsthand involvement in

15  determining whether that 2,4-D was able to leave the warehouse

16  and get out into the area west of the site?

17  A     Yes.  In the manufacturing area, there was the pipe that

18  went directly from the manufacturing area out of the

19  warehouse, out of the large warehouse, under the railroad

20  tracks, and into the pasture.

21  Q     Okay.  Did you do anything with that pipe?

22  A     Yes.  We concreted that whole area off.

23  Q     What do you mean, the "whole area"?

24  A     Well, I mean the whole area that they had been

25  manufacturing was actually lower down on the floor, so we

1    actually filled the whole thing full of concrete and up to

2    original floor or regular floor level.

3    Q    Okay.  So when you -- and when Dyce was through with its

4    improvements to the big warehouse, there was no longer a way

5    for materials to get out of the warehouse, under the tracks,

6    and out to the west side --

7    A    No.

8    Q    -- is that true?

9         Okay.  Well, do you know that it was 2,4-D that was

10   causing devegetation out there in the west?

11   A    Yes.

12   Q    How do you know that?

13   A    Well, first of all, there was almost a little pond right

14   where the pipe ended that came out of the warehouse, and every

15   time it would rain, it looked like crude oil coming up out of

16   the ground that would just follow down through the dead

17   vegetation out farther to the northwest into the pasture.  And

18   that's one of the reasons I had Kaivos do several tests in

19   that area, to determine the problems.

20   Q    So you could actually see the 2,4-D?

21   A    Yes.

22   Q    And what did rain or moisture have to do with that?

23   A    Well, the 2,4-D was lighter than water, so when the water

24   soaked in the ground, it would push the 2,4-D up out of the

25   ground, and it was just like a puddle of crude oil that would

1    start flowing to the northwest.

2    Q    And once it got spread out to the northwest, what did it

3    do to the vegetation?

4    A    It killed it all.

5    Q    You were asked a series of questions about answers that

6    Suzanne Miller prepared to questions presented by the EPA, and

7    I know she prepared them.  Do you know all of the information

8    she had available to her at that time?

9    A    No, I don't.

10   Q    Do you know whether she had available to her all these

11   maps that we're looking at here in this trial?

12   A    Not that I'm aware of.

13   Q    Okay.  You were asked on direct examination -- on

14   cross-examination about previous testimony in this case, and

15   the question was, Didn't you previously say that you believed

16   that the inventory discrepancy occurred in December of 1975?

17   Correct?

18   A    Yes.

19        MR. COZZENS:  May I approach, Your Honor?

20        THE COURT:  Yes.

21   BY MR. COZZENS:

22   Q    I've just handed you a transcript of that previous

23   testimony, and I would like to read a portion that was not

24   read to you by Mr. Johnson.  If you would turn, please, to

25   944?

727

1    A    Okay.

2    Q    Before I read it, I want to ask you.  Mr. Johnson

3    actually did read from your deposition testimony that was

4    taken in 2005, and in that deposition testimony, you said that

5    the discrepancy was in '74, '75, or '76, correct?

6    A    Yes.

7              MR. JOHNSON:  Objection.  Misstates the testimony,

8    Your Honor.  He's got the years wrong.

9              THE COURT:  Well --

10             MR. JOHNSON:  Suggesting years to this witness that

11   he didn't testify to in his deposition.  He said '75, '76, or

12   '77.

13             THE COURT:  Overruled.

14             MR. COZZENS:  Okay.

15             THE COURT:  Overruled.  You're going to read it, I

16   assume?

17             MR. COZZENS:  Well, right now I'm going to read from

18   the trial transcript, Your Honor.

19   BY MR. COZZENS:

20   Q    And now I'm reading from page 944, beginning on line 8.

21        "All right.  And there was discussion during your direct

22   examination about inventory discrepancies, and you testified

23   that you think this inventory discrepancy happened in December

24   of '75?  Is that what you said?"

25        Answer, "Going back and working through the time frames,

1    yes, to the best of my knowledge, that's --"

2         Question, "When did you come up with that thought, that

3    it was December of 1975?  How long ago was that?"

4         Answer, "Over probably the last several weeks."

5         Question, "So prior to several weeks ago, you never told

6    anybody that you thought it was in December of 1975; isn't

7    that correct?"

8         Answer, "I believe I said '74 or '75 or '76.  I knew it

9    had to be in that time frame because it was shortly after

10   Rod -- you know, Rod hadn't been there that long."

11        Question, "All right.  So it could have been '74, could

12   have been '75, could have been '76, but you believe it was in

13   December?"

14        Answer, "But, Rod, I was still on the order desk in '74,

15   so I kind of ruled that out.  And Rod, you know, wouldn't have

16   been that new of an employee in '76, so I kind of calculated

17   or, you know, tried to figure, in my mind, what happened and

18   when it happened and what other things were happening at the

19   same time to come up with most likely '75.

20        "All right.  But you're not --"

21        And then you say, "It's kind of a --"

22        And then the answer is, "Well, I mean, I just tried to

23   justify in my mind what else was going on as far as employees

24   and things to, okay, what year was this?  It was -- so that's

25   how I came up with that date, is this is the most likely with

                              729

1  everything else that I remember at that time, as this was the

2  most likely period, because I can remember it was just before

3  they were going back down to Phoenix, for one thing, so that

4  kind of pinpointed a quarter."

5      Okay.  Is that what you testified to in your previous

6  testimony in this case?

7  A    Yes.

8           MR. COZZENS:  Would you pull up Exhibit 5042,

9  please?

10          DOCUMENT TECHNICIAN:  (Complied with request.)

11          MR. COZZENS:  Would you actually focus that in on

12  the area that starts with the bottom of the lower warehouse

13  and goes up to the cement ponds on the -- in the north?

14          DOCUMENT TECHNICIAN:  (Complied with request.)

15  BY MR. COZZENS:

16  Q    Okay.  We're showing you a photograph that's dated

17  April 30, 1987.  On cross-examination, you were asked a series

18  of questions about waters getting into what were called cement

19  ponds or cement evaporation ponds or something.  Can you show

20  the jury where those are in that photograph?

21  A    They're right here.

22  Q    Okay.  And as of this date, April 30, 1987, there was no

23  catch pond left, right?

24  A    No.

25  Q    The historical catch pond?

1   A    Right.  The historical catch ponds were gone.

2   Q    Okay.  And do you know when they constructed these cement

3   ponds that you were asked about on cross-examination?

4   A    I think it was around 1987.

5   Q    Okay.  So there's no way -- they didn't even exist prior

6   to that time --

7   A    No.

8   Q    -- is that correct?

9        No way anything could have gone out of there that would

10  have any impact on contamination that already existed by that

11  time, correct?

12  A    Correct.

13            MR. COZZENS:  Okay.  Would you pull up Exhibit --

14  well, first let's go to the '77.  Is that 33, 5033?

15        (Discussion off the record at counsel table.)

16            MR. LYNCH:  The '77 one?

17            MR. COZZENS:  Yes.  5024?

18            MR. LYNCH:  5024.

19            DOCUMENT TECHNICIAN:  (Complied with request.)

20            MR. COZZENS:  Okay.  Would you focus on the corner

21  of the, the northwest corner of the berms and then the area

22  that's going to the northwest corner of the property, or

23  what's been referred to as the northwest corner?

24            DOCUMENT TECHNICIAN:  (Complied with request.)

25  ///

1   BY MR. COZZENS:

2   Q    Okay.  You were asked some questions by Mr. Johnson about

3   what he called cuts in that area, and he asked you if it

4   wasn't true that those cuts were caused by fluids coming out

5   of the containment pond.  Do you remember that?

6   A    Yes.

7   Q    And you told him no.  Do you remember that?

8   A    Yes.

9   Q    And I can't remember how this went right now, but what

10  were those things that he's calling cuts?

11  A    Well, I thought it was an old game trail or cattle and

12  horse trail.

13          MR. COZZENS:  Okay.  Now would you call up

14  Exhibit 5009, please?

15          MR. LYNCH:  5006?

16          MR. COZZENS:  5006.  You're right.

17          DOCUMENT TECHNICIAN:  (Complied with request.)

18          MR. COZZENS:  It's hard to believe it's so late in

19  the afternoon that I'm seeing 9s for 6s, Judge, but I am.

20  BY MR. COZZENS:

21  Q    Okay.  Now this is a photograph dated 1969, long before

22  Dyce was even on the property.  Do you see in there the cow

23  trail that turns into the, quote, cut that was discussed by

24  Mr. Johnson on cross-examination?

25  A    Yes, I do.

732

1    Q    Can you show the jury where that is?

2    A    It starts clear out here and comes into here.

3              MR. COZZENS:  Okay.  Now would you call up 5008,

4    please?

5              DOCUMENT TECHNICIAN:  (Complied with request.)

6    BY MR. COZZENS:

7    Q    Can you see the same cow trail, and this is in a

8    photograph that's dated August 18, 1971, now still two years

9    before Dyce has even purchased the property.  Can you see the

10   same cut in that photograph?

11   A    Yes.

12   Q    It's a different color now, isn't it?

13   A    Well, part of it is.  Part of it, going to the west, has

14   moisture in it from the Dow plume, and part to the right is

15   just white trail.

16   Q    Okay.  So that cut existed before Dyce ever even moved on

17   the property, correct?

18   A    Yes.

19   Q    In cross-examination by Mr. Johnson, you were asked --

20   first he talked about taking sludge from the catch pond and

21   spreading it out over the fields.  He showed you a memo where

22   Mr. Pomeroy had suggested that you do that after the sludge

23   was treated; is that correct?

24   A    Yes.

25   Q    Can you tell the jury who Mr. Pomeroy is?

1    A    He had a chemical engineering degree and was more of a

2    chemist and environmental management consultant.

3    Q    Okay.  And when you pointed out that he had suggested

4    that you do that, Mr. Johnson asked you whether that -- there

5    had been any testing for perc in the testing that Mr. Pomeroy

6    did.  Do you remember that?

7    A    Yes.

8    Q    Frankly, I think you said yes once and then the second

9    time you said no, so I just want to make sure that everybody

10   is clear about this.

11         Could you pull up what's been admitted as Exhibit 56A and

12   then go to page 68, please?

13              MR. LYNCH:  856A.

14              MR. COZZENS:  Yeah, 856A, and then page 68.

15              DOCUMENT TECHNICIAN:  (Complied with request.)

16              MR. COZZENS:  Would you blow that page up from the

17   area from A past C, please?

18              DOCUMENT TECHNICIAN:  (Complied with request.)

19   BY MR. COZZENS:

20   Q    Okay.  Did Mr. Pomeroy, in fact, test for perc when he

21   did his inspection of the property in, was it, 1985 that he

22   did that?

23   A    Yes.

24   Q    Okay.  Did he test for perc?

25   A    Yes.

1    Q     And where does this document reveal that?

2    A     Under B.  Perc is one of the halocarbons.  That's just a

3    group of chemicals which perc is one of.

4    Q     Okay.  So, in fact, he didn't find any halocarbons there?

5    A     No.

6    Q     My last question -- well, a couple last questions.  I'll

7    be careful, Judge.

8          Are you presently retired?

9    A     Yes.

10   Q     You testified that you're getting paid -- you hope it

11   will be $150 an hour -- for your time in this?

12   A     Yes.

13   Q     Is $150 an hour enough money to get you to come into a

14   Federal District Court and commit perjury?

15   A     No, it is not.

16         MR. COZZENS:  That's all I have, Your Honor.

17         THE COURT:  You can step down.

18         THE WITNESS:  Thank you.

19         THE COURT:  Call your next witness.

20         MR. BANKER:  Your Honor, Soco would like to read the

21   deposition testimony of Charles Bender.  Due to the nature of

22   how that video was taken, we would need to read the first five

23   minutes, and we're prepared to read designation of both

24   parties.

25         Before we do that, Soco would request an instruction

735

1   on the reading of depositions at trial.

2           THE COURT:  Well, I'm just going to give you an

3   instruction off the top of my head.

4           A deposition, ladies and gentlemen, is a process, as

5   you've already learned, where a witness is brought in.

6   They're put under oath.  The attorneys for all of the parties

7   were present at the deposition.  One party did a direct

8   examination, and then the other party or parties had an

9   opportunity to cross.

10          The questions and answers are recorded by a court

11  reporter, and when a person is unavailable at the trial to

12  testify, a deposition of that person may be used at trial.

13          You should consider deposition testimony presented

14  to you in court -- I don't think this will be the only one --

15  in lieu of live testimony insofar as possible in the same way

16  as if the witness had been present to testify.  Do not place

17  any significance on the behavior or tone of voice of any

18  person reading the questions or answers.

19          And, also, I should tell you this.  In getting ready

20  for this trial, as you can see, there were many pages of

21  documents filed.  There were many pages called pleadings and

22  that sort of thing in direct response to scheduling orders and

23  that sort of thing that I issued.  There were many documents

24  filed with me.  One of the things I did to try to expedite

25  this trial is rather than have, for instance, Soco or the

736

1    insurers put on the part of the deposition that they wanted to

2    read and skip different parts in depositions and then have

3    somebody else come in and put in the parts they wanted, I

4    required the parties to, if it's a video deposition -- I think

5    this is video except for the first five minutes?

6              MR. BANKER:  That's correct, Judge.

7              THE COURT:  I assume most of them will be video that

8    are played?

9              MR. BANKER:  That's correct.

10             THE COURT:  And what I've required them to do is

11   just let the tape run.  And so it could be that one party or

12   the other requested that a certain part of the deposition be

13   read but not another party, and I said, "We're not going to

14   take it out of context.  We're not going to mess around like

15   that.  We're just going to run the direct exam, put everything

16   in that I admitted out of the direct exam, put everything in

17   that I admitted out of the cross-examinations."

18             So it doesn't mean necessarily that one party or

19   another offered it.  I'm not -- we're not going to make a

20   distinction as to who requested what part of the deposition

21   read.  The deposition is going to be put in, and every part

22   that was requested is going to go in the order in which it was

23   given.  Correct?

24             MR. BANKER:  That's correct, Your Honor.

25             THE COURT:  Is that fair?

1          MR. DAVIS:  Yes.

2          MR. MICKELSON:  (Nodded head affirmatively.)

3          THE COURT:  Anything more?

4          MR. BANKER:  I don't think so.

5          THE COURT:  Good.  I guess that's a loaded question,

6    "Is that fair?"  What are you going to say?

7          MR. DAVIS:  When you're the one asking questions,

8    the answer is always yes, Judge.

