1  JoAnn Corson Bacheller
   Registered Diplomate Reporter
2  Certified Realtime Reporter
   P. O. Box 1424
3  Billings, Montana 59103-1424
   406/247-4477 office
4  406/247-7008 fax
   joann_bacheller@mtd.uscourts.gov
5
   United States Court Reporter
6

7

8               IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MONTANA
9                      BILLINGS DIVISION

10
   UNITED STATES FIDELITY        )
11 AND GUARANTY COMPANY,         )
                                 )  Nos. CV-04-29-BLG-RFC
12               Plaintiff,)         CV-08-29-BLG-RFC
        and                      )
13                               )  **VOLUME 4**
   THE CONTINENTAL INSURANCE     )  **TRANSCRIPT OF JURY TRIAL**
14 COMPANY,                      )
              Plaintiff Intervenor,)
15      vs.                      )
                                 )
16 SOCO WEST, INC.,              )
                      Defendant.)
17 _____)

18
               **BEFORE THE HONORABLE RICHARD F. CEBULL**
19          **CHIEF UNITED STATES DISTRICT COURT JUDGE**
                 **FOR THE DISTRICT OF MONTANA**
20
            James F. Battin United States Courthouse
21                 316 North 26th Street
                   Billings, Montana 59101
22              Thursday, March 11, 2010
                   08:37:53 to 16:50:36
23

24
            Proceedings recorded by machine shorthand
25     Transcript produced by computer-assisted transcription

1                         **APPEARANCES**

2    For the Plaintiff:              MR. ROBERT C. JOHNSON
                                     MR. JOHN I. GROSSBART
3                                    MS. WENDY N. ENERSON
                                     Attorneys at Law
4                                    8000 Sears Tower
                                     233 South Wacker Drive
5                                    Chicago, Illinois 60606

6                                    MR. MARSHAL L. MICKELSON
                                     Attorney at Law
7                                    P. O. Box 509
                                     Butte, Montana 59703
8
     For the Plaintiff               MR. BRIAN W. WALSH
9    Intervenor:                     Attorney at Law
                                     Suite 330
10                                   555 Mission Street
                                     San Francisco, California 94105
11
                                     MR. STEVEN M. CRANE
12                                   Attorney at Law
                                     Suite 1500
13                                   515 South Figueroa Street
                                     Los Angeles, California 90017
14
                                     MR. MAXON R. DAVIS
15                                   Attorney at Law
                                     P. O. Box 2103
16                                   Great Falls, Montana 59403

17   For the Defendant:              MR. CHRISTOPHER L. LYNCH
                                     MR. PAUL A. BANKER
18                                   Attorneys at Law
                                     4200 IDS Center
19                                   80 South Eighth Street
                                     Minneapolis, Minnesota 55402
20
                                     MR. LAWRENCE B. COZZENS
21                                   Attorney at Law
                                     Suite 104
22                                   1643 24th Street West
                                     Billings, Montana 59102
23
     Also present for               MS. JULIANNE ROHM
24   graphics display:              MR. NEIL BAILEY

25

1

**CONTENTS**

Volume/Page

2

**Volume 1 Proceedings** ................................. 1/   16
*Voir Dire* Examination
     By the Court ..................................... 1/   43
     By Mr. Cozzens ................................... 1/  101
     By Mr. Mickelson ................................. 1/  114
     By Mr. Davis ..................................... 1/  131
Selection of Jury .................................... 1/  147
Instructions to Jury ................................. 1/  150
Opening Statement by Mr. Cozzens ..................... 1/  160
Opening Statement by Mr. Johnson ..................... 1/  185
Opening Statement by Mr. Davis ....................... 1/  200
Volume 1 Reporter's Certificate ...................... 1/  251

**Volume 2 Proceedings** ................................. 2/  267
Volume 2 Reporter's Certificate ...................... 2/  554

**Volume 3 Proceedings** ................................. 3/  570
Volume 3 Reporter's Certificate ...................... 3/  829

**Volume 4 Proceedings** ................................. 4/  845
Volume 4 Reporter's Certificate ...................... 4/ 1101

**Volume 5 Proceedings** ................................. 5/ 1117
Defendant Rests ...................................... 5/ 1334
Plaintiffs' Motion for Judgment ...................... 5/ 1334
Order of Court Reserved .............................. 5/ 1337
Volume 5 Reporter's Certificate ...................... 5/ 1339

**Volume 6 Proceedings** ................................. 6/ 1355
Volume 6 Reporter's Certificate ...................... 6/ 1610

**Volume 7 Proceedings** ................................. 7/ 1626
Order of Court re: Plaintiffs' Motion for Judgment .. 7/ 1870
Volume 7 Reporter's Certificate ...................... 7/ 1879

**Volume 8 Proceedings** ................................. 8/ 1895
Plaintiffs Rest ...................................... 8/ 1904
Defendant's Motion for Judgment ...................... 8/ 2010
Order of Court re: Defendant's Motion for Judgment .. 8/ 2018
Plaintiffs' Motion for Judgment Renewed .............. 8/ 2018
Order of Court re: Plaintiffs' Motion for Judgment .. 8/ 2018
Settlement of Instructions ........................... 8/ 2019
Volume 8 Reporter's Certificate ...................... 8/ 2072

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CONTENTS  (Continued)**

Volume/Page

**Volume 9 Proceedings** ................................. 9/ 2088
Instructions to Jury ................................. 9/ 2092
Closing Argument by Mr. Banker ...................... 9/ 2105
Closing Argument by Mr. Johnson ..................... 9/ 2137
Closing Argument by Mr. Davis ....................... 9/ 2159
Rebuttal Closing Argument by Mr. Banker ............. 9/ 2171
Jury Verdict ........................................ 9/ 2186
Volume 9 Reporter's Certificate ..................... 9/ 2190

        REPORTER'S NOTE:  "Uh-huh" and "Um-hmm" indicate
affirmative responses.  "Huh-uh" and "Hm-umm" indicate
negative responses.

1                              **WITNESSES**

2    **For the Defendant:**                                 **Volume/Page**

3    Mr. Dennis Allen St. George
          Direct Examination by Mr. Banker ................ 1/  211
4         Cross-Examination by Mr. Johnson ................ 1/  239
          Cross-Examination by Mr. Davis .................. 1/  248
5         Redirect Examination by Mr. Banker .............. 1/  249

6    Mr. James Sullivan
          Direct Examination by Mr. Lynch ................. 2/  276
7         Cross-Examination by Mr. Grossbart .............. 2/  316
          Redirect Examination by Mr. Lynch ............... 2/  358
8
     Mr. Richard Allen Colver
9         Direct Examination by Mr. Cozzens ............... 2/  367
          Cross-Examination by Mr. Johnson ................ 2/  403
10        Redirect Examination by Mr. Cozzens ............. 2/  484

11   Mr. Rodney Hallsten
          Direct Examination by Mr. Banker ................ 2/  490
12        Cross-Examination by Mr. Grossbart .............. 2/  514
          Cross-Examination by Mr. Davis .................. 2/  551
13        Redirect Examination by Mr. Banker .............. 2/  552

14   Mr. Monte I. Naff
          Direct Examination by Mr. Cozzens ............... 3/  570
15        Cross-Examination by Mr. Johnson ................ 3/  610
          Cross-Examination by Mr. Davis .................. 3/  702
16        Redirect Examination by Mr. Cozzens ............. 3/  718

17   Mr. Charles Bender (deposition)
          Examination ..................................... 3/  738
18
     Mr. Desmond Slater (deposition)
19        Examination ..................................... 3/  763

20   Mr. Larry Nelson (deposition)
          Examination ..................................... 3/  802
21
     Mr. Marvin Johnson
22        Direct Examination by Mr. Cozzens ............... 4/  846
          Cross-Examination by Mr. Johnson ................ 4/  863
23
     Mr. Douglas Johnston
24        Direct Examination by Mr. Banker ................ 4/  867
          Cross-Examination by Mr. Grossbart .............. 4/  898
25        Cross-Examination by Mr Davis ................... 4/  921
          Redirect Examination by Mr. Banker .............. 4/  924

1                      **WITNESSES (Continued)**

2    **For the Defendant:**                            **Volume/Page**

3    Mr. David Warne
         Direct Examination by Mr. Banker ................  4/  925
4        Cross-Examination by Mr. Davis .................  4/  953
         Redirect Examination by Mr. Banker .............  4/  987
5
     Ms. Suzanne Miller
6        Direct Examination by Mr. Cozzens ..............  4/  992
         Cross-Examination by Mr. Crane .................  4/ 1030
7        Redirect Examination by Mr. Cozzens ............  4/ 1067

8    Robert Leslie Powell, Ph.D.
         Direct Examination by Mr. Lynch ................  4/ 1068
9        Direct Examination (Continued) by Mr. Lynch .....  5/ 1118
         Cross-Examination by Mr. Grossbart .............  5/ 1213
10       Cross-Examination by Mr. Davis .................  5/ 1301
         Redirect Examination by Mr. Lynch ..............  5/ 1319
11
     **For the Plaintiffs:**
12
     Mr. Marvin Johnson (deposition)
13       Examination ....................................  6/ 1356

14   Mr. Ken Kjos (deposition)
         Examination ....................................  6/ 1471
15
     Ms. Kristen Kohler Stout
16       Direct Examination by Mr. Johnson ..............  6/ 1537
         Cross-Examination by Mr. Lynch .................  6/ 1593
17       Redirect Examination by Mr. Johnson ............  6/ 1607

18   Peter Shanahan, Ph.D.
         Direct Examination by Mr. Grossbart ............  7/ 1626
19       Cross-Examination by Mr. Lynch .................  7/ 1704
         Redirect Examination by Mr. Grossbart ..........  7/ 1721
20
     Mr. Richard Brill (deposition)
21       Examination ....................................  7/ 1728

22   Yaron M. Sternberg, Ph.D.
         Direct Examination by Mr. Crane ................  7/ 1774
23       Cross-Examination by Mr. Lynch .................  7/ 1805
         Redirect Examination by Crane ..................  7/ 1826
24

25


                                835

1                    **WITNESSES (Continued)**

2   **For the Plaintiffs:**                          **Volume/Page**

3   Bruce Edwin Dale, Ph.D.
          Direct Examination by Mr. Davis ................  7/ 1831
4         Cross-Examination by Mr. Lynch ................  7/ 1862
          Redirect Examination by Mr. Davis .............  7/ 1866
5
6   **For the Defendant in Rebuttal:**

7   Wayne Martin Grip
          Direct Examination by Mr. Lynch ................  8/ 1905
          Cross-Examination by Mr. Johnson ...............  8/ 1954
8         Redirect Examination by Mr. Lynch .............  8/ 1995

9   Robert Leslie Powell, Ph.D.
          Direct Examination by Mr. Lynch ................  8/ 1999
10        Cross-Examination by Mr. Crane ................  8/ 2005

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **EXHIBITS**

2  **Exhibit No.**                            **Received Volume/Page**

3  5       09/05/89 Letter to Hol from Johnson ........ FPT/    56

4  30      09/11/85 Memo to Managers of All Plants from
           Q. Dyce  ................................... FPT/    56
5
   72      11/04/75 Daily sales report to Bender,
6          Hallsten, Don, Grady, and Naff from Q. Dyce.   2/   536

7  90      05/29/86 Sales report .....................   3/   697

8  143     02/26/82 Continental General Liability
           Survey Report form ........................ FPT/    23
9
   231     06/15/00 Letter to USF&G from Whalen ....... FPT/    24
10
   234     09/25/00 Letter to Downing from
11         Mielenhausen .............................. FPT/    24

12 352     04/08/74 Memo to Bender from Whaley ........ FPT/    28

13 353     09/27/72 Memo to Murray from Q. Dyce ....... FPT/    57

14 359     09/11/85 Memo from Q. Dyce ............... FPT/    28

15 362     09/13/89 Memo to Q. Dyce from Naff ......  FPT/ 28, 57

16 366     Warning label for perchloroethylene and
           instructions on empty container handling
17         and reuse ................................. FPT/    57

18 382     11/05/92 Montana Department of Health Field
           Investigation Report ......................   4/   975
19
   383     07/23/00 Letter to Rowe from Miller ........ FPT/    29
20
   429     06/09/98 E-mail between Warne and Naff .....   3/   668
21
   433     12/16/99 Letter to G. Staarjes from USEPA .. FPT/    58
22
   436     01/06/99 E-mail between Miller and Warne ... FPT/    58
23
   442     08/06/96-08/09/00 Containment pit runoff
24         water sampling ............................   4/ 1059

25 445     03/16/73 USF&G Advertising ................ FPT/    30

1                       **EXHIBITS (Continued)**

2     **Exhibit No.**                          **Received Volume/Page**

3     499     11/04/75 Aerial photograph ................. FPT/    31

4     505     02/23/82 Continental General Liability Survey
              Report ................................... FPT/    31
5
      784     08/21/95 Handwritten notes ................ FPT/    58
6
      785     08/18/95 Memo to Naff, Hilton, Biondo,
7             Gilbert, Akers and Liebling from Simko ..... FPT/    58

8     856A    09/25/89 Versar Inc. Environmental Risk
              Assessment Survey ...................... FPT/ 32, 58
9
      859     07/24/89 Draft letter to Hol from Johnson .. FPT/    59
10
      1104    09/08/05 Letter to O'Reilly from Terp ...... FPT/    32
11
      2532    11/1975 Aerial photograph ................. FPT/    32
12
      2533    11/04/75 Aerial photograph ................ FPT/    32
13
      2545    12/30/05 Bulk Handling and Properties of PPG
14            Chlorinated Solvents:  Perchloroethylene,
              Trichloroethylene, Tri-Ethane .............. FPT/    59
15
      2558    04/07/04 Letter to O'Reily from Sullivan ...    2/   293
16
      3004    08/23/00 Letter to Rowe from Miller ........ FPT/    32
17
      3006    08/27/72 Aerial photograph ................. FPT/    32
18
      3015    07/1995 HCI Dyce site plan ................. FPT/    32
19
      3017    01/1983 Dyce personnel manual ............. FPT/    33
20
      3024    10/29/85 Company policy re: hoses .........    4/   888
21
      3025    07/02/87 Memo to Dick, Russ, Bob, Kevin,
22            Ivan, John and File from Roger ............ FPT/    36

23    3029    1986-2001 Dyce manager's monthly report ....    8/ 1896

24    3043    11/29/99 Lockheed Martin Final Report ......    1/    37

25

838

1              **EXHIBITS (Continued)**

2    **Exhibit No.**                              **Received Volume/Page**

3    3044    12/16/99 USEPA First Request for Information
             Pursuant to 104(e) ........................ FPT/    37
4
     3045    03/01/00 Dyce Response to First 104(e)
5            Request .................................... FPT/    37

6    3047    08/23/00 Letter to Naff from Risner &
             Kercher .................................... FPT/    37
7
     3048    08/23/00 Dyce Supplemental Response to
8            USEPA's Second 104(e) Request ............. FPT/    37

9    3049    10/03/00 Maxim Technologies Inc. Site
             Investigation Report ...................... FPT/    38
10
     3050    06/2003 Tetra Tech EM Inc. Remedial
11           Investigation Report for MDEQ ............. FPT/    39

12   3051    07/07/04 Tetra Tech Final Feasibility Study
             Report for MDEQ ........................... FPT/    39
13
     3052    11/2004 MDEQ/USEPA Proposed Remedial Action
14           Plan for Lockwood Groundwater Solvent
             Plume Site ................................ FPT/    39
15
     3058    12/2003 Tetra Tech Addendum 01 to the Final
16           Remedial Investigation Report for MDEQ ..... FPT/    39

17   3059    08/2005 MDEQ/USEPA Record of Decision for
             Lockwood Solvent Groundwater Plume Site .... FPT/    39
18
     3060    02/28/06 Letter to Terp from Risner &
19           Kercher .................................... FPT/    40

20   3102    09/16/85 Memo to Colver ................... FPT/    41

21   3115    11/25/92 Letter and permit application to
             Lincoln from Diede ........................ FPT/    42
22
     3174    06/09/00 Letter to Webster from Miller ..... FPT/    43
23
     3175    06/12/00 Letter to Miller from Webster ..... FPT/    43
24
     3178    07/25/00 Fax to Stevenson from Miller ...... FPT/    43
25

1                          **EXHIBITS (Continued)**

2  **Exhibit No.**                              **Received Volume/Page**

3  3191    11/13/03 ATC Associates Inc. Soil and
           Groundwater Data Remedial Design Investigation
4          Report .................................... FPT/    43

5  3200    Compilation:  USF&G Policy No. SMP326188 ... FPT/    44

6  3201    Compilation:  USF&G Policy No. 1CC599480 ... FPT/    44

7  3202    Compilation:  USF&G Policy No. SMP406309 ... FPT/    44

8  3203    Compilation:  USF&G Policy No. 1CC944574 ... FPT/    44

9  3204    Compilation:  USF&G Policy No. CEP64280 .... FPT/    44

10 3205    Compilation:  USF&G Policy No. 1CC945882 ... FPT/    44

11 3206    Compilation:  USF&G Policy No. CEP64348 .... FPT/    44

12 3207    Compilation:  USF&G Policy No. SMP535107 ... FPT/    44

13 3208    Compilation:  USF&G Policy No. SMP576121 ... FPT/    44

14 3209    Compilation:  USF&G Policy No. 1CCA31253 ... FPT/    44

15 3210    Compilation:  USF&G Policy No. CEP84958 .... FPT/    44

16 3211    Compilation:  USF&G Policy No. SMP594660 ... FPT/    44

17 3213    Compilation:  USF&G Policy No. CEP104806 ... FPT/    44

18 3214    Compilation:  USF&G Policy No. SMP654057 ... FPT/    44

19 3216    Compilation:  USF&G Policy No. CEP114516 ... FPT/    44

20 3217    Compilation:  USF&G Policy No. SMP772986 ... FPT/    44

21 3219    Compilation:  USF&G Policy No. CEP114641 ... FPT/    44

22 3220    03/03/06 Stipulation as to Existence and
           Content of USF&G Insurance Policies ........ FPT/    44
23
   3287    02/28/05 Letter to Terp from Risner &
24         Kercher .................................... FPT/    48

25

1                           **EXHIBITS (Continued)**

2    **Exhibit No.**                          **Received Volume/Page**

3    3321      03/03/06 Stipulation as to Existence and
               Content of Continental Insurance Policies
4              and Exhibits ............................... FPT/   49

5    3363      09/29/89 Agreement to Purchase Real
               Property ..................................  8/ 1903
6
     3407      1971 Chemical Safety Data Sheet for
7              perchloroethylene ...................... FPT/ 49, 61

8    3408      1972 Hooker Chemical MSDS for
               trichloroethylene ......................... FPT/   49
9
     3410      1980 PPG manual .......................... FPT/   50
10
     3420      05/25/00 Second Request for Information
11             Pursuant to Section 104 of CERCLA for the
               Lockwood Solvent Site Billings .............  3/  676
12
     3433      1983 Dyce brochure ....................... FPT/   50
13
     3436      11/1979 Ledger sheet .....................   3/  622
14
     3438      04/1971 Perchloroethylene brochure ......  FPT/ 50, 61
15
     3471      08/05/85 Sales report ....................   3/  591
16
     3475      02/06/84 Dyce policies re: DOT ............ FPT/   50
17
     3476      06/02/79 Expense Report ...................   3/  585
18
     3483      Aerial photograph ........................ FPT/   51
19
     3484      Aerial photograph ........................ FPT/   51
20
     3485      Aerial photograph ........................ FPT/   51
21
     3486      Aerial photograph ........................ FPT/   51
22
     3487      Aerial photograph ........................ FPT/   51
23
     3488      Aerial photograph ........................ FPT/   51
24
     3490      1972 Aerial photograph ................... FPT/   51
25

1                    **EXHIBITS (Continued)**

2  **Exhibit No.**                        **Received Volume/Page**

3  3491    1981 Aerial photograph ..................... FPT/    51

4  3492    1987 Aerial photograph ..................... FPT/    51

5  3660    09/09/09 Dale photographs .................   2/   318

6  3674    Site photographs taken by Hargis ...........   8/  2040

7  3800    05/27/57 Aerial photograph ................ FPT/    52

8  3801    06/26/66 Aerial photograph ................ FPT/    52

9  3802    05/22/69 Aerial photograph ................ FPT/    52

10 3803    08/18/71 Aerial photograph ................ FPT/    52

11 3804    04/23/72 Aerial photograph ................ FPT/    52

12 3805    Circa 1973 Aerial photograph .............. FPT/    52

13 3806    06/18/74 Aerial photograph ................ FPT/    52

14 3807    11/04/75 Aerial photograph ................ FPT/    52

15 3808    06/23/77 Aerial photograph ................ FPT/    52

16 3809    09/06/77 Aerial photograph ................ FPT/    52

17 3810    05/03/79 Aerial photograph ................ FPT/    52

18 3811    05/14/79 Aerial photograph ................ FPT/    52

19 3812    07/31/79 Aerial photograph ................ FPT/    52

20 3813    03/13/81 Aerial photograph ................ FPT/    52

21 3814    06/02/81 Aerial photograph ................ FPT/    52

22 3815    08/24/81 Aerial photograph ................ FPT/    52

23 3816    05/27/83 Aerial photograph ................ FPT/    52

24 3817    07/27/83 Aerial photograph ................ FPT/    52

25 3818    04/30/87 Aerial photograph ................ FPT/    52

1                          **EXHIBITS** (Continued)

2   **Exhibit No.**                         **Received Volume/Page**

3   3826    08/08/05 Response to 06/24/05 CERCLA 104(e). FPT/   53

4   3827    02/14/05 Letter to Moskowitz from
            Mielenhausen ............................. FPT/   53
5
    3828    02/15/05 Letter to Walsh from Mielenhausen . FPT/   53
6
    3886    06/15/00 Letter to Continental from Whalen . FPT/   55
7
    3887    09/25/00 Letter to Giblin from Mielenhausen. FPT/   55
8
    3888    01/08/07 Second stipulation as to existence
9           and content of USF&G insurance policies .... FPT/   55

10  4027    Aerial photograph (D032604) ...............   4/  848

11  4032    10/10/00 Communication to Gilbert from
            Simko .....................................   3/  691
12
    4039    09/13/89 Memo to Q. Dyce from Hallsten .....   8/ 1903
13
    4044    07/1976 Location Survey of Dyce site ....... FPT/   62
14
    4087    01/06/99 E-mail to Warne from Hallsten .....   2/  547
15
    4089    02/29/00 E-mail to Naff from Warne .........   4/ 1066
16
    4143    Aerial photograph .........................   6/ 1485
17
    4320    1980 Bulk Handling and Properties of PPG
18          Chlorinated Solvents ...................... FPT/   63

19  4400    01/14/05 Fax to LeCours from Sullivan ......   2/  335

20  4516    09/12/02 Letter to EPA from Sullivan .......   2/  354

21  4721    08/18/03 Fax to MDEQ from Sullivan .........   2/  308

22  4757    08/03/04 Letter to Sullivan from MDEQ ......   2/  313

23  4811    04/28/03 Letter to Ross from Sullivan ......   2/  342

24  4822    07/20/00 E-mail to Miller from Naff ........ FPT/   64

25

1                              **EXHIBITS  (Continued)**

2       **Exhibit No.**                              **Received Volume/Page**

3       4831      Exhibit 5017 aerial photograph with Colver
                  notations ...................................  2/   483
4
        4832      Exhibit 5019 aerial photograph with Colver
5                 notations ...................................  2/   483

6       4833      Exhibit 5024 aerial photograph with Colver
                  notations ...................................  2/   483
7
        4834      Exhibit 5028 aerial photograph with Colver
8                 notations ...................................  2/   483

9       4835      04/30/86 General manager's monthly report ..  4/   899

10      5000-
        5064      Historical photographs ....................  2/   267
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          PROCEEDINGS

2         (Open court.)

3         (Jury present.)

4              THE COURT:  Please be seated.

5              Good morning, ladies and gentlemen.

6              Mr. Cozzens, you may proceed.

7              MR. COZZENS:  Your Honor, Soco calls Marvin Johnson.

8              Do you need any help getting situated?

9              THE WITNESS:  No, I'm all right.

10             THE COURT:  Good morning, sir.

11             THE WITNESS:  Can I talk to you for a minute?

12             THE COURT:  Shoot.

13             THE WITNESS:  I'm going to have to, because I have

14    cancer, I'm going to have to use the water and spit in this.

15    Should I do that here, or do I have to be excused and go

16    outside?

17             THE COURT:  Probably -- how often do you have to do

18    it, sir?

19             THE WITNESS:  About every, as I'm being talked,

20    about every ten or 15 minutes.  I'll do it discreetly.  I'll

21    come over here in the corner and do it.

22             THE COURT:  You know, I'm sure you would.  We'll try

23    that and see how it goes.  I'll take whatever breaks you need.

24             THE WITNESS:  All right.  All right.  As far as an

25    actual break, after I've been coughing and spitting once in a

                                  845

1   while, it still builds up, and when it builds up, for me to

2   leave the room and go to the bathroom and really clear it out

3   good, how do I do that?  Just raise my hand at you?

4              THE COURT:  That's all you have to do, and say --

5              THE WITNESS:  All right.  All right.

6              THE COURT:  You just stick your hand up.  You don't

7   need to say anything, and I'll shut this thing down, and you

8   can go do that.

9              THE WITNESS:  All right.  But that will only be

10  probably a couple times here in the morning.  The rest of the

11  time, I can take care of it right here discreetly.

12             THE COURT:  Okay.

13             THE WITNESS:  All right?

14             THE COURT:  Sounds fair.  But anytime you need to

15  leave, you just tell me.  Raise your hand.  You don't even

16  need to say anything.

17             THE WITNESS:  All right.

18             WHEREUPON,

19                   MR. MARVIN JOHNSON,

20  called for examination by counsel for defendant, after having

21  been first duly sworn to testify the truth, the whole truth,

22  and nothing but the truth, testified as follows:

23                  DIRECT EXAMINATION

24  BY MR. COZZENS:

25  Q    Thank you, Mr. Johnson, and you've just explained to the

846

1  judge a medical condition that has some impact on your

2  testimony here today; is that correct?

3  A    Sir, I'm having a little trouble hearing you, and I do

4  have my hearings aids on, but --

5  Q    No, no.  It's my fault.  I always forget to talk into

6  this thing.  Is that better?

7  A    Much better.

8  Q    All right.

9  A    Yeah.

10 Q    Well, let me start from the beginning.  Would you state

11 for the record your full name and address?

12 A    Yeah.  My name is Marvin L. Johnson, 2517 Roth Lane,

13 R-o-t-h, Roth Lane, Billings, Montana.

14 Q    All right.  And you've just had a discussion with the

15 judge about a medical condition you have.

16 A    Correct.

17 Q    And some special accommodations you've asked him if you

18 could do.

19 A    Right.

20 Q    If you get those accommodations, do you have any problem

21 answering questions or talking for a period of two to three

22 hours?

23 A    No.  Excuse me.  No.  Only if I'm able to, throughout the

24 interrogation, if I'm able to rinse my mouth into this and

25 spit out, but I won't do it in front of everybody.  If it's

1    all right with the judge, I'll go over here and do that.

2    Q    Okay.

3    A    Other than that, I should be able to be all right to do

4    the whole thing, with leaving once or twice to really clear it

5    out good.

6    Q    Okay.  Very good.

7         Was there a time when you worked for Dyce Chemical out in

8    the Lockwood area?

9    A    Yes.

10   Q    Do you recall what years you worked out there?

11   A    The way I recall it, it was about in the year 1981 to

12   about 1988.

13   Q    Okay.  And do you recall when your deposition was taken

14   in a case in 2001?

15   A    Yeah, I recall that very much so.

16        MR. COZZENS:  Can we pull up -- and this has been

17   reserved, Your Honor, so it's not an exhibit, but

18   Exhibit 4027, please?

19        MR. JOHNSON:  No objection.

20        THE COURT:  4027, are you offering it?

21        MR. COZZENS:  Yes.

22        THE COURT:  It's admitted.

23        (Exhibit 4027 was received in evidence.)

24   BY MR. COZZENS:

25   Q    Okay.  Even blown up, that's kind of a tough thing to see

1   on this screen, isn't it?

2   A     What screen?

3               THE COURT:  To your right, sir.

4               THE WITNESS:  Oh.  Yeah, that's pretty blurry.

5   BY MR. COZZENS:

6   Q     Okay.  Now what I've done is I have a bigger one that I'm

7   going to try to put on a tripod here, and maybe you can see

8   that better, and I'll try to find the right place to put it.

9         Is this going to be a problem, Judge, if it's right here,

10  sitting right here, so he and the jury can see it?

11              THE COURT:  It would be better if you put it over

12  there.

13              MR. COZZENS:  Over here?  Thank you.  You're right.

14  This would be better.

15              THE COURT:  You can angle it so the jury can see it,

16  too.

17              MR. COZZENS:  Yeah.  I need more dexterity, Your

18  Honor.  I'm not sure -- can anybody see this?  I guess not

19  with me leaning against this.

20              Can you see this okay?

21              THE WITNESS:  I can.

22         (Jurors nodded heads affirmatively.)

23              MR. COZZENS:  Okay.

24  BY MR. COZZENS:

25  Q     Is that a better -- I mean, can you see that better than

849

1    what you saw on the screen?

2    A    Yeah.  That's much better, uh-huh.

3    Q    Okay.  Were you familiar with a catch pond that was

4    located on the Dyce site when you went to work in 1981?

5    A    Yes, I was.

6    Q    Okay.  And now I'm going to see if you're able to -- this

7    wasn't meant to be a test, Mr. Johnson, but I'm having

8    logistical problems.  If you can locate where that catch pond

9    is on that photo and then go to the screen and draw a circle

10   where it is?  Can you do that for us?

11   A    Yes.  How do I draw on this?

12   Q    Just put your finger on it.  It's just a touch screen.

13   A    (Complied with request.)  That's not very good.

14   Q    Okay.  Very good.

15   A    Down further.

16   Q    That's okay.  That locates the general area of the catch

17   pond when you went there in 1981?

18   A    Yes.

19   Q    Now you've met me before.  We've talked about what your

20   testimony is going to be here today, correct?

21   A    Yes.

22   Q    I want to get right to pipe that you remember being in

23   that catch pond.  Can you show the jury approximately where

24   that pipe was located?

25   A    On this?

1    Q     Yes.

2    A     There.

3    Q     Okay.

4    A     When I drew it, it is over further than what it came on

5    the screen.

6    Q     Okay.  Why don't you draw it again.

7    A     (Complied with request.)

8    Q     Right in there?

9    A     That's not right, either.

10   Q     Okay.  Was it along the north line or the east line?

11   A     On the north line.

12   Q     Okay.

13   A     I think it was about No. 4.

14   Q     Let me, let me try this.  If I put it about right -- see,

15   I'm not any better at it than you are.  If I put it about

16   right there, would that be correct?

17              MR. JOHNSON:  Your Honor, he just testified.

18              THE WITNESS:  It was just a little ways to the left

19   of there.

20              THE COURT:  Say again?

21              THE WITNESS:  Over to the left.

22              MR. JOHNSON:  Your Honor, he's testified.

23              THE COURT:  It's overruled.

24              It's over which way?

25              THE WITNESS:  On my -- it needs to come to the left.

851

1          THE COURT:  Needs to come to the left.

2          MR. COZZENS:  Okay.  Let me try it again.

3      Right here?

4          THE COURT:  No, that's to the right.

5          MR. COZZENS:  Well, that's my thumb at this point,

6  my knuckles and not my finger, Judge.

7          Boy, this thing is about a half inch off.

8  BY MR. COZZENS:

9  Q    Right there?

10 A    More over.

11 Q    Left more?

12 A    (Nodded head affirmatively.)

13         MR. COZZENS:  You know, maybe I can do it better on

14 this thing with a Marks-A-Lot.

15         MR. JOHNSON:  Your Honor, I object to this.  He

16 just --

17         THE COURT:  What?

18         MR. JOHNSON:  He's just marked it himself, and --

19         THE COURT:  No, it's -- can you get up and draw it

20 there?

21         THE WITNESS:  Yeah.

22         THE COURT:  How about that?

23         MR. JOHNSON:  That would be good.

24         MR. COZZENS:  I just didn't want to have him jumping

25 up and down, Judge.

852

1                THE COURT:  Yeah.

2                THE WITNESS:  I'll be all right.

3                MR. COZZENS:  Okay.

4                THE COURT:  Maybe we'll just have him do it this

5      once.

6                THE WITNESS:  I'll be all right.  Do you want me to

7      draw right on the paper?

8                MR. COZZENS:  Yes, please.

9                THE WITNESS:  (Complied with request.)

10               MR. JOHNSON:   Can you make a little bit bigger

11     mark, Mr. Johnson, so we can see it?

12               THE WITNESS:  (Complied with request.)

13               MR. JOHNSON:  Can we have him mark that, Your Honor,

14     for the record?  Otherwise, it's just a black spot.

15               THE WITNESS:  Pardon me?

16               THE COURT:  It's --

17               THE WITNESS:  Well, this is it.  You see No. 4?

18     BY MR. COZZENS:

19     Q    Yes.  It is No. 4.

20     A    All right.

21     Q    Is that where you intended to put it?

22     A    Yeah.

23     Q    Right where No. 4 is?

24     A    Yeah.

25     Q    Thank you.

1    Okay.  Can you tell the jury how big that pipe is?

2  A    It was, it was about an inch and a quarter, or inch and a

3  half pipe.  That's about an inch and a quarter, and that's

4  about an inch and a half.

5  Q    And when you say those numbers, that's outside diameter?

6  A    OD, yeah.

7  Q    Okay.  And can you tell the jury, was there any valve or

8  any way to open and close anything on that pipe?

9  A    Yes, towards the end of the pipe.

10  Q    Where was that -- here is what I'm going to try to do,

11  and I am not doing this to do anything except expedite it, but

12  in my office, there was a couple times that I've drawn a

13  cross-section of that pipe.  I'm going to try to do that for

14  you today.  If I do something wrong and you don't agree with

15  what I'm doing, please tell me, okay?

16  A    Yes.

17  Q    Okay.

18        MR. JOHNSON:  Your Honor, I object to this on the

19  grounds that he's leading the witness now with regard to what

20  the witness's testimony is going to be and suggesting it, as

21  opposed to getting the witness just to testify as to his own

22  recollection.

23        THE COURT:  Well, I agree.  Why don't -- you can

24  take that board up and have him draw it.

25        MR. COZZENS:  Okay.

854

1              THE COURT:  If you've got, if you've got a board.

2      Do you have just a blank board or something there?

3              MR. COZZENS:  Just a blank sheet of paper.

4              THE COURT:  There you go.  Sure.

5              THE WITNESS:  Yeah.

6              THE COURT:  Put it right up there next to the

7      witness stand.

8              MR. COZZENS:  Okay.  Right here?

9              THE COURT:  Sure.  Someplace where he can get to it.

10     BY MR. COZZENS:

11     Q    Can you draw a cross-section of the berm and the pipe and

12     the pond?

13     A    I'll try it.  I'll try.  I'm not much good at

14     cross-section stuff.  I'm not sure.

15          (Pause.)

16     BY MR. COZZENS:

17     Q    Okay.  I see what you've drawn.

18     A    Can you read that?

19     Q    I can read it okay.

20     A    Can you read that all right?

21     Q    Now you've got the pipe going into the water in the pond?

22     A    Right.

23     Q    Okay.  Could you -- where was the valve located?

24     A    Right there.

25     Q    Okay.  How far was the valve located from the inside edge

1    of the berm?

2            MR. BANKER:  Excuse me, gentlemen.  I can't see.

3            MR. JOHNSON:  Well, we can't, either.

4        (Discussion off the record.)

5            THE COURT:  Counsel, why don't you just pull up a

6    chair.  Pull it over towards the table.

7            MR. DAVIS:  I think I can kneel here.  Is that okay,

8    Judge?

9            THE COURT:  That's okay.

10           THE WITNESS:  It was, from the berm, it was about a

11   foot to a foot and a half out from the berm on the pipe.

12   BY MR. COZZENS:

13   Q    Okay.  And how far did the pipe extend out across into

14   the pond?

15   A    This part here?

16   Q    Yeah, from the inside of the berm --

17   A    Into the pond?

18   Q    Across the pond.

19   A    Half, halfway out to the pond.

20   Q    Okay.  And how far was it from the top of the berm to the

21   point where the pipe came out of the berm on the side of the

22   pond?

23   A    (Nodded head affirmatively.)

24   Q    Okay.  You've written "1 foot to 18 inches" from the top

25   of the berm to where the pipe would come out of the berm?

1   A     Yes, uh-huh.

2   Q     Okay.  And you've drawn that with the entirety of the

3   pipe being underwater?

4   A     Sometimes.  Sometimes, if there wasn't enough rain or

5   musch from the snow melting, it would be above the water.

6   Q     Okay.  So whether or not the pipe even got into the water

7   was a function of how much water was in the pond, correct?

8   A     Correct.

9   Q     Okay.  Did you ever see water coming out of that pipe?

10  A     Yes, I did.

11  Q     And can you tell me how many times?

12  A     How many times total while I was employed or --

13  Q     Over the seven years you were there, yeah.

14  A     Maybe eight or ten times.

15  Q     Okay.  Did you ever have any discussions with anybody

16  that you worked with there about you opening the valves so

17  that the water could go through?

18  A     Yes, I did.

19  Q     What were those discussions?

20  A     Well, most of the time it was my supervisor.  My

21  immediate boss would tell me to go out and check the pond and

22  maybe open it so it would drain.  Or if it was already

23  draining, I wouldn't have to do anything.

24  Q     Okay.  And do you recall the name of the supervisor who

25  asked you to do that?

