1  JoAnn Corson Bacheller
   Registered Diplomate Reporter
2  Certified Realtime Reporter
   P. O. Box 1424
3  Billings, Montana 59103-1424
   406/247-4477 office
4  406/247-7008 fax
   joann_bacheller@mtd.uscourts.gov
5
   United States Court Reporter
6

7

8           IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MONTANA
9                   BILLINGS DIVISION

10
   UNITED STATES FIDELITY        )
11 AND GUARANTY COMPANY,         )
                                 )  Nos. CV-04-29-BLG-RFC
12                 Plaintiff,)       CV-08-29-BLG-RFC
        and                      )
13                               )  **VOLUME 5**
   THE CONTINENTAL INSURANCE     )  **TRANSCRIPT OF JURY TRIAL**
14 COMPANY,                      )
              Plaintiff Intervenor,)
15      vs.                      )
                                 )
16 SOCO WEST, INC.,              )
                   Defendant.)
17 _____)

18

19        **BEFORE THE HONORABLE RICHARD F. CEBULL**
          **CHIEF UNITED STATES DISTRICT COURT JUDGE**
               **FOR THE DISTRICT OF MONTANA**
20

21      James F. Battin United States Courthouse
               316 North 26th Street
22              Billings, Montana 59101
               Friday, March 12, 2010
               08:33:50 to 16:19:22
23

24
           Proceedings recorded by machine shorthand
25    Transcript produced by computer-assisted transcription

1                          **APPEARANCES**

2   For the Plaintiff:                MR. ROBERT C. JOHNSON
                                      MR. JOHN I. GROSSBART
3                                     MS. WENDY N. ENERSON
                                      Attorneys at Law
4                                     8000 Sears Tower
                                      233 South Wacker Drive
5                                     Chicago, Illinois 60606

6                                     MR. MARSHAL L. MICKELSON
                                      Attorney at Law
7                                     P. O. Box 509
                                      Butte, Montana 59703
8
    For the Plaintiff                 MR. BRIAN W. WALSH
9   Intervenor:                       Attorney at Law
                                      Suite 330
10                                    555 Mission Street
                                      San Francisco, California 94105
11
                                      MR. STEVEN M. CRANE
12                                    Attorney at Law
                                      Suite 1500
13                                    515 South Figueroa Street
                                      Los Angeles, California 90017
14
                                      MR. MAXON R. DAVIS
15                                    Attorney at Law
                                      P. O. Box 2103
16                                    Great Falls, Montana 59403

17  For the Defendant:                MR. CHRISTOPHER L. LYNCH
                                      MR. PAUL A. BANKER
18                                    Attorneys at Law
                                      4200 IDS Center
19                                    80 South Eighth Street
                                      Minneapolis, Minnesota 55402
20
                                      MR. LAWRENCE B. COZZENS
21                                    Attorney at Law
                                      Suite 104
22                                    1643 24th Street West
                                      Billings, Montana 59102
23
    Also present for                  MS. JULIANNE ROHM
24  graphics display:                 MR. NEIL BAILEY

25

1

**CONTENTS**

Volume/Page

2

**Volume 1 Proceedings** ................................ 1/   16
3    *Voir Dire* Examination
        By the Court ................................... 1/   43
4        By Mr. Cozzens ............................... 1/  101
        By Mr. Mickelson ............................. 1/  114
5        By Mr. Davis ................................. 1/  131
    Selection of Jury .................................. 1/  147
6    Instructions to Jury ............................... 1/  150
    Opening Statement by Mr. Cozzens ................... 1/  160
7    Opening Statement by Mr. Johnson ................... 1/  185
    Opening Statement by Mr. Davis ..................... 1/  200
8    Volume 1 Reporter's Certificate .................... 1/  251

9    **Volume 2 Proceedings** ................................ 2/  267
    Volume 2 Reporter's Certificate .................... 2/  554
10

    **Volume 3 Proceedings** ................................ 3/  570
11    Volume 3 Reporter's Certificate .................... 3/  829

12    **Volume 4 Proceedings** ................................ 4/  845
    Volume 4 Reporter's Certificate .................... 4/ 1101
13

    **Volume 5 Proceedings** ................................ 5/ 1117
14    Defendant Rests .................................... 5/ 1334
    Plaintiffs' Motion for Judgment .................... 5/ 1334
15    Order of Court Reserved ............................ 5/ 1337
    Volume 5 Reporter's Certificate .................... 5/ 1339
16

    **Volume 6 Proceedings** ................................ 6/ 1355
17    Volume 6 Reporter's Certificate .................... 6/ 1610

18    **Volume 7 Proceedings** ................................ 7/ 1626
    Order of Court re: Plaintiffs' Motion for Judgment .. 7/ 1870
19    Volume 7 Reporter's Certificate .................... 7/ 1879

20    **Volume 8 Proceedings** ................................ 8/ 1895
    Plaintiffs Rest .................................... 8/ 1904
21    Defendant's Motion for Judgment .................... 8/ 2010
    Order of Court re: Defendant's Motion for Judgment .. 8/ 2018
22    Plaintiffs' Motion for Judgment Renewed ............. 8/ 2018
    Order of Court re: Plaintiffs' Motion for Judgment .. 8/ 2018
23    Settlement of Instructions ......................... 8/ 2019
    Volume 8 Reporter's Certificate .................... 8/ 2072

24

25

1                    **CONTENTS  (Continued)**

                                              **Volume/Page**
2

**Volume 9 Proceedings** ................................  9/ 2088
3   Instructions to Jury ................................  9/ 2092
    Closing Argument by Mr. Banker ......................  9/ 2105
4   Closing Argument by Mr. Johnson .....................  9/ 2137
    Closing Argument by Mr. Davis .......................  9/ 2159
5   Rebuttal Closing Argument by Mr. Banker .............  9/ 2171
    Jury Verdict ........................................  9/ 2186
6   Volume 9 Reporter's Certificate .....................  9/ 2190

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24          REPORTER'S NOTE:  "Uh-huh" and "Um-hmm" indicate
    affirmative responses.  "Huh-uh" and "Hm-umm" indicate
25   negative responses.

1                                    **WITNESSES**

2      **For the Defendant:**                               **Volume/Page**

3      Mr. Dennis Allen St. George
            Direct Examination by Mr. Banker ................ 1/   211
4          Cross-Examination by Mr. Johnson ................ 1/   239
            Cross-Examination by Mr. Davis .................. 1/   248
5          Redirect Examination by Mr. Banker .............. 1/   249

6      Mr. James Sullivan
            Direct Examination by Mr. Lynch ................. 2/   276
7          Cross-Examination by Mr. Grossbart .............. 2/   316
            Redirect Examination by Mr. Lynch ............... 2/   358
8
       Mr. Richard Allen Colver
9          Direct Examination by Mr. Cozzens ............... 2/   367
            Cross-Examination by Mr. Johnson ................ 2/   403
10         Redirect Examination by Mr. Cozzens ............. 2/   484

11     Mr. Rodney Hallsten
            Direct Examination by Mr. Banker ................ 2/   490
12         Cross-Examination by Mr. Grossbart .............. 2/   514
            Cross-Examination by Mr. Davis .................. 2/   551
13         Redirect Examination by Mr. Banker .............. 2/   552

14     Mr. Monte I. Naff
            Direct Examination by Mr. Cozzens ............... 3/   570
15         Cross-Examination by Mr. Johnson ................ 3/   610
            Cross-Examination by Mr. Davis .................. 3/   702
16         Redirect Examination by Mr. Cozzens ............. 3/   718

17     Mr. Charles Bender (deposition)
            Examination ..................................... 3/   738
18
       Mr. Desmond Slater (deposition)
19         Examination ..................................... 3/   763

20     Mr. Larry Nelson (deposition)
            Examination ..................................... 3/   802
21
       Mr. Marvin Johnson
22         Direct Examination by Mr. Cozzens ............... 4/   846
            Cross-Examination by Mr. Johnson ................ 4/   863
23
       Mr. Douglas Johnston
24         Direct Examination by Mr. Banker ................ 4/   867
            Cross-Examination by Mr. Grossbart .............. 4/   898
25         Cross-Examination by Mr Davis ................... 4/   921
            Redirect Examination by Mr. Banker .............. 4/   924

1                         **WITNESSES (Continued)**

2    **For the Defendant:**                              Volume/Page

3    Mr. David Warne
          Direct Examination by Mr. Banker ................ 4/  925
4         Cross-Examination by Mr. Davis ................. 4/  953
          Redirect Examination by Mr. Banker ............. 4/  987
5
     Ms. Suzanne Miller
6         Direct Examination by Mr. Cozzens .............. 4/  992
          Cross-Examination by Mr. Crane ................. 4/ 1030
7         Redirect Examination by Mr. Cozzens ............ 4/ 1067

8    Robert Leslie Powell, Ph.D.
          Direct Examination by Mr. Lynch ................ 4/ 1068
9         Direct Examination (Continued) by Mr. Lynch ..... 5/ 1118
          Cross-Examination by Mr. Grossbart ............. 5/ 1213
10        Cross-Examination by Mr. Davis ................. 5/ 1301
          Redirect Examination by Mr. Lynch .............. 5/ 1319
11
     **For the Plaintiffs:**
12
     Mr. Marvin Johnson (deposition)
13        Examination ................................... 6/ 1356

14   Mr. Ken Kjos (deposition)
          Examination ................................... 6/ 1471
15
     Ms. Kristen Kohler Stout
16        Direct Examination by Mr. Johnson .............. 6/ 1537
          Cross-Examination by Mr. Lynch ................. 6/ 1593
17        Redirect Examination by Mr. Johnson ............ 6/ 1607

18   Peter Shanahan, Ph.D.
          Direct Examination by Mr. Grossbart ............ 7/ 1626
19        Cross-Examination by Mr. Lynch ................. 7/ 1704
          Redirect Examination by Mr. Grossbart .......... 7/ 1721
20
     Mr. Richard Brill (deposition)
21        Examination ................................... 7/ 1728

22   Yaron M. Sternberg, Ph.D.
          Direct Examination by Mr. Crane ................ 7/ 1774
23        Cross-Examination by Mr. Lynch ................. 7/ 1805
          Redirect Examination by Crane ................. 7/ 1826
24

25


                              1107

1

**WITNESSES (Continued)**

2

**For the Plaintiffs:**                                    **Volume/Page**

3
Bruce Edwin Dale, Ph.D.
        Direct Examination by Mr. Davis ................. 7/ 1831
4       Cross-Examination by Mr. Lynch .................. 7/ 1862
        Redirect Examination by Mr. Davis .............. 7/ 1866
5

6       **For the Defendant in Rebuttal:**

Wayne Martin Grip
7       Direct Examination by Mr. Lynch ................. 8/ 1905
        Cross-Examination by Mr. Johnson ................ 8/ 1954
8       Redirect Examination by Mr. Lynch .............. 8/ 1995

9   Robert Leslie Powell, Ph.D.
        Direct Examination by Mr. Lynch ................. 8/ 1999
10      Cross-Examination by Mr. Crane .................. 8/ 2005

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    **EXHIBITS**

2      **Exhibit No.**                          **Received Volume/Page**

3      5       09/05/89 Letter to Hol from Johnson ........ FPT/   56

4      30      09/11/85 Memo to Managers of All Plants from
               Q. Dyce  .................................. FPT/   56
5
       72      11/04/75 Daily sales report to Bender,
6              Hallsten, Don, Grady, and Naff from Q. Dyce.  2/  536

7      90      05/29/86 Sales report .....................  3/  697

8      143     02/26/82 Continental General Liability
               Survey Report form ........................ FPT/   23
9
       231     06/15/00 Letter to USF&G from Whalen ....... FPT/   24
10
       234     09/25/00 Letter to Downing from
11             Mielenhausen .............................. FPT/   24

12     352     04/08/74 Memo to Bender from Whaley ........ FPT/   28

13     353     09/27/72 Memo to Murray from Q. Dyce ....... FPT/   57

14     359     09/11/85 Memo from Q. Dyce ............... FPT/   28

15     362     09/13/89 Memo to Q. Dyce from Naff ......  FPT/ 28, 57

16     366     Warning label for perchloroethylene and
               instructions on empty container handling
17             and reuse ................................. FPT/   57

18     382     11/05/92 Montana Department of Health Field
               Investigation Report .....................  4/  975
19
       383     07/23/00 Letter to Rowe from Miller ........ FPT/   29
20
       429     06/09/98 E-mail between Warne and Naff .....  3/  668
21
       433     12/16/99 Letter to G. Staarjes from USEPA .. FPT/   58
22
       436     01/06/99 E-mail between Miller and Warne ... FPT/   58
23
       442     08/06/96-08/09/00 Containment pit runoff
24             water sampling ............................  4/ 1059

25     445     03/16/73 USF&G Advertising ................ FPT/   30

1                              **EXHIBITS  (Continued)**

2       **Exhibit No.**                                **Received Volume/Page**

3       499      11/04/75 Aerial photograph ................. FPT/    31

4       505      02/23/82 Continental General Liability Survey
                 Report ................................... FPT/    31
5
        784      08/21/95 Handwritten notes ................ FPT/    58
6
        785      08/18/95 Memo to Naff, Hilton, Biondo,
7                Gilbert, Akers and Liebling from Simko ..... FPT/    58

8       856A     09/25/89 Versar Inc. Environmental Risk
                 Assessment Survey ...................... FPT/ 32, 58
9
        859      07/24/89 Draft letter to Hol from Johnson .. FPT/    59
10
        1104     09/08/05 Letter to O'Reilly from Terp ...... FPT/    32
11
        2532     11/1975 Aerial photograph ................. FPT/    32
12
        2533     11/04/75 Aerial photograph ................. FPT/    32
13
        2545     12/30/05 Bulk Handling and Properties of PPG
14               Chlorinated Solvents:  Perchloroethylene,
                 Trichloroethylene, Tri-Ethane .............. FPT/    59
15
        2558     04/07/04 Letter to O'Reily from Sullivan ...   2/   293
16
        3004     08/23/00 Letter to Rowe from Miller ........ FPT/    32
17
        3006     08/27/72 Aerial photograph ................. FPT/    32
18
        3015     07/1995 HCI Dyce site plan ................ FPT/    32
19
        3017     01/1983 Dyce personnel manual ............. FPT/    33
20
        3024     10/29/85 Company policy re: hoses .........   4/   888
21
        3025     07/02/87 Memo to Dick, Russ, Bob, Kevin,
22               Ivan, John and File from Roger ............ FPT/    36

23      3029     1986-2001 Dyce manager's monthly report ....   8/  1896

24      3043     11/29/99 Lockheed Martin Final Report ......   1/    37

25

1

**EXHIBITS (Continued)**

2

**Exhibit No.**                                          **Received Volume/Page**

3     3044     12/16/99 USEPA First Request for Information
               Pursuant to 104(e) ......................... FPT/     37

4

      3045     03/01/00 Dyce Response to First 104(e)
5              Request ................................... FPT/      37

6     3047     08/23/00 Letter to Naff from Risner &
               Kercher ................................... FPT/      37

7

      3048     08/23/00 Dyce Supplemental Response to
8              USEPA's Second 104(e) Request ............. FPT/      37

9     3049     10/03/00 Maxim Technologies Inc. Site
               Investigation Report ...................... FPT/      38

10

      3050     06/2003 Tetra Tech EM Inc. Remedial
11             Investigation Report for MDEQ ............. FPT/      39

12    3051     07/07/04 Tetra Tech Final Feasibility Study
               Report for MDEQ ........................... FPT/      39

13

      3052     11/2004 MDEQ/USEPA Proposed Remedial Action
14             Plan for Lockwood Groundwater Solvent
               Plume Site ................................ FPT/      39

15

      3058     12/2003 Tetra Tech Addendum 01 to the Final
16             Remedial Investigation Report for MDEQ ..... FPT/     39

17    3059     08/2005 MDEQ/USEPA Record of Decision for
               Lockwood Solvent Groundwater Plume Site .... FPT/     39

18

      3060     02/28/06 Letter to Terp from Risner &
19             Kercher ................................... FPT/      40

20    3102     09/16/85 Memo to Colver ................... FPT/      41

21    3115     11/25/92 Letter and permit application to
               Lincoln from Diede ........................ FPT/      42

22

      3174     06/09/00 Letter to Webster from Miller ..... FPT/     43

23

      3175     06/12/00 Letter to Miller from Webster ..... FPT/     43

24

      3178     07/25/00 Fax to Stevenson from Miller ...... FPT/     43

25

1                        **EXHIBITS  (Continued)**

2    **Exhibit No.**                        **Received Volume/Page**

3    3191    11/13/03 ATC Associates Inc. Soil and
             Groundwater Data Remedial Design Investigation
4            Report ................................... FPT/    43

5    3200    Compilation:  USF&G Policy No. SMP326188 ... FPT/    44

6    3201    Compilation:  USF&G Policy No. 1CC599480 ... FPT/    44

7    3202    Compilation:  USF&G Policy No. SMP406309 ... FPT/    44

8    3203    Compilation:  USF&G Policy No. 1CC944574 ... FPT/    44

9    3204    Compilation:  USF&G Policy No. CEP64280 .... FPT/    44

10   3205    Compilation:  USF&G Policy No. 1CC945882 ... FPT/    44

11   3206    Compilation:  USF&G Policy No. CEP64348 .... FPT/    44

12   3207    Compilation:  USF&G Policy No. SMP535107 ... FPT/    44

13   3208    Compilation:  USF&G Policy No. SMP576121 ... FPT/    44

14   3209    Compilation:  USF&G Policy No. 1CCA31253 ... FPT/    44

15   3210    Compilation:  USF&G Policy No. CEP84958 .... FPT/    44

16   3211    Compilation:  USF&G Policy No. SMP594660 ... FPT/    44

17   3213    Compilation:  USF&G Policy No. CEP104806 ... FPT/    44

18   3214    Compilation:  USF&G Policy No. SMP654057 ... FPT/    44

19   3216    Compilation:  USF&G Policy No. CEP114516 ... FPT/    44

20   3217    Compilation:  USF&G Policy No. SMP772986 ... FPT/    44

21   3219    Compilation:  USF&G Policy No. CEP114641 ... FPT/    44

22   3220    03/03/06 Stipulation as to Existence and
             Content of USF&G Insurance Policies ........ FPT/    44
23
     3287    02/28/05 Letter to Terp from Risner &
24           Kercher ................................... FPT/    48

25


                            1112

1

**EXHIBITS (Continued)**

2

**Exhibit No.**                                    **Received Volume/Page**

3  3321   03/03/06 Stipulation as to Existence and
         Content of Continental Insurance Policies
4        and Exhibits ............................. FPT/   49

5  3363   09/29/89 Agreement to Purchase Real
         Property ................................  8/ 1903
6
   3407   1971 Chemical Safety Data Sheet for
7         perchloroethylene ......................  FPT/ 49, 61

8  3408   1972 Hooker Chemical MSDS for
         trichloroethylene ......................... FPT/   49
9
   3410   1980 PPG manual .......................... FPT/   50
10
   3420   05/25/00 Second Request for Information
11        Pursuant to Section 104 of CERCLA for the
         Lockwood Solvent Site Billings ............  3/  676
12
   3433   1983 Dyce brochure ....................... FPT/   50
13
   3436   11/1979 Ledger sheet .....................   3/  622
14
   3438   04/1971 Perchloroethylene brochure ......  FPT/ 50, 61
15
   3471   08/05/85 Sales report ....................   3/  591
16
   3475   02/06/84 Dyce policies re: DOT ............ FPT/   50
17
   3476   06/02/79 Expense Report ...................   3/  585
18
   3483   Aerial photograph ......................... FPT/   51
19
   3484   Aerial photograph ......................... FPT/   51
20
   3485   Aerial photograph ......................... FPT/   51
21
   3486   Aerial photograph ......................... FPT/   51
22
   3487   Aerial photograph ......................... FPT/   51
23
   3488   Aerial photograph ......................... FPT/   51
24
   3490   1972 Aerial photograph .................... FPT/   51
25

```
 1                        EXHIBITS (Continued)

 2   Exhibit No.                          Received Volume/Page

 3   3491    1981 Aerial photograph ..................... FPT/   51

 4   3492    1987 Aerial photograph ..................... FPT/   51

 5   3660    09/09/09 Dale photographs ..................   2/  318

 6   3674    Site photographs taken by Hargis ...........   8/ 2040

 7   3800    05/27/57 Aerial photograph ................. FPT/   52

 8   3801    06/26/66 Aerial photograph ................. FPT/   52

 9   3802    05/22/69 Aerial photograph ................. FPT/   52

10   3803    08/18/71 Aerial photograph ................. FPT/   52

11   3804    04/23/72 Aerial photograph ................. FPT/   52

12   3805    Circa 1973 Aerial photograph ............... FPT/   52

13   3806    06/18/74 Aerial photograph ................. FPT/   52

14   3807    11/04/75 Aerial photograph ................. FPT/   52

15   3808    06/23/77 Aerial photograph ................. FPT/   52

16   3809    09/06/77 Aerial photograph ................. FPT/   52

17   3810    05/03/79 Aerial photograph ................. FPT/   52

18   3811    05/14/79 Aerial photograph ................. FPT/   52

19   3812    07/31/79 Aerial photograph ................. FPT/   52

20   3813    03/13/81 Aerial photograph ................. FPT/   52

21   3814    06/02/81 Aerial photograph ................. FPT/   52

22   3815    08/24/81 Aerial photograph ................. FPT/   52

23   3816    05/27/83 Aerial photograph ................. FPT/   52

24   3817    07/27/83 Aerial photograph ................. FPT/   52

25   3818    04/30/87 Aerial photograph ................. FPT/   52
```

1114

1                          **EXHIBITS  (Continued)**

2    **Exhibit No.**                         **Received Volume/Page**

3    3826    08/08/05 Response to 06/24/05 CERCLA 104(e). FPT/    53

4    3827    02/14/05 Letter to Moskowitz from
             Mielenhausen ............................ FPT/    53
5
     3828    02/15/05 Letter to Walsh from Mielenhausen . FPT/    53
6
     3886    06/15/00 Letter to Continental from Whalen . FPT/    55
7
     3887    09/25/00 Letter to Giblin from Mielenhausen. FPT/    55
8
     3888    01/08/07 Second stipulation as to existence
9            and content of USF&G insurance policies .... FPT/    55

10   4027    Aerial photograph (D032604) ...............    4/   848

11   4032    10/10/00 Communication to Gilbert from
             Simko .....................................    3/   691
12
     4039    09/13/89 Memo to Q. Dyce from Hallsten .....    8/ 1903
13
     4044    07/1976 Location Survey of Dyce site ....... FPT/    62
14
     4087    01/06/99 E-mail to Warne from Hallsten .....    2/   547
15
     4089    02/29/00 E-mail to Naff from Warne .........    4/ 1066
16
     4143    Aerial photograph .........................    6/ 1485
17
     4320    1980 Bulk Handling and Properties of PPG
18           Chlorinated Solvents ...................... FPT/    63

19   4400    01/14/05 Fax to LeCours from Sullivan ......    2/   335

20   4516    09/12/02 Letter to EPA from Sullivan .......    2/   354

21   4721    08/18/03 Fax to MDEQ from Sullivan .........    2/   308

22   4757    08/03/04 Letter to Sullivan from MDEQ ......    2/   313

23   4811    04/28/03 Letter to Ross from Sullivan ......    2/   342

24   4822    07/20/00 E-mail to Miller from Naff ........ FPT/    64

25

1                              **EXHIBITS (Continued)**

2      **Exhibit No.**                                **Received Volume/Page**

3      4831      Exhibit 5017 aerial photograph with Colver
                 notations ................................  2/   483
4
       4832      Exhibit 5019 aerial photograph with Colver
5                notations ................................  2/   483

6      4833      Exhibit 5024 aerial photograph with Colver
                 notations ................................  2/   483
7
       4834      Exhibit 5028 aerial photograph with Colver
8                notations ................................  2/   483

9      4835      04/30/86 General manager's monthly report ..  4/   899

10     5000-
       5064      Historical photographs .....................  2/   267
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1

2          (Open court.)

3          (Jury not present.)

4                MR. COZZENS:  There's a housekeeping matter to

5    discuss first.

6                THE COURT:  What?

7                MR. COZZENS:  It has to do with their designations

8    of the portions of the deposition of Marvin Johnson they want

9    to play today.

10               THE COURT:  Be seated.

11               I read the briefs.  I like this statement in your

12   brief, "The insurers elected to cross-examine Johnson on

13   matters within the scope of his direct, and they have now

14   waived their ability to elicit further testimony on subjects

15   that they could have asked about but did not."

16               I don't really know what that means.

17               MR. COZZENS:  Can I explain that?

18               THE COURT:  No.  I laid down the rule that you're

19   not going to rehash what you did on cross, which was not very

20   much.

21               MR. JOHNSON:  The only thing I asked was about dates

22   of employment.  We've taken dates of employment out of the

23   tape we're going to play.

24               THE COURT:  I am denying the motion --

25               MR. JOHNSON:  Thank you, Your Honor.

1117

1           THE COURT:  -- on the Marvin Johnson motion to

2    exclude certain designated deposition testimony.

3           And then I just found out that I didn't -- I guess I

4    haven't gotten through Richard Brill's depo, but I will do

5    that during this -- I'll have it done here in short order.

6           MR. JOHNSON:  Thank you, Your Honor.

7        (Jury present.)

8           THE COURT:  Good morning, ladies and gentlemen.

9    Please sit.

10          All right.  I think, Mr. Lynch, you were in direct

11   exam.

12          MR. LYNCH:  Yes, Your Honor.

13          While we're waiting, Julianne, could you please pull

14   up Illustrative DD136?

15          DOCUMENT TECHNICIAN:  (Complied with request.)

16          WHEREUPON,

17              ROBERT LESLIE POWELL, Ph.D.,

18   called for examination by counsel for defendant, after having

19   been previously sworn to testify the truth, the whole truth,

20   and nothing but the truth, testified as follows:

21              DIRECT EXAMINATION (Continued)

22   BY MR. LYNCH:

23   Q    Good morning, Dr. Powell.

24   A    Good morning.

25   Q    When we left off yesterday, you were telling us about

1118

1    some of the indicators that the government contractors had

2    used to try to find and identify the DNAPL source areas on the

3    Dyce Chemical property.  I'd like to briefly continue with

4    that.

5         I believe you said that soil concentrations are the most

6    reliable indicator of the local source of DNAPL; is that

7    correct?

8    A    That's correct.

9    Q    And why is that?

10   A    EPA computed a concentration that would be at a level

11   that it would have been impossible to achieve this much or to

12   see this much perc in the soil unless there was a DNAPL

13   present.  What they essentially assumed is that the soil was

14   completely saturated, the water in the soil contained perc at

15   its solubility limits, so the maximum amount that you could

16   ever dissolve in the water, and that the perc from the water

17   then also absorbs into the soil, because the soil is like a

18   sponge.  It will soak up some of the perc out of the water.

19   And with all of that, they computed what would be that

20   threshold level, and that is the 189 parts per million that

21   they computed.

22        If there is more than that there, it is more than water

23   and soil can hold without there being a DNAPL-phase, without

24   there being pure perc also in the soil, so they use that as a

25   threshold for identification of perc.  In my experience,

1    that's quite a high level.  If you have levels up in the 200

2    ppm or higher, it's almost a dead certainty you have a perc

3    condition, a DNAPL condition of perc in the soil.

4    Q     Dr. Powell, in addition to looking at soil

5    concentrations, do you also look at the mixture or the variety

6    of chemicals that are found in the soil?

7    A     Well, that's certainly a factor in this case.  When

8    you're looking at the soil in the northwest corner, it is

9    unique as compared to other areas of the site in that it

10   contains only perc and its degradation products.  It doesn't

11   contain the other chemicals that the facility was handling and

12   that you find in other parts of the property.

13   Q     Let's turn to groundwater, then.  I believe you said

14   groundwater is the next most reliable indicator.  What makes

15   it not as good as soil as an indicator of a local DNAPL

16   source?

17   A     The indicator they use for groundwater is the

18   concentration of the chemical in water as compared to its

19   solubility limit.  The solubility limit for perc -- and I

20   believe, Mr. Lynch, we have a demonstrative to show that will

21   help me.

22            MR. LYNCH:  Julianne, would you please pull up

23   DD137?

24            DOCUMENT TECHNICIAN:  (Complied with request.)

25            THE WITNESS:  This is essentially a bar chart.  The

1    left side of the chart would indicate a region in which there

2    is low concentrations of perc in the water.  As you go left to

3    right, the concentrations are increasing.  The solubility

4    limit of perc in water is 240 parts per million, or 240,000

5    parts per billion.  One percent of that is 2,400 parts per

6    billion, and that's what you see here as the first region on

7    the bar chart.

8         One percent of the solubility limit is considered to

9    be an indicator of a DNAPL-like condition in the soil.

10   There's enough contamination in the soil that, when it

11   contacts groundwater, it can cause these levels of

12   contamination.  Anything less than that, and it's unlikely

13   you'd have a DNAPL condition.

14        In my own experience, I would say at that point it's

15   certainly possible but not absolute certainty that a DNAPL

16   condition exists.  As you move up the bar chart to even higher

17   concentrations, to 10 percent, for example, of the solubility

18   limit, a possibility becomes a very high probability that

19   there is a DNAPL condition.  Certainly anything over

20   10 percent of solubility limits is just about a certainty that

21   there is DNAPL in the soil that's affecting the water.

22        The reason this is not as reliable an indicator,

23   though, as the soil itself is groundwater moves.  It doesn't

24   just stay in one place, and so if you have a perc DNAPL source

25   in soil that's affecting groundwater, you're certainly going

1121

1    to see high concentrations right there in the area where the

2    soil is contaminated.  But as that groundwater moves

3    downstream and forms a plume of contamination, you'll see very

4    high levels in that plume as well.  That doesn't necessarily

5    mean that the downstream area contains DNAPL, but it means

6    that the groundwater that is in that area has been affected at

7    some point upstream by a DNAPL source.

8             As an example of that, I'm working on a site in

9    Massachusetts right now that has a very large perc DNAPL

10   source.  It was a dry well where they were disposing perc into

11   the soil, and it affected groundwater.  A thousand feet

12   downstream from that dry well, the groundwater is discharging

13   into a swamp, and we have concentrations down there of 2 to

14   10,000 parts per million, so it's in this possible, to

15   probable, to almost dead certainty range that there's a DNAPL

16   source there, but it's far removed from where the actual perc

17   was released, and we have no indication there's any disposal

18   down there, but it's clearly a high level, nonetheless.

19            So you have to be careful interpreting groundwater

20   data that it's indicative of a DNAPL release but not

21   necessarily a release in the location where the measurements

22   are being made.  It could be somewhere else further upstream.

23   And in that respect, it's not quite as definitive as the soil

24   numbers.  If there's a release in soil and you drill and test

25   the soil, you're going to see it, and it's going to be right

1    there.

2              MR. LYNCH:  You can take that down, Julianne.

3              DOCUMENT TECHNICIAN:  (Complied with request.)

4    BY MR. LYNCH:

5    Q    The third factor that EPA relied on was off-scale MIP

6    readings.  And, again, what are those?

7    A    An MIP probe is a probe that's driven into soil with a

8    hydraulic ram, and there's an instrument on the end of it, a

9    detector, and it measures an electrical signal.  And like an

10   electrocardiogram or a seismograph, it's plotting a line on a

11   chart.  And when it's getting a very strong signal, what EPA

12   calls an off-scale signal, it's indicative of high levels of

13   chlorinated compounds in the soil or in the groundwater that

14   would possibly be indicative of a perc NAPL zone or otherwise

15   just a contaminated zone with perc.  It is not as definitive

16   as the other measurements because it's not a direct

17   measurement of how much is there.  It's sort of an indirect

18   detector that indicates, "There's something there we ought to

19   go take a look at.  Let's go get a sample and see what's

20   really there," but it's not a direct measurement where it's

21   reporting the concentration of perc in the soil.

22   Q    Now, Dr. Powell, I'd like to turn to the data that was

23   gathered from the northwest corner itself and discuss how

24   these various indicators appear in that data.

25             Can you just generally describe what was found in the

1  soils in the northwest corner?

2  A    Well, in those areas where there was a DNAPL release,

3  they typically found very high concentrations of perc in the

4  soil, well above their 189 ppm threshold.  They found very

5  high concentrations in the groundwater in the monitoring wells

6  they drilled through those soils, concentrations as high as

7  30 percent or more of the solubility limit.  And they found

8  MIP logs which were off-scale, almost from the surface all the

9  way down to the bottom of the bore hole.  So all three

10  indicators that EPA was using were essentially a bright signal

11  that there's a DNAPL source here.

12  Q    And I believe we have a demonstrative on this.

13       Julianne, can you please pull up Proposed Demonstrative

14  DD139?

15           DOCUMENT TECHNICIAN:  (Complied with request.)

16  BY MR. LYNCH:

17  Q    And, Dr. Powell, could you explain this figure that's on

18  the screens?

19  A    Well, this shows illustrative data from the northwest

20  corner area at Boring MP-100 and PT-2.  They are two separate

21  borings that were very close to each other.

22       The first thing they observed when they did the testing

23  there was they did an MIP log and got an off-scale reading.

24  That's the chart that's on the right side of this

25  demonstrative, and, this, initially what was a low level here

1124

1   near the surface went off the scale, and then they charted

2   off-scale all the way to the bottom of the hole, and this is

3   the type of signature you'd expect to see if you were in a

4   DNAPL source area.  At least you would see that type of

5   signature as long as you were within the DNAPL zone.

6       They also then went in and tested soil at several

7   intervals in a bore hole right next to where this MIP log was

8   done, and they found concentrations well above the threshold

9   for DNAPL.

10      There were two samples that they collected.  These are

11  both from the silty clay layer within the water table, so they

12  weren't up in the vadose zone.  They were down in the water

13  table.

14      The shallower of those two, which was collected from 6 to

15  8 feet below ground, contained over 2,000 parts per million.

16  So more than 10 times their threshold level for DNAPL.

17      The deeper sample from 10 to 12 feet contained

18  1,300 parts per million.  This sample is right at the bottom

19  of the silty clay layer, just as you're starting to break

20  through into the sand and gravel.

21      Both of them are indicative of DNAPL conditions in the

22  soil, and it shows that the DNAPL, once it was released,

23  migrated down through the vadose zone and all the way through

24  the silty clay, at least to the bottom of it, and eventually,

25  I believe, into the sand and gravel unit.

1          They also tested groundwater at this location and got

2     72,000 parts per billion.  That's 30 percent of the solubility

3     limit.  It's in a range in which it's an absolute dead

4     certainty there's a NAPL source there, or very close by.  You

5     don't see those kinds of concentrations unless you're in a

6     NAPL zone.

7          (Discussion off the record.)

8     BY MR. LYNCH:

9     Q    Dr. Powell, earlier you had mentioned -- we were talking

10    about the mixture of chemicals that were found in the

11    northwest corner.  Can you tell us, you know, what was found

12    there as far as types of variety of chemicals?

13    A    The chemicals that were found there that are of interest

14    to EPA certainly in the Superfund program are the chlorinated

15    solvents.  Perc is the main chemical that's there.  By far,

16    it's the largest mass of chemical that was there.

