1  JoAnn Corson Bacheller
   Registered Diplomate Reporter
2  Certified Realtime Reporter
   P. O. Box 1424
3  Billings, Montana 59103-1424
   406/247-4477 office
4  406/247-7008 fax
   joann_bacheller@mtd.uscourts.gov
5
   United States Court Reporter
6

7

8              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MONTANA
9                      BILLINGS DIVISION

10
   UNITED STATES FIDELITY          )
11 AND GUARANTY COMPANY,           )
                                   )   Nos. CV-04-29-BLG-RFC
12                     Plaintiff,)       CV-08-29-BLG-RFC
        and                        )
13                                 )   **VOLUME 7**
   THE CONTINENTAL INSURANCE       )   **TRANSCRIPT OF JURY TRIAL**
14 COMPANY,                        )
                Plaintiff Intervenor,)
15      vs.                        )
                                   )
16 SOCO WEST, INC.,                )
                       Defendant.)
17 _____)

18
              **BEFORE THE HONORABLE RICHARD F. CEBULL**
19           **CHIEF UNITED STATES DISTRICT COURT JUDGE**
                  **FOR THE DISTRICT OF MONTANA**
20
             James F. Battin United States Courthouse
21                  316 North 26th Street
                    Billings, Montana 59101
22                 Tuesday, March 16, 2010
                    08:29:44 to 17:20:37
23

24
              Proceedings recorded by machine shorthand
25       Transcript produced by computer-assisted transcription

|    |                                |                                        |
|----|--------------------------------|----------------------------------------|
| 1  |                                | **APPEARANCES**                        |
| 2  | For the Plaintiff:             | MR. ROBERT C. JOHNSON                   |
|    |                                | MR. JOHN I. GROSSBART                   |
| 3  |                                | MS. WENDY N. ENERSON                    |
|    |                                | Attorneys at Law                        |
| 4  |                                | 8000 Sears Tower                        |
|    |                                | 233 South Wacker Drive                  |
| 5  |                                | Chicago, Illinois 60606                 |
| 6  |                                | MR. MARSHAL L. MICKELSON                |
|    |                                | Attorney at Law                         |
| 7  |                                | P. O. Box 509                           |
|    |                                | Butte, Montana 59703                    |
| 8  |                                |                                         |
|    | For the Plaintiff              | MR. BRIAN W. WALSH                      |
| 9  | Intervenor:                    | Attorney at Law                         |
|    |                                | Suite 330                               |
| 10 |                                | 555 Mission Street                      |
|    |                                | San Francisco, California 94105         |
| 11 |                                |                                         |
|    |                                | MR. STEVEN M. CRANE                     |
| 12 |                                | Attorney at Law                         |
|    |                                | Suite 1500                              |
| 13 |                                | 515 South Figueroa Street               |
|    |                                | Los Angeles, California 90017           |
| 14 |                                |                                         |
|    |                                | MR. MAXON R. DAVIS                      |
| 15 |                                | Attorney at Law                         |
|    |                                | P. O. Box 2103                          |
| 16 |                                | Great Falls, Montana 59403              |
| 17 | For the Defendant:             | MR. CHRISTOPHER L. LYNCH                 |
|    |                                | MR. PAUL A. BANKER                      |
| 18 |                                | Attorneys at Law                        |
|    |                                | 4200 IDS Center                         |
| 19 |                                | 80 South Eighth Street                  |
|    |                                | Minneapolis, Minnesota 55402            |
| 20 |                                |                                         |
|    |                                | MR. LAWRENCE B. COZZENS                 |
| 21 |                                | Attorney at Law                         |
|    |                                | Suite 104                               |
| 22 |                                | 1643 24th Street West                   |
|    |                                | Billings, Montana 59102                 |
| 23 |                                |                                         |
|    | Also present for               | MS. JULIANNE ROHM                       |
| 24 | graphics display:              | MR. NEIL BAILEY                         |
| 25 |                                |                                         |

1

**CONTENTS**

Volume/Page

**Volume 1 Proceedings** ................................ 1/   16
*Voir Dire* Examination
    By the Court ...................................... 1/   43
    By Mr. Cozzens .................................... 1/  101
    By Mr. Mickelson .................................. 1/  114
    By Mr. Davis ...................................... 1/  131
Selection of Jury ..................................... 1/  147
Instructions to Jury .................................. 1/  150
Opening Statement by Mr. Cozzens ...................... 1/  160
Opening Statement by Mr. Johnson ...................... 1/  185
Opening Statement by Mr. Davis ........................ 1/  200
Volume 1 Reporter's Certificate ....................... 1/  251

**Volume 2 Proceedings** ................................ 2/  267
Volume 2 Reporter's Certificate ....................... 2/  554

**Volume 3 Proceedings** ................................ 3/  570
Volume 3 Reporter's Certificate ....................... 3/  829

**Volume 4 Proceedings** ................................ 4/  845
Volume 4 Reporter's Certificate ....................... 4/ 1101

**Volume 5 Proceedings** ................................ 5/ 1117
Defendant Rests ....................................... 5/ 1334
Plaintiffs' Motion for Judgment ....................... 5/ 1334
Order of Court Reserved ............................... 5/ 1337
Volume 5 Reporter's Certificate ....................... 5/ 1339

**Volume 6 Proceedings** ................................ 6/ 1355
Volume 6 Reporter's Certificate ....................... 6/ 1610

**Volume 7 Proceedings** ................................ 7/ 1626
Order of Court re: Plaintiffs' Motion for Judgment .. 7/ 1870
Volume 7 Reporter's Certificate ....................... 7/ 1879

**Volume 8 Proceedings** ................................ 8/ 1895
Plaintiffs Rest ....................................... 8/ 1904
Defendant's Motion for Judgment ....................... 8/ 2010
Order of Court re: Defendant's Motion for Judgment .. 8/ 2018
Plaintiffs' Motion for Judgment Renewed ............. 8/ 2018
Order of Court re: Plaintiffs' Motion for Judgment .. 8/ 2018
Settlement of Instructions ............................ 8/ 2019
Volume 8 Reporter's Certificate ....................... 8/ 2072

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

**CONTENTS  (Continued)**

                                       **Volume/Page**

2

**Volume 9 Proceedings** ................................  9/ 2088
Instructions to Jury ................................  9/ 2092
Closing Argument by Mr. Banker ......................  9/ 2105
Closing Argument by Mr. Johnson .....................  9/ 2137
Closing Argument by Mr. Davis .......................  9/ 2159
Rebuttal Closing Argument by Mr. Banker .............  9/ 2171
Jury Verdict ........................................  9/ 2186
Volume 9 Reporter's Certificate .....................  9/ 2190

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24        REPORTER'S NOTE:  "Uh-huh" and "Um-hmm" indicate
affirmative responses.  "Huh-uh" and "Hm-umm" indicate
25 negative responses.

1                               **WITNESSES**

2   **For the Defendant:**                           **Volume/Page**

3   Mr. Dennis Allen St. George
        Direct Examination by Mr. Banker ................ 1/  211
4       Cross-Examination by Mr. Johnson ................ 1/  239
        Cross-Examination by Mr. Davis .................. 1/  248
5       Redirect Examination by Mr. Banker .............. 1/  249

6   Mr. James Sullivan
        Direct Examination by Mr. Lynch ................. 2/  276
7       Cross-Examination by Mr. Grossbart .............. 2/  316
        Redirect Examination by Mr. Lynch .............. 2/  358
8
    Mr. Richard Allen Colver
9       Direct Examination by Mr. Cozzens ............... 2/  367
        Cross-Examination by Mr. Johnson ............... 2/  403
10      Redirect Examination by Mr. Cozzens ............. 2/  484

11  Mr. Rodney Hallsten
        Direct Examination by Mr. Banker ................ 2/  490
12      Cross-Examination by Mr. Grossbart .............. 2/  514
        Cross-Examination by Mr. Davis .................. 2/  551
13      Redirect Examination by Mr. Banker .............. 2/  552

14  Mr. Monte I. Naff
        Direct Examination by Mr. Cozzens ............... 3/  570
15      Cross-Examination by Mr. Johnson ............... 3/  610
        Cross-Examination by Mr. Davis .................. 3/  702
16      Redirect Examination by Mr. Cozzens ............. 3/  718

17  Mr. Charles Bender (deposition)
        Examination .................................... 3/  738
18
    Mr. Desmond Slater (deposition)
19      Examination .................................... 3/  763

20  Mr. Larry Nelson (deposition)
        Examination .................................... 3/  802
21
    Mr. Marvin Johnson
22      Direct Examination by Mr. Cozzens ............... 4/  846
        Cross-Examination by Mr. Johnson ............... 4/  863
23
    Mr. Douglas Johnston
24      Direct Examination by Mr. Banker ................ 4/  867
        Cross-Examination by Mr. Grossbart .............. 4/  898
25      Cross-Examination by Mr Davis .................. 4/  921
        Redirect Examination by Mr. Banker .............. 4/  924

**WITNESSES (Continued)**

**For the Defendant:**                                    Volume/Page

Mr. David Warne
       Direct Examination by Mr. Banker ................  4/  925
       Cross-Examination by Mr. Davis ..................  4/  953
       Redirect Examination by Mr. Banker ..............  4/  987

Ms. Suzanne Miller
       Direct Examination by Mr. Cozzens ...............  4/  992
       Cross-Examination by Mr. Crane ..................  4/ 1030
       Redirect Examination by Mr. Cozzens .............  4/ 1067

Robert Leslie Powell, Ph.D.
       Direct Examination by Mr. Lynch .................  4/ 1068
       Direct Examination (Continued) by Mr. Lynch .....  5/ 1118
       Cross-Examination by Mr. Grossbart ..............  5/ 1213
       Cross-Examination by Mr. Davis ..................  5/ 1301
       Redirect Examination by Mr. Lynch ...............  5/ 1319

**For the Plaintiffs:**

Mr. Marvin Johnson (deposition)
       Examination .....................................  6/ 1356

Mr. Ken Kjos (deposition)
       Examination .....................................  6/ 1471

Ms. Kristen Kohler Stout
       Direct Examination by Mr. Johnson ...............  6/ 1537
       Cross-Examination by Mr. Lynch ..................  6/ 1593
       Redirect Examination by Mr. Johnson .............  6/ 1607

Peter Shanahan, Ph.D.
       Direct Examination by Mr. Grossbart .............  7/ 1626
       Cross-Examination by Mr. Lynch ..................  7/ 1704
       Redirect Examination by Mr. Grossbart ...........  7/ 1721

Mr. Richard Brill (deposition)
       Examination .....................................  7/ 1728

Yaron M. Sternberg, Ph.D.
       Direct Examination by Mr. Crane .................  7/ 1774
       Cross-Examination by Mr. Lynch ..................  7/ 1805
       Redirect Examination by Crane ...................  7/ 1826

1                    **WITNESSES (Continued)**

2     **For the Plaintiffs:**                          **Volume/Page**

3     Bruce Edwin Dale, Ph.D.
         Direct Examination by Mr. Davis ................  7/ 1831
4        Cross-Examination by Mr. Lynch ................  7/ 1862
         Redirect Examination by Mr. Davis .............  7/ 1866
5
      **For the Defendant in Rebuttal:**
6
      Wayne Martin Grip
7        Direct Examination by Mr. Lynch ...............  8/ 1905
         Cross-Examination by Mr. Johnson ..............  8/ 1954
8        Redirect Examination by Mr. Lynch .............  8/ 1995

9     Robert Leslie Powell, Ph.D.
         Direct Examination by Mr. Lynch ...............  8/ 1999
10       Cross-Examination by Mr. Crane ................  8/ 2005

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **EXHIBITS**

2    **Exhibit No.**                          **Received Volume/Page**

3    5      09/05/89 Letter to Hol from Johnson ........ FPT/   56

4    30     09/11/85 Memo to Managers of All Plants from
            Q. Dyce  ................................. FPT/   56
5
     72     11/04/75 Daily sales report to Bender,
6           Hallsten, Don, Grady, and Naff from Q. Dyce.  2/  536

7    90     05/29/86 Sales report .....................  3/  697

8    143    02/26/82 Continental General Liability
            Survey Report form ........................ FPT/   23
9
     231    06/15/00 Letter to USF&G from Whalen ....... FPT/   24
10
     234    09/25/00 Letter to Downing from
11          Mielenhausen .............................. FPT/   24

12   352    04/08/74 Memo to Bender from Whaley ........ FPT/   28

13   353    09/27/72 Memo to Murray from Q. Dyce ....... FPT/   57

14   359    09/11/85 Memo from Q. Dyce ............... FPT/   28

15   362    09/13/89 Memo to Q. Dyce from Naff ......  FPT/ 28, 57

16   366    Warning label for perchloroethylene and
            instructions on empty container handling
17          and reuse ................................. FPT/   57

18   382    11/05/92 Montana Department of Health Field
            Investigation Report ......................  4/  975
19
     383    07/23/00 Letter to Rowe from Miller ........ FPT/   29
20
     429    06/09/98 E-mail between Warne and Naff .....  3/  668
21
     433    12/16/99 Letter to G. Staarjes from USEPA .. FPT/   58
22
     436    01/06/99 E-mail between Miller and Warne ... FPT/   58
23
     442    08/06/96-08/09/00 Containment pit runoff
24          water sampling ............................  4/ 1059

25   445    03/16/73 USF&G Advertising ................. FPT/   30

1                           **EXHIBITS** (Continued)

2  **Exhibit No.**                              **Received Volume/Page**

3  499     11/04/75 Aerial photograph ................. FPT/    31

4  505     02/23/82 Continental General Liability Survey
           Report ................................... FPT/    31

5

6  784     08/21/95 Handwritten notes ................ FPT/    58

7  785     08/18/95 Memo to Naff, Hilton, Biondo,
           Gilbert, Akers and Liebling from Simko ..... FPT/    58

8  856A    09/25/89 Versar Inc. Environmental Risk
           Assessment Survey ....................... FPT/ 32, 58

9

10 859     07/24/89 Draft letter to Hol from Johnson .. FPT/    59

11 1104    09/08/05 Letter to O'Reilly from Terp ...... FPT/    32

12 2532    11/1975 Aerial photograph ................. FPT/    32

13 2533    11/04/75 Aerial photograph ................. FPT/    32

14 2545    12/30/05 Bulk Handling and Properties of PPG
           Chlorinated Solvents:  Perchloroethylene,
15         Trichloroethylene, Tri-Ethane .............. FPT/    59

16 2558    04/07/04 Letter to O'Reily from Sullivan ...    2/   293

17 3004    08/23/00 Letter to Rowe from Miller ........ FPT/    32

18 3006    08/27/72 Aerial photograph ................. FPT/    32

19 3015    07/1995 HCI Dyce site plan ................. FPT/    32

20 3017    01/1983 Dyce personnel manual ............. FPT/    33

21 3024    10/29/85 Company policy re: hoses .........    4/   888

22 3025    07/02/87 Memo to Dick, Russ, Bob, Kevin,
           Ivan, John and File from Roger ............ FPT/    36

23 3029    1986-2001 Dyce manager's monthly report ....    8/ 1896

24 3043    11/29/99 Lockheed Martin Final Report ......    1/    37

25

1

**EXHIBITS (Continued)**

2

**Exhibit No.**                                      **Received Volume/Page**

3    3044    12/16/99 USEPA First Request for Information
             Pursuant to 104(e) ........................ FPT/    37

4

     3045    03/01/00 Dyce Response to First 104(e)
5            Request ................................... FPT/    37

6    3047    08/23/00 Letter to Naff from Risner &
             Kercher ................................... FPT/    37

7

     3048    08/23/00 Dyce Supplemental Response to
8            USEPA's Second 104(e) Request ............. FPT/    37

9    3049    10/03/00 Maxim Technologies Inc. Site
             Investigation Report ...................... FPT/    38

10

     3050    06/2003 Tetra Tech EM Inc. Remedial
11           Investigation Report for MDEQ ............. FPT/    39

12   3051    07/07/04 Tetra Tech Final Feasibility Study
             Report for MDEQ ........................... FPT/    39

13

     3052    11/2004 MDEQ/USEPA Proposed Remedial Action
14           Plan for Lockwood Groundwater Solvent
             Plume Site ................................ FPT/    39

15

     3058    12/2003 Tetra Tech Addendum 01 to the Final
16           Remedial Investigation Report for MDEQ ..... FPT/   39

17   3059    08/2005 MDEQ/USEPA Record of Decision for
             Lockwood Solvent Groundwater Plume Site .... FPT/   39

18

     3060    02/28/06 Letter to Terp from Risner &
19           Kercher ................................... FPT/    40

20   3102    09/16/85 Memo to Colver ................... FPT/    41

21   3115    11/25/92 Letter and permit application to
             Lincoln from Diede ........................ FPT/    42

22

     3174    06/09/00 Letter to Webster from Miller ..... FPT/   43

23

     3175    06/12/00 Letter to Miller from Webster ..... FPT/   43

24

     3178    07/25/00 Fax to Stevenson from Miller ...... FPT/   43

25

1                            **EXHIBITS (Continued)**

2    **Exhibit No.**                          **Received Volume/Page**

3    3191     11/13/03 ATC Associates Inc. Soil and
              Groundwater Data Remedial Design Investigation
4             Report ................................. FPT/    43

5    3200     Compilation:  USF&G Policy No. SMP326188 ... FPT/    44

6    3201     Compilation:  USF&G Policy No. 1CC599480 ... FPT/    44

7    3202     Compilation:  USF&G Policy No. SMP406309 ... FPT/    44

8    3203     Compilation:  USF&G Policy No. 1CC944574 ... FPT/    44

9    3204     Compilation:  USF&G Policy No. CEP64280 .... FPT/    44

10   3205     Compilation:  USF&G Policy No. 1CC945882 ... FPT/    44

11   3206     Compilation:  USF&G Policy No. CEP64348 .... FPT/    44

12   3207     Compilation:  USF&G Policy No. SMP535107 ... FPT/    44

13   3208     Compilation:  USF&G Policy No. SMP576121 ... FPT/    44

14   3209     Compilation:  USF&G Policy No. 1CCA31253 ... FPT/    44

15   3210     Compilation:  USF&G Policy No. CEP84958 .... FPT/    44

16   3211     Compilation:  USF&G Policy No. SMP594660 ... FPT/    44

17   3213     Compilation:  USF&G Policy No. CEP104806 ... FPT/    44

18   3214     Compilation:  USF&G Policy No. SMP654057 ... FPT/    44

19   3216     Compilation:  USF&G Policy No. CEP114516 ... FPT/    44

20   3217     Compilation:  USF&G Policy No. SMP772986 ... FPT/    44

21   3219     Compilation:  USF&G Policy No. CEP114641 ... FPT/    44

22   3220     03/03/06 Stipulation as to Existence and
              Content of USF&G Insurance Policies ........ FPT/    44
23
     3287     02/28/05 Letter to Terp from Risner &
24            Kercher .................................. FPT/    48

25

1                         **EXHIBITS (Continued)**

2    **Exhibit No.**                        **Received Volume/Page**

3    3321     03/03/06 Stipulation as to Existence and
              Content of Continental Insurance Policies
4             and Exhibits ............................... FPT/   49

5    3363     09/29/89 Agreement to Purchase Real
              Property .................................   8/ 1903
6
     3407     1971 Chemical Safety Data Sheet for
7             perchloroethylene ...................... FPT/ 49, 61

8    3408     1972 Hooker Chemical MSDS for
              trichloroethylene ......................... FPT/   49
9
     3410     1980 PPG manual .......................... FPT/   50
10
     3420     05/25/00 Second Request for Information
11            Pursuant to Section 104 of CERCLA for the
              Lockwood Solvent Site Billings .............   3/   676
12
     3433     1983 Dyce brochure ....................... FPT/   50
13
     3436     11/1979 Ledger sheet .....................   3/   622
14
     3438     04/1971 Perchloroethylene brochure ......  FPT/ 50, 61
15
     3471     08/05/85 Sales report ....................   3/   591
16
     3475     02/06/84 Dyce policies re: DOT ............ FPT/   50
17
     3476     06/02/79 Expense Report ...................   3/   585
18
     3483     Aerial photograph ........................ FPT/   51
19
     3484     Aerial photograph ........................ FPT/   51
20
     3485     Aerial photograph ........................ FPT/   51
21
     3486     Aerial photograph ........................ FPT/   51
22
     3487     Aerial photograph ........................ FPT/   51
23
     3488     Aerial photograph ........................ FPT/   51
24
     3490     1972 Aerial photograph ................... FPT/   51
25

1                          **EXHIBITS** (Continued)

2    **Exhibit No.**                         **Received Volume/Page**

3    3491    1981 Aerial photograph ..................... FPT/   51

4    3492    1987 Aerial photograph ..................... FPT/   51

5    3660    09/09/09 Dale photographs .................   2/  318

6    3674    Site photographs taken by Hargis ...........  8/ 2040

7    3800    05/27/57 Aerial photograph ................. FPT/   52

8    3801    06/26/66 Aerial photograph ................. FPT/   52

9    3802    05/22/69 Aerial photograph ................. FPT/   52

10   3803    08/18/71 Aerial photograph ................. FPT/   52

11   3804    04/23/72 Aerial photograph ................. FPT/   52

12   3805    Circa 1973 Aerial photograph ............... FPT/   52

13   3806    06/18/74 Aerial photograph ................. FPT/   52

14   3807    11/04/75 Aerial photograph ................. FPT/   52

15   3808    06/23/77 Aerial photograph ................. FPT/   52

16   3809    09/06/77 Aerial photograph ................. FPT/   52

17   3810    05/03/79 Aerial photograph ................. FPT/   52

18   3811    05/14/79 Aerial photograph ................. FPT/   52

19   3812    07/31/79 Aerial photograph ................. FPT/   52

20   3813    03/13/81 Aerial photograph ................. FPT/   52

21   3814    06/02/81 Aerial photograph ................. FPT/   52

22   3815    08/24/81 Aerial photograph ................. FPT/   52

23   3816    05/27/83 Aerial photograph ................. FPT/   52

24   3817    07/27/83 Aerial photograph ................. FPT/   52

25   3818    04/30/87 Aerial photograph ................. FPT/   52

1                          **EXHIBITS (Continued)**

2     **Exhibit No.**                           **Received Volume/Page**

3     3826    08/08/05 Response to 06/24/05 CERCLA 104(e). FPT/    53

4     3827    02/14/05 Letter to Moskowitz from
              Mielenhausen ............................. FPT/    53
5
      3828    02/15/05 Letter to Walsh from Mielenhausen . FPT/    53
6
      3886    06/15/00 Letter to Continental from Whalen . FPT/    55
7
      3887    09/25/00 Letter to Giblin from Mielenhausen. FPT/    55
8
      3888    01/08/07 Second stipulation as to existence
9             and content of USF&G insurance policies .... FPT/    55

10    4027    Aerial photograph (D032604) ...............   4/   848

11    4032    10/10/00 Communication to Gilbert from
              Simko .....................................   3/   691
12
      4039    09/13/89 Memo to Q. Dyce from Hallsten .....   8/ 1903
13
      4044    07/1976 Location Survey of Dyce site ....... FPT/    62
14
      4087    01/06/99 E-mail to Warne from Hallsten .....   2/   547
15
      4089    02/29/00 E-mail to Naff from Warne .........   4/ 1066
16
      4143    Aerial photograph .........................   6/ 1485
17
      4320    1980 Bulk Handling and Properties of PPG
18            Chlorinated Solvents ...................... FPT/    63

19    4400    01/14/05 Fax to LeCours from Sullivan ......   2/   335

20    4516    09/12/02 Letter to EPA from Sullivan .......   2/   354

21    4721    08/18/03 Fax to MDEQ from Sullivan .........   2/   308

22    4757    08/03/04 Letter to Sullivan from MDEQ ......   2/   313

23    4811    04/28/03 Letter to Ross from Sullivan ......   2/   342

24    4822    07/20/00 E-mail to Miller from Naff ........ FPT/    64

25

1                          **EXHIBITS  (Continued)**

2    **Exhibit No.**                           **Received Volume/Page**

3    4831     Exhibit 5017 aerial photograph with Colver
              notations ...................................  2/   483
4
     4832     Exhibit 5019 aerial photograph with Colver
5             notations ...................................  2/   483

6    4833     Exhibit 5024 aerial photograph with Colver
              notations ...................................  2/   483
7
     4834     Exhibit 5028 aerial photograph with Colver
8             notations ...................................  2/   483

9    4835     04/30/86 General manager's monthly report ..  4/   899

10   5000-
     5064     Historical photographs .....................  2/   267
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              PROCEEDINGS

2         (Open court.)

3         (Jury present.)

4              THE COURT:  Please be seated.

5              Call your next witness.

6              MR. GROSSBART:  Your Honor, the insurers call

7    Dr. Peter Shanahan.

8              WHEREUPON,

9                        PETER SHANAHAN, Ph.D.,

10   called for examination by counsel for plaintiffs, after having

11   been first duly sworn to testify the truth, the whole truth,

12   and nothing but the truth, testified as follows:

13                        DIRECT EXAMINATION

14   BY MR. GROSSBART:

15   Q    Good morning, Dr. Shanahan.

16   A    Good morning.

17   Q    Now you have been retained by counsel for United States

18   Fidelity and Guaranty Company and the Continental Insurance

19   Company to give expert testimony here today?

20   A    That's correct.

21   Q    All right.  Why don't you tell us a little bit about

22   yourself, and let's start out with where are you from?

23   A     I am from Massachusetts.  I live in the town of Acton,

24   Massachusetts and also have a business there.

25   Q    Okay.  Well, let's talk about what you do in Acton,

1    Massachusetts.  Is that, by the way, is that near Boston?

2    A    It is near Boston.

3    Q    Tell us what you do for a living.

4    A    I actually have two jobs.  I teach at the Massachusetts

5    Institute of Technology, MIT, and I also have a consulting

6    business which I started in 1988, and I conduct my consulting

7    business from the town of Acton near my home.

8    Q    And why don't you just briefly describe for us the types

9    of things you teach in the MIT portion of your livelihood.

10   A    I teach several classes each year.  The classes I teach

11   the most frequently are one in hazardous waste site

12   management; that's a graduate-level class.  I also teach a

13   course in fate and transport of chemicals in the environment,

14   which is also a graduate-level course.  I also teach a senior

15   project class, which is a class we have for our senior

16   undergraduates.  And then I also do a project class with our

17   masters students, generally a field-based project course with

18   a handful of graduate students.

19   Q    And how long have you been teaching at MIT?

20   A    I've been teaching at MIT since 1996.

21   Q    Okay.  And you said you had a consulting business.  Tell

22   us the name of that business and what it does.

23   A    The name of the business is HydroAnalysis, Incorporated,

24   and I offer specialty services in hydrology and environmental

25   engineering.

1    Q    Can you tell us what hydrology is?

2    A    Well, I guess a short description is hydrology is the

3    science of water in the environment.

4    Q    Okay.  And this is a case about water in the environment,

5    at least among other things; that's a fair statement?

6    A    That's correct.

7    Q    Okay.  Thank you.

8         Tell us about your educational background, where you went

9    to college and the degrees you've received, please.

10   A    I have four academic degrees.  I have two bachelor of

11   science degrees.  One is in civil engineering in which I

12   concentrated in water resources, and the other is in earth and

13   planetary sciences.  Both of those are from MIT.  I have a

14   master of science in environmental earth sciences from

15   Stanford University, and I also have a Ph.D. in environmental

16   engineering from MIT.

17   Q    When did you get your Ph.D.?

18   A    I received my Ph.D. in 1981.  I think the degree is

19   actually '82.  I finished my work in '81.

20   Q    All right.  The early '80s?

21   A    Yes.

22   Q    When did you start HydroAnalysis?

23   A    In 1988.

24   Q    So that company has been around for just over 20 years,

25   22 years?

1628

1   A    Twenty-two years, yes.

2   Q    Did you work at any consulting areas before starting

3   HydroAnalysis?

4   A    Yes.  Prior to that -- I'd actually worked between my

5   masters degree and my Ph.D.  I worked for four years.  Went

6   back to school.

7        And then, after finishing school, I went to work for a

8   company; at the time it was called ERT, Incorporated.  It has

9   since changed its name to ENSR, E-N-S-R, all capital letters,

10  and again it's changed name to AECOM, which is, again, all

11  capital letters, A-E-C-O-M.

12  Q    Did they do work similar to what you do now with

13  HydroAnalysis?

14  A    Yes.  They were a full-service environmental firm, but my

15  particular work was the same kind of work I'm now doing with

16  HydroAnalysis.

17  Q    All right.  Can you describe generally your experience in

18  dealing with, whether it's teaching or consulting or some

19  combination of both, can you just describe for us generally

20  your experience dealing with issues regarding the study of

21  groundwater pollution?

22  A    Yes.  I actually do two types of work in my business.  I

23  do work in water supply, particularly groundwater protection.

24  I've done a number of studies in the State of Massachusetts

25  for municipalities to define where the groundwater coming from

1629

1    public water supplies comes from so that those areas can be

2    protected.  And then I also have done a good bit of work in

3    hazardous waste site investigation.  I've worked on about 50

4    federal Superfund sites, a slightly larger number of state

5    Superfund sites, another group of manufacturing sites which

6    are under the Resource Conservation Recovery Act, so a good

7    variety of hazardous waste sites.

8    Q    Does any of that work involve trying to figure out how

9    groundwater became contaminated?

10   A    Yes.

11   Q    Does all of it involve that?  Can you speak to that a

12   little bit?

13   A    Yes.  In fact, I guess I would say my specialty is

14   working with data, taking the various kinds of hydrogeologic

15   and hydrologic and water quality data and understanding how a

16   site works; what happened, what the various phenomena are that

17   create the situation that's seen in the data.

18   Q    Okay.  Have you had experience over these many years, in

19   looking at groundwater, have you had experience with

20   situations where the contamination involved chlorinated

21   solvents?

22   A    Yes.  I've worked on a large number of chlorinated

23   solvent sites.  The majority of the sites I've worked on have

24   been chlorinated solvent sites.  For example, one site that I

25   worked on quite extensively is the Woburn Wells G and H site,

1    which is two public water supply wells that were contaminated

2    by perchloroethylene and trichloroethylene, and I was the --

3    worked on the investigation phases of that and then also was

4    the manager of the groundwater remediation for that site.

5    Q    Now you mentioned perchloroethylene, I believe, in your

6    last answer.  That's perc, right?

7    A    That's perc, yes.

8    Q    And for short, we'll just call it perc today.

9    A    Yes.

10   Q    All right.  And that's a chlorinated solvent?

11   A    It is, yes.

12   Q    What are the three or four main chlorinated solvents that

13   we may hear about in your testimony today?

14   A    We'll hear about perc, which is also called

15   perchloroethylene or tetrachloroethylene.  It's a chemical

16   that has four chlorine atoms on it.  We'll also hear about

17   trichloroethylene, which is a similar chemical but has only

18   three chlorines.  And we'll hear about cis-1,2

19   dichloroethylene, which, again, is a similar compound; only

20   two chlorines on that molecule.

21   Q    All right.  But they're all within the family of

22   chlorinated solvents?

23   A    They are.

24   Q    Okay.  In your consulting work, can you describe, in

25   overview fashion, the types of different clients you've had

1    who have come to you for work, companies of what sort,

2    *et cetera*?  Just talk to that, please.

3    A    All right.  I have a large variety of clients.  I've done

4    work for state governments, municipalities, private citizens,

5    citizen groups, watershed associations, the United Nations,

6    the World Bank, a little bit of federal government work, as

7    well as industrial companies, and, of course, insurance

8    companies, or at least counsel for insurance companies.

9    Q    All right.  And some of that work has -- has some of that

10   work led to you having to give testimony, whether in

11   depositions or courtrooms?

12   A    Yes, it has.

13   Q    Can you -- have you testified in chlorinated solvent

14   cases before, either depositions or courtrooms, that you

15   recall?

16   A    Yes, I have.

17   Q    Okay.  Are you a member or affiliated with any

18   professional organizations or associations?

19   A    Yes.  I'm active in a number of professional

20   associations.  I'm a fellow of the American Society of Civil

21   Engineers and have been on technical committees of the

22   society.  I'm a member of the groundwater -- the Association

23   of Groundwater Scientists and Engineers, and I've been on the

24   editorial board of the Journal of Groundwater.  I'm also a

25   member of the American Geophysical Union, the International

1  Water Association, and a number of other professional

2  associations.

3  Q    Have you written on the topics within your area of

4  expertise?

5  A    Yes.  I've written about 50 journal articles, book

6  chapters, and other technical publications.

7  Q    Okay.  And you're not here for free.  I assume you're

8  being paid, right?

9  A    I am being paid.  I'm being paid $300 an hour for my time

10  here and in preparation to be here.

11  Q    Okay.  Why don't we start generally with what you were

12  asked to do in this particular case.  Can you describe for us

13  what you were asked to look at and consider, please?

14  A    Well, I was asked to look at the contamination at the

15  Dyce facility and, in particular, to evaluate what might be

16  the cause of the contamination in the northwest corner of the

17  site, and also to evaluate the hypothesis put forward that

18  there was a one-time spill in the 1975 to '77 time range and

19  that that was the cause of the contamination seen in the

20  northwest corner of the site.

21  Q    And we'll obviously spend a lot of time talking about

22  this, but why don't you just start with telling us whether or

23  not you have formed opinions with regard to what you were

24  asked to do and what those opinions are, please.

25  A    Yes.  I've formed three opinions, which I put into my --

1633

1    put into an expert report.

2         The first opinion is that the site is -- there's

3    widespread contamination at the site.   The operation area is

4    highly contaminated, as well as the northwest corner.

5         The second opinion is that the most likely explanation

6    for the contamination in the northwest corner is the steady

7    discharge of wastewater, which included perchloroethylene,

8    from the catch pond, and that that was done over a good number

9    of years and that that accumulation is what we see in the

10   northwest corner.

11        And then, finally, I do not believe that the data support

12   the theory that there was a one-time release that caused the

13   contamination in the northwest corner.

14   Q    All right.   Can you describe for the jury the types of

15   things you've looked at and reviewed and studied that bear on

16   the opinions you're going to expound upon later in your

17   testimony?   What did you look at?

18   A    Well, there's a large number of reports and a good

19   quantity of data at this site.   I focused on the technical

20   data.   I looked at the past consultant reports, either done

21   for the government agencies or done for Soco and its

22   predecessors.   I've looked at the data behind those reports,

23   and so that includes the laboratory analyses, the various

24   water quality analyses that were done in the laboratory, the

25   well logs in which the folks out in the field recorded what

1634

1    they found when they drilled wells, field notes that are a

2    part of those reports.

3        I also -- actually some of those reports really weren't

4    of very good quality.  I couldn't really see the maps too

5    clearly and all that, so I actually arranged to make a visit

6    to the MDEQ, the Montana Department of Environmental Quality,

7    and obtain better quality documents, and I actually obtained

8    some additional documents that had not been exchanged by the

9    parties in this case.  I also obtained a copy of their

10   computer database with all of the various laboratory analyses

11   and results that were recorded there.

12       I also looked at a good number of aerial photographs.  I

13   obtained aerial photographs from the web and different

14   sources, as well as I was provided some aerial photographs.

15       I'm trying to think what else.

16   Q   That's okay.  Just what you remember.  Is that a pretty

17   good overview?

18   A   (No response.)

19   Q   Did you -- oh, I'll ask you one.  Did you look at Dyce's

20   sworn statements to the EPA in connection with their

21   investigation?

22   A   Yes, I did have that, and I had, I had a little bit of

23   historical information.  I had Dyce's sworn statements.  I had

24   the Versar report, which was a relatively early report that

25   reported on characteristics of the site and the business that

1    went on at the site.

2    Q    Now is the Dyce facility part of a larger Superfund site?

3    A    It is.  It's part of the Lockwood solvent Superfund site.

4    Q    Can you describe -- that's a shorthand expression for

5    something.  What does it mean to be a Superfund site?

6    A    A Superfund site is a site that has been officially

7    listed under the federal Superfund Act.  They have something

8    that they call the national priorities list, which is, in

9    essence, a list of the worst hazardous waste sites in the

10   country that need to be cleaned up.

11   Q    Okay.  And is that a -- is a Superfund site -- well, let

12   me ask it this way.  Is the Superfund site then here under the

13   jurisdiction of at least, among others, the Environmental

14   Protection Agency?

15   A    Yes.  It's under the -- it's actually shared

16   jurisdiction, at least on this site.  The Environmental

17   Protection Agency and Montana DEQ are both involved in the

18   Superfund site.

19   Q    Now as a result of being a Superfund site, does that put

20   into place a certain series of reports and investigations that

21   have been carried out by governmental agencies?

22   A    Yes.  There's actually a very tightly defined set of

23   procedures, and there's extensive regulations that govern

24   Superfund sites.  In particular, there is a step called the

25   remedial investigation.  We've heard a lot of references to

1636

1    the RR report.  The conduct of a remedial investigation is

2    actually something that's required by the regulations.  The

3    remedial investigation develops the data necessary to figure

4    out how to clean up a site.

5         The remedial investigation is generally followed by the

6    feasibility study, and the feasibility study is an

7    investigation or engineering study in which one evaluates

8    various alternatives to clean up a site, and so it will

9    basically be a laundry list of potential technologies and

10   whether those apply to the site and then finally a short list

11   of technologies or cleanup plans that would work at the site.

12        Those are generally done by engineering contractors, both

13   the RI and the FS, and then that information is evaluated by

14   the government agencies, and the agency, the agency in charge

15   will issue a record of decision in which they pick a

16   particular set of cleanup actions from the feasibility study

17   and say this is the one set that we will actually go through

18   with at the site.

19   Q    Now do all those types of reports exist in this matter,

20   this Superfund site?

21   A    Yes, they do.  And, in fact, the RI was done in two

22   stages.  There's an original RI report, and then they went out

23   and did sort of an additional study, and that's reported in

24   the RI addendum report.

25   Q    I take it these are -- well, are these long,

1637

1    comprehensive reports, as a general proposition?

2    A    Yes.  In fact, I don't think I've seen a paper copy of

3    the RI report.  I understand it comes to 18,000 pages and so

4    no one has actually -- well, I shouldn't say no one.  I

5    imagine there are some printed copies, but I haven't seen a

6    printed copy.

7    Q    Now as part of your work in forming your opinions, did

8    you look at all of the depositions and prior sworn testimony

9    of various Dyce employees and others that were taken in

10   various matters leading up to where we are today?

11   A    I have read some depositions, although actually I did not

12   read the depositions until after I finished my expert report,

13   at least the first part of my expert report, in which I stated

14   my opinions.  I really based my conclusions upon the technical

15   data that was available.  I subsequently have read some

16   depositions and heard testimony in the court, but my opinions

17   were not based on that material.

18   Q    All right.  And did you later get an opportunity to

19   actually go visit the Dyce site?

20   A    Yes.  I have visited the site.

21   Q    Do you recall when that was?

22   A    I think it was in the summer, but to be honest, I can't

23   recall the date.

24   Q    Okay.  In any event, the opinions that you did originally

25   in this case and have described for us remain your opinions

1    today; is that right?

2    A    That's correct.

3    Q    There's nothing you've seen since you've done your

4    original opinions that has changed your views as to the

5    conclusions you've laid out for us so far this morning,

6    correct?

7    A    No, nothing has changed.

8    Q    Let's talk a little bit about what is a groundwater

9    contamination investigation, and, in particular, focusing on

10   what happened here.

11        How do people such as yourself, experts such as yourself,

12   figure out what's in the groundwater?  What do they do?  Can

13   you generally talk to that?

14   A    Yes.  There's a certain difficulty in doing a groundwater

15   investigation because it's underground.  You can't just walk

16   up to the groundwater and sample it.  You have to do

17   subsurface investigation, and so the primary tool is a -- some

18   sort of groundwater monitoring well or soil boring, and so

19   generally there's a lot of drilling involved.  There are a lot

20   of punching holes into the ground.

21        The typical procedure would be to drill wells, take soil

22   samples as you drill a well, do some field screening as you go

23   through that process, and there are field devices, which, the

24   shorthand for them are sniffers.  They're basically vapor

25   detectors that one can use to screen soil samples and see if

1   there's contamination in there, and that will often help

2   dictate which samples get sent to the laboratory for analysis.

3       Sometimes the borings are not completed as wells, but

4   often this boring -- which is, you know, just basically a hole

5   in the ground.  It's like putting down a wood bit, a drill bit

6   as you would use in wood, and those are often completed as

7   monitoring wells.  So pipe is put down, and it's open to a

8   certain interval, depth interval in the aquifer, and

9   groundwater samples can be extracted from that as well.

10      That's sort of the deluxe sampling technique.  There is

11  also simpler sampling techniques in which one just, in

12  essence, uses a hydraulic device and pushes a pipe down into

13  the ground and can do either measurements or take a one-time

14  sample of soil or groundwater.  That's a less expensive

15  technique, and those are sealed back up generally and not used

16  as a permanent monitoring well.

17  Q   So all sampling doesn't involve samples going to a

18  laboratory; is that what you're telling us?

19  A   That's correct.  A subset of the samples goes to the

20  laboratory, and generally what goes to the laboratory is

21  decided in the field based on these field screening devices,

22  the sniffers that I mentioned.

23  Q   And how are -- can you just describe generally how

24  laboratory samples are gathered and just how that process

25  works?

1    A    Well, there are very formal procedures for this.  There's

2    a lot of quality assurance and other techniques that are

3    involved to make sure that your samples are representative and

4    that they're properly analyzed, but it's a process of

5    collecting soil with properly cleaned instruments and devices

6    and putting those in bottles and sending them to a laboratory,

7    usually shipped overnight, and then the laboratory does an

8    analysis using sophisticated chemical analysis equipment.

9    Q    Are some sampling techniques considered more reliable or

10   precise than others?

11   A    Well, in general, the laboratory techniques would be

12   considered the most reliable.  There are field sampling

13   techniques and these field screening techniques, and those

14   would be a little bit less -- not quite the same high quality

15   as the laboratory analysis.  The laboratory analysis would be

16   typically considered the best.

17   Q    Okay.  Now you've mentioned perchloroethylene or perc.

18   Let's talk a little bit about the nature of perc, its general,

19   commonly understood properties.  The floor is yours.  What's

20   perc?

21   A    Well, probably everyone is familiar with the smell of

22   perc.  It's the "what you smell" in a drycleaner.  It's a

23   chlorinated solvent, and it has a few properties which are

24   important as far as its behavior as an environmental

25   contaminant.  One is that it is a good deal heavier than

1   water, and so it will sink in an open water body.  It will

2   also sink, you know, due to gravity in the subsurface.  It's

3   also runnier than water.  It has a lower viscosity than water,

4   so it will actually travel somewhat more freely in the

5   subsurface than water will.  It's also a volatile compound.

6   Q    Well, let me stop you there.  When you say "volatile,"

7   what do you -- you don't mean it explodes, do you?

8   A    No.  It means that it tends to evaporate, so it's -- it

9   evaporates quickly and very readily.

10  Q    Okay.  Does it mix well with water?

11  A    No.  It is sparingly soluble.  We've -- you've heard in

12  the courtroom a lot of discussion of a part per billion as a

13  measure of concentration, and that's a measure of the amount

14  of perc that has dissolved in water.  It's usually reported in

15  parts per billion.

16       A part per billion is an exceedingly small concentration.

17  It's the equivalent of one drop in a 25,000-gallon railroad

18  tank car.  If you thought about it as, say, as an analogy with

19  time, it's one second in 32 years, is a part per billion.

20  Q    Does that mean there's a billion seconds in 32 years?

21  A    Yes, yes.  So it's a very, very small concentration, and

22  perc is -- you know, perc dissolves in water at these low

23  concentrations, but it's really sparingly soluble.  It really

24  doesn't mix with water.

25  Q    Thank you.

1    We've heard a phrase "DNAPL," D-N-A-P-L.  Is that an

2  acronym for something?  And answer that, please, and tell us

3  what DNAPL is.

4  A    It is an acronym.  It stands for "dense nonaqueous phase

5  liquid."  A nonaqueous phase would be a liquid that exists as

6  something separate from the water.  And "dense," obviously,

7  it's denser than water.

8  Q    Is that another way of saying heavier?

9  A    Yes.  Kind of the shorthand is it's a sinker as opposed

10  to a floater.

11  Q    All right.  Now we've heard references to BTEX.  Is that

12  an acronym?  And, if so, what is it and tell us what that

13  means.

14  A    BTEX is an acronym for benzene, toluene, ethylbenzene,

15  and xylene, a family of related compounds that are associated

16  with petroleum, and those are floaters.  Those are lighter

17  than water, so they're kind of the opposite of perc as far as

18  its density behavior.

19  Q    Are they volatile, also?

20  A    They are also volatile.  They tend to evaporate quickly.

21  Q    How about -- you mentioned, you talked about solubility

22  of perc.  How about the BTEX compounds?  Do they mix well with

23  water?

24  A    No.  They are also sparingly soluble, and that's why they

25  form an LNAPL, a light nonaqueous phase liquid.  They

1  basically remain as a separate phase, a separate liquid.

2  Q    Let me see if this would help illustrate things.  If I

3  had a pitcher of water in one hand and a container with perc

4  in the other hand and I poured the perc into the water

5  pitcher, what would happen to it?

6  A    Well, what you would see is they're both clear liquid, so

7  you would see these two clear liquids, but you'd see an

8  interface between them.  So the perc would settle to the

9  bottom, and you would see, you know, a separate phase there,

10  and then the water would be on top of that.

11  Q    What if I then stirred it, left the room, and came back

12  in an hour?  What would I see?  Would I see something

13  different or the same thing?

14  A    Well, it would be kind of like oil and vinegar, a

15  dressing.  I mean, they would separate back out, and you would

16  see the two layers forming again.

17  Q    Okay.  What if I took that same pitcher of water now with

18  perc at the bottom and took another container, same amount of

19  the perc as before but, this time, one of the BTEX chemicals

20  and poured it into the same pitcher of now water on top, perc

21  on the bottom?  What would, what would happen?

22  A    Well, you'd wind up with three layers.  You'd have perc

23  at the bottom, water in the middle, and then, say, xylene

24  floating on the top, because it's lighter than water.

25  Q    So of the three layers, the layer exposed to the air is,

1    in that case, the xylene, the BTEX?

2    A    The xylene would be on top and would be exposed to the

3    air, and, as I've mentioned, it's volatile.  It wants to

4    evaporate and so that would tend to be -- tend to evaporate

5    off from the surface.

6    Q    So what's going to evaporate first from our pitcher of

7    water in that situation -- or I should say our pitcher of

8    BTEX, water, and perc?  What's going to evaporate out of there

9    first if it was left alone for some time?

10   A    Well, the BTEX on the top, the floating on the top would

11   evaporate first.  Then the water; after all of the BTEX was

12   evaporated off, then the water would be exposed, and that

13   would start to evaporate.  And then, finally when the water

14   was gone, the perc would start to evaporate.

15   Q    All right.  Neil, could you please -- I want to go to

16   your first opinion.  Your first opinion was that there's

17   widespread contamination; is that right?

18   A    That's right.

19   Q    All right.  Let's delve into that a little bit for a

20   while.

21        Neil, would you please put up 3059, page 119, please?

22   Now, Neil, would you just focus on the lower right-hand corner

23   where the document is described?

24            DOCUMENT TECHNICIAN:  (Complied with request.)

25            MR. GROSSBART:  All right.  And I'll flash back,

1   but -- now flash back to the full picture.

2            DOCUMENT TECHNICIAN:  (Complied with request.)

3   BY MR. GROSSBART:

4   Q    Why don't you tell us what we're looking at here.  What

5   is this diagram, and where is it from?

6   A    Actually it might be helpful just to zoom in on this just

7   quickly, and we can see the legend on the figure as well.

8            DOCUMENT TECHNICIAN:  (Complied with request.)

9   BY MR. GROSSBART:

10  Q    Okay.  However you want it.  You just tell Neil how you

11  want to set it up, and tell us what the document is and what

12  it shows us.

13  A    Well, particularly you can see that bottom box in the

14  legend says, "Target Area for Groundwater Remediation,

15  Concentration of," and it lists a number of chlorinated

16  solvents, "exceeds MCL," the maximum contaminant level.  So

17  these are compound -- those yellow shaded areas are areas in

18  the Superfund site where the concentration of groundwater is

19  too high for the water to be drunk safely.

20            MR. GROSSBART:  All right.  Let me ask you, Neil,

21  would you just go to the diagram itself?

22            DOCUMENT TECHNICIAN:  (Complied with request.)

23  BY MR. GROSSBART:

24  Q    And -- okay.  And that's a plume, right?  That's a

25  picture of a plume, right?

1646

1    A    Well, actually two plumes.

2    Q    Okay.  This is -- is this the whole Superfund site?  What

3    are we --

4    A    Yeah.  The area with the line that goes around here,

5    that's the entirety of the Superfund site.

6    Q    Okay.  And this case is about which plume?  The top one?

7    A    Yes.  We've been looking at this plume.  I don't actually

8    think that the entirety of the plume has been shown in an

9    exhibit, but it extends from the Dyce facility, the Dyce site,

10   all the way down to the river.  You can see there's a large

11   area in which groundwater has been contaminated.

12   Q    All right.  And that's the Yellowstone River; is that

13   right?

14   A    That's right.

15        MR. GROSSBART:  All right.  And, Neil, focus in on

16   that area, generally speaking, please.

17        DOCUMENT TECHNICIAN:  (Complied with request.)

18   BY MR. GROSSBART:

19   Q    All right.  And with respect to this plume, can you just

20   maybe put a little mark about where it starts and tell us what

21   that starting point is?

22   A    Well, the starting point, you can actually see that

23   building that's there.  I just circled it, and I'll take the

24   mark off.  That's the large warehouse at the Dyce facility, so

25   the plume starts at the Dyce facility.

1    Q    All right.  And it extends all the way to the Yellowstone

2    River?

3    A    That's correct.

4         MR. GROSSBART:  All right.  Neil, pull up 3059,

5    page 121, which is two pages later.

6         DOCUMENT TECHNICIAN:  (Complied with request.)

7    BY MR. GROSSBART:

8    Q    And is this -- so is this a closeup of that beginning

9    section of the plume that we saw on the prior page?

10   A    That's right.  This is the start of the plume.

11   Q    And you circled the large warehouse on the prior diagram.

12   Why don't you just put a, just put a check mark, or I think if

13   you just poke the screen --

14   A    (Complied with request.)

15   Q    Okay.  And if this were spread out in this direction,

16   we'd eventually hit the Yellowstone River; is that right?

17   A    That's right.

18   Q    All right.  The data you looked at is focused on this

19   area on this particular diagram; is that right?

20   A    That's right.  I've been looking at the area near the

21   Dyce facility.

22   Q    All right.  And there has been a lot of testing?

23   A    (No response.)

24   Q    Well, let me ask you in a nonleading way.  Has there been

25   a lot of testing in the Dyce site property and surrounding

1648

1  area?

2  A    This is a fairly intensively sampled site.  There is a

3  good bit of data that's been collected at this site.  There's

4  some areas obviously more intensively sampled than others.

5          MR. GROSSBART:  All right.  Neil, would you please

6  put up Exhibit 5064?

7          And, Your Honor -- well, let me just ask you first.

8          DOCUMENT TECHNICIAN:  (Complied with request.)

9  BY MR. GROSSBART:

10  Q    Dr. Shanahan, you recognize this.  Is this one of the

11  aerial photos that you reviewed in doing your work?

12  A    Yes.  This is the 1983 aerial photo that I looked at.

13  Q    All right.  And you looked at it obviously without the

14  yellow dots on it, at least initially; is that right?

15  A    That's right.

16          MR. GROSSBART:  All right.  Your Honor, I'd like to

17  publish a stipulation of the parties as follows.  This is

18  Exhibit 5064, and I'm going to read part of the stipulation of

19  the parties:

20          The location of the sampling points superimposed

21  over historical area photographs depicted on Exhibits 5060,

22  5061, 5062, 5063, and 5064 are accurate to a reasonable degree

23  of professional certainty.

24          That's -- the parties have agreed to that.

25          THE COURT:  Thank you.

1649

1    BY MR. GROSSBART:

2    Q    All right.  Now this doesn't literally -- well, this --

3    is every single sampling location done in this area reflected

4    on this particular exhibit?

5    A    Well, the vast majority of the data are on this exhibit.

6    Not every single one, but the vast majority.

7    Q    Okay.  And if you looked, is this -- does this -- have

8    you looked at the data associated with these sampling

9    locations?

10   A    Well, not each and every single one, but certainly the

11   majority of them, I have.

12   Q    Well, have you looked at them sufficiently in order to

13   tell us whether or not there is contamination or not at

14   various data points?

15   A    Yes, I have.  I actually have evaluated the data for all

16   of these.

17        MR. GROSSBART:  Okay.  And, Neil, would you put up

18   Demonstrative 490, please?

19        DOCUMENT TECHNICIAN:  (Complied with request.)

20   BY MR. GROSSBART:

21   Q    What is this demonstrative showing us?

22   A    This is based on our analysis of the data.  It's largely

23   drawn from the database that Montana DEQ put together.  We

24   actually put it into our own spreadsheet so it would be easier

25   to work with, and we tallied every well at which there was a

1   detection of a chlorinated solvent and also the MP borings

2   which are -- which were a set of field analyses done, any of

3   those at which there was an off-scale reading on their

4   detector.

5   Q    Okay.

6   A    So between those, basically between soil, groundwater,

7   and then the membrane interface probe data, this is all of the

8   places where you have what we would call hits; in other words,

9   detected chlorinated solvents.

10  Q    All right.  This doesn't refer us to concentrations or

11  anything more detailed like that?  It's just up or down,

12  there's a hit?  Is that what you're showing here?

13  A    Yes.  It includes all of the hits, even low-level hits.

14  They obviously vary.

15  Q    Is this a pattern you would expect to see with a company

16  that was supposedly well run except for, I guess, one bad day

17  in 1975, '76, or '77?

18  A    No.  This shows a pattern of contamination.  In

19  particular, if you go to the operational area, back where you

20  see the buildings and the tanks, there's contamination there,

21  so this is a -- there's a pattern here of chemicals having

22  been released to the environment basically throughout the

23  site.  It's a dirty site.

24          MR. GROSSBART:  Okay.  Neil, would you put back on,

25  please, 3059, page 121?  That's the --

1    DOCUMENT TECHNICIAN:  (Complied with request.)

2    MR. GROSSBART:  Okay.  And, Neil, would you focus on

3  the operational area?

4    DOCUMENT TECHNICIAN:  (Complied with request.)

5  BY MR. GROSSBART:

6  Q    There are two green areas here, Dr. Shanahan, and those

7  have been classified by the EPA as what?

8  A    The EPA has defined those as source areas.

9  Q    And what does that mean?

10  A    Well, those are basically the areas from which the EPA

11  has determined that the chlorinated solvents, which you see in

12  that groundwater plume, those are areas that are sources of

13  those chlorinated solvents.  The chlorinated solvents are

14  coming from those areas.

15    MR. GROSSBART:  Now, Neil, would you put up

16  Demonstrative 494, page 6, please?

17    DOCUMENT TECHNICIAN:  (Complied with request.)

18  BY MR. GROSSBART:

19  Q    This is a photo dated May 1, 2004, which, without the

20  markings, I believe is in evidence as another document.  Do

21  you have that in front of you on the telestrator?

22  A    Yes, I do.

23  Q    All right.  And the four areas on the ROD figure that we

24  saw are indicated where we've sort of done a combination green

25  and black dotted line, just to point them out.  Is that right?

1    A    That's right.  Those are the same areas as in the figure

2    we just looked at from the ROD.

3    Q    And there are also some, a smaller number of well plots

4    that this demonstrative focuses on?  Individual well-sampling

5    locations.  Do you see those?

6    A    Yes.  The yellow dots show some of the sampling locations

7    on the site.

8    Q    Okay.  I want to talk about a few of those just and have

9    you expand on what they show.

10        Moving from sort of bottom to top, in this area, there's

11   a reference -- Neil, why don't you just zoom in on that part.

12   Get me in here, please, Neil.

13            DOCUMENT TECHNICIAN:  (Complied with request.)

14   BY MR. GROSSBART:

15   Q    Okay.  Let's talk about BHM.  Just can you describe

16   generally, from the data -- and if you have some, the data in

17   front of you related to this -- what's BHM?  What was found

18   there?  Is it significant?  Tell us how.  Expand on that, if

19   you would, please.

20   A    Well, BHM is in that, in the source area that's at the

21   lower right part of the diagram here as it's blown up.  That

22   was a well that was installed by Maxim, a contractor that was

23   hired by Soco; I'm not sure if in those days it was Dyce or

24   Brenntag, but one of the predecessors to Soco.

25   Q    Well, let me ask you this.  What kind of sampling tool

1653

1    was used at BHM, and what was found?

2    A    You know, to be honest, I'm not a hundred percent sure if

3    it was -- actually I do see it.  It was a direct-push sample.

4    So this is one of those samples where you put a pipe down; in

5    essence, put in a temporary well with a direct-push device, a

6    hydraulic push that pushes a pipe down into the ground, a very

7    sophisticated pipe, and samples were taken at BHM.

8             MR. LYNCH:  Your Honor, could we get a reference to

9    the document the witness is looking at?

10            MR. GROSSBART:  Yes, you can.

11   BY MR. GROSSBART:

12   Q    And I see you're looking at documents.  There's a lot of

13   data in this case.  Did you bring some of the excerpts from

14   the data up there with you in order to -- you didn't memorize

15   every sample, did you?

16   A    No, I didn't, and I'm looking for the actual data for

17   this particular, for this particular well, because I don't

18   remember it off the top of my head.

19            MR. LYNCH:  Do you have a copy for us, Counsel, of

20   what he's looking at?

21            MR. GROSSBART:  I beg your pardon?

22            MR. LYNCH:  Do you have a copy for us?

23            THE COURT:  Can you refer to a Bates stamp or page

24   number?  Is this from the ROD?

25            MR. GROSSBART:  This is from the evidence.  This is

1    a report.  I believe this is from Exhibit 3049, page 66.  Do

2    you have that?

3    BY MR. GROSSBART:

4    Q    Is that what you're looking for, Dr. Shanahan?

5    A    You know, what I have is the -- I couldn't tell you the

6    exhibit off the top of my head, but the Maxim report has some

7    detailed maps in which they show the analytical results for

8    the different wells on the map, and it's in the Maxim report,

9    and I just have a photocopied excerpt of that so I can

10   remember the numbers.

11   Q    Would you like to see the Maxim report, then?  Could you

12   find it?

13   A    Oh, yes.  I could, I could find it.  However, this is one

14   of the reports, which, the original report wasn't a very good

15   quality, and I had to get a better quality copy from MDEQ.  So

16   I can show you the -- I can show it to you in the official

17   document, but I'm not sure it would be very clear.

18   Q    Well, I just need it to help, if it would refresh your

19   recollection as to what's there, so you can tell us what's

20   there.  Would you like me to bring you a copy of the Maxim

21   report?

22   A    Well, I have the excerpt from it, so --

23   Q    All right.  Then what -- tell us what you're looking at.

24   The Maxim report is Exhibit 3049?

25   A    Yes, and this is a figure from that report in which --

1   Q    Tell us, tell us the page.

2   A    I don't have the page.  I just have -- it's a large

3   oversized figure, and I just have an excerpt from that page

4   with the results on it.

5   Q    All right.  Is it one of the figures attached to the

6   report?

7   A    Yes, it's one of the several figures from the back of the

8   report.

9              MR. GROSSBART:  Your Honor, may I approach?

10             THE COURT:  Do you want to put it on this DOAR?

11             MR. GROSSBART:  Well, I've got to figure out what

12   page it is.  I thought we had the page.

13             May I just approach the witness for a second?

14             THE COURT:  Yes.

15             THE WITNESS:  One of these.  I think it's Figure 2

16   or 3, possibly, from the Maxim report.

17             MR. GROSSBART:  Neil -- I'm sorry, Your Honor.  This

18   will just take a second.

19        (Discussion off the record at counsel table.)

20             MR. GROSSBART:  Exhibit 3049, page 24, please.

21             DOCUMENT TECHNICIAN:  (Complied with request.)

22             MR. GROSSBART:  Why don't you enlarge the data,

23   please.  And, Neil, push the page up, please.  No, the other

24   direction.  Enlarge on this, please.

25             DOCUMENT TECHNICIAN:  (Complied with request.)

1    BY MR. GROSSBART:

2    Q    Did I get it right?  Is that what you were looking at?

3    A    It's that, and these are the data for the chlorinated

4    solvents, and then there is also another figure.  Probably the

5    next figure in the report has the data for the BTEX compounds.

6    Q    All right.  Well, let's talk about the chlorinated

7    solvents.  What was found at BHM?  Can you decipher this for

8    us?

9    A    Yes.  As you can see here, they took three samples of

10   groundwater at different elevations below ground surface, and

11   so you see 11 feet BGS for below ground surface, 20 feet and

12   26 feet.  And the concentration of the chlorinated solvents,

13   particularly in the shallow, the 14-foot sample, are quite

14   high.  The DCE is 86,000.  The TCE is 8,800.  The PCE is 580.

15   Vinyl chloride is 240.

16   Q    Let me -- rather than read them, is this a significant

17   finding of chlorinated solvents or not?

18   A    It is, yes.

19   Q    All right.  Why don't you put up -- you said there was

20   another page that talked about the BTEX?

21   A    I think probably the next figure has the BTEX.

22   Q    Let me show you 3049, page 25.

23        And give us that, please, Neil.

24             DOCUMENT TECHNICIAN:  (Complied with request.)

25   ///

1   BY MR. GROSSBART:

2   Q    And was there a lot of BTEX found there?

3   A    Yes.  In particular, you can see that the toluene was

4   very high -- 210,000, again, at that 11-foot,

5   below-ground-surface reading.

6        So if you sum up all of these volatile organic compounds,

7   according to my calculations, this is the most contaminated

8   well, in total chemicals, at the site.

9        MR. GROSSBART:  All right.  Let's go back to 4094-6,

10  and specifically --

11        DOCUMENT TECHNICIAN:  (Complied with request.)

12        MR. GROSSBART:  Thank you.

13  BY MR. GROSSBART:

14  Q    MP-105, why don't you just describe generally -- do you

15  have that?  Do you see that in front of you?

16  A    I do.

17  Q    Just describe generally what the EPA reports found at

18  MP-105, and generally describe the findings.

19  A    This was one of the membrane interface probe analyses.

20  What they found is high concentra- -- well, a high hit of, on

21  the detector at the very bottom of the boring, basically on

22  the bedrock surface, and they took a sample that was a

23  groundwater sample that was sent into a laboratory, and they

24  found 2,960 parts per billion of PCE in that sample as well as

25  other compounds at lower levels.

1   Q     All right.

2            MR. LYNCH:  Your Honor, again, the witness is

3   reading from a document.  Can we have a reference?

4            MR. GROSSBART:  I don't know that he is reading from

5   a document.  I think he's organizing his mix.

6   BY MR. GROSSBART:

7   Q     But are you reading from a document?

8   A     Yes.  It's Exhibit 3058-0120.

9   Q     All right.  Thank you.

10         Now both of these areas were designated as source areas

11  by the EPA, 1 and 2; is that right?

12  A     That's correct.

13  Q     Okay.  Do you disagree with that, with those findings,

14  that particular finding?

15  A     No.  Based on the concentrations that you see, those

16  certainly match the criteria that the EPA defined, and those

17  are reasonable criteria, and those are source areas.  I would

18  say, if anything, that they could be a bit bigger than what's

19  shown on the diagram.

20           MR. GROSSBART:  All right.  Actually put that back

21  up for a second, Neil.

22           DOCUMENT TECHNICIAN:  (Complied with request.)

23           MR. GROSSBART:  You just said something.

24           Take me back to the operational area again.

25           DOCUMENT TECHNICIAN:  (Complied with request.)

1    BY MR. GROSSBART:

2    Q    You've heard testimony in this courtroom about some

3    additional sampling that either wasn't or at least may not

4    have been provided to the EPA.  Were you here for

5    Mr. Sullivan's testimony?

6    A    I was.

7           MR. GROSSBART:  All right.  And, Neil, put up

8    Exhibit 4811, please.

9           DOCUMENT TECHNICIAN:  (Complied with request.)

10   BY MR. GROSSBART:

11   Q    And is this one of the documents you reviewed in doing

12   your work?

13   A    It is, yes.

14   Q    Can you generally describe what this document tells us

15   additionally about contamination in the operational area of

16   the Dyce site?

17   A    Well, this Phase 1 soil investigation involved collection

18   of a number of samples around the operational area.  There was

19   one in particular which was in the corner of the containment

20   pit for the flammable containment area, I believe is what they

21   called it.

22   Q    All right.  Let me stop you there and get a demonstrative

23   to show that.

24        Neil, 469, page 2.

25           DOCUMENT TECHNICIAN:  (Complied with request.)

1    BY MR. GROSSBART:

2    Q    Now this is the same photograph that we had up a minute

3    ago from 2004.  Do you see that, Dr. Shanahan?

4    A    Yes.

5    Q    Now you just mentioned a containment area.  Can you point

6    us out, what you're referring to on this photo?

7    A    Well, it's the red dot which shows up pretty clearly in

8    this.

9    Q    Then we don't need to add any more red.

10   A    No.

11   Q    Okay.  And there were findings.  Why don't you continue.

12   I interrupted you.  I'm sorry.

13   A    Well, in that particular sample, they drilled through the

14   concrete that was the base of the containment area and took a

15   soil sample directly underneath that, and they found high

16   concentrations of perc in the soil.  Those concentrations were

17   above the EPA limits as far as defining source area, so the

18   source area really should be expanded to include that, and, if

19   they did additional exploration, it could possibly be expanded

20   more.  It's hard to say.

21   Q    All right.  In reviewing at least the EPA's database, you

22   did not find that particular finding referenced anywhere in

23   the EPA's materials that you reviewed, did you?

24   A    No, I didn't -- well, it's actually the MDEQ database,

25   but it's not in there, no.

1    Q     Either one?

2    A     No.

3    Q     Okay.  And the red dot is in a containment structure of

4    sorts?  Is that how you understand this, based on the

5    testimony you've heard over the course of the week?

6    A     Yes.  It's a concrete containment structure, concrete

7    sides to it and a concrete floor.

8    Q     Let me show you, in evidence, Exhibit 3674, page 31.

9          DOCUMENT TECHNICIAN:  (Complied with request.)

10   BY MR. GROSSBART:

11   Q     Do you -- you were at the Dyce site.

12   A     I was.

13   Q     And does this photo -- I think it's -- this is in

14   evidence as a photograph of the Dyce site, and you recognize

15   it as such; is that right?

16   A     Yes.

17   Q     Or at least part of it?

18   A     Yes.

19   Q     Can you see, in this photo, that concrete basin or a part

20   of it, or at least what you think is that concrete basin or

21   part of it?

22   A     Yes.  It's the basin that's over on the far left here.

23   Q     Now you've been involved with Superfund investigations in

24   the past.  I think you've told us that; is that right?

25   A     That's right.

1    Q      Is it your understanding of the rules and regulations

2    that apply to Superfund investigations that data like that set

3    forth in the ATC report, Exhibit 4811, were required to be

4    turned over to the government agencies?

5    A      I would think so, yes.  Generally if you're in a

6    Superfund situation, your data gets turned over to the

7    agencies.

8              MR. GROSSBART:  Okay.  Now, Neil, toggle back,

9    please, to the demonstrative that we had up a minute ago, 494,

10   page 6.

11             DOCUMENT TECHNICIAN:  (Complied with request.)

12             MR. GROSSBART:  Now -- and again focus on the basin

13   area.  Right there.

14             DOCUMENT TECHNICIAN:  (Complied with request.)

15   BY MR. GROSSBART:

16   Q      In the photograph, you pointed out basically just the

17   beginning of that basin, in through here, and we saw the other

18   two basins right here.  Have I oriented people right?

19   A      That's right.  Basically the photo, I think, was kind of

20   shot from this direction, and you could see the standing water

21   in those three basins.

22   Q      Okay.  Now right outside the basin is another well point

23   called MW-104.  Do you see that?

24   A      I do.

25   Q      Now as I understand it, the sample here was soil.  I

1   think you told us that.

2   A    Yes.

3   Q    All right.  What kind of sample was MW-104?  What kind

4   of, what kind of well was it?

5   A    Well, MW-104 was a drilled well.  They took both soil

6   samples at that and then have taken a number of groundwater

7   samples at that over time.

8   Q    And are the results of that sampling at MW-104 reported

9   in any of the environmental data that you've seen?

10   A    This well was installed as part of the remedial

11   investigation, and the RI report includes the first sets of

12   data that came from this well, and then it was subsequently

13   sampled over time as part of a regular monitoring program.

14   The RI appendices include, for example, the borehole log for

15   this --

16   Q    Let's hang on.

17        It's a monitoring well.  What does that mean?  Does that

18   mean -- is it sampled once?  Many times?  Something in

19   between?

20   A    It was sampled, sampled many times.  There was, for a

21   while, at least for a while, a quarterly monitoring program,

22   and this well was sampled, at least the MW wells, in general,

23   were sampled regularly under that.

24   Q    And in order to -- and you mentioned earlier an MDEQ

25   database?

1   A     Yes.

2   Q     And that's a large computerized document, I take it?

3   A     Yes.  It's a Microsoft Access database.

4   Q     And have you looked at that?

5   A     Yes.

6   Q     What is it?  Is it just a collection over time of things?

7   Describe it.  What is it?

8   A     It's a collection of a bunch of tables of data, and it

9   has information on the various wells, how they were

10  constructed and so forth, as well as the sampling data from

11  various times they've gone out and collected data, sent it to

12  the laboratory, and had the samples analyzed.

13  Q     And one would need a computer, then, to go in there and

14  look at all of the different sampling points over time and

15  figure out what they show at any point in time; is that a fair

16  statement?

17  A     You'd need the computer and the proper software.

18  Q     Right.  There's not a report that looks backwards in time

19  over all of that data?  In other words, there's not a

20  document, other than the database itself, that captures all of

21  that data?

22  A     Not that I've seen.

23  Q     All right.  So, for example, the RI was done in -- do you

24  recall the year, the remedial investigation?

25  A     It was June '03, I believe.

1    Q    And does the database continually update the findings

2    over the course of time?

3    A    Yes.  And, in fact, we've obtained several versions of

4    the database over years.  You know, it's been updated several

5    times in the years since '03.

6    Q    And what's the last iteration, if you will, the last,

7    roughly, time period that you've seen in the database?

8    A    I can't remember if it was '07 or '08 or maybe even both.

9    I might have both.

10   Q    All right.  But after the RI and even the record of

11   decision was completed, right?

12   A    Yes.

13   Q    And do you recall the year of the record of decision?

14   A    No, I don't.

15   Q    Put up --

16   A    I thought it was July '04.

17   Q    I'll just see if I can refresh your recollection.  It's

18   in evidence, but we'll put up, I believe it is, 30- --

19          THE COURT:  Let's stop there for a minute.

20          MR. GROSSBART:  Okay.

21          THE LAW CLERK:  All rise.

22      (Recess taken from 09:29:38 to 09:44:16.)

23      (Open court.)

24      (Jury present.)

25          THE COURT:  Please be seated.

1666

1           Please continue.

2           MR. GROSSBART:  Thank you, Your Honor.

3           Neil, let's -- I want to go back and pick up on

4    something.

5           Just closing in on something, Dr. Shanahan.

6           Neil, would you put up Demonstrative Exhibit 494,

7    page 6?

8           DOCUMENT TECHNICIAN:  (Complied with request.)

9    BY MR. GROSSBART:

10   Q    And I think we talked about these are the source areas as

11   designated by the EPA's record of decision but superimposed on

12   a photograph dated 2004.  Have I got that right?

13   A    Correct.

14   Q    Now I want to talk about that particular source area

15   and -- you don't have to blow it up.  Let's take that one

16   down.

17          DOCUMENT TECHNICIAN:  (Complied with request.)

18          MR. GROSSBART:  And, Neil, put up Demonstrative 614,

19   page 6, which is a different date of photography but with the

20   same ROD figure superimposed.

21   BY MR. GROSSBART:

22   Q    Is that what we were talking about a minute ago where

23   MP-105 is located?

24   A    That's right.  It's in the area of the historic catch

25   pond.

1    Q    And when they made the catch pond bigger -- Neil, put up

2    494, page 4.

3            DOCUMENT TECHNICIAN:  (Complied with request.)

4    BY MR. GROSSBART:

5    Q    Is that our same source area?

6    A    That's correct, yes.

7            MR. GROSSBART:  All right.  Thank you.  You can take

8    that down.

9            DOCUMENT TECHNICIAN:  (Complied with request.)

10   BY MR. GROSSBART:

11   Q    Now you're talking a little bit about MW-104, and I don't

12   need you to read the individual findings over time, but was

13   chlorinated solvent contamination found in the groundwater at

14   MW-104?

15   A    Yes.

16   Q    Can you just generally describe high, low, medium, what

17   it was?

18   A    I believe it was, I believe it was high.

19   Q    Okay.  Now you talked earlier in your testimony about

20   things that you reviewed like boring logs and field notes and

21   things like that.  Do you recall generally that testimony?

22   A    Yes.

23   Q    And I want to show you what I think is the boring log for

24   MW-104, and let's put up Exhibit 3050 at page 645, please.

25           DOCUMENT TECHNICIAN:  (Complied with request.)

1   BY MR. GROSSBART:

2   Q    Tell me what that is.  There's a second page to it, too.

3   And explain what that is and what it shows us about MW-104.

4   The floor is yours.

5   A    This is the boring log when you're out on the field

6   drilling a monitoring well.  You'll generally have a geologist

7   or an engineer working with the drillers.  They will actually

8   make a detailed record of what kind of soil you find and what

9   their observations are of the soil as they go down.  You can

10  see here that there's a lithologic description, and that's

11  their --

12  Q    Well, tell us what that is.

13  A    Yeah, that's their transcribed field notes as to what

14  they saw in the way of soils and the different kinds of soils

15  that they encountered going down the borehole.  You can see

16  there's a headspace, PID reading.  The PID --

17  Q    I'm sorry.  I don't mean to talk over you, but when you

18  get to these big words, slow it down and tell us what you're

19  seeing.

20  A    Okay.  The "PID" stands for "photo ionization device."

21  This is one of those sniffers that I mentioned.  So they take

22  readings to get a field screening value of how much volatile

23  organic compounds would be in the soil there.

24       MR. GROSSBART:  Why don't you scroll down to the

25  bottom of the page, Neil.

1          DOCUMENT TECHNICIAN:  (Complied with request.)

2    BY MR. GROSSBART:

3    Q    And it says drilling date, June 24, 2002.  Do you see

4    that reference?

5    A    Yes.

6    Q    And so is that the date they put the hole in the ground

7    the first time?  What is that?  What's the drilling date?

8    A    That's the date they drilled the hole.  That's the date

9    they put the hole in the ground.

10   Q    And what did they find in the hole?  Other than the

11   laboratory results which you've talked a little bit about,

12   what did the field investigators find in the hole that you

13   think is significant and bears on your opinion about the

14   operational area being contaminated?

15   A    Well, we can probably just leave it right on this blowup.

16   But you can see a number of annotations in the field log, and

17   so they have, you know, that they, for example, found clay at

18   6 feet below ground surface.  They described it here.  It was

19   dark, black, stained clay.  The next little bit, "No

20   recovery."  The soil actually didn't come back up in the

21   drilling tool, so they didn't actually get a sample of soil to

22   look at, and that happens pretty regularly.  But you can see

23   they keep on going down.  They get down to the silty clay down

24   here at around 10 1/2 feet, and they noted a strong odor.

25   Below that it's, "Dark, black, stained."  They continue on

1    down.  You can see down about 16 feet, "Odor and staining

2    dropping out."  And, in fact, the odors were high enough that

3    when you look at their field notes, they took the photo

4    ionization device and tested their work space to make sure

5    that the vapors weren't so high that it would be unsafe to

6    work.

7    Q    Let me stop you there and put up, from the same exhibit,

8    Neil, page 407.

9              DOCUMENT TECHNICIAN:  (Complied with request.)

10   BY MR. GROSSBART:

11   Q    This isn't your writing, is it?

12   A    No.  These are -- this is another part of the RI

13   appendices, so this is part of those 18,000 pages, and --

14   Q    Well, you mentioned, you mentioned concern about the odor

15   being too strong.  Is that reflected in these notes?

16   A    Yes, and you can see here, at 8:30 they began drilling at

17   MW-104.  They have a detailed record of what went on in the

18   field.  And here you can see, "Measuring head space on soil,

19   and many at 9,999-plus ppm."  And then it says, "Take

20   breathing zone PID readings at work station and drill rig."

21   Q    And why would field investigators need to do that?

22   A    Well, one of the aspects of doing this kind of work is

23   that you have to have a detailed health and safety plan, and

24   you have to work safely.  You're working around potentially

25   hazardous chemicals.  And so this was a routine test, when

1  they start to smell vapors, to just check that it was still

2  okay to work or if they needed to put on a respirator.  You

3  know, the workers needed to be protected.

4        MR. GROSSBART:  Okay.  Let's take that one down, and

5  let's move on to another topic.

6        DOCUMENT TECHNICIAN:  (Complied with request.)

7  BY MR. GROSSBART:

8  Q    At the beginning of your testimony, you mentioned three

9  opinions.  You've talked about your opinion so far about the

10  operational area being contaminated, and now I want to move on

11  to the second opinion, which, as I recall, you said that

12  routine discharges over time from the catch pond account for

13  the contamination in the northwest corner.  Got that straight?

14  A    Yes.

15  Q    Okay.  Generally describe for us the types of things that

16  you looked at that support that opinion.

17  A    Well, I looked at the aerial photographs.  I obtained

18  aerial photographs, as well as was provided some, and looked

19  at those over time.  I looked at some of the historical

20  accounts of the catch pond as they were -- or the catch pond

21  was basically nearing the end of its days and they were

22  getting ready to close it out.  They did some studies.  Those

23  were done by Kaivos, a local consulting firm.  And I also then

24  looked at the technical data, the groundwater and soil data,

25  as well as the field, other field explorations that were done.

1    Q    Now let me start with the aerial photographs and see if I

2    can't truncate this for everybody.

3         You were in the courtroom yesterday for Kris Stout's

4    expert testimony, were you not?

5    A    I was.

6    Q    And she commented on a number of aerial photographs.

7    You've heard that, right?

8    A    Yes.

9    Q    And you've looked at the same photographs, among others?

10   A    Yes.  I actually did my work independently before she did

11   hers.

12   Q    All right.  And do you agree with her testimony about the

13   features and so forth to the extent she pointed them out on

14   those photographs?

15   A    Yes, I do.

16   Q    Did you reach similar conclusions, or, indeed, the same

17   conclusions in doing your own work prior to even hearing

18   Ms. Stout's opinions some time ago?

19   A    In general, yes.

20   Q    Okay.  In terms of your opinion about catch pond

21   discharges, I'm not going to go through each photograph one by

22   one, but can you generally describe what is significant to

23   your opinion about the various changes over time that are

24   reflected on the photographs?  Just tell us generally, and we

25   can zoom in on something specifically, but why are the

1   photographs important?  What do they show?

2   A    Well, there were two things in particular about the

3   photographs that I thought were important and when I did my

4   analysis.  One is the fact that they were cutting ditches and

5   so forth.  Other, you know, that and other signs that they

6   were discharging liquids from the catch pond.  There's various

7   kinds of evidence that Ms. Stout talked about, and I saw those

8   as well.

9        And then also, then, the progression of the devegetation

10  over those years from about, oh, 1975 going forward in time.

11  I noticed that same progression in devegetation, and that said

12  to me that something was going on that was, you know, killing

13  off the vegetation slowly but surely, and I eventually

14  concluded that that was the discharges from the catch pond.

15  Q    Okay.  And the vegetation kept getting worse?  It

16  certainly never got better from '74 on?

17  A    Yes, and it was really the progression that was

18  significant over those years.

19  Q    Okay.  I want to talk about one particular photograph,

20  now.  It's the, I believe it's the last photograph we have

21  that's good before the catch pond was closed.  It's 5036 in

22  evidence.

23       Neil, please put it up.

24            DOCUMENT TECHNICIAN:  (Complied with request.)

25  ///

1674

1    BY MR. GROSSBART:

2    Q    And do you recognize this as the July 1983 photo?

3    A    Yes, I do.

4    Q    And this is one of the photographs you looked at early on

5    in your work?

6    A    Yes.

7            MR. GROSSBART:  All right.  Now let's -- give me

8    about like yay, Neil, please.

9            DOCUMENT TECHNICIAN:  (Complied with request.)

10   BY MR. GROSSBART:

11   Q    Now -- and, again, I don't want you to repeat what

12   Ms. Stout testified to, but there appear to be these lighter

13   areas, almost white on the photograph.  Do you see what I'm

14   referring to?

15   A    Yes.  In particular, there's white areas here.

16   Q    Have you heard anything in the courtroom over the past

17   week that you believe explains or bears on those whited areas?

18   And, if so, tell us what it is.

19   A    Well --

20   Q    And I don't mean to limit you to what you heard in the

21   courtroom.  Based on other documents you've seen, obviously.

22   Go ahead.

23   A    Well, based on some of the things I've heard in the

24   courtroom, but really also what I learned when I first started

25   to look at the information and continued to look at it, the

1    Kaivos reports, in particular, but this is confirmed by other

2    information, talk about the fact that, you know, the pond was

3    acid.  They needed to add lime to it to neutralize it, to get

4    the acidity down.  And so when you add lime, which is a

5    calcium chemical, to a pond that has hydrochloric acid in it,

6    among other things, you can get calcium chloride.  That's the

7    white salt that's used as a sidewalk deicer.  So -- and there

8    are other chemicals that went in there which would form salts

9    like that, and so there's a number of white salts that could

10   have been produced by the mix of chemicals between the acids

11   and what they used to neutralize it.  And so this seems

12   consistent with that, to me, that they had salty water from

13   the mix of chemicals in the pond.  It got discharged out from

14   the pond over the side, and, when it evaporated, it left

15   behind these white deposits.

16   Q    Did you hear testimony earlier this week from witnesses

17   about a hydrochloric acid spill that happened after the catch

18   pond had been enlarged?

19   A    Yes, I did.

20   Q    And you recognized -- and this 1983 photo is post or is

21   after that catch pond enlargement?  I think it's undisputed

22   that it happened by 1981; is that right?

23   A    Yes.  This is after the enlargement.

24   Q    Okay.  So acid in a catch pond, lime to neutralize acid,

25   produces this white crystalline combination?

1    A    Yeah.  Calcium chloride, so similar to table salt but a

2    little bit different.  Not sodium chloride, which would be

3    table salt, but calcium chloride.

4    Q    Okay.  And it's -- that's a -- it would be something you

5    could buy in a store and sprinkle on ice in crystal form?

6    That's the same chemical, essentially, is it not?

7    A    Yes, a lot of the sidewalk deicer, I believe, is calcium

8    chloride.

9         MR. GROSSBART:  All right.  Now, Neil, just put the

10   first page of Exhibit 3191 on the board, please.

11        DOCUMENT TECHNICIAN:  (Complied with request.)

12   BY MR. GROSSBART:

13   Q    Have you found any evidence of crystalline substance in

14   the northwest corner?

15   A    Yes.  ATC has a number of -- did a number of soil

16   borings.  The PZ soil borings in the northwest corner and the

17   well logs for those indicate white crystals.

18   Q    All right.  And we won't go through all of the well logs,

19   but is the white, is that white crystal findings in every well

20   log in the northwest corner or just some?

21   A    No, it's just some of them.  It's not all of them.

22   Q    All right.  And do you believe the white crystals that

23   were found in some but not all of the northwest corner samples

24   were there naturally?

25   A    Obviously you could get them there naturally but they're

1    not reported in the other logs, either from the PZ logs or

2    other logs, and so they specifically called out the fact that

3    there were white samples in the shallow -- excuse me, white,

4    white crystals in the shallow soil samples in selected PZ

5    borings in the northwest corner, and certainly suggests an

6    association with the same white patterns you see here in this

7    1983 photograph.

8    Q    All right.  Let me just show you one -- I just want to --

9    let's just do one well log.

10        Put up page 36 of this ATC report, and blow that up to

11   the extent you can, Neil.

12            DOCUMENT TECHNICIAN:  (Complied with request.)

13            MR. GROSSBART:  Give me this area generally, Neil,

14   please.

15            DOCUMENT TECHNICIAN:  (Complied with request.)

16   BY MR. GROSSBART:

17   Q    This -- tell us what this document is, and refer us to

18   what's relevant to the point you're making.

19   A    Well, again, this is one of the field logs, boring logs

20   that was prepared by the engineer geologist for ATC.  And you

21   can see, "Top 1 foot, dark brown, hard clay, white crystals."

22   And you see similar kinds of notations in some of the other PZ

23   logs.

24            MR. GROSSBART:  Okay.  And, Neil, please put up --

25   to the top of that.

1

2           DOCUMENT TECHNICIAN:  (Complied with request.)

3   BY MR. GROSSBART:

4   Q    Can you tell from this boring log what the well location

5   is here?

6   A    Yes.  Right, right in the very middle.  I overlooked it

7   at first.  It's PZ-10, SB-10, Soil Boring 10, which was then

8   completed as Piezometer 10.

9           MR. GROSSBART:  All right.  Just for -- just to

10  orient us, Neil, would you put up Exhibit 4400, page 60?  All

11  right.  Can you rotate that one click counterclockwise.  All

12  right.  And expand it, please.

13          DOCUMENT TECHNICIAN:  (Complied with request.)

14  BY MR. GROSSBART:

15  Q    This is an ATC diagram.  Do you recognize this outline as

16  at least generally the northwest corner area?

17  A    Yes.  That's the northwest corner source area footprint.

18  Q    Okay.  And is that the same PZ-10 referred to in the soil

19  boring log we just saw?

20  A    Yes, it is.  Same location.

21          MR. GROSSBART:  All right.  You can take that down,

22  Neil.  Thank you.

23          DOCUMENT TECHNICIAN:  (Complied with request.)

24  BY MR. GROSSBART:

25  Q    You mentioned Kaivos.  I want to put up one page from a

1    Kaivos letter.  It's 856A, page 75.

2        And, Neil, please blow up on the top half of that.

3            DOCUMENT TECHNICIAN:  (Complied with request.)

4            MR. GROSSBART:  Now the letter is dated -- highlight

5    the date, please.  Okay.

6            DOCUMENT TECHNICIAN:  (Complied with request.)

7    BY MR. GROSSBART:

8    Q    I read that as August 6, 1985.  Is that how you

9    understood it?

10   A    Yes.

11           MR. GROSSBART:  All right.  What -- this -- Neil,

12   highlight this for us, please.  From there, the first

13   sentence, to -- yeah, just, "North sides of the fenced plant

14   site."  Stop there.  And scroll down, please, and add that to

15   that.  Okay.  And you can highlight that.

16           DOCUMENT TECHNICIAN:  (Complied with request.)

17   BY MR. GROSSBART:

18   Q    All right.  Tell us your take-away, if you will, from

19   this particular report in 1985.

20   A    Well, they took a number of soil samples and checked the

21   pH, and you can see -- actually you can't see, but -- I take

22   that back.  You can just see Samples 4 and 5 poking through,

23   and they were really acid, and those are up in the vicinity of

24   the northwest corner.  They're kind of just past that little

25   apex, that point in the fence.

1   Q    Well, let me stop you --

2   A    And --

3   Q    I'm sorry.  Let me stop you there so you can show us

4   where you believe that's referring to.

5        And why don't we put up, for these purposes, the diagram,

6   the 1983 photo that we had up a minute ago, which is 5036.

7   And again, zoom in on this.

8        DOCUMENT TECHNICIAN:  (Complied with request.)

9   BY MR. GROSSBART:

10  Q    And you said the other side of the apex.  Did I hear you

11  correctly?

12  A    Yeah.  They generally took --

13  Q    Just generally draw it.

14  A    Yeah -- took samples in this general area.

15  Q    Okay.

16  A    And others as well.

17       MR. GROSSBART:  All right.  Let's go back to the

18  Kaivos document, not what we've highlighted.

19       DOCUMENT TECHNICIAN:  (Complied with request.)

20  BY MR. GROSSBART:

21  Q    Can you explain, if acid was in the catch pond -- well,

22  let's -- I don't want to -- I'll let you do the talking.

23       What does this suggest to you?  What does this

24  demonstrate to you that's relevant to your opinion that the

25  catch pond is the source of contamination for perc and other

1    chemicals migrating outward toward the northwest corner?

2    A    Well, the catch pond was acid.  They have other reports

3    on the catch pond, and, you know, that H -- that hydrochloric

4    acid had been spilled and reached the catch pond.  I think

5    they also mentioned sulfuric acid.  And so the pond was acid.

6    They indicate right here that acid residue from catch pond has

7    significantly affected the soil pH.  That suggested strongly

8    to me that they were discharged liquids from the catch pond.

9    And you see that evidence in those very low pHs, very acid

10   soils that are off from the corner of where the catch pond

11   was.

12             MR. GROSSBART:  Now let's take that down.

13             DOCUMENT TECHNICIAN:  (Complied with request.)

14   BY MR. GROSSBART:

15   Q    Let me ask you this question.  There are other Kaivos

16   studies that refer to not finding halocarbons above detection

17   limits, or words to that effect.  Do you recall looking at

18   material like that?

19   A    Yes.

20   Q    And you heard Dr. Powell testify about that as well, did

21   you not?

22   A    I did.

23   Q    And just generally tell us this.  Does that give you any

24   pause or concern about your opinion?

25   A    No, it doesn't.

1  Q    Well, explain.  Explain why, please.

2  A    Well, it was one analysis, one particular date.  We don't

3  know where the analysis was taken.  We don't know the method

4  detection limits.  We really don't know very much about the

5  sample at all, and so there's really not enough information to

6  really evaluate that sample, how accurate it would have been,

7  how representative it would have been.  So I'm not concerned

8  about, you know, the fact that a single sample of rather

9  unknown quality didn't show halocarbons.

10           MR. GROSSBART:  All right.  Let's move off that for

11  a minute, and let's go to 614-6, Neil, Demonstrative 614-6.

12           DOCUMENT TECHNICIAN:  (Complied with request.)

13  BY MR. GROSSBART:

14  Q    And I want to talk about another source area.  This is

15  the May 1979 photograph with the same EPA/MDEQ source area

16  diagram superimposed over the top of it, is it not, sir?

17  A    Yes.

18  Q    All right.  And we haven't heard much about this little

19  fellow right here.  What has the EPA -- just generally, has

20  the EPA concluded that that is a source area as well?

21  A    Yes.  The EPA has identified that as a source area, also.

22  Q    And do you agree with that particular finding of the EPA?

23  A    Yes, I do.  There is a direct-push sample.  I think it's

24  DP-63, at that spot, which shows it meets the criteria that

25  they defined and that it is a source area.

1    Q     Is there any indication to you from this aerial

2    photograph that supports the proposition that catch pond

3    discharges have led to or contributed to that source area?

4    A     Yes.  You can see that in the devegetated pattern.

5    Ms. Stout talked about this the other day, that there are sort

6    of two lobes, if you like.  There is one here, and there is

7    one here.

8    Q     Let's talk about the second one, because we're talking

9    about -- I want you to focus on the devegetation going to that

10   one.

11   A     Yes.  And so there is clearly devegetation that leads up

12   to the source area on -- the smaller source area that the EPA

13   defined.

14          MR. GROSSBART:  And, Neil, if you go to the

15   following photograph in time, page 8 of 614?

16          DOCUMENT TECHNICIAN:  (Complied with request.)

17   BY MR. GROSSBART:

18   Q     Do you still see the devegetation?

19   A     Yes.  In fact, it becomes clearer.  The connection

20   becomes clearer in this 1981 photo.  Basically the devegetated

21   area leads right to that green circle.

22          MR. GROSSBART:  All right.  Let's take that one

23   down, please.

24          DOCUMENT TECHNICIAN:  (Complied with request.)

25   ///

1684

1    BY MR. GROSSBART:

2    Q    Okay.  Well, if perc is, among other things, among other

3    chemicals, is being discharged from the catch pond, I take it

4    it has to get there first?  That's just logical, right?

5    A    That's correct.

6    Q    All right.  Have you considered, based upon your review

7    of the testimony and evidence and whatever else, ways and

8    means for perc to get to the catch pond at various points in

9    time over the course of which the catch pond was in business,

10   so to speak?

11   A    Yes, I have.

12   Q    Why don't you describe what you take from the scientific

13   data or the evidentiary record that leads you to conclude that

14   perc made its way to the catch pond in the first place.  Can

15   you generally talk about that?

16   A    Certainly.  Well, first of all, from past site

17   experience, I've seen other sites where you get to a, kind of

18   a low, quiet area in the flow from a site; so, for example, a

19   wetlands or a pond or something like that, a place where water

20   will get quiet.  And if wastewater from the site is going to

21   that, you often see things accumulate.

22        And, you know, we've talked about the properties of perc

23   and the fact that it's sparingly soluble, and so, for example,

24   if you have perc on the pavement and you wash it down with a

25   hose, what you're going to have is little bitty bubbles of

1685

1    perc getting carried by that stream of water.  So the perc is

2    going to be almost like suspended.  It's almost like suspended

3    sediment, how water will carry mud, and then, when the water

4    gets quiet, the mud settles out and you get a clay, you know,

5    deposit.  It would be the same kind of thing.

6         You would have the water carrying little bubbles of perc,

7    and because they're just small bubbles, they're carried along

8    with the water.  But when they get to a quiet place like the

9    catch pond, then they, you know, quietly sit there.  They

10   start to settle out.  They're heavier than water, so they can,

11   you know, they can be carried by the flowing water with the

12   turbulence, but then when they get to the catch pond, they can

13   settle out, and you'll get an accumulation of the dense

14   liquids down at the bottom of the pond.  And so in the low

15   places in the -- or the low place in the pond, you'll get an

16   accumulation of separate-phase perc.

17   Q    And you heard witnesses, various witnesses -- excuse me.

18        You've heard various witnesses talk about the hosing down

19   of chemicals in the ordinary course of business over the

20   course of the last week, have you not?

21   A    Yes, I have.

22   Q    And you've seen Dyce's 104(e) responses to the

23   government, talking about hoses and rinsewater and things

24   going to the catch pond?

25   A    Yes, and it's really those kinds of wastewater streams

1686

1    where you've got rinsewater, you've got hose -- you know,

2    things that have been hosed down, where you can get these

3    little bubbles suspended in the water.  They're not going to

4    evaporate particularly strongly because they're in the water.

5    The water is above them, or between them and between the

6    bubbles and the atmosphere, and so you get this ability to

7    carry little bubbles of perc down to the catch pond.

8    Q    And that's sort of consistent and typical with patterns

9    you've seen just in your experience generally doing this kind

10   of work?  Did I hear you say that?

11   A    Yes.  I've seen that kind of phenomenon at a lot of

12   sites.  It's really quite a common phenomenon.

13            MR. GROSSBART:  And, Neil, would you just -- let's

14   just go back to one of the earlier demonstratives we talked

15   about.  469, page 2, is from the ATC diagram.

16            DOCUMENT TECHNICIAN:  (Complied with request.)

17   BY MR. GROSSBART:

18   Q    That's right under a catch basin?

19   A    That's right.

20   Q    Are we seeing the same thing there, in effect?

21   A    In fact, we're seeing really what looks like the exact

22   same thing.  Dribs and drabs of material get hosed down and

23   get carried to that containment area, and that particular

24   boring has concentrations of perc that are above that soil

25   criterion that the EPA said.  And, if you remember, Dr. Powell

1    talked about that as being sort of the dead-certainty kind of

2    standard, that there was DNAPL there.  Well, the soil sample

3    right below that basin has that, you know, DNAPL signature,

4    and it seems clear to me that what happened is wash waters and

5    rinsewaters and so forth carried perc down to that basin.  The

6    perc settles out, seeped through cracks and breaks in the

7    concrete, and you see this indication that separate-phase

8    perc, DNAPL perc, came out of that basin and contaminated the

9    soil right under the basin.

10         MR. GROSSBART:  All right.  Now in the case of --

11   let's go back to our ROD diagram, Neil.  Page 121 of the ROD,

12   3051-121.  And blow up on the fun stuff.

13         DOCUMENT TECHNICIAN:  (Complied with request.)

14   BY MR. GROSSBART:

15   Q    All right.  We've talked a little bit about MP-105 and

16   that's the catch pond?  That's the source area over the catch

17   pond, in effect, right?

18   A    The source area right near the catch pond, yes.

19   Q    All right.  Let's focus on that.

20         And there was not perc detected underneath there until

21   you got quite deep.  Do you recall hearing that testimony and,

22   I mean --

23   A    Well, that's not quite correct.

24   Q    So -- well, tell me what's correct, and tell me about the

25   findings generally there.  I don't necessarily mean the

1    numbers, but the findings there and how they fit in with your

2    opinion that perc and other chemicals over the course of time

3    made their way to the historic catch pond.

4    A    Well, this was one of the membrane interface probes.

5    They got a bit of a hit, if you like.  They found evidence

6    of -- well, the ECD detector spiked up a bit right at the

7    interface between the fly ash.  So this was the fill that was

8    put in after the pond was closed.  So basically once they got

9    to the original soil, they got a bit of a hit there.  And

10   then, you know, it kind of flat-lined.  There wasn't any

11   detection until you then got down to the bedrock surface, and

12   then there was a good, high hit there.  And they actually took

13   a groundwater sample at that location of the groundwater that

14   came off the bedrock surface.

15   Q    All right.  And what's, what's, based upon what you

16   understand from looking at all of the evidence and data and so

17   forth, what's happened to the catch pond area over time in

18   terms of excavation or changes?

19   A    Well, you know, we don't know exactly what happened.

20   There aren't records.  There is -- there are some documents

21   which indicated that, you know, they needed to get the sludge,

22   the material in the catch pond out before they redeveloped it,

23   but then there's no records really to say whether that

24   happened, but it's a logical conclusion.  You wouldn't really

25   want to build on it.  I think Mr. Johnson described it as

1   muddy and yucky.  It wouldn't be a very good thing to build

2   on.  So presumably that was removed, and certainly the area

3   has been redeveloped, and, you know, fill was brought in, and

4   the whole area was changed.

5   Q    And before that, the catch pond actually was enlarged?

6   A    That's right.  It had an early configuration in the '70s

7   and then was enlarged in 1981 --

8   Q    All right.

9   A    -- I believe.

10  Q    And is the photographic evidence that you've seen --

11  well, I'll strike that.

12       Is it clear from the photography to you that in enlarging

13  the catch pond, it was, in effect, excavated to make it

14  bigger?

15  A    Yes.  I mean, it -- you know, the area within the berms

16  was expanded, and that would be a low area, so it looks like

17  they had to do some excavation there.

18  Q    Now there's another sampling point in the catch pond area

19  called MP-129.  I don't think it involved a laboratory sample,

20  but it didn't show a hit for perc.  Could you tell me whether

21  that is an anomaly that's problematic, or do you have some

22  thoughts on that?

23  A    Well, it's, you know, it's, I think it's about 15 feet or

24  16 feet away from MP-105.  The -- well, if we -- when we

25  consider what various witnesses have said, it sounds like

1    there was some sort of a liner, at least at some time,

2    underneath the pond.  And, you know, liners are actually very

3    tricky to construct.  A good liner is actually very difficult.

4    I spend about four lectures in my course on hazardous waste

5    site management talking about the difficulties and care that's

6    needed to construct liners.

7         But a liner under there would be at least partially

8    effective.  You wouldn't expect it to leak everywhere.  It

9    only has to leak one or a few places to be an ineffective

10   liner, and so it doesn't particularly surprise me that you

11   don't find, say, perc all the way from that surface down to

12   the bottom.  In fact, I wouldn't really expect it because I

13   would expect that it would be localized where the liner leaked

14   or where the edge of the liner occurs.  So that kind of

15   localized pattern is really what I would expect to find, and

16   so I -- you know, there's only really two, two samples, two MP

17   samples in that location, and I think you would, you know,

18   need to do more samples before you could really, you know,

19   fully characterize what was going on there.

20   Q    Okay.  Let's -- I want to switch gears a little bit and

21   talk about a couple of things that came up in Dr. Powell's

22   testimony.

23        And let's put up Demonstrative 279, page 7.

24            DOCUMENT TECHNICIAN:  (Complied with request.)

25   ///

1691

1  BY MR. GROSSBART:

2  Q    And I want to talk about two things, specifically as

3  follows.

4       First of all, orient us to what this demonstrative is

5  attempting to show generally, and then we'll ask you some more

6  specific questions.

7  A    Well, this is another pie chart, and it shows the

8  distribution of chemicals in various groundwater samples that

9  were collected in the, you know, in the operational area in

10 the northwest corner.  This one just shows the distribution.

11 It's not scaled to the concentration, so they're all the same

12 size.  You don't have information on the concentra-, you know,

13 the overall concentrations in these particular samples, but it

14 does show the mix of the chemicals.

15 Q    All right.  Let me see if I can break that down a little.

16      We've got different colors.  Well, perc is red.

17 A    Perc is red.

18 Q    And we have different colors.  We'll put aside yellow for

19 other chlorinated solvents; is that right?

20 A    Yes, and those are the degradation byproducts from when

21 perc is biodegraded.

22 Q    All right.  We'll talk about -- let's talk about that for

23 a second.

24      Left to itself in the right conditions, perc changes over

25 time?  It degrades; is that right?

1    A    That's right.  It's -- you know, the chlorines on the

2    perc come off, and you go from perc to trichloroethylene to

3    dichloroethene as basically bacteria take chlorine atoms off

4    of the molecule.

5    Q    All right.  And do I understand you correctly that what

6    you're showing here, among other things, is, for example, the

7    ratio of perc on the one hand to some of these degradation

8    products on the other?

9    A    Yes.  That shows in here.

10   Q    And you also have yellow for BTEX, and that's showing in

11   comparative ratios to BTEX as well?  Is that what we're seeing

12   here?

13   A    Yes.

14   Q    All right.  Now you've heard -- is it true, as a general

15   proposition, based upon your review of the scientific data,

16   that the area around PT-2 and 6 is kind of ground zero in the

17   northwest corner, if you will?  Is that a fair statement?

18   A    That's a fair statement.

19   Q    All right.  If you're just looking at ratios and looking

20   at PT-2 and PT-6, which pie that's on this chart is the most

21   similar to PT-2 and PT-6?

22   A    Well, there are three pies which have that signature of

23   basically mostly red, PT-2 and PT-6, and then MP-105, the

24   groundwater sample that was collected below the former catch

25   pond.

1693

1  Q    All right.  Let me ask you a couple questions here.

2        Start with BTEX.  We don't see the yellow coloring that

3  you have for BTEX out in the northwest corner.  Why not?  What

4  is it about BTEX that helps you understand that condition?

5  A    Well, it's a little bit complicated, but these compounds

6  all biodegrade.  Bacteria will basically cause chemical

7  reactions that make these chemicals turn into other chemicals.

8  The BTEX are very readily biodegraded.  They're pretty easy to

9  break down, and they're broken down in reactions with oxygen.

10 So, in essence, the carbon becomes carbon dioxide, and you

11 get -- it's really the same kind of reactions that you would

12 see in a compost pile, how a compost pile breaks down organic

13 matter.  So it is what is known as an aerobic reaction, and

14 those move along pretty quickly.

15       So what you see is a pattern where the BTEX is up on the

16 site, and that's, you know, where there's high concentrations

17 of these BTEX compounds.  Groundwater is flowing generally to

18 the northwest, and so what you see is those compounds

19 disappear as they get biodegraded.

20 Q    What about BTEX in the catch pond?  Where would it go if

21 spilled BTEX went into the catch pond?

22 A    Well, again, if you remember back to our glass of or

23 pitcher of perc on the bottom, water in the middle, BTEX on

24 the top, BTEX is a floater.  BTEX is going to be on the

25 surface.  It's very volatile.  It evaporates readily, so that

1    stuff is going to evaporate off of the top of the pond for the

2    most part.

3    Q    Might not even make it out there because it's first in

4    line for evaporation?

5    A    Yes.  It could well evaporate off of the pond,

6    particularly -- the pond, at least as I understand it, wasn't

7    drained that often, and it would have some time to sit out

8    there and evaporate.

9    Q    Okay.  And let's talk about the perc byproducts or

10   biodegradation products.  There are, if I'm understanding this

11   pie chart right, there is, for example, biodegradation going

12   on here and here.  We see, we see more colorful pie, right?

13   A    Yes.

14   Q    All right.  Less so here?  Is that what you're depicting

15   on this demonstrative?

16   A    Yes.  Much less so.

17   Q    And what is it about the conditions or the perc

18   concentrations at or around PT-2 and 6 that, in your judgment,

19   explain why there's less degradation, perc degradation there

20   than higher and lower on the chart?

21   A    Well, people have studied this, and there's scientific

22   literature about this, and when you have DNAPL, in essence the

23   concentrations are too high.  You poison the bugs.  You poison

24   the reactions.  And so DNAPL doesn't get biodegraded very,

25   very much at all, if at all.  So it's a different situation

1    between DNAPL and then chemicals that are dissolved in the

2    groundwater.  The dissolved chemicals will be biodegraded

3    fairly readily, but the DNAPL is not.  And this would

4    indicate, of course, that we're right at a DNAPL source.

5    That's why those concentrations or those mixes are so

6    dominated by perc.

7    Q    Now in terms of wastewater getting to the catch pond and

8    moving chemicals with it and so forth, have you seen, in the

9    record, in the evidentiary record you reviewed and what you

10   witnessed in court, and can you speak to sort of the

11   wastewater issue generally and Dyce's wastewater management

12   challenges?  What have you seen in those regards that sort of

13   just bear on the issue of wastewater management and how it

14   might be pertinent to your opinion?

15   A    Well, clearly they were generating wastewater.  There's

16   discussion in the Versar report, for example, of the fact that

17   they had various kinds of rinsewaters.  There is discussion in

18   Dyce's response to the 104(e) request from the EPA, again,

19   that they had various kinds of rinsewaters, as well as then

20   they also had stormwater that was collecting and going to the

21   catch pond.

22          MR. GROSSBART:  Let me show you Exhibit 382 in

23   evidence.

24          DOCUMENT TECHNICIAN:  (Complied with request.)

25   ///


                              1696

1    BY MR. GROSSBART:

2    Q    And is this one of the documents you've seen in doing

3    your work?

4    A    Yes.  This is a report of a site visit by Montana

5    Department of Health and Environmental Sciences.

6             MR. GROSSBART:  All right.  Neil, would you go to

7    the next page, please?

8             DOCUMENT TECHNICIAN:  (Complied with request.)

9             MR. GROSSBART:  Excuse me.  Page 3 of the document.

10   Highlight the top, first full sentence.

11            DOCUMENT TECHNICIAN:  (Complied with request.)

12   BY MR. GROSSBART:

13   Q    Is that MDEQ finding and statement there consistent with

14   your take-aways from looking at all of the evidence and data

15   that's available?

16   A    Yeah.  This dates from 1992 but clearly would be

17   indicative of kind of what their practices were and that they

18   encountered problems with their wastewater management during

19   that site visit.  And as they say here, "Clearly Dyce Chemical

20   does not have control of its waste streams."  That would be

21   these water streams.

22   Q    Okay.  Let's move on, then, to the third and last of your

23   opinions.

24       Take this down, Neil.

25            DOCUMENT TECHNICIAN:  (Complied with request.)

1   BY MR. GROSSBART:

2   Q    Now you've heard testimony from Dr. Powell that a very

3   large volume, one-time spill flowed through a ditch along the

4   railroad spur to the northwest corner, probably sometime in

5   1975, '76, or '77, and that that spill explains the

6   contamination here.  I don't mean to put words in his mouth,

7   but is that what you heard as well?

8   A    Generally something like that, yes.

9   Q    And I take it you disagree with that?

10  A    Yes.  I don't think that was the case at all.

11  Q    All right.  Tell me why.

12  A    Well --

13  Q    Tell us why.

14  A    We've talked about the properties of perc and the fact

15  that this perc is really a very runny fluid.  It's less

16  viscose than water.  It would very readily infiltrate into the

17  soil if it went down that ditch as they have said, and you'd

18  see that evidence in the analytical data.  You would see

19  concentrations that would reflect the fact that perc had

20  traveled down that ditch, soaked into the ground, and then

21  acted as a source to continue contaminating groundwater.  So

22  if that had happened, I'd expect to see, you know, some very

23  high concentrations in those wells near that ditch.

24  Q    Well --

25  A    And that doesn't happen.

1    Q    Well, let's see if we can cut through this a little bit.

2    Let me put up page 464, page 2.  It's a demonstrative that

3    Ms. Stout used yesterday.  And again, talk to me generally

4    about MW-101 and BH-F in terms -- just their relativeness to

5    one another in terms of the contamination there.

6    A    Well, BH-F is highly contaminated.  It has high

7    concentrations of organic, organic, chlorinated organic

8    compounds; a perc concentration that's well above the

9    groundwater criterion that the EPA set.

10           MR. LYNCH:  Again, Your Honor, can we get a

11   reference to the document the witness is reading from?

12   BY MR. GROSSBART:

13   Q    All right.  Were you reading from a document bearing on

14   this?

15   A    I was looking again at that same diagram that was in the

16   Maxim report.

17   Q    Okay.  What about MW-101 relative to BH-F?

18   A    MW-101 has much lower concentrations of perc, you know,

19   as opposed to -- well, Borehole F has concentrations of, you

20   know, 13,000 of perc.  MW-101 has concentrations of perc that

21   are in the 10s.  A little bit of variation.  It was sampled a

22   number of times, but, you know, in the ballpark of, oh, 10 to

23   80, so much, much lower concentration.  Much less perc than

24   you see --

25           MR. LYNCH:  Your Honor?

1          THE WITNESS:  -- in Borehole F.

2          MR. LYNCH:  MW-101 isn't in the Maxim report.  Are

3   you looking at a different document for that?

4          THE WITNESS:  Yes.  I have a spreadsheet, an excerpt

5   from my spreadsheet that I developed from the Montana DEQ

6   data.

7          MR. LYNCH:  Do you have a copy of that, Counsel?

8   BY MR. GROSSBART:

9   Q    You took what you're reading for for MW-101 as the data

10  you extracted from the DEQ database?

11  A    That's correct.

12  Q    And you put a disk like this on your computer and wrote

13  down, on a piece of paper, the MW-101 findings; is that, in

14  effect, what you did?  Maybe a little fancier than that?

15  A    Yeah.  I didn't write it down on a piece of paper, but I

16  transferred data from the database to a spreadsheet where it

17  was just much easier to work with.

18  Q    It's not your data?  It's the MDEQ's data, right?  Just

19  so it's clear?

20  A    Yes.

21         MR. GROSSBART:  All right.  You can have mine,

22  Mr. Lynch (handing).

23  BY MR. GROSSBART:

24  Q    All right.  In terms of its location on this diagram,

25  we've heard terms about upgradient, downgradient.  Can you,

1    from that perspective, explain the orientation of MW-101 to

2    BH-F spatially, if you will?

3    A    Well, the general direction of groundwater flow is

4    roughly in this direction, up towards the northwest.  Okay.

5    And you can see that Borehole F, the contaminated borehole is

6    downstream of this area, downgradient, excuse me, of this area

7    where Ms. Stout showed that wastewater from the pond, from the

8    catch pond, would have gone.  Okay.

9        MW-101 is not downgradient of that area.  It is,

10   however -- let me just draw it in here.  That is the -- that's

11   the ditch.  It is downgradient of the ditch, and so if perc

12   had traveled down that ditch in the hundreds of gallons that

13   they talk about, that ditch would be contaminated with perc,

14   and then you would see MW-101 to be highly contaminated with

15   perc as well.

16            MR. GROSSBART:  Okay.  Now let's take -- you can

17   leave that up.  Actually, leave the ditch there, too.

18            DOCUMENT TECHNICIAN:  (Complied with request.)

19   BY MR. GROSSBART:

20   Q    Would it be, given all this mapping and whatnot and so

21   forth, would it be possible to go to the site and figure out

22   where that ditch was historically and test it?

23   A    Well, you certainly wouldn't be able to do it visually,

24   but as you can see, if you have all these maps, we figured out

25   where things were historically.  It would be a simple matter

1  to go out, use a global positioning system device, which is

2  what they use to figure out where they put their wells after

3  they're done, and go and find where the ditch had been and put

4  in some of these relatively inexpensive direct-push borings

5  and sample that ditch right along the length of it.

6  Q    And if the surface there was now hard or concrete, you

7  could drill through that, I assume?  We've got -- we've come

8  that far with technology, have we not?

9  A    Yes.  I mean, you can see from the various borings that

10 were put on the site, they've basically gotten through

11 everything.  Some of it has been a little bit harder,

12 obviously, but they've gotten through everything and put in

13 bore holes all over the place.

14 Q    All right.  Why don't we just -- let's go back to, let's

15 get back down from 20,000 feet down to the ground level.

16      And, Neil, why don't you put up 3674, page 52.

17           DOCUMENT TECHNICIAN:  (Complied with request.)

18 BY MR. GROSSBART:

19 Q    Now, again, you were at the site --

20 A    That's correct.

21 Q    -- this summer.

22      And this is the railroad spur coming from the south and

23 moving to the northwest.  Have I oriented that right?

24 A    Yeah.  You can just barely make out the edges of the rail

25 ties and then the line where the rail itself is.

1    Q    All right.  And you know from your work that fill was put

2    in this area in order to extend the railroad track and

3    reconfigure the plant over time?

4    A    Yes.  You can see that in the aerial photographs, and

5    when you go to the site, it's very clear.  You can see this

6    kind of rise here in the land surface where the fill was

7    placed.

8    Q    All right.  And so unlike, for example, the catch pond

9    area -- well, strike that.

10        In the ditch, it's sort of just the other side of these

11   railroad tracks?  You can't really see it well in this photo,

12   but if this is the track, is it your understanding that the

13   ditch is the other side of it?

14   A    Yeah, just, just -- well, yeah, over on the other side

15   from this viewpoint.

16   Q    Okay.  And so that ditch, if I'm understanding these

17   photos correctly, that ditch is underneath the fill that was

18   added in later years?

19   A    That's correct.

20   Q    Is it your belief there are areas along Soco's -- the

21   ditch that Soco uses as the basis for its opinion that haven't

22   been excavated but actually, I think in the words of

23   Mr. Sullivan, were entombed by fill that has come later?

24   A    Yes.  I'd expect, you know, essentially all of the soil

25   beneath that ditch would still be there.  Perhaps a little bit

1703

1    might have been scraped off the surface.  They might have

2    gotten some topsoil, but I would expect most of that soil to

3    be there and then other soil placed on top of it.

4    Q    And in your judgment, if the volumes of perc that Soco

5    alleges traveled down that ditch really happened, more likely

6    than not a program of ditch testing would reveal some evidence

7    of that?

8           MR. LYNCH:  Asked and answered.

9           THE COURT:  Overruled.

10           THE WITNESS:  Yes.

11   BY MR. GROSSBART:

12   Q    You have not seen, in your work, any evidence that

13   suggests that Soco or its consultants have attempted to do so,

14   have you?

15   A    No.

16           MR. GROSSBART:  I have nothing further, Your Honor.

17           THE COURT:  You may cross.

18                          CROSS-EXAMINATION

19   BY MR. LYNCH:

20   Q    Good morning, Dr. Shanahan.

21   A    Good morning.

22   Q    First I'd like to just deal with some of these

23   distractions here.

24        It's your opinion that it's more likely than not that the

25   contamination that EPA found in the northwest corner source

1   area originated from an event or events that happened prior to

2   1987, isn't it?

3   A    That's correct.  I wouldn't say an event, though.  I

4   would say it was the more or less continuous process,

5   intermittent but continuous process of discharge from the

6   catch pond that occurred over time.

7   Q    It happened prior to 1987, though?

8   A    Yes, prior to the closure of the catch pond.

9   Q    You started the day talking about samples from the

10  operational area and discussing what was found in those.

11  Isn't it true that the contaminants of concern identified by

12  EPA for the Lockwood solvent site are perc and its degradation

13  products?

14  A    Yes.

15  Q    The BTEX compounds you discussed have not been identified

16  as contaminants of concern for the remedial investigation,

17  have they?

18  A    No.  They aren't carried in the groundwater plume because

19  of the biodegradation.

20  Q    And you understand, in this action, Soco is not seeking

21  coverage for contamination found in the operation area, don't

22  you?

23        MR. GROSSBART:  Objection to that.  He hasn't given

24  an opinion on what Soco is seeking coverage on.

25        THE COURT:  Yeah.  I'll sustain it.

1  BY MR. LYNCH:

2  Q    You talked about your findings from a couple of samples

3  this morning in the operational area, MW-104 and Borehole M.

4  Is the mixture of chemicals that's found at Borehole M in the

5  operational area similar to what we see in the northwest

6  corner source area?

7  A    No.

8  Q    Significantly different?

9  A    Yes.  There's substantial BTEX in that sample.

10  Q    Oh, at MW-104.

11  A    If I could consult my spreadsheet to refresh my memory?

12  Q    Certainly.

13  A    No, MW-104 also has BTEX as well as biodegradation

14  products.

15        MR. LYNCH:  Could we please go to Figure 7 of the

16  record of decision?  I believe it's 3059, page 121.

17        DOCUMENT TECHNICIAN:  (Complied with request.)

18  BY MR. LYNCH:

19  Q    This, again, is the figure from the EPA depicting various

20  source areas on the site; isn't that correct?

21  A    That's correct.

22  Q    And it's true that the source areas identified in green

23  on this diagram are identified as source areas because they

24  contain contaminated soil, correct?

25  A    Not just contaminated soil, I don't believe.  It's based

1    on the three criteria that they define in the RI addendum.

2              MR. LYNCH:  Let's look at the legend of the diagram,

3    please.

4              DOCUMENT TECHNICIAN:  (Complied with request.)

5    BY MR. LYNCH:

6    Q    The green areas, which -- that you just identified as the

7    source areas, are labeled as estimated extent of source area

8    saturated zone soil and estimated extent of contaminated

9    vadose zone soil above remediation goals.

10   A    Correct.

11   Q    And the reason EPA is concerned with the places where

12   contamination is found in soil is because soil samples are the

13   most pertinent samples for characterizing a DNAPL source area,

14   correct?

15   A    No, no.  I think you've misinterpreted the legend.  Those

16   three indicators are used to indicate where DNAPL is present,

17   where DNAPL would contaminate soil.  So they use the three

18   indicators to draw those zones, those, you know, green blobs,

19   but those are based on these indicators which give the

20   indication that there's DNAPL in the soils.

21   Q    Would you agree that soil samples are the most pertinent

22   for characterizing a DNAPL source area?

23   A    No, I wouldn't.  I think you have to consider the

24   totality of the data.

25   Q    Are soil samples the most pertinent sample for finding,

1707

1  for determining the location of the release that caused the

2  contamination?

3  A    Well, they're probably the most unequivocal, but I don't

4  know that they're the most pertinent.  It depends on what data

5  you have available, and, you know, some of these are clearly

6  not drawn from soil samples, in my opinion.

7           MR. LYNCH:  May I approach, Your Honor?

8           THE COURT:  Yes.

9  BY MR. LYNCH:

10  Q    (Handing.)  You filed a report in connection with this

11  matter, didn't you --

12  A    I did.

13  Q    -- Dr. Shanahan?

14       On page 17 of your report, talking about contamination at

15  the site, you state, "Soil samples are the most pertinent

16  inasmuch as flowing groundwater can bring high concentrations

17  from upstream locations and do not necessarily reflect local

18  origin."  Did I read that correctly?

19  A    I am not finding it.  Where is it?

20  Q    Top of page 17.

21  A    I did say that.

22  Q    Now the sample you're relying on primarily at MP-105 is

23  the groundwater sample, correct?

24  A    That's correct.

25  Q    That was a groundwater sample found deep in the ground,

1    just above bedrock, correct?

2    A     That's right.

3    Q     Okay.  And according to your own words, that could

4    indicate concentrations of perc coming from an upstream

5    location and does not necessarily reflect local origin,

6    correct?

7    A     That could, yes.  But I do want to add one caveat to

8    that, is we've talked about these three criteria that are in

9    the RI.  When you actually look at the EPA guidance

10   documentation, they have other criteria which are indicative

11   of DNAPL presence, and one of them is the pattern vertically,

12   and so the fact that you see a high hit down on the bedrock

13   surface is one of the things that the EPA indicates is, you

14   know, is an indicator of DNAPL.  So what you're seeing with

15   that high concentration right on the bedrock surface is the

16   likelihood that perc DNAPL -- and again, this is strongly

17   contaminated by perc -- that perc DNAPL is sitting somewhere

18   on the bedrock surface not far from that site, that sampling

19   location.

20   Q     And perc can flow along the surface of the bedrock,

21   correct?

22   A     Yes, yes.

23   Q     DNAPL perc.  So it could have flowed from upstream?

24   A     Well, it wouldn't necessarily flow from upstream.  You've

25   got something that's heavy flowing on a surface, and so what

1709

1    it's going to do is flow from uphill on the bedrock.

2    Q    "Uphill" is fine.

3         Now even though you, in your own report, say soil samples

4    are the most pertinent samples, I don't know that you

5    discussed a single soil sample in your entire direct

6    examination.

7         Can you put up -- what was your demonstrative chart?  I

8    believe 274, their demonstrative.

9         (Discussion off the record at counsel table.)

10            MS. ENERSON:  279.

11            MR. LYNCH:  279.

12            MS. ENERSON:  Page 7.

13            MR. LYNCH:  279, page 7.

14            DOCUMENT TECHNICIAN:  (Complied with request.)

15            THE COURT:  Let's stop here and take another quick

16   break.

17            THE LAW CLERK:  All rise.

18        (Recess taken from 10:50:54 to 11:03:25.)

19        (Open court.)

20        (Jury present.)

21            THE COURT:  Please be seated.

22   BY MR. LYNCH:

23   Q    Dr. Shanahan, we're again looking at your

24   Demonstrative 279.  I believe on direct you indicated that --

25   well, just looking at the ratios here, you've made MP-105 look

1    just like PT-2 and PT-6, correct?

2    A    That's what it looks like, yes.

3    Q    Your demonstrative, you indicated, doesn't have

4    information on overall concentrations, does it?

5    A    Excuse me?

6    Q    Your demonstrative does not have information on overall

7    concentrations, does it?

8    A    No, they're not scaled to concentration.

9    Q    But that evidence is in the record?  It's in the

10   documents you have before you, isn't it?

11   A    Oh, yes, yes.

12   Q    Isn't it a fact that if you actually look at the

13   concentrations, the perc found in the groundwater at MP-105,

14   prior to just, prior to just wells drilled prior to 2003,

15   which is the limit you put on this, is 24 times less than what

16   was found at PT-2 and over 40 times less than what was found

17   at PT-6, the highest concentrations in both those samples?

18        Exhibit 3191, Dr. Shanahan.

19   A    What's Exhibit 3191?

20   Q    The ATC report that records PT-2 and PT-6.

21   A    Yes.  I don't know about the exact ratios that you just

22   said, but those have considerably -- PT-2 and PT-6 have much

23   higher concentrations of perc, but, nonetheless, the

24   concentration of perc that you see at MP-105 is above that

25   threshold that's indicative of the presence of DNAPL, and, as

1    I said, the other indicator of DNAPL being present is --

2              MR. LYNCH:  Your Honor, we'd ask that the witness be

3    directed to just answer the question.

4              THE WITNESS:  -- its orientation in the vertical.

5              THE COURT:  Pardon?

6              MR. LYNCH:  We'd ask that the witness just answer

7    the question without the narrative.

8              MR. GROSSBART:  He's correctly answering the

9    question.

10             THE COURT:  No, I thought he answered.  But I have

11   to -- I have to follow this procedure I learned in order to

12   get hooked back up.

13        (Discussion off the record.)

14             THE COURT:  Yeah, I'll sustain the objection.  He

15   asked about the ATC report that records PT-2 and PT-6.

16             Go ahead and start again.

17             MR. LYNCH:  Thank you, Your Honor.

18   BY MR. LYNCH:

19   Q    Dr. Shanahan, isn't it true that perc released at the

20   surface soils, as it tends to go through the vadose zone and

21   then into the saturated zone, will tend to leave a residual

22   trail of DNAPL as it goes down vertically?

23   A    That's correct.

24   Q    And soil samples, I believe you indicated, are the most

25   pertinent samples to examine when looking for an origin.  You

1  read that in your record just a few minutes ago, correct?

2  A     (No response.)

3  Q     MP-105, do you recall what the soil sample reading was?

4  A     I don't recall, I don't recall the specific number, but I

5  know that there was a soil sample taken at MP-105.

6  Q     I can tell you it was .17J.

7  A     Yes, but if we were to put up the MP log for that well,

8  what you'll see is the soil sample was taken -- they basically

9  missed the hit.  As you go down the log, you get a spike at

10  the original land surface, and then, I don't know, I think it

11  was about 2 feet down below that is where they took the soil

12  sample after the ECD log had come back down.  So they missed,

13  they missed the hot spot, if you like, and they did not take a

14  soil sample down at the lower part where they again found high

15  concentrations.

16  Q     They had no MIP hits except for the one at the top and

17  the one at the very bottom, correct?

18  A     Yes, and then they took the soil sample where they didn't

19  have an MIP hit.

20  Q     The only soil sample we have from MP-105 is 1,000

21  times -- more than 1,000 times less than the site DNAPL

22  indicator used by the government contractors; isn't that

23  correct?

24  A     You'd have to show me the actual number.  I don't recall

25  the specific number.  If we could look at the log, I can see

1    that.

2             MR. LYNCH:  Julianne, why don't you pull up -- it

3    will be easier -- Exhibit 3058-0038.  It's a page from, I

4    believe it is, the RI addendum.  Can you pull out the soil

5    sample information for MP-105?  Right where I put the red

6    mark.

7             DOCUMENT TECHNICIAN:  (Complied with request.)

8    BY MR. LYNCH:

9    Q    And the perc hit on that, Dr. Shanahan, is as I

10   represented, 0.17J, correct?

11   A    Yes, but again, I asked to see the log --

12            MR. LYNCH:  Your Honor, I'd just ask that the

13   witness answer the question.

14            THE COURT:  Well, yeah.  Answer the question.  He

15   asked about the perc hit.

16            THE WITNESS:  Yeah, it is .17J, the J indicating

17   it's an approximate quantification.

18            MR. LYNCH:  If you'd go to the same document,

19   Julianne, page 35?

20            DOCUMENT TECHNICIAN:  (Complied with request.)

21   BY MR. LYNCH:

22   Q    Here, Dr. Shanahan, we see the results of some other soil

23   samples collected at the Dyce site.  And SB-10, which I

24   believe is a sample you were discussing earlier in the

25   northwest corner, it's over 7,500 times the perc that was

1   found at MP-105; isn't that correct?

2   A    Yes.  These numbers are higher, certainly.

3   Q    Significantly higher?

4   A    Yes.

5   Q    Thousands and thousands of times higher, in many

6   instances?

7   A    Yes.

8   Q    And there's been other tests that have been done in the

9   catch pond, correct, at least one other boring that you and

10  Mr. Grossbart discussed --

11  A    That's correct.

12  Q    -- MP-129.  And you didn't find that conclusive as to

13  whether -- or informative as to whether the catch pond is, in

14  fact, the source of the northwest corner?

15  A    No.  As I indicated, all they did there was the ECD log,

16  and that one, you know, came up essentially clean.  But, of

17  course, we have only those two data points at the catch pond

18  as opposed to the many data points in the northwest corner, so

19  it's much more difficult to understand what's going on at the

20  catch pond with many fewer data.

21  Q    Would it assist your conclusion to have more data points

22  in the catch pond area?

23  A    I would expect it would be useful to have more data,

24  certainly.

25  Q    Okay.  And you haven't asked for any more samples to be

1    taken from that area, have you?

2    A    I didn't know I could.  You know, it's not my site.

3            MR. LYNCH:  You can close out of this, Julianne.

4            DOCUMENT TECHNICIAN:  (Complied with request.)

5    BY MR. LYNCH:

6    Q    There's been another sample that was taken at the catch

7    pond that you referred to, the Kaivos sample, correct, in

8    1985?

9    A    Yes.

10   Q    And Kaivos found no indication of halocarbons above their

11   detection limit, correct?

12   A    That's right.

13   Q    Perc is a halocarbon, correct?

14   A    That's right.

15   Q    So Kaivos found no perc in the catch pond in 1985?

16   A    Well, actually you said above the detection limit.  I

17   don't even know what the detection limit was.  They don't

18   indicate that.  So at least, you know, for whatever detection

19   limit they had, they didn't find anything, but when you look

20   at those Kaivos reports, most of the detection limits are

21   pretty high.

22   Q    If there was a significant amount of DNAPL perc in the

23   bottom of that catch pond, don't you think it's more likely

24   than not that Kaivos would have detected it in that test?

25   A    Depends on where they sampled in the pond, among other

1    things, and also, you know, what was going on at the time.

2    Q    But we know they tested both liquids and solids from the

3    bottom of the pond, don't we?

4    A    Well, I don't know if they say from the bottom.  They say

5    they sampled both liquids and solids.

6    Q    And even without knowing the detection limits, you think

7    that if there was DNAPL perc in the catch pond, it's more

8    likely than not that Kaivos would have found it in that test?

9    A    No, I don't necessarily think so.  I mean, for example,

10   when you look at the later pit records, you see very low

11   concentrations of perc in those pit records.  I don't think

12   they would have been detectable -- or, well, I shouldn't say

13   that.  I don't know if they would have been detectable in the

14   Kaivos, because I don't know their detection limits, but

15   they're low concentrations, and yet we know from the, from

16   that one borehole in the corner of the containment pit that

17   DNAPL perc came out of that containment pit.  So despite

18   seeing very low concentrations in the water phase, we know

19   that there was DNAPL there.

20   Q    You had your deposition taken in this case, didn't you,

21   Dr. Shanahan?

22   A    I did.

23   Q    And you swore to tell the truth?

24   A    I did, yes.

25           MR. LYNCH:  May I approach, Your Honor?

1          THE COURT:  Yeah.

2     BY MR. LYNCH:

3     Q     (Handing.)  I'm going to direct your attention to

4     page 168 of your deposition, Dr. Shanahan, and we're

5     discussing the Kaivos sample where they did not detect perc in

6     the catch pond.  168, line 10.

7          Question, "Even without knowing the detection limits, can

8     you form an opinion as to whether it's more likely than not

9     that if these tests, if DNAPL perc were present in the catch

10    pond at the time these tests were taken, that the tests would

11    have detected it?"

12         Answer, "It well could, yes."

13         Question, "More likely than not?"

14         Answer, "I would think so, yes."

15         That was your testimony, wasn't it, Dr. Shanahan?

16    A     It was, but it was before I had seen the pit records, and

17    so I would say the information from the pit records and also

18    the boring that ATC had done, you know, I've changed my

19    opinion a bit on this because I've seen that additional data.

20    Q     You looked at some aerial photos that you interpreted as

21    having signs of repeated releases from the catch pond,

22    correct?

23    A     That's right.

24    Q     Yet we know that you've been here all week and seen the

25    documents that have been introduced.  We've seen the

1718

1   Continental inspection report from 1982.  We know that when

2   they inspected the site, they didn't mention anything about

3   those obvious signs of drainage, did they?

4   A    I don't recall.  I'm not sure that I've even seen that

5   document.

6   Q    You've been here all week, haven't you?

7   A    I have.

8   Q    We saw records from an EPA and state official inspection

9   of the Dyce site in 1985.  Again, no mention of any sign of

10  drainage from the catch pond, was there?

11  A    Which document is that?

12  Q    The notations regarding the EPA and state official

13  inspection of the site in 1985.

14  A    It doesn't ring a bell.

15  Q    You've referenced a couple times the ATC samples.  You're

16  referring to the samples that were done in, I believe it was,

17  2003 from the concrete containment unit?

18  A    I forget the exact date, but, yes, it's the one from the

19  concrete containment area.

20          MR. LYNCH:  Julianne, can you please pull up 4811?

21          DOCUMENT TECHNICIAN:  (Complied with request.)

22  BY MR. LYNCH:

23  Q    Are these the samples you're referring to, Dr. Shanahan?

24  A    It's in this document, yes.

25  Q    And it's your opinion that the sample -- these samples

1    were taken in 2003, correct?

2    A    Correct.

3    Q    From a concrete containment, subsequent concrete

4    containment unit that didn't exist in the mid 1970s?

5    A    That's right.  It was built after that.

6    Q    And I believe you said it's your opinion that these

7    samples are the exact same thing we'd expect to see in a

8    release from a catch pond -- in contamination resulting in a

9    release from the catch pond?

10   A    Well, yes.  In essence, these containment pits replaced

11   the catch pond, so it's, it's the same kind of water.  The

12   same kind of wastewater would have been going to these, as I

13   understand it, that went to the catch pond back in the earlier

14   days.

15          MR. LYNCH:  Julianne, could you go to the next page,

16   please?  Pull up the final paragraph, "Concrete, soil,

17   analytical results, flammable containment areas."

18          DOCUMENT TECHNICIAN:  (Complied with request.)

19   BY MR. LYNCH:

20   Q    "Constituents detected in either one or both of the

21   concrete samples include ethylbenzene, methylene chloride,

22   PCE, and xylenes.  None of the constituent concentrations

23   exceeded the PRGs.  The soil sample collected immediately

24   beneath the containment areas exceeded the PRGs for

25   ethylbenzene, PCE, TCE, and total xylenes."

1          Dr. Shanahan, are ethylbenzene and xylenes, at least,

2     BTEX compounds?

3     A     Well, yes, they're BTEX.

4     Q     And BTEX compounds are virtually absent in the northwest

5     corner, aren't they, Dr. Shanahan?

6     A     Yes, they are.

7               MR. LYNCH:  Okay.  No further questions.

8               THE COURT:  Redirect?

9               MR. GROSSBART:  Just briefly.

10                       REDIRECT EXAMINATION

11    BY MR. GROSSBART:

12    Q     You referenced a log for MP-105.  Did you want to look at

13    that log to explain an answer about MP-105 or not?

14    A     Yeah, we could look at that, yes.

15    Q     Do you have it up there?

16    A     Yes.  It's 3058-0120.

17    Q     What did you want to say before Mr. Lynch moved on to his

18    next question about that?

19          Why don't we first put it on the screen.  Hang on.

20               DOCUMENT TECHNICIAN:  (Complied with request.)

21    BY MR. GROSSBART:

22    Q     Is that the document you want to see?

23               THE WITNESS:  Neil, can you rotate it 90 degrees?

24               DOCUMENT TECHNICIAN:  (Complied with request.)

25               THE WITNESS:  Yeah.  Okay.

1    BY MR. GROSSBART:

2    Q     Tell us what you wanted to say.

3    A     Okay.  That's good.

4          What you see here is the log from the membrane interface

5    probe, and along here you see 024.  That's the depth below

6    ground surface, so this is the log as you go down, and you can

7    see -- this part of the graph, this graph is what they saw in

8    the ECD reading, and so you can see that they go along.  It

9    comes up, and they have a spot here where they get a hit.

10         This line -- or that hit occurs.  It's a little hard to

11   read, but it says, "Base fly ash."  So this is, this is the

12   fly -- you know, above that is the fly ash that was put down

13   on the ground surface to fill the area, and so then when

14   you're below that fly ash, you're most likely at the original

15   soil.  And you can see they've got that little -- they got a

16   hit right there, right at the original soil level, and then

17   this, these are the written-in analyses for the soil sample

18   that was taken, and this little symbol right here -- I kind of

19   made a mess of that, but you can see that right there --

20   that's where they took the soil sample.  So they basically had

21   the hit, and after it went back down to really no hit at all

22   in this area on the ECD log, that's when they took the soil

23   samples.  So they didn't really -- you know, they missed their

24   chance, if you like, to get the contaminated soil on that

25   particular, that particular sample.

1          MR. GROSSBART:  All right.  Let's take that off.

2          DOCUMENT TECHNICIAN:  (Complied with request.)

3   BY MR. GROSSBART:

4   Q    You were asked some questions about, I think, DNAPL going

5   downhill or coming from upstream or something to that effect.

6          The DNAPL found at MP-105 is either close to or on top of

7   the bedrock at that location, is it not?

8   A    Yes.  It's basically right at the bedrock.

9   Q    All right.  And there are -- and you've seen, in the

10  data, contouring that's been done of the bedrock.

11         And I want you to put up, Neil, please, 614, page 6.

12         DOCUMENT TECHNICIAN:  (Complied with request.)

13  BY MR. GROSSBART:

14  Q    Is it fair to say that from basically this location out

15  towards the river, the bedrock slopes downward?

16  A    Well, it actually -- there's almost kind of a valley

17  structure, so this area is generally lower.  It does slope

18  that way, but you also get a component that's kind of sloping

19  this way --

20  Q    All right.

21  A    -- into that valley.

22  Q    Have you seen anything in the data that would explain how

23  the DNAPL here, if it really had been sliding down the

24  bedrock -- well, let me just ask it this way.  How did the

25  DNAPL, if it was coming from upstream, know how to stop under

1723

1    the catch pond?  Or --

2    A    Well --

3    Q    It doesn't know, does it?

4    A    Well, more than that, I also looked uphill.  There's

5    other wells uphill, and they look very, very different than

6    what you see at MP-105.  They don't have that signature with

7    the strong perc concentration.

8              MR. GROSSBART:  Nothing further.  Thank you.

9              THE COURT:  You can step down.

10             Call your next witness.

11             MR. JOHNSON:  Your Honor, at this point we'd like to

12   play the deposition of Richard Brill, which will take us

13   clearly to lunch, maybe a little bit after, as well.

14             THE COURT:  All right.

15             MR. JOHNSON:  This is the deposition of Richard

16   Brill that was taken on February 12, 2003.

17             THE COURT:  Let me have a sidebar.

18        (Discussion on the record at sidebar.)

19             THE COURT:  Here is a note that Cheri wrote:

20   "Judge, the jury was confused yesterday during the reading of

21   the deposition right after lunch.  Apparently there was a

22   change in the person testifying, or so they thought, yet the

23   reader remained the same."  Then it says, "This must have

24   occurred when Amanda was in here because I don't remember it.

25   If there are any further depositions read, they would like to

1    request that they be notified when the testimony changes or

2    have the reader change."

3              MR. GROSSBART:  It was obviously one deposition with

4    one reader split by the lunch hour.

5              THE COURT:  Yeah.  I think what -- they want to know

6    when there's a question being asked by somebody else, I think,

7    if it's cross or direct, so --

8              MR. GROSSBART:  Well, I don't know.  The depositions

9    are read consecutively as they follow the deposition.  I'm not

10   sure I follow what you're saying.

11             THE COURT:  What I, what I can do -- you know, I

12   explained this to them at the start.  I can reemphasize it,

13   that these lawyers, you guys went around the country taking

14   depositions.  Whoever was taking it would ask questions first.

15   Then other people who were there got to ask questions in

16   followup.

17             MR. GROSSBART:  Right, and I think they should

18   disregard -- they should not draw an inference because a

19   lawyer for one party is asking a question as opposed to

20   another lawyer from another party.  They should take nothing

21   from that.

22             MR. LYNCH:  And I don't believe we have any more to

23   be read.

24             THE COURT:  Was it the one after, was it the one

25   after lunch that you guys were reading?

1             MR. MICKELSON:  Yeah.  Yes.

2             MR. GROSSBART:  We started before and finished up

3     after lunch.

4             MR. COZZENS:  It might not hurt to remind them again

5     that everything both sides want to be read is being read at

6     one time.

7             THE COURT:  Yeah.

8         (Open court.)

9         (Jury present.)

10            THE COURT:  Ladies and gentlemen, the reason I had a

11    sidebar is this.  Cheri gave me a note that you were confused

12    yesterday after the reading of the deposition right after

13    lunch.  As I told you at the beginning of the trial,

14    depositions are to be considered as though the person was

15    sitting here testifying.  Most likely my insistence -- or the

16    depositions that are either read or played to you on

17    videotape, on the videotape you can hear a change in the voice

18    of people who are asking questions.

19            Lawyers, the lawyers in this case, for a significant

20    period of time, traveled around and took depositions.  And

21    those depositions, one party, whoever requested the

22    deposition, they're the ones first asking the questions.

23    Other lawyers that are there, then, have an opportunity and a

24    right to ask their own questions.  You shouldn't put any

25    significance on the fact of who is taking the deposition or

1    really who is asking the questions.  Listen to the questions,

2    the answers.  That's the testimony of the witness.

3            Now the next deposition, I think it's the last one,

4    isn't it?

5            MR. JOHNSON:  We have a very short one after this

6    one, Your Honor.

7            THE COURT:  Is it video?

8            MR. JOHNSON:  This is the last long one.

9            THE COURT:  Is it video?

10           MR. JOHNSON:  Yes.  Both of the two remaining ones

11   are video.

12           THE COURT:  We're not going to have any more read,

13   but it's just as though the witness was sitting here

14   testifying in the courtroom, and what happened is each side

15   had an opportunity to make objections to questions in the

16   deposition.  I've ruled on them before they played them, and

17   if I sustained them, they took it out.  They're not, in some

18   cases, playing the entire deposition.  They both have gone in,

19   both sides, Soco and the insurers, have gone in, selected

20   portions of the depositions that they wanted the jury to hear

21   and that I ruled was relevant, and the insurers did the same

22   thing.

23           Go ahead.

24           WHEREUPON,

25   ///

1727

1                        MR. RICHARD BRILL,

2     called for examination through deposition by counsel for

3     plaintiffs, after having been previously sworn to testify the

4     truth, the whole truth, and nothing but the truth, testified

5     as follows:

6                            EXAMINATION

7     Q    (By counsel for *Weiss* plaintiffs)  "Could you please

8     state your name for the record?

9     A    "My name is Richard Brill."

10    Q    "Okay.  Do you understand that your sworn testimony may

11    be used at the trial of this case?

12    A    "I do."

13    Q    "Where do you live?

14    A    "In Worland, Wyoming.  I live at 608 Grace Avenue."

15    Q    "And you previously worked at Dyce Chemical in Lockwood,

16    Montana, correct?

17    A    "That's correct."

18    Q    "When did you begin work at Dyce Chemical?

19    A    "1988, approximately.  I'm not sure of those, absolutely

20    positive of those dates, what date or what month or anything

21    like that.

22    Q    "Do you know when it was that you left employment with

23    Dyce Chemical?

24    A    "Early '94."

25    Q    "Well, we really appreciate your going out of your way to

1   be here.

2       "Is it fair to say that your work at Dyce Chemical was

3   really the only time that you've worked in the chemical

4   industry?

5   A    "Yes.

6   Q    "Okay.  I would like for you to tell me, if you could,

7   beginning in 1987 or '88, when you first came to Dyce, kind of

8   what the progression of your jobs for that company were.

9   A    "Okay.  In the beginning, when I started work for Dyce, I

10  was a yard hand, and we done loading and unloading trucks.  We

11  filled drums from bulk tanks.  We took care of the warehouse

12  and tank farm, and we cleaned the sediment out of the tanks --

13  the collection pits, actually, not tanks but collection pits,

14  and just worked around the yard.

15  Q    "And that's the job you did when you first started there

16  at Dyce?

17  A    "Yes.

18  Q    "And did you move to some other job?

19  A    "Yes, I did.  I moved -- I was there for a year and a

20  half or two, and then one of the foremens left, so I took the

21  foreman's job.  And then after the foreman's job, they moved

22  me to delivery truck driver.

23  Q    "Can you tell me when it was that you took over as

24  warehouse foreman?

25  A    "I don't remember the dates.  No, I can't tell you.  I

1   don't remember exactly when that was.

2   Q     "Can you tell me about how long it was after you started?

3   A     "About two years, approximately.

4   Q     "So about probably 1989 or '90?

5   A     "Approximately, yes.

6   Q     "What were your duties as warehouse foreman?

7   A     "To make sure that the operation run smoothly, that we

8   got the tank cars unloaded, that the delivery trucks were

9   loaded, that the product that we needed delivered, you know,

10  in town.  We had three refineries to deliver to in the local

11  area.  Then we had just in-town deliveries for the local

12  people, and then we had bulk product that we drummed into

13  55-gallon drums for distribution.

14  Q     "As warehouse foreman, did you have any role in training

15  employees?

16  A     "Very little.  Most of the employees that we had were

17  there.  I mean, there wasn't a big turnover in employment.

18  So, no, really everybody was pretty well trained, so I didn't

19  have -- actually it was quite the reverse.  Most of those guys

20  trained me, you know, and that's pretty much how that worked."

21  Q     "Were you being trained by the employees that you

22  supervised while you were warehouse manager?

23  A     "Yes.  It was not -- it was -- we all worked together.  I

24  mean, there wasn't a lot of, you know, separation between the

25  warehouse foremen and the other guys that worked in the yard.

1730

1    When I say they trained me, it's because they knew as much

2    about the operation as I did, and the guys that just made sure

3    that everything got done and followed up to make sure that

4    that was done and that, you know, the little paperwork that we

5    done, they had to make sure that it got in and those kinds of

6    things, you know.  Scheduling drivers and make sure that the

7    workers were at work and make sure that everybody was working.

8    Q    "Did you ever -- first of all, how long were you a

9    warehouse foreman?

10   A    "Oh, not very long.  About a year and a half.

11   Q    "During that time, did you have any new employees come

12   into the warehouse?

13   A    "Yes.  There was a couple younger fellows came in.

14   Q    "Do you recall their names?

15   A    "A guy by the name of Dan.  I don't remember his last

16   name.

17        "Greg Guelff started after --

18            THE REPORTER:  "Greg Wells?

19            THE WITNESS:  "Guelff.

20            THE REPORTER:  "Guelff?

21            THE WITNESS:  "Guelff.  I'm not sure how to spell

22   it.  G-u-e-l-f, I think.  Something like that.

23   Q    (By counsel for *Weiss* plaintiffs)  "And do you recall

24   that his name was Craig Guelff?

25   A    "Yes.

1    Q     "Okay.  Did you get to know Mr. Guelff while you were

2    supervising him?

3    A     "Yes, I did.

4    Q     "Did he strike you as an honest, trustworthy employee?

5    A     "Yes."

6    Q     "Do you recall ever getting any specific training from

7    Dyce, yourself, when you started as a warehouseman, about

8    preventing spills into the environment?

9    A     "Yes, and it was ongoing.  Dyce provided training.  They

10   showed us some safety films continuously.  We attended all of

11   Burlington Northern's safety seminars, and whenever Conoco or

12   Exxon Refinery had safety meetings and so forth, usually

13   annually or sometimes even more often, we attended a lot of

14   those.  It was a safety process because we dealt with some

15   serious chemicals, and there was times when the local fire

16   department came out, and they brought breathing apparatuses

17   and retrieval tanks and air tanks and so forth and showed us

18   how to use those.  I think their safety training was ongoing

19   continuously."

20   Q     "It sounds to me like you're describing a fair bit of

21   training about personal safety, how not to get hurt while

22   handling these chemicals.

23   A     "Yeah, and what to do if you have a spill or if there's a

24   spill or how to handle it."

25   Q     "We're going to talk a fair bit about chlorinated

1732

1   solvents here today, and when I say 'chlorinated solvents,'

2   what I mean is perchloroethylene and trichloroethylene.  Do

3   you recall handling those chemicals when you were at Dyce?

4   A   "Yes.

5   Q   "Do you ever recall getting any instruction from your

6   managers at Dyce about the dangers to the environment if those

7   were spilled outside containment?

8   A   "The training that we had on those, we watched several

9   films, and it was -- I think they were made available by the

10   supplier, and we -- I'm trying to think how extensive that

11   training was.  But we knew that, and in comparison to the

12   other chemicals that we used there, these were -- you know, we

13   didn't use them that much.  I mean, very seldom did we have

14   that much to do with them, because we supplied local cleaners

15   with perc, and we did drum it, and it was always, it was

16   always diluted and washed to the holding tanks just behind the

17   tank farm.  You know, it was diluted with water and washed

18   down.  It was --

19   Q   "What was diluted?

20   A   "The trichlor or the chlorinated solvents were always

21   diluted with water and washed to the drain, and then they were

22   contained in the pits behind the tank farm.

23   Q   "You mean when they were spilled during drumming?

24   A   "Yes.

25   Q   "Was that pretty common, to have small spills there?

1   A     "No, it wasn't.  Very seldom did we have any.  There was

2   a tank that we delivered from the -- on the back of the truck,

3   and there was a -- then we pulled it out of a tank and put it

4   in 55-gallon drums, and seldom was there, you know, outside of

5   what was in the nozzles, which is a cup or half cup, you know.

6   Once in a while when we'd take some of it out of town, there

7   would be some in a hose that would drain on the ground, on the

8   asphalt where we would wash it, or cement.  We would wash it

9   to the drain, and it would go back to the tank farm.

10  Q     "So Dyce had a policy of cleaning out those spills

11  immediately; is that right?

12  A     "Yes, exactly.

13  Q     "And what you were telling me was that the way that those

14  spills were cleaned up was to hose the concrete off --

15  A     "Yes, that's correct.

16  Q     "-- with water?

17  A     "Right.

18  Q     "Okay.  Tell me again where that water went once they

19  were hosed off.

20  A     "It went to the drain, and it went to the holding tanks

21  that were right behind the, right behind the tank farm.

22  There's two big ponds right behind the tank farm, you know,

23  for that purpose, you know.  Anything that we spilled or run

24  off went to them.

25  Q     "Did you almost always have a little bit drip onto the

1  concrete when you were drumming, say that half cup out of the

2  nozzle?

3  A    "Pretty regularly, yes.

4  Q    "Do you ever recall anyone at Dyce Chemical telling you

5  what the environmental dangers of a chlorinated solvent spill

6  were?

7  A    "Yes.  They were part of the training we got from the

8  supplier, like I said, and we played -- those things were

9  reintroduced every year as part of a safety program, and I

10 think that every year that I was there we went through

11 training and how to be as cautious as we could not to spill it

12 and to carry drip pans and those kinds of things so we got as

13 little as possible onto the ground."

14 Q    "I'm going to hand you a document marked Exhibit 232 and

15 ask you to take a look at that.  I'll represent to you that's

16 an aerial photograph of Dyce Chemical taken about 1987 --

17 A    "Okay.

18 Q    "-- which was about the time that you started work there,

19 correct?

20 A    "That's correct.

21 Q    "Do you recognize that as Dyce Chemical?

22 A    "Yes, I do.

23 Q    "Okay.  I'm also going to hand you a pen.  I would like

24 for you to make some markings on this exhibit for me, if you

25 would.  The first thing I would like for you to mark is the

1   area where you were explaining there were catch basins behind

2   the tank farm.

3   A    "Okay.  The tank farm is right here, and right here

4   there's -- I can just encircle that.

5   Q    "That would be great.

6   A    "Right here.

7   Q    "Could you please draw lines off of those, maybe to the

8   top of that pole barn or something, where you can label that

9   with a number 1?

10  A    "Okay.

11  Q    "Great.  So the three kind of long oval circles next to

12  one another on this Exhibit 232 are the catch basins on the

13  back side of the tank farm?

14  A    "That's correct.

15  Q    "And that's what you were describing for me?  That's the

16  place that Dyce used to contain the small, routine spills from

17  drumming and such?

18  A    "That's correct.

19  Q    "Okay.  Can you tell me where the drain is that you

20  described a moment ago about where those spills would be

21  washed into?

22  A    "Okay.  Right here in front of it is a, a drumming shed.

23  Right there.  And it had, it had a drain in it.  I'm trying to

24  recall how that . . .

25       "I remember how that drain went, but it was -- it ran, it

1   ran back, back to these, back to these tanks.

2   Q   "Okay.  Can you label the drumming shed for me as well

3   with a number 2?  Why don't you, why don't you draw that line

4   over to the top of the pole barn, if you would, so that we

5   know that it will photocopy well.

6   A   "(Complied with request.)

7   Q   "Great.  Okay.  And that what you labeled as No. 2 on

8   Exhibit 232 is where the drumming shed was?

9   A   "That's correct.

10  Q   "And it's your testimony that there was a drain that ran

11  from the drumming shed or right near the drumming shed to the

12  catch basins?

13  A   "Yes, that's correct.

14  Q   "Okay.  What did you call those catch basins?

15  A   "They were just the collection pits or ponds.

16  Q   "Okay.

17          THE REPORTER:  "Or ponds?

18          THE WITNESS:  "Or ponds.

19          THE REPORTER:  "Thank you.

20  Q   (By counsel for *Weiss* plaintiffs)  "Do you recall seeing

21  those collection pits built?

22  A   "No.  They were built when I started.

23  Q   "Okay.  Do you remember any other ponds at the facility

24  when you started there?

25  A   "Yes.  The two large ones that are toward the back of the

1737

1    lot were built after I got there.

2    Q    "Okay.  Were there any other ponds that you can recall

3    when you were there?

4    A    "No.  That's all.

5    Q    "Do you recall any pond down in this area, down at the

6    end of the railroad spur?

7    A    "When I first started there, that was kind of a, kind of

8    a desolate, no man's land, and then they, they filled it in,

9    and it was -- later on, they just graded it and filled it in

10   preparation for those ponds.  I don't recall exactly how that

11   all come about.  They, they filled that in and made it usable,

12   because there was, there was nothing back there.  It was just

13   an extra lot, and I don't recall them ever using it for

14   anything.

15   Q    "You said it was kind of desolate.  What's your

16   recollection about the way that looked?

17   A    "It was real rough ground.  It was unkempt.  And at one

18   point we went back and picked up all the debris and broken

19   pallets and things like that, and then they hauled, I think

20   they hauled some dirt in and gravel and leveled it all off in

21   preparation for building the ponds that they built."

22   Q    "I want to talk with you about some of the ways that you

23   and the other Dyce employees moved chlorinated solvents there

24   at the facility when you worked there, and let's go ahead and

25   start with when chemicals were brought in.  Did chlorinated

1  solvents usually come in on a truck?

2  A     "Yes.  They came in in a tank truck.

3  Q     "And how did you move, how did you move those solvents

4  off the truck?

5  A     "They were hose and pump.  We hooked up usually a 2-inch

6  hose and pumped them off into a designated tank.

7  Q     "An above-ground storage tank?

8  A     "Above-ground storage tank, that's correct.

9  Q     "Did Dyce have the same policy for immediately cleaning

10 up any spills that occurred during that process?

11 A     "Yes.

12 Q     "And how did you do that?

13 A     "Basically they were, the trucks were unloaded right in

14 front of the drumming shed.

15 Q     "Can I have you circle that area for me as well?

16 A     "The trucks were parked right here in front of that

17 drumming shed.  Right in here.

18 Q     "Can you draw a line off of that to somewhere where it's

19 light-colored so we can -- and label that with a 3?

20 A     "A 3?

21 Q     "Yeah.  So No. 3 on Exhibit 232 is the area that you're

22 describing chlorinated solvents were unloaded off of trucks?

23 A     "That's correct.

24 Q     "Okay.  And you were describing the clean-up process for

25 spills during that process?

1    A    "Right there when they parked was, was all cement, and

2    then it was, it was washed down to the drain, and then the

3    drain ran back to the, to the settling tanks or the pits right

4    behind the tank farm.

5    Q    "Okay.  What quantity of chlorinated solvent was commonly

6    spilled during that process?

7    A    "Very little, because they were, they were —— they kept

8    pretty close tabs on us, because they were aware.  I think

9    that maybe a little residue out of the hose, you know, which

10   would be a 15— or 20—foot, 2—inch hose that ran from the truck

11   to the pump, you know, or to the tank.  And that was

12   probably —— you know, I have no idea how much was in there.

13   Q    "Are we talking about a relatively small amount, say less

14   than a gallon?

15   A    "Approximately, yes.  There wouldn't be any more than

16   that, because we always had to drain it into the pump, and the

17   pump would pump it into the tank, so, yeah, that much.

18   Seldom, if ever, more than that.

19   Q    "Do you think you ever saw more than a gallon spilled

20   during that process?

21   A    "I'm trying to think of an incident where we might have.

22   No, I don't recall.  Like I say, whatever was —— you know,

23   when you disconnected the hose from the pump, there was a

24   little there, but, see, there was drip pans, and we had the

25   drip pans, and we collected the drip.

1    Q    "Was it common to have, say, as much as half a gallon in

2    that hose, in that area?

3    A    "Approximately.  Between a half and a gallon.  You know,

4    it was somewhere in there.

5    Q    "Okay.  How, how much of that -- and is that, is that --

6    was that an average?  I mean, that's basically what you would

7    say?

8    A    "Probably an overall average.  That would be a good, a

9    good estimate, yes.

10   Q    "Okay.  So it's your testimony that, that you would, you

11   would see about a half-gallon to a gallon escape when you

12   unloaded a truck?

13   A    "Yes, sir.

14   Q    "Okay.  How much of that actually got cleaned up and

15   taken back to the collection pits?

16   A    "We had to clean it all up because there was another

17   product that would follow it, so it had to be, it had to be

18   cleaned up real well, because it was -- you know, it would, it

19   would contaminate another product, so we had to be real

20   cautious and not contaminate, or cross-contaminate any of the

21   other products we had.

22   Q    "Okay.  So are you saying that on average when a truck

23   came in, about half a gallon or a gallon of solvent would be

24   cleaned up and washed back to those collection pits?

25   A    "Yes, that's correct.

1   Q    "How often did you get trucks of perc during the time

2   that you worked there?

3   A    "Perc, okay.  Maybe twice a year, roughly.  You know,

4   approximately.  Maybe three times, but seldom more than that.

5   Depend on, of course, depend on how much we were using, but

6   then, of course, they -- there was something about trichlors

7   were being -- not being used anymore, so they were on, they

8   were on decline.  So toward the end of the time I was there,

9   they slowed to very little.  You know, I would say a part of a

10  truckload a year, you know, was all.

11  Q    "For trichloroethylene --

12  A    "For trichloroethylene and perc.

13  Q    "Again, we need to be real careful not to talk over each

14  other.

15      "Tell me about -- does that basically summarize what you

16  recall about how chlorinated solvents were taken off of

17  trucks?

18  A    "Yes, as far as I recall.  And, like I say, it was --

19  there are so many other things that were -- that we used so

20  much more of, you know, that -- I'm trying to think of what

21  would -- what it was that we used.  I mean, how often we --

22  when it come in, it was handled right away.  We had a pretty

23  good idea how much needed to go into drums.  So it came in.

24  We put it in steel drums and then pulled it out of stock as we

25  needed it.  So I -- and it happened, like it would come in one

1    day, and the next day we'd put it in drums, and then we'd have

2    the bulk tank for, for distribution of 100 or 200 gallons at a

3    time, or 300 gallons at a time.  So, I, you know -- we

4    didn't -- it's not one of the things that I recall moving a

5    bunch of.

6    Q    "And that's relative, right?  You moved thousands and

7    thousands of pounds or gallons of the acids and solvents and

8    such?

9    A    "Right, yeah.

10   Q    "Tell me about how you drummed perc.

11   A    "Okay.  There was a pump in the drumming shed.  We would

12   connect the supply line to the pump in the drumming shed, and

13   then there was a filler nozzle.  And we done it by hand, each

14   drum individually, and it was on a scale, and when the scale

15   would -- we would fill it until the scale read so many

16   gallons, and then we would shut the nozzle off and moved it to

17   the next drum.

18   Q    "And I think you already testified that Dyce had a policy

19   of cleaning spills during that process up immediately as well?

20   A    "Yes, that's correct.

21   Q    "Can you tell me, on average, what the average spill was

22   from that process?

23   A    "Very little from that process.  There was one where the

24   most that you would have would be where you disconnected the

25   hose from the pump, you know, the quick couple, and that would

1   be probably the most.

2   Q    "What do you mean by that?  What kind of volume are you

3   talking about?

4   A    "We're talking about, oh, a quart.  Maybe a half a

5   gallon, you know.

6   Q    "Now was that on average?

7   A    "Yeah.  And, see, that wasn't each drum.  That was per

8   filling of -- you know, when we filled perc drums or trichlor

9   drums, we usually tried to fill like 50 of them or so, so we'd

10  have enough on hand that we wouldn't have to stop and do this

11  whenever an order came.  So probably every 60 days, I would

12  say, roughly, we would drum perc or trichlor."

13  Q    "And I want you to recall this as carefully as you can,

14  you know, what your best recollection is of the amount that

15  would, on average, spill during a drumming episode of perc.

16  A    "Okay.  I understand that, and I'm trying to think.  With

17  perc, it was in smaller quantities because we didn't --

18  because it was -- that was a cleaning solvent, and that was --

19  it was pretty much the same because there was very little,

20  because of the caution that we, you know, tried to exercise,

21  and I'm speaking for myself and a few guys during the time

22  that, you know, that I worked there.

23  Q    "When you say a 'smaller' quantity, do you mean like

24  about a half gallon?

25  A    "Yeah, a half gallon, but, I mean, overall amounts of

1744

1  drums of perc and versus drums of trichlor.  There just

2  weren't that many of them."

3  Q    "Were there times when you moved perc where you, during

4  drumming, where only, say, like a 12-ounce pop can amount was

5  spilled?

6  A    "It would be -- you know, if we had -- usually, you know,

7  it varied from each filling, but what I'm saying is that when

8  we, you know, when we filled the bulk tank on the back of the

9  small truck and delivered it in town, or when we filled the

10  drums with -- we would put perc in 5-gallon steel cans, also,

11  and it was a process that seldom ever netted more than, like

12  any more than a half gallon.  So pop can amount, you know, if

13  you accumulate what was in the drain pans, it would, you know,

14  overall accumulated amount would still be up to a half

15  gallon."

16  Q    "Did you almost always end up hosing off the pavement

17  after you moved perc?

18  A    "Yes.  Always.  If there was a spill, you know, I mean,

19  if there was any residue of any kind, like I said, we had to

20  be real cautious of cross-contamination.  So we were real

21  cautious about washing down -- to wash off the truck bed and

22  the equipment.  And the reason being is the next guy that came

23  to set up to drum something would have to be cautious of what

24  was used, what was run before him, and it was the procedure to

25  wash down after you got done, you know."

1          THE COURT:  Can you stop it?

2          THE WITNESS:  "And I would grant you that maybe once

3   in a while, but seldom, if somebody got in a hurry, they would

4   leave it and say --"

5          THE COURT:  Go ahead and finish this and then stop

6   it.

7          THE WITNESS:  "-- 'Would you, would you clean this

8   up?  I've got a delivery to make,' or, 'I've got so much

9   time,' you know.  Occasionally that happened.  And when I was

10  foreman, that's a lot of what I did, you know.  This guy has

11  to go make a delivery, and I would clean up what he had left

12  and make sure we were ready for the next -- you know, that was

13  part of my responsibilities."

14         THE COURT:  Ladies and gentlemen, we're taking a

15  noon recess.  I give you the usual admonition.

16         We'll be in recess; I'm going to say 1:20.

17         THE LAW CLERK:  All rise.

18  (Recess taken from 12:00:45 to 13:24:10.)

19  (Open court.)

20  (Jury present)

21         THE COURT:  Please be seated.

22         Go ahead.

23  Q   (By counsel for *Weiss* plaintiffs)  "And here's why I ask.

24  What I'm really trying to get at is to know, on average, you

25  know, when you moved perc, when you drummed it, for instance,

1746

1   how much got washed down to those catch pits?

2   A    "Very little, because we had contaminated product drums

3   that we, you know, would drum that stuff, and then they were

4   sent to, I guess, the distribution or disposal site, whatever

5   that -- I think it was in Utah.

6   Q    "Okay.  What do you mean by 'very little'?

7   A    "Like, you know, whatever we have in the catch pans or

8   that would be dumped into 55-gallon drums that was going to

9   the hazardous waste disposal.  And we're talking about the

10  half gallons that we talked about, maximum a gallon.  But we

11  put them in those drums, and that stuff would be sent off."

12  Q    "And there you're talking about what came out of those

13  catch basins?

14  A    "Right.

15  Q    "So on average you're saying that a cup or so would get

16  washed down to the catch basins when you moved perc?

17  A    "Yes, basically.  But sometimes maybe, maybe a quart.

18  Maybe up to a quart.  That would be an extreme case.

19  Q    "Did you ever -- do you recall the skid that was used to

20  deliver perc to the drycleaners in town?

21  A    "Yes.

22  Q    "Do you recall that that skid had a long hose on it, on a

23  roll on the back of it?

24  A    "On a reel, yes.

25  Q    "Do you ever recall any issues with trying to get perc

1747

1  out of that hose back into the skid?

2  A    "No, I don't recall anything of that nature.

3  Q    "Okay.  There's been other testimony in the case that

4  sometimes perc was spilled while trying to walk that hose back

5  to the skid, to drain that hose back into the skid.  Do you

6  recall that ever happening?

7  A    "I don't recall that being a problem.

8  Q    "And did you rinse out the hoses that you used?

9         THE REPORTER:  "'Rinse'?

10        COUNSEL FOR WEISS PLAINTIFFS:  "Rinse --

11        THE REPORTER:  "Okay.

12 Q    "-- out the hoses that you used to move chlorinated

13 solvents when you worked at Dyce?

14 A    "Yes, we did.

15 Q    "Tell me how that process worked.

16 A    "That, that was part of the cleanup process at the end of

17 drumming or unloading or loading, and they would, they would

18 be emptied, and then we'd just take the water hose and wash

19 them, wash them out, and we'd put the hoses up on a, on a hose

20 rack.

21 Q    "Okay.  So if, if you moved perc from a truck to your,

22 your above-ground storage tank, how long is that hose?

23 A    "I think I mentioned earlier, 15, maybe 20 feet.

24 Q    "Okay.  How did you hook the water hose up to that hose

25 to clean it up?

1  A    "We put one end in the drain, and we'd hold it, just hold

2  it in our hand.  We'd take a spray nozzle and push it into

3  the, into the hose.

4  Q    "Did you do that every time that you moved perc?

5  A    "Yes.

6  Q    "Why?

7  A    "To keep the hoses clean.  You know, to keep the, to keep

8  from, like I say, cross-contamination.  You have to be real

9  careful of that.

10 Q    "Okay.  You said you put the spray nozzle in one end of

11 that hose?

12 A    "Um-hmm.

13 Q    "Where did you put the other end of the hose?

14 A    "In the drain.

15 Q    "Into the drain that drained to the catch basin?

16 A    "That's correct.

17 Q    "Okay.  Do you have a feel for how much perc would be in

18 that hose when you rinsed them out like that?

19 A    "As far as liquid, whatever residue hung to the, to the

20 inside of the hose was all that was there, you know, and we

21 just wanted to make sure that it was -- you know, and it was a

22 rubber product or a neoprene product, and it would be like

23 whatever was held against that product, you know, because the

24 liquid had already been dumped.  I mean, the liquid that would

25 run, you know, would move, was already gone.  You know, we

1   dumped it out.

2   Q    "How did you do that?

3   A    "We put it in the, in the drip pan, in the catch basin

4   and walked the hose up, walked the hose out.

5   Q    "Was that difficult to do alone?

6   A    "Oh, sometimes.  Usually when it was cold, it was.  The

7   hose got pretty stiff.

8   Q    "Did you ever, ever have any problem with the hose

9   jumping out of the drip pan and knocking the drip pan over?

10  A    "Not knocking it over.  Occasionally I'd say it probably

11  jumped out of there.

12  Q    "So would you have small spills when that happened?

13  A    "I guess.

14  Q    "Again, are you talking, when you say 'small,' are you

15  talking less than a gallon?

16  A    "Yeah.

17  Q    "How often might that happen?

18  A    "Every other month, you know, when we drummed, when we

19  drummed perc or trichlor.

20  Q    "So once every couple months is what you're saying?

21  A    "Yeah.

22  Q    "Okay.  So you washed the hoses out every time you

23  drummed perc as well as when you moved it off the truck?

24  A    "That's correct.

25  Q    "Okay.  Did you use the same, the same length hose for

1    drumming as you did for moving from the truck?

2    A    "Yes, because they were dedicated hoses to trichlors.

3    Q    "Do you mean that that hose only got used for chlorinated

4    solvents?

5    A    "That's correct.

6    Q    "But you still rinsed it out each time?

7    A    "Yes."

8    Q    "I want to talk with you about the waste and rinsewater

9    that went back to those evaporation pits.

10   A    "Okay.

11   Q    "Did those pits also collect rainwater that fell at the

12   facility there?

13   A    "Yes, that's correct.

14   Q    "Did you ever see those pits fill up?

15   A    "Yes.

16   Q    "Did you ever see those pits emptied?

17   A    "Yes.  We pumped-- the pits behind the tank farm were

18   pumped to the aeration pond down below."

19   Q    "Okay.  Now, you said that those aeration ponds were

20   built while you were there; is that correct?

21   A    "Yes.  That's correct.

22   Q    "Where were those pits drained before the aeration ponds

23   were built?

24   A    "They pumped it into hazardous waste drums.  That was why

25   they built the pond back there, because they had to pump all

1  that in those three pits into hazardous waste, and to take

2  hazardous waste and get it disposed of was terribly expensive.

3  So that's why they built the aeration ponds down below there.

4  Q    "Do you know, as we sit here today, whether water from

5  those pits off of the tank farm was ever pumped into the

6  pasture out back of Dyce?

7  A    "I don't recall that.

8  Q    "Okay.  Do you know if -- why don't you go ahead and

9  circle these evaporation pits for me and label those with a 4.

10  A    "Okay.

11  Q    "Now the pits that you have labeled on Exhibit 232 with

12  the number 4, those are what you're referring to as

13  evaporation pits, correct?

14  A    "That's correct.

15  Q    "Okay.  And you said that those were built just after you

16  started there?

17  A    "That's correct.

18  Q    "Okay.  What would happen when those pits themselves

19  filled up with water?

20  A    "They, like I said, they had a sprinkling system that

21  aerated the, took the water, evaporated the water out, and

22  then the residue inside was scooped and put into hazardous

23  waste drums.

24  Q    "Did you ever see those pits drained anywhere?

25  A    "No, I didn't.

1  Q    "All right.  Do you know if the water in the pits on the

2  north side of the tank farm was ever tested to see what its

3  chemical composition was?

4  A    "Well, we always tested it for pH levels to find out

5  where it was at, and then we would, we would -- always before

6  we pumped it down there, it had to be a neutral before we

7  pumped it down there.

8  Q    "Did you ever test it for anything other than pH?

9  A    "No, I did not.

10 Q    "Would you presume, based on the fact that it also

11 received rinsewater from the, say, the perc hoses and perc

12 spills and things like that, that it probably had some amount

13 of perc in it as well?

14 A    "That, that would be a safe assumption, sure."

15 Q    "Mr. Brill, I want to talk with you a bit about how

16 returned drums were stored at Dyce Chemical during the time

17 you worked there.  Do you recall drums being returned from

18 customers?

19 A    "I do.

20 Q    "Did most of the drums that went out get returned?

21 A    "Yes, because there was a deposit on the drums, and they

22 were -- largely all of them were returned.

23 Q    "During the time that you worked at Dyce, where were

24 those returned drums stored?

25 A    "I showed on the picture.  They were stored down here

1   against the back fence, and there's -- the blue area indicates

2   plastic drums, and the steel drums were along the back fence.

3   Q    "Can you circle that area for me and label it on

4   Exhibit 232 with a number 5?

5   A    "(Complied with request.)

6   Q    "Okay.  Now you've circled an area that looks to me to be

7   blue.  Is there another area where the steel drums were kept?

8   A    "Yes, there are.  The blue area -- pardon me -- are the

9   plastic drums.  The steel drums are down here against the

10  fence.

11  Q    "Okay.  Can you label that area on Exhibit 232 with a 6?

12  A    "(Complied with request.)

13  Q    "I'd like for you to hold that up for the camera, if you

14  could.

15  A    "(Complied with request.)

16  Q    "Okay.  Thank you.  I don't think we are going to be able

17  to zoom in quite close enough to pick that up.

18       "Were perc drums returned to Dyce as well?

19  A    "Yes, they were.

20  Q    "Okay.  Who hauled the drums away for Dyce?

21  A    "It was a company out of Oregon.  Beehive Drum.

22  Q    "Do you recall any of the names of the folks that

23  actually -- the drivers that came in to pick drums up?

24  A    "It was the same guy all the time.  I don't recall his

25  name.

1  Q     "Does the name Art ring a bell?

2  A     "Yes, it does.

3  Q     "Do you happen to recall Art's last name?

4  A     "No, I don't.

5  Q     "Do you know anything else about Art?

6  A     "Art was -- I loaded his truck several times, and he was

7  pretty fussy about making sure the drums were empty before we

8  put them in his truck.  That was a big thing, getting loaded

9  as fast as we could, because he had a long trip.

10 Q     "What do you mean he was fussy about having empty drums?

11 A     "Because he took the drums back, and he washed them all

12 out and reconditioned them and brought them back to us."

13 Q     "And where did that happen?

14 A     "Right back here in this back area where the drums were

15 located.  He would back his truck down here, depending on

16 whether he was getting plastic drums or steel drums, and he

17 would back his truck down here, and we would load him right

18 down there in that area.

19 Q     "So that dumping would occur in the areas marked 5 and 6

20 on Exhibit 232?

21 A     "That's correct.

22 Q     "Okay.  How often did that happen?

23 A     "Oh, he was there -- I can't tell you how often he was

24 there.  Pretty regularly, because we had a lot of drums.  The

25 other thing is some of the drums were dumped on the ground.

1    There was also hazardous waste drums that they had that we

2    dumped a lot of product in, also.  There was a lot of -- it

3    seemed like they had as many drums with product in them as we

4    did empty --

5              THE REPORTER:  "'It seemed' --

6              THE WITNESS:  "That we had as many drums with

7    product in them as we did empty ones, because the customers

8    weren't draining their drums completely.

9    Q    (By counsel for *Weiss* plaintiffs)  "Was that a continuing

10   problem over the time you worked at Dyce, having drums come

11   back with product in them?

12   A    "Yes.

13   Q    "How much product are you talking about in a drum that

14   would get dumped out?

15   A    "It's really hard to estimate.  You know, you take the

16   lids off, the bungs out of a drum and tip it up, and a lot of

17   times it would be because they sat their drums upright, and it

18   would rain, and, I mean, the heating and cooling would draw

19   the water in.  So some of them was just -- it wasn't all

20   product.  I mean, it was not all product.  It was a matter

21   of -- when we got empty drums, we laid them on their sides or

22   upside down so they wouldn't, you know, pull any moisture in

23   or condensation or draw any rainwater.  But what we dumped out

24   of them wasn't always product.  It was just water.  So -- and

25   you can get from a cup to a gallon, you know.  Sometimes more.

1756

1  Q    "When that happens, when you dumped those drums out, do

2  you have any way to know what portion of the liquid in there

3  is product and what portion of it is water?

4  A    "Absolutely none.  Absolutely none.

5  Q    "Who was it that actually dumped the drums?  Was it

6  yourself and Art and other folks?

7  A    "Yeah.  Everybody.  I mean, Art would do it, and

8  employees would do it.

9  Q    "Did you ever do it personally?

10  A    "Yes, I did.

11  Q    "Did you ever see any other employees do it?

12  A    "Usually when I went back to load, we sent one guy back

13  because Art was there and one other guy was there.  So, no,

14  not really, I didn't ever witness anybody else.

15  Q    "What portion of the time -- let me just ask you this.

16  How many times do you suppose that happened, that you had

17  liquid to dump out of the drums on the ground there?

18  A    "Whenever we loaded Art, so, you know, I have no idea how

19  many times he was there.  He was there real regularly.

20  Q    "Did that happen over the whole course of the time that

21  you worked at Dyce?

22  A    "Yes.

23  Q    "So it's your testimony that some of those drums got

24  dumped out onto the ground just about every time that Art

25  came?

1   A     "That's correct.

2   Q     "Were you concerned that there might be dangerous

3   chemicals in those drums?

4   A     "Yes, and the reason that I stated earlier was we

5   considered most of it just accumulated water, and so I'm sure

6   there was some chemical residue in there, but we figured that

7   it was diluted to a point that it was relatively harmless.

8   Q     "Let me ask you this.  If you have a drum that has a

9   gallon of product in it, a gallon of liquid in it, is there

10  any way for you to know if that is 99 percent product or

11  99 percent water?

12  A     "There is no way of knowing without testing it to find

13  out.

14  Q     "Do you know of any testing that was ever done prior to

15  dumping those drums out?

16  A     "No.

17  Q     "Did you ever ask any of your bosses at Dyce, the

18  managers there, 'Hey, should we be dumping this product out on

19  the ground?'

20  A     "We talked about it, and, you know, I never really did

21  get a satisfactory answer.  'Just get the truck loaded and

22  move him out,' was kind of, kind of the consensus that we got.

23  Q     "Who told you that?

24  A     "I'm trying to think of his name.  Dave.  Dave Warne, I

25  think it was.

1758

1          THE REPORTER:  "Dave Warne?

2          THE WITNESS:  "Warne, yeah.  I think it was Warne.

3   Yeah, Warne, Dave Warne.  And it was actually, before that,

4   anyway, they said just do what it took to get that truck

5   loaded.  They didn't want him sitting there overnight.  They

6   wanted to get him loaded and get him out of there.  It was

7   always a hurry-up deal to get him loaded and get him out of

8   there.

9   Q    (By counsel for *Weiss* plaintiffs)  "But you specifically

10  remember Dave Warne telling you that?

11  A    "Specifically, no.  What he said was, 'Just get it done.'

12  You know, that was pretty much it.  'Don't mess around.  Just

13  get it done.'

14  Q    "But he said that to you after you expressed to him

15  concern about --

16  A    "Concern about --

17          THE REPORTER:  "After he expressed --

18  Q    (By counsel for *Weiss* plaintiffs)  "Go ahead and finish

19  your answer.

20  A    "I lost it.  He said, his comment was that he was

21  concerned about not wasting Art's time and getting him back on

22  the road.  He said like, 'Just get it done and get him out of

23  here.'

24  Q    "But Dave's comment was in response to your raising

25  concerns about being concerned about dumping dangerous

1   chemicals?

2   A    "Yes."

3   Q    "Do you know if those returned drums were dealt with any

4   differently in the years before you worked at Dyce?

5   A    "I have no idea.

6   Q    "Sure.  Do you know if any managers at Dyce Chemical

7   other than Dave Warne were ever talked to about that dumping?

8   A    "I think Monte Naff was approached.  I mean, because it

9   was an ongoing concern, you know, and I'm sure that Monte Naff

10  was aware of it.

11  Q    "Do you ever recall any response from Monte on that

12  issue?

13  A    "No, I don't.  I know Monte Naff was the manager for a

14  while, but he didn't have much to do with us.  I mean, I knew

15  who he was, and that was about the size of it.  He didn't

16  avail himself to the working people outside.

17  Q    "During the time that you said that you had talked with

18  Dave Warne about it, what was Dave's position with Dyce?

19  A    "I'm not sure if he was assistant manager then or

20  production man or something.  Production manager, maybe.  I'm

21  not sure what he was.

22  Q    "Was he one of the bosses?

23  A    "One of the bosses, yes.  The position name, I'm not sure

24  what it was.

25  Q    "Okay.  Do you ever recall working with Jim Diede when

1  you were there?

2  A    "Yes.

3  Q    "Do you know if Jim ever knew about that dumping?

4  A    "Yes, he did."

5  Q    "So if you had, say, 300 drums to be picked up, did you

6  sometimes find yourself having to empty out onto the ground

7  150 of those drums?

8  A    "I don't think it was that many.  Maybe a third of it,

9  but not a half.

10  Q    "So maybe a hundred?

11  A    "Possibly.

12  Q    "You said -- you made some comments earlier that made it

13  sound to me like you had raised your concerns about that

14  dumping with the management more than once.

15  A    "That's correct, yes.

16  Q    "How many times did you personally have discussions with

17  management about, 'Hey, should we be doing this?'

18  A    "Probably three times.  Three or four times, roughly.

19  Q    "Was that during the time that you were warehouse

20  foreman?

21  A    "Yes, it was.

22  Q    "Did you ever have that discussion with them before you

23  became warehouse foreman?

24  A    "I talked to Gary Cornwell about it, who was the foreman

25  when I started, and he said he'd take care of it.

1    Q    "Did he ever take care of it?

2    A    "It didn't ever change."

3    Q    "During the time that you worked at Dyce, did Dyce sell

4    almost -- well, did it sell all of the chemicals that it had

5    on site in drums?

6    A    "Nearly all of it, yes.

7    Q    "Did it sell xylene in drums?

8    A    "Yes.

9    Q    "Do you recall if it sold toluene in drums?

10   A    "Yes, it did.

11   Q    "Did it sell perc and trichloroethylene in drums?

12   A    "Yes.

13   Q    "And did those drums come back to Dyce Chemical?

14   A    "Yes, they did.

15   Q    "Do you have any knowledge whatsoever of any above-ground

16   storage tank ever leaking chlorinated solvent?

17   A    "No, I don't recall.

18   Q    "I want to talk with you real briefly about spill

19   reporting policies at Dyce Chemical when you worked there.  We

20   talked earlier about the kinds of small routine spills that

21   would happen when you were moving chemical.  Was there a

22   policy for reporting spills to managers when they occurred?

23   A    "Yes.

24   Q    "What was that policy?

25   A    "Reportable quantities, according to the hazmat controls,

1    anything that was a gallon or two.  Less than that was an

2    unreportable quantity so we didn't say too much about it.  If

3    we spilled larger quantities, five, ten, we dropped a

4    55-gallon drum of something and it spilled, we -- it had to be

5    reported.

6    Q    "So if you just spilled a gallon of perc, for instance,

7    that wasn't something that you had to go tell a manager about?

8    A    "No, it wasn't."

9    Q    "So you didn't report some of the things we were talking

10   about earlier?  If you spilled, for instance, a quart of perc

11   disconnecting from a tank or something like that, that didn't

12   have to be reported; is that correct?

13   A    "No, that's correct.

14   Q    "That just got cleaned up?

15   A    "Yes, cleaned up and washed.

16   Q    "Who taught you about what kind of spills had to be

17   reported?

18   A    "Safety training.  Part of the training program that we

19   learned while we were there.  In the beginning, they, when I

20   very first started, they said, 'If you get something on the

21   ground, tell somebody,' you know, and then they would help

22   determine whether it was a reportable quantity or not.  That's

23   what we did."

24   Q    "Did you ever play a role in helping maintain inventory

25   when you worked at Dyce?

1763

1   A    "No, not other than, than counting and reporting what

2   was, what was there.

3   Q    "Okay.  That's what I mean.

4   A    "We took inventory.

5   Q    "Did you ever have times when -- and let's talk about

6   chlorinated solvents here -- when there was a discrepancy

7   between what the folks in the office thought you had and what

8   your inventory showed you actually had?

9   A    "See, we didn't know that.  We, we, we, we told them what

10  we had outside, and we didn't know what, what the, what the

11  total was inside.  We didn't know that.

12  Q    "Did you ever have somebody from the office ask you to go

13  find out how much perc there was, for instance, and come back

14  in and say, 'This is how much perc we have,' and have someone

15  say, 'Nah, that can't be right.  Go measure again'?

16  A    "Yes.  We, we checked inventory, and I'm, I'm not sure

17  where, where we -- but we usually found it in -- when we put

18  it in drums.  Somebody would neglect to say that they had

19  taken it out of bulk storage and put it in drums, and they,

20  they didn't make a record of it, and that was usually where

21  the difference was.  Because they, they would check the amount

22  of perc in the, in the bulk tank and then, then go from there,

23  you know.  And then they would try to account for where

24  everything was at.

25  Q    "So how much of a difference could there be when that

1764

1  sort of thing happened?

2  A    "Oh, gosh.  We would fill, like I say, maybe 30 drums, 30

3  to 50 drums.  So that would be 55 gallons per, and we'd take

4  that out of the, out of the storage tank.  So it could be, it

5  could be, it could be that far off.

6  Q    "How many gallons would that be?

7  A    "1,500 to -- or approximately.  Give or take.

8  Q    "So given -- and you're saying that that, that actually

9  occurred?

10  A    "That actually occurred, but we accounted for it.  See,

11  we went and found it.  The drumming had taken place, and we

12  accounted for it.

13  Q    "Do you recall discrepancies in the perc inventory more

14  than once?

15  A    "Several times.  Yeah, more than once, but I don't --

16  like I say, we always went and accounted for where it was at.

17  It was just recordkeeping, which was part of my responsibility

18  as warehouse foreman, to make sure that things worked out, and

19  somewhere between the fellow that filled the drums and the

20  5-gallon containers and the office, we'd lost track of it.

21  Q    "During the time that you worked at Dyce, do you think

22  that if there was, say, a 40-gallon discrepancy in the perc

23  inventory between what you actually had and what the office

24  thought you had, would that small of a discrepancy have been

25  something that would have been cause for alarm?

1765

1    A    "Yes, it would.  We needed to find it.

2    Q    "How small a discrepancy would not be an issue?

3    A    "I don't know.  You know, that wouldn't be my call.  If

4    we had -- you mentioned 40 gallons.  If we were that far off,

5    it was definitely something to be concerned about.  We needed

6    to be finding that.  And I don't know where the cutoff was."

7    Q    "Okay.  How about Ken Kjos?  Did you know Ken?

8              THE REPORTER:  "Kjos?

9              COUNSEL FOR WEISS PLAINTIFFS:  "K-j-o-s.

10             THE WITNESS:  "Yes, I know Ken.

11   Q    (By counsel for *Weiss* plaintiffs)  "Did Ken also strike

12   you as an honest, trustworthy employee?

13   A    "Yes, he did."

14   Q    "Other than the barrel dumping that we've talked about

15   today, do you have any knowledge whatsoever of how

16   perchloroethylene could have gotten into the ground at Dyce

17   Chemical?

18   A    "No idea.  You know, since, since the first contact, I've

19   been thinking about that, and I don't know how that could have

20   happened.

21         "The only thing that occurred to me is, is that possibly

22   one of those, one of those sediment pits in the back leaked,

23   because as far as running over, they were real cautious about

24   that.  They didn't -- when they got full -- you know, they'd

25   fill up with rainwater, you know, and when they got full, you

1   know, they drummed it off or they, they pumped it back to the

2   evaporation ponds.

3       "But as far as that -- and I can remember twice or three

4   times a year going back there, and one of those ponds, they'd,

5   they'd use two and let one of them dry, and they'd, they'd

6   clean up, and they'd put a coating in there.  And so as far as

7   that, that's the only way that I could think of that it could

8   possibly be, you know.

9   Q    "Did you ever have an opportunity to look at the bottom

10  of those pits when they were dry?

11  A    "Yes.  I cleaned -- at one time or another, I cleaned all

12  three of them.

13  Q    "What was the appearance of the concrete?

14  A    "It was, it was pitted and chemically attacked, you know.

15  Like I say, they sealed the corners with, with different

16  products.  Usually a tar.  They used to seal those corners to

17  keep them from . . .

18  Q    "And you said that there was sludge removed from those

19  pits?

20  A    "Yes, sir.

21  Q    "You said that that sludge was treated as hazardous

22  waste?

23  A    "Yes.

24  Q    "Why was that?

25  A    "Because of where it came from.  I mean, it came from

1  those retaining areas off of those tanks and off those tank

2  farms.  It, it, it was all, you know, it was all, all stuff

3  out of those tanks from one point or another, and it was, it

4  was the water that drained off of that, that whole lot that

5  came back into those, into those pits.

6  Q    "Let me ask you this.  How many, how many barrels of the

7  liquid that came out of those pits would you have when you

8  drained the pits?

9  A    "Oh, gosh.  One time we had a bunch of them.  I'm trying

10  to think.  We cleaned the one pit, and I remember we had like

11  30 barrels of stuff that we, you know, we drummed up as

12  hazardous waste.

13  Q    "So what did you do with that 30 barrels of hazardous

14  waste?

15  A    "We set it, we set it on pallets, and then a hazardous

16  waste truck came and picked it up and hauled it off."

17  Q    "Do you have any idea whether water like that, from those

18  pits, was ever dumped out back the way that these other drums

19  were dumped?

20  A    "No, not that I recall.

21  Q    "Based on the six years that you worked there, including

22  the time that you worked as warehouse manager, do you think

23  that, that Dyce became a safer facility from the perspective

24  of preventing environment contamination during the time that

25  you worked there?

1  A    "I think there was a growing concern.  Yes, I do.  I

2  believe that that occurred."

3  Q    (By counsel for Beall Trailers)  "During your time, do

4  you recall any problem with the tanks rusting in the tank farm

5  area?

6  A    "I do.  There was several of them that had been replaced,

7  and during the time that I was there, but I don't recall that

8  any of them were ever a perc tank.

9  Q    "Okay.  When the tanks were replaced, do you know, were

10  they tested prior to that, or how was it determined they

11  should be replaced?

12  A    "Just visually.  Inspection of the tanks was the only

13  thing that I could think of that we ever did to make sure that

14  the tanks weren't leaking or that the product was contained

15  safely.

16  Q    "Who was generally involved in the visual inspection, do

17  you know?

18  A    "There again, Dick Colver took care of the tank farm, and

19  usually when I was managing the warehouse, it was me or

20  whoever the manager was at that time.

21  Q    "And when did you leave Dyce?

22  A    "'94.  Early '94.

23  Q    (By counsel for Dyce Chemical)  "Did you talk about any

24  of the facts or any of the things we talked about here in your

25  deposition today?  Did they ask you any questions about the

1   operation at Dyce?

2   A     "Yes, they did.  Some of the same questions that I have

3   answered today were some of the things that we talked about in

4   that phone conversation."

5   Q     "One of the things that we talked about today was

6   training.  Do you think the training that employees at Dyce

7   received was adequate?

8   A     "Yes.  I think that they went full length to give us the

9   training that was necessary.

10  Q     "We spent quite a lot of time talking about what we

11  called the spills or drips from hoses.  First I understood you

12  to say that you seldom had spills.  Is my recollection

13  correct?

14  A     "That's correct.

15  Q     "And then I understood you to say that you might have a

16  half a cup or thereabouts come out of the hoses when you

17  finished drumming or moving product; is that correct?

18  A     "That's correct."

19  Q     "Again, am I correct that normally you would have drip

20  pans to catch that sort of, call it a spill?

21  A     "Okay.  A spill would be when you lost control of the

22  product.

23  Q     "Okay.

24  A     "And then when you catch it in a catch pan, I, you know,

25  I didn't consider that -- maybe a definition of terms, maybe,

1   but if we caught it and contained it, what splashed out or

2   what residue was in the hose was the stuff that we washed down

3   the drain."

4   Q    "What were the blue plastic drums used for?

5   A    "Blue plastic, plastic drums contained products that

6   would not eat up the plastic drums.  They were usually

7   glycols.  Our acids were all in -- acids and caustics were all

8   put in plastic drums.

9   Q    "What were the steel drums used for?

10  A    "Materials that would dissolve plastic.  We're talking

11  about xylene, the trichlors, and things like that that would

12  eat plastic, would dissolve plastic."

13  Q    "Did Dyce have a policy that drums weren't supposed to be

14  dumped?

15  A    "Yes, I think they did.  They did.  It was one of those

16  policies that was set, and it was in the heat of getting

17  loaded; you know, do what it takes to get them loaded.  And it

18  was just -- you know, if we didn't dump them prior to that,

19  you know, when the truck driver and the route drivers came

20  back, they were supposed to have all those drums emptied

21  before they put them in the stack, and that didn't always

22  happen.

23  Q    "Was there also a policy that when drums were returned

24  from the customers, that they were supposed to be emptied?

25  A    "That's correct.

1   Q     "Did you ever discuss in any Dyce safety meetings or

2   other type of Dyce meetings those two policies, the policy

3   that drums were supposed to be returned empty and the policy

4   that they weren't supposed to be emptied?  Did you ever

5   discuss those?

6   A     "Yes, we did.

7   Q     "And who did you discuss those with?

8   A     "We had -- there were meetings when we had -- the

9   management was there, usually Dave Warne and Jim Diede.  The

10  sales guys that were up front, and the warehouse staff would

11  be there.

12  Q     "In some of those meetings, did Dave Warne and Jim Diede

13  refresh people's memory that they had this policy on empty

14  drums being returned and not dumping drums?  Did they ever

15  discuss that, as you recall, at any safety meetings or other

16  type of meetings?

17  A     "Yes, they did."

18  Q     "Was Monte Naff ever at any of those safety meetings or

19  company meetings?

20  A     "Occasionally."

21  Q     "Now I take it that Dyce handled lots of different types

22  of products; is that correct?

23  A     "That's correct."

24  Q     "So you were the foreman just for a few months?

25  A     "First -- yeah.  Well, it was longer than that.  It was a

1    year or better.  Close -- well, no.  How did that work?  I

2    drove truck, and then I helped, and then I -- gosh.  Last

3    thing I did was drive a delivery truck, and Ken Kjos was the

4    foreman.

5              THE REPORTER:  "Ken Kjos?

6              THE WITNESS:  "Yeah.  But I don't remember when that

7    transpired, when that all happened."

8    Q    (By counsel for Dyce Chemical)  "Okay.

9    A    "I don't recall."

10   Q    (By counsel for *Weiss* plaintiffs)  "Mr. Brill, I have

11   three short questions for you.  My first question is Mr. Ross

12   asked you a question about whether or not you thought Dyce was

13   cautious and conscientious about spill prevention, and I'd

14   like to ask you if, in your mind, the dumping of drums that

15   you related today qualifies as cautious and conscientious

16   behavior.

17   A    "That would be the one area that we probably fell down.

18   Probably not.

19   Q    "So you don't think that was cautious and conscientious?

20   A    "No.

21   Q    "Would you like to change your answer in that respect?

22   A    "Overall, you know, overall we were real cautious, and in

23   that respect, we probably -- yes, I guess I would have to.

24   Q    "Okay.  Mr. Ross also asked you whether you thought your

25   training was adequate.  Did you ever get any training from

1    anyone at Dyce to stop reconditioners or other Dyce employees

2    if you saw them dumping drums behind Dyce's facility?

3    A    "No.

4    Q    "Do you think that your training was inadequate, then?

5    A    "No, because they, like I said, they told us that we

6    weren't supposed to do that, and in an effort to get the job

7    done, we did it."

8              THE COURT:  Call your next witness.

9              MR. CRANE:  Thank you, Your Honor.

10             The insurers call Dr. Yaron Sternberg.

11             WHEREUPON,

12                  YARON M. STERNBERG, Ph.D.,

13   called for examination by counsel for plaintiffs, after having

14   been first duly sworn to testify the truth, the whole truth,

15   and nothing but the truth, testified as follows:

16                       DIRECT EXAMINATION

17   BY MR. CRANE:

18   Q    Ready to go?

19   A    Yes, I am.

20   Q    All right.  Can you state your name, please?

21   A    Yaron M. Sternberg.

22   Q    Dr. Sternberg, what do you do for a living?

23             THE COURT:  You can pull the mike towards you.

24             THE WITNESS:  (Complied with request.)

25             THE COURT:  There you go.

1          THE WITNESS:  I have two positions.  The first one

2   is I'm an emeritus professor of civil engineering at the

3   University of Maryland in College Park.  The second is I'm a

4   principal of a consulting firm by the name of Signum

5   Environmental, Inc.

6   BY MR. CRANE:

7   Q    All right.  Let's start with the first one.  How long

8   have you been a professor at the University of Maryland?

9   A    I believe, my recollection is right, I joined the faculty

10  in 1971 as an associate professor, and I became a full

11  professor in either 1973 or 1974.

12  Q    And what is civil and environmental engineering?  Can you

13  describe that for us?

14  A    The department offers courses both in civil engineering

15  and in environmental engineering.  In the early 1970s, there

16  was less focus on environmental engineering and more focus on

17  civil engineering courses, such as bridge building, soils,

18  transportation, and so on.  And as our awareness of

19  environmental, general environmental issues became greater,

20  the shift moved from civil engineering to more and more

21  environmental engineering, and today I think the ratio is

22  about 50/50.

23  Q    All right.  So what do you teach at the University of

24  Maryland?

25  A    I teach both graduate and undergraduate courses in

1    environmental engineering.  The undergraduate courses consist

2    of fluid mechanics and groundwater hydrology.  The graduate

3    courses consist of groundwater hydrology and hazardous waste

4    management.

5    Q     Can you describe briefly what groundwater hydrology is?

6    A     Groundwater hydrology is the study of the occurrence and

7    movement of groundwater.  Groundwater is that part of the

8    water cycle, if you wish, that resides below the surface of

9    the earth.  Almost anywhere in the world, if you go and drill

10   a well, at some point you're going to encounter water.  It may

11   be good water, it may be brackish water, but you're going to

12   encounter some water.

13         And in most places, this water is moving slowly or

14   slightly faster, and it is moving from one point to another

15   point, and it is continuously moving.  As it moves, it

16   dissolves whatever constituents there are in the pores that

17   the groundwater fills.  And as it moves, it dissolves and

18   carries these dissolved constituents to other places.  For

19   example, if you look at groundwater in areas that have

20   limestone, the groundwater will be hard.  It will consist of a

21   lot of calcium carbonate.  If we're looking at the groundwater

22   in this site, if you have perc in the saturated soil and the

23   groundwater moves through it, it will dissolve some of the

24   perc and will carry it with it.

25   Q     All right.  Let's talk about the other part of your

1  worklife, and that's your work at Signum.  Can you tell us

2  about that?

3  A    As I said, Signum is an environmental consulting firm,

4  and I established Signum in 1994, and the work that we do is

5  primarily associated with evaluation of environmental data

6  collected by others.  We do not go out and collect data

7  ourselves.  We do not have drilling rigs.  We do not have

8  geologists.

9       What we do is rely on the data that has been generated by

10  others, collect all of these data, evaluate it and analyze it

11  to answer questions such as, Where did the contamination start

12  from?  When did it start?  What is the projection; if we want

13  to clean the groundwater, how long is it going to take?  What

14  is the likelihood that we will get clean groundwater?  And

15  questions of this nature, in other words, associated with the

16  migration, generally, of contaminated groundwater.

17  Q    Have you worked in relation to Superfund sites?

18  A    Yes, I've worked in quite a few Superfund sites.

19  Q    All right.  And how about with chlorinated solvents?

20  A    Yes, quite a few of those were chlorinated solvents.  As

21  a matter of fact, I think last data that I've seen, about 70

22  to 75 percent of all the Superfund sites are there because of

23  chlorinated solvents.

24  Q    So is it fair to say that your consulting part of your

25  worklife generally involves groundwater contamination issues,

1   including Superfund and chlorinated solvent issues?

2   A    That's correct.

3   Q    How long have you been doing that kind of work?

4   A    Well, I started doing consulting work in 1965, and today

5   is 2010, so about 45 years.

6   Q    All right.  And can you give us a sense of who some of

7   your clients are in your consulting work?

8   A    They range from large industries, municipalities.  The

9   United States Agency for International Development, which is

10  part of the state department.  The World Bank.  The real

11  estate developers.  I probably missed one or two, but it

12  covers a whole host of different clients.

13  Q    Do you work for insurance companies?

14  A    Oh, yes.  And I forgot, and insurance companies.  Thank

15  you.

16  Q    All right.  And so tell us about your education and

17  background that allows you to do the kind of consulting work

18  and the teaching work that you do in the environmental field.

19  A    I received my bachelors degree in agricultural

20  engineering from the University of Illinois in 1961.  And then

21  I moved to the University of California at Davis and received

22  my masters in 1963 in water and groundwater hydrology.  And I

23  then continued on and received my Ph.D. in 1965, again in

24  groundwater hydrology.

25  Q    Now are you acquainted with Dr. Powell who is the expert

1  for Soco?

2  A    Yes, I am.

3  Q    And how did you become acquainted with him?

4  A    Dr. Powell was my student at the University of Maryland.

5  He did his Ph.D. dissertation, doctoral dissertation, under

6  me.

7  Q    Can you give us a sense of some of your professional

8  affiliations related to the area that we're talking about?

9  A    I am a member, I think it's a life member, of ASC, the

10 American Society of Civil Engineering.  I am a member of the

11 American Geophysical Union.  I just dropped membership with

12 the National Water Well Association.  I probably am a member

13 of one or two other organizations.  I don't know.

14 Q    And have you appeared in court and in depositions as an

15 expert in these kinds of matters?

16 A    Yes.  I appeared in a number of federal and state courts.

17 Q    All right.  And you have been retained by counsel for

18 USF&G and Continental in this case to provide an expert

19 opinion; is that right?

20 A    That's correct.

21 Q    Are you being compensated for your time?

22 A    Yes, I am.

23 Q    How much?

24 A    At the rate of $265 an hour.

25 Q    Let's turn to what you were asked to do as it relates to

1   what you're going to talk about today.

2   A    I was asked to estimate the amount of perc and its

3   degradation product in the subsurface environment, starting

4   from the area known as the northwest corner, all the way down

5   to the Yellowstone River.

6   Q    All right.  Let's pull up Exhibit 3059, page 121, and

7   maybe you can show everyone the area you're talking about.

8   A    The area that I'm talking about is the -- whoops.

9   Q    We moved it on you.  Let's try it again.

10           THE CLERK:  Lower right on the screen.

11           THE WITNESS:   (Complied with request.)

12   BY MR. CRANE:

13   Q    All right.  Try it again.

14   A    (Complied with request.)

15       Well, let's put it this way.  The green area, the blob as

16   it's called, the sort of elongated area is known as the

17   northwest corner, and the allegation is that perc was released

18   in this particular location.  And I was asked to look at all

19   of the available data and come up with an estimate of how much

20   perc is there in the subsurface environment, starting from the

21   northwest corner area of the green elongated area and

22   extending all the way to the Yellowstone River.

23   Q    Can you show us where the Yellowstone River -- the

24   direction of it, anyway?

25   A    The direction would be out here, but it's off, it's off

1780

1    the map.

2    Q    All right.  And is there other perc contamination in the

3    area that you have not included in your evaluation amount?

4    A    Yes.  If you look at the -- this area in here, you can

5    clearly see that there is gold or light-yellow-color plume

6    indicated, and that plume originates from the Dyce operational

7    area.  And the contamination originates and starts from the

8    Dyce area and moves through the north -- through the area we

9    talked about, the northwest area, and continues on towards the

10   Yellowstone River.

11   Q    Now why did you not include that contamination that

12   you've described as originating from the Dyce operational area

13   in your calculation for the amount of perc in the northwest

14   corner to the Yellowstone River?

15   A    Because the allegation was that the release of perc

16   occurred in the northwest corner, and, therefore, my task was

17   to start from the northwest corner and carry northwest all the

18   way to the point where it discharges into the Yellowstone

19   River.

20        I'd like to point out while we are talking about this --

21   how do I erase?

22            THE CLERK:  Lower right corner.

23            THE WITNESS:  I'd like to point out something that

24   may or may not be obvious.  We have groundwater that is moving

25   in the northwest direction and has been moving in that

1781

1    direction for many, many, many years, long before, you know,

2    Dyce started operation there, and you can see the green arrow.

3    That starts with clean groundwater.  Groundwater at that

4    particular location is clean.  Once it moves into the Dyce

5    operational area, that's where it starts to pick up the

6    contaminants, and it continues now as contaminated water and

7    reaches all the way to the Yellowstone River.

8    BY MR. CRANE:

9    Q    All right.  Let's talk about some of the things you

10   studied and reviewed to formulate your opinions.  Can you give

11   us a sense of the material that you reviewed?

12   A    As you heard a number of times, there have been numerous

13   documents that have been generated by various consultants.

14   There were consultants for the government.  There were

15   consultants for Soco and its predecessors.  I reviewed all of

16   those.  And each one of those documents has generally a text

17   and then a number of appendices, and the appendices contain

18   all of the sort of the nitty-gritty data.

19        And I believe I reviewed all of these, and these will

20   include information on the types of soils that you encounter

21   on the concentration of different constituents, both in the

22   groundwater and in the soil.  It will include information as

23   to the physical characteristics of the soil; in other words,

24   What's the density of the soil?  What is the weight of the

25   soil?  All sorts of other pieces of information that, in my

1    area of study, are important.

2         In addition to all of those documents, I also reviewed a

3    fair number of depositions.  I have been in court here since

4    Monday afternoon, so obviously I heard all of the testimony to

5    date with the exception of Monday morning.

6         And in addition to that, I looked at the number of aerial

7    photographs, and if my memory serves me right, I spent a day

8    at the site, and I believe it was in August of 2009, looking

9    over and sort of getting familiar with the site.

10   Q    All right.  And based on all of that review and study,

11   have you formed an opinion as to the amount of perc and its

12   degradation products in the northwest corner and to the

13   Yellowstone River?

14   A    Yes, I have.

15   Q    And why don't you go ahead and give us your opinion.

16   A    My opinion is that approximately 80 gallons were released

17   in the northwest corner.

18   Q    In that 80 gallons, in your opinion, are you including

19   both soil and groundwater contamination?

20   A    Yes, I do.

21   Q    How many gallons do you conclude are in the groundwater?

22   A    Approximately 40 gallons are in the groundwater, and

23   approximately 40 gallons are in the soils.

24   Q    Do you agree with Dr. Powell as to how much is in the

25   groundwater?

1    A    Yes, I do.

2    Q    Do you agree with Dr. Powell about how much is in the

3    soil?

4    A    No, I do not.

5    Q    All right.  Why don't we pull up Demonstrative 491.  Will

6    this demonstrative help you --

7    A    Yes.

8    Q    All right.  Explain -- go ahead and explain.

9    A    What you see in front of you is a summary of perc and

10   perc equivalent, and what this means is the mass of or the

11   amount of perc that is represented by the degradation product.

12   And on the left, what you can see is Dr. Powell's analysis,

13   and what you see on the right is my analysis.  And we may have

14   broken it up differently and analyzed it somewhat differently,

15   but overall the agreement is quite good.  Dr. Powell has

16   estimated there are 36.5 gallons.  My estimate is

17   33.8 gallons.  We differ by about 10 percent, and I don't

18   think that this difference is significant at all.  So as far

19   as the groundwater is concerned, we are, I believe, in full

20   agreement.

21   Q    Now I notice that you have concluded about 8 gallons

22   discharged to the Yellowstone River and Dr. Powell has none.

23   A    Right.  Now what is this 8.1 gallons that discharged into

24   the Yellowstone?  If I can have the previous slide for a

25   moment?

1              DOCUMENT TECHNICIAN:  (Complied with request.)

2              THE WITNESS:  What we have in here, as I said

3    before, we have groundwater that is moving in this direction,

4    and it's obviously contaminated with perc and degradation

5    product and discharges into the Yellowstone River.  As I said

6    before, this groundwater is moving, and there may be some

7    disagreement about how fast it's moving, but an approximate

8    number is about 400 or thereabouts feet per year.

9              So if the length of the plume is -- and by that I

10   mean the length of the plume if you measure it from the

11   beginning of the plume from the Dyce operational area all the

12   way to the Yellowstone River, the length is, I believe,

13   something around 3,000 feet.  And, therefore, if the velocity

14   of the groundwater is about 400 feet per year, it will take a

15   groundwater particle somewhere between eight and nine years to

16   traverse the distance.  In other words, starting here, by the

17   time it reaches the Yellowstone River, it's about eight or

18   nine years.  Take 400 and divide by 3,000, you'll find how

19   many years.

20             But we needed to account for that, because the

21   contamination has been in the ground for quite some time, and

22   in order to be fair to the analysis, some of what was released

23   in the northwest corner is already gone, because it has been

24   some 30 years or so, so we accounted for that, and that number

25   we estimate, I estimate to be 8.1 gallons.

1   BY MR. CRANE:

2   Q    All right.  And Dr. Powell just didn't do that

3   calculation?  He didn't come up with anything on that?  He

4   ignored that, right?

5   A    That's correct.

6   Q    So explain to us how you arrived at your opinion

7   regarding the amount of perc contamination in the soil -- and,

8   Your Honor, if we could -- if I could approach?  Dr. Sternberg

9   wants to use an easel to explain this.

10          THE COURT:  Yes.

11          MR. CRANE:  Thank you.

12          THE WITNESS:  I left my marker in my jacket.

13      (Discussion off the record.)

14          THE COURT:  I don't need to see it.

15          THE WITNESS:  Thank you, Your Honor.

16          THE COURT:  Nothing personal, but I am not the

17   fact-finder in this case.

18          THE WITNESS:  I just want to make sure.

19          THE COURT:  Yes.  Thank you.

20          THE WITNESS:  The question was, how does one go

21   about finding what is the amount of perc in the soil?  In

22   order to answer that question, we need information on two

23   things.  First of all, what is the concentration of perc in

24   the soil?  And I will just write the abbreviation for the

25   concentration of perc in the soil.

1          And the next thing we need to know is what is the

2    volume of the soil that has been impacted?  If we know the

3    average concentration, if we know the volume of soil, if we

4    can take the product of the concentration times the volume and

5    multiply that product by a series of constants that everybody

6    agrees on, we'll end up with the amount of perc in gallons.

7          So we have two tests in here.  One is to determine

8    what's the concentration.  The other one is to determine

9    what's the volume.  So let's tackle the first one first.  How

10   do we determine what is the concentration?

11         First, you heard this morning concentration can have

12   various expressions, parts per million, parts per billion, and

13   so on.  When you're dealing with the concentration of perc in

14   soil, the term that we often use is milligrams per kilogram.

15   Now milligrams of what?  It's milligrams of perc and kilograms

16   of soil.

17         So the concentration in soils is generally given in

18   milligrams per kilogram.  You heard the term before that the

19   concentration of perc that signifies that we have DNAPL -- I

20   believe the number you heard was 189.  That means

21   189 milligrams of perc per kilogram of soil.  So this is how

22   concentration is defined.

23         Now milligrams, for those --

24   BY MR. CRANE:

25   Q    Dr. Sternberg, can I just stop you right here for one

1    second?

2         Is any of what you've just described controversial?

3    A    No, not at all.

4    Q    That's generally accepted?

5    A    Yes.

6    Q    All right.

7    A    Now just to give you a sense of what these terms are, a

8    kilogram is about 2.2 pounds, and there are about a million --

9    not "about."  There are a million milligrams in a kilogram.

10   So when we look and we look at a number like 189 milligrams

11   per kilogram, we are talking about a relatively small

12   concentration.  It's a relatively small amount of perc in a

13   kilogram of soil.

14        So the first thing that we need to understand, then, and

15   the first value that we need to obtain is what is the

16   concentration of perc in the soil in terms of milligrams per

17   kilogram?

18        So we'll get back to this in a moment.

19        The next thing we need to understand is what is the

20   volume of soil that is being impacted?  Now you heard

21   Dr. Powell talk about that in his estimation, there have been

22   about 200 to 300 gallons of perc released in the northwest

23   corner.  Well, what does it amount to in terms of the depth of

24   perc on the soil itself?

25        Now if you recall, the little green area that was shown

1    on one of the previous slides, doesn't exactly look like this,

2    but it's close enough, and this area is approximately 5,600

3    square feet.

4         Now if you believe that perc occupied or evenly

5    distributed over this 5,600 square feet, what you would do is,

6    or to find out what is the depth, you will take one of those

7    values and, for the sake of being on the conservative side,

8    let me use the 300 gallons.

9         So if I want to find out what is the depth of perc if it

10   is evenly distributed over this 5,600 feet, what I would do is

11   I would take, first of all, the 300 gallons, and I would

12   convert it to how many cubic feet it is.  And there are

13   7.5 gallons in a cubic foot.

14   Q    Is that just a mathematical calculation?  Nothing

15   controversial about that?

16   A    This is a constant, you know.  This is a known constant.

17        And, therefore, this gives me 40 cubic feet of perc, and

18   if now I take the 40 cubic feet of perc, divided by 5,600

19   square feet, what you get is about a little more than 1/16th

20   of an inch.

21        Now this is sort of unrealistic because what we assume is

22   that the perc is distributed evenly.  If it occupied 1/16th of

23   an inch, we wouldn't be here, because all of that perc would

24   evaporate, so clearly that is not the case.  So what is -- so

25   let's start with some reasonable amount of perc that could

1   have accumulated on the soil.

2        So if you ask yourself, how much will 40 cubic feet --

3   what kind of an area will it require for 1 inch, you will find

4   out that this area in here is equal to 500 square feet.  That

5   means that if now we are looking at an area that receives

6   1 inch uniformly distributed, this area now drops down to

7   500 square feet.

8        Now this is just an example.  Let's see what happens if

9   we have 1 inch of soil -- of perc on the soil.

10       I've looked at some aerial photographs, and the northwest

11  corner is an area that has not been disturbed.  It has not

12  been graded, has not been flattened, so a normal soil area has

13  an undulating surface.  You have low places, you have high

14  places, and, therefore, what you have in here is simply an

15  uneven surface.

16       And before I start with this, if we can see the next --

17            MR. CRANE:  Can we pull up Exhibit 3051, page 812?

18  And if we could focus in on PT-2, I think?

19            DOCUMENT TECHNICIAN:  (Complied with request.)

20  BY MR. CRANE:

21  Q    Does that help you, Dr. Sternberg?

22  A    Yes.  What you can see, then, this is a cross-section,

23  and you have seen this figure a number of times.  This is a

24  cross-section; in other words, a geological cross-section of

25  about the center of the green area.

1    Q    And this is from the feasibility study, correct?

2    A    It's either from the feasibility or from the ROD, but

3    this particular figure appears in almost every document.

4    Q    All right.  Go ahead.

5    A    But what you have in front of you is you can see the

6    yellow area or the light brown area is the topsoil which is

7    silty clay, and then you can see the blue line which is the

8    water table.  What I'd like to do is to sort of blow this up

9    and talk a little bit about this area.

10        So what we have in here is we have an area in here,

11   which, the distance from the soil surface to the water table

12   is about 5 feet, and this whole area in here, the vertical

13   area here, is simply a silty clay material, and it carries on

14   below the water table.

15   Q    Can you label the water table?  I know there's a symbol

16   there, but if you can --

17   A    Yes.

18   Q    Thanks.

19   A    (Complied with request.)

20        Now what does this water table mean?  What we have below

21   here is totally saturated zone.  That means that only two

22   things are in here:  soil and water.  There's absolutely no

23   air in here.  And this is the groundwater that I talked to you

24   before is moving at a rate of about 400 feet per year from the

25   right to the left on your screen, and it is just water.

1   Q    Now it's not -- let me just stop you for a second.  It's

2   not like a, in that saturated zone, it's not like a river of

3   groundwater?

4   A    No, no, no, no, no.  It's not a river at all.  It's

5   simply the groundwater that is within the pores -- between the

6   soils are pores, and it moves around the pores -- and it is

7   moving in a northwest direction.  There are no big rivers

8   here.

9        And what we have on top of the water table is known as

10  the unsaturated zone, and this zone has three things:  it has

11  air, some water, and the silty clay particles.

12       So let's see what happens if an inch of perc gets trapped

13  or pooled on the soil surface.  So this, this, this, I'm going

14  to start here with 1 inch of soil.  You heard that it's

15  heavier than water, and as it's heavier than water and it

16  moves rather -- it's less viscose than water, it will

17  penetrate the soil, and as it penetrates the soil, it is going

18  to migrate downward.  And as it migrates, it's going to coat

19  the silty clay particles.  So now the silty clay particles

20  have a little bit of perc attached to those particles.

21       And at some point, and whether it is a week or two weeks

22  or as many weeks or as many days, it is going to reach this

23  water table.  And as you recall, Dr. Powell said that the

24  characteristics of perc are such that even though it is

25  heavier than water, it cannot penetrate the groundwater

1    directly; it needs to pool up to develop sufficient pressure

2    to break through, and I fully agree with him.  There is no

3    disagreement there.  That's the, one of the characteristics of

4    perc.

5         So the question, then, is two things:

6         First of all, One inch of perc, how much of perc are we

7    going to see above the water table?

8         Question No. 2 is, Is this enough to break through?

9         So let's address the first question first.  If you have a

10   beaker that has no water, and you have two identical beakers,

11   one has an inch of water and one has no water, you pour 1 inch

12   to the new beaker, you're going to see 1 inch of water.

13        Now take the same beaker and fill it with sand, and fill

14   it to a height of, let's say, 5 inches.  This is all now sand.

15   Take the beaker where you had 1 inch of water and pour it into

16   the beaker that has the sand, and how much water is now going

17   to be in the beaker of sand?  It's not going to be 1 inch

18   because the water has only to fill the pore space.  It doesn't

19   have to fill the solid particles.  It has only to fill the

20   pore space, and it is a function of the porosity of the soil.

21   The porosity of the soil is the amount of pore space that the

22   water has to fill.  And the calculation is very simple.  If we

23   assume for the sake of simplicity that the porosity is

24   25 percent, the height that the water will rise is 1 over 25,

25   or 4 inches.

1   Q     Now why did you use 25 percent there?

2   A     For one reason, it's simple, 1 over 25 percent.  The

3   other reason is that this number appears in the, in the ROD

4   and in various documents; the porosity of the actual soils in

5   here, anywhere from 25 to 30 percent, so instead of dividing

6   by 30 percent, 25 percent is easier.

7   Q     All right.

8   A     So what we have now is that 1 inch of perc, by the time

9   it gets to the water table, is going to have somewhat less

10  than 4 inches because it coated some of the material in here.

11        But let's, for the sake of simplicity, forget that it

12  coated anything.  It starts from here, ends up in here, and

13  now we have 4 inches of perc sitting on top of the water

14  table.

15        The question is, Does 4 inches of perc generate

16  sufficient pressure for the perc to break through?  And the

17  answer is, No.  The amount of perc that you need to develop

18  sufficiently high pressure in here that will allow the perc to

19  break through, the minimum is about 8 inches.

20        So what does it translate to?  It translates to the fact

21  that now we need not 1 inch; we need 2 inches of perc.  And if

22  we need 2 inches of perc, the area is no longer 500 square

23  feet; it is now 250 square feet.  Or, stated differently, we

24  needed 2 inches of perc in the little pool in here because

25  without it, it cannot penetrate into the groundwater, and we

1    know that the groundwater is contaminated, so we know it

2    penetrated, and, therefore, you need 2 inches in here in order

3    to break into the groundwater.

4         We also know that if we start from 300 gallons and we

5    want 2 inches of perc, that means that we now have an area

6    that's contaminated only 250 square feet.  Now that doesn't

7    mean that the 250 square feet must be contiguous.  It can

8    be -- if you look at the northwest corner, there can be a

9    little place in here and a little place in here and a little

10   place in here, so on, so forth, as long as they all, the

11   little areas, combine to 250 square feet.  So this is how the

12   perc gets into the groundwater.

13        Now what we need to do is to try to figure out, from this

14   information, how the area that I talked about, how do we

15   translate it into a volume of soil?

16        And can I have the next slide?

17   Q    You want this one here?

18   A    Yes.

19            THE COURT:  Can we take a break here?

20            MR. CRANE:  Sure.  Thank you, Your Honor.

21            THE LAW CLERK:  All rise.

22        (Recess taken from 14:44:44 to 14:57:09.)

23        (Open court.)

24        (Jury present.)

25            THE COURT:  Please be seated.

1          You may continue.

2          MR. CRANE:  Thank you, Your Honor.

3    BY MR. CRANE:

4    Q     Now, Dr. Sternberg, before the break, you were talking

5    about your calculations of volume and concentration.  Can you

6    just give us a brief summary of the significance of those

7    calculations?

8    A     Yes.  The significance is this.  Again, if you need, if

9    you need 2 inches of perc in order to break into the

10   groundwater, and for 300 gallons that Dr. Powell assumes, that

11   translates into a total area of 250 square feet.

12         Now if you look at the area that Dr. Powell used, which

13   is 5,600 square feet, and you ask yourself, okay, what kind of

14   a volume of perc do I need to generate this 2 inches of perc,

15   and the answer for that is 7,000 gallons.  Obviously, nobody

16   has testified 7,000 gallons.  That's more than half of the

17   amount that Dyce used in a year.

18         So the fact is that what we are looking at is a much

19   smaller area of contamination.  It's not 5,600 feet.  There

20   are pockets in here of contamination that make up a total of

21   250 square feet.

22   Q     All right.  Now you've testified that you obviously

23   disagree with Dr. Powell's number.  Can you explain why you

24   disagree?  Where do you believe Dr. Powell went wrong?

25   A     All right.  If I can have the next --

1    Q      Do you want the demonstrative up?

2    A      Yes.

3           MR. CRANE:  612, please, Neil.  Thank you.

4           DOCUMENT TECHNICIAN:  (Complied with request.)

5    BY MR. CRANE:

6    Q      You're going to have to -- Dr. Sternberg, if you need to

7    look at it, it's going to be on the screen.

8    A      Thank you.

9           What you see in front of you is a cross-section through

10   the northwest corner.  The area on top, the green, corresponds

11   to the area of the northwest corner.

12          Maybe just for clarification can we see the first slide?

13          MR. CRANE:  Sure.  Let's pull up 3059-121.

14          DOCUMENT TECHNICIAN:  (Complied with request.)

15          THE WITNESS:  You can see the green area in here,

16   and now, if you visualize this on the side, let's go back to

17   the -- now we have this area sitting on top here.  And what we

18   are looking at is the soils that are underlying this total

19   cross-section of area.  And what Dr. Powell has done is he

20   broke it into five sections; I'm sorry, into four sections.

21   The first section is zero, meaning from the soil surface down

22   to 4 feet.  The second section is from 4 to 8 feet.  The third

23   is 8 feet to 12 feet, and the last one is from 12 feet to

24   25 feet.

25          What I'd like to focus on is the first area, the

1797

1  zero to 4 feet.

2          If I can have the next slide, please?

3          MR. CRANE:  All right.  432, page 1, please.

4          DOCUMENT TECHNICIAN:  (Complied with request.)

5  BY MR. CRANE:

6  Q    Okay.  It's clear now.  Good.

7  A    What you see in here is now, again, the northwest corner

8  or the 5,600 square feet.  Now it's divided into six different

9  zones marked A through G.  And you can see, in two of the

10  zones, in Zone D and in Zone C, you can see a series of

11  letters and numbers.  These are borings from which soil

12  samples were collected.  So we have PZ-1 and PZ-8 and PZ-9 in

13  Area D, and PZ-10 and a boring marked SB-4 also in Area C.

14      And since these are soil samples that were collected and

15  analyzed by laboratory, we have the data for these five

16  samples.

17      And can I have the next slide, please?

18          DOCUMENT TECHNICIAN:  (Complied with request.)

19          MR. CRANE:  It should be up there.

20          THE WITNESS:  Yes, but I don't have the copy.  I

21  want to write.  Can I have yours?

22      (Discussion off the record at the podium.)

23          THE WITNESS:  So what I'd like to do is to simply

24  mark this in here.  We have the zero to 4 feet, and what you

25  see in front of you, you see four black locations and one

1    orange.  And, again, what does it mean?  Let's take the PZ-1.

2             The depth of the soil, or from where the soil was

3    collected, was from zero to 2 feet, so that means that the

4    soil sample went from zero to 2 feet.  This is the soil

5    sample.  Next we have what was the date that the soil was

6    collected, and you can see it's July of 2003.  And the last

7    piece of information is what was the concentration of perc,

8    and this is in milligrams per kilogram.  So what was the

9    concentration of this particular soil sample?

10            So now if we look at this, at the four, and you can

11   see that the four black ones range somewhere between 1 and 10.

12   The lowest one is 1.4.  The highest one is 9.6.  But the

13   general range, we have four samples that range from 1 to 10.

14   These are all the black samples.  And then we have one sample

15   in orange that was collected in 2004, and that concentration

16   is 11,050 milligrams per kilogram.  So we have a total of five

17   samples; four samples, 1 to 10, and one sample, 1,050.

18            And what Dr. Powell did is he combined the five

19   samples, so he added the values in the black, the values in

20   the orange, divided by 5, and found out an average

21   concentration of 300 and -- 236 milligrams per kilogram is the

22   average of these five numbers that you see in front of you.

23   And this is wrong.

24   BY MR. CRANE:

25   Q    Can you explain why you think that's wrong?

1   A    Yes.  Let me give you sort of a financial analysis.

2   Imagine that there are -- there's a street with 25 homes.  We

3   know the salary of five of the individuals.  There are four

4   homes, each having a salary of $50,000 and one having a salary

5   of $5 million.  The average of these five numbers is

6   $1.04 million.

7       Now why did I pick these numbers?  Remember that the

8   range of the four samples were 1 to 10, and one sample was

9   1,150.  If I am trying to do a comparable analysis, I have

10  four families, each making $50,000.  The outlier or the large

11  should be in the same ratio of the 1 to 10 to 1,150.  And what

12  is this ratio?  It is approximately 1 to 100.  1,150 is about

13  100 times greater than 1 to 10.  And, therefore, if we are

14  looking at 50, if we multiply it by 100, we're getting

15  5 million, and the average of this is $1.04 million.

16      So what does it mean?  It means that the five families

17  that we are talking about, right now, each one is making

18  $1.04 million.  Just imagine what's going to happen when the

19  IRS gets hold of this data.  The next thing you know, these

20  five families -- or four families are going to be subjected to

21  an audit because they'll claim that they clearly

22  underestimated their income by a million dollars.

23      It gets worse than that, because the next thing is, if

24  you take this $1.04 million and assign it to the remaining

25  20 families, we have no idea what their income is, but now,

1  based on the average, they're now earning $1.04 million.  And

2  this is what Dr. Powell did in his analysis.

3       If you look at the diagrams, zero to four samples -- zero

4  to 4 feet what we have now is that each zone, A, B, C, D, E,

5  F, G, has an average concentration of 236 milligrams per

6  kilogram.  As you can see, there is absolutely no data for A,

7  B, E, F, and G.  But doing this average and assigning this

8  value of 236 to each one of the areas translates to a very

9  large and, in my opinion, unrealistic average for this whole

10 area.

11      And now if you want to find out the volume, you take this

12 236 milligrams per kilogram -- or that's what Dr. Powell has

13 done -- you multiply by this total volume, which is about

14 5,600 feet and the depth is 4 feet, you get a very large

15 volume, you get a very large average concentration, and you

16 end up obviously with a very large volume of perc.

17 Q    Now did Dr. Powell apply this same methodology that

18 you've just described across the site and to all layers down?

19 A    The same methodology was applied to the subsequent

20 layers.

21 Q    So bottom line, what's the effect of Dr. Powell's

22 averaging on the calculation of the amount of the perc in the

23 soil?

24 A    Well, obviously it inflates the amount of perc that is in

25 the soil, and it's all because of the improper way that the

1    averages were calculated.

2    Q     Now what did you do to account for that problem?

3    A     I used an averaging technique that is known as the

4    weighted average, and what that technique does is it assigns a

5    certain weight to a concentration, so if you have a high

6    concentration over a smaller area, and a middle concentration

7    with a slightly larger area, it accounts for the product of

8    each one of those, and then we divide by the total area, and

9    we get much more realistic averages.

10   Q     And is this weighted averaging that you used a generally

11   accepted method, statistical method, when you have an outlier

12   like you're talking about?

13   A     Yes, it is.

14   Q     All right.  I think you can go ahead and sit down.

15   A     (Complied with request.)

16   Q     Let me turn to another topic, Dr. Sternberg.  You heard

17   testimony from Mr. Sullivan that as of about two weeks ago,

18   ATC, through its extraction system, had removed about

19   109 gallons of perc.  Do you recall that?

20   A     Yes.

21   Q     Does that testimony give you any pause or heartburn as to

22   your opinion as to the amount of perc in the soil in the

23   northwest corner?

24   A     Absolutely not.

25   Q     Can you explain that, please?

1    A    Yes.  Because I have looked at the data from ATC, and in

2    my opinion, approximately 70 percent of the amount that was

3    reported as 109 gallons actually comes from groundwater.

4    Q    Not soil?

5    A    Not soil.  The remaining approximately 30 percent comes

6    from the soil.

7    Q    And then that would be consistent with the opinion you've

8    given today?

9    A    That's correct.

10   Q    All right.  Let me turn to another topic, and that is I

11   think we've heard some testimony or seen the Lockheed report

12   that indicated that there may be around 200 gallons in the

13   groundwater.  Does that in any way conflict with your

14   opinions?

15   A    No, it does not.  The Lockheed report was done, I

16   believe, in 1999, towards the end of 1999.  And at that time,

17   really, we didn't have much data, so I don't really assign

18   much credibility to this report, but since Dr. Powell

19   mentioned it, I thought it would be fair to make a comment on

20   it, too.

21        And what the Lockheed report basically says is that based

22   on the data that they had, there is approximately 200 gallons

23   in total in the groundwater over the whole plume.  That

24   means -- if I can see the first slide?

25              MR. CRANE:  Yeah.  Let's blow up 3059, page 121,

1803

1    again, if we could.

2            DOCUMENT TECHNICIAN:   (Complied with request.)

3    BY MR. CRANE:

4    Q     Thank you.

5    A     Thank you.

6          That means that if we start from here and we go all the

7    way to the Yellowstone River, which is not present here,

8    according to the Lockheed report, that 200 gallons in the

9    groundwater, in this plume.  Now my analysis says that the

10   groundwater from this point to the Yellowstone River contains

11   about 40 gallons, and this is consistent with Dr. Powell's

12   analysis.  So if you look at the value of 200, which is in the

13   groundwater, 200 gallons in the groundwater in the total

14   plume, and you subtract from that the 40 gallons that is

15   present in the groundwater from the northwest corner and

16   northwest, you are left with the cross-hatched area in here,

17   which is 160 gallons.

18         So that suggests that the Dyce facility actually

19   contributed quite a bit of perc to the groundwater.

20   Q     From the Dyce operation?

21   A     The Dyce operational area.  I'm sorry.  Yes.

22   Q     Right.  And obviously the groundwater is apples and

23   oranges with the soil, correct?

24   A     Absolutely.  You cannot compare the soil to the

25   groundwater, and the Lockheed report only deals with soil --

1    with the groundwater.

2    Q    And so are you saying, then, that the 160 or so gallons,

3    if you subtract the 40 from the 200, that's coming from the

4    Dyce operational area, that's just the gift that keeps on

5    giving to the contamination?

6    A    That's right.  In other words, there is no, there is no,

7    in other words, there is no limit to this.  It keeps giving.

8    As I said before, clean groundwater comes in here, and it

9    becomes contaminated in here, and this number, based on the

10   Lockheed report, suggests that it's 160 gallons.

11              MR. CRANE:  Thank you, Dr. Sternberg.

12              THE WITNESS:  Thank you.

13              THE COURT:  You may cross.

14                        CROSS-EXAMINATION

15   BY MR. LYNCH:

16   Q    Good afternoon, Dr. Sternberg.

17   A    Good afternoon.

18   Q    You were talking a little bit about the differences

19   between your mass calculations and some of the other mass

20   calculations that have been gathered and mass measurements

21   that have been made by other parties in this action.

22        You find fault, I take it, as you said, with ATC's

23   measurement of the perc they actually got out of the

24   groundwater, correct?  I'm sorry, out of the vadose zone with

25   the SV extraction system; is that correct?

1   A     I'm sorry.  I didn't hear you.

2   Q     You found fault with ATC's measurement of the perc they

3   got out of the vadose zone through the soil vapor extraction

4   system; is that correct?

5         MR. CRANE:  Objection.  Misstates the witness's

6   testimony.

7         THE WITNESS:  I didn't say I find fault.  I have no

8   way of judging whether the number 109 gallons is correct or

9   not.  I first heard it when I sat here; I believe it was

10  either Monday or Thursday.

11  BY MR. LYNCH:

12  Q     Did you also compare your mass estimates to the mass

13  estimates ATC made in 2005?

14  A     I believe I did compare it, yes.

15  Q     And what was the comparison?

16  A     I'm not sure what you're referring to.  Are you referring

17  to the comparison that, in other words, our checking of the

18  values of ATC?

19  Q     No.

20        Julianne, would you please pull up Exhibit 4400?

21        DOCUMENT TECHNICIAN:  (Complied with request.)

22        MR. LYNCH:  And could you go to page 31 of that

23  exhibit, please?  Page 31, please.

24        DOCUMENT TECHNICIAN:  (Complied with request.)

25  ///

1806

1   BY MR. LYNCH:

2   Q    This is the January 14, 2005 report of ATC.   They

3   submitted it to DEQ.

4   A    Yeah.

5   Q    This is the report you've reviewed in connection with

6   your work; is that correct?

7   A    Sure.

8        MR. LYNCH:  Could you please go to page 43,

9   Julianne?  And zoom in on the fifth bullet point, I believe.

10  Where I put the blue mark.

11       DOCUMENT TECHNICIAN:  (Complied with request.)

12  BY MR. LYNCH:

13  Q    It states, "The mass of CVOCs within the vadose zone,

14  zero to 5 feet below ground surface, was estimated to be

15  between 750 and 1,550 pounds."

16  A    And your question is?

17  Q    Is ATC wrong, too?

18  A    Well, I believe these numbers are inflated, also.

19  Q    Why is that?

20  A    Well, can we go back to page -- go back to 4400-0054?

21       MR. LYNCH:  Pull that up, Julianne.

22       DOCUMENT TECHNICIAN:  (Complied with request.)

23       THE WITNESS:  Can I just take my reading glasses?

24  (Pause.)

25       THE WITNESS:  Well, let's take a look at Table 3-10.

1    If you look at, let's say, Soil Section A, the only

2    information that is available is from 4 to 5 feet, which says

3    that it's 15 milligrams per kilogram.  That is as far as the

4    soil is concerned.  Then you have PID readings for other

5    sections of the Section A.  The proper way to do it would be

6    to take the depth of soil multiplied by the respective

7    concentration.  What they have done is have looked at the

8    total value, averaged it, and then multiplied by the total

9    depth.

10   BY MR. LYNCH:

11   Q    So in your conclusion, ATC is wrong as well?

12   A    My conclusion is that the computation here is improper.

13   Q    Let's look at your computation, then.

14        Can we go back to the ROD figure, 3059-0121?

15            DOCUMENT TECHNICIAN:   (Complied with request.)

16   BY MR. LYNCH:

17   Q    I believe at the start of your testimony today, you

18   circled that as the northwest corner source area, correct?

19   A    Yes.

20   Q    And you said the square footage of that area is, I

21   believe, approximately 5,600 square feet?

22   A    That's correct.

23   Q    And according to this diagram, at least, EPA says that

24   this green area constitutes their estimated extent of source

25   area soils that are contaminated with perc, correct?

1    A     That's correct.

2    Q     And you understand that that entire green area is -- are

3    the soils that EPA is asking Soco to clean up in this action?

4    A     You are missing the word "estimated."  It's simply an

5    estimated area.

6    Q     Certainly, an estimated area.

7    A     That's correct.

8              MR. LYNCH:  And you go to -- please go to ROD

9    Figure 11, which is 3059-0125.

10             DOCUMENT TECHNICIAN:  (Complied with request.)

11             MR. LYNCH:  Actually I believe it's the page before

12   this, 012 -- I have the wrong page number.  One moment.

13             I was right, 125.

14             MR. JOHNSON:  Your Honor, I'm having a little

15   trouble hearing.  Can he pull the microphone out?

16             THE WITNESS:  (Complied with request.)  Sorry.

17             MR. JOHNSON:  Thank you.

18   BY MR. LYNCH:

19   Q     Again, Dr. Sternberg, we have the northwest corner there,

20   correct?

21   A     Yes.

22             MR. LYNCH:  And could you pull up the legend,

23   Julianne?

24             DOCUMENT TECHNICIAN:  (Complied with request.)

25   ///

1   BY MR. LYNCH:

2   Q    And we see the -- again, the legend in green and the

3   green hash marks are estimated extent of contaminated soils

4   above remediation goals and soil excavation area, correct?

5   A    Correct.

6   Q    So again, that's EPA's estimate as to the area of the

7   contaminated soil, correct?

8   A    Correct.

9        MR. LYNCH:  Close that, please.

10       DOCUMENT TECHNICIAN:  (Complied with request.)

11       MR. LYNCH:  Let's go to Demonstrative DD151.

12       DOCUMENT TECHNICIAN:  (Complied with request.)

13  BY MR. LYNCH:

14  Q    In calculating your mass estimates, Dr. Sternberg, you

15  used a reconfigured area for the northwest corner of 2,600

16  square feet total, correct?

17  A    That's correct.

18  Q    This area here?

19  A    Correct.

20  Q    It's a little more than half of EPA's estimated extent of

21  the contaminated area?

22  A    That's correct.

23  Q    And that effectively reduces the mass of PCE, perc, that

24  you estimate to be in the northwest corner, correct?

25  A    That's correct.

1  Q     EPA is not just going to let Soco dig up that 2,600

2  square feet, are they, because that's what you say is

3  contaminated?

4           MR. CRANE:  Objection.  Lacks foundation.

5  Argumentative.

6           THE COURT:  Overruled.  This is cross.

7           You can answer.

8           THE WITNESS:  I don't know what EPA is going to ask

9  Soco to do, they're going to ask Soco to do to clean it up.

10  But the green area is the estimated.  There is no confirmation

11  how much they actually need to clean.  That's an estimate.

12  BY MR. LYNCH:

13  Q     All of these mass calculations are estimates, aren't

14  they, Dr. Sternberg?

15  A     That's correct, but the area to be cleaned up is also an

16  estimate.

17  Q     As is your mass calculation, correct?

18  A     Sure.

19           MR. LYNCH:  Please go to Exhibit 3058-0050.

20           DOCUMENT TECHNICIAN:  (Complied with request.)

21  BY MR. LYNCH:

22  Q     This is a page from the RI addendum.

23           In calculating your mass of the northwest corner soils,

24  Dr. Sternberg, you only took samples within that area,

25  correct?

1    A    I only considered samples from that area?  Is that what

2    you're saying?

3    Q    In calculating the mass of the soils.

4    A    I considered the data from this, plus whatever data is

5    adjacent to it.  And we didn't find it.

6    Q    You didn't consider the perc that's been found in that

7    area, did you?

8    A    I'm sorry?

9    Q    You didn't consider the perc that's been found in the

10   area that I've circled on the diagram, did you?

11   A    That value was extremely small.

12   Q    Do you recall what that value was, Dr. Sternberg?

13   A    I'm sorry?

14   Q    Do you recall what that value was, the one you said was

15   extremely small?

16   A    I don't, but I can pull it up.  What well was it?

17   Q    PT-1.  I believe it's 304 milligrams per kilogram.

18   A    PT-1?

19   Q    One.

20   A    When was it taken?

21   Q    There, you might have me.

22        Actually, Julianne, if you'd go to 3051?  This is the RI

23   addendum, page 815.

24             DOCUMENT TECHNICIAN:  (Complied with request.)

25             MR. LYNCH:  If you could pull out this area in here?

1          DOCUMENT TECHNICIAN:  (Complied with request.)

2    BY MR. LYNCH:

3    Q    We have results right above where I'm drawing the line,

4    Dr. Sternberg, for PT-1, 6 to 8 feet below ground surface

5    taken in 2001, 304 milligrams per kilogram.  That's well

6    above --

7    A    Yes, I don't -- I see it.  I don't recall right now why

8    we did not consider this data point.  That must have been -- I

9    can't remember right now why, but there was a reason why, why

10   I didn't include it.

11   Q    And that data point is indicative of DNAPL perc, isn't

12   it, Dr. Sternberg?

13   A    This one is, yes.

14          MR. LYNCH:  You can take that down.

15          DOCUMENT TECHNICIAN:  (Complied with request.)

16          MR. LYNCH:  Go back to the ROD Figure 7, 3059-0121.

17          DOCUMENT TECHNICIAN:  (Complied with request.)

18          THE WITNESS:  I am sorry.  I think we did --

19   BY MR. LYNCH:

20   Q    Dr. Sternberg, just wait for the question, please.

21   A    Well, let me correct myself.  We did include it.

22          MR. LYNCH:  Can you pull up, Julianne, Figure 8 to

23   Dr. Sternberg's expert disclosures in this matter?

24          DOCUMENT TECHNICIAN:  (Complied with request.)

25          MR. LYNCH:  May I approach, Your Honor?

1          THE COURT:  Yes.

2    BY MR. LYNCH:

3    Q    (Handing.)

4    A    Right.  What we did now, I recall.  What we did is we did

5    not include it because we considered it to be, as the RI did,

6    as a separate area.

7          MR. LYNCH:  Now go back to the ROD figure,

8    3059-0121.

9          DOCUMENT TECHNICIAN:  (Complied with request.)

10   BY MR. LYNCH:

11   Q    Am I correct, Dr. Sternberg, that after the RI, by the

12   time of the ROD, EPA has made this a contiguous source area?

13   A    They did.

14         MR. LYNCH:  Go back to Demonstrative DD151.

15         DOCUMENT TECHNICIAN:  (Complied with request.)

16   BY MR. LYNCH:

17   Q    Now, Dr. Sternberg, not only did you cut EPA's source

18   area in half this way, you cut it in half again that way,

19   didn't you, when you were determining mass?

20   A    Yes.  I looked at the two separate areas because there

21   are two separate sets of data there.

22   Q    This, the side on the right has soil borings?

23   A    Correct.

24   Q    Because that's on Soco West property, and ATC could

25   conduct soil borings on that side, correct?

1814

1    A    I don't know if they could do borings only on one side or

2    on both sides.  The fact is that there are no soil borings on

3    the west side.

4    Q    So you just assumed, because there's no soil borings,

5    that the left side -- you understand this is the Keller

6    fenceline between those two, isn't it?

7    A    Yes.

8    Q    And I understand there's no soil sampling data from the

9    Keller side to tell us exactly what soil concentrations are

10   there, but EPA did not stop its estimated extent of DNAPL

11   contamination at the fenceline, did they?

12   A    No.  Neither did we.  We attempted to calculate, as you

13   well know, what is the concentration in the soil in the light

14   blue area, and we came up with a number.

15        MR. LYNCH:  Julianne, please go to RI addendum,

16   3058, page 50.

17        DOCUMENT TECHNICIAN:  (Complied with request.)

18   BY MR. LYNCH:

19   Q    Even in the limited area you considered, Dr. Sternberg,

20   EPA says that the half of that that's on the Keller side, this

21   side, is contaminated with DNAPL?  That's what they've

22   estimated, isn't it?

23   A    Yes.

24        MR. LYNCH:  And go back to the ROD Figure 7,

25   3059-0121.

1          DOCUMENT TECHNICIAN:  (Complied with request.)

2   BY MR. LYNCH:

3   Q    And again, EPA has made no distinction, in its source

4   area, just because of the fenceline there, have they?

5   A    No.

6   Q    And yet, according to your calculations, you've assumed

7   that just because there's a fenceline there and we don't have

8   soil data on it, that the side on the Keller property is

9   completely different?

10  A    No, I did not.  If you can go back to the slide that

11  shows our Areas 1 and 2?

12          MR. LYNCH:  Let's go to DD151, then.

13          DOCUMENT TECHNICIAN:  (Complied with request.)

14          THE WITNESS:  The area in yellow is an area for

15  which there are soil borings, and we have considered all of

16  those.  The light blue area has no boring, has no soil data,

17  but it does have, I believe, four, three or four -- what are

18  those? -- DP wells.  And some of those, or all of those -- I

19  don't remember right now.  I have to look at my data sheet --

20  have pegged.  And what we attempted to do is find out what is

21  the value of the perc in the soils in the blue area that

22  corresponds to information from those MP wells, and I believe

23  that we did it, and we came up with a number.  We did not

24  ignore this area.

25  ///

1    BY MR. LYNCH:

2    Q    You did not ignore the area, but according to your

3    calculations, Dr. Sternberg, if your estimates of the amount

4    of contamination in that area are correct, that area would not

5    be a DNAPL area, would it?

6    A    The EPA has used various criterias to determine what is a

7    DNAPL area or not DNAPL area, and one of those was when the MP

8    well pegs, and three or four of those pegged, so EPA concluded

9    that it is a DNAPL area.  Again, it's an estimate.  But the

10   estimate does not have any quantitative numbers behind it.

11   It's only qualitative.  And it's perfectly all right for an

12   estimate to be qualitative, but when one wants to calculate an

13   actual estimate concentration, you need hard numbers.  You

14   can't simply go by estimates.  And we have attempted to assign

15   real numbers to the light blue area, and we documented how we

16   did it.  And, therefore, I feel very comfortable with our

17   analysis, as well as with EPA's estimate.

18   Q    According to your analysis, Dr. Sternberg, there would --

19   the average concentration of PCE on the blue side of the fence

20   would be 44 milligrams per kilogram, correct, in the 5- to

21   14-foot range?

22   A    I don't remember what the numbers are.  I mean, I will

23   take your word for it, but I don't see it in here.  Here, it

24   only shows the total gallons of PCE.

25   Q    And that's far below what EPA has identified as a soil

1    NAPL indicator, isn't it?

2    A    It is.

3    Q    And the results of that is that just because there's a

4    fenceline on Keller property, you have about a tenth of the

5    volume of perc on this side as you do on the Soco side; isn't

6    that correct?

7    A    No, the fence has nothing to do with it.

8         Can you show our Figure 7?

9              MR. LYNCH:  Figure 7, Julianne.

10             DOCUMENT TECHNICIAN:  (Complied with request.)

11             THE WITNESS:  Okay.  Can you blow it up?

12             DOCUMENT TECHNICIAN:  (Complied with request.)

13             THE COURT:  We can switch over to --

14             THE CLERK:  Oh.  Sorry.

15             DOCUMENT TECHNICIAN:  (Complied with request.)

16             THE WITNESS:  Now you can see where the fenceline

17   is, and you can see that west of the fenceline, there are four

18   MP wells:  122, 121, 120, and 119.  None of these have any

19   data associated with them.

20   BY MR. LYNCH:

21   Q    Soil data?

22   A    Soil data.  So how do we determine what is the

23   corresponding concentration to these particular wells?

24        Well, can I see our table, I believe it is, either 506?

25        (Pause.)

1          THE WITNESS:  Can we?

2          MR. LYNCH:  I'm not controlling it.

3          MR. JOHNSON:  I think we --

4          THE WITNESS:  Oh.

5          MR. LYNCH:  We can cover this on redirect.

6          THE WITNESS:  Pardon?

7          MR. LYNCH:  Why don't we cover this on redirect.

8    BY MR. LYNCH:

9    Q    Actually, let's do go back to that.  The MIP locations

10   that you chose don't have soil data associated with them, do

11   they?

12   A    That's correct.

13   Q    So you chose soil data from other MIP locations?

14   A    Well, what I tried to do is to find out some way of

15   correlating a value for an MP well that has pegged with those

16   locations where the MP well has pegged and there is some soil

17   data.

18   Q    The EPA RI addendum states that MIP pegging, the soil

19   correlation is anywhere from 10 to 100 milligrams per

20   kilogram, doesn't it?

21   A    I'm sorry?

22   Q    Doesn't the RI addendum state that EPA -- that MIP

23   pegging correlates to soil concentrations of anywhere from 10

24   to 100 milligrams per kilogram?

25   A    I have seen other numbers.

1    Q    Not a very accurate correlation of soil data in that

2    particular MIP?

3    A    That's correct.  That's correct.

4    Q    You didn't use the soil data from just across the fence

5    on the Soco side even though it's within 10 feet of these

6    samples, did you?

7    A    Of course I did.

8    Q    To determine what's on the Keller side?

9    A    Sure.

10   Q    Other than MP-138?

11   A    We used MP-139.

12   Q    But you didn't use any of the other soil samples?

13   A    I'm sorry?

14   Q    You didn't use any of the other soil samples on the Soco

15   side?

16   A    We used MP-109, MP-139, MP -- well, if you show our

17   Table, I believe it's either 6 or 7, it lays out exactly which

18   wells we used.

19   Q    What I'm getting at, Dr. Sternberg, though, is you didn't

20   use the soil samples that were within the DNAPL zone right

21   across the fence in calculating and estimating the

22   concentrations in soil on the Keller side?

23   A    I can't use actual soil data concentration from a point

24   that is a hundred feet away from the point I'm looking at,

25   because if you look at the data itself in here, there's

1    enormous variability.  There are some data points that are

2    5 feet apart and you get towards a magnitude of difference, so

3    I have no right of translating 500 or 200 feet distance, take

4    one point and move it 200 feet away.  That will be absolutely

5    unacceptable.  But what I can do is take the data that is

6    provided, namely the MP wells, and try to, to the best of my

7    ability, see what it translates to, and that's what, exactly

8    what I have done.

9    Q    Let's look at some of the other aspects of your mass

10   calculations, Dr. Sternberg.

11       Now you've criticized somewhat other people's mass

12   calculations, but it's true in this case you've already

13   provided corrected versions of your mass calculations several

14   times; isn't that correct?  Or at least one time?

15   A    I don't know if it's several times.  I remember one time

16   is we simply made an arithmetic error, and if you look at all

17   of the numbers, I don't think it's totally unreasonable to add

18   six numbers and skip one and come up with one that is a

19   different number.  The total difference was, I believe,

20   something of 2 gallons, so we're not talking about some

21   horrendous error that we corrected.  And as soon as I found

22   the error, we reported it.  So there was nothing to hide.

23   Q    Okay.  And you've corrected it now?  Your report is

24   correct, your estimate?

25   A    I believe so.

1821

1    Q    Can we please pull up -- actually let me ask you

2    something about your report, and let's look at your corrected,

3    a corrected version of your report.

4         May I approach, Your Honor?

5              THE COURT:  Yes.

6    BY MR. LYNCH:

7    Q    (Handing.)

8    A    Thank you.

9              MR. LYNCH:  Julianne, can you please pull up Table 2

10   of the corrections to Dr. Sternberg's report?

11             DOCUMENT TECHNICIAN:  (Complied with request.)

12   BY MR. LYNCH:

13   Q    I believe this is a groundwater calculation that you did;

14   isn't that correct, Dr. Sternberg?

15   A    Just a minute.

16        Yes.

17   Q    Okay.  And one of the things you did in connection with

18   making your mass estimates is you determined the PCE

19   equivalent amount, I believe, for all of these various

20   breakdown products?

21   A    Correct.

22             MR. LYNCH:  And just so I'm sure I understand this,

23   Julianne, could you please pull up Demonstrative DD5?

24             DOCUMENT TECHNICIAN:  (Complied with request.)

25   ///

1  BY MR. LYNCH:

2  Q    And one of the things we discussed with Dr. Powell

3  yesterday, perc or PCE breaks down to trichloroethylene when

4  it loses a chlorine, essentially; loses a chlorine and breaks

5  down to either cis or trans dichloroethylene; loses a chlorine

6  and breaks down into vinyl chloride.   Generally true?

7  A    Yes.

8  Q    Okay.  So to come up with your estimate of perc, the

9  equivalent amount, you convert everything back to perc when

10 you're doing your analysis, correct?

11 A    Yes.

12 Q    And that end perc equivalent amount should be something

13 greater than the sum of the volume of these breakdown

14 products; is that correct?

15 A    The sum of the volumes -- no, not necessarily.  I mean,

16 when perc -- I may not understand your question.

17       MR. LYNCH:  Let's go back to Table 2, Julianne.  Can

18 you enlarge that, please?

19       DOCUMENT TECHNICIAN:  (Complied with request.)

20 BY MR. LYNCH:

21 Q    This amount is the volume you calculated for the TCE in

22 the groundwater, correct?

23 A    Correct.

24 Q    So the amount of perc that it would have taken to have

25 made that volume of TCE is something greater than 390,

1    correct?

2    A    I don't know.  I'll have to go back and take a look at

3    it, because it's a function of molecular weight, and the

4    molecular weight of PCE is greater than of TCE.

5    Q    So the amount of PCE that it takes to make 3.9 gallons of

6    TCE should be greater than 3.9 gallons, correct?

7    A    Not necessarily.  I'll have to go back and calculate

8    these, because it's not -- as you can see, the molecular

9    weight of each one of those is less, is decreasing, so that

10   doesn't, doesn't necessarily mean that the volume itself is

11   going to be bigger.  We are talking about constituents that

12   have different weights.  We can't compare volume and volume.

13   You have to compare the actual mass of the material itself.

14   Q    Do you recall your deposition in this case,

15   Dr. Sternberg?

16   A    Yes.

17            MR. LYNCH:  Do you have his transcript?

18            MR. BANKER:  (Handing.)

19   BY MR. LYNCH:

20   Q    (Handing.)  Please go to page 116 --

21   A    All right.

22   Q    -- line 14.

23        And we're discussing this Table 2 in your report, aren't

24   we, Dr. Sternberg, there?

25   A    Yes.

1   Q    The question states, "Okay, and let me ask you this.  If

2   you have like say a gallon of PCE, could the degradation

3   products of that gallon equal more than a gallon?  It has to

4   be less than a gallon; isn't that correct?"

5        Your answer, "You can't create something from nothing."

6        Question, "Okay.  So it has to be less than a gallon?"

7        Answer, "Absolutely."

8        Question, "The degradation products?"

9        Answer, "Sure."

10       So, Dr. Sternberg, on Table 2, when we add up all of

11  these volumes of the degradation products, we get a total sum

12  of 26.92.

13  A    Correct.  I clearly misspoke because, I mean, that -- you

14  cannot compare a gallon with a gallon.  You cannot compare

15  these things on a volumetric basis.  You have to compare it on

16  a mass basis.  In other words, you cannot simply say that, for

17  example, a gallon of water and a gallon of gasoline are the

18  same, because they weigh differently, and, therefore, I

19  clearly misspoke in my deposition.

20  Q    Well, maybe we'll have Dr. Powell explain it in rebuttal,

21  but, Dr. Sternberg, isn't it true you're creating something

22  from nothing there and underestimating the amount of perc in

23  all of your calculations?

24            MR. CRANE:  Objection.  Argumentative.

25            THE COURT:  Sustained.

1825

1          THE WITNESS:  I don't think so.  I mean, the bottom

2     line is that Dr. Powell and I agreed --

3          THE COURT:  I sustained it.

4          THE WITNESS:  Oh.  Sorry.

5          MR. LYNCH:  I have nothing further.

6          THE COURT:  Redirect?

7          MR. CRANE:  A few questions, Your Honor.  Thank you.

8          THE COURT:  Do you have any questions?

9          MR. GROSSBART:  No, Your Honor.

10          MR. CRANE:  If we could pull up Demonstrative 492, I

11     think it is?

12          DOCUMENT TECHNICIAN:  (Complied with request.)

13                      REDIRECT EXAMINATION

14     BY MR. CRANE:

15     Q    Counsel was asking you about the difference between the

16     2,600 square feet that you used and the EPA's 5,600.  Do you

17     recall that?

18     A    Yes.

19     Q    Is this demonstrative helpful to you to explain what you

20     did and why you did it in that regard?

21     A    Yes.  I mean, when EPA first came up with the RI, which

22     is the remedial investigation, and then the addendum to the

23     remedial investigation, they identified two separate source

24     areas, the one on the bottom, PT-1, and the larger area as two

25     separate sources because in between, in this area and here,

1    there are either no soil -- there are basically no soil data,

2    or, if you look at the data from PZ, I believe PZ-5, there

3    were very small concentrations.  And, therefore, in EPA's mind

4    at that time, these two were separate areas, and, likewise,

5    when EPA drew this, they concluded that the area impacted by

6    perc in the northwest corner had an approximate area of

7    2,600 feet.

8         Between the issuance of the RI and the FS, no additional

9    data was collected in this area.  When the EPA came up with

10   their estimate for the contaminated soil, they increased the

11   area quite a bit.  And I believe we have a demonstrative that

12   shows the one over -- one overlays the other.  Maybe we can

13   see it?

14   Q    Well, let me just ask you this to crystallize what you're

15   talking about.  In your view, is it scientifically valid to

16   assume data that doesn't exist?

17   A    Absolutely not.

18   Q    Why not?

19   A    Well, because you are reporting, you are making a

20   calculation, and you need to have some data for this estimate.

21   If you have no data, you have absolutely no right to assume

22   that this data -- that this location has some contamination.

23   It may or may not, but you, you have absolutely no right to

24   assume that it has some.

25            MR. CRANE:  Pull up D424, if you would.

1                DOCUMENT TECHNICIAN:  (Complied with request.)

2    BY MR. CRANE:

3    Q    Would this demonstrative help you explain your last

4    answer in terms of data being there or not there and its

5    utility in this case?

6    A    Sure.  I mean, if you look at this, this area looks like

7    Swiss cheese.  I mean, they have punched holes all over the

8    place.  And in many of the holes, they either did not collect

9    any samples because -- may very well have been that the field

10   screening suggested that there is no reason to send the sample

11   to the laboratory.  Every time you send a sample to the

12   laboratory, somebody has to pay for it.  That's why we do

13   field screening.  We take a soil sample.  We split it in two.

14   We analyze it in the field, and if the field analysis says

15   that there is little or no contamination, there is no reason

16   to send the soil out.

17        So the fact is that we have quite a bit of data, and I've

18   used whatever appropriate data there is in here.  But if there

19   are no data in a certain area, you really have no right to

20   assume that there is contamination and proceed with the

21   estimate.

22   Q    Given the Swiss cheese nature, would you tend to assume

23   the opposite?

24   A    No.

25   Q    You just couldn't assume one way or the other?

1828

1  A    I would only use the available data.  If there are no

2  data, I will try to find out what is the equivalent data like

3  I was talking to Mr. Lynch.  There are some MP wells, that the

4  only information we have is that those wells pegged, and I

5  attempted to find out what is the correlation between a well

6  that pegs and the soil contamination.  I found information

7  about four wells, and that's the information that I've used in

8  my analysis.

9  Q    All right.  And is it your understanding that the EPA's

10 goal is to clean up and not necessarily quantify the amount of

11 contamination in the soil?

12 A    That's correct.  For estimating purposes, it's perfectly

13 all right to draw a line or to draw a curve, and you can draw

14 it at 5,600, and if they drew it at 5,700 or at 5,500, nobody

15 would argue with that because it is an estimate.  But when you

16 come to estimate the amount of contamination in the soil, you

17 cannot rely on an estimate.  You have to rely on the available

18 data.

19         MR. CRANE:  Let's go back to Demonstrative 492 for

20 just a second.

21         DOCUMENT TECHNICIAN:  (Complied with request.)

22 BY MR. CRANE:

23 Q    And you see the extra little blob down here.

24 A    Right.

25 Q    Would counting that blob materially change your opinion?

1829

1    A    No.

2    Q    And Mr. Lynch was, I guess, criticizing you about Table 2

3    in your report.  Did Table 2 have anything to do with soil?

4    A    No.

5    Q    That was groundwater?

6    A    Correct.

7    Q    And you don't have any disagreement with Dr. Powell about

8    the amount of perc in the groundwater?

9    A    That's correct.

10            MR. CRANE:  Thank you, Dr. Sternberg.

11            THE COURT:  You can step down.

12            THE WITNESS:  Thank you.

13            THE COURT:  Let's take another quick break here.

14            THE LAW CLERK:  All rise.

15        (Recess taken from 15:54:35 to 16:10:14.)

16        (Open court.)

17        (Jury present.)

18            THE COURT:  Please be seated.

19            Call your next witness.

20            MR. DAVIS:  The insurers call Bruce Dale.

21            Witness sheet?

22            THE COURT:  I don't need it.

23            MR. DAVIS:  You don't need it?  Okay.  Thank you.

24            WHEREUPON,

25    ///

1                   BRUCE EDWIN DALE, Ph.D.,

2    called for examination by counsel for plaintiffs, after having

3    been first duly sworn to testify the truth, the whole truth,

4    and nothing but the truth, testified as follows:

5                        DIRECT EXAMINATION

6    BY MR. DAVIS:

7    Q    Would you state your name, please?

8    A    Bruce Edwin Dale.

9    Q    Where do you live, sir?

10   A    I live in Mason, Michigan.

11   Q    What do you do for a living?

12   A    I'm a professor of chemical engineering at Michigan State

13   University.

14   Q    What is the academic field of chemical -- well, what is

15   the field of chemical engineering?

16   A    Chemical engineering is that branch of engineering that

17   deals with taking raw materials and converting them by

18   chemical or physical means to things that are more useful,

19   more valuable.  For example, crude oils that come out of the

20   ground really isn't good for very much, so we heat it, distill

21   it.  We make gasoline, diesel fuel.  You further process it.

22   You get plastics and paints and so forth.  Or, for example,

23   trees coming out of the forest aren't really very much good

24   for writing on, but we process them and pulp them, and now you

25   have paper and other kinds of products.  So any place where

                              1831

1    there's raw materials being converted to more valuable finish

2    products by chemical processing, that's where you find

3    chemical engineers working.

4    Q    How long have you been a professor of chemical

5    engineering at Michigan State?

6    A    About 15 years.

7    Q    As someone who is -- well, maybe we should first go

8    through your background.

9         What is the extent of your formal education?

10   A    I received a bachelors and a masters degree in chemical

11   engineering from the University of Arizona; in 1976, I got the

12   masters degree.  Then I went on to Purdue University to get

13   the Ph.D. or the doctorate and graduated there in 1979.

14   Q    After graduating from Purdue, what have you done?

15   A    I was first on the faculty at Colorado State University

16   down in Fort Collins for eight years; then the faculty at

17   Texas A&M University, also for about eight years.

18        Following that, I was offered the position of department

19   chair at Michigan State University, where I have been ever

20   since.  Not always as department chair, but that's where I've

21   been ever since.

22   Q    As someone who has apparently been teaching chemical

23   engineering for several decades now, have you become

24   acquainted, in that academic career, with the chemical

25   properties of perchloroethylene?

1    A    Yes.

2    Q    Have you served as an expert witness in lawsuits

3    involving perchloroethylene, or perc?

4    A    Yes, I have.

5    Q    What kind of cases, Professor Dale?

6    A    Mostly they've been connected with perc contamination

7    around the operation of drycleaning facilities.  That's where

8    most of it has been.

9    Q    Are you -- you're appearing as an expert witness for the

10   insurers here, are you not?

11   A    Yes.

12   Q    You're being paid for your time?

13   A    Yes.

14   Q    Both in and out of court?

15   A    Yes.

16   Q    What do you charge for your time, sir?

17   A    $275 an hour for outside of court and $400 for being

18   grilled here.

19   Q    What were you asked to do in this case?

20   A    I was asked to offer my opinions about what would happen

21   if a spill of hundreds of gallons of perc occurred in the

22   loading and unloading area there at Dyce Chemical.

23   Q    Based upon your education, the training you've received,

24   and your experience as a professor of chemical engineering,

25   and specifically on your knowledge of the properties of perc,

1    do you have an opinion as to whether Soco's spill claim, which

2    it is advancing in this lawsuit, is at all plausible -- and

3    let me finish -- specifically, that there was a spill of

4    500 gallons of perc in the loading/unloading area of Dyce

5    Chemical in Lockwood in the mid 1970s, and that no one has

6    ever noticed such a spill?

7    A    No, it's not plausible to me.

8    Q    My question was, Do you have an opinion on this?

9    A    Oh, sorry.  Yes, I have an opinion.

10   Q    And the opinion is?

11   A    It just doesn't make any sense that you have a spill that

12   large and nobody notice it.

13   Q    Are the known chemical properties of perc, did they enter

14   into the bases for your opinion?

15   A    Yes.

16   Q    And what are some of the known properties of perc upon

17   which you have formed your opinion?

18   A    Well, some of them have been mentioned already, but, for

19   example, the density of perc.  It's heavier than water, and so

20   it will sink in water.  It's also not very soluble in water.

21   There's also a property we call viscosity, which just

22   basically means how runny it is; if you pour it, how far it

23   will spread out.

24   Q    Maybe you better --

25   A    Slow down?

1834

1    Q     I need to stop you there.

2    A     Okay.

3    Q     And you need to slow down.

4    A     Okay.  A little nervous.  Sorry.

5    Q     That's okay.

6          You mean, "how runny it is," can you give examples for

7    the jury of comparative runniness or viscosities of things

8    that they may encounter in their own lives?

9    A     Sure.  For example, ketchup, if you poured some ketchup

10   on a plate or on a table, it won't spread out very far.

11   Ketchup is not very vis- -- sorry.  It's quite viscose.  It's

12   quite -- it's not very runny.  It's fairly thick.  If you pour

13   water on the table, of course, it spreads out quite a bit.

14         Perc is even less viscose than water.  That means it's

15   more runny.  It will spread out further, and it will spread

16   out faster than an equal sized spill of water, so it will

17   spread out to a greater extent and will do it more quickly

18   than water would.

19   Q     You mentioned weight.  You mentioned viscosity.  What

20   about the jury has heard the term that perc acts as a solvent.

21   Did you -- is that correct?

22   A     Yes.

23   Q     And did you take that property of perc into account in

24   reaching your opinion?

25   A     Yes, I did.

1    Q    And what do we mean when chemical engineers talk about a

2    chemical being a solvent?

3    A    Well, when you talk about something being a solvent, it

4    means that it will dissolve or bring into solution something

5    else.  For example, water is a solvent for sugar.  It will

6    dissolve sugar.  Perchloroethylene and water aren't solvents

7    for each other.  They won't dissolve each other.  But perc is

8    a very good solvent for things that are like it, like, well,

9    like grease and tar, and, as it turns out, the black part, the

10   tarry part of asphalt.  It's a very good, a very good solvent

11   for those.

12   Q    We'll get to that in a minute.

13        Another characteristic or property of perchloroethylene

14   that we've heard about is its volatility.  Is that the

15   correct -- am I using the correct noun?

16   A    Yes, you are.

17   Q    All right.  And what do we mean, what do chemical

18   engineers mean by "volatility" of a chemical?

19   A    It just means how easily something evaporates, how

20   readily it evaporates at a particular temperature, how fast it

21   goes from a liquid to a gas or a vapor.

22   Q    Let me shift your attention to the operation, your

23   knowledge of the operational area of the Dyce facilities in

24   the mid '70s.

25        And, Neil, if we could, have you -- first of all, have

1836

1    you examined aerial photographs?

2    A     Yes, I have.

3              MR. DAVIS:  Could we look at Exhibit 5019?

4              DOCUMENT TECHNICIAN:  (Complied with request.)

5    BY MR. DAVIS:

6    Q     And do you recognize this aerial as the Dyce facility as

7    of November 4, 1975?

8    A     Yes.

9    Q     And what has been laid down in the operational area, the

10   loading -- first of all, could you show us where you

11   understand the loading/unloading area was?

12   A     It's for solvents like perc.  It was right here in front

13   of the drumming shed.  Let's see if I did this right.

14   Q     And what was that surface area at that point in time?

15   A     It was asphalt.

16   Q     I want to stop you right there and put your chemical

17   engineering cap back on.

18         What is asphalt?

19   A     Asphalt consists of really two things.  The first, which

20   is most of it, is just rocks, small gravel, or we call it

21   aggregate, but it's just small rock of the right size.  The

22   rest of it, the black part that actually holds the gravel

23   together is called bitumen.  That's the technical name, but

24   what it basically is is the bottoms, after we take crude oil,

25   make gasoline and diesel and so forth, what's left on the

1  bottom of the pot.  Literally the bottom of the barrel.

2  Q    At the refinery?

3  A    Yeah.

4  Q    The bottom of the pot at the refinery?

5  A    Right.  At the oil refineries, right.

6  Q    And what is at the bottom of the pot?

7  A    Well, it's bitumen.  It's tar.

8  Q    Okay.  And so --

9  A    Very high molecular weight hydrocarbons, to be more

10  technical.

11  Q    And so 26th Street out here in front of the courthouse is

12  asphalt.  What's involved in the process of taking the rocks

13  and the bitumen and making it into 26th Street?

14  A    You heat up the bitumen, and you mix it with the rock,

15  with the aggregate, and then you spread it out, and then you

16  roll it down.  Now you have, now you have an asphalt pavement.

17  Q    What happens when perchloroethylene contacts asphalt?

18  A    Perchloroethylene, or perc, is a good solvent for

19  bitumen, and just as soon as the perc contacts the asphalt, it

20  starts dissolving that bitumen, the black part of the asphalt.

21  Q    And in its refined state, what color is perc?

22  A    It's clear.  It looks like water.

23  Q    And on the assumption that -- so if we poured some

24  perchloroethylene, walked out on the street in front of this

25  courthouse and poured perchloroethylene out on 26th Street,

1838

1    what would you anticipate happening?

2    A    Well, the perc would immediately start dissolving some of

3    the -- it would depend on how much you poured and over how

4    much area, but perc would immediately start dissolving the

5    asphalt, but it's also evaporating.  So the perc dissolves

6    some of the asphalt, and then, as it evaporated, that asphalt,

7    which isn't volatile, would go back down.  You'd see very dark

8    black areas.  If you poured a lot more, you might see puddles.

9    It's just depends.

10    Q    On the assumption -- I think we both assumed that Judge

11    Cebull was not going to adjourn court and allow us to go down

12    and pour some perc on 26th Street.  Have you prepared an

13    exhibit that you made that allows the jury to see the effect

14    of perchloroethylene on asphalt?

15    A    Yes, I have.

16              MR. DAVIS:  And, Neil, can we have the video?

17              DOCUMENT TECHNICIAN:  (Nodded head affirmatively.)

18    BY MR. DAVIS:

19    Q    First of all, when did you make this?

20    A    May of last year.

21    Q    All right.  Where did you make it?

22    A    It's in my garage.

23    Q    In Mason, Michigan?

24    A    In Mason, Michigan, right.

25    Q    Who was present?

1   A     Well, you were there, Mr. Grossbart was there, the

2   videographer, and, of course, myself.

3   Q     All right.  And before Neil starts, we'll have to start

4   and stop this.  You've seen this video before, have you not?

5   A     Yes.

6   Q     And just so the jury and the judge knows, it doesn't last

7   but for a couple minutes, does it?

8   A     Four minutes, I think, total.

9   Q     All right.  And what do we see there besides you?

10  A     Well, just a little table where I've set up a couple jars

11  with asphalt, and I'm holding a bottle of perchlor- -- the

12  brown bottle there is perchloroethylene.

13  Q     And what are these two black objects there?

14  A     Well, that's chunks of asphalt.

15  Q     Where did you obtain them?

16  A     By the side of the road near my house.

17  Q     All right.  Shall we start the video now?

18  A     Sure.

19          DOCUMENT TECHNICIAN:  (Complied with request.)

20  BY MR. DAVIS:

21  Q     You poured the perchloroethylene into a container.  Is

22  there any magic to that particular container?

23  A     It's just a plastic called -- from polycarbonates, so it

24  resists perc.

25  Q     Easier to use than the big jar?

1840

1   A    Yes.

2   Q    All right.  What are you doing now?

3   A    Holding up a chunk of the asphalt.  It's about an inch

4   and a half, 2 inches cubed.

5   Q    And what do you have there?

6   A    That's a bottle of water, Aquafina.

7          MR. DAVIS:  Let's stop it right there.

8          DOCUMENT TECHNICIAN:  (Complied with request.)

9   BY MR. DAVIS:

10  Q    What are you about to do?

11  A    I'm about to pour some of the perc, the

12  perchloroethylene, directly onto the asphalt in that Mason

13  jar.

14  Q    All right.  And what should the jury look for?

15  A    Well, what you'll see is immediately -- the perc is

16  white.  It's clear.  But it looks like water.  Of course, it's

17  not water, but it has that same clear.  You'll immediately see

18  the perc start to turn black.

19         MR. DAVIS:  Start it, Neil.

20         DOCUMENT TECHNICIAN:  (Complied with request.)

21  BY MR. DAVIS:

22  Q    What's happening?

23  A    The perc is dissolving some of the bitumen out of the

24  asphalt.

25  Q    You're putting on a timer.  What for?

1   A    Just to give the jury an idea of how long it takes for

2   some of these things to happen.

3   Q    Now what are you going to do next?

4   A    Just holding it up so the people can see that the perc is

5   dark.  It's black.

6   Q    The second one, this is the one with the water on it?

7   A    Right.  The jury has already heard that perc is heavier

8   than water and not soluble, so the perc will go right through

9   water.  This is what I'm showing you here.  The perc is being

10  poured.  It goes right through the water layer and starts

11  dissolving the asphalt chunk that's at the bottom there with

12  the water layer.

13       And so you see it turning black.

14  Q    Same as the other jar?

15  A    Yes.

16  Q    Except it's covered with water?

17  A    Right.

18  Q    Rather than keep -- I think this is pretty static.  What

19  are you going to do next?

20  A    Well, next, at about two minutes, I'm going to put a lid

21  on the jar on the left, and the lid has got holes in it, and

22  I'm going to shake some of the perc that's got some dissolved

23  bitumen, some of the dissolved tar, over some rocks and then

24  over some building material, some wood and some polyvinyl

25  chloride, just to show you how it would stain.  Because,

1842

1    again, this perc is volatile, and it's dissolved this tar in

2    it, so when the perc evaporates, it leaves the tar behind and

3    would stain things black.  I'm going to show you that.

4         There goes the lid.

5         Waited close to two minutes.  And now --

6    Q    What do you have in the baking jar, in the baking dish?

7    A    There's gravel and some rocks and some chunks of

8    concrete.

9    Q    And why did you pick those types of objects to put in the

10   baking dish?

11   A    Just to show the jury that if perc that had dissolved

12   some asphalt into it -- I'm sorry, some bitumen into it,

13   flowed over gravel or rock, what you'd see is a lot of

14   staining, actually I think a lot more staining than this.  And

15   then I'm pouring it over other kinds of building materials

16   that you might see there; for instance, the piece of 2 by 4,

17   the vinyl downspout -- I'm sorry, the aluminum downspout,

18   painted, and then the piece of vinyl siding.

19   Q    And why did you, in relation to the alleged spill of

20   several hundred gallons of perc in the Dyce loading area that

21   Soco now wants to contend took a path out to the northwest

22   corner from the loading and unloading area sometime in the mid

23   '70s, why did you have those objects there?

24   A    Right.  If perc had spilled on asphalt and then dissolved

25   some of the tar, the bitumen out of it, and then flowed over

1843

1   land like we've heard, what you would see was a lot of black

2   staining all the way down the path, because the perc was

3   evaporating, as Dr. Powell has testified.  It's evaporating,

4   but it's leaving behind the tar that it's dissolved, so you

5   get this, basically a bathtub ring, kind of effect.  You'll

6   see where the tar has been deposited as the perc evaporates.

7   Q    While the video is still playing, I want to move on.

8   We're about done with it, with the video, but I think we can

9   talk over it, Professor Dale.

10  A    Sure.

11  Q    Let me return you to the subject of viscosity.

12  A    Right.

13  Q    And that's how easily and far something will spread if

14  you spill it?

15  A    Yes.  It's basically it's how well it resists flow.

16  Q    All right.  Do you understand that Soco here has posited

17  that this spill that no one has ever noticed in the loading

18  and unloading area may have involved 500 gallons of

19  perchloroethylene?

20  A    Yes.

21  Q    Something in that range.

22       Can you, as a chemical engineer, calculate how far a

23  500-gallon spill of perchloroethylene would spread?

24  A    Yes, I can.

25  Q    How do you do that?

1    A    Well, you have to make some assumptions about what was

2    happening, but there are standard methods in our practice of

3    chemical engineering for calculating how far liquids will

4    spread.  You need to know their viscosity, that we talked

5    about, the density and other things, but you can estimate how

6    far a given spill will spread out.

7    Q    And what kind of assumptions do you make to engage in

8    that type of calculation?

9    A    For this particular calculation, what I assumed was all

10   of the spill occurred all at once in one spot and then it

11   spread out.  Then further I assumed that it occurred on a

12   surface that was level, or essentially level, and that it was

13   a surface that the perc wasn't interacting with, wasn't

14   dissolving; in essence, it would be concrete or some other

15   surface that perc didn't interact with.

16   Q    What would be the effect of the interaction?  Would it --

17   A    It would tend to slow down, probably, the spreading

18   somewhat.  The perc would dissolve and become less viscose --

19   more viscose, rather.

20          MR. DAVIS:  May I get a demonstrative exhibit from

21   the corner, Judge?

22          THE COURT:  Yes.

23   BY MR. DAVIS:

24   Q    Can you see what I put up there, Professor?

25   A    Yes.

1  Q     You recognize that to be what?

2  A     That's an aerial photo of the Dyce site.

3  Q     And we see it's scaled at the bottom?

4  A     Two hundred-foot scale.

5  Q     All right.  And I ask you, using the assumptions you just

6  did --

7  A     Yes.

8  Q     -- can you calculate the volume that would be filled by a

9  500-gallon spill of perchloroethylene?

10 A     You mean the area rather than --

11 Q     The area that it would encompass.

12 A     Yeah.  Yes, I can.

13 Q     And what is it?

14 A     It's about 67 feet, roughly the distance from this end of

15 the courtroom to that end of the courtroom.

16        MR. DAVIS:  All right.  May I approach the witness

17 to give him some more demonstrative aids?

18        THE COURT:  Yes.

19        THE WITNESS:  Yes.

20 BY MR. DAVIS:

21 Q     And can you place that on the scale, on the loading area,

22 that calculated spill diameter?

23 A     This is -- I guess it's 68 feet.  So here is the loading

24 and unloading area, and a 68-foot diameter spill would spread

25 out like that.

1    Q    All right.  Just for the sake of taking into account the

2    range of Soco's posited, unnoticed spill, do you remember what

3    the upper and lower ranges were?

4    A    Well, I think it's between 250 and 1,000 gallons for the

5    lower range and then the upper range.

6    Q    All right.  And how big a spill area would 250 gallons

7    entail, using the same assumptions?

8    A    Yeah.  A 250-gallon spill spilled in the

9    loading/unloading area, using my assumptions, would look about

10   like that.

11   Q    All right.  What about the 1,000-gallon spill?  How big a

12   diameter would that be?

13   A    It's roughly 96 feet in diameter.  So a 1,000-gallon

14   spill would do that.

15   Q    Now let me ask you -- why don't you get back on the

16   witness stand.

17   A    Sure.

18   Q    You can leave that.

19        Let me ask you a minute about your assumptions.  You

20   assumed, what, a perfectly flat surface?

21   A    Yeah, basically a flat surface, yes.

22   Q    All right.  Have you been to the Dyce site?

23   A    Yes, I have.

24   Q    Have you also seen other aerials?

25        And, Neil, could we pull up 5033?

1          DOCUMENT TECHNICIAN:  (Complied with request.)

2    BY MR. DAVIS:

3    Q    Can you see a spill there in the loading area --

4    A    Yes.

5    Q    -- or some kind of liquid?

6    A    Yes.

7          MR. DAVIS:  All right.  And 5036.

8          DOCUMENT TECHNICIAN:  (Complied with request.)

9    BY MR. DAVIS:

10   Q    Do you see another spill there in a later photo?

11   A    Yes.

12         MR. DAVIS:  And, finally, 5042.

13         DOCUMENT TECHNICIAN:  (Complied with request.)

14   BY MR. DAVIS:

15   Q    All right.  Based on your own site visit and the

16   examination of the aerial photographs, do you feel you were

17   being unfair or unreasonable to assume a level spill area?

18   A    No.

19   Q    Why not?

20   A    Well, because as you would expect in a working area, it

21   is basically flat.  You don't want to have a big slope where

22   men are using heavy equipment and moving things around.  So

23   apart from a little bit of slope to drain off the water, the

24   site looks flat to me, and it is as I would expect it to be.

25   Q    Do you have an opinion with a reasonable degree of

1848

1    scientific certainty how much of the asphalt in the

2    loading/unloading area would have been impacted by a

3    500-gallon spill of PCE in the mid 1970s?

4    A    I think all of it would have been.

5    Q    What would have been seen after a 500-gallon --

6    500 gallons of perc had been spilled in the loading/unloading

7    area?

8    A    You would see a darkening, changing of color of the

9    asphalt, more blackening.  If perc had run over some of the

10   asphalt and actually dissolved some of the bitumen, the tar

11   out, you would see the aggregate exposed.  So if the aggregate

12   was a lighter color, as a lot of the aggregate is, you would

13   see that, I'm sure, and it would look white.  You would see

14   the exposed rock or the aggregate.  And you would see puddles,

15   too.  Sorry.

16   Q    Why would you see puddles?

17   A    Well, because any surface, any -- you know, basically any

18   pavement or parking lot, it's not a perfectly flat sheet of

19   glass.  There's ruts and dips and valleys.  And so wherever

20   there's a low spot, some of the perc will accumulate there.

21   And, you know, like, for instance, you see rain on a parking

22   lot or rain on pavement, you'll see water in the ruts and in

23   the low spots.

24   Q    And what would be going on in those low spots?

25   A    Yeah.  Well, perc is a solvent, again, for asphalt.  So

1849

1    the perc at that spot is dissolving the black part, the tar

2    out of the asphalt.  Really it's destroying the asphalt,

3    because what holds asphalt together is the stickiness of the

4    tar holding the rock together, the aggregate together.  If you

5    destroy that, if you break apart that, then the asphalt is

6    just basically a collection of small rocks, and it doesn't --

7    it loses its physical strength.

8    Q    And I forgot to ask you this.  A 500-gallon spill, how

9    much does that weigh?

10   A    It's a little short of -- it's about 3.4 tons, a little

11   short of three and a half tons, but right at 3.4 tons.

12   Q    So that weight of perchloroethylene in that area, what,

13   is that going to exacerbate?  Is it going to make it less

14   noticeable than what you've just described?

15   A    Well, it's just, it's just a really big spill.  This is

16   not a small amount of stuff.  We're not talking a gallon.

17   We're talking hundreds of gallons.  We're not talking, you

18   know, a few pounds.  We're talking almost three and a half

19   tons.  It would really, really affect the asphalt.

20   Q    Have you personally seen a spill of any substantial

21   volume of perchloroethylene on asphalt in conditions similar

22   to the Dyce loading/unloading area in your work as a chemical

23   engineer?

24   A    I haven't seen, personally, but I've seen pictures of

25   one.

1    Q    Are you aware, then, of such an event having occurred?

2    A    Yes, I am.

3    Q    Can you explain?

4    A    A friend of mine, Mr. Elden Dickinson, who works for the

5    Michigan Department of Environmental Quality --

6         MR. LYNCH:  Object as foundation, Your Honor.  This

7    is foundation and hearsay.

8         THE COURT:  Overruled.  He's at least put on the

9    stand as an expert.

10        THE WITNESS:  A friend of mine, a Mr. Elden

11   Dickinson, who is a -- who worked with the Michigan Department

12   of Environmental Quality, he was -- he actually had

13   responsibility for inspecting drycleaners for their compliance

14   with environmental standards.  And about 20 years ago, he was

15   conducting an environmental visit, an environmental audit of a

16   drycleaner there in my home area of Michigan when a fellow

17   came in the door who was going to deliver perc to the

18   facility, and he was saying, yelling, "My perc is leaking from

19   my truck.  I need help.  Help me.  I've got a big leak going

20   on."

21   BY MR. DAVIS:

22   Q    And was Mr. Dickinson able to memorialize this event with

23   photographs?

24   A    Yes, he was.

25   Q    And were you able to obtain those photographs?

1   A     Yes.

2   Q     Do those photographs support what you've just told the

3   jury?  Are they consis- -- or do they not support what you've

4   just told?

5   A     No, they absolutely support what I've just told you.

6             MR. DAVIS:  Neil, would you please pull up

7   Exhibit 4313, page 11?

8             This is being offered for demonstrative purposes,

9   Judge.

10            THE COURT:  Yes, illustrative purposes.

11            MR. DAVIS:  Illustrative.

12  BY MR. DAVIS:

13  Q     Is this one of the photographs of the spill that

14  Mr. Dickinson related to you?

15  A     Yes.

16            MR. DAVIS:  And I offer it for illustrative

17  purposes, Judge.

18            THE COURT:  It's admitted for illustrative purposes.

19            MR. DAVIS:  All right.

20  BY MR. DAVIS:

21  Q     And what do you see here, Bruce, that you believe is

22  consistent with what you've just told the jury?

23  A     Well, three things, I think, are important for you to

24  see:

25        One is that the perc has spread out quite a bit.  You see

1852

1    a lot of asphalt affected.

2         The second is that, so -- and the second is the really

3    pronounced color difference between the asphalt pavement

4    that's had perc contact, or just the dark part of the pavement

5    and the other pavement that hasn't had any perc contacted with

6    it.

7         And the third place -- third thing is the puddles or the

8    pools where there's low spots in the pavement and the perc

9    accumulated in those low spots.

10             MR. DAVIS:  There's another photograph that

11   Mr. Dickinson took.  Can we see page 16 of that same exhibit?

12             DOCUMENT TECHNICIAN:  (Complied with request.)

13   BY MR. DAVIS:

14   Q    What do we see here?

15   A    Mr. Dickinson called the fire people, and they came

16   quickly.  I don't know how quickly, but they came, and one of

17   the firemen actually stepped in a piece of the asphalt that

18   had been attacked by the perc, and that's a picture of his

19   boot mark there.  So as I mentioned, the perc will attack and

20   destroy the strength of asphalt.  It just destroys it.

21   Q    Let me direct your -- change the topic to the one of

22   volatility.  And again, that's, what, how quickly it

23   evaporates?

24   A    Yes.

25   Q    Have you had your own -- you obviously haven't had the

1 personal experience with seeing the spill on asphalt.  Have

2 you had any personal experience sampling the volatility of

3 perchloroethylene outside of a laboratory setting?

4 A Yes, I have.

5 Q Can you explain that to the jury?

6 A As I mentioned earlier, a lot of my work with perc has

7 involved drycleaners, so I've actually visited drycleaners --

8 not the front of the shop, back where they do the clothing

9 cleaning -- to see how the equipment operated, and I've had

10 some close encounters with perc back in those, in that kind of

11 environment.

12 Q While we still have the picture up, and I forgot to ask

13 you this, do you know how big a spill Mr. Dickinson was

14 dealing with in those pictures?

15 A Yeah.  He believed -- it was never really accurate.  He

16 believed it was less than 150 gallons, and that's consistent

17 with what we've heard.  When people deliver perc to

18 drycleaners, they take out -- this is essentially a skid tank,

19 also, apparently about the same size, but we don't know

20 whether that tank was full, but it was less than 150 gallons.

21 Q All right.  So what the jury saw in that other picture,

22 the earlier picture -- there it is -- that represents

23 something less than, approximately a third, perhaps, of the

24 hypothesized 500-gallon spill at the Dyce facility?

25 A That's only one piece of this spill, because that's one

1   photograph.   There's other parts of it.

2   Q    All right.  Let me go back to volatility again.  Your own

3   personal experience, what did you experience?

4   A    Well, I was working with what's called a still, which is

5   the piece of drycleaning equipment that takes dirty perc

6   that's cleaned your clothes.  So when you go to a drycleaners,

7   that characteristic smell you have, that's usually the smell

8   of perc.  And I was working with a piece of equipment called a

9   still that evaporates the perc to clean it up so that it can

10  be reused, and I was working with the lid open off this still,

11  and I got too close to it, and I got a face full of the vapor,

12  the perc vapor.

13  Q    And what was the effect on you?

14  A    I couldn't continue working.  My eyes started running

15  really fast.  My nose started running, and I had real

16  shortness of breath.  I had to get out of there for a while to

17  recover so that I could go back and do the work.  It took me

18  20 or 30 minutes until I was able to go back, but my eyes were

19  burning.  I could hardly see.  My nose was run-, my nose was

20  running.  It wasn't very pretty.  And I -- the real shortness

21  of breath from catching a face full of it.

22  Q    Does the volatility of perc have anything to do with

23  whether it's heavier or lighter than air?

24  A    Yes, it does.

25  Q    Can you explain that, Professor?

1    A    Perc, liquid perc is heavier than water, so it sinks to

2    the bottom of water, as you're just seeing.  Perc vapors are

3    also heavier than air, so when perc evaporates, the perc

4    vapors, as they evaporate, will push air out of the way.

5    They'll push it up, so you get a greater and greater

6    concentration of perc as stuff evaporates close to the ground.

7    Q    Can you calculate the size of an area in which a specific

8    size spill of perc can be noticed?

9    A    Yes.

10   Q    How do you do that?

11   A    Well, most people can smell perc when it's at a

12   concentration of about 50 parts per million.  That's 5/1000ths

13   of 1 percent.  Or just to give you a little comparison, we all

14   know what a percent is, 1 out of a hundred.  So one penny out

15   of a dollar.  A hundredth of that is you take that penny and

16   you divide that up into a hundred pieces.  Now you take half

17   of that.  That's the comparison of how much we can smell.  So

18   we can really smell perc down to pretty low levels.

19   Q    So if we posit, again, a 500-gallon spill of perc, how

20   big a sphere would that be in which that amount of perc would

21   be noticeable?

22   A    If you assume that all of the perc evaporated at once and

23   so it filled up this area, basically a bowl, that bowl would

24   be about 1,000 feet across.  So roughly in the area of

25   1,000 feet, or within a distance of 1,000 feet, people could

1856

1    be able to smell the perc.

2    Q    All right.  Well, wouldn't that be affected by wind?

3    A    Yes, sure.

4    Q    Well, you understand the wind blows in Billings, don't

5    you?

6    A    Yes, I know.

7    Q    All right.  Is there anything about the Dyce operational

8    area which affects the reasonableness of this

9    1,000-foot-sphere assumption which you've made?

10   A    Well, the prevailing winds here in Billings, if I

11   understand right, are from the south, southwest, and the west.

12   It turns out that the unloading area, loading/unloading area

13   is shielded pretty much from those kinds of winds.

14            MR. DAVIS:  Neil, could you pull up 3674?  I think

15   there is no objection to it.  001, yeah.

16            DOCUMENT TECHNICIAN:  (Complied with request.)

17   BY MR. DAVIS:

18   Q    Is that what we're looking at?

19   A    Yes.  Yes, it is.

20   Q    So what was your point about it?

21   A    Well, just that a spill on the ground there, because

22   that's a pretty enclosed area, winds coming from the south,

23   the west/southwest, wouldn't be able to get back in the

24   loading and unloading area very well.  It's pretty shielded

25   back there.

1    Q    Well, let's assume that, consistent with the spill

2    hypothesis that Soco advanced here, that the spill occurs when

3    nobody is around that loading and unloading area for some

4    period of time.  Do you have an opinion with a reasonable

5    degree of certainty as whether a spill of 500 gallons would go

6    unnoticed anywhere in the Dyce facility?

7    A    Yes, I do have an opinion.

8    Q    What's your opinion?

9    A    I don't see how people wouldn't know that you'd spilled

10   500 gallons of this chemical out there, because you have the

11   air intake, you know, from -- there's the office building

12   right next, right next to the unloading area.  You have the

13   air intake to bring fresh air into the building.  It's going

14   to be picking up some of that perc, and they'll smell it

15   inside, too.

16   Q    Do you understand that Mr. Hallsten has said how he

17   discovered the perc inventory shortage?

18   A    No, I don't recall.

19   Q    Well, all right.  Let me ask you this.  Do you understand

20   how big a storage container for perchloroethylene Dyce had in

21   the mid 1970s?

22   A    Yeah.  It was around 1,500 gallons.

23   Q    All right.  And do you understand what -- how perc was

24   unloaded at Dyce?

25   A    Yes.

1   Q     What, what's your understanding?

2              THE COURT:  This is cumulative, isn't it?

3              MR. DAVIS:  What?

4              THE COURT:  This is cumulative, I said.

5              MR. DAVIS:  Well, I don't think so, Judge, but I --

6              THE COURT:  How it was unloaded at Dyce?

7              MR. DAVIS:  Well, I think I need --

8              THE COURT:  Haven't we heard that time and time

9   again?

10             MR. DAVIS:  The sequence -- not the pumping but the

11  which came first.  The drums -- what I want to get to is that

12  it was partially stored in tank and partially drummed.

13             THE COURT:  That's cumulative.

14             MR. DAVIS:  All right.

15  BY MR. DAVIS:

16  Q     Well, let me ask you, Professor Dale, subject to the

17  judge's admonition.  Does that -- can you -- do you have an

18  opinion with a reasonable degree of scientific certainty as to

19  whether perc could be spilled and still unloaded?

20  A     No, I don't think anybody could continue to work in an

21  area where you had 500 gallons, anywhere near that size, of a

22  perc spill.  They just, they just couldn't continue to

23  function.

24  Q     Could they continue -- do you know how many drums they

25  would have to fill after filling a 1,500-gallon tank to

1  offload 3,000 gallons?

2  A    Yeah.  If they've already offloaded 1,500 gallons and

3  they're receiving 3,000, that means another, you know,

4  1,500 gallons, so that's another 30 drums, roughly.

5  Q    All right.  And can you, can you imagine any

6  circumstances where that drumming activity could continue in

7  the loading/unloading area after 500 gallons had been spilled?

8  A    No.

9  Q    Why?

10  A    Well, just based on my experience.  There's at least two

11  reasons:

12      One is that the perc is destroying the asphalt so that

13  the -- even if the perc -- the worker could continue to work

14  there, they're sinking down into this soft asphalt.

15      And, second, more importantly, you can't function.

16  People literally get drunk or intoxicated on a certain level

17  of perc at about 200 to 500 parts per million, and then you

18  pass out, and that person would probably fall in the pool of

19  perc and die.  You could not continue to function.  You just

20  couldn't do it.

21  Q    Okay.  And lastly, you understood how perc was

22  delivered --

23  A    Yes.

24  Q    -- to the operational area.

25      How?

1   A    Well, it was delivered in these large trucks.

2           MR. DAVIS:  Can you, Neil, pull up 5038, please?

3           DOCUMENT TECHNICIAN:  (Complied with request.)

4           MR. DAVIS:  All right.  Can we blow the loading area

5   up, please?

6           DOCUMENT TECHNICIAN:  (Complied with request.)

7   BY MR. DAVIS:

8   Q    Something like what you and the jury can see in 5038?

9   A    Yes.

10  Q    All right.  Assuming a 500-gallon spill of perc in the

11  loading area where that tanker truck is parked in 5038, what

12  would happen to the truck?

13  A    Well, perc attacks the rubber of the truck tire -- of the

14  rubber, also, so perc spilled in that area would almost

15  certainly start contacting the rubber of the tires and start

16  destroying the tires.  But, second, again, I mentioned perc

17  will attack the asphalt and destroy its integrity.  That truck

18  probably can't get out of there afterwards because the asphalt

19  is gone.  If it could, if it actually managed to get out of

20  there after the spill, it would leave huge ruts that, again,

21  would certainly be noticed by people.

22  Q    So can you imagine any set of circumstances where 250 to

23  1,000 gallons of perc could be spilled in that loading and

24  unloading area and nobody ever notice it?

25  A    No.  I just can't.  I just can't accept that.  I can't

1    believe it.

2              MR. DAVIS:  Thank you.  Nothing further.

3              THE COURT:  You may cross.

4                        CROSS-EXAMINATION

5    BY MR. LYNCH:

6    Q    Good afternoon, Dr. Dale.

7    A    Hi, Mr. Lynch.

8    Q    Dr. Dale, when did you visit the Dyce site?

9    A    It was in August of last year, late August.

10   Q    You have no personal knowledge of how this site looked in

11   the 1970s time frame; is that correct?

12   A    That's right.

13   Q    Have you ever seen chemicals being unloaded from a bulk

14   tanker truck?

15   A    No, I haven't.

16   Q    Aside from the pictures and the story you heard

17   secondhand from Mr. Dickinson, have you ever seen a perc spill

18   on asphalt?

19   A    No, I haven't.

20   Q    Of any size?

21   A    No, I haven't.

22   Q    What's your specialty at Michigan State?

23   A    My research is what we call biochemical engineering.

24   Actually I do alternative fuels.

25   Q    Isn't it true all of your experience dealing with matters

1    involving perchloroethylene are as an expert witness or

2    consultant?

3    A    Apart from my undergraduate training in chlorinated -- or

4    basically that's true, yeah.  So fundamentally, you're right.

5    Q    I'd like to go through a few of the assumptions you made

6    for your calculations that form the basis of your opinion.

7         Regarding the spread assumptions, first, you assumed a

8    perfectly level surface.

9    A    Yes.

10   Q    A surface that didn't interact with perc?

11   A    That's right.

12   Q    So not asphalt.

13   A    That's right.

14   Q    Instantaneous release, I believe you said?

15   A    Yes.

16   Q    All at once?

17   A    All at once.

18   Q    How about temperature?  Did you assume a temperature?

19   A    Yes, I did.

20   Q    And what was that temperature?

21   A    About 75 degrees Fahrenheit.

22   Q    And now your vapor calculations, you again assumed -- was

23   that another 500-gallon release?

24   A    I'm sorry?

25   Q    For your vapor calculations, a 500-gallon release?

1863

1   A      I am not sure what you mean by "vapor calculations."

2   Q      When you calculated the 1,000-foot dome or hemisphere.

3   A      No, I think that was the 250-gallon release.

4   Q      The 250-gallon release?

5   A      Yeah, if I recall correctly.

6   Q      And what was the wind speed that you assumed for that?

7   A      For the release for the vapor calculation?

8   Q      Yes, for the vapor.

9   A      No wind speed at all.

10  Q      No wind speed.

11  A      Right.

12  Q      What was the evaporation rate you assumed for that?

13  A      Well, I calculated an evaporation rate.  I didn't assume

14  it.  That was actually the point of the calculation, was to

15  get how fast the perc would evaporate, but I don't recall.  It

16  isn't something that I've worked to prepare for for this case.

17  Q      To smell the perc, wouldn't it have to evaporate?

18  A      Yes.

19  Q      And how quickly did you assume it evaporated to fill your

20  hemisphere?

21  A      Well, that it starts evaporating immediately.  I'm sorry;

22  I assumed that all of it evaporated immediately.

23  Q      So you assumed it all evaporated instantaneously?

24  A      Right, all 250 gallons evaporated immediately.

25  Q      Is that even possible?

1   A    No, it's not.

2   Q    I believe you said perc is viscose, correct?

3   A    No, I said it wasn't very viscose.

4   Q    Or wasn't.  I'm sorry.  It wasn't very viscose?

5   A    Yeah.  It's nonviscose, yes.

6   Q    That means it's runnier than water?

7   A    Runnier than water.

8   Q    Heavier than water?

9   A    Yes.

10  Q    It will flow downhill?

11  A    Yes.  All fluids flow downhill.

12  Q    Further and faster than water?

13  A    Yes.  I guess I better add to that; of course, like

14  water, depending on what the hill is made of.  You know, it

15  can be sinking in as it's flowing downhill.

16  Q    Assuming that perc is -- assuming the surface the perc is

17  spilled on has a particular drainage direction, the perc will

18  follow that drainage direction, will it not?

19  A    Well, all fluids would follow general drainage direction.

20  They would also spread out.

21  Q    Will perc interact with concrete?

22  A    No, not much.

23  Q    Will perc interact with wood?

24  A    It will soak into wood a little bit, but it doesn't

25  really interact with it much.

1    Q    I believe you said you calculated an evaporation rate in

2    connection with your work in this matter; is that correct?

3    A    Not with my work in this matter.

4    Q    Not with your work in this matter.

5         I have no further questions.

6    A    Thank you.

7              MR. DAVIS:  Briefly?

8              THE COURT:  Real brief.

9              MR. DAVIS:  Very brief.

10                        REDIRECT EXAMINATION

11   BY MR. DAVIS:

12   Q    You assumed, for the sphere calculation, that the perc

13   all evaporated at once.

14   A    That's right.

15   Q    It doesn't evaporate all at once?

16   A    No, it doesn't.

17   Q    So would the odor linger over assumedly a smaller area?

18   A    Yes, for a longer time.

19             MR. DAVIS:  Thank you.  That's all.

20             THE COURT:  Thank you.  You can step down.

21             Ladies and gentlemen, we'll be in recess, 8:30 in

22   the morning.

23             I give you the usual admonition.  Don't talk amongst

24   yourselves.  Don't talk to anybody.  Keep an open mind.

25             We'll see you at 8:30 in morning.

1          (Jury not present.)

2               THE COURT:  Be seated.

3               How many more witnesses do the insurers have?

4               MR. JOHNSON:  Your Honor, we have only a short

5     video.  I think it's about 17 minutes, and we were going to

6     call David Nanzig, but I understand that there is a motion

7     that has been filed today by the other side.  In fact, there

8     are a couple of competing motions, Your Honor.

9               THE COURT:  Yeah.  Yeah, I thank you for it, too.  I

10    don't have anything else -- you know, I like to read these

11    things at night.

12              MR. JOHNSON:  Yeah.  We tried to give you good

13    reading material.

14              THE COURT:  Yeah, I know you have.

15              All right.  On Soco's motion on Nanzig, I guess the

16    question is, What does "or can be reasonably anticipated"

17    mean?  Now I can't -- where is my order of December 11, 2006?

18              THE LAW CLERK:  Where is it?

19              THE COURT:  I've been looking for it up here.  I

20    thought I had it.

21          (Discussion off the record.)

22              THE COURT:  Let's not talk about this for a minute

23    until I see this.  Go get me one.

24              Let's talk about the insurers' motion to exclude

25    Hargis and limit rebuttal expert testimony of Robert Powell.

1  Here are my notes in reading this brief.

2         I had read the Soco brief first, because I got that

3  first on the motion *in limine* to limit or preclude testimony

4  of David Nanzig, but I need to see my order first.

5         On Hargis and Dr. Powell, again, now as I recall,

6  Dr. Powell started to testify at approximately 4 p.m. one day

7  and ended at approximately 4 p.m. the next day.  Am I wrong on

8  that recollection?

9         MR. LYNCH:  No, Your Honor.

10         THE COURT:  I can't remember the days.  They all

11  seem to run together.  I know it wasn't Saturday or Sunday.

12         First, as to Dr. Powell, rebuttal, as I said the

13  last trial, rebuttal is rebuttal.  I don't want to hear a

14  rehash of expert testimony.  The way I view these kinds of

15  trials, you can have an expert in a particular area.  One

16  expert.  Anything more than one saying the same thing is

17  cumulative.  That rule stands whether it's direct examination,

18  as I've just alluded to, and it stands certainly for rebuttal.

19         Now when you put the same expert back on the stand,

20  as Dr. Powell, after he's testified, you run the risk of

21  having the testimony be cumulative, especially if he's

22  testified over a whole day of court and he has anticipated or

23  maybe not personally addressed the opinions of the defense

24  experts in this case, the insurers' experts, but he has

25  addressed them.

1        As I understand it, if Dr. Powell himself is called

2   back as a rebuttal expert, he can't reiterate his own

3   opinions.  The only opinion that, as far as I'm concerned, the

4   only opinion that Dr. Powell has not discussed is his, I

5   assume, his particular agreement with 80 gallons.

6        Now the insurers' position is that since Dr. Powell

7   gave an opinion that the size of the spill was, as I recall,

8   200 to 300 gallons, something like that, that he can't rebut

9   Dr. Sternberg's position that it's only 80 gallons and that he

10  was wrong.  As far as I'm concerned, that is proper rebuttal,

11  but that's the only thing that Dr. Powell -- he can't get up,

12  again reiterate his position as to the amount of the spill and

13  how he arrived at it.

14       Apparently in the rebuttal report, Powell identified

15  three of Shanahan's opinions with which he disagrees:  Soil

16  and water contamination is widespread throughout the Dyce

17  facility.  The pattern of contamination along the ditch is

18  inconsistent with historical release of perc.  And the pattern

19  of contamination in the northwest corner is consistent with

20  the release of fluids from the former pond.

21       As far as I'm concerned, Dr. Powell has already

22  testified that the soil and groundwater contamination is not

23  widespread.  He's already testified the northwest corner is

24  limited to pure perc while other areas of the Dyce property

25  have other chemicals in addition to the perc.  He even had the

1869

1   pie chart.  The pattern of contamination along the ditch is

2   inconsistent with a historical release of perc into these

3   areas.  In his direct testimony, Dr. Powell discussed

4   Borehole F, how its finding supported his opinion that it

5   traveled along the ditch, arrived at the northwest corner.

6   Also on direct, he testified the absence of the perc in the

7   subsurface area surrounding the ditch is due to the fact that

8   evaporation prevented the perc -- he can't testify to any of

9   those things.  And I will sit here and, if there's a venture

10  into a reiteration of his testimony, you people will object,

11  and I will rule.

12          Now as far as Mr. Hargis -- and I don't know if it's

13  Dr. Hargis or Mr. Hargis.

14          MR. LYNCH:  It's Dr. Hargis, Your Honor.

15          THE COURT:  Okay.  Doctor.  He also supposedly is

16  going to refute Shanahan's opinion there is widespread

17  contamination throughout the Dyce site.  If you would have put

18  Hargis, Dr. Hargis on to testify to that, he would have been

19  cumulative to Dr. Powell.  Powell stated the opinion that the

20  most likely explanation for the contamination in the northwest

21  corner is a large spill of a bulk-size quantity, and the

22  insurers' brief sets forth the trial transcript and the pages.

23          MR. LYNCH:  Your Honor, Soco is not intending to

24  call Dr. Hargis at this point.  The opinions that he was going

25  to rebut, some of them haven't been offered.

1870

1          THE COURT:  Oh, you're not going to have him at all?

2     Then I will shut up.

3          Now let's get to your motion on -- first, when the

4     time comes, I'm going to deny the insurers' motion for a

5     directed verdict, I am sure as you've all contemplated.

6          Second, I'll give instructions on notice, and as

7     I've ruled previously, I will give instructions on prejudice

8     and the requirement that you have to prove prejudice.

9          But I'm looking for -- I've issued so many orders in

10    this case that I can't recall.  I doubt if I'd been able to

11    recall them 20 years ago.

12         The question I'm going to have is -- and maybe I

13    covered it in this order.  I haven't had a chance to read

14    it -- what does it mean under the term, you have to have

15    knowledge of the accident and the property damage, or at least

16    damage that you could "reasonably anticipate"?  What is the

17    meaning of that?

18         If "reasonable anticipation" includes the fact that

19    this alleged spill occurred in 1975, '76, or '77, and I think

20    at some point after the EPA investigation and coverage was

21    denied, the inventory shortages were developed in this case,

22    the question is, Can the insurers bring in evidence from the

23    date of the alleged spill clear up to the time they received

24    notice?  And, if they are, then they can put in evidence of --

25    I assume that's what they would be attempting to do, put in

1    evidence of how they were prejudiced in the sense that had

2    they been told of the spill, in the event that this kind of

3    damage could have reasonably been anticipated, that they would

4    have had the ability to, I don't know, attempt to remediate it

5    or go make determinations.  But I assume that's what is

6    purported in this Nanzig testimony, right?

7              MR. JOHNSON:  That is correct, Your Honor.

8              THE COURT:  Have we briefed this issue?

9              MR. BANKER:  Well, I think there are a couple

10   concerns with Mr. Nanzig, and Soco has filed a brief to

11   preclude the testimony of Mr. Nanzig, but it takes us more

12   fundamentally back to, as a first issue, on Nanzig, as to

13   USF&G, USF&G has waived the defense of notice or prejudice by

14   not raising it in its reservation of rights letters.  The

15   first time that USF&G --

16             THE COURT:  I ruled against you the last time,

17   didn't I?

18             MR. BANKER:  Pardon me?

19             THE COURT:  Didn't I rule against you on that issue

20   in the last case?

21             MR. BANKER:  I don't believe that that issue was

22   explicitly ruled on.

23             THE COURT:  I gave an instruction on notice to the

24   jury, didn't I?

25             MR. JOHNSON:  You did indeed, Your Honor.

1          THE COURT:  Well, then, that means I ruled against

2     you.

3          Go ahead.

4          MR. BANKER:  To the extent that Mr. Nanzig would

5     testify, the concern is consistent with the instructions that

6     were given last time on notice that if notice is notice when

7     you can reasonably anticipate a claim, there's no evidence in

8     this case whatsoever that there was any property damage that

9     Soco was aware of to third parties really until the claims

10    were made in 2000.  But even if you made the argument from the

11    Lockheed Martin report in 1999, there is no way that

12    Mr. Nanzig ought to be able to testify about the 1970s, the

13    1980s, and the 1990s, to talk about notice and prejudice.

14         THE COURT:  Let me stop you there.

15         You say there's no evidence in this case whatsoever

16    that there was any property damage that Soco was aware of to

17    third parties really until the claims were made.  I think

18    actual notice, that's true.  When the spill happened, could

19    you or should you have reasonably anticipated the claims?

20         MR. BANKER:  There's no evidence in the record that

21    would suggest there's any reasonable anticipation of damage to

22    third-party property.

23         THE COURT:  Well, they're talking about -- experts

24    talked about, even the last expert talked about the smell, the

25    damage that would have occurred to the asphalt, that kind of

1    thing.

2            MR. BANKER:  Sure.

3            THE COURT:  Isn't that a jury issue?

4            MR. BANKER:  I don't think so, Your Honor.  I mean,

5    the groundwater here that's at issue that's being complained

6    of in terms of coverage, I mean, this is not a property damage

7    claim that Soco is making.

8            THE COURT:  I know.  This is a liability policy.

9            MR. BANKER:  And so you have a unique situation with

10   the groundwater, you know, and that goes back to the Montana

11   Constitution about who owns the groundwater and whose rights

12   you have.

13           THE COURT:  Let's not get into that.

14           MR. BANKER:  Even if we assume a spill occurred and

15   got down to the northwest corner, there's no evidence in the

16   record to suggest any knowledge that that would have done

17   anything other but, you know, but been a release of product,

18   Soco's product, onto Soco's land.  So without some evidence to

19   go beyond that, there's really no reason to be able to draw

20   that back from, you know, 1999 further.  And I guess --

21           THE COURT:  Let me interrupt you.

22           Doesn't the fact that you're now claiming that there

23   was this spill, release, escape of perc in 1975, 1976, or 1977

24   that flowed down there that is now the cause of all of this,

25   because of the fact that you're making the claim, doesn't that

1    make this relevant as to whether a claim should have been

2    reasonably anticipated?  And you all claim, and your position

3    is, you had no idea it was out there until after the EPA came

4    in and then the ROD was issued and then claims were asserted.

5    It wasn't even then that you claimed that there had been a

6    spill.  I mean, how long could you have waited to assert that

7    there was this inventory discrepancy that must have resulted

8    from the spill?

9            MR. BANKER:  Well, it's not so much the question of

10   at what point was the inventory issue to be raised with the

11   insurance company.  You had a 1999 Lockheed Martin report that

12   first suggested that there was a source area on the Dyce site.

13   That's followed by the *Weiss* action complaint in June of 2000.

14   In June of 2000, within two weeks of when that was issued,

15   Soco tendered that to its insurance companies.  But between

16   1999 and June of 2000, Soco was putting together its

17   historical insurance program so that it could make a tender.

18   Mr. Nanzig is not in a position to offer any probative

19   testimony whatsoever on the question of, you know, notice or

20   awareness in the '70s, the '80s, and the '90s.

21           THE COURT:  No.  I assume what he'd be offered for

22   is to prove the prejudice part of it.  Is that it?

23           MR. JOHNSON:  Correct, Your Honor.

24           MR. BANKER:  Well, prejudice between December of

25   1999 and June of 2000 is one thing.

1875

1           THE COURT:  Yes, I know.  It's a whole lot different

2  when you go back to '75 when you all say this -- or '76 or '77

3  when you all say this occurred.

4           MR. BANKER:  And I think, you know, given, given how

5  the Court has bifurcated this case into two phases, if

6  Mr. Nanzig was going to take -- if the Court was inclined to

7  allow Mr. Nanzig to take the stand, we would at least have a

8  concern that his testimony be carefully limited to what is

9  pertinent to this case.

10          THE COURT:  Which you say is '99 to 2000 or 2001.

11          MR. BANKER:  If you want to talk about between '99

12  and 2000 --

13          THE COURT:  Right, and I'm saying I don't know what

14  the answer to that question is.  I'm telling you, why I'm

15  having, why I'm having this discussion, to tell you what I'm

16  bothered by.

17          MR. CRANE:  Your Honor, could I make a couple of

18  observations along those lines?

19          THE COURT:  You can.

20          MR. CRANE:  Thank you.

21          There's a false premise in Mr. Banker's argument.

22  The testimony is very clear from Dyce's own employees,

23  including Mr. Colver and Mr. Naff, that they knew perc was

24  dangerous to the environment, they knew it shouldn't get to

25  the environment, and if it happened the way they argued it

1    happened, they designed a facility to make it get to the

2    environment and damage the environment.  So the false premise

3    is that they wouldn't reasonably anticipate damage to the

4    environment.  That's what they designed, and that's a jury

5    question.

6              THE COURT:  I know.  I know, and I'm saying, is that

7    what "reasonably anticipate" means?

8              MR. CRANE:  I think it is certainly encompassed

9    within that.

10             And then the second problem, if I could, Your Honor,

11   as to Continental, they've been waving this Continental loss

12   form to the jury with every single witness where Mr. Naff now

13   testifies that he took the Continental people around and said,

14   "There's no loss."  Well, we wouldn't have even issued a

15   policy if they had told us there was a loss.  So I think that

16   has to go to the jury, too, on prejudice.

17             THE COURT:  Well, I don't know the answer.  You all

18   be prepared to tell me in the morning --

19             MR. CRANE:  Thank you, Your Honor.

20             MR. JOHNSON:  Thank you, Your Honor.

21             THE COURT:  -- in about five minutes, because I'm

22   inclined to think, because of the facts of this case and the

23   way the testimony has come in, we go all the way back to 1975.

24             However, you have a battery of lawyers, apparently,

25   both sides, and you work.  They work during the day so they

1   can feed them to me at night.  They can work tonight and feed

2   them to me in the morning.

3            MR. BANKER:  They'll be happy to hear that, Your

4   Honor.

5            MR. JOHNSON:  Thanks, Your Honor.

6            THE COURT:  Yeah, I figured they would be.  I have

7   to read them.

8            MR. JOHNSON:  Thank you.

9            THE COURT:  Thank you.

10       (Proceedings were recessed at 17:20:37.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  VOLUME 7 REPORTER'S CERTIFICATE

2            I, JoAnn Corson Bacheller, a Registered Diplomate

3    Reporter and Certified Realtime Reporter, certify that the

4    foregoing transcript is a true and correct record of the

5    proceedings given at the time and place hereinbefore

6    mentioned; that the proceedings were reported by me in machine

7    shorthand and thereafter reduced to typewriting using

8    computer-assisted transcription; that after being reduced to

9    typewriting, a certified copy of this transcript will be filed

10   electronically with the Court.

11           I further certify that I am not attorney for, nor

12   employed by, nor related to any of the parties or attorneys to

13   this action, nor financially interested in this action.

14           IN WITNESS WHEREOF, I have set my hand at Billings,

15   Montana this 27th day of April, 2010.

16

17                           /s/ JoAnn Corson Bacheller

18                           _____
                             JoAnn Corson Bacheller
19                           United States Court Reporter

20

21

22

23

24

25