1   JoAnn Corson Bacheller
    Registered Diplomate Reporter
2   Certified Realtime Reporter
    P. O. Box 1424
3   Billings, Montana 59103-1424
    406/247-4477 office
4   406/247-7008 fax
    joann_bacheller@mtd.uscourts.gov
5
    United States Court Reporter
6

7

8            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MONTANA
9                   BILLINGS DIVISION

10
    UNITED STATES FIDELITY        )
11  AND GUARANTY COMPANY,         )
                                  )   Nos. CV-04-29-BLG-RFC
12                     Plaintiff,)        CV-08-29-BLG-RFC
         and                      )
13                                )   **VOLUME 8**
    THE CONTINENTAL INSURANCE     )   **TRANSCRIPT OF JURY TRIAL**
14  COMPANY,                      )
              Plaintiff Intervenor,)
15       vs.                      )
                                  )
16  SOCO WEST, INC.,              )
                       Defendant.)
17  _____)

18
            **BEFORE THE HONORABLE RICHARD F. CEBULL**
19          **CHIEF UNITED STATES DISTRICT COURT JUDGE**
                **FOR THE DISTRICT OF MONTANA**
20
            James F. Battin United States Courthouse
21                 316 North 26th Street
                   Billings, Montana 59101
22               Wednesday, March 17, 2010
                   08:42:07 to 16:14:06
23

24
            Proceedings recorded by machine shorthand
25      Transcript produced by computer-assisted transcription

1                              **APPEARANCES**

2   For the Plaintiff:              MR. ROBERT C. JOHNSON
                                    MR. JOHN I. GROSSBART
3                                   MS. WENDY N. ENERSON
                                    Attorneys at Law
4                                   8000 Sears Tower
                                    233 South Wacker Drive
5                                   Chicago, Illinois 60606

6                                   MR. MARSHAL L. MICKELSON
                                    Attorney at Law
7                                   P. O. Box 509
                                    Butte, Montana 59703
8
    For the Plaintiff              MR. BRIAN W. WALSH
9   Intervenor:                    Attorney at Law
                                   Suite 330
10                                  555 Mission Street
                                    San Francisco, California 94105
11
                                    MR. STEVEN M. CRANE
12                                  Attorney at Law
                                    Suite 1500
13                                  515 South Figueroa Street
                                    Los Angeles, California 90017
14
                                    MR. MAXON R. DAVIS
15                                  Attorney at Law
                                    P. O. Box 2103
16                                  Great Falls, Montana 59403

17  For the Defendant:             MR. CHRISTOPHER L. LYNCH
                                   MR. PAUL A. BANKER
18                                  Attorneys at Law
                                    4200 IDS Center
19                                  80 South Eighth Street
                                    Minneapolis, Minnesota 55402
20
                                    MR. LAWRENCE B. COZZENS
21                                  Attorney at Law
                                    Suite 104
22                                  1643 24th Street West
                                    Billings, Montana 59102
23
    Also present for              MS. JULIANNE ROHM
24  graphics display:             MR. NEIL BAILEY

25

1

**CONTENTS**

                                                    Volume/Page

2

**Volume 1 Proceedings** ...............................  1/   16

3  *Voir Dire* Examination
      By the Court .....................................  1/   43

4      By Mr. Cozzens ..................................  1/  101
       By Mr. Mickelson ................................  1/  114

5      By Mr. Davis ....................................  1/  131
    Selection of Jury ..................................  1/  147

6  Instructions to Jury ................................  1/  150
    Opening Statement by Mr. Cozzens ...................  1/  160

7  Opening Statement by Mr. Johnson ....................  1/  185
    Opening Statement by Mr. Davis .....................  1/  200

8  Volume 1 Reporter's Certificate .....................  1/  251

9  **Volume 2 Proceedings** ...............................  2/  267
    Volume 2 Reporter's Certificate ....................  2/  554

10

    **Volume 3 Proceedings** ...............................  3/  570
11  Volume 3 Reporter's Certificate ....................  3/  829

12  **Volume 4 Proceedings** ...............................  4/  845
    Volume 4 Reporter's Certificate ....................  4/ 1101

13

    **Volume 5 Proceedings** ...............................  5/ 1117
14  Defendant Rests ....................................  5/ 1334
    Plaintiffs' Motion for Judgment ....................  5/ 1334

15  Order of Court Reserved ............................  5/ 1337
    Volume 5 Reporter's Certificate ....................  5/ 1339

16

    **Volume 6 Proceedings** ...............................  6/ 1355
17  Volume 6 Reporter's Certificate ....................  6/ 1610

18  **Volume 7 Proceedings** ...............................  7/ 1626
    Order of Court re: Plaintiffs' Motion for Judgment ..  7/ 1870

19  Volume 7 Reporter's Certificate ....................  7/ 1879

20  **Volume 8 Proceedings** ...............................  8/ 1895
    Plaintiffs Rest ....................................  8/ 1904

21  Defendant's Motion for Judgment ....................  8/ 2010
    Order of Court re: Defendant's Motion for Judgment ..  8/ 2018

22  Plaintiffs' Motion for Judgment Renewed ............  8/ 2018
    Order of Court re: Plaintiffs' Motion for Judgment ..  8/ 2018

23  Settlement of Instructions .........................  8/ 2019
    Volume 8 Reporter's Certificate ....................  8/ 2072

24

25

1                        **CONTENTS  (Continued)**

                                                        **Volume/Page**
2

**Volume 9 Proceedings** ................................  9/ 2088
3  Instructions to Jury ................................  9/ 2092
   Closing Argument by Mr. Banker ......................  9/ 2105
4  Closing Argument by Mr. Johnson .....................  9/ 2137
   Closing Argument by Mr. Davis .......................  9/ 2159
5  Rebuttal Closing Argument by Mr. Banker .............  9/ 2171
   Jury Verdict ........................................  9/ 2186
6  Volume 9 Reporter's Certificate .....................  9/ 2190

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24          REPORTER'S NOTE:  "Uh-huh" and "Um-hmm" indicate
   affirmative responses.  "Huh-uh" and "Hm-umm" indicate
25 negative responses.

1                              **WITNESSES**

2    **For the Defendant:**                              **Volume/Page**

3    Mr. Dennis Allen St. George
         Direct Examination by Mr. Banker ................  1/   211
4        Cross-Examination by Mr. Johnson ................  1/   239
         Cross-Examination by Mr. Davis ..................  1/   248
5        Redirect Examination by Mr. Banker ..............  1/   249

6    Mr. James Sullivan
         Direct Examination by Mr. Lynch .................  2/   276
7        Cross-Examination by Mr. Grossbart ..............  2/   316
         Redirect Examination by Mr. Lynch ...............  2/   358
8
     Mr. Richard Allen Colver
9        Direct Examination by Mr. Cozzens ...............  2/   367
         Cross-Examination by Mr. Johnson ................  2/   403
10       Redirect Examination by Mr. Cozzens .............  2/   484

11   Mr. Rodney Hallsten
         Direct Examination by Mr. Banker ................  2/   490
12       Cross-Examination by Mr. Grossbart ..............  2/   514
         Cross-Examination by Mr. Davis ..................  2/   551
13       Redirect Examination by Mr. Banker ..............  2/   552

14   Mr. Monte I. Naff
         Direct Examination by Mr. Cozzens ...............  3/   570
15       Cross-Examination by Mr. Johnson ................  3/   610
         Cross-Examination by Mr. Davis ..................  3/   702
16       Redirect Examination by Mr. Cozzens .............  3/   718

17   Mr. Charles Bender (deposition)
         Examination .....................................  3/   738
18
     Mr. Desmond Slater (deposition)
19       Examination .....................................  3/   763

20   Mr. Larry Nelson (deposition)
         Examination .....................................  3/   802
21
     Mr. Marvin Johnson
22       Direct Examination by Mr. Cozzens ...............  4/   846
         Cross-Examination by Mr. Johnson ................  4/   863
23
     Mr. Douglas Johnston
24       Direct Examination by Mr. Banker ................  4/   867
         Cross-Examination by Mr. Grossbart ..............  4/   898
25       Cross-Examination by Mr Davis ...................  4/   921
         Redirect Examination by Mr. Banker ..............  4/   924

**WITNESSES (Continued)**

**For the Defendant:**                                      Volume/Page

Mr. David Warne
    Direct Examination by Mr. Banker ................ 4/  925
    Cross-Examination by Mr. Davis .................. 4/  953
    Redirect Examination by Mr. Banker ............. 4/  987

Ms. Suzanne Miller
    Direct Examination by Mr. Cozzens .............. 4/  992
    Cross-Examination by Mr. Crane ................. 4/ 1030
    Redirect Examination by Mr. Cozzens ............ 4/ 1067

Robert Leslie Powell, Ph.D.
    Direct Examination by Mr. Lynch ................ 4/ 1068
    Direct Examination (Continued) by Mr. Lynch ..... 5/ 1118
    Cross-Examination by Mr. Grossbart ............. 5/ 1213
    Cross-Examination by Mr. Davis ................. 5/ 1301
    Redirect Examination by Mr. Lynch .............. 5/ 1319

**For the Plaintiffs:**

Mr. Marvin Johnson (deposition)
    Examination .................................... 6/ 1356

Mr. Ken Kjos (deposition)
    Examination .................................... 6/ 1471

Ms. Kristen Kohler Stout
    Direct Examination by Mr. Johnson .............. 6/ 1537
    Cross-Examination by Mr. Lynch ................. 6/ 1593
    Redirect Examination by Mr. Johnson ............ 6/ 1607

Peter Shanahan, Ph.D.
    Direct Examination by Mr. Grossbart ............ 7/ 1626
    Cross-Examination by Mr. Lynch ................. 7/ 1704
    Redirect Examination by Mr. Grossbart .......... 7/ 1721

Mr. Richard Brill (deposition)
    Examination .................................... 7/ 1728

Yaron M. Sternberg, Ph.D.
    Direct Examination by Mr. Crane ................ 7/ 1774
    Cross-Examination by Mr. Lynch ................. 7/ 1805
    Redirect Examination by Crane .................. 7/ 1826

1

**WITNESSES (Continued)**

2

**For the Plaintiffs:**                              **Volume/Page**

3

Bruce Edwin Dale, Ph.D.
    Direct Examination by Mr. Davis ................ 7/ 1831

4

    Cross-Examination by Mr. Lynch ................. 7/ 1862
    Redirect Examination by Mr. Davis .............. 7/ 1866

5

**For the Defendant in Rebuttal:**

6

Wayne Martin Grip

7

    Direct Examination by Mr. Lynch ................ 8/ 1905
    Cross-Examination by Mr. Johnson ............... 8/ 1954

8

    Redirect Examination by Mr. Lynch .............. 8/ 1995

9

Robert Leslie Powell, Ph.D.
    Direct Examination by Mr. Lynch ................ 8/ 1999

10

    Cross-Examination by Mr. Crane ................. 8/ 2005

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## EXHIBITS

| Exhibit No. | | Received Volume/Page |
|---|---|---|
| 5 | 09/05/89 Letter to Hol from Johnson ........ | FPT/ 56 |
| 30 | 09/11/85 Memo to Managers of All Plants from Q. Dyce .................................. | FPT/ 56 |
| 72 | 11/04/75 Daily sales report to Bender, Hallsten, Don, Grady, and Naff from Q. Dyce. | 2/ 536 |
| 90 | 05/29/86 Sales report ..................... | 3/ 697 |
| 143 | 02/26/82 Continental General Liability Survey Report form ........................ | FPT/ 23 |
| 231 | 06/15/00 Letter to USF&G from Whalen ....... | FPT/ 24 |
| 234 | 09/25/00 Letter to Downing from Mielenhausen .............................. | FPT/ 24 |
| 352 | 04/08/74 Memo to Bender from Whaley ........ | FPT/ 28 |
| 353 | 09/27/72 Memo to Murray from Q. Dyce ....... | FPT/ 57 |
| 359 | 09/11/85 Memo from Q. Dyce ............... | FPT/ 28 |
| 362 | 09/13/89 Memo to Q. Dyce from Naff ...... | FPT/ 28, 57 |
| 366 | Warning label for perchloroethylene and instructions on empty container handling and reuse ................................. | FPT/ 57 |
| 382 | 11/05/92 Montana Department of Health Field Investigation Report ...................... | 4/ 975 |
| 383 | 07/23/00 Letter to Rowe from Miller ........ | FPT/ 29 |
| 429 | 06/09/98 E-mail between Warne and Naff ..... | 3/ 668 |
| 433 | 12/16/99 Letter to G. Staarjes from USEPA .. | FPT/ 58 |
| 436 | 01/06/99 E-mail between Miller and Warne ... | FPT/ 58 |
| 442 | 08/06/96-08/09/00 Containment pit runoff water sampling ............................. | 4/ 1059 |
| 445 | 03/16/73 USF&G Advertising ................ | FPT/ 30 |

1                          **EXHIBITS (Continued)**

2     **Exhibit No.**                              **Received Volume/Page**

3     499      11/04/75 Aerial photograph ................. FPT/    31

4     505      02/23/82 Continental General Liability Survey
               Report ................................... FPT/    31

5
      784      08/21/95 Handwritten notes ................ FPT/    58
6
      785      08/18/95 Memo to Naff, Hilton, Biondo,
7              Gilbert, Akers and Liebling from Simko ..... FPT/    58

8     856A     09/25/89 Versar Inc. Environmental Risk
               Assessment Survey ....................... FPT/ 32, 58
9
      859      07/24/89 Draft letter to Hol from Johnson .. FPT/    59
10
      1104     09/08/05 Letter to O'Reilly from Terp ...... FPT/    32
11
      2532     11/1975 Aerial photograph ................. FPT/    32
12
      2533     11/04/75 Aerial photograph ................ FPT/    32
13
      2545     12/30/05 Bulk Handling and Properties of PPG
14             Chlorinated Solvents:  Perchloroethylene,
               Trichloroethylene, Tri-Ethane ............. FPT/    59
15
      2558     04/07/04 Letter to O'Reily from Sullivan ...   2/   293
16
      3004     08/23/00 Letter to Rowe from Miller ........ FPT/    32
17
      3006     08/27/72 Aerial photograph ................ FPT/    32
18
      3015     07/1995 HCI Dyce site plan ................ FPT/    32
19
      3017     01/1983 Dyce personnel manual ............. FPT/    33
20
      3024     10/29/85 Company policy re: hoses .........   4/   888
21
      3025     07/02/87 Memo to Dick, Russ, Bob, Kevin,
22             Ivan, John and File from Roger ............ FPT/    36

23    3029     1986-2001 Dyce manager's monthly report ....   8/  1896

24    3043     11/29/99 Lockheed Martin Final Report ......   1/    37

25

                                 1888

1                         **EXHIBITS (Continued)**

2    **Exhibit No.**                              **Received Volume/Page**

3    3044    12/16/99 USEPA First Request for Information
             Pursuant to 104(e) ........................ FPT/    37
4
     3045    03/01/00 Dyce Response to First 104(e)
5            Request .................................. FPT/    37

6    3047    08/23/00 Letter to Naff from Risner &
             Kercher .................................. FPT/    37
7
     3048    08/23/00 Dyce Supplemental Response to
8            USEPA's Second 104(e) Request ............. FPT/    37

9    3049    10/03/00 Maxim Technologies Inc. Site
             Investigation Report ...................... FPT/    38
10
     3050    06/2003 Tetra Tech EM Inc. Remedial
11           Investigation Report for MDEQ ............. FPT/    39

12   3051    07/07/04 Tetra Tech Final Feasibility Study
             Report for MDEQ ........................... FPT/    39
13
     3052    11/2004 MDEQ/USEPA Proposed Remedial Action
14           Plan for Lockwood Groundwater Solvent
             Plume Site ................................ FPT/    39
15
     3058    12/2003 Tetra Tech Addendum 01 to the Final
16           Remedial Investigation Report for MDEQ ..... FPT/    39

17   3059    08/2005 MDEQ/USEPA Record of Decision for
             Lockwood Solvent Groundwater Plume Site .... FPT/    39
18
     3060    02/28/06 Letter to Terp from Risner &
19           Kercher .................................. FPT/    40

20   3102    09/16/85 Memo to Colver ................... FPT/    41

21   3115    11/25/92 Letter and permit application to
             Lincoln from Diede ........................ FPT/    42
22
     3174    06/09/00 Letter to Webster from Miller ..... FPT/    43
23
     3175    06/12/00 Letter to Miller from Webster ..... FPT/    43
24
     3178    07/25/00 Fax to Stevenson from Miller ...... FPT/    43
25

**EXHIBITS (Continued)**

Exhibit No.                                    Received Volume/Page

3191    11/13/03 ATC Associates Inc. Soil and
        Groundwater Data Remedial Design Investigation
        Report ................................... FPT/    43

3200    Compilation:  USF&G Policy No. SMP326188 ... FPT/    44

3201    Compilation:  USF&G Policy No. 1CC599480 ... FPT/    44

3202    Compilation:  USF&G Policy No. SMP406309 ... FPT/    44

3203    Compilation:  USF&G Policy No. 1CC944574 ... FPT/    44

3204    Compilation:  USF&G Policy No. CEP64280 .... FPT/    44

3205    Compilation:  USF&G Policy No. 1CC945882 ... FPT/    44

3206    Compilation:  USF&G Policy No. CEP64348 .... FPT/    44

3207    Compilation:  USF&G Policy No. SMP535107 ... FPT/    44

3208    Compilation:  USF&G Policy No. SMP576121 ... FPT/    44

3209    Compilation:  USF&G Policy No. 1CCA31253 ... FPT/    44

3210    Compilation:  USF&G Policy No. CEP84958 .... FPT/    44

3211    Compilation:  USF&G Policy No. SMP594660 ... FPT/    44

3213    Compilation:  USF&G Policy No. CEP104806 ... FPT/    44

3214    Compilation:  USF&G Policy No. SMP654057 ... FPT/    44

3216    Compilation:  USF&G Policy No. CEP114516 ... FPT/    44

3217    Compilation:  USF&G Policy No. SMP772986 ... FPT/    44

3219    Compilation:  USF&G Policy No. CEP114641 ... FPT/    44

3220    03/03/06 Stipulation as to Existence and
        Content of USF&G Insurance Policies ........ FPT/    44

3287    02/28/05 Letter to Terp from Risner &
        Kercher ................................... FPT/    48

1

**EXHIBITS (Continued)**

2

**Exhibit No.**                                    **Received Volume/Page**

3    3321    03/03/06 Stipulation as to Existence and
             Content of Continental Insurance Policies
4            and Exhibits ............................... FPT/   49

5    3363    09/29/89 Agreement to Purchase Real
             Property .................................   8/ 1903
6
     3407    1971 Chemical Safety Data Sheet for
7            perchloroethylene ...................... FPT/ 49, 61

8    3408    1972 Hooker Chemical MSDS for
             trichloroethylene ........................ FPT/   49
9
     3410    1980 PPG manual .......................... FPT/   50
10
     3420    05/25/00 Second Request for Information
11           Pursuant to Section 104 of CERCLA for the
             Lockwood Solvent Site Billings .............   3/   676
12
     3433    1983 Dyce brochure ....................... FPT/   50
13
     3436    11/1979 Ledger sheet .....................   3/   622
14
     3438    04/1971 Perchloroethylene brochure ......  FPT/ 50, 61
15
     3471    08/05/85 Sales report ....................   3/   591
16
     3475    02/06/84 Dyce policies re: DOT ............ FPT/   50
17
     3476    06/02/79 Expense Report ...................   3/   585
18
     3483    Aerial photograph ........................ FPT/   51
19
     3484    Aerial photograph ........................ FPT/   51
20
     3485    Aerial photograph ........................ FPT/   51
21
     3486    Aerial photograph ........................ FPT/   51
22
     3487    Aerial photograph ........................ FPT/   51
23
     3488    Aerial photograph ........................ FPT/   51
24
     3490    1972 Aerial photograph ................... FPT/   51
25

1           **EXHIBITS (Continued)**

2     **Exhibit No.**                          **Received Volume/Page**

3     3491    1981 Aerial photograph ..................... FPT/    51

4     3492    1987 Aerial photograph ..................... FPT/    51

5     3660    09/09/09 Dale photographs .................    2/   318

6     3674    Site photographs taken by Hargis ...........   8/  2040

7     3800    05/27/57 Aerial photograph ................. FPT/    52

8     3801    06/26/66 Aerial photograph ................. FPT/    52

9     3802    05/22/69 Aerial photograph ................. FPT/    52

10    3803    08/18/71 Aerial photograph ................. FPT/    52

11    3804    04/23/72 Aerial photograph ................. FPT/    52

12    3805    Circa 1973 Aerial photograph ............... FPT/    52

13    3806    06/18/74 Aerial photograph ................. FPT/    52

14    3807    11/04/75 Aerial photograph ................. FPT/    52

15    3808    06/23/77 Aerial photograph ................. FPT/    52

16    3809    09/06/77 Aerial photograph ................. FPT/    52

17    3810    05/03/79 Aerial photograph ................. FPT/    52

18    3811    05/14/79 Aerial photograph ................. FPT/    52

19    3812    07/31/79 Aerial photograph ................. FPT/    52

20    3813    03/13/81 Aerial photograph ................. FPT/    52

21    3814    06/02/81 Aerial photograph ................. FPT/    52

22    3815    08/24/81 Aerial photograph ................. FPT/    52

23    3816    05/27/83 Aerial photograph ................. FPT/    52

24    3817    07/27/83 Aerial photograph ................. FPT/    52

25    3818    04/30/87 Aerial photograph ................. FPT/    52

1                          **EXHIBITS (Continued)**

2    **Exhibit No.**                              **Received Volume/Page**

3    3826    08/08/05 Response to 06/24/05 CERCLA 104(e). FPT/    53

4    3827    02/14/05 Letter to Moskowitz from
             Mielenhausen ............................. FPT/    53
5
     3828    02/15/05 Letter to Walsh from Mielenhausen . FPT/    53
6
     3886    06/15/00 Letter to Continental from Whalen . FPT/    55
7
     3887    09/25/00 Letter to Giblin from Mielenhausen. FPT/    55
8
     3888    01/08/07 Second stipulation as to existence
9            and content of USF&G insurance policies .... FPT/    55

10   4027    Aerial photograph (D032604) ...............   4/   848

11   4032    10/10/00 Communication to Gilbert from
             Simko .....................................   3/   691
12
     4039    09/13/89 Memo to Q. Dyce from Hallsten .....   8/ 1903
13
     4044    07/1976 Location Survey of Dyce site ....... FPT/    62
14
     4087    01/06/99 E-mail to Warne from Hallsten .....   2/   547
15
     4089    02/29/00 E-mail to Naff from Warne .........   4/ 1066
16
     4143    Aerial photograph .........................   6/ 1485
17
     4320    1980 Bulk Handling and Properties of PPG
18           Chlorinated Solvents ...................... FPT/    63

19   4400    01/14/05 Fax to LeCours from Sullivan ......   2/   335

20   4516    09/12/02 Letter to EPA from Sullivan .......   2/   354

21   4721    08/18/03 Fax to MDEQ from Sullivan .........   2/   308

22   4757    08/03/04 Letter to Sullivan from MDEQ ......   2/   313

23   4811    04/28/03 Letter to Ross from Sullivan ......   2/   342

24   4822    07/20/00 E-mail to Miller from Naff ........ FPT/    64

25

1                        **EXHIBITS (Continued)**

2      **Exhibit No.**                              **Received Volume/Page**

3      4831    Exhibit 5017 aerial photograph with Colver
               notations ...............................   2/  483
4
       4832    Exhibit 5019 aerial photograph with Colver
5              notations ...............................   2/  483

6      4833    Exhibit 5024 aerial photograph with Colver
               notations ...............................   2/  483
7
       4834    Exhibit 5028 aerial photograph with Colver
8              notations ...............................   2/  483

9      4835    04/30/86 General manager's monthly report ..  4/  899

10     5000-
       5064    Historical photographs ....................   2/  267
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1

2          (Open court.)

3          (Jury not present.)

4               THE COURT:  Please be seated.

5               I've been waiting since 7:30 this morning for briefs

6     to pop up on my screen.

7               MR. MICKELSON:  We decided last night and notified

8     the other side -- we didn't know how to notify you -- but we

9     wouldn't be calling Mr. Nanzig or using the deposition of

10    Mr. Simko.

11              THE COURT:  Are you going to rest?

12              MR. MICKELSON:  We have a few publications of

13    documents, and then we're going to rest.

14              THE COURT:  And what is the rest of your case?

15              MR. LYNCH:  Your Honor, we just have two rebuttal

16    experts.

17              THE COURT:  Who?

18              MR. LYNCH:  Wayne Grip, who is going to rebut

19    testimony of Kristen Stout and then Dr. Powell just to touch

20    on the mass estimates of Dr. Sternberg.

21              THE COURT:  Okay.  Get the jury in here.

22              THE CLERK:  Okay.

23          (Jury present.)

24              THE COURT:  Please be seated.

25              The insurers may call their next witness.

1          MR. GROSSBART:  Your Honor, we would like to publish

2     just three documents and highlight some brief sections from

3     each.  They're all on the exhibit lists that have been

4     submitted in this case.  None of them have been objected to.

5          The first is Exhibit 78.

6          Could you pull that up, Neil?

7          MR. COZZENS:  Do you have copies of that?

8          MR. GROSSBART:  I'm sorry.  Try 3029.  My mistake.

9          DOCUMENT TECHNICIAN:  (Complied with request.)

10          MR. GROSSBART:  This is a manager's monthly report

11     from Dyce Chemical dated January 28, 1986, and if you would go

12     to the second page of this document, Neil?

13          Is there any objection to the document?

14          MR. COZZENS:  Is this going to the jury?

15          THE COURT:  It is.

16          MR. GROSSBART:  Well, yeah.  I would like to publish

17     the document and move its admission.  There is no objection to

18     the document as I understand it.

19          THE COURT:  Tell me the number, and I'll admit it.

20          MR. GROSSBART:  3029.

21          THE COURT:  3029 is admitted.

22        (Exhibit 3029 was received in evidence.)

23          MR. GROSSBART:  Could you go to the last page of the

24     document, Neil?

25          DOCUMENT TECHNICIAN:  (Complied with request.)

1          MR. GROSSBART:  And -- no.  You had it there a

2   second ago with the signature.  Right there.  It's the page

3   with the Bates number ending in 146.

4          DOCUMENT TECHNICIAN:  (Complied with request.)

5          THE COURT:  While you're looking, just one second

6   (returning to chambers).

7       (Discussion off the record.)

8          MR. COZZENS:  Your Honor, can we have a sidebar

9   about this?

10         THE COURT:  Did the record show the judge left the

11  courtroom?

12         THE REPORTER:  No.

13         THE COURT:  Just kidding.

14         Let's have a sidebar.

15      (Discussion on the record at sidebar.)

16         THE COURT:  Why are we having this sidebar?

17         MR. COZZENS:  Because I want to know what's going

18  on.

19         MR. GROSSBART:  Your Honor --

20         MR. COZZENS:  Let me speak first.

21         MR. GROSSBART:  I'm sorry.

22         THE COURT:  You want to know what's going on.  He's

23  going to tell you.

24         MR. COZZENS:  All right.  I'll listen.

25         THE COURT:  No, go ahead.  Do you know what he's

1   going to do?

2          MR. COZZENS:  No, I don't know what he's going to

3   do, and I don't know how he gets this evidence in front of the

4   jury when there's no witness, nobody to talk about it.  He's

5   right, we don't object to it, but now he's pointing out

6   specific points to the jury, and there's nobody to talk about

7   it.

8          MR. GROSSBART:  I would say two things.  I would say

9   if a document is not objected to and it's admissible in

10  evidence, I'm entitled to stand up there and, I suppose I

11  could read it cover to cover, but, I could point out a line or

12  two.

13         THE COURT:  You are.

14         MR. GROSSBART:  So the problem we're having right

15  now is just technical in him finding the correct page.

16         THE COURT:  Let's see the page.

17         MR. GROSSBART:  I'm trying to get him to find that

18  page, and I wanted to read, "One of our ongoing problems is

19  trying to dispose of the runoff rainwater," *et cetera*.

20         THE COURT:  I don't care what you do with it.

21         MR. JOHNSON:  Find it.

22         MR. GROSSBART:  I just need to have him find it.

23  Maybe I'll pass the baton to Marshal.  He can do his -- he's

24  got a couple things to publish, and I'll work with Neil to try

25  to get the page figured out.  If I can't, I guess it's my

1    problem.

2           MR. COZZENS:  So everybody knows, one of those we

3    are going to object to.  They're going to try to publish a

4    portion of their complaint in this case relating to notice,

5    and that's going to be completely -- and we do object.  That's

6    completely misleading and confusing.  Yes, they did complain

7    about notice in the complaint.  That was four years after the

8    reservation-of-rights letter where they never raised that

9    issue.  And the jury doesn't need to know, anyway.  I object

10   to that.

11          MR. MICKELSON:  Well, if they're raising waiver,

12   which, they've said that we waived it, the objection to their

13   lack of proper notice, we're entitled to put on, I think, some

14   evidence that we put them on notice, and that was part of our

15   complaint.

16          MR. JOHNSON:  And we published it last time, Your

17   Honor.  You allowed us to publish it in the first trial.

18          MR. COZZENS:  I'm not sure it was ever an issue in

19   the last trial.

20          THE COURT:  I thought it was.

21          MR. JOHNSON:  It was, and we did publish it, and

22   we're doing it this time.

23          MR. COZZENS:  From the time they wrote the first

24   reservation-of-rights letter in June 2000 until 2004, was the

25   first time they raised the notice issue.  You're the only one

1    who needs to know that.  The jury doesn't.

2            THE COURT:  Doesn't the jury have to rule on waiver?

3    Isn't that a jury question?

4            MR. COZZENS:  I think that's a question of law for

5    the Court.

6            THE COURT:  I don't think it is.

7            MR. COZZENS:  All of the cases, the courts, the

8    Montana Supreme Court decided that as a matter of law.  Did

9    they raise it initially --

10           THE COURT:  Did I decide it as a matter of law last

11   time?

12           MR. COZZENS:  No.

13           MR. JOHNSON:  The only thing you had in the verdict

14   form last time was the date notice should have been given.

15   There was a line item in the verdict form they never got to

16   that said, "Notice is supposed to be given as soon as

17   possible.  When is the date the notice should have been

18   given?"  And that's, that's what happened last time.  So there

19   wasn't, in the verdict form, a waiver issue.

20           MR. MICKELSON:  A waiver issue.

21           MR. JOHNSON:  But it seems like they've been arguing

22   waiver throughout.  They have our reservation-of-rights

23   letters in evidence already.  They're going to argue to the

24   jury, I presume, that we didn't put in the

25   reservation-of-rights letter a specific reservation with

1    regard to lack of notice or late notice, even though the

2    reservation-of-rights letter says that we're reserving all

3    rights.  And if they're going to argue to the jury that

4    there's a waiver, then we're entitled to publish the complaint

5    portion that we rely on that says, of course, we didn't waive.

6    We gave them notice of -- we told them that one of our

7    defenses is late notice, and we told them that when we filed

8    the complaint.

9            Now if Your Honor is not going to submit that issue

10   to the jury, then I guess we don't have to publish the

11   complaint, but we haven't had an instruction conference yet so

12   we don't know exactly what's going to be submitted to the jury

13   and what isn't on this particular issue, and my -- do you have

14   a jury instruction on waiver?

15           MR. COZZENS:  No, because it's a question of law for

16   the Court.  That's how it's decided in every case.  And we're

17   not going to argue it to the jury.

18           MR. JOHNSON:  All right.  Well, if Your Honor is

19   going to decide that as a matter of law and it's not a jury

20   issue --

21           THE COURT:  I'm going to decide it as a matter of

22   law.  It isn't going to be a question for the jury.  You don't

23   have to put it in.

24           MR. COZZENS:  Thank you, Your Honor.

25           MR. JOHNSON:  Thank you, Your Honor.

1        (Open court.)

2        (Jury present.)

3        MR. GROSSBART:  Neil, would you put up 3363?

4   Highlight the title of the document, "Agreement to Purchase

5   Real Property."  Highlight the first paragraph before the

6   recitals.

7        DOCUMENT TECHNICIAN:  (Complied with request.)

8        MR. GROSSBART:  And I will read part of that that

9   says, "This agreement is made as of September 29, 1989 at

10  Billings, Montana, among the Quentin Dyce Charitable Remainder

11  Unitrust," and others, and Market Enterprises, Inc., and it's

12  an agreement to purchase real property in connection with the

13  sale of Dyce to HCI.

14       Would you please go to page 4 of the document?

15  Recital -- excuse me, portion K at the bottom, and highlight

16  just K.

17       DOCUMENT TECHNICIAN:  (Complied with request.)

18       MR. GROSSBART:  I will read a portion of that

19  document:  "The selling parties," defined earlier in the

20  document as Dyce and others, "The selling parties have no

21  knowledge of underground storage tank leaks, nor do they have

22  any knowledge of any spill, disposal, discharge, or release of

23  any hazardous material into, upon, from, or over the real

24  property."

25       Would you go to page 13 of the document?  And

1902

1    highlight the section that begins "Manager Letters."  There,

2    please.

3              DOCUMENT TECHNICIAN:  (Complied with request.)

4              MR. GROSSBART:  This is a reference to certain

5    managers' letters to Quentin Dyce, quote, stating that "they

6    do not know of any spills or problem areas that have not been

7    revealed by us."

8              And then three letters are referred to:  Monte

9    Naff's letter dated 9/13/1989, Rod Hallsten's letter dated

10   9/13/89, and Robert Gilbert's letter dated 9/13/89.

11             And then you can take that down.

12             DOCUMENT TECHNICIAN:  (Complied with request.)

13             MR. GROSSBART:  I move that document into evidence.

14   There is no objection.

15             THE COURT:  What document was that?

16             MR. GROSSBART:  3363.

17             THE COURT:  It's admitted.

18        (Exhibit 3363 was received in evidence.)

19             MR. GROSSBART:  Exhibit 4039, Neil --

20             THE COURT:  This is admitted, also, is it agreed?

21             MR. GROSSBART:  There's no objection.

22             MR. COZZENS:  (Shook head negatively.)

23             THE COURT:  Okay.

24        (Exhibit 4039 was received in evidence.)

25             MR. GROSSBART:  Just highlight the date, please.

1           DOCUMENT TECHNICIAN:  (Complied with request.)

2           MR. GROSSBART:  September 13, 1989, and the author,

3    Rod Hallsten.  And this is to confirm -- I'll read the first

4    paragraph -- this sentence, rather.  "This is to confirm,"

5    would you highlight that, please?

6           DOCUMENT TECHNICIAN:  (Complied with request.)

7           MR. GROSSBART:  "This is to confirm our telephone

8    conversation about any spills or pollution at the various

9    sites."

10           And now put the pages side by side, please.

11           DOCUMENT TECHNICIAN:  (Complied with request.)

12           MR. GROSSBART:  There is no reference in the

13   document to Billings.

14           And then please highlight the last sentence.

15           DOCUMENT TECHNICIAN:  (Complied with request.)

16           MR. GROSSBART:  To the best of my recollection, this

17   involves all the incidents involving spills and pollution."

18           I move the admi- -- I guess that one is admitted,

19   4039?

20           THE COURT:  I already admitted it.

21           MR. GROSSBART:  Thank you.

22           MR. MICKELSON:  Your Honor, we rest.

23           THE COURT:  Rebuttal.

24           MR. BANKER:  One housekeeping matter, before we do

25   that, Your Honor.

1           At the Court's earliest convenience, Soco has a

2   motion at the close of the insurers' case in chief.

3           THE COURT:  I will allow you to reserve it and make

4   it at our next recess as if it were made at this time.

5           MR. COZZENS:  (Nodded head affirmatively.)

6           MR. BANKER:  Thank you.

7           MR. LYNCH:  Your Honor, Soco calls Wayne Grip.

8           And, Your Honor, before we begin the testimony of

9   Mr. Grip, some of his images are stereo anaglyphs that the

10  jurors and the Court would need these 3D glasses to see

11  stereoscopically.  If we could have those handed out to the

12  jury and the Court?

13          THE COURT:  Sure.

14          THE CLERK:  (Complied with request.)

15          WHEREUPON,

16                    MR. WAYNE MARTIN GRIP,

17  called for examination in rebuttal by counsel for defendant,

18  after having been first duly sworn to testify the truth, the

19  whole truth, and nothing but the truth, testified as follows:

20                    DIRECT EXAMINATION

21  BY MR. LYNCH:

22  Q    Good morning, Mr. Grip.

23  A    Good morning.

24  Q    Could you please state your name for the record?

25  A    Wayne Martin Grip.

1    Q    And, Mr. Grip, where do you live?

2    A    I live in Gonzales, Louisiana.  It's a suburb of

3    Baton Rouge, Louisiana.

4    Q    And where do you work?

5    A    At Aero-Data Corporation, which is located in

6    Baton Rouge.

7    Q    And what do you do for a living?

8    A    I'm a photo interpreter, photogrammetrist, and pilot.

9    Q    And what is the business of Aero-Data Corporation?

10   A    Aero-Data is an aerial mapping company.  We have our own

11   airplanes and camera systems and stereophoning devices that we

12   used to produce topographic and planometric maps.

13   Q    I believe, when I asked what you did, you listed off

14   several things.  Maybe we'll touch them in order.

15        I think you said you were a photo interpreter?

16   A    That's right.

17   Q    And what is that?

18   A    Well, photo interpretation is the science of the

19   identification of objects in photography and determining their

20   meaning.

21   Q    And you also said you're a photogrammetrist?

22   A    Yes.  Photogrammetry is the science of making

23   measurements from photographs.  Basically it's really the

24   science of making maps.

25   Q    Did you say you're also a pilot?

1    A    Yes.  I have over 3,500 hours' time as a pilot in

2    command.  In photo missions alone, I have over 1,000 hours.

3    Q    Let's start with your educational background.  Could you

4    just tell us where you went to college and what your degree is

5    in?

6    A    I have a B.S. degree in geology from the University of

7    Wisconsin, Madison.

8    Q    And then can you -- what is your work experience relating

9    to photo interpretation and photogrammetry?

10   A    Well, it started right after I graduated.  I went into

11   the United States Air Force in officer training school and was

12   commissioned as second lieutenant.  I was assigned to a

13   reconnaissance technical squadron.  In that squadron, we

14   produced and developed film and produced charts of various

15   types of aircraft.

16   Q    Then after the Army, what was your work experience?

17   A    Not the Army.  The Air Force.

18   Q    I'm sorry.  I apologize.

19        After the Air Force, what was your experience?

20   A    After the Air Force, I went back to school in Wisconsin

21   for another three semesters, and I took additional courses in

22   soils and agronomy with the idea of becoming a golf course

23   superintendent, which was my next job.

24   Q    Then how did you end up going from golf course

25   superintendent to photo interpreter and photogrammetrist?

1   A     Well, I went back to it, really.  After working for the

2   State of Louisiana managing computer systems, I went back to

3   geology, and I regulated surface minings in the State of

4   Louisiana, and I started again using photo missions and photo

5   interpretation to look at the mine sites before I inspected

6   them on the ground.

7   Q     When did you get into photo interpretation and

8   photogrammetry more full-time?

9   A     It was in 1982 while I was still working for the state.

10  I started a consulting company with two other individuals, and

11  I was doing analysis of land loss in costal Louisiana for

12  companies or agencies that were not regulated by the surface

13  mining division.

14  Q     And at this point, were you doing photo interpretation

15  more or just flying mapping missions?

16  A     It was more of a photo interpretation nature.  We didn't

17  have all the powerful stereo plotters that we do today, but

18  within about six years of forming the company, Aero-Data, we

19  purchased our first stereo plotter.

20  Q     Have you done photo interpretation and photogrammetry

21  work in connection with environmental matters before?

22  A     Yes.  About 50 percent of the work that we do in mapping

23  and photo interpretation does involve environmental tech

24  applications.

25  Q     Can you just tell us who some of your clients are that

1  you do this work for?

2  A    Well, talking about the government first, we've worked

3  for the U.S. Justice Department, the Corps of Engineers, the

4  Soil Conservation Service, and some regulatory authorities in

5  Louisiana, the office of conservation and the office of

6  surface mining.

7       And for public clients, we've worked for chemical plants,

8  refineries, oil fields, municipalities.  We fly large counties

9  and produce the imagery and map it for them.  We work for a

10  lot of consulting firms, construction firms, engineering firms

11  that might be either doing environmental work or planning a

12  new shopping center or even a new subdivision, something of

13  that nature.

14  Q    In addition to flying missions and reviewing current

15  aerial photographs, does your work entail reviewing and

16  interpreting historic aerial photographs?

17  A    Yes, quite a bit of the work involves historical

18  photography, which is like a time machine.  What we do is we

19  get the photography, scan it all in at the same scale, put it

20  in a computer, and that allows us to look at it in a

21  time-lapse mode.  We can also look at it stereoscopically,

22  much like Ms. Stout did here.  I heard her testimony earlier.

23       And by looking at the photography stereoscopically, you

24  can get about four times as much detail as you can get from a

25  single monoscopic frame.  In fact, since the 1930s, most photo

1    missions have been flown in stereoscopic coverage because

2    that's what you need to really map the site.

3    Q    And I guess I forgot this in the introduction, so I

4    should back up a little bit.  You're obviously here testifying

5    as an expert witness today; is that correct?

6    A    That's right.

7    Q    And you're being paid for your time, obviously?

8    A    I hope so.

9    Q    And what is the rate?

10   A    I charge $200 an hour regardless.  All my clients, I

11   charge the same rate.

12   Q    You were talking a little bit about reviewing

13   stereoscopic photography.  When Ms. Stout was here the other

14   day, she showed us pictures of some of her equipment.  Can you

15   describe what equipment you used to view the photographs

16   stereoscopically?

17   A    Well, some of the same equipment that she has.  I have

18   mirror stereoscopes.  I have very powerful zoom stereoscopes

19   that sit on a light table.  I have analytical stereo plotters,

20   which are mapping devices that allow you to look directly at

21   the aerial film while you look through a powerful view-finder

22   and actually can produce topographic maps.

23        And then I have, which we prefer today, which is a device

24   called a digital stereo plotter.  A digital stereo plotter

25   involves scanning the film so you can put it in your computer

1    system, and then you are able to look at both overlapping

2    frames, zoom in as far as you want.  You can enhance the

3    imagery.  As you're drawing a line or mapping a building, you

4    can actually see what you're mapping superimposed right over

5    the image in stereo.  And if you're producing a topographic

6    map, you can see your contour lines that you're drawing or the

7    elevation points that you're putting in, and you can put in a

8    dozen or so and then just look at it, and if the points are

9    not floating right on the surface of the land, you know that

10   you have to make some corrections.

11       So the digital stereo plotter also allows me to switch

12   from one date; say, a current date.  I can go back to a date

13   in 1940, and I can put it on an old building, my cursor, and

14   switch back and forth in about a second, and I can then tell

15   if there's a small structure in that same location, that

16   building has been there for a long time.  So it's really a

17   handy device to use, not only in mapping but especially in

18   photo interpretation of environmental sites, looking at

19   changes that have occurred over time.

20   Q    And we heard Ms. Stout talk a little bit about viewing

21   some of the historical photographs in this case with an

22   analytical stereo plotter.  Can you do those same functions

23   with an analytical stereo plotter?

24   A    You can, but it's a lot clumsier and more time-consuming

25   because whereas with my digital stereo plotter, I don't just

1    look at one date and map it.  I'm always looking back and

2    forth in time, trying to figure out what certain fuzzy

3    features are.  And being able to switch between dates in about

4    a second or so is a very powerful tool, whereas with the

5    analytical stereo plotters, and I've done this before when

6    that's all we had, it takes five to ten minutes, at least, to

7    go from one date to another because you have to pull the film

8    out, put the new film in, adjust it just right, go through

9    some procedures, and then you can look at it.  So you really

10   can't go back and forth with an analytical stereo plotter like

11   you can with a digital.  And, really, the military, the CIA,

12   they had these digital stereo plotters designed because they

13   wanted to use it as an interpretation and mapping tool.  So

14   the digitals are the current type of equipment that are being

15   sold and used in many installations today.

16   Q    Obviously given your background and profession, you've

17   reviewed photographs in connection with this case.  Can you

18   just tell us what range of photographs you've reviewed?

19   A    Well, the date range, we had photographs as early as

20   1951, I believe, up through I think we have a 2004 photograph.

21   We have something like at least 30 dates, possibly more,

22   unique dates of photography, most of which are in stereoscopic

23   coverage.

24   Q    And I take it from reviewing those photographs, you've

25   developed some opinions regarding various features on those of

1912

1    the Dyce facility on different dates; is that correct?

2    A    Yes.  I produced what I call interpreted images, as well

3    as I produced a written report verbally describing what I saw

4    in the photography.  And, of course, my report is based on a

5    written description, plus the images, the interpreted images,

6    because the story about a picture is worth a thousand words is

7    certainly true in my profession.

8    Q    Why don't we start going through those images.  I believe

9    they're on your computer; is that correct?

10   A    Yes.  I have them on my laptop here, and what I'm going

11   to be using is something called a geographic information

12   system.  It's a good way of combining images and data, and I

13   can turn specific dates on.  For example, the first date in my

14   series is May 27 of 1957.

15   Q    And just for the record, this is Demonstrative DD017.

16   A    And I've turned that on, and my exhibits are identical to

17   this except that on the outer sides, the left and the right

18   outside the framing, that's some additional photographic area,

19   so I'm trying to show the exhibit as it was in my report, and

20   then I can do other things with it.

21        But the site, as I call it, the Dyce facility, is going

22   to be located in this area, and I'm saying "No Development"

23   because the site isn't there yet.  This is a vegetated field.

24   It slopes generally from the lower right to the upper left.

25   And, incidentally, in all of my photographs, in all of my

1    images, north will be to the top except for some of the stereo

2    images.

3            THE COURT:  Stop there for a minute, would you?

4            Ladies and gentlemen, do you have any -- do you see

5    these things on your screens?

6        (Jurors nodded heads affirmatively.)

7            THE COURT:  I have that "Video Input" thing on my

8    screen that says "Out of Range."  What is that?

9            THE CLERK:  I don't know.

10       (Discussion off the record.)

11           THE COURT:  Keep going.

12   BY MR. LYNCH:

13   Q    Mr. Grip, I see on this 1957 photo you have two features

14   labeled there.  Can you tell us what those features are and

15   why you've labeled them?

16   A    Well, I labeled them because we'll see something fairly

17   close to these locations later on in time that are more

18   significant, but it appears as though we have a fenceline.

19   Any linear feature that on other dates I'm able to see is a

20   fairly narrow, shallow ditch running parallel with the

21   fenceline which obviously carries some of the drainage from

22   the field further to the north.

23   Q    Why don't we go to the next date.

24   A    The next date is May 22 of 1969.

25           MR. GROSSBART:  Number, please?

1          MR. LYNCH: Yes, that's what I was getting.  DD022.

2          MR. GROSSBART:  Twenty-two?

3          MR. LYNCH:  Twenty-two.

4     (Discussion off the record.)

5  BY MR. LYNCH:

6  Q    Mr. Grip, we're looking at a photograph dated 5/22/1969.

7  Please describe some of the significant features you viewed on

8  this photograph.

9  A    Yes.  I have in yellow, with a line, I've got them

10 labeled here, and I'll go over some of these now and then

11 probably won't talk about them too much in later dates, but

12 the large warehouse is this building.  We've got the small

13 warehouse here.  Some people call it a garage.

14     On this line here is a fenceline, which I've got labeled,

15 and the other fence is difficult to see on this date.  I think

16 this is probably it.  But there's an opening in the fence, and

17 there's an area where there's less vegetation within that

18 opening.

19     Then what I'm going to do is I'm going to zoom in on a

20 portion of the site like this and so the jury can see it

21 better.  We've got an elevated rail spur here with some

22 railcars on it right in here.  There's also a ditch that's

23 taking discharges and flowing out in the direction that I'm

24 showing with the cursor.  And the area that's light in tone is

25 unvegetated, and the cause of that are a number, one or more.

1915

1    It could be mechanical impacts caused by equipment driving

2    around it.  It could be chemical impacts caused by chemicals

3    that are toxic to plant growth.  And it could also be a

4    combination of environmental conditions, lack of rainfall,

5    toxicity, or traffic on the soil.  So I don't really know the

6    reason, but there are numbers that could be possible for it.

7    Q    You have a feature, some features labeled, in the upper

8    portion of this picture, "Cattle/Horse Trail."  What's the

9    significance of those?

10   A    These are areas where the cattle or horses tend to walk

11   in the same area, and they wear out the vegetation.  They

12   actually create a little depression on the surface of the

13   earth that can be seen.  In particular, in arid climates like

14   this, you can see these trails for quite a few years.  And in

15   later dates of photography, we're going to see that some of

16   the drainage, in my opinion, actually occupies and used some

17   of these trails as a path of least resistance, so the water

18   differentially flows using some of those trails.

19   Q    Why don't we go to the next photograph.  I believe it's a

20   1971 photograph.

21   A    Yes, August 18 of 1971.

22   Q    DD24.

23        And, Mr. Grip, if you would, please, just describe some

24   of the features you found informative on this photograph.

25   A    Well, I think I'm going to zoom in on this one because

1916

1    most of the features are within range of vision.

2         This photograph is interesting.  It probably shows the

3    way that liquids flow in these ditches probably the best of

4    any of the dates that I have.  I'm calling this wet soils, or

5    there could be liquid in it, but certainly the soil is wet.

6    You see a very dark signature.  Some of it is kind of wiggling

7    off here to the left.  It would be to the west.  Other

8    proceeds up in this direction and then proceeds in a straight

9    line virtually.

10        So you might think that's a man-made ditch or something,

11   but if I do what I call flickering, I go back and forth from

12   one date to another, where this happens to be the first date

13   in 1969, and then here is a 1971 date, and you can see, right

14   in here, there's a light-tone horse or cattle trail going

15   right through this area, and it appears to me that the flow

16   coming down this ditch is going into that cattle trail and

17   then flowing further to the west.

18        Also, we see a lot of these light-toned lines, which all

19   seem to be converging to one location, and then they diverge

20   again.  Well, that's typically an opening in the fence.  So

21   all of the cattle or horses have to go through that area as

22   they're proceeding from north to south or vice versa.

23   Q    And does that fence opening contribute to the lack of

24   vegetation in that area?

25   A    Yes.  Wherever in a climate like Montana, where, if you

1   had that much traffic, you're not going to have much

2   vegetation surviving.

3   Q    And I believe the date of this photo is 1971, so this is

4   still before Dyce Chemical moved out into --

5   A    Yes, Yes, it is.  And, of course, there's a large area,

6   dark-toned area, which I have also labeled as wet soils.  I

7   don't know whether it's water or a combination of other

8   materials, but it certainly is dark-toned, and it's wet on

9   this date.

10       And the dark features we see beside the buildings, these

11  are actually shadows cast by the building, and those shadows

12  are so dark that you really can't pick up any detail within

13  them at all.  If you have special equipment, you might see

14  some things, but it's really difficult to map within those

15  very dark shadows.

16  Q    And, Mr. Grip, just maybe for clarification, the stereo

17  -- or the photographs we're viewing now are monoscopic

18  photographs, correct?

19  A    That's right.  These are -- I didn't make stereoscopic

20  frames for them because they're not as high in resolution as I

21  normally use for a stereo for a jury, but I'll tell you when

22  we have stereo photographs, and I'll also put my glasses on.

23  And then when I tell you to, you can take your glasses off,

24  because you don't want to wear the glasses probably for more

25  than three or four minutes at a time.  Until your eyes get

1918

1    adjusted to looking at this stuff like mine are, why, you

2    might feel some eye strain, but it won't last for very long.

3    Q    And, Mr. Grip, when you were interpreting and analyzing

4    these photographs, were you viewing them stereoscopically?

5    A    Oh, yes.  I always use stereo whenever it's available.

6    Stereo actually gives me, in my opinion, about four times the

7    detail that I can get from a single frame, because I get the

8    three-dimensional aspect, and height of objects is useful in

9    identifying them, and then this will actually have two

10   separate photographs of the same object, so you're combining,

11   you're essentially doubling the resolution.  So we all like to

12   use stereoscopic imagery when we interpret and certainly when

13   we map a site.

14   Q    Mr. Grip, why don't we go to the next photograph.

15   A    The next date is April 23, 1972.

16          MR. GROSSBART:  DD number, please?

17          MR. LYNCH:  It is DD25.

18   BY MR. LYNCH:

19   Q    Again, Mr. Grip, if you could just -- not many features

20   in this photo that you have labeled, but just briefly describe

21   what you found significant.

22   A    Okay.  I'm going to zoom in again, because the feature

23   that I wanted to show the jury is more visible that way.

24          What we have on this date is evidence of a liquid surface

25   flowing in this ditch, and I call this the west ditch.  It's

1919

1    on the west side of the railroad tracks.  And this one, we

2    clearly can see a liquid surface because, by looking at it

3    with other dates, we can see a reflection of the sun.  We call

4    that sun glint, and sun glint indicates that there is a liquid

5    surface.

6         And, in addition to that, we can see some lighter-toned

7    areas where it looks like the vegetative cover is not as thick

8    or as healthy.  We might call that or I would call that stress

9    vegetation in this area.  And vegetation can be stressed

10   because not enough water, too much water, which we call water

11   logging, or there could be some slightly toxic chemicals to

12   plant growth in the near soil, and the combination of

13   environmental factors can result in less vegetative growth or

14   actually the die-back of vegetation, so that shows that the

15   flow of this ditch is getting up almost to the area of the

16   fence that I pointed out on previous dates.

17   Q    Why don't we go to the next photograph, Mr. Grip.

18   A    The next date is -- I'm saying 1/1/73, but that's our

19   key.  That means that sometime in 1973, this photograph was

20   taken.  We know it was after the first date because of changes

21   in the photograph, and we know it's before the date following

22   it, so we're saying this is sometime in 1973.

23   Q    And this is document, Illustrative Document DD30.

24        Mr. Grip, again, if you could just describe the relevant

25   features, the features you found informative on this

1 photograph?

2 A     All right.  The basic Dyce -- well, it's not Dyce yet,

3 but the construction of the two buildings really hasn't

4 changed much.  There is a little -- there's a white signature

5 in this area that could be reflection of sun glint, and also

6 there is a light-toned area that really has no vegetative

7 cover in it.  I call that an unvegetated area.  And then it's

8 ringed by darker materials which may be healthier vegetation.

9      So something is causing this, either mechanical impacts,

10 too much water, not enough water, or some chemical compounds,

11 but, in any event, it's now worked its way out almost to the

12 opening in that fence that I pointed out before.  And there's

13 another lobe of it that's coming to the north and then

14 swinging back to the west again.  And I think that's probably,

15 if I flicker between these two dates here, yes, that area is

16 the same, same area that I pointed out before.  I think it's a

17 horse or a cattle trail that provides less resistance to flow

18 of the surface water and, hence, the water from this ditch, or

19 parts of it, anyway, are flowing down that slightly depressed

20 trail, further to the west.

21 Q     Let's go to the next date, please.

22 A     The next date is June 18 of 1974.

23 Q     DD31.  It appears that there are some additional, new

24 features on this photograph, Mr. Grip.  Why don't you describe

25 what some of your observations were on this date of

1  photography.

2  A    Yeah.  Definitely the facility has expanded, and now for

3  the first time we can see a tank farm.  These are vertical

4  storage tanks, and the very dark features we see here, I'm

5  just going to zoom in on that again.  The dark features are

6  shadows that are being cast by the tanks.  And then I have

7  kind of orange lines here, and I've got it labeled "Berm Under

8  Construction," so I can turn those features off here, and you

9  can see this is the berm, and then I'll turn my labels back on

10  again.

11      So the berm is incomplete, and as I told the jury

12  earlier, the land slopes from the lower right to the upper

13  left.  And by putting in the berms here, they're developing a

14  point where they can retain fluid.  If it spills from these

15  tanks, some of it would be captured in this northwestern

16  portion of the bermed area, and, also, to some extent, if

17  there was a heavy rainfall event, it might keep water from

18  flooding from the adjoining pastures coming into the site.

19  But right now, on this date, the berm is just incomplete, and

20  it wouldn't have much of a capability of storing much liquid.

21  Q    Mr. Grip, there's a feature coming off the little

22  warehouse just where I've drawn that green circle.  Can you

23  tell us what that is?

24  A    From the little warehouse, the feature --

25  Q    Just this little -- within my circle, there's a linear

1   feature coming off the east side of the little warehouse.  And

2   I think you had it labeled, if you want to turn back --

3   A    Yeah.

4   Q    -- turn your labels back on.

5        The feature you have labeled "Concrete Apron"?

6   A    Oh, yes, yes, and I'll zoom in closer so we can see that.

7   That's what these labels are good for.  It gets confusing at

8   times.  But there is a light-toned feature coming out here.

9   It's a rectangular feature, and I'm tracing it with my cursor,

10  and that is a concrete apron, and that will be there for quite

11  some number of years in the future.

12  Q    Okay.  Why don't we go to the next date of photography.

13  A    All right.  The next date is November 4 of 1975.

14  Q    This is Illustrative DD33.

15       And, Mr. Grip, if you would, please, discuss some of the

16  features you found informative on this date of photography.

17  A    All right.  Just looking at it from a distance away,

18  we've got an area, a dark-toned area here.  This is a new

19  asphalt surface that's seen for the first time on this date,

20  and I'm tracing out the areas of asphalt.

21       Then what I'm going to do, I think, is I'm just going to

22  zoom in on a portion of the site, using my zoom tool here, and

23  just start looking at the features.

24       This is a drum shed or a pole building that I think we're

25  seeing for the first time on this date.  This is where some of

1923

1    the drums were stored and where they were filled and so on,

2    and the area just outside here, apparently, is the area where

3    some of the -- where we see some stains or liquids over time

4    which indicates either precipitation events or some type of a

5    drippage occurring in this location.

6        In blue I have outlined the drainage ditches.  There are

7    two of them, the west ditch on the west side of the rail spur,

8    and the east ditch, as I call it, on the east side.  I'll turn

9    off the labels so the jury can see that the east ditch is

10   fairly dark in tone and continues on out in this direction,

11   and the west ditch is rather light in tone with probably more

12   stressed or dead vegetation than the east ditch.  I'll turn

13   the outlines back on again.

14   Q    Mr. Grip, what does the -- does the dark tone in the east

15   ditch indicate anything to you?

16   A    It indicates to me that it's -- that the soils are wet in

17   that area.  There could be some possible vegetation, but I

18   think it's probably wet soils.  And the indication is that

19   the, to me, that the flow is coming from this portion of the

20   site and flowing in this direction and then going into the

21   east ditch and then swinging off and going to the west here

22   where the flow from the west ditch also joins it at a point

23   not too far from that fence opening that I've been talking

24   about on other dates.

25   Q    And that fence opening, again, I see it occurs that

1924

1    there's some devegetation in that area?  Is that due to

2    traffic going through the fence opening?

3    A    Yes, that would be stress vegetation or devegetation

4    caused by traffic, cattle, horses, maybe people walking back

5    and forth.  The vegetation just isn't tolerant to heavy

6    traffic.

7         And then, in addition, another significant feature that

8    we see is the berm, as I call it, and I'll turn that on and

9    off again.  Just looking at it, the berm is the elevated, kind

10   of like a dike structure that's more complete now, and it's

11   more effective as far as handling spills from the tanks and

12   perhaps handling surface runoff from precipitation events.

13   Q    Mr. Grip, I noted that you have both your ditch line and

14   your berm line going through the shadow area in here.  Were

15   you able to, using your equipment, see into that area?

16   A    Yes.  Using my digital stereo plotter, it not only is

17   good for mapping, it also allows you to enhance and to process

18   the imagery in different methods to bring out more detail.

19   And I can come close to showing that here with my laptop, but

20   not complete.

21   Q    Before we move on to an enhanced image, without enhancing

22   that area, were you able to visually see into those shadows to

23   determine whether or not there was, in fact, a berm or a

24   ditch?

25             MR. JOHNSON:  Your Honor, objection.  This is beyond

1925

1    his report.  In fact, it's not in his report.  And he didn't

2    testify to it at his deposition, either.

3              THE COURT:  Sidebar.

4          (Discussion on the record at sidebar.)

5              THE COURT:  I don't have his report, and I don't

6    have his deposition.

7              THE LAW CLERK:  I can get you his report.

8              THE COURT:  No, these guys -- I mean, is what he's

9    saying true or not?

10             MR. JOHNSON:  Your Honor --

11             THE COURT:  I'm asking the Soco people if what you

12   say is true or not.  I mean, this is --

13             MR. LYNCH:  I'm not sure I understand the objection.

14   He's saying what he can see.

15             THE COURT:  His objection is this opinion wasn't

16   disclosed in the report nor during his deposition, right?

17             MR. JOHNSON:  That's exactly right.

18             MR. LYNCH:  These are observations.  These are

19   figures attached to his report.  He is saying what he can see.

20             THE COURT:  Show me --

21             MR. JOHNSON:  Your Honor, if I could, he testified

22   in his deposition.  Starting at page 94, the question I asked

23   him, "Do you recall how far into the shadow the berm -- you

24   saw the berm go?"

25             Mr. Lynch said, "Which shadow?"

1          Question, "The shadow, the shadow behind the drum

2    shed."

3          Answer, "No.  I couldn't tell it within the drum

4    shed shadow area.  And I could --"

5          And then question, "Could you --"

6          "And I sort of lost it right in the shadow area

7    right near the end that I originally drew it."

8          Question, "Uh-huh."

9          Answer, "But then when I get in the sunlight area, I

10   can see the berm there.  So I'm assuming the berm is also

11   present in that little segment of shadow."

12         Question, "Oh, okay.  So you can see -- you saw,

13   because it's in the sunlight, between the shadow from the drum

14   shed and the shadow from the small garage -- you can see --

15   you saw in your digital stereoplotter, a portion of the berm,

16   correct?"

17         Answer, "Yes."

18         And the question, "And you're assuming that -- and

19   what you also saw on your digital stereoplotter, you saw on

20   the orange line that you have already put, that you put on the

21   document ahead of time, correct?"

22         Answer, "Yes.

23         "You actually saw it?

24         "Yes."

25         MR. LYNCH:  This is actually what he's testifying

1    about.

2            THE COURT:  Is his testimony going to be any

3    different?

4            MR. LYNCH:  No.  It's what you can see in the

5    shadow.

6            THE COURT:  I'll overrule it and listen to what he

7    says.

8            MR. JOHNSON:  Your Honor, if I could, he just said

9    that he can see the berm in his stereo plotter.  That's

10   directly contrary to what he said in his deposition, and it's

11   not in his report.

12           MR. COZZENS:  It's different shadows.

13           THE COURT:  You can cross-examine him.

14           MR. JOHNSON:  Okay.  Thank you, Your Honor.  I will.

15       (Open court.)

16       (Jury present.)

17   BY MR. LYNCH:

18   Q    Mr. Grip, I believe we were just discussing what you

19   could see on the unenhanced or adjusted version of this

20   photography, and could you tell us, were you able to see, in

21   the shadow area in here, whether or not there was a berm on

22   the unenhanced version of this photography?

23   A    In the unenhanced version?

24   Q    Yes.

25   A    No, I couldn't tell, although on the corner, where it

                              1928

1    turns, I could see a berm right up to that point, and I could

2    see a berm right in the light-toned area that I'm circling

3    here, but I couldn't confirm that it was continuous within the

4    dark shadow areas because the berm is not a very distinct

5    feature to start out with.  In the shadows, it's very

6    difficult to see.

7    Q    Were you viewing this on your digital stereo plotter?

8    A    Yes.  When I did it with my digital stereo plotter with

9    the additional capabilities that it has, I could see a faint

10   indication of --

11             MR. JOHNSON:  Your Honor, I object to this.  This

12   goes beyond his rebuttal and beyond the deposition.

13             THE COURT:  Now that part isn't in the report, is

14   it?

15             MR. LYNCH:  He testified about this at his

16   deposition, Your Honor.  He was asked how he could observe the

17   berm being there.

18             THE COURT:  Let me see it.

19             MR. LYNCH:  (Handing.)

20        (Discussion off the record at sidebar among Court and

21         attorneys Lynch and Johnson.)

22             THE COURT:  Objection sustained.

23             MR. JOHNSON:  Your Honor, did you rule on the

24   objection?

25             THE COURT:  I sustained it.

1929

1          MR. JOHNSON:  Thank you, Your Honor.

2     BY MR. LYNCH:

3     Q    Mr. Grip, leaving aside the adjusted image for the time

4     being, did you also attempt to view this date of photography

5     on any of your other equipment?

6     A    Yes, I did.  I used it, I viewed it with my mirror

7     stereoscope.  I also viewed it with my zoom stereoscope, which

8     is very powerful and very bright, and I also looked at it with

9     the analytical stereo plotter, and I couldn't clearly identify

10    it with those other devices.

11    Q    And do those devices have any type of a light or anything

12    that can shine through the film positive?

13    A    Yes, a very bright light, intended to use for film that

14    wasn't very high in quality.  For example, this film is too

15    contrasty for really good mapping, but it looks pretty.  It's

16    snappy, but it's not good for topographic mapping.

17    Q    So even with those bright lights, you were unable to see

18    into that shadow area to determine whether there was a berm

19    there; is that correct?

20    A    Just with those optical devices, yes, although I could

21    see a trace of the berm beginning --

22         MR. JOHNSON:  Your Honor, this is going beyond the

23    question that was asked.  This raises the issue that we raised

24    before.

25         THE COURT:  Sustained.

1930

1          MR. JOHNSON:  Thank you, Your Honor.

2   BY MR. LYNCH:

3   Q    Mr. Grip, I believe you did say you were able to see a

4   berm in this sunlight in that area there and then again

5   starting up in that area there; is that correct?

6   A    Yes.

7   Q    Could you zoom in on this portion of the berm?

8          MR. JOHNSON:  Your Honor, he just drew a circle

9   around a portion of the berm that he's just said he doesn't

10  see.

11         MR. LYNCH:  This portion of the photograph.  I

12  apologize.

13         THE COURT:  Yeah.  I can't, because of the screen, I

14  can't see where he drew.

15         MR. JOHNSON:  You don't get the circles that he's

16  making?

17         THE COURT:  No.

18  BY MR. LYNCH:

19  Q    And I'm simply asking about this portion in the sunlight

20  here.

21  A    And I think perhaps there's confusion.  I wasn't drawing

22  a circle.  That's how you zoom in on a portion of the site.

23  When I go like this and it zooms, that's -- I'm not intending

24  to indicate something within that area.  I'm just zooming in

25  on it.

1    Q    And, Mr. Grip, I just wanted to ask you about, and I

2    believe Ms. Stout testified to this, that she thought there

3    were breaks in the berm in that area?

4    A    Yes.  She testified in the area that I'm moving the

5    cursor over.  I'll go get a bigger-sized cursor or use a hand.

6    There are areas in the berm here where it's not very high.

7    It's lower.  But, still, there is a ditch flowing through

8    here, and the flow is not going off into the eastern area

9    within the tank farm.  So whatever berm is there is sufficient

10   to keep the flow within the ditch.

11   Q    Now you do, Mr. Grip, have a blue -- if you turn off

12   maybe your berm line, turn off the orange line.

13   A    All right.

14   Q    You do have a blue line indicating a ditch in that area.

15   How is it you were able to, if the shadows were so dark,

16   determine there was what you've identified as a ditch feature

17   in that area?

18   A    I could see it, the ditch coming up and sort of beginning

19   at a point where the cursor is now.  And using my stereo, my

20   digital stereo plotter, I could see a faint indication of it,

21   a darker area.

22   Q    And how were you able to do that on a digital stereo

23   plotter if the shadows are so dark?

24   A    Using the enhancement capabilities of the digital stereo

25   plotter.

1932

1    Q     Can you just briefly explain what those are?

2    A     The digital stereo plotter is designed for espionage, I

3    guess, and reconnaissance, as well as mapping, and it has

4    capabilities of stretching contrast, of doing various

5    complicated calculations, trying to bring out more detail than

6    is visible to the naked eye.  And that, I used that function

7    here.  I stretched and compressed the contrast within

8    different bands and was able to detect a darker-toned feature

9    within that dark shadow.

10   Q     Do you have an illustrative exhibit that shows that?

11   A     Yes.  This is it.

12   Q     Can you just describe for me what we're seeing here?

13   A     Well, first I'm going to flicker back and forth between

14   the photo and the enhanced image that allows me to see in

15   shadows.  I'll point out that there are shadows throughout

16   here.  The jury can see that.  And when I turn the image off,

17   you can see that some of the shadows have disappeared, so the

18   very, very dark areas, like this, with the very dark area in

19   the center is where I interpreted there to be some flow coming

20   across this site and emptying into this ditch and then moving

21   out.

22         MR. JOHNSON:  Counsel, is there a number on this

23   demonstrative?

24         MR. LYNCH:  The number I have is -- it's the same

25   image that's DD59.  That one was a split screen.  It's the

1933

1    image that's on the left in that demonstrative.

2            THE COURT:  Let's take a break.  I'm going to get

3    Cecil in here to switch my computer.

4            THE LAW CLERK:  All rise.

5        (Recess taken from 09:45:58 to 10:09:15.)

6        (Open court.)

7        (Jury present.)

8            THE COURT:  Please proceed.

9    BY MR. LYNCH:

10   Q    Mr. Grip, we're looking at, again, a closeup of a version

11   of that same 11/4/1975 photograph that you enhanced using your

12   digital stereo plotter.  Can you please just orient us to what

13   we see on the photo here?

14   A    Well, first let me just show the unenhanced version and

15   then go back.

16        This is essentially the area to the north of the small

17   warehouse where -- the tank farm is going to be in this area,

18   and here are some of the shadows cast by a few of the tanks,

19   and this, of course, would be a shadow cast by the large

20   building on the site.  So once again, north is to the top,

21   west is to the left, east to the right, and south to the

22   bottom.

23   Q    And can you tell us what you observed in this area that

24   caused you to indicate it was a continuation of the ditch?

25   A    I saw a darker-toned feature, a linear feature that I can

                                1934

1    see here with this two-dimensional image, keeping in mind that

2    what I was looking at was a stereoscopic-enhanced image which

3    is more informative than this.  But this is where I drew the

4    line for the ditch, and then I took it back in this direction.

5    Q    Can you go back to the unenhanced version of this?

6    A    All right.

7    Q    You heard Ms. Stout the other day talk about her

8    equipment and how she was able to view this photograph with a

9    light source behind it.  Again, did you view this photograph

10   with similar equipment?

11   A    Yes, I did.

12   Q    And what type of equipment was that?

13   A    I had a very powerful, modern -- well, relatively modern

14   zoom stereoscope, and I turned the light source up as high as

15   I could, and I still couldn't get any detail out of it.

16   Q    Why don't we go to the next image.

17   A    That would be 1977, June 23.

18   Q    Actually if we could go back to the '75 one --

19   A    Okay.

20   Q    -- I believe that's one of the ones you have the stereo

21   anaglyph for?

22   A    Yes, and I will show the anaglyph image.  So you see it's

23   a red and blue image.  And now if you put your red and blue

24   glasses on --

25   Q    This is DD43.

1935

1    A    -- the majority of you are going to be able to see a

2    three-dimensional image.

3        All right.  Shall we talk about this a little bit?

4    Q    If you can just maybe orient us a little bit?  We've

5    talked about the photo.

6    A    All right.  Well, in this particular stereo image, north

7    is still pretty much the top.  West is going to be at the left

8    and so on.  The large building, I'm circling with the cursor.

9    This is a small building or garage, as some people call it,

10   and the pole barn or the drum shed is in this location.  Of

11   course, this dark-toned area here, that's the new asphalt

12   that's seen for the first time on this date of photography.

13       And the berm that I pointed out with the cursor, if you

14   notice the cursor right about here, the cursor seems to be

15   floating on the top of the berm.  And then if I move the

16   cursor further left, it's now floating in the air.  That means

17   that the land is dropping off underneath the cursor until I

18   get to this point where the land is the same elevation as the

19   cursor.  And if I was making a contour map, I would draw the

20   cursor around and make circles or patterns, indicating lines

21   of equal elevation.

22       But from this point to the berm, it's about the same

23   height, so the berm has a sloping floor, and at some point a

24   berm is unnecessary.  Like this point here is above the

25   highest point of the berm here, so putting a berm in this

1936

1    location wouldn't do any good.  It would just be unnecessary.

2         But this is the incomplete berm that Ms. Stout mentioned,

3    and I don't really disagree with that.  However, there's

4    enough of a berm structure there to keep the flow in this

5    ditch to a very tightly constrained area.

6         And as I move down to the northwest, the jury should be

7    able to see that the land is dropping off underneath the

8    cursor, so there's a fairly good slope or gradient that would

9    allow liquids to flow within that area.

10        And then once we get out further to the west, of course,

11   the gradient or the slope is not as significant.

12   Q    Why don't we go to the next date of photography.

13   A    All right.  You can take your glasses off now.  You'll

14   see a little bit of color haze or something, but it will go

15   away shortly.

16        This is 1977, June 23.

17             MR. GROSSBART:  Number?

18             MR. LYNCH:  It's DD36.

19   BY MR. LYNCH:

20   Q    Can you tell us what you found informative about this

21   date of photography, Mr. Grip?

22   A    This is a relatively low-resolution date of photography,

23   so it can't show us the finer details, but it does clearly

24   show this dark feature here that I've labeled a wet ditch.  It

25   curves around here and goes in this direction, so that

1   indicates to me that there's still liquid flow going through

2   the eastern ditch off to the northwest.

3   Q     How about the next date of photography?

4   A     This is 1977, September 6.

5   Q     This is DD37.

6         Can you tell us what you see or discuss some of the

7   features you have labeled on this date of photography?

8   A     In this date of photography, first of all, I'll zoom

9   in -- I'll do it this way.  And I'll turn the berm lines off;

10  berm, that is.  And the berm is more complete on this date,

11  more continuous, especially in this area on its southwestern

12  corner of the tank farm.  And I've also drawn the berm -- the

13  ditch, which, I'll flicker that on and off.  The ditch flows

14  fairly continuously, and you can see it curve out here, and,

15  once again, it occupies that cattle trail or horse trail that

16  I mentioned earlier.

17        And then I can flicker between two different dates like

18  this.  I'm now showing you the '75 date and then going back to

19  the '77 date.  So in '75, the flow was coming off further to

20  the west, and now it's shifted back further to the north.

21  This is just -- it's so flat in there that that switching is

22  not unusual.

23  Q     On the '77 date, just a couple features I'd like to ask

24  about.  First, you have the ditch continuing again north of

25  the little warehouse and south of the tank farm.  Are you

1    visually able to see any portion of that ditch on that date in

2    that area?

3    A    Not through the unenhanced photography, but through the

4    enhanced photography, I see much the same image that I saw on

5    the previous date.

6    Q    Do you have a feature labeled -- well, first, the feature

7    labeled "Fence Opening" here, is that a feature we, same

8    feature we saw in the 1975 photograph?

9    A    Yes, and it's also unvegetated, and most likely that's

10   mechanical impacts.  The hooves of the horses or cattle or

11   even people walking through there are preventing vegetation

12   from growing in that area.

13   Q    Now you also have a feature labeled "Cut, Outside Berm."

14   Could you maybe remove the label so we can see it and discuss

15   what you believe that is?

16   A    And I'm also going to zoom in on that area.  I'm not

17   circling -- this is my zoom tool here.  So now we zoomed in,

18   and stereoscopically it's easier to see it, but that is a long

19   narrow feature that begins and ends.  And the question is

20   whether or not it's a conduit for carrying fluid flow, and as

21   far as I can tell, it is not because I never see any evidence

22   of fluid erosion in this area connecting up to the ditch, and

23   I also don't see any evidence of erosion or liquid flowing on

24   this end of the notch.  I call it a notch, but I've never

25   really seen any evidence of flow on any, any of the dates that

1    I've looked at.  And, of course, we have an anaglyph of this

2    date, too, that probably shows it better.

3    Q    Why don't we pull up that anaglyph, then.

4    A    All right.  It's time to put the red and blue glasses

5    back on again.

6    Q    This is DD054.

7    A    The anaglyph has to be oriented the way the airplane was

8    flying over the site, and they're not always nice enough to

9    fly them in an east-west direction in this particular case.

10       So this is the notch that we're talking about right in

11   here, and in this area, I don't see any evidence of a channel

12   or anything indicating the flow of liquids.  And, of course,

13   the notch is above the berm by maybe a half foot or so.

14       And then looking over the rest of the site, you can see

15   the rail spur is higher than everything else.  I can see the

16   berm on the side of the tanks here, and I can also see the

17   berm extending up to about this point, and there may be a

18   fence in there that, dark line, that may be shadows cast by a

19   fence.

20   Q    Mr. Grip, in an earlier date of photography, I believe

21   the 1974, you pointed out a concrete apron to the east of the

22   little warehouse?

23   A    Yes.

24   Q    Do you see any indication of that on this date?

25   A    Yes, I do.  I'll kind of trace out the edge of it with a

1    cursor, going this way, and then it makes a 90-degree turn and

2    then goes back into the building.  So I believe that's the

3    same concrete slab that I saw there much earlier.

4    Q    Okay.  Why don't we go to the next date of photography.

5    A    We can take our glasses off now.

6         Again, the next date is May 14 of 1979.

7    Q    Hold on one second while I get the illustrative number.

8    It's Illustrative DD40.

9         And again, Mr. Grip, if you could discuss the features

10   you observe in this photograph?

11   A    All right.  I'm going to zoom in so I show the areas that

12   have been labeled.  First of all, I've labeled the concrete

13   apron that I just talked about on the previous date.  I

14   believe it's still there.  That's my opinion.  The elevated

15   rail spur.  The ditch that I've been talking about, I'll trace

16   it with the cursor, and it goes up in this area.  And what's

17   interesting about this date is we've got a large amount of

18   unvegetated area here, and it seems to be connected to the

19   flow from this ditch.  So here we have -- this is the opening

20   in the fence.  That could be a combination of chemical or

21   liquids, as well as mechanical, the cattle and so on, but this

22   area would appear to be more related to flow coming out of

23   this ditch.

24   Q    And, Mr. Grip, you see a linear feature near my green

25   line that I just drew.  Is that a feature we had seen in an

1    earlier date?

2    A    I didn't see where --

3    Q    I'm sorry.

4    A    Okay.  Over there?

5    Q    Yes.

6    A    Yes, we did see this on an earlier date.  This is that

7    fenceline and small ditch that I talked about early in my

8    testimony, and it looks like the flow is going in the southern

9    direction for a short distance on that ditch, but most of it

10   is going up to the north.

11   Q    Okay.

12   A    And this is the greatest extent of disturbed or

13   unvegetated surface within this area.

14   Q    Do you have a --

15   A    There will be other things occurring up in here later on.

16   Q    You have a feature labeled "Cut, Outside Berm."  Can you

17   just discuss that again?

18   A    I'll zoom into that very closely.  That's that same cut

19   that we talked about in the previous date, and I also have an

20   anaglyph image for this date as well.

21   Q    Why don't we go to that anaglyph.

22   A    Okay.  So put our glasses back on again.

23        MR. GROSSBART:  Number?

24        THE WITNESS:  Just going back to the ditch --

25        MR. LYNCH:  One second while I get the DD number.

1942

1        THE WITNESS:  Okay.  Sorry.

2        MR. LYNCH:  DD055, Illustrative DD55.

3   BY MR. LYNCH:

4   Q    Please go ahead, Mr. Grip.

5   A    All right.  What I call the east ditch on the east side

6   of the rail spur, we can clearly see that.  It's dark in tone.

7   It's fairly deep.  You can see it dropping off, coming around

8   in the corner, and then going up in that direction.  The

9   notch, this is the notch here.  It's harder to see on this

10  date.  I still don't see any flow patterns or connection to

11  that notch.

12       And, of course, on this date, the north corner --

13  northwestern corner of the bermed area doesn't have any liquid

14  in it.  It's called a catch pond, but it's really not much of

15  a pond on this date.  The berm just simply berms off the

16  existing surface, and there's no real depression that's been

17  constructed in that area.

18  Q    Mr. Grip, in your review of these photographs, did you

19  see any indication of any drainage or discharge of liquids

20  from the catch pond as of 1979 or any of the prior dates?

21  A    No, I didn't.

22       I also want to point out that I can clearly see the berm

23  in this '79 date.  There's a little portion of it obscured by

24  shadow, but the elevated berm is clearly visible on this date.

25  Q    Why don't we go to the next date of photography.

1943

1    A    All right.  We can take our glasses off.

2         The next date will be 1981, June 2.

3    Q    This is Illustrative DD45.

4         And, Mr. Grip, can you please discuss some of the

5    features you found informative on this photograph?

6    A    All right.  I'm going to zoom in on that.

7         First of all, the most significant thing, I think, is

8    that the berm has been reconfigured.  The one end has been

9    shifted more to the east and enlarged, and the light -- the

10   white dashed line that I'm tracing with the cursor now, that's

11   the former position of the berm.  It's white.  It's a

12   ghosty-like thing.  That's how I do features that aren't there

13   anymore.  And the new berm, we can see it here coming from the

14   rail spur and coming around like this, and I will turn it off

15   so the jury can see it easier with the unaided eye.

16        And another thing about this, we have the fence opening.

17   We still have dead or stressed vegetation similar to what I

18   showed on the previous date, although the amount or the area

19   of stressed or dead vegetation has decreased by this date.  So

20   the land is recovering.  And there is a new area of dead or

21   stressed vegetation extending to the northeast, and that could

22   be mechanical impacts or water logging or other things like

23   that, keeping in mind that there's been construction

24   activities in the northwestern corner of the berm areas.

25   Q    Mr. Grip, right about where you have your cursor appears

1    to be a dark feature on the corner of the berm.

2    A    All right.  I will zoom in on that quickly.  Right in

3    here.

4    Q    Can you discuss what that is, what you believe that to

5    be?

6    A    It's very irregular, and I have to look at it

7    stereoscopically again, but it seems to be conforming to the

8    slope of the land, so I think that's either some type of a

9    grass or something growing there, or something has been

10   dropped in that location.  Beyond that, I can't tell.

11   Q    During this date of photography, did you see any

12   indication that there had been any drainage or discharge of

13   liquids from that catch pond?

14   A    Nothing definitive.  There is, of course, the area out

15   here to the north that I don't really know what the reason for

16   that is.  There's a combination of reasons, but I never saw a

17   pipe in this pond.  I never saw any active discharges

18   occurring, and, generally speaking, the fluid levels were

19   never very high within the pond.  In fact, this particular

20   date, the fluid levels are pretty much at their maximum limit.

21   Q    Did you ever see any drain feature whatsoever in that

22   catch pond?

23   A    No.  And the catch pond is an excavated feature.  You can

24   see the deeper area here, so it goes below the existing

25   surface, and how far deep it goes, I can't really tell because

1945

1    I can't see through the liquid into the bottom of the surface,

2    or the bottom is so uniform I can't detect where it is.

3    Q    The feature that you have labeled "West Ditch to Catch

4    Pond" --?

5    A    Yes.

6    Q    I just traced it there roughly -- is that in the same --

7    well, how does the location of that compare to the location of

8    the eastern ditch that we'd seen that used to run out to the

9    northwest corner area?

10   A    That segment is the same.  They simply used it -- let me

11   see if I've got it here.  Here.  This is it.  This is from an

12   older date in '79.  I've colored it differently so the jury

13   can see it.  But you can see here is the ditch.  Here is the

14   flow coming in here like this, and then the eastern ditch,

15   from this segment on, right about here is where the

16   construction of the new berm went over the old ditch and then

17   diverted the flow, now no longer to the northwest, but now the

18   flow is diverted into the catch pond.

19   Q    I believe we have an anaglyph from this date as well?

20   A    Yes.  Time for the glasses.

21   Q    That's DD56, Illustrative DD56.

22        I think you've already discussed most of the features,

23   Mr. Grip, on this photo, but if you could just maybe orient us

24   a little better?

25   A    Yes.  Well, north is pretty much to the top.  This

1946

1    feature is called a fiducial mark.  It's the very edge of the

2    photogrammetric camera frame, so that is not anything on the

3    ground.  These are the two new ditches that we see in the old

4    section and then flowing into the catch pond here.

5        There is some dark features here in the pavement.  I

6    interpreted that to be a stain.  It could be liquid as well.

7    And now there is a berm that's been changed a little bit.

8    It's more irregular and so on, but there is still a berm

9    present here, possibly with some gaps in it.  But in any

10   event, all of the flow, whether it's coming from here or going

11   through what I call the east ditch, it's still going to wind

12   up in the catch pond if indeed it gets that far.

13   Q    Why don't we go to the next date of photography, then.

14   A    Okay.  We can take our glasses off.

15        This will be 1981, August 24.

16   Q    This is Illustrative DD46.

17   A    And then I'm going to zoom in on it.

18   Q    First, Mr. Grip, can you explain the coloration on this

19   photograph?

20   A    Yes.  This is, the red coloration is -- there's not

21   really vegetation growing out there that's red in color.  This

22   is color infrared film.  It was developed during World War II

23   to detect camouflage.  In other words, a green tarp over a

24   tank would look green to the unaided eye, but if you look at

25   it in color infrared, it would be kind of an orangish color.

1947

1    Color infrared is very effective for detecting healthy and

2    stressed vegetation in land and water contacts.  As well, it

3    also penetrates the atmosphere from higher altitude, so it's

4    generally used in higher altitude photography and was

5    plentiful during this period.

6         And what it does show, it shows the vegetation that is

7    present around it.  It does show the area of stressed

8    vegetation or dead vegetation out, going out towards that

9    northwest corner again.

10   Q    Is that the --

11   A    And it shows liquid in the catch pond.  The very dark

12   tone indicates liquid.  It doesn't mean that it's really black

13   liquid in that pond.  It just means that it's liquid.

14   Q    Why don't we go to the next date of photography.

15   A    All right.  Take your -- oh, you didn't have your glasses

16   on.  Okay.

17        The next date is 1983, May 27.

18   Q    This is Illustrative DD47.

19        Please discuss some of the features you have labeled on

20   this photograph, Mr. Grip.

21   A    All right.  The ditches, I'm no longer mapping them

22   because they're not receiving fluid in a way that I can

23   detect.  The existing stress vegetation or dead vegetation

24   from 1979 is still present.  I'm tracing that with the cursor.

25   Then we have this area to the northeast, or, rather,

1948

1  northwest, that has increased in surface area.

2  Q    Mr. --

3  A    And then after this date, it will get smaller quite

4  rapidly.  It will recover.

5  Q    Mr. Grip, I believe we've heard some testimony in court

6  this week about some large acid spills from railcars.  In your

7  opinion, could that be an explanation for that increased area

8  of devegetation we see to the east?

9  A    Yes.

10           MR. JOHNSON:  Objection, Your Honor.

11           THE COURT:  What's the objection?

12           MR. JOHNSON:  Objection, Your Honor.  The testimony

13  didn't set the date.  He's talking about a 1983 photo.  I

14  don't see how he can look from the air and determine if

15  there's acid on the ground or not.

16           THE COURT:  Well, he's --

17           MR. JOHNSON:  I think it's an opinion he can't

18  render.

19           THE COURT:  Well, is that what he's saying?

20           MR. LYNCH:  I did ask him whether that could be a

21  possible explanation for what is to the right.

22           THE COURT:  Yeah.  It's overruled.

23           THE WITNESS:  I can answer, then, right?

24           THE COURT:  Yes.

25  ///

1  BY MR. LYNCH:

2  Q    Yes.

3  A    Yes, definitely acid would kill vegetation for a period

4  of time, and then the land would recover with precipitation.

5  Q    I also see, Mr. Grip, you have features on this

6  photograph labeled "Stout's Ground Scar" and "Stout's Dark

7  Feature."

8  A    Yes.

9  Q    Zoom in on those, and you can discuss those a little bit.

10  A    All right.  This is, the light-toned feature is the

11  feature I understand that Ms. Stout mapped as a ground scar.

12  And let me move this a little bit so we can see that label

13  better.  This is a dark feature.  Once again, this feature

14  appears to be right on the surface of the berm, not on the top

15  of the berm but a little bit below the outside edge of the

16  berm.

17  Q    And I believe, Mr. Grip, that Ms. Stout testified that

18  those were indicative of drainage from the catch pond.  Do you

19  share that opinion?

20  A    No, I don't.

21  Q    And can you tell us why not?

22  A    Well, if we go back further to the right here, this, on

23  other dates, we see it extends back further, so this could be

24  more of a pathway or maybe somewhere where they've laid some

25  equipment, but I wouldn't expect the flow pattern to look like

1    this.

2    Q    And maybe let's go to the next date of photography.  It

3    might be a little clearer.

4    A    This is July 27 of 1983.

5    Q    Can you discuss some of your observations from the photo

6    from this date?

7              MR. JOHNSON:  What's the number?

8              MR. LYNCH:  I'm sorry.  DD48.

9              THE WITNESS:  Okay.  Can I go?

10   BY MR. LYNCH:

11   Q    Yes.

12   A    I'm going to zoom in, and on this date I've mapped the

13   berm, and actually there are two berms.  There is the original

14   berm that used to constrain what I called the east ditch here,

15   and now there is a new berm which is part of the rail spur,

16   but then it continues on out like I'm tracing it here.  And so

17   we have two ditches flowing into the catch pond, and they're

18   capturing -- a lot of the runoff from the buildings and the

19   area around the buildings are going into the catch pond.  And

20   to the north of the berm, and I'm tracing along the fenceline,

21   is that light-toned feature.  It looks very similar to the

22   feature that Ms. Stout interpreted on the previous date, and I

23   don't think that's a flow pattern.

24   Q    How about the dark feature I just circled on the corner

25   of the berm?  Do you have an opinion as to what that might be?

1   A     It's still there, and it still looks pretty much the same

2   as it has on the other dates.  The size and shape are changing

3   somewhat.

4   Q     Does that indicate to you whether that's a natural or

5   man-made feature?

6   A     Well, I don't think it's a piece of equipment.  It could

7   be either natural or man-made, but I would, I would lean more

8   towards a natural-occurring feature, vegetation or something

9   like that.

10         And, also, the area to the north here is recovering

11   somewhat from the previous date.  The vegetation is coming

12   back, whereas the area of the original stress or dead

13   vegetation from 1977 and later is still present, and it's

14   still not recovering.

15   Q     Mr. Grip, in your opinion, do the features we've

16   discussed on this photograph indicate that there was

17   discharges from the catch pond occurring as of this time?

18   A     I can't be certain of that.  There are a number of

19   reasons to account for this:  the acid spill, as well as

20   mechanical impacts, as well as there might have been chemicals

21   in the soil that were released when this berm was

22   reconstructed and pushed over here.

23   Q     Why don't we go to the next date of photography.

24   A     The next date is August 13 of 1983.

25   Q     And hold on while I get a number.  Illustrative DD49.

1    A    Well, what this date shows, and I don't have to zoom in
2    to show it because it's not really a high resolution date,
3    but, first of all, I can see that there is a fair amount of
4    revegetation occurring in that area to the northwest.
5          MR. JOHNSON:  We don't have a copy of this.  You
6    didn't give us a copy of this.
7          MR. LYNCH:  Oh, I'm sorry (handing).
8          MR. JOHNSON:  You didn't give us a copy with the
9    labels.
10         MR. LYNCH:  I'm sorry.
11   BY MR. LYNCH:
12   Q    Take off the labels, please.
13   A    (Complied with request.)
14   Q    Can you discuss the features on this photograph again?
15   A    Well, once again, vegetation is returning to this area to
16   the northwest, whereas the other area that was disturbed or
17   unvegetated in the late -- in the middle '70s still is
18   unvegetated.  So the vegetation just isn't coming back in that
19   area.  And, of course, the catch pond is still present.  It's
20   hard to see very much more than that.  The parking area here
21   is a little darker in tone on this date.  And there's overall
22   probably better vegetative cover on this date than a lot of
23   other ones.
24   Q    And how about the next date of photography, Mr. Grip?
25   A    The next date is 1987, and the --

1          MR. GROSSBART:  Number, please?

2          MR. LYNCH:  DD51.

3          THE WITNESS:  I've used the ghost outlines to

4   indicate.  These are the berms that used to be associated with

5   the former catch pond which has now been filled in.  It's not

6   there any longer.  There are some of the other concrete

7   containment structures and features in here that I think we

8   heard about on the videotaped deposition testimony the last

9   couple of days.  I'll zoom in a little bit.  And this, in the

10  dashed blue line, these are the former course of the east and

11  the west ditches, I called it, prior to 1981 when the berm was

12  relocated.

13         And in this area, the pole barn or the drum loading

14  area has been changed.  There's no longer a roof there, and

15  there are also some vertical tanks and other structures that

16  are faintly visible within the dark shadows because they're

17  painted white and close to the edge of the shadow.

18         MR. LYNCH:  I have no further questions for you.

19         THE COURT:  Thank you.

20         You may cross.

21         MR. JOHNSON:  Thank you, Your Honor.

22                          CROSS-EXAMINATION

23  BY MR. JOHNSON:

24  Q    Good morning, Mr. Grip.

25  A    Good morning.

1954

1    Q    I took your deposition a while ago.  You recall that?

2    A    Yes.

3    Q    Now you say that you were here for Kris Stout's

4    testimony, correct?

5    A    Yes, I was.

6    Q    And you heard her say, I take it, that -- strike that.

7         You say that you've used a digital stereo plotter to

8    analyze the photographs that you've talked about today; is

9    that correct?

10   A    Yes.

11   Q    And you were here to hear her testimony to say that she's

12   also reviewed these photographs through a digital stereo

13   plotter?

14   A    I'm not sure that she indicated that she interpreted and

15   mapped the photographs with a digital stereo plotter.

16   Q    All right.  Did you hear her say that she looked at the

17   photographs through a digital stereo plotter?

18   A    Yes, I heard her mention that.

19             MR. JOHNSON:  Can you go to DD24?

20             DOCUMENT TECHNICIAN:  (Complied with request.)

21   BY MR. JOHNSON:

22   Q    Now this is -- you've marked up this photograph.  It's

23   the 1971 photograph.  And in this particular location, you've

24   noticed that -- you've designated there "Wet Soils," correct?

25   A    Yes.

1    Q    All right.  And actually those wet soils are emanating

2    from this warehouse down here; isn't that correct?

3    A    It's possible.

4    Q    Right.  And they're flowing in a northwesterly pattern

5    because that's the slope of the property, correct?

6    A    Correct.

7    Q    They're flowing towards what will ultimately become the

8    catch pond, the historical catch pond that we've heard so much

9    about in this case, correct?

10   A    Yes.

11   Q    And it's flowing in that direction, is it not, even

12   though there's no berm on this date across there, correct?

13   A    Correct.

14        MR. JOHNSON:  Now let's go to 31, DD31.

15        DOCUMENT TECHNICIAN:  (Complied with request.)

16   BY MR. JOHNSON:

17   Q    Now this is a photograph of 1974.  And the berm, you've

18   indicated in this photograph, is under construction as of the

19   date of this photograph, which is June 18, 1974, correct?

20   A    Yes.  I indicate that it's incomplete.  I don't know if

21   they're actually working on it at this time, but it's -- it

22   will be developed further.

23   Q    All right.  Well, actually, you designated that it was

24   under construction, not incomplete.  You said the berm is

25   under construction; isn't that the case?

1    A    I'm meaning to be more precise.  I can't really say that

2    they were actually working on it on that date.

3    Q    All right.  We can't see anybody on the ground, I would

4    agree with that, that is working on it, but the question I

5    have for you is, Isn't it a fact that they were in the

6    process, as of this date, of constructing a berm based on the

7    photographs that you've seen before and the photographs that

8    you've seen after in time?

9    A    Yes.

10   Q    In this area here, you've noted it's revegetated, isn't

11   that correct, from the prior photos?

12   A    That's right.

13   Q    And the area on the northwest corner, that area there is

14   also revegetated; isn't that correct?

15   A    Yes.

16   Q    Now you said that -- and the berm, you show the berm

17   ending right here, correct?

18   A    Correct.

19   Q    So it hasn't been built up south of that on the western

20   portion of the tank farm?

21   A    That's right.

22   Q    And, of course, there's nothing on the south side,

23   correct?

24   A    That's correct.

25          MR. JOHNSON:  Now let's go to 33.

1          DOCUMENT TECHNICIAN:  (Complied with request.)

2    BY MR. JOHNSON:

3    Q    Demonstrative Exhibit 33.  This is the photograph from

4    11/4/75, is it not?

5    A    Yes.

6    Q    All right.  And you agree with Ms. Stout that the berm on

7    the west side of this tank farm is uneven and there are low

8    spots in it; isn't that correct?

9    A    Yes.

10   Q    Now isn't it -- if there were 1,000 gallons of

11   perchloroethylene that went through that ditch all at once,

12   isn't it possible that the perchloroethylene would go through

13   those low spots and go back into the tank farm?

14   A    You mean it's some type of a tidal wave all at once,

15   or --

16   Q    Yeah, some type of a tidal wave all at once.  That's what

17   the allegation is in this case.

18          MR. LYNCH:  Objection.  Argumentative.

19          THE COURT:  Overruled.

20          THE WITNESS:  I can't say whether it would, would or

21   would not.  If there was an instantaneous discharge or break

22   that occurred just a little bit upstream, it's possible that

23   some of it would flow into the tank farm area, but I have no

24   way of knowing that.

25   ///

1958

1    BY MR. JOHNSON:

2    Q    Now when I took your deposition in this case, you

3    acknowledged that there is no -- that you can't see into the

4    shadows to see the berm on the south side where I'm, where I'm

5    going there, right?

6    A    I think actually I did.  I was confused about the date.

7    But, no, I did not see, within the deep shadows, I didn't see

8    the berm on this date.

9    Q    All right.  And it's really hard to look into those deep

10   shadows to see detail, isn't it?

11   A    Yes, it is.

12   Q    Okay.  And during the deposition, you told me that you

13   just assumed that the berm was there north of the little

14   warehouse because otherwise there was no point in having a

15   berm; isn't that correct?

16   A    Yes, and I saw the berm there on other dates as well.

17            MR. JOHNSON:  Right.

18            Your Honor, could you have him answer the questions?

19            THE COURT:  Yeah.

20            Listen to the questions.  Answer the question.

21   BY MR. JOHNSON:

22   Q    All right.  At your deposition, you told me that you

23   assumed the berm was there north of the little warehouse

24   because otherwise there is no point in having a berm there,

25   correct?

1   A      Once again, yes, correct.

2   Q      And despite that fact, you drew in -- strike that.

3          And you can't -- you told me during the deposition that

4   north of the drumming shed, over here, you couldn't see in

5   that shadow, either, to see whether or not there's a berm,

6   correct?

7   A      Correct.

8   Q      And yet you've drawn a continuous line from this point to

9   that point with regard to the fact that you've designated that

10  that's a berm, correct?

11  A      Correct.

12  Q      Now you testified about the ditch that you drew in here,

13  which is north of the little warehouse, which is about there,

14  you claim, correct?

15  A      Right.

16  Q      All right.  But you would agree with me, wouldn't you,

17  that in deep shadows like this that are north of the little

18  warehouse, in this area here, you can't measure the elevations

19  there, can you?

20  A      No, you cannot.

21  Q      All right.  It would not be possible to do it, correct?

22  A      Correct.  It's more difficult to measure elevation than

23  simply identify a feature.

24  Q      All right.  And at your deposition, you actually told me,

25  despite the fact that you've labeled this a ditch, that it's

1    really not a ditch; it's just merely a slight depression.

2    That's what you think you have seen, correct?

3    A    That's right.

4    Q    All right.  It's -- at some point, you termed it a swale,

5    correct?

6    A    Correct.

7    Q    A very slight, very slight depression?

8    A    That's what I think it is, yes.

9    Q    All right.  And it's not at all like the ditch that's on

10   the east side -- I'm sorry, the west side of the tank farm

11   that has a little bit of depth to it, correct?

12   A    That's right.  It's not at all like the ditch.

13   Q    It's just a slight depression in through that point,

14   correct, north of the little warehouse?

15   A    Correct.

16   Q    That's what you think it is, right?

17   A    Yes.

18   Q    All right.  And isn't it a fact that that area, where

19   you've drawn that elevation, that slight depression, excuse

20   me, this area right here, that that's part of the darkest

21   parts of the shadows in these pictures?

22   A    That's right.  That's why I interpreted the ditch being

23   in that location.

24        MR. JOHNSON:  Your Honor, would you direct him to

25   answer yes or no, again?

1                THE COURT:  Yeah.  He didn't ask you why.

2                THE WITNESS:  What was the question, again?

3                MR. JOHNSON:  We'll go on.

4     BY MR. JOHNSON:

5     Q    Now let me show you Exhibit 4838, which is a

6     demonstrative we created.  This is a picture -- this is a

7     photograph of the same date, correct?

8     A    Correct.

9     Q    And let me show you -- and this is one that's unenhanced,

10    unlightened.  You would agree with that?

11    A    I'm not sure what you mean.  You mean enhanced the way

12    that I enhanced it?

13    Q    Yes, sir.

14    A    No, it certainly is not.

15    Q    All right.  And this is, indeed, the same picture that

16    you enhanced, is it not?

17    A    It's the same -- I don't know if it's the same frame, but

18    it's one of two overlapping frames.

19                MR. JOHNSON:  Can you go to 4839?

20                DOCUMENT TECHNICIAN:  (Complied with request.)

21    BY MR. JOHNSON:

22    Q    Now this is the same frame lightened up, correct?

23    A    Yes.

24    Q    All right.  And at this point in time, you can see that

25    the whole area has been lightened, but you can still see the

1    dark shadows there, right?

2    A    Right.

3    Q    You can see the dark shadow here that is north of the big

4    warehouse.  You can see the dark shadow here that's north of

5    the little warehouse.  You can see the dark shadows coming off

6    of the tanks that are there, and you can see the dark shadow

7    that's on the other side of the berm, correct?

8    A    Correct.

9              MR. JOHNSON:  All right.  Go to Exhibit 4840.

10             DOCUMENT TECHNICIAN:  (Complied with request.)

11   BY MR. JOHNSON:

12   Q    This is the same frame, Frame 4, November 1975.  It's

13   even lightened up some more, correct?

14   A    Yes.

15   Q    All right.  And you can see the same dark shadows.  Even

16   though this has been lightened up, you see the same dark

17   shadow north of the big warehouse, north of the little

18   warehouse, north of the tanks, north of the berm, correct?

19   A    You mean the shadows are as dark as they were on other

20   dates or the same shadow?

21   Q    Well, the shadows have lightened up, but the shadows

22   still appear, despite the fact that we can't really make out

23   hardly anything else in this photo at this time because it's

24   been lightened up so much, correct?

25   A    They're the same shadows.

1          MR. JOHNSON:  Okay.  Go to the next one, which is

2    4841.

3          DOCUMENT TECHNICIAN:  (Complied with request.)

4    BY MR. JOHNSON:

5    Q    All right.  And we did this one, since we've lightened it

6    up so much, that we've designated for the jury and the judge

7    what it is that we saw here in the prior photos.  This is the

8    same photograph, the same one that actually you actually did,

9    correct?  This has got your name on it right there, your

10   company's name, right?

11   A    Yes.

12         MR. JOHNSON:  All right.  Flip back to the prior

13   one, 4840.

14         DOCUMENT TECHNICIAN:  (Complied with request.)

15   BY MR. JOHNSON:

16   Q    It's the same photograph, isn't it?

17        Flip back to his.

18   A    Flip again.

19         DOCUMENT TECHNICIAN:  (Complied with request.)

20         THE WITNESS:  I can't, I can't be certain of that.

21   If you're going to tell me it, I'll accept what you're saying.

22   BY MR. JOHNSON:

23   Q    And what we designated here that you can't see anymore

24   because we've lightened it up so much is the big warehouse and

25   the small warehouse, the tank shadows, the berm shadow, and

1964

1    the shadow from the drumming shed, correct?

2    A    I'm sorry; say that again.

3    Q    Well, let me withdraw that question.

4    A    I didn't follow all that.

5    Q    Let me withdraw that question, and I'll ask this

6    question.

7        That's the shadow from the large warehouse, correct?

8    A    Correct.

9    Q    This is the shadow from the small warehouse, isn't it?

10   A    Yes.

11   Q    This is the shadow from the drumming shed?

12   A    I'd have to see another unenhanced version of the

13   photograph.

14            MR. JOHNSON:  All right.  Flip back.  Just flip back

15   one.

16            DOCUMENT TECHNICIAN:  (Complied with request.)

17   BY MR. JOHNSON:

18   Q    Here it is.

19   A    Yes, that's the shadow from the small drumming shed.  Of

20   course, the shadow is smaller.

21            MR. JOHNSON:  Okay.  Go back.

22            DOCUMENT TECHNICIAN:  (Complied with request.)

23   BY MR. JOHNSON:

24   Q    This is the shadows, as you can see them, from the tank,

25   what I've just marked, the tank shadows, correct?

1   A     Yes.

2   Q     And this is the shadow or the portion of the shadow from

3   the berm, correct?

4   A     Correct.

5   Q     Now there is no connection in the shadows here, are

6   there -- is there, between the loading -- the shadow in the

7   loading/unloading area that's north of the shadow that's cast

8   by the big warehouse and the shadow that's cast by the small

9   warehouse?  There's no shadow between the two of those,

10  correct?

11  A     Not as you've got it on this date.

12  Q     Okay.  And what --

13  A     Wait a minute.  No.  I can -- I'm not sure that "yes"

14  would be the correct answer.  I can say "yes" with some

15  explanation, but I'm not going to just give you a "yes."

16  Q     Well, this --

17  A     It's not as simple as that.

18  Q     Well, this one doesn't seem too tough.  We're looking

19  at -- everybody in this courtroom is looking at the shadows

20  that we can see with our eye.  There's one here, and there's

21  one here, and they're not connected; isn't that correct?

22  A     Yes, but they're smaller.  They are the portions of the

23  shadows that we can see on other photographs.

24  Q     All right.  And what you've testified to here today is

25  that this shadow that's north of the small warehouse is the

1   evidence that you're telling us as to the fact that there was

2   a slight depression in that area north of the small warehouse.

3   Isn't that the case?  That's what you base that opinion on,

4   correct?

5   A    In part, yes.

6   Q    And in part on the berm that you, that you testified --

7   that -- it's also based on the berm issue, or is it only

8   based -- I'll withdraw that.

9        So it's in part based upon this particular shadow,

10  correct?

11  A    Yes, the darker shadow in that area.

12  Q    All right.  And there are dark shadows everywhere around

13  here, aren't there?  I mean, there's not just a dark shadow

14  here.  It's just as dark there.  It's just as dark here as it

15  is in -- right here, north of the small warehouse, correct?

16  A    We're looking for the darkest areas of the shadows, not

17  just the dark shadows.

18  Q    I understand, but it's just as dark in this area here as

19  it is in that area there, right?

20  A    That's right.

21  Q    And it's even darker up here, isn't it?

22  A    Up where?

23  Q    Where I just did it, right up here.  Let me do that.

24  It's even darker right there?

25  A    It's about the same as the larger area to the south.

1              MR. JOHNSON:  You can take it down.

2              DOCUMENT TECHNICIAN:  (Complied with request.)

3    BY MR. JOHNSON:

4    Q    Now you agree that the area in front of the drumming shed

5    has a fairly shallow gradient, don't you?

6    A    Yes.

7    Q    But you can't determine the grade of the loading and

8    unloading area south of the drumming shed on the date of this

9    photo?

10        And why don't you put up 31 -- 33 again.

11             DOCUMENT TECHNICIAN:  (Complied with request.)

12   BY MR. JOHNSON:

13   Q    All right.  You can't -- there's a dark shadow here in

14   the drumming area, correct?

15   A    Yes.

16   Q    Unloading/loading?

17   A    Yes, south of the drumming area, there is a dark shadow.

18   Q    All right.  And you can't determine the grade of the

19   loading and unloading area that I've just circled south of the

20   drumming shed on this date because of the deep shadow in that

21   area; isn't that correct?

22   A    That's correct.

23   Q    And if there was a spill of hundreds of gallons of perc

24   in that area, you don't know exactly where it would run

25   because you could not determine the elevations in the shadow;

1968

1  isn't that correct?

2  A    Just from this date alone, yes, that would be correct.

3  Q    All right.  In fact, such a spill might pool in front of

4  the drumming shed; isn't that right?

5  A    It could pool or it could run off.

6  Q    Okay.  But it could pool, correct?

7  A    Yes, that's one of the possibilities.

8  Q    All right.  And you know that that area in front of the

9  drumming shed was paved with asphalt as of this date, correct?

10  A    Correct.

11  Q    And as you've heard the testimony in this case, there

12  were incredibly heavy trucks full of chemicals that came in

13  and out of that asphalted portion directly north of the little

14  warehouse -- of the big warehouse, correct?

15  A    Yes, there were tanker trucks.

16  Q    And they're real heavy, correct?

17  A    If they were fully loaded, I would assume they would be

18  quite heavy, yes.

19  Q    Tons?  They weigh tons, correct?

20  A    Yes.

21  Q    And asphalt in that area, you would agree with me, in

22  1975, could not possibly have been as smooth as glass?

23  A    No.  I don't think asphalt is smooth as glass anywhere.

24  Q    All right.  Asphalt typically, in a surface like that, in

25  a heavily trafficked surface area like that, has

1    irregularities and low points in it; isn't that correct?

2    A    Minor, minor depressions, certainly.

3    Q    All right.  And when you say "minor depressions," you

4    agree with me that you saw depressions in some of these photos

5    in the loading and unloading area of a couple of inches or so,

6    correct?

7    A    No.  I couldn't measure them.  I assumed they were some

8    minor depressions because that seems to be where liquids or

9    stains would accumulate.

10   Q    Okay.

11   A    And that's typically slightly lower areas within a paved

12   area.

13   Q    All right.  And you agree, don't you, that the location

14   of water bodies and puddles over time is a good indicator of

15   the microtopography of a site?

16   A    Yes.

17   Q    And the microtopography of a site means small variations

18   in the nature of 1, 2, 3, 4 inches, something like that,

19   correct?

20   A    Well, not that large, but very minor, maybe in the range

21   of an inch or so that you cannot actually measure with the

22   digital stereo plotter, but you can detect because they tend

23   to be areas that hold water after a rainfall event.

24   Q    Okay.  Or after spills of chemicals, correct?

25   A    Correct.

1970

1    Q    And now you didn't mention this on your direct, but this

2    is part and parcel of your report.  You've measured two

3    12-by-5-foot horizontal tanks there, correct?

4    A    Correct.

5    Q    And you were here -- were you here for Mr. Colver's

6    testimony?

7    A    When did he testify?

8    Q    Well, that was a long time ago in this trial.  What day

9    did you show up?

10   A    Friday.  I was here all day Friday.

11   Q    All right.  Well, Mr. Colver testified before that, but

12   he testified, you can assume with me, that he testified that

13   one of those was a perc tank.  Have you been told that?

14   A    I think that's my understanding.

15   Q    Okay.  And if a spill in this area happened in that perc

16   tank, in the loading or unloading of that perc tank, if a

17   tanker truck pulled up next to it, for instance, that spill

18   would run off to the catch pond as of this date, 1975,

19   correct?

20   A    That's the slope of the terrain, so, yes, it would.

21   Q    Now let's talk about the catch pond, because it's, as of

22   1975, it's just a low point within the bermed area; isn't that

23   correct?

24   A    That's all it is.  Right.

25   Q    All right.  It's just -- everything flows back there, but

1971

1    as far as you could tell, it wasn't an excavated area as of

2    1975, correct?

3    A    Correct.

4    Q    In fact, it's fairly smooth and uniform on those dates

5    than when you -- when there wasn't water there.  You could see

6    that, correct?

7    A    Yes, you can.

8    Q    But when there's -- you couldn't tell exactly how deep it

9    was, right?

10   A    It had to have been very shallow on this date.

11          MR. JOHNSON:  All right.  Let's go to Demonstrative

12   Exhibit 37, DD37.

13          DOCUMENT TECHNICIAN:  (Complied with request.)

14   BY MR. JOHNSON:

15   Q    Now on this particular date, in your demonstrative that

16   we're looking at now, you extended the line of the berm behind

17   the drumming shed, right?

18   A    Yes.

19   Q    Okay.  But still behind the drumming shed, there's a dark

20   shadow, isn't there?

21   A    Yes, there is.

22   Q    And you weren't able to see, when I took your deposition,

23   you weren't able to see into that shadow to see if the berm

24   really extended into that area, correct?

25   A    I think that's true, at least on this photograph, because

1972

1    of the tank lean.

2    Q    All right.  And when you say the "tank lean," the

3    tanks -- why don't you explain to us what the tank lean is

4    that you're talking about.

5    A    Well, the term for it is called parallax.  Depending on

6    where the camera is when the picture is taken, tall objects

7    are displaced outward from the center of the frame.  So if the

8    camera was to the north, the taller objects would be leaning

9    away from it or leaning back to the south or to the southeast.

10   And if this was -- if I flicker between two stereo dates, the

11   lean would switch around from date to date.  So as I stated in

12   my deposition, that one tank was leaning over the berm area,

13   at least on this photo.

14   Q    All right.  And the berm, if there were a berm there, it

15   would be pretty low, right?  It's only a foot or two, if there

16   were?

17   A    Probably, yes.

18   Q    But because of the tank lean, you couldn't see the

19   berm --

20   A    Not on this --

21   Q    -- north of the drumming shed, right?

22   A    Not on this single photograph here, yes.

23   Q    All right.  Now in the area in front of the drumming

24   shed -- can I have a second, Your Honor?

25        THE COURT:  Yeah.  Let's take a quick break.

1973

1          THE LAW CLERK:  All rise.

2      (Recess taken from 11:05:49 to 11:15:14.)

3      (Open court.)

4      (Jury present.)

5          THE COURT:  Please be seated.

6          Continue.

7          MR. JOHNSON:  Thank you, Your Honor.

8          So I don't forget, I'd like to move for admission

9  for illustrative purposes of Exhibits 4839, 4840, and 4841,

10 which I've already shown the witness.

11         THE COURT:  They're admitted for illustrative

12 purposes.

13         MR. JOHNSON:  Neil, please put up DD37, please, and

14 blow up the area south of the drumming shed.

15         DOCUMENT TECHNICIAN:  (Complied with request.)

16 BY MR. JOHNSON:

17 Q    All right.  Now in the area directly in front of the

18 drumming shed, right here, that's a wet area, isn't it?

19 A    Wet area or a stain.

20 Q    All right.  And if it were stained, it would be stained

21 because that's a low point in the depression where liquid

22 would pool, correct?

23 A    Correct.

24         MR. JOHNSON:  And in this -- go down a little bit,

25 Neil.

1          DOCUMENT TECHNICIAN:  (Complied with request.)

2     BY MR. JOHNSON:

3     Q    All right.  And in this area that I'm circling right

4     here, there's flow of water, is there not, going to the

5     northwest?

6     A    There appears to be a flow of some type of liquid, yes.

7     Q    Now let me go over to the catch pond area.  On this

8     particular date of the photography, which is September 6,

9     1977, the catch pond is bone dry, right?

10    A    It's dry.

11    Q    It's bone dry.  I mean, you don't even see any wetness

12    there, do you?

13    A    I'm going to say it's dry.  I'm not going to say it's

14    extremely dry.  I can't tell that from the photography.

15    Q    But you don't see any wetness in that area, or do you?

16    You tell me.

17    A    I don't see any wet soils.  I don't see any liquid

18    surface, no.

19          MR. JOHNSON:  Pull out a little bit more.

20          DOCUMENT TECHNICIAN:  (Complied with request.)

21    BY MR. JOHNSON:

22    Q    In fact, you designated it as being a dry surface,

23    correct?

24    A    Yes.

25    Q    All right.  And you've designated that there is a cut

1975

1    outside, on the outside of the berm right here, correct?

2    A    Yes.  I talked about that in my direct testimony.

3    Q    And this is the first time in the photos that you've seen

4    chronologically in which you've seen that cut outside the

5    berm, correct?

6    A    Let me check here a minute.

7         Yes, I believe that's the first time that I saw it.

8    Q    And I don't know what you looked at because you're

9    looking at your own computer, but that cut wasn't there in the

10   1975 photograph, the November 4, 1975 photograph that we

11   looked at a little while ago, correct?

12   A    That's correct.

13   Q    All right.  And, indeed, this is a man-made cut, isn't

14   it?

15   A    Most likely, yes.

16   Q    Well, you told me in the deposition; you agreed it was a

17   man-made cut, correct?

18   A    Most likely, yes.  Correct.

19   Q    Monte Naff testified that that was part of a horse trail.

20   Do you disagree with that?

21   A    Say that again, please?

22   Q    Monte Naff testified that that portion right there is

23   part of a horse or cow trail as far as he's concerned.  Do you

24   agree with that testimony?

25   A    Was he -- I don't recall the name, but, no, I wouldn't

1   agree with that.

2   Q    Okay.  And if you dumped a couple hundred gallons of

3   liquid in that cut, it would flow to the west and eventually

4   join up with this, with what you've drawn here, correct, for

5   the ditch?

6   A    It could join up, but I would expect it would leave some

7   trace of flow.

8   Q    But it would join up, correct?

9   A    Very possibly, yes.

10            MR. JOHNSON:  Let's go to the next photo.

11            DOCUMENT TECHNICIAN:  (Complied with request.)

12            MR. JOHNSON:  DD40.

13   BY MR. JOHNSON:

14   Q    Now you've drawn the berm as far as you can tell.

15        Go into the southern berm portion.

16            DOCUMENT TECHNICIAN:  (Complied with request.)

17   BY MR. JOHNSON:

18   Q    Now here, you can see -- and this is the date of May 14,

19   1979.  You can actually see a berm that extends north of the

20   drumming shed, correct?

21   A    Yes.  It's easier to see on this date.

22   Q    Because it's not in the shadow, right?

23   A    That's one of the reasons, yes.

24   Q    And there's also, in this area right here, what either

25   you can see is piping or a shadow of piping.  Would you agree

1   with that?

2   A    Yes, I would.

3          MR. JOHNSON:  And go up to the catch pond.  Come out

4   a little bit.

5          DOCUMENT TECHNICIAN:  (Complied with request.)

6   BY MR. JOHNSON:

7   Q    In any event, going back to the piping, that's the first

8   photo that you've seen where that piping is evident, correct,

9   north of the drumming shed?

10  A    Well, now you're taxing my memory --

11  Q    All right.  You know what?

12  A    -- but that's probably true.

13  Q    All right.  Well, it was testified to, so let's just go

14  on --

15  A    Okay.

16  Q    -- okay?

17        And on this particular date, in connection with the catch

18  pond, you specify again, "Catch pond surface is dry," right?

19  A    Yes.

20  Q    All right.  And you see the cut outside the berm?  In

21  fact, you've designated it on this photo, correct?

22  A    Yes, just like the other one.

23  Q    And that's the same cut, that same man-made, probably

24  man-made cut, correct?

25  A    Most likely.  It's in the same position.

1    Q    Let's go to -- let me show you a photo that you didn't --

2    from this same approximate time period.  And it's page 54 of

3    your report.  It's a photo taken on, it's a photo taken on

4    March 13, 1981.  Did you testify about this one on direct?  I

5    don't think you did.  Maybe you did.

6         (Pause.)

7    BY MR. JOHNSON:

8    Q    No, you didn't.  I didn't list it.

9         But you looked at this one, and this one is attached as

10   an exhibit to your expert report in this case; isn't that

11   correct?

12   A    Yes.

13         MR. JOHNSON:  All right.  And, indeed -- can you go

14   in on the catch pond area?

15         DOCUMENT TECHNICIAN:  (Complied with request.)

16   BY MR. JOHNSON:

17   Q    All right.  Now this is, this is 1981, and this is after

18   the berm has been reconfigured, correct?

19   A    Correct.

20   Q    All right.  And you've specified here that this whole

21   area around there, that whole dark area there, that's a wet

22   area, isn't it?

23   A    Yes.  It's dark in tone, so I interpreted that to mean

24   that it was wet.

25   Q    This isn't the best photograph that we've seen in terms

1  of quality, is it?

2  A    No, it's not.

3  Q    All right.  But you can see good enough to designate that

4  it's wet there.  Do you see water in that berm as of this

5  date?

6  A    I can't tell, but it's dark in tone, and that usually

7  means wet soils.

8  Q    All right.  So the wet soils, they come pretty far to the

9  southwest.  They're coming back towards the tank farm, aren't

10  they?

11  A    Yes.

12          MR. JOHNSON:  Let's go to one of those that you

13  showed us on your direct examination, which was DD45.

14          DOCUMENT TECHNICIAN:  (Complied with request.)

15  BY MR. JOHNSON:

16  Q    Now this is a photograph that was taken on June 2, 1981,

17  and it's about three months after the photo that I just showed

18  you, okay?  Do you agree with me on that?

19  A    Let me just check on that a minute.

20          Yes.

21  Q    All right.  And in this particular photo -- go to the

22  front of the drumming shed.

23          DOCUMENT TECHNICIAN:  (Complied with request.)

24  BY MR. JOHNSON:

25  Q    You see the concrete pad that you say is always there,

1   right?

2   A     Yes.

3   Q     All right.  And you see pooling right in front of that

4   concrete pad, right?

5   A     I see staining or pooling.

6   Q     All right.  Well, the staining would be because liquid

7   pooled there, correct?

8   A     Most likely, yes.

9   Q     And you drew in this east ditch and the west ditch,

10  right, on this one?

11  A     Well, that's a different term for east ditch, but, yes.

12  There's an eastern ditch and a western ditch within the

13  containment area.

14        MR. JOHNSON:  All right.  Pull out a little.

15        DOCUMENT TECHNICIAN:  (Complied with request.)

16  BY MR. JOHNSON:

17  Q     All right.  This is the west ditch to the catch pond,

18  this blue one right here, right?

19  A     Right.

20        MR. JOHNSON:  All right.  And go back to the

21  drumming head area.

22        DOCUMENT TECHNICIAN:  (Complied with request.)

23  BY MR. JOHNSON:

24  Q     You have that ditch emanating from the side of the

25  drumming shed, don't you?  Right here?  Oops.  I missed it.

1    Let me do that again.

2    A    Yes, I've drawn a ditch that starts in that location.

3    Q    All right.  You don't have the ditch starting right there

4    in front of the drumming shed, do you?

5    A    No.

6              MR. JOHNSON:  Pull out.

7              DOCUMENT TECHNICIAN:  (Complied with request.)

8    BY MR. JOHNSON:

9    Q    Now there's a new tank behind the drumming shed; isn't

10   that correct?  This one right here?  There's actually two of

11   them I just circled.

12   A    Yes.  Those are probably new tanks on this date.

13   Q    All right.  So those new tanks were installed since the

14   last date we saw, at least since 1979, correct?

15   A    Yes, since July of -- late July or August 1 of '79.

16   Sometime between that and this date, the tanks were moved or

17   installed in that location.

18   Q    All right.  Now let me go up -- let's go up to the catch

19   pond area, but let's -- there you go.

20             DOCUMENT TECHNICIAN:  (Complied with request.)

21   BY MR. JOHNSON:

22   Q    You've identified in the catch pond that there's a liquid

23   surface, correct?

24   A    Correct.

25   Q    All right.  Would you identify for us, if you can, where

1   the liquid surface is that you saw?  You can outline it on the

2   telestrator.

3   A     Well, it's going to be difficult to be very precise

4   because it grades from an obvious liquid surface to wet soils

5   to drier soils.

6   Q     All right.  And the wet soils -- I'm just going to do

7   this here.  The wet soils, to me at least, to my untrained

8   eye, appear to be on the inside northwest of where I just drew

9   that line; isn't that correct?  Because it's darker there.

10  A     Well, that's generally correct.  The darker-toned areas I

11  interpreted to be wet soils, and in this area -- let's see if

12  I can do it right -- is more of a depressed or an excavated

13  area.

14  Q     All right.  And that, you think that that's liquid -- you

15  say "Liquid Surface" --

16  A     Yes.

17  Q     -- so I presume that you determined that that was liquid,

18  right --

19  A     Yes, that's my opinion.

20  Q     -- the darker area.

21        Now on the outside of the catch pond is this area right

22  here.  Right to the west of the berm is an area that's got

23  no -- has no grass growing on it at all, correct?

24  A     Yes.

25  Q     All right.  And that, you understand that to be a

1  mounded, it's a mounded area of dirt; isn't that correct?

2  A    It's a slightly mounded area, that's correct.

3  Q    All right.  And that slightly mounded area now covers up

4  that man-made ditch or at least what you called the cut that

5  was evident in the 1979 photograph, correct?

6  A    Correct.

7  Q    Where the two fences come together, right here, there's a

8  fence along the north and a fence along the east, is there

9  not?

10 A    Yes.

11 Q    I'm sorry; along the west.  I'm sorry.  Along the north

12 and along the west.

13      And in this area right here, this is, this is a slightly

14 depressed area, is it not?

15 A    I don't think I ever noticed that it was depressed.  It's

16 pretty much the same elevation as the surrounding surface in

17 that region.

18 Q    All right.  And you mentioned -- pull into this black

19 feature that is on the outside right here.

20           DOCUMENT TECHNICIAN:  (Complied with request.)

21 BY MR. JOHNSON:

22 Q    Now you can't identify what that black feature is there,

23 right?

24 A    That's right.

25 Q    Now you were here, I presume, to see Marvin Johnson's

1  videotaped testimony?

2  A    Yes.

3  Q    All right.  And you heard Marvin Johnson testify that

4  there was a 1 1/4- to 1 1/2-inch pipe that ran through the

5  berm into the catch pond through which they discharged

6  thousands of gallons of liquid in the catch pond from time to

7  time, correct?

8  A    I heard him.  I recall him talking about a pipe.

9  Q    All right.  And I think you said on direct you couldn't

10  see the pipe, right?

11  A    I've never been able to see a pipe in that pond.

12  Q    All right.  Well, you wouldn't be able to see something

13  in this digital photograph that's only an inch and a quarter

14  to an inch and a half thick; isn't that correct?

15  A    No, it's not correct.

16  Q    Well, aren't the pixels of this digital photograph,

17  aren't they 4 inches?

18  A    I'd have to look at that, but let's assume they are.

19  That still wouldn't mean that I couldn't see a feature like

20  that.

21  Q    All right.  But that doesn't mean you could see it,

22  right, because the pixels of this photograph wouldn't

23  necessarily pick up an item that's an inch and a quarter to an

24  inch and a half wide; isn't that correct?

25  A    No, that's not correct.

1    Q    Well, can you see a quarter on the ground in this

2    photograph?

3    A    We're not talking about a quarter.  We're talking about a

4    linear feature.

5    Q    All right.  Could you see something that's an inch and a

6    quarter, an inch and a half circular in this photograph?

7    A    If it was there.  I can see some pipes or fence lines

8    that are probably not any wider than that.  They're clearly

9    visible, because linear features will affect the pixels around

10   them, and you'll still be able to see them.  If they contrast

11   in color to the surface or if they're casting a shadow on a

12   portion of the surface, you'll have a dark line that you'll be

13   able to see even if the pixels are 4 inches or even 6 inches.

14   Q    All right.  But you don't -- but you can't necessarily

15   see something that small?  You might.  You might not.

16   Correct?

17   A    Yeah.  I can't say that I would always be able to pick it

18   up.

19        MR. JOHNSON:  Okay.  Let's go to the 7/27/83 photo,

20   which is Demonstrative Exhibit No. 47.

21        DOCUMENT TECHNICIAN:  (Complied with request.)

22   BY MR. JOHNSON:

23   Q    All right.  Now this one you talked about on your direct

24   examination as well, correct?

25   A    Yes.

1              MR. JOHNSON:  Go into the drumming shed area.

2              DOCUMENT TECHNICIAN:  (Complied with request.)

3     BY MR. JOHNSON:

4     Q    All right.  There's significantly more staining in front

5     of the drumming shed, isn't there?

6     A    Maybe, maybe 40 to 50 percent more than on some of the

7     other dates in which I could see staining, yes.

8     Q    All right.  But you don't know whether that's staining or

9     standing water, looking at this picture, do you?  Because you

10    just can't see the detail in this picture, right?

11    A    I can't -- well, it would have to be extremely

12    high-resolution photography before I could tell the difference

13    between staining and standing liquids, unless there's sun

14    glint.

15             MR. JOHNSON:  Let's go out to the catch pond.

16             DOCUMENT TECHNICIAN:  (Complied with request.)

17             MR. JOHNSON:  Further out.

18             DOCUMENT TECHNICIAN:  (Complied with request.)

19             MR. JOHNSON:  Further.  Keep going out.

20             DOCUMENT TECHNICIAN:  (Complied with request.)

21    BY MR. JOHNSON:

22    Q    All right.  In the catch pond on this date, there is

23    liquid, correct?

24    A    Yes.

25    Q    Clearly visible.  In fact, you say "Liquid Surface,"

1    correct?

2    A    Correct.

3    Q    Okay.  And on this date, also, there appears as though

4    there's some sort of white stuff that they stuck on top of the

5    inside of the berm; isn't that correct?

6    A    The entire inside face of the berm is very light in tone.

7    Q    All right.  And do you know whether that's been gunnited

8    as of that date?  Can you tell?

9    A    Certainly it would be consistent with gunnite.

10            MR. JOHNSON:  And go back out further.

11            DOCUMENT TECHNICIAN:  (Complied with request.)

12    BY MR. JOHNSON:

13    Q    All right.  And right here, you drew a leader to "Stout's

14    Dark Feature," correct?

15    A    Yes.

16    Q    But you still, on this date of the photography, can't

17    figure out what the heck that dark feature is, right?

18    A    Right.

19            MR. JOHNSON:  But -- go back in further.

20            DOCUMENT TECHNICIAN:  (Complied with request.)

21            MR. JOHNSON:  All right.  That's good.

22    BY MR. JOHNSON:

23    Q    But that dark feature is pretty close to where her ground

24    scar is; isn't that correct?

25    A    Well, I can measure it for you.

1    Q    All right.  Well, I don't need you to measure it.  Just

2    tell us whether or not it's close.

3    A    It's about 23 feet from her ground scar, as I'm measuring

4    it.

5    Q    All right.  Is it 23 -- well, let's talk about that.

6         The ground -- there's a white portion that goes pretty

7    close to that.  Is that 23 feet away, the one I just hit

8    there?  Right there?

9    A    You know, I'll measure that.

10        That's about 7 feet away.

11   Q    All right.  So that's only about 7 feet away from that

12   black thing, right?

13   A    Yeah.  It's a very faint, white feature.

14   Q    All right.  And the 23 feet you're talking about is the

15   white area to the north, correct?

16   A    Well, more to the northwest.

17   Q    All right.  More to the northwest.  Like to here?

18   A    Yes.  Not quite as far out as that.

19   Q    All right.  Now there is liquid right here, right?

20   A    Yes.  There's liquid within that area where I have the

21   dot showing "Liquid Surface," ringed by lighter, drier

22   materials.

23             MR. JOHNSON:  All right.  And pull out a little bit.

24             DOCUMENT TECHNICIAN:  (Complied with request.)

25             MR. JOHNSON:  All right.  Let's go back.  Let me go

1    back to another photograph.  Let's use our photographs.  5017,

2    which is in evidence.

3             DOCUMENT TECHNICIAN:  (Complied with request.)

4    BY MR. JOHNSON:

5    Q    All right.  Now this is the, this is the photograph that

6    was taken -- you've seen this one before.  This is a

7    photograph that was taken June 18, 1974, correct?

8    A    Yes.

9    Q    All right.  And you would agree with me, sir, that the

10   area of the northwest corner which is up there, or around

11   there, is pretty well vegetated at this point; isn't that

12   correct?

13   A    Yes.  It's fairly well vegetated.

14            MR. JOHNSON:  All right.  Let's go to the next

15   photograph, which is 5019.

16            DOCUMENT TECHNICIAN:  (Complied with request.)

17   BY MR. JOHNSON:

18   Q    This is a photograph that's taken on November 4, 1975,

19   which we've seen before, and, again, let me draw the northwest

20   corner area around there.  It's nicely vegetated on that date

21   as well, isn't it?

22   A    Yes, fairly well.

23            MR. JOHNSON:  All right.  Let's go to 5024.  Now

24   this is about two years later.  This is September 6, 1977.

25   And go a little bit towards the northwest corner area.

1              DOCUMENT TECHNICIAN:  (Complied with request.)

2    BY MR. JOHNSON:

3    Q    All right.  The northwest corner area, you would agree

4    with me, is around there somewhere, right?

5    A    Yes.

6    Q    All right.  And that's still pretty well vegetated as of

7    that date, correct?

8    A    Yes.  There's a lobe of stressed or unvegetation moving

9    into it from this area.

10   Q    Right.  Correct.  This area right here is unvegetated,

11   but the northwest corner is still pretty good, right?

12   A    Yes, pretty good.

13           MR. JOHNSON:  Okay.  Go to the next one, which is

14   5028.

15           DOCUMENT TECHNICIAN:  (Complied with request.)

16   BY MR. JOHNSON:

17   Q    All right.  And this photograph is May 14, 1979, so

18   that's, if I've got my dates right, that's almost another two

19   years into the future.  And, boy, oh, boy, the devegetation

20   here in the northwest corner is readily apparent, right?

21   A    Yes.  It's at its most, greatest extent on this date.

22   Q    All right.  And there is devegetation leading all the way

23   to that northwest corner, in this area, correct?

24   A    Yes.  Not as large as you've drawn it, but definitely.

25   Q    Well, I'm just trying to circle it so I don't cover it

                                1991

1   up.

2       All right.  And the devegetation starts to go north,

3   right?

4   A    Yes.  But there's a lot of mechanical impacts in that

5   area.

6   Q    All right.  Have you heard the testimony in this case

7   that they didn't do any work in this area?

8   A    I didn't hear that, but I'm not assuming that they did.

9   I'm talking about cattle and horses and people moving through

10  that area that's -- it's a pitch area due to the fence.

11  Q    All right.  Are you telling us that this devegetation is

12  caused by people walking around and cattle and horses walking

13  around?

14  A    Not as you've drawn it, no.

15  Q    Well, how about smaller?  In this area right here?  Is

16  that because of cattle and people and horses?

17  A    I think I stated that it could be cattle, people, horses,

18  and chemicals in the soil that account for stress vegetation,

19  and that's what it probably results from.

20  Q    Isn't it more likely that it's chemical than animal?

21  A    Not by itself, I don't think so.  I think it's a

22  combination.

23  Q    Let's go to the next photograph, which is -- that was

24  '79.  Let's go to 5033.

25           DOCUMENT TECHNICIAN:  (Complied with request.)

1    BY MR. JOHNSON:

2    Q    All right.  Now you just testified that the prior one was

3    the area of largest devegetation.

4         Go to the devegetated area.

5         DOCUMENT TECHNICIAN:  (Complied with request.)

6    BY MR. JOHNSON:

7    Q    This area of devegetation, you're not telling us that

8    that's a small area of devegetation and that it's revegetated

9    all that extremely much; isn't that right?

10   A    No, but most of it is attributable to activities that

11   occurred prior to '79.  The area -- this area, I think, is

12   more -- in fact, there's a shift in the registration of this

13   screen, but that's 1979 and earlier impacts.  This is the more

14   recent-type impacts.

15   Q    All right.  Well, you don't really know by looking down

16   at these photos, historical photos that were taken, what,

17   4,000 feet in the air; is that right?

18   A    Depends on the scale.  The scale is half the altitude.

19   Q    All right.

20   A    Or vice versa, I mean.

21   Q    2,000, 4,000 feet?  Somewhere around there?

22   A    It's easy to identify stress vegetation in this

23   photography.

24   Q    Oh, I'll agree with you there.  It's very easy to

25   identify stress vegetation.  But you can't tell by looking

1    down at this photo exactly what's on the ground that caused

2    that devegetation, can you?

3    A    No, I can't, but I can look at the impacts and the

4    rate --

5            MR. JOHNSON:  Your Honor, can you direct him to just

6    answer the question?

7            THE COURT:  Yes.  He just asked you, can you or

8    can't you?

9            THE WITNESS:  Just from one single frame, no.

10           MR. JOHNSON:  All right.  Go to 5033.

11           DOCUMENT TECHNICIAN:  (Complied with request.)

12           MR. JOHNSON:  All right.  This is taken on June 2,

13   1981.  Go up to this area again.

14           DOCUMENT TECHNICIAN:  (Complied with request.)

15   BY MR. JOHNSON:

16   Q    We've still got substantial devegetation in that area,

17   including this area right here, don't we?

18   A    Yes, the one --

19   Q    All right.

20   A    -- that's correct.

21   Q    All right.  And that area, are you telling us that that

22   area is devegetated because people are walking around there

23   and there's cattle and horses in that area?

24   A    That, plus probably chemical impacts.  It's a combination

25   of that.

1994

1          MR. JOHNSON:  Let's go to 5036.

2          DOCUMENT TECHNICIAN:  (Complied with request.)

3          MR. JOHNSON:  All right.  Let's go to the

4    devegetated area.

5          DOCUMENT TECHNICIAN:  (Complied with request.)

6    BY MR. JOHNSON:

7    Q    Boy.  It got worse, didn't it?  Didn't the devegetation

8    get worse on this date?

9    A    Yes.  I think that's the maximum extent of the

10   devegetation in the area to the north portion.  The other area

11   is slowly recovering, but it's still stressed or dead.

12   Q    All right.  That area right there, are you telling us

13   that cattle and people caused that devegetation, at least in

14   part?

15   A    Cattle, people, and chemicals.

16         MR. JOHNSON:  I have no further questions, Your

17   Honor.

18         THE COURT:  Any redirect?

19         MR. LYNCH:  Just real briefly, Your Honor.

20                    REDIRECT EXAMINATION

21   BY MR. LYNCH:

22   Q    Mr. Grip, if you could go to the 11/4/1975 photo?

23         It's illustrative DD33.

24   A    (Complied with request.)

25   Q    This is the photo we were discussing earlier that you

                              1995

1   created using your digital stereo plotter, an enhanced image

2   of, and if you could actually remove the labels from it?

3   A    (Complied with request.)

4   Q    And then go to the -- in the first place, can you explain

5   how you create the enhanced image with the stereo plotter?  Is

6   that just a matter of overexposing the picture?

7   A    No, it's not.  I'm looking at it stereoscopically, and

8   the stereo plotter has a number of different programs,

9   software in there, to bring out details, and the one that we

10  used was the one that used a combination of contrast

11  stretching within certain bands of the light spectrum.

12  Q    Can you go to that enhanced version in this photograph,

13  please?

14  A    (Complied with request.)

15  Q    Can you zoom in on the area by the warehouse?

16  A    (Complied with request.)

17       Just so we can see where we are (indicating).

18  Q    Mr. Johnson was asking you about the shadow feature in

19  this area.  Can you explain how you were able to identify a

20  swale going towards the ditch on the east side of the rail

21  spur in that shadow feature?

22  A    Yes.  Well, what I had done is I had enhanced the imagery

23  to the point where I could see through some of the shadows

24  enough to the point that I could identify, in shadow areas,

25  the even darker-than-normal portions of the surface of the

1996

1   land in that area.  And if there's liquid flowing or staining

2   or something of that nature in a swale or a slightly depressed

3   area, it would be darker in tone.  And that, in fact, this

4   linear feature that I'm tracing here is what I saw in this

5   enhanced imagery, and that's what I used to interpret that the

6   swale or the ditch was flowing through that area and then

7   linking it up to, to this ditch here, which I call the eastern

8   ditch.

9   Q    Can you go to Demonstrative -- or please go to the

10  9/6/1977 photo, and it's Illustrative DD37.

11  A    (Complied with request.)

12  Q    Actually, you can leave it on that scale.

13       Mr. Johnson was asking you a little bit about the cut

14  outside the berm and where liquids might go if they, any

15  liquids had, in fact, gone into that cut.  If, in fact,

16  hundreds or thousands of gallons of liquid were being

17  discharged through that cut, would you expect to see any

18  erosional features?

19  A    Yes.  There would be a gully.  A gully would very quickly

20  form right in this area through these soft materials and link

21  up with this ditch, and it might even enlarge the width of the

22  ditch and extend further out to the west had that occurred.

23  Q    And did you see any such erosional features on any of the

24  dates of photography you reviewed?

25  A    I did not.  I looked at all the dates of photography in

1    which this notch or this cut was present and never saw that it

2    linked up with any other drainage features.  No erosional

3    features were existing on either end of that cut outside the

4    berm.

5              MR. LYNCH:  I have no further questions.

6              THE COURT:  Okay.

7              We're going to -- I have a conference call with

8    other judges starting right now.  We're going to take a noon

9    recess until 1:15.

10             I give you the usual admonition.  We'll be in recess

11   until 1:15.

12             THE WITNESS:  Am I released?

13             THE COURT:  And you may step down.  You're released.

14             THE WITNESS:  Thank you, sir.

15             THE LAW CLERK:  All rise.

16        (Recess taken from 11:46:15 to 13:16:48.)

17        (Open court.)

18        (Jury present.)

19             THE COURT:  Please be seated.

20             Call your next rebuttal witness.

21             MR. LYNCH:  Soco calls Dr. Robert Powell.

22             THE COURT:  I'll remind you, you're still under

23   oath.  You may proceed.

24             MR. LYNCH:  Thank you.

25             WHEREUPON,

1998

1                    ROBERT LESLIE POWELL, Ph.D.,

2    called for examination in rebuttal by counsel for defendant,

3    after having been previously sworn to testify the truth, the

4    whole truth, and nothing but the truth, testified as follows:

5                           DIRECT EXAMINATION

6    BY MR. LYNCH:

7    Q    Good afternoon, Dr. Powell.

8    A    Good afternoon.

9    Q    I take it you were in the courtroom yesterday to hear the

10   testimony of Dr. Sternberg, correct?

11   A    Yes, I was.

12   Q    Okay.  And I believe you heard Dr. Sternberg estimates

13   that there was a release of about 80 gallons of perc to the

14   northwest corner source area.  You agree with that opinion?

15   A    No, I do not.

16   Q    Can you tell us what, if any, faults you found with

17   Dr. Sternberg's methodology or his conclusions?

18   A    Well, his methodology, in a most general sense, was

19   similar to one that I employed.  What was substantially

20   different in our two approaches was how the data was treated.

21   There are three substantive differences between his treatment

22   of the data and mine that I believe led to the discrepancy in

23   estimates:

24       No. 1, I considered the area on the southern portion of

25   the northwest corner to be contaminated as it had been mapped

                                1999

1   by EPA in the ROD and the feasibility study.  Dr. Sternberg

2   did not consider this apparently to be a contaminated area,

3   and it wasn't included in his mass estimate.

4        No. 2, in the northern portion of the northwest corner,

5   Dr. Sternberg subdivided the long, sort of elongated green

6   blob into a western half and an eastern half.  In the eastern

7   half, he used data from soil borings, as I did, to estimate

8   the mass.  In the western half, there were no direct soil

9   measurements.  There were only MIP logs, and he assumed that

10  the concentration in that western half, on the west side of

11  the fence, was only 10 percent of what the concentration was

12  on the east side of the fence.  I don't think that that's a

13  reasonable assumption, and I used the soil data from the west

14  side -- excuse me, from the east side of the fence to

15  represent the entire area.

16       And then, lastly, there are certain soil boring data that

17  were collected by ATC in the fall of 2004.  They were too late

18  to become part of EPA's remedial investigation report, but

19  they're valid samples, I believe, nonetheless, of soil data,

20  and Dr. Sternberg apparently did not consider those data and

21  incorporate them into his mass estimate.  I did.  And in some

22  cases, they were important data points where we previously had

23  no measurements that subsequently added to the mass.  So I

24  believe the differences in our mass estimates are principally

25  because of those three different aspects of how we used the

1    data.

2    Q    And just to briefly touch on those -- and, Julianne, if

3    you could please pull up Exhibit 3058, page 50, I believe it

4    is?

5                DOCUMENT TECHNICIAN:    (Complied with request.)

6    BY MR. LYNCH:

7    Q    This, Dr. Powell, is a figure from the RI addendum where

8    they originally delineated the DNAPL source areas.  Can you

9    please point out the southern portion of the northwest corner

10   that, it's your understanding, Dr. Sternberg did not include

11   in his estimates?

12   A    It would be an area approximately bounded by that line.

13   Q    And I note that at least in that portion of it, EPA has

14   identified a NAPL source area, correct?

15   A    I'm sorry; I didn't see any mark on the screen.

16   Q    I'm sorry; the green dot on the bottom.  Is it your

17   understanding that EPA has identified that as a NAPL source

18   area?

19   A    Yes, they have.

20   Q    And was soil contamination, in fact, impact found in that

21   area?

22   A    Yes, there was.

23   Q    Do you recall the concentrations?

24   A    The highest concentration, in a soil sample in that

25   location, was approximately 300 parts per million.

1    Q    And if included in a mass estimate, would including that

2    concentration raise the overall mass of perc in the soils in

3    the northwest corner?

4              MR. CRANE:  Objection, Your Honor.  Beyond the scope

5    of the rebuttal.  It's also beyond the scope of the rebuttal

6    opinion.

7              THE COURT:  Sustained.

8    BY MR. LYNCH:

9    Q    Well, Dr. Powell, let's go to your second assumption, or

10   the second fault you found with Dr. Sternberg's methodology.

11        And, Julianne, if you could please pull up Demonstrative

12   Exhibit DD151?

13             DOCUMENT TECHNICIAN:  (Complied with request.)

14   BY MR. LYNCH:

15   Q    Dr. Powell, this is a demonstrative showing

16   Dr. Sternberg's perc source areas superimposed over the

17   estimated extent of the perc source area as indicated in the

18   record of decision.

19        Would you again describe how -- I believe you said the

20   east-west division by Dr. Sternberg you don't think was

21   justified.

22   A    Yes.  In the western area, the area that's colored sort

23   of a light blue or aqua color, there were no direct

24   measurements of perc in soil, and Dr. Sternberg assumed that

25   the concentration of perc in that area was roughly 10 percent

2002

1    of what it was in the adjoining area immediately to the east,

2    the sort of yellow color.

3    Q    Did you see anything in the data you reviewed from the

4    sampling locations collected on, I guess, the Keller side of

5    the fenceline as opposed to the Soco side of the fenceline

6    that would lead you to believe there was a 10-fold difference

7    in contamination on the other side of the fence?

8            MR. LYNCH:  Objection.  Beyond the scope of the

9    rebuttal opinion and the report itself.

10           THE COURT:  Sustained.

11   BY MR. LYNCH:

12   Q    All right, Dr. Powell.  Let's go to the third fault you

13   found with Dr. Sternberg's methodology.  Can you again

14   describe why you believe he should have included the

15   additional data points?

16   A    When ATC drilled some additional borings in the fall of

17   2004, they sampled in some portions of the northwest corner

18   that had heretofore not really been tested.  Most importantly,

19   and this was a specific part of my calculation that

20   Dr. Sternberg spoke to yesterday, they drilled a sample, a

21   soil boring called SB-4.  It was in more or less the center of

22   the northern portion of the northwest corner.  They sampled

23   the soil in that boring at an interval of 2 to 4 feet below

24   ground surface, and that was one of the data points that I

25   used in my calculation that Dr. Sternberg spoke to yesterday.

1          That data point is the only information that we have from

2    all of the testing that's been done on what lies from 2 to

3    4 feet below ground surface in terms of actual perc

4    concentrations.  It's the only place that's actually been

5    measured.  And it showed a concentration of perc much, much

6    higher than was found in the shallower samples from zero to

7    2 feet below ground surface.

8          There were five samples overall that were used.

9    Dr. Sternberg criticized that deeper sample which had much

10   higher concentrations as being an outlier and excluded it from

11   his calculations.  I believe that the MIP logs clearly

12   demonstrate that the highest levels of contamination begin

13   approximately 2 feet below ground and extend to greater depth.

14   That sample is not an outlier; it simply reflects the pattern

15   of contamination in that first 4-foot soil interval, which was

16   the first slice in which I was estimating mass.  It's a valid

17   data point.  It should have been included in the mass estimate

18   as I did.

19   Q    And had Dr. Sternberg included that additional data in

20   his mass calculations, would it have had the result of

21   increasing the total amount of mass estimated in the northwest

22   corner?

23          MR. CRANE:  Objection.  Beyond the scope of the

24   rebuttal and the report.

25          THE COURT:  Well, it's beyond the scope of rebuttal.

1    Sustained.

2                MR. LYNCH:  I have no further questions.

3                THE COURT:  Do you have any cross?

4                MR. CRANE:  Just a couple of quick ones, Your Honor.

5                          CROSS-EXAMINATION

6    BY MR. CRANE:

7    Q    Good afternoon, Dr. Powell.

8    A    Good afternoon.

9    Q    If we could pull up Demonstrative 492, this is a similar

10   demonstrative to the one you just saw on direct; is that

11   right?

12   A    It's similar, yes.

13   Q    Right.  And if you see, in this area here, the light

14   shaded area, there are very few data points, correct?

15   A    That's correct.

16   Q    Now you mentioned a difference between you and

17   Dr. Sternberg on the east-west fenceline issue, and there were

18   some MIP logs, correct?

19   A    That's correct.

20   Q    But, in fact, Dr. Sternberg did ascribe perc

21   contamination to the western portion, correct?

22   A    Yes, he did.

23   Q    The soil data that you used for the other side of the

24   fenceline to impute to the other side of the fenceline, how

25   far away was that soil data?

1    A    It varies boring to boring, but roughly within 10 to

2    20 feet.

3    Q    Some of them were 20 feet away, right?

4    A    Some of them were probably 20 feet away, yes.

5    Q    Now on the ATC borings that you mentioned, the SB-4,

6    wasn't the SB-4 a reading that was taken after the remediation

7    system started up?

8    A    Yes.  It began -- it was taken a couple weeks after they

9    started remediation.

10            MR. CRANE:  Thank you.  No further questions.

11            THE COURT:  You can step down.  Thank you.

12            Any further rebuttal?

13            MR. LYNCH:  No, Your Honor.

14            THE COURT:  Sidebar.

15        (Discussion on the record at sidebar.)

16            THE COURT:  Well, it's going to take a while to get

17    instructions done in this case.

18            MR. CRANE:  (Nodded head affirmatively.)

19            MR. DAVIS:  (Nodded head affirmatively.)

20            THE COURT:  It could take the rest of the afternoon.

21            MR. JOHNSON:  I think you're right.

22            MR. CRANE:  I think that's fair.

23            THE COURT:  I'm going to release the jury and have

24    them come back at 9.  I have a doctor's appointment at 8.

25    I'll be done by 9.  Maybe I'll say we're going to shoot for

```
 1   8:45.

 2            I'm going to explain to the jury that if they're

 3   deliberating -- well, maybe I won't.  Maybe I'll keep that to

 4   myself.  I don't let juries deliberate anymore after 5 o'clock

 5   at night.  If we start at a quarter of 9 tomorrow, we ought to

 6   have this to a jury by around lunchtime.

 7            MR. DAVIS:  Eleven, 11:30, yeah.

 8            THE COURT:  What, did I give you 15 or 20 minutes a

 9   side?

10            MR. COZZENS:  Wasn't it three hours apiece, Judge?

11            THE COURT:  Yeah, right.  This jury would love to

12   hear you guys argue three hours a side.

13            I'll just tell the jury they'll get it by at least

14   lunch tomorrow, and then we'll see.  If they're still

15   deliberating at 5, we've got a problem, because I ain't going

16   to be here Friday.

17            MR. DAVIS:  I am.  I got something with Judge Ostby

18   on Friday.

19            THE COURT:  I mean, if I have to, I'll get Shanstrom

20   to -- I don't think it's going to take them -- well, it might.

21   I won't worry about telling them that I'm kicking them out of

22   here -- you know, it may be that tomorrow night, as I'm

23   standing here thinking about it, as I'm talking, hell, maybe

24   I'll let them go tomorrow night for a while if they get it by

25   noon.  Then I won't have to worry about it, so I won't talk
```

1    about anything like that.

2              MR. DAVIS:  It's pretty mild, so you won't freeze

3    them out of here tomorrow.  Isn't that your concern, with GSA

4    turning down the thermostats?

5              THE COURT:  Yeah.

6              MR. DAVIS:  But it should be relatively mild

7    tomorrow, so you could offend the folks in Denver if you

8    needed to.

9              THE COURT:  Or kick a window out.

10        (Open court.)

11        (Jury present.)

12             THE COURT:  Well, I have some good news and bad news

13   for you.  The bad news is I'm going to turn you loose now.  I

14   have to go through with the attorneys on the record a

15   process -- and I don't remember if I did this during the

16   *voir dire*.  I don't think so.  I may have.  If I did, pardon

17   me.

18             I have to go through a process of settling

19   instructions.  Each side -- did I tell you this?  Each side

20   has submitted -- they have a right to submit proposed jury

21   instructions.  There are a lot of legal issues in this case.

22   And you can imagine the number of legal issues maybe I don't

23   even know exist just by counting the number of lawyers that

24   are in this courtroom.

25             So what I'm going to do now is sit down with the

1    court reporter, all these lawyers, and we're going to go

2    through, and I will decide, after going through the

3    instructions -- and I've gone through them myself, but I'll

4    have to decide which instructions to give and which ones to

5    refuse.  That involves, sometimes, a lot of times, in a case

6    like this, reformulating the instruction.  It will be the

7    proper law to give to you.  It's your job to find the facts.

8    You apply to those facts the law as I give it to you.  So I've

9    got to decide what the instructions are going to be.  That's

10   going to take the rest of the afternoon.

11          The good news is you'll get it -- we'll start at a

12   quarter to 9 in the morning.  You'll get it tomorrow at least

13   by lunch, maybe even before.  You'll get it for deliberation

14   and verdict.

15          And the weather is crummy out there, my law clerks

16   tell me.  What is it, 60?  So we're going to be in recess, at

17   least as far as the jury is concerned, until a quarter to 9.

18          I'll see you, Counsel, in my chambers as soon as we

19   can get in there, and we'll get to work.

20          And I'll read the instructions to you folks first

21   thing tomorrow morning.  The lawyers will argue.  It will be,

22   then, submitted to you for deliberation and verdict.

23          Also, one of the things I should mention.  It's

24   going to be difficult -- we'll get it done, of course -- but

25   formulating the verdict in this case.  You'll have to answer

1    what are called special interrogatories, questions.  You'll

2    answer yes or no.  And it may be simple, but it may not be.

3    So I know the instructions are going to take a long time.  And

4    we'll get to work, and we'll stay here.  We'll stay here all

5    night until we get them done, but we'll get them done.

6              And so we're in recess.

7              I give you the usual admonition.  Don't talk amongst

8    yourselves.  Don't talk to anybody about the case.  Keep an

9    open mind.

10             We'll be in recess until 8:45 in the morning.

11             THE LAW CLERK:  All rise.

12        (Jury not present.)

13             MR. JOHNSON:  Your Honor, if I could, we do have a

14   motion for judgment.

15             THE COURT:  That's right.  Pardon me.

16             MR. JOHNSON:  Something else for you to read, Your

17   Honor.

18             THE COURT:  And they need to make a motion.  I

19   allowed them to reserve it.

20             Go ahead, Mr. Banker.

21             MR. BANKER:  Your honor, Soco moves the Court for

22   judgment as a matter of law on the questions of notice and

23   prejudice, judgment in Soco's favor against both USF&G and

24   Continental.

25             On the question of notice, Soco has the burden of

2010

1    proof, which means that it has the burden of production.  Soco

2    has presented evidence in its case in chief of notice, and

3    there has been no corresponding production of evidence by the

4    insurers on the question of notice.

5         Therefore, no reasonable jury could find in the

6    insurers' favor on the question of notice.

7         Stepping past that, on the question of prejudice,

8    the insurers have the burden of proof on the question of

9    prejudice, and in the insurers' case in chief, they have

10   presented no evidence of prejudice, so, therefore, no

11   reasonable jury could find in the insurers' favor on that

12   question.

13        Soco would ask for judgment in its favor on those

14   issues.

15        MR. JOHNSON:  Your Honor, the notice requirement

16   that we're talking about here is a notice of an occurrence

17   which allegedly took place a quarter of a century ago when a

18   spill occurred in 1975, 1976, or 1977, according to Soco, and

19   at a time and a place in which they understood that, as their

20   testimony has made clear, that a release of contamination to

21   the environment would indeed cause property damage.

22        The notice requirement, involving Continental's and

23   USF&G's policies, requires notice of an occurrence containing

24   reasonably obtainable information with respect to time, place,

25   and circumstances and the names and addresses of the injured

1    and of available witnesses as soon as practicable.

2            Obviously we didn't get notice of the occurrence.

3            Obviously we've been prejudiced by the failure to

4    give us any notice of the occurrence until after claims had

5    actually been filed against Soco.

6            With regard to the issue --

7            THE COURT:  I don't think prejudice is presumed, is

8    it?

9            MR. JOHNSON:  Prejudice can be proved inferentially,

10   Your Honor.  They're here today trying to prove inferentially

11   that a spill occurred.  I'm not asking you to presume

12   prejudice, Your Honor, but what we're asking you -- what we're

13   saying is that the evidence is replete with prejudice.  That

14   is, that witnesses have died; Quentin Dyce, in particular.

15   Witnesses have obviously lost their memory of events that

16   occurred.  There are obviously very different recollections as

17   to what occurred 25, 35 years ago.

18           There are no records of this so-called inventory

19   shortage which is the inferential evidence that they have with

20   regard to the fact that this occurred.  There are no records

21   of inventory, no records of inventory shortage, shortages.

22   There have been substantial changes in the configuration.

23   You've heard varying testimony as to what would happen if a

24   spill, the spill that's hypothesized by them, had indeed

25   occurred.  Obviously all we have left are historical photos,

2012

1    and you've heard contradictory evidence with regard to what

2    those historical photos show.

3           So just as they have convinced the Ninth Circuit

4    that you can prove something through piling inference upon

5    inference, I don't think we have to pile inference upon

6    inference, but clearly there was inferential evidence in the

7    record with regard to how we have been prejudiced by the loss

8    of witnesses and records and the passage of time.

9           The notice requirement, again, requires them,

10   requires them to give us the time, place, and circumstances of

11   the event that gave rise to the occurrence and the names and

12   addresses of the injured and available witnesses.  We were not

13   given such information 35 years ago when this allegedly

14   happened, and obviously we've been prejudiced by that.

15          We think that the evidence proves prejudice and that

16   the totality of the evidence proves prejudice inferentially.

17   I don't know, frankly, how else we could prove it other than

18   to explain to the jury that what the circumstances are here

19   with regard to the fact that we didn't get notice and that we

20   have obviously been prejudiced by our inability to interview

21   witnesses when their memories were fresh, people when they

22   were alive, and to review documents when they existed.  All of

23   those things are now gone, and I think, Your Honor, the

24   prejudice is obvious.

25          The other thing that gives rise to prejudice is, of

2013

1    course, had somebody told the insurance companies back in

2    1975, or '76, '77, whenever it might be, that, that there was

3    a spill of perc, efforts could have been undertaken with

4    regard to cleaning up the environment at that time to now

5    we're faced with a claim that potentially will require us, if

6    we were to be found liable, to pay millions of dollars.  Had

7    it been cleaned up at the time it happened, it obviously could

8    have been done much less expensively.

9           Finally, with regard to the issue of prejudice, they

10   have, they have withdrawn, they have withdrawn claims against

11   USF&G with regard to any policy issued before 1978.  This case

12   used to involve policies in '75, '76, and '77 that USF&G

13   issued to them.  It does no longer contain those policies.  In

14   other words, the loss here, the damage, the event, the

15   occurrence occurred before our first policy issued, and we

16   obviously, in the context of underwriting this, should have

17   been advised of that loss at the time that it occurred.  And,

18   as a practical matter, had that loss occurred, we either

19   wouldn't have written -- you know, inferentially I think it's

20   obvious that we either wouldn't have written that policy or we

21   would have asked for an exclusion.

22          THE COURT:  You're going a little overboard on that,

23   aren't you?

24          MR. JOHNSON:  Your Honor, I understand that this is

25   a new argument, but I think that it's absolutely true.  Had

2014

1    they told us, when we were their insured, back in '75, '76, or

2    '77, that they had this gigantic spill, before our policies

3    incepted in 1978 we would have said, "That spill is not

4    covered.  That spill is not covered.  Maybe we'll issue you a

5    policy.  Maybe we won't.  But if we issue a policy, we're not

6    about to cover you for your property damage that arises out of

7    that spill."

8            MR. CRANE:  Your Honor, if I could, for Continental,

9    just add one comment, and that is I don't think Continental

10   would be going overboard on that argument because they put

11   into evidence Exhibit 143, which is the Continental inspection

12   report, and we've heard testimony from, I think, Mr. Nelson

13   about the purpose for inspections.  It was obviously to find

14   out what the risks were, and that's clear from the exhibit

15   itself.

16           The testimony from Mr. Naff in relation to that

17   exhibit was they didn't tell us about the spill, so I think

18   clearly there is an inference for Continental to get to the

19   jury on that we were out there for a purpose.  It was an

20   underwriting purpose.  We wanted to find out what the risk

21   was, and they didn't tell us about it.  I think the jury

22   clearly can come to the conclusion that we were prejudiced

23   when we weren't told that in terms of issuing the policy, or

24   what kind of risk we would have undertaken.

25           THE COURT:  So what you're talking about is a known

2015

1  risk instruction for Continental?

2         MR. CRANE:  Well, I think it's that and an inference

3  that we were prejudiced by the late notice.

4         THE COURT:  Well, I'm not going to allow -- I mean,

5  I know what you're talking about, "inferences."  You're not

6  using that in the same sense as "presumption."

7         MR. CRANE:  No, not at all.  And it's circumstantial

8  evidence.  It's inference, but I think it's also known loss.

9  I agree with Your Honor.

10         THE COURT:  Well, I'm not going to consider known

11  loss for USF&G.  Maybe under those circumstances I will

12  consider an instruction, such an instruction for Continental.

13  I'm not sure yet.

14         Why are you standing, Mr. Banker?

15         MR. BANKER:  Just very briefly, Your Honor.

16         I think this is a lot simpler than Mr. Johnson and

17  Mr. Crane are making it.  Your Honor is correct that you

18  cannot infer or presume prejudice.

19         THE COURT:  You can't presume it.  Now I didn't say

20  you couldn't infer it.

21         MR. BANKER:  Well, there's been no witness from

22  USF&G or Continental who have taken the stand in this case to

23  explain how their companies have been prejudiced by any of

24  this, so what we have is Mr. Johnson making an argument.

25         THE COURT:  It would be more than an inference,

1    then.   That would be direct testimony.   What Mr. Johnson is

2    arguing is Soco has -- at least according to the Ninth

3    Circuit, you're entitled to -- and I don't know if I want to

4    use Mr. Johnson's description, pile inference upon inference.

5    I certainly wouldn't go that far.   But I think in this

6    situation you don't need direct testimony for a jury to find

7    or infer that, from this lapse of time of almost 30 years,

8    that there was prejudice.

9            MR. BANKER:   Well, I think that they are misstating

10   what the instruction was last time.   The instruction was, last

11   time, on the question of notice, you have to give notice of an

12   occurrence when you could reasonably anticipate third-party

13   property damage.   There is no evidence in this case from which

14   you can infer notice, that Soco had information of third-party

15   property damage any earlier than 1999.

16           THE COURT:   No, well, but let's talk about

17   inferences again.   If, as people testified, if there's a spill

18   and there's no way you can have such a spill without somebody

19   noticing it, number one, you could infer that it should have

20   reasonably been anticipated, I would think.

21           Also, if you design a facility like there was

22   testimony that says -- or that is designed to drain off

23   premises and drain out on somebody else's property, or even on

24   your property, pollutants, I would think you might be able to

25   reasonably anticipate a claim.   And talking about what I did

1    last time, I know I denied -- I'm looking at the transcript.

2    I denied your Rule 50 motion on the basis of the same motion

3    you're making now.  It wasn't you; it was Mr. Mielenhausen.

4            And I'm going to do it again for the reasons that

5    I've stated.  That your experts have testified this 250 to

6    1,000 gallons of perc was spilled in a sudden and accidental

7    fashion.  That it went down into that ditch and went out into

8    the northwest pasture.  The building or the facility was

9    designed for it to do that.  Again, there's been testimony, if

10   this kind of spill would have happened, there's no way on

11   earth that anybody would not have known about it; at least

12   that's what the insurers are going to argue.

13           I think, with those kinds of facts, it can be argued

14   that the insured was on notice and you either knew or should

15   have known that there was a damage, that it reasonably could

16   have been anticipated, and, therefore, your motion is denied.

17           MR. BANKER:  Thank you.

18           THE COURT:  Thank you.

19           Your motion, also, insurers, I know you're going

20   to -- are you going to renew it?

21           MR. JOHNSON:  We're filing a new motion, Your Honor,

22   but fundamentally it kind of looks like the one that we filed

23   at the close of our case.

24           THE COURT:  Well, I am -- is it -- I'm going to deny

25   it.

1          MR. JOHNSON:  What can I say?  What can I say?  We

2     filed it -- did we file it today?

3          MS. ENERSON:  Not yet.

4          MR. JOHNSON:  We will file it online, Your Honor.

5          THE COURT:  I have a clerk of court who has told me

6     that she'll open her veins if we have to try this a third

7     time.

8        (Laughter.)

9          MR. JOHNSON:  She's not alone, Your Honor.

10         THE COURT:  All right.  We'll do it in here.  You

11    guys can take your coats off.  Let's take a break.  We'll go

12    over these instructions.  Get your instructions out and get

13    your other stuff put away.

14       (Recess taken from 13:50:47 to 13:58:37.)

15       (Open court.)

16       (Jury not present.)

17         THE COURT:  All right.  Let's get started.

18         Stocks:

19         3.1.

20         3.2.

21         3.3, but I'm going to take out paragraph 3.  Oh, no.

22    No, I'm going to take out the first sentence.  I don't think

23    I've instructed them to disregard any evidence.

24         Can't you hear?  You need hearing aids.

25         MR. COZZENS:  It's a little hard to hear.

1          MR. JOHNSON:  It is a little hard to hear.

2          MR. COZZENS:  Not just me, Judge.

3      (Discussion off the record.)

4          THE COURT:  And let's see.

5          5.1.

6          3.5.

7          3.6.

8          Any objections to those stocks so far?  Do you know

9   which ones they are?

10         MR. MICKELSON:  I know 3.1, 3.2, 3.3.

11         THE COURT:  Well, 5.1 is burden of proof,

12  preponderance of the evidence.

13         3.5 is direct and circumstantial evidence.

14         3.6 is credibility of witnesses.

15         MR. MICKELSON:  Which was –– yeah.  No.

16         THE COURT:  Huh?

17         MR. MICKELSON:  We have no objection to those.

18         MR. BANKER:  No objection from Soco.

19         THE COURT:  All right.

20     (Discussion off the record.)

21         MR. MICKELSON:  The numbers that we have are the

22  beginning numbers.  These are the later numbers, and so

23  they're intro and it's the same instruction after.  That's the

24  difference.

25     (Discussion off the record.)

1           THE COURT:  Then I'm going to give Jury Instruction

2    No. 25, and this is USF&G and Continental's proposed.  I

3    looked at Defendant's Proposed -- Soco's, I'm going to say,

4    Soco's Proposed 15 that adds that italicized paragraph,

5    "However, an employee's knowledge is not considered to be the

6    corporation's knowledge if the employee, acting in his own

7    interest and adversely to the corporation's interest, does not

8    disclose his knowledge to the corporation."  I'm going to

9    refuse that instruction.  I don't think there was any evidence

10   that they acted in their own interest and adversely to the

11   corporation's interest.

12          Then I'm going to give 3.7, which is the stock for

13   opinion evidence, expert witness.

14          Then I'm going to give Soco's Proposed 17, which is

15   a stock, 2.13, which is that certain charts and summaries have

16   been introduced.

17          Now if there are any objections to these -- and I

18   should go back to that one.  If there are any objections, stop

19   me.

20          I should go back to -- I decided to give USF&G's

21   Proposed 25 over Soco's Proposed 15.  I think that's

22   sufficient, but do you have something else to say?

23          MR. BANKER:  Well, in Soco's view --

24          THE COURT:  You don't have to say something.

25          MR. BANKER:  I understand.

1          Soco's view of its proposed instruction, 15, is that

2     it comports more closely with the law.  There is a

3     well-established exception to corporate knowledge.  We believe

4     that the evidence supports the idea that if, given the

5     policies and procedures of the Dyce corporation as it existed

6     throughout the 1970s and 1980s, we're to report spills and to

7     treat spills as an emergency, and to the extent that a spill

8     happened and it wasn't reported, that would be an employee

9     acting outside the course and scope of their employment.  So

10    we think the instruction is appropriate as Soco proposed with

11    the italicized language at the end.

12          THE COURT:  All right.  Okay.

13          I talked about Soco's 17, charts and summaries.

14    Let's see here.

15          I'm looking now at Soco's Proposed 18, their

16    Proposed 19, and USF&G's Proposed 27.  No, wait a minute.  No,

17    forget 27.  Nineteen -- there's another one in here.

18          MR. MICKELSON:  Our 26?  Is that what you're looking

19    for, Your Honor?  Ours is similar to their 19.

20          THE COURT:  I might have shuffled this.

21       (Discussion off the record.)

22          THE COURT:  Doesn't look like there's any

23    difference.

24          MR. MICKELSON:  The only difference is they had

25    changed from "allegedly issued," which was in the last

1    instruction, to "issued," which, we would have no objection to

2    that.  I don't know about Continental.

3           THE COURT:  I'll give Soco's Proposed 19.

4           Does that cover what's on -- do I need to give 18,

5    Soco's proposed?  That's that -- I don't think I do.  That's

6    what that last one says, doesn't it?  You decide each case

7    separately?  One of these does that.

8           MR. MICKELSON:  We have the same one as No. 5, 18.

9    I guess the only --

10          THE COURT:  Oh.

11          MR. MICKELSON:  Just because there's two parties

12   here, I think, is the reason.

13          THE COURT:  I'm going to give Soco's Proposed 18.

14          Now I'm looking at USF&G's 27, Soco's Proposed 20.

15   It looks like it's the same except for the last sentence that

16   USF&G put in, and then there's a difference in the

17   defendant's; that is, they added D.W. Land Company, Dyce Land,

18   Inc.

19          MR. JOHNSON:  I don't think those names ever came up

20   in the evidence, Your Honor.

21          MR. MICKELSON:  (Shook head negatively.)

22          THE COURT:  Yeah, I didn't think they did, either.

23   Did they?

24          MR. COZZENS:  I don't think they did, Judge.

25          THE COURT:  Why do we need, then, the last -- I'll

2023

1    refuse Soco's 20.  Why do we need that last sentence in there?

2    Isn't that what that instruction says?

3          MR. MICKELSON:  It may be duplicative, Your Honor.

4          THE COURT:  It is.  I'm going to give USF&G and

5    Continental's Proposed 27, but the last sentence is stricken.

6          I don't want cause in here right now.  Hold that

7    off.

8          Now I'm looking at Soco's Proposed 21 and USF&G's

9    Proposed 28.

10          MR. COZZENS:  Judge, on our 21, we have a typo at

11    the bottom.  That should be '78, not '75.  Very last sentence.

12          THE COURT:  I do not like, I do not like the first

13    paragraph of either one.

14          MR. MICKELSON:  We'd be fine with the Court's

15    instruction from last time.  Both parties here modified the

16    last instruction slightly.

17          THE COURT:  Well, I've got to find it here.

18          MR. COZZENS:  Which one was that?

19          MR. MICKELSON:  Thirteen.  With the change in 1978,

20    obviously.

21          MR. COZZENS:  Right.

22       (Discussion off the record.)

23          MR. DAVIS:  We're okay with that.

24          MR. MICKELSON:  I would also add, Your Honor, that

25    that first paragraph, the one from last trial says, "cost to

1    clean up this pollution," and this case is a little broader

2    than that.  We added "for claims."

3                THE COURT:  No, I agree.  I'm not going to take

4    that.  But isn't the, isn't the question whether there was a

5    sudden and accidental spill or release at the Lockwood,

6    Montana facility in 1975, '76, or '77?

7                MR. COZZENS:  Or '78, first quarter of '78.

8                THE COURT:  When did the '78 –- yeah, I know you

9    guys have been talking about '78.  When did the '78 come in?

10               MR. JOHNSON:  It didn't, Your Honor.  I think he's

11   claiming property damage that occurred six months later.

12               MR. COZZENS:  No, I'm not.  I'm talking about Rob

13   Johnson's cross-examination of Mr. Hallsten where he said,

14   "Couldn't it have happened in the first quarter of '78?" and

15   Mr. Hallsten said, "Yes."

16               THE COURT:  Oh, did he?

17               MR. COZZENS:  Yes.

18               MR. BANKER:  He did.

19               MR. MICKELSON:  We should point out, this was a

20   statement-of-the-case instruction last time, not necessarily a

21   statement-of-law case, and perhaps we've already agreed to a

22   different statement-of-the-case instruction.  Maybe we don't

23   need this or we can utilize the one we used at the beginning.

24               THE COURT:  You know, in looking at my old one,

25   that's fine, except why do we say, "More specifically"?

1          MR. CRANE:  I don't think that that's a part of this

2    phase.  I don't think we need it.

3          THE COURT:  Well, maybe.

4          MR. BANKER:  I think that the problem with the one

5    last time was, Soco's problem with it is, that the concept of

6    a single, one-time spill release is adding language that is

7    not present in the insurance policy.  We can talk about a

8    sudden and accidental release, but a single, one-time release

9    I don't think is an accurate statement of what Soco has to

10   prove.

11         THE COURT:  You know, I agree, but there's only

12   evidence of one alleged spill.  Now we don't know what years

13   it allegedly occurred in.

14         Here is what I had penciled on Soco's Proposed 21:

15   "The case before you is about whether Soco can prove that a

16   sudden and accidental spill/release of perchloroethylene

17   occurred at its Lockwood, Montana facility in 1975, 1976,

18   1977, or early 1978 that caused pollution or contamination at

19   the Lockwood solvent Superfund site and whether there is any

20   insurance coverage for the costs for claims resulting

21   therefrom."

22         MR. COZZENS:  That sounds good to us, Judge.

23         THE COURT:  Pardon?

24         MR. COZZENS:  That sounds good to us.

25         MR. JOHNSON:  Your Honor, we'd object to the

1    insertion of the year 1978.  Their interrogatory answers, you

2    recall, that they filed in this case a long time ago said that

3    the single spill occurred in '75, '76, or '77.  Just because I

4    asked somebody on cross-examination in order to show that he

5    didn't have a very good recollection at all, that his

6    recollection potentially could be '78, I don't think undercuts

7    the interrogatory answer that we've all relied on in this case

8    as to when this occurred, and they've taken the position that

9    it could be '75, '76, or '77.

10           THE COURT:  You mean in the written interrogatory

11   answers?

12           MR. JOHNSON:  Yes, sir.

13           MR. WALSH:  Yes, and they're bound by that.

14           THE COURT:  Was there ever a claim that it was some

15   other time than those three years?

16           MR. JOHNSON:  Never.

17           MR. WALSH:  No.

18           MR. BANKER:  Well, before we move off of that point,

19   I mean, it is Mr. Johnson's question on cross-examination, and

20   the answer comes in as evidence, and so he elicited the

21   testimony.  So to say that it's merely for --

22           THE COURT:  Yeah, I understand what you're saying.

23   I'm going to leave "or early 1978."  I think you're right,

24   although I don't think that's going to be a turning point.

25           Looking back at Proposed 21, I'm going to give that

1    first paragraph as I read it.

2              I'm going to give the second one.

3              I mean, I'm still at a loss; looking at the third

4    paragraph, why do we need to say, "More specifically"?

5              MR. CRANE:  We don't think you need to, Your Honor.

6              THE COURT:  "The parties -- Soco, USF&G and

7    Continental -- are here in court to have you, the jury, decide

8    certain facts that are necessary to resolve the questions that

9    determine whether the insurance policies" -- so in the third

10   paragraph, I'm going to strike that whole first sentence, and

11   then the second sentence of the paragraph I will leave in.

12   I'm going to change '75 to '78.

13             Are there objections?

14             MR. BANKER:  No.  Soco agrees with that.

15             MR. MICKELSON:  We are agreeing with that.  Are we

16   in agreement with that statement?

17             MR. JOHNSON:  We're in agreement to the second

18   paragraph, obviously.  My objection has been stated with

19   regard to the 1978.

20             THE COURT:  Yes.

21             MR. CRANE:  Your Honor, before we move off of that,

22   I think the last three words of that paragraph now don't fit

23   because that referred to the "more specifically" paragraph.

24             THE REPORTER:  I'm having a hard time hearing you.

25   I'm sorry; just that last --

1           MR. CRANE:  The last three words of the third

2    paragraph I don't think we need, because it's a remnant now

3    from the "more specifically" that you struck, so I think we

4    could put a period after "provide coverage."

5           MR. COZZENS:  We don't object to that, Judge.

6           THE COURT:  No, I agree with you.  They're off.

7           Okay.  And I'm refusing USF&G's 28 because I already

8    took care of it.

9           I'll give Soco's Proposed 22.

10          MR. WALSH:  There might be a problem with that, Your

11   Honor.  This combines the definition of both "property damage"

12   and "occurrence," but their title references only property

13   damage, so perhaps it should be two instructions if it's going

14   to be titled in that fashion.  It's a little misleading to

15   bear the "occurrence" definition.

16          THE COURT:  Say it begin.

17          MR. WALSH:  Soco's 22 includes both a "property

18   damage" definition and an "occurrence" definition, but as I

19   see their proposed title, it's as to the "property damage"

20   definition.  Perhaps this should be either retitled or split

21   into two instructions.

22          THE COURT:  No, this -- no.  The title, nothing

23   below the instruction the jury sees.  This is just for our

24   benefit.  When I, when I give the instruction, when the jury

25   gets them, everything below the substantive part of the

1    instruction, everything under "Working Set Information" is

2    not -- none of that is on there.

3              MR. WALSH:  (Nodded head affirmatively.)

4              THE COURT:  You understand that, don't you?

5              MR. WALSH:  Yes.

6              MR. MICKELSON:  We have no objection to the

7    Defendant's Proposed No. 22.

8              THE COURT:  Use "Soco" instead of "defendant."

9              MR. CRANE:  All right.  Your Honor, one point on

10   that, since we're combining the "property damage" definition

11   and the "occurrence" definition into one under Soco's 22, I

12   wonder if we could take up the issue on Insurers' 31, the last

13   paragraph.

14             THE COURT:  Yeah, I've got it next.

15        (Discussion off the record.)

16             THE COURT:  Why wouldn't I give the whole

17   instruction, except doesn't it require that Soco did not

18   expect nor intend?

19             MR. CRANE:  Yeah, although I don't think from

20   Continental's perspective we're accusing them of intentional.

21   We're just accusing them of expectation, so from our

22   perspective, we don't need the "intentional" part, but I agree

23   that all of 31 ought to go in.

24             THE COURT:  Objections?

25             MR. LYNCH:  To 31?

1          THE COURT:  To the Insurers' Proposed 31.

2          MR. LYNCH:  Certainly the final sentence of the

3    instruction, "If Soco expected any kind of contamination,"

4    that's just language that's simply not in the policy.

5          MR. BANKER:  And to the extent that you're already

6    giving Soco 22 that has a definition of "occurrence," I think

7    that their 31, the first paragraph, is duplicative.  So either

8    you would cut out from Soco 22 or not include the insurers'

9    first paragraph of 31.

10          MR. DAVIS:  I think that was Brian's point.

11          MR. CRANE:  The easiest way to solve this, I think,

12    Your Honor, is to give Insurers' 29, 30, and 31 and not give

13    Soco 22.  We've got all three concepts in there, then.

14          MR. BANKER:  Soco disagrees with that.  The

15    Insurers' Proposed Instruction 31, for example, is

16    incorporating redundancy on --

17          THE COURT:  Let me just read them all here first.

18      (Discussion off the record.)

19          THE COURT:  Twenty-three is covered by 22, and 23 is

20    covered by -- or 30 is covered by 23, also.  Twenty-three is

21    just a nice, simple statement.  Doesn't that pretty much say

22    it all?  Oh, they're talking about 22.  No. 30 is covered by

23    22, also.  No. 29 is covered by 22.  And then it looks like 31

24    is also -- yeah, 29, 30, and 31, when I went through it

25    before, I put down, "Covered by Soco's 23," and as I review

1  them again, it still appears that way to me.

2          MR. WALSH:  Your Honor, all parties' verdict forms

3  handle occurrence and property damage separately.  I mean,

4  these are separate elements for the jury to decide.  The

5  instructions -- I mean, all parties agree on that.

6          THE COURT:  Well, but don't I give instructions

7  coming up on property damage requirements --

8          MR. WALSH:  Those would appear to be similar, but I

9  think the "occurrence" definition instruction, No. 31, should

10  be given separately.

11          MR. CRANE:  Yeah, that doesn't seem to be covered by

12  their 22 and 23, Your Honor.

13          THE COURT:  All right.  I'm going to give the whole

14  first paragraph and the first sentence of the second

15  paragraph.  I'm going to strike the third.  I think it's --

16          MR. MICKELSON:  Which one are you on?

17          THE COURT:  I'm looking at 31.  And maybe I will

18  just put the whole thing in.  Let me read it.

19          "If Soco expected any kind of contamination,

20  coverage is precluded even if the damage caused was of a

21  different character, magnitude, or extent than the damage Soco

22  expected."

23          Now what was your position, Mr. Banker, that that's

24  not a correct statement of the law?

25          MR. BANKER:  Well, the last sentence of their 31,

1    it's objectionable because that's not what the policies say.

2    I mean, the concept there, any kind of contamination, Soco

3    could have -- we're talking about third-party contamination in

4    this case, and I think that last sentence there is gratuitous.

5         But my larger point was that the language on

6    "occurrence" that we have in Soco's Proposed 22 is saying

7    essentially what the first paragraph of the Insurers' 31 is

8    saying.  I don't think that there's a material difference.

9    The fact they're contained in one instruction I don't think is

10   a problem.

11        And then we go on.  If you are considering them

12   together, Soco's 23 then goes on to incorporate some of the

13   concepts, I think all of the concepts that the insurers are

14   asking -- if you take Soco's 22 and 23, that covers what the

15   insurers are asking for in their 29, 30, and 31.

16        MR. CRANE:  Your Honor, here is the problem.  They

17   don't have, in their 22 and 23, they don't have the

18   burden-of-proof language on the "occurrence" requirement,

19   No. 1.

20        No. 2, the cases we've cited in support of the last

21   sentence of our 31 support the point; that is, we don't want

22   them to be arguing to the jury, "Well, gee, we didn't know the

23   groundwater contamination was going to be that bad."  That's,

24   that's not what the law is.  If they expected any kind of

25   contamination out there, then it's expected, and they can't

1   parse it that way, and that's what those cases that we've

2   cited say.

3          MR. BANKER:  Soco has never argued that there was

4   groundwater contamination and now the groundwater

5   contamination is worse than Soco expected.  Soco's position is

6   that it never expected groundwater contamination.  It had no

7   reason to expect groundwater contamination regardless of what

8   might have been known about a spill released to the northwest

9   corner.

10         So I think that -- I mean, the Insurers' Proposed 31

11  is a manuscript instruction.  I think it gives undue weight to

12  the burden of proof.  You see it repeated in 29, 30, and 31

13  again and again.  The burden-of-proof instruction is out

14  there, preponderance of the evidence.  You instruct that Soco

15  has the burden of proof.  We don't need to repeat that over

16  and over and over.

17         THE COURT:  Well, you know, I'm looking at last

18  time's -- my instruction from last time.  I can't tell you

19  what offer it is.  It's Instruction No. 15.  That's the

20  "property damage" requirement.

21         MR. MICKELSON:  Your Honor, I think if you look at

22  these three instructions as the three distinct elements, the

23  29, the Insurers' 29 is "property damage" defined, 30 is that

24  property damage is required, and 31 is the "occurrence" and

25  "expected" requirement, and I think that if you look at it in

1    those terms, as three distinct parts of this policy, then they

2    should be set forth in each, in each instruction so the jury

3    understands that they are distinct.  And with respect to the

4    burden of proof, the standard instructions continually refer

5    to burden of proof to make sure they know who has the burden

6    on each of those instructions.

7            THE COURT:  No, what you're saying there is true.

8    Yeah, what you guys are talking about is those three as an

9    alternative to 22.

10           MR. MICKELSON:  And 23, essentially.

11           MR. CRANE:  Right.

12           MR. MICKELSON:  Their 23 is the "property damage

13   required" portion.

14           THE COURT:  Okay.  Your 29 is taken from No. 14 in

15   the last case, modified to exclude, quote, "Each policy

16   defines 'occurrence' as an accident, including continuous or

17   repeated exposure to conditions which results in property

18   damage neither expected nor intended from the standpoint of

19   the insured."

20           MR. MICKELSON:  We added that to 31.  We split that.

21           THE COURT:  Then your Proposed 30 is this Court's

22   instruction in the last case, No. 15 --

23           MR. MICKELSON:  Correct.

24           THE COURT:  -- modified to solely apply to

25   government cleanup.  Why did you modify that?

1          MR. CRANE:  I think that's the issue the parties

2     were trying here, is to make it clear to the jury.

3          MR. BANKER:  Actually I don't think that's the issue

4     that we're trying here.  The insurers have asked for the

5     consolidation of the *Burbank* claim, and there are still issues

6     with respect to Continental as to the *Weiss* claim.  So there's

7     more than just the government claim.  I don't know exactly

8     what the treatment of that needs to be, because I think that

9     the understanding among everyone is that we'll decide "sudden

10    and accidental," and that will apply to all.

11         THE COURT:  Well, all we've been talking about is

12    the third-party cleanup claims.

13         MR. BANKER:  Yeah.

14         MR. JOHNSON:  I think that the stipulation was, and

15    we could go back and take a look at it, but that we would try

16    this case insofar as we're talking about third-party cleanup

17    and that it would be binding, obviously, on both parties with

18    regard to the *Burbank* claim, which is yet to be resolved.

19    That's my understanding.  That's probably in the pretrial

20    order.

21         MR. CRANE:  Yeah, that was our understanding as

22    well.  That's why there was no evidence of *Burbank* in the

23    case.

24         MR. DAVIS:  I mean, there's just a host of evidence

25    about EPA doing this and EPA doing that, and that just

1    references that again, the government cleanup.  That's all

2    they've heard about, but they have heard about it repeatedly.

3          THE COURT:  So why don't I just give my 14 and 15

4    from last time?

5          MR. JOHNSON:  Your Honor, just to clarify this issue

6    of *Burbank*, can I be heard?

7          The pretrial order on page 10, it talks about the

8    handling of *Burbank* issues and says, "The parties have reached

9    an agreement on the handling of *Burbank* issues in the Phase 1

10   trial.  Phase 1 will determine whether groundwater

11   contamination was caused by an occurrence and arose out of a

12   sudden and accidental release.  That determination will apply

13   to all parties and claims in *Weiss* . . . and in the *Burbank*

14   matter."  All other issues relating to *Burbank* will be

15   reserved to Phase 2.

16         MR. COZZENS:  Your Honor, back to the point.  Why

17   don't you give the 14 and 15 that you gave last time?

18         THE COURT:  Yeah.  What's wrong with them?

19         MR. DAVIS:  I don't have them in front of me.

20         MR. MICKELSON:  I have portions of them.  His 14 was

21   our 29 except we split the "occurrence" off, and his 15 is our

22   30.

23         MR. WALSH:  Well, again, same issue, Your Honor.

24   The jury is being asked in the verdict form to decide

25   "property damage" and "occurrence" separately, so they should

1  be separate instructions.

2       (Discussion off the record.)

3            THE COURT:  I gotcha.

4            MR. BANKER:  You know, I think that the reason

5  they're all grouped together in 14 is because if you look at

6  the first sentence of 14, it talks about what the grant of

7  coverage is, "obligated to pay as damages because of property

8  damage to which the insurance applies caused by an

9  occurrence."  It then goes on to define, in the next sentence,

10 the concept of "property damage," and then, in the sentence

11 after that, the concept of "occurrence."  So it's all in one

12 place there in three sentences.  The alternative would be to

13 have three instructions, each one sentence long.  I think it

14 makes more sense to give it as it was given last time.

15           THE COURT:  I am going to give my 14 and 15 from the

16 last trial, and I am not going to give 22.

17      (Discussion off the record.)

18           THE COURT:  You guys showed your 22 as my 14.

19           MR. LYNCH:  That's correct, Your Honor.

20           THE COURT:  Is it word for word?

21           MR. LYNCH:  I believe so.

22           THE COURT:  Yeah, we're going to give 22.  I guess I

23 just want to waste you guys' time.

24           I'm going to refuse 29, 30, and 31.  I'm going to

25 give 14 and 15 from the last case.

1          All right.  Now Soco's Proposed 23 is my 15.  So I'm

2     going to give their 22, and I'll give 23 because that's my 15

3     from the last time.

4          Now Soco's Proposed 24, apparently, is my 16, except

5     it has those last three or last number of words added.  Now

6     you guys were objecting to me talking about ditches and

7     waterways, and now you want me to put "atmosphere, any

8     watercourse, or body of water"?  Be glad to, but I'm going to

9     go back to the ditches and stuff if that's what you want.

10         Just kidding.  Those words are coming out.

11         I'm going to give your 24, which, absent the last

12    words, quote, "the atmosphere or any watercourse or body of

13    water," that's being stricken, and it will be the same as my

14    16 from the prior trial.

15         MR. MICKELSON:  Your Honor, there was also an

16    addition at the top there, "dispersal, release, or escape,"

17    modified from your previous 16.

18         MR. LYNCH:  And that, we have no objection.  That

19    was just included because that's the policy language, but we

20    have no objection if you want to take those three out.

21         THE COURT:  Well, you know, I guess I ought to

22    consider this with USF&G's Proposed 32, which is 16, also, but

23    it has, oh, "the alleged one-time discharge . . . flowed

24    through a ditch or ditches."  Yeah.  I'm going to refuse 23 --

25    or, I mean, 32, and I'm going to give Proposed 24 with the

1   deletion of those last words as I've said.

2          Did anybody offer any similar to my Instruction

3   No. 17 from the last case?

4          Let's take a break.

5       (Recess taken from 14:46:22 to 14:56:22.)

6       (Open court.)

7       (Jury not present.)

8          THE REPORTER:  Judge, there is reference and use in

9   the transcript to Exhibit 3674 as if it had been received, but

10  you never did say it was received.

11         THE COURT:  All right.

12         MR. GROSSBART:  We certainly used it.

13         THE COURT:  3674 is admitted.

14      (Exhibit 3674 was received in evidence.)

15         THE COURT:  Okay.  Now my Instruction No. 17 is

16  included in Soco's Proposed 25, and do they have the

17  italicized language -- and this brings, I think this raises

18  the issue of "substantial factor" versus "proximate cause."

19         MR. MICKELSON:  Which, we're not trying a personal

20  injury case.  This is a contract case, so I don't see where

21  that comes in.  It's the language of the policy.

22         MR. WALSH:  They also proposed this language last

23  time, Your Honor, and you rejected it.

24         THE COURT:  Say again?  They did propose it?

25         MR. WALSH:  I believe so.  We talked about

                                2040

1    contributing factors, substantial factors.

2            MR. BANKER:  I think that Montana law is quite clear

3    on the question in the context of the pollution exclusion that

4    "arising out of" means a predominant factual cause.  And there

5    is a component here; if you think back on the evidence, the

6    insurers are arguing about other source areas contributing to

7    the groundwater plume that goes to the northwest.  Soco is

8    only seeking coverage for the northwest corner.  I think that

9    the language about "substantial factor" will help clarify

10   that.  If they believe that the northwest corner is a

11   substantial factor and there is evidence to suggest that, it

12   will clarify that that's all that's required, even if other

13   causes upstream are contributing to the problem.

14           THE COURT:  Does this allow seven inferences on top

15   of each other?

16           MR. BANKER:  I don't think that there's any

17   inference.  It just clarifies.

18           THE COURT:  I'm just kidding you.  This is another

19   piling inferences on inferences.

20           MR. BANKER:  I can't see the bottom half of your

21   face, Your Honor.

22       (Laughter.)

23           MR. MICKELSON:  Your Honor, we don't believe that a

24   "substantial" -- I mean, if we're going to give a "substantial

25   factor," then there's a whole bunch of other things that we

1    have to put in here as far as "proximate cause," and it just

2    isn't a "substantial factor" case.  They're seeking coverage

3    for the pollution, and the key issue here is whether there was

4    a sudden and accidental release.  We're not trying to divide

5    up the two, and there's insufficient evidence to do so.

6    That's all Phase 2.

7         MR. CRANE:  The other thing, Your Honor, is I don't

8    think it's an accurate statement of Montana law.  We've

9    proffered Instruction 34, which we think is the appropriate

10   one in this context.  But I think the Court certainly should

11   not give the italicized portion of their 25.  It's just not

12   accurate, not applicable.

13        THE COURT:  Does your 34 use, what, a causal

14   connection?

15        MR. CRANE:  Pardon?

16        MR. MICKELSON:  That's what your 34 uses as far as

17   a --

18        MR. CRANE:  Oh, that Soco must prove by a

19   preponderance of the evidence how much of the contamination

20   for which it is liable resulted from the sudden and accidental

21   discharge.

22        MR. COZZENS:  That is not Montana law.

23        MR. BANKER:  I don't think it's ever been --

24        THE COURT:  How is there evidence in this record of

25   how a jury could make that determination?

1          MR. CRANE:  Well, I think both parties put in

2     evidence of that.  I think that their experts talked something

3     about the 10 to 1 ratio or something, and our experts disputed

4     that.  But it certainly is not Montana law that, if there is a

5     drop of sudden and accidental discharge out there and the

6     overwhelming cause of the contamination is nonsudden and

7     accidental, that they win.

8          THE COURT:  No, but in this case, it's been -- I

9     mean, there isn't any dispute there's perc out there.  It

10    either got out there because Soco/Dyce was dumping it out

11    there and it wasn't a sudden and accidental discharge, or it

12    was.  Isn't that it?

13         MR. COZZENS:  Yep.

14         MR. CRANE:  And that's why we don't need their

15    italicized paragraph.

16         THE COURT:  Yeah, I think you're right.

17         MR. MICKELSON:  Your Honor, there is one other issue

18    with this instruction.  It's a little bit misleading, and it's

19    not an accurate recitation of the language of the insurance

20    policies, because the insurance policies, if you look, for

21    example, at the Insurers' 32, the insurance policy provides

22    that it excludes coverage for property damage arising out of

23    the discharge, dispersal, release, or escape of pollutants or

24    other irritants into or upon the land, the atmosphere, but

25    this exclusion does not apply that such a discharge,

2043

1    dispersal, release, or escape is sudden and accidental.  And

2    what they, in here, do is put those two concepts together and

3    talk about which occurred during the policy's time period,

4    "arose out of a sudden and accidental" spill.  So it doesn't

5    track the policy language.

6              THE COURT:  What doesn't track it, specifically?

7              MR. MICKELSON:  Where they say, in the first

8    paragraph, that it "arose out of a sudden and accidental

9    discharge."  That's not language from the policy.  What the

10   policy says is that the property damages arise out of a

11   discharge, but it's excluded if the discharge is sudden and

12   accidental.

13             MR. JOHNSON:  It's an exclusion with an exception.

14   The exclusion, Your Honor, applies to all pollution, property

15   damage arising from pollution.

16             THE COURT:  I know.  And the "sudden and accidental"

17   is the exception.

18             MR. JOHNSON:  Correct.  And they just stick the

19   "arising out of" in the wrong place.

20             MR. BANKER:  Well, it isn't, it isn't that Soco did

21   that.  That is -- I mean, Soco's instruction is the Court's

22   Instruction No. 17 from the last time.

23             THE COURT:  Yeah.

24             MR. BANKER:  The only thing Soco added was the

25   italicized language at the bottom.

1          THE COURT:  "In order to obtain property damage

2    liability coverage under any USF&G or Continental insurance

3    policy, Soco has the burden of proving that groundwater

4    damage, if any, which occurred during that policy's time

5    period arose out of a sudden and accidental discharge,

6    dispersal, release, or escape of perchloroethylene."

7          Well, what's wrong with that?  That sounds just -- I

8    mean, we have the occurrence; that in order to obtain the

9    coverage, they have to prove that the damage was a result of

10   an occurrence that arose out of a sudden and accidental

11   release.

12         MR. MICKELSON:  They have to prove the property

13   damage arose out of a discharge that is sudden and accidental.

14   I mean, that's the way the policy reads for the exception to

15   apply.

16         THE COURT:  I know, but isn't that what it's saying

17   in terms you can understand?  And I say "that"; I'm talking

18   about my 17.

19         MR. MICKELSON:  Right.  I understand that.

20         THE COURT:  Well, I'm going to give my 17.  I'm not

21   giving -- I'm refusing 25 because of that other language.

22         MR. MICKELSON:  And, Your Honor, just for the

23   record, we'd also object to the definition of "arose out of"

24   because it's not in the policy.

25         THE COURT:  I know, but I --

1              MR. MICKELSON:  I understand.

2              THE COURT:  I think the last time I believed it

3    needed to be in there because of what's called the law.

4              MR. MICKELSON:  Yes, sir.  I understand.

5              THE COURT:  All right.  Now Soco's 26 is my No. 18.

6    I'm going to give it.

7              Soco's 27 is my 19.

8              I don't know.

9              MR. MICKELSON:  It's modified.

10             THE COURT:  You know, I'm still looking back at 18.

11   Haven't we agreed there wasn't any -- nobody is claiming

12   intent?

13             MR. CRANE:  Your Honor, I think this instruction --

14   I was just going to try to break in.  I think their 26 is not

15   appropriate at this point.  We are only claiming expected

16   damage.

17             MR. COZZENS:  Well, maybe that's Continental's

18   position, but we sure heard an awful lot about intentional

19   pumping out of wastewater.  The jury heard it.

20             MR. BANKER:  I think the insurers' entire argument

21   in this case has been to accuse Soco of intentional pollution.

22   I think that 26 is entirely appropriate.

23             THE COURT:  Yeah, I'm going to leave 18 in there.

24             Now No. 27 is my 19.  No, it isn't.  They added

25   stuff.  They added "when a property damage claim against the

1   insured."

2           MR. MICKELSON:  I believe that's an argument, not a

3   statement of law.

4           THE COURT:  I agree.  I'm going to refuse 27 and

5   give my 19.

6           MR. WALSH:  Your prior 19, Your Honor?  It was the

7   prior 19, right?

8           THE COURT:  The prior 19 is what I'm giving.  I'm

9   going to refuse USF&G and Continental's Proposed 35 on the

10  grounds it's covered by my 19.

11          Now I'm looking at Soco's Proposed 28.

12          MR. JOHNSON:  Your Honor --

13          THE COURT:  This is new.

14          MR. JOHNSON:  I'm sorry.

15          MR. COZZENS:  We withdrew that, Your Honor.

16  Twenty-eight has been withdrawn.

17          Is that the waiver, Marshal?

18          MR. MICKELSON:  Yes.

19          MR. COZZENS:  We withdraw that, Judge.

20          THE COURT:  We're not considering 28.

21          MR. MICKELSON:  Your Honor, can we be a little

22  bit -- can we understand what your 19 was?

23          THE COURT:  Yeah.  I'll be glad to read it to you.

24          MR. MICKELSON:  Sure.  Thank you.

25          THE COURT:  "The insurance policies in this case

1   require Soco West or its predecessors, in the event of an

2   occurrence, to provide written notice containing reasonably

3   obtainable information with respect to time, place, and

4   circumstances and the names and addresses of the injured and

5   of available witnesses to USF&G and/or Continental as soon as

6   practicable.  The phrase 'as soon as practicable' means within

7   a reasonable time from the date when a claim is made or can be

8   reasonably anticipated."

9          MR. JOHNSON:  Your Honor, we objected to that last

10  time, and obviously I think our objections are shown on the

11  record because we've submitted an instruction that doesn't

12  have that last statement in it.  That last statement is taken

13  out of case law, and I think the case law on this issue with

14  regard to "as soon as practicable" and the definition thereof

15  doesn't necessarily require that the claim be made -- that "as

16  soon as practicable" means when the claim is made or can be

17  reasonably anticipated.  Our position is that "as soon as

18  practicable," in itself, doesn't need a definition.  That's

19  the requirement of the insurance policy language.  It's plain

20  and unambiguous, and it doesn't need the added paragraph that,

21  in effect, modifies those plain and unambiguous words.

22         THE COURT:  Well, I doubt if I got the definition of

23  "as soon as practicable" out of thin air.  I'm really not

24  going to go back to the arguments from last time, and I think

25  there is some Montana authority that talks about it, so I'm

2048

1    going to give it anyway.

2                MR. JOHNSON:  Okay.

3                THE COURT:  Now we're looking at defendant's, or

4    Soco's, Proposed 29, notice of occurrence.

5         (Discussion off the record.)

6                THE COURT:  Well, this is prejudice.

7         (Discussion off the record.)

8                THE COURT:  You guys object to that?

9                MR. MICKELSON:  Yes, Your Honor.  We think that what

10   they're doing is utilizing their argument or their argument

11   into the instruction and not stating Montana law as you've

12   ruled in the *Patrol Helicopter* case.  We can provide an

13   alternative instruction, and I haven't had a chance to talk to

14   Continental about an alternative that we've drafted.

15               THE COURT:  Well, let's work one out here.  We're

16   going to need one, I think.

17               MR. MICKELSON:  If you're going to rule prejudice is

18   present, we'll probably need one.

19               THE COURT:  Yeah.

20               MR. BANKER:  What is the insurers' objection to

21   Soco's 29, assuming prejudice is in the case?

22               THE COURT:  You know, the word "actually" I've got

23   penciled in above your "materially."

24               MR. MICKELSON:  And I don't think it's a complete

25   statement of the law.  There's a couple of issues here with

2049

1    regard to notice.  There is the idea of notice when notice can

2    be excused and then prejudice.  I think there's three parts

3    that both the *Murnion* case talk about and your decision talk

4    about, and both of those cases talk about notice can only be

5    excused when the accident is trivial, results in no apparent

6    harm, and furnishes no reasonable ground for Soco to believe

7    that a claim might arise.

8         Then you have the issue of prejudice.  If you find

9    Soco failed to give notice as soon as practicable, the

10   insurers must prove by a preponderance of the evidence that

11   they suffer prejudice.  Prejudice includes denying the

12   insurers the opportunity to acquire full information about the

13   circumstances of the case, assess its rights and liabilities,

14   and take early control of the proceedings, and that's out of

15   your *Patrol Helicopter* case.

16        THE COURT:  I've got that case in front of me.

17        MR. BANKER:  I think if we go much further than what

18   Soco is proposing in its Proposed 29, then we are getting into

19   Phase 2 issues about claims-handling.  I think Soco's

20   Proposed 29 accurately states what the prejudice issue is.

21   Soco is not arguing excuse.  The question before the jury will

22   be, Was notice provided as soon as practicable, on the one

23   hand, and, if not, whether the insurers have shown actual

24   prejudice as a result.

25        MR. MICKELSON:  Well, I think there needs to be some

1    instruction to the jury about prejudice and what it, what it

2    means, and your opinion talks about that.

3            THE COURT:  What page were you on?

4            MR. MICKELSON:  Of your opinion?

5            THE COURT:  Yeah.

6            MR. MICKELSON:  It's at least on page 11, as

7    indicated on the Westlaw internal citation and page 10 of the

8    Westlaw printout.  I can approach the bench and show you, Your

9    Honor, if you want.

10       (Discussion off the record.)

11           MR. MICKELSON:  And, Your Honor, just to point out

12   that the *Helicopter* case was a case involving notice of a

13   claim versus notice of occurrence, which is a different issue

14   than we have here.

15           THE COURT:  It was a liability policy.

16           MR. MICKELSON:  It was.  But there's two parts.

17   There's notice of occurrence and notice of a claim.

18           MR. BANKER:  What we get from *Patrol Helicopter* is

19   the general concept that Montana would be a notice/prejudice

20   state.  I don't think that it is appropriate to go any

21   farther -- I mean, the instructions have to reflect what the

22   evidence has been in the case, and as we talked about in

23   Soco's motion for judgment as a matter of law, the insurers

24   have presented no evidence about how their claims-handling

25   would or could have been affected by this.  So if they're

1    allowed to make arguments, that's one thing, but the

2    instruction, I think, should be limited to just the question

3    that they have the burden of proving prejudice.

4            MR. DAVIS:  We'll agree to that.

5            THE COURT:  Well, the only question I really have

6    is, in 29, is whether it should say "actually" or "materially"

7    prejudiced.

8            MR. LYNCH:  "Materially" is fine with Soco.

9            MR. COZZENS:  We would agree with "materially."

10           THE COURT:  Pardon?

11           MR. COZZENS:  We would agree with "materially," if I

12   can say it right.

13           THE COURT:  That was in the -- I'm going to change

14   "actually" to "materially," and then I'm going to give 29.

15   You guys can argue, but I'm going to give it.

16           Okay.  Then we have -- wait.  Then I'm looking at

17   USF&G and Continental's Proposed 9.

18           MR. DAVIS:  Which one, Judge?

19           THE COURT:  Your Proposed 9, "The absence of

20   evidence does not create an inference that the missing fact

21   exists; rather, it indicates a failure of proof."

22       (Discussion off the record.)

23           THE COURT:  You guys object to that?

24           MR. BANKER:  Yes, we do, Your Honor.  I think that

25   your initial instruction, 3.5, on direct and circumstantial

2052

1   evidence covers the concept.  I don't think that Insurers'

2   Proposed Instruction No. 9 comports with the law or with the

3   Ninth Circuit's instruction in this case, particularly with

4   respect to the first sentence.  I think that's just wrong.

5   It's not a correct statement of the law.

6          THE COURT:  I'm going to get these cases.

7          MR. MICKELSON:  I have them, if you want them.

8          THE COURT:  He's coming for them.

9          MR. MICKELSON:  (Handing.)

10         MR. JOHNSON:  Your Honor, while we're doing that, I

11  just want to make sure the record reflects that USF&G objects

12  to the "prejudice" requirement.  I just want to make it

13  crystal clear that we're objecting to that instruction with

14  regard to the requirement of prejudice.

15         THE COURT:  That's fine.  I think you've done it.

16         MR. JOHNSON:  I think so, too, but I wanted to make

17  sure.

18         THE COURT:  Any of the rest of you going to be on

19  senior status in three years or so?

20      (Laughter.)

21      (Discussion off the record.)

22         THE COURT:  Yeah, now this *Bieghler v. Kleppe* is a

23  summary judgment case, but there is some relevant language.

24         "In this circuit we use the federal standard to

25  measure the sufficiency of the evidence to raise a fact

1    question, even when state law supplies the substantive rule of

2    decision. . . .  The federal test is whether the evidence in

3    its entirety would rationally support a verdict for the

4    plaintiff, assuming a view of the evidence most favorable to

5    the plaintiff.  The inferences necessary to support a

6    plaintiff's verdict must, however, have a sufficient

7    evidentiary basis.  The evidence is insufficient if the

8    strongest inference to be drawn in the plaintiff's favor is

9    that defendant's negligence could possibly have been the cause

10   of an accident. . . .  The evidence must make one explanation

11   of cause more likely than another."

12          Isn't that covered in that burden of proof and the

13   definition of direct and circumstantial evidence?  You can

14   talk about this.  Why am I going to give an instruction on --

15   I mean, they have to prove, they have to be convinced more

16   likely than not that this spill occurred and it went over

17   there and caused this contamination.

18          MR. CRANE:  I think, Your Honor, that the point of

19   this is it's a slightly different issue than the

20   circumstantial evidence instruction.  The focus of this is

21   more on the inference and that the inference itself that Soco

22   wants the jury to draw has to be more probable than not, and I

23   think it's important --

24          THE COURT:  No, but --

25          MR. CRANE:  -- for the jury to understand what that

2054

1    standard is.

2           THE COURT:  I'm assuming you're going to point that

3    out.  I'm saying I've given an instruction on circumstantial

4    and direct evidence, on the burden of proof.  Circumstantial

5    evidence is, in effect, an inference.  They're entitled --

6    circumstantial evidence is entitled to the same weight as

7    direct evidence, but it's measured by the same standard of

8    proof.  All the inferences together have to establish, by the

9    probabilities, that this happened.

10          MR. CRANE:  We agree.

11          THE COURT:  If they don't, if it's just a

12   possibility or it's evenly balanced on whether or not it

13   happened, you're entitled to win.  But why do I need to put an

14   instruction in that says that?

15          MR. CRANE:  Well, I think it just makes it clear to

16   the jury when the parties are arguing the significance of the

17   inferences, that the inference has to be more probable than

18   not, which is I think what that *Fegles* case says.

19          MR. BANKER:  In Soco's view, I think it draws undue

20   attention and actually puts circumstantial evidence and

21   inferences at a disadvantage that's inconsistent with the

22   initial instruction that the two are equally proper in the

23   eyes of the Court, in the eyes of the law.

24          MR. COZZENS:  And we agree with Your Honor.  It's

25   covered in your other instructions.

1          THE COURT:  What?

2          MR. COZZENS:  We agree with you.  It's covered in

3    your other instructions.

4          THE COURT:  I'm looking at this *Fegles v.*

5    *McLaughlin*.

6          "While the plaintiff must show that the inferences

7    favorable to him are more reasonable or probable than those

8    against him, the circumstantial evidence in civil cases need

9    not rise to that degree of certainty which will exclude every

10   other reasonable conclusion.  The rule itself is operative

11   chiefly in the trial court and does not detract from the

12   established principle that when a finding is attacked as being

13   unsupported, the power of the appellate court begins and ends

14   with a determination as to whether, considering the whole

15   record, there is substantial evidence which supports the

16   conclusion reached by the trier of fact.  When two or more

17   inferences can be reasonably deduced from the facts, the

18   reviewing court is without power to substitute its deductions

19   for those of the trial court."

20         We're off the record for a minute.

21      (Discussion off the record.)

22         THE COURT:  Back on the record.

23         I'm going to refuse it.  I think you can argue about

24   it all you want.  You can talk about it, you're right, but

25   then I'd have to get into a long definition of what I just

                              2056

1    read, and I don't want to do that.

2              Now are there any other offered instructions by

3    either party before I get to the remaining?

4              MR. CRANE:  We have the "known loss" one, Your

5    Honor.

6              THE COURT:  Oh.  Oh.

7              MR. CRANE:  It's our 36.

8              THE COURT:  I see.  Okay.

9              Yeah, I see I have some here that I need to . . .

10             MR. BANKER:  Soco's view of Insurers' Proposed

11   Instruction 36 is that that quite simply isn't Montana law,

12   and there's no such thing as a "known loss" defense to

13   coverage in Montana.

14             THE COURT:  Well, since I adopted "prejudice," maybe

15   I ought to go another step further so you guys can cover the

16   whole gamut of insurance defense.

17             MR. COZZENS:  You could write a book.  It could be

18   *Cebull on Insurance*.

19             THE COURT:  Maybe go on a lecture tour, huh?

20             MR. COZZENS:  I could be your driver when I retire.

21             THE COURT:  You know, this says "knew."  It doesn't

22   say anything -- or "should have known" or something like that.

23   I mean, I don't . . .

24             MR. MICKELSON:  We would add "or should have known."

25             THE COURT:  Yeah.  Yeah, those are -- are those the

1    only two states in the country that have adopted this?

2              MR. WALSH:  No, Your Honor.  There are several other

3    jurisdictions.

4              THE COURT:  Pardon?

5              MR. WALSH:  There are several other jurisdictions

6    which have adopted "known loss."  In addition to these,

7    Pennsylvania, the *Rohm and Haas* decision.  There are several

8    decisions from Texas.  Oregon, within the Ninth Circuit, has

9    also adopted "known loss."  In all fairness, the jurisdictions

10   that have considered it have split.  Montana just simply

11   hasn't addressed the issue yet.

12             MR. BANKER:  Well, although I think it's fair to say

13   that we've -- you know, it's apples and oranges.  When the

14   "known loss" defense has been adopted by courts, it's

15   generally they're dealing with a situation, for example, if

16   you've got an automobile accident and you had a car crash and

17   you turn around and you call your insurance broker --

18             THE COURT:  Yeah, and you lie, in essence.

19             MR. BANKER:  Yeah.

20             THE COURT:  Yeah.

21             MR. BANKER:  And we have a very different situation

22   here.

23             THE COURT:  Yeah.  I'm not going to broaden the

24   Montana law to do that.  It's refused.

25             Now I'm looking at USF&G and Continental's

2058

1    Proposed 33.  Haven't we covered this?  I mean, it has to be a

2    sudden and accidental spill.  That's directly opposite a

3    routine business operation.  Haven't we covered it?

4            MR. COZZENS:  Yes.

5            THE COURT:  I didn't ask you guys.  I know what

6    you'll say.

7            MR. MICKELSON:  The only thing is, they've heard

8    about routine spills from the operations, and this just, I

9    think, further defines what that is, but --

10           THE COURT:  Well, but it's kind of a comment on the

11   evidence.  I'm going to refuse it.  I mean, this is one of

12   your theories.  It's true, under the policy, routine --

13   contamination resulting from routine business operations is

14   not covered.  Refused.

15           MR. MICKELSON:  Thank you, Your Honor.

16           THE COURT:  Now Proposed 34.

17           MR. BANKER:  I think we've talked about this concept

18   in rejecting the paragraph that Soco --

19           THE COURT:  Yes, we have.  You know, when I was

20   thinking about this, going through this here the other day,

21   you know, I remember, for instance, when "substantial factor"

22   came out when I was in practice, and it was always "proximate

23   cause," and then I'd be defending these malpractice cases and

24   that goofy "substantial factor" came out.  It came out in a

25   malpractice case, as I recall, that it was developed if there

1  was more than one cause, or allegedly more than one cause.  I

2  didn't like it.  I always loved "proximate cause," "but for."

3       But then, you know, that's different than the issue

4  raised here.  When I read these cases, I think of *Callihan v.*

5  *BN.*  You know, in an aggravation of a preexisting condition,

6  if I couldn't differentiate between the injuries before this

7  accident and the injuries after, if I couldn't divide it up,

8  then I got to pay for the whole thing.

9       I'm not going to give this.  It's refused.

10       I'm looking at USF&G and Continental's 39.

11  (Discussion off the record.)

12       THE COURT:  I like this.  This is one of my stocks.

13  You guys modified it, and I appreciate you telling me by

14  including the italicized language in there.  Three-quarters of

15  the offered instruction is in italicized language.

16       You know, this is an eastern Montana jury.  These

17  people are not dumb.  I mean, I don't know how many juries

18  I've had in cases.  They're not dumb.  I don't need to go into

19  this kind of detail.

20       Are there other instructions that Soco has to offer?

21       Did I not cover some of yours?  Let's see here.  Oh,

22  wait a minute here.  I guess -- yeah, there are some here.  By

23  golly, there are more.  Pardon me.

24       Here I'm looking at the Insurers' Proposed 19.

25       MR. JOHNSON:  Yeah, I think we withdrew that, Your

1    Honor.  I don't think there's any evidence of a request to

2    admit.  I read one to them, but I didn't explain what it was.

3              THE COURT:  Okay.

4              I'm not going to give Insurers' Proposed 22 on

5    experts, questions containing assumed facts.  It's covered by

6    my general stock opinion instruction.

7              I refuse Insurers' 21.  It's covered by the same

8    thing.

9              Insurers' Proposed 15 is "party having power to

10   produce better evidence."  You want me to instruct on this

11   inference, right?

12             MR. DAVIS:  Yes.

13             THE COURT:  I'm not going to.  It's refused.

14             Your Proposed 16, I'm going to refuse it.  It's a

15   comment on the evidence.

16             I have here Defendant's Proposed 12, which is, "The

17   parties have agreed to certain facts.  You should therefore

18   treat these facts as having been proved."  I covered that in

19   stock instructions, stipulations.

20             I have here Insurers' Proposed 14, impeachment,

21   inconsistent statements.  I give that one on evaluating

22   testimony.  I'm going to refuse it.

23             Okay.  Now let's see here.  Are there some I haven't

24   gone through?

25             MR. BANKER:  Maybe give us a moment to just double

1    check.

2         (Discussion off the record.)

3             THE COURT:  There are some that I haven't even

4    talked about because they're either preliminary instructions

5    or stock instructions that are covered.

6         (Discussion off the record.)

7             THE COURT:  Yeah, "Evidence will be presented to you

8    in the form of answers to written interrogatories."  I think I

9    told them something along those lines at the time you did it,

10   didn't I?

11            MR. COZZENS:  Nothing got introduced that way,

12   Judge.

13            THE COURT:  Pardon?

14            MR. COZZENS:  I don't think you have anything in

15   evidence like that.

16            MR. CRANE:  Yeah, we had Marvin Johnson.

17        (Discussion off the record.)

18            THE COURT:  We have the verdict form.

19        (Discussion off the record.)

20            MR. BANKER:  I think that covers it from Soco's

21   perspective.

22            THE COURT:  Do you have any additional instructions,

23   Insurers?

24            MR. MICKELSON:  No, we do not.

25            THE COURT:  All right.  Then for the last ones, the

1    stocks, I'll give:

2            4.1.

3            4.3.

4            4.4.

5            Wait a minute.

6        (Discussion off the record.)

7            THE COURT:  I need to give that instruction on

8    notes, "Some of you have taken notes."  It's my Instruction 21

9    from the last case.  "Some of you have taken notes during the

10   trial.  Whether or not you took notes, you should rely on your

11   own memory of what was said," and so on.  I'm going to give

12   that one.

13           Then 4.1.

14           4.2.

15           4.3.

16           4.4.  Isn't it?

17           THE LAW CLERK:  Yes.

18           THE COURT:  Any objections to those?

19           MR. MICKELSON:  Which ones -- can you give us the

20   headings of those stock instructions?

21           THE COURT:  Yeah.

22           4.1 is duty to deliberate.

23           4.2 is the notes one.

24           4.3 is communication with the Court; if it becomes

25   necessary to communicate, you've got to send me a note.

1          And 4.4 is the return of the verdict.

2          MR. MICKELSON:  No, Your Honor.  No objection.

3          MR. COZZENS:  We have no objections.

4          THE COURT:  All right.  Let's talk about the verdict

5    form.

6      (Discussion off the record.)

7          THE COURT:  All right.  Here is what the verdict

8    form is going to be.

9          In looking at both you guys', this was a great

10   verdict form.  This is way too complicated for Montana guys.

11         MR. MICKELSON:  You just said how smart they were,

12   Your Honor.

13         THE COURT:  Here is what Question No. 1 is going to

14   be.  I mean, it's going to state like the special verdict.

15   I'm looking at Question No. 1 of the insurers', and it's going

16   to say this:  Has Soco proved by a preponderance of the

17   evidence that a sudden and accidental discharge, dispersal,

18   release, or escape of perchloroethylene occurred at its Soco

19   Lockwood facility in 1975, '76, '77, or early '78 and from

20   there into the groundwater underneath that northwest corner,

21   defined as the 'discharge'?  Yes or no.  If you answer no,

22   don't answer any more.  If you answered yes, proceed to

23   Question 2.

24         Then Question 2 is going to be, and I'm looking at

25   Soco's Question 2.  It's going to be, was Soco's -- no.  Let's

1    see.  Yeah, I guess it would have to be Question No. 3 from

2    Soco's.

3              And then Question No. 4 is, Was the notice within a

4    reasonable time after the property damage claim was made or

5    reasonably anticipated?  And USF&G.  And then there will be, I

6    guess, another question, Was Continental prejudiced by the

7    timing of Soco's notice?

8              That sounds to me like a fairly simple --

9              MR. DAVIS:  Judge, we didn't hear 2 and 3.

10             THE COURT:  You didn't hear 2 and 3?

11             MR. DAVIS:  No.  They slipped by us.

12             THE COURT:  After No. 1, No. 2 is going to be, Was

13   that groundwater, was that groundwater contamination occurring

14   by 1978?

15             No. 3 will be, Was Soco's June 2000 notice to

16   USF&G --

17             MR. CRANE:  Your Honor, I think we need an

18   "occurrence" one.  If you look at our No. 3, we need a

19   separate "occurrence" question, Was there an occurrence?

20             THE COURT:  No, I got "occurred" up in the first

21   question.  I've defined, told them what "occurrence" is in the

22   instructions.

23             MR. CRANE:  But there's two separate issues here,

24   Your Honor.  One, Was the discharge sudden and accidental?

25   And, separate from that, Was the damage expected?  And that's

1    a separate concept that's embodied in, Was there an

2    occurrence?

3            THE COURT:  Well, then, Has Soco proved by a

4    preponderance of the evidence that a sudden and accidental

5    discharge, dispersal, release, or escape occurred at its

6    facility during these certain years?  Doesn't that cover it?

7            MR. JOHNSON:  No.

8            THE COURT:  Why?

9            MR. JOHNSON:  Because they have to prove an

10   occurrence, Your Honor.  The policy is set up so that they

11   first have to prove an occurrence, which means that they

12   didn't expect the injury.  They had an accident, and they

13   didn't expect it.  Or continuous exposure, same conditions,

14   and they didn't report having injury.

15           Plus, then they have to -- then there's an exclusion

16   with regard to all pollution, but an exception that brings

17   pollution coverage back if it either was a sudden and

18   accidental discharge.  They're separate requirements, and

19   there's an issue.  There's a Phase 2 issue here as to -- that

20   they've alleged with regard to the failure to give notice of

21   our roll-on of the pollution exclusion, in which case, if

22   they, if they -- we would have to try the case all over again,

23   heaven forbid, if we, if --

24           MR. MICKELSON:  They answer only one question.

25           MR. JOHNSON:  -- if they answer only one question.

1  So they have to, they have to answer the "occurrence" issue,

2  and it's in both of the instructions.

3          MR. DAVIS:  Verdict form.

4          MR. JOHNSON:  Or verdict form.  Excuse me.  The only

5  difference is that "sudden and accidental" comes first in

6  ours, and they have "occurrence" first in theirs.

7          THE REPORTER:  I'm sorry; "occurrence" is what?

8          MR. JOHNSON:  "Occurrence" is second in ours, or

9  third in ours, whatever it is, and first in theirs.

10          THE COURT:  Maybe I ought to just use Soco's form.

11  I mean, I wanted to embody that instruction in that first

12  question.

13          MR. BANKER:  The reason Soco framed its form the way

14  it did is because of the issue Mr. Johnson raises.  If you put

15  "sudden and accidental" first and the jury were to answer no

16  and stop, they wouldn't get any further.  If you put

17  "occurrence" first and the jury answers -- let me see if I've

18  got that right.  Yeah, if you put "sudden and accidental"

19  first and they say no and stop, that creates a problem if the

20  "sudden and accidental" requirement is actually decided in

21  Phase 2.

22          THE COURT:  Okay.  I understand.  If I changed your

23  No. 2 to say, Did the groundwater contamination arise out of a

24  sudden and accidental release of perchloroethylene at its

25  Lockwood facility in 1975, 1976, 1977, or early 1978, that

1   would be good there, wouldn't it?

2           Second question, I'm looking at Soco's form.

3           MR. COZZENS:  All we need is by sometime during

4   1978.

5           MR. JOHNSON:  You're talking about "sudden and

6   accidental," though.

7           THE COURT:  Yeah.  I'm just talking about "sudden

8   and accidental."

9           MR. JOHNSON:  That's fine, Your Honor.  Are you

10  adding the language in from there as to groundwater?

11          THE COURT:  Yeah.  I'd use the first question on

12  Soco's.  The second question would state, Did groundwater

13  contamination arise out of a sudden and accidental release of

14  perchloroethylene at its Lockwood facility in 1975, '76, '77,

15  or early 1978?  Period.

16          MR. BANKER:  And if you did that, I don't know that

17  we would need the next question, because I think it's

18  undisputed in the case that if groundwater contamination -- if

19  that happened, then groundwater damage would occur within six

20  months.

21          THE COURT:  I tend to agree with you.

22          You guys, I'm going to go back here for a minute.

23  You talk about it.  I mean, we can simplify this thing.

24          MR. JOHNSON:  Okay.

25          THE COURT:  We're on the right track.

1          (Recess taken from 16:00:57 to 16:09:53.)

2          (Open court.)

3          (Jury not present.)

4               THE COURT:  You got 'er agreed?

5          (Discussion off the record.)

6               MR. JOHNSON:  When we took a break, you asked if the

7     insurers were amenable to dropping the paragraph 3 in Soco, in

8     Soco's instruction -- in the verdict form about was that

9     groundwater contamination occurring by 1978, and I think that

10    we've agreed that that's okay to pull.

11              And then with regard to the next two, 4 and 5, there

12    needs to be -- do we need separate verdict forms as to USF&G

13    and Continental?

14              THE COURT:  The questions are going to be, one, Was

15    groundwater contamination caused by an occurrence?  If the

16    answer is no, stop.

17              Second, Did groundwater contamination arise out of a

18    sudden and accidental release of perc at its Lockwood facility

19    in '75, '76, '77, or early '78?  If the answer is no, do not

20    answer any questions.  Sign.

21              Question 3, then, will be, Was Soco -- then we go to

22    notice?

23              MR. BANKER:  Yes.

24              MR. COZZENS:  Yep.

25              MR. JOHNSON:  Yes.

1              THE COURT:  And it's just as it's written there.

2              And then Question 4 will be, Was USF&G prejudiced.

3     Right?

4              MR. COZZENS:  Correct.

5              MR. JOHNSON:  Correct.  Then a separate one for

6     Continental.

7              THE COURT:  Okay.  And you guys apparently have

8     machines set up and everything where you can produce these,

9     right?

10             MR. JOHNSON:  We do, indeed.

11             MR. GROSSBART:  We brought typewriters.

12             MR. COZZENS:  People waiting to be told to produce

13    them.

14             MR. JOHNSON:  We're cutting and pasting.  Those were

15    the good old days.

16             THE COURT:  I remember the good old days.  And they

17    were good old days.

18             MR. JOHNSON:  They were good.

19         (Discussion off the record.)

20             THE COURT:  Is there anything else?

21             MR. COZZENS:  How much time for closing?

22             MR. MICKELSON:  Time for closing?

23             MR. COZZENS:  And we were thinking, Judge, that

24    since we all collectively earn a gold star for getting this in

25    as quickly as we did, that maybe, rather than a gold star, you

1    would give us an hour each side for closing?

2              THE COURT:  An hour each side?  You got it.

3              MR. COZZENS:  Did I ask for too little?

4              THE COURT:  No.  No, and you didn't ask for too

5    much, either.

6              MR. COZZENS:  Okay.

7              THE COURT:  Yeah, I mean, I don't think they're

8    going to want to hear any more than an hour apiece.

9              You guys got to split it up, I guess.

10             MR. DAVIS:  We'll split it.

11             MR. JOHNSON:  That's fine.

12             MR. DAVIS:  That includes -- the hour includes their

13   rebuttal, right?

14             THE COURT:  Yeah.

15             MR. COZZENS:  Right.

16             MR. DAVIS:  Okay.  No, that's fine.

17             THE COURT:  Great.

18             You guys are going to type this verdict form up on

19   your typewriter you brought?

20             MR. GROSSBART:  Yeah.

21             THE COURT:  Okay.

22        (Proceedings were recessed at 16:14:06.)

23

24

25

1                    VOLUME 8 REPORTER'S CERTIFICATE

2           I, JoAnn Corson Bacheller, a Registered Diplomate

3    Reporter and Certified Realtime Reporter, certify that the

4    foregoing transcript is a true and correct record of the

5    proceedings given at the time and place hereinbefore

6    mentioned; that the proceedings were reported by me in machine

7    shorthand and thereafter reduced to typewriting using

8    computer-assisted transcription; that after being reduced to

9    typewriting, a certified copy of this transcript will be filed

10   electronically with the Court.

11          I further certify that I am not attorney for, nor

12   employed by, nor related to any of the parties or attorneys to

13   this action, nor financially interested in this action.

14          IN WITNESS WHEREOF, I have set my hand at Billings,

15   Montana this 27th day of April, 2010.

16

17                            /s/ JoAnn Corson Bacheller

18                            _____
                              JoAnn Corson Bacheller
19                            United States Court Reporter

20

21

22

23

24

25