9          WHEREUPON,

10                    MR. CHARLES BENDER,

11   called for examination through deposition by counsel for

12   defendant, after having been previously sworn to testify the

13   truth, the whole truth, and nothing but the truth, testified

14   as follows:

15                    EXAMINATION

16   Q    (By counsel for USF&G)  "Mr. Bender, when did you first

17   meet Quentin Dyce?

18   A    "Oh, I don't remember what year it was.  I drove truck

19   for him for a couple of years before I want into the

20   warehouse.

21   Q    "Did you meet him in the 1960s?

22   A    "Yes.

23   Q    "Do you remember how you met him?

24   A    "No, not really.

25   Q    "Did you apply for a job with his company?

1    A    "Yeah."

2    Q    "Was this before Dyce Chemical relocated its facility to

3    the Lockwood location?

4    A    "Yes.

5    Q    "And where was the Dyce facility originally located?

6    A    "Down on First Avenue South."

7    Q    "And when you took the job as a driver in the latter part

8    of the 1960s, what business do you recall Dyce being in at

9    that time?

10   A    "It was the chemical.  He would haul lumber east and

11   usually pick up chemical and bring it back.

12   Q    "Was he a distributor for both chemical and lumber?

13   A    "No.  He just hauled the lumber so that he could unload

14   east so he could pick up his chemical."

15        THE COURT:  Let me interrupt you.  Whose deposition

16   is this?

17        MR. BANKER:  This is the deposition of Charles

18   Bender.

19        THE COURT:  All right.  Thank you.

20   Q    (By counsel for USF&G)  "And when you were driving, as a

21   driver, were you delivering chemicals or lumber or both?

22   A    "No.  We just brought chemicals back to the plant there

23   on First Avenue South.  They unloaded it.  They had a

24   warehouseman doing it."

25   Q    "And when he moved his facility to the Lockwood site,

1    were you still a driver for him or did you take a different

2    position?

3    A    "I took a different position.

4    Q    "And what position did you take?

5    A    "Warehouse foreman.

6    Q    "And what were your responsibilities as the warehouse

7    foreman?

8    A    "We started changing the building around.  Everybody

9    worked, the salesmen and Quentin himself, his brother.  We

10   didn't have any other help then.  Just a couple of salesmen, I

11   guess."

12   Q    "You said there were salespeople also helping out.  Do

13   you remember the names of any salespeople?

14   A    "Monte Naff was one of them.  Grady was one of them.

15   That's about all.  Bud Nadene was the foreman down there at

16   the time when I was hauling truck.

17   Q    "So you said Bud Nadene?

18   A    "Yeah.  He's dead now, so forget about him."

19   Q    "As the warehouse foreman, you said you took on that job

20   when the company moved to the Lockwood facility.  What were

21   your job responsibilities?

22   A    "Well, mostly when we was changing the place around, we

23   all worked together.

24   Q    "So when you say, 'changed the place around,' do you mean

25   renovation to the facility?

1    A    "Yeah, getting it ready to the way they wanted it set up.

2    Q    "Making the changes for their business?

3    A    "Yeah.   Right.

4    Q    "Did you have any other job responsibilities as the

5    warehouse foreman?

6    A    "Well, I did later on.   They hired the men to come in,

7    and I interviewed them.   Hired them if he wanted them -- or if

8    he wanted to.

9    Q    "So one of the things you did was hired some new

10   employees?

11   A    "Yeah."

12   Q    "Does the name Delmer Hutchinson ring a bell?

13   A    "Yes.

14   Q    "Delmer was one of the guys you interviewed and hired?

15   A    "Yeah."

16   Q    "And do you remember a guy named Richard Colver?

17   A    "Yeah."

18   Q    "In addition to Colver and Hutchinson --"

19        MR. JOHNSON:  Excuse me.  Where are you?

20        (Discussion off the record.)

21        MR. JOHNSON:  Okay.  Thank you.

22   Q    (By counsel for USF&G)  "In addition to Colver and

23   Hutchinson -- let me take a step back.  Do you remember what

24   jobs those two individuals held?  What did Hutchinson do?

25   What was his job?

741

1    A    "They all done the same.  They unloaded cars, unloaded

2    trucks, cleaned the warehouse.  Just general work.

3    Q    "When you say, 'unloaded the cars and trucks,' you are

4    talking about unloading chemicals?

5    A    "Yeah."

6    Q    "Do you remember what time, when you left the company?

7    A    "It was about '78, somewhere in there."

8    Q    "And when you were the warehouse foreman, did you report

9    directly to Quentin?

10   A    "Yeah, most of the time.

11   Q    "Did you report to anybody else?

12   A    "Whaley.

13   Q    "And did you see Quentin pretty much every day?

14   A    "Pretty regular, yeah."

15   Q    "Let's talk a bit about the chemicals that were delivered

16   to the Dyce facility.  Do you recall whether or not a chemical

17   called perchloroethylene, sometimes called perc, was delivered

18   to the facility?

19   A    "Yes.

20   Q    "In the early 1970s, was that -- at the Lockwood

21   facility, was that a chemical that was delivered?

22   A    "Yeah.

23   Q    "And do you recall how frequently that chemical would be

24   delivered to the facility?  Would it come in every day?  Would

25   it come in once a week?  Would it come in once a month?

1    A       "Whenever they ordered it, I guess.

2    Q       "But in a given week, would you go an entire week, do you

3    recall, without having a delivery of perc?

4    A       "Sure.  Many times.

5    Q       "Would you go an entire month without having a delivery

6    of perc?

7    A       "We would get a truckload, and we would unload four

8    barrels to a pallet, stack it in the warehouse.

9    Q       "So perc was delivered by truck?

10   A       "Yes.

11   Q       "Was it delivered by rail?

12   A       "Not when I was there, it wasn't."

13   Q       "And when a truck came in with perc, do you recall how

14   big the tank was?  I mean, how much perc would be delivered?

15   A       "Drums.  50-gallon drums.

16   Q       "So they delivered drums?

17   A       "Yes.

18   Q       "And you said 50-gallon or 55-gallon?

19   A       "Fifty, 55.  I don't remember which.

20   Q       "Other than 55-gallon drums, was perc ever delivered in a

21   tanker, in a tank?

22   A       "Not that I remember."

23   Q       "What's the standard length of a semi?

24   A       "Back then, 40, 50 feet.  I don't know."

25          MR. BANKER:  I believe that's where the video

1    begins.

2          THE COURT:  You know, let's take a break.  I want

3    the jury to get into those fresh cookies that were taken in.

4    Let's take a quick break.

5          THE LAW CLERK:  All rise.

6    (Recess taken from 14:15:11 to 14:31:23.)

7    (Open court.)

8    (Jury present.)

9          THE COURT:  Please be seated.

10          Were they as good as they looked?

11    (Jurors nodded heads affirmatively.)

12          THE COURT:  All right.  Let's continue this

13    deposition testimony.

14    Q    (By counsel for USF&G)  "And you said that you unloaded

15    the pallets that had the 55-gallon drums of perc with the

16    forklift, and would you unload those with the forklift, and

17    where would you take them once you had it on the forklift?

18    A    "Into the warehouse, there.

19    Q    "Into the warehouse.  So the warehouse had some type of

20    opening that was big enough --

21    A    "Oh, yeah.

22    Q    "-- so that the forklift could drive right through it?

23    A    "Sure.  There was a big door there."

24    Q    "When the driver came with the pallets, did he have any

25    paperwork that he would give you, showing what he was

744

1    delivering?

2    A    "Yeah, I'm sure he did.

3    Q    "And would he give that paperwork to you?

4    A    "Yeah.

5    Q    "And what would you do with that paperwork?

6    A    "Turned it into the office.

7    Q    "Okay.  Did you ever have to check to see whether or not

8    the amount of drums, the number of drums or pallets that were

9    being delivered matched what was actually on the truck to make

10   sure you were getting what the company ordered?

11   A    "Sure.  You always checked that out.

12   Q    "So you did a count?

13   A    "Yeah."

14   Q    "And what would happen next with these drums, if, for

15   example -- let me ask you this.  Do you recall who Dyce sold

16   perc to when you worked there?

17   A    "No, not, not everybody, no.  Cleaners, a lot of the

18   cleaners.

19   Q    "Sold to drycleaners?

20   A    "Yeah.

21   Q    "And do you remember if they sold perc to refineries?

22   A    "They probably did.  I think so.  I don't recall all of

23   that.  Hell, that's been 30 years ago.

24   Q    "I understand.  I understand.  And when Dyce was going to

25   ship out perc in the warehouse, would they load it onto one of

                              745

1   their own trucks?  Was there a Dyce truck that was used to

2   make deliveries of perc?

3   A    "Sure."

4   Q    "And would there be any paperwork done at that time to

5   say, 'We took two pallets out of the warehouse.  We put it on

6   the Dyce truck'?

7   A    "There would be a work order where it was supposed to go,

8   and the driver took that with him and got it signed and

9   brought it back for the office.

10  Q    "Okay.  So there would be paperwork reflecting that, for

11  example --

12  A    "Four drums went out or two drums or whatever went out,

13  yeah."

14  Q    "All right.  And do you recall where that paperwork went

15  once it was completed?

16  A    "To the office.  Everything went to the office.

17  Q    "Okay.  Do you remember who specifically in the office

18  got that paperwork?

19  A    "No."

20  Q    "The office manager?

21  A    "Yeah."

22  Q    "Okay.  So when you were working there, I think you

23  indicated you started in the late '60s, and you left in

24  1978 --

25  A    "Yeah.

1   Q    "-- when you were working there, perc in 55-gallon drums

2   was never transferred out of those drums at any time?

3   A    "Not that I know of.  I don't remember it.

4   Q    "Okay.

5   A    "I mean, I don't remember all that.  Like I told you, it

6   was too many years ago.

7   Q    "I understand.  Did Dyce have any type of storage tank it

8   used to store perc other than in 55-gallon drums?

9   A    "Not when I was there, that I remember.

10  Q    "You don't recall there being a Dyce truck that had a

11  tank on the flatbed that was used to store perc and deliver it

12  to customers?

13  A    "Yeah, they did at one time.  It had a little tank on the

14  truck.  I don't remember.  I don't remember how they filled it

15  for sure anymore."

16  Q    "Do you recall, in the time you worked there -- again,

17  you said you started in the late '60s.  You left in 1978.  Do

18  you recall ever seeing any perc spill?

19  A    "No, I don't."

20  Q    "Do you recall Dyce ever using hoses to transfer perc

21  from when it was delivered?

22  A    "I don't recall.  I don't remember nothing.  You are

23  talking about 30 years ago, and I didn't give a damn about

24  what happened after I left that place or what happened

25  before."

747

1   Q    "Mr. Bender, looking back at this photograph I showed

2   you, the area where you marked and we've now labeled 1, which

3   is the loading dock, what you indicated is the loading dock to

4   the best of your recollection, do you recall whether that was

5   an asphalt or concrete surface there at the loading dock where

6   the trucks pulled up?

7   A    "The dock itself was concrete, and where the trucks

8   pulled up was asphalt.

9   Q    "Was asphalt.  Okay.

10  A    "Yeah.

11  Q    "Was it asphalt for the entire time you worked there?

12  A    "Yeah.

13  Q    "Okay.  Do you recall the condition of the asphalt?  It

14  was in pretty good shape?

15  A    "Um-hmm."

16  Q    "When you were unloading the chemicals through the

17  process you just described, was there anyone else in the area

18  when you would be doing that unloading?

19  A    "Oh, the truck driver.  Maybe one of the other men.

20  Q    "Now you had said before that when the truck driver would

21  deliver perc in barrels up to the warehouse, they would

22  typically go have a cup of coffee in the office.

23  A    "Yeah.

24  Q    "Was it different when a truck driver delivered a bulk

25  tank?

1   A    "Well, yeah.  He did most of the hooking of the joints.

2   It was his pump.

3   Q    "Okay.

4   A    "He would have to run his pump, his power takeoff and

5   pump it into our tank farm.

6   Q    "So the driver would participate in the process of

7   transferring the chemical?

8   A    "Yeah.

9   Q    "Did that mean the driver was around for the entire time

10  that the transfer was going on?

11  A    "Oh, yeah.

12  Q    "Okay.  He didn't leave to go into the office?

13  A    "No.

14  Q    "He was around because he was involved in the process?

15  A    "Yeah."

16  Q    "And you had described, when you talked about the

17  delivery of perc in 55-gallon drums, that there was paperwork

18  that the driver would have, and that when you operated the

19  forklift and took the pallets off the truck, part of your job

20  was to make sure that there were the right amount of pallets

21  on the truck and drums as what the driver had.

22  A    "Yeah.

23  Q    "When product was delivered in a bulk tank, was there

24  paperwork that the driver had?

25  A    "Oh, sure.

1   Q    "Okay.  Did that paperwork reflect how much the amount of

2   the chemical that the driver said he was delivering?

3   A    "Sure.  I think so.  Oh, yeah.

4   Q    "And was there any type of process or procedure that you

5   or someone else unloading the chemicals would take to confirm

6   that they had delivered what they said -- what it said on the

7   paperwork?

8   A    "Well, we had measurements on these tanks.  You could

9   tell how many gallons was going in.

10  Q    "Okay.

11  A    "So it would match what they delivered.

12  Q    "So part of the process was confirming that they had

13  delivered what they said they were supposed to?

14  A    "Yeah.

15  Q    "Okay.  And as with the process on the paperwork with the

16  perc, would that paperwork go into the office after that

17  process was done?

18  A    "Yeah.

19  Q    "Do you ever recall an instance in that process of

20  unloading chemicals from a bulk tank to one of these tanks in

21  Area 2 where there was any type of chemical that was spilled

22  or leaked or dripped, anything that didn't make its way from

23  the bulk tank into the tanks?

24  A    "Not that I remember."

25  Q    "Okay.  Do you recall up here on this corner of the

1   property here if there was a pond?

2   A    "I don't remember.

3   Q    "Okay.  And by 'a pond,' I don't necessarily -- I'm not

4   necessarily referring to a pond that you and I might think of

5   where, you know, you go fish, but, instead, more of -- simply

6   a depression in the land, a basin?

7   A    "Well, we had berms all the way around this whole thing

8   all for a little opening right in there.

9   Q    "Okay.  Could you tell me where those -- you said in this

10  area.  Do you recall more specifically where the berms ran?

11  A    "Around the tanks.

12  Q    "Okay.  So --

13  A    "They surrounded all these tanks.

14  Q    "They surrounded the tanks.  And do you recall why those

15  berms were in place?

16  A    "In case of spills or something.

17  Q    "Okay.  But you never recall a spill?

18  A    "No, I don't ever recall a spill.

19  Q    "Do you have a recollection as to which way the

20  groundwater ran, that the surface water run off here, so if it

21  rained, you know, which way the property was sloped?

22  A    "Well, mostly north, yeah.

23  Q    "North?

24  A    "(Nodded head affirmatively.)

25  Q    "Okay.  Do you recall there being any type of ditches or

```
 1   trenches on the sides of the property to run rainwater off?

 2   A    "No.  I don't remember.

 3   Q    "Okay.

 4   A    "There might have been.  I don't remember.

 5   Q    "Okay.  Do you recall -- well, let me -- let's go back to

 6   the perc deliveries from Dyce to its customers.  You indicated

 7   that perc, in 55-gallon drums, would be loaded onto a Dyce

 8   truck and would be delivered to businesses such as

 9   drycleaners, correct?

10   A    "(Nodded head affirmatively.)

11   Q    "What would those drycleaners do with the barrels of perc

12   once they had used them?  Would they send the barrels back to

13   Dyce?

14   A    "Send the barrels back, yes.

15   Q    "Okay.  And do you recall -- well, let me ask you this.

16   Did Dyce, did a Dyce truck go back to, for example, the

17   drycleaner and pick up empty barrels?

18   A    "They picked them up when he delivered another barrel.

19   Q    "Okay.  So when you delivered a new load, you'd pick

20   up --

21   A    "Pick up the empties.

22   Q    "Okay.  Were there ever instances in which barrels were

23   picked up that had some perc product still in them that wasn't

24   totally used?

25   A    "No.  That stuff was pretty expensive.  I think they used
```

1  it all, every bit of it."

2  Q    "Okay.  Do you ever recall anyone at the Dyce facility

3  taking the barrels and just dumping them out to make sure

4  there was nothing in them?

5  A    "No, I don't recall that.  I don't remember."

6  Q    "Do you recall having safety meetings while you were

7  working at the Dyce facility in Lockwood?

8  A    "Oh, once in a while, we would have safety meetings.

9  Q    "Those safety meetings, regular meetings, did they happen

10  once a week or once a month?

11  A    "Oh, maybe once a month or something like that.

12  Q    "Do you recall who attended those meetings?

13  A    "Oh, all the workers.

14  Q    "Including yourself?

15  A    "Oh, yeah."

16  Q    "Okay.  I understand.  I understand, sir, it was a long

17  time ago.

18       "Do you recall, at the time you worked at Dyce, if there

19  was a policy in place for taking inventory of chemicals?

20  A    "Yeah.

21  Q    "All right.  Can you tell me, to your recollection, what

22  the process was for inventorying chemicals?

23  A    "We sat around and counted everything in the warehouse."

24  Q    "Okay.  Do you recall ever doing inventory and finding a

25  discrepancy in how much you thought was supposed to be at the

1   facility and how much you actually found?

2   A    "No.  We was pretty careful about it.  If we would break

3   a bag, we took that in separately, taped them up, sold them at

4   a discount.

5   Q    "Okay.

6   A    "Everything come out pretty -- we didn't have losses and

7   stuff, if that's --

8   Q    "You can't recall any losses?

9   A    "No.

10  Q    "Okay.  And was one of your responsibilities as warehouse

11  manager, inventory, knowing how much product was in your

12  warehouse and in your tanks?

13  A    "The office done most of it.

14  Q    "The office was responsible more for the inventory?

15  A    "Yeah.  We would go out and inventory, but the office

16  knew if there was a shortage or if there wasn't, because they

17  was the ones that sold the stuff.

18  Q    "So the office would have the paperwork reflecting how

19  much the company purchased and how much it sold --

20  A    "Yeah.

21  Q    "-- and then they would compare that against what was out

22  in the facility --

23  A    "Yeah.

24  Q    "-- and check the records?

25  A    "Yeah.

1   Q    "And you don't recall an instance where that process was

2   undertaken and the office came back to you or someone else in

3   the warehouse, saying, 'We're supposed to have 15 barrels' --

4   A    "No.

5   Q    "-- 'of this chemical.  We only have ten'?

6   A    "No.

7   Q    "Never recall that?

8   A    "Never recall that.

9   Q    "Mr. Bender, I'd like you to tell the ladies and

10  gentlemen of the jury, do you recall, yourself, ever spilling

11  250 gallons of perc?

12  A    "No, sir.

13  Q    "Do you recall ever spilling 500 gallons of perc?

14  A    "I don't recall any.

15  Q    "Okay.  A thousand gallons of perc?

16  A    "No.

17  Q    "Yeah.  If you spilled that much perc, would you recall

18  it?

19  A    "Yes, I'm sure I would.

20  Q    "Because that's a lot of perc, correct?

21  A    "Yeah.

22  Q    "Okay.  And would that be the type of thing that would

23  have gotten everybody's attention in the office?

24  A    "If you what?

25  Q    "If you spilled 250 gallons of perc, would that have

1    gotten everybody's attention in the office?"

2    A    "I'm sure it would."

3    Q    "Do you ever recall any other Dyce employee spilling

4    250 gallons of perc?

5    A    "No.

6    Q    "Ever recall spilling 500 gallons of perc?

7    A    "No.

8    Q    "How about 1,000 gallons of perc?

9    A    "No."

10   Q    "Okay.  And I apologize if I've covered this ground

11   already, but do you recall there being policies in place for

12   how you were supposed to respond if there was a spill?

13   A    "Yeah.

14   Q    "Okay.  Do you recall what those policies were?

15   A    "Not anymore, I don't recall."

16   Q    "Okay.  Do you recall ever being contacted by a

17   representative of Dyce about a government investigation into

18   contamination?

19   A    "Not that I can recall.

20   Q    "Okay.  You don't recall being interviewed by anyone?

21   A    "Not that I remember of it."

22   Q    "Okay.  Mr. Bender, do you recall at the time you worked

23   at Dyce, at the Lockwood facility, if there was ever an issue

24   that you were aware of regarding theft of barrels of perc?

25   A    "No.

1    Q    "Do you ever recall, at the time that you worked at the

2    Lockwood facility, the Dyce facility in Lockwood, as to the

3    evaporation of perc being an issue, perc evaporating in tanks?

4    A    "Not that I can recall."

5    Q    (By counsel for Continental)  "So I guess from the

6    point -- I mean, was there ever a period of time before you

7    hurt your back in '78 from the time of the move from downtown

8    Billings to when you hurt your back in 1978 when you were out

9    at Lockwood that you weren't the guy in charge of the

10   warehouse?

11   A    "No.  I was in charge of the warehouse.

12   Q    "The whole time you were out at Lockwood --

13   A    "Yes.

14   Q    "-- until you quit?

15   A    "(Nodded head affirmatively.)

16   Q    "Is that right?

17   A    "Right.

18   Q    "All right.  Mr. Moskowitz asked you about if you knew

19   any, had any memory of any spills of perc out at Lockwood up

20   to the time that you quit, and your answer was what?

21   A    "I don't remember any."

22   Q    "Okay.  Was perc stored at the Dyce facility in Lockwood

23   up to the time you hurt your back in 1978?  Was it stored in

24   anything other than 55-gallon drums?

25   A    "Not that I remember."

1  Q    "Okay.  And do you ever recall any kind of spills of

2  those drums holding perc?

3  A    "No."

4  Q    "Were there ever any kind of spills or leaks out of,

5  leaks out of the tanks in the tank farm or spills of drums or

6  spills off of offloading out of railroad cars or off of semis

7  or tank trucks that came in there, of any kind of chemical,

8  Mr. Bender, where there was a spill and you were the only guy

9  out there, and you thought, 'Boy, if Whaley or Quentin find

10 out about this, I'll be in big trouble.  I'm just going to

11 wash it away and nobody will know'?

12 A    "No, by golly.

13 Q    "Are you sure?

14 A    "Yes."

15 Q    "Did you ever tell any of the people working for you out

16 at the warehouse from '72 to '78, 'Hey, somebody spilled

17 something.  Go wash it away before Whaley and Quentin hear

18 about this'?

19 A    "Not that I recall.  Not that I remember.

20 Q    "Do you know, do you remember a guy named Ron Hallsten?

21 A    "Who?

22 Q    "Hallsten?

23 A    "No, I don't.

24 Q    "All right.  Something else I just remembered.  Do you

25 remember, for a period of time, that you tried to steam-clean

1   these drums?

2   A    "Remember what?

3   Q    "Steaming out the barrels?

4   A    "I might remember a little of it.  We didn't do it very

5   long.

6   Q    "When you say 'very long,' how long?

7   A    "Oh, maybe a month or two.

8   Q    "Oh, okay.

9   A    "It didn't pay out for us.

10  Q    "All right.  So when the perc barrels, particularly,

11  these 55-gallon drums of perc came back from the cleaners, I

12  think you indicated they were empty?  You wouldn't take them

13  back with maybe a quarter full or --

14  A    "No.  It's pretty expensive stuff.  They made sure they

15  were drained pretty good.

16  Q    "Okay.

17  A    "And it evaporates pretty good, too.

18  Q    "Okay.  Well, that's the next question.  Were all the

19  55-gallon drums that the perc came in when you were there, a

20  standard drum with a bunghole with a tap on it?

21  A    "Yeah.

22  Q    "Or something so it would be air-tight?

23  A    "Sealed, yeah.

24  Q    "Okay.  And when they came back from the cleaners, did

25  they ever come back without the cap on the bunghole, the --

1  A    "Oh, some of them would lose them once in a while.

2  Q    "Okay.  And do you ever recall that there would be any

3  that spilled out when they came back?

4  A    "No.

5  Q    "If there was a little bit left, even a little tiny bit

6  left and it would spill out because there was no cap?

7  A    "No.  We didn't store them upside down.

8  Q    "Well, good point.  And I guess the other question, I

9  guess, when the perc was coming in in 55-gallon drums, would

10  you, before it got shipped out, it was still in inventory at

11  Dyce, would the 55-gallon drums be stored outside out by the

12  tank farm, or would they be stored inside the warehouse?

13  A    "Inside the warehouse."

14  Q    (By counsel for USF&G)  "Okay.  Mr. Bender, you said a

15  few times today, when you talked about drums being returned

16  from drycleaners with perc that they didn't get returned with

17  perc in them because it was expensive stuff.

18  A    "Yeah.

19  Q    "Because you understood perc was an expensive product.

20  A    "Yeah.

21  Q    "Okay.  And your responsibilities as the warehouse

22  manager, knowing this was an expensive product, did that

23  change the way or did that influence the way you handled the

24  perc on the site?  Were you extra careful about it, make sure

25  you had it all?

1    A     "Damn right you had to be careful.

2    Q     "And did you ever hear from Quentin, knowing that it was

3    expensive stuff, did Quentin ever say to you, you know, 'Look.

4    This is expensive stuff.  We've got to make sure we've got all

5    of the stuff we ordered in.  We're shipping it out.  We've got

6    it all'?  Do you ever remember Quentin saying anything about

7    that?

8    A     "No."

9    Q     (By counsel for Soco)  "And you don't remember whether

10   there was ever any spill of perc on the site during the time

11   you were there?

12   A     "I don't remember any."

13   Q     "Now let's go back to the bulk loading and unloading.  Do

14   you remember whether there were times that the truck driver

15   would go in and get coffee?

16   A     "Not while we was unloading.

17   Q     "Typically it was --

18   A     "He would have to stay with his truck, because his pump

19   was running, and so was our pumps.

20   Q     (By counsel for USF&G)  "Could I just ask one followup

21   question on that, Mr. Bender?  Mr. Mielenhausen asked you,

22   with respect to the times that you were not present during a

23   bulk delivery, whether you could say if the driver was present

24   at the time of delivery or not, and then you answered no

25   because you weren't there.

1        "My question is, Did Dyce, did the Dyce company have a

2    policy whereby it told drivers that were coming in, 'Hey, when

3    you deliver bulk chemicals, we want you to be by the truck and

4    assist with the delivery and work out that way'?

5    A    "Yeah, I think so.

6    Q    "That was the policy of the company?

7    A    "Probably a policy, yeah.

8    Q    "So given the policy of the company, you have no reason

9    to expect that the driver wouldn't be there?

10   A    "I would expect him to be there.

11   Q    "Thank you."

12   Q    (By counsel for Continental)  "I was just going to say,

13   Mr. Bender, isn't it a fact that when you offload from a

14   bulk -- from a truck, doesn't the truck driver have to run the

15   power takeoff for his own pump?

16   A    "Yeah, I think so.

17   Q    "And basically in your experience, when a truck driver

18   has got anything running on their truck, do they stay pretty

19   close to it?

20   A    "Yeah, they have to.

21   Q    "Isn't that what was going on?

22   A    "Yeah.

23   Q    "They're not going to let you run their truck for them,

24   are they?

25   A    "No.  I could have.

1  Q    "You could have, but they weren't going to let you?

2  A    "No.  That's right."

3            THE COURT:  Call your next witness.

4            MR. BANKER:  Your Honor, Soco would ask to next play

5  the deposition video of Desmond Slater.

6            WHEREUPON,

7                      MR. DESMOND SLATER,

8  called for examination through deposition by counsel for

9  defendant, after having been previously sworn to testify the

10 truth, the whole truth, and nothing but the truth, testified

11 as follows:

12                      EXAMINATION

13 Q    (By counsel for USF&G)  "Good morning, Mr. Slater.

14 A    "Good morning.

15 Q    "We were previously introduced, and I will reintroduce

16 myself on the record.  My name is Marshal Mickelson, and I

17 represent the plaintiff, USF&G Insurance Company, in a lawsuit

18 involving the companies that, I understand, were a former

19 employer of yours, and so we are going to talk a little bit

20 about your employment and what you know about your employment

21 with -- did you work for Dyce Chemical Company?

22 A    "Yes, I did."

23 Q    "Tell me, tell me a little bit about yourself.  Do you

24 live here in Billings?

25 A    "I don't.

763

1   Q    "Okay.  Where do you live?

2   A    "I reside in Sherman Oaks, California.

3   Q    "Okay.  And how long have you been in Sherman Oaks?

4   A    "About three months.  Actually about two months.

5   Q    "Okay.  Where did you live before that?

6   A    "Billings, Montana.

7   Q    "Okay.  So you recently moved away from Billings?

8   A    "Yes."

9   Q    "Did you, before the -- in preparation for this

10  deposition, have a chance to review any documents,

11  photographs, papers of any type?

12  A    "Yes.

13  Q    "Tell me about what documents you reviewed.

14  A    "Photographs of the facility at Dyce Chemical where I was

15  employed at one time.

16  Q    "Okay.  Anything else?

17  A    "No.

18  Q    "Okay.  And you've had an opportunity to meet with

19  Mr. Mielenhausen?

20  A    "Yes, I have.

21  Q    "Okay.  And how many times have you met with

22  Mr. Mielenhausen?

23  A    "Three times, including this morning.

24  Q    "Okay.  And can you recall the first time you met with

25  Mr. Mielenhausen?

```
 1   A      "Yes."

 2          "Perhaps in May of this year.

 3   Q      "Where did that meeting take place?

 4   A      "We met in downtown Billings.

 5   Q      "And when was your next meeting, do you recall?

 6   A      "Well, we had it scheduled for yesterday, and -- in the

 7   morning.  It did take place in the afternoon yesterday.

 8   Q      "Okay.  And then your third time was this morning?

 9   A      "Yes, sir."

10   Q      "Okay.  Tell me about where did you grow up?

11   A      "Billings, Montana.

12   Q      "Okay.  Where did you graduate from high school?

13   A      "Billings West High."

14   Q      "Okay.  So after graduation, which, you would have

15   graduated about '72?

16   A      "High school?

17   Q      "Yes.

18   A      "I graduated in '75."

19   Q      "Okay.  Okay.  So what were the dates of your employment

20   with Dyce?

21   A      "It was the summer of '76.  I was thinking June, perhaps,

22   of '76 through the fall of '76.  A brief period of time I

23   worked with them."

24   Q      "Okay.  You worked, you worked for Dyce for that summer?

25   A      "Yes, sir."
```

1  Q    "So you were hired in approximately 19, summer of 1976 at

2  the Dyce facility in Lockwood?

3  A    "Yes, sir.

4  Q    "Okay.  And who hired you?

5  A    "I don't recall the gentleman's name.

6  Q    "Who was your supervisor?

7  A    "Dick Bender.

8  Q    "Okay.  And does the name Quentin Dyce mean anything to

9  you?

10 A    "I'm aware that he was the owner, I believe, of the

11 company.

12 Q    "Okay.  Did you talk to, or do you recall talking to

13 Mr. Dyce before you were hired?

14 A    "I do recall speaking with someone who I believe was

15 Mr. Dyce."

16 Q    "Okay.  Tell me about who at Dyce you can remember names

17 of that you worked with or around other than Dick Bender.

18 A    "There was a Michael Armstrong, and I also worked with

19 Mr. Dyce's boy, the crippled youngster.  His name fails me

20 now.  Those are the only two that I have a specific

21 recollection of.

22 Q    "Okay.  And what did Mike Armstrong do?

23 A    "He assisted me -- or actually I should say I assisted

24 him in the steam cleaning of barrels that came into that

25 facility.  He also had duties in the warehouse with a forklift

1    that I did not have.

2    Q    "Okay.  What was your title that you were hired at?

3    A    "I would call it laborer.

4    Q    "Okay.  And what were your hours, do you recall?  Were

5    they the standard --

6    A    "It was a standard day shift.  I believe we started at

7    7 a.m., and we were finished by 3:30 p.m."

8    Q    "Who -- tell me about, when you got hired, how you were

9    instructed on what your job was or what you were to do.  Who

10   did that, and how did they go about it?

11   A    "Dick Bender described the general duties and basically

12   put me under the wing of Mike Armstrong, who had been there

13   for a longer period than I, and I learned from Mike Armstrong

14   the duties to be performed.

15   Q    "Okay.  And let's run through now kind of the duties that

16   you performed.  Tell me about, in as general and as specific

17   terms as you can, what duties you had at Dyce in that summer

18   of 1976.

19   A    "Steam-cleaning barrels.

20   Q    "That was your primary duty?

21   A    "Yes.

22   Q    "For the entire time you worked for Dyce?

23   A    "Yes.

24   Q    "Okay.  So let's talk about that.  Tell me, in a typical

25   day, what you did.

1   A    "Well, we would start the steam-cleaning machine, if you

2   will.  It was a small boiler and not in very good condition.

3   And then prepare to steam-clean barrels.  There would be a

4   group of barrels that needed to be cleaned, and we pulled the

5   bungs off the tops of the barrels, give it a cursory

6   inspection inside, and then place the barrel on a

7   steam-cleaning rack.  And the steam-cleaning apparatus was a

8   wand, actually a steam lance, if you will, that would be

9   placed inside the barrel, and the barrel would be rotated as

10  you steamed the residual from that barrel.  Then before you

11  removed the barrel from the rack, another look inside to be

12  sure that you had properly cleaned it, and that barrel was

13  then removed from the rack and placed in the clean barrel

14  area, if you will.

15  Q    "Okay.  Where did this work occur?

16  A    "It occurred on the south side toward Brickyard Road."

17  Q    "Dyce facility in November, I believe, of 1975.  Does

18  that look similar to the photograph that you looked at before?

19  A    "Yes.

20  Q    "Could you identify for me the area -- well, before we

21  get there, let's kind of just -- if you would set that down so

22  we can kind of both look at it, let's orientate ourselves a

23  little bit to the map or to the photograph.  On that

24  photograph is a building labeled 'Warehouse.'  Do you see

25  that?

768

1   A     "Yes, sir.

2   Q     "And do you recognize that?

3   A     "Yes, I do.

4   Q     "And the -- describe for me the warehouse facility at the

5   time that you were there in the summer of 1976.

6   A     "Describe the warehouse itself?

7   Q     "Yeah.  What was the warehouse like?  Kind of bring me --

8   tell us about that area of the property.

9   A     "Okay.  The barrels that needed to be cleaned that I'm

10  referring to were generally stacked in this area here.  That

11  steam rack that I referred to was placed right here.  There

12  was a door on this south side -- I call this the south portion

13  of the warehouse -- a door here where we went up this ramp and

14  had access to the main warehouse building where various things

15  were stacked and kept on shelves and racks within this

16  warehouse.

17  Q     "So on the south side of the warehouse is the area where

18  you worked cleaning the barrels?

19  A     "That's correct.  Right on this, in this area here.

20  Q     "Okay.  And on this particular Deposition Exhibit 371,

21  there is a -- some numbers in that area, and that may be a way

22  to identify that area, but it looks like there's a No. 12?

23  A     "Yes, sir.

24  Q     "Okay.  And that No. 12 is on the south side of the

25  warehouse, and that's the approximate area where the steam

769

1  cleaning of the barrels took place?

2  A    "It was.

3  Q    "Okay.  Describe for me, were you inside the warehouse?

4  Were you outside the warehouse?  Where were you?

5  A    "Outside."

6  Q    "And the steam-cleaning machine and rack, was it down on

7  the gravel?

8  A    "No.  The steam-cleaning -- the small boiler was located

9  in this small room adjacent to this main door, rear door of

10 the warehouse.

11 Q    "At the top of the ramp?

12 A    "Yes.

13 Q    "Okay.  And then did you have hoses that ran from the

14 boiler to your area?

15 A    "We did.

16 Q    "Okay.  And where was the steam-cleaning rack located?

17 A    "Area 12.

18 Q    "Okay.  On the gravel, though?

19 A    "Yes."

20 Q    "Okay.  Where did you store -- where were the barrels

21 that needed cleaning stored?

22 A    "They were placed approximately in Area No. 8.

23 Q    "Okay.  And how were they placed there?

24 A    "They were set on the ground.

25 Q    "Okay.  Were they stacked just one high?

1    A    "Yes.

2    Q    "All right.  And these barrels would be delivered there

3    from who?

4    A    "I'm not aware of who that -- where they came from.

5    Q    "Okay.

6    A    "I don't remember.

7    Q    "Did you ever observe the unloading of the used barrels

8    into this area?

9    A    "No.

10   Q    "Okay.  They just seemed to show up there?

11   A    "They just seemed to show up there.

12   Q    "Did -- where were the cleaned barrels stored?

13   A    "We would position them beside the dirty barrels, if you

14   will, as I recall, more in this area, more, it would have

15   been, in a --

16   Q    "To the west.

17   A    "-- westerly direction."

18   Q    "Were you ever involved in the moving of any of the

19   barrels?

20   A    "Yes, I was.

21   Q    "What was your involvement in the movement of the

22   barrels?

23   A    "There were barrels that, for whatever reason, were taken

24   to the Billings public landfill.  I was involved in the moving

25   of those barrels.

1  Q      "Okay.  And how did you move those barrels?

2  A      "With a truck.

3  Q      "Okay.  And how often would you do that?

4  A      "As I recall, approximately once a week.

5  Q      "Okay.  And do you know why those barrels were disposed

6  of at the landfill?

7  A      "I do not know.

8  Q      "Were those barrels full or empty?

9  A      "Neither.

10  Q      "Sometimes empty?  Sometimes had a little bit of stuff in

11  them?

12  A      "Yes.

13  Q      "Do you know what was in those barrels?

14  A      "I didn't at the time.  However, I suspect at least some

15  of them contained sulfuric acid."

16  Q      "Okay.  And that was about once a week?

17  A      "As I recall.

18  Q      "How many barrels would you take out there?

19  A      "On any given trip, approximately ten."

20  Q      "And was there any effort on your part to determine

21  whether the barrels had any contents in them and what should

22  be done with any contents that were in them?

23  A      "No, sir."

24  Q      "Okay.  Did you, did you then make the assumption that

25  the barrels you were taking out to the landfill were also

1   sulfuric acid?

2   A    "Some were.  In addition, I witnessed an incident at the

3   landfill that also reaffirmed my belief that we were taking

4   sulfuric out there.

5   Q    "What was that incident?

6   A    "The gentleman that drove the piece of equipment that

7   would mash those down, shortly after we had dropped a group of

8   barrels and before we had left the landfill, he walked over

9   those barrels with that machine and had to jump out of the cab

10  of it because of the odor that emanated from those crushed

11  barrels.

12  Q    "How did you hear about that?

13  A    "I saw it.

14  Q    "Oh, okay.  So you were still out there when he started

15  going over there with that big garbage masher?

16  A    "Yes.

17  Q    "And then he jumped out.  Did he come over to you and

18  say, 'What the heck was in those barrels?'

19  A    "No.  We were hightailing it away."

20  Q    "Okay.  Do you recall what color the perc barrels were?

21  A    "Yes, I do.

22  Q    "What color were they?

23  A    "Blue."

24  Q    "Okay.  Now what types of drums did you clean in this

25  cleaning area?

1   A     "All the types that came into that facility.

2   Q     "So in addition to whatever color drums the sulfuric acid

3   was, you also were cleaning the blue drums that you identified

4   as perc drums?

5   A     "Yes, sir.

6   Q     "Okay.  The area where you were cleaning the drums was a

7   gravel area, correct?

8   A     "As I recall.

9   Q     "Okay.  Did it have –– all right.  Do you have any idea

10  whether there was any type of lining underneath the gravel, or

11  do you have any knowledge of what was underneath the gravel?

12  A     "I don't.

13  Q     "Okay.  Was there any sort of drain system set up in that

14  area?

15  A     "Not that I recall.

16  Q     "Okay.  Explain for me the cleaning rack, as best you

17  can.  Was it –– look like a commercial-purchased rack or

18  something that was built there?

19  A     "It was, as I recall, it was a handmade, a handmade rack.

20  Q     "Okay.  Was it welded out of pieces of iron?

21  A     "Yes.

22  Q     "Okay.

23  A     "Welded or bolted together.

24  Q     "Okay.  Was it kind of a framework-appearing structure?

25  A     "Yes.  Yes, sir.

1   Q    "And it had a place where you could set a barrel so it

2   wouldn't move?

3   A    "Yes.

4   Q    "Okay.  And did you say you could rotate the barrel?

5   A    "You could.

6   Q    "Was it on bearings or rollers or just --

7   A    "No.  The dimensions were such that the barrel would lay

8   in it at an angle so that as the steaming took place, it could

9   drain.  But there was enough, there was enough of a difference

10  so that you could spin the barrel on that rack without moving

11  it off of the rack.

12  Q    "Okay.  So -- and you described the barrel.  You talked

13  about the head.  And the head, as I understand it, is the top

14  of the barrel?

15  A    "Yeah.

16  Q    "What we would refer to as the top of the barrel?

17  A    "Okay.

18  Q    "And in that head, there are two holes?

19  A    "Yes.

20  Q    "Okay.  And those are threaded holes?

21  A    "Yes.

22  Q    "And then you have a metal plug or bung, as it's called,

23  that screws into the top of that hole?

24  A    "Yes.

25  Q    "Okay.  And the way that you would set up the barrel is

1   that the head would be lower than the bottom of the barrel,

2   correct?

3   A    "Yes.

4   Q    "And you would open up both bungs?

5   A    "Yes.

6   Q    "And in one bung, you would stick the steam wand?

7   A    "Yes.

8   Q    "You would steam the inside of the barrel, and then the

9   barrel would drain out of the other bung?

10  A    "Yes.

11  Q    "Okay.  Where would that drain water run?

12  A    "My recollection is that there was a grating, a metal

13  grating right at the base of that rack that the drum would be

14  placed on to drain any excess water that might have remained

15  in the drum.

16  Q    "Okay.  I'm not quite following that.  After you cleaned

17  it, you would put it somewhere?

18  A    "Well, it would come right off the rack, and the residual

19  water and whatnot that was left into it would be drained right

20  there at the rack.

21  Q    "Okay.

22  A    "As I recall, there was a metal grating there at the base

23  of that steam rack.

24  Q    "Okay.  So directly underneath the barrel as you're

25  cleaning it and the water is draining out, was that draining

1   into that grated area?

2   A    "It would have.  However, I don't recall there being a

3   catch basin.  It was as if it was just placed on the ground so

4   that we didn't put the barrel back into the gravel or the

5   dirt.

6   Q    "Oh, okay.

7   A    "It was to help keep it up off the ground.

8   Q    "So there was a grating that didn't run anywhere.  Like

9   it didn't have a drain underneath it?  It was just something

10  to keep the barrel from hitting the dirt and the gravel?

11  A    "That's my belief.

12  Q    "Okay.  And if there was any mud or anything, it kind of

13  kept you up above that?

14  A    "Yes.

15  Q    "Okay.  Was there a lot of water and waste generated as a

16  result of the operation?

17  A    "I wouldn't say a lot.

18  Q    "Okay.  Did it seem to just soak right into the ground,

19  or was there enough that you would get puddles, or would it

20  run, or --

21  A    "All of the above.  I mean, it would get muddy, of

22  course.  And some would go into the ground, but the gravel

23  that was there assisted in, you know, dispersing runoff.

24  Q    "Okay.  Okay.  Could you tell the direction that the

25  surface water ran, or was it -- there was no direction?

777

1    A    "No.  I couldn't tell.

2    Q    "Okay.  There was no real drainage set up in this area to

3    drain it in any particular area?

4    A    "Not that I remember.

5    Q    "Okay.  As these drums were set there for cleaning, did

6    they have the bungs in them?

7    A    "They came in with the bungs in them; loosened, but in

8    them.

9    Q    "Okay.  And then would you -- you and Mr. Armstrong would

10   just take a drum, unscrew the bungs, set it in the rack?

11   A    "Yes.

12   Q    "And then you would utilize the steam cleaner.  How long

13   would it take, generally, to steam-clean the drum?

14   A    "Obviously it would depend on what the drum had contained

15   and how thoroughly it had been drained.

16   Q    "Okay.  So a lot of these drums, when they came in -- and

17   don't let me put words in your mouth about 'a lot,' but -- and

18   you can tell me about that, but did some of the drums, as they

19   came in, still have some type of chemical in them?

20   A    "Yes.

21   Q    "Okay.  Would the majority of the drums still have some

22   type of chemical in them?

23   A    "Yes.

24   Q    "And --"

25   A    "Not much.  I would estimate rarely more than half a

1    quart, if that.  Most generally --"

2    Q    "When you would do the cleaning of the barrel with it

3    tipped, would you get all of your residual water and chemical

4    out of the barrel, or would there still remain some in there?

5    A    "I would say pretty close to all of it out.

6    Q    "Let's talk a little bit about -- before we go there,

7    were you provided -- what were you provided as far as

8    clothing, goggles, respirators, gloves?  What were you

9    provided?

10   A    "We were provided a hard hat, safety glasses, a polyvinyl

11   protective glove, as I recall, and rain gear should we choose

12   to wear it.  Steel toes were provided and recommended;

13   however, they were not mandatory, is my recollection.

14   Q    "Okay.  So while you were in the area, were you required

15   to wear a hard hat?

16   A    "Yes.

17   Q    "Okay.

18   A    "I believe that was a requirement.  I did whether or not

19   they insisted on it.  I believe it was a requirement.

20   Q    "Okay.  How about safety glasses?  Were you required to

21   wear the safety glasses?

22   A    "I believe that was a requirement.

23   Q    "Okay.  And were you are required to wear the gloves?

24   A    "We were required, I believe, to wear a glove.  Whether

25   or not it was that particular glove, I don't know.

1   Q    "Okay.  And were these the types of gloves, these kind of

2   rubberized, that had the long, about-up-to-your-elbow long

3   sleeve?

4   A    "Yes.  Gauntlets.

5   Q    "Okay.  And did you wear those types of gloves when you

6   were doing your job?

7   A    "Yes, I did."

8   Q    "Okay.  The cleaning operation with respect to perc, was

9   perc, which you said were the blue barrels, handled any

10  differently than any other of the barrels that you cleaned?

11  A    "No.

12  Q    "Okay.  Were you given, when you started your employment,

13  any training with respect to the proper handling or safety

14  procedures to be utilized around certain chemicals?

15  A    "I don't recall what they were.  It's my belief that I

16  was introduced to MSDS.

17  Q    "Okay.  Someone went through an MSDS with you concerning

18  some of the chemicals you were working around?

19  A    "It's my belief that there was a safety orientation."

20  Q    "Do you recall, do you recall any specific instructions

21  with respect to safety around perc?

22  A    "No.

23  Q    "At the time you were working there, did you know what

24  perc was?

25  A    "No.

1  Q    "Do you know what perc is now?

2  A    "Not specifically.

3  Q    "Okay.  Do you have any knowledge now as to the hazards

4  associated with perc?

5  A    "No.

6  Q    "Okay.  Did you have any knowledge then about the hazards

7  associated with perc?

8  A    "I don't recall.  If it had been addressed in the safety

9  orientation, I then would have had that knowledge, but I don't

10 remember."

11 Q    "All right.  Could you at all estimate the amount of perc

12 barrels or blue barrels that you cleaned as a percentage of

13 the whole?

14 A    "Perhaps one-third or one-fourth."

15 Q    "Did you, Mr. Slater, ever work inside the warehouse?

16 A    "Very briefly.

17 Q    "What did you do?

18 A    "I would assist Mike Armstrong in warehouse, various

19 general warehouse duties; cleanup, or, you know, stocking.

20 Q    "Okay.  When you say 'cleanup,' cleanup with respect to

21 sweeping?

22 A    "Sweeping.

23 Q    "Okay.  Did -- how many barrels a day would you do out

24 there, if you could estimate that?

25 A    "I can recall steaming 27 in one day that they were

1    pleased about.  Again, it would depend on the effort needed

2    per barrel."

3    Q     "Okay.  Would you say that probably 20-barrels a day

4    would be fairly typical?

5    A     "(Nodded head affirmatively.)

6    Q     "Did you have -- you worked just a little bit in the

7    warehouse.  Did you work anywhere else around the Dyce

8    facility?

9    A     "No.

10   Q     "Okay.  Were you ever in the area of what they call the

11   tank farm where they had bulk storage of chemicals?

12   A     "I toured it.  Just a walk-through with Mike Armstrong.

13   Did I work down there?  No.

14   Q     "Okay.  Were you ever involved in or around the unloading

15   of chemicals from semitruck tankers?

16   A     "No.

17   Q     "Okay.  Were you ever involved in any of the, what they

18   called, drumming or filling drums with chemicals?

19   A     "No, not that I recall."

20   Q     "Okay.  Why did you leave Dyce?

21   A     "Other employment.

22   Q     "Okay.  And that was when you went to Exxon?

23   A     "That was when I went to Sound World.

24   Q     "Oh, to Sound World.  Okay.  Was that better pay?  Was

25   it --

1   A    "Better pay and better conditions.

2   Q    "Okay.  It wasn't the most pleasant job at Dyce?

3   A    "No, it wasn't.

4   Q    "Pretty hot work?

5   A    "Hot, and it could be very dirty."

6   Q    "Was there ever any discussion with you, or was there any

7   knowledge about any losses of chemical at the site?

8   A    "Was there ever any discussion directed to me about that?

9   Q    "Yes.

10  A    "No.

11  Q    "Did you ever hear any information, rumors, gossip, those

12  sorts of things, about losses of chemical at the site?

13  A    "Could you define 'loss,' please?

14  Q    "Well, how would you define 'loss'?  Obviously you've

15  heard something.

16  A    "Yes.

17  Q    "Why don't you tell me about that, and then we can

18  explore that.

19  A    "Okay.  Well, I did witness what I believe to have been a

20  chemical spill.

21  Q    "Okay.  And why don't you tell me about that.

22  A    "It was right at our lunch hour, and I was -- I had taken

23  my protective equipment off and had left the steaming rack

24  area on my way to the lunchroom.  And in so doing, you walk

25  through the main warehouse.  Those doors on the east side were

1   open.  It was a hot summer day, and those doors were open.

2   And as I proceeded to the warehouse, I was able to look out

3   the main warehouse doors, and I recall seeing a fairly large

4   quantity of liquid on the pad, and it was being rinsed down

5   with water hoses.  A fairly significant quantity."

6   Q    "Did you ever observe trucks backed up to that loading

7   dock?  Is that how it was utilized?

8   A    "I don't remember.

9   Q    "Okay.  Were there any trucks, do you remember whether

10  there were any trucks in that area at the time that we are

11  discussing here?

12  A    "There were not that day.

13  Q    "Okay.  So you step out onto the loading dock, and you

14  look to your left.  Tell me what you see.

15  A    "It's my recollection that I observed Dick Bender with a

16  water hose, approximately a 1-inch water hose, and there was a

17  spill of liquid on the blacktop that he was rinsing, that he

18  was rinsing in this direction.

19  Q    "Towards the west?

20  A    "Towards the west, yes.

21  Q    "How, how did you know that there was something on the

22  blacktop?

23  A    "I could see it.

24  Q    "Okay.  Was it colored?

25  A    "It appears, it appears to me that it was a clear liquid,

784

1   a somewhat light, clear liquid.

2   Q    "How could you differentiate between the clear liquid and

3   the water?

4   A    "I could see where the liquid was standing at.  And I

5   could see -- the liquid and the water would be the same color,

6   but I could see where the liquid was standing on the blacktop,

7   and he was utilizing the hose to chase it away.

8   Q    "Okay.  As I look at where you've indicated you saw --

9   you said Dick Bender?

10  A    "I believe it was Mr. Bender, yes.

11  Q    "Okay.  Your, I guess would I be correct in saying your

12  field of vision to the west was fairly limited?

13  A    "Yes.

14  Q    "Okay.  Because you have the corner of the warehouse

15  right there, correct?

16  A    "Yes.

17  Q    "Okay.  And he was pushing this towards the west?

18  A    "Yes."

19  Q    "Okay.  Were there anyone else -- was there anyone else

20  other than Dick Bender?

21  A    "It's my recollection that there was a second person

22  there also with a water hose.

23  Q    "Two water hoses being utilized?

24  A    "I believe so."

25  Q    "Okay.  Can you give us some idea of the size of what you

785

1    observed to be the standing liquid?

2    A    "The approximate spill that I saw, 10 to 12 feet in

3    diameter or possibly 12 feet in width and a bit longer than

4    that in length.

5    Q    "Okay.  Do you have any idea how deep the clear liquid

6    was?

7    A    "I don't.  It wouldn't have been that deep.

8    Q    "Okay.  It's not like there was an inch of liquid in

9    there?  It would have been spread out?

10   A    "Yes.

11   Q    "Fairly thin as it spread out?

12   A    "Yes.

13   Q    "Okay.  Do you have any idea where it was being washed

14   to?

15   A    "No.

16   Q    "Do you have any idea what the liquid was?

17   A    "No.

18   Q    "Did you ask anyone about that after you observed it?

19   A    "No, I did not.

20   Q    "Did you hear anything in the lunchroom about that?

21   A    "Yes, I believe I did.

22   Q    "What did you hear?  What do you remember hearing?

23   A    "During that lunch -- it was toward the end of that lunch

24   period.  Mr. Bender came into the lunchroom late, which was

25   quite unusual because the crew normally lunched together at

1   the same time, and I recall that he came in the lunchroom

2   door, sat back against the wall in a chair.  And he was quite

3   flustered and quite agitated, and perspiring heavily -- as

4   were we all.  It was a very hot summer day -- and I recall him

5   saying, 'Well, I probably just lost my job.'

6   Q    "Okay.

7   A    "It was my impression that his remark related to that

8   spill.

9   Q    "Okay.  And you referred to this as a spill.  Do you know

10  what spilled from something?

11  A    "I don't.

12  Q    "Okay.  You don't know the source of that liquid?

13  A    "I don't recall.

14  Q    "Okay.  Did you ask Mr. Bender anything like, 'What do

15  you mean?' or --

16  A    "No, I did not.

17  Q    "Okay.  Do you recollect that Mr. Bender lost his job?

18  A    "In fact, I, I'm quite certain he didn't lose his job

19  over that incident because he continued working."

20  Q    "Did you ever hear any rumors, gossip, whatever, of what

21  that chemical or liquid was?

22  A    "No.

23  Q    "Did you ever hear, through gossip, rumor, or otherwise,

24  how it got to be on the asphalt on that day?

25  A    "I have a vague recollection of it, the source of the

787

1    spill being from a truck that was unloading a load.

2    Q    "Okay.  And do you recall where you get --

3    A    "I don't.  It's been a long time ago.

4    Q    "Sure.  So you don't remember whether" --

5         "Was there, do you recall whether there were any safety

6    meetings or monthly, weekly, daily?

7    A    "I don't recall.

8    Q    "And likewise, then, you don't recall whether this

9    situation was ever discussed at any sort of employee meeting?

10   A    "I do know that it wasn't."

11   Q    "Do you recall approximately when, during your

12   employment, this incident occurred?

13   A    "When during my employment?

14   Q    "Yeah.  You worked there --

15   A    "Yeah.

16   Q    "-- around June to the fall.

17   A    "Time of day?

18   Q    "Well, let's just start generally.

19   A    "Yeah.

20   Q    "Was it -- do you know the month?

21   A    "Well --

22   Q    "Towards the end?  The beginning?  The middle?

23   A    "Well, I believe it would have been in -- my best guess

24   is that it would have been July or August of '76.  I'm not

25   certain.  I'm basing that on the short time that I did work

1    there and what I recall the weather conditions being at the

2    time.

3    Q    "Okay.  And obviously it happened, at least your

4    observation, was around noon?

5    A    "Yes.

6    Q    "Okay.  Were there a lot of people around at the time you

7    observed this?

8    A    "No.

9    Q    "Was that unusual that there weren't or just because --

10   A    "No.

11   Q    "How many people generally were working at the Dyce

12   facility while you were working there?

13   A    "It was a very small crew.  Possibly six."

14   Q    "And you, as we sit here today, throughout your

15   employment there and any subsequent events, don't have any

16   knowledge as to the amount of substance that was spilled?

17   A    "No.

18   Q    "And you wouldn't even be able to hazard a guess as to

19   how much was spilled?

20   A    "No.

21   Q    "Other than this situation that we've just discussed, are

22   you aware of any other spills or releases of any chemicals at

23   the plant?

24   A    "I am not.

25   Q    "Other than, of course, the amount that was dumped

1    through."

2         "Did -- no one at Dyce came up to you at any time and

3    asked you about the incident?

4    A    "No.

5    Q    "Has anyone after your employment ended asked you about

6    the incident?

7    A    "(Shook head negatively.)"

8    Q    "Did the Environmental Protection Agency ever talk to

9    you?

10   A    "No.

11   Q    "I mean, other than when Mr. Mielenhausen got a hold of

12   you and met in May, have you told anyone else about this

13   incident that we've just been referred to?

14   A    "(Shook head negatively.)"

15   Q    "Did you see any barrels around the area that you've

16   labeled C, if you recall?

17   A    "Not that I recall.

18   Q    "And just from our discussion, if it was a blue barrel,

19   such as perc, if there was a blue barrel around, would that be

20   easily --"

21        "How would you describe the -- if you had to describe the

22   Dyce operation while you worked there?

23   A    "I thought it was a fairly well-run operation.  That

24   warehouse was clean, orderly, and kept that way.  You know, an

25   ongoing, daily process.  The dock areas, also, it's my

1  recollection that they were orderly and tidy.  And, to the

2  landfill, which, I was not in the loop as far as why that was

3  taking place.  It didn't -- it raised a few questions for me

4  as to why that was going on, but other than that, I would call

5  them a, call them a very professional-run facility.

6  Q    "Were you uncomfortable in taking the barrels out to the

7  landfill?

8  A    "I wasn't until that incident occurred, and then I

9  realized that we were probably doing something that needed to

10 be done another way.

11 Q    "And the incident you're talking about is when the

12 landfill worker went over the barrels and had to leave his

13 cab?

14 A    "Yes.

15 Q    "And that's the reason you hightailed it out of there, is

16 you felt uncomfortable that maybe somebody might get in

17 trouble for that?

18 A    "Sad, but true.

19 Q    "Okay.  Was Mike Armstrong with you?

20 A    "Yes.

21 Q    "Okay.  And did you continue to take barrels out to the

22 landfill?"

23 Q    (By counsel for Continental)  "Do you remember ever

24 sensing that there were any fumes coming out of any of the

25 barrels?

1   A      "Very much so.  On numerous occasions.

2   Q      "And what kind of physical reaction did that cause?

3   A      "Well, as I described earlier, extreme irritation to my

4   mucous membranes, heavy, heavy watering, reddening of the

5   eyes, shortness of breath.  You know, immediate.  And those

6   symptoms would dissipate rapidly."

7   Q      "I want to talk a little bit about the incident you

8   mentioned of liquid in -- just outside of the warehouse area;

9   is that correct?

10  A      "Yes.

11  Q      "Do you know for a fact that it was not water that was

12  being rinsed down?

13  A      "Yes.

14  Q      "How do you know that?

15  A      "It was standing on the asphalt pad.  And even though

16  it's my recollection that it was the same color of water, they

17  would not have been using water hoses to wash water away with

18  water.

19  Q      "Do you recall what the area looked like the next day?

20  A      "I don't recall."

21  Q      "You testified earlier that you briefly toured the tank

22  farm area; is that correct?

23  A      "Yes.

24  Q      "Do you recall whether or not there was a bulk tank for

25  perc on site?

1   A      "I don't.  I don't know.

2   Q      "Do you recall anything about the condition of the tanks?

3   A      "Well, again, it was my impression that the facility was

4   pretty well kept.  Maintenance was up to par.  Housekeeping

5   was, you know, adequate, and it was a pretty well-run

6   facility."

7   Q      "I just have a couple more questions for you, and then

8   I'll turn it over to your counsel.  You said that you

9   considered Dick Bender a nice man?

10  A      "I think he was a decent man, yes.

11  Q      "Do you consider him an honest man?

12  A      "Yeah, I would consider him an honest man."

13  Q      "Did you get a sense that management, that management --

14  you could not tell management about accidents, that there

15  would be repercussions?

16  A      "No.

17  Q      "You weren't encouraged --

18  A      "No.

19  Q      "-- to let them know about things that happened?

20  A      "Yes.

21  Q      "Yes, you were encouraged, or you weren't?

22  A      "Yeah, we would have been encouraged.  Had there been an

23  accident, yes, we would have been encouraged to bring it to,

24  yeah, the attention of management, yes."

25  Q      "Do you -- from your impression of when you worked at the

793

1    Dyce facility, would it have been possible for there to have

2    been a large release of perc without management knowing about

3    it?

4    A    "Yes.

5    Q    "And why is that?

6    A    "It's my belief that the layout of the facility and the

7    time frames involved and the delivery times, that something

8    like that could have taken place and that management didn't

9    necessarily find out about.  I'm referring specifically to the

10   spill that I believe I witnessed occurring during a lunch hour

11   when management personnel had left the site for their own

12   lunches, and it was disposed of without their knowledge."

13   Q    "How often did you see anyone from the office out in the

14   warehouse area?

15   A    "Very infrequently, is my recollection.

16   Q    "Okay."

17   Q    (By counsel for USF&G)  "You never observed or were aware

18   of any disposal of any chemicals in the catch pond or in the

19   pasture to the north of the catch pond or anywhere else on the

20   facility?

21   A    "Not that I can recall."

22   Q    (By counsel for Soco)  "When you -- did you have an

23   opportunity to observe Mr. Bender's demeanor when he was

24   taking the actions that he was?

25   A    "Very briefly, I observed him with the water hose.

1   Q    "Okay.  And did you have an opportunity to observe his

2   demeanor or his state -- in other words, you mentioned he was

3   flushed when he came into the lunchroom.  What didn't you

4   observe in terms of his physical appearance and his actions

5   when he was out hosing down the liquid?

6   A    "I don't remember anything specific.

7   Q    "Did you observe him as being in a calm state or in a --

8   in the same kind of state when you saw him in the lunchroom?

9   A    "I don't remember.

10  Q    "Okay.  But now later when you saw him in the lunchroom,

11  I think you mentioned he was flushed and --

12  A    "Yeah.  He seemed to be agitated --

13  Q    "Okay.

14  A    "-- flushed and perspiring heavily.  However, I think, as

15  I mentioned, it was a hot summer day, and he was not the only

16  one perspiring heavily.

17  Q    "But you did observe him, that he was in an agitated

18  state?

19  A    "Yes.

20  Q    "Okay.  When you came upon Mr. Bender hosing down this

21  liquid, had he just started doing that, or was he in the

22  process of doing that, or was --

23  A    "It was my impression that it had been ongoing.  I don't

24  know how long it had been taking place, if he had just

25  initiated the action, but it was my impression that it had

1    been going on for at least a short period of time prior to my

2    observation."

3    Q    (By counsel for USF&G)   "You mentioned, Mr. Slater, that

4    you believe that Mr. Bender had been washing this area for

5    some time before you got there.   Did I understand that

6    testimony correctly?

7    A    "Yeah.   He was in the process of doing so.

8    Q    "Okay.   I'm just trying to understand what you observed

9    that led you to the conclusion that he had been doing this for

10   some time versus --

11   A    "Well, he had the water hose strung out, and he had full

12   flow to it and was in the process of that wash-down, so he was

13   not just initiating the action.

14   Q    "Okay.   So not -- in other words, you didn't -- when you

15   turned and looked, it wasn't like he was just getting the hose

16   out?

17   A    "Correct.

18   Q    "He was already hosing?

19   A    "Correct.

20   Q    "And he could have been hosing for 30 seconds, or he

21   could have been hosing for two days?   You don't know?

22   A    "I don't know.

23   Q    "Okay.   That's what I was trying to understand from that.

24   A    "(Nodded head affirmatively.)

25   Q    "And I take it from what you have just testified to that

1  your observation of Mr. Bender here was relatively brief?

2  A    "Yes.

3  Q    "You stepped outside, you looked around, saw Mr. Bender

4  hosing down some liquid on the asphalt to the northwest side

5  of the -- or northeast side of the warehouse, and then you

6  walked back in the lunchroom.

7  A    "Yes.

8  Q    "That whole process was less than 30 seconds?

9  A    "Yes.

10 Q    "Okay.  And you said that from that observation to the

11 time Mr. Bender came in was about 20 minutes, approximately?

12 A    "I believe so.

13 Q    "Okay.  And when you left the lunchroom that day, did you

14 go over to the area and inspect it at all?

15 A    "No.

16 Q    "So in that 20-minute interval between the time you saw

17 Mr. Bender and when he came into the lunchroom, you are

18 unaware of what he may have done in addition to hosing down

19 that area in that 20 minutes?

20 A    "That's correct.

21 Q    "You don't know whether he proceeded directly to the

22 lunchroom from that area that he was hosing down?

23 A    "I do not.

24 Q    "Okay.  And you have no knowledge of or have heard no

25 rumors or gossips about how this liquid that you saw there got

1  there?

2  A    "I'm sorry; could you repeat that?

3  Q    "You have no knowledge -- and let me break the question

4  down.  You have no knowledge about how the liquid that you

5  observed there for that period of time that you saw Mr. Bender

6  washing it down, how it got there?

7  A    "I have no specific knowledge of that.

8  Q    "Okay.  And you didn't hear any rumors or gossip or talk

9  about how it got there?

10  A    "Not that I recall.

11  Q    "Okay.  So you don't know whether it came from a truck,

12  came from a barrel, came from a tank, or how it was even put

13  there or placed there?

14  A    "I don't have any specific knowledge of that, no.  My

15  impression was that it didn't come from a barrel because there

16  was considerably more there than would have come from a

17  barrel.  I don't remember if there had been a truck sitting

18  there, if it was a skid truck, if they were loading or

19  unloading.  I just don't recall.

20  Q    "And when you say there was more there than what would

21  have come from a barrel, how do you know that?  What's that

22  based on?

23  A    "It's just based on the amount that I saw down on the

24  deck.  It appeared to me that it would have been more than

25  what was contained in a 55-gallon drum.

1   Q    "So it's your observation that -- well, let me ask you

2   this.  Have you ever seen 55 gallons of liquid on asphalt?

3   A    "Yes, I have.

4   Q    "And where have you seen that?

5   A    "Exxon Oil Refinery."

6   Q    "Okay.  Would that be a real accurate -- are you saying

7   to any degree of accuracy that what you saw there exceeded

8   55 gallons?

9   A    "I can't say with much degree of accuracy --

10  Q    "No.

11  A    "-- no.

12  Q    "There's a real big range there of how much could have

13  been on the ground, based upon what you saw about 30 years

14  ago?

15  A    "Yes, indeed.

16  Q    "Okay."

17           THE COURT:  Is that it?

18           MR. BANKER:  Yes, Your Honor.

19           THE COURT:  Let's take another cookie break.

20           THE LAW CLERK:  All rise.

21      (Recess taken from 15:51:01 to 16:06:16.)

22      (Open court.)

23      (Jury not present.)

24           THE COURT:  All right.  What are we going to do now?

25           MR. BANKER:  We were planning to read the deposition

1  of Larry Nelson.  We are waiting for a ruling on the Doug

2  Johnston issue.

3          MR. DAVIS:  I couldn't hear counsel.  Say that

4  again?

5          MR. BANKER:  I said we are planning to read the

6  deposition of Larry Nelson right now, which I think will

7  probably take us through most of the rest of today, although

8  we are waiting on a ruling on Doug Johnston, who would be our

9  next witness after Larry Nelson.

10          THE COURT:  You plan to put on Johnston before

11  Marvin?

12          MR. BANKER:  Well, we didn't call Marvin today

13  because of the time and his health conditions.

14          THE COURT:  It doesn't sound like Marvin is doing

15  very well.

16          MR. BANKER:  Pardon me?

17          THE COURT:  It does not seem like Marvin Johnson is

18  doing very well.  At least that's the report I got from, I

19  think, JoAnn.

20          MR. COZZENS:  Yeah, you know, he's not doing very

21  well.  I've visited with him several times.  He's okay for

22  short periods of time.  He just can't spend a long time

23  talking because then he has to irrigate his throat.

24          THE COURT:  Well, how long could he -- during that

25  last deposition -- I just went through the transcript to see

1  how long his deposition went during the last trial, and it was

2  like 80 pages, approximately.

3         MR. COZZENS:  Your Honor, I intend to ask him 15, no

4  more than 20 minutes worth of questions.

5         MR. JOHNSON:  Yeah, Your Honor.  We'll try to cross

6  him as quickly as we can, but you're right.  I mean, he is in

7  very sad shape, and I would assume that his cross-examination

8  would last no more than an hour, but I can't -- I don't know

9  until he answers questions or doesn't answer questions,

10 depending on what I ask him.

11        MR. BANKER:  Ideally what we'd like to do is we'd

12 like to call Marvin Johnson first thing tomorrow morning,

13 followed by Doug Johnston, and we could use the time today to

14 put in the deposition testimony of Larry Nelson.

15        THE COURT:  All right.  Too bad you don't play his

16 deposition and just put him on for anything new and let a

17 cross happen and get him off.

18        MR. JOHNSON:  That would be fine with us, Your

19 Honor.

20        THE COURT:  That's a suggestion.

21        MR. COZZENS:  You do recall that we asked the Court

22 to take his deposition prior to trial and they objected?

23        THE COURT:  Oh, yeah, I recall.

24        MR. COZZENS:  Okay.

25        THE COURT:  All I'm saying is I'm throwing out a

1    suggestion.

2            Let's go ahead and get the jury in.

3            And if we don't make it until 5, that's okay.  I'm

4    getting tired of sitting here.

5        (Jury present.)

6            THE COURT:  Please be seated.

7            All right.  Call your next witness, please.

8            MR. BANKER:  Soco would like to read the deposition

9    of Larry Nelson.

10           WHEREUPON,

11                       MR. LARRY NELSON,

12   called for examination through deposition by counsel for

13   defendant, after having been previously sworn to testify the

14   truth, the whole truth, and nothing but the truth, testified

15   as follows:

16                       EXAMINATION

17   Q    (By counsel for Soco)  "Mr. Nelson, we haven't met before

18   today, have we?

19   A    "That is correct.  We have not.

20   Q    "I'm going to be asking you a number of questions in a

21   lawsuit involving USF&G Insurance Company and my client, Dyce

22   Chemical, which has now been purchased by Soco West, Inc.

23   Okay?

24   A    "All right.

25   Q    "Was there any general training with respect to

1    environmental issues or chemicals?

2    A    "The only training for chemicals was recognition of the

3    type and hazard it presented, how it should be stored and

4    used."

5    Q    "So you began working at USF&G in approximately 1980?

6    A    "That's correct.  December 15, 1980."

7    Q    "All right.  What were you provided with?

8    A    "We had access to procedural manuals and numerous code

9    manuals for codes that pertained to our business, such as

10   National Fire Protection Association manuals, Best's

11   engineering manuals, Paas manuals, P-a-a-s, they were audit

12   manuals, and OSHA regulation manuals, all types of industry

13   manuals pertaining to insurance, loss control.

14   Q    "And I'm going to go through those in a little more

15   detail, but with respect to the procedural manuals and

16   guidelines, what did they contain?  And I'm asking you about

17   the USF&G ones as opposed to these other industrial manuals.

18   A    "I understand.  Many of the sections were on company

19   procedures from human resources, how to ask for vacation to

20   how you got paid, how you were to conduct yourself in the

21   business community.  Other sections were on procedures if you

22   were asked to -- again, it was divided by type of coverage.

23   If you were asked to do a property inspection, you were

24   expected to identify hazardous situations, conditions under

25   which you were to make a diagram, things of that nature.

1    Guidance, guidance issues.  What to do with the report once

2    you completed your report."

3    Q    "Did the manuals change over the time that you were at

4    USF&G, that you recall?

5    A    "There were always updates, especially to company

6    policies."

7    Q    "Did you ever have any loss control surveys or

8    inspections of any chemical distributors?

9    A    "Chemical in the sense that we would inspect like a

10   warehouse or something, where someone was dealing with drum or

11   chemical materials, carbon-based, you know, oils, lubricants."

12   Q    "You said that the guidelines would give you basic

13   guidance on identifying the different types of materials and

14   commodities that were there and how they were stored and so

15   forth.  Did you also discuss potential exposures that might be

16   related to those different commodities that were stored?

17   A    "If they were related to coverage we were providing, yes.

18   Q    "Okay.  So, for example, if you were looking at a

19   coverage for general liability, for example, and you were

20   looking at a chemical distributor, what were the types of

21   things that you would look at as far as potential exposures

22   when you were doing a loss control survey or loss control

23   report?

24   A    "Me personally?

25   Q    "Yes, as an employee, as an employee of USF&G.

                              804

1   A    "The primary issue with general liability coverage was

2   the exposure of the public to injury by coming on the

3   premises.  If you're talking just general liability, then it's

4   on-premises situation, so that we would look for how, how was

5   the warehouse configured so that the general public hopefully

6   does not come into contact with the warehouse contents.  And

7   if there was a reason for them to be there, how they were

8   protected.

9   Q    "Let me expand.  Instead of just general liability,

10  you're using it more generally than I am.  I mean, by general

11  liability, including both bodily -- including bodily injury,

12  products liability, anything associated with any of the

13  products or commodities that were being handled either on site

14  or off site by the policyholder.  So with that more broadened

15  description of general liability, what were the types of

16  exposures you were looking for in doing a loss control survey

17  or report?

18  A    "I personally had no experience doing a loss control

19  survey for any chemical exposure that -- where there was

20  product coverage provided.

21  Q    "None?

22  A    "I don't recall any.

23  Q    "Do you know if the loss control manuals or guidelines

24  provided any discussion of that scenario?

25  A    "They would discuss -- if we were asked to do a products

805

1    liability survey, it would identify things that we should look

2    for, yes."

3    Q    "Anything further than that, when you're dealing with,

4    for example, a chemical distributor?  Would there be any

5    requirement in the guidelines to discuss potential exposure of

6    nearby, even beyond 50 feet, nearby businesses or homes?

7    A    "I don't recall specific instructions of that nature.

8    Q    "What about --

9    A    "But I can't say that they weren't there, either.

10   Q    "What about generally?  In your experience as a loss

11   control person at USF&G, would that be the type of thing you

12   would expect that you would include in an inspection report?

13   A    "We would comment on things we observed, physical things

14   that were observed, so if I saw a puddle of substance draining

15   off the property, I would probably comment on that, but if I

16   didn't see something, we usually didn't speculate on what

17   might happen."

18   Q    "What about was there anything in the guidelines that

19   would require you or suggest that you would discuss management

20   and their management procedures and safety regulations,

21   whether they kept a clean operation, those types of things?

22   A    "Those were generally included in the report.  The

23   manuals would indicate that you should mention --

24   Q    "What about recommendations for improvements or safety

25   improvements, things like that?  Were those things that were

1  generally required to be in reports as well?

2  A    "Yes.  If we observed something that was not properly

3  controlled in accordance with whatever reference we were

4  referred to, then we would make good recommendation those

5  controls be instituted.

6  Q    "What specific documents, when you were at USF&G -- and

7  let me put a tail end on this.  I think you said you started

8  with USF&G in Spokane in 1980?

9  A    "That is correct.

10 Q    "How long were you with USF&G?

11 A    "I was terminated in July of 1992.

12 Q    "And at some point, did you leave the Spokane office?

13 A    "Yes.

14 Q    "And when was that?

15 A    "1984.

16 Q    "And where did you go from Spokane?

17 A    "Helena, Montana."

18 Q    "And at the time that you were in Helena, Montana -- in

19 the Helena, Montana office, or Spokane, have you ever had

20 contact, any contact with Dyce, Dyce Chemical, Dyce Sales and

21 Engineering, anything along those lines?

22 A    "None whatsoever.

23 Q    "Does that name ring any bells for you?

24 A    "Don't know it existed.

25 Q    "And do you have anybody that may have provided any

1    services on behalf of USF&G for that entity?

2    A     "I did not."

3    Q     "And what do you mean, for certain coverages?

4    A     "For example, there would be a form for garage liability,

5    and that would identify yes or no questions for issues

6    strictly pertaining to that.  There was a supplement for

7    swimming pools, for example.  More or less specialty things

8    within liability issues that were of particular concern.

9    Q     "What about chemical distributors?  Would there be any --

10   A     "Not aware of any form.

11   Q     "And not even a general-type property form or a

12   general-type CGL form that you're aware of?

13   A     "No.

14   Q     "Going back under property-type coverages, was there any

15   other section that you're aware of?  You said there was this

16   physical description.

17   A     "Nothing other than the physical."

18   Q     "And again, you're talking about sort of motorized

19   vehicles.  What about in the context of chemical

20   manufacturing, or chemical distributing, rather?  Was there

21   anything you were told to keep your eyes on in that context?

22   A     "Not aware that we ever did anything, any products

23   regarding any chemical substances.

24   Q     "Was that something USF&G just didn't write coverage for

25   while you were there?

1   A    "I can't answer that question.  I was not in a department

2   to determine what could be written and what could not be

3   written.

4   Q    "But in your experience, that's just something you didn't

5   see?

6   A    "I personally didn't see it.

7   Q    "What about as a supervisor?  Did you have loss control

8   people under you who were writing those types of coverages?

9   A    "Not that I'm aware of."

10  Q    "Have you ever heard of an organization called American

11  Insurance Association, AIA?

12  A    "Oh, yes.

13  Q    "Do you know if USF&G is or was a member of the AIA when

14  you were involved?

15  A    "I believe they were, because I took a lot of training

16  courses through them.

17  Q    "And are you familiar with the publication called the

18  Chemical Hazards Bulletin?

19  A    "Yes.

20  Q    "Was the Chemical Hazards Bulletin one of the documents

21  you had as a loss control person in the library or had access

22  to?

23  A    "Yes."

24  Q    "And did you find those bulletins to be generally correct

25  and authoritative?

1    A     "Well, we had no reason to believe that they weren't

2    correct.

3    Q     "And that's my next question.  Did you ever come across

4    anything in them that you felt was incorrect or misleading?

5    A     "Not to my knowledge."

6    Q     "And my questions assume that it does relate to the

7    coverage that you're providing.

8    A     "But as I stated earlier, we didn't normally provide

9    those coverages, so that's not something we looked at."

10   Q     "In your experience with chemical distributors or in your

11   experience with, at all, with any knowledge about chemical

12   distributors, do you know if they were normally inspected more

13   than just once during the course of coverage for them?

14   A     "There was -- I'm not aware of any requirement to go back

15   and look at them other than the issues I mentioned of

16   significance change.

17   Q     "Other than any requirement, in your experience, do you

18   recall them being reviewed?

19   A     "I know of instances where we did go back because of the

20   customer asking for help with an issue, or they perhaps added

21   a new type of operation that wasn't taking place at the time

22   we looked at it originally.

23   Q     "If other USF&G loss control people or underwriters who

24   were involved in Montana in the 1970s indicated that generally

25   for chemical distributors that there were loss control reports

1   or inspections done about every two or three years, would you

2   have any reason to dispute that?

3   A    "They could request them anytime they wanted.  Like I

4   say, I never did any, so I couldn't tell you what the

5   frequency was."

6   Q    "When you arrived in 1984, was the Billings suboffice

7   already in place?

8   A    "It was.

9   Q    "Had it already been in place for some time?

10  A    "It had, yes.

11  Q    "Do you know approximately how long?

12  A    "I do not.

13  Q    "Was it a decade or a month?

14  A    "I have no idea."

15  Q    "And do you have any idea, sitting here today, who you

16  would expect to have done the loss control survey for Dyce in

17  the late '60s, '70s?

18  A    "I wouldn't have a clue."

19  Q    "Now we've touched on this briefly, but when you were

20  doing a loss control survey and report for a chemical

21  distributor generally, and I'm not saying specifically, but

22  generally, in your experience what types of environmental

23  matters are reviewed?  Again, I know it's going to depend on

24  the type of insurance that's being provided, but assuming it's

25  broad-form insurance, CGL, property, products-type coverage,

1  what are the types of environmental matters that are reviewed?

2  A    "If, in fact, all those coverages were provided, our

3  procedure would be to identify specific chemicals, the source

4  of the chemicals, what they did with the chemicals.  I mean,

5  how they stored them, how they used them.  If there was a

6  waste product, how it was disposed of.  I guess that's pretty

7  much it.

8  Q    "What about cleanup or spills-type issues?

9  A    "Well, that would be -- fall in the waste category, I

10  guess, the waste or spillage or --

11  Q    "And even predating your work at USF&G, going back to

12  your early work with Aetna and other loss control entities,

13  was that true during that entire time frame that you were

14  working in loss control?

15  A    "That was a pretty general expectation of a survey on

16  that type of business, yes, regardless of the insurer."

17  Q    "Other than what you've already testified to, can you

18  provide me with any other names of individuals in loss control

19  or underwriting who may have had contact with Dyce from the

20  1968, '69 time frame to the 1982 time frame?  If you had to

21  guess, is there anybody other than --

22  A    "From those two departments, no, I don't know anybody

23  that was there that long."

24  Q    "Can you tell me generally what the role, in the grand

25  scheme of things, what role generally is loss control or the

1    IE&A department is?  What's your role?  What purpose are you

2    serving?

3    A     "In a nutshell, we're the eyes and ears of the

4    underwriting department.  Our specific role was at the

5    direction of an underwriter to go to a business and tell the

6    underwriter what was there, what the hazards for loss in

7    regard to the insurance coverages were, what controls were in

8    place to minimize or perhaps eliminate those exposures, and to

9    make recommendations for uncontrolled hazards."

10   Q     "And who would decide whether a facility would require a

11   loss control investigation at all?

12   A     "Those were underwriting parameters that I'm not aware

13   of.  I mean, I'm aware that they had parameters.  I'm not

14   aware of what they were.

15   Q     "In the situation where you have a policyholder,

16   potential policyholder who is a chemical -- in chemical sales

17   or distribution, would that be the type of risk, again,

18   assuming there is a broad form of coverage, that would require

19   a loss control survey, in your experience?

20   A     "Most circumstances that would trigger a need for a

21   survey."

22   Q     "And you had given me a general overview of the role of

23   loss control.  Obviously what you said is to identify possible

24   exposure for both, I suppose, the policyholder and the

25   insurance company, correct?

1   A      "Yes.  We were to protect our interests and then also to

2   provide a service to the business owner of something he may

3   not be aware of that could be better controlled."

4   Q      "Were -- was there training on environmental risks?

5   A      "I don't remember doing that because we didn't do those

6   kinds of surveys as a rule.  I don't recall, during my time, I

7   don't recall ever doing that."

8   Q      "Generally, though, if USF&G was providing broad coverage

9   to a chemical sales or chemical distribution company, would an

10  environmental-type survey be the type of thing that loss

11  control would do?

12  A      "You're saying in general, but you're talking about

13  specifics, so the only thing I can say is whoever was

14  providing the coverage may ask for a survey.  I personally was

15  not asked on behalf of USF&G to do any type of survey.  I am

16  not aware of anybody in the company that was.

17  Q      "But as a manager of a branch office at USF&G, if you

18  were asked to do a loss control survey for a company that did

19  chemical sales or chemical distribution, as part of your loss

20  control survey, would you do some sort of environmental

21  assessment?

22  A      "Not necessarily.

23  Q      "And the answer is, 'Not necessarily.'  Why not?

24  A      "It would depend on the coverages we were providing.  It

25  would depend on what underwriting asked me to do."

814

1    Q    "If you were asked to do an environmental assessment --

2    A    "If I were asked to.

3    Q    "-- then what would be included in an environmental

4    assessment in that scenario?

5    A    "Within the realm of our department, we would be asked,

6    number one, what are the substances in question, what harm

7    could potentially happen if they were to leave the premises,

8    and what water resources are nearby, lakes, ponds, rivers,

9    irrigation canals, and identify those things.  Assess maximum

10   exposures, what's the biggest tank, and, if it ruptured, you

11   know, Is it normally kept full?  Is it normally kept half

12   full?  That physical information.  If asked, those would be --

13   Q    "What else would be included in your environmental

14   assessment?

15   A    "I'd have to be there to --

16   Q    "Would you look at safety measures that are in place?

17   A    "Oh, yeah.  I mean, identify what could possibly happen.

18   What are the precautions to cause it not to happen or to

19   contain it should it happen?  Are the tanks in diked areas or

20   not?  What kind of response training do the employees have?

21   What type of equipment do they have available to confine a

22   spill?"

23   Q    "Do you look for whether the company has documented any

24   sorts of spills or handling issues?

25   A    "I would.  If doing a survey for those types of things,

1    we would be looking for some sort of log of, you know, Do you

2    or are you capable?  Have you had past spills or are you

3    capable of recording what happens should you have a spill?  Do

4    you have a procedure in place?  We would look at that.

5    Q    "Do you look at prior claims under either same company or

6    other company policies?

7    A    "Preparation for going out to do the survey may involve

8    inquiring about any past claims."

9    Q    "All right.  And again, what I'm trying to find out is,

10   other than this questionnaire that you've already mentioned,

11   did USF&G have any sort of form that had this type of

12   information that's on the top of 506 that would automatically

13   list the insured, address, location, and agency, stuff you'd

14   fill out here before doing the narrative?

15   A    "I'm actually not aware of the form at the time you're

16   talking about.

17   Q    "I'm talking about when you were there.

18   A    "Which was subsequent to this, was -- that information

19   was there.  This is more representative than the Continental

20   form of what our product might have looked like.

21   Q    "But did you have at least some form that had a top

22   section that you'd fill in the blanks on name and so forth,

23   and then it would be more of the written narrative report that

24   you discussed?

25   A    "Not necessarily.  This information was, I mean, just

816

1  dictated, typed rather than in a block format.

2  Q    "So USF&G didn't have any standard form like this that it

3  would use on every report?

4  A    "Not for use on every report.  They had some forms in

5  this format for certain circumstances, but not for every

6  circumstance.

7  Q    "And being specific with respect to chemical sales and

8  distribution, would there have been any sort of form that

9  would have been used like this that you're aware of?

10  A    "Not that I'm aware of."

11  Q    "And the next section, 2.4.13, it discusses opinions of

12  risk, and the next page talks about recommendations.  Again,

13  do you recall similar provisions being included in the USF&G

14  guide?

15  A    "No.

16  Q    "All right.  What was different about the USF&G guide?

17  A    "We just stated facts.  We didn't give an opinion of the

18  risk.

19  Q    "Recommendations that you provided, though?

20  A    "We would provide recommendations, but they stood on

21  their own.

22  Q    "So when, under the section of opinion of risk, where it

23  says impression of the risk should be indicated separately for

24  each line of coverage with your justification for this grade,

25  you didn't do any grading of risk in your loss control

1    reports?

2    A    "USF&G loss control reps did not.  At the time I was

3    there, did not."

4    Q    "Would you say it's fair to say, in your experience, not

5    only at USF&G and at Aetna, and any other places you were

6    providing loss control surveys, that chemical distributors,

7    whether they be wholesale or retail, and chemical sales

8    companies were looked at more closely than other general

9    businesses for purposes of loss control?

10   A    "No, I would not say that.

11   Q    "And why is that?

12   A    "We would give equal attention to the hazards present for

13   the coverage provided, irregardless.  I mean --

14   Q    "That's fair.  That's a fair response.  Would you be

15   willing to say that chemical companies, however, were looked

16   at very closely for purposes of evaluating risk?

17   A    "Well, yes.  They were looked at closely.

18   Q    "And was that true even in the 1970s?

19   A    "Wasn't there.  Don't know.

20   Q    "I'm not talking about USF&G, but you were working at

21   Aetna as a loss control person in the 1970s, weren't you?

22   A    "Yes.

23   Q    "And in your experience at Aetna, whether actually doing

24   loss control surveys for chemical companies or being trained,

25   is it your understanding that even in the 1970s, that chemical

818

1  sales businesses and chemical wholesalers were looked at

2  closely for purposes of loss control?

3  A      "As was any business.

4  Q      "And in the 1970s, you were aware of the risks associated

5  with chemicals, whether it be environmental risks or other

6  types of risks associated with chemicals and chemical sales

7  and chemical handling; is that fair?

8  A      "Yes.

9  Q      "And whether it be in 1970s or '80s, if you became aware

10 of a chemical sales facility that was a polluter, that you

11 clearly found evidence that there was a pollution issue, and

12 the type of insurance that you were doing your loss control

13 survey may cover pollution, that's the type of risk that would

14 not be covered.  Is that a fair statement?  Or the loss

15 control survey would point that out and cause an underwriter

16 not to provide coverage?"

17 A      I wouldn't say that's not a fair statement.

18 Q      Why not?

19 A      "I would say that's not a fair statement.

20 Q      "Why not?

21 A      "The loss control report identified, would identify

22 physical conditions.  What anyone else would do with that

23 report, I have no knowledge of.

24 Q      "In your experience, if, in looking at these, did you

25 ever come across situations where underwriters didn't provide

1   coverage for certain reasons?

2   A    "Yes.

3   Q    "And in the situation of a chemical distributor, did you

4   ever come across situations where an underwriter didn't

5   provide coverage because the loss control survey discovered

6   potential pollutions?

7   A    "I am not aware of any such circumstance."

8             MR. BANKER:  Thank you.

9             THE COURT:  Thank you.

10            Now do you have -- I need to resolve, ladies and

11  gentlemen of the jury, I need to resolve a legal issue.

12            Counsel, Mr. Banker, do you have a witness that you

13  want to get on and off now, or can we do it now, resolve the

14  issue that I need to resolve?

15            MR. BANKER:  Let's resolve the issue.

16            THE COURT:  All right.

17            Ladies and gentlemen, I am going to -- you're going

18  to have an early recess.  I give you the usual admonition.

19  Don't talk amongst yourselves.  Don't talk to anybody about

20  the case.  Keep an open mind until you get it in the jury room

21  for decision.

22            We will be in recess until 8:30 in the morning.

23  Thank you.

24        (Jury not present.)

25            THE COURT:  Be seated.

820

1          All right.  The testimony of Doug Johnston, I am

2     going to deny the insurers' objection for the reasons stated

3     in Soco's response to the insurers' objection to witness Doug

4     Johnston; for the reason stated therein, the inadvertent

5     omission of a Rule 26(a)(1)(A) disclosure of the name of a

6     potential witness known to all parties.  He was listed.  I

7     would adopt the brief in total if I were going to sit here and

8     read an opinion into the record.  So I do that.  So that is

9     overruled.  Denied.

10          Now, of course, I don't know what kind of condition

11    Marv Johnson is in.  If, Mr. Cozzens, you're going to take 20

12    minutes on a direct exam, it could be that a cross-exam would

13    exceed the scope of direct.  The insurers are going to have

14    the option -- and, you know, I will be able to observe

15    Mr. Johnson and see how he's doing.  You'll have the option to

16    simply cross-examine that portion of the testimony that he

17    gives in 20 minutes, and then -- you've listed him as a

18    will-call in your own case -- run his deposition in your own

19    case.

20          MR. JOHNSON:  That would be fine with us, Your

21    Honor.  I would request, however, an understanding of what

22    they're going to ask him.  If the short testimony that he's

23    going to give is going to be limited to the position of the

24    pipe in the berm, which I presume is what you want to elicit,

25    and not try to elicit from him how much he spilled or how much

1    he didn't spill, if they wanted to talk to him about spills

2    and how much he spilled or didn't spill, then I would like to

3    cross-examine him live, because otherwise the jury will be

4    left with perhaps the wrong impression.

5           But with regard to the placement of the pipe, we

6    have no --

7           THE COURT:  Well, you're going to be able to

8    cross-examine him on any subject -- or on the subject of his

9    direct examination.  It will be a question of how -- what kind

10   of condition he's in as to whether there's leeway given in

11   that scope or not.  I may be strict in what the scope of the

12   direct was and what the following scope of cross will be.

13          MR. DAVIS:  Well, as I understand you, and I think

14   we'll be able to make that assessment when he shows up

15   tomorrow --

16          THE COURT:  And under the rules, you can use that

17   deposition for any purpose, but you'd have to put it on --

18          MR. DAVIS:  In our case.

19          THE COURT:  -- in your case.

20          MR. DAVIS:  That's fine.

21          MR. JOHNSON:  We're happy to do that.

22          THE COURT:  You can do that.

23          MR. JOHNSON:  We are happy to do that.

24          MR. COZZENS:  I have one issue about that.  We

25   talked about this at the pretrial early Monday morning.  Both

                                822

1    sides subpoenaed him.  He called me and said, "Well, I've got

2    one for the 9th.  I've got one for the 15th."

3            And I said, "Look.  You can go ahead and get a

4    doctor's appointment scheduled for the 15th because the judge

5    has already said" -- at some point you did say we'll have him

6    do it all at once.

7            If they're going to call him back, they'll need to

8    do something other, because I think he does have a doctor's

9    appointment now scheduled for the 15th.

10           MR. JOHNSON:  We're talking about putting on his

11   deposition.

12           THE COURT:  Yeah, they're not going to call him

13   back.

14           MR. JOHNSON:  We're talking about putting on his

15   deposition only.

16           MR. COZZENS:  Then I don't have an issue.

17           THE COURT:  I would presume, and it's decisions that

18   you all make, I would presume if he's physically fit,

19   sufficiently, to testify if we take breaks every 20 minutes,

20   we're going to be able to judge that, and let's see how things

21   go.  I just have this feeling, in thinking about that he has

22   throat cancer -- and I guess I never tumbled to it before.  It

23   does not sound very good.

24           MR. JOHNSON:  He is in bad shape, and, frankly, it

25   would be an imposition to have him testify for the length of

823

1      time that we probably would need him.

2                  MR. DAVIS:  Judge?

3                  MR. JOHNSON:  Playing the deposition would be --

4                  THE COURT:  But under the rules, you have the right

5      to do that.

6                  MR. DAVIS:  I think we're in the same position

7      mentally, Judge.  I mean, I don't know.  You have his

8      transcript.  If you look at the video of his deposition from

9      eight years ago, I believe, and you --

10                 THE COURT:  I've looked at his transcript.

11                 MR. DAVIS:  Well, no.  I mean the video of that.

12                 THE COURT:  Oh.

13                 MR. DAVIS:  If you compare the video to what you're

14     going to see tomorrow, I think it's an easy call to make at

15     that point.

16                 THE COURT:  I don't, I don't have any recollection

17     other than I think if somebody would have been in bad physical

18     shape, I would remember it even to this day.

19                 MR. COZZENS:  Judge, are you ruling that they can

20     take that deposition and not call him back and discuss things

21     that he doesn't discuss at all on direct?

22                 THE COURT:  "Are you ruling that they can take that

23     deposition and not call him back and discuss things that he

24     doesn't discuss at all on direct?"

25                 No, that isn't what I'm ruling.  Didn't I say that

1    there is the rule about the scope of the direct and that the

2    cross can't exceed it?  Isn't that what I said?

3              MR. COZZENS:  Yes.

4              THE COURT:  Well, where did you get that they can

5    take that deposition and not call him back and -- oh.  Oh.

6              MR. COZZENS:  Yeah.

7              THE COURT:  Oh, sure.  In their case in chief, they

8    can use that video deposition.

9              MR. COZZENS:  Even though he's available?

10             THE COURT:  Sure.  I'm going to -- if he's as bad as

11   I think he is, yeah.  I'm sure that's -- I'll have to observe

12   that.  That's what I'm trying to say.  I'm going to observe

13   how he's doing, but I have this feeling, if he's got to have

14   relief every 20 minutes, it will be an easy call to make.

15   That's all I'm telling you.

16             MR. COZZENS:  Okay.  I guess we'll see how it works

17   out.

18             THE COURT:  Maybe he won't be.  If he isn't, if he

19   isn't, then I can consider a motion from them to put him on

20   out of order, and they could, in essence, open their case in

21   chief so he doesn't have to come back if he's not in that bad

22   of shape.

23             MR. JOHNSON:  Having talked to him, we would prefer

24   to play his deposition.  I think Your Honor will see tomorrow.

25             THE COURT:  Well, I'm going to see.

1          MR. DAVIS:  Okay.

2          MR. JOHNSON:  And then the other thing, Your Honor,

3     is that their case is winding down, and we may be on as early

4     as Friday with regard to our case.  We did have three

5     depositions that we wanted to read or play right off the bat

6     in our case.  That would be Brill, Kjos and Simko.  I think

7     those designations and objections are pending.  I just wanted

8     to bring that to the Court's attention.

9          THE COURT:  Thanks.  Ryan will dig those out for me

10    and slap them on my desk.

11         MR. JOHNSON:  Thank you, Your Honor.

12         MR. BANKER:  One concern before we leave that point.

13    I guess, you know, we have put in objections in the record to

14    the designations of Brill, Kjos, and Simko.  I wonder whether

15    the Court would entertain a motion to strike those witnesses

16    altogether given the line of demarcation that we're talking

17    about in this case between 1975 and 1987.  If their expert

18    witness is testifying it is more likely than not that the

19    release happened before 1987, Kjos, Brill, and Simko are all

20    employees that didn't begin working until 1987, after the

21    catch pond was out of existence and you had the concrete

22    containment pits that we've seen in the photos here.  So I

23    don't know what relevance Brill, Kjos, or Simko could probably

24    have to this case.

25         THE COURT:  I don't know.  I just listened to a

1  deposition of a guy who didn't know who Dyce was.

2          MR. COZZENS:  Didn't know what?

3          MR. JOHNSON:  Your Honor, as you heard me say

4  earlier today, there's a pattern and practice of disposing of

5  pollutants into the environment, and these people talk about

6  that as well as a bunch of other things, and we think that

7  this is all relevant with regard to what it was that Dyce was

8  doing throughout the entire period.

9          THE COURT:  I'm not foreclosing you from filing a

10 quick motion and a brief to preclude that on that basis.

11         MR. COZZENS:  Sure.

12         MR. BANKER:  We'll file something.

13         THE COURT:  I mean, I don't want to have to try this

14 a third time.

15         MR. BANKER:  I understand.  And all we're trying to

16 do, if we have a time frame that's established and their

17 expert is going to testify that 1987 is the close-off date,

18 you know, the concern is that we have to finish by next

19 Friday.  I don't know that we want to -- and we have

20 significant rebuttal experts to be called in this case

21 depending on the experts that they've disclosed.  I don't want

22 to find ourselves in a situation where we get to Thursday and

23 we haven't had time to properly have the rebuttal case that we

24 need to put on because they have spent time presenting

25 evidence from a 1987 time frame on that's not relevant.

827

1            And I would note that, you know, I don't believe

2    Soco has yet put on a witness for longer than 60 minutes of

3    direct examination, and the insurers have, you know, doubled

4    and sometimes tripled the amount of time that they've spent

5    cross-examining witnesses.  If we continue at that pace and we

6    get into post-'87 issues, we're not going to finish by

7    Thursday.

8            MR. JOHNSON:  Your Honor, these depositions, I

9    think, aren't two hours in total.

10           THE COURT:  We'll be in trouble if we don't.

11           Pardon?

12           MR. JOHNSON:  I think these depositions are not very

13   long.

14           MR. MICKELSON:  Two hours.

15           MR. JOHNSON:  Maybe two hours in total, Your Honor,

16   and they go to this whole issue of the way in which this

17   company dealt with wastewater, and the way they dealt with

18   wastewater was to dump it into the environment.

19           THE COURT:  I think you'll file a motion.

20           MR. JOHNSON:  Okay.

21           THE COURT:  I'll give you a ruling on that.

22           Let's go to the house.

23           THE LAW CLERK:  All rise.

24       (Proceedings were recessed at 16:43:27.)

25

828

1                VOLUME 3 REPORTER'S CERTIFICATE

2          I, JoAnn Corson Bacheller, a Registered Diplomate

3   Reporter and Certified Realtime Reporter, certify that the

4   foregoing transcript is a true and correct record of the

5   proceedings given at the time and place hereinbefore

6   mentioned; that the proceedings were reported by me in machine

7   shorthand and thereafter reduced to typewriting using

8   computer-assisted transcription; that after being reduced to

9   typewriting, a certified copy of this transcript will be filed

10  electronically with the Court.

11         I further certify that I am not attorney for, nor

12  employed by, nor related to any of the parties or attorneys to

13  this action, nor financially interested in this action.

14         IN WITNESS WHEREOF, I have set my hand at Billings,

15  Montana this 27th day of April, 2010.

16

17                          /s/ JoAnn Corson Bacheller
                            _____
18                          JoAnn Corson Bacheller
                            United States Court Reporter
19

20

21

22

23

24

25