1    A    I had several supervisors over a period of time.  The

2    first person that started me and trained me was named Mark

3    Carpenter.  Do you want me to list the ones that I remember?

4    Q    Sure.  Please do that.  The first one was Mark Carpenter?

5    A    The first one was Mark Carpenter.

6         I don't know if I have it in order after this, but

7    another supervisor I see here as the next one was Greg.  I

8    have trouble with that letter; it's the letter G.  Greg

9    Hartman.  He was a local Billings person.

10   Q    Greg Hartman?

11   A    Hartman.

12   Q    Okay.

13   A    He was there about six months.

14   Q    Okay.

15   A    The third supervisor I had, Doug Johnston.

16   Q    Doug Johnston?

17   A    With a T, yeah, Doug Johnston.

18   Q    Okay.

19   A    And he was there about -- you know, I'm reaching way

20   back, but I think he was there about a year or a year and a

21   half.

22   Q    Okay.

23   A    The next one that I remember was Gary Cornwell.

24   Q    Gary Cornwell?

25   A    Yeah.

1   Q    Okay.

2   A    And he was there quite a while; I'm going to guess four

3   or five years.  That's, that's just a long time ago.

4           MR. COZZENS:  Okay.  That's all I have.  Thank you,

5   Mr. Johnson.

6           THE WITNESS:  Uh-huh.

7           THE COURT:  Mr. Johnson.

8           MR. JOHNSON:  Your Honor, could we have a sidebar

9   first?

10          THE COURT:  Yes.

11          I'm going to have a little conference over here at

12  the sidebar with the lawyers.  You can go ahead and rinse if

13  you'd like.

14          THE WITNESS:  I will.  Thank you, Judge.

15          THE COURT:  Thank you.

16      (Discussion on the record at sidebar.)

17          THE COURT:  Shoot.

18          MR. JOHNSON:  Your Honor, we talked about this

19  yesterday, and it's our position that having us ask this guy

20  cross-examination questions and also direct testimony at this

21  point -- I mean, you can hear him having problems now.  It

22  would make more sense and it would be more, frankly, humane to

23  show his deposition tape.

24          THE COURT:  Well, here's what I'm going to do.  I'm

25  going to give you the opportunity to cross just on what he's

859

1    testified about.

2         MR. JOHNSON:  Okay.

3         THE COURT:  And then I'm not going to allow you to

4    open your case and put him on in direct examination in your

5    case now.  If you want him, you'll have to call him.

6    (Open court.)

7    (Jury present.)

8         THE WITNESS:  I'm sorry.

9    (Discussion on the record at sidebar.)

10        MR. JOHNSON:  He's talking to the jury.

11        THE COURT:  No, he just apologized.

12        MR. COZZENS:  He apologized.

13        THE COURT:  He's a nice old guy.

14        MR. JOHNSON:  Very nice guy.

15        THE COURT:  And he wants to -- I'm having a real

16   difficult time understanding him.

17        MR. JOHNSON:  Right.

18        THE COURT:  And I think medically for any kind of

19   rigorous cross-examination, he's going to be unavailable.

20        MR. JOHNSON:  Okay.

21        THE COURT:  And I think he even said he's going to

22   be unavailable for the 15th.

23        MR. COZZENS:  He has a doctor's appointment that

24   morning.

25        THE COURT:  I can send the jury out of here, put him

1   on the record, ask him his diagnosis.  I don't want to ask him

2   his prognosis.  I'm sure it is not good, is it?

3            MR. COZZENS:  I think he's in remission, Judge, but

4   that's just his condition.

5            MR. DAVIS:  He's eaten up by cancer.

6            THE COURT:  I mean, he's a great old guy.  I just am

7   having a hard time understanding him.

8            And I'll ask the court reporter.  It looks like you

9   are, also.

10            THE REPORTER:  Sometimes.

11            THE COURT:  I mean, he just has, he just has a

12   difficult time, and he really wants to, he really wants to

13   function, but he's, unfortunately, inflicted with a horrible

14   condition.  But he's obviously got the right attitude for

15   living, by golly.  But I just think, under 804, he's

16   unavailable for prolonged testimony over 45 minutes or so.  I

17   just, I just think it's --

18            MR. JOHNSON:  Okay.

19            THE COURT:  So I'll allow you guys to put in his

20   deposition.

21            MR. JOHNSON:  In our case?

22            THE COURT:  In your case in chief, but I don't want

23   repeated what comes out on your cross-examination.  I don't

24   want -- I just don't want repetition.  Do you understand?

25            MR. JOHNSON:  (Nodded head affirmatively.)

861

1          MR. COZZENS:  Okay.  And, Judge, I just need to make

2     a quick record.  I understand your ruling.  I think that we

3     asked to do a trial deposition under conditions where he could

4     have taken any break he wanted to take, and we could have gone

5     as slow as he needed to, and it's our position that their

6     objection to that invited his unavailability under these

7     circumstances, and so we object.  We understand your ruling.

8          THE COURT:  Well, and, for the record, just

9     listening to him right now over there clearing his throat,

10    even though he's a courageous older fellow, he is having a

11    difficult time.  I denied the motion to retake his deposition

12    on the grounds I didn't want to reopen discovery, and after

13    seeing Mr. Johnson personally on the witness stand and

14    listening to him testifying now, trying to get himself

15    prepared for cross, I'm glad I did deny it because putting him

16    through another deposition wouldn't be fair to him.

17         MR. JOHNSON:  Thank you, Your Honor.

18        (Open court.)

19        (Jury present.)

20         MR. COZZENS:  As a housekeeping matter, Your

21    Honor --

22         THE WITNESS:  What?

23         MR. COZZENS:  I am just talking to the Judge for a

24    second.

25         Could we assign a number to that demonstrative that

862

1    he's drawn, shown this morning?

2              THE COURT:  Do we have a number?

3         (Discussion off the record.)

4              MR. COZZENS:  If I made it 6000 -- we don't have any

5    that are that high -- then we'd be okay?

6              THE COURT:  That sounds fair, Soco's Exhibit 6000.

7              THE CLERK:  6000.

8              THE COURT:  And Soco's Exhibit 6000 is admitted for

9    illustrative purposes.

10             MR. COZZENS:  Thank you, Judge.

11             THE COURT:  Thank you.

12        (Discussion off the record at counsel table.)

13             THE COURT:  Mr. Johnson, do you have any cross?

14             MR. JOHNSON:  Yes, I do, Your Honor.

15                          CROSS-EXAMINATION

16   BY MR. JOHNSON:

17   Q    Good morning, Mr. Johnson.

18   A    Hi.

19   Q    I'm a Johnson and you're a Johnson.

20   A    Hey.

21   Q    That's good, but we're not related, right?

22   A    No, sir.

23   Q    All right.  Let me ask you -- I'm only going to ask you a

24   few questions, but one of the questions I guess I have for you

25   is that you testified that you were there from 1981 -- you

1   were a Dyce employee from 1981 to 1988?

2   A    That's the best of my recollection, yes.

3   Q    All right.  Do you remember a situation in which there

4   was a perc tank that had a liner failing?  Do you recall if

5   that happened while you were there?

6   A    Yes.

7   Q    All right.  And let me show you --

8   A    Excuse me.

9   Q    Go ahead.

10  A    Can I repeat a little different way?

11       I recall it, but management was the one that determined

12  there was a problem with the lining, not me.

13            MR. COZZENS:  Your Honor?

14            THE WITNESS:  Management.

15            MR. COZZENS:  This is clearly beyond the scope of

16  the direct, and I thought we had an understanding about that.

17            THE COURT:  Sustained.

18            MR. JOHNSON:  Your Honor, it goes to the issue as to

19  whether he was there in 1979 or not.

20            MR. COZZENS:  That would still be irrelevant.

21            THE COURT:  Ask him.

22            MR. JOHNSON:  He testified that he was there in '81.

23  BY MR. JOHNSON:

24  Q    All right.  Let me ask you this.  Isn't it a fact that

25  you actually became employed at Dyce in 1979?

1    A    No.

2    Q    How do you know that?

3    A    My wife and I were married in 1977.  I have a son that

4    graduated from college.  We didn't have him; he wasn't born

5    until at least four years after my wife and I were married.

6    77 and 4 is 81.  My son was born after I was employed at Dyce.

7    That's how I know.

8              MR. JOHNSON:  Okay.  Thank you.

9              Can I take just a second, Your Honor?

10             THE COURT:  Yes.

11        (Discussion off the record at counsel table.)

12             MR. JOHNSON:  Mr. Johnson, I have no other

13   questions.

14             THE WITNESS:  All right.

15             THE COURT:  Sure.  You can step down.

16             THE WITNESS:  Thank you, Your Honor.  Am I relieved

17   from further interrogation, then?

18             THE COURT:  Yes.

19             THE WITNESS:  All right.

20             MR. COZZENS:  I might add, Your Honor, he had asked

21   for some assurance, because of the subpoena for next week --

22             THE COURT:  Yeah.

23             MR. COZZENS:  -- and I have assured him he does not

24   have to respond to that.

25             THE COURT:  No, you don't have to.  I discussed that

1    situation at sidebar, and you do not have to.  If the other

2    side wants to call you, they can call you by playing your

3    deposition.  You don't have to come back here and worry about

4    this, all right?

5              THE WITNESS:  Thank you, everybody.

6              THE COURT:  Yeah.  And take care of yourself.

7              Is that your picture, Mr. Johnson?

8              THE WITNESS:  No.  I'll leave it for you to take

9    home and put on your wall, Your Honor.  Do you want me to sign

10   it?

11       (Laughter.)

12             THE COURT:  Probably not a bad idea.

13             THE WITNESS:  Thank you, gentlemen.

14             MR. JOHNSON:  Thank you very much.

15             THE COURT:  Could be worth something someday, huh?

16             THE WITNESS:  Very much so.  Me and Elvis Presley,

17   you know.

18       (Discussion off the record at counsel table.)

19             THE COURT:  Now I think we're ready for another

20   witness.

21             MR. BANKER:  Your Honor, Soco calls Doug Johnston to

22   the stand.

23             WHEREUPON,

24                   MR. DOUGLAS JOHNSTON,

25   called for examination by counsel for defendant, after having

866

1  been first duly sworn to testify the truth, the whole truth,

2  and nothing but the truth, testified as follows:

3                          DIRECT EXAMINATION

4  BY MR. BANKER:

5  Q    Good morning.  Could you maybe put the microphone closer

6  to your mouth?

7  A    Sure.  Is that good?

8  Q    Yes.  Thank you.

9       Could you please state your name for the record?

10  A    Doug Johnston.

11  Q    Mr. Johnston, were you ever employed at the Dyce facility

12  in Lockwood?

13  A    Yes, I was.  1985 to 1986.

14  Q    What was your role at the Lockwood facility?

15  A    I was the warehouse supervisor.

16  Q    What were your responsibilities as the warehouse

17  supervisor?

18  A    Pretty much all of the day-to-day activity.  Shipping,

19  receiving, blending, maintenance.  Just supervision of

20  everything that went on there.

21  Q    How many employees were you responsible for supervising?

22  A    I had three normally, and then in the summer we had a

23  fourth.  Do you --

24  Q    Go ahead.

25  A    Dick Colver worked for me.  Marvin Johnson.  John

1  Vanover.  And, in the summer, a professor from EMC, Jay Shaw,

2  worked for us.

3  Q    Before you worked at the Dyce facility in Lockwood, where

4  had you worked previously?

5  A    I had been a plant manager of a refractory plant in

6  Pittsburgh.  I had worked for that company for 13 1/2 years.

7  We did specialty chemicals for the steel industry.

8  Q    What exactly is a refractory plant?

9  A    We made all types of high-temperature mortars and

10  coatings and ramming compounds.  A refractory material is a

11  material with a higher melting point than metal.

12  Q    In the years that you worked at the refractory plant, did

13  you have experience with chemical handling and storage?

14  A    Sure.  All types.

15  Q    When you came to the Dyce facility in Lockwood, how did

16  you get your job?

17  A    I, at the time, I was living over west of Missoula with

18  my wife and three kids, and I had come over to Billings.  I

19  had an interview at Montana Sulfur right by the Exxon

20  Refinery, and what they had for a position was basically very

21  entry-level and wasn't a great fit for me.  And as I was

22  leaving Montana Sulfur, I looked over to the right and I saw a

23  tank farm, which looked like home.

24  Q    Okay.

25  A    So I turned in there and just asked if they might be

1    looking for somebody.  And for whatever reason, their

2    warehouse superintendent had quit or been fired, whatever.  I

3    don't recall.  And so they were looking for somebody.  And Jim

4    Diede showed me around the facility and, you know, I was very

5    familiar with everything they were doing, so they made an

6    offer.  I accepted it.  Went home to Missoula County and got

7    my family.

8            MR. BANKER:  Can I you ask you to pull up Admitted

9    Exhibit 5038?

10           DOCUMENT TECHNICIAN:  (Complied with request.)

11   BY MR. BANKER:

12   Q    Do you recognize what's being depicted in this picture?

13   A    Yeah.  That's Dyce Chemical, and it looks to be the time

14   frame that I was there, the way it was configured.

15   Q    I'll represent to you that this is a 1983 photograph.  Do

16   you see any significant differences in the photograph between

17   that and the time that you were there?

18   A    The only thing that I see, this picture has one caustic

19   soda tank in between the two big buildings, and when I was

20   there, there were two tanks, high grade and low grade.

21   Q    If you touch the screen, it will leave a mark.  Could you

22   just mark where the caustic soda tank you were talking about

23   was?

24   A    Oh, sorry.

25   Q    I can get that off of there.

1    A    Yeah, it doesn't quite go where you put it.

2    Q    Is that close?

3    A    Actually they were in tandem, very close together.

4    Q    Okay.

5    A    And there was one other tank missing.  There was also a

6    full-strength bleach tank, sodium hydrochloride, a

7    polypropylene tank that sat there.

8    Q    Okay.  Any other significant differences between that

9    photograph and when you were there in 1985, '86?

10   A    No, that's what it looked like when I got there, pretty

11   much, with the exception of those tanks.  And then we did

12   have -- there was a big propane bottle over here, but I'm not

13   seeing it in this picture, but it was there when I was there.

14   Q    Okay.  Were you familiar with the containment at the Dyce

15   facility in 1985, 1986?

16   A    Yes.  That was -- should I touch the screen again?

17            MR. BANKER:  Well, why don't we zoom in on the --

18   show the berm area.

19            DOCUMENT TECHNICIAN:  (Complied with request.)

20   BY MR. BANKER:

21   Q    Now if you touch the screen, it should leave a mark.

22   A    Yeah.  It was just this area here, and there was a low

23   point in that pond that you see where, if need be, a suction

24   hose could be dropped to recover product.

25   Q    Why would you drop a suction hose into that pond?

1    A    Well, if there was something there you had to get back

2    out to rework or dispose of somehow, you'd have to pump it

3    into drums or a tanker or something, and the plan always was

4    that, were that the case, there's a low spot.  I forget

5    exactly where it was situated, but you would put a suction

6    hose there and pump the fluid out.

7    Q    And where would you pump the fluid?

8    A    To a tank truck or some suitable vessel.

9    Q    Did that ever happen while you were there?

10   A    No.

11   Q    Was there a berm when you were there in 1985, '86?

12   A    Yeah.  The L-shape structure there was a berm.  It, I

13   believe, was bentonite clay, which is impervious to fluid, and

14   also it had a membrane over it, like a heavy rubber membrane;

15   a mat, actually, that went in that whole ponding area and then

16   wrapped up over the berm.

17   Q    What was the purpose of the containment?

18   A    Well, as you can see -- you can't really see great, but

19   if anything were to spill in that whole tank farm area or the

20   loading area, the way that the property sloped, it would end

21   up in that corner.

22   Q    And was that by design?

23   A    Oh, I'm sure that it was.

24   Q    And why was that?

25   A    Well, you -- the bottom line in a facility like this, you

1   don't want anything to leave the property.  And I felt the

2   Dyce family, you know, was doing everything they could to be

3   good stewards.  What I found there appeared to be pretty well

4   put together, and there was enough volume in that pond area if

5   one, two, three of those chemical tanks would have ruptured,

6   for whatever reason, all that fluid would have been captured

7   there.

8   Q    Why was it that you didn't want any product to leave the

9   property?

10  A    Well, not all that stuff is environmentally friendly.

11  Q    And by "leave the property," do you mean get outside of

12  the containment berm?

13  A    Right.

14  Q    Did you feel -- did you have an occasion to walk the

15  containment area?

16  A    Well, right after I started there, because I was going to

17  be responsible for everything that was happening here, I

18  walked everything, and I looked at that whole containment

19  area.  The problem that I had with it when I started was that

20  it had become a catch-all for old rusty barrels and buckets

21  and busted pallets.  And whenever they would repipe something,

22  the old pipe and valves and fittings would get thrown there,

23  and it had become kind of a, just a catch-all for junk.

24  Q    Do you see any of those items in this 1983 picture?

25  A    Not really.

872

1    Q    Could you indicate where you saw that material?

2    A    Well, kind of in the area around where my first X was.

3    It was actually beyond the two points of the berm, so it was

4    inside of the area where you would catch product.

5    Q    So what did you do about that?

6    A    Well, I told Jim Diede that I didn't care for that

7    because if we did have a chemical spill, in addition to

8    recovering the product, now I had dozens of pallets and all of

9    the pipe and all of the equipment and junk that I had to wash

10   down, and that just would exacerbate the problem if you had a

11   spill.  So he let me use John Vanover and one of our big

12   flatbed trucks to haul all that stuff away.  And I guess we

13   probably sent five or six fully loaded flatbed trucks to the

14   landfill.

15   Q    Did you ever see the containment area when it was empty?

16   A    You know, quite a bit.  Most of the summer, into the hot

17   dry weather, it would be bone dry.

18   Q    Did you ever have an opportunity to look at the inside of

19   the berm when it was empty?

20   A    Sure.

21   Q    Did you ever have a chance to walk along the top of the

22   berm?

23   A    I never walked on it to crumble it or anything, but I

24   walked around it just to make sure everything was copacetic,

25   and it was in good shape the whole time that I was there.

873

1    Q     Now I'll represent to you that there has been testimony

2    in this case from Marvin Johnson about a pipe in this

3    containment area.  Did you see a pipe in the containment area?

4    A     No.

5    Q     That would be used to drain the containment area?

6    A     No.  No.

7    Q     What would you have done if you would have seen that?

8    A     Well, I would have had a problem with that.

9              MR. GROSSBART:  Objection, Your Honor.  It calls for

10   speculation.

11             THE COURT:  It does.  Sustained.

12   BY MR. BANKER:

13   Q     Would you have been concerned if you saw that?

14             MR. GROSSBART:  Same objection.

15             THE COURT:  Overruled.

16             THE WITNESS:  Answer?

17   BY MR. BANKER:

18   Q     Yes.

19   A     There's not much point in having a berm with a membrane

20   over it and then compromise it with a pipe of some type.

21   Q     Are you familiar with the full spectrum of chemicals that

22   Dyce was handling in the 1985-'85 time frame?

23   A     Yeah.  I unloaded, loaded all of them.

24   Q     If you are to -- those different chemicals have different

25   reactions with other materials?

1    A    Um-hmm.

2    Q    If you were to put a steel pipe into the containment

3    area, would that be resistant to the full spectrum of products

4    that were handled by the Dyce facility?

5            MR. GROSSBART:  Objection.  Calls for expert

6    conclusions.

7            THE COURT:  Overruled.

8            Well, I'm going to reverse that.  It's sustained.

9    It does call for expert conclusion.

10   BY MR. BANKER:

11   Q    Are you familiar with the effect that hydrochloric acid

12   has on steel?

13   A    Um-hmm, yes.

14   Q    Did you ever see that?

15   A    Yes.

16   Q    When did you see that?

17   A    We had hydrochloric acid at our main refractories, and it

18   dissolves steel.

19   Q    So if there was a steel pipe in the catch pond and

20   hydrochloric acid was in the catch pond, would that be sound?

21           MR. GROSSBART:  Your Honor, lacks foundation.  I

22   thought you just sustained this.

23           THE COURT:  It's irrelevant, too.  Sustained.

24   BY MR. BANKER:

25   Q    During the time that you were there, did the containment

1  ever overflow?

2  A    No.

3  Q    Was the containment ever pumped over the berm during the

4  time that you were there?

5  A    No.  Never did anything with it.  What was there just

6  evaporated.

7  Q    Was there ever any release of liquids or sediments from

8  the catch pond?

9  A    You mean an intentional release?

10 Q    Yes.

11 A    No.

12 Q    How about an unintentional release?

13 A    No.  I never saw that berm compromised, and we had some

14 very heavy rains.  I never saw it overflow.

15 Q    Were there any ditches dug outside of the berms?

16 A    You can see, in the picture, that there were ditches on

17 both sides that would funnel anything from the tank farm in

18 the loading area to the catch basin.

19 Q    And those ditches that you're pointing, could you just

20 mark those on the screen?

21 A    (Complied with request.)

22 Q    Okay.

23 A    And in addition to those, Dick Colver and I, because we

24 were getting so much parking lot and driveway water coming

25 through the loading area and going down to the containment

1    area, we cut through the asphalt and dug down and formed a

2    concrete trough with a steel grating cover that would catch

3    it, and that came off of the corner here and went to this

4    corner and then out to the back, so that any rainwater that

5    was cascading towards the loading area would be caught in that

6    trough and kicked out the back.  Otherwise, it would just lay

7    in that holding pond until it evaporated.

8    Q    So what was the purpose of that new grate that you put

9    in, exactly?

10   A    Well, if you did have a spill and you would allow

11   5,000 gallons of rainwater to make its way back there, now

12   you've just increased your capture by 5,000 gallons.

13   Q    I'd like to show you illustrative Exhibit 6000.

14        Your Honor, may I approach?

15            THE COURT:  Yes.

16   BY MR. BANKER:

17   Q    Are you able to see that diagram, Mr. Johnson?

18   A    Yes.

19   Q    I'll represent to you that that is a side-view diagram

20   that was drawn by Marvin Johnson, describing the pipe that he

21   testified was in the catch pond going through the berm.  And

22   he has indicated there, you can see on the picture, that it

23   was a foot to 18 inches below the top of the berm and went

24   down into the catch pond with a valve that he's indicated --

25   it's hard to see, but the valve he indicates is right there.

1        Did you see any such thing when the catch pond was empty?

2   A    No.  No.

3        Did he intend for it to be drawn sloping towards the

4   pond?

5   Q    That is the --

6           MR. GROSSBART:  Objection, Your Honor.  That is

7   improper.

8           THE WITNESS:  Oh, I'm --

9           THE COURT:  Yeah.  You have to answer questions.

10          THE WITNESS:  Oh, I'm sorry.

11  BY MR. BANKER:

12  Q    But you didn't see any such thing?

13  A    No.  Nope.

14          MR. BANKER:  Could we back out on the exhibit we

15  have up here so that -- let's leave it there for a moment.

16          DOCUMENT TECHNICIAN:  (Complied with request.)

17          MR. BANKER:  Thanks.

18  BY MR. BANKER:

19  Q    When you first began working at the Dyce facility and you

20  walked the property and took a look at it, were there any

21  other issues that you saw that caused you concern?

22  A    Yes, there were.  It was on first look, when I walked the

23  whole place to see what they had, what was going on, what

24  their safety measures were, I saw this mess down here.

25          Should I touch the screen?

1    Q    Why don't you touch the screen and show me where you're

2    focused.

3    A    This area down here in the corner where I could see --

4              MR. BANKER:  Let's zoom in now on that segment.

5              DOCUMENT TECHNICIAN:  (Complied with request.)

6    BY MR. BANKER:

7    Q    Are you able to better see that area now?

8    A    Yeah.  Just on first glance, I could see that that soil

9    was poisoned and sterile.

10   Q    Um-hmm.

11   A    And that caused me a lot of concern because while I was a

12   plant manager in Pittsburgh, we had annual visits from the

13   EPA, and we ran a very clean shop and always got a clean bill

14   of health.  And if there was something habitually leaving the

15   premises that was destroying the soil like that, I was ready

16   to quit.  I wasn't going to stay a full day.  I wasn't signing

17   on to that.

18         And I mentioned it to Dick Colver, and I said, you know,

19   "What's the deal with all of that sour ground down there?  It

20   won't even grow weeds."

21         And he indicated that there had been some kind of an

22   incident --

23             MR. GROSSBART:  Your Honor, this is all hearsay.

24             THE COURT:  It is.  Sustained.

25   ///

1  BY MR. BANKER:

2  Q    Did you develop an understanding of what had gone on down

3  there?

4        MR. GROSSBART:  It's going to be -- it's eliciting

5  the same hearsay, because that's what his understanding is

6  based on.

7        THE COURT:  Well, he just asked him if he developed

8  an understanding.  I'll overrule it if he asks what it is.

9  BY MR. BANKER:

10 Q    Did you develop an understanding of what had caused that?

11 A    Yes.

12 Q    And did it satisfy your concern?

13 A    Yes.

14 Q    Did you have any further concerns after receiving that

15 explanation?

16 A    Not regarding that, no.

17 Q    Would you have worked there as a supervisor of the

18 warehouse if your concerns hadn't been rectified?

19 A    No.

20        MR. GROSSBART:  Objection.  Calls for speculation.

21        THE COURT:  It's overruled.

22 BY MR. BANKER:

23 Q    Are you familiar with the perc handling at the Dyce

24 facility in the 1985 to 1986 time frame?

25 A    Yes.

1    Q    Are you familiar with the volume of perc that Dyce

2    handled with respect to other chemicals?

3    A    Compared to the acids or the caustic sodas, it was, you

4    know, a much smaller volume.  Just a fraction.

5    Q    Could you compare the weight of perc to the weight of

6    water?

7    A    I believe perc is a little heavier than water.

8    Q    Did you ever see -- can you compare how perc runs

9    compared to water?

10   A    Any of the chlorinated solvents are very fluid.

11   Q    Are you aware of any perc that ever reached the

12   containment area?

13   A    Not while I was there.

14   Q    If there had been a spill of, say, 5 gallons of perc --

15   A    Um-hmm.

16   Q    -- do you believe that it would have reached the

17   containment area?

18        MR. GROSSBART:  Objection, Your Honor.  Calls for

19   speculation.  Lack of foundation.  Expert opinion.

20        THE COURT:  Overruled.

21        THE WITNESS:  Answer?

22        THE COURT:  Overruled.

23   BY MR. BANKER:

24   Q    Yes.

25   A    Perc is very volatile and flashes off quickly.  It

1    evaporates.

2    Q    When you say -- okay.

3    A    And it would take a lot more than 5 gallons to get all

4    the way down to that containment area.

5    Q    When you say "a lot more than 5 gallons," what are we

6    talking about?

7    A    Oh, it would take, it would take hundreds of gallons to

8    make its way down there.

9    Q    If hundreds of gallons had gotten to the containment pond

10   and you were the warehouse supervisor, what would you have

11   done?

12   A    I would have drug a pump down there and, depending how

13   much there was, taken some empty barrels or a tote tank or

14   something and salvaged it.

15   Q    Why is that?

16   A    Well, for two reasons.  One, you don't want it to leave

17   the property like I indicated earlier.  And, two, it wouldn't

18   be any good for drycleaners, but it would still be good as a

19   degreaser, so we could have filtered it and sold it for

20   something.

21   Q    Would you have been concerned about perc -- if hundreds

22   of gallons of perc were sitting in the catch pond and you

23   didn't pump it out, would you be concerned about it sitting

24   down there?

25              MR. GROSSBART:  Objection.

1          THE COURT:  Sustained.

2    BY MR. BANKER:

3    Q    Are you familiar with the loading and unloading process

4    for perc at the Dyce facility in the 1985, 1986 time frame?

5    A    I don't recall a lot of specifics, but I know we had one

6    tank that just -- that was used for perc, and there was a

7    discharge hose on it that was dedicated to that tank, and it

8    had a cap on the end of the hose, a cam-lock cap with a gasket

9    in it, and the valve, so that, you know, there was a safety on

10   it.  And we only loaded it out sporadically.  We had, I guess,

11   four or five drycleaners in the area here that we would

12   provide with perc, using the little one-ton city delivery

13   truck, and then occasionally when our big truck would go down

14   to Cody or Hardin or somewhere with a load, they'd have a few

15   barrels of perc on there to deliver.

16   Q    Before I forget, on this picture, in the area where you

17   were concerned about the soil, were there ever any operations

18   down in that area in the 1985 or 1986 time frame?

19   A    No.

20   Q    How about chemical storage?

21   A    In that area?

22   Q    In that area.

23   A    No.  We never did anything back there.

24   Q    How many people were involved in the process of unloading

25   bulk tank or bulk truck deliveries when they came into the

1    Dyce facility?

2    A    Of the four of us that were there most of the time,

3    usually it would just be Dick Colver or myself that would

4    unload the railcars and the trucks.

5    Q    Would the -- when it came in on a truck, would the truck

6    driver be there?

7    A    Um-hmm, yes.

8    Q    Would the truck driver always stay with the truck when

9    they were unloading it?

10           MR. GROSSBART:  Your Honor, objection.  The truck

11   drivers go in for coffee.  It is irrelevant.

12           THE COURT:  It is repetitious from what other

13   witnesses have testified to.

14           MR. BANKER:  I am not doing a lot with that, Your

15   Honor.

16           THE WITNESS:  Answer?

17           MR. BANKER:  Yes.

18           THE COURT:  Go ahead.  Answer.

19           THE WITNESS:  Yeah, generally the truck drivers

20   would hang around and just kind of make sure the product got

21   from Point A to Point B and ended up where it needed to be.

22   BY MR. BANKER:

23   Q    Would the Dyce employees always stay with the truck

24   during the unloading process?

25   A    There was a lot of activity at any given time, and so it

1    would be impossible to just stay right there for the entire

2    unloading.  Once you determined that you had enough room in

3    the storage tank where the load was going and that all of the

4    fittings were tight and the pump was working and there were no

5    leaks, once everything looked okay, then you could go off and

6    do something else, hook up a railcar.  We had customer pickups

7    all the time.  We'd have to run over to the loading dock and

8    get somebody, you know, a 100-pound bag of this or that.

9    Q    When you say there's a lot going on, I mean, can you give

10   us a snapshot of what a typical day was like in 1985, '86?

11   A    I can remember going home one time, and I told my wife, I

12   said -- I just -- I was frazzled when I got home.  I said I

13   could not believe how much stuff I had going on at one time.

14   I had a railcar of, I believe it was, isopropyl alcohol that I

15   was unloading and a railcar of hydrochloric acid and a railcar

16   of caustic soda, and I had tank trucks one after the other

17   coming in for an outbound load or were bringing product in.  I

18   had barrels of product that I had to fill and buckets of

19   product that I had to fill, and I would have all that stuff

20   going on, and the office would page me to come and get some

21   guy a bag of caustic soda or whatever.  And it was just, it

22   was just hectic.  It was almost always like that.

23   Q    Even with all that going on, do you feel that you were

24   able to operate safely?

25   A    Well, I was -- I had a background in that kind of thing,

885

1    and I knew what I was doing, and I felt that I was competent.

2    Q    Are you familiar with the policies and procedures that

3    Dyce had in the 1985 and 1986 time period?

4    A    Just in -- just conceptually.  Just generally.  I don't

5    recall, you know, the verbiage.

6    Q    Was safety an important concept at the Dyce facility in

7    1985 and '86?

8    A    Oh, very much so.

9         MR. BANKER:  I'd like to pull up Admitted

10   Exhibit 3017, please, page 5 of the exhibit.  Pull out the

11   first half of the document there.

12        DOCUMENT TECHNICIAN:  (Complied with request.)

13   BY MR. BANKER:

14   Q    I'll represent to you that this is an exhibit that's been

15   admitted into evidence from the 1983 time period from the

16   personnel manual at the Dyce facility.  I'm going to read to

17   you from the document, if you would follow along:

18        "All employees are expected to perform their work in a

19   safe, efficient manner.  Precautions for maximum safety have

20   been adopted.  All equipment including trucks are to be kept

21   in a safe operating condition.  The supervisor or department

22   head should be informed immediately of any unsafe or faulty

23   equipment.  All personnel must wear hard hats in the

24   warehouse, in the tank farm, and on warehouse grounds.

25   Violation for safety procedures are grounds for immediate

1   dismissal.  A good safety program includes regular inspection

2   to detect safety hazards, constant adherence to safety rules,

3   knowledge of your materials and equipment, knowledge of

4   yourself and your fellow workers."

5        Is that consistent with the concept of the safety that

6   Dyce had when you were there in 1985 and 1986?

7   A    Yes.

8             MR. BANKER:  I'd like to turn to Admitted Exhibit --

9   this is Reserved Exhibit 3024.

10            DOCUMENT TECHNICIAN:  (Complied with request.)

11  BY MR. BANKER:

12  Q    Are you familiar conceptually with the Dyce facility

13  policy on the use of hoses to transfer chemicals in the 1985,

14  '86 time period?

15  A    I don't remember specific wording.

16  Q    Do you remember, generally speaking, what the policies

17  were regarding the use of hoses?

18  A    We had dedicated hoses for families of product so that

19  you didn't have to purge the hoses so much.

20  Q    Were those policies reduced to writing?

21  A    I seem to recall so, but that's been quite a little

22  while.

23            MR. BANKER:  Move for the admission of Reserved

24  Exhibit 3024.

25            MR. GROSSBART:  No objection.

1           THE COURT:  3024 is admitted.

2        (Exhibit 3024 was received in evidence.)

3           MR. BANKER:  Can we zoom in a little bit on the

4    first half of the document so it's easier to read?

5           DOCUMENT TECHNICIAN:  (Complied with request.)

6    BY MR. BANKER:

7    Q    Showing you what I'll represent to you is a Dyce company

8    policy from 1985 regarding hoses used to fill or empty tanks,

9    showing you, on the screen, where it says "Exhibit 1," I'm

10   going to read to you from the exhibit.

11       It says, "Hoses are not to be used for dissimilar

12   products.  In other words, the hose used for all types of

13   glycols is not to be used for amines, alcohols, caustics, or

14   other chemicals because we will have hoses for each of the

15   chemicals in a similar chemical group."

16       Is that consistent with the hose policy when you were

17   there in 1985, 1986?

18   A    Right.  That's what I mentioned earlier.  We had

19   dedicated hoses for chemical families.

20   Q    Why would you use -- why would you have dedicated hoses?

21   A    Well, you don't want to contaminate product, for one.

22   And to keep from doing that, you'd have to purge the hose.

23   Sometimes water would work.  You know, some chemicals, you

24   might have to use a solvent, so it would create a real mess to

25   have to clean that hose.

1    Q    Looking at the second paragraph that I've just marked,

2    the exhibit says, "Hoses are not to be left unattended when

3    the discharge is in a tank farm, tank drum, or other

4    receptacle."

5         Do you see that there?

6    A    Um-hmm.

7    Q    Is that consistent with the company policy when you were

8    there in 1985, '86?

9    A    I suppose.  I don't recall specifically.

10         MR. BANKER:  Can we go to the bottom half of the

11    document, please?

12         DOCUMENT TECHNICIAN:  (Complied with request.)

13    BY MR. BANKER:

14    Q    Looking at paragraph 7, it says, "All fittings used with

15    the hoses shall also be made of material that is compatible

16    with the material being handled and the temperature of that

17    material.  The same specifications apply to the joint

18    compounds and sealing tape used."

19         Do you know why that was?

20    A    Well, you didn't want to use a hose that had PVC fittings

21    with something that's a solvent for PVC.

22    Q    Why is that?

23    A    Because it would melt it, and that wouldn't be good.

24    Q    Did you ever see that happen?

25    A    No.  We were careful to segregate the hoses, and they

1    were dedicated to the product that they were suited for.

2    Q    Looking at paragraph 8 of this document, it says, "Leaks

3    will not be permitted, and any connection, hose, or fitting

4    that is dripping and leaking must be fixed before continuing

5    with the transfer of the liquid through the hose."

6        Is that consistent with the policy when you were there in

7    1985 and '86?

8    A    Right.  If we had a leaky fitting, we'd put new gaskets

9    in.

10   Q    What is the gasket on a hose?

11   A    That's the upper rubber O-ring that makes a soft seal

12   between the two pieces of metal and the male and female

13   fittings so that it is fluid-tight.

14            MR. BANKER:  I'd like to pull up Admitted

15   Exhibit 3102, please.  Can we zoom in on the top half of the

16   document, please?

17            DOCUMENT TECHNICIAN:  (Complied with request.)

18   BY MR. BANKER:

19   Q    You see at the top of the document there where it says

20   "Purpose"?

21   A    Yes.

22   Q    I'm going to read to you from the purpose of the company

23   policy.  It says, "Dyce Chemical, Inc. is dedicated to

24   maintaining a safe and clean environment.  Therefore, we have

25   policies and procedures that have, as a minimum, the legal

1    requirements of the EPA and other government agencies.  The

2    requirements of the enforcement agencies will vary from time

3    to time and from state to state.  It is our intent to keep you

4    updated and completely knowledgable about the requirements,

5    and we expect you to follow the instructions and, if any

6    problems exist, to correct it immediately and inform

7    management of the problem and action taken."

8         Is that consistent with the company policy when you were

9    there in '85 and '86?

10   A    Yes.

11   Q    Down below that, in the "Conditions" paragraph, do you

12   see that there?

13   A    Um-hmm, yes.

14   Q    It says, "Our policy anticipates safety standard to meet

15   and also actions to be taken.  This will cover the major

16   problems that we can face.  However, there are always the

17   unexpected and frequent occurrences that can happen.  We would

18   hope that our general policy towards the environment and

19   normal procedures to follow will give you the direction to

20   take in circumstances that occur unexpectedly."

21        Was that the policy that was there in 1985 and '86 when

22   you were there?

23   A    Yes.

24        MR. BANKER:  Can we zoom back out to the full

25   document, please?

891

1          DOCUMENT TECHNICIAN:  (Complied with request.)

2          THE COURT:  How much longer are you going to be with

3    this witness?  I'm going to take a -- let's take a recess

4    right now.

5          MR. BANKER:  Okay.

6          THE LAW CLERK:  All rise.

7       (Recess taken from 09:48:23 to 10:01:59.)

8       (Open court.)

9       (Jury present.)

10         THE COURT:  Please be seated.

11   BY MR. BANKER:

12   Q   Okay.  Before the break, Mr. Johnson, we were talking

13   about general statements of company policy.

14       I'd like to turn to page 2 of this exhibit, if we could,

15   and pull out the paragraph that starts with, "Spills."

16         DOCUMENT TECHNICIAN:  (Complied with request.)

17   BY MR. BANKER:

18   Q   And I'll read to you from that document.  "In the event a

19   spill occurs, it is to be handled in accord with your local

20   plant's published, written plan.  This plan is available from

21   the local manager if you have not seen it.  It is up to you to

22   make sure that you understand the plan for your local plant.

23   Information is available, and you should read and sign a copy

24   of it.  Management will make this available to you, but in the

25   rare event that you have not seen it, it is your duty to ask

892

1    to see it.  All spills are to be handled in accord with the

2    published laws and rules."

3         Is that an accurate statement of the company policy on

4    spills in the 1985, '86 time frame?

5    A    Yes.

6              MR. BANKER:  Turning to page 15 of the exhibit, blow

7    up, please, the first half of the document.

8              DOCUMENT TECHNICIAN:  (Complied with request.)

9    BY MR. BANKER:

10   Q    You recognize this as the spill policy for the Dyce

11   Lockwood facility?

12   A    Yes, I do.

13   Q    The first paragraph of the document -- I guess I've got

14   white here -- do you see where it says, "The policy of Dyce

15   Chemical, Inc. is to take every possible measure to prevent

16   contamination of the environment by any of the chemicals we

17   handle.  When we refer to environment, we are including air,

18   soil, and water as possible media of contamination that we

19   wish to protect"?

20        Was that true while you were at Dyce Chemical?

21   A    Yes.

22   Q    In the second paragraph, it goes on to say, "The

23   management of Dyce Chemical, Inc. is providing all of the

24   employees who will be physically handling materials with a

25   written policy.  We realize that we cannot cover every

893

1    possible condition that can arise.  However, we are depending

2    upon you to handle emergencies in a manner consistent with the

3    intent of our written policy.  Any questions you have should

4    be taken to your supervisor, and if he does not answer your

5    question to your satisfaction, it is your duty to ask him to

6    get further and satisfactory information for you from

7    management or other sources available to him."

8         Is that consistent with the policy in your time there?

9    A    Yes, it is.

10   Q    It goes on to say, "We want all employees to be concerned

11   for the environment and to make suggestions on anything they

12   feel we could do to improve our system of handling chemicals

13   to make it a safer procedure.  The suggestion should be in

14   writing and routed to Quentin Dyce, chairman of the board.

15   Since Mr. Quentin Dyce is making the environmental concerns

16   one of his priority projects, he will welcome any suggestions,

17   so do not feel that you should not bother him with this type

18   of data because he needs it for an efficient and workable

19   program."

20        Was that how Mr. Dyce reacted to suggestions?

21   A    Yes.

22            MR. GROSSBART:  Objection, Your Honor.

23            MR. BANKER:  I didn't hear your answer.

24            THE COURT:  Overruled.

25   ///

894

1   BY MR. BANKER:

2   Q    I didn't hear your answer, Mr. Johnson.

3   A    Yes.  Quentin was very diligent about all that.

4   Q    And were you?

5   A    Yes.

6   Q    The next paragraph, it says, "It is our policy to be

7   concerned about any spill that occurs whether it is of a

8   hazardous material or a nonhazardous material."

9        Were you concerned about any sort of spills that would

10  have occurred on your watch?

11  A    Very much so.

12            MR. BANKER:  Can we go to the bottom half of the

13  document?  Could we blow up, actually, the last paragraph on

14  the page, please?

15            DOCUMENT TECHNICIAN:  (Complied with request.)

16  BY MR. BANKER:

17  Q    I've blown up the last paragraph here, and I'm going to

18  read it to you.  It says, "Any spill that we have, whether it

19  is hazardous material or nonhazardous material, shall be

20  handled to prevent its loss into the environment.  For

21  instance, if a bag of soda ash breaks and spills on the

22  ground, it is a nonhazardous material.  You will still take

23  tape and repair the bag satisfactorily or rebag it into a new

24  bag and label it by placing the broken bag label on the bag or

25  writing the name of the product on the new bag and all other

895

1    necessary information for it to be legal and to be identified.

2    We would expect a broom and dust pan to be used to recover

3    every possible ounce."

4        Is that consistent with the policy when you were there in

5    1985 and 1986?

6    A    We did that, yes.

7        MR. BANKER:  Turn to the next page of the exhibit,

8    3102, page 16, please.  I'd like to blow up the last paragraph

9    on that page.

10       DOCUMENT TECHNICIAN:  (Complied with request.)

11   BY MR. BANKER:

12   Q    This says, "Our policy is that all spills be handled as

13   emergencies and be cleaned up as quick as possible so they do

14   not soak into the ground, run into any stream or ditch or

15   water of any kind or sewer.  Remember that powdered and solid

16   material can be just as dangerous, and, once it is dissolved,

17   it becomes and acts as a liquid.  Therefore, the precautions

18   should be taken while these materials are still solids and

19   more easily handled."

20       When you were at the Dyce facility in 1985 and 1986, was

21   it your policy to treat all spills as emergencies?

22   A    Yes, it was.  We -- you know, that wasn't a thing that

23   happened.

24   Q    It wasn't a thing that happened, but this was the policy

25   if it did happen?

1    A    Right.

2    Q    Now you worked most directly with three people, I think,

3    as a supervisor?

4    A    Yes.

5    Q    During your time there in 1985, '86, do you believe it

6    would have been possible for a spill to have occurred that you

7    wouldn't have known about?

8              MR. GROSSBART:  Objection, Your Honor.

9              THE COURT:  Sustained.

10   BY MR. BANKER:

11   Q    During the time that you were there in 1985, '86, was

12   there any theft of perc that you were aware of?

13   A    No.

14   Q    I want to focus you back.

15        And could we pull up Exhibit 5038?  I'd like to focus in

16   on the catch pond area and berm.

17             DOCUMENT TECHNICIAN:  (Complied with request.)

18   BY MR. BANKER:

19   Q    When you were looking at the inside of that berm and the

20   containment was empty --

21   A    Um-hmm.

22   Q    -- do you know how tall the berm was on the inside,

23   facing north?

24   A    It was probably 3 to 4 feet.

25   Q    And you had a chance to observe that?

1    A    Yes.

2    Q    Now you remember when we talked earlier and we looked at

3    Exhibit 6000 of the drawing that Marvin Johnson made, I'll

4    represent to you that there's been testimony by Marvin Johnson

5    that his supervisor asked him to go out and drain liquid from

6    containment, and, in particular, he named you, Doug Johnston,

7    as his supervisor who asked him to do that.

8         Let me ask you.  Did you ever ask Marvin Johnson to go

9    and drain any liquid from that catch pond through a pipe?

10   A    No.  Never.

11   Q    Would you have done that?

12   A    No.  It makes me cringe to even envision that.  And there

13   wasn't any pipe to drain it through in the first place.

14   Q    Do you know what Marvin Johnson is talking about, then?

15             MR. GROSSBART:  Objection, Your Honor.

16             THE COURT:  Sustained.

17             MR. BANKER:  I have nothing further.

18             THE COURT:  Mr. Grossbart.

19                       CROSS-EXAMINATION

20   BY MR. GROSSBART:

21   Q    Good morning, Mr. Johnston.  My name is John Grossbart.

22   I represent one of the insurance companies here today, USF&G.

23        You said you worked out at Dyce Lockwood in 1985 and

24   1986.  Do you know when in 1986 your employment terminated or

25   ended?

1   A     Seems like it was in the fall.

2            MR. GROSSBART:  All right.  Would you put up

3   Exhibit 4835, please, just for the witness and counsel?  I'm

4   going to ask if there are objections to this document.

5            MR. LYNCH:  No objections.

6            MR. GROSSBART:  All right.

7            Go to the last page.  It's only a two-paged

8   document, Neil.

9            THE COURT:  4835 is admitted.  Does it show that on

10  the record?

11           MR. GROSSBART:  Yeah, I move the admission of 4835.

12  There's no objection.

13           THE COURT:  Admitted.

14       (Exhibit 4835 was received in evidence.)

15           MR. GROSSBART:  I'm sorry; go to the first page,

16  Neil.

17           DOCUMENT TECHNICIAN:  (Complied with request.)

18  BY MR. GROSSBART:

19  Q    The document states at the top, "General Manager's

20  Monthly Report, Billings, Montana, April 30, 1986."  Do you

21  see that, sir?

22  A    Yes.

23  Q    And you think you were still there at the time?

24  A    Yes.

25           MR. GROSSBART:  All right.  Go to the second page,

899

1    Neil, please.  Highlight the first line under "Personnel."

2              DOCUMENT TECHNICIAN:  (Complied with request.)

3    BY MR. GROSSBART:

4    Q    This says you've resigned and will be replaced by Gary

5    Cornwell.  That's what the exhibit in evidence says, right?

6    A    It seemed a lot longer.

7    Q    Well, that's okay.  It's not a criticism.  My question

8    was going to be, You didn't resign and then stay around for

9    six months --

10   A    Oh, no.

11   Q    -- to train somebody new or anything like that?

12   A    I made it through the winter.

13   Q    So when you resigned, you were done?

14   A    Oh, I haven't even driven past it, even though I lived in

15   town another four years.

16   Q    Well, that's fine.  So you were gone by April 30, 1986,

17   in terms of your employment?

18   A    Yeah, according to this, I was.

19   Q    Okay.  Do you remember when you started in 1985, what

20   time of year it was?

21   A    It was the first Monday in June, and John Vanover and I

22   started the same week.

23   Q    First Monday in June of 1985, and you were gone by the

24   end of April of 1986, so we've heard a lot of questions about

25   Dyce's policies in 1985 and 1986, but in point of fact, you

1    were there for ten months?

2    A    Right.

3    Q    Correct?

4    A    Yes.

5    Q    Happened to span those two calendar years, but you

6    weren't there for a year and a half or two years?  You were

7    there for ten months?

8    A    Correct.

9    Q    Now you were shown Exhibit 5038.

10        Could you pull that up, please, Neil?  And enlarge on the

11   catch pond area.

12            DOCUMENT TECHNICIAN:  (Complied with request.)

13   BY MR. GROSSBART:

14   Q    Correct me if I'm wrong, but I believe you described this

15   berm area as bentonite?  Did I hear you correctly?

16   A    It appeared to either be made of bentonite clay or topped

17   with bentonite clay.

18   Q    Right.  The surface visible to you was bentonite?

19   A    I thought it was.

20   Q    Yes.  And bentonite is a clay?  At least that's your

21   understanding --

22   A    Right.

23   Q    -- correct?

24        And was it whiter or lighter in color than the

25   surrounding soil in actuality when you walked around it and as

1    it appears on this photo?

2    A    Yes.  It's a light powdery gray.

3    Q    Do you know what gunnite is?

4    A    Yes.

5    Q    This was not gunnite?

6    A    There may have been gunnite in the structure of it, but I

7    don't recall specifically.

8    Q    Well, I'm asking you whether what you saw on top of the

9    berm might have been gunnite rather than bentonite, or are you

10   certain it's bentonite?

11   A    It could have been gunnite.

12   Q    Could it have been something else altogether, neither

13   bentonite nor gunnite?

14   A    Well, whatever it was, it was impervious to liquid, and

15   it was a good, durable berm.

16   Q    All right.  So you don't really know that it's either

17   bentonite or gunnite?  You're guessing?

18   A    I didn't probe it.  I didn't disturb it or core-sample

19   it.

20   Q    You could tell the difference?

21   A    I just saw it there.

22   Q    You could tell the difference between bentonite and

23   gunnite just by going up and kind of touching it, couldn't

24   you?

25   A    Well, sure.

902

1  Q    And you didn't do that?  You didn't touch it?  Didn't

2  want to go near there?

3  A    Didn't have a need to.

4  Q    All right.  You don't know what it is, do you, sir?

5  A    You know, that's 26 years ago.

6  Q    It's not a criticism.  I'm just asking.  You really don't

7  know what it is, do you?

8  A    I thought that it was -- I seem to recall that it was

9  bentonite.  And I know what gunnite is.  I have placed gunnite

10 numerous times.  But --

11 Q    But you couldn't rule out -- I don't mean to be picking

12 on you here, but do you know what it was or not?

13 A    From where I'm sitting today, 26 years later, I can't

14 say --

15 Q    Sure.  Okay.

16 A    -- for sure, bentonite or gunnite.

17 Q    Whatever it was, how far down -- well, let me rephrase

18 that.

19      Whatever it was, it was on the top of the berm surface,

20 whatever it was, correct?

21 A    The berm surface was the same.  It was monolithic up the

22 front and over the top, down the other side.

23 Q    Well, that's what I'm getting at.  But there's a top of

24 the berm, and this material is on -- at the top of the berm,

25 right, whatever it is?

1   A     Right.

2   Q     And it then goes down the slope, if you will, of the

3   berm; is that right?

4   A     Yes.

5   Q     And did you ever observe how far down the slope it went?

6   A     Back to grade on the far side.

7   Q     Okay.  What about on the side, the catch pond side?  How

8   far did it go?

9   A     There was a membrane over it.  So without pulling the

10  membrane away, I couldn't say definitively where the berm

11  material stopped and started.

12  Q     Now as long as we're on this photo, I believe you talked

13  about this area here being -- I think you described it as

14  sterile?

15  A     Soured.

16  Q     I'm sorry?

17  A     Soured.

18  Q     Soured?

19  A     Well, the soil had been contaminated with something to

20  where it wouldn't even grow weeds.

21  Q     All right.  So it was bare soil to the naked eye,

22  correct?

23  A     Right.

24  Q     And was this an area -- did this area just sort of slope

25  in through there, kind of in that direction, or was it level?

1  Can you describe that area there?

2  A    As I recall, everything sloped to a gradual downhill off

3  to the northwest.

4  Q    So -- but the area through here, then, was flat with a

5  slope to the north, northwest?  Is that a fair statement?

6  A    Yes.  There was a bevel to it, to the northwest.

7  Q    Right.  You don't remember this as a great big pile of

8  dirt, do you?

9  A    I don't recall that.

10  Q    You don't recall that.  You don't, even as a not-so-big

11  pile of dirt, couple-feet pile of dirt?

12  A    There may have been.

13  Q    Well, do you remember it or not?

14  A    Specifically how the dirt was configured, whether it was

15  piled or graded smooth or --

16  Q    Well, you told me this area was graded smooth just a

17  minute ago.  And now I'm asking you, are you sure, and isn't

18  it -- I'll ask it differently.  Let me start over.

19      You told me a minute ago that the area was graded, was

20  graded flat or smooth with a slope going in that direction.

21  A    Right.

22  Q    Now I'm asking you, is it possible that you're wrong and

23  that's a great big pile of dirt; 2, 3 feet pile of dirt tall?

24  A    The overall terrain --

25  Q    Can you just really try to answer my question first?

905

1    A    I'm trying to ascertain what it is.  I can't speak to how

2    the texture of the ground was.  All I can tell you is that it

3    was higher here than there.  I can't recall ripples in between

4    or pilings.

5    Q    I am not asking about ripples.  But if somebody went into

6    this catch pond, just perchance, with a backhoe and dug out

7    the dirt and put it over there, there would be a pile of dirt,

8    and everybody would know it's a pile of dirt because we all

9    know what a pile of dirt is?

10             MR. BANKER:  Objection.  Speculation.

11             THE COURT:  Overruled.

12             THE WITNESS:  There may have been some dirt piled

13   there.

14   BY MR. GROSSBART:

15   Q    Okay.

16   A    I can't specifically recall that.

17             MR. GROSSBART:  All right.  Neil, would you please

18   put up 5033, please?  And enlarge on the same area.

19             DOCUMENT TECHNICIAN:  (Complied with request.)

20   BY MR. GROSSBART:

21   Q    Do you see a pile of dirt there?  Same area we're talking

22   about?  Do you see it more clearly in this photo?

23   A    I see disturbed soil, fresh soil, but, from this angle,

24   it's hard to tell the depth of it.

25   Q    Well, this is the area you told me was sterile and

1    couldn't grow anything.  Same area, right?

2    A    Well, beyond that, where there was natural vegetation?

3    Q    No, sir.  I'm talking about the dirt pile, quite frankly.

4    This thing.  I'm talking about that area.  You told me it was,

5    and told us on direct, it was sterile in 1983.  It wouldn't

6    grow anything.

7    A    In '85.

8    Q    Well, the last picture was 1983.

9    A    But in 1985 when I looked at it, it was -- I determined

10   that it wouldn't even grow weeds.

11   Q    Well, all right.  And you looked at a 1983 picture and

12   you saw no weeds growing, right?

13   A    Right.

14   Q    Now we're in 1981.  You don't see any weeds -- weeds are

15   still not growing on this area, right?

16   A    Well, that appears to be freshly excavated earth.

17   Q    So you don't think whatever was in that freshly excavated

18   earth in 1981 -- you would concede, would you not, that

19   whatever was in that pile of earth in 1981 may have left

20   something behind by the time you got there in 1985?

21   A    How would I know that?

22        MR. BANKER:  Objection, Your Honor.  He's asking

23   questions --

24        THE COURT:  Yeah.  Sustained.

25   ///

907

1   BY MR. GROSSBART:

2   Q    When you were employed your ten months, was there

3   construction, major construction project going on at Dyce?

4   A    In the spring of '86, they did bring in a contractor to

5   redo the tank farm, and they poured all new concrete, and the

6   plan was to put a concrete wall around the tank farm.

7   Q    How long a project, timewise, was that intended to take?

8   A    I'm not sure.  Initially they talked about Dick Colver

9   and I doing it in our spare time, but we really didn't have

10  any spare time, so they brought somebody in from the outside,

11  and that project was just getting started when I decided to

12  leave.

13  Q    Just getting started in April of 1986?

14  A    Right.

15  Q    Did that project involve, as far as you understood, the

16  filling in or decommissioning, I guess might be the word, of

17  the catch pond and going to a different system of wastewater

18  management?

19  A    I wasn't part of any of those discussions, if it were.

20  Q    And by the time you left in April of 1986, was the catch

21  pond still up and functioning as it always had while you were

22  employed there?

23  A    Yes.

24        MR. GROSSBART:  Can you put back up Exhibit 4835,

25  please?  Highlight the bottom line and onto the next page.

1    Yes, very bottom line.

2              DOCUMENT TECHNICIAN:  (Complied with request.)

3    BY MR. GROSSBART:

4    Q    It says, "Billings tank farm construction is progressing

5    steadily.  If weather permits, completion of this project

6    should be the latter part of May."

7    A    Um-hmm.

8    Q    This memo was written the latter part of April, so that's

9    a month away, and it's your testimony that all this

10   construction was just starting?

11   A    Well, they had done a lot of the concrete work to set the

12   tanks on.  A lot of the floor of the tank farm was already

13   poured.

14   Q    Well, so with that happening, wasn't the catch pond gone

15   by then?

16   A    I don't recall, but we would have still needed it because

17   there was nothing else.

18   Q    Why don't you put up -- let me ask you this.  You've been

19   at least by the Dyce facility since the project was finished,

20   have you not?  You've looked at it?

21   A    No.

22   Q    You've not been back there at all since 1987?

23   A    Since the day that I quit, I haven't even been down

24   Lockwood Road.

25   Q    Oh, okay.

1    A    It's . . .

2    Q    Now getting ready for today, did you have the opportunity

3    to meet with some of the lawyers representing Soco?

4    A    Yes.

5    Q    Could you just tell us who you met with?

6    A    With Paul.

7    Q    Paul Banker.  Anyone else?

8    A    A few years ago, I was interviewed by, I believe it was,

9    Tom Mielenhausen.

10   Q    Tom Mielenhausen interviewed you a few years ago?

11   A    Right.

12   Q    Where did that happen?

13   A    In Madison, Wisconsin.

14   Q    That's where you --

15   A    Where I currently work.

16          MR. GROSSBART:  Now would you put back up

17   Exhibit 5038 and enlarge on it?

18          DOCUMENT TECHNICIAN:  (Complied with request.)

19   BY MR. GROSSBART:

20   Q    Now I think you said in direct that somewhere in this

21   side of the catch pond there was a suction hose there in case

22   it was needed.

23   A    No, I said we would drag a suction hose there.  There was

24   nothing there all the time.

25   Q    Okay.

1    A    But that was the plan, was to go in there with a pump and

2    recapture whatever may have been spilled.

3    Q    And during your ten months, you never saw that suction

4    hose used for any purpose having to do with the catch pond;

5    fair statement?

6    A    No, there was no need.

7    Q    Right.  I understand.  And because there was no need, you

8    never saw it utilized for any purpose relating to the catch

9    pond?

10   A    You're talking about it like it's a specific hose.

11   Q    No, no, sir.  Used to deal with something going into the

12   catch pond, for whatever reason.  You never saw it used for

13   that purpose?

14   A    But when you say "it," you're calling, you're alluding to

15   a specific hose.

16   Q    Any hose.

17   A    We would have taken whatever hose was germane to that

18   family of products had a product been spilled.

19   Q    I didn't mean to suggest it was a specific hose.  But you

20   never saw any hose used for that purpose?

21   A    No.  We never had anything back there but a little bit of

22   muddy rainwater.

23   Q    You don't know what happened by way of draining or not

24   draining the catch pond before June of 1985?  You have no

25   personal knowledge one way or another of that, correct?

1   A      No, I would have no way of knowing.

2   Q      Of course.

3          Would you put up Exhibit 3024, please?

4          DOCUMENT TECHNICIAN:  (Complied with request.)

5   BY MR. GROSSBART:

6   Q    This policy is dated October 29.  Do you see that at the

7   top?

8   A    Yes.

9          MR. GROSSBART:  And why don't you highlight -- let's

10  start at the beginning of the hoses section, the first two

11  paragraphs.

12         DOCUMENT TECHNICIAN:  (Complied with request.)

13  BY MR. GROSSBART:

14  Q    And there's an introductory sentence about hoses, and the

15  document goes on to say, "We find that this is a condition

16  that has caused overfilling, possible spill conditions, and,

17  in general, resulting in conditions that are not acceptable to

18  good operating practices."

19         Do you see that?

20  A    Yes.

21  Q    So it's a fact, is it not, sir, as plainly evident from

22  this document dated October 29, 1985, that before October 29,

23  1985, there were problems with hoses, and that's why this

24  policy came out as it did, correct?

25         MR. BANKER:  Objection.  Lack of personal knowledge.

1  He's testified --

2          THE COURT:  Well, if he knows.

3  BY MR. GROSSBART:

4  Q    If you know.

5  A    I'm not sure what specifically this is alluding to.

6  Q    Fair enough.

7       The document goes on, in the very next sentence, "Our

8  policy on hoses and their use shall be as follows."

9       And then all of the stuff that Mr. Banker read follows,

10 right?

11 A    Right.

12 Q    And you got this document while you were an employee, did

13 you not?

14 A    Right.

15 Q    And you understood that this was an announcement that

16 this is how we're going to do it from this day forward,

17 meaning from October 29, 1985?  That's how you understood it

18 then, didn't you?

19 A    Dedicated hoses.

20 Q    Yeah.  Starting in October of '85, right?

21 A    Well, we'd done it before that, but it was in writing as

22 of that date.

23 Q    Well, are you telling us that this is just confirming

24 what had always been the case as opposed to announcing a new

25 policy?

913

1   A     Pretty much so.

2   Q     Well, what does that mean?  Yes?

3   A     Well, it means if you had hoses that were only used for

4   caustic soda, you didn't use them for acid or amines or

5   anything else.

6   Q     You don't have any personal knowledge about how hoses

7   were used or not prior to June of 1985, do you?

8   A     No, I do not.

9   Q     You don't know anything about rinsing of hoses prior to

10  that time?

11  A     Nope.

12  Q     About rinsing of pumps prior to that time?

13  A     No, sir.

14  Q     Barrel cleaning prior to that time?

15  A     Not before I was there.

16  Q     And if you had seen a spill -- you weren't afraid of

17  Mr. Dyce, were you, Quentin Dyce?

18  A     No.

19  Q     If you had seen a spill, you would have reported it?

20  A     Sure.

21        MR. GROSSBART:  And if you would pull up, Neil,

22  Exhibit 3102?

23        DOCUMENT TECHNICIAN:  (Complied with request.)

24  BY MR. GROSSBART:

25  Q     This is a whole 'nother series of policies that were read

1  to you on direct on a document dated September 16, 1985.  Do

2  you see that?

3  A    Yes, I do.

4  Q    Is this just another sort of confirming-how-we've-done-

5  it-all-along memo, or is this announcing a new policy as of

6  that date?

7  A    No, I think it was affirmation of what was going on, what

8  was good practice that had been in place.

9  Q    But you would agree with me, this is the first written

10  pronouncement of what you claim has always been going on?

11  A    That's --

12  Q    Is that your testimony?

13  A    -- the first written announcement that I was aware of.

14  Q    Well, you'd been at Dyce for -- since June of '85.

15  A    Something may have come and gone prior to me, but in my

16  tenure there, this is the first that I recall --

17  Q    All right.  So from --

18  A    -- where things were restated.

19  Q    Well, if this is the first one you've seen, how do you

20  know things are being restated rather than stated for the

21  first time?

22  A    We had policies.

23  Q    Were any of them shown to you on direct examination?

24  A    When I started there, there was an employee handbook,

25  and --

                                915

1   Q    So my question is, Were any of them shown to you on

2   direct examination?  Just point them out to me and I'll deal

3   with it.  I was here, too, and I didn't see them.  Were any of

4   them shown to you on direct examination today?

5   A    We had policies and procedures, things that we did.

6   Q    In writing?

7   A    Dedicated -- no, I'm just -- let me --

8   Q    Go ahead.

9   A    -- complete my whole statement.

10       We had policies and procedures, dedicated hoses, ways

11   that we did things that made the most sense, the least rinsing

12   of hoses, no opportunity for cross-contamination.  Those were

13   in effect, and, for whatever reason, they felt that at this

14   point in time, in the fall of '85, they should put it in

15   writing and make it very clear and succinct.

16   Q    Were you consulted about putting it in writing as a

17   manager and all that?

18   A    I was the warehouse manager.  I was not privy to

19   high-level discussions.

20   Q    So the answer is no?

21   A    The answer is no.

22       MR. GROSSBART:  Now can we take a -- let's take a

23   look at 5033.  Focus in on the tank area.

24       DOCUMENT TECHNICIAN:  (Complied with request.)

25   ///

916

1  BY MR. GROSSBART:

2  Q    And I'm using this photo.  It's very similar to the '83

3  photo, but I think something is clearer on this photo.  Is

4  this, in fact -- and I'm just going to put a line on it.  Then

5  I'm going to remove it, because I don't want to obstruct, but

6  you see where I've made the line.

7       Is that the beginning of a channel or a drain that, if

8  you follow it up the photo, goes to the catch pond?

9  A    It appears to be, but this is not the configuration of

10 the facility in '85.

11          MR. GROSSBART:  Okay.  Let's go to, then let's go to

12 5038, and enlarge the same area.

13          DOCUMENT TECHNICIAN:  (Complied with request.)

14 BY MR. GROSSBART:

15 Q    This is the photo that you testified from on direct.

16 Isn't that the same thing we just saw, a drain to the catch

17 pond?

18 A    It appears to be.

19 Q    Okay.  So you would agree with me that particular

20 feature, that drain apparent on the '81 photo, we're looking

21 at now an '83 photo, is now an 1983 photo, okay?

22          THE REPORTER:  I'm sorry; it's apparent on the --

23 BY MR. GROSSBART:

24 Q    The 1981 photo is -- let me just start all over again.

25       This ditch or drain or tunnel or trench, whatever you

917

1   want to call it, you've identified it on 5038, correct?

2   A    Well, I agreed with what it appears to be.  It appears to

3   be a ditch or a swale.

4   Q    Well, do you remember a ditch there?

5   A    Not specifically.

6   Q    In any event, I think you said on direct that in order

7   for a perc spill to reach the catch pond, it would have to be,

8   did you say, hundreds of gallons?

9   A    Well, it's quite a ways from where we would load perc

10  over in this area, all the way to the catch pond.

11  Q    I'll get to that.

12       You said it had to be hundreds of gallons, right?

13  A    Well, at the rate that it evaporates, I would say yes.

14  Q    Okay.  So it's your testimony that if 200 gallons of perc

15  spilled on top of that drain, none of it would get to the

16  catch pond?

17  A    Two hundreds are hundreds.

18  Q    Two hundred.

19  A    Two hundred is hundreds.

20  Q    So is -- I wanted to narrow it down.  I picked 200.

21  We'll pick some other numbers for fun after that, but how

22  about 200?

23  A    Well, it's -- I don't know within gallons the specific

24  quantity.  Let me rephrase that and say it would have to be a

25  lot of perc.

1   Q      What do you mean by "a lot"?

2   A      Enough to still have some fluid as it got clear back to

3   the pond.

4   Q      You don't know how much perc?

5   A      I never spilled hundreds of gallons to experiment.

6   Q      I understand that, sir, but you testified about it on

7   direct, and I'm trying to establish now quite frankly that you

8   really don't know what you just --

9   A      I envisioned, if you will, having worked around the

10  product quite a little bit and observed how fast it

11  evaporates, that it would have to be quite a quantity of perc

12  to still have flow when it got all the way down to the catch

13  pond.

14  Q      And I am just trying to understand how much.  So -- but

15  the "quite a quantity" you're talking about has at least three

16  digits, right?  A one, a zero, and a zero, or higher?  I'm

17  just trying to get some order of magnitude.

18  A      I would think so.

19  Q      Okay.  Would that be true irrespective of whether the

20  drain had some other fluid in it or was dry, or does that not

21  make a difference?

22  A      Well, the condition of that ditch would be germane, I'm

23  sure, but, there again, I haven't experimented either way with

24  a dry ditch or a wet ditch.

25  Q      When you were there in 1985, 1986, for ten months, was

919

1    this ditch lined with some material, concrete, metal, asphalt,

2    or was it a dirt ditch, or you don't recall?

3    A    What I recall about those ditches is that they were just

4    dirt.  And as far as the nature of perchloroethylene and its

5    behavior in a spill, all I ever saw hit the ground would be

6    one or two drops when you took the hose fittings loose.

7    Q    So if perc made it to the catch pond from here, it had to

8    be a lot of perc; otherwise, on the way there, it would

9    evaporate or go into the ground in the ditch?

10   A    That was my assertion.

11   Q    Okay.

12   A    And now I regret putting a volume to it, but that was my

13   assertion.

14   Q    No, but you've clarified it.

15        Are you being paid for your time today?

16   A    As far as?

17   Q    As far as anything.

18   A    Well --

19   Q    I'm sure -- you obviously got paid for your plane ticket.

20   I understand that.  Right?

21   A    They paid to get me here, but the company that I work for

22   has a policy where, if you're called for jury duty or to be a

23   witness, either one, that I get, still get my salary this

24   week.

25   Q    I beg your pardon?

1    A    I still get my salary from work.

2    Q    And you're not getting a consulting fee or anything from

3    Soco West, are you?

4    A    No.

5         MR. GROSSBART:  Okay.  I have nothing further.

6         MR. DAVIS:  Briefly, Judge?

7         THE COURT:  Yes.

8         MR. DAVIS:  Thank you.

9                        CROSS-EXAMINATION

10   BY MR. DAVIS:

11   Q    Mr. Johnson, my name is -- Johnston, my name is Max

12   Davis.

13        I take it the policies that Mr. Grossbart talked to you

14   about, Mr. Banker showed to you and the jury, those were kept

15   in binders somewhere?

16   A    Yes.

17   Q    I mean, I don't want to be facetious about this, but you

18   and the people working under you out on the Dyce yard didn't

19   walk around with binders tethered to your belts with policies?

20   A    No, but the information was in the office, and anything

21   you had a question about, I would go to Jim Diede, and he

22   would clarify.

23   Q    All right.  And for those policies in binders to be

24   implemented, it took management to direct the people working

25   underneath management to follow the policies, right?

1   A      Right.

2   Q      And you've been in situations where there have been

3   policies and binders on the shelves and they stay on the

4   shelf, and they don't get implemented; isn't that true?

5   A      You mean where policies were neglected or ignored?

6   Q      Yeah, yeah.  You've seen that.

7   A      I don't know that I have.

8   Q      Oh, you haven't.  All right.  You're kind of a guy who

9   makes sure that the rules are followed, I take it?

10  A      Well, I've been in management for a number of years.  I

11  worked around chemicals starting back in high school from the

12  age of 16 on, and I learned good practice in the early years,

13  and that's what I was raised to do.  That's what I grew up

14  doing, is proper handling of chemicals.

15  Q      All right.  By the way, we got 5038 still on the screen

16  there?

17  A      Yes.

18  Q      That's a -- I'm going to put a dot on it.  That's a

19  tanker truck, isn't it?

20  A      Yes, it is.

21  Q      Yeah.  And it's pulled up by the drumming shed?

22  A      Right.

23  Q      And that's normally how, when tanker trucks came into the

24  Dyce yard for the ten months you worked there, that's where

25  they pulled in to unload liquids, isn't it?

922

1    A    Yeah.  There was a complex of pumps and fittings kind of

2    in that area.

3    Q    So, I mean, what's depicted there is a typical scene of a

4    tanker truck at Dyce when you were there, isn't it?

5    A    Yep.

6    Q    Okay.  Going back to the other thing, the other point I

7    was trying to make with you -- Neil, could you pull up

8    3059-121?  It's in evidence.

9              DOCUMENT TECHNICIAN:  (Complied with request.)

10   BY MR. DAVIS:

11   Q    Mr. Johnston, I think you testified that as long as you

12   were at Dyce over those ten months, the most perc that was

13   ever spilled was one or two drops?

14   A    Well, just taking a hose loose, there are always a few

15   drips, but I never was aware of any quantity of perc.

16   Q    Okay.  And so if I represent to you that the dark green

17   dots here and here represent what the United States government

18   has determined to be concentrations of perc below the surface

19   at Dyce --

20   A    Um-hmm.

21   Q    -- I take it that didn't happen on your watch?

22   A    I'd say that would be a very safe assumption --

23   Q    Okay.

24   A    -- because I wasn't aware of anything in either area.

25   You know, our handling of perc was very tight while I was

                                   923

1   there.

2   Q    You'd agree, though, that if that, in fact, represents

3   perc beneath the surface of the ground at the Dyce facility as

4   found by the U.S. government, somebody, either before or after

5   you were there, didn't have -- didn't follow a policy of

6   treating all spills as emergencies?

7   A    You'd have to assume that.

8          MR. DAVIS:  Thank you.  That's all I have.

9          THE COURT:  Redirect?

10                      REDIRECT EXAMINATION

11  BY MR. BANKER:

12  Q    Is there any question in your mind that there were

13  policies and procedures in place when you started working at

14  the Dyce facility in 1986?

15  A    No.

16  Q    Would you have started working there as the warehouse

17  supervisor if there weren't?

18  A    No, not really.  I wasn't -- that was my whole point with

19  the condition of the soil in the northwest corner.  If this

20  was a sloppy operation that was habitually spilling stuff, I

21  didn't want to be part of it.

22  Q    And was it a sloppy operation that was habitually

23  spilling stuff while you were there?

24  A    While I was there, I never saw anything other than a

25  company trying to be conscientious in what they did, and that

1  was evidenced by the documents that Quentin created in the

2  fall of '85.

3  Q    When we met before your testimony to talk about your

4  testimony, did I tell you that it was important to testify to

5  the best of your recollection and to tell the truth?

6  A    Yes.

7  Q    And have you done that here today?

8  A    Yes.

9           MR. BANKER:  Thank you.  Nothing further.

10           THE COURT:  You can step down.

11           THE WITNESS:  Thanks.

12           THE COURT:  Call your next witness.

13           MR. BANKER:  Your Honor, Soco would call Dave Warne

14  to the stand.

15           WHEREUPON,

16                      MR. DAVID WARNE,

17  called for examination by counsel for defendant, after having

18  been first duly sworn to testify the truth, the whole truth,

19  and nothing but the truth, testified as follows:

20                    DIRECT EXAMINATION

21  BY MR. BANKER:

22  Q    Good morning.

23  A    Good morning.

24  Q    Would you state your name for the record, please?

25  A    David Warne.

1    Q    Have you worked for the Dyce -- would you like some

2    water?

3    A    Yes, please.

4    Q    Go ahead.

5    A    Thank you.

6    Q    Have you worked for the Dyce facility out in Lockwood?

7    A    Yes.

8    Q    When did you start there?

9    A    July 1, 1981.

10   Q    What did you do when you first started working there?

11   A    I was hired to work inside sales.  I worked primarily

12   with the salesmen who handled the product, the products for

13   the oil well service companies, so I was in charge of

14   ordering, for example, hydrochloric acid, making sure it

15   shipped to various locations, took care of the orders,

16   invoicing, and all of the paperwork involved with that.

17   Q    At some point did your job change there?

18   A    Yes.  About a year after that, in the spring of '82, I

19   moved to outside sales and started traveling in Wyoming and

20   calling on customers directly.

21   Q    At some point did you come back to working at the

22   Lockwood facility?

23   A    Yes.  In 1985, much of our business was involved with oil

24   and natural gas, and we had a slow year, so business was down,

25   and in, I think, in November or December of 1985, then I came

1   back into the office and worked on the order desk.

2           MR. BANKER:  One moment.  I forgot to give the court

3   clerk something (handing).

4           THE CLERK:  Thank you.

5   BY MR. BANKER:

6   Q    How long did you work on the order desk?

7   A    Until approximately -- for about four years, until fall

8   of 1989, and then I went into outside sales again.

9   Q    How long were you in outside sales?

10  A    For approximately three years.  And then in the spring of

11  '92, I became the branch manager at the Billings office.

12  Q    How long did you work as the branch manager?

13  A    That continued until approximately 2006 or 2007.  Then I

14  became a district manager.  I already was working with the

15  Gillette facility and Dickinson, North Dakota where we had

16  satellite operations.  And I did that for two or -- for a

17  couple of years and then became district manager.

18  Q    And did you at some point retire from working at Dyce?

19  A    Yes.  In 2008, I did retire.

20  Q    Taking you back to when you first started in 1981, did

21  you have an opportunity to work with Quentin Dyce?

22  A    I did.

23  Q    What was it like to work with Quentin?

24  A    I liked Quentin.  He was honest and direct.  Well, you

25  knew where you stood with Quent, without a doubt.  He cared

1    about the employees.

2         Another characteristic that I admired a great deal is he

3    did a lot of work for the community.  He helped buy the

4    facility, the building for the family -- for the rescue

5    mission family center and worked through the details of

6    structural repair.  He was very active with the Special K

7    Ranch and involved with his church.

8    Q    I'd like to pull up Admitted Exhibit 5033, and it will be

9    on your screen there.

10   A    Okay.

11        DOCUMENT TECHNICIAN:  (Complied with request.)

12   BY MR. BANKER:

13   Q    Do you recognize this as a photograph of the Dyce

14   facility from 1981?

15   A    Yes, I do.

16   Q    Are you familiar with the history of handling of perc at

17   the Dyce facility?

18   A    Yes.

19   Q    Was perc handled in bulk at the Lockwood facility?

20   A    Yes.  There was a bulk tank when I first came to work in

21   '81.  I did not work directly with perc.  I was involved with

22   sulfuric acid, hydrochloric acid, and some of the products

23   that were sold directly to the oil well service companies.

24   Q    Do you recall how big the perc tank was when you started

25   in 1981?

1    A    I think it was a 1,500-gallon tank.  I don't remember for

2    sure.

3    Q    Did that change at any point during your tenure there?

4    A    I know that when I came back into the office in 1985 to

5    work on the order desk, then I started working with the full

6    range of products, and at that point in '85 it was a

7    4,000-gallon tank, and in '85 I was -- I knew that because I

8    was responsible for ordering the truckloads that would bring

9    in the chlorinated solvent.

10   Q    During your tenure at the company, are you ever aware of

11   the perc tank having a leak of any kind?

12   A    No.

13   Q    When you were working on the order desk in '85 onward, or

14   from '85 until '89, could you compare the volume of perc that

15   you were handling to the volume of other chemicals that you

16   were distributing?

17   A    Yes.  The volume of perc was minimal compared to the

18   other products, and a good example is the hydrochloric acid.

19   That had changed.  We didn't have a separate person handling

20   the acid and some of the other products for the service

21   companies.  It was handled -- there were two people on the

22   order desk, and so we split responsibilities.

23        But, for example, I can remember, you know, in one of the

24   years, we ordered and handled 100 railcars of hydrochloric

25   acid through the Dyce Chemical facility in Billings.  So

1  that's approximately 20,000 gallons per car, 2 million gallons

2  in a year.  And comparing that one product to the perc, it

3  seems as though I ordered a truckload of mixed chlorinated

4  solvents about every quarter.  So I'm estimating that there

5  may have been 100,000 pounds to maybe 150,000, sometimes a

6  little bit more, but in that range.  So it's a fraction of a

7  percent of how much volume of hydrochloric acid we handled.

8  And then we had methanol, sulfuric acid, other solvents that

9  comprised the majority of the products that we sold.

10 Q    So we've talked about the volume of perc compared to

11 other materials.  Could you make that same comparison with

12 respect to the expense of perc compared to other chemicals?

13 A    Most of the other products that we handled were much less

14 expensive.  Hydrochloric acid was 5 cents a pound.  The perc

15 typically was 30, 35 cents a pound.  Sometimes more.  So by

16 comparison, it was more expensive.  Perc was one of the more

17 expensive products that we did handle there.

18 Q    When you were on the order desk, were you responsible for

19 the perc inventory?

20 A    I was involved with the quarterly inventories that we

21 did, so I was -- we had a computer that kept track of the

22 invoicing, and so there was a computer-generated inventory

23 number, and then we would, we would check that.  It was a

24 group effort in trying to look at inventories, reconciling the

25 difference between physical inventory and computer inventory.

1   Q     Were there any large, unreconciled perc inventories

2   during your tenure on the order desk?

3   A     No.

4   Q     Were there any small perc inventory discrepancies while

5   you were there?

6   A     There were.

7   Q     Could you talk about that?

8   A     Well, at the time, it was a 4,000-gallon tank, and it was

9   vented to atmosphere, and perc is very volatile.  It

10  evaporates.  And the example -- I mean, what struck me with

11  the volatility of perc is that we had plastic sample bottles,

12  so every time a liquid product came into the facility, a

13  sample was taken and kept in case there was question about --

14  from a customer about the quality of the product that we

15  delivered to them.  And we used a high-quality polyethylene, a

16  plastic, for the perc.  After a short time, a month or two,

17  the sides of the perc container -- and it was about this

18  large.  It was about a pint.  Maybe a little bit more.  The

19  sides would suck in because the perc had evaporated, even

20  though the container was tightly closed.

21        So we had a 4,000 horizontal -- 4,000-gallon horizontal

22  tank that was vented to atmosphere at the top.  And what

23  happens with a liquid, especially in warm weather, the liquid,

24  molecules from the liquid will -- there is an equilibrium

25  established.  They will evaporate and fill in the volume of

1    the tank, and so --

2    Q    Maybe let me just ask a question here.

3    A    Okay.

4    Q    When we talk about small perc inventory discrepancies

5    when you were on the order desk --

6    A    Yes.  A couple gallons, yeah.

7    Q    Pardon me?

8    A    A couple gallons of product.

9    Q    And I take it you attributed that to evaporation?

10   A    I did, yes, and I think that was the consensus of other

11   people, too.

12   Q    Was it ever more than a couple of gallons?

13   A    Not that I remember.

14   Q    How long did the Dyce facility continue distributing

15   perc?

16   A    I believe it was approximately 2002.  There was a

17   corporate decision made by the vice-president of sales out of

18   then Brenntag Pacific -- Brenntag West, I'm sorry, and out of

19   Los Angeles, and it was decided that we would no longer handle

20   perc on the facility, but we continued to sell it.  It was

21   shipped directly to customers, not through the warehouse.

22   Q    During your tenure at the company, are you ever aware of

23   a theft of perc?

24   A    I am not.

25            MR. BANKER:  I want to go back to Exhibit 5033, and

1  let's zoom in on the tank farm and berm area.

2          THE COURT:  While we're doing that, let's take -- I

3  need a quick break, so we're going to take one.

4          THE LAW CLERK:  All rise.

5      (Recess taken from 10:59:17 to 11:12:09.)

6      (Jury not present.)

7          MR. JOHNSON:  Your Honor, could I raise a quick

8  housekeeping issue?

9          THE COURT:  Do you want to do it at sidebar?

10         MR. JOHNSON:  I don't think so.  I mean, the issue

11 only is deposition designations.

12     (Discussion off the record.)

13         MR. JOHNSON:  The issue is deposition designations

14 of Marvin Johnson.  We need to have those ruled on as well,

15 because if we're starting tomorrow, we would like to show his

16 video.  You obviously ruled on them all last time, and I

17 expect you're going to have the same rulings this time.

18         THE COURT:  Well, I will, I will look through them

19 here, and you'll have it.

20         MR. JOHNSON:  Thank you.  Thank you, Your Honor.

21     (Jury present.)

22         THE COURT:  Please be seated.

23 BY MR. BANKER:

24 Q   Mr. Warne, before the break, I put up on the screen here

25 Exhibit 5033, which is a 1981 photograph that's been admitted

933

1    into evidence.

2         Are you able to see the catch pond in that picture?

3    A    Yes.

4    Q    If you just touch the screen, it will leave a mark.

5    Could you touch the screen where you see the catch pond?

6    A    The berm starts back here off the tracks and runs all the

7    way around.  Excuse me.  All the way like that.

8    Q    Okay.  And where is the catch pond?

9    A    It's back in this area right here.

10   Q    Okay.  Did you ever have a chance to see that catch pond

11   when it didn't have any liquid in it?

12   A    Yes.

13   Q    Did you ever stand in what would be the catch pond,

14   looking north?

15   A    What I remember is standing outside and then trying to

16   see the bottom of the berm and then climbing to the top.  I

17   couldn't see the bottom from the outside, and then climbing to

18   the top and looking at it.  So my estimate is 5 feet.

19   Q    That the berm is 4 to 5 feet tall?

20   A    Yeah.

21        MR. DAVIS:  I object.  It's not responsive.

22        THE COURT:  He said it was 5 feet.

23        MR. DAVIS:  That wasn't the question.

24        THE WITNESS:  On the inside, inside, from the bottom

25   to the top of the berm, was 5 feet.

934

1    BY MR. BANKER:

2    Q    Okay.  Looking north?

3    A    Yes.  I guess what I was trying to say, from my

4    perspective, I remember trying to stand outside the pond and

5    look inside, not being able to see the bottom, climbing the

6    berm, and then standing on the top and looking at it.  My

7    estimation of the depth on the inside is about 5 feet.

8    Q    Okay.  Now at some point after '81, was the configuration

9    of the Dyce tank farm changed?

10   A    Yes.  I think in the mid '80s, there were concrete

11   containment walls and cells, we called them, built to contain

12   the tanks.

13           MR. BANKER:  Could we pull up, please, Exhibit 5042?

14   And zoom in on the tank farm area, please.

15           DOCUMENT TECHNICIAN:  (Complied with request.)

16           MR. BANKER:  Let's back up a little bit.

17           DOCUMENT TECHNICIAN:  (Complied with request.)

18           MR. BANKER:  There we go.

19   BY MR. BANKER:

20   Q    Is this the configuration that you were talking about?

21   A    Yes, it is.

22   Q    Could you explain the difference between the photo we

23   just looked at and the photo we're looking at now in terms of

24   the containment?

25   A    Yes.  What happened is that products were segregated by

935

1    types of hazards, so that in one of the tank farms, there were

2    caustics and acids, corrosive materials.  Then in the center,

3    I think that's the one that had flammables and combustibles.

4    And then there were some miscellaneous chemicals.  KOH, I can

5    tell by the large horizontal tank there at the top, that

6    contained potassium hydroxide.

7         So the tanks were separated, and then containment was

8    included in that concrete construction so that you could see

9    the back, toward the north, northwest side of the containment,

10   there are rectangular sections which were several feet deeper

11   than the tank farm, and those were designed so that if a tank

12   were to burst, they would hold the product.  The tank farms

13   had to contain the product if a tank were to burst.

14   Q    And is the reason for having three separate -- what would

15   you call those three areas at the back of the tank farm?

16   A    Containment areas, three separate containment areas.

17   Q    And is the reason for having three separate containment

18   areas because if you were to mix the chemicals from the

19   separate containment areas, they wouldn't be compatible?

20   A    Yes.  That was part of the reason, yes.

21   Q    Now in the 1987 time frame, what had happened to the

22   catch pond that we talked about on the previous exhibit?

23   A    It was, it was eliminated.

24   Q    And do you see it on this photograph here --

25   A    I do not.

1  Q    -- that we're looking at from 1987?

2  A    No.  I don't see it anymore.

3            MR. BANKER:  Let's go back, if we could, to

4  Exhibit 5033 and zoom in on the catch pond area, please.

5            DOCUMENT TECHNICIAN:  (Complied with request.)

6  BY MR. BANKER:

7  Q    Was there a pipe in that catch pond that was used to

8  drain materials outside of containment?

9  A    No.

10 Q    How do you know that?

11 A    Well, I mean, my first reaction is to say I don't see any

12 pipe in the picture, but from firsthand experience of standing

13 on the dike, there was no pipe there.

14 Q    How certain are you that there was no pipe there?

15 A    Absolute.

16 Q    I'd like to shift gears and talk a little bit about

17 policies and procedures at the Dyce facility in Lockwood when

18 you were there.

19     When you started there in 1981, did Dyce have policies

20 and procedures?

21 A    There were verbal policies and procedures for handling

22 products.  Because we had a wide variety, they couldn't all be

23 handled the same way.  So there were some, there were some

24 policies.  There were procedures about how to handle, say,

25 hydrochloric acid as compared to, say, caustic pot ash.

937

1    Q    And was it important to lay out the different ways of

2    addressing those different chemicals?

3    A    Yes.

4    Q    Why is that?

5    A    Well, for the safety of handling the products, and --

6    yeah, that would be the primary reason, because they had to be

7    handled differently.

8    Q    At some point did the oral policies and procedures, were

9    they reduced to writing?

10   A    Yes.  In, I think it was, in the middle of the 1980s,

11   then there was an effort made, and Jim Diede was the primary

12   person involved.  He was -- he had that responsibility of

13   trying to write down policies, procedures, and develop a

14   safety program.

15   Q    The written policies and procedures in the 1985 time

16   frame, were those something new or were they the earlier

17   procedures reduced to writing?

18   A    They were the earlier procedures reduced to writing.

19   Q    Did the policies and procedures change over time?

20   A    Yes.

21   Q    How did they change?

22   A    Well, as -- it was an evolution, and as we learned more

23   about the products and how to handle, it was -- there was

24   always an effort to handle the products more safely.  So it

25   was an evolution of trying to improve procedures and maybe

1    find, the first time you write a procedure, it's not quite as

2    detailed as needed, and so changes were made accordingly.

3    Q    Do you believe that Dyce was, the Dyce facility was

4    concerned about safety?

5    A    Yes.

6    Q    And the environment?

7    A    Yes.

8    Q    Why do you say that?

9    A    Because of Quentin Dyce.  I think he is the type of

10   person who wouldn't have condoned haphazard handling of

11   materials.  It was just the general atmosphere of the people

12   who worked there.  We tried to handle the products safely.  We

13   didn't want anyone to get hurt, burned by sulfuric acid or

14   hydrochloric acid, certainly.

15   Q    Now we talked about how you started at Dyce in 1981.

16   What was your background before that?  What had you done?

17   A    I was a high school teacher here in Billings.

18   Q    What made you come to work at the Dyce facility?

19   A    Steve Dyce approached me one summer.  I knew the family

20   through the Presbyterian church.  Also had Steve's younger

21   brother John in class at West High, so I was familiar with the

22   family.  And Steve's philosophy at the time was to hire the

23   type of person he wanted and then to train, train them in the

24   job.  So he approached me, and I was interested.

25   Q    Did you have any reservations about moving from being a

1    high school teacher to working at a chemical-handling

2    facility?

3              MR. DAVIS:  Your Honor, I object.  This is

4    irrelevant.

5              THE COURT:  Sustained.

6    BY MR. BANKER:

7    Q    In addition to the written policies and procedures we

8    talked about in the mid 1980s, was there anything else that

9    Dyce did with respect to safety that you can remember?

10             MR. DAVIS:  I object as vague.

11             THE COURT:  Overruled.  If he can answer it.

12             THE WITNESS:  Well, we started to have regular

13   safety meetings, and --

14   BY MR. BANKER:

15   Q    Tell us about those.

16   A    Well, we would typically meet for breakfast and talk

17   about safety issues or procedures or policies.  There was a

18   process, you know, that they would be discussed and then

19   people would have a chance to talk about what they thought,

20   and then there was discussion.  Sometimes there were changes.

21   Sometimes there were not.  Sometimes they were just

22   informative.  But generally everyone in the warehouse and the

23   office attended those meetings.

24   Q    Looking back at Exhibit 5033 and looking at the catch

25   pond, during the time that you were there and the catch pond

1   was in existence until 1987, did that catch pond ever

2   overflow?

3   A     Not that I know of.

4   Q     Did that -- was that catch pond ever drained?

5   A     Not that I know of.

6          MR. DAVIS:  I object.  It's been asked and answered.

7          MR. BANKER:  I don't think it has.

8          THE COURT:  Sustained.  I think it has.

9   BY MR. BANKER:

10  Q     Was there ever a large spill of perc that you were aware

11  of during your tenure at Dyce?

12  A     No.

13  Q     When did you first become aware of the potential for

14  contamination of perc at the Lockwood facility?

15  A     I became aware of groundwater contamination in Lockwood

16  in, let's see, '98, I believe.  Catherine LeCours, with the

17  Montana DEQ, and another lady with Pioneer, a private

18  contracting company, came to the office.  They said there were

19  some issues about groundwater contamination.

20  Q     And when we say "Lockwood," we're not referring to the

21  Dyce facility in Lockwood at this point?  We're referring to

22  the area, you know, the town of Lockwood?

23  A     Yes, yes.

24  Q     And that was in 1998?

25  A     Yes.

941

1  Q    When did you first learn about the potential for

2  contamination of perc on the Dyce facility in Lockwood?

3  A    When we found out that -- well, they did testing in '98

4  and didn't find anything.

5  Q    Because they were looking in general and investigating

6  the Lockwood area?

7  A    No.

8         MR. DAVIS:  I object as leading.

9         THE COURT:  Sustained.

10 BY MR. BANKER:

11 Q    Why did they do testing?

12 A    Catherine LeCours said that there was contamination in

13 the area.  They asked if they could come onsite and drill some

14 test wells and do some testing.  I said, "Absolutely.  You're

15 welcome to come in."  And they were primarily working outside

16 of our operations area.  So they came in, did the testing, and

17 didn't find any contamination on the Dyce site.

18      So then you asked when I found out about it.  Pete

19 Stevenson, with the federal EPA, came in -- came to the

20 facility in the summer of or spring of '99 and asked if they

21 could do some further testing.  So I said, "Absolutely.  Come

22 in."  They did further testing, and they did find some perc

23 contamination on the Dyce property.

24 Q    Did you learn the results of those tests at that time?

25 A    Initially I think -- that was in the fall of '99 when

1    they were starting to get some results.  Pete talked with me

2    in the office, and he said, "There is some perc contamination

3    in the groundwater under Dyce Chemical."  So that doesn't

4    necessarily mean that it came from us.

5              MR. DAVIS:  I'll object --

6              THE WITNESS:  Oh.

7              MR. DAVIS:  -- to giving speeches.

8              THE COURT:  Yeah, I'll sustain it.

9              Listen to the question and then answer it.

10             THE WITNESS:  Okay.

11             I guess the answer to the question was --

12             MR. DAVIS:  I object.  There's no question pending.

13             THE COURT:  Yeah, there isn't a question.

14             Go ahead.

15             THE WITNESS:  Okay.

16   BY MR. BANKER:

17   Q    We were talking about the September or the fall of '99

18   time frame and what you were learning from Pete LeCours.  What

19   did he tell you about it in the fall?

20             MR. DAVIS:  Objection.  You mean Catherine LeCours

21   or Pete Stevenson?

22   BY MR. BANKER:

23   Q    Pete Stevenson.  I'm sorry.

24   A    Yes.  It was in the fall when Pete said that they found

25   some perc in the groundwater below Dyce Chemical.

943

1    Q      Okay.  And did you learn -- did you ever receive formal

2    testing results back from the EPA?

3    A      That came in December when they issued the Lockheed

4    Martin report, and they had a public meeting sometime in

5    December of '99.

6    Q      What was your understanding of the problem upon receiving

7    the Lockheed Martin report?

8    A      They said that they had found contamination.  They showed

9    some of the results of the findings.  And they said at one

10   point that Dyce Chemical may be a PRP.

11   Q      What's a PRP?

12   A      Principal responsible party.

13   Q      Did they give you an idea about how much perc they

14   thought had been released?

15   A      Yes.  It seemed to me it was more than 150 gallons,

16   200 gallons.  A fairly significant volume.  And that it --

17   Q      Let me stop you there.

18   A      Yeah.

19   Q      What makes you say that's a fairly significant volume?

20   A      Just because, because we had never lost any sort of a

21   volume.  Since I had been at Dyce Chemical, there was never

22   any discrepancy of that size or of that volume.  I thought it

23   was a significant amount because of the cost of the material,

24   that it was typical -- for the amount we handled, that that

25   was a very significant volume of product.

1    Q    Did the Lockheed Martin report give you any sense of when

2    the EPA thought that the perc had gotten there?

3    A    I believe they mentioned ten to 15 years prior.

4    Q    I take it you understood at that point, from the Lockheed

5    Martin report, that Dyce had been a source area or potential

6    source area?

7    A    Yes.

8    Q    What did you do after you learned that?

9    A    Notified corporate, of course, and the appropriate

10   individuals in our environmental section.  Suzanne Miller and

11   I both attended that public meeting, and we found out that

12   eventually there would be a formal 104(e) request forthcoming.

13        I apologize.  We decided to make a trip.  They said we

14   should try to find out what -- we wanted to find out what

15   would happen, so we contacted -- I contacted Catherine LeCours

16   and arranged a meeting.  Suzanne Miller and I made the trip to

17   Helena and talked with Catherine about what would happen.

18   Q    Okay.  And let me just stop you there.

19   A    Yeah, yeah.

20        And that was the first part of January.

21   Q    Okay.  And what was the substance of that meeting with

22   Catherine LeCours?

23   A    Well, we wanted to find out what would happen, what our

24   responsibilities were, what we could do to help, so it

25   involved everything.  It was the first time I had ever been

945

1    involved in anything like this, and --

2    Q    Sure.  Let me ask you.  I mean, this is January of 2000?

3    A    Yes.

4    Q    You had been -- at that point, you know, you had worked

5    for the company since '81, but you were -- at points you left,

6    but you came back in '85 and had been there consistently from

7    '85 through 2000 at that point, correct?

8    A    Yes.

9    Q    Did you have an explanation in January of 2000 for why

10   there might be 200 gallons of perc contamination?

11   A    I did not.

12   Q    What was your reaction to learning that the EPA thought

13   that it was on the Dyce facility?

14   A    Well, you start looking at possibilities, at what could

15   have happened to cause it or whether it even came from our

16   facility.  Perhaps -- I mean, there's a possibility it could

17   have migrated underneath our property from somewhere else.

18   Because initially, that Pioneer report showed Kuck Trucking as

19   the source of the perc, which is outside of Dyce property.

20   Q    But in January of 2000, you didn't know --

21   A    No.

22   Q    -- where that perc had come from?

23   A    No.

24   Q    And you talked about the meeting with Catherine LeCours

25   in January of 2000, and she had described an investigation

946

1   process?

2   A     Yes.

3   Q     Did that start at some point?

4   A     Yes.

5   Q     Tell us about that.

6   A     I think toward the end of January, we received the formal

7   104(e), which was a list of questions in regard to the

8   contamination, and we started to work through that procedure.

9   Suzanne Miller was the person who dealt with that primarily.

10  Q     Who is Suzanne Miller?

11  A     Suzanne Miller was our environmental person for Dyce

12  Chemical at the time.

13  Q     Was she located in Billings?

14  A     Billings and Ogden, Utah.  She was responsible for

15  environmental questions, concerns in all of the Dyce

16  facilities in Ogden, Billings, and Dickinson, North Dakota.

17  Q     Were you involved with Suzanne Miller in responding to

18  the EPA's investigation request?

19  A     Yes.  Sometimes I worked with her on some of the answers.

20  I knew where the courthouse was.  We had to delineate the

21  ownership of the property, so we came down and looked at some

22  of the deeds.  So I did -- I was actively involved with the

23  answers to some of the questions, but Suzanne was primarily

24  the person who drafted the responses and called on other

25  individuals as needed for help.

1    Q    Did Suzanne Miller turn to you for historical knowledge

2    of the company, at least back to when you had begun?

3    A    Yes.

4    Q    And were you able to provide her with some of that

5    information?

6    A    Yes.  As much as I could, yes.

7    Q    Were you able to identify individuals who'd worked at the

8    Dyce facility over time?

9    A    I did, yes, especially through the '80s, so --

10   Q    During the time that you were there?

11   A    Right, right.

12   Q    What was your attitude in responding to the EPA's

13   investigation requests?

14            MR. DAVIS:  Object as irrelevant.

15            THE COURT:  Sustained.

16   BY MR. BANKER:

17   Q    Did you cooperate with the EPA in responding to their

18   investigation request?

19   A    Absolutely.

20   Q    And why is that?

21   A    Because that's, because that's the right thing to do.

22   Q    Did you work with Rod Hallsten?

23   A    Yes.

24   Q    Tell us about your work with Rod Hallsten.

25   A    When I started with the company in the summer of 1981,

1  Rod was a salesman in Dickinson, North Dakota, so I met him

2  occasionally when he would come to Billings for managers'

3  meetings.  And then at some point he moved to Ogden, Utah, and

4  I got to know Rod more closely after I became branch manager.

5  He was the branch manager in Ogden, Utah.  And then when I

6  became branch manager in '92, then I worked with him more

7  closely.

8  Q    What was it like to work with Rod Hallsten?

9  A    Rod, Rod is, he's, he's --

10       MR. GROSSBART:  Your Honor, I'm going to object to

11 this.  What, is he trying to establish Hallsten's character?

12 I don't get it.

13       THE COURT:  I don't know, either, but I'm going to

14 sustain it.

15 BY MR. BANKER:

16 Q    Did you ever have an opportunity to talk with Rod

17 Hallsten about the Romero claim?

18 A    I did.

19       MR. DAVIS:  Objection.  Irrelevant.

20       THE COURT:  Sustained.

21 BY MR. BANKER:

22 Q    The EPA investigation that we've talked about was in

23 2000, correct?

24 A    Yes, yes.

25 Q    At some point in 2000, was a property damage claim made

949

1  against Dyce?

2  A    Yes.

3  Q    Were you involved in that at all?

4  A    Yes.

5  Q    Tell us how.

6  A    I interviewed some of the attorneys, the firms here in

7  Billings, and helped with the selection of Holland & Hart as

8  attorneys to represent Dyce Chemical in the *Weiss* lawsuit.  I

9  was involved in trying to talk to office warehouse personnel

10  during my period of time at Dyce Chemical so that they could

11  interview them.

12  Q    At some point later, was there another property damage

13  claim made against Dyce?

14  A    Yes.

15  Q    What was that?

16  A    Children of the previous plaintiffs filed a complaint

17  against Dyce Chemical.

18  Q    Were you involved in the handling of that?

19  A    Yes.

20  Q    Did you have any involvement in identifying historical

21  Dyce insurance information?

22  A    I did.  I am the one who found the insurance policies and

23  the reference to Continental Insurance.

24  Q    Tell us about that.

25          MR. DAVIS:  Well, I'm going to object.  This is

950

1    irrelevant to this.

2             THE COURT:  It is.  What's relevant?

3             MR. BANKER:  Well, actually, Your Honor, it goes to

4    the notice question, and I just want to establish what his

5    participation in that was.

6             THE COURT:  Notice will be relevant.  Go ahead.

7             THE WITNESS:  Okay.  Repeat the question, please.

8    BY MR. BANKER:

9    Q    You had just said that you had found the insurance

10   policies.  Could you tell us about that?

11   A    We had lots of paperwork.  I don't think any of the

12   history of Dyce Chemical since they started in '57 had been

13   ever thrown out, so there was lots of boxes to look at.  And

14   so Suzanne went through a lot.  Monte went through his file.

15   And then because I was involved with daily business, at that

16   point, then, we weren't finding anything, and then I started

17   to take the time and made a detailed search and looked through

18   individual pages of documents and papers, trying to find

19   references.

20   Q    Okay.

21            THE COURT:  Is there going to be testimony about

22   notice?

23            MR. BANKER:  Yes.

24            THE COURT:  That's relevant to notice?

25            MR. BANKER:  Yes, there is.

1    BY MR. BANKER:

2    Q    At some point did you identify USF&G and Continental as

3    historical insurers?

4    A    Yes.

5    Q    And were you involved in the providing of notice to those

6    carriers of the claims that had been made against Dyce?

7    A    Well, I talked to management.  There was contact with the

8    corporate attorney, and, as far as I know, there was notice

9    sent.

10   Q    And in 2000, you were the district manager of Dyce?

11   A    No.  I was branch manager at that time.

12   Q    Branch manager.

13   A    Yes.

14   Q    When did you become district manager?

15   A    About 2006.

16   Q    2006.  I'm sorry.

17        So in 2000, in the year 2000 when you were the branch

18   manager through, say, 2007, did a representative of USF&G or

19   Continental ever advise you that the notice that had been

20   provided to them of the claims was inadequate?

21             MR. DAVIS:  Objection.  Irrelevant.

22             THE COURT:  Overruled.

23             THE WITNESS:  I was never contacted in that regard.

24             MR. BANKER:  I have nothing further.

25             THE COURT:  You may cross.

1              MR. DAVIS:  Thank you, Judge.

2                         CROSS-EXAMINATION

3    BY MR. DAVIS:

4    Q    Mr. Warne, my name is Max Davis.  I don't know that we've

5    met previously --

6    A    Glad to meet you.

7    Q    -- have we?

8    A    I don't know.

9    Q    I don't think so.

10        This last question, you didn't write to the insurance

11   companies, yourself, did you?

12   A    No.

13   Q    Lawyers did it, didn't they?

14   A    I, I don't know.

15   Q    All right.  So you wouldn't expect to hear back from the

16   insurance companies because you never wrote to them, did you?

17   A    No.

18   Q    All right.  I think you said just a couple minutes ago

19   that Dyce had everything going back to the beginning?

20   A    When --

21   Q    Was that your testimony?

22   A    Oh, no, no.  No, we didn't have all of the documents and

23   papers.

24   Q    No.

25   A    I'm sorry.  No.

1   Q      Yeah.

2   A      That was not the case.

3   Q      That --

4   A      Yeah.

5   Q      -- wasn't the case because --

6   A      In 1989, when Dyce Chemical was purchased by HCI, a lot

7   of the files, a lot of the history was thrown out.  That's the

8   case.

9   Q      Isn't it true that Steve Dyce's wife Lois threw out a lot

10  of records when the business -- when the Dyce family sold to

11  HCI?

12  A      I know that she -- I was working on the order desk at the

13  time.  I know that she went through our correspondence file

14  and that she threw away a lot of papers.

15  Q      Yeah.  And the fact of the matter is that as long as this

16  dispute has been pending, Dyce hasn't been able to find any

17  perc inventory records going back into the early '80s or into

18  the '70s; isn't that true?

19  A      As far as I know.

20  Q      Yeah.  And while we're on the subject of perc inventory

21  records, you indicated, I think, in your testimony, in answer

22  to questions posed to you by Mr. Banker, that, you know, perc

23  evaporated, and there was always a little evaporation.  That

24  wasn't any particular big deal in the normal course of

25  operations.  Is that the gist of what you were trying to tell

954

1  this jury?

2  A    Yes.

3          MR. DAVIS:  Neil, would you please pull up

4  Exhibit 34, I believe?  I believe this is -- there is no

5  objection to this exhibit, correct?  Or is there?  It's in

6  evidence, isn't it?

7          THE COURT:  What is it?

8          MR. DAVIS:  It's discovery in the -- well --

9          THE COURT:  Well, as I told you, you can ask

10 witnesses questions about it.  These pleadings are not going

11 to a jury.

12         MR. DAVIS:  All right.  Well, I do want to ask

13 questions.

14 BY MR. DAVIS:

15 Q    You had mentioned, towards the end of your examination by

16 Mr. Banker, that there was a property damage claim that you

17 got involved with and helped pick attorneys to defend, right?

18 A    Yes.

19 Q    And the property damage claim was actually a lawsuit in

20 which the first named plaintiff was somebody, people named

21 *Weiss*?

22 A    Yes.

23 Q    And, in fact, there were over a dozen people who were in

24 this one lawsuit that lived out in Lockwood that were suing

25 Dyce Chemical and HCI originally and then Soco over the fact

1   that --

2           MR. BANKER:  Objection, Your Honor.  I object to the

3   relevance of this.  Perhaps we could have a sidebar.

4           THE COURT:  Let's have a sidebar.

5       (Discussion on the record at sidebar.)

6           MR. BANKER:  We have tried to put in the complaints

7   of the *Burbank* and *Weiss* actions and those have been held out.

8           THE COURT:  They're not going to go in.

9           MR. BANKER:  And the issue of whether there was a

10  *Burbank* or *Weiss* lawsuit has been talked about here, but I

11  don't think we need to go as far into the *Weiss* plaintiffs and

12  their claims.

13          THE COURT:  My problem is this.  What are we talking

14  about this for?  If you've got something in there to impeach

15  him with or talk to him about, forget the history of the

16  lawsuit.  I can't care who the plaintiffs are.  *Weiss*, you got

17  that in.  Get it done.

18          MR. DAVIS:  All right.  Fair enough.

19      (Open court.)

20      (Jury present.)

21  BY MR. DAVIS:

22  Q    You assisted in answering questions in this property

23  damage lawsuit that Mr. Banker referenced; isn't that true?

24  A    Yes.

25          MR. DAVIS:  Could we turn to page 18 of Exhibit 34,

1   please?

2            DOCUMENT TECHNICIAN:  (Complied with request.)

3   BY MR. DAVIS:

4   Q    Isn't it true that in that case, Dyce indicated that you

5   and Monte Naff were not constantly surprised with the lack of

6   product in the bulk storage tank?

7   A    Small volumes.  Couple gallons, 2, 3 gallons.

8   Q    And that you also went on to indicate that from 1982 to

9   present, there were discussions among Dyce employees about

10  loss of product.  Some of the suspicions were that it could be

11  due to evaporation as the bulk tank did not have a pressure

12  valve and that employees may have possibly taken product to be

13  sold or given away?  That was something that was discussed,

14  wasn't it, Mr. Warne?

15  A    In passing.

16  Q    Just in passing?

17  A    Yes.

18  Q    Isn't it true that Quentin Dyce was pretty upset about

19  the inventory issue with PCE back in the mid '80s?

20  A    I, I know that all inventories were a concern to Quent.

21  Q    Well, in fact--

22  A    So --

23  Q    -- he wrote a memo, didn't he, specifically about PCE?

24  A    He was -- he did write a memo about chlorinated solvents.

25            MR. DAVIS:  Right.  Could we pull up Exhibit 30,

957

1    please?

2          DOCUMENT TECHNICIAN:   (Complied with request.)

3          MR. DAVIS:  Okay.  Could you scroll down further,

4    Neil, please?  Let's get the signature, too.  Just a little

5    further down.

6          DOCUMENT TECHNICIAN:   (Complied with request.)

7          MR. DAVIS:  Okay.  And could you highlight paragraph

8    4?

9          DOCUMENT TECHNICIAN:   (Complied with request.)

10   BY MR. DAVIS:

11   Q    This is a memo from Mr. Dyce, isn't it?

12   A    Yes, it is.

13   Q    All right.  And here he's talking about perchloroethylene

14   in drums, isn't he?

15   A    Yes, he is.

16   Q    Not in a perc storage tank?

17   A    Right.

18   Q    Right.  And he was concerned, wasn't he, when he's

19   talking about a ready market for it, if went out the back

20   door, correct?

21   A    Yes.

22   Q    You understood that to mean he thought that there might

23   be people stealing perc?

24   A    My personal reaction was that it was something that

25   happened before I came to Dyce Chemical.

958

1   Q     Well, this is --

2   A     That his concern was about inventory loss before I

3   started working in '81.

4         MR. DAVIS:  Okay.  Can we go up to the top of this

5   memo, Neil, please?

6         DOCUMENT TECHNICIAN:  (Complied with request.)

7   BY MR. DAVIS:

8   Q     September 11, 1985.  Do you see the date there?

9   A     Yes.

10  Q     You had already been there, what, four years at that

11  point?

12  A     Yes.

13  Q     Okay.  So would you agree with me that four years into

14  your tenure at Dyce, the owner of the business was concerned

15  enough about the inventory discrepancies of perc, not just in

16  the big storage tank but in the drums, that if we go back down

17  to the bottom of this memo that he wrote, he's saying, "If we

18  can't solve the inventory problem, we're going to get out of

19  the chlorinated solvent business"?

20  A     I remember that during that period of time, there was

21  what later became Montreal protocol, and there was concern

22  about chlorinated solvents depleting ozone and that there was

23  pending legislation governing volumes.  So --

24  Q     I'm not asking -- go ahead.

25  A     There was discussion about that and that we needed to be

959

1    as accurate as possible about inventories.

2    Q    All right.  And the inventories never did match, did

3    they --

4    A    They did.

5    Q    -- for PCE?

6    A    No, they did.

7    Q    They did not, did they?

8    A    They did.  They did.

9    Q    And to this day, you don't know why they didn't match, do

10   you?

11   A    I'm sorry, but while I worked on the order desk and while

12   I was branch manager, the volumes, the discrepancies, the

13   differences between the physical inventory and our

14   computer-generated inventory never differed more than a few

15   gallons.

16   Q    When you heard from the Montana -- you said, I think,

17   that you heard from the Montana Department of Environmental

18   Quality that it was investigating groundwater contamination in

19   the Lockwood area in 1998, correct?

20   A    Yes.

21   Q    All right.  And then in 1999, you learned from the EPA

22   that the focus was perchloroethylene in the groundwater in

23   Lockwood, correct?

24   A    Yes.

25   Q    All right.  And you knew -- at that time you were the

960

1   branch manager, were you not?

2   A    Yes.

3   Q    And you had been there for the better part of two

4   decades, '81 to 2000, or '99, 18 years?

5   A    Yes.

6   Q    And you knew that for all that period of time, Dyce

7   Chemical had been receiving shipments of perchloroethylene,

8   offloading that product from however it came in, and

9   repackaging it in different sized containers, basically either

10  a storage tank of 1,500 or 4,000 gallons or in 55-gallon

11  drums, correct?

12  A    Yes.

13  Q    And you also knew, during that 18-year period of time,

14  that once Dyce had offloaded that product -- which you

15  described as volatile?

16  A    Yes.

17  Q    Yes?

18  A    It would evaporate, yes.

19  Q    And you -- once it was offloaded from however it came in

20  to Dyce -- and, I think, would you agree with me, it typically

21  came in on tanker trucks?

22  A    It always came in on tanker trucks.

23  Q    All right.  And after you offloaded it from tanker trucks

24  in your operations area into, into a storage tank or into

25  55-gallon drums, then the product was transferred again in

1    Dyce operations area so it could be sold to customers; is that

2    correct?

3    A    Yes.

4    Q    And the typical manner that it was sold to customers, at

5    least -- let me back up.

6         And the customers that you sold the good-grade

7    perchloroethylene to were drycleaners?

8    A    Well, actually we sold catalyst-grade perc in the '80s to

9    the refineries --

10   Q    I was going to get to that.

11   A    -- so we brought in both products, yeah.

12   Q    I was going to get to that.  You're jumping ahead of me.

13        But I said the distilled grade as opposed to catalyst

14   grade.  I don't know; there's a different term for what I'm

15   trying to say, but there's catalyst grade that goes to the

16   refineries.  We'll get to that in a minute.  But what do you

17   call the other grade?

18   A    Drycleaning grade.

19   Q    Okay.  Fair enough.

20   A    It's separate because of a special inhibitor package

21   that's included in the product --

22   Q    All right.

23   A    -- because the drycleaners use it.  It becomes filled

24   with grease and oil, and then they distill it.  They boil it

25   off, reclaim it, and the inhibitors keep it from rusting,

1    corroding the equipment and machinery.

2    Q    All right.  But your customers for this distilled-grade

3    or drycleaning-grade perchloroethylene were drycleaners,

4    right?

5    A    Yes.

6    Q    And then there was also a catalyst-grade

7    perchloroethylene, and I think you actually continued to sell

8    that after you discontinued, in the last decade, the

9    drycleaning perchloroethylene.  You continued to sell

10   catalyst-grade perchloroethylene; is that correct?

11   A    Yes.

12   Q    All right.  And the catalyst grade is a different grade,

13   and it was sold primarily to oil refineries, correct?

14   A    Only to oil refineries.

15   Q    Only to them.  Okay.  So the customers for

16   perchloroethylene were drycleaners and oil refineries,

17   correct?

18   A    Yes.

19   Q    There weren't any drycleaners in Lockwood that you sold

20   perchloroethylene to, were there?

21   A    No.

22   Q    No.  And the only -- there is an oil refinery, and it's

23   downstream from you, the Exxon Refinery.  Was that about a

24   mile east of the Dyce facility?

25   A    I'm not sure how far, but it is approximately a mile east

1  of --

2  Q    Okay.

3  A    -- of Dyce facility.

4  Q    You'd agree it's both downstream if you were on the

5  Yellowstone, and it's certainly downgradient, as the

6  groundwater would flow from the Dyce facility?

7  A    I can't vouch for the downgradient, but it is downstream

8  from Dyce Chemical.

9  Q    Okay.  All right.

10 A    Yeah.

11 Q    All right.  So when you heard that the EPA had determined

12 that there was perchloroethylene in the groundwater in

13 Lockwood, you've mentioned there might have been other

14 sources.  Wouldn't you agree that as soon as you heard that,

15 that you knew that your facility, the Dyce Chemical facility

16 on Taylor Lane in Lockwood, was at the top of a very, very,

17 very short list of possible suspects?

18 A    We were, we were on that list, but, for example, Kuck

19 Trucking was the site where they originally found the

20 contamination.  Kuck Trucking handled asphalt.  Perc could

21 have been used to clean their trailers of asphalt.  So it's

22 not impossible.

23    Right next door to us, Keller Trucking hauled asphalt.

24 It is possible that they could have used perchloroethylene in

25 cleaning compounds to clean the asphalt off of the trailers.

964

1    Q    I understand that, sir.  I understand there are many

2    possibilities.

3    A    So -- yeah.

4    Q    My question to you was, When the guy from the EPA,

5    Mr. Stevenson, comes in and gives you the information that you

6    heard, in your own mind, weren't -- didn't you put 2 and 2

7    together and come up with 4 and say, "Perchloroethylene in

8    Lockwood, chances are it's us"?

9    A    Yes.

10           THE COURT:  Let's take a break for lunch.  We'll be

11   in recess for lunch until 1:15.

12           I give you the usual admonition.  We'll be in

13   recess.

14           THE LAW CLERK:  All rise.

15       (Recess taken from 11:58:00 to 13:17:02.)

16       (Open court.)

17       (Jury present.)

18           THE COURT:  Please be seated.

19           You may continue.

20           MR. DAVIS:  Thank you, Judge.

21           Neil, would you pull up 5043?

22           DOCUMENT TECHNICIAN:  (Complied with request.)

23           MR. DAVIS:  This is stipulated in, Judge.

24   BY MR. DAVIS:

25   Q    Do you see the aerial, Mr. Warne?

965

1    A    Yes.

2    Q    All right.  So I think, in your direct, there was

3    testimony about these pits that are behind the tank farm,

4    three pits?

5    A    Yes.

6    Q    And I think you've described, in your direct or your

7    answers to Mr. Banker's questions, there were three different

8    pits there to catch if there had been a spill out of the three

9    different tank farms?

10   A    Yes.

11           MR. DAVIS:  Okay.  Can we scroll back out or go back

12   out?

13           DOCUMENT TECHNICIAN:  (Complied with request.)

14   BY MR. DAVIS:

15   Q    So that was a new addition by Dyce in the mid '80s,

16   wasn't it?

17   A    Yes.

18   Q    Okay.  And then out here, I don't know if we've talked

19   about those.  Would you tell the jury what those are?

20   A    That looks like two slope pits.

21   Q    Okay.  And what -- would you explain to the jury the

22   relationship between the slope pits and the other pits, if

23   there was any?  Was one to catch overflow from the other?

24   A    No.  The slope pits were used when there was a rainwater

25   or snow water that collected in the pits, and then it was

966

1    pumped to the slope pits --

2    Q    All right.

3    A    -- to aid with evaporation.

4    Q    That's what I'm trying to get at.  So the three

5    containment pits right behind the tank farm, if they ever got

6    filled, then you would be able to transfer water into these

7    other pits to let -- to enhance evaporation, correct?

8    A    Well, not necessarily if they got filled, but it was to

9    move water to the other pits for evaporation.

10          MR. DAVIS:  Okay.  And then just to go through the

11   history here of -- can we look at 5050, please, Neil?  Again,

12   this is admitted, I believe.

13          DOCUMENT TECHNICIAN:  (Complied with request.)

14   BY MR. DAVIS:

15   Q    And just please educate me, Mr. Warne.  Are those the

16   same pits, or are those different ones?

17   A    It looks like there are the slope pits, but there's also

18   a second containment area with some tanks in it behind the

19   slope pits --

20   Q    All right.

21   A    -- to the north.

22   Q    All right.  And then that reflects how it looked in 2002?

23   A    I'm not quite sure of the exact year, but, yes,

24   approximately.

25   Q    We'll, I'll give it to you.  You can cheat.

1    A    Yeah.

2    Q    Look at it.

3    A    It's 2002?

4    Q    Yeah.

5    A    It is, then.

6    Q    Okay.  All right.

7         All right.  And, finally, if we get towards the end of

8    your tenure -- if we could look at 5051, Neil?

9         DOCUMENT TECHNICIAN:  (Complied with request.)

10   BY MR. DAVIS:

11   Q    It looks like this is -- I think by stipulation it's an

12   '04 one.  It's in color, finally.  What happened to the slope

13   pits, Mr. Warne?

14   A    They have been taken out.

15   Q    And why was that?

16   A    That, I think at that point they were no longer used for

17   evaporation.

18   Q    All right.  Now isn't it true that in the '90s and

19   into -- up to that point in time, up to the point in time that

20   the slope pits were in use, that from time to time Dyce would

21   discharge from those pits out into the field to the north?

22        MR. BANKER:  Objection, Your Honor.  Relevance as to

23   time.

24        MR. DAVIS:  Well --

25        THE COURT:  Overruled.

1              THE WITNESS:  Would you please ask the question

2    again?

3    BY MR. DAVIS:

4    Q    Didn't Dyce discharge from the slope pits -- maybe we can

5    go back, Neil, to the previous exhibit, 5050, so the jury can

6    see.

7              DOCUMENT TECHNICIAN:  (Complied with request.)

8    BY MR. DAVIS:

9    Q    Didn't Dyce from time to time discharge fluids from those

10   slope pits out to the field?

11   A    Not that I know of.

12   Q    Well, did you discharge from these pits out into the

13   field?

14   A    No, not that I know of.

15   Q    Is it your testimony that Dyce never discharged the

16   contents of any pit out into a field?  Pumped it out?

17   A    In -- later, where those tanks are --

18   Q    Yeah.

19   A    -- there was water that collected in there.  I believe

20   that there were tests done on the water --

21   Q    Right.

22   A    -- and that it was okayed, and water from that pit was

23   pumped into the field to the north.

24   Q    All right.  That's what I'm getting at.  I mean, I think

25   both sides have seen you would need to get the water tested

                                    969

1  before you pumped it out, right?

2  A    Yes.

3  Q    In the records of this case, and I think you're familiar

4  with them, there are all kinds of testing records?  You would

5  send stuff to Energy Labs for testing, wouldn't you, water

6  samples?

7  A    I believe that they went.  Jim Diede handled that.

8  Q    All right.

9  A    He was the environmental.

10 Q    You were the manager?  He worked under you at that point?

11 A    Well, no, he didn't work under me.

12 Q    All right.

13 A    We had separate responsibilities and reported to Monte

14 Naff.  I was never Jim Diede's boss.

15 Q    Okay.  But is it sufficient to say that what to do with

16 water on this site was a consistent source of attention by the

17 people running Dyce Chemical?

18 A    No, not always.  It depended on precipitation.

19 Q    Well, I understand the weather here can be changeable,

20 but as these aerial photographs reflect, Dyce management spent

21 time and money dealing with water issues at the site; isn't

22 that true?

23 A    Over time, I would say we did spend some time and money

24 and concern with that, yes.

25 Q    All right.  And you were -- from time to time, that was

1    the subject of attention by regulators from the state, wasn't

2    it?  They'd come and check on you?

3    A    I know that we had regulators come and check, but they

4    dealt primarily with Jim.

5              MR. DAVIS:  All right.

6              Could you pull up Exhibit 382 which has not been

7    admitted?

8              DOCUMENT TECHNICIAN:  (Complied with request.)

9    BY MR. DAVIS:

10   Q    Would you take a look at this, see if this refreshes your

11   recollection?

12             MR. BANKER:  Your Honor, I object and would request

13   a sidebar.

14             THE COURT:  No.  I'll tell you if I need one.

15             Go ahead.

16        (Pause.)

17             THE WITNESS:  Okay.

18             THE COURT:  Let's have a sidebar.

19        (Discussion on the record at sidebar.)

20             THE COURT:  What is the relevance?

21             MR. DAVIS:  If you go to page 2 of the exhibit, the

22   state notes that there's been a continual problem with runoff

23   at this facility.  That's the point.

24             MR. GROSSBART:  They have runoff problems all the

25   way through.  This is a wastewater problem, and because

971

1    there's no records from the early days, we --

2            THE COURT:  I'll let you do it.

3            MR. BANKER:  If I might speak to that just before we

4    get back, on direct exam of several witnesses, we have tried

5    to elicit testimony about other spills and other conditions to

6    show that there were accidents and incidents that happened.

7    And, you know, to allow them to go into the '90s and the late

8    '80s after their expert says 1987 is the line of demarcation

9    really is going to keep us here.

10           THE COURT:  Well, here's the problem.  On several of

11   these witnesses, you have opened the door about what a great

12   company it was and about how they've always complied with

13   safety and never spilled anything, and it just had been a fine

14   operation, which they may have been.  If there's evidence that

15   shows that there was perhaps a practice that existed prior to

16   1987 that they need to use circumstantially, proof after 1987,

17   I think it's relevant.

18           MR. BANKER:  On the question of habit and practice,

19   which they talked about yesterday, you know, habit and

20   practice evidence that is dealing with different physical

21   configurations of the site, different employees, that's not

22   habit and practice.  And, moreover, when you look at that

23   evidence, it's probity of conduct later in time, not

24   necessarily time going, time going forward, not necessarily

25   time going backward, so --

972

1          THE COURT:  It can be going backward, can't it?

2          MR. BANKER:  I think the weight of authority is

3   stronger on the idea that it has to go forward, and I'd be

4   happy to submit a point brief on that if it would be helpful.

5          MR. GROSSBART:  That's almost preposterous.  We

6   don't have any records from the early days because they were

7   all thrown away.  We have records from the later days that

8   document this stormwater problem, and there was -- and

9   again -- or wastewater problem.  It was thrown out in the

10  field.  Whether any one or more of those caused the northwest

11  corner isn't the point.  The point is you've attacked Marvin

12  Johnson for saying, in effect, "We had a wastewater problem.

13  I had to get rid of it out in the field."  I can prove that's

14  what you were doing in later years.  It goes directly to

15  dealing with how you're contesting what Marvin Johnson did.

16  There were wastewater problems every year.

17         MR. COZZENS:  Who attacked Marvin Johnson?

18         MR. GROSSBART:  I have a feeling you're going to

19  attack him after the video is played, but in any event, you

20  get my drift.

21         THE COURT:  I'm looking at, for instance, the Brill

22  deposition.  There is a lot of irrelevant stuff in there, but

23  because of what he's testified to on direct, for instance, and

24  he has said that there was no pipe or anything, and because of

25  how he's testified about what a great operation this was, I

                              973

1   think Brill's, Brill's testimony is probably relevant to the

2   extent that he claims that Dave Warne, even back then when he

3   was working, was authorizing him, telling him to do these

4   things.  That stuff is relevant.  The other stuff isn't.  Now

5   I haven't had a chance to look at those other guys' depos.

6              So are you going to offer this into evidence?

7              MR. DAVIS:  Yes, yes.

8              THE COURT:  Have you stated an official objection

9   for the -- I think you probably have.

10             MR. BANKER:  Maybe not for that exhibit.

11             THE COURT:  But go ahead and do it now.

12             MR. BANKER:  I think I would object as to relevance,

13  402, 403, and I don't believe it's relevant to -- there is no

14  evidence in this case that will suggest anything that happened

15  after 1987 --

16             THE COURT:  I need to see that second page.

17             MR. DAVIS:  Sure.

18             MR. GROSSBART:  But it's an official government

19  record as much as any others in the case.

20             MR. DAVIS:  There wasn't a foundation objection.

21  It's just relevance.

22             THE COURT:  Prejudice outweighs probative value.

23             MR. DAVIS:  He didn't make that.

24             THE COURT:  He did.

25             MR. DAVIS:  You're right.  I stand corrected.

1           THE COURT:  Um-hmm.  That's what's in that rule

2    there.   403, I think, is where it is.

3           MR. DAVIS:  You're right.  You know your numbers.

4       (Open court.)

5       (Jury present.)

6           MR. DAVIS:  Maybe it's page 3.  Is there a 3 there?

7           DOCUMENT TECHNICIAN:   (Complied with request.)

8           THE COURT:  I'll overrule the objection.  What's the

9    number?

10          THE CLERK:  382.

11          THE COURT:  382 is admitted.

12      (Exhibit 382 was received in evidence.)

13   BY MR. DAVIS:

14   Q    And do you recall this 1992 visit from officials from the

15   Montana Department of Health and Environmental Sciences?

16   A    Yes.

17   Q    Okay.

18   A    Yeah.

19   Q    And you showed them your water collection systems, did

20   you not?

21   A    I'm trying to remember if I did or if the operations

22   manager did at the time.

23   Q    All right.  Well --

24   A    Ken Kjos.

25   Q    Can you look at page 3, Mr. Warne?

1    A     Yes.

2    Q     You got a thank-you at the bottom.  Do you see that?

3    A     Yeah.  I mean, when they came in, I tried to be as

4    cooperative as possible --

5    Q     All right.

6    A     -- to make sure they got answers to what they were

7    looking for or any help that they needed, so --

8    Q     And I take it -- I'm sorry to cut you off.

9    A     No, that's, that's all.

10   Q     And did you agree or disagree with the conclusion at the

11   top of page 3?

12   A     I disagree.

13   Q     Okay.  But -- and Dyce continued to spend time and

14   attention on that issue, did it not?

15   A     Yes.

16   Q     Okay.

17   A     Yeah.

18   Q     Let me skip ahead to the environmental process that I

19   think I questioned you about briefly before lunch, the

20   environmental investigation that began in '98 or '99.

21         I think we'd take a look at Exhibit 436, which is

22   admitted.

23              DOCUMENT TECHNICIAN:  (Complied with request.)

24   BY MR. DAVIS:

25   Q     And this is an e-mail you sent January 6 of '99?  Do you

                                   976

1    see that?

2    A    (No response.)

3    Q    Yes or no?

4    A    Yes.

5    Q    Okay.

6    A    I'm sorry.  Yes.

7    Q    And you sent it to Ms. Miller, whom you've already

8    identified.  She was at that point the lady in charge of

9    environmental issues for several Dyce -- or several HCI

10   branches, including Billings?

11   A    Yes.

12   Q    Okay.  And she -- if we go down in this e-mail chain,

13   this is -- I think you're reporting, earlier in the day, to

14   Suz.  I guess is that also Ms. Miller?

15   A    It is, yes.

16   Q    I'm sorry.

17   A    Yeah, she often went by that name.

18   Q    Okay.  And you're talking about -- let me see if I can

19   get that off.

20       What you wanted to report to Ms. Miller on January 6 of

21   '99 was that Ms. LeCours from the Montana Department of

22   Environmental Quality had been in for a visit.

23   A    Yes.

24   Q    Yeah.  And it was pretty clear to you, even then, that

25   they were looking at perc.

977

1      If we could scroll down, Neil?

2           DOCUMENT TECHNICIAN:  (Complied with request.)

3           THE WITNESS:  Yes, it does say perc contamination.

4           MR. DAVIS:  All right.  And let's go back up, Neil,

5      if we can, on this.  Right there.

6           DOCUMENT TECHNICIAN:  (Complied with request.)

7      BY MR. DAVIS:

8      Q    And one of the people besides Ms. Miller, the other two

9      people you elected to send this e-mail to were Monte and Rod,

10     correct?

11     A    Yes.

12     Q    And Monte, of course, was Monte Naff?

13     A    Yes.

14     Q    And he at that point -- was he in Tulsa or was he in

15     Billings at that point, in '99?

16     A    Well, he worked out of both offices.

17     Q    All right.

18     A    He was in both places part of the time.

19     Q    But you understood he was someone higher up than you in

20     the organization?

21     A    Yes.  He was my boss.

22     Q    Okay.  So that was understandable.

23          And Mr. Hallsten -- "Rod" would be Rod Hallsten, would it

24     not?

25     A    Yes.

1    Q    And Mr. Hallsten was not above you in the organization,

2    was he?

3    A    No, he was a peer manager, a branch manager.

4    Q    He at that point was in Ogden, was he not?

5    A    Yes, that's correct.

6    Q    All right.  But you knew that he had been in Billings?

7    A    Yes.  I knew he had been in Billings for a time.

8    Q    Okay.  And why, why is he one of the three people that

9    you would send an e-mail to?  Why he besides Ms. Miller and

10   Mr. Naff in January of 1999?

11   A    Well, Rod is a branch manager, and he was a friend.  I

12   often talked with him about operations, business.  I knew that

13   he handled chlorinated solvents, so it was as much about the

14   process of handling similar products.  So other than that, I

15   guess those were the reasons why I copied him on the e-mail.

16   Q    He was one of the people you thought ought to be in the

17   loop on the issue of perc contamination at the Lockwood site

18   from about day two of this problem, wasn't he?

19   A    No, not necessarily.  I mean, he, he was handling perc,

20   so he was included in the e-mail.

21   Q    All right.  And Mr. Hallsten was pretty prompt on

22   responding to you when you brought him into the loop, wasn't

23   he?  And I'm not --

24   A    He always tried to answer e-mails --

25   Q    All right.

```
 1   A    -- as quickly as possible.

 2            MR. DAVIS:  Can we pull up, I think it is, Admitted

 3   Exhibit 4087?

 4            DOCUMENT TECHNICIAN:  (Complied with request.)

 5            THE WITNESS:  Yeah, yeah.

 6   BY MR. DAVIS:

 7   Q    I am not trying to trick you or trap you at all,

 8   Mr. Warne.

 9   A    Yeah, yeah.

10   Q    I think the jury has even seen this e-mail, so you can,

11   now, too.

12        4087, Neil.

13            DOCUMENT TECHNICIAN:  (Complied with request.)

14   BY MR. DAVIS:

15   Q    And there we see, same date.  January 6?

16   A    Okay.

17   Q    Yeah.  And he gets right back to you, doesn't he, if you

18   read down?

19        Let's pull that up, Neil.

20            DOCUMENT TECHNICIAN:  (Complied with request.)

21            THE WITNESS:  It looks, it appears that way, yes.

22   BY MR. DAVIS:

23   Q    Yeah.

24   A    Yeah.

25   Q    And other than his spelling and the word "to" should have
```

1  an extra O in it in that sentence, "It does not appear that

2  you have too much to be concerned about"?

3  A    Right.

4  Q    The fact that you and I are having this exchange today in

5  a federal courtroom, I guess it would be safe to say, in that

6  regard, Mr. Hallsten was off a little bit in the level of

7  concern that you ought to have had?

8            MR. BANKER:  Objection, Your Honor.

9            THE COURT:  That's sustained.

10           MR. DAVIS:  All right.

11  BY MR. DAVIS:

12  Q    From January 6, 1999 over the next five-year period, did

13  Rod Hallsten ever tell you that he recalled a significant

14  short -- inventory shortage of perc that might reflect some

15  kind of problem in operations at the Lockwood Dyce facility in

16  the mid 1970s?

17  A    From what time frame, again?  '98 until --

18  Q    No, January 6, '99, when we see he's at least then in the

19  loop.  For the next four years, December of '04.

20  A    He did not immediately.

21  Q    He did not ever in that time frame, did he, tell you,

22  "Hey, Dave.  I remember something back in the mid '70s."  He

23  didn't tell you that, did he?

24  A    No, he didn't tell me that.

25  Q    When you say, "He didn't tell me that," what you know now

981

1    is he told a fellow named Tom Mielenhausen that, didn't he?

2    A    That's what I understand, yes.

3    Q    Yeah.  And that was after a Christmas party here in

4    Billings of Dyce employees -- or HCI employees, I guess I

5    should say.  You guys were Brenntag by then, weren't you?

6    A    Yes, we were.

7    Q    Yeah.  That was after a Christmas party in '04, wasn't

8    it?

9    A    Yes.

10         MR. DAVIS:  And, lastly, if we could pull up the

11   104(e) response?  I have to find my notes.  That would be 383.

12   This is an admitted exhibit.

13         DOCUMENT TECHNICIAN:  (Complied with request.)

14   BY MR. DAVIS:

15   Q    The first page you see there is a cover letter to the

16   environmental -- Region 8 of the Environmental Protection

17   Agency from Suzanne Miller?  Do you see that?

18   A    Yes.

19   Q    And you're a copy addressee on that letter, aren't you,

20   Mr. Warne?

21   A    Yes.

22   Q    All right.  And she is, at that point on July 23, 2000,

23   sending the EPA your company's response to the Section 104(e)

24   information request, was she not?

25   A    Yes.

982

1          MR. DAVIS:  And if we go on to the next page?

2          DOCUMENT TECHNICIAN:  (Complied with request.)

3          MR. DAVIS:  Well, let's go on to the next page.

4          DOCUMENT TECHNICIAN:  (Complied with request.)

5     BY MR. DAVIS:

6     Q    And you understood she was signing under oath on behalf

7     of HCI, Dyce Chemical Company?

8     A    Yes.

9     Q    All right.  You would help Ms. Miller; I think you

10    explained in answer to Mr. Banker's questions before lunch,

11    you bird-dogged some records?  You went down to the county

12    courthouse to find real estate records to help assist in this?

13    A    I did assist, yes.

14         MR. DAVIS:  Yes.  And if we could turn to page 5 of

15    the document, Neil?

16         DOCUMENT TECHNICIAN:  (Complied with request.)

17         MR. DAVIS:  There's a list of people that were

18    interviewed to find out anything about the PCE problem in

19    Lockwood.  Go on to the next page, Neil.

20         DOCUMENT TECHNICIAN:  (Complied with request.)

21    BY MR. DAVIS:

22    Q    And from your learning about the history of the company,

23    you recognize somebody reached out to talk to Don Whaley who

24    had been a former owner of the business back in the 1960s and

25    '70s.  Do you see that?

983

1    A    Yes.

2    Q    Someone had gone and talked to Dick Bender, who had

3    worked there in the '70s, correct?

4    A    Yes.

5    Q    Had talked to a Delmer Hutchinson, down at the bottom,

6    who had also worked there in the '70s?

7    A    Yes.

8         MR. DAVIS:  Okay.  Can we do both boxes together,

9    Neil?

10        DOCUMENT TECHNICIAN:  (Complied with request.)

11        MR. DAVIS:  Good enough.

12   BY MR. DAVIS:

13   Q    Obviously you were one of the guys who got interviewed?

14   A    Yes.

15   Q    And my understanding is you were interviewed by a

16   paralegal at the Holland & Hart law firm?

17   A    Yes.

18   Q    Okay.  Even though a concerted effort -- someone had made

19   the effort to reach back into the early days of Dyce with

20   Mr. Whaley and Mr. Hutchinson, among others, and Mr. Bender,

21   you'd agree with me that somehow Marvin Johnson never managed

22   to make this first list, did he?

23   A    His name is not on there.

24   Q    Okay.  Nor, in fact, is Mr. Hallsten's name on that list?

25   A    Nope.  Rod's is not.

984

1   Q    And, in fact, as far as Marvin Johnson is concerned, did

2   you personally make any effort to find out what Mr. Johnson

3   may or may not have known about the handling of

4   perchloroethylene at the Dyce facility at any time before you

5   retired from the business?

6   A    Personally, I did not --

7   Q    All right.

8   A    -- contact Marvin.

9   Q    Did you direct anyone, such as Ms. Miller?  "You ought to

10  go see, talk to Marvin Johnson.  He might know something"?

11  A    I did not.

12         MR. DAVIS:  Can we see now, Neil, page 121 of

13  Exhibit 3059?

14         DOCUMENT TECHNICIAN:  (Complied with request.)

15  BY MR. DAVIS:

16  Q    You've seen this document before, have you not,

17  Mr. Warne?

18  A    I believe that I have.

19  Q    I would imagine you probably can envision it with your

20  eyes closed.

21         MR. BANKER:  Objection.  Argumentative.

22         THE COURT:  Yeah.  I'd have to sustain it.

23         MR. DAVIS:  All right.

24  BY MR. DAVIS:

25  Q    All right.  And as you sit here today, as the man who has

985

1    been the manager or was the manager for this facility from,

2    what, 1992, correct?

3    A    Yes.

4    Q    Until -- to what?  To last year?

5    A    2008.

6    Q    Yes.  Two years ago.  Time flies.

7    A    Yeah.  Yes.

8    Q    All right.  You have no explanation, do you, for why

9    perchloroethylene is found beneath the ground surface in those

10   two locations, do you?

11   A    I do not.

12              MR. DAVIS:  That's all I have.  Thank you.

13              THE COURT:  Redirect.  Oh.  Did he do it for all of

14   you?

15              MR. GROSSBART:  Yes, he did a very nice job for all

16   of us.  We have no questions.

17              THE COURT:  Well, I don't need comments, an

18   evaluation of how he did.  It's just nice if one of you gets

19   up, is all.

20              Redirect.

21              MR. BANKER:  Could I have Exhibit 30, please?

22              DOCUMENT TECHNICIAN:  (Complied with request.)

23              MR. BANKER:  Could I have this paragraph blown up?

24              DOCUMENT TECHNICIAN:  (Complied with request.)

25   ///

986

REDIRECT EXAMINATION

BY MR. BANKER:

Q     On cross-examination, Mr. Davis asked you about this
particular sentence, and I'll read that first sentence.
"Perchloroethylene in drums has been a hard item to balance in
inventory."

       Do you know what Mr. Dyce is talking about there?  What
was hard about balancing inventory in perc drums?

A     Well, there are a couple of things that could be
happening.  Perchloroethylene, the drycleaning grade, came in
in bulk tank trucks.  It went into the bulk tank.  And from
that tank, perc was drummed in the drumming shed, so it was
not uncommon for receiving reports filled out by the
warehousemen not to have been completed, so they may have
drummed product and not have sent paperwork into the office so
that it could be moved from one inventory item to the other,
from bulk to drums.

       So when, when we looked at drum inventory, it was always
in conjunction with the bulk, and regardless of the product --
it happened quite often with sulfuric and hydrochloric which
were drummed much more often -- the differences in the
inventory could be accounted for with the bulk tank.  So
that's, that is what I would assume would be the issue with
drummed inventory.  Other than that, it could have been
something that happened before --

987

1   Q      Okay.

2   A      -- or suspicion of something that happened before.

3          MR. BANKER:  You can take that exhibit down, please.

4          DOCUMENT TECHNICIAN:  (Complied with request.)

5   BY MR. BANKER:

6   Q   Mr. Davis asked you about why Marvin Johnson wasn't on

7   your list in the second request that you sent, responding to

8   the EPA.  Did you know Marvin Johnson?

9   A      Yes.

10  Q      When -- did you work with him?

11  A      I did.

12  Q      When did you work with him?

13  A      He started work after I started in '81, and then -- and

14  I'm not sure when he left, but it was in the '70s, late --

15  excuse me.  Late '80s, yeah.

16  Q      Okay.  Mr. Davis talked to you --

17  A      And I guess, in answer to your question, we tried to

18  contact -- you know, initially the Martin Lockheed report

19  showed ten to 15 years, so we were concentrating on the '80s,

20  initially, and we were looking for, we were looking for a

21  spill that happened.

22  Q      Okay.

23  A      So . . .

24  Q   Mr. Davis asked you a couple questions about how your

25  awareness developed with the EPA through '98, '99, 2000.

1    A     Right.

2    Q     Do you remember at some point the EPA advised Dyce of its

3    potential liability?

4    A     I think that came with Pete Stevenson.  And obviously I

5    said Pete was the first one who talked about the perc.

6    Obviously it happened earlier.  But I think Pete talked about

7    some of the responsibilities that Dyce Chemical would have.

8              MR. BANKER:  Could I have Exhibit 3047, please?

9              DOCUMENT TECHNICIAN:  (Complied with request.)

10   BY MR. BANKER:

11   Q     Have you seen this letter before?

12   A     Yeah.  I'm sorry; it's a little fuzzy.  I might have

13   to --

14             MR. BANKER:  Could we blow up the text, please?

15             DOCUMENT TECHNICIAN:  (Complied with request.)

16             THE WITNESS:  Okay.  I can see it.

17             Yeah, it looks like a letter addressed to Monte

18   Naff.  Potential -- and it talks about the potential

19   liability.

20   BY MR. BANKER:

21   Q     Do you recall that on August 23, 2000, Dyce was advised

22   by the EPA that they were a potentially responsible party?

23   A     I -- obviously from the letter, we were.  I remember that

24   as a general time frame.

25             MR. BANKER:  Okay.  Could I have Exhibit 382,

1    please?

2         DOCUMENT TECHNICIAN:  (Complied with request.)

3         MR. BANKER:  And I think I'd like the next page.

4         DOCUMENT TECHNICIAN:  (Complied with request.)

5         MR. BANKER:  Maybe the next page.

6         DOCUMENT TECHNICIAN:  (Complied with request.)

7         MR. BANKER:  There we go.  Can we blow up the first

8    sentence there, first paragraph?

9         DOCUMENT TECHNICIAN:  (Complied with request.)

10   BY MR. BANKER:

11   Q    So Exhibit 382, a letter in December of 2002, I think --

12        MR. DAVIS:  '92, Paul.

13        MR. BANKER:  What year?

14        MR. DAVIS:  That's a '92 letter.

15        MR. BANKER:  '92 letter?  December 9 of '92 is the

16   letter.

17        If we could blow the first paragraph up where it

18   says, "Clearly Dyce Chemical does not have control of its

19   waste streams."

20        DOCUMENT TECHNICIAN:  (Complied with request.)

21   BY MR. BANKER:

22   Q    You said that you disagreed with that.  Why do you

23   disagree with that?

24   A    Because if that happened, I think it was an exception.  I

25   think that the great majority of the time, we had control of

990

1  the product on the property.

2  Q     What makes you say that?

3  A     Several things.  Just that -- tried to handle the product

4  safely and consistently.  When you look at the millions of

5  pounds that ship through that facility, the vast majority of

6  it was handled, handled well.

7  Q     Was the -- were there any steps taken in response to that

8  comment in the 1992 letter that Dyce doesn't have control over

9  its waste streams?  Were there any steps taken to respond to

10  that concern raised by the EPA?

11  A     Absolutely.

12  Q     What steps?

13  A     Jim Diede directed that, but we -- and so I can't speak

14  to the exact details, but I know it was a big concern, and Jim

15  Diede, as part of his responsibility, handled it.  It was not

16  taken lightly.  It was addressed.

17           MR. BANKER:  Pull up Exhibit 3059, page 121.  Can we

18  zoom in on the largest of the three -- or the four green

19  blobs?

20           DOCUMENT TECHNICIAN:  (Complied with request.)

21  BY MR. BANKER:

22  Q    Mr. Davis asked you about two spots to the east.  I'm

23  wondering about the spot to the west.  Do you know what that

24  is?

25  A     Well, yeah.  It looks like a center of contamination for

1    perc.

2    Q    And does that area have a name?

3    A    Well, that's the northwest property portion of the

4    property.  It didn't have a name.  We didn't have operations

5    out there.

6    Q    Have people referred to it as the northwest corner?

7    A    Yes.

8            MR. BANKER:  Thank you.  I have nothing further.

9            THE COURT:  You can step down.  Thank you.

10           THE WITNESS:  Thank you.

11           THE COURT:  Call your next witness.

12           MR. COZZENS:  Your Honor, Soco will call Suzanne

13   Miller.

14           WHEREUPON,

15                      MS. SUZANNE MILLER,

16   called for examination by counsel for defendant, after having

17   been first duly sworn to testify the truth, the whole truth,

18   and nothing but the truth, testified as follows:

19                      DIRECT EXAMINATION

20   BY MR. COZZENS:

21   Q    Good afternoon, Ms. Miller.  Would you state your full

22   name and address for the record, please?

23   A    I'm Suzanne Miller.  617 Las Barrancas Drive in Danville,

24   California.

25   Q    Was there a time when you were employed by Dyce Chemical?

1   A     Yes.

2   Q     And tell me what period of time that was.

3   A     I was employed from October of 1997 to May 2002.

4   Q     Would you outline for the jury your educational

5   background?

6   A     In 1983, I started college at BYU University and finished

7   up in 1987 at DePauw University in Indiana.  And in 1995, I

8   began my graduate work at Utah State University and received

9   my diploma in 2002.

10  Q     What degree did you receive in 2002?

11  A     Environmental engineering masters.

12  Q     All right.  What was your job title when you first went

13  to work for Dyce?

14  A     As a regional environmental manager.

15  Q     Who hired you for that position?

16  A     I was originally interviewed by Rod Hallsten, and then I

17  met with Monte Naff and Jim Diede.

18  Q     And do you know why they were looking for an

19  environmental manager?

20  A     Yes.  Jim Diede was going to retire, and they wanted to

21  replace him.

22  Q     Where was your office?

23  A     Well, originally I was going to be in the Ogden, Utah

24  office.  They did not have an office.  They were in the

25  process of building a new office building, and so I came up to

1   Billings, Montana for the first few months.

2   Q    And were you trained by anybody at Dyce to perform your

3   duties as the environmental manager?

4   A    Yes.  I came up to Billings and trained under Jim Diede

5   until he retired.

6   Q    And do you know for what period of time that was?

7   A    It was approximately two months.

8   Q    And have you -- have I asked you how long you worked

9   there?

10  A    Yes.

11  Q    Then the jury already knows.

12       Why did you leave?

13  A    At the time, my husband and I were moving to Alaska.

14  Q    Are you being paid to be here today?

15  A    No.  I have my normal salary.  Just my expenses.

16  Q    Okay.  During the period that you were here in Billings,

17  what were you doing on the job?

18  A    Well, my job as regional environmental manager entailed

19  health and safety training, regulatory compliance, and any

20  environmental issues that would come from that.

21  Q    Okay.  Did you have any -- what was your involvement in

22  employee training?

23  A    To basically oversee the training program.  I did assist

24  in training and developing training programs.

25  Q    Okay.  Who were the other people that you were working

1   off -- with at the Billings office?

2   A    Well, the operational manager at that time was Craig

3   Guelff, and Dave Warne was the branch manager.

4   Q    When you say "operations manager," what part of the

5   facility in Billings did he manage?

6   A    He was over the warehouse and the people that actually

7   handled the chemicals.

8   Q    And did you have any responsibility for teaching

9   employees materials handling?

10  A    Yes.  That's part of the training, would be how to handle

11  the materials that we had onsite.

12  Q    Where did you learn what to teach them?

13  A    Well, part of it was in my graduate studies.  Learned

14  about different materials handling.  And then I did take

15  additional training courses after my employment began with

16  Dyce.

17  Q    Okay.  Did Dyce at that time have policies and procedures

18  regarding handling materials?

19  A    They did.

20  Q    Did you review those?

21  A    Yes.

22  Q    Were they, in your opinion, adequate?

23  A    Yes.  They were comprehensive.

24  Q    And who was your immediate supervisor?

25  A    Monte Naff.

1    Q     Where was his office?

2    A     He was located out of Sand Springs, Oklahoma.

3    Q     Did there come a time when you became aware that there

4    was at least an investigation about ground contamination in

5    the Lockwood area?

6    A     Yes.  DEQ came and let us know that they were doing some

7    investigations in the area.

8    Q     Do you recall when that was?

9    A     June '98, I believe.  In that summer of '98.

10   Q     And what did the DEQ personnel tell you?

11   A     They basically let us know that they would be in the

12   area.  They were looking in the Lockwood area and

13   investigating throughout the area, and they may have occasion

14   to come and speak with us.

15   Q     Did they?

16   A     They did.

17   Q     And what did they do?

18   A     They did some investigative work in the area, and that

19   work took place in the winter and the spring of '99, so the

20   following year.

21   Q     Okay.  Did you ever get a report from the DEQ

22   investigation?

23   A     Yes.  They provided a report, and it came out in the late

24   spring/summer of '99.

25   Q     And what was that report called?

1   A     Well, I don't know the exact title of the report, but it
2   was produced for DEQ by Pioneer, who was their consultant.
3   Q     What did the report say?
4   A     Basically that they had concerns about chlorinated
5   solvents in the area and had found some evidence of
6   chlorinated solvents in the groundwater.
7   Q     Did they tell you they found it in the groundwater at the
8   Dyce facility or just in Lockwood in general?
9   A     In Lockwood in general.
10  Q     At that time, had anybody suggested to you that Dyce was
11  a potential source of that groundwater contamination?
12  A     Not at that time, no.
13  Q     Was there anybody else in Dyce who was responsible for
14  environmental matters?
15  A     Well, we had a corporate environmental manager.
16  Q     What was his name?
17  A     Jim -- sorry.  Jeff Simko.
18  Q     Okay.  Did you discuss these matters with Mr. Simko?
19  A     I did.
20  Q     Was there anything that you were asked to do during the
21  course of the DEQ's investigation?
22  A     Well, I was basically the site contact for DEQ, so
23  whenever they came on site, I met with them and accompanied
24  them when they did their sampling on site.
25  Q     What sampling did they do?

1    A    They did some soil vapor extraction and some well

2    sampling.

3    Q    What is a soil vapor extraction?

4    A    They basically put a probe into the soil and pull out

5    vapors and see if there's any contaminants that are

6    off-gassing into the soil.

7    Q    That are going what?

8    A    Off-gassing.

9    Q    And what does that mean?

10   A    It basically means if you have a volatile contaminant,

11   you can pull vapers out and it will tend to vaporize into

12   those vapors.

13   Q    Did they have to get somebody's permission to be getting

14   those samples from the Dyce site?

15   A    Well, it's more of a courtesy.  I mean, they can come on

16   site.  They usually come and ask you.  If you have a problem

17   with them coming on site -- you know, we didn't -- then you

18   can refuse them, and then they would come with a subpoena.

19   But that wasn't necessary.

20   Q    You just cooperated.

21   A    Yeah.

22   Q    Did the DEQ investigation continue throughout 1999?

23   A    At that point, EPA became involved, and I believe DEQ

24   turned over a lot of the responsibility to EPA.

25   Q    Do you know why?

1    A     I don't know what their internal discussions were, but I

2    believe it had to do with some funding and resources.

3    Q     Did there come a time when you started dealing primarily

4    with EPA officials?

5    A     Yes.

6    Q     When was that?

7    A     In the summer of '99 and in the fall.

8    Q     Okay.  Did you get a report from the EPA?

9    A     Yes.  EPA provided a report of their investigation in

10   December of 1999.

11          MR. COZZENS:  Okay.  Would you pull up Exhibit,

12   Admitted Exhibit 3043?

13          DOCUMENT TECHNICIAN:  (Complied with request.)

14          MR. COZZENS:  Wait, wait.  It's not admitted,

15   apparently.

16          THE CLERK:  It got admitted on the 8th.

17          MR. COZZENS:  Okay.

18          MR. GROSSBART:  It's admitted.

19          THE CLERK:  Yes.

20          MR. COZZENS:  All right.  Didn't want to goof up

21   again, Judge.

22   BY MR. COZZENS:

23   Q     All right.  Can you tell me what Exhibit 3043 is?

24   A     This appears to be the cover page of the EPA report.

25   Q     And when was that actually provided to you?

1    A    I believe it was signed in December of '99.  I don't

2    recall if we received it then or early 2000.

3    Q    Do you know who prepared this report?

4    A    EPA's contractor, Lockheed Martin.

5    Q    All right.  Was there -- well, do you recall what

6    conclusions were reached in that report?

7    A    I believe they stated that HCI/Dyce would be a likely

8    source of the contamination in the area.

9    Q    Is that the first time anybody had told you that Dyce was

10   a potential source of the groundwater contamination?

11   A    Yes, it is.

12   Q    And that was in December of 1999?

13   A    Yes.

14        MR. COZZENS:  Would you go to page 14 of that

15   exhibit, and if you would blow up the paragraph that starts in

16   the middle of the page that says, "The release of VOCs"?

17        DOCUMENT TECHNICIAN:  (Complied with request.)

18   BY MR. COZZENS:

19   Q    Can you tell the jury what a VOC is?

20   A    Yes.  It's a volatile organic compound.

21   Q    And what does that mean in the context of this

22   investigation and this report?

23   A    Well, the chemicals they were looking for fit into that

24   category of chemical.

25   Q    What chemicals were they looking for?

1    A      Chlorinated solvents.

2    Q      Okay.  And is perc a chlorinated solvent?

3    A      Yes, it is.

4    Q      All right.  They estimated that there was a volume

5    release of PCE.  Can you tell the jury what PCE is?

6    A      Perchloroethylene, also known as tetrachloroethylene.

7    Q      And can you tell the jury how much Lockheed Martin

8    estimated was released?

9    A      Approximately 200 gallons.

10   Q      And did they suggest how long ago it would have been

11   released?

12   A      Minimum of ten to 15 years.

13          MR. COZZENS:  All right.  Would you blow up, please,

14   the last paragraph of that page?

15          DOCUMENT TECHNICIAN:  (Complied with request.)

16   BY MR. COZZENS:

17   Q      That's the paragraph, is it not, where Dyce is identified

18   as a potential source?  Is that correct?

19   A      Yes, that's correct.

20   Q      And the ultimate conclusion is that additional

21   investigation will be necessary, correct?

22   A      Yes, that's correct.

23   Q      Well, what did you do about this information?

24   A      Well, following this report, the EPA asked us to conduct

25   additional investigation at the facility.

1    Q    Even before they did that, I'm assuming you passed this

2    information on to your superiors?

3    A    Yeah.  Absolutely.

4    Q    Okay.  And did they instruct you to do anything

5    specifically in relation to the information contained in this

6    report?

7    A    I guess I'm not quite sure what you're asking.  I mean --

8    Q    I mean, did they ask you to do anything, do any

9    investigation of your own or talk to people or do anything at

10   that time?

11   A    No.

12   Q    Okay.  Well, what happened next in regards to the EPA

13   investigation?

14   A    They asked us to provide them with some information.

15   Q    And is there a standard -- in your business, is there a

16   name for that request?

17   A    Yes.  It's a 104(e) request.

18   Q    And what does that mean, "104(e)"?

19   A    It's the regulatory reference, and it's part of a CERCLA

20   action, and so they basically ask, send out a letter, asking

21   companies for different company information.

22   Q    And what is CERCLA?

23   A    It's Comprehensive Environmental Response and Liabilities

24   Act.  It's a regulatory branch of EPA.  They basically handle

25   the waste disposal or sites where there's been some

1    contamination.

2              MR. COZZENS:  Okay.  Would you pull up Admitted

3    Exhibit 3045, please?

4              DOCUMENT TECHNICIAN:  (Complied with request.)

5    BY MR. COZZENS:

6    Q    Can you tell the jury what Exhibit 3045 is?

7    A    It's the signature page that went along with our answers

8    to the 104(e) request.

9    Q    Okay.  And let me just try to do it this way.  If you

10   look through this -- or do you know, does this document

11   include not just the questions that were presented to you but

12   also your answers to them?

13   A    Yes.  This would be the signature page that went with our

14   answers.

15   Q    Okay.  First I'd like it if you could blow up the top

16   where it says, "Notarized certificate," and all of the

17   information underneath there.

18             DOCUMENT TECHNICIAN:  (Complied with request.)

19   BY MR. COZZENS:

20   Q    Would you read the first paragraph for the jury, please?

21   A    "I, Suzanne Miller, having been duly sworn and being of

22   legal age, hereby state" -- do you want me to just continue

23   on?

24   Q    Yes.

25   A    Okay -- "I am the person authorized by HCI/Dyce Chemical,

1    Incorporated to respond to the Environmental Protection

2    Agency's request for information concerning the Lockwood

3    solvent site located in Billings, Montana."

4    Q    Okay.  Stop right there, if you would.

5         Do you know the significance of that first paragraph?

6    A    Yes.

7    Q    What is it?

8    A    Well, that I am certifying that what is in the document

9    is true to the EPA.

10   Q    Did you understand it to have anything to do with that

11   your response to the requests was being submitted under oath?

12   A    Yes.

13   Q    Did you understand that if they weren't true, there was a

14   penalty of perjury?

15   A    Yes.

16   Q    Okay.  How did it come to be that you were the one that

17   was preparing and submitting this response to request?

18   A    Once we received the response, I spoke with our corporate

19   environmental manager, and he indicated that they wanted me to

20   prepare the response.

21   Q    And who was that, again?

22   A    Jeff Simko.

23   Q    Okay.  So what did you do to prepare this response?

24   A    Well, we read through the questions and then searched the

25   documents that were available at the facility.  So we went

1004

1  through and reviewed all of the documents and found the ones

2  that were responsive to the questions.  I also spoke to

3  personnel that were onsite, so the people that had been at the

4  facility, especially the operations people, for a period of

5  time, so that they could help me formulate the responses to

6  the questions.

7  Q    Okay.  You said, in response to my question, that "we"

8  did this.  Who was involved in actually gathering that

9  information?

10  A    Well, I spoke with the people at the facility, so I spoke

11  with Dave Warne.  I spoke with Monte Naff, who was my boss,

12  who had been at that facility.  I spoke with Ron Benson, who

13  was the maintenance man at the facility; Jim Charlton, who was

14  a contract driver for us who had been at the facility for a

15  number of years; and then John Cleveland, who had also been in

16  operations at the facility.  Those are the key people who

17  helped me out.  And Craig Guelff, who was the operations

18  manager at that time.

19  Q    And what you call operations manager, would that -- the

20  warehouse foreman, is that the same thing as that position

21  used to be?

22  A    Yes, yes.

23  Q    Okay.  What did you do to search for documents?

24  A    Well, I started with the obvious documents that were in

25  use at the time, but then we also went and looked through the

1    facility documents.  So we went through filing cabinets.  We

2    went -- there's a storage room, an upper warehouse.  And then

3    there was also a trailer onsite that they housed documents.

4    So we went through each and every document to see what was

5    responsive to the questions.

6    Q    When you say "we," was somebody helping you go through

7    each of the documents?

8    A    Well, Dave Warne helped me search through documents, but

9    I did the majority of looking and pulling out documents

10   myself.  So if I had a question about what a document meant, I

11   might ask for clarification from someone who was at the

12   facility.

13   Q    Did you personally look at all of the documents that you

14   thought were relevant to these requests?

15   A    Yes, I did.

16   Q    What did you find regarding documents that were

17   available?

18   A    Previous to about 1989, there were very few documents.

19   1989 onward was pretty comprehensive, but anything which I

20   considered a historical document prior to HCI buying the

21   facility, there were very few documents available.

22   Q    Do you remember the date of the initial request for the

23   information?

24   A    I believe December 16 in 1999.

25   Q    And do you remember how much time you were given to

1  gather this information and respond to the EPA?

2  A    Forty-five days.

3  Q    Okay.  Were you able to do it in 45 days?

4  A    No.  We asked for an extension from the EPA.

5  Q    And when you say "we," was that you or did somebody else

6  make that request?

7  A    That was me.

8  Q    Okay.  Did they agree to that extension?

9  A    They did.

10  Q    Were there other places that you looked for documents

11  that were relevant to these requests?

12  A    Well, in the course of moving down to the Ogden, Utah

13  office, I had taken some environmental documents with me, so I

14  looked through all those documents as well to make sure that I

15  hadn't taken anything that would be needed for the request.

16  Q    Was this the first time you had ever dealt with a 104(e)

17  letter?

18  A    Yes.  This is the first one I'd done.

19  Q    Okay.  Would you look and read to the jury paragraph 2 of

20  the notarized certificate?

21  A    Do you want me to read that?

22  Q    Yes.  Just read it aloud, please.

23  A    All right.  "I have made a complete and thorough review

24  of all documents, information, and sources relevant to the

25  request."

1    Q    When you signed that document, did you think that was

2    true?

3    A    Yes.

4    Q    Do you think it's true today?

5    A    Yes.  I did review all of the documents that were on the

6    facility.

7    Q    Would you, finally, read paragraph 3, please?

8    A    "I hereby certify that the attached response to EPA's

9    request is true, accurate, and complete and contains all

10   information and documents responsive to the request."

11   Q    Did you believe that that was true when you signed this

12   document?

13   A    Yes, I did.

14   Q    Do you believe it was true today?

15   A    Yes, I do.

16   Q    Did you take these requirements of the federal government

17   very seriously in preparing your responses to this?

18   A    Absolutely.

19   Q    Okay.  In the course of gathering information about -- in

20   response to this request from the EPA, did you ever talk to

21   Rod Hallsten?

22   A    No, I didn't.

23   Q    Why not?

24   A    Rod had been at the facility for a short time and had not

25   been in an operations role.  Had been in a more administrative

1   position.

2   Q    Any other reasons?

3   A    Just didn't feel that he would have information regarding

4   this request.  It wasn't brought up by any of the other people

5   I spoke to as him being a source, a good source of

6   information.

7   Q    Do you know how long Rod had actually even worked at the

8   Billings facility?

9   A    I don't, but it was a short period of time.

10  Q    Did the 104(e) request specifically ask you to identify a

11  source of contamination?

12  A    No, it did not.

13  Q    It just asked for information about procedures and those

14  kinds of things; is that correct?

15  A    Yes, information about the facility.

16  Q    Did you talk to Monte Naff in preparing your responses to

17  this?

18  A    I did.

19  Q    Was he a valuable source of information?

20  A    He had been at the facility a long time.  He was a source

21  of information, a good source of information.

22          MR. COZZENS:  Okay.  Specifically would you turn to

23  3045, page 5, and then would you blow up the question and

24  response to Question No. 9, please?

25          DOCUMENT TECHNICIAN:  (Complied with request.)

1    BY MR. COZZENS:

2    Q    Okay.  Read the question, if you would, to the jury,

3    please.

4    A    Okay.  "Identify the location of ponds, impoundments,

5    holding tanks, waste or chemical storage areas or retention

6    basins that are currently or historically associated with the

7    Dyce Chemical facility."

8    Q    Now in this area, you talked about a historic storm and

9    rinse wastewater unlined pond.  Can you tell me what that was?

10   A    Well, people I talked to related to me that there had

11   been a pond, a historic pond out behind the tank farm area and

12   that it had been unlined.  It was no longer in use by the time

13   I arrived at the facility, so I was going by information that

14   other people relayed to me.

15   Q    Did it even exist when you arrived at the facility?

16   A    No, it did not.

17   Q    Who told you that the pond was unlined?

18   A    Well, I had a variety of people.  People I talked to

19   relayed that to me.  More than one person indicated.  I

20   remember Jim Charlton specifically saying that, but I believe

21   it was corroborated by other people that I talked to.

22   Q    As you sit there today, do you still believe that that

23   pond was unlined?

24   A    I've heard a variety --

25            MR. CRANE:  Objection, Your Honor.  Relevance and

1    hearsay, depending on when she learned what she's about to

2    say.

3              THE COURT:  I mean, if she knows.  He's asked, as

4    you sit here today, do you know?

5    BY MR. COZZENS:

6    Q    Yes.

7    A    I don't know.  I've heard stories from other people.

8    Q    Fair enough.

9    A    But I don't have specific knowledge of that.

10             MR. COZZENS:  Would you move, then, to page 10?  And

11   take the top half of that page and blow it up, please.

12             DOCUMENT TECHNICIAN:  (Complied with request.)

13   BY MR. COZZENS:

14   Q    All right.  What we've got blown up now is a request for

15   the total volumes in gallons of materials used during the.

16   Specified time period.  Can you tell me what the materials

17   were?

18   A    Yes.  We're looking at perchloroethylene and

19   tetrachloroethylene.

20   Q    And are both those chlorinated solvents?

21   A    They are.

22   Q    And what were you asked to provide?

23   A    We were asked to provide the volume that was used at the

24   facility during the time period in gallons.

25   Q    Did Dyce actually use perchloroethylene or

1    trichloroethylene on its premises?

2    A    We didn't.  We didn't use it in a process or operations,

3    but we did handle it, and we repackaged it and sold it.

4    Q    Okay.  And you have provided the amount sold by Dyce, and

5    is this limited to the Billings facility?

6    A    As far as I could tell from the documents.  However,

7    there was some question as to whether it was all sold from

8    this facility.  There may have been transfers to some of the

9    other Dyce branches.  It's difficult to tell from the

10   documents.

11   Q    Okay.  What I'm looking at is you have a ten-year span

12   there from '89 to '99?

13   A    Yes.

14   Q    Did you have any records of the amount of perc, in

15   particular, that was sold by Dyce for any years prior to 1989?

16   A    No.  We had a few incomplete documents from '88, 1988,

17   but that was it.  There was no other older documents.

18   Q    And you note that at the bottom of this paragraph,

19   correct?

20   A    Yes.

21   Q    Do you know what happened in '89 that would explain that

22   cutoff date for records for Dyce?

23   A    Well, that was the year that HCI purchased Dyce Chemical,

24   and so I was told there was a computer transition in that

25   year, so that was kind of my understanding of the records

1    retention issue.

2    Q    Okay.  At any rate, did you do everything you could to

3    find all of the information that was available concerning

4    those sales?

5    A    Yes.  I looked through all of the documents.

6         MR. COZZENS:  Turn to the next page, please.  And

7    blow up, again, the top half.

8         DOCUMENT TECHNICIAN:  (Complied with request.)

9    BY MR. COZZENS:

10   Q    Now there is another table on that page.  What does it

11   relate to?

12   A    This is a table showing the amount of product purchased.

13   Q    Okay.  The previous table was the amounts that were sold?

14   A    That's correct.

15   Q    And again, you've got information from '89 to '99?

16   A    Yes.

17   Q    So if I took all of the purchased documents, or amounts,

18   and subtracted from them the sold amounts, would I have the

19   inventory for perc during those years for Dyce?

20   A    No, that would not reflect inventory.

21   Q    Why not?

22   A    Because it doesn't show you what's in storage at the

23   facility, and so it's not just a straight mass balance.

24   Q    Okay.  Starting in 1989, if you know, was there more than

25   one facility for Dyce?

1   A     Yes.

2   Q     Where were they?

3   A     We had facilities in Ogden, Utah and also in Dickinson,

4   North Dakota.

5   Q     Okay.  The information requested by the EPA just related

6   to the Billings facility; is that correct?

7   A     That's correct.

8   Q     Did you include, in these two tables, the same

9   information for Ogden and/or Dickinson, North Dakota?

10  A     No.

11  Q     Were there ever intercompany transfers of product?

12  A     Yes, there were.

13  Q     Were you able to track those?

14  A     I wasn't able to tell from the documents if there was a

15  stock transfer because that wasn't necessarily reported in

16  those documents.  The same thing with purchases, as well.  If

17  one branch brought it in, I don't know if that branch

18  particularly sold that amount.

19  Q     Did the EPA ask you for inventory discrepancies or any

20  information like that in its request?

21  A     No, they didn't.

22  Q     So these two tables weren't intended to give that

23  information; is that correct?

24  A     That's correct.

25  Q     And if somebody tried to do that with them, would they

1   end up with the correct number of inventory?

2   A    No.  It wouldn't be accurate.

3         MR. COZZENS:  Okay.  Let's go to page 13, please.

4         DOCUMENT TECHNICIAN:  (Complied with request.)

5         MR. COZZENS:  I hope that's 12, because I'm not

6   seeing what I'm looking for.  I probably confused you.

7         DOCUMENT TECHNICIAN:  (Complied with request.)

8         MR. COZZENS:  There we go.  Thank you.

9   BY MR. COZZENS:

10  Q    Can you tell the jury what is now shown on the screen?

11  A    This is a table I put together.  The question that this

12  refers to asked for spills or releases at the facility, and so

13  I looked through all of the records that I had regarding

14  spills and releases, and this is what I was able to find and

15  document.

16  Q    Okay.  Did you also ask people about spills at the

17  facility?

18  A    Yes, I did.

19  Q    What you're able to document -- if somebody had told you

20  about a spill, would you have included it on this table, even

21  if you didn't have documentation of it?

22  A    Yes.

23  Q    So it includes all of the spills that anybody told you

24  about?

25  A    That's correct.

1    Q    And again, we've only got information here from '99 to

2    '93.  Did you have any documents that would allow you to

3    determine what, if any, spills occurred prior to 1989?

4    A    No.  I was not able to find any.

5    Q    Did you talk to anybody about whether there were spills

6    that should be included on this table prior to 1989?

7    A    Yes, I did.

8    Q    Who did you talk to?

9    A    The same people that I talked to as far as gathering

10   information, so Craig and Dave Warne, Monte Naff, Ron Benson,

11   Jim Charlton, and, let's see, John Cleveland.

12   Q    And does everything that they told you about spills

13   appear on this document?

14   A    Yes, it does.

15   Q    Did the EPA ask for all spills or did they just want

16   spills relating to perc?

17   A    They asked for all spills.  They didn't designate just

18   chlorinated solvents.

19   Q    Okay.  As you look at your list today, does it designate

20   or does it specify any spills of chlorinated solvents at all?

21   A    No, it doesn't.

22        MR. COZZENS:  And finally, if we could go to -- back

23   to the certification, I just want to get a date on this.

24        DOCUMENT TECHNICIAN:  (Complied with request.)

25   ///

1016

1  BY MR. COZZENS:

2  Q     Let me just ask the question.  Do you recall when you

3  completed this response to the first request?

4  A     This was March 1 --

5  Q     Okay.

6  A     -- 2000.

7  Q     Would that have been the extended time that the EPA had

8  given you to respond to them?

9  A     Yes.  We filed within their deadline.

10  Q     So it would have been effectively that you had two and a

11  half months to put this together?

12  A     Yes, that's correct.

13          MR. COZZENS:  Would you pull up Exhibit 3420,

14  please?

15          DOCUMENT TECHNICIAN:  (Complied with request.)

16  BY MR. COZZENS:

17  Q     Can you tell the jury what 3420 is?

18  A     This is a second request for information from the EPA.

19  Q     Okay.  What's the date of that request?

20  A     May 25, 2000.

21  Q     Do you recall how much time they gave you to respond to

22  that request?

23  A     I believe this one was 30 days.

24  Q     And what did you do in response to that request?

25  A     Well, we went through the questions, and, again, spoke

1    with personnel and looked for records that would be

2    responsive.  And this particular request had some additional

3    requests for interviews of personnel and information from

4    previous employees.  And at that point we had retained

5    counsel, and they helped us with part of this response.

6    Q    Who was counsel?

7    A    Holland & Hart.

8    Q    Okay.  Was that the local firm here in Billings?

9    A    Yes, it's local in Billings.

10   Q    Were you the liaison between Dyce and Holland & Hart?

11   A    I was not.  That came from our corporate office.  We had

12   corporate counsel, and then also from our corporate

13   environmental manager.  They dealt directly with Holland &

14   Hart.

15   Q    What was your understanding of what Holland & Hart was

16   going to do regarding this request?

17   A    Well, for the interviews, for past employees, they were

18   going to interview them and ask them the questions that would

19   be responsive to the request.

20   Q    Were you present during those interviews?

21   A    I was not.

22   Q    Did you determine who they were going to interview?

23   A    No.

24   Q    Do you know who did?

25   A    I don't.

1  Q    Were you given any information about the interviews?

2  A    After the interviews were conducted, they gave to me a

3  summary of the interviews and the answer that they had

4  prepared, because I was going to be the one signing the

5  104(e).  So I reviewed the interview summaries and just

6  reviewed the answer to the question that it pertained to, just

7  to see if I felt that it was responsive to the question.

8           MR. COZZENS:  Okay.  Could you pull up Exhibit 383,

9  please?

10          DOCUMENT TECHNICIAN:  (Complied with request.)

11  BY MR. COZZENS:

12  Q    Can you tell me what Exhibit 383 is?

13  A    This just looks like the cover letter to our second

14  request for information response.

15  Q    Okay.  And what's the date of that?

16  A    July 23, 2000.

17  Q    Were you able to put together the second response within

18  the 30 days that was originally specified?

19  A    No.  We asked for an additional extension.

20  Q    And did they extend through at least July 23?

21  A    Yes, they did.

22  Q    Okay.  Did the EPA ever complain about the timeliness of

23  your responses to their requests?

24  A    No.

25  Q    During this time, was this all that was going on?  I

1019

1    mean, was EPA also asking to inspect the premises, or were

2    they doing anything else to investigate that you knew of?

3    A    Well, it was during this time that they asked us to do

4    some additional work.  So this was kind of all happening kind

5    of at the end of when this response was due, and so we were

6    also involved with EPA in putting together that investigative

7    work.

8    Q    Okay.  What additional things were you doing?

9    A    Well, in order to conduct work with the EPA, you have to

10   submit a work plan, and so we had hired a consultant, a local

11   consultant at that time to help us put together this work

12   plan, because you have to submit it to EPA and they have to

13   approve it prior to doing the work.

14   Q    Who was the local consultant?

15   A    Maxim.

16   Q    Okay.  Did they ever complete a proposal that went to the

17   EPA?

18   A    They did.

19   Q    What else were you doing at this time frame?  Anything?

20   A    Are you --

21   Q    Just in relation to working with the EPA.

22   A    Just in relation to this?

23   Q    Yeah, on this investigation.

24   A    We weren't doing any additional work, but we were --

25   there was correspondence going on as far as, you know, verbal

1    correspondence.  And they also -- again, dealing with the work

2    plan and getting ready to do the site investigation.

3    Q    "They" being the EPA?

4    A    Yes.

5    Q    Okay.  They had not yet investigated the site?

6    A    Not on our facility, so they had done some preliminary

7    work in the area.  That was their report that came out with

8    their consultants at the end of '99, and then this was kind of

9    what they wanted us to do in addition on our facility.

10        MR. COZZENS:  Would you turn to page 3 of that

11   document, please?

12        DOCUMENT TECHNICIAN:  (Complied with request.)

13   BY MR. COZZENS:

14   Q    Now without spending too much time on it, this is

15   virtually the same notarized certificate that you had on the

16   first response; is that correct?

17   A    That's correct.

18   Q    Did you take this just as seriously as you took the first

19   one?

20   A    Yes, I did.

21        MR. COZZENS:  If you would go to page 5?  And I

22   don't know if you can do it, 5 and 6, if you can bring those

23   up?  I couldn't even bring the first one up, so I'm not

24   complaining.  Let's look at the bottom of page 5.

25        DOCUMENT TECHNICIAN:  (Complied with request.)

1021

1    BY MR. COZZENS:

2    Q    Contained herein is a list of people who were

3    interviewed.  Are these the interviews that you're talking

4    about being conducted by Holland & Hart?

5    A    Yes.

6              MR. COZZENS:  Now if you'd go to the top of page 5

7    and just quickly show the rest of that list?

8              DOCUMENT TECHNICIAN:  (Complied with request.)

9    BY MR. COZZENS:

10   Q    Did you have any involvement in the decision to interview

11   each of these people for this second response?

12   A    No.  I didn't make the list.

13   Q    And did you have any involvement in excluding anybody

14   from the people who were interviewed?

15   A    No.

16             MR. COZZENS:  Okay.  Would you pull up Exhibit 3049,

17   please?

18             DOCUMENT TECHNICIAN:  (Complied with request.)

19   BY MR. COZZENS:

20   Q    Can you tell the jury what Exhibit 3049 is?

21   A    This is the investiga- --

22        Wait a minute.  Stop.

23        Has that been admitted?  I thought it was --

24             MR. LYNCH:  Yes.

25             MR. COZZENS:  -- but I was getting ahead of myself.

1    All right.  It has been admitted.  Thanks.

2    BY MR. COZZENS:

3    Q    Okay.  And what is this?

4    A    This is the site investigation report that was prepared

5    by Maxim.

6    Q    What's the date of that report?

7    A    I believe it's on the next page, but --

8         MR. COZZENS:  Oh, can you go to the next page,

9    please?

10        DOCUMENT TECHNICIAN:  (Complied with request.)

11        THE WITNESS:  It's October 3, 2000.

12   BY MR. COZZENS:

13   Q    Now is this something that the EPA requested?

14   A    Yes.  This is the investigation report from the work that

15   the EPA requested we do on our site.

16   Q    Okay.  And you contracted that work out to Maxim?

17   A    Yes, that's correct.

18        MR. COZZENS:  Now I'm going to ask you to go back to

19   383 and go to, my notes indicate, page 5.

20        DOCUMENT TECHNICIAN:  (Complied with request.)

21        MR. COZZENS:  No, we're going to have to go to

22   page 6.

23        DOCUMENT TECHNICIAN:  (Complied with request.)

24        MR. COZZENS:  Can you disappear that?  What I'm

25   looking for is Question 8 and the response to it.  Would you

1    go to the next page, please?

2             DOCUMENT TECHNICIAN:  (Complied with request.)

3             MR. COZZENS:  You found it.  Thanks.

4    BY MR. COZZENS:

5    Q    What involvement did you have in preparing the response

6    to No. 8?

7         And can you show me the question, too, if you have that

8    all together here?

9             DOCUMENT TECHNICIAN:  (Shook head negatively.)

10            MR. COZZENS:  No, you can't.  Okay.  Go ahead and

11   blow up what you had.  Sorry.

12            DOCUMENT TECHNICIAN:  (Complied with request.)

13   BY MR. COZZENS:

14   Q    Okay.  What involvement did you have in preparing this

15   response?

16   A    Well, I spoke with the people who had operational

17   knowledge at the time, because a lot of this was historical

18   information, so they're asking us to speculate, if a spill had

19   occurred, where it would go in the facility, and the facility

20   had changed over time.  So I spoke with the people who I

21   indicated before had helped me, you know, kind of construct

22   this answer.

23   Q    Okay.  And you got -- you kind of broke it down into two

24   time groups.  The first was '72 to '85, right?

25   A    Yes.

1    Q     Did anybody ever tell you there were changes in the

2    configuration at the Dyce site between '72 and '85?

3    A     Well, we knew there had been different concrete

4    structures constructed over that time, but this answer at the

5    time appeared correct.

6    Q     Okay.  Are you able to identify any person or group of

7    people from whom you got that information?

8    A     Yes.  I talked to Craig Guelff, I talked to Jim Charlton,

9    because they worked out back in that area, and Dave Warne.

10   And, you know, I don't recall specifically talking to other

11   people, but we did talk about the different configurations of

12   the facility to determine, you know, when things were

13   constructed and where a spill would go.

14   Q     Did you have a site plan available for you for the period

15   of '72 to '85?

16   A     I did not.

17   Q     Did you have any aerial photographs of the site for the

18   period prior to 1989?

19   A     No, I didn't.

20             MR. COZZENS:  Would you pull up Exhibit 2533,

21   please?

22             THE COURT:  Let's take a brief recess.

23             THE LAW CLERK:  All rise.

24        (Recess taken from 14:42:39 to 14:55:57.)

25        (Open court.)

1        (Jury present.)

2              THE COURT:  Please be seated.

3              Go ahead.

4              MR. COZZENS:  Thank you.

5    BY MR. COZZENS:

6    Q    I've asked to have Exhibit 383 pulled back up at

7    Question 8.  I'm going to read the question as it relates to

8    the time period between 1972 and 1985.  Would you just read,

9    then, to the jury your response to that?

10        The question was, and I quote, "If a spill occurred prior

11   to 1992 while unloading a truck of PCE or TCE, where would the

12   spilled liquid have collected between 1972 and 1985?"

13        And would you read your answer to that question, that

14   portion of that question?

15   A    Okay.  "Between 1972 and 1985, any large quantity of

16   spilled product likely would have drained into the tank farm

17   cement containment area."

18              MR. COZZENS:  Okay.  Now would you go to

19   Exhibit 2533?

20              DOCUMENT TECHNICIAN:  (Complied with request.)

21   BY MR. COZZENS:

22   Q    Ms. Miller, I will represent to you that it's been

23   stipulated that this marked-up photograph of the Dyce site was

24   provided to Soco by USF&G in May of 2005.

25        And would you blow up the area from above the berm on the

                                1026

1    top down to below the warehouse, please?

2              DOCUMENT TECHNICIAN:  (Complied with request.)

3    BY MR. COZZENS:

4    Q    Okay.  Have you seen this photograph before?

5    A    Just recently.

6    Q    Okay.  And does -- can you identify the area where trucks

7    handling PCE or perc were handled?

8              MR. CRANE:  Objection.  Lacks foundation.

9              THE COURT:  Sustained.

10   BY MR. COZZENS:

11   Q    All right.  Look at the photograph where it says "PCE

12   handling."  This is in relation to your response to the

13   Environmental Protection Agency.  Have you seen the pathway

14   that's indicated with the green lines that is outside of any

15   containment?

16             MR. CRANE:  Objection, Your Honor.  She already

17   testified she didn't see any aerial photographs in her

18   investigation.

19             THE COURT:  Well, I think he must be asking her if

20   she saw it outside of the photographs, in her experience.

21   That's what I'm assuming, right?

22             MR. COZZENS:  And then I'm going to ask if she had

23   this photograph when she prepared her response, Judge.

24             MR. JOHNSON:  Your Honor, with regard to her

25   experience, it's a 1975 photo.  There's no foundation she ever

1027

1  saw that.

2          THE COURT:  Well, she just said she didn't until

3  just, what, a few days ago?

4          MR. JOHNSON:  The point is, Your Honor, she wasn't

5  at the property back in 1975.

6          MR. COZZENS:  And the point is, also --

7          THE COURT:  Well, no, hold it.  That's the point.

8  I'm assuming that you're asking if she's acquainted with this

9  area in general, first.

10          MR. COZZENS:  Sure.  I will do it that way, if you

11 want, Judge, but the point ultimately is to get to how she

12 gave the answer she did to the EPA and whether it's right.

13          THE COURT:  Well, proceed.

14          MR. COZZENS:  Thank you.

15 BY MR. COZZENS:

16 Q    Do you have any firsthand, personal knowledge of the

17 configuration of the Dyce facility in November of 1975?

18 A    No, I don't.

19 Q    When you were preparing your response to the EPA, did you

20 see any aerial photographs that showed the configuration that

21 we're now seeing on the screen?

22          MR. CRANE:  Objection.  Asked and answered.

23          THE COURT:  Yeah, I thought it was.  Didn't you say

24 you just saw it?

25          THE WITNESS:  Yeah.  I haven't seen this before.

1           THE COURT:  Yeah.

2           MR. COZZENS:  The question was any photographs, but

3    that's okay.

4    BY MR. COZZENS:

5    Q    Do you see a pathway --

6           THE COURT:  Oh.

7    BY MR. COZZENS:

8    Q    -- where a truck would be loaded and unloaded with perc

9    at the Dyce facility that would not result in a spill being

10   within containment?

11          MR. CRANE:  Objection.  Lacks foundation.  Calls for

12   conclusion of the witness.

13          THE COURT:  Yeah, it really, it really is.

14          MR. COZZENS:  Judge, can I respond?  This is --

15          THE COURT:  No, you can't.

16          MR. COZZENS:  They have, they have alleged that

17   we've --

18          THE COURT:  Hold it.

19          MR. COZZENS:  -- changed our story.

20          THE COURT:  Hold it.  I've ruled.

21          MR. COZZENS:  Okay.

22          THE COURT:  There is no foundation.  She wasn't even

23   there.  She hasn't seen the photograph.

24   BY MR. COZZENS:

25   Q    When you responded to the EPA, did you have any

1029

1    information that would have led you to believe that there was

2    a pathway outside of containment from the loading and

3    unloading area from 1972 to 1985?

4    A     No.

5    Q     Okay.  Ms. Miller, if you had had a dozen lawyers and ten

6    years to respond to these requests from the EPA, would they

7    have been more accurate and complete?

8              MR. JOHNSON:  Objection, Your Honor.  Argumentative.

9              MR. GROSSBART:  Objection.  Lacks foundation.  Calls

10   for speculation.

11             THE COURT:  Yeah.  Yep, I'd have to sustain that.

12             MR. COZZENS:  I have no further questions, Your

13   Honor.

14                          CROSS-EXAMINATION

15   BY MR. CRANE:

16   Q     Good afternoon, Ms. Miller.  My name is Steve Crane.  I

17   represent Continental Insurance Company in this case.  We've

18   not met before, correct?

19   A     Correct.

20   Q     I'm going to ask you some more details about the 104

21   response, in particular, to start out with.

22         Now you indicated that you have a degree in some sort of

23   environmental engineering; is that right?

24   A     That's correct.

25   Q     And as part of that, you studied remediation of

1    environmental contamination and remedial activities in

2    response to state or EPA investigations, correct?

3    A    Yes, that's true.

4    Q    And you had done those studies before you provided the

5    104 response; is that right?

6    A    What do you mean by the "studies"?  I studied this in

7    school, yes, that's correct.

8    Q    Right.  And that was before the 104 response.

9    A    That's correct.

10    Q    All right.  And you knew that the Montana Department of

11    Environmental Quality and the EPA were investigating the

12    northwest corner contamination before you sent out the 104

13    response; is that right?

14    A    That area, not specifically.  It was the general Lockwood

15    area.

16    Q    Right.  You knew that the EPA was investigating the

17    contamination in the Lockwood area before you sent out the 104

18    response.

19    A    That's correct.

20    Q    And you understood that the EPA uses the 104 process to

21    gather information about whether a company is the cause of

22    contamination, correct?

23    A    Well, they're looking for information on the company's

24    activities, that's correct.

25    Q    And they were looking for information on company's

1    activities to determine whether that company was the cause of

2    contamination?  You understood that, didn't you?

3    A     Yes.  Potentially, yes.

4    Q     And you were, in fact, charged by Dyce, and I know

5    there's some name changes, HCI and Dyce, but I'll use "Dyce"

6    if you're comfortable with that.

7    A     That's fine.

8    Q     You were charged with, by Dyce, with getting information

9    for and responding to the EPA's 104 request; is that right?

10   A     Yes.

11   Q     And Mr. Naff assisted you in that; is that right?

12   A     Yes.

13   Q     In fact, I think I recall, in your direct testimony, that

14   you reported to Mr. Naff?

15   A     Yes, he was my direct report.

16   Q     Right.  And you knew that he had started at Dyce way back

17   in about 1972, correct?

18   A     That's correct.

19   Q     And he was one of your principal sources of historic

20   information in responding to the 104 request for the EPA,

21   right?

22   A     Yeah, he was one of the sources, yes.

23   Q     He was one of the sources, in particular, of the historic

24   information, correct?

25   A     That's correct.

1          MR. CRANE:  All right.  Let's look at, if we could

2     call up, Exhibit 3044.

3          DOCUMENT TECHNICIAN:  (Complied with request.)

4          MR. CRANE:  And if we could just blow up the first

5     paragraph, please?

6          DOCUMENT TECHNICIAN:  (Complied with request.)

7     BY MR. CRANE:

8     Q    Now I think this is the letter, the first letter from the

9     EPA, asking for information, correct?

10    A    Yes.

11    Q    And if you look in the first sentence there, the EPA is

12    asking Dyce for information and documents that may contribute

13    to the EPA's understanding in regard to activities, materials,

14    and parties that may have contributed to contamination at the

15    Lockwood solvent site, correct?

16    A    That's correct.

17    Q    And you understood, when you got this letter from the

18    EPA, that in that sentence, the EPA was interested in finding

19    out how the contamination happened and who was responsible,

20    correct?

21    A    That's true.

22    Q    And you understood from your course work and your

23    experience that the EPA wanted that information for at least

24    two reasons.  One, to hold companies responsible who caused

25    the contamination, right?

1    A    Yes.

2    Q    And, two, knowing where the contamination was and the

3    kind of magnitude of the contamination would help in

4    determining the scope of the remediation, correct?

5    A    That's true.

6            MR. CARNE:  Now let's go to the second page, if we

7    could, and blow up the first paragraph.

8            DOCUMENT TECHNICIAN:  (Complied with request.)

9    BY MR. CRANE:

10   Q    And this is a reference to the CERCLA law that you

11   mentioned on direct, correct?

12   A    Yes.

13   Q    And the CERCLA law is really generally called the

14   Superfund law, right?

15   A    That's true.

16   Q    And that's a law that the United States Congress passed

17   to deal with, in part, remediating contaminated sites?

18   A    Um-hmm, yes.

19           MR. CRANE:  All right.  Let's blow up the paragraph

20   that starts, "While the EPA seeks your voluntary cooperation."

21           DOCUMENT TECHNICIAN:  (Complied with request.)

22   BY MR. CRANE:

23   Q    Now first of all, you understood this was not a voluntary

24   process, that this was a mandatory process, that you had to

25   comply with the EPA's requests, right?

1   A     Yes.

2   Q     And you understood -- if we could just highlight a little

3   further down on that -- the failure to provide a complete

4   response?

5          DOCUMENT TECHNICIAN:   (Complied with request.)

6   BY MR. CRANE:

7   Q     You understood that you had to be completely forthcoming

8   and not leave anything out, right?

9   A     Yes.

10  Q     And you understood that if you didn't provide complete

11  and accurate information, you were subject to criminal

12  charges, right?

13  A     Yes.

14  Q     And you knew that Dyce had to leave no stone unturned in

15  your review and in your investigation in order to comply with

16  the EPA's request; is that right?

17  A     Yes.

18  Q     And in conducting the investigation that you were

19  required to undertake, you knew that you were going to have to

20  certify the answers under oath, right?

21  A     Yes.

22          MR. CRANE:   And if we could go down to page 4 of the

23  request and blow up the first paragraph?

24          DOCUMENT TECHNICIAN:   (Complied with request.)

25  ///

1    BY MR. CRANE:

2    Q    Now this is the part of the request where the EPA is

3    setting out the instructions on how you're supposed to

4    respond, right?

5    A    Yes.

6    Q    And you understood from these instructions that

7    incomplete or evasive or ambiguous answers would be considered

8    to be a failure to respond by the EPA; is that right?

9    A    Yes.

10            MR. CRANE:  And if we could blow up paragraph 3 on

11   that same page?

12            DOCUMENT TECHNICIAN:  (Complied with request.)

13            MR. CRANE:  Thank you.

14   BY MR. CRANE:

15   Q    You understood that the EPA expected you to seek out

16   responsive information from all company records and from

17   current and former employees, correct?

18   A    Yes.

19   Q    And if you didn't do that, the EPA would consider that

20   your response was inadequate and that you would not have

21   complied with the request; is that right?

22   A    Yes.

23            MR. CRANE:  And then if we could blow up paragraph 6

24   on that page?

25            DOCUMENT TECHNICIAN:  (Complied with request.)

1    BY MR. CRANE:

2    Q     You also understood that Dyce was under a continuing

3    obligation to provide information or to correct the

4    information that had been previously provided, correct?

5    A     Yes.

6    Q     Now after having read all of the instructions and

7    understanding all of that, did Dyce, in fact, meet its

8    obligation to the EPA by doing a complete and thorough

9    investigation and by providing complete, thorough, and

10   nonevasive answers?

11   A     Yes, I feel we did.

12   Q     All right.  Let's look at some of the requests that the

13   EPA made in this first request.

14         And if we could turn to page 10?

15             DOCUMENT TECHNICIAN:  (Complied with request.)

16             MR. CRANE:  Paragraph 20.

17             DOCUMENT TECHNICIAN:  (Complied with request.)

18   BY MR. CRANE:

19   Q     One of the things the EPA asked Dyce to provide

20   information about was all leaks, spills, or releases into the

21   environment, including but not limited to accidents, spills,

22   or disposals, correct?

23   A     Yes.

24   Q     And then if any of those were identified, they asked you

25   to provide a whole bunch of additional information, correct?

1  A    Yes, that's correct.

2  Q    Including notification to any agencies or governmental

3  units about any particular release?

4  A    Yes.

5  Q    And you understood that to be a notification to any

6  governmental agency or authority at the time of the release?

7  A    Yes, that's true.

8  Q    And they also wanted you to provide anybody with

9  information, identify anybody who had information about any

10  such release, right?

11  A    Yes.

12        MR. CRANE:  Let's turn back a page, if we could, and

13  just highlight the first paragraph, paragraph 18.

14        DOCUMENT TECHNICIAN:  (Complied with request.)

15  BY MR. CRANE:

16  Q    The EPA also wanted to know specifically with respect to

17  PCE -- and you understand that's another name for perc?

18  A    Um-hmm, yes.

19  Q    All right.  And specifically with respect to PCE, they

20  wanted to know whether any of those were ever stored, disposed

21  of, used, or otherwise handled, and then if you answered yes,

22  they had about 15 separate questions to follow up on that,

23  correct?

24  A    Yes.

25        MR. CRANE:  And then if we could turn to 11?

1038

1           DOCUMENT TECHNICIAN:  (Complied with request.)

2           MR. CRANE:  Paragraph 22.

3    BY MR. CRANE:

4    Q    They also asked you to provide any other information

5    about documents which may address the source of soil or

6    groundwater contamination at the Dyce facility or in the

7    Lockwood area, correct?

8    A    Correct.

9           MR. CRANE:  All right.  Let's look at Exhibit 3045.

10          DOCUMENT TECHNICIAN:  (Complied with request.)

11   BY MR. CRANE:

12   Q    And this is the first response that you were shown on

13   direct, correct?

14   A    That's correct.

15   Q    And I think Mr. Cozzens went through it with you, your

16   certification where you swore that you had done a thorough and

17   complete investigation, correct?

18   A    That's true.

19   Q    And you were signing as the authorized person at Dyce to

20   do that?

21   A    Yes.

22   Q    And you recognized at the time the significance and the

23   importance of this information and the importance of the

24   accuracy of this information to the EPA?

25   A    Yes.

1    Q    Because of the reasons we've already discussed, and that

2    is the EPA needed to find out who caused the contamination and

3    where it was so they could hold the responsible parties to the

4    task and to aid in the remediation itself?

5    A    Yes.

6    Q    And so in order to make sure that you had done an

7    accurate job, and given the importance of this information to

8    the EPA, a number of people in management at Dyce HCI reviewed

9    this response before it went out, correct?

10   A    Yes, they did.

11   Q    And in order to make sure that you had fully complied

12   with the EPA's request, you spoke with a number of employees

13   who would have knowledge not only about the current conditions

14   but the historic conditions at the site; is that right?

15   A    That's true.

16   Q    And you got a lot of information from Mr. Naff?

17   A    Yes.

18        MR. CRANE:  All right.  Let's look at a couple of

19   Dyce's responses.  If we could go to Question 9 on page 4?

20        DOCUMENT TECHNICIAN:  (Complied with request.)

21   BY MR. CRANE:

22   Q    And here the EPA has asked Dyce to identify ponds, and

23   particularly historically associated with the Dyce facility.

24   Do you see that?

25   A    Yes.

1    Q    And the response was, "There was a historic storm and

2    rinsewater unlined pond," correct?

3    A    That's correct.

4    Q    Now that's the unlined pond you were talking about with

5    Mr. Cozzens on direct, right?

6    A    Yes.

7    Q    And this is part of the information you got from the Dyce

8    employees who had historic knowledge about the Dyce site,

9    correct?

10   A    Yes, it is.

11   Q    And so the answer to the EPA was that rinse wastewater

12   went to this unlined pond as a natural part of operations,

13   correct?

14   A    Yes.

15   Q    And that pond was used from 1973 to 1985, according to

16   your answer, correct?

17   A    Yes.

18            MR. CRANE:  And then if you would quickly flip over

19   to Question 16, which is on page 8?

20            DOCUMENT TECHNICIAN:  (Complied with request.)

21            MR. CRANE:  And if you would look -- it's about

22   three or four lines up from the bottom, if we could highlight

23   that, where it says "33."

24            DOCUMENT TECHNICIAN:  (Complied with request.)

25   ///

1   BY MR. CRANE:

2   Q    Right.  You repeated that information to the EPA where

3   you say, "The use of unlined storm and rinsewater pond,

4   approximately 1985," correct?

5   A    Yes.

6   Q    Now the rinsewater that you're talking about in this

7   response is rinsing from various operations such as

8   nondedicated hoses, correct?

9   A    Yes, that's correct.

10  Q    Can you tell us what nondedicated hoses are?

11  A    Well, when you transfer chemical products, it's often

12  done through hoses, and so if you're switching a chemical and

13  you don't have a dedicated hose to that product, sometimes you

14  have to rinse it out so the next product coming through it

15  doesn't become contaminated.

16  Q    All right.  And that's at least some of the rinsewater

17  we're talking about here that went to the unlined pond?

18  A    Yes.

19          MR. CRANE:  Now if we could go to page 7?

20          DOCUMENT TECHNICIAN:  (Complied with request.)

21  BY MR. CRANE:

22  Q    And now we're looking at Question 14 and your response to

23  that.

24      And if we could just highlight where it starts,

25  "Previously"?  It says, "Previously."  Just below that.  There

1042

1    you go.

2              DOCUMENT TECHNICIAN:  (Complied with request.)

3    BY MR. CRANE:

4    Q    You responded to the EPA that previously there were no

5    dedicated hoses, totes, and there were very few pumps, so

6    rinsing was more common, correct?

7    A    Yes.

8    Q    And that's the kind of rinsing that we were just talking

9    about --

10   A    Yes.

11   Q    -- where you have cross-contamination issues?

12   A    Um-hmm.  That's true.

13   Q    Is that yes?

14   A    Yes.

15   Q    Now another rinse operation was when Dyce rinsed out

16   tanker trucks in the loading and unloading area; is that

17   correct?

18   A    They may have had occasion to do that, yes.

19   Q    You testified to that in your deposition, didn't you?

20   A    Yes, I believe so.

21   Q    That they did that, right?

22   A    Yes.

23   Q    And your investigation determined that this rinsing from

24   the loading/unloading area, operations area, drained to the

25   unlined pond, correct?

1    A    Yes.

2    Q    And that happened in two ways.  One, gravity, meaning

3    that the rinse sloped from the loading/unloading area into the

4    catch pond area, correct?

5    A    Yes.

6    Q    And the second way was that employees drained containers

7    directly into the catch pond, correct?

8    A    I don't recall that.

9    Q    You recall giving that testimony at your deposition?

10   A    I don't.  I don't remember that --

11   Q    All right.

12   A    -- that statement.

13   Q    Let me see if I can refresh your recollection.

14        May I approach, Your Honor?

15             THE COURT:  Yes.

16   BY MR. CRANE:

17   Q    (Handing.)  If I could have you turn to what I hope is

18   page 171?

19             MR. COZZENS:  I'm sorry.  What page?

20             MR. CRANE:  171.

21   BY MR. CRANE:

22   Q    And if you could just -- are you there yet?

23   A    Yes.

24   Q    Okay.  If you could just review lines 3 through about 16

25   for me?  And then I will ask you a question.

1   A      Okay.

2          (Pause.)

3              THE WITNESS:   Okay.

4   BY MR. CRANE:

5   Q      Does that refresh your recollection that as part of your

6   investigation, you learned that employees drained containers

7   directly into the catch pond?

8   A      According to this, I did have some recollection that

9   there was some rinseate put into the pond, but I didn't recall

10  at the time, and I still don't, who specifically told me that.

11  Q      Right.   You don't recall who specifically told you that,

12  but you remember, during your investigation, that you were

13  specifically told that employees drained containers directly

14  into the catch pond, correct?

15  A      Yes.

16  Q      And then once the rinse was in the unlined pond, it could

17  get to the subsurface and groundwater, correct?

18  A      Depending on the -- well, that would depend on a variety

19  of factors.

20  Q      But it could get there, correct?

21  A      Yes, potentially.

22  Q      Now let's go back to your response to the EPA, and I'm

23  looking at page 8.

24         And if we could highlight the paragraph that starts

25  approximately at the top of the page?

1              DOCUMENT TECHNICIAN:  (Complied with request.)

2   BY MR. CRANE:

3   Q    You say that approximately 102,000 gallons of

4   rinse/stormwater was disposed of on site in 1999; in 1998,

5   approximately 96,000 gallons; in 1997, approximately

6   65,000 gallons was disposed of on site; and then no records

7   were kept prior to 1997.  Correct?

8              MR. COZZENS:  Objection to relevance.  Misleading.

9              MR. CRANE:  It's part of the EPA response, Your

10  Honor.

11             THE COURT:  Well, it is.  It's in evidence, but

12  what's relevant to the issues?

13             MR. CRANE:  Well, it's what I think we discussed at

14  the sidebar, in the last few.

15             THE COURT:  Oh, all right.  It's in evidence.

16             MR. CRANE:  All right.

17  BY MR. CRANE:

18  Q    So that was your response to the EPA, correct?

19  A    Yes, that's correct.

20  Q    And so just during those three years, 1997 and 1999, more

21  than 250,000 gallons of rinse/stormwater was disposed of,

22  correct?

23  A    Yes.

24  Q    And that was disposed of into the pasture at the Dyce

25  property, correct?

1    A    Yes.

2    Q    And, in fact, you created what were called pit reports to

3    document when the disposals took place, correct?

4    A    We did document, yes.

5    Q    All right.  I don't think I need to show you those, but I

6    would offer into evidence at this point Exhibit 441, which are

7    the pit reports.

8              MR. COZZENS:  We object on the grounds of relevance,

9    Your Honor.

10             MR. CRANE:  We can take it up later, Your Honor.

11             THE COURT:  Well, I am going to sustain the

12   objection.

13             MR. CRANE:  All right.

14   BY MR. CRANE:

15   Q    Now on page 9, I think you briefly touched on this with

16   Mr. Cozzens, you were providing information on inventory

17   information, correct?  The EPA was asking you for how much

18   Dyce purchased every year of PCE, how much it sold, correct?

19   A    They asked for purchased and handled, yes.

20   Q    And those were based on purchase and invoice records for

21   the current period of time?

22   A    Yes.

23   Q    But you didn't have the older invoice information?

24   A    That's correct.

25   Q    But you understood from those questions and your

1047

1    background and experience in these things that one of the

2    reasons why the EPA was asking for that kind of information

3    was to see if there were any inventory discrepancies that

4    would indicate a spill or release, correct?

5    A    That's not how I read the question.

6    Q    You didn't understand they had any interest at all in

7    that kind of information?

8    A    That wasn't the question that they asked in the 104(e).

9    Q    No, but if you recall in our conversation a little bit

10   earlier, you understood that they were looking for all

11   information that would indicate a spill had taken place,

12   correct?

13   A    Yes, and those were covered during the spill questions.

14   Q    And so any information that might connect to or indicate

15   a spill is what you put in this 104 response, correct?

16   A    Yes.  I tried to be responsive to the questions.

17   Q    And so any information that would indicate a spill had

18   taken place or bear on that a spill had taken place, you tried

19   to put in this response?

20   A    Yes, that would have been part of the response.

21   Q    And, finally, let's go to page 13, paragraph 20.  And

22   this is the specific question where they asked you to identify

23   any leaks, spills, or releases, including any accidents,

24   correct?

25   A    That's correct.

1   Q     And the only information you provided was on the table

2   that Mr. Cozzens showed you, correct?

3   A     That's correct.

4   Q     And those were all from 1992 and forward, correct?

5   A     Yes.

6   Q     And none of those had anything to do with PCE?

7   A     That's correct.

8   Q     And then as to those 11 releases -- spills or releases

9   that you did identify, you indicated at paragraph 20 -- if you

10  could just highlight a little bit lower down?

11           DOCUMENT TECHNICIAN:   (Complied with request.)

12  BY MR. CRANE:

13  Q     -- that site management and warehouse managers at the

14  time of the incident were aware of all incidents, correct?

15  A     Yes.

16  Q     And, in addition, the environmental manager was notified?

17  A     Yes.

18  Q     So as to the events that you identified, every one of

19  those was known to the company, correct?

20  A     That's my understanding, yes.

21  Q     Now after the EPA got this response, they needed some

22  more information from Dyce, correct?

23  A     Yes.

24  Q     And they sent out a request for additional information,

25  correct?

1    A     Yes.

2             MR. CRANE:  All right.  Let's look at Exhibit 3420.

3             I'm sorry; it hasn't been shown yet, but I think

4    there's no objection.  It was previously admitted.

5             THE CLERK:  It was admitted on the 10th.

6             MR. CRANE:  Okay.  Great.  Thank you.

7             All right.  So let's show that.

8             DOCUMENT TECHNICIAN:  (Complied with request.)

9    BY MR. CRANE:

10   Q    This is the second request for information from the EPA.

11   A     Yes.

12   Q    And the EPA reminded you, again, that they needed

13   complete and full and accurate information?

14   A     Yes.

15   Q    And that you were going to have to swear to tell the

16   truth and all of that, right?

17   A     Yes.

18   Q    The whole truth, and nothing but the truth, right?

19   A     Yes, that's my understanding.

20            MR. CRANE:  Now let's go to Question 7.  That's on

21   page 8.

22            DOCUMENT TECHNICIAN:  (Complied with request.)

23   BY MR. CRANE:

24   Q    This is the specific question where the EPA requests that

25   Dyce interview current and past senior management, owners,

1    and/or employees of the facility to determine whether they

2    have any recollection of past spills and, in particular,

3    spills or releases of PCE or TCE; is that right?

4    A    Yes.

5    Q    And specifically they wanted you to identify when any

6    such release occurred, how much was released, any response

7    action taken at the time, right?

8    A    Yes, that's correct.

9    Q    And so for this particular supplemental response, you had

10   help from Dyce's lawyers, Holland & Hart?

11   A    Yes, that's correct.

12   Q    And the process that you went through to answer

13   Question 7 regarding spills was to identify people who were

14   likely to have information about Dyce's facility and

15   operations?

16   A    Yes.

17   Q    Now you mentioned on direct that you didn't have any

18   aerial photographs or plot layouts of the historic facility,

19   correct?

20   A    Right.  There was one from 1989, I believe, is the only

21   one we had.

22   Q    You had information in the Maxim report, correct?

23   A    Yes.

24   Q    All right.  And I'm not going to show you that, but you

25   had reviewed the Maxim report?

1    A     Well, that was -- the Maxim report came out after the

2    104(e) requests were submitted.

3    Q     After the supplemental requests?

4    A     Yes.

5    Q     Okay.  You don't know, though, what documents Dyce's

6    lawyers, who were actually doing the interviewing of the

7    employees, had when they conducted the interviews, do you?

8    A     I do not.

9    Q     And as I understand it, there were summaries prepared of

10   the interviews, and you got those summaries?

11   A     Yes, that's correct.

12   Q     And then you reviewed the summaries in connection with

13   providing the supplemental response?

14   A     Yes.

15   Q     And 19 current and former employees were interviewed as

16   part of this process, right?

17   A     I don't recall the correct --

18   Q     Well, if you look --

19   A     -- the exact number.

20   Q     Yeah.  If you look at -- I tallied them up.

21   A     Okay.

22   Q     But if you look at the chart that Mr. Cozzens showed

23   you -- and if you want, we can go to Admitted 383.

24         Let's just put that up real quick.

25              DOCUMENT TECHNICIAN:  (Complied with request.)

1   BY MR. CRANE:

2   Q     This is the supplemental response, right?

3   A     (No response.)

4   Q     And I'm now looking at pages 5 and 6, and you see all of

5   the employees?

6   A     Yes.

7   Q     Former employees that were interviewed, right?

8   A     Yes.

9   Q     So if my math is right, there's about 19.  Is that all

10  right with you?

11  A     Sure, without counting them, yes.

12  Q     All right.  But the people that were interviewed about

13  historic operations included Mr. Warne?

14  A     Yes.

15  Q     Mr. Naff?

16  A     Yes.

17  Q     Steve Dyce?

18  A     Yes.

19  Q     Grady Dyce?

20  A     Yes.

21  Q     Dick Bender?

22  A     Yes.

23  Q     Richard Colver?

24  A     Yes.

25  Q     And Delmer Hutchinson, among others, right?

1    A     Yes.

2    Q     And they were the ones that particularly had knowledge

3    about the earlier periods of time, the historic information?

4    A     Okay.

5    Q     Is that true?

6    A     It would appear they were in that group, yes.

7    Q     And you believed, when you reviewed the summaries and

8    provided the substance of the information that you gleaned

9    from the summaries to the EPA in response to their request,

10   that the people that were interviewed were truthful and fully

11   honest, correct?

12   A     Yes.

13   Q     Otherwise, you would not have relied on them for your 104

14   response to the EPA?

15   A     Yes.

16   Q     And your answers to the EPA accurately reflect the

17   interviews, because you reviewed them, correct?

18   A     I reviewed the interview summaries.

19   Q     All right.

20   A     I believe the answer did reflect accurately the interview

21   summaries.

22   Q     That you saw.

23         And as of the time you left Dyce's employment, you fully

24   stood by what you submitted to the EPA as a thorough and

25   truthful investigation?

1    A    Yes.

2    Q    And, in fact, as of the time of your deposition in August

3    2005, you stood by that submission, correct?

4    A    Yes.

5         MR. CRANE:  All right.  Let's keep 383 up, and let's

6    go to page 6.  If we could just blow up the text of that?

7         DOCUMENT TECHNICIAN:  (Complied with request.)

8    BY MR. CRANE:

9    Q    So in this supplemental response to the EPA, you report,

10   after all these interviews, that no one had any knowledge of

11   any meaningful quantity of PCE or TCE being released at the

12   site, correct?

13   A    That's correct.

14   Q    And you reported that the loading and unloading area was

15   either asphalt or concrete?

16   A    Yes.

17   Q    And you reported to the EPA that if there had been a

18   spill of PCE or TCE during unloading, it would have reacted

19   with the asphalt, correct?

20   A    Yes.

21   Q    And that there was no breakdown of asphalt in that area

22   reported by any employee that you interviewed?

23   A    That's my understanding, yes.

24   Q    And that as a result, their conclusion was that likely

25   there had not been any spill of PCE in the loading/unloading

1   area, correct?

2   A    Yes, based on that.

3            MR. CRANE:  And then if you would turn to

4   Question 8?

5            DOCUMENT TECHNICIAN:  (Complied with request.)

6   BY MR. CRANE:

7   Q    In Question 8, the EPA is now specifically asking where a

8   spill would have gone before 1985 if a spill had occurred in

9   the loading/unloading area, correct?

10  A    Yes.

11  Q    And Dyce's answer was that the slope of the area was such

12  that the drainage goes into the containment area in the tank

13  farm, correct?

14  A    Yes.

15           MR. CRANE:  And if we could turn to Question 10,

16  which is on page 8?

17           DOCUMENT TECHNICIAN:  (Complied with request.)

18  BY MR. CRANE:

19  Q    The EPA there specifically asks Dyce when the use of

20  dedicated hoses and pumps began, and Dyce's answer was 1992 to

21  1993, correct?

22  A    That's correct.

23  Q    And in Question 11 on that same page, the EPA asks where

24  the rinse from the nondedicated hoses and pumps went before

25  1985, and Dyce answered that it went to the unlined pond,

1   correct?

2   A    Yes.

3   Q    And that's what we talked about earlier with the gravity

4   going to the unlined pond?

5   A    That's correct.

6   Q    Question 13 on page 9, the EPA specifically asked Dyce

7   whether the historic unlined pond collected runoff from the

8   operational part of the site, correct?

9   A    Yes.

10  Q    And Dyce answered that due to the natural slope of the

11  property, the historic unlined pond probably collected runoff

12  from the operational area, right?

13  A    That's correct.

14  Q    And this answer, that specific answer was based not only

15  on discussions with employees and former employees but

16  inspection of the facility, correct?

17  A    Well, the current configuration that was there when I was

18  there.

19  Q    Visual inspection of the facility?

20  A    Yes.

21  Q    And again, you signed these under oath and swearing that

22  a complete and thorough investigation had been done and the

23  answers were accurate, correct?

24  A    Yes.

25  Q    And your investigation, whose purpose was to identify and

1   report to the EPA any spill or release, did not turn up any

2   spill or release of PCE or any accident involving PCE,

3   correct?

4   A     Yeah, based on people's recollections to me and the

5   documents I was able to find, that's correct.

6   Q     And while you were at Dyce, you did not send any

7   corrections or changes to any of the responses you provided in

8   this supplemental response, correct?

9   A     That's correct.

10  Q     Now you testified in the *Weiss* case, correct?

11  A     Yes.

12  Q     And the *Weiss* case was the case brought by some

13  neighboring homeowners?

14  A     Yes.

15  Q     And you testified similarly in the *Weiss* case, where you

16  were asked for information about spills or releases, that

17  there was no information whatsoever about any spill or release

18  at the Dyce facility, correct?

19  A     Well, the information we had provided was the information

20  that we had available.

21  Q     And that the information, based on all of the interviews

22  that you did, historic employees, and all of the records you

23  reviewed, no releases or spills?

24  A     Well, there were, but they were the ones that we

25  indicated that we knew about.

1   Q     Right, the post-1992 ones that had nothing to do with

2   PCE?

3   A     That's correct.

4          MR. CRANE:  All right.  Let's turn to Exhibit 442,

5   which has not been admitted yet.  And we'll offer that.

6       (Discussion off the record at counsel table.)

7          MR. COZZENS:  Your Honor, we continue to object to

8   this on the grounds that, given the time frame, it's

9   irrelevant.

10          MR. CRANE:  This is the same issue as the sidebar,

11   Your Honor.

12          THE COURT:  I overrule the objection.

13       (Exhibit 442 was received in evidence.)

14          MR. CRANE:  Let's look at 442, and let's go to 442A

15   to start out with.

16          DOCUMENT TECHNICIAN:  (Complied with request.)

17   BY MR. CRANE:

18   Q     Now you recall in about 2000 that Dyce was testing liquid

19   in the containment pits for VOCs, including PCE?

20   A     In what time frame?

21   Q     Around 2000.

22   A     Yes, we did an analysis.

23   Q     And you recall that those, the samples were taken by an

24   outside lab and then the results returned to Dyce, correct?

25   A     Yes.  We pulled the sample and delivered it to the lab.

1          MR. CRANE:  If you would scroll down and highlight

2     tetrachloroethylene on this?

3          DOCUMENT TECHNICIAN:  (Complied with request.)

4     BY MR. CRANE:

5     Q    Now tetrachloroethylene is the same as PCE or perc,

6     correct?

7     A    Yes, that's correct.

8     Q    And this 442A that we're looking at now is an example of

9     the test results that you got back from the lab, correct?

10    A    Yes.

11    Q    And this test indicates a finding of PCE in 1.9

12    micrograms per liter in the west slope pit in January 2000,

13    correct?

14    A    That's correct.

15         MR. CRANE:  All right.  Let's go to 442B.

16         DOCUMENT TECHNICIAN:  (Complied with request.)

17         MR. CRANE:  And if we could go down to

18    tetrachloroethylene again?

19         DOCUMENT TECHNICIAN:  (Complied with request.)

20    BY MR. CRANE:

21    Q    This test report indicates that 3.7 micrograms per liter

22    of PCE was found in the east slope pit in April 2000, correct?

23    A    That's correct.

24         MR. CRANE:  All right.  Let's go to C, 442C.

25         DOCUMENT TECHNICIAN:  (Complied with request.)

1   BY MR. CRANE:

2   Q    Now this is an invoice for one of the tests, correct?

3   A    Yes, that's what it appears to be.

4   Q    And it looks like to do one of these tests for PCE in the

5   year 2000, it costs $120, correct?

6   A    Yes.

7           MR. CRANE:  All right.  Let's go to 442 -- let's go

8   ahead and skip to E, if we could, and highlight

9   tetrachloroethylene.

10          DOCUMENT TECHNICIAN:  (Complied with request.)

11  BY MR. CRANE:

12  Q    This test indicates that 108 micrograms per liter of PCE

13  was found in the east slope in May of 2000, correct?

14  A    I can't see the location of the sample, but --

15  Q    If you look up above there?

16  A    East slope.  Okay.

17  Q    See that?

18  A    Yes, that's correct.

19  Q    All right.  And then if we go to 442F and we highlight

20  tetrachloroethylene, and you see that there's a finding of

21  4.3 micrograms per liter of PCE in the holding tank in May

22  2000, correct?

23  A    Yes, that's correct.

24          MR. CRANE:  All right.  Let's go to 442G.

25          DOCUMENT TECHNICIAN:  (Complied with request.)

1   BY MR. CRANE:

2   Q    This is a little different format but this is another

3   example of a lab analysis on the testing in 2000, correct?

4   A    Yes.

5          MR. CRANE:  All right.  Let's go to the second page

6   of that.  And if we could highlight tetrachloroethylene about

7   halfway down?

8          DOCUMENT TECHNICIAN:  (Complied with request.)

9   BY MR. CRANE:

10  Q    You'll see there's a finding of 6 micrograms per liter of

11  PCE found in the east slope in June 2000, correct?

12  A    That's correct.

13         MR. CRANE:  And then H, second page.

14         DOCUMENT TECHNICIAN:  (Complied with request.)

15         MR. CRANE:  Actually why don't we skip to I.

16         DOCUMENT TECHNICIAN:  (Complied with request.)

17  BY MR. CRANE:

18  Q    This is a letter that you sent concerning one of the

19  findings, correct?

20  A    No.  This is a fax cover sheet from Craig to me.

21  Q    Yeah, right, concerning one of the findings, the lab

22  findings?

23  A    Yes, yes.

24         MR. CRANE:  All right.  And then if we go to the

25  third page of that, and if we would highlight

1    tetrachloroethylene?

2              DOCUMENT TECHNICIAN:  (Complied with request.)

3    BY MR. CRANE:

4    Q    You'll see there's a finding of 16 micrograms per liter

5    of PCE in the west slope pit in August 2000, correct?

6    A    That's correct.

7              MR. CRANE:  And then, finally, 442J, the second

8    page?

9              DOCUMENT TECHNICIAN:  (Complied with request.)

10   BY MR. CRANE:

11   Q    Tetrachloroethylene, there was a finding of 9 micrograms

12   per liter in the tank farm pits in September 2000, correct?

13   A    Yes.

14   Q    So these lab analyses show that PCE was getting into the

15   pits in 2000, correct?

16   A    Yes.

17   Q    All right.  Now I want to clear up a little bit of

18   confusion on my part on some of the direct testimony.  I'm not

19   sure I heard right, but did you say to Mr. Cozzens that

20   Mr. Hallsten had no involvement whatsoever in the

21   investigation of the contamination at the Dyce site and your

22   participation in that?

23   A    He was not one of the primary people we spoke to to ask

24   for information about the operations at the facility.

25   Q    Yeah, but that wasn't my question.  Was Mr. Hallsten

1    involved at all in the contamination issues that you were

2    involved in?

3    A    No.

4    Q    You didn't communicate with him?  Weren't in any e-mail

5    communication with him at all?

6    A    I don't recall any.

7    Q    All right.  Let me see if I can refresh your recollection

8    on that.

9    A    Okay.

10          MR. CRANE:  Let's look at 436, which has been

11   admitted.

12          DOCUMENT TECHNICIAN:  (Complied with request.)

13   BY MR. CRANE:

14   Q    And if you could highlight the top, you'll see this is an

15   e-mail from you to Mr. Warne on January 6, 1999.  Is that

16   right?

17   A    Well, it's from Dave to me.

18   Q    I got it backwards again.  Yeah.  You're involved in the

19   e-mail communication, correct?

20   A    Yes, that's correct.

21   Q    All right.  And let's go down about halfway, and you'll

22   see there's another e-mail communication with a cc to Monte

23   and Rod.

24   A    Okay.

25   Q    Do you see that?

1   A     Yes.

2   Q     Monte is Monte Naff?

3   A     Yes.

4   Q     And Rod is Rod Hallsten?

5   A     That's correct.

6   Q     And this is reporting on a visit by Catherine LeCours,

7   who is with the Department of Environmental Quality from

8   Montana, correct?

9   A     Yes, that's correct.

10   Q     And if we go down about five lines from the bottom,

11   they're discussing PCE, correct?  PCE contamination in

12   particular in this paragraph, right?

13   A     Yes, they're talking about it in the e-mail.

14   Q     All right.  And then if you go down a few lines more,

15   you'll say, "This is" -- the e-mail says, "This "-- I'm sorry.

16   "That is part of the reason why this to you, Monte and Rod,"

17   meaning why we're sending this to you, Monte and Rod, correct?

18   A     Yes.

19   Q     So Dyce is looking for information about PCE from Rod

20   Hallsten in January 1999?

21   A     Dave included him on the e-mail.

22   Q     Okay.  And Mr. Hallsten, notwithstanding the fact that

23   Dyce was involved in this process with the EPA and was looking

24   for information from him about PCE in particular, never

25   communicated to you that he had any information about any

1  significant inventory loss in the '70s, correct?

2  A    Yes.  I don't recall receiving that information at all.

3          MR. CRANE:  And if we could go to 4089, not admitted

4  but I understand there's no objection?

5          THE COURT:  What is it?

6          MR. CRANE:  It's a February 29, 2000 e-mail.

7          THE COURT:  Is there an objection?

8          MR. CRANE:  4089.

9          MR. COZZENS:  I haven't seen it yet, Judge.  I think

10  this was shown somewhere, but we have no objection, Judge.

11          THE COURT:  4089 is admitted.

12      (Exhibit 4089 was received in evidence.)

13  BY MR. CRANE:

14  Q    And you'll see this is a February 29, 2000 e-mail, and

15  you're involved in this discussion, correct?  Do you see it

16  says, "Suzanne is finishing a response to EPA inquiry"?

17  A    Yes, my name is mentioned in the e-mail.

18  Q    And you'll see that Rod Hallsten is copied on this as

19  well?

20  A    Yes.

21  Q    And you'll see, at the bottom under paragraph 3, Monte

22  and Rod were being asked questions in order to respond to the

23  EPA inquiries, correct?

24  A    Yes, they were asked to identify warehouse managers.

25          MR. CRANE:  Thank you very much, Ms. Miller.  I

1    appreciate your time.

2              THE WITNESS:  Thank you.

3              MR. JOHNSON:  No questions, Your Honor.

4              THE COURT:  Thank you.

5              Any redirect?

6                        REDIRECT EXAMINATION

7    BY MR. COZZENS:

8    Q    In your involvement in investigating the ground

9    contamination out at Dyce, has anybody suggested to you that

10   any discharges in the late '90s or 2000 had anything to do

11   with that?

12   A    No, they haven't.

13   Q    Were there discharges of water from the Dyce facility

14   during '97 through 2000?

15   A    Yes.

16   Q    Did the DEQ approve all of those before they were

17   discharged?

18   A    Yes.

19   Q    Then there was some discussion on cross-examination about

20   talking to past and current management about perc spills.

21   A    Yes.

22   Q    To this day, has anybody in either past or current

23   management at Dyce ever identified to you a perc spill?

24   A    Not to me, no.

25   Q    When you were preparing these responses to the EPA, were

1    you trying to mislead anybody in any way?

2    A    No.

3              MR. COZZENS:  I have nothing further, Your Honor.

4              THE COURT:  You can step down.

5              THE WITNESS:  Thank you.

6              THE COURT:  I need to take a quick break, so that

7    means you're going to take a quick break.

8              THE LAW CLERK:  All rise.

9         (Recess taken from 15:55:23 to 16:03:03.)

10        (Open court.)

11        (Jury present.)

12             THE COURT:  Please be seated.

13             Call your next witness, please.

14             MR. LYNCH:  Soco calls Dr. Robert Powell to the

15   stand.

16             WHEREUPON,

17                  ROBERT LESLIE POWELL, Ph.D.,

18   called for examination by counsel for defendant, after having

19   been first duly sworn to testify the truth, the whole truth,

20   and nothing but the truth, testified as follows:

21                       DIRECT EXAMINATION

22   BY MR. LYNCH:

23   Q    Dr. Powell, could you please state your name for the

24   record?

25   A    Robert Leslie Powell.

1   Q     And where are you from, Dr. Powell?

2   A     I currently reside in Parrish, Florida.  It's a little

3   bit south of Tampa.

4   Q     The jury may have seen you in the courtroom today.  Am I

5   correct that you've been retained as an expert witness in this

6   case?

7   A     Yes, that's right.

8   Q     And who retained you?

9   A     Soco.

10  Q     And are you being paid for your testimony here today and

11  your work in this case?

12  A     Yes, I am.

13  Q     And what is your rate?

14  A     $275 per hour.

15  Q     Is that your usual rate?

16  A     It's a typical rate for doing litigation work.

17        One qualifier on my last answer.  My firm is being paid.

18  I'm not being directly compensated for this work.

19  Q     Unfortunately.

20        What's the purpose of the retention?

21  A     It's to provide expert opinion related to certain issues

22  in this case.

23  Q     What's your profession?

24  A     I'm an environmental engineer and groundwater

25  hydrologist.

1   Q    And what is an environmental engineer?

2   A    Well, in my case, I typically work on projects involving

3   soil and groundwater pollution; to a lesser degree, surface

4   water and sediment pollution that results from commercial and

5   manufacturing facilities such as the facility at issue in this

6   case.

7   Q    And where do you work?

8   A    I work for ENVIRON International Corporation.

9   Q    And what does ENVIRON International Corporation do?

10  A    It's a consulting firm.  We do public health,

11  environmental science, and environmental engineering work.

12  Q    How long have you been with ENVIRON?

13  A    It will be 25 years in July.

14  Q    And what's your current position there?

15  A    I'm a principal and the chief administrative officer of

16  the firm.

17  Q    What does it mean to be a principal?

18  A    Essentially it means you're one of the top practitioners

19  and shareholders of the firm.  In other consulting firms, it

20  would be analogous to a title of vice-president.

21  Q    Have you held other positions at ENVIRON?

22  A    Yes.  For six years I was the president of ENVIRON.

23  Q    I've been calling you "Dr." Powell, so I assume you have

24  a Ph.D.  Can you tell us what your Ph.D. is in?

25  A    It is generally in the field of groundwater hydrology.

1    Q    Can you just describe briefly what is groundwater

2    hydrology?

3    A    It's the study of the origin and movement of water in the

4    subsurface, below the ground surface.  It also branches, then,

5    into the movement of chemicals in water in that subsurface

6    environment.

7    Q    Okay.  And when did you get your Ph.D.?

8    A    In 1983.

9    Q    And from what school?

10   A    The University of Maryland.

11   Q    What's your undergraduate education?

12   A    It was a degree in civil engineering with a specialty in

13   environmental engineering.

14   Q    And where did you get that from?

15   A    Also from the University of Maryland.

16   Q    Do you have any professional registration or licensing?

17   A    Yes.  I'm currently a registered professional engineer in

18   the State of Maryland.  I originally was licensed in 1977, and

19   I also have a professional engineering license in the State of

20   Florida where I currently reside and practice.

21   Q    Are you a member of any professional organizations?

22   A    American Society of Civil Engineers.

23   Q    I'd like to talk a little bit about your work experience.

24   Since you obtained your Ph.D. in 1983, what's been the focus

25   of your practice?

1    A    The vast majority of my work has involved investigating,

2    planning for the remediation, and conducting remediation at

3    contaminated industrial and commercial facilities.  I've also

4    done some work as an expert witness over those years.

5    Q    Have you done any work in connection with Superfund

6    sites?

7    A    Yes.  I've worked on a very large number of Superfund

8    sites.

9    Q    How many would you estimate?

10   A    Oh, probably 40 or 50 over the years.

11   Q    Have you worked on other projects conducted under federal

12   environmental regulations like CERCLA or RCRA?

13   A    Yes.  I've worked on a large number of sites in both

14   CERCLA and RCRA.  They're regulated under both CERCLA and

15   RCRA.

16   Q    When you say you've worked on sites, are you actually out

17   in the field, you know, conducting analysis, doing the work?

18   A    Well, I don't spend as much time on a drill rig as I did

19   earlier in my career, but today my role is typically

20   supervising the work that our firm is doing to investigate

21   sites and to plan for their remediation.  I have staff that

22   work for me now that spend the time on the back end of the

23   drill rig.  Earlier in my career, though, I spent a great deal

24   of time drilling holes in the ground and doing field

25   investigations.

1    Q    Have you ever worked on sites involving contamination by

2    chlorinated solvents?

3    A    Yes.  Quite a large number of them.

4    Q    Can you give us some examples?

5    A    Well, I'm currently working on a site in Massachusetts

6    that was a manufacturing facility and had a very, very large

7    release of chlorinated solvents, perchloroethylene,

8    trichloroethylene, TCE.  It's regulated under RCRA, and it's

9    going through an investigation and corrective action process,

10   and I've been working with the company responsible for that

11   site for quite a long time, helping to investigate the site

12   and plan for its premediation.

13        I'm also working, currently working on a site in Illinois

14   which used perchloroethylene as a degreasing solvent, and

15   unfortunately at some point they decided to use their waste

16   perc as a weed control on their parking lot, so now they're

17   dealing with a problem with perc in the soil beneath the

18   parking lot that has caused some groundwater contamination,

19   and we're doing the investigation of that property and have

20   developed a plan for its remediation and will be implementing

21   this coming year.

22   Q    Are any of these sites you've worked on involving

23   chlorinated solvents as large of a contamination issue as we

24   see in the Lockwood solvent groundwater plume site?

25   A    Many of them are quite a bit larger than the problem here

1073

1   at this site.

2   Q    You've indicated you've been an expert witness before.

3   What portion of your work is devoted to being an expert

4   witness?

5   A    It's varied over my career.  As time has gone on and some

6   of my partners that are a generation ahead of me in the firm

7   have retired, I've done more and more because I've become the

8   go-to expert on certain issues in the firm.

9        Today, probably 50 percent of my professional time is

10  spent as an expert witness.  The other 50 percent, doing work

11  on -- still working on what I call real sites, doing

12  investigations, remediation planning.

13  Q    When you've been retained as an expert witness, is it

14  always in connection with insurance coverage cases?

15  A    No.  I'd say insurance coverage cases are probably

16  20 percent, 25 percent of the cases I'm retained to work on.

17  The others are other types of cases.

18  Q    When you do work on insurance coverage cases, do you

19  always represent the policyholder, or are you always retained

20  by the policyholder?

21  A    Well, the majority of my work has been for policyholders,

22  but I've also done work from time to time for carriers.

23  Q    And have you testified in court before?

24  A    Yes, quite a number of times.

25  Q    I'd like to talk a little bit about some of the materials

1    you might have reviewed in connection with your work on this

2    matter.  Could you just discuss generally what you've

3    reviewed?

4    A    Well, I've reviewed the reports that have been done by

5    the government's contractors, the remedial investigation,

6    feasibility studies done by Tetra Tech, the earlier report

7    done by Lockheed Martin for EPA where they were investigating

8    possible sources of groundwater contamination.  I've reviewed

9    the reports that have been done by ATC where they've done

10   investigations on the property and gone in and begun to do

11   some remediation.  I've reviewed the reports that they've

12   prepared.

13       I've also reviewed a lot of documents from the company

14   about their operating practices.  I've reviewed a very large

15   number of depositions from former employees of the company

16   about their memories and activities on the property.

17   Q    Have you reviewed the underlying sampling data that was

18   collected from the Dyce Chemical site?

19   A    Yes.

20   Q    Have you reviewed any of the boring logs or other

21   materials relating to the fieldwork that was done there?

22   A    Yes, I have.

23   Q    How about historic aerial photographs of the site?

24   A    Yes, I've seen quite a number of historic photographs.

25   Q    Have you ever visited the Dyce Chemical site?

1   A     Yes, I have.

2   Q     And when was that?

3   A     It was sometime last fall, because I remember I was

4   surprised how warm it still was here.  When I left Florida, I

5   expected to be coming somewhere that was going to be a little

6   bit colder by then, and it really was a very warm day.

7   Q     And obviously you've been in court this week, listening

8   to the witnesses testify, and the documents and photographs

9   they've been shown.

10        Dr. Powell, based on your education and experience and

11  your review of the materials and information you just listed,

12  have you formed an opinion as to the most likely source of the

13  perc contamination in the northwest corner of the Dyce

14  Chemical property?

15  A     Yes, I have.

16  Q     And what is that opinion?

17  A     I think the most likely explanation for the contamination

18  is a large spill of a bulk-size quantity, meaning much more

19  than a single drum of perc, in the unloading area that flowed

20  via the surface drainage down into the corner, settled into

21  the ground, and left the area of contamination.

22  Q     Let's explore the basis for that opinion.

23        I guess first we've been hearing a lot about the Lockwood

24  solvent Superfund site.  Just briefly, what is a Superfund

25  site?

1    A     Well, Superfund is a, as we've heard in some of the other

2    testimony, is a federal statute by which the government can

3    conduct investigations and enforce cleanup of contaminated

4    properties.  A Superfund site can either be an individual

5    property, or, in this case, it's really a region.  It's a

6    vicinity, a neighborhood in which there is contamination

7    that's been found in private wells or in monitoring wells that

8    are subsequently drilled, and it may involve one facility.  It

9    may involve multiple facilities.  So it all depends on the

10   specific circumstances of the individual project.

11   Q     Well, what are the chemicals of concern that are

12   associated with the Lockwood solvent site?

13   A     Well, insofar as the Superfund interest, it is almost

14   entirely related to chlorinated solvents.

15   Q     And any chlorinated solvents in particular?

16   A     Mainly perchloroethylene.  There are other solvents also

17   found in the groundwater, but they're likely just a natural

18   degradation byproduct of the perc.  As it decomposes, these

19   other solvents are formed.

20   Q     We've also heard some reference throughout the trial so

21   far to BTEX compounds.  What are BTEX compounds?

22   A     BTEX is an acronym.  It stands for benzene, toluene,

23   ethylbenzene, and xylene.  These are four individual and

24   different chemicals that are all formed from the distillation

25   of crude oil.  They're a common, very common constituent that

1    you find in gasoline, but they're also found and used in other

2    manufacturing processes.

3    Q    Dr. Powell, has EPA identified BTEX compounds as

4    chemicals of concern associated with the Lockwood site -- or,

5    I'm sorry, yeah, the Lockwood site?

6    A    I don't recall that they have.  I don't believe they've

7    listed BTEX as a COC.

8    Q    I believe you said a Superfund site can involve more than

9    one location.  Does some of the groundwater contamination

10   that's the subject of the Lockwood solvent site originate from

11   the Dyce Chemical property?

12   A    Yes, it does.

13   Q    And what's the primary chemical of concern on the Dyce

14   Chemical property?

15   A    Perchloroethylene, perc.

16   Q    Obviously we've, since we're here today and we've seen

17   all of the reports, we all understand that perc is now

18   recognized as an environmental hazard.  Was it recognized as

19   such in the 1970s and '80s?

20   A    Well, certainly by the 1980s it was.  The regulatory

21   programs that began to focus on these kinds of industrial

22   contaminants were passed in the late '70s, early '80s.  I

23   think there was a growing awareness of the importance of perc

24   and other types of industrial solvents through the '70s with

25   the adoption of statutes, for example, like the Clean Water

1    Act, the Safe Drinking Water Act.  These are federal statutes

2    in the 1970s that began to focus on the protection of water

3    quality.  And as standards began to be promulgated for those

4    statutes, there began to be a much greater concern for

5    industrial solvents like perc in the environment.

6         Subsequently, with the adoption of other statutes like

7    RCRA, the Resource Conservation and Recovery Act, in, I

8    believe it was, 1976, and then CERCLA a few years later,

9    chemicals like perc were really front and center in terms of

10   the regulatory awareness of their importance in the

11   environment.

12   Q    In the mid 1970s, was there a general industry awareness

13   of perc as an environmental hazard?

14   A    I think there was a general awareness that it was a

15   hazardous chemical from some of the facilities that I worked

16   on, but most of the concern that I've heard expressed from the

17   guys out in the plant, if I could put it that way, was more

18   for what I would say were health and safety concerns.

19        I recall one plant where they were using chlorinated

20   solvents and the gentleman told me he knew it was hazardous

21   because it used to make him light-headed, and when he came

22   home from work at night, his wife swore that he was stopping

23   at a bar on the way home from work, so he knew it was a

24   hazardous chemical.  I don't think the focus at that time was

25   so much, though, the environmental implications as much as it

1   was the health and safety to workers involved in using it.

2   Q    In the mid 1970s, was there general industry awareness

3   that perc was a potential contaminant to groundwater?

4   A    I don't think there really was.  There may have been some

5   academic work done on it at that time, some work coming out of

6   research labs, but the real awareness of these chemicals as a

7   groundwater contaminant, I think, really emerged by 1980 and

8   into the 1980s.

9   Q    Based on your review of documents and your listening to

10  the testimony in court this week, have you observed anything

11  in the way Dyce Chemical handled perchloroethylene that you

12  would consider inconsistent with prevailing industry standards

13  at the time?

14  A    No.  The information I've read in the records in the

15  case, and certainly the testimony I've heard this week, my

16  impression is that the Dyce Chemical facility was operating

17  pretty much in accordance with what I would say would be the

18  state of the practice for industry at that time.

19  Q    What do you mean by "state of the practice"?

20  A    Well, there are certain industry standards that are

21  recommended by organizations, like the Chemical Manufacturers

22  Association, for example, and others, that companies should

23  adhere to if they want to maintain practices that are

24  consistent with what industry should expect of itself as it

25  tries to self-police itself.

1    The practices that Dyce were using are completely

2   consistent with practices that I've seen at dozens and dozens

3   of other like facilities around the country at the same time.

4   If anything, Dyce was probably a little ahead of their time in

5   terms of their understanding of the importance of protecting

6   areas where they're going to be storing chemicals in bulk

7   tanks against release into the environment.

8            MR. LYNCH:  Julianne, if you could, please pull up

9   Exhibit 3059.

10           DOCUMENT TECHNICIAN:  (Complied with request.)

11  BY MR. LYNCH:

12  Q    This is a document we've seen before.  It's the record of

13  decision in this case.

14       Go to page 28 of that exhibit, please.  And if you could

15  highlight -- I'm sorry.  Pull out the second paragraph -- I'm

16  sorry, the third paragraph that begins in "Area A."

17           DOCUMENT TECHNICIAN:  (Complied with request.)

18  BY MR. LYNCH:

19  Q    The last sentence of that paragraph, or the last portion

20  of the sentence of that paragraph, states, "The Brenntag

21  source area has been further defined as three NAPL

22  contaminated areas:  the northwest corner, the main tank farm,

23  and the acid tank farm."

24       Dr. Powell, have you reviewed the data underlying the

25  EPA's conclusions about those source areas?

1    A    Yes, I have.

2    Q    Do you agree with their assessment of those areas?

3    A    Well, I certainly agree with regard to their assessment

4    of the northwest corner and the main tank farm area.  I think

5    it's very clear those areas have been affected by a DNAPL

6    release.  I think the acid tank farm, the data is more

7    ambiguous as to whether there was a local release in that area

8    or whether they're simply seeing a downstream reflection of a

9    release that occurred farther upstream in the tank farm.

10         MR. LYNCH:  Could you please pull up page 121 of

11   this same exhibit?

12         DOCUMENT TECHNICIAN:  (Complied with request.)

13   BY MR. LYNCH:

14   Q    And this is a figure we're all too familiar with in this

15   case.

16        Dr. Powell, could you identify the northwest corner on

17   that exhibit, please?

18   A    Using the telestrator?

19   Q    I believe if you touch the screen, it will leave a mark.

20   A    (Complied with request.)

21   Q    And since you're offering an opinion about the cause of

22   that northwest corner contamination, I take it you understand

23   that that's the contamination that Dyce is seeking insurance

24   recoverage for in this litigation?

25   A    Yes, that's my understanding.

1           MR. LYNCH:  Thank you.

2           And could you please pull up Exhibit 3508?

3    Actually, I'm sorry; that should be 3058.

4           DOCUMENT TECHNICIAN:  (Complied with request.)

5    BY MR. LYNCH:

6    Q    This is another report from the government contractors.

7    It's the addendum to the remedial investigation report.  I

8    just want to look at how the government has been describing

9    the northwest corner.

10          Please go to page 27.  And could you pull out the

11   paragraph that begins, "5.4.1"?

12          DOCUMENT TECHNICIAN:  (Complied with request.)

13   BY MR. LYNCH:

14   Q    This portion describing the northwest corner of the

15   Brenntag property states, "From evaluation of soil,

16   groundwater, and MIP data, a PCE NAPL source area was

17   identified in the northwest corner of the Brenntag property.

18   The main release area is located in the vicinity of Monitoring

19   Wells PT-2 and PT-6.  Vadose zone contamination beginning at

20   2.5 feet below ground surface was identified as offscale ECD

21   responses in the MIP log from Boring MP-100 and likely

22   represents the surface release location."

23          It continues, "MIP and soil sample data from adjacent

24   borings indicate accumulation and horizontal spreading of PCE

25   NAPL below the water table in the silty clay and silty sand

1083

1    unit to an approximate depth of 10 to 12 feet below ground

2    surface."

3         You can take it down.

4              DOCUMENT TECHNICIAN:  (Complied with request.)

5    BY MR. LYNCH:

6    Q    Based on your review of the underlying data, Dr. Powell,

7    do you agree with the EPA's assessment of the northwest corner

8    contamination as resulting from a surface release of perc that

9    accumulated and spread below the water table?

10   A    Yes, I do.

11   Q    Before we get further into the basis of that opinion, the

12   EPA report mentions NAPL.  Can you tell me, What is NAPL?

13   A    "NAPL" is an acronym.  It means "nonaqueous phase

14   liquids."  It's something other than water.  Oil is a NAPL,

15   for example.  Gasoline would be a NAPL.  These are usually

16   referred to as LNAPLs, meaning they're light, lighter than

17   water.  If they're released onto water, they'll float on top

18   of the water.

19        The issues in this case relate to a class of chemicals

20   that are referred to as "DNAPLs," meaning "dense nonaqueous

21   phase liquids," meaning they're denser than water, and if

22   they're released onto water, they will sink through the water

23   to the bottom of whatever it's found in.

24   Q    So in layman's terms, is NAPL/DNAPL perc, perc that's not

25   dissolved in water?

1084

1    A    Yes.  It's a separate organic liquid that is not yet

2    dissolved in water.

3    Q    So when we're talking about NAPL perc, we're basically

4    talking about perc in its pure-phase form?

5    A    That's correct.

6    Q    What are the chemical and physical properties of

7    pure-phase perc?

8    A    Well, perc, aside from being heavier than water, is also

9    a very volatile chemical.  It has a high vapor pressure, and,

10   if it's exposed to air, it will readily evaporate.  It also is

11   a chemical that is very thin.  Its viscosity is similar to

12   water, and so it runs through the ground fairly easily.  When

13   it reaches a water table, if it's percolating down through

14   soil and it reaches the water table, it will penetrate through

15   the water table and continue to migrate down through the wet

16   soil, unlike, for example, oil, which would stop there because

17   it would float on top of the water table.  Perc will keep on

18   going.

19   Q    Dr. Powell, what are some of the factors that drive how

20   quickly and deeply the perc will migrate down into the soils?

21   A    Part of the -- one of the factors is certainly the type

22   of soil.  If you release it onto gravel, for example, it's

23   going to move through very fast.  If you release it onto clay,

24   it's going to move through slower because clay is tighter and

25   has a lower permeability.

1          Another important factor is the level of moisture in
2     soil.  This is important because perc is one of a class of
3     DNAPLs which is less wet than water, meaning it will not
4     readily penetrate into very fine pore space that's
5     water-filled and push the water out of the way.  Some types of
6     DNAPLs will do that, but perc is not one of those types, and,
7     for that reason, when perc begins to encounter a wet layer of
8     soil, for example, if it encounters the water table where the
9     soil is completely saturated, it will not initially push
10    through into the water table until it has built up a pooled
11    layer on top, creating greater and greater pressure, and it
12    reaches what we call a critical entry pressure, at which point
13    it will then begin to push the water out of the way.  But it
14    will not do it spontaneously, unlike some DNAPLs might, like a
15    creosote, for example.  So when it's released into the soil
16    and soil is wet, it will tend to slow down but not stop the
17    rate of migration of the perc.
18    Q    Dr. Powell, as the perc is sinking through the soil, is
19    it leaving a trail or any residue behind?
20    A    Yes.  Any soil that it comes in contact with, it's going
21    to leave a coating on the grains of the soil.  It's going to
22    leave small little beads or globules of perc trapped in the
23    pores of the soil, so any soil that a DNAPL-phase perc is
24    passed through is going to remain highly contaminated.  Even
25    though the main body of the perc may have moved on, the soil

1  that it's gone through will remain very contaminated.

2          MR. LYNCH:  Could we please pull up, I believe it

3  is, Exhibit 3051?  This is the government's final feasibility

4  study report.  Could you please go to page 812?

5          DOCUMENT TECHNICIAN:  (Complied with request.)

6          MR LYNCH:  Could you focus in on the area around

7  PT-2?

8          DOCUMENT TECHNICIAN:  (Complied with request.)

9  BY MR. LYNCH:

10  Q    Dr. Powell, using this document, can you describe for us

11  the aquifer system in the northwest corner area?

12  A    The aquifer that's been of interest in the Superfund

13  action is a shallow groundwater zone.  The aquifer really is

14  comprised of two separate soil layers.  The shallowest of the

15  soil layers, if I can use the telestrator here without messing

16  up, this layer is a silty clay, not very permeable, but below

17  the water table.  Obviously completely wet.  The lower layer

18  down here is a sand and gravel, completely saturated, well

19  below the water table.  This is really the main aquifer in the

20  area where groundwater will flow.  The permeability of that

21  layer would be quite a bit higher than the silty clay.

22      The water table is indicated in this figure by the dashed

23  blue line with the little blue triangle on top of it.  That's

24  a symbol hydrologists use for a water table.  Beneath that

25  level, all of the soil would be fully saturated with water.

1087

1    Above that level, the silty clay is only partially saturated.

2    There's some moisture there, but it's not completely wet, and

3    there will be open pore space.  That's what we would refer to

4    as a vadose zone, an unsaturated zone above the water table.

5             MR. LYNCH:  Would you take off the zoom?

6             DOCUMENT TECHNICIAN:  (Complied with request.)

7    BY MR. LYNCH:

8    Q    And I probably should have done this previously to

9    orientate everyone, but this figure represents a cross-section

10   of the Dyce Chemical property; is that correct?

11   A    That's correct.

12   Q    And where I'm marking here, that's Sample MP-104, I

13   believe.  That's in the tank farm area of the property?

14   A    Yes, I believe that's correct.

15   Q    And the section we were just looking at, PT-2 there,

16   that's the northwest corner of the property?

17   A    That's correct.

18   Q    And that, does that cross-section represent the elevation

19   change between those points?

20   A    Yes.  It's not, not very easy to see on this

21   cross-section because it's such a small scale, but there's

22   about an 8-foot difference in elevation from one -- from the

23   tank farm area down to that corner.

24   Q    Dr. Powell, I'd like you to assume that you have

25   100 gallons or more of perc.  If you take that perc and spill

1    it onto the ground and it spreads out evenly over a wide area,

2    would you expect there to be -- would you expect to get very

3    deep infiltration?

4    A    That depends.  What kind of surface is it spilled on?

5    Q    Just bare earth.

6    A    If you spilled it all at once and it spread out over a

7    large area, no, it probably wouldn't go very deep.

8    Q    Okay.  And why is that?

9    A    Because it spreads out to a very thin layer, and in each

10   little square inch of soil, there's only a small amount of

11   perc sitting on top that can infiltrate.  So as it spreads out

12   over a very large surface, it won't penetrate very deeply.

13   Q    Assuming everything else is the same and you take that

14   same amount of perc and spill it into an area where it pools,

15   into a relatively smaller area, would you expect to get deeper

16   infiltration?

17   A    Yes, you would.  And I think the, sort of the real-world,

18   to me, before I got into this field, analogy to that is if I

19   put 100 gallons of water on my lawn with a sprinkler system,

20   I'm probably going to water my grass about a half-inch deep.

21   But if I put 100 gallons of water onto my shrubbery with a

22   drip irrigation system where it's concentrated in a very small

23   area, I'm going to water very, very deep into the soil.  The

24   same principle applies here.

25   Q    Does the investigation data that you've reviewed in this

1    case tell us which of those scenarios happened in the

2    northwest corner?

3    A     I think the latter analogy is probably the closer example

4    of what happened.  You had a large quantity of perc --

5    Q     Actually, I'm sorry to interrupt, but I do believe you

6    prepared a demonstrative that might help illustrate this.

7    A     Okay.

8              MR. LYNCH:  Can you please pull up Proposed

9    Demonstrative DD135?

10             MR. GROSSBART:  Can I get a number, please?

11             MR. LYNCH:  We have DD135.

12   BY MR. LYNCH:

13   Q     And, Dr. Powell, can you just discuss this, this figure

14   you've prepared for the jury?

15   A     Well, this is meant to be an illustration of, at least at

16   a conceptual level, of how the perc migrated when it reached

17   the northwest corner.  Initially it settled into a relatively

18   small area, whatever surface depressions were there.  It would

19   principally have settled there, and it would begin to slowly

20   percolate into the soil.  It would move more or less straight

21   down through the vadose zone soils, the unsaturated soils,

22   until it reached the water table.

23        At that point, it would begin to pond, because it's

24   encountering a very wet soil, and as I mentioned earlier, it

25   doesn't easily migrate into wet, wet soils, and as it begins

1    to form that pond layer at the top of the water table, it will

2    begin to spread laterally, sideways.

3         This silty clay unit is not just one monolithic unit of

4    pure silty clay.  There are thin beds of sand laminated within

5    the silty clay, so as the perc reaches the water table and it

6    begins to pond up, it's going to start to flow along those,

7    those pathways of least resistance through the sand, and it's

8    going to begin to spread laterally as it wants to continue

9    spreading down.

10        And so an initially small area of release in a portion of

11   the northwest corner, as it hits the water table, it then

12   begins to spread laterally across the water table as it

13   continues a downward movement, and it becomes a larger

14   footprint within the water table zone, and that's what I'm

15   trying to illustrate here.

16        Eventually the evidence is that the perc migrated through

17   the silty clay as a DNAPL and, quite likely, all the way into

18   the sand and gravel unit, at least in some limited areas.

19             MR. LYNCH:  Actually can you pull up Exhibit 3059,

20   page 121?

21             DOCUMENT TECHNICIAN:  (Complied with request.)

22   BY MR. LYNCH:

23   Q    This is, again, the figure from -- the source area figure

24   from the record of decision.  Do you understand, Dr. Powell,

25   that the green areas represent soils that are contaminated

1    with perc?  Is that correct?

2    A    That's correct.

3    Q    And the yellowish or tanish area represents a groundwater

4    plume, a plume of groundwater contaminated with perc?

5    A    That's correct.

6    Q    Can you tell me how the green causes the brown?

7    A    Well, once the perc is in contact with water, it's going

8    to start to slowly dissolve.  It's not readily miscible in

9    water.  It's not like alcohol, for example.  If you mix that

10   with water, it completely dissolves right away.  It has a

11   moderate to low solubility, but it will dissolve nonetheless

12   into water.

13        So once that DNAPL phase of the perc migrates through the

14   vadose zone and reaches the water table and starts to flow

15   through or into the water table zone, it will start to slowly

16   dissolve and release contaminants that then go from the NAPL

17   phase into a dissolved, soluble phase in the groundwater.

18        The groundwater, though, is not static.  It's not staying

19   in one place.  It's constantly moving.  In this case, it's

20   moving towards the Yellowstone River.  So as the perc is

21   dissolving into the groundwater, it's being carried downstream

22   to the north towards the river, and that eventually forms this

23   groundwater plume.

24   Q    Once perc is trapped in the soils, the subsurface soils,

25   how long is it going to continue to act as a source of

1    groundwater contamination?

2    A    Well, if there's no proactive steps taken to remediate

3    it, it will be there for a very, very long time; certainly

4    many decades, potentially hundreds of years.  It's very, very

5    persistent in the environment once it's released in this form.

6    Q    I believe in your previous figure you had represented

7    that there was, in the northwest corner, there was both perc

8    in the vadose zone, and what is the vadose zone?

9    A    It's the unsaturated soils above the water table.

10   Q    So those are the soils above the water table, and also

11   there's perc below the water table in the soils; is that

12   correct?

13   A    Yes, all the way down into the sand and gravel aquifer.

14   Q    Does the perc in both areas act as a source of

15   groundwater contamination?

16   A    Yes.  The perc that's in the water table is a source of

17   contamination, as they say, 24/7.  Every second of every day,

18   there's new perc being released to the groundwater that

19   continues to contaminate.

20       The perc that's trapped up in the vadose zone will

21   periodically be released into the groundwater.  As there are

22   heavy rains, for example, the area becomes wet.  Water starts

23   to percolate down through that soil.  It picks up some of the

24   perc that's trapped there in the dissolved form, and that's,

25   then, carried to the water table.

1    So both the vadose zone and the water table zone are

2    continuing sources of perc.

3    Q    And is that true in the northwest corner?  Has the perc

4    that's trapped down there acted as a source of groundwater

5    contamination from the time it first got there through today?

6    A    Yes, it has.

7         MR. LYNCH:  You can take that exhibit down.

8         DOCUMENT TECHNICIAN:  (Complied with request.)

9    BY MR. LYNCH:

10   Q    Now we've talked a little bit about DNAPL perc.  Has

11   DNAPL perc actually been observed anywhere in the Dyce

12   Chemical property?

13   A    Well, not directly.  I mean, there's certain tests that

14   have been performed that are indicative of the fact that it's

15   there, but it's never been seen where you can actually look at

16   it in a soil sample and see the perc in the sample.

17   Q    Is that unusual for a site that's contaminated with

18   DNAPL, that you haven't actually observed it?

19   A    No, not at all.  Of the DNAPL sites that I've worked on

20   in my career, which probably number 20 or 30, I think I've

21   only actually seen perc or seen DNAPL in any form in two or

22   three of those sites.  It's the norm that you don't see it as

23   a separate free phase.  It's unusual that you'll be able to

24   see it as a separate, separate product phase.

25   Q    And you discuss, if you can't see it, you use some

1    indicators to see whether it's there or not, and why don't we

2    pull up Proposed Illustrative Exhibit DD136.

3              MR. GROSSBART:  Can we get these in a numbered

4    fashion so we can find them in our book?

5         (Discussion off the record at counsel table.)

6              THE COURT:  Let's just take the time so you can find

7    them.

8              MR. JOHNSON:  Do they have an extra copy to give us,

9    Your Honor?

10             THE COURT:  Pardon?

11             MR. JOHNSON:  All we want is a copy.

12             MR. GROSSBART:  I raised this with Mr. Lynch

13   yesterday, and --

14             MR. LYNCH:  I apologize.  I didn't know that the

15   ones we gave you didn't have numbers.

16        (Discussion off the record at counsel table.)

17   BY MR. LYNCH:

18   Q    This is DD136.

19        All right.  Dr. Powell, can you describe what this

20   illustration is?

21   A    These are three indicators, factors, that EPA and MDEQ

22   used in the investigation of the site to determine when they

23   may have indications of perc in soil or groundwater.

24   Q    Okay.  And can you -- what's the first one?

25   A    The first one is simply what's the concentration of perc

1    in the soil?  You drill a hole, pull the sample out, send it

2    to the lab.  How much perc is there?  So they're measuring the

3    concentration directly in the soil sample.  And if that

4    concentration exceeds 189 milligrams per kilogram, which are

5    parts per million, then that's a direct indication, I think a

6    clear, unambiguous indication that you have perc in a DNAPL

7    form in the soil.  There's too much there for it to be

8    explained by something other than DNAPL.

9    Q    Okay.  How about the second one?  That's PCE

10   concentrations in groundwater?

11   A    That's right.  You use the concentration of perc in

12   groundwater that's in contact with soil, and based on that

13   concentration you're drawing some inference as to whether or

14   not the concentrations are high enough that they would be

15   indicative of a DNAPL-like condition.

16   Q    And EPA uses 1 percent of the solubility.  Where do they

17   derive that figure from?

18   A    It's a rule of thumb that's developed in the industry

19   over the years.  Frequently you'll see high concentrations of

20   perc in groundwater at DNAPL sites, and you'll see lesser

21   concentrations outward from that.  It's a -- I don't know that

22   there's so much hard science behind it as it is a rule of

23   thumb that the industry has developed; that if you have a

24   concentration of perc in excess of 1 percent of its solubility

25   limit, which in this case would be 240,000 micrograms per

1    liter, or parts per billion, 1 percent of that is 2,400.  So

2    groundwater above 2,400 would be viewed as indicative of a

3    possible release of perc in a DNAPL form that affected the

4    groundwater.

5    Q    Okay.  The third one is readings on an ECD instrument

6    used with a membrane interface probe.  Can you describe that a

7    little bit more for us?

8    A    It's essentially a probe that's driven into the ground

9    with a hydraulic ram.  On it is an instrument which heats the

10   soil, and they measure the vapors coming off of the soil, and

11   that's run through a detector, and it produces a strip chart

12   that looks a little bit like a seismograph or an

13   electrocardiogram.  You're looking for the deviation of a

14   needle on a chart.

15        When it encounters a chlorinated solvent like perc, the

16   detector will read a higher value, and you'll get a deflection

17   of the needle, and so you have to calibrate the individual

18   detectors to the chemicals.  But in this case, they used that

19   kind of mapping, driving probes into the ground and looking

20   for the deviation on this strip chart, as indicative of where

21   they may have a DNAPL-like condition.

22   Q    Do any one of these indicators alone provide conclusive

23   evidence that there's DNAPL there?

24   A    I think the only one that is clear and unambiguous that

25   you have a local DNAPL source would be the concentration in

1    the soil.  When you pull a soil sample out of the ground and

2    it's tested in the lab and you have something in excess of 189

3    parts per million, there's no doubt you have a DNAPL perc

4    condition in that soil right there in that local area.

5        The other two indicators that are used, I think, are more

6    ambiguous as to whether you have a local source or potentially

7    a source that is somewhere else that you're seeing downstream.

8        And in the case of the MIP log, some of the data that has

9    been seen at the site suggests that it may give a response

10   that might look like DNAPL even though concentrations don't

11   really rise to a level that a DNAPL is likely present.

12       So of the three, certainly the first one, concentration

13   in soil, is the most clear and unambiguous.  I'd say the

14   second most reliable is the concentration in groundwater, and

15   the third most reliable is the MIP log.

16   Q    Okay.  Well, let's look at the concentration --

17              THE REPORTER:  I'm sorry.  I'm sorry.

18              The second is the?

19              THE WITNESS:  Concentration in groundwater.

20              THE REPORTER:  Okay.  And the third?

21              THE WITNESS:  The MIP log.

22              THE REPORTER:  Thanks.

23              THE WITNESS:  I'm sorry; I'll try to speak a little

24   slower.

25              THE REPORTER:  It's the end of the day.

1          THE WITNESS:  It is.

2          THE COURT:  Yeah.  Your fingers are about to fall

3    off, kid.

4          Let's, let's take a recess for this evening.

5          Ladies and gentlemen, we'll be in recess until 8:30

6    in the morning.

7          I give you the usual admonition.  Keep an open mind

8    about the case.  Don't talk to anybody, even amongst

9    yourselves, until you get it in the jury room.

10          8:30 in the morning.

11          THE LAW CLERK:  All rise.

12       (Jury not present.)

13          THE COURT:  Have a seat.

14          Tell me, insurers, what is the purpose of the Simko

15    deposition?  What is the relevance?

16          MR. JOHNSON:  Your Honor, we just filed a brief on

17    this.  We're filing a brief right now.

18          THE COURT:  You did file a brief?

19          MR. JOHNSON:  Yeah, we're filing a brief.  It should

20    be filed by now.

21          MR. MICKELSON:  Or by 5.

22          MR. JOHNSON:  Or by 5.

23          THE COURT:  Oh.  Well, I'm going to deny the motion

24    to prevent the reading of Brill or Kjos.  The only one I'm

25    wondering about is Simko.  I have no idea.  Maybe your brief

1    will enlighten me.

2              MR. JOHNSON:  I hope so, Your Honor.

3              THE COURT:  Maybe it will show me that it's not

4    going to be cumulative, too.  I think the jury, as well as I

5    am, is getting tired of hearing the same things.

6              How many more witnesses, Counsel, after this?

7              MR. COZZENS:  He's our last one.

8              MR. LYNCH:  He's our last one, Your Honor.

9              THE COURT:  Okay.  Let's go to the house.

10             THE LAW CLERK:  All rise.

11             THE COURT:  That's slang for we're in recess.

12        (Proceedings were recessed at 16:50:36.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  VOLUME 4 REPORTER'S CERTIFICATE

2              I, JoAnn Corson Bacheller, a Registered Diplomate

3    Reporter and Certified Realtime Reporter, certify that the

4    foregoing transcript is a true and correct record of the

5    proceedings given at the time and place hereinbefore

6    mentioned; that the proceedings were reported by me in machine

7    shorthand and thereafter reduced to typewriting using

8    computer-assisted transcription; that after being reduced to

9    typewriting, a certified copy of this transcript will be filed

10   electronically with the Court.

11             I further certify that I am not attorney for, nor

12   employed by, nor related to any of the parties or attorneys to

13   this action, nor financially interested in this action.

14             IN WITNESS WHEREOF, I have set my hand at Billings,

15   Montana this 27th day of April, 2010.

16

17                              /s/ JoAnn Corson Bacheller

18                              _____
                                JoAnn Corson Bacheller
19                              United States Court Reporter

20

21

22

23

24

25