17         As the perc begins to dissolve into water, bacteria can

18    break it down into other chemicals; first, into

19    trichloroethylene, what we call TCE; and subsequently into

20    dichloroethene, DCE.  But that won't happen until it's

21    dissolved in the water.  The same bacteria cannot break perc

22    down as long as it's in a NAPL form.  So there are low

23    concentrations of TCE and DCE that are detected in this same

24    area, the degradation products of the perc.

25         As compared to samples further up in the property,

1126

1    though, you don't really see BTEX in this area, in the soil.

2    This is really a monochromatic, a monolithic perc problem.

3    That's really all that's there, and really it's all that's a

4    focus of the Superfund cleanup, is the perc that's there.

5    Q    And how about the location of the chemicals in the

6    subsurface?  I believe you said there were hits from shallow

7    to deep.  What was the range in the subsurface that they found

8    concentrations of perc?

9    A    The highest that I can recall in the soil sample was in

10   the range of about 2,500 parts per million.  So that's roughly

11   15 times EPA's threshold number for identifying a DNAPL zone.

12   Q    And how deep in the subsurface did they find perc in the

13   northwest corner?

14   A    The highest levels were found in the middle and lower

15   part of the silty clay unit from 4 feet down to about 12 feet

16   below ground surface.  Essentially it's in the water table

17   portion of the silty clay, not up in the vadose zone.  And

18   then lower levels were found below that in the sand and gravel

19   aquifer.

20   Q    And, Dr. Powell, the exhibit, demonstrative, you have on

21   the screen here, this is referring to two borings, you said?

22   A    Yes.  The MP-100, which is where the MIP log was done,

23   and then subsequent PT-2, which is where they drilled a soil

24   boring and installed a monitoring well.

25   Q    Okay.  And we've seen the figure from the ROD where we

1   have the green figures depicting the source areas.  The

2   northwest corner is a fairly sizable area.  Is this pattern

3   repeated throughout the entire northwest corner?

4   A    The general patterns are repeated, but they vary

5   depending on the bore hole.  This particular boring was taken

6   in an area where EPA believes there was a surface release of

7   the perc and it migrated down through the vadose zone, reached

8   the water table, and then began to spread laterally.  In other

9   portions of the northwest corner, the patterns may be slightly

10  different because they may represent, for example, lateral

11  spreading within the water table rather than percolation down

12  from the surface.  So each location may look slightly

13  different, but they all show these same characteristics of

14  high levels in the soil, high levels in the water, and strong

15  MIP signals in at least a portion of the boring.

16              MR. LYNCH:  You can take down the demonstrative.

17              DOCUMENT TECHNICIAN:  (Complied with request.)

18  BY MR. LYNCH:

19  Q    When we look at the factors you were just talking about,

20  the high concentrations in soil and groundwater, the general

21  lack of BTEX, little degradation, and the off-scale MIP

22  readings throughout the boring, when you compare that to the

23  contamination that was found in the operational portions of

24  the site, do you see the same contamination signature?

25  A    Well, you do with regard to perc.  I mean, there was perc

1128

1  found in the operational portions of the site behind the,

2  behind the drum loading shed.  And so you see the same kind of

3  characteristics:  high levels of perc in the soil, high levels

4  in groundwater, MIP signals that are strong.

5       What's different about that area, though, is there's a

6  lot of other chemicals there, too.  In particular, there's a

7  lot of BTEX there, particularly xylene, toluene, because

8  that's one of the major chemicals that they were handling in

9  that area.  And there were releases of BTEX obviously to the

10  soil that's affected that area as well.  That's distinctly

11  different than the northwest corner because you don't see

12  those high levels of BTEX and other types of chemicals in the

13  northwest corner as you do up in the operations area.

14              MR. LYNCH:  Maybe let's put up Illustrative DD104.

15              DOCUMENT TECHNICIAN:  (Complied with request.)

16              MR. LYNCH:  I'm sorry.  That's DD103, please.

17              DOCUMENT TECHNICIAN:  (Complied with request.)

18  BY MR. LYNCH:

19  Q    I believe, Dr. Powell, you were just talking about the

20  contamination that was found in the main tank farm area.  Can

21  you point out where that is shown on this figure?  And then

22  the northwest corner, can you indicate that as well?

23  A    (Complied with request.)

24  Q    Now, Dr. Powell, can you tell us what these, the pie

25  graphs on this chart represent?

1  A     The colors, as you can see in the legend down in the

2  lower left corner, are related to specific chemicals.  The

3  green, the large green circles in the northwest corner depict

4  areas in which perc, PCE, was detected at concentrations above

5  EPA's threshold for identification of the DNAPL area, and so

6  you can see there's quite a number of individual borings

7  throughout that northwest corner area where they found these

8  high levels of perc in the soil.

9       The pie chart up in the main plant area, the one in the

10 lower right-hand portion of this figure, also shows that

11 there's quite a lot of perc there in the soil.  There clearly

12 was a perc release there.  But the second most dominant

13 chemical, the yellow color, is associated with xylene.  That's

14 one of the BTEX compounds.  And so there are significant

15 quantities of BTEX there as well, and you can see by this

16 figure that that area is distinctly different than the

17 northwest corner in that it contains a richer menu of

18 chemicals, if I could put it that way.

19          MR. LYNCH:  Close out of this one, please, Julianne.

20          DOCUMENT TECHNICIAN:  (Complied with request.)

21          MR. LYNCH:  Let's pull up, then, DD105.  Blow it up,

22 please.

23          DOCUMENT TECHNICIAN:  (Complied with request.)

24 BY MR. LYNCH:

25 Q     And, Dr. Powell, can you explain what's depicted on this

1130

1    chart?  And again, contrast the northwest corner from the main

2    tank farm area.

3    A    Well, this chart is showing the concentrations of

4    chemicals dissolved in groundwater as compared, in the case of

5    perc, as compared to EPA's 1 percent of solubility threshold

6    of 2,400 ppb, so we've only shown on the chart those locations

7    where we've crossed over that threshold and it might be

8    indicative of a NAPL-like condition.

9         What the chart shows is that we have very high levels of

10   perc in the groundwater throughout the northwest corner area.

11   There are some much lower concentrations of TCE, that's the

12   light blue color, or cis-1,2-DCE, that's the darker blue

13   color.  Those are the two primary degradation products for

14   perc once it dissolves into the water.  That's what it will

15   break down into.

16        Up in the main plant area, you also have perc in the

17   water, but the concentrations are lower.  For example, down

18   towards the catch pond area, the concentrations they found of

19   perc in the water there are much lower than were found just a

20   little further downstream in the northwest corner area.

21             MR. LYNCH:  Close out of this one, Julianne.

22             DOCUMENT TECHNICIAN:  (Complied with request.)

23   BY MR. LYNCH:

24   Q    And, Dr. Powell, you just mentioned the contamination

25   found near the old catch pond area.  Is that the source area

1    EPA has identified as the acid tank farm source area?

2    A    Yes.  It's the same area.

3    Q    And I believe you said it was near the former catch pond.

4         Can we please pull up Illustrative Exhibit DD132?

5         DOCUMENT TECHNICIAN:  (Complied with request.)

6    BY MR. LYNCH:

7    Q    Can you explain what this illustrative is, Dr. Powell?

8    A    Well, these are two different aerial photographs that

9    show the catch pond area at different points in time.  The

10   photograph on the left is a picture from 1975.  It shows a

11   smaller catch pond of roughly 400 or 500 square feet in area

12   in the corner of the berm.

13        In late 1980 or early 1981, the catch pond and berm were

14   rebuilt, and you can see, in the photograph on the right, that

15   it became quite a bit larger than the earlier catch pond in

16   '75.  So it's two different views of the same area reflecting

17   that reconstruction.

18        MR. LYNCH:  Okay.  And could you close out of this

19   one and please pull up Illustrative DD082?

20        DOCUMENT TECHNICIAN:  (Complied with request.)

21   BY MR. LYNCH:

22   Q    What does this illustrative depict, Dr. Powell?

23   A    This demonstrative shows the locations of two soil

24   borings that EPA drilled in the vicinity of the catch pond

25   which were investigated -- being used to investigate for the

1   potential source of a DNAPL release.  They were wanting to

2   find out if there were DNAPL-like conditions in the soil

3   around the catch pond, so they drilled these borings.

4   Q    And this is over the 1975 configuration of the catch

5   pond; is that correct?

6   A    That's correct.

7         MR. LYNCH:  And could you please pull up DD118?

8         DOCUMENT TECHNICIAN:  (Complied with request.)

9   BY MR. LYNCH:

10  Q    And, Dr. Powell, this is a similar figure.  Is this the

11  same borings superimposed over the 1981 configuration of the

12  catch pond?

13  A    Yes, it is.

14  Q    Accurate to say, then, that both of those borings were

15  actually within the eastern side of the catch pond as it was

16  configured at this time?

17  A    Well, I think it would be accurate to say in 1975 these

18  borings would have been just off the eastern edge of the catch

19  pond, perhaps in an area where it could have overflowed but

20  not inside the pond proper.  With the expansion of the pond in

21  1981, the borings were inside the boundary of the pond.

22        MR. LYNCH:  Close that out, Julianne.

23        DOCUMENT TECHNICIAN:  (Complied with request.)

24  BY MR. LYNCH:

25  Q    And, Dr. Powell, was the contamination signature that was

1    found in those borings the same as what we just discussed that

2    was found in the northwest corner?

3    A    No, it was quite different than what was found in the

4    northwest corner.

5         MR. LYNCH:  And, Julianne, maybe pull up

6    Illustrative DD140.

7         DOCUMENT TECHNICIAN:  (Complied with request.)

8    BY MR. LYNCH:

9    Q    Can you walk us through this illustrative, Dr. Powell?

10   A    This is an exhibit that shows information from one of the

11   two borings in the catch pond, MP-105.  This is the boring

12   that led the consultants working for EPA and the remedial

13   investigation to identify this as a possible area of release

14   of perc into the soil.

15        Like in the northwest corner, they used the same types of

16   investigative techniques.  They did an MIP log, which is shown

17   on the right side.  This log is distinctly different than what

18   we saw in the northwest corner in that it didn't immediately

19   push the needle out to the far right side off scale and

20   maintain it there all the way down, and so you see a chart.

21   It's this fine line here, if I can trace it.  You see a chart

22   that, for the most part, doesn't give you much of a signal.

23   One little blip here at about this level.  And then, finally,

24   an off-scale signal right here at the very bottom of the bore

25   hole.  That off-scale signal at the bottom of the bore hole,

1   over in the northwest corner area, was exhibited top to bottom

2   from just a foot or two below the surface all the way to the

3   bottom of the bore hole.

4        So the MIP log for this area is quite different in that

5   it doesn't show nearly the level of signal that might be an

6   indication of a contamination from top to bottom as we saw

7   over in the northwest corner.

8        The other things that are distinctly different about this

9   area and this log is they went in, after doing the MIP log,

10  having identified this area where they got the first blip on

11  the log, and this deeper area, and they took samples.  In the

12  shallower of those two, they took a soil sample and tested it

13  for perc, and they found .17 parts per million.  That's a very

14  low level as compared to what they were looking for.  That's

15  only 1/1000th of their threshold for a NAPL release.  That's

16  10,000 times less than was found over in the northwest corner

17  in the highest borings that have NAPL-like conditions.  So

18  it's a relatively low level of perc.

19       It's probably indicative, because that, that sample is

20  taken at what would have been the base, the bottom soil layer

21  in the catch pond before it was filled with fly ash, it's

22  probably indicative of, sometime in the past, stormwater

23  runoff from the main plant getting to the catch pond that had

24  some amount of perc dissolved in it that then was absorbed

25  into and became part of the soil in the bottom of the pond.

1   But it's not nearly high enough to be indicative of a DNAPL

2   condition in the pond.  As I said, it's a thousand times below

3   that DNAPL threshold that they were using.

4        Deeper, they took a second sample.  At the very bottom of

5   the bore hole, so this is at the very, very bottom of the sand

6   and gravel unit, right on the top of bedrock, where they got

7   the other off-scale signal, and they found 2,960 parts per

8   billion of perc in the groundwater.  This is just slightly

9   above 1 percent of the solubility limit, so it's up into that

10  range where a DNAPL condition is possible.  Not necessarily

11  dead certain, but certainly possible.

12       This is different, though, than what was seen in the

13  northwest corner, both in terms of the concentrations that

14  were seen.  You may recall that the monitoring wells in the

15  northwest corner were showing levels as high as 72,000.  This

16  is only 2,900, so it's quite a bit less.  But it's also

17  distinctive that they only found perc in the groundwater at

18  the very bottom of the aquifer.  They didn't find any

19  indication on the MIP log that there was any contamination in

20  the shallower zones in the groundwater.

21       The reason that's important is that when you have a

22  release of perc in a DNAPL area that's at the surface, the

23  first shallow groundwater at the water table should reflect

24  that contamination, because the perc is trickling down through

25  the soil and ultimately invading the water table.  The water

1    table should be contaminated from the surface all the way down

2    to the bottom of the DNAPL zone.

3        When you see a pattern like this where the contamination

4    is deep but not shallow, it's indicative of a release that

5    probably occurred somewhere further upstream and has been

6    flowing down to this area, because as these chemical plumes

7    migrate with groundwater from the upland area down into a low

8    area, they tend to move deeper into the aquifer as they

9    migrate.  And here we only see the contamination at the bottom

10   of the aquifer.  We don't see anything at the surface of the

11   aquifer, the top of the water table.

12       That's a strong indication, I think, that there was no

13   DNAPL release in this area, but there is high levels,

14   nonetheless, in the groundwater likely reflecting a release

15   that occurred somewhere further upstream, perhaps up in the

16   tank farm area of the property.  And in that respect, I mean,

17   this condition is quite unlike what we saw over in the

18   northwest corner where there was a clear, unambiguous signal

19   of a NAPL release right there in the local soil.

20           MR. LYNCH:  Can you close out of this one and again

21   pull up Illustrative DD118?

22           DOCUMENT TECHNICIAN:  (Complied with request.)

23       (Discussion off the record.)

24   BY MR. LYNCH:

25   Q    Again, this is the borings that were taken in the catch

1    pond area.  We just got done discussing MP-105.  Now I would

2    like to take a look at what was found in MP-129.

3           And, Julianne, could you please pull up Illustrative

4    DD141?

5           DOCUMENT TECHNICIAN:  (Complied with request.)

6    BY MR. LYNCH:

7    Q    Would you explain what this is, please, Dr. Powell?

8    A    This is an MIP log that EPA collected from Boring 129,

9    which was in the same footprint in the catch pond.  As the

10   first bullet says, there was no meaningful response.  You can

11   see the chart here is essentially a flat line.  No signal of

12   any note from the surface all the way down to the bottom of

13   the bore hole.  There was so little of interest on this, this

14   MIP log that EPA decided it wasn't worth their time and money

15   to spend sampling the soil or the groundwater, so this

16   essentially is a signal that there is no contamination here,

17   certainly no perc contamination or DNAPL levels of perc

18   contamination.

19   Q    I think you probably covered most of this, but just for

20   comparison sake, Julianne, can you please pull up DD140?  I'm

21   sorry; that's DD143.

22          DOCUMENT TECHNICIAN:  (Complied with request.)

23   BY MR. LYNCH:

24   Q    And obviously, Dr. Powell, this is labeled comparison of

25   the borings found from the northwest corner and the catch pond

1    areas.  Can you just again briefly describe what the

2    differences are?

3    A    Well, this just contrasts what we saw in a clear DNAPL

4    release area that's MP-100 on the right side.  Top to bottom,

5    strong signal in the MIP log.  High concentrations in the

6    soil.  Though it's not shown on this log, very high

7    concentrations in the groundwater.  As contrasted to MP-105 in

8    the catch pond area, where there's a more erratic signal,

9    generally a low signal where the tested soil concentrations

10   were very low.  And where they found contamination of the

11   groundwater, it was only at the very bottom of the bore hole.

12            MR. LYNCH:  You can close out of that, Julianne.

13            DOCUMENT TECHNICIAN:  (Complied with request.)

14   BY MR. LYNCH:

15   Q    And Dr. Powell, in review of the material in connection

16   with this case, did you review any historical sampling from

17   the catch pond area that also informs your opinion as to

18   whether that is a local DNAPL source?

19   A    Yes.  Sometime around 1985, Dyce had a local contractor,

20   local consultant, come in and do some sampling --

21   Q    Perhaps I could pull up --

22   A    -- sampling of sediments in the catch pond.

23            MR. LYNCH:  Perhaps we could pull up Exhibit 856A.

24   And go to page 2, please.

25            DOCUMENT TECHNICIAN:  (Complied with request.)

1   BY MR. LYNCH:

2   Q    Dr. Powell, this is an exhibit we looked at with Monte

3   Naff the other day.

4        Could you please turn to page 68 of this exhibit?

5            DOCUMENT TECHNICIAN:  (Complied with request.)

6   BY MR. LYNCH:

7   Q    And, Dr. Powell, this is one of the pages from the

8   exhibit that Monte Naff discussed, and it showed some results

9   of some samples he had taken from the liquids and solids in

10  the catch pond area.  Can you tell us what about the findings

11  of this inform your opinion?

12  A    In paragraph 2 --

13           MR. LYNCH:  Can you zoom out, Julianne, please?

14  Just go from there to the bottom.

15           DOCUMENT TECHNICIAN:  (Complied with request.)

16           MR. LYNCH:  Thank you.

17           THE WITNESS:  In paragraph -- actually now that it's

18  blown up, I guess it's B, of this report, they report on the

19  results of their testing of sediments from the bottom of the

20  catch pond for halocarbons.  Halocarbons are a synonym for

21  chlorinated hydrocarbon compounds.  It would include perc,

22  TCE, DCE, the things that we've been finding in groundwater

23  and soil, so it's a test for the same kind of chemicals.  And

24  as they report here at the bottom of this paragraph, no

25  measurable levels of these chemicals were found in the

1    sediments in the pond.

2    BY MR. LYNCH:

3    Q    And how does that inform your conclusions about the

4    origins of the contamination beneath the catch pond that EPA

5    has found?

6    A    Well, I think this finding is completely consistent with

7    what the borings showed that EPA drilled in this area.  There

8    is no high levels of perc or TCE or other chlorinated

9    compounds that are found here, were found here in '85 or were

10   subsequently found in the investigations by EPA.  I think all

11   of that information is telling a consistent story, that there

12   never has been a significant DNAPL release of perc to this

13   catch pond or from the catch pond subsequently into the soils

14   beneath it down into the water table.

15           MR. LYNCH:  You can close out of this, Julianne.

16           Pull up again Illustrative DD103.

17           DOCUMENT TECHNICIAN:  (Complied with request.)

18   BY MR. LYNCH:

19   Q    This, again, Dr. Powell, is the illustrative showing the

20   borings on the site where soil samples in excess of the EPA

21   criteria were found.  I direct your attention to this small

22   dotted circle in that area.  Can you tell us what that is,

23   that location?

24   A    That's a location of a bore hole, SB-22, that was drilled

25   as part of the investigation of this area.  And it's a

1   location where relatively low levels of perc were found in

2   shallow soils, the 1- to 4-foot range, so they're in the

3   vadose zone.

4   Q    And is that another DNAPL source area?

5   A    No.  The concentrations that were found there were far

6   too low to be indicative of a DNAPL release.  They are

7   probably more reflective of, at some point in time, water that

8   contained perc seeped into the soil in that area, absorbed

9   into the soil, and has created the low level of residual

10  contamination.

11            MR. LYNCH:  You can close out of that, please,

12  Julianne.

13            DOCUMENT TECHNICIAN:  (Complied with request.)

14  BY MR. LYNCH:

15  Q    Dr. Powell, based on all of the data you've reviewed and

16  the differences we've just discussed between the northwest

17  corner source area and the other source areas identified on

18  the property, do you have an opinion as to whether whatever

19  type of release caused the northwest corner source area was

20  the same type of release that caused the upgradient

21  contamination?

22  A    Well, I don't think releases in the tank farm area could

23  have caused the contamination down in the northwest corner.

24  The two areas are similar in that they both contain high

25  levels of perc, but they're distinctly dissimilar because the

1    tank farm area also contains BTEX and other compounds that you

2    don't see in the northwest corner.  So the chemical signatures

3    are quite different in that respect.

4         Also, any release in the tank farm area is within the

5    containment.  It's within the bermed area, and it would have

6    been trapped within the berm and would have, if there were

7    enough release that it would have migrated, it would have

8    ended up in the catch pond.  And as we've been seeing looking

9    at the data, there really is no evidence that the catch pond

10   is a significant area of perc contamination.  So those areas

11   are different in my mind than the northwest corner.

12   Q    Dr. Powell, then, is it your opinion that whatever caused

13   the northwest corner had to be a separate and distinct type of

14   release from what caused the contamination we see in the acid

15   and main tank farm areas?

16   A    Yes.  I think it's something completely unrelated to

17   those areas.

18   Q    Dr. Powell, do you have an opinion as to how much perc is

19   in the northwest corner source area?

20   A    Yes, I do.

21   Q    And how much do you believe is down there?

22   A    In the northwest corner and the downstream groundwater

23   plume that's formed, that's flowed out to the Yellowstone

24   River, I believe there is a quantity of perc somewhere in the

25   range of 200 to perhaps a little more than 300 gallons, some

1143

1    number within that range.  It's a sizable release, to be sure.

2    It's somewhere between two and maybe a little over

3    300 gallons.

4    Q    Now did you actually go out and measure the perc in the

5    subsurface?

6    A    No.  It's not something you can measure directly, and I

7    haven't done any personal tests.  I've looked at a lot of

8    tests that others have performed, but I haven't done any

9    personal tests myself.

10   Q    So how did you arrive at your opinion of 200 to 300-plus

11   gallons?

12   A    Well, there's been a lot of testing of the soil and the

13   groundwater in this area.  When you test the soil, the

14   laboratory is reporting the concentration of perc in the soil.

15   When you map those concentrations and define an area of

16   contamination in which there is perc, you can then, from that

17   mapping, define a volume of soil that's contaminated, and,

18   with some information on the weight of the soil, how many

19   pounds per cubic foot does it weigh, you can convert volume

20   into mass of soil that's contaminated.  And then when you

21   multiply that mass by the concentration reported by the lab,

22   which are in units of pounds of perc per pounds of soil, if

23   you would, you can then directly estimate how much perc is

24   there in the soil mass.

25        You then also have to consider what's in the groundwater,

1144

1    and, again, it's a process of determining the volume of the

2    groundwater plume and the amount of water that's there,

3    multiplying that volume by the concentration that's found

4    within the plume, and that gives you a mass of perc.

5         And then, finally, you have to consider that while there

6    is perc in the water, there is also perc absorbed to the soil

7    in the aquifer.  So it's not really in the water; it's in the

8    soil that the water is in contact with, and there are standard

9    formulas for estimating that partition between water and soil.

10   So with knowledge of how much is in the water, you also can

11   then compute how much is in the soil.  And when you add all

12   those things up, you get a total volume of perc that's been

13   released, and that's essentially the process that I followed.

14   Q    Okay.  Well, let's talk a little bit about your specific

15   calculations, and maybe we'll start with groundwater.

16        What data did you rely on to determine the concentrations

17   in the groundwater between the northwest corner source area

18   and the Yellowstone River?

19   A    I principally relied on the groundwater data that was

20   collected during the EPA investigation, and then I also

21   considered some other groundwater data that was collected by

22   ATC during their investigations of the property.

23        I used the groundwater data that was collected before ATC

24   began their pilot testing and remediation program because that

25   began to remove perc from the soil, and so to understand how

1    much was originally there, I wanted to roll back the clock, if

2    you would, to a point in time before that remediation began.

3    So I was using all of those as sources of data with that in

4    mind as to when they began that remediation program.

5    Q    And you spoke a little while ago about developing

6    contours for the data.  Did you develop your own contours for

7    the groundwater contamination?

8    A    Yes and no.  I mean, most of this plume has been mapped.

9    The portion of the plume downstream of the source, the

10   northwest corner source area, has been mapped in detail in the

11   EPA reports by your contractor, Tetra Tech, and I simply

12   adopted their mapping and their contours of the plume for

13   purposes of doing those mass estimates.

14        In the source area itself, they didn't do, they really

15   didn't do much discretization of the plume there.  They didn't

16   map contours with any degree of accuracy, if I could put it

17   that way, or discretization.  It was essentially just one

18   large area with a lot of perc.  And so I went into that area,

19   which was only a small part of the plume, and did some

20   additional mapping so that I could better understand where the

21   groundwater was most contaminated and where it was less

22   contaminated in that source area.  I wanted to do that to make

23   sure my estimates were as accurate as possible, but that's a

24   small part of the overall plume.  In most of the plume, I

25   simply adopted Tetra Tech's mapping.

1146

1          MR. LYNCH:  Maybe to give me, if no one else, a

2    better picture of this, Julianne, can you please pull up

3    Exhibit 3051, which is the FS report, page 171?

4          DOCUMENT TECHNICIAN:  (Complied with request.)

5    BY MR. LYNCH:

6    Q    And, Dr. Powell, this is a figure from the government

7    contractors' final feasibility study report.  Does this show

8    some of the contours you relied on in calculating the amount

9    of perc in the groundwater?

10   A    Yes.  The area up here at the top of the figure is the

11   Brenntag plume, and the contours that were mapped here show

12   the concentration of perc in the groundwater.  I believe this

13   is perc, yes.  Yes, it's perc.  And so for the largest part of

14   the plume, I relied on that kind of mapping from the

15   government's contract reports.

16         MR. LYNCH:  Could you go to the next page of the

17   exhibit, please, Julianne?  And highlight the legend portion

18   of it or the label below that.  Yes, there.

19         DOCUMENT TECHNICIAN:  (Complied with request.)

20   BY MR. LYNCH:

21   Q    And, Dr. Powell, am I correct that the contours on this

22   figure show the amount of TCE groundwater concentrations,

23   correct?

24   A    That's correct.

25   Q    And TCE is one of the breakdown products of perc?

1  A    Yes.  As I mentioned earlier, once perc dissolves into

2  the water, bacteria will begin to break it down, and in the

3  first product that's formed, when you strip a chlorine

4  molecule off of a perc molecule, it's TCE.  It goes from four

5  chlorines to three chlorines, so it goes from perc to

6  trichloroethylene.

7          MR. LYNCH:  Okay.  Maybe we could pull up

8  Illustrative Exhibit DD005?

9          DOCUMENT TECHNICIAN:  (Complied with request.)

10 BY MR. LYNCH:

11 Q    Dr. Powell, is this an exhibit essentially showing perc

12 and its breakdown products and how it breaks down?

13 A    Yes.  You start with perc at the top.  Strip off one

14 chlorine, and you get TCE.  Strip off a second chlorine and

15 you get DCE.  The principal form of -- there's two forms of

16 DCE that are shown there, cis and trans.  The principal one

17 that you're going to see is cis DCE, the one on the left.  And

18 then, finally, strip off another chlorine, and you get vinyl

19 chloride.  So that's the typical breakdown process for perc in

20 the groundwater.

21 Q    So essentially you have a given amount of perc, it kicks

22 off a chlorine, you get a little bit lesser amount of TCE,

23 kicks off another chlorine, a little less of the cis DCE, and

24 so on?

25 A    That's correct.

1   Q    Now did you take into consideration the amount of TCE and

2   DCE and VC that was in the groundwater in computing your

3   calculations of the mass?

4   A    Yes, because all of this originally began as perc before

5   this degradation process began.  You have to look at all four

6   chemicals and, in effect, back them up, adjust them back to

7   what they would have been on an equivalent amount of perc in

8   order to do this calculation, so that's what I did.  I mapped,

9   mapped considered mass estimates for all four chemicals and

10  then determined how much perc would have been necessary to

11  have created that mass of the individual chemicals.

12  Q    Can you tell us, Dr. Powell, then, how did you compute

13  the mass of the perc that was actually in the soil in the

14  northwest corner?

15  A    I used the mapping of the source area presented by EPA in

16  the feasibility study and record of decision.  This was

17  their -- the ROD is their official report on what they found

18  and what they intend to do about it in the Superfund.  And so

19  I used the boundary of the source area as EPA mapped it in

20  their record of decision.

21       MR. LYNCH:  Okay.  And let's pull up again that

22  figure from the ROD.  It's Exhibit 3059, page 121.

23       DOCUMENT TECHNICIAN:  (Complied with request.)

24       MR. LYNCH:  And could you blow up the northwest

25  corner area, please?

1149

1          DOCUMENT TECHNICIAN:  (Complied with request.)

2    BY MR. LYNCH:

3    Q    So that's the area for the soil of the northwest --

4    excuse me.

5          That's the area of the northwest corner that you used in

6    computing your soil mass calculations, correct?

7    A    That's correct.  This big oblong-shaped green area on the

8    left is the northwest corner source area that I used.

9          MR. LYNCH:  Close out of that, Julianne.

10         DOCUMENT TECHNICIAN:  (Complied with request.)

11   BY MR. LYNCH:

12   Q    Now I believe we've seen in one of the earlier government

13   reports, the RI addendum report, that EPA initially drew the

14   northwest corner source area somewhat differently.

15         And let's please pull up Exhibit 3058, page 50.

16         DOCUMENT TECHNICIAN:  (Complied with request.)

17   BY MR. LYNCH:

18   Q    This is a figure from the RI addendum report, Dr. Powell.

19   And if we look at the northwest corner area, it's somewhat

20   different from what was depicted in the ROD, correct?

21   A    It is slightly different, yes.

22   Q    It would be, at least the portions of that that are

23   green-shaded, it's a smaller surface area; is that correct?

24   A    Yes.  If you could blow that section up, I think I could

25   illustrate what the differences are, but it would be a little

1    hard at this scale.  My finger is not quite that fine.

2              DOCUMENT TECHNICIAN:  (Complied with request.)

3              THE WITNESS:  What EPA essentially did between the

4    RI addendum and the feasibility study and ROD is they came to

5    the judgment that the area to the south, centered on Boring

6    MP-132, the area down here, and the larger area to the north,

7    are interconnected and are interrelated and represent a

8    continuous zone of contamination, not two separate and

9    distinct zones of contamination.  So they essentially

10   connected these areas by drawing a boundary around them like

11   this and concluded that the area in between, where they didn't

12   have any test results, was contaminated as well and should be

13   considered part of the source area.

14             MR. LYNCH:  Can you go back to the ROD figure, 3059,

15   page 121?  And blow up the northwest corner area again.

16             DOCUMENT TECHNICIAN:  (Complied with request.)

17   BY MR. LYNCH:

18   Q    Dr. Powell, did you again review the sampling and data

19   that was collected from that area?

20   A    Yes, I did.

21   Q    Do you agree with the government contractors' expansion

22   of that northwest corner into the size depicted in the ROD?

23   A    Yes, I do.

24   Q    And why is that?

25   A    Well, if you look at what was found in the southern-most

1    sample, MP-132, down here in the figure, the contamination

2    that they found was clearly indicative of a DNAPL release.

3    There was over 300 parts per million of perc there in the soil

4    in the upper part of the water table.  Not in the vadose zone

5    above it, but in the upper part of the water table.  It's

6    twice their threshold level for DNAPL, so it's clear,

7    unambiguous information that there's a DNAPL there in the

8    soil.

9         They concluded, apparently, that when the NAPL first hit

10   the water table, more up in this area, it began to laterally

11   spread within the water table through the process that I was

12   describing to you yesterday.  It begins to pool when it hits

13   that wet soil, and then it begins to migrate laterally along

14   those little laminar beds of sand that are embedded in the

15   silty clay and eventually spread down to this southern area.

16        Well, it can't spread from the point of release to that

17   southern area without leaving tracks behind.  As it flows

18   through the soil, even within the water table, it coats the

19   soil, and it leaves contamination behind.  And given that, EPA

20   came to the value judgment that these two areas are

21   interrelated, and, hence, there must be a region of

22   contamination between them as well.  And so they, in effect,

23   connected the dots and said, "This is all just one continuous

24   region of contamination."  And I think, given what they knew

25   and what they could reasonably infer, that it was the correct

1    judgment for them to come to.

2    Q    And this figure from the ROD, I believe, Dr. Powell, you

3    said is the government's final decision on the contamination

4    of the Lockwood site; is that correct?

5    A    It's their final mapping of the source area, yes.

6    Q    So is this larger version of the northwest corner the

7    area that Soco is ultimately going to be responsible to clean

8    up?

9    A    Yes, it is.

10          MR. LYNCH:  Pull up, if you would, please, a page

11   from the FS report, 3051, page 812.  And if you could zoom in

12   on the area around PT-02?  Right there.

13          DOCUMENT TECHNICIAN:  (Complied with request.)

14          MR. LYNCH:  Yep.  Thank you.

15   BY MR. LYNCH:

16   Q    Dr. Powell, you talked about, in developing your mass

17   calculations, dividing the soil into layers.  This is a

18   cross-section of a portion of the northwest corner, correct?

19   A    That's correct.

20   Q    Could you tell us -- you had the area from the ROD being

21   the total area.  How did you decide how to divide the

22   subsurface into layers when you were developing your mass

23   calculations?

24   A    Well, anytime you do this kind of discretization,

25   breaking up the data into different pieces, you have to

1    consider a number of different factors:  What's the nature of
2    the soil?  There's a distinct difference between the vadose
3    zone where the soils are unsaturated and the groundwater below
4    the water table where they're saturated, for instance.  And so
5    my first layer that I used in the mass calculation were the
6    samples from the vadose zone.  So that boundary was between
7    zero and roughly 4 feet below ground surface.  And there are a
8    series of samples that they have collected in the soils up
9    here in the vadose zone that I then used to define the mass
10   within that first layer of the calculation.
11       They also did sampling within the water table.  Typically
12   on 2-foot intervals, 4 to 6 feet, 6 to 8 feet, 8 to 10, 10 to
13   12.  There was no real consistency in each bore hole as to
14   where they sampled, so sometimes they'll sample the higher
15   portion, sometimes the lower portion, sometimes both.
16   Sometimes it's a sample over a 4-foot interval, not a 2-foot
17   interval, so those data have to be sorted and mixed and
18   matched to decide the layering.
19       Ultimately I decided there was enough information to
20   define two distinctive layers within the water table for the
21   silty clay unit, so I drew a boundary approximately through
22   here and here, which defined samples that were taken from 4 to
23   8 feet and from 8 to 12 feet, which is approximately the
24   bottom of the silty clay, and so I collected all of the
25   samples in those intervals, grouped them together,

1154

1    individually estimated the mass in each of those layers.

2         And then, finally, there were few, a few, but relatively

3    fewer samples taken in the sand and gravel unit below 12 feet.

4    That's this deeper layer down here.  And I treated that as one

5    layer in the mass estimates.  So ultimately I had four layers,

6    and it was really guided by where they did testing, where I

7    had enough data that I could do a reasonable estimate of the

8    mass in each layer.  There's no point having too many layers

9    and then not ending up with any data points in a layer because

10   then there's nothing to estimate from.  And so it's a value

11   judgment that you have to make when you're sorting the data

12   and doing this kind of estimate.

13            MR. LYNCH:  Close out of that, Julianne.

14            THE COURT:  Is this a place where we could break for

15   a minute?

16            MR. LYNCH:  Certainly.

17            THE COURT:  We're going to be in recess here.

18            THE LAW CLERK:  All rise.

19        (Recess taken from 09:33:21 to 09:53:36.)

20        (Open court.)

21        (Jury present.)

22            THE COURT:  Please be seated.

23            You may continue, Mr. Lynch.

24            MR. LYNCH:  Thank you.

25   ///

1    BY MR. LYNCH:

2    Q    The first thing, Dr. Powell, during the break somebody

3    asked me -- mentioned that you had used the term

4    "discretization" a few times and asked me what it meant.  I'm

5    at a loss.  Can you tell us what "discretization" means?

6    A    It simply means taking something large and breaking it up

7    into smaller pieces.  For example, I took a 25-foot-aquifer

8    and broke it up into four layers.  That would be a form of

9    discretization, so that's all it simply means.

10   Q    And I believe you said, Dr. Powell, that it was a value

11   judgment as to how you chose those layers.  What was your

12   judgment based on?

13   A    It was based first on the observation that there's a

14   distinct vadose zone, unsaturated zone, versus the aquifer.

15   There are two distinct soil layers within the water table.

16   There's the silty clay, which is the first unit from 4 to

17   approximately 12 feet below ground, and then there's the

18   deeper sand and gravel.  So I observed that there's at least

19   those three discrete layers.  And then, finally, within the

20   silty clay, there was considerable sampling done from both 8

21   to 12 feet -- or 4 to 8 feet and 8 to 12 feet, and the

22   concentrations found between those two intervals tended to

23   vary quite a bit.  There was much higher levels of

24   contamination found in the 4- to 8-foot range than there was

25   in the 8 to 12, and so I felt it was appropriate to separate

1156

1    those samples along those two depth intervals and estimate the

2    mass separately between them.

3    Q    Doctor, could you have divided it differently?

4    A    Sure.  There's a thousand ways you can slice and dice the

5    data.

6    Q    And that would change your result, I take it?

7    A    Every different way of chopping the data up is going to

8    give you a slightly different result.

9    Q    Is there a danger in dividing it too finely, making too

10   many sections?

11   A    Well, you wouldn't want to subdivide it so fine that you

12   end up with a lot of units that don't have any data, because

13   then you don't have anything from which you can estimate, so

14   you wouldn't want to say, well, I'm going to take 1-foot

15   layers when the samples are being reported on 2-foot

16   intervals, for example, or you wouldn't want to subdivide

17   layers so that you end up with no data points in the layer

18   that you can do an estimate.

19   Q    Would it also change your conclusion or your number,

20   estimate, on the mass if you had used the older depiction of

21   the northwest corner from the RI addendum as opposed to the

22   final one that was shown in the ROD?

23   A    Yes, that has some impact on an estimate of the mass.

24   Q    How much of an impact would that have?

25   A    Well, if I use the map of the northwest corner source

1    area as shown in the RI addendum and I assume that between the

2    larger northern area and that small southern area, that

3    there's absolutely nothing there, there is nothing but clean

4    soil, the total mass of perc that I would estimate was

5    released would be about 200 gallons, so something a little

6    over 300 would be reduced to 200 gallons.

7            MR. LYNCH:  Can you please pull up a page from,

8    Illustrative, now, Exhibit 3878?

9        (Discussion off the record at counsel table.)

10           MR. LYNCH:  Exhibit 3878-0117.

11           DOCUMENT TECHNICIAN:  (Complied with request.)

12   BY MR. LYNCH:

13   Q    Can you tell us what this table depicts, Dr. Powell?

14   A    This shows the volume in each of the segments that we

15   considered in the mass estimate, the volume of perc and of the

16   principal breakdown products, TCE, PCE, vinyl chloride, that

17   were in each segment.  So the first one with the yellow

18   highlighting, for example, is the amount of perc and the other

19   chemicals in the groundwater between the Coulson ditch, which

20   is a drainage ditch just downstream of the property, which,

21   it's the amount in groundwater between the Coulson ditch and

22   the Yellowstone River, both the amount that's in the water and

23   the amount that's absorbed into the aquifer that the water is

24   flowing through.  And these are all in gallons.  You total

25   them up, and there's about 30, just a little over 32 gallons

1    of perc in the groundwater zone in that region.

2         Similarly, as you go down through the other areas, the

3    next one is an estimate in the northwest corner area, how much

4    was in the groundwater.

5         The third with the blue highlighting is an estimate of

6    how much was in the soil in the northwest corner area.

7         The so-called total is just the sum of all of those, and

8    then, finally, at the bottom, with the gray highlighting, is

9    an estimate of how much is in the sand and gravel aquifer.

10   Q    Why did you separate that out from the total?

11   A    It's a unit where we have far less data.  There's only a

12   few soil samples that were collected in that deeper unit, and

13   so it's -- our ability to estimate mass accurately there is

14   less so.  There's a bigger confidence interval around any

15   estimate that you're going to make in the sand and gravel

16   because we have so many fewer data points, and, for that

17   reason, I labeled it as greater than 50 gallons, but even that

18   is an estimate.  I mean, it could be less than 50 gallons.  It

19   could be greater than 50 gallons.

20        I think the data is clear; there is a DNAPL condition in

21   the sand and gravel aquifer.  Concentrations are very, very

22   high in the groundwater in this region.  I don't think the

23   data, though, is really sufficient to do a very accurate

24   estimate of the mass in that, in that region, so I separated

25   it out as a separate number from the others.

1159

1          MR. LYNCH:  Take it down, Julianne.

2          DOCUMENT TECHNICIAN:  (Complied with request.)

3    BY MR. LYNCH:

4    Q    Dr. Powell, have you compared your mass estimates against

5    other estimates of the mass of contamination at the Dyce

6    Chemical site?

7    A    Yes.  Whenever you do something like this, you always

8    want to ground-truth it against other like estimates that have

9    been made to see if it's similar or differs, and, if it

10   differs, why does it differ?  Perhaps my numbers need to be

11   adjusted, so you always want to consider that.

12   Q    Okay.  I believe we heard earlier that there was a mass

13   estimate, a rough mass estimate done by contractors for the

14   EPA in the 1999 Lockheed Martin report.  Did you compare your

15   mass estimate against that one?

16   A    Yes, I did.

17   Q    And what were your conclusions?

18   A    Well, their estimate was based on a little bit of data

19   and an awful lot of deductive reasoning.  They estimated how

20   much was in the groundwater as perc.  They estimated how much

21   had previously been in the groundwater as perc but degraded

22   into other chemicals.  They estimated how much might have

23   already been lost through complete degradation, and, from

24   that, they concluded that they were dealing with a large

25   source area; there must still be a source up, somewhere

1   further upstream in the aquifer that is creating the

2   conditions they were seeing.

3        And with all of that, which, arguably which was a little

4   bit of data and a lot of deduction, they concluded there was

5   about 200 gallons in the original release.

6   Q    And if that was just a preliminary estimate for

7   discussion purposes, why did you consider it or compare it

8   against your mass estimate?

9   A    Well, it was a data point.  I mean, I think they were

10  reacting to the fact that the conditions that they saw in the

11  aquifer suggested that there was a large release.  I don't, I

12  don't think I would say that their number was a particularly

13  accurate estimate because it was based an awful lot on

14  guesswork on their part, deduction on their part.  Certainly

15  not as accurate as some of the estimates that can be done

16  today with all of the testing that's been done, but it is a

17  data point for comparison.

18           MR. LYNCH:  Julianne, could you please pull up

19  Admitted Exhibit 4400?  And please go to page 31 of that

20  exhibit.

21           DOCUMENT TECHNICIAN:  (Complied with request.)

22  BY MR. LYNCH:

23  Q    Dr. Powell, this is a report from ATC that Mr. Sullivan

24  was speaking about when he was here testifying the other day.

25  Do you understand that ATC also did mass estimates for soils

1  in the northwest corner?

2  A    Yes, that's correct.

3         MR. LYNCH:  If we'd please turn to page, I believe

4  it is, 43 of this exhibit?  And please pull out the fifth

5  bullet point.

6         DOCUMENT TECHNICIAN:  (Complied with request.)

7  BY MR. LYNCH:

8  Q    It states that the mass of CVOCs within the vadose zone,

9  zero to 5 feet below ground surface, was estimated to be

10 between 750 and 1,550 pounds.

11        The first question, Dr. Powell, is, What are CVOCs?

12 A    Chlorinated volatile organic compounds; essentially perc,

13 TCE, DCE.

14 Q    Assuming it was all perc, how many gallons would 750 to

15 1,550 pounds of perc be?

16 A    It would be approximately 55 to 115 gallons of perc.

17 Q    Did you review the data and calculations underlying ATC's

18 mass estimates?

19 A    Yes, I did.

20 Q    Okay.  And how do you -- how do they compare to your mass

21 estimates?

22 A    Well, they're comparable to my estimates only to a

23 limited degree.  As this report stated, their estimate was

24 only for the vadose zone, zero to 5 feet.  I had an estimate

25 from zero to 4 feet, so it's not quite apples and apples, but

1     it's close.

2         Their estimate is based on sampling data that they

3     collected, and I used that same sampling data as part of the

4     information I considered.  Their methodology for estimating

5     the mass is essentially the same as I used, using the

6     footprint, taking the average concentration within the

7     footprint, multiplying it by the volume, hence the mass of

8     soil and getting the number.  So methodologies were

9     comparable.

10        Their estimate is not comparable to my total number

11    because I was looking not just at what's in the vadose zone

12    but what's in the water table below it and what's in the

13    aquifer as dissolved product in the groundwater.  So it's a

14    little different.  The comparable number from my mass estimate

15    to their numbers, I estimated roughly 32 gallons in the vadose

16    zone as compared to their 55 to 115 gallons, so my number was

17    a little smaller than theirs.

18             MR. LYNCH:  Okay.  And if you would please go to

19    page 60 of that same exhibit; 4400, page 60?

20             DOCUMENT TECHNICIAN:  (Complied with request.)

21    BY MR. LYNCH:

22    Q    Dr. Powell, this is a figure -- yeah, please blow that

23    up.

24             DOCUMENT TECHNICIAN:  (Complied with request.)

25    ///

1    BY MR. LYNCH:

2    Q    Does this figure represent how ATC decided to divide the

3    northwest corner source area in conducting their mass

4    estimates?

5    A    Yes.  This is how they discretized the footprint of the

6    source area.

7    Q    So they sliced it up horizontally whereas you had done it

8    vertically?

9    A    Yes.  They're only looking at one layer.  I was looking

10   at four layers, moving down vertically through the aquifer,

11   but the one layer they looked at, they sliced it up and did

12   their estimates this way.

13   Q    Did you look at any other measurements or calculations

14   that you compared your mass estimates against?

15   A    Yes.  I considered information that ATC had published on

16   how much they actually recovered from the vadose zone when

17   they ran their remediation system.  Of all of these estimates,

18   that's probably the most reliable of all in understanding how

19   much is really there, because how much you're pulling out of

20   the ground is a real number.  It's not an estimate based on

21   data.

22         MR. LYNCH:  Let's pull up again the same exhibit,

23   4400, page 43, again.  Please pull out the fourth bullet

24   point.

25         DOCUMENT TECHNICIAN:  (Complied with request.)

1164

1   BY MR. LYNCH:

2   Q    This is again the ATC report, and the last sentence

3   states, "The total mass of CVOCs removed between October 12

4   and December 17, 2004 is approximately 350 pounds."

5        Was that measured through the vapor extraction system

6   that Mr. Sullivan was talking about the other day?

7   A    Yes, that's correct.

8   Q    And 350 pounds, assuming it was all perc, how many

9   gallons of perc would that be?

10  A    It's about 25 gallons.

11            MR. LYNCH:  Can we go to admitted Exhibit 3826,

12  page 1?

13            DOCUMENT TECHNICIAN:  (Complied with request.)

14  BY MR. LYNCH:

15  Q    Dr. Powell, this is another document that Mr. Sullivan

16  was talking about, another communication from him to the EPA.

17       Please go to page 9 of this exhibit.

18            DOCUMENT TECHNICIAN:  (Complied with request.)

19            MR. LYNCH:  And this document is dated August of

20  2005 whereas the last one was dated January of 2005.

21            Please pull out the paragraph that starts 4.A.

22            DOCUMENT TECHNICIAN:  (Complied with request.)

23  BY MR. LYNCH:

24  Q    The last sentence states, "As of April 2005, estimated

25  VOC mass removal rates were relatively steady at approximately

1165

1   100 pounds per month with a total cumulative mass removal of

2   approximately 780 pounds in six months of pilot operation."

3        Is ATC here saying that they pulled out 780 pounds

4   essentially of perc from their vapor extraction system?

5   A    Yes.  From the beginning of its operation in November of

6   2004 through April of 2005, they ran it continuously and are

7   reporting a total of 780 pounds of perc being recovered.

8   Q    And how many gallons of perc would that be?

9   A    It's approximately 60 gallons.

10  Q    Am I correct that that vapor extraction system is still

11  running today?

12  A    To the best of my knowledge, yes.

13  Q    And if it is, it's still pulling perc out of the soil in

14  that northwest corner area?

15  A    As far as I'm aware, it is.

16  Q    Now ATC, in their report, stated they pulled out, at

17  least as of April 2005, 60 gallons, roughly 60 gallons of perc

18  in the first 5 feet of soils.  I believe your estimate was

19  there was 32 gallons of perc in the first 4 feet of soils.

20  Does that difference cause you to question at all the accuracy

21  of your mass estimate?

22  A    It really doesn't.  I mean, it's very common, in my

23  experience, that when you take soils data and try to estimate

24  how much contamination might be there, that inevitably you

25  understate.  We've been running a similar remediation program

1    in California to recover carbon tetrachloride from soil, and

2    what we got out as of the end of last year is almost four

3    times what we initially estimated might be there, so these

4    kinds of differences between a real remediation process and

5    what you've estimated at the front end are pretty common.

6          Also, the 32 gallons I estimated is only the first

7    4 feet.  The soils data from the northwest corner area shows

8    that as you begin to approach and get right into the very top

9    of the water table, things become much more contaminated, and

10   as that water table is cycling up and down over the season,

11   that very contaminated zone may be saturated, in which case

12   you're not recovering much from it, or, as it drains down, you

13   start to get some recovery from that zone.

14         So I think the differences between what ATC is reporting

15   and what I estimated in part reflect the fact that it's likely

16   achieving some treatment of the soils below 4 feet, perhaps

17   down as deep as 5 or 6 feet into the soil, and that's not

18   really part of that 32-gallon estimate.

19   Q    All right, Dr. Powell.  We've talked about what the

20   chemical signature of perc in the northwest corner is, the

21   fact that it's spread out over a significant area, and the

22   mass, the amount of perc you've estimated is down there.

23   Based on those factors, have you formed any conclusions as to

24   how significant of a contribution the northwest corner soil

25   contamination is contributing to the contaminated groundwater

1    plume that's coming off the Dyce Chemical property?

2    A    Well, if you consider the different areas where

3    contamination has been found, I think it's pretty clear the

4    northwest corner is, to coin a phrase to use, it's the

5    800-pound gorilla at this site.  It is the big primary source

6    area of contamination that's affecting groundwater at this

7    site.

8    Q    And what leads you to conclude that?

9    A    Well, I've done an analysis of how much contamination is

10   being released from that area versus other areas of the site.

11   I mean, I think just a simple inspection of the data, when you

12   look at the concentration ranges that are being found there

13   and over how big an area they're being found, both in soil and

14   groundwater, it's apparent that there's much more mass of perc

15   in the soil and in the groundwater in that area than there is

16   upstream.  The areas where it's been found upstream have been

17   much more localized and not nearly as large.

18        But I've also done some just rough calculations as to how

19   much mass is being contributed to the groundwater in the

20   northwest corner area versus an area just upstream of it, and

21   those calculations suggest that if you look at the total

22   amount of perc moving through the aquifer, for example, in the

23   vicinity of the catch pond versus just downstream in the

24   northwest corner area, there's almost a ten-fold increase in

25   the amount of perc moving through the aquifer from that, over

1168

1    that short distance.

2                   MR. LYNCH:  Maybe, Julianne, let's pull up

3    Illustrative Exhibit DD144.

4                   DOCUMENT TECHNICIAN:  (Complied with request.)

5    BY MR. LYNCH:

6    Q    And could you explain what this figure is, Dr. Powell?

7    A    It's just a caricature indicating what I recently was

8    just a moment ago speaking of.  I essentially did an estimate

9    of the amount of perc that is migrating through the aquifer,

10   approximately here, upstream in the northwest corner, and then

11   the same calculation down here through the northwest corner

12   area.  And when I did that, I concluded that looking at one

13   number versus the other, there's a relative difference of

14   about 10 to 1, and it was completely consistent with what I

15   concluded just from an inspection of the data.  The northwest

16   corner is a very big source area as compared to what's

17   upstream.

18   Q    You have a 10-to-1 ratio in the figure.  From your

19   calculations, can you remember the absolute amount of perc

20   that's coming off the northwest corner compared to the

21   upstream areas?

22   A    No, you can't.  All you can really do is determine the

23   relative differences between those two areas.

24   Q    Can you briefly tell us why that is?

25   A    Well, in order to do these kinds of estimates, you're

1169

1    using three types, three pieces of information.  One is the

2    concentration of perc in the groundwater.  We know that pretty

3    well.  There's been a lot of testing.  We have wells.  That's

4    been measured.  We also need to know the width of the plume

5    and the thickness of the aquifer.  That's another factor

6    that's used.  And again, we know that pretty well.  It's been

7    mapped as it's depicted on this drawing and some of the EPA

8    drawings, and there's been a lot of borings, so we have a good

9    idea how thick the aquifer is.

10        What we don't know very well is how much groundwater is

11   actually flowing through this area.  There have been varying

12   estimates of that in reports by different contractors.  Tetra

13   Tech estimated that the groundwater is flowing through this

14   area at a rate consistent with a permeability of about 70 feet

15   per day.  Groundwater flow is estimated as the product of a

16   permeability and a slope of the water table.

17        Other permeability estimates in the area, though, range

18   from as low as .2 feet per day to as high as 600 feet per day,

19   so there's a very, very large range of estimates.

20        As far as I'm aware, no one has actually done an aquifer

21   pump test here in this location, and without a pump test, no

22   one really knows for sure what the permeability of these sands

23   and gravels are, and, hence, you really can't estimate

24   precisely how much groundwater flow is moving through this

25   area.  So in that sense, these estimates of these mass fluxes

1    are not intended to be accurate in an absolute sense but only

2    in a relative sense one to the other.

3         And I say that because I think it's reasonable to believe

4    that between these two lines, these two red lines that I've

5    drawn on the screen, the groundwater flow, whatever it is, is

6    approximately the same because there's no one adding or

7    subtracting groundwater in between these two locations.  No

8    one is pumping a well out there, for example.

9         So whatever the true number is on the groundwater flow,

10   it should be approximately the same at both locations, and,

11   hence, the comparison of one transect versus the other, one

12   line versus the other is valid even though we don't know the

13   precise groundwater flow estimate.  And we really won't know

14   that unless someone does a pump test.

15   Q    Just so I make sure I understand, Dr. Powell, what was

16   your ultimate number for how many -- how much perc is coming

17   off of the northwest corner?

18   A    I believe it was about 1,500 grams per day, if I remember

19   correctly.

20   Q    And you're telling us you can't state with scientific

21   certainty that that's the actual amount that's coming off the

22   northwest corner?

23   A    No.  It could be more.  It could be quite a bit less than

24   that.  I think we just don't know because no one has done an

25   actual aquifer test to measure the groundwater flow.

1171

1   Q    But does that affect the legitimacy of the calculation as

2   showing a ratio of perc that's coming off the northwest corner

3   source area as opposed to what's coming from the upstream

4   source areas?

5   A    No, it doesn't, in that whatever the flow rate, true flow

6   rate is, it's the same at both locations.  So if we were to

7   adjust it downward, you'd adjust at a comparable amount at

8   each location so the ratio of the flows, one to the other,

9   would remain exactly the same.

10  Q    All right.  Dr. Powell, we've talked about the northwest

11  corner chemical signature and size and your recent mass flux

12  calculations.  I'd like to turn now and talk about how that

13  information supports the basis for your conclusions that the

14  northwest corner resulted from a bulk spill of perc in the

15  loading and unloading area.  I know you've said we've got a

16  lot of pure perc in the northwest corner.  Did you consider

17  the possibility that someone just dumped perc right in the

18  northwest corner itself?

19  A    Yes.  That's certainly a possibility that would have to

20  be considered.

21  Q    And did you conclude that was a likely cause for the

22  northwest corner contamination?

23  A    I think it's unlikely that that was the cause.

24  Q    And why is that?

25  A    Well, first, having read many depositions of former

1172

1    employees, no one that I'm aware of --

2            MR. GROSSBART:  Your Honor, I'm going to object to

3    him talking about depositions.  He can talk about what he saw

4    in the courtroom, but he can't talk about what he's read in

5    depositions.

6            THE COURT:  Is it something that he's listed he

7    relied on?

8            MR. LYNCH:  Yes, sir.

9            MR. GROSSBART:  He's listed every deposition that

10   was ever taken.

11           THE COURT:  Well, I'm going to overrule it.

12           THE WITNESS:  Having reviewed testimony of many

13   employees, I didn't find any instance where employees were

14   reporting dumping of chemicals down in that portion of the

15   property.  Had there been dumping, I did not observe, on any

16   of the photographs, any discrete area -- a pit, for example --

17   that would have been an obvious place that chemicals might

18   have been dumped.  So in my experience, when you have this

19   kind of random disposal in the back 40, so to speak, it

20   creates a region of contamination that is not discrete in one

21   area, and the perc source that's been identified here is

22   pretty discrete and in a very limited area.

23           The facility handled many chemicals.  Perc was only

24   a small part of everything they handled, and if there were

25   drums coming back to the facility that had chemical residue in

1173

1    them and they were being dumped on the ground, it's illogical

2    to me that they would have only dumped the perc residue but

3    nothing else ever got dumped out there, and we don't really

4    find other chemicals out there other than perc.  We don't

5    find, for example, any BTEX out there in the soil.

6           And then, lastly, perc is a valuable product, and

7    there's a lot of perc out there, at least several hundred

8    gallons out there.  It's illogical to me that a company that's

9    in the business of selling perc would be, in effect, pouring

10   fresh product on the ground.  It would be like pouring money

11   out on the ground.

12          For those reasons, I think it's unlikely that this

13   release occurred as a result of a pattern of dumping that

14   occurred out in that area.

15   BY MR. LYNCH:

16   Q    Well, what makes you -- let me back up.

17        You testified that you believe it's predominantly pure

18   perc down there and a lot of it.  Do you have an understanding

19   of where on the site bulk volumes of pure perc product were

20   kept?

21   A    They were loaded and unloaded in the unloading area up

22   near the warehouse, and they were stored in tanks in the tank

23   farm and in drums in the warehouse.

24   Q    And you've testified that you've assessed a lot of these

25   sites over the course of your career.  In your experience,

1    where in such a facility is there most likely to be a release

2    of a large amount of pure-phase product?

3    A    The most likely location is going to be in the loading

4    and unloading area.  I mean, a secondary location could be

5    where it's stored in tanks, but catastrophic failures of tanks

6    that release all of the product to the ground are very, very

7    rare in my experience, so the highest probability would be in

8    the loading/unloading area.

9    Q    Have you seen any indication during trial this week, in

10   the testimony you've heard and the documents we've seen, that

11   at the Dyce site, the bulk perc storage tank was ever outside

12   of secondary containment?

13   A    No.  As far as I'm aware, it was always inside the tank

14   farm area which was contained within the berm.

15   Q    In your opinion, how would, then, a spill of a bulk

16   product in the loading/unloading area get to that northwest

17   corner?

18   A    Well, in the period prior to 1981, the stormwater runoff

19   and any chemicals spilled within that same area, the unloading

20   area, would have flowed off to the west to a ditch that was

21   constructed along the rail siding and ultimately through that

22   ditch off to the northwest and down into the northwest corner

23   area.  That would have been the pathway for any large spill to

24   have reached the northwest corner.

25             MR. LYNCH:  Okay.  And let's pull up the 1977 photo,

1   Exhibit, Admitted Exhibit 5024.  Can you zoom in on the area

2   just above, north of the berm and then down to the south,

3   below the lower warehouse?

4           DOCUMENT TECHNICIAN:  (Complied with request.)

5           MR. LYNCH:  That's good.

6   BY MR. LYNCH:

7   Q    Can you point to the pathway you're referring to,

8   Dr. Powell?

9   A    The loading and unloading would have occurred at

10  approximately this area of the property, and anything released

11  would have flowed down past the small warehouse to the rail

12  siding and then, via the ditch on the east side of the siding,

13  ultimately down here into the northwest corner area.

14  Q    Now as we've drawn that circle on the northwest portion

15  of this, is that actually the northwest corner area?

16  A    It's close.  I would have to see the EPA's mapping of it

17  to be sure.  It's not shown on this map, but it's down in that

18  vicinity.

19          MR. LYNCH:  Can you zoom out, please, Julianne?

20          DOCUMENT TECHNICIAN:  (Complied with request.)

21          MR. LYNCH:  Actually, let's pull up Illustrative

22  Exhibit DD098.  And focus in on -- just pull up the entire

23  picture portion of it, please.

24          DOCUMENT TECHNICIAN:  (Complied with request.)

25  ///

1  BY MR. LYNCH:

2  Q    This is that same 1977 photo.  You've labeled some

3  features on this, Dr. Powell.  Can you describe those for me?

4        MR. GROSSBART:  Excuse me, Mr. Lynch.  Can you tell

5  me what number this is?

6        MR. LYNCH:  DD098.

7        MR. GROSSBART:  Thank you.

8        THE WITNESS:  We've labeled some of the, some of the

9  features at the facility.  The loading/unloading area is up

10 here.  The ditch, which is the blue line that flowed from that

11 loading/unloading area down to the northwest corner.  The

12 green image on the upper left portion of it is the boundary of

13 what EPA identified as the perc source area in the northwest

14 corner.  And, of course, we've labeled the berm, the catch

15 pond, and a couple of the borings and monitoring wells that

16 have been drilled down in that area just to the west of the

17 catch pond.

18 BY MR. LYNCH:

19 Q    Okay.  And, Dr. Powell, what causes you to believe that a

20 release or a spill of bulk perc in the area you've indicated

21 with the red dot there wouldn't simply flow into the tank farm

22 that's bermed?

23 A    Well, with a berm along the south side of the tank farm,

24 there was no way for water to flow down into the tank farm.

25 It would have been trapped by the berm, and it would have then

1177

1   had to flow off to the west until it encountered the ditch.

2   Q    How do you know there's a berm on the south side of the

3   tank farm?

4   A    Well, you can see it on some of the aerial photography

5   over this time period.  I've reviewed a number of the photos,

6   and in some it's visible, and in some it's masked by shadows

7   from the buildings.  On many of the photos, the berm is

8   visible.  And I've also heard testimony from employees that's

9   been consistent in stating there was a berm along that portion

10  of the property in the late 1970s up until, I believe, around

11  1981.

12  Q    And admittedly it's a somewhat poor-resolution quality

13  photograph, but, Dr. Powell, can you see any portion of the

14  berm in this '77 photo?

15  A    Yes, I can.

16  Q    And can you indicate that on the photo?  The south berm,

17  we're talking about.

18  A    It's approximately here, and then it goes into the shadow

19  and you can't see it.

20          MR. LYNCH:  You can close out of that, please,

21  Julianne.

22          DOCUMENT TECHNICIAN:  (Complied with request.)

23          MR. LYNCH:  And why don't we pull up a similar

24  version, marked-up version of the 1975 photo, Illustrative

25  Exhibit DD064.

1          DOCUMENT TECHNICIAN:  (Complied with request.)

2          MR. LYNCH:  That must be the wrong one.  Close out

3    of that one, please.

4          DOCUMENT TECHNICIAN:  (Complied with request.)

5          MR. LYNCH:  Why don't we pull up the actual 1975

6    photo, Admitted Exhibit 5019, I believe.  And let's zoom in on

7    the same area just north of the berm, south of the lower

8    warehouse, the little warehouse.

9          DOCUMENT TECHNICIAN:  (Complied with request.)

10   BY MR. LYNCH:

11   Q    This is the 11/4/1975 photo of the Dyce Chemical

12   facility, Dr. Powell.  Can you see any portion of the south

13   berm on this photo as of this date?

14   A    Most of it is obscured in the shadow of the building.

15   There is a small area here which I believe is a remnant of the

16   berm, but you really can't see much of it.  This area is

17   pretty obscured by shadow.  You, of course, can see the berm

18   here along the railroad tracks pretty distinctly outside of

19   the shadow.

20   Q    And, Dr. Powell, is there anything else, based on your

21   experience, not being able to see the berm in this photo, that

22   would suggest to you that, in fact, the drainage, during this

23   period of time, was into that ditch running along the east of

24   the rail spur?

25   A    Yes.  When I visited the site, I, in part, put on my hat

1179

1    or my thinking as a drainage engineer.  Earlier in my career,

2    I did quite a lot of drainage stormwater protection work, and

3    so I examined the site in terms of the patterns of drainage:

4    Where is stormwater generated?  Where is runoff being

5    generated?  Where would it have to go?

6        And I observed that the entire loading/unloading area is

7    pitched, tipped, if you would, so that the runoff flows to the

8    west down to the vicinity of the corner of the small

9    warehouse.  All of the runoff from the roofs on the north side

10   of the large warehouse and from the entire roof surface of the

11   small warehouse also goes down onto the ground in this area.

12   So there's quite a lot of impervious surface -- the roofs, the

13   parking lot, the unloading area -- that's going to generate a

14   considerable amount of stormwater runoff that ultimately

15   concentrates right down there in the corner of the small

16   warehouse area.

17       With the south berm in place, there is nowhere for that

18   runoff to go other than via the ditch along the railroad

19   tracks down into the northwest corner, and when you examine

20   various aerial photographs over a period of time, you can see

21   a very distinct eroded ditch that, at times, is much darker

22   than the surrounding soil, so that would be indicative of the

23   fact that the soils are wet.

24       You can also see, in the photographs, the eventual

25   formation of a small delta-like, deltaic deposit of sediment

1    at the bottom of that ditch down as it flows out into the

2    northwest corner area where it's eroding the soil along the

3    ditch as stormwater is running down through it and the soils

4    are being deposited as a small delta-like feature down there

5    where the ditch exits or turns off to the northwest into that

6    low area.

7         So all of those features suggest to me that this ditch

8    was being used to actively convey stormwater from the

9    unloading area.  Quite frankly, if the unloading area wasn't

10   putting stormwater down there, there is no other watershed

11   there.  It is the only watershed to that ditch that would

12   provide that type of runoff, and it would have been illogical

13   to have constructed the site in this way with a rail siding

14   and a berm and a drainage ditch in between if the intention

15   wasn't to drain the unloading area, because there is no other

16   watershed for the ditch to drain.

17   Q    Dr. Powell, how long did this pathway that you've

18   identified from the loading/unloading area out to the

19   northwest corner exist at the Dyce Chemical facility?

20   A    It was first constructed sometime in 1974 when they began

21   constructing the berm along the west side of the -- excuse me,

22   on the east side of the rail tracks.  The ultimate completion

23   of it appears from the aerial photography to have been

24   sometime in 1975 when they completed the berm and the south

25   portion of the berm.  And so from that time up until very

1    early in 1981 when they reconfigured the berm, this ditch

2    would have been there and been conveying runoff or any spilled

3    chemicals from the unloading area down into that northwest

4    corner.

5            MR. LYNCH:  And, Julianne, would you please pull up

6    Illustrative DD109?

7            DOCUMENT TECHNICIAN:  (Complied with request.)

8    BY MR. LYNCH:

9    Q    This is a marked-up version, Dr. Powell, that you've

10   marked up of the June 2, 1981 photo.

11           Thank you, Julianne.

12           Could you please discuss the changes that you were

13   referring to?

14   A    Well, this shows the configuration of the site after the

15   berm was reconstructed.  The original berm that existed up

16   until 1981, you can see on the photo a remnant of it still

17   down through approximately this area.  And just to the west of

18   that, the blue line depicts the old stormwater ditch that

19   formerly would have conveyed water out this way into the

20   northwest corner but now, with the reconstruction of the berm,

21   is conveying stormwater into the new catch pond.

22           And so the reconstruction of this area, particularly the

23   reconstruction of the berm, caused any runoff from the

24   unloading area, as of the completion of this project, to now

25   be trapped in the catch pond rather than go to the northwest

1    corner.

2    Q    And, Dr. Powell, do these changes to the Dyce Chemical

3    facility in 1980 to '81, does that give you an opinion as to

4    the time frame for when the spill you believed caused the

5    contamination in the northwest corner likely occurred?

6    A    Yes.  Once the site was reconfigured in this way, it

7    would have been impossible for a release in the unloading area

8    to have flowed directly down to the northwest corner.  Any

9    release in the unloading area, as of this reconfiguration of

10   the site, would have been trapped within the containment

11   around the tank farm and ultimately ended up down in the catch

12   pond.

13   Q    And, Dr. Powell, before we leave this topic, the

14   configuration that existed at the site prior to '81 where the

15   ditch drained water from the unloading area out to the

16   northwest corner area, would such a design have been

17   consistent with then-existing industry standards?

18   A    It would have.

19   Q    And how do you know that?

20   A    Well, I have done forensic studies and remedial studies

21   of any number of sites just like this around the country.  In

22   the 1970s it was common that areas where you have heavy truck

23   traffic where you were unloading chemicals were paved, in part

24   because, as we heard in testimony earlier in the trial, there

25   was concern with the trucks getting stuck in the mud when the

1    soils get wet.  So that type of pavement was pretty much

2    common, standard of practice, in these type facilities in the

3    loading and unloading areas.

4        But you really didn't see containment of those areas as

5    part of the normal way plants were constructed and operated

6    until later in the '80s when it became much more of a concern

7    about releases with the adoption of statutes, for example,

8    like RCRA and Superfund, that companies began to put

9    containment on these loading and unloading areas.

10   Q    And, Dr. Powell, during the time the site was configured

11   that way, when the ditch ran from the loading/unloading area

12   to the northwest corner, could small releases of product

13   during routine chemical-handling operations or perhaps rinsing

14   of hoses or drums, could that have caused, in the unloading

15   area, could that have caused what we see in the northwest

16   corner?

17   A    No.  A small release would never get a DNAPL product like

18   this down there.

19   Q    And can you explain why not?

20   A    Well, when you release a product like perc onto the

21   ground, the first thing it's going to do is start to wet the

22   pavement.  And if there's a large enough quantity, it will

23   begin to flow across the pavement, but along the way in that

24   process, it's creating even more and more wet pavement.  So

25   some of what is initially released is simply going to result

1    in a wet spot, and that will then evaporate off and it never

2    will migrate.

3         There's a minimum level that you'd have to release in the

4    unloading area before any perc is going to reach that

5    northwest corner, and certainly small leaks, small releases,

6    are far below that minimum.

7    Q    Okay.  Have you calculated the volume of perc that you'd

8    need to release in the loading/unloading area to result in the

9    contamination that we see in the northwest corner today?

10   A    Yes, I've done some illustrative calculations of that.

11   Q    Can you explain how you determined that?

12   A    Well, I've looked at a couple of different factors;

13   first, how much might be retained on the pavement.  If there's

14   a spill in front of the unloading or the drumming shed, for

15   example, and it flowed to the ditch in the northwest -- the

16   ditch over along the rail tracks, how much would just be

17   retained because it wet the pavement along the way?  That's

18   probably a number in the range of 20 to 40 gallons, would just

19   be retained on the pavement, and that would subsequently

20   evaporate off and go no further.

21        As product, then, flows down the ditch to the northwest

22   corner, there's going to be additional loss in part because it

23   will begin to infiltrate into the soils on the bottom of the

24   ditch, and so there's some loss there, and there's also

25   evaporation from the product as it's flowing down the ditch,

1   because it's just a free surface and it will be more of

2   evaporation.

3       The evaporative piece as it's flowing down the ditch I

4   estimated is in the range of about 36 to 40 gallons.  How much

5   is lost to infiltration in the soil depends a great deal on

6   the condition of the soil at the time of the release and

7   particularly the wetness of the soil at the time of the

8   release and whether it's frozen.

9       If the soil is very dry, then the perc will infiltrate

10  into the soil, and for these types of silty clays, I've

11  estimated an infiltration rate of about a half an inch per

12  hour.  A large spill would only go on for a period of a few

13  minutes, ten, 15 minutes, perhaps, so you're going to lose

14  some.  I estimated, if the soil was very dry and perc could

15  freely infiltrate, you might lose 100 gallons or more, 130

16  gallons, perhaps, through infiltration along the ditch, so

17  that comes off.

18      And then finally, once the perc reaches the northwest

19  corner, it's going to pool in whatever low area is down there,

20  and it doesn't immediately go into the ground.  The only way

21  it could get underground very, very quickly would be if the

22  soil were so dry that you got desiccation cracking, which you

23  commonly see in clay soils when they get very dry.  You'll

24  actually see cracks in the soil.  Or if there were animal

25  burrows in the soil.  Those sorts of features would allow the

1   perc to very quickly drain below ground.

2       But in the absence of that, if the soil were intact and

3   there were no holes, then it's going to take a while for the

4   perc to get below ground to where it will no longer evaporate,

5   and, in the process, there's going to be additional

6   evaporative losses.

7       I estimated that for a large spill, one of perhaps

8   300 gallons that reach that area, which was one of my

9   estimates of the mass of perc in the ground, you might lose

10  another hundred gallons or so from evaporation before it gets

11  underground.

12      So if you total all of those up, it's very plausible that

13  a large spill in the unloading area, you could lose perhaps as

14  little as 150, perhaps as much as 250 gallons along the way,

15  depending on how much percolates into the soils in the ditch.

16      The reason that number is a bit uncertain is, as I

17  mentioned earlier when we were talking about how perc behaves

18  in the subsurface, is when it encounters wet soils, the

19  ability to percolate through them slows down, and so if the

20  ditch was wet at the time a release occurred, you would get a

21  little loss along the edge of the ditch as it coated the

22  soils, but you wouldn't get a lot of percolation.

23      Alternatively, if the ditch were wet and frozen, you get

24  virtually no percolation at all because perc will not melt

25  ice, and so that would have prevented any percolation.

1187

1    So the loss rates, you know, vary.  We don't know precise

2    conditions at the time a release occurred.  We don't know the

3    air temperature, for example.  That affects evaporation rates.

4    We don't know the wetness of the ditch.  That would affect the

5    percolation rate.  But a reasonable estimate of the loss

6    between the unloading area and the northwest corner is

7    probably in the range of 150 to perhaps 200, 250 gallons.

8    Q    Okay.

9    A    And so it gives you a sense of an order of magnitude.

10   It's not a precise number.

11   Q    Okay.  So how large of a spill would you estimate would

12   have had to have occurred in the loading/unloading area to

13   result in what we have in the northwest corner?

14   A    Well, if we're benchmarking it against the 300-,

15   310-gallon estimate of what's there, it would have likely

16   taken a spill of 500 to 600 gallons.  If we're benchmarking

17   against the 200-gallon estimate, it would have been a little

18   bit smaller; perhaps 400 to 500 gallons.  But it's a number

19   within that range.

20   Q    I'd like to ask you a few followup questions about your

21   analysis, Dr. Powell.

22        First, you indicated once the perc pooled in the

23   northwest corner, depending on the conditions, it would take

24   some time to sink into the soil, the subsurface soils.  In

25   your opinion, how long would it take perc, once it settled on

1  the surface in the northwest corner, to reach groundwater?

2  A    Well, I think in some of my earlier expert reports I

3  commented that it would have been no more than six months.  If

4  the soil were dry, and certainly if there were any cracking,

5  any animal burrows, it could have been very quick, a matter of

6  days.  If the soil were wet, damp, such as the perc moved

7  relatively slowly, it may have taken a few months, but perc in

8  the vadose zone moves pretty rapidly.  A lot of experiments

9  have been done to look at that question, and it goes very fast

10 through dry soil.

11 Q    Now I want to talk to you also about the estimations of

12 how much perc would have infiltrated in the soils along the

13 ditch as the spill flowed through.  I believe you said there

14 was different factors that affected that.  For your

15 calculations, did you assume the soils were wet or dry?

16 A    I assumed that they were dry so that the perc would

17 readily infiltrate.

18 Q    Did you assume that the soils were frozen?

19 A    No.

20 Q    So the assumption you based on would have assumed a high

21 rate of infiltration as compared to what might have existed

22 under other conditions?

23 A    That's right.  If the soils were wet or if they were

24 frozen at the time, there would have been much less

25 infiltration.

1  Q    And I believe you said the figure you arrived at for

2  infiltration along the ditch would have been 130-some gallons?

3  A    That's right.

4  Q    That's not an insignificant amount of perc.  Wouldn't

5  that result in DNAPL contamination conditions similar to what

6  we see in the northwest corner?

7  A    No, I don't think it would.  Even if that number were the

8  actual number, I don't think it would result in a DNAPL

9  condition.

10  Q    Why is that?

11  A    DNAPL conditions down in the aquifer typically result

12  when you have a concentrated release in one area that is

13  reinforcing so that the first amount of mass that goes into

14  the soil is reinforced by subsequent infiltration, and

15  subsequent infiltration, and subsequent, and it pushes it down

16  deep into the aquifer.

17      The analogy that I used yesterday in talking about a drip

18  irrigation system and why they're so effective in watering

19  soils deeply, that they're dripping, just continuous, more and

20  more water in the same place, you need that kind of condition

21  to cause DNAPLs to migrate deeply into soils and down into

22  aquifers.

23      In the ditch, we had a condition where, if arguably the

24  soils were dry, perc flowed through.  It infiltrated, I've

25  estimated, just a tenth of an inch, but, in the porosity of

1190

1    the soil, perhaps a half an inch of the soil became wetted

2    with perc initially.  But once the bulk release of perc has

3    flowed through the ditch, it's essentially dry again.  There's

4    still a residue of perc in the soil, but there's no perc

5    ponded up on top of that to reinforce that initial

6    infiltration and to push it any deeper into the soil.

7         So once the ditch began to dry out, evaporation

8    immediately begins, and the soils that are very close to the

9    surface that have been contaminated with perc are largely

10   going to lose that perc over a period of time simply through

11   evaporation back to the atmosphere.

12        That's quite unlike the northwest corner, where the perc

13   likely pooled in low areas and the initial infiltration was

14   reinforced by the additional amount in the pool that continued

15   to push it down deeper.

16   Q    Now, Dr. Powell, I believe Mr. Sullivan told us earlier

17   in the week that EPA would allow additional testing on the

18   site if it was requested.  Have you requested that there be

19   any additional testing on the site to support your

20   conclusions?

21   A    No.

22   Q    Do you think it would help resolve this matter, to go in

23   and try and test that ditch area today for perc?

24   A    I don't think it would.

25   Q    And why not?

1    A    Well, as I just was describing, I think even assuming

2    that a release did occur down through that ditch, it's

3    unlikely that there's much contamination left there today, so

4    drilling a hole and finding nothing isn't particularly

5    informative.  It doesn't really resolve the debate.

6         Also, this area has been heavily reconstructed since the

7    time that ditch was there.  The berms were removed.  The area

8    was filled.  New tank farms were built.  It was concreted

9    over.  Given all of the construction that's gone on, I think

10   it would be arguable, if I drilled a hole at some particular

11   location, whether I was even sampling the soils that were

12   originally at the bottom of the ditch.  I think that would be

13   very difficult to try to pinpoint that to know you were

14   precisely in the right location.

15   Q    Have there been any samples collected by ATC, EPA, or any

16   of the contractors that have worked on the site from that

17   historic ditch area?

18   A    There was one sample, and I honestly don't remember who

19   drilled the hole, which of the various contractors did it.

20   There was a sample that's called Borehole F, BH-F, on the

21   drawings.

22            MR. LYNCH:  Julianne, maybe pull up Illustrative

23   DD070.

24            DOCUMENT TECHNICIAN:  (Complied with request.)

25   ///

1  BY MR. LYNCH:

2  Q    Some markings you've made on the 1975 photo.  Maybe you

3  could explain what you're referring to.

4  A    Borehole F is this sample location right here.  It was a

5  borehole that was drilled through the soil down to the water

6  table.  I don't recall that they did any sampling in the soil

7  itself, but they did sample the groundwater at that location

8  and found a very high level of perc in the groundwater; if

9  memory serves me, about 13,000 parts per billion of perc, so

10 it's well up into the range that's indicative of a DNAPL

11 release.

12 Q    Dr. Powell, one followup question regarding the

13 loading/unloading area.  Based on the testimony you've heard

14 and the documents you've seen this week, if there were an

15 accident during a loading/unloading operation, equipment

16 failure, employee negligence, whatever, how quickly or how

17 long would it take for 500 to 600 gallons of perc to be

18 released?

19 A    I'm sorry; I missed the last part of that question.

20 Q    How quickly would it take for 500 to 600 gallons of perc

21 to be released?

22 A    I think that depends entirely on where the release

23 occurred.  There's been testimony, and in some of the

24 documents I've read, that the pump that was used to transfer

25 perc from the tank truck to the bulk storage tank had a

1193

1    capacity of 60 gallons per minute.  So if the release occurred

2    somewhere between that pump and the storage tank, then it

3    probably would have been flowing out at the rate of the pump,

4    and that would have taken roughly eight or nine minutes.

5         If the release occurred, though, between the pump and the

6    tank truck, if the hose came loose there and it was flowing

7    from that hose, I don't think I have a good estimate for what

8    that flow rate would have been.  I don't think it would have

9    been defined by the pumping rate, because the pump at that

10   point isn't involved.  It's just flowing out of the pipe, and

11   I don't know what that release rate would be and how long it

12   would take.

13   Q    Could it have been higher?

14   A    It could have been higher.  It could have been lower.  I

15   just don't know.

16   Q    One of the other alternative causes that we heard, in

17   opening, the insurance company suggest that resulted in the

18   northwest corner contamination is releases from, you know, the

19   former catch pond.  In your opinion, could the northwest

20   corner contamination have resulted from a release of materials

21   from the catch pond?

22   A    No, I don't believe that happened.

23   Q    And to play devil's advocate here, we've heard some

24   testimony that at least after the 1981 revisions, the catch

25   pond did capture drainage from the loading/unloading area,

1194

1    correct?

2    A     That's correct.

3    Q     Couldn't the types of occasional releases that have been

4    testified to this week during loading/unloading operations,

5    couldn't that have resulted in an accumulation of DNAPL perc

6    in that catch pond?

7    A     Small releases of a few gallons to arguably even

8    50 gallons I don't think would have ever reached the catch

9    pond.  They would have been trapped on the surface of the

10   pavement, of the soil.  They would have evaporated.  They

11   never would have gotten there as a DNAPL.  If there were

12   stormwater runoff, some dissolved perc in the stormwater might

13   have reached the catch pond, but I don't believe that a small

14   release of DNAPL could get to the catch pond, certainly not

15   from the unloading area.

16              MR. LYNCH:  Okay.  And why don't we pull up the 1981

17   photo, Admitted Exhibit 5033.  If we could zoom in on the same

18   area we always zoom in on?

19              DOCUMENT TECHNICIAN:  (Complied with request.)

20   BY MR. LYNCH:

21   Q     Dr. Powell, could you again indicate on this photograph

22   where the loading/unloading area is?

23   A     It's up here.

24   Q     Okay.  And the catch pond?

25   A     Approximately here.

1    Q     Do you know what the distance between the

2    loading/unloading area and the catch pond is?

3    A     Not precisely but, as I recall, it's a few hundred feet,

4    200 or 300 feet.

5    Q     And do you know what the soil or the ground surface is

6    between the loading/unloading area and the catch pond?

7    A     Once you get outside the immediate unloading area, it's

8    essentially bare soil.

9    Q     Any idea how large of a perc spill it would take to get

10   from the loading/unloading area to the catch pond?

11   A     Well, I haven't tried to estimate it precisely, but as

12   compared to the estimates I did for the unloading area to the

13   northwest corner -- I thought about this for a while yesterday

14   evening -- it would probably take a release somewhere in the

15   vicinity of 100 gallons or more before you're going to get any

16   significant amount of perc in the catch pond, if it happened

17   in the unloading area.

18   Q     All right.  Now let's assume that a release as a result

19   of operations somehow got to the catch pond.  A release of

20   perc from operations somehow got to the catch pond.  Would you

21   expect still to find chemicals other than perc in that catch

22   pond as well?

23   A     Yes.  The catch pond was a catch pond for the whole

24   operation.  All of the chemicals that they used there that are

25   released onto the ground and are transported via runoff are

1    going to end up in that catch pond.

2    Q    Based on your listening to the testimony today and review

3    of documents, any understanding of the amount of perc that was

4    handled at the site compared to some of the other chemicals,

5    specifically some of the BTEX compounds?

6    A    I don't have a specific knowledge of the volumes of BTEX.

7    I understand it was relatively large volumes of BTEX that were

8    handled.

9         With regard to the perc, I understand they had initially

10   a 1,500-gallon storage tank; later, a 4,000-gallon storage

11   tank; and the deliveries of perc to the site were in

12   quantities commensurate with those tank volumes.

13   Q    Now assuming these chemicals, both BTEX and perc, got to

14   the catch pond, I believe you testified yesterday, when you

15   were talking about BTEX, that BTEX floats; is that correct?

16   A    Yes.  It's an LNAPL, lighter than water.  It will float.

17   Q    Perc, on the other hand, sinks?

18   A    It's a DNAPL.  It's a sinker.

19   Q    Would the catch pond waters then not have been expected

20   to have any BTEX in them?

21   A    Well, if there were a release of a large quantity of

22   BTEX, xylene, for example, it's going to flow down to the

23   catch pond.  It's going to form a floating oily-like layer on

24   top of the pond, on the top of the water in the pond.

25   Q    Is the water in the pond going to have any dissolved BTEX

1  in it?

2  A    Oh, yes.  BTEX, like perc, is soluble in water, and it

3  will dissolve in the water.

4  Q    I'd like you to assume that, contrary to what you had

5  said about whether you think a release of perc could have

6  gotten to the catch pond, assume that small types of releases

7  from the result of operations, whatever chemicals, did get to

8  the catch pond.  If the catch pond were then drained, what

9  would you expect the resulting contamination to look like?

10  A    I'm not really clear about your question.  Are we talking

11  about the contamination left in the bottom of the pond or the

12  contamination in the water that's drained?

13  Q    The contamination that would have resulted from the water

14  that was drained.

15  A    The water that's drained is going to have a rich menu of

16  everything that's there, similar to the kinds of menu of

17  chemicals that were found in the concrete catch ponds that

18  were eventually built behind the later tank farm.  It would

19  just be a rich mix of everything that's there in the facility

20  that was released.

21          MR. LYNCH:  Julianne, if you could pull up

22  Exhibit 4811?

23          THE COURT:  Let's take another quick break here.

24          THE LAW CLERK:  All rise.

25      (Recess taken from 10:57:00 to 11:05:59.)

1          (Open court.)

2          (Jury present.)

3                THE COURT:  Please be seated.

4                You may continue.

5     BY MR. LYNCH:

6     Q    Dr. Powell, before you on the screen is one of the

7     documents we looked at with Mr. Sullivan yesterday when he was

8     testifying.  It's the results of some samples he took in the

9     operational area of the Dyce site.

10         I'd like you to turn to page 2 of that document, please,

11    Julianne, and pull out the last paragraph under "Concrete and

12    Soil Analytical Results."

13                DOCUMENT TECHNICIAN:  (Complied with request.)

14    BY MR. LYNCH:

15    Q    This paragraph, Dr. Powell, describes the findings

16    Mr. Sullivan made when he tested that subsequent concrete tank

17    pond on the site, and it states that constituents in either

18    one or both of the concrete samples include ethylbenzene,

19    methylene boride, PCE, and xylenes.  Are some of those

20    constituents -- let me back up.

21         PCE is perc, right?

22    A    Yes, that's right.

23    Q    Are some of the other constituents BTEX compounds?

24    A    Yes.  Ethylbenzene is the E in BTEX, and xylene is the X

25    in BTEX.

1    Q    And you understand, Dr. Powell, that this sample was

2    taken from the very bottom of essentially what was the

3    concrete catch pond?

4    A    That was my understanding, yes.

5    Q    If chemicals were getting to the historic catch pond that

6    existed on the Dyce site in any appreciable amounts, would you

7    expect to see a similar profile in that historic catch pond?

8    A    Well, I don't know that the concentrations would have

9    been precisely the same, but the same general mix of chemicals

10   would have been expected to be found.  You should have seen

11   BTEX, perhaps perc, other kinds of chemicals.

12   Q    And, Dr. Powell, if they had regularly drained that

13   historic catch pond, is it even conceivable to conclude that

14   each time they drained that catch pond, the only thing they

15   pulled out of it was pure perc?

16   A    No.  They would have pulled out what was ever in the

17   water in the pond.  There was no way for them to physically

18   separate perc from everything else in the water when they

19   discharged water.  Everything would have gone with it.

20   Q    Now Marvin Johnson came in yesterday and testified that

21   he believes he recalls that there was a pipe in the catch

22   pond.

23        And may I approach, Your Honor?

24              THE COURT:  Yes.

25   ///

1200

1    BY MR. LYNCH:

2    Q    And I've put up on the easel, Dr. Powell, Marvin

3    Johnson's illustration of how that pipe ran in the catch pond.

4    You can't really tell from that diagram, but do you have any

5    idea how far from the bottom of the catch pond the end of that

6    pipe would have been?

7    A    No.  I don't think that's something he commented on

8    during his testimony.  Not that I heard.

9    Q    Did he give you any indication of whether it was at the

10   very bottom?

11   A    Well, I recall --

12           MR. GROSSBART:  Objection, Your Honor, to this

13   characterization of his testimony.

14           THE COURT:  Sustained.

15   BY MR. LYNCH:

16   Q    Do you have understanding as to whether that pipe was

17   always, end of the pipe that he believes he saw, was always

18   underwater?

19           THE REPORTER:  I'm sorry; Do you have any

20   understanding --

21           MR. GROSSBART:  Same objection.

22           THE REPORTER:  Wait.

23           Your question?  I didn't hear you clearly.

24           MR. LYNCH:  Oh.

25   ///

1    BY MR. LYNCH:

2    Q    Do you have an understanding as to whether the bottom of

3    that pipe in the catch -- that he believes was in the catch

4    pond was always under the water?

5             MR. GROSSBART:  Same objection.

6             THE COURT:  Sustained.  I don't know that he --

7    well, did he testify to that yesterday?

8             MR. COZZENS:  (Nodded head affirmatively.)

9             THE COURT:  I don't remember.

10            MR. COZZENS:  Yes, he did, Your Honor.

11            THE COURT:  Well, go ahead and answer if you have an

12   answer.

13            THE WITNESS:  To the best of my recollection, he

14   commented that sometimes the pipe would be underwater and

15   sometimes the water level in the pond was low enough that the

16   pipe was not down in the water.

17   BY MR. LYNCH:

18   Q    Given the area of that pond as it existed in the early

19   1980s, how much perc would it take to get even an inch layer

20   of perc, pure-phase perc, in the bottom of that catch pond?

21   A    It would, it would take a release of somewhere in the

22   neighborhood of 1,000 gallons, perhaps a little less, that

23   actually reached the pond.  Depending on where the release

24   occurred, it may have to be bigger than that to get that much

25   perc to the pond, but 1,000 gallons would create a layer in

1    the bottom of the pond of about an inch of perc.

2    Q    It would be a lot of drips and drabs, or even 5-gallon

3    spills of perc, wouldn't it?

4    A    I don't think drips and drabs and 5-gallon spills would

5    ever reach the pond in the DNAPL form.  To get a thousand

6    gallons back there, you would have to have a very large

7    release, all at once, or it's just not going to get back to

8    the back corner.

9    Q    Even assuming that, you know, that the end of that catch

10   pond was an inch or two above the bottom of the catch pond and

11   thousands of gallons of perc had been released into the catch

12   pond, could that perc have drained out of the pond by opening

13   the valve on the pipe that Mr. Johnson described?

14   A    No, I don't believe it could.

15   Q    And why is that?

16   A    Perc is a very heavy liquid as compared to water.  It's

17   denser than water.  In order for the perc to drain from the

18   pipe, assuming that the pipe was even down in the perc layer,

19   there would have to be enough water pressure in the pond to

20   push that heavy liquid up the pipe all the way to the top.

21       As Mr. Johnson has drawn this pipe, the outside end of

22   it, the one outside the berm on the left, is nearly at the top

23   of the berm.  And there's been testimony that the berm was

24   about 5 feet tall.  So the maximum water you can pond inside

25   that berm is 5 feet.  Any more than that is simply going to

1    spill over and start to flow outside the pond.

2        So the maximum water pressure that you can form on the

3    pond side of that pipe, the end that's sticking down in the

4    perc layer, is comparable to 5 feet of water pressure.

5        Perc is 60 percent denser than water.  Water has an

6    actual density of 1 gram per cubic centimeter.  Perc has a

7    density of roughly 1.6 grams per cubic centimeter.  Five feet

8    of water pressure on the bottom of that pipe would be capable

9    of lifting a column of perc approximately 3 feet up from the

10   bottom of the pond in the pipe, at which point the pressure of

11   perc inside the pipe and the pressure of the water outside of

12   the pipe are in what's called a hydrostatic equilibrium and

13   the perc can't flow up any higher.  There is nothing to

14   continue to push it up higher.

15       Three feet of perc in that pipe would put it partway up

16   in the pipe, but it's not sufficient to lift it nearly to the

17   top of the pipe as Mr. Johnson has drawn it here, so even if

18   there were perc in the bottom of the pond and the pipe is

19   sitting in that perc and the pond is completely full of water,

20   there is not enough pressure to push that perc up to the top

21   of that pipe and hence out of the pond.

22   Q    Dr. Powell, is there any way that the pure-phase perc

23   that we now find in the northwest corner could have

24   accumulated in the catch pond and simply overflowed the berm?

25   A    I'm sorry; could you read that question back?

1  Q    Sure.  I apologize.

2       Is there any way that pure-phase perc could have simply

3  accumulated in the catch pond and risen up to a level that it

4  would have simply overflowed the berm?

5  A    Not unless it was an enormous quantity of perc, because

6  perc settles -- perc is a DNAPL, so it's going to settle to

7  the bottom of the pond.  There may be water on top that will

8  eventually overflow, but whatever perc is there in the bottom

9  of the pond below the water layer, perc could never overflow

10 that berm unless the entire pond were full of perc to the

11 point that it was spilling over the top of the berm.  And

12 that's an enormous quantity.

13 Q    Can you give us an estimate as to the amount of that

14 quantity?

15 A    Well, the pond, as it existed in 1981, was about 2,000

16 square feet in size.  The berm is 5 feet high, so the product

17 of those two things is 10,000 cubic feet.  That's assuming

18 that it doesn't expand beyond the edge of the pond into the

19 lower part of the tank farm, which I expect would have

20 occurred.  But assuming it even stayed confined within the

21 boundary of only the pond, you're talking about 75,000 gallons

22 of perc.  I mean, it's far in excess of anything that was ever

23 onsite.

24 Q    You previously reviewed some of the sampling data from

25 the pond; specifically, the Kaivos testing that was done in

1    1985.  Does that in any way inform your opinion as to whether

2    an appreciable amount of perc, DNAPL perc, ever reached this

3    catch pond?

4    A     Yes, it does.

5    Q     And how so?

6    A     Well, if perc had migrated to the pond as a DNAPL, it

7    would have first settled to the bottom of the pond and would

8    have been on the bottom layer of the pond.  There was a soil

9    layer sitting on top of the liner in this pond, and so the

10   perc, when it settles to the bottom of the pond, begins then

11   to percolate, to infiltrate down into the soil layer in the

12   same way, over in the northwest corner, it eventually went

13   down into the water table.

14        So an inch, for example, of perc on the bottom of the

15   pond from a 1,000-gallon release would have largely ended up

16   initially down in that -- trapped down in that soil layer, and

17   when Kaivos went in and tested, in 1985, those same sediments,

18   if there had been anything remotely like that in the past,

19   they should have been able to see it in their test.

20   Q     Dr. Powell, have you considered the possibility that

21   DNAPL perc simply accumulated in the bottom of the pond, went

22   into the subsurface soils there, and then migrated, simply

23   migrated to the northwest corner?

24   A     I don't think that the evidence in this case supports

25   that theory in any way.

1206

1    Q      Why doesn't the evidence support that?

2    A      Well, it certainly is plausible in my view that if perc

3    accumulated in the bottom of the pond that it could have gone

4    through the bottom of the pond into the soil beneath it.  The

5    liner systems that were available back in that era were really

6    not effective in containing something like perc.  The better

7    liner systems, high-density polyethylene, for example, that

8    eventually began to be used for these types of facilities

9    really wasn't available until later.

10          So it's plausible that the perc could have gone through

11   the liner system into the ground, but if that had occurred, as

12   I have said several times, it leaves tracks behind.  The

13   ground under that pond would be highly contaminated.  It would

14   look just like the northwest corner area.  When they went in

15   and drilled and tested, they should have seen that high level

16   of contamination in the soil tests that they performed, in the

17   MIP logs they performed, and groundwater samples they

18   collected, and the contamination with regard to groundwater

19   should have been right at the first top of the aquifer, not

20   down deep where they eventually found it in Boring MP-105.

21          So I don't think the data they collected from that area

22   in any way suggested that there was ever a DNAPL release from

23   the pond that went through the bottom of the pond into the

24   soil and, hence, to the water table.

25   Q      Dr. Powell, just following up on that, I believe you

1207

1    testified that in MP-105, the location where they found perc

2    near the former catch pond, where was the perc found, the

3    DNAPL indicator found?

4    A    At the very bottom of the sand and gravel aquifer in

5    groundwater.  There was nothing above that, higher up in the

6    water table or in the vadose zone, that was indicative of a

7    DNAPL perc condition.

8    Q    And in the northwest corner, what levels were -- what was

9    the first level where indications of DNAPL perc were found?

10   A    It was found beginning about 2 feet under the ground and

11   then all the way down through the aquifer into the sand and

12   gravel unit, continuously.

13   Q    Assuming, for argument's sake, that somehow perc had

14   gotten into the ground beneath the catch pond, migrated

15   laterally to the northwest corner, is there any way that DNAPL

16   perc could have moved up through the soils to see the result

17   in the contamination we see in the northwest corner?

18   A    Certainly not into the vadose zone.  Gravity pulls things

19   down.  It doesn't push them up.  And the perc arguably, if

20   there had been enough released from the pond, might have

21   migrated in the water table zone to the northwest corner, but

22   it would have left a large region of contamination behind on

23   the way.  But once it reached the northwest corner, it could

24   not have then migrated upward, back up towards the surface

25   into the vadose zone in the kind of concentrations that have

1208

1    been seen there today.

2    Q    We've seen a lot of photographs in this case, Dr. Powell,

3    that show varying degrees of vegetation along that northwest

4    corner area.

5         And, Julianne, maybe if you could please pull up Admitted

6    Exhibit 5024?  You don't need to blow it up.

7              DOCUMENT TECHNICIAN:  (Complied with request.)

8              MR. LYNCH:  In this area here that I'm referring to.

9              And now Admitted Exhibit 5028?

10             DOCUMENT TECHNICIAN:  (Complied with request.)

11             MR. LYNCH:  This is the '79 photo that we've looked

12   at, that area.

13             Admitted Exhibit 5033?

14             DOCUMENT TECHNICIAN:  (Complied with request.)

15             MR. LYNCH:  We're talking about this area in here.

16             And then Admitted Exhibit 5036?

17             DOCUMENT TECHNICIAN:  (Complied with request.)

18             MR. LYNCH:  In this area in here.

19   BY MR. LYNCH:

20   Q    Does the existence of that devegetated area, Dr. Powell,

21   undermine your conclusion that there were no releases of perc

22   from this historic catch pond?

23   A    Could you read the question back, please?  I'm not sure I

24   caught every word.

25   Q    I'll reask it.  It was probably a bad question.

1209

1    Does the existence of that devegetated area, does that

2    undermine your conclusion that perc was not released from this

3    catch pond?

4    A    No, not at all.

5    Q    And why not?

6    A    Well, there are very simple and direct explanations for

7    why that area is devegetated.  It doesn't require a release

8    from the catch pond to explain why the vegetation has a hard

9    time growing down there.

10   Q    What are some of those simpler explanations?

11   A    Well, the first and obvious one is Dow Chemical was

12   manufacturing 2,4-D on this site.  It's a very potent

13   herbicide.  It's a product that you'll commonly find in weed

14   killers like Ortho Weed B Gon, for example.  2,4-D is an

15   active ingredient in that.

16       There was formerly a small impoundment on the west side

17   of the railroad tracks where waste from that operation was

18   apparently disposed.  And I believe it was Mr. Naff who

19   testified earlier in the trial that he observed occasional

20   releases from that impoundment, and you can certainly see in

21   the photography areas of devegetated soils leading from that

22   impoundment down into the northwest corner area.  So to the

23   degree there's episodic releases of 2,4-D that flow down

24   there, have historically flowed down there, they would

25   certainly contribute to devegetation in that area.

1    Also, when ground becomes very acidic, it's difficult for

2    vegetation to grow, and I believe one of the former employees

3    at Dyce -- I honestly don't recall his name -- yesterday

4    talked about his concern with what he described as sour ground

5    down in that area.  That's a euphemism for acidic ground.

6    There was regular unloading operations along the rail siding

7    of tank cars of things like hydrochloric acid that occurred,

8    and it's inevitable, in my experience, in those types of

9    unloading operations, there will be small drips and drabs that

10   get onto the ground.  And concentrated hydrochloric acid goes

11   a long way when mixed with stormwater in terms of creating

12   acidic conditions, and any drips along that rail siding,

13   because of the way the drainage was oriented in the late '70s,

14   would have inevitably flowed, in stormwater, down into the

15   northwest corner area.  The combination of those two, the

16   herbicides, the acids that might have washed down there, would

17   both contribute to devegetation.

18   In addition, perc, in a DNAPL form, will kill vegetation.

19   I know that because I think I mentioned yesterday I have a

20   client who unfortunately was using it as a weed killer on his

21   parking lot, and now his parking lot is in the middle of a big

22   Superfund site, and he is spending a lot of money doing a

23   cleanup, but they were spraying it to kill weeds.  And so to

24   the degree there is a DNAPL release of perc in that area, it

25   will also contribute to the die-off of vegetation.  So you

1211

1   have any number of readily available, simple, direct

2   explanations for why vegetation died in that area.  It doesn't

3   require pumping of the catch pond to explain it.

4   Q    And, Dr. Powell, we've heard testimony this week from a

5   couple of witnesses about an inventory discrepancy of bulk

6   perc in the mid 1970s.  Is that consistent with your

7   conclusion that the contamination in the northwest corner most

8   likely resulted from a bulk spill in the loading area of the

9   perc site in the mid 1970s?

10  A    Yes, it is.

11  Q    And how so?

12  A    Well, it's consistent insofar as the volumes that I've

13  estimated would have been required to create the contamination

14  in the northwest corner.  Five to 600 gallons likely would

15  have had to have been released to cause the 200 to 300 gallons

16  to be deposited in the soils in that corner.

17       It's also consistent in that a discrepancy during that

18  period of time, if it indeed resulted from a large bulk

19  release in the unloading area, would have naturally flowed to

20  the northwest corner via the drainage ditch along the rail

21  siding, so the volumes are approximately correct, and the

22  pathway existed at that time for the contamination to reach

23  that northwest corner.  And so they're consistent in that

24  respect.

25  Q    Dr. Powell, based on the totality of the information

1212

1    you've reviewed, your experience, and the testimony and

2    documents you've looked at this week at trial, is there any

3    other explanation for the contamination they found in the

4    northwest corner source area that is as likely as a bulk -- a

5    release of a bulk amount of perc in the loading/unloading area

6    in the mid 1970s?

7    A    No, there's not.

8             MR. LYNCH:  I have nothing further.

9             THE COURT:  Who is crossing?  Mr. Grossbart?  You're

10   up, at least for 32 minutes.

11            MR. GROSSBART:  A couple seconds to get organized.

12                      CROSS-EXAMINATION

13   BY MR. GROSSBART:

14   Q    I would say, "Good afternoon," but we're not quite there.

15   A    Good morning.

16   Q    Good morning, Mr. Powell, Dr. Powell.  Excuse me.

17        We've obviously met before.  You gave a deposition in

18   this case.  Do you recall --

19   A    Yes --

20   Q    -- that?

21   A    -- I do.

22   Q    I think we were in Minnesota.  Good to see you again.

23            THE REPORTER:  Gentlemen, we have to go one at a

24   time.  Thank you.

25            THE COURT:  She's the best in the world, but even

1213

1   they can't take two at the same time.

2   BY MR. GROSSBART:

3   Q    All right.  I will do my best to slow it down and pause.

4   I guess you will, too.

5        Can we put up -- well, let me just ask you this.  Your

6   firm, ENVIRON, has been working with Soco and some of its

7   predecessor-named companies for several years on issues

8   relating to the Dyce plant in Billings; isn't that correct?

9   A    There's been work done by other professionals in my firm

10  on the site prior to mine, yes.

11  Q    Right.  I'm not limiting it to you.  I'm limiting it to

12  ENVIRON, the company you are partial owner of.

13  A    That's correct.

14  Q    All right.  And that work goes back to when?  2002 or so?

15  A    I don't honestly know.  Until I became engaged to work on

16  this, this project, as an expert witness, I wasn't in any way

17  involved in the site, and so I don't know when the work

18  actually began.

19  Q    Well, in your expert report, you listed 45 or 50 pages of

20  material that you reviewed in connection with doing your work

21  for this case, right?

22  A    Well, I think there was a lot more than 45 or 50 pages,

23  but I listed what I've reviewed.

24  Q    No, the list was 45 or 50 pages.  Not what you reviewed

25  was 45 or 50 pages.

1214

1    A    Okay.

2    Q    So you didn't see, in doing that review, all of the other

3    things ENVIRON had done for Soco while the EPA investigation,

4    for example, was pending?

5    A    Yes, I believe there was some additional work done by

6    ENVIRON.

7    Q    Right.  And you saw the work, for example, done by

8    ENVIRON that was attempting to convince the EPA to take a

9    different course than it ultimately did?  You saw that, right?

10   A    I don't have a specific recollection of that as I sit

11   here today.  It's been a long time since I've looked at those

12   reports.

13   Q    Who helped you with your work in this case?

14   A    Most of the work, the staff support that I received, was

15   by Dr. Mark Hawley.  He's an engineer and hydrologist that

16   works in our Arlington, Virginia, office.

17   Q    Who else?

18   A    There were other members of the professional staff in

19   Arlington that assisted Mark.  I didn't work directly with the

20   staff.  I worked only through Mark, so I don't know the

21   specific names.

22   Q    Did you work with Steve Dielman?

23   A    I had asked him questions once or twice in the course of

24   my work, but I didn't have extensive interactions with him.

25   Q    Did he summarize materials for you?

1   A      Not directly, no.

2   Q      Did he summarize them indirectly?

3   A      Well, I understand from my discussions with Mr. Hawley

4   that he had previously had discussions with Mr. Dielman about

5   certain aspects of the earlier work on the case, and to the

6   degree those were information that Mr. Hawley was relying on

7   to put together documents for me, it would have been indirect

8   that any input from Mr. Dielman would have been considered.

9   Q      All right.  So you worked with Mr. Hawley, who in turn

10  worked with Mr. Dielman?

11  A      I don't think it's fair to say that Mr. Hawley was

12  working with Mr. Dielman in the course of my personal work on

13  this case, because Mr. Dielman left our firm last year and is

14  no longer a member of ENVIRON.  I know Mr. Hawley had a couple

15  of conversations with Mr. Dielman in the last few months to

16  clarify some information that he found in our records.

17  Q      Isn't much of your analytical work in this case based on

18  work that's been done previously in this case by others within

19  ENVIRON?

20  A      Some of it adapted work that was done previously by other

21  professionals in my firm.  Some of it is work where I took

22  previous work product -- for example, the original mass

23  estimates as to how much was in the northwest corner -- and I

24  updated that with further information that I had to produce

25  new estimates.

1    Q    That's right.  But they were essentially the same -- let

2    me strike that.

3         Let's go to Exhibit 3059, page 121, please.

4         DOCUMENT TECHNICIAN:  (Complied with request.)

5    BY MR. GROSSBART:

6    Q    Now this is a document everyone is familiar with, and

7    certainly yourself, correct?  It's from the ROD, the record of

8    decision issued by the EPA in August of 2005; is that correct?

9    A    I believe that's correct, yes.

10        MR. GROSSBART:  All right.  Now, Neil, could you

11   just enlarge it so we get --

12        DOCUMENT TECHNICIAN:  (Complied with request.)

13        MR. GROSSBART:  Okay.  That's fine.

14        Now why don't you, Neil, scroll or push the picture

15   over so we can see the legend.

16        DOCUMENT TECHNICIAN:  (Complied with request.)

17   BY MR. GROSSBART:

18   Q    And the green areas are -- there's a green area in the

19   legend and a hatched area, but the green signifies, according

20   to this diagram, source area saturated zone soil.  I

21   paraphrased it.  Do you see that?

22   A    Yes.

23   Q    Okay.  Now let's go back to the diagram.  So at least

24   according to the EPA, there are four source areas in and

25   around the Dyce plant, right?

1    A    (No response.)

2    Q    One, two, three, four green blobs?

3    A    (No response.)

4    Q    According to the EPA?

5    A    I am not quite sure what you mean by the term "source

6    area."  I understand they are depicting on here areas in which

7    they believe that the soils on the site exceed their cleanup

8    goals, their remediation targets.

9    Q    I mean what the EPA said in the legend that we just saw.

10   There are four of those.  Right?

11   A    Yes, there are.

12   Q    Okay.  And when you refer to the northwest corner, you're

13   referring just to this, right?

14   A    That's correct.

15   Q    And this, this fellow is not the northwest corner, is he,

16   according to you?

17   A    It's not what I would normally associate with that term,

18   but I don't know that it's not part and parcel of the same

19   problem.  It's in fairly close proximity.

20   Q    Is this area explained by the spill that you have

21   suggested occurred and worked its way out to the northwest

22   corner or not?

23   A    It may be.  I don't, I don't know that the data is

24   completely definitive in that regard.

25   Q    So maybe yes?  Maybe no?

1  A    That's right.

2  Q    And this source area, is that explained by the spill on

3  which you base your entire opinion, of which there's no

4  evidence, but that you hypothesized occurred?

5  A    You're referring to a spill in the unloading area?

6  Q    I'm referring to the spill that we've been here for a

7  week on now, the one that supposedly happened in 1975, '76,

8  '77, in the loading and unloading area and went southwest to a

9  ditch and then northwest to the northwest corner.  Is that

10 explained by that alleged spill?

11 A    No.

12 Q    Whatever it is, something else caused it?

13 A    That's right.

14 Q    How about that area?  Is that explained by the spill,

15 again, that no one has seen or heard -- or recorded, but on

16 which you base your opinion?

17 A    I don't think it probably is.

18          MR. GROSSBART:  Okay.  Would you go, Neil, to

19 Demonstrative 469, page 2?

20          DOCUMENT TECHNICIAN:  (Complied with request.)

21 BY MR. GROSSBART:

22 Q    Do you recall the testimony about this demonstrative by

23 Mr. Sullivan on Monday?

24 A    I recall Mr. Sullivan's testimony.  I don't recall this

25 specific demonstrative.

1219

1  Q    Well, just a couple minutes ago you talked about

2  Exhibit 4811 and some soil sampling that was done by ATC in

3  2003. Do you recall that exhibit?

4  A    Yes, I do.

5  Q    Okay. And that's the situation where, among other

6  things, Mr. Sullivan went into the concrete area depicted on

7  this photo, dug up the concrete and found perc and, to be

8  fair, other contamination immediately underneath there.

9  Right?

10  A    I believe that was his testimony, yes.

11  Q    Right. And you don't have any reason to doubt those

12  findings, do you?

13  A    No.

14  Q    And were you provided with this analysis when you did

15  your original expert work in this case?

16  A    It probably was information that we had and reviewed. I

17  just don't recall specifically. This is a very large file.

18  Q    I understand that.

19      And do you recall whether -- you recall, in doing your

20  expert work in this case, you were required to identify the

21  various documents and things that you reviewed to do your

22  work, right?

23  A    Yes.

24  Q    And did you list Exhibit 4811, either by that number or

25  its actual title, in your expert report?

1    A    Just for clarification, 4811 is --

2    Q    Well, we'll put 48- --

3    A    -- this specific demonstrative?

4    Q    We can put 4811 back up.

5         DOCUMENT TECHNICIAN:  (Complied with request.)

6    BY MR. GROSSBART:

7    Q    This thing.  This document.

8    A    I don't recall.  As you stated earlier, there were 40 or

9    50 pages of documents, and I don't have that level of memory.

10   Q    Okay.  That's fine.

11        You didn't discuss it, however, until today in any of

12   your prior work in this case, did you?

13   A    Well, I discussed the fact that --

14   Q    My question, sir, is, Did you discuss this particular

15   investigative report by ATC?

16   A    (No response.)

17   Q    Apart from whether you listed it or not in your

18   attachment, did you discuss it?

19   A    I don't recall whether we discussed this specific

20   document.  We discussed these types of tests and the findings,

21   such as have been reported here, as being a condition of this

22   area of the plant in the report.

23   Q    All right.

24   A    I'm certain of that.

25   Q    The plant is dirty, isn't it?

1221

1    A      There are areas of the plant where there is contamination

2    in soil and groundwater.

3    Q      Contamination is all over the place in the plant area,

4    isn't it?

5    A      It's found in a few discrete areas, and then it has

6    spread in groundwater to form the plume that's been mapped.

7    Q      I'm not talking about just perc and chlorinated solvents.

8    I'm talking about everything.  The plant is dirty, isn't it?

9    It's contaminated with all sorts of things?

10   A      There is contamination in soil in the plant in some

11   areas.  There is groundwater contamination in portions of the

12   plant.  I don't, quite frankly, know what you mean by the word

13   "dirty," because that's not a very precise term of art that I

14   would use as a scientist.

15   Q      There's a lot -- well, contaminations are high in the

16   plant, and they are of multiple different chemicals?

17   A      I would agree there are multiple chemicals, and, in some

18   areas, contamination levels are high.

19          MR. GROSSBART:  All right.  Would you go back to

20   469, page 2?

21          DOCUMENT TECHNICIAN:  (Complied with request.)

22   BY MR. GROSSBART:

23   Q      And the chlorinated solvent contamination, specifically

24   perc, found here, I don't know if you can see it, but we've

25   superimposed the ROD figure right here on this diagram; in

1  other words, the green blob.  Do you see that?

2  A    Yes.

3  Q    Okay.  And the perc contamination here is obviously

4  outside that green source area as delineated on the ROD

5  figure.  Fair statement?

6  A    Yes.

7  Q    And do you recall Mr. Sullivan testifying that, in point

8  of fact, if you were to factor in this information, the source

9  area in the main part of the plant would be larger; that

10 without this information, contamination in the plant proper is

11 understated?  Do you recall him saying that?

12 A    I don't recall him saying that, but I wouldn't disagree

13 with the underlying position that if you incorporate these

14 additional test results, that you would have drawn a somewhat

15 larger boundary there as representing the contaminated area

16 around the tank farm.

17 Q    All right.  And the EPA didn't have this information?

18 You heard him say that, too, did you not?

19           MR. LYNCH:  Objection.  Mischaracterizes the

20 testimony.

21           MR. GROSSBART:  Well, you heard -- I'll rephrase.

22           THE COURT:  Overruled.

23           MR. GROSSBART:  Well, all right.

24           THE WITNESS:  I don't recall that testimony, but

25 it's my understanding that the borings that ATC drilled that

1    are the basis of this were done after EPA had done their work,

2    and so it probably wasn't information they had and were able

3    to consider.

4    BY MR. GROSSBART:

5    Q    Well, the report is dated April 2003.  The EPA wasn't

6    done, didn't do its ROD until August of 2005.

7    A    But as I recall, the remedial investigation was issued

8    earlier than that.  The ROD is the last document in a series

9    of documents that are typically prepared over a period of

10   several years.

11   Q    Are you telling us that just because the -- well, first

12   of all, the remedial investigation I think is dated June 2003,

13   so even that one doesn't work, does it?

14   A    I don't believe that many of the borings that ATC

15   drilled, as part of their investigation, were incorporated

16   into the EPA's remedial investigation, for whatever reason,

17   whether it was timing or whatever reason, because when I look

18   at mapping that they did of the borings that they drilled and

19   that they used to map, for example, the northwest corner

20   source area, I noted that many of the borings that ATC drilled

21   in that area --

22            MR. GROSSBART:  Your Honor, can I get an answer to

23   my question?

24            THE WITNESS:  -- are not displayed on their map --

25            THE COURT:  Yeah.

1224

1          THE WITNESS:  -- so I don't believe they considered

2     them.

3          THE COURT:  Listen to the question he asked.

4          Ask it again.

5          MR. GROSSBART:  I pretty much forgot it, but I'll

6     start over.

7     BY MR. GROSSBART:

8     Q    The remedial investigation is dated June of 2003,

9     correct?

10    A    I don't recall the specific month.  I'll accept it as

11    correct if you represent it so.

12    Q    Well, you're the one who studied all this material.  You

13    don't even remember that?

14    A    No, I don't remember that specific date.

15         MR. GROSSBART:  Okay.  Then I'll double check, and

16    let's see if I'm right.

17        (Discussion off the record at counsel table.)

18         MR. GROSSBART:  Would you put the first page of 3050

19    on the screen, please, Neil?

20         DOCUMENT TECHNICIAN:  (Complied with request.)

21    BY MR. GROSSBART:

22    Q    Okay.  So you don't have to take my word for it, right?

23    A    Okay.

24    Q    And this report done in April of 2003, you heard, was at

25    least not turned over by Mr. Sullivan to EPA, right?

1    A    I don't know when Mr. Sullivan turned over his data to

2    the EPA or if he ever did.  I just don't know that for

3    certain.

4    Q    All right.  You didn't hear him say that he personally

5    did not turn over Exhibit 4811 -- put that back up, please --

6    to the EPA, the April 28, 2003 report completed prior to the

7    RI finalization?

8    A    I don't recall any testimony about, from Mr. Sullivan

9    about that.

10   Q    And as a professional who works with Superfund sites and

11   all these state and federal rules and regulations, wasn't

12   it -- wouldn't it have been incumbent upon the owner of

13   property being evaluated as part of the Superfund

14   investigation, as this was at this time, and the PRP letter

15   had come out and so forth, wasn't it incumbent upon Soco to

16   turn this information over to the EPA and MDEQ as a matter of

17   law, as you understand it?

18   A    I make it a point not to give clients legal advice.  As a

19   matter of law, I have no idea whether they were required to

20   turn this over or not.  That's not my practice.  I'm not an

21   attorney.

22   Q    You don't know that -- are you a licensed engineer?

23   A    I'm a professional engineer in Maryland and Florida.

24   Q    So you have a license from Maryland and Florida.

25   A    Yes.

1  Q    And does that licensure require -- would that licensure

2  require you to turn this over to Maryland and Florida

3  authorities if you were working on a site in those states?

4  A    No, it would not.

5  Q    Are you sure about that?

6  A    Yes, I am.

7         MR. GROSSBART:  Now can you put 469, page 2, up

8  there?

9         DOCUMENT TECHNICIAN:  (Complied with request.)

10 BY MR. GROSSBART:

11 Q    Do you have any idea how the perc that was found here,

12 how it got there; that is to say, underneath that catch basin

13 area?

14 A    Well, not specifically, but if you'd indulge a little bit

15 of professional speculation, more likely than not, what

16 happened was there were drips and drabs and small spills in

17 the tank farm area which subsequently were washed with

18 stormwater or via a hose -- it could have been either -- and

19 accumulated in the ponds there behind the tank farm.  And then

20 subsequently the water became contaminated with the perc, and

21 it seeped down through cracks in the concrete and ponds and

22 got into the soil underneath it.  That would be the most

23 likely explanation.

24 Q    Sure.  And you heard Mr. Sullivan say there was no, when

25 they dug this up, there was no liner underneath the concrete?

1227

1    Do you remember him saying that?

2    A    I believe that was his testimony, yes.

3    Q    All right.  And the soil concentration there is

4    274 milligrams per kilogram?  Do you recall him saying that?

5    A    No, not specifically.

6         MR. GROSSBART:  Would you put 4811 back up, please?

7    Would you flip through to the table, Neil?  Just keep going

8    and I'll see it.

9         DOCUMENT TECHNICIAN:  (Complied with request.)

10        MR. GROSSBART:  Next one, please.  Can you highlight

11   the section?

12        DOCUMENT TECHNICIAN:  (Complied with request.)

13        MR. GROSSBART:  All right.  Let's swing down.  Stop

14   there, please.

15        DOCUMENT TECHNICIAN:  (Complied with request.)

16   BY MR. GROSSBART:

17   Q    That's, that's the finding of 274 at that location, isn't

18   it, sir?

19   A    (No response.)

20   Q    Tetrachloroethylene?  That's perc, right?

21   A    Well, it certainly reports 274 parts per million.  I

22   can't see the top of the page --

23   Q    All right.

24   A    -- at this point so I'm not sure --

25   Q    We can fix it for you.

1    A    -- what it's associated with.

2              MR. GROSSBART:  All right.  Highlight the top of the

3    page.

4              DOCUMENT TECHNICIAN:  (Complied with request.)

5    BY MR. GROSSBART:

6    Q    Does that square that away for you?

7    A    It reports that it's soil.  I presume it's underneath

8    that concrete.

9    Q    Yeah.

10   A    You know, I can't tell that just from the information in

11   front of me, but I will presume for argument sake that it is.

12   Q    You testified about this exhibit just a few minutes ago

13   on direct examination, and did you read it in preparation for

14   your testimony here in court?

15   A    Yes.  I saw it.

16             MR. GROSSBART:  All right.  You can take all this

17   off.

18             DOCUMENT TECHNICIAN:  (Complied with request.)

19   BY MR. GROSSBART:

20   Q    Now you testified a lot about MIP borings during your

21   direct examination.  Do you recall that?

22   A    Yes.

23   Q    And if I recall correctly, you compared the MIP boring at

24   105, which is in the catch pond, with a boring called MP-100.

25   Let's see if I can find that.

1      This would be DD143, Soco's exhibit.  You made those
2  comparisons and remarked that they look considerably
3  different.  Do you recall that?
4  A    Yes, I did.
5  Q    And then you remarked about MP-100 by noting how close it
6  is to PT-2.  That's what you say over here.  Right?
7  A    (No response.)
8  Q    That's the point you're making?
9  A    Well, I don't believe I commented on the closeness in the
10 specific area you circled.  It's actually noted a little bit
11 higher up on the boring logs.
12 Q    Okay.
13 A    Six feet north of MP-100.
14 Q    All right.  I stand corrected.
15     The point is, you believe that's significant because
16 there are not any analytical results for MP-100, and by that I
17 mean actual laboratory results.  It's just the ECD detector
18 results for that particular site, right?
19 A    That's correct.  It's just a -- it's a line on a strip
20 chart.  It's not an actual concentration of chemicals in the
21 soil.
22 Q    Because a lab sample was not taken at MP-100 by the EPA
23 or DEQ, correct?
24 A    Not that I'm aware of, no.
25 Q    All right.  And a lab sample was taken, however, at

1   MP-105.

2   A    My understanding is they went back in, drilled a hole

3   next to 105, and took a sample and looked at horizons they

4   selected, yes.

5   Q    They reported a high groundwater contamination deep in

6   MP-105; the lab did, right?

7   A    The lab reported a high con- -- a concentration of about

8   2,900 parts per billion at the bottom of the borehole, which

9   would be the bottom of the sand and gravel aquifer at 105.

10   Q    That was not an ECD reading?  That was a lab reading?

11   A    That's right.

12   Q    All right.  And whatever significance MP-100 had to the

13   EPA and MDEQ investigators who were looking at that sample,

14   they didn't think it was significant enough to send to the lab

15   for further analysis?  We can infer that, can't we, from the

16   fact that it wasn't done?

17   A    No.  I think you're confused about this sampling

18   technique.  An MIP boring is not a technique by which you're

19   taking cores of soil or groundwater out of the ground.  It's a

20   reading that's made with a probe that's driven continuously

21   into the ground.  In order to get a soil or a groundwater

22   sample, you have to then go back in and drill a hole next to

23   it or nearby and take those samples.  So there isn't any

24   inherent soil or groundwater sampling associated with MP-100.

25   Q    I understand that, sir.  But having seen the ECD readings

1    as reported on this document, the MDEQ and EPA investigators

2    did not think it significant to go back in there and take a

3    sample at any depth to have it checked in the lab, did they?

4    A    I don't agree.  I think they did go back and take

5    samples.  They took PT-2, which was only 6 feet away.

6    Q    Well, PT-2 was done -- do you know when PT-2 was done?

7    A    I don't recall the specific date.

8    Q    Wasn't that done by Mr. Sullivan when he was with Secor

9    back in late 2001, early 2002?

10   A    It may have been.  I don't recall the specific date.  I

11   think it was one of the early tests in that area.

12   Q    All right.  When was the MP-100 ECD test run, do you

13   know?

14   A    I don't recall the specific date.  It was done during the

15   RI.

16   Q    Well, it was done after the RI, wasn't it?

17   A    I don't recall the specific date it was done.

18   Q    It was done and reported in the addendum to the RI that

19   came out in December of 2003, correct?

20   A    I believe that's correct, yes.

21   Q    All right.  And we just saw the RI, and that came out in

22   June of 2003, and then additional work, including the MP-100

23   ECD detector test, was done later, correct?

24   A    As far as I'm aware, yes.

25   Q    All right.  So they didn't go in and look at PT-2 for the

1    first time after MP-100 was done.  That came before.

2    A    I believe that's correct.

3    Q    Okay.  So let's go back to my original question.

4         Having done the boring at MP-100 and seeing what you've

5    displayed in your demonstrative, the EPA and MDEQ did not go

6    in and try to test soil or groundwater at that bore location,

7    correct?

8    A    As far as I'm aware, they didn't go back in and try to

9    replicate the information they already had.  They already

10   had --

11             MR. GROSSBART:  Your Honor?

12             THE COURT:  Hold it.

13             MR. GROSSBART:  Come on.

14             THE COURT:  He asked a simple question.  Answer yes

15   or no.  He didn't ask for an explanation.

16             THE WITNESS:  Okay.

17   BY MR. GROSSBART:

18   Q    They didn't go back in there and take a sample at any

19   depth for the lab to look at, correct?

20   A    Not that I'm aware of, no.

21             MR. GROSSBART:  All right.

22             THE COURT:  Now let's stop for lunch.  We're going

23   to have a lunch recess until 1:15.

24             I give you the usual admonition.

25             We'll be in recess, 1:15 p.m.

1          THE LAW CLERK:  All rise.

2      (Recess taken from 11:58:21 to 13:19:14.)

3      (Open court.)

4      (Jury present.)

5          THE COURT:  Mr. Grossbart, you may continue.

6          MR. GROSSBART:  Thank you, Your Honor.

7  BY MR. GROSSBART:

8  Q    I want to start by just following up on something that we

9  only touched upon briefly before the break but you talked

10  about more significantly, I think, during your direct

11  examination.

12     Neil, could you please put up Exhibit 3059, page 121,

13  which is the ROD diagram, and blow up on where the source

14  areas are shown.

15         DOCUMENT TECHNICIAN:  (Complied with request.)

16  BY MR. GROSSBART:

17  Q    And do I recall correctly, Dr. Powell, that as to that

18  particular representation, you have -- you don't accept the

19  EPA and MDEQ's characterization of that as a source area?  Did

20  I understand you correctly?

21  A    No, I don't think you did understand me correctly.

22  Q    Okay.  It is a source -- is it a source area, however,

23  that you can, based on the data, in any way tie to the spill

24  that you have hypothesized must have occurred?

25  A    I think it may be.  I'm not sure.

                              1234

1    Q    You're not sure.

2         And do you know why the EPA and MDEQ characterized --

3    excuse me, concluded that that was a DNAPL source area or at

4    least had indicators of DNAPL?

5    A    I don't think they indicated it was a DNAPL source area.

6    They indicated it was a source area of PCE that was higher

7    than their remediation goal.

8    Q    So is it your understanding, then, that the data in that

9    area doesn't -- did not meet any of the various indicators

10   that you had discussed during your direct examination?

11   A    To the best of my recollection, it did not.

12   Q    Did not.

13        And isn't it a fact, sir -- well, let me do it this way.

14        Neil, would you put up Demonstrative 494, page 1?  And

15   enlarge on the northwest corner and towards the -- all right.

16   Show me the -- give me some more to the left, please.  A

17   little more.  A little more.

18            DOCUMENT TECHNICIAN:  (Complied with request.)

19   BY MR. GROSSBART:

20   Q    All right.  Can you clearly see on the photograph in

21   front of you, which is a copy of the 1975 photograph, can you

22   see the area we've been talking about?  It's just got dotted

23   green lines.  Do you see that on your monitor?

24   A    Yes.

25   Q    All right.  And do you know what was found at DP-063?

1   A    I don't recall specifically.

2   Q    Do you recall generally?

3   A    No.

4   Q    Do you even know what report that comes out of?

5   A    I believe that may have been some of the very early work

6   done as part of the Lockheed assessment, but I'm not

7   absolutely certain.

8   Q    All right.  Wouldn't it be important to look at all of

9   the data to determine whether or not one or more of your three

10  indicators were met in doing the work you did?

11  A    Yes.  You should consider all of the data that's

12  available.

13  Q    All right.  And if DP-63 had groundwater contamination

14  north of 2,400 parts per billion, is that one you would have

15  missed, based on the pie charts we went through earlier today?

16  Because I didn't see it on there.

17  A    If it had been above 2,400, it probably should have had a

18  pie chart put on it.

19        MR. GROSSBART:  All right.  Would you put up

20  Exhibit 3043, please?

21        DOCUMENT TECHNICIAN:  (Complied with request.)

22  BY MR. GROSSBART:

23  Q    That's the Lockheed report in evidence.  I think you

24  talked about that in your direct.

25  A    That's right.

1          MR. GROSSBART:  All right.  And would you go to

2     page 27?  And, Neil, please, to the right-hand side, right

3     here, blow up that box.

4          DOCUMENT TECHNICIAN:  (Complied with request.)

5          MR. GROSSBART:  And that's DP -- hang on.  Wrong

6     box.  Go back to the big one.  One below it.

7          DOCUMENT TECHNICIAN:  (Complied with request.)

8     BY MR. GROSSBART:

9     Q    And that, at least in this particular sample, is showing

10    north of 2,400 parts per billion, is it not?

11    A    Yes, it is.

12    Q    Okay.  So in order to make the pie charts that you talked

13    about in your direct examination fully complete, we would need

14    to add a piece of pie for DP-63, correct?

15    A    Yes.

16    Q    Now we'll come back to the pie charts and talk about some

17    of those a little bit.

18         But we were talking about DD143 before we broke, and you

19    were remarking and we were talking about MP-100 and the fact

20    there were no analytical samples, which is to say no

21    laboratory samples for that area, that boring location,

22    correct?

23    A    As far as I'm aware, yes.

24    Q    Okay.  And what you have thought relevant here is the

25    proximity of MP-100 to PT-2, where there are lab samples that

1237

1  show the perc contamination that you, indeed, superimpose on

2  your MP-100 diagram right in here, correct?

3  A    Correct.

4  Q    And there actually are MP borings even closer, by a

5  little bit, but even closer to PT-2 than is MP-100, aren't

6  there?

7  A    I don't specifically recall.  I'd have to look at all of

8  the data on the map to be sure.  I don't know.

9  Q    You don't know.  And if there are MP borings, one or more

10 MP test locations closer to PT-2 or as close to PT-2 as MP-100

11 that look radically different than the one you've picked, that

12 would be something you would need to consider and decide

13 whether it impacts the points you were making about MP-100

14 early this morning, correct?

15 A    Well, you'd want to consider all of the borings that you

16 have in the area.  That's right.

17 Q    Well, did you consider MP-138?

18 A    We considered all of the borings in that area.

19 Q    All right.  And you don't recall what MP-138 shows, do

20 you?

21 A    Not off the top of my head, no.

22 Q    Isn't it a fact that the MIP log for 138 shows no

23 off-scale readings at all?

24 A    I don't recall.

25 Q    The MIP data was set forth in the remedial investigation,

1    Addendum No. 1, correct?

2    A    Yes.

3    Q    And that's the one that came out -- refresh me, if you

4    could.  That came out when?

5    A    I believe it was 2003.

6    Q    I'm sorry; when?

7    A    2003, but I don't recall the specific date.

8            MR. GROSSBART:  All right.  Let's pull up 3058, the

9    first page, please.

10           DOCUMENT TECHNICIAN:  (Complied with request.)

11   BY MR. GROSSBART:

12   Q    Is that the RI addendum that sets forth the various MIP

13   findings and results, do you know?

14   A    I believe it is, but --

15           MR. GROSSBART:  Okay.  And would you go to page 154,

16   Neil?

17           DOCUMENT TECHNICIAN:  (Complied with request.)

18   BY MR. GROSSBART:

19   Q    And is that -- it's oriented a little differently than

20   yours, but that is a representation of the findings at

21   MIP-138, correct?

22   A    It appears to be, yes.

23   Q    And when you did your demonstrative exhibit -- let's go

24   back to DD143.

25           DOCUMENT TECHNICIAN:  (Complied with request.)

1    BY MR. GROSSBART:

2    Q    You were showing in orange on this demonstrative

3    exhibit -- Neil, could you blow up that area here?

4              DOCUMENT TECHNICIAN:  (Complied with request.)

5    BY MR. GROSSBART:

6    Q    You were showing on this demonstrative exhibit a reading,

7    if you will, that was greater than whatever that is, right?

8    A    Right.

9    Q    And because, as you go from left to right, and I don't

10   want to get bogged down in what all these things mean, but on

11   the right is more than it is on the left, so to speak?  That's

12   the way the scale works, right?

13   A    That's right.  On the right side is a higher signal than

14   the left.

15   Q    And when you talk about the meter pegging, you're talking

16   about the meter crossing this line?  Is that what that means?

17   A    Yes.  EPA, I believe, used a million microvolts as sort

18   of their off-scale benchmark.

19   Q    All right.  So that's a shorthand for a million

20   microvolts?

21   A    Yes.

22             MR. GROSSBART:  And can we go back to the RI

23   addendum at page 154?

24             DOCUMENT TECHNICIAN:  (Complied with request.)

25   ///

1240

1    BY MR. GROSSBART:

2    Q    You have that in front of you, and I can blow up any part

3    you want to look at, because I can't make heads or tails of

4    this, but do you see any readings north of a million

5    microvolts depicted on that document?

6    A    No, I don't.

7         MR. GROSSBART:  Okay.  Let's take that off.

8         DOCUMENT TECHNICIAN:  (Complied with request.)

9    BY MR. GROSSBART:

10   Q    And you don't know, as you sit there, where MP-138 is in

11   relationship to either MP-100 or PT-2, correct?

12   A    Not as I sit here.  I've seen it on maps, but not as I

13   sit here.

14   Q    I understand.  As you sit there.

15        And you would expect that if it was in very close

16   proximity to, example, for MP-100, there would be more

17   similarity between MP-100 and MP-138 that you just looked at,

18   correct?

19   A    Not necessarily, no.

20   Q    Well, if I told you they were only 2 feet apart, does

21   that not give you some pause about what may or may not be

22   going on in this particular area, given that you've pegged

23   from top to bottom on MP-100 and not pegged at all on MP-138?

24   Is that not significant to you as a scientist?

25   A    If they were 2 feet apart and looked this different, it

1241

1    would be surprising to me.

2              MR. GROSSBART:  Okay.  Why don't you turn, Neil, to

3    3058, page 86.

4              DOCUMENT TECHNICIAN:  (Complied with request.)

5    BY MR. GROSSBART:

6    Q    And the field investigator has mapped, in his field notes

7    on this document, the locations of PT-100 -- excuse me, PT-2,

8    MP-100, and MP-138.  Do you see that, sir?

9         Neil, why don't you blow up on that area.

10             DOCUMENT TECHNICIAN:  (Complied with request.)

11   BY MR. GROSSBART:

12   Q    Do you see that, sir?

13   A    Yes, I do.

14   Q    And you said, in your demonstrative, that DD143 -- and

15   why don't we just toggle back to that.

16             DOCUMENT TECHNICIAN:  (Complied with request.)

17   BY MR. GROSSBART:

18   Q    You said in your demonstrative that MP-100 is

19   approximately -- excuse me, that PT-2 is approximately 6 feet

20   north of MP-100.  That's what you say there, right?

21   A    Right.

22   Q    And you, you computed that, and you believe that to be

23   accurate, right?

24   A    As far as I'm aware, yes.

25   Q    Okay.  Well, that gives us a little frame of reference.

1          Could we go back to page 86?  Blow that area up.

2               DOCUMENT TECHNICIAN:  (Complied with request.)

3    BY MR. GROSSBART:

4    Q    So you've told us that this distance from there to there,

5    PT-2 to MP-100, is 6 feet.  Right?

6    A    Right.

7    Q    MP-138 is actually a smidgeon closer to PT-2 than is

8    MP-100, at least according to the field investigator who wrote

9    this out, isn't it?

10   A    It's drawn as being closer, yes.

11   Q    Yes.  And if the distance between MP-100 and PT-2 is

12   6 feet, as you've studied, then just by looking at this and

13   eyeballing it, MP-100 and MP-138, 2 feet apart, according to

14   the field investigator?

15   A    I wouldn't know.  This isn't a detailed, scaled drawing,

16   but it appears to be closer.

17   Q    All right.  So based on your prior answer, studying

18   further MP-138 may be something worthwhile to do to try to get

19   to the bottom of what you characterize as something that would

20   be surprising to you, right?

21   A    I'm not sure what you mean by the question.

22   Q    You told me if MP-138 and MP-100, just a few questions

23   ago, were as close together as 2 feet and looked as different

24   as you've already said they do, that would be surprising to

25   you.  Didn't you just say that a minute ago?

1    A    Yes, I did.

2    Q    Are you surprised?

3    A    If they're that close together, it's surprising to me

4    that the logs look so different.

5    Q    That's at least worthy of further attention and thought,

6    isn't it?

7    A    (No response.)

8    Q    I'm not asking you to give it up for me, sir, but isn't

9    it at least worthy of another look?

10   A    I'm not sure.  It depends on what, what you're using the

11   information for.

12   Q    I'm using the information like you're using the

13   information.  You don't -- is it irrelevant?  If it is, I'll

14   just move on.

15   A    I'm not sure how you're using the information, sir.

16   Q    Well, I'm using the information in a courtroom to try to

17   figure out if a spill happened in the loading and unloading

18   area and zigged and zagged its way up to the northwest corner

19   and caused all this commotion.  That's how I'm using it.  Is

20   it relevant to that?

21   A    Is this boring relevant to that?

22   Q    Yeah.

23   A    Yes, I think it is.

24   Q    All right.  And you're surprised, given the difference

25   between MP-100 and MP-138, right?

1   A    It is a bit surprising to me that the logs look this

2   different when they're this close together.

3   Q    All right.  Are you aware of the fact, when they pulled

4   the MP rod out of the ground at MP-100, the one your

5   demonstrative deals with, the needle was still pegging?  Is

6   that unusual?

7   A    Not necessarily, no.

8   Q    That does not indicate at least the possibility that

9   maybe there was a problem?

10  A    No, not necessarily.

11  Q    Did you try to determine, through the field notes

12  relating to MP-100, if that, in fact, was happening, whether

13  the rod used for MP-100 was decontaminated in a way that was

14  affecting the readings?

15  A    No.

16  Q    Did you notice the field investigator's note that

17  suggests some unusual behavior, if you will, of that

18  particular boring?

19  A    No, I did not.

20  Q    You did not notice his note?

21  A    No.

22          MR. GROSSBART:  Let's take that off, please, Neil.

23          DOCUMENT TECHNICIAN:  (Complied with request.)

24          MR. GROSSBART:  Would you put 3059-121 back up,

25  please?  Would you please enlarge --

1           DOCUMENT TECHNICIAN:  (Complied with request.)

2           MR. GROSSBART:  That's perfect.  Thank you.

3  BY MR. GROSSBART:

4  Q    Now I think on direct examination there was some

5  discussion about this figure and how it compared to a figure

6  that was trying to depict similar things but in the earlier

7  EPA/MDEQ report.  Do you recall that?

8  A    Yes.

9  Q    And I can put it back up if you want me to, but this area

10  was -- and I'm just not trying to do it to scale, so -- but

11  there basically was a gap, if you will, in between the two

12  areas, right?

13  A    You're referring to the depiction of this in the RI

14  addendum?

15  Q    Yes, sir.

16  A    Yes, there was a gap.

17  Q    All right.  And isn't it a fact that in the RI

18  addendum -- well, strike that.

19      In any event, by the time of the ROD, those areas had

20  been connected on this diagram?  That really has to do with

21  where Soco is going to be required or somebody is going to be

22  required to fix things, correct?

23  A    Correct.

24  Q    And the ROD makes no statement about whether the

25  situation out here is one release, two releases, or a hundred

1    releases, doesn't it?  It doesn't speak to that issue at all?

2    A     I don't think the ROD cares how many releases are

3    created.

4    Q     Whether it cares or not, it doesn't speak to the issue,

5    does it?

6    A     No.

7    Q     And in the RI addendum that you just referred to,

8    EPA/MDEQ suggested, based upon the uncertainty of the data,

9    that the area down here might be a separate source; isn't that

10   correct?

11   A     I don't recall.

12              MR. GROSSBART:  Would you pull up 3058, please?

13              DOCUMENT TECHNICIAN:  (Complied with request.)

14   BY MR. GROSSBART:

15   Q     Would you go to page -- this is the RI addendum, right?

16   A     Yes, it is.

17              MR. GROSSBART:  Would you go to page 27 of the

18   exhibit, please?

19        (Discussion off the record.)

20              MR. GROSSBART:  Scroll down, please.  Neil, would

21   you, first of all, highlight the title?

22              DOCUMENT TECHNICIAN:  (Complied with request.)

23   BY MR. GROSSBART:

24   Q     And this part of the RI addendum is talking about the

25   northwest corner.  Fair statement?

1    A    Yes.

2    Q    And the first paragraph talks about I guess what we could

3    all agree is the main area of the northwest corner?  It refers

4    to PT-2 and 6, which, we know those to be as kind of the

5    center of that source area, if you will.  Fair statement?

6    A    Yes.  It's in more or less the center of the northern of

7    these two areas, the bigger area.

8    Q    Right.  And then if you highlight, Neil, the first

9    sentence of the second paragraph, it says, "A smaller PCE NAPL

10   source area was identified in the vicinity of Monitoring Well

11   PT-1 and Boring 132," *et cetera*.  Do you see that?

12   A    Yes.

13        MR. GROSSBART:  And go back, Neil, to the ROD

14   figure, 131 -- excuse me, 3059, page 29.

15        DOCUMENT TECHNICIAN:  (Complied with request.)

16        MR. GROSSBART:  No, 3059, page 121.  Enlarge there.

17        DOCUMENT TECHNICIAN:  (Complied with request.)

18   BY MR. GROSSBART:

19   Q    Isn't it a fact, sir, if you know, that PT-1 is, in fact,

20   down there?

21   A    That's correct.

22   Q    All right.  And as a scientist, you can't rule out the

23   possibility, can you, that at a minimum, two surface releases

24   account for what we see on this ROD figure, or more, but at

25   least two?  You cannot rule that out, can you?

1    A    I don't think that would be a reasonable interpretation

2    of the data that exists for that area, no.

3    Q    So is that your way of saying you can rule it out?

4    A    I'm sorry; could you restate the question?

5    Q    My question was, You cannot rule out the possibility,

6    based on the data, like we heard from the EPA and the MDEQ,

7    that this source area might be the way it is as a result of at

8    least two, possibly more, but let's just stick with two, two

9    different surface releases?

10   A    I don't think that could be categorically ruled out.

11   Q    Okay.  As a matter of fact, you can't rule out the

12   possibility of two or more releases coming from the Dyce site

13   in traveling to the northwest corner, can you?

14   A    No.  There could have been more than one release.

15   Q    Could have been two?

16   A    Could have been two.

17   Q    And didn't you also tell me previously at your

18   deposition, could even have been three?

19   A    I believe I said there could have been as many as three

20   but I doubted that there were that many --

21   Q    Right.

22   A    -- that there were probably no more than one or two.

23   Q    All right.  Could have been two.

24        And then we would have, if there were two, to use your

25   more conservative number, we'd have two hypothesized spills

1   accounting for the northwest corner situation, according to

2   your theory, rather than one; two that nobody saw, two that

3   nobody smelled, two that nobody cleaned up, two that nobody

4   reported, *et cetera*, *et cetera*, *et cetera*, correct?

5   A    There could have been two.

6   Q    And there was plenty of time before the plant was

7   reconfigured in 1981 in which these one or more spills could

8   have occurred, right?  Anytime up to 1981 as a matter of fact;

9   isn't that correct?

10  A    Well, there was certainly a number of years when the

11  plant was configured this way and they operated.  If that's

12  what you mean by "plenty of time," okay.

13  Q    Yeah.  That's what I mean.  Six, seven years, right?

14  A    Right.

15  Q    So notwithstanding the inventory shortage issue that

16  referred to an inventory shortage, and you heard the

17  testimony, in 1975, '76, and '77 -- you recall hearing that in

18  this courtroom, correct?

19  A    Yes, I did.

20  Q    Sometime in that period -- there's nothing about either

21  the science in the northwest corner or the configuration of

22  the plant itself that, if we were to be true to your

23  hypothesized spill and pathway, there's nothing that rules out

24  1978, '79, or 1980, right?

25  A    That's correct.

1    Q    You need the inventory shortage to make this spill

2    happen, don't you?

3    A    I'm not sure I understand the question.  I would say no.

4    Q    All right.  Is the inventory -- are you relying on the

5    inventory shortage --

6    A    No.

7    Q    -- as support for your scientific opinion that we've

8    heard here today?

9    A    Well, I gave a lot of opinions today.  Which specific

10   opinion?

11   Q    Any of them.  Any of them.

12   A    No, I'm not.

13   Q    The inventory shortage is irrelevant to your opinion?

14   A    No, I didn't say that.

15   Q    Well, are you relying on the inventory -- let me try it

16   again, because I thought one followed the other, but let me

17   try it again.

18        You have offered an opinion.  Are you offering an opinion

19   as to the timing of the spill that you hypothesized made it

20   from the loading and unloading area to the northwest corner?

21   Are you giving an opinion on that or not?  I guess I'm not

22   clear.

23   A    Yes, I am.

24   Q    And is that opinion that the, that the spill happened in

25   1975, 1976, or 1977, or is it something else?

1    A    It's something else.

2    Q    It's anytime up to 1981, right?

3    A    Yes.  The spill would have had to have occurred sometime

4    before 1981.

5    Q    And without the inventory shortage and whatever that may

6    mean and however any of us listening in might view it

7    ourselves, without that inventory shortage, based upon your

8    work, 1975 or '76 is as likely a time period or candidate for

9    this as 1979 or 1980, right?

10   A    In the absence of the inventory shortage, that's correct.

11   Q    Right.  And you're not relying on the inventory shortage,

12   so you're not placing this in any point in time as an expert?

13   You're not offering that opinion?

14           MR. LYNCH:  Objection.  Asked and answered.

15           MR. GROSSBART:  Well, I just want to be --

16           THE COURT:  Sustained.

17           MR. GROSSBART:  -- sure the answer's clear.

18   BY MR. GROSSBART:

19   Q    Now you looked at photographs, and you are -- your

20   opinion is dependent, is it not, on there being a berm at the

21   southern edge of the tank farm?

22   A    If you're referring to my opinion about runoff from the

23   unloading area going to the northwest corner, yes, it's

24   contingent on there being a berm.

25   Q    And if there was no berm, you would have to reevaluate

1252

1    your opinion; is that right?

2    A    Yes.

3    Q    If there were cuts in the berm, you would have to

4    reevaluate your opinion, correct?

5    A    That would depend on how deep the cuts were.

6    Q    All right.  If there was only a partial berm, you would

7    have to reevaluate your opinion?

8    A    That depends on where the partial berm was located.

9    Q    Between the drumming shed and the railroad tracks.

10   A    If there were a partial berm between the drumming shed

11   and the railroad tracks, it would not affect my opinion.  It

12   would be supportive of my opinion.

13   Q    Even if it was not a complete berm?

14   A    Perhaps I don't understand what you mean by "partial"

15   berm.

16        MR. GROSSBART:  Let's put up the 1975 photo.

17        (Discussion off the record at counsel table.)

18        DOCUMENT TECHNICIAN:  (Complied with request.)

19        MR. GROSSBART:  This is 5017.  Next.

20        MS. ENERSON:  5019.

21        DOCUMENT TECHNICIAN:  (Complied with request.)

22        MR. GROSSBART:  Could you blow up on the loading and

23   unloading area?

24        DOCUMENT TECHNICIAN:  (Complied with request.)

25   ///

1    BY MR. GROSSBART:

2    Q    I believe it was your testimony that you believe that a

3    continuous berm runs through there, or thereabouts, at least,

4    correct?

5    A    Correct.

6    Q    And you can't, however, see a berm doing that, running

7    continuously in this photo at this point in time, can you?

8    A    Not on this photo.  The shadows obscure most of it.

9    Q    Well, the shadows obscure that area, so they could be

10   obscuring a berm, or they could be obscuring nothing at all

11   because there's no berm there?  You can't tell one way or

12   another?

13   A    Not from this photo, no.

14   Q    Okay.  Well, this is the only photo from late '75.

15   Everything you see on a subsequent photo would only tell us

16   what was there on the date of the subsequent photo; isn't that

17   right?  That's just logical, isn't it?

18   A    I don't think I would completely agree with that, no.

19   Q    All right.  That's okay.

20        If there were two spills -- well, strike that.

21        Other than the existence of a southern berm -- well, let

22   me ask you this.  You believe there's a southern berm based on

23   testimony you've heard; is that right?

24   A    It's in part testimony I've heard and in part photography

25   I've reviewed.

1254

1    Q    Well, at least in 1975, it's based on testimony, isn't

2    it, because you can't see it here?

3    A    That date, it would principally be testimony.

4    Q    Is there anything else that suggests a berm other than

5    testimony, that you're aware of?

6    A    Only that I can clearly see the berm on photographs in

7    the following years in the same place the testimony describes

8    it was present in '75.

9    Q    I understand.  But that doesn't put the berm in '75, the

10   fact that it might be there later, does it?

11   A    It would corroborate the testimony.

12   Q    All right.  And listening to that testimony and forming

13   your opinion as to this essential element of your opinion, you

14   rejected, I take it, then, the sworn statement by Dyce as

15   executed by Suzanne Miller that in this period of time that

16   we're talking about, 1975, liquid in the loading and unloading

17   area would flow to the catch pond?  Your opinion necessarily

18   requires you to reject that statement, does it not?

19          MR. LYNCH:  Objection.  Misstates the evidence.

20          THE COURT:  Overruled.

21          THE WITNESS:  I don't recall that specific testimony

22   or statement, whatever you're referring to.

23   BY MR. GROSSBART:

24   Q    Well, whether you recall the statement or not, did you

25   read the Rule 104(e) responses that Soco/Dyce provided in 2000

1255

1    to the EPA in doing your work in this case?

2    A    Yes.  I read it quite a long time ago.

3    Q    All right.

4    A    It's not something I reviewed recently.

5    Q    All right.  Isn't it a fact that those sworn 104(e)

6    responses say exactly what I just said; which is, that in

7    those responses, Soco told the United States government and

8    the Montana Department of Environmental Quality that had a

9    spill happened in this area in the period prior to the

10   reconfiguration of the plant, liquid would make its way to the

11   catch pond because the slope of the property was generally in

12   that direction?

13   A    I don't, I don't recall whether it said that or not with

14   regard to that specific time period.  I just don't recall.

15   Q    All right.  Now let's come back to that in a minute, but

16   I'm going to ask you a few questions about some of the pie

17   charts that you showed earlier.

18        Could you put up DD104?

19        DOCUMENT TECHNICIAN:  (Complied with request.)

20   BY MR. GROSSBART:

21   Q    This particular pie chart is labeled "Chemicals" --

22        MR. LYNCH:  Objection.  We actually didn't show this

23   pie chart.

24        MR. GROSSBART:  I may have it under a different

25   number.  You didn't show this one at all?

1           MR. LYNCH:  (Shook head negatively.)

2           MR. GROSSBART:  Well, let's take it down.

3           DOCUMENT TECHNICIAN:  (Complied with request.)

4           MR. GROSSBART:  Can I just -- for Mr. Lynch's

5    benefit, I apologize, but I have many charts with the same

6    numbers.

7           Can you look at DD102?  Did you use that one?

8           MR. LYNCH:  I frankly don't recall if I used that

9    one.

10          THE COURT:  The objection is overruled.  I mean, if

11   it's part of the report, you can use it.

12          MR. GROSSBART:  All right.

13      (Discussion off the record at counsel table.)

14          MR. LYNCH:  Your Honor, this is just an illustrative

15   exhibit or a proposed illustrative exhibit that was never used

16   or offered.

17          THE COURT:  Oh.

18          MR. GROSSBART:  To be fair, Mr. Lynch and I have an

19   agreement.  We've exchanged large volumes of demonstrative

20   exhibits with one another, and the deal was, unless the other

21   side uses it, I won't, but --

22          THE COURT:  I thought it was part of the report.  I

23   don't have the report.  I reverse myself.  Sustained.

24          MR. GROSSBART:  I'll stipulate to that, Your Honor.

25          MR. LYNCH:  I believe it was 103 and 105.

1          MR. GROSSBART:  Irrespective of the number, was it

2    the exhibit that had --

3          THE CLERK:  It was 103 and 105, is what I have.

4        (Discussion off the record at counsel table.)

5          THE COURT:  The clerk's records show 103 and 105.

6          THE CLERK:  I have DD103 and DD105 is what you

7    showed.

8        (Discussion off the record at counsel table.)

9          MR. GROSSBART:  All right.  Would you go to DD105?

10   I can make the point with this.

11         DOCUMENT TECHNICIAN:  (Complied with request.)

12   BY MR. GROSSBART:

13   Q    And this demonstrative that you did talk about on direct

14   is called "Chemicals in Groundwater Samples in Concentrations

15   Greater than 2,400," and that's the symbol for parts per

16   billion?  It's not really the symbol for parts per billion,

17   but that's what everybody calls it, right?

18   A    Yeah, micrograms per liter means parts per billion.  Same

19   thing.

20   Q    Right.  Synonymous.

21         And in doing that, was it your intention to capture every

22   groundwater sample that exceeded that amount?

23   A    No, not necessarily.  It was intended to be illustrative

24   of the approximate levels of VOCs that are being found in

25   these locations that's reflected by the size of the circles

1258

1    and the general mix of VOCs that are being found at each

2    location.  I don't know that it necessarily is each and every

3    sample, but it was just meant to be illustrative of the

4    general patterns of groundwater contamination.

5    Q    Well, okay.  So if there -- so there may be groundwater

6    samples otherwise on the Dyce site broadly defined that exceed

7    this number that you haven't included; is that correct?

8    A    There could be, yes.

9    Q    Okay.  So you made -- basically you looked and you just

10   picked out kind of the best ones to make the point?

11   A    Not the best ones, no.  I meant to pick out ones that

12   were illustrative, and it was my intention that we would pick

13   out all of them that exceeded this 2,400.  If we missed any,

14   then, you know, they're not shown.

15   Q    Was there any other criteria that you used in deciding

16   what to depict and what not to depict?

17   A    No.  That was the main criteria, areas where perc was

18   above the 1 percent solubility limit.

19   Q    All right.  Did you put any date restriction on the dates

20   of the samples in terms of what might disqualify a sample from

21   making your pie chart?

22   A    The only restriction we put on the groundwater data was

23   once they began their remediation process in the northwest

24   corner, which, I believe, the first pilot testing was in 2003,

25   if I'm not mistaken, we didn't use any data after that because

1    the data was biased by their remediation project that they

2    were doing.

3    Q    The process of sparging and vapor extracting and so forth

4    calls into question the validity of the data taken after those

5    projects began?  That's just sort of a general principle that

6    you scientists adhere to; is that correct?

7    A    No, I don't think it calls it into question as much as

8    it's a different period with different data.  It doesn't

9    reflect sort of a preremediation condition of the site.

10   Q    And it's your view that looking at things as sort of

11   preremediation is a better way of analyzing the situation

12   because things are not disturbed by the remediation process?

13   Do I have that right, or am I close?

14   A    For the purposes of what I'm trying to convey here, I

15   felt it was appropriate to use the preremediation data.

16   Q    All right.  And this preremediation data, when you draw

17   your cutoff, is that the very first, at the time of the very

18   first pilot that you're cutting that off?

19   A    Yes, to the extent we're talking about the area in the

20   northwest corner.  They haven't done remediation everywhere.

21   Q    No, I'm talking about -- I understand that the

22   operational area of the plant is different.  There is not

23   ongoing remediation of the sort that you talked about in your

24   direct like there is going on in the northwest corner,

25   correct?

1    A    That's correct.

2    Q    And so isn't it a fact that the first pilot test, which

3    was an air sparge/soil vapor extraction, started sometime in

4    2002?

5    A    It may have been.  I remembered 2003.  It could have been

6    2002, though.

7    Q    Wasn't that followed by an ozone sparge/soil vapor

8    extraction project that came next?

9    A    Yes, it was.

10   Q    And then that was followed by a soil vapor extraction

11   project which came -- only, which came even later; is that

12   right?

13   A    Yes, in 2004.

14   Q    And your data all predates the first of those pilots, or

15   it was intended to; is that correct?

16   A    Yes.

17   Q    Whenever it was?

18   A    Yes, in that part of the property.

19   Q    Now this ozone, this sparging process and soil vapor

20   extraction process, is that the process where ATC or those

21   hired by, went out into the northwest corner and dug 11-foot

22   trenches there, and I suppose other places, but at least

23   there, and to set up their remediation equipment?

24   A    No, that's not.

25   Q    Isn't it a fact that 11-foot trenches were dug all over

1   the northwest corner by 2003 for an ozone sparge system, soil

2   vapor extraction?

3   A    To my recollection, the trenches were dug after the

4   initial pilot tests, the air and the ozone pilot tests.

5   Q    Well, the ozone test was an ozone and soil vapor

6   extraction combined process, wasn't it?

7   A    Yes.

8   Q    So that required trenches, didn't it?

9   A    No.

10  Q    Are you sure?

11  A    No, it did not.

12  Q    Are you absolutely sure about that?

13  A    Yes.  As I recall the ATC reports, they initially put in

14  vertical extraction wells for vapor recovery, and, finding

15  those didn't work too well in these soils, they subsequently

16  put in trenches at a later period.

17       MR. GROSSBART:  Bear with me.

18     (Pause.)

19       MR. GROSSBART:  Would you pull up 4400?  Go to

20  page 30.

21       DOCUMENT TECHNICIAN:  (Complied with request.)

22  BY MR. GROSSBART:

23  Q    Do you have that in front of you?

24  A    Yes, I do.

25       MR. GROSSBART:  And go to the next page.

1        DOCUMENT TECHNICIAN:  (Complied with request.)

2   BY MR. GROSSBART:

3   Q    And you talked on direct examination about all sorts of

4   poundage of chlorinated compounds being removed as a result of

5   various remediation activities to date.  Do you recall that

6   generally?

7   A    Yes, I do.

8        MR. GROSSBART:  Would you flip to page 34?  And

9   highlight the paragraph that begins, "The horizontal trench

10  vapor extraction."

11       DOCUMENT TECHNICIAN:  (Complied with request.)

12  BY MR. GROSSBART:

13  Q    While you're reading that, this report reports on a

14  soil-vapor-extraction-only system, not any ozone sparging,

15  right?

16  A    That's right.

17  Q    All right.  Isn't it a fact that the trenches used for

18  that remediation date back to the ozone sparging that was done

19  in the year earlier as reflected here; isn't that what this

20  says?  Quote, the second sentence, "The trench system was

21  originally constructed and designed as part of an *in situ*,

22  ozone-sparging initiative."

23  A    That's what it says, yes.

24  Q    All right.  So I was right, wasn't I?

25  A    I'm not sure I understand the question.

1    Q    The trenches, the trenches go back to at least 2003?

2    A    I don't recall the specific date.  This refers to 2004.

3    I don't have the date in front of me when the trenches were

4    installed.

5    Q    But you would agree that whenever the ozone sparging was

6    done, that's when the trenches had to have been built,

7    correct?

8    A    I think that's correct.

9    Q    Okay.

10        (Discussion off the record at counsel table.)

11   BY MR. GROSSBART:

12   Q    All right.  Going back to the demonstrative that we had

13   up, and we're calling that DD one zero -- what is that? --

14   five, all right, where is that?

15   A    I don't understand the question.

16   Q    What's the name of that well?

17   A    I don't know.  That information is not on here.  I don't

18   recall the specific name.

19   Q    But you picked it, right?

20   A    Yes.

21   Q    Are you aware that it was represented to me in materials

22   that were provided to me so I wouldn't object to this exhibit

23   that that is, in fact, a well location called T-5?

24   A    I am not aware of what's been represented to you, no.

25   Q    All right.  Do you deny that that is T-5?

1   A    I can neither confirm nor deny.  I don't know for

2   certain.

3   Q    Have you heard of a well site called T-5?  Or T anything,

4   for that matter?

5   A    Not that I recall, no.

6   Q    Doesn't that stand for samples taken from the trenches

7   that we've just been talking about?

8   A    That would be a reasonable inference.

9   Q    All right.  How about that one?  If I represented to you

10  that that was a T sample, in that case, Trench 9, you would

11  have no basis to dispute me, then, would you?

12  A    I -- no.  I don't know.

13  Q    T-4?

14  A    I don't know.

15  Q    Any basis of dispute?

16  A    No.

17  Q    T-6 south?  Any basis to dispute?

18  A    I'm sorry; I didn't see where you made a mark.

19  Q    (Indicating.)

20  A    No.

21  Q    And if those are samples taken from these trenches, then

22  the criteria you just talked about, which is to say take

23  samples before remediation, were, in effect, violated by this

24  selection of sampling locations, correct?

25  A    I don't know.  I would have to look at the actual

1    concentrations there and how they compared to what was going

2    on in the aquifer around it.  If they showed a materially

3    different level of contamination from what historically was

4    placed there, then I would not have intended to use them.  On

5    the basis of what I have in front of me, I would say I don't

6    know.

7              MR. GROSSBART:  Okay.  All right.  Let's -- would

8    you pull up 3074, page 26?

9              DOCUMENT TECHNICIAN:  (Complied with request.)

10             MR. GROSSBART:  I'm sorry; 3674.

11             DOCUMENT TECHNICIAN:  (Complied with request.)

12             MR. GROSSBART:  Page 26.

13   BY MR. GROSSBART:

14   Q    You have been to the site, have you not, sir?

15   A    Yes, I have.

16   Q    And I think one of the things you told us on direct is

17   some aspects of the site, as it currently exists, helped you

18   picture the pathway that you have hypothesized for how this

19   perc left the loading and unloading area; is that right?

20   A    That's right.

21   Q    Okay.  Do you know what we're looking at here?

22   A    We are looking at a view of the site from the west side

23   of the railroad tracks, I believe, to the east along the north

24   wall of the small warehouse.

25   Q    Okay.  I would agree with that.  And if your spill

1    pathway theory is correct, hundreds of gallons of perc came

2    through that area, right?

3    A     That's correct.

4    Q     All right.  And, now it's not there on this picture, but

5    then hit a ditch and turned this way, and that ditch -- I

6    would accept that this building wasn't there at the time, but

7    somewhere in this, either under the sidewalk or perhaps in a

8    little farther under that building there was a ditch, and that

9    allowed, according to your opinion, the perc to get to the

10   northwest corner?

11   A     That's correct.

12   Q     All right.  And at the time in question, which is the

13   late '70s, '75 to '81, this area was what composition?

14   Asphalt?  Concrete?  Gravel?  Dirt?  What was it?

15   A     To my understanding, it was unpaved.  I believe it may

16   have been gravel-covered, but it definitely was not paved.

17   Q     All right.  So the perc then, again accepting your theory

18   for the time being, would have come across what at the time

19   was a gravel area in there?

20   A     Yes.

21   Q     All right.  And it's your opinion that going underneath

22   that concrete and looking is futile?  Looking for perc.  Is

23   that right?

24   A     I don't believe, if you tested there today, it's likely

25   you're going to find high levels of perc, if that's what you

1    mean by "futile."

2    Q    Well, if you found high levels of perc there, that would

3    tend to support your theory, wouldn't it?

4    A    It might.

5    Q    Why not look, then?

6    A    Because for the same reasons I explained related to the

7    sampling of the ditch.  I don't believe it's likely you're

8    going to find much there in the soils, and this is an area

9    that's obviously been reconstructed since that early period.

10   Q    Well, digging trenches didn't stop you from using data

11   that we just saw.  Why, why worry about all of the

12   reconstruction here?  Why not just jack up some concrete and

13   take a look?  What would it cost?

14   A    I'm afraid I don't understand the analogy.

15   Q    What would it cost to jackhammer up the concrete in a

16   couple of places and look, just to see, for the fun of it, if

17   there's any perc under there?

18   A    It would likely cost $5,000 or $10,000 to go in and do a

19   drilling program in that area and do the testing.

20   Q    I'm not asking for a drilling program.  How about drop

21   two of them there?  How much would that cost?

22   A    Probably $5,000.

23           MR. GROSSBART:  Okay.  And would you put up Picture

24   28, same exhibit, page 28?

25           DOCUMENT TECHNICIAN:  (Complied with request.)

1    BY MR. GROSSBART:

2    Q    And the old ditch is coming -- I can do a better job than

3    that.  The old ditch is coming somewhere in there or in there.

4    You could sample that anywhere along the line to look for

5    perc, if you wanted, right?

6    A    You could sample along the ditch.

7    Q    Did you have any discussions with anybody about the

8    wisdom, or not, of running samples like those?

9    A    It's an issue that Mr. Lynch and I spoke about at some

10   point during my work on the case.

11   Q    Well, we have an agreement not to get into your

12   conversations with the Soco lawyers, and I will respect that,

13   but I'm talking about with anybody else besides Soco's

14   lawyers.  For example, internally.  Did you have discussions

15   like that internally?

16   A    It's something that Dr. Hawley and I spoke about.

17   Q    And decided it wasn't worth the time and effort?

18   A    Yes.

19   Q    And is the only reason it would be not worth the time and

20   effort, in your opinion, because whatever perc was deposited

21   there on its way to the northwest corner evaporated a long

22   time ago?

23   A    Yes.  I think it's unlikely we would find things there if

24   we looked today, and we can't be certain, where we look, it's

25   really the soil that was at the bottom of the ditch because of

1    all of the construction that's gone on since then.

2    Q    Well, the only thing that happened since then is that

3    area, at least farther down the tracks, has been raised up,

4    right?  It hasn't been dug up?  It's been raised up so they

5    could make the tracks go farther to the northwest; isn't that

6    true?

7    A    It's been regraded and filled, and then there's been

8    considerable construction, new construction on top of it.

9    Q    Well, not all the way to the northwest corner.

10   A    Not all the way to the northwest corner.

11   Q    Well, what about in the area on the way to the northwest

12   corner where there hasn't been construction?  What about

13   testing there?

14   A    Well, there's been, in the area where there hasn't been

15   construction, there's already been considerable testing.  I

16   didn't feel we needed to do more.  There's already been quite

17   a bit already.

18   Q    What well point or well points do you believe have a

19   condition in them revealed by the testing that supports your

20   theory that one spill came down that ditch and went to the

21   northwest corner?

22   A    Borehole F has conditions in it that are consistent with

23   a spill coming down that ditch.

24   Q    Any others?

25   A    Not until you get into the northwest corner itself.

1270

1   Q    And Borehole F doesn't have -- Borehole F has

2   biodegradation byproducts and so forth, unlike the center of

3   the northwest corner?  You talked about that at length, right?

4   It doesn't look like the northwest corner, does it?

5   A    It does in that it has high levels of perc, but it also

6   has degradation products of perc as well.

7   Q    Borehole F, you made a point on direct this morning

8   saying that plant area looks like something completely

9   different than the northwest corner area when you looked at

10  things like BTEX and biodegradation products.  Do you remember

11  that?  That was a point you made this morning.

12  A    Yes, that's correct.

13  Q    And Borehole F looks a lot more like the plant than it

14  does like the northwest corner, doesn't it?

15  A    I would say it's somewhere in between the two.

16  Q    All right.

17           THE COURT:  Let's stop.  It's cookie time.

18           MR. GROSSBART:  Can I have one, Your Honor?

19           THE COURT:  No.

20       (Recess taken from 14:18:58 to 14:33:48.)

21       (Open court.)

22       (Jury not present.)

23           THE COURT:  First off, again, when you're looking

24  for an exhibit, talk with Amanda.  She knows which exhibits

25  have been admitted and what they are.

1          Now I just learned this morning -- this is how

2    competent I am with the modern miracles of technology.  I just

3    learned this morning that you tweet on Twitter.  So having

4    said that, we've got all these notebooks and all these

5    exhibits that have been admitted.  Is there a chance that each

6    of you will be able to make a disk of the exhibits that have

7    been admitted on your side, on Soco's side, and then maybe you

8    could each submit a -- and I don't know this.

9          We don't have extra laptops, do we?

10          THE CLERK:  We might.  I can talk with Michael.

11          THE COURT:  We'll have to talk with our IT people.

12          THE LAW CLERK:  We have one, I know for sure.

13          THE COURT:  That's clean?

14      (Laughter.)

15          THE COURT:  You know, here I'm using the miracles of

16    modern technology.  I don't mean that bad in any way, "clean,"

17    but, I mean, nothing on it.  I don't even know if it's

18    possible to have a computer with nothing on it.  I suppose.

19          And then what we'd end up doing during jury

20    deliberations is I know there's a big-screen TV on a cart

21    around here.  We'd haul it in there, hook it up.  If they each

22    had a laptop, one for the Soco's exhibits and one for the

23    insurers, we could probably -- I know that on the realtime

24    summary you've been getting every night there's been -- it's

25    set out in there what exhibits have come in during the day.

1    Right, JoAnn?

2            THE REPORTER:  Um-hmm.

3            THE COURT:  What's involved in putting together a

4    contents?

5            THE REPORTER:  I have that.  I just haven't provided

6    it to anybody.

7            THE COURT:  Oh, really.

8            THE REPORTER:  Yeah.  I've given it to Amanda.

9    Yeah, I have that.

10           THE COURT:  With the exhibits?

11           THE REPORTER:  Um-hmm, um-hmm.

12           THE COURT:  You just push a button?

13           THE REPORTER:  Um-hmm.

14           MR. COZZENS:  Yeah, we can do that easily, Judge.

15           THE COURT:  I'll be darned.  So that's what I want

16   you guys to think about over the weekend, because it will be

17   silly putting all these books in there, now that we have all

18   these fancy gadgets.  And I include TV with that.

19           MR. COZZENS:  They have to keep the books for me.

20           THE COURT:  Pardon?

21           MR. COZZENS:  I said, they have to keep the books

22   for me.

23           THE COURT:  And me.  Right.

24           All right.  Let's get the jury.

25           THE LAW CLERK:  All rise.

1    (Jury present.)

2         THE COURT:  Please be seated.

3         How were they?

4    (Jurors responded affirmatively.)

5         THE COURT:  I even snuck one.  My prerogative.

6         Go ahead, Counsel.

7         MR. GROSSBART:  Thank you.  Thank you, Your Honor.

8    BY MR. GROSSBART:

9    Q    Dr. Powell, let me just ask you a few miscellaneous

10   questions to close up a couple subject areas and I'll move on

11   to another one.

12        I think you said, in the last session we just had, that

13   you understood this ozone sparging system or pilot project to

14   involve vertical trenches or vertical something or other.

15   What did you say?

16   A    I said the earlier pilot tests that were run initially

17   involved vertical wells to use for the soil vapor extraction

18   component, and when they found that those didn't work too well

19   in these silty clay soils, they then later installed trenches

20   for the further testing they did.

21   Q    Sure.  Do you dispute the fact that the trenches were in

22   place by no later than January of 2003?

23   A    I don't recall the specific dates so I wouldn't dispute

24   that.

25   Q    All right.  Let me see if I can refresh your

1274

1  recollection, then, with Exhibit 3191.  It's actually already

2  in evidence.  Maybe we'll just put it up.  3191.

3       Go to the second page, Neil.  Let's go back to the first

4  page.

5       DOCUMENT TECHNICIAN:  (Complied with request.)

6  BY MR. GROSSBART:

7  Q    This is a report by ATC dated November 13, 2003.  Do you

8  see that?

9  A    Yes.

10       MR. GROSSBART:  Okay.  Now we can go to the second

11  page.  First paragraph, blow that up.

12       DOCUMENT TECHNICIAN:  (Complied with request.)

13  BY MR. GROSSBART:

14  Q    That's talking about this ozone sparging system, right?

15  A    Yes, it is.

16  Q    And by that time, you've tried to weed out data from your

17  pie charts that comes after that point in time, right?

18  A    Well, it was the intention to weed out data that would be

19  affected by pilot testing, yes.

20  Q    All right.  And this refers to trenches, does it not?

21  A    Yes, it does.

22       MR. GROSSBART:  Okay.  In the second paragraph, just

23  highlight the first sentence.

24       DOCUMENT TECHNICIAN:  (Complied with request.)

25  BY MR. GROSSBART:

1275

1  Q     That puts the time frame on it; early 2003, right?

2  A     Yes, it appears to.

3  Q     All right.  So in point of fact, when I asked you about

4  horizontal trenches and all that, I didn't have it wrong, did

5  I?

6  A     Pardon me?

7  Q     I'll withdraw the question.

8        One followup on these MIP wells.  The EPA/MDEQ's MIP

9  results, we talked about how they came out in the RI addendum

10 at the end of 2003.  Do you recall that --

11 A     Yes.

12 Q     -- just generally?

13       And do you recall that -- well, let me ask you a few

14 questions about these MIP things.

15       Aren't they really considered more of a field screening

16 device rather than an analytical test?  Is that a true

17 statement?

18 A     Yes, they're a screening tool.  They don't provide

19 specific information on concentrations in groundwater or soil.

20 Q     And it's very tricky correlating an ECD response to a

21 total concentration; would you agree with that?

22 A     Yes.  Yes, it is.

23 Q     Okay.  And would you also agree that off-scale ECD

24 readings are not, by themselves, an indicator of the presence

25 of a NAPL source?

1   A     Yes, I would agree with that.

2   Q     By themselves, they're not enough, right?

3   A     That's right.

4   Q     You need a confirmatory lab sample to make that leap, do

5   you not?

6   A     Yes, you would want to go in and do testing.

7   Q     Right.  And as a matter of fact, when the RI addendum

8   came out and was using this MIP data to delineate source areas

9   on the Dyce plant, ENVIRON, along with ATC, pushed back on the

10  EPA/MDEQ and told them, in effect, that at least in the

11  opinion of ATC and ENVIRON, the EPA and MDEQ was wrong in

12  their reliance on these MIP samples; is that not correct?

13  A     I don't specifically recall, but I wouldn't agree -- I

14  wouldn't disagree with the position that it would be wrong to

15  rely on those alone in making these judgments.

16  Q     Well, and as a result, ATC and ENVIRON wrote reports to

17  the EPA, questioning the degree to which the EPA was relying

18  on those MIP results; isn't that correct?

19  A     I believe that is correct, yes.

20  Q     Now in talking about the catch pond -- and would you put

21  up DD143, please?

22        DOCUMENT TECHNICIAN:  (Complied with request.)

23  BY MR. GROSSBART:

24  Q     In talking about the catch pond, that brings into play

25  MP-105, which is an ECD reading in the catch pond, right,

1   among other things?  It's at least that, right?

2   A    That's right.

3   Q    And that particular location also had a confirmatory lab

4   sample on top of the ECD, and perc was found in the

5   groundwater; isn't that correct?

6   A    That's correct.

7   Q    All right.  And you remarked during direct how, if the

8   catch pond was a source, you would have expected to see

9   concentrations higher up, closer to the surface; isn't that

10  correct?

11  A    Concentrations in the groundwater, yes, and in the soil.

12  Q    Either?

13  A    Either.

14  Q    Okay.  And now the EPA was out there doing all of this

15  sampling in 2002, 2003, 2004, in through that period; I guess

16  2002 and 2003, right?

17  A    Right.

18  Q    And you know, sir, that by no later than 1981, that whole

19  catch pond area was dug out and made bigger?

20  A    The original catch pond from '75 was enlarged in '81,

21  yes.

22  Q    And it was enlarged by digging out and removing large

23  quantities of dirt and earth, among other things; isn't that

24  correct?

25  A    I am not sure.  I don't know how much dirt they actually

1    had to move to build it.

2    Q    All right.  Did you not -- well, let's just put up this.

3         Would you put up 5033, please, Neil?  Enlarge on the

4    catch pond area.

5              DOCUMENT TECHNICIAN:   (Complied with request.)

6    BY MR. GROSSBART:

7    Q    You look at aerial photos all the time as part of your

8    job, right?

9    A    Right.

10   Q    Isn't, in fact, what's shown here plainly a pile of earth

11   or dirt?

12   A    It's an area of disturbed soil.  It appears to be an area

13   of disturbed soil to me.  I wouldn't characterize this as a

14   pile based on looked on this alone, and I'd have to look at it

15   in stereo to know if there was any elevation to it.

16   Q    All right.  So you can't rule that out as you sit here,

17   correct?

18   A    I have no basis to agree or disagree.

19   Q    All right.  And you didn't look at that in stereo?

20   A    I don't think I've seen this set of dated photos in

21   stereo that I recall.

22   Q    Okay.

23   A    I may have, but I just don't recall.

24   Q    And just so the jury understands, experts like yourself,

25   there's a process where you can put these photographs on a

1    machine that kind of makes them show up in 3D, in effect, to

2    keep it simple; isn't that a fair statement?

3    A    Yes.  You look at two photographs side by side, look at

4    them through a special instrument, and you can see 3D in the

5    photos.

6    Q    And if that was a dirt pile, presumably, of any

7    consequence, you'd see the 3D effects of the dirt pile?

8    A    If you had stereo coverage, yes.

9    Q    Right.

10   A    You should be able to see it.

11   Q    Right.  And you didn't do that?

12   A    No.

13   Q    Okay.  Now if the catch pond was dug up to some

14   significant depth as part of the project that's led to the

15   reconfiguration of the plant, then whatever contaminants were

16   in the dug-up soil, assuming they were there, would be removed

17   right with the dirt; isn't that right?

18   A    Some of the contaminants would have likely been removed.

19   Whether they were all removed would depend on how much they

20   excavated --

21   Q    Sure.

22   A    -- or how deep the contaminants had penetrated into the

23   soil.

24   Q    And isn't it a fact that even later, this was

25   reconfigured again, and several feet of fly ash were put into

1    the hole?

2    A    Yes.  The boring data shows this area was subsequently

3    filled with fly ash.

4    Q    You heard testimony, I believe, from Mr. Naff about an

5    acid spill off a railcar.  Do you recall that earlier this

6    week?

7    A    I recall testimony about the spill.  I don't recall which

8    witness talked about it.

9    Q    Fair enough.  But a witness talked about an acid spill.

10   And you also recall from that testimony that the witness said

11   it was more likely than not that that acid spill happened

12   after the plant had reconfigured by no later than the date of

13   this picture, 1981; isn't that correct?

14   A    I don't remember that testimony, but I understand that

15   the big spill that was being talked about occurred later after

16   the reconfiguration occurred, but I don't remember specific

17   testimony about that.

18   Q    Well, okay.  But you have a general recollection from

19   your work that this big acid spill at the end of the railroad

20   tracks happened after the reconfiguration was done?

21   A    That's my understanding, yes.

22   Q    Okay.  Fair enough.

23        And that acid, because thankfully the plant had been

24   reconfigured, to the extent it flowed anywhere, would have

25   flowed to the catch pond; isn't that right?

1    A    I'm not sure.  I think it depends on which side of the

2    tank car the spill occurred.  If it occurred on the left side,

3    the west side, it would have arguably gone down outside the

4    berm.  If it occurred on the east side, the tank farm side, it

5    would have likely gone down the berm and into the catch pond.

6    I just don't remember any specific information on which side

7    of the car it occurred on.

8    Q    What if the tank just went off the end of the tracks?

9    It'd be within the tank, right?

10    A    I don't understand.

11    Q    I'll withdraw the question.

12         The point of moving the berm from east of the tracks to

13    west of the tracks and spending all that money to fix things

14    up that way was to catch spills emanating from railcars?  That

15    was the point of doing it, right?

16    A    In part, I think that's true.  I think there were other

17    areas they were trying to capture as well.

18    Q    Well, I understand that.  But among other things, they

19    were trying to ensure that anything happening on the tracks

20    would be caught by the catch pond?

21    A    I think that was part of their motivation, yes.

22    Q    Okay.  So if things worked like they were supposed to

23    when this acid spill happened, acid running off away from the

24    site would go into the catch pond?  Isn't that just logical?

25    A    It's only logical to me if the spill occurred on the east

1     side of that tank, that tank car that's sitting there.

2     Q     You don't -- you have, you have no information as to the

3     details of how this spill happened?

4     A     I don't recall any information or testimony earlier this

5     week as to which side of the tank car it actually occurred on.

6     Q     All right.  Now you also talked earlier about a company

7     called Kaivos doing some testing in and around the catch pond.

8     Do you recall that?

9     A     Yes.

10    Q     And that was done in the mid '80s, 1985, '86,

11    thereabouts.  Do you recall that?

12    A     Yes.

13    Q     And obviously at that time the plant's been reconfigured?

14    We can all agree on that, right?

15    A     Yes.

16    Q     Okay.  And Kaivos, you know from looking at their

17    reports, looked at soil samples, quote, in the pasture area on

18    the west and north sides of the fenced plant.  Okay?  Do you

19    remember that, from all your study and work?

20    A     Vaguely, yes.

21    Q     All right.  And you would agree that this is fenced?

22    A     It is.

23    Q     Okay.  And this is fence?

24    A     It is.

25    Q     And Kaivos looked out here?  Thereabouts?  The exact

1    location isn't important, but that's what they're talking

2    about, the pasture area along the west and north sides of the

3    fenced plant?  That's how you take that to mean, correct?

4    A    I understand they looked certainly north of the fence.

5    I'm not sure whether they looked west of the fence as you've

6    shown, because that's not Dyce Chemical's property.  That's

7    someone else's property, and I don't know whether they went

8    over there and tested or not.  I just don't recall.

9    Q    What, you think this isn't Dyce property?

10   A    I believe the other side of that fence was a trucking

11   company property.

12          MR. GROSSBART:  Slide the picture to the right,

13   Neil.

14          DOCUMENT TECHNICIAN:  (Complied with request.)

15   BY MR. GROSSBART:

16   Q    Isn't this the Dyce property line?

17   A    Okay.  You're right.  With the larger photo.

18   Q    All right.

19   A    You're correct.

20          MR. GROSSBART:  Go back the other way, please.

21          DOCUMENT TECHNICIAN:  (Complied with request.)

22   BY MR. GROSSBART:

23   Q    I don't need to belabor it, it's not really important,

24   but somewhere in that arc, Kaivos did testing, and that's what

25   they mean by outside -- or, excuse me, around the west and

1    north sides of the fenced plant?  That's how you read the

2    report, too, isn't it?

3    A    Yes.

4            MR. GROSSBART:  Okay.  Would you pull up

5    Exhibit 856A, page 75?  And the very last sentence, beginning,

6    "Also."  Just the last sentence.

7            DOCUMENT TECHNICIAN:  (Complied with request.)

8    BY MR. GROSSBART:

9    Q    Okay.  And according to Kaivos, acid residue from the

10   catch pond has significantly affected soil pH.  Do you see

11   that sentence?

12   A    Yes.

13           MR. GROSSBART:  Okay.  Let's go back to the photo.

14   Take that down and go back to the '81 photo.

15           DOCUMENT TECHNICIAN:  (Complied with request.)

16   BY MR. GROSSBART:

17   Q    So if they're testing for acid out here and saying acid

18   residue from the catch pond is affecting pH, doesn't that mean

19   something is coming out of the catch pond?

20   A    I didn't read it that way, but I didn't write the report,

21   so --

22   Q    You can't comment on that one way or another?

23   A    I can't comment.  I didn't understand that's what they

24   meant when I read it, but I didn't write the report.

25   Q    Okay.  Now let's talk about some of the aerial photos in

1    the devegetated areas that are apparent on some of them.

2         It's your -- I think you testified this morning during

3    direct examination that at least in some significant part that

4    devegetation seen over the years on these photos is due to the

5    periodic release, I guess, or runoff of 2,4-D, a chemical

6    manufactured by the company that occupied the site prior to

7    Dyce?

8    A    That's correct.

9    Q    All right.  Now Dyce bought this property and moved out

10   there -- well, they bought the property in 1972.  You know

11   that, do you not?

12   A    Yes.  Approximately '72.

13   Q    Um-hmm.  And they moved there in '73 and started

14   operations.  You know that, right?

15   A    Yes, I believe that's correct.

16   Q    You also know from your work that Dyce never manufactured

17   or sold 2,4-D in the entire, the entire time it operated,

18   right?

19   A    Not to my knowledge, they didn't, no.

20   Q    So they didn't handle 2,4-D?

21   A    Not that I'm aware of, no.

22   Q    All right.  So whatever 2,4-D is out there is left over

23   from the prior owner, or, I should say, the operations of the

24   prior owner?

25   A    That's my understanding.

1    Q    And it's your testimony that the progression of

2    denudement that's apparent in the aerial photos is all due to

3    2,4-D that was left over from the early '70s?

4    A    No, that was not my testimony.

5    Q    Okay.  Well, is any of the denudement seen in '79, '81,

6    '83, can any of that be explained by 2,4-D from ten years

7    earlier?

8    A    Some of it, I think, can be, yes.

9    Q    Some of it can be.

10   A    Yeah.

11        (Discussion off the record at counsel table.)

12   BY MR. GROSSBART:

13   Q    We'll do a few of these, and then I'll turn the floor

14   over to Mr. Davis.

15        All right.  Let's go to 5017, please.  And, Neil, I'll

16   take this off, but let's -- give me, if you can, thereabouts.

17        DOCUMENT TECHNICIAN:  (Complied with request.)

18   BY MR. GROSSBART:

19   Q    Okay.  Now fair to say, sir, is it not, that in the

20   northwest corner area, you'd agree with me is out there,

21   right?

22   A    Yes.

23   Q    There really is not significant devegetation out there

24   that's visible on this photo in 1974, is there?

25   A    Doesn't appear to be, no.

1    Q    All right.  And you'd agree with me it's a little spotty

2    in through there?

3    A    It's spotty in there.

4    Q    Maybe a little worse down low?

5    A    That's right.

6    Q    All right.  Do you attribute any of the devegetation that

7    we see on this photo to 2,4-D?

8    A    Yes.

9    Q    And would that be down here, among other places?

10   A    Among other places, yes.

11   Q    How about up here?

12   A    Yes.  It's quite likely from 2,4-D.

13            MR. GROSSBART:  Okay.  Let's go to 1975,

14   Exhibit 5019.

15            DOCUMENT TECHNICIAN:  (Complied with request.)

16   BY MR. GROSSBART:

17   Q    Now do you attribute any -- well, let's bring it out a

18   little, Neil.

19            DOCUMENT TECHNICIAN:  (Complied with request.)

20            MR. GROSSBART:  Okay.  Hold it right there.

21            DOCUMENT TECHNICIAN:  (Complied with request.)

22   BY MR. GROSSBART:

23   Q    Again, pretty good out there, right, all things

24   considered?

25   A    It doesn't appear to be heavily devegetated, if that's

1    what you mean by "pretty good."

2    Q    Yeah, that's what I mean.

3    A    Okay.

4    Q    So no 2,4-D out there causing any problem?

5    A    Not at this time.

6    Q    Now 2,4-D, that operation has been shut down now for at

7    least three years, maybe more, but that, you think that 2,4-D

8    is going to come back to life sometime in the future as we go

9    through these things?  Is that what we're going to hear?

10   A    Based on the testimony I heard from Mr. Naff yesterday, I

11   believe that there are episodic periods when there's releases

12   of 2,4-D in which it has an impact and then that impact

13   subsides and then it can reoccur.

14   Q    Okay.  Well, whatever causes the 2,4-D to emerge from the

15   depths, it's not happening in '74 or '75, is it, and affecting

16   this area?

17   A    Not affecting that area, no.

18   Q    Okay.  What about is that 2,4-D or is that something

19   else?

20   A    It quite likely could be 2,4-D.

21   Q    All right.  Could it have anything to do with the barrel

22   washing operation we heard from Mr. Slater who testified by

23   video as having taken place down there?  He was there in the

24   summer of '76.  Could it be due to that?

25   A    I don't think so.

1289

1    Q    So whatever Mr. Slater was doing by steaming or washing

2    barrels here, right here, that has nothing to do with --

3    that's all 2,4-D?

4    A    I think more likely than not, it's an impact from 2,4-D,

5    yes.

6    Q    All right.  By the way, Mr. Slater talked about seeing a

7    spill about 12-foot by 12-foot, or thereabouts, standing on

8    the -- he used that word, "standing" on the loading and

9    unloading area.  Somewhere in here, I gather.  Do you recall

10   that testimony?

11   A    I recall his testimony about seeing a spill, yes.

12   Q    All right.  And do you recall that he worked there in the

13   summer of 1976?  Do you recall him saying that?

14   A    I don't recall the specific time that he worked.  I know

15   he said he was there in the summer because he said it was hot

16   at the time.

17        (Discussion off the record at counsel table.)

18   BY MR. GROSSBART:

19   Q    You do not mean to suggest, I take it, that what Slater

20   saw, in his testimony, has anything to do with the spill that

21   you've hypothesized occurred and went to the northwest corner;

22   isn't that correct?

23   A    I don't know whether they're related or not.  I just

24   don't know.

25   Q    Well, how -- a spill of water that was 12 feet in

                                  1290

1    diameter could be how many gallons?  You can actually do those

2    computations, can't you?

3    A     If I knew the depth of the water, I could.

4    Q     Well, standing on an asphalt, a piece of asphalt

5    pavement, I don't think it would be very deep.

6    A     It's possible to do those calculations, yes.

7    Q     It would be about -- wouldn't be more than 20 gallons,

8    would it?

9    A     I don't know.  I haven't done those calculations.

10   Q     Can't you -- wouldn't be more than 50 gallons?  Do you

11   need to do a calculation even to tell us that?

12   A     I'd have to think about it and do some calculations, yes.

13            MR. GROSSBART:  All right.  Well, I'm going to --

14   Your Honor, the parties have stipulated in this case as part

15   of the final pretrial order that Desmond Slater's employment

16   was the summer-fall of 1976.

17            Did I read that correctly?

18            MR. BANKER:  Yes.

19   BY MR. GROSSBART:

20   Q     How long would it take you to do those kind of

21   calculations?

22   A     A couple of minutes.

23   Q     You would at least agree with me, wouldn't you, that if

24   the spill that you base your entire opinion on has some

25   connection to an inventory shortage which you've heard

1291

1   testimony happened in either the fourth quarter of the year or

2   the first quarter of the year, that a spill witnessed by

3   Desmond Slater in July or August of the calendar year, in his

4   case, 1976, had to be something else?  That's just logical,

5   isn't it?

6   A    Yes, it is.

7   Q    Okay.  All right.  Let's go back to denudement,

8   devegetation.

9        Is "denudement," is that a word you use in your business?

10  A    No, it really isn't.

11  Q    Oh, okay.  We'll call it devegetation.

12  A    I understand what you mean.

13       MR. GROSSBART:  All right.  Now let's go to

14  Exhibit 5024, please.  And, Neil, if you could, bring it out a

15  little.

16       DOCUMENT TECHNICIAN:  (Complied with request.)

17  BY MR. GROSSBART:

18  Q    Now this is 1977, and do you know what that thing is?

19  A    That is an old pit that I understand was used during the

20  Dow era.

21  Q    Okay.  And it's empty now, right?

22  A    It appears to be dry in this photo, yes.

23  Q    And you would agree that things are devegetated there,

24  right?

25  A    They seem to be, yes.

1292

1    Q    And is it your professional opinion that that is caused

2    by 2,4-D?

3    A    I think more likely than not, that's why it's denuded,

4    yes.

5    Q    And again, this barrel washing and steaming operation

6    that went on down there actually -- would you agree with me

7    that looks actually wet right there at that point?

8    A    It is certainly dark.  It could be wet.

9    Q    Okay.  And you ruled that out, that operation out, as a

10   contributor to the devegetation that we see here; is that your

11   professional opinion?

12   A    Yes.

13   Q    Okay.  Well, whatever was causing that devegetation, for

14   the most part, you would agree with me, stops by that point,

15   right?

16   A    At this time, yes.

17   Q    Right.  But you would also agree with me, would you not,

18   that there is devegetated area starting to show up there?

19   Right there?

20   A    There appears to be, yes.

21   Q    Okay.  But in between the two, there is no apparent

22   devegetation, right?

23   A    I don't see any on this photo, no.

24   Q    All right.  So I'll take a chance with this one.  You

25   would agree with me that whatever is running in this direction

1   and causing that area of devegetation is separate and distinct

2   from what's happening there?

3   A    At this point in time, yes, I think that's true.

4   Q    Okay.  Good.  Okay.

5        Let's go to 5028, please.  This is May of '79.

6             DOCUMENT TECHNICIAN:  (Complied with request.)

7             MR. GROSSBART:  Neil, bring it -- okay.  Stop right

8   there.  Zoom.  Push it away a little.  Okay.

9             DOCUMENT TECHNICIAN:  (Complied with request.)

10            MR. GROSSBART:  Perfect.

11  BY MR. GROSSBART:

12  Q    Would you agree we still see what appears to be a dark,

13  perhaps wet area where Desmond Slater testified he was

14  steaming barrels, although by 1979 he's obviously not doing

15  it, but presumably somebody else is?  Do you see that?

16  A    I see the dark area, yes.

17  Q    Right.  And is this a little outbreak of 2,4-D?  Is that

18  what accounts for that devegetation?

19  A    I think it is, yes.

20  Q    Nothing to do with the barrels, steaming, and all of the

21  chemicals, the residue, *et cetera*?

22  A    No.

23  Q    Okay.  In any event, it pretty much stops there.  Is that

24  a fair characterization?

25  A    I don't know that I'd agree with that.

1294

1   Q    Oh.  All right.  You're a little concerned about that

2   stuff?

3   A    Yes.

4   Q    Okay.  Well, it certainly seems to peter out a little.

5   Would you agree that far?

6   A    It's less pronounced the further northwest you go.

7   Q    All right.  But then we see -- and I don't mean to

8   suggest what I've drawn is devegetated, but I don't want to

9   cover up the devegetated area with my drawing.  I want to

10  focus on the area, and I have, it's fair to say, circled a

11  devegetated area newly apparent in this particular photo.

12  Fair statement?

13  A    Yes.

14  Q    And is this all caused by 2,4-D?

15  A    No, I don't think it is.

16  Q    Do you have an opinion as to what caused it?

17  A    I testified that it could have been caused either by

18  2,4-D at various times, or by the runoff of acidic stormwater

19  from along the tracks, or at some point in time by the release

20  of perc into that area which would kill vegetation.  It could

21  be any of those.  But less likely 2,4-D and more likely the

22  other factors by this time.

23  Q    Well, if the inventory shortage is to be believed, the

24  perc spill happened in '75, '76, or '77, right?

25  A    (No response.)

1    Q     Your perc spill, or at least one of them?

2    A     It's not mine, fortunately.

3    Q     Well, you know what I mean.

4    A     Yes.

5    Q     Okay.  So -- and perc is -- you even have a client who

6    uses perc as a weed killer.  Got in trouble for doing so.

7    Didn't you mention that in direct?

8    A     I don't think I said they got in trouble.  They ended up

9    with a contaminated piece of property.

10   Q     All right.  They ended up with a contaminated piece of

11   property such that they had to hire you.

12   A     That's right.

13   Q     All right.  And using perc as a weed killer, it's not

14   this delayed action thing?  It kills the weeds once you apply

15   it?  Doesn't take years to kill the weeds?

16   A     It kills the weeds when you first apply it, and it

17   continues to kill the weeds as it sits there as a residue in

18   the soil.

19   Q     Sure.  But by the end of the period -- let's go to

20   September 1977, 5024.

21         DOCUMENT TECHNICIAN:  (Complied with request.)

22   BY MR. GROSSBART:

23   Q     We're now through at least the first quarter of 1977, the

24   end of that inventory -- frankly, the end of the period

25   altogether, because it was only Mr. Hallsten who referred to a

1    first quarter inventory shortage.  Mr. Naff referred to a

2    fourth quarter one.  Do you recall that?

3    A    Yes, I recall that testimony.

4    Q    Well, there's no indication out here of perc having

5    spilled sometime in '75, '76, or up to and including the date

6    of this photo, September 1977, getting out here, pooling, and

7    devegetating the area.  It's just not there, is it?

8    A    There's evidence of devegetation within the general area

9    you're circling, certainly.

10         MR. GROSSBART:  Well, let's toggle back to the 1979

11   photo, which is 5028.  Bring it in a little, please, Neil.

12         DOCUMENT TECHNICIAN:  (Complied with request.)

13   BY MR. GROSSBART:

14   Q    I mean, you'd have to agree there's a major difference

15   between '77 and '79 in the devegetation, wouldn't you?  It's

16   startling.

17   A    The '79 photo shows a greater area as being devegetated,

18   yes.

19   Q    As a matter of fact, if I was to -- all right.  Strike

20   that.

21         Let's go to 5033.  Bring it in, please, Neil.

22         DOCUMENT TECHNICIAN:  (Complied with request.)

23         MR. GROSSBART:  Let's see.

24   BY MR. GROSSBART:

25   Q    Overall worse, right?

1297

1    A    I'm not sure.  Worse as compared to when?

2    Q    The last photo.

3    A    No, actually I think it's a little bit better.  The '79

4    photo, which I believe is the last one you showed me --

5    Q    Yes, it is.

6    A    -- the apparently devegetated area is a little bit

7    larger.  It's a little smaller here.

8    Q    Maybe a little bit more skinny on the edge, but you

9    actually think that that's an improvement over '79?  I mean,

10   that's okay, but that's your opinion?

11   A    I think it is as compared to what I remember seeing on

12   the photo.

13   Q    All right.  Any chance that any of this is related to

14   2,4-D?

15   A    Probably not at that time, no.

16   Q    Right.  I mean, what you actually see here is very little

17   by way of devegetation compared to the prior photos we've been

18   looking at, right?

19   A    You're referring to the 2,4-D area?

20   Q    Yes, sir.

21   A    Yeah.  You still see some minor devegetation, but it

22   doesn't extend all the way down to this northwest corner area.

23   Q    Well, it never extended all the way down to -- strike

24   that.

25        What you have referred to as the 2,4-D-impacted area

1298

1    looks much less distinct on this photo than it has on several

2    of the prior ones, right?

3    A    That's correct.

4    Q    And I don't think we saw any photo where you had 2,4-D

5    impacts all the way to the northwest corner, at least not yet.

6    A    I think there was one that you showed me.  1975, perhaps?

7    There's been a lot of photos here, but there was one that you

8    showed me that extends all the way down to that area.

9    Q    All the way to the northwest corner?

10   A    No, down to the area where the fenced corner makes the

11   sharp angle.

12   Q    I know, but here is --

13   A    Down in that area.

14   Q    That's the biggest area of denudement, out there.

15        Alls I'm trying to get you to agree with me on is what I

16   thought was the obvious, that this is not, this isn't 2,4-D.

17   It just simply can't be.

18   A    I don't think, at the time of this photo, that it's

19   principally from 2,4-D, no.

20   Q    And the barrel washing operation appears to be at least

21   inactive down there, doesn't it?

22   A    Yes.  It appears to have ended.

23   Q    And you don't think that has any relationship to what

24   you've characterized as the 2,4-D area improving?

25   A    No, I don't.

1          MR. GROSSBART:  Okay.  Go to 5036, please.  Bring it

2    in, if you would.  Bring it down.

3          DOCUMENT TECHNICIAN:  (Complied with request.)

4    BY MR. GROSSBART:

5    Q    Would you at least agree with me that there's no

6    improvement between the '81 photo and the '83 photo in terms

7    of the area of devegetation out in the northwest corner?

8    A    The differences between those two time periods seem to be

9    fairly small.

10   Q    Right.  So if a '75, '76, or '77 perc spill or release

11   happened here and somehow -- and I know this is past the time

12   frame -- made it out, made its way out there and that is the

13   source of the devegetation, why wouldn't it have been much

14   better, improved, by 1979, in 1981, in 1983?  It's staying the

15   same or getting worse.

16   A    Well, over time, I think as the perc has migrated down

17   deeper into the soil and the concentrations near the surface

18   have become less and less, any impact it was going to have on

19   vegetation would have diminished.

20   Q    But it doesn't get better out here?  From '79 to '81 to

21   '83, it doesn't get better, correct?

22   A    I don't agree.  I think it did get better as compared to

23   '79.  '81 and '83 don't seem to show a big difference.

24   Q    Okay.  Do you mean to offer as an opinion here to a

25   reasonable degree of certainty that the devegetation on any

1    one of these photos that we've seen, you can, again, to a

2    reasonable degree of scientific certainty, attribute to the

3    perc spill that you have hypothesized as the basis for why the

4    northwest corner is the way it is?

5    A     No.

6            MR. GROSSBART:  Okay.  Then with that, I will -- I

7    have no further questions, and I thank you for your time.  I

8    know it's been a long day for everybody.

9            THE WITNESS:  Thank you.

10           MR. DAVIS:  May I briefly, Judge?

11           THE COURT:  Yep.

12                    CROSS-EXAMINATION

13   BY MR. DAVIS:

14   Q     Dr. Powell, I have good news for you.  No more wells.

15   A     That's good news.

16   Q     Okay.  But we will talk about the spill scenario.

17   Mr. Lynch asked you this morning that you think the most

18   likely explanation is a spill of approximately 500 gallons in

19   the loading or unloading area at Dyce in the mid '70s to

20   account for what you've analyzed in the northwest corner; is

21   that correct?

22   A     I don't recall in my original opinion I put a date on it,

23   but a spill of that size, yes.

24   Q     Yes.  Okay.  Because some of it's going to, a lot of it,

25   or I think roughly 35, 40 percent, isn't going to make it from

1  the loading area to the northwest corner for one reason or

2  another, evaporation or infiltration along the pathway,

3  correct?

4  A    For a spill of that size, that's correct.

5  Q    Yeah.  So you need to have, the mass you've calculated in

6  the northwest corner of several hundred gallons, you need

7  roughly 500 gallons, taking into account variables for

8  atmospheric conditions, in the original spill?  Something in

9  that range?

10 A    That's right.

11 Q    All right.  And you'd agree with me, sir, that there are

12 three scenarios for a spill, possible scenarios, and I think

13 we'll be able to eliminate two of them very quickly, for a

14 spill in the operations area of Dyce:  No. 1, perc coming in;

15 No. 2, perc sitting there; or, No. 3, perc going out.  Those

16 would be the three different scenarios, wouldn't they?

17 A    I'm not sure I understand what you mean by "coming in,"

18 "sitting there," or "going out."

19 Q    All right.  Well, perc was delivered to the Dyce

20 facility, was it not, in bulk?

21 A    Yes, it was.

22 Q    That's your understanding, isn't it?

23 A    Yes.

24 Q    Perc was stored at the Dyce facility?

25 A    Yes.

1    Q    And then perc was sold to customers and taken off of the

2    facility, off the premises?

3    A    That's right.

4    Q    Those are the three scenarios I'm talking about.

5    A    Okay.

6    Q    All right?  And you'd agree that perc was stored in the

7    mid '70s at Dyce Chemical in Lockwood in either a 1,500-gallon

8    horizontal tank or in 55-gallon drums.

9    A    That's the testimony I've heard, yes.

10   Q    Yes.  And I think the drums were stored in the warehouse,

11   were they not?

12   A    That's the testimony I've heard, yes.

13   Q    All right.  And so obviously, if -- and in 55-gallon

14   drums, you would need nine or ten drums to spontaneously

15   catastrophically fail in the warehouse and then get outside

16   and then follow the path where you posited.  We can eliminate

17   that, can't we?

18   A    Yes.  I don't think that's likely.

19   Q    All right.  And by the same token, we can eliminate a

20   catastrophic failure of the 1,500-gallon tank because it was

21   in containment?

22   A    Yes.

23   Q    It would have gone into the catch pond?

24   A    That's right.

25   Q    So we know that Scenario 2 didn't happen, don't we?

1   A    (No response.)

2   Q    That there was a failure during a static condition at

3   Dyce?

4   A    I'm a little confused.

5   Q    I know.  It's late.

6   A    I don't know what you mean by "Scenario 2."

7   Q    Coming in, staying there, going out.  Scenario 2 is just

8   staying there, that it's stored in the 55-gallon drums and the

9   1,500-gallon horizontal tank.

10  A    Yes, I think it's unlikely the spill occurred by the mere

11  storage of product in tanks or drums.

12  Q    I'm just trying to go through this logically with you,

13  sir.

14  A    Okay.

15  Q    And then the third scenario was perc going out, being

16  sold to customers, correct?

17  A    Correct.

18  Q    We're going to come back to No. 1.

19  A    Okay.

20  Q    I haven't forgotten about it.

21       And perc going out, you understood, perc went out in a

22  smaller skid tank to drycleaners or in drums.

23  A    I have heard testimony that it went out either in a tank

24  or in drums.

25  Q    All right.  And the tank was 150 gallons?

1304

1    A     I don't recall the specific volume.

2    Q     Well, it was certainly smaller than 500-gallons as a

3    delivery container, wasn't it?

4    A     I just don't recall that.

5    Q     All right.  But obviously, again, if there's some problem

6    with drums, to get to 500 gallons and you're delivering perc

7    in drums, you'd need to, like Humpty-Dumpty, break open or

8    have nine or 10 barrels somehow fail at the same time?

9    A     That's right.

10   Q     Doesn't seem likely, does it?

11   A     That's right.  When I said it was a bulk-size release, I

12   meant to imply it is not a release from drums.

13   Q     All right.  And if perc -- if the skid tank that

14   delivered perc in bulk to drycleaners was 150 gallons, it's

15   pretty hard to have that tank fail and create a 500-gallon

16   spill?

17   A     If it's 150 gallons and the release was from a failure of

18   the tank, it would not, obviously, create a 500-gallon spill.

19   Q     All right.  So I think we're back to Scenario 1, perc

20   coming into the facility, aren't we?

21   A     I'm not sure that's the case.

22   Q     You got another scenario?

23   A     Well, I don't think I could rule out that in the process

24   of filling the tote tank to take perc to customers, that

25   someone became distracted, didn't keep an eye on the filling

1    process, the tank overfills, and there's a large spill and, by

2    the time they get back, there's perc on the ground.  I don't

3    know whether that could have occurred or not, but I can't rule

4    it out.

5    Q    All right.  So you'd agree, and we've heard testimony --

6    you heard it in this courtroom -- that it was pumped by Dyce's

7    pumps at about 60 gallons a minute?

8    A    I have heard that, yes.

9    Q    Yeah.  So if it took 60 gallons a minute, it would take a

10   little over two and a half minutes, or take about two and a

11   half minutes to fill a 150-gallon skid tank, wouldn't it?

12   A    That's right.

13   Q    And so if someone, instead of standing by the perc, the

14   skid tank for two and a half minutes, they'd have to wander

15   off for how long at 60 gallons a minute to cause a 500-gallon

16   spill?

17   A    It would be about eight or nine minutes.

18   Q    And then the first scenario that I think you discussed,

19   and I presume you were alluding to when Mr. Lynch was asking

20   you questions, was when perc came in on a tanker and was

21   offloaded, and I think you said you really didn't know; if

22   there was a failure between the tanker and the pump, if that

23   hose somehow came undone, you had no way to predict at what

24   rate the perc would come out of the tanker?

25   A    That's right.  I don't know what that flow rate would be.

1    Q     But that's the scenario you had in mind when you were

2    answering Mr. Lynch's questions, wasn't it?  They were

3    offloading a tanker, making a delivery of perc?

4    A     I'm not sure which question you're referring to.  I think

5    I said that the flow rate depended on which side of the pump

6    it occurred on.  If it was on the tank farm side of the pump,

7    it probably would have been 60 gallons a minute.  If it was on

8    the other side, I don't know what the rate would have been.

9    Q     But what you're talking about there is a delivery being

10   made to Dyce in that scenario that you were envisioning for

11   Mr. Lynch, wasn't it?

12   A     That's what I had in mind, yes.

13   Q     Yeah.  That's all I'm trying to see.

14         And you heard Mr. Hallsten testify in this courtroom, did

15   you not, that they normally ordered about 3,000 gallons of

16   perc a quarter?

17   A     I heard 3,000.  I heard 4,000.

18   Q     All right.

19   A     I'm not sure what was finally settled as the right

20   number.

21   Q     All right.  Either one will do for my purposes.

22         And you'd agree with me logically, in the offloading

23   scenario, if you have a 1,500-gallon tank and you're getting

24   3,000 or 4,000 gallons of perc, only a portion of that load is

25   going to go in the tank, correct?

1307

1   A    That's right.

2   Q    The rest had to be drummed off?

3   A    That's right.

4   Q    Okay.  And at 55 gallons, there would be a lot of drums

5   to fill, wouldn't there, after, after the 1,500-gallon tank

6   was filled?

7   A    If it was a 3,000-gallon load, it would be about 30

8   drums.

9   Q    Common sense tells you, doesn't it -- we didn't really

10  hear any direct testimony on that -- the logical way to do

11  that would be to fill the 1,500-gallon tank first, make sure

12  it was filled, and then turn to fill the drums?

13  A    I don't know.  I've never thought about it, but they

14  might have done it that way.

15  Q    Yeah.

16  A    I don't recall anyone testifying about that topic.

17  Q    I understand.  I'm just asking you.  You've done forensic

18  examinations of other contaminated sites.  I'm just trying to

19  get you to see if that makes sense to you, when you put on

20  your forensic hat.

21  A    I don't think I've ever considered that question in

22  another site.

23  Q    All right.  You'd agree though, sir, I mean, if there

24  were a failure, the situation of there being a failure filling

25  the 1,500-gallon tank -- well, let me back up.

1         You heard Mr. Hallsten testify that's where the inventory
2    shortage was discovered, right, was the 1,500-gallon tank?
3    A    Yes, I heard that.
4    Q    Yeah.  He had someone go out and check it three times.
5    There wasn't the right volume in that tank, was there,
6    according to him?  That was his recollection?
7    A    That's what I understand, yes.
8    Q    Okay.  And that's what the jury heard.  That's what they
9    have to base their decision on, the evidence they hear here,
10   correct, and the documents they see --
11   A    Yes.
12   Q    -- including your testimony?
13   A    That sounds like instructions from His Honor.
14   Q    No.
15   A    I assume that's the case.
16        THE COURT:  Yeah.  You're getting carried away now.
17        MR. DAVIS:  Okay.
18   BY MR. DAVIS:
19   Q    If, in fact, there were a failure filling that
20   1,500-gallon tank, does it make any sense to you that someone
21   would then go proceed to fill a dozen 55-gallon drums with
22   this huge puddle or spill of perc right there in the loading
23   area and nobody heard about it or knew about it?
24   A    It doesn't, it doesn't seem logical to me that, having
25   just witnessed a large spill, someone would then proceed to go

                              1309

1   ahead and fill a bunch of drums.  That doesn't seem logical to

2   me, if that's what you're asking.

3   Q    It seems downright silly, doesn't it?

4   A    It doesn't seem logical to me that someone would do that.

5   Q    All right.  And let's try the other scenario, that they

6   filled the drums first before they filled the tank.  You

7   understood how they filled drums, don't you?

8   A    Yes, in general.

9   Q    They filled them by weight, didn't they?

10  A    Yes, that's the testimony I heard.

11  Q    So you filled each 55-gallon drum, and I think Mr. Bender

12  said they had four on a skid and they would fill them

13  sequentially.  Do you remember hearing that in his videotaped

14  testimony?

15  A    I heard they filled them one at a time, and then there

16  were four placed on pallets --

17  Q    Okay.

18  A    -- once they were filled.

19  Q    But you'd have to weigh each one, wouldn't you?

20  A    Yes, you'd weigh them one at a time.

21  Q    In the drumming shed.

22  A    Yes.

23  Q    All right.  And so at 60 gallons a minute, how long would

24  it take to fill a 55-gallon drum?

25  A    Just under a minute.

1    Q    Okay.  And so does that sound at all credible to you that

2    someone filling a 55-gallon drum, which takes a minute or so

3    to fill, somehow would cause a spill of 500 gallons in that

4    process in the drumming shed?

5    A    No, that doesn't seem likely.

6    Q    Okay.  And if it were in the drumming shed, it would

7    probably, as you understand it, would have run through back to

8    the catch pond?

9    A    That's not entirely clear to me.  I thought, the

10   testimony that I've heard this week about where fluids within

11   the drumming shed would flow and some of the exhibits I've

12   seen, it's unclear whether it would have gone back inside in

13   containment or come out into the unloading area.

14   Q    All right.  In either situation, if someone left the pump

15   going while they're filling a 55-gallon drum to allow the

16   equivalent of ten or so drums be lost in that process to

17   create this 500-gallon spill, you'd agree that drumming shed

18   would be a mess, wouldn't it?

19   A    If it happened there, there would be a lot of perc on the

20   floor.

21   Q    Yeah.  And you've certainly heard no testimony about

22   that, have you?

23   A    No.

24   Q    And, in fact, you'd also agree the vicinity of the

25   drumming shed was asphalt during all periods of time that we

1    need to be concerned about here?

2    A    As far as I'm aware, the unloading area immediately in

3    front of the shed was asphalt.

4    Q    Okay.  And you would agree that perc serves as a solvent

5    for asphalt?

6    A    Yes.  It will dissolve the bitumen, the heavy tar-like

7    material that is in asphalt.

8    Q    And you don't disagree with what Dyce or I guess Soco or

9    I guess it was HCI told the EPA back in 2000, that they

10   would -- that everyone connected with the facility would have

11   expected to see some evidence of that happening if there had

12   been a spill there?

13   A    I don't recall that specific communication to EPA, so I

14   don't think I can agree or disagree.

15         MR. DAVIS:  Neil, can you pull up Exhibit 383,

16   please?

17         DOCUMENT TECHNICIAN:  (Complied with request.)

18   BY MR. DAVIS:

19   Q    This is something Ms. Miller was examined about, and I

20   think Mr. Warne, too, yesterday when you were here.  This is

21   the second request for information to the Section 104(e) or

22   second responses -- I'm sorry.  The responses to the second

23   request of information pursuant to Section 104(e) of CERCLA.

24        You're familiar from your other work that some of the

25   people you work for have to fill out these 104(e) responses?

1    A    Yes, I'm familiar with what these are.

2         MR. DAVIS:  Okay.  Could you turn to page 6, Neil?

3    And down at the bottom, the bottom paragraph.

4         DOCUMENT TECHNICIAN:  (Complied with request.)

5    BY MR. DAVIS:

6    Q    You'd agree -- or you don't disagree with what Dyce or

7    Soco told the EPA in this response, do you?

8    A    I certainly agree with some of it.  I'm not sure I would

9    agree with all of it.

10   Q    So you take issue with what Dyce told the EPA?

11   A    I don't know that I would completely agree with all of

12   it.

13        MR. DAVIS:  Could we see, Neil, Exhibit 5038?  Can

14   you blow that up, at least the loading/unloading area?

15        DOCUMENT TECHNICIAN:  (Complied with request.)

16   BY MR. DAVIS:

17   Q    And you were here yesterday when I asked Mr. Warne about

18   this picture?

19   A    Yes.

20   Q    Okay.

21   A    I've seen this picture.

22   Q    And you remember that he said that the semitractor that's

23   parked by the drumming shed represented the typical unloading

24   or loading configuration?

25   A    Yes, I recall that testimony.

1    Q    Okay.  And that's the only testimony that you recall

2    hearing in this courtroom, isn't it true, about where semis

3    would come into the Dyce facility to unload by the drumming

4    shed?

5    A    Well, Mr. Naff testified about where trucks came into the

6    facility, but on that specific question about if they were

7    going to unload to the drumming shed, would that be where they

8    parked?  I believe that was the only instance anyone testified

9    about that topic.

10   Q    Okay.  And again, it's your testimony that if there's a

11   spill in this loading and unloading area back in the mid '70s,

12   that the natural course would be for liquids to flow westward

13   on the north side of the small barn or the small warehouse and

14   then down along the railroad ditch?  I realize this picture

15   shows a reconfiguration where it wouldn't have happened.

16   A    That's right.

17   Q    All right.  But that would be the natural flow pattern as

18   far as you were concerned?

19   A    That's right.

20   Q    All right.  Can we see -- and you base that opinion not

21   simply on looking at the aerial photographs but your

22   on-the-ground examination when you went out there in the much

23   more recent past?

24   A    In part, yes.

25             MR. DAVIS:  Okay.  Neil, may we see Exhibit 5033,

1   please?

2          DOCUMENT TECHNICIAN:  (Complied with request.)

3   BY MR. DAVIS:

4   Q    I think we've talked about the fact that there's a

5   concrete pad extending west -- or eastward from the small

6   warehouse down in the loading area.  Correct?

7   A    Yes, I've --

8   Q    And you can see it here, can't you?

9   A    I see an area of lighter pavement, if that's what you're

10  referring to.

11  Q    And do you think that's the concrete pad?

12  A    A portion of it probably is, yes.

13  Q    Yeah.  And it runs -- it's higher on the west end than it

14  is on the east end, isn't it?  It slopes downward to the east?

15  A    Yes, it slopes to where it comes out of the door of the

16  warehouse so it's a little bit higher than it is out further

17  on the pavement so that runoff runs away from the door.

18  Q    It runs eastward, doesn't it?

19  A    In that immediate area, yes.

20  Q    Okay.  And in this picture, can you see a wet area?

21  A    I do, what appears to be a wet area, an area where the

22  pavement is dark.

23  Q    All right.  Yeah.  In front of the drumming shed.

24  A    Yes.

25  Q    And do you see any evidence of that trying to flow in the

1    path you've depicted that this 500-gallon perc spill would

2    have taken that would have flowed westward?  Do you see any

3    evidence of a westward flow in that wet area?

4    A    No.

5    Q    In fact, any westward flow is impeded by that light area

6    that may be the concrete slope, isn't it?

7    A    I don't think I can agree with that based on what I see

8    in this photo.

9    Q    All right.  But you don't see any evidence of it flowing

10   westward, do you, from out in front of the drumming shed?

11   A    No, no.

12            MR. DAVIS:  Can we look at 5036, Neil?  Can you blow

13   up the --

14            DOCUMENT TECHNICIAN:  (Complied with request.)

15            MR. DAVIS:  Let's go back so we can see what year

16   that is.  I think -- and if we could, just for the record, go

17   back to 5033 for a second?

18            DOCUMENT TECHNICIAN:  (Complied with request.)

19   BY MR. DAVIS:

20   Q    5033, you would agree with me, sir, is an '81 photo?

21   A    Yes.

22            MR. DAVIS:  Okay.  Now let's go to 5036, and let's

23   blow up --

24            DOCUMENT TECHNICIAN:  (Complied with request.)

25   BY MR. DAVIS:

1    Q    This is an '83 photo, is it not, Dr. Powell?

2    A    Yes.  July of '83.

3         MR. DAVIS:  Okay.  Would you blow up the loading

4    area, Neil?

5         DOCUMENT TECHNICIAN:  (Complied with request.)

6    BY MR. DAVIS:

7    Q    And again, we have another wet spot in front of the

8    drumming shed, don't we?

9    A    Yes, we do.

10   Q    And do you see any evidence that the natural flow pattern

11   that that wet spot represents is westward around the small

12   warehouse?

13   A    Yes, I do.

14   Q    How far?

15   A    Over to the corner where the ditch is paralleling the

16   railroad tracks.

17   Q    All right.  To the drumming shed?

18   A    From the drumming shed over to the corner where the ditch

19   is paralleling the railroad tracks.

20   Q    But you'd agree, would you not, sir, that there seems to

21   be a larger area right in front of the drumming shed that it's

22   pooled before any of it ran off to the west?

23   A    Yes.

24        MR. DAVIS:  Okay.  And, finally, let's look at 5042,

25   please, Neil.

1317

1          DOCUMENT TECHNICIAN:  (Complied with request.)

2          MR. DAVIS:  Let's blow that up.

3    BY MR. DAVIS:

4    Q    And this, again, before you blow it up, is a 1987

5    photograph?

6    A    That's correct.

7          MR. DAVIS:  Okay.  Let's blow up the operations

8    area.  Can we blow up any more?

9          DOCUMENT TECHNICIAN:  (Complied with request.)

10   BY MR. DAVIS:

11   Q    It looks to me here, doesn't it to you, Dr. Powell, that

12   it looks like there's some kind of liquid that came down from

13   the small warehouse and pooled up in the asphalt loading area

14   in front of where the drumming shed used to be?

15   A    There is a dark area there that would be consistent with

16   a liquid release.

17   Q    Yeah.  And you can see a trail coming right out of the

18   small warehouse, can't you?

19   A    I see a dark area that might be a trail for the liquid,

20   yes.

21   Q    Yeah.  Yeah.  So that would represent a flow in exactly

22   the opposite direction of the one that you posited likely

23   caused this 500-gallon spill to get to the northwest corner?

24   A    That flow is off to the east.  It is not to the west.

25   Q    180 degrees the wrong way, isn't it?

1    A    I wouldn't agree it's the wrong way.

2    Q    For your theory, for the theory that Soco is trying to

3    advocate in this courtroom, it's 180 degrees the wrong way for

4    that, from that theory, isn't it?

5    A    No, I don't agree with that characterization.

6    Q    All right.  You'd agree, though, that the picture clearly

7    demonstrates that something is flowing eastward from the

8    warehouse and collecting in a puddle on the asphalt?

9    A    Yes, I'd agree with that.

10            MR. DAVIS:  Thank you.  I have nothing further.

11            THE COURT:  All right.  Redirect, sir.

12                      REDIRECT EXAMINATION

13   BY MR. LYNCH:

14   Q    All right, Dr. Powell.  I'll try not to keep you here too

15   long.

16        First, Julianne, can you please pull up the photograph

17   that was just up, the 4/30/1987 photo, Exhibit 5042?

18            DOCUMENT TECHNICIAN:  (Complied with request.)

19   BY MR. LYNCH:

20   Q    This is the photo you were just looking at, Dr. Powell,

21   and as we discussed before, by this time am I correct the

22   catch pond had been removed and Dyce had installed the

23   concrete tank farm with the containment units behind it?

24   A    That's correct.

25   Q    And is it your understanding at this time the drainage of

1    the facility was meant to be such that water in the

2    loading/unloading area would drain into that concrete tank

3    farm?

4    A    Yes, into the tank farm and then into the containment

5    ponds.

6    Q    It's not your opinion in this case that as of 1987, when

7    the site had been reconfigured, that the drainage from the

8    loading/unloading area was out to the northwest corner?

9    A    No, it's not.

10            MR. GROSSBART:  Your Honor, could he not lead the

11   witness, please?

12            THE COURT:  Yeah.  Ask him questions on redirect,

13   not lead him.  At least not to that extent.

14            MR. LYNCH:  I apologize, Your Honor.

15            Could you please pull up Exhibit D079?  I'm sorry;

16   Illustrative DD -- that's the wrong one.  I'm sorry.  Now I'm

17   getting confused as to which is in.  DD105.

18            DOCUMENT TECHNICIAN:  (Complied with request.)

19   BY MR. LYNCH:

20   Q    This is the pie chart that we were referring to earlier.

21   Do you recall that, Dr. Powell?

22   A    Yes.

23            MR. LYNCH:  Now please pull up Illustrative DD078.

24            DOCUMENT TECHNICIAN:  (Complied with request.)

25   BY MR. LYNCH:

1320

1    Q     This is a chart that -- strike that.

2          Dr. Powell, this is a chart entitled "Groundwater Samples

3    with PCE Greater than 2,400 Micrograms Per Liter"; is that

4    correct?

5    A     That's correct.

6    Q     And are those the locations that are depicted on the pie

7    chart we just saw?

8    A     Yes, I believe that's the case.

9    Q     Okay.  And if you look at the bottom where I've just

10   drawn the line, those are the several T samples that I believe

11   Mr. Grossbart was referring to; is that correct?

12   A     Yes.

13   Q     And what's the date those samples were taken on?

14   A     October 12 of 2004.

15         MR. LYNCH:  Close out of this one, please, Julianne.

16         DOCUMENT TECHNICIAN:  (Complied with request.)

17         MR. LYNCH:  Please pull up Exhibit 4400, 4400, and

18   go to page -- I lost my page now.  Go to page 31, please, of

19   this exhibit.

20         DOCUMENT TECHNICIAN:  (Complied with request.)

21   BY MR. LYNCH:

22   Q     Dr. Powell, is this the soil vapor extraction report from

23   ATC?

24   A     Yes, it is.

25   Q     And this is the pilot test where they were pulling vapors

1   through the trenches Mr. Grossbart was referring to; is that

2   correct?

3   A    Yes, it is.

4         MR. LYNCH:  Please go to page 34 of this report.

5   And if you'd pull up the second paragraph, please?

6         DOCUMENT TECHNICIAN:  (Complied with request.)

7   BY MR. LYNCH:

8   Q    In the final sentence of that paragraph, Dr. Powell, does

9   it state when that remediation test was begun?

10  A    October 12 of 2004.

11  Q    So is it correct that the T samples were not commenced

12  after this, or were not taken after this system had been

13  commenced?

14  A    No, they appear to be taken the day the system began

15  operation.

16        MR. LYNCH:  Close out of that, please, Julianne.

17        DOCUMENT TECHNICIAN:  (Complied with request.)

18  BY MR. LYNCH:

19  Q    Now prior to that, there had been some remediation

20  systems in the northwest corner area, correct?

21  A    There were two short-term pilot tests.  I don't know that

22  I would call those remediation systems, but there were two

23  pilot tests.

24        MR. LYNCH:  Please pull up Exhibit 3191.

25        DOCUMENT TECHNICIAN:  (Complied with request.)

1    BY MR. LYNCH:

2    Q    And this is another document Mr. Grossbart had shown you.

3    It's a report from some of ATC's pilot tests that you were

4    just referring to; is that correct?

5    A    That's correct.

6         MR. LYNCH:  Okay.  And if you go to page 2 of this

7    exhibit, please, and pull out the first two paragraphs,

8    please?

9         DOCUMENT TECHNICIAN:  (Complied with request.)

10   BY MR. LYNCH:

11   Q    The final sentence in the first paragraph refers to the

12   trenches that were excavated that Mr. Grossbart asked you

13   about; is that correct?

14   A    That's right.

15   Q    And the second -- strike that.

16        The second paragraph states, "The OS/SVE pilot test was

17   initially conducted for eight weeks beginning on January 3,

18   2003.  During the pilot test, concentrations of PCE declined

19   97 percent and 74 percent respectively at Monitoring Wells

20   PT-2 and PT-6."

21        Does that indicate that the results of this testing was

22   actually to reduce concentrations of PCE in the water in the

23   northwest corner?

24   A    Yes, that was the intent of it.

25   Q    So to the extent that you referred to groundwater samples

1323

1    taken from the northwest corner after this date, would those

2    results tend to bias the samples low or bias them high?

3    A    It would bias them low.

4    Q    Because there would be less PCE in the groundwater?

5    A    Yes.

6    Q    You were asked questions on cross about some of the

7    devegetated areas in the photographs.  I'd like to go through

8    some of those with you.

9         First, can you please pull up Exhibit 5009?

10        DOCUMENT TECHNICIAN:  (Complied with request.)

11   BY MR. LYNCH:

12   Q    And Dr. Powell, that's a 1972 aerial photograph; is that

13   correct?

14   A    Right.

15   Q    Is it your understanding that that's before Dyce moved

16   out to the property?

17   A    That's correct.

18   Q    Do you see a devegetated area where I've traced?

19   A    Yes, I do.

20   Q    And in your opinion, what's the likely cause of that

21   devegetation?

22   A    2,4-D.

23   Q    And can 2,4-D persist in the soil for a long time,

24   Dr. Powell?

25   A    Yes.  It's a very persistent herbicide.

1               MR. LYNCH:  Please pull up 5015.

2               DOCUMENT TECHNICIAN:  (Complied with request.)

3    BY MR. LYNCH:

4    Q     This is a 1973 photograph, and, again, we see an area of

5    devegetation, is that correct --

6    A     That's correct.

7    Q     -- on this photograph?

8    A     That's correct.

9    Q     And is it your understanding that this is again before

10   Dyce had at least started operations in the tank farm in the

11   facility?

12   A     Yes.  There's no tank farm in this photo.

13   Q     Do you have an opinion as to what the likely cause of

14   that devegetation is?

15   A     2,4-D.

16              MR. LYNCH:  Please pull up a photograph

17   Mr. Grossbart didn't show you, 5026.

18              DOCUMENT TECHNICIAN:  (Complied with request.)

19   BY MR. LYNCH:

20   Q     And that's a 1978 aerial photograph, Dr. Powell.  Do you

21   see another area of devegetation coming from here that links

22   out and heads out towards the northwest corner?

23   A     Yes.

24   Q     Could that also be the result of remnants of 2,4-D?

25   A     Well, certainly a portion of it is likely from 2,4-D, up

1   to approximately here.  Beyond that, it could be from 2,4-D or

2   other causes.  It could be from something released along the

3   siding.

4           MR. LYNCH:  And please pull up Exhibit 5027.

5           DOCUMENT TECHNICIAN:  (Complied with request.)

6   BY MR. LYNCH:

7   Q    That's a 1979 photograph that we haven't seen yet.  Do

8   you see the dark line I've traced there, Dr. Powell?

9   A    Yes, I see it.

10  Q    Could you maybe -- thank you, Julianne.

11       And I believe earlier did you testify what might dark

12  soils indicate?

13  A    Normally they indicate soil that's wet.

14  Q    And is that the pathway along the ditch to the east side

15  of the rail spur that you've previously discussed?

16  A    Yes, it is.

17  Q    Does it head out to the northwest corner?

18  A    Yes, it does.

19          MR. LYNCH:  Please go to 5029; I'm sorry, 5028.

20          DOCUMENT TECHNICIAN:  (Complied with request.)

21  BY MR. LYNCH:

22  Q    This is the 1979 photograph we're more familiar with.

23  Could you describe for us or tell us how small releases of

24  acid during unloading operations might contribute to the

25  vegetation along the northwest corner area?

1326

1    A    Well, acid is typically very concentrated, and when you

2    mix, mix it even with large volumes of water, you're still

3    going to end up with a solution that has a very low pH, so

4    small releases of acid along the rail siding which

5    subsequently are washed and mixed with even a relatively large

6    amount of stormwater are going to cause a progressive

7    acidification of the soils in the northwest corner area that

8    will be injurious to the vegetation, causing kill-off of the

9    vegetation.  A little acid goes a long way when it's mixed

10   with water.

11   Q    Dr. Powell, if -- what would be the -- strike that.

12       Close out of this, please.

13           DOCUMENT TECHNICIAN:  (Complied with request.)

14           MR. LYNCH:  May I approach the witness, Your Honor?

15           THE COURT:  (No response.)

16           MR. LYNCH:  Your Honor, may I approach?

17           THE COURT:  Yes.  I'm daydreaming here.  It's

18   getting late.

19           MR. LYNCH:  I'll try and be brief.

20           THE COURT:  Don't take it personally.  It's just

21   late in the day on a Friday.

22           MR. LYNCH:  Could you please pull up Exhibit 5038,

23   Julianne; or, I'm sorry, 3058, Julianne?

24           DOCUMENT TECHNICIAN:  (Complied with request.)

25   BY MR. LYNCH:

1327

1   Q     Dr. Powell, this is the final addendum report you've been

2   shown both on direct and cross; is that correct?

3   A     That's correct.  It's the final RI addendum.

4   Q     I'm sorry, the final RI addendum.

5         Please go to page 26 of the exhibit, Julianne.  Pull out

6   the portion of the page under 5.4.

7               DOCUMENT TECHNICIAN:  (Complied with request.)

8   BY MR. LYNCH:

9   Q     And that portion of the page, titled "NAPL Source Areas,"

10  states, "One or more of the following criteria were used to

11  identify PCE NAPL source areas in the study area," then lists

12  the various criteria.

13        If you look at the first two criteria there, Dr. Powell,

14  are those the soil concentrations and off-scale MIP readings

15  that you were discussing earlier today?

16  A     That's right.

17              MR. LYNCH:  And then go to the next page, please,

18  Julianne.

19              DOCUMENT TECHNICIAN:  (Complied with request.)

20  BY MR. LYNCH:

21  Q     And the bullet point on the top is the groundwater PCE

22  concentrations; is that correct?

23  A     That's correct.

24              MR. LYNCH:  Would you please, Julianne, go to

25  page 39 of this exhibit?

1328

1          DOCUMENT TECHNICIAN:  (Complied with request.)

2    BY MR. LYNCH:

3    Q    And, Dr. Powell, that's a table from the same document

4    entitled "Evaluation of Criteria for PCE NAPL Source

5    Identification."  Am I correct that it lists the boring or

6    monitoring wells that EPA relied on to delineate the DNAPL

7    areas, and then there's an X if they met one of the DNAPL

8    criteria?  Is that correct?

9    A    That's right.

10          MR. LYNCH:  Julianne, could you please pull up

11   page 50 of this document?  And could you zoom in on the

12   northwest corner, please?

13          DOCUMENT TECHNICIAN:  (Complied with request.)

14   BY MR. LYNCH:

15   Q    And, Dr. Powell, do you see there, there are various

16   borings that are within the northwest corner; is that correct?

17   A    That's correct.

18          MR. LYNCH:  Julianne, could you leave this up?

19          DOCUMENT TECHNICIAN:  (Complied with request.)

20   BY MR. LYNCH:

21   Q    But, Dr. Powell, could you turn back to the page we were

22   just on, the table?

23   A    Okay.

24   Q    And now I've lost it.

25          Page 39.  What was the MIP reading for MP-119?

1329

1    A    It reports that it was off scale.

2    Q    How about MP-120?

3    A    Off scale.

4    Q    How about MP-121?

5    A    Off scale.

6    Q    How about MP-122?

7    A    Off scale.

8    Q    How about MP-132?

9    A    Off scale.

10   Q    How about MP-137?

11   A    Off scale.

12   Q    Let's go back up to this one at the top.  How about

13   MP-100?

14   A    Off scale.

15   Q    And then how about MP-139?

16   A    Off scale.

17   Q    And, Dr. Powell, am I correct that this chart indicates

18   that all of those off-scale MIP readings are within the

19   northwest corner source area?

20   A    Yes.

21          MR. LYNCH:  Can you remove the highlighting,

22   Julianne?

23          DOCUMENT TECHNICIAN:  (Complied with request.)

24   BY MR. LYNCH:

25   Q    Dr. Powell, I believe you testified that soil

1    concentrations were the most reliable indicator of a localized

2    DNAPL source area; is that correct?

3    A     Yes, they're the most unambiguous indication.

4    Q     Are you on page 39 of the document?

5    A     Yes, I am.

6    Q     If you look at where saturated soil PCE concentrations

7    were greater than the 1.89 indicator identified by EPA, can

8    you tell me whether that indicator was met with PZ-8 or just

9    touched?

10   A     Yes, they report that as above the 189 parts per million.

11   Q     How about PZ-10?

12   A     Yes.

13   Q     PZ-11?

14   A     Yes.

15   Q     PZ -- PT-2?

16   A     Yes.

17   Q     And I'm not seeing the other ones.  That suffices.

18         Were some of those concentrations -- and those are

19   labeled, on this chart, PZSB numbers; is that correct?  "SB"

20   stands for a soil boring that was also taken at that location?

21   A     Yes, that's right.

22   Q     If you'd go to page 35 of the same document, Dr. Powell?

23         Julianne, stay here.

24         DOCUMENT TECHNICIAN:  (Complied with request.)

25   BY MR. LYNCH:

1  Q     Do you recall what the soil concentrations found at

2  MP-105 under the catch pond were?

3  A     .17, 0.17 ppm.

4  Q     What's the concentration of perc that was found in

5  PZSB-8, according to the chart of page 35 of the RI?

6  A     992.

7  Q     How many times greater than was found at MP-105, roughly?

8  A     (No response.)

9  Q     Too late in the day for that?

10 A     Too late in the day for that.  I can do it, but I can't

11 do it quickly.

12 Q     A little over 1,000 times?

13 A     Oh, yeah.  Much more than 1,000.  Several thousand times.

14 Q     How about PZSB-10?

15 A     1,290.

16 Q     Even greater?

17 A     Yes.

18 Q     PZSB-11?

19 A     520.

20 Q     PT-2B, which I don't see.  Do you understand that PT-2B

21 is in the approximate location of PT-2?

22 A     Yes, it's the same location.  1,820.

23 Q     Okay.  And PZ-19, PZSB-19?

24 A     546.

25 Q     And all of those locations are in the northwest corner

1    source area, correct?

2    A    Yes.

3    Q    Does that lead you to believe that the northwest

4    source -- what does that indicate about the northwest corner

5    source area?

6    A    Well, I think it's clear there's a large DNAPL zone there

7    interconnected between these borings.

8    Q    And is that anything like what's found in MP-105?

9    A    No, it is thousands of times more contaminated than

10   MP-105.

11          MR. LYNCH:  I have no further questions.

12          THE COURT:  Well, that's good.  I was just going to

13   take a break.  You can step down.  You're done.

14          THE WITNESS:  Thank you.

15          THE COURT:  Let's take a quick break.

16          THE LAW CLERK:  All rise.

17       (Jury not present.)

18          THE COURT:  Counsel, get your software people or

19   your computer gurus.  My law clerk is going to take them down

20   to talk with our IT expert so we can find out what kind of

21   software you're using.  And he thinks we can convert it to a

22   .pdf format that can be uploaded onto a court computer and

23   that would be -- so go down there now with my law clerk.

24          MR. LYNCH:  Okay.

25          MR. JOHNSON:  Thank you, Your Honor.

1          (Recess taken from 16:03:39 to 16:12:13.)

2          (Open court.)

3          (Jury present.)

4               THE COURT:  Please be seated.

5               Call your next witness.

6               MR. COZZENS:  Your Honor, Soco rests their case in

7     chief.

8               THE COURT:  Ladies and gentlemen, I know you're not

9     going to like this, but I'm going to send you home.  All

10    right.  You'll just have to leave here disappointed, is all.

11              All right.  We're going to be in recess until Monday

12    morning at 8:30.

13              I give you the usual admonition.  Don't talk to

14    anybody about the case.  Don't talk amongst yourselves.  Keep

15    an open mind.  If there are articles in the paper, don't tweet

16    or whatever all the other things I told you about.  Don't do

17    any of those things.  Don't do any research on the internet.

18              We'll see you Monday morning.

19              THE LAW CLERK:  All rise.

20         (Jury not present.)

21              THE COURT:  Be seated.

22              Some of you are going to make a motion?

23              MR. JOHNSON:  It just so happens, Your Honor, that I

24    have a motion.  We'll file it officially -- do you want two

25    copies?

1334

1          THE CLERK:  Yes.  Thank you, sir.

2          MR. JOHNSON:  We have a motion, Your Honor, for

3    judgment as a matter of law.

4          The centerpiece of our motion, although there are

5    several grounds for it, Your Honor --

6          THE COURT:  Well, if you're doing it in writing, why

7    do you need to --

8          MR. JOHNSON:  I just thought I'd preface it a little

9    bit.  If you just want to read it, that's fine with us, Your

10   Honor.

11         THE COURT:  Yeah.  I have to say that I don't think

12   "gunshy" would be an understatement on my part.

13         MR. JOHNSON:  We can always take a sealed verdict.

14         THE COURT:  I think we had a note from the jury --

15         MR. JOHNSON:  Yeah.

16         THE COURT:  -- saying there wasn't enough, but the

17   Court of Appeals, in their wisdom, said, well, yeah, there

18   was.

19         MR. JOHNSON:  Well, Your Honor, what's different

20   about this motion than the one we filed three years ago is the

21   testimony that we heard from both Mr. Naff and Dr. Powell who

22   have testified that Dyce intentionally and deliberately

23   constructed its facility so that any large spill of perc would

24   run off into the environment, into the ditch, and then off

25   into the northwest corner.

1          That's different testimony than we heard last time,

2   Your Honor, definitive testimony that they made it that way,

3   and since they made it that way and they understood that perc

4   was going to damage the environment and third-party property,

5   they have not proved an occurrence.  An occurrence requires

6   that the damage be unexpected, and here the damage was not

7   unexpected from any large spill.  Quite to the contrary.  It

8   was wholly expected by them because they knew that if there

9   was any large spill of chemical, it would run directly off

10  into the environment and create property damage, Your Honor.

11          Accordingly, there's no occurrence, and that is a

12  different issue than what fully was decided last time by the

13  Ninth Circuit with regard to the sudden and accidental issue.

14          THE COURT:  I remember, gee, back 30 years ago,

15  neither one -- is it called neither intended or expected or

16  something like that, from the standpoint of the insured?

17          MR. JOHNSON:  Yeah.  The policy requires that the

18  property damage be neither expected nor intended from the

19  standpoint of the insured, and if there -- if you don't have

20  that, you don't have an occurrence.  And in order to get

21  coverage, you have to prove an occurrence, and they haven't

22  done it here.

23          THE COURT:  Well, I'll tell you what.  I'll give you

24  guys -- do you want a chance to respond to this by Monday?

25          MR. COZZENS:  We would like that, Your Honor, yes.

1336

1           THE COURT:  You've got it.  I'll reserve until

2    Monday.

3           MR. JOHNSON:  Thank you, Your Honor.

4           MR. COZZENS:  Your Honor, the only other thing that

5    we have is we just want to make sure that we're clear on what

6    you've done with the depositions.  Is the Simko deposition

7    going to be read?

8           THE COURT:  Oh, I don't know.  Here.  Just sit

9    tight.  Let me get my notes in here.  I left them on my desk.

10          MR. JOHNSON:  We have rulings that were given to us,

11   Your Honor, on Simko.

12          THE COURT:  Well, but I still haven't ruled on the

13   motion.

14          MR. JOHNSON:  Okay.

15          THE COURT:  You're not going to go through all of

16   it.

17       (Pause.)

18          THE COURT:  Thanks for reminding me.  I am going to

19   grant your motion in part; when I say "yours," I'm talking

20   about Soco's motion in part to the deposition testimony of

21   Jeffrey Simko.  The only thing I believe that is not

22   cumulative from his testimony is his testimony instructed

23   employees to destroy environmental audits and corrective

24   action plans related to the Dyce site, and that's it.  I

25   don't, I don't want to hear testimony about him refuting

1   Soco's clean company theory or the waste minimization plan due

2   to the concern that they weren't handling -- already handled

3   stuff.  How is that?  You got the parameter?

4             MR. COZZENS:  Thank you, Judge.

5             MR. JOHNSON:  We understand.  We'll cut it back.

6             MR. COZZENS:  Thank you.

7             THE COURT:  What else?

8             MR. COZZENS:  That's all we have, Judge.

9             THE COURT:  You can't get a directed verdict at this

10  time.

11            MR. COZZENS:  You know, I wasn't going to move,

12  Judge.

13            THE COURT:  Maybe that would be the way to go.

14            MR. COZZENS:  As much as I enjoy your company, I

15  wouldn't want to be back here again.

16            THE COURT:  Yeah.  Who knows?

17            THE LAW CLERK:  All rise.

18       (Proceedings were recessed at 16:19:22.)

19

20

21

22

23

24

25

1338

1              VOLUME 5 REPORTER'S CERTIFICATE

2          I, JoAnn Corson Bacheller, a Registered Diplomate

3    Reporter and Certified Realtime Reporter, certify that the

4    foregoing transcript is a true and correct record of the

5    proceedings given at the time and place hereinbefore

6    mentioned; that the proceedings were reported by me in machine

7    shorthand and thereafter reduced to typewriting using

8    computer-assisted transcription; that after being reduced to

9    typewriting, a certified copy of this transcript will be filed

10   electronically with the Court.

11         I further certify that I am not attorney for, nor

12   employed by, nor related to any of the parties or attorneys to

13   this action, nor financially interested in this action.

14         IN WITNESS WHEREOF, I have set my hand at Billings,

15   Montana this 27th day of April, 2010.

16

17                              /s/ JoAnn Corson Bacheller

18                              _____
                                JoAnn Corson Bacheller
19                              United States Court Reporter

20

21

22

23

24

25