1   JoAnn Corson Bacheller
    Registered Diplomate Reporter
2   Certified Realtime Reporter
    P. O. Box 1424
3   Billings, Montana 59103-1424
    406/247-4477 office
4   406/247-7008 fax
    joann_bacheller@mtd.uscourts.gov
5
    United States Court Reporter
6

7

8           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MONTANA
9                 BILLINGS DIVISION

10

UNITED STATES FIDELITY        )
11  AND GUARANTY COMPANY,      )
                               )   Nos. CV-04-29-BLG-RFC
12              Plaintiff,)        CV-08-29-BLG-RFC
        and                    )
13                             )   **VOLUME 9**
    THE CONTINENTAL INSURANCE  )   **TRANSCRIPT OF JURY TRIAL**
14  COMPANY,                   )   **AND VERDICT**
            Plaintiff Intervenor,)
15      vs.                    )
                               )
16  SOCO WEST, INC.,           )
                    Defendant.)
17  _____)

18

        **BEFORE THE HONORABLE RICHARD F. CEBULL**
19      **CHIEF UNITED STATES DISTRICT COURT JUDGE**
              **FOR THE DISTRICT OF MONTANA**
20

        James F. Battin United States Courthouse
21              316 North 26th Street
              Billings, Montana 59101
22           Thursday, March 18, 2010
              08:59:07 to 16:26:46
23

24

            Proceedings recorded by machine shorthand
25      Transcript produced by computer-assisted transcription

1                          **APPEARANCES**

2   For the Plaintiff:          MR. ROBERT C. JOHNSON
                                MR. JOHN I. GROSSBART
3                               MS. WENDY N. ENERSON
                                Attorneys at Law
4                               8000 Sears Tower
                                233 South Wacker Drive
5                               Chicago, Illinois 60606

6                               MR. MARSHAL L. MICKELSON
                                Attorney at Law
7                               P. O. Box 509
                                Butte, Montana 59703
8
    For the Plaintiff           MR. BRIAN W. WALSH
9   Intervenor:                 Attorney at Law
                                Suite 330
10                              555 Mission Street
                                San Francisco, California 94105
11
                                MR. STEVEN M. CRANE
12                              Attorney at Law
                                Suite 1500
13                              515 South Figueroa Street
                                Los Angeles, California 90017
14
                                MR. MAXON R. DAVIS
15                              Attorney at Law
                                P. O. Box 2103
16                              Great Falls, Montana 59403

17  For the Defendant:          MR. CHRISTOPHER L. LYNCH
                                MR. PAUL A. BANKER
18                              Attorneys at Law
                                4200 IDS Center
19                              80 South Eighth Street
                                Minneapolis, Minnesota 55402
20
                                MR. LAWRENCE B. COZZENS
21                              Attorney at Law
                                Suite 104
22                              1643 24th Street West
                                Billings, Montana 59102
23
    Also present for            MS. JULIANNE ROHM
24  graphics display:           MR. NEIL BAILEY

25

1

**CONTENTS**

                                                        Volume/Page

2

**Volume 1 Proceedings** ................................  1/   16
3    *Voir Dire* Examination
        By the Court ...................................  1/   43
4       By Mr. Cozzens .................................  1/  101
        By Mr. Mickelson ...............................  1/  114
5       By Mr. Davis ...................................  1/  131
     Selection of Jury .................................  1/  147
6    Instructions to Jury ..............................  1/  150
     Opening Statement by Mr. Cozzens ..................  1/  160
7    Opening Statement by Mr. Johnson ..................  1/  185
     Opening Statement by Mr. Davis ....................  1/  200
8    Volume 1 Reporter's Certificate ...................  1/  251

9    **Volume 2 Proceedings** ................................  2/  267
     Volume 2 Reporter's Certificate ...................  2/  554
10

     **Volume 3 Proceedings** ................................  3/  570
11   Volume 3 Reporter's Certificate ...................  3/  829

12   **Volume 4 Proceedings** ................................  4/  845
     Volume 4 Reporter's Certificate ...................  4/ 1101
13

     **Volume 5 Proceedings** ................................  5/ 1117
14   Defendant Rests ...................................  5/ 1334
     Plaintiffs' Motion for Judgment ...................  5/ 1334
15   Order of Court Reserved ...........................  5/ 1337
     Volume 5 Reporter's Certificate ...................  5/ 1339
16

     **Volume 6 Proceedings** ................................  6/ 1355
17   Volume 6 Reporter's Certificate ...................  6/ 1610

18   **Volume 7 Proceedings** ................................  7/ 1626
     Order of Court re: Plaintiffs' Motion for Judgment ..  7/ 1870
19   Volume 7 Reporter's Certificate ...................  7/ 1879

20   **Volume 8 Proceedings** ................................  8/ 1895
     Plaintiffs Rest ...................................  8/ 1904
21   Defendant's Motion for Judgment ...................  8/ 2010
     Order of Court re: Defendant's Motion for Judgment ..  8/ 2018
22   Plaintiffs' Motion for Judgment Renewed ...........  8/ 2018
     Order of Court re: Plaintiffs' Motion for Judgment ..  8/ 2018
23   Settlement of Instructions ........................  8/ 2019
     Volume 8 Reporter's Certificate ...................  8/ 2072

24

25

1

## CONTENTS  (Continued)

Volume/Page

2

**Volume 9 Proceedings** ................................  9/ 2088
Instructions to Jury ................................  9/ 2092
Closing Argument by Mr. Banker ......................  9/ 2105
Closing Argument by Mr. Johnson .....................  9/ 2137
Closing Argument by Mr. Davis .......................  9/ 2159
Rebuttal Closing Argument by Mr. Banker .............  9/ 2171
Jury Verdict ........................................  9/ 2186
Volume 9 Reporter's Certificate .....................  9/ 2190

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24        REPORTER'S NOTE:  "Uh-huh" and "Um-hmm" indicate
affirmative responses.  "Huh-uh" and "Hm-umm" indicate

25  negative responses.

1                               **WITNESSES**

2   **For the Defendant:**                          **Volume/Page**

3   Mr. Dennis Allen St. George
        Direct Examination by Mr. Banker ................ 1/  211
4       Cross-Examination by Mr. Johnson ................ 1/  239
        Cross-Examination by Mr. Davis .................. 1/  248
5       Redirect Examination by Mr. Banker .............. 1/  249

6   Mr. James Sullivan
        Direct Examination by Mr. Lynch ................. 2/  276
7       Cross-Examination by Mr. Grossbart .............. 2/  316
        Redirect Examination by Mr. Lynch ............... 2/  358
8
    Mr. Richard Allen Colver
9       Direct Examination by Mr. Cozzens ............... 2/  367
        Cross-Examination by Mr. Johnson ................ 2/  403
10      Redirect Examination by Mr. Cozzens ............. 2/  484

11  Mr. Rodney Hallsten
        Direct Examination by Mr. Banker ................ 2/  490
12      Cross-Examination by Mr. Grossbart .............. 2/  514
        Cross-Examination by Mr. Davis .................. 2/  551
13      Redirect Examination by Mr. Banker .............. 2/  552

14  Mr. Monte I. Naff
        Direct Examination by Mr. Cozzens ............... 3/  570
15      Cross-Examination by Mr. Johnson ................ 3/  610
        Cross-Examination by Mr. Davis .................. 3/  702
16      Redirect Examination by Mr. Cozzens ............. 3/  718

17  Mr. Charles Bender (deposition)
        Examination ..................................... 3/  738
18
    Mr. Desmond Slater (deposition)
19      Examination ..................................... 3/  763

20  Mr. Larry Nelson (deposition)
        Examination ..................................... 3/  802
21
    Mr. Marvin Johnson
22      Direct Examination by Mr. Cozzens ............... 4/  846
        Cross-Examination by Mr. Johnson ................ 4/  863
23
    Mr. Douglas Johnston
24      Direct Examination by Mr. Banker ................ 4/  867
        Cross-Examination by Mr. Grossbart .............. 4/  898
25      Cross-Examination by Mr Davis ................... 4/  921
        Redirect Examination by Mr. Banker .............. 4/  924

1

**WITNESSES (Continued)**

2

**For the Defendant:**                                    Volume/Page

3

Mr. David Warne
        Direct Examination by Mr. Banker ................  4/  925
4       Cross-Examination by Mr. Davis .................  4/  953
        Redirect Examination by Mr. Banker .............  4/  987

5

Ms. Suzanne Miller
6       Direct Examination by Mr. Cozzens ..............  4/  992
        Cross-Examination by Mr. Crane .................  4/ 1030
7       Redirect Examination by Mr. Cozzens ............  4/ 1067

8

Robert Leslie Powell, Ph.D.
        Direct Examination by Mr. Lynch ................  4/ 1068
9       Direct Examination (Continued) by Mr. Lynch ....  5/ 1118
        Cross-Examination by Mr. Grossbart .............  5/ 1213
10      Cross-Examination by Mr. Davis .................  5/ 1301
        Redirect Examination by Mr. Lynch ..............  5/ 1319

11

**For the Plaintiffs:**

12

Mr. Marvin Johnson (deposition)
13      Examination ....................................  6/ 1356

Mr. Ken Kjos (deposition)
14      Examination ....................................  6/ 1471

15

Ms. Kristen Kohler Stout
16      Direct Examination by Mr. Johnson ..............  6/ 1537
        Cross-Examination by Mr. Lynch .................  6/ 1593
17      Redirect Examination by Mr. Johnson ............  6/ 1607

18

Peter Shanahan, Ph.D.
        Direct Examination by Mr. Grossbart ............  7/ 1626
19      Cross-Examination by Mr. Lynch .................  7/ 1704
        Redirect Examination by Mr. Grossbart ..........  7/ 1721

20

Mr. Richard Brill (deposition)
21      Examination ....................................  7/ 1728

22

Yaron M. Sternberg, Ph.D.
        Direct Examination by Mr. Crane ................  7/ 1774
23      Cross-Examination by Mr. Lynch .................  7/ 1805
        Redirect Examination by Crane ..................  7/ 1826

24

25

1                          **WITNESSES (Continued)**

2      **For the Plaintiffs:**                          **Volume/Page**

3      Bruce Edwin Dale, Ph.D.
           Direct Examination by Mr. Davis ................  7/ 1831
4          Cross-Examination by Mr. Lynch .................  7/ 1862
           Redirect Examination by Mr. Davis ..............  7/ 1866
5

6      **For the Defendant in Rebuttal:**

       Wayne Martin Grip
7          Direct Examination by Mr. Lynch ................  8/ 1905
           Cross-Examination by Mr. Johnson ...............  8/ 1954
8          Redirect Examination by Mr. Lynch ..............  8/ 1995

9      Robert Leslie Powell, Ph.D.
           Direct Examination by Mr. Lynch ................  8/ 1999
10         Cross-Examination by Mr. Crane .................  8/ 2005

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                  **EXHIBITS**

2   **Exhibit No.**                              **Received Volume/Page**

3   5       09/05/89 Letter to Hol from Johnson ........ FPT/    56

4   30      09/11/85 Memo to Managers of All Plants from
            Q. Dyce  .................................. FPT/    56
5
    72      11/04/75 Daily sales report to Bender,
6           Hallsten, Don, Grady, and Naff from Q. Dyce.  2/   536

7   90      05/29/86 Sales report .....................  3/   697

8   143     02/26/82 Continental General Liability
            Survey Report form ........................ FPT/    23
9
    231     06/15/00 Letter to USF&G from Whalen ....... FPT/    24
10
    234     09/25/00 Letter to Downing from
11          Mielenhausen .............................. FPT/    24

12  352     04/08/74 Memo to Bender from Whaley ........ FPT/    28

13  353     09/27/72 Memo to Murray from Q. Dyce ....... FPT/    57

14  359     09/11/85 Memo from Q. Dyce ............... FPT/    28

15  362     09/13/89 Memo to Q. Dyce from Naff ......  FPT/ 28, 57

16  366     Warning label for perchloroethylene and
            instructions on empty container handling
17          and reuse ................................. FPT/    57

18  382     11/05/92 Montana Department of Health Field
            Investigation Report ......................  4/   975
19
    383     07/23/00 Letter to Rowe from Miller ........ FPT/    29
20
    429     06/09/98 E-mail between Warne and Naff .....  3/   668
21
    433     12/16/99 Letter to G. Staarjes from USEPA .. FPT/    58
22
    436     01/06/99 E-mail between Miller and Warne ... FPT/    58
23
    442     08/06/96-08/09/00 Containment pit runoff
24          water sampling ............................  4/ 1059

25  445     03/16/73 USF&G Advertising ................ FPT/    30

1                             **EXHIBITS** (Continued)

2      **Exhibit No.**                        **Received Volume/Page**

3      499      11/04/75 Aerial photograph ................. FPT/    31

4      505      02/23/82 Continental General Liability Survey
                Report ................................... FPT/    31
5
       784      08/21/95 Handwritten notes ................ FPT/    58
6
       785      08/18/95 Memo to Naff, Hilton, Biondo,
7               Gilbert, Akers and Liebling from Simko ..... FPT/    58

8      856A     09/25/89 Versar Inc. Environmental Risk
                Assessment Survey ...................... FPT/ 32, 58
9
       859      07/24/89 Draft letter to Hol from Johnson .. FPT/    59
10
       1104     09/08/05 Letter to O'Reilly from Terp ...... FPT/    32
11
       2532     11/1975 Aerial photograph ................. FPT/    32
12
       2533     11/04/75 Aerial photograph ................. FPT/    32
13
       2545     12/30/05 Bulk Handling and Properties of PPG
14              Chlorinated Solvents:  Perchloroethylene,
                Trichloroethylene, Tri-Ethane .............. FPT/    59
15
       2558     04/07/04 Letter to O'Reily from Sullivan ...    2/   293
16
       3004     08/23/00 Letter to Rowe from Miller ........ FPT/    32
17
       3006     08/27/72 Aerial photograph ................. FPT/    32
18
       3015     07/1995 HCI Dyce site plan ................. FPT/    32
19
       3017     01/1983 Dyce personnel manual ............. FPT/    33
20
       3024     10/29/85 Company policy re: hoses .........    4/   888
21
       3025     07/02/87 Memo to Dick, Russ, Bob, Kevin,
22              Ivan, John and File from Roger ............ FPT/    36

23     3029     1986-2001 Dyce manager's monthly report ....    8/ 1896

24     3043     11/29/99 Lockheed Martin Final Report ......    1/    37

25

1                          **EXHIBITS (Continued)**

2    **Exhibit No.**                              **Received Volume/Page**

3    3044    12/16/99 USEPA First Request for Information
             Pursuant to 104(e) ........................ FPT/    37
4
     3045    03/01/00 Dyce Response to First 104(e)
5            Request ................................... FPT/    37

6    3047    08/23/00 Letter to Naff from Risner &
             Kercher ................................... FPT/    37
7
     3048    08/23/00 Dyce Supplemental Response to
8            USEPA's Second 104(e) Request ............. FPT/    37

9    3049    10/03/00 Maxim Technologies Inc. Site
             Investigation Report ...................... FPT/    38
10
     3050    06/2003 Tetra Tech EM Inc. Remedial
11           Investigation Report for MDEQ ............. FPT/    39

12   3051    07/07/04 Tetra Tech Final Feasibility Study
             Report for MDEQ ........................... FPT/    39
13
     3052    11/2004 MDEQ/USEPA Proposed Remedial Action
14           Plan for Lockwood Groundwater Solvent
             Plume Site ................................ FPT/    39
15
     3058    12/2003 Tetra Tech Addendum 01 to the Final
16           Remedial Investigation Report for MDEQ ..... FPT/   39

17   3059    08/2005 MDEQ/USEPA Record of Decision for
             Lockwood Solvent Groundwater Plume Site .... FPT/   39
18
     3060    02/28/06 Letter to Terp from Risner &
19           Kercher ................................... FPT/    40

20   3102    09/16/85 Memo to Colver ................... FPT/    41

21   3115    11/25/92 Letter and permit application to
             Lincoln from Diede ........................ FPT/    42
22
     3174    06/09/00 Letter to Webster from Miller ..... FPT/   43
23
     3175    06/12/00 Letter to Miller from Webster ..... FPT/   43
24
     3178    07/25/00 Fax to Stevenson from Miller ...... FPT/   43
25

|   |   |
|---|---|
| 1 | **EXHIBITS (Continued)** |
| 2 | **Exhibit No.**                                    **Received Volume/Page** |

| | | | | |
|---|---|---|---|---|
| 3 | 3191 | 11/13/03 ATC Associates Inc. Soil and Groundwater Data Remedial Design Investigation | | |
| 4 | | Report .................................... FPT/ | | 43 |
| 5 | 3200 | Compilation:  USF&G Policy No. SMP326188 ... FPT/ | | 44 |
| 6 | 3201 | Compilation:  USF&G Policy No. 1CC599480 ... FPT/ | | 44 |
| 7 | 3202 | Compilation:  USF&G Policy No. SMP406309 ... FPT/ | | 44 |
| 8 | 3203 | Compilation:  USF&G Policy No. 1CC944574 ... FPT/ | | 44 |
| 9 | 3204 | Compilation:  USF&G Policy No. CEP64280 .... FPT/ | | 44 |
| 10 | 3205 | Compilation:  USF&G Policy No. 1CC945882 ... FPT/ | | 44 |
| 11 | 3206 | Compilation:  USF&G Policy No. CEP64348 .... FPT/ | | 44 |
| 12 | 3207 | Compilation:  USF&G Policy No. SMP535107 ... FPT/ | | 44 |
| 13 | 3208 | Compilation:  USF&G Policy No. SMP576121 ... FPT/ | | 44 |
| 14 | 3209 | Compilation:  USF&G Policy No. 1CCA31253 ... FPT/ | | 44 |
| 15 | 3210 | Compilation:  USF&G Policy No. CEP84958 .... FPT/ | | 44 |
| 16 | 3211 | Compilation:  USF&G Policy No. SMP594660 ... FPT/ | | 44 |
| 17 | 3213 | Compilation:  USF&G Policy No. CEP104806 ... FPT/ | | 44 |
| 18 | 3214 | Compilation:  USF&G Policy No. SMP654057 ... FPT/ | | 44 |
| 19 | 3216 | Compilation:  USF&G Policy No. CEP114516 ... FPT/ | | 44 |
| 20 | 3217 | Compilation:  USF&G Policy No. SMP772986 ... FPT/ | | 44 |
| 21 | 3219 | Compilation:  USF&G Policy No. CEP114641 ... FPT/ | | 44 |
| 22 | 3220 | 03/03/06 Stipulation as to Existence and Content of USF&G Insurance Policies ........ FPT/ | | 44 |
| 23 | | | | |
| 24 | 3287 | 02/28/05 Letter to Terp from Risner & Kercher .................................... FPT/ | | 48 |
| 25 | | | | |

1                          **EXHIBITS (Continued)**

2    **Exhibit No.**                        **Received Volume/Page**

3    3321    03/03/06 Stipulation as to Existence and
             Content of Continental Insurance Policies
4            and Exhibits ............................... FPT/   49

5    3363    09/29/89 Agreement to Purchase Real
             Property .................................   8/ 1903
6
     3407    1971 Chemical Safety Data Sheet for
7            perchloroethylene ...................... FPT/ 49, 61

8    3408    1972 Hooker Chemical MSDS for
             trichloroethylene ........................ FPT/   49
9
     3410    1980 PPG manual .......................... FPT/   50
10
     3420    05/25/00 Second Request for Information
11           Pursuant to Section 104 of CERCLA for the
             Lockwood Solvent Site Billings ............   3/   676
12
     3433    1983 Dyce brochure ....................... FPT/   50
13
     3436    11/1979 Ledger sheet .....................   3/   622
14
     3438    04/1971 Perchloroethylene brochure ...... FPT/ 50, 61
15
     3471    08/05/85 Sales report ....................   3/   591
16
     3475    02/06/84 Dyce policies re: DOT ........... FPT/   50
17
     3476    06/02/79 Expense Report ..................   3/   585
18
     3483    Aerial photograph ........................ FPT/   51
19
     3484    Aerial photograph ........................ FPT/   51
20
     3485    Aerial photograph ........................ FPT/   51
21
     3486    Aerial photograph ........................ FPT/   51
22
     3487    Aerial photograph ........................ FPT/   51
23
     3488    Aerial photograph ........................ FPT/   51
24
     3490    1972 Aerial photograph ................... FPT/   51
25

1                          **EXHIBITS (Continued)**

2  **Exhibit No.**                              **Received Volume/Page**

3  3491     1981 Aerial photograph .................... FPT/    51

4  3492     1987 Aerial photograph .................... FPT/    51

5  3660     09/09/09 Dale photographs ................   2/   318

6  3674     Site photographs taken by Hargis ...........  8/ 2040

7  3800     05/27/57 Aerial photograph ................ FPT/    52

8  3801     06/26/66 Aerial photograph ................ FPT/    52

9  3802     05/22/69 Aerial photograph ................ FPT/    52

10 3803     08/18/71 Aerial photograph ................ FPT/    52

11 3804     04/23/72 Aerial photograph ................ FPT/    52

12 3805     Circa 1973 Aerial photograph .............. FPT/    52

13 3806     06/18/74 Aerial photograph ................ FPT/    52

14 3807     11/04/75 Aerial photograph ................ FPT/    52

15 3808     06/23/77 Aerial photograph ................ FPT/    52

16 3809     09/06/77 Aerial photograph ................ FPT/    52

17 3810     05/03/79 Aerial photograph ................ FPT/    52

18 3811     05/14/79 Aerial photograph ................ FPT/    52

19 3812     07/31/79 Aerial photograph ................ FPT/    52

20 3813     03/13/81 Aerial photograph ................ FPT/    52

21 3814     06/02/81 Aerial photograph ................ FPT/    52

22 3815     08/24/81 Aerial photograph ................ FPT/    52

23 3816     05/27/83 Aerial photograph ................ FPT/    52

24 3817     07/27/83 Aerial photograph ................ FPT/    52

25 3818     04/30/87 Aerial photograph ................ FPT/    52

1

**EXHIBITS (Continued)**

2

**Exhibit No.**                                          **Received Volume/Page**

3   3826    08/08/05 Response to 06/24/05 CERCLA 104(e). FPT/    53

4   3827    02/14/05 Letter to Moskowitz from
            Mielenhausen ............................. FPT/    53

5

    3828    02/15/05 Letter to Walsh from Mielenhausen . FPT/    53

6

    3886    06/15/00 Letter to Continental from Whalen . FPT/    55

7

    3887    09/25/00 Letter to Giblin from Mielenhausen. FPT/    55

8

    3888    01/08/07 Second stipulation as to existence
9           and content of USF&G insurance policies .... FPT/    55

10  4027    Aerial photograph (D032604) ...............    4/   848

11  4032    10/10/00 Communication to Gilbert from
            Simko .....................................    3/   691

12

    4039    09/13/89 Memo to Q. Dyce from Hallsten .....    8/ 1903

13

    4044    07/1976 Location Survey of Dyce site ....... FPT/    62

14

    4087    01/06/99 E-mail to Warne from Hallsten .....    2/   547

15

    4089    02/29/00 E-mail to Naff from Warne .........    4/ 1066

16

    4143    Aerial photograph .........................    6/ 1485

17

    4320    1980 Bulk Handling and Properties of PPG
18          Chlorinated Solvents ...................... FPT/    63

19  4400    01/14/05 Fax to LeCours from Sullivan ......    2/   335

20  4516    09/12/02 Letter to EPA from Sullivan .......    2/   354

21  4721    08/18/03 Fax to MDEQ from Sullivan .........    2/   308

22  4757    08/03/04 Letter to Sullivan from MDEQ ......    2/   313

23  4811    04/28/03 Letter to Ross from Sullivan ......    2/   342

24  4822    07/20/00 E-mail to Miller from Naff ........ FPT/    64

25

1 **EXHIBITS (Continued)**

2 **Exhibit No.**                                    **Received Volume/Page**

3  4831   Exhibit 5017 aerial photograph with Colver
          notations ...................................   2/   483
4
    4832   Exhibit 5019 aerial photograph with Colver
5          notations ...................................   2/   483

6  4833   Exhibit 5024 aerial photograph with Colver
          notations ...................................   2/   483
7
    4834   Exhibit 5028 aerial photograph with Colver
8          notations ...................................   2/   483

9  4835   04/30/86 General manager's monthly report ..   4/   899

10 5000-
    5064   Historical photographs .....................   2/   267
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1

2     (Open court.)

3     (Jury not present.)

4        THE COURT:  Be seated.

5        All right.  What is the problem?

6        MR. MICKELSON:  Your Honor, when we looked at the

7 jury instructions last night, Instruction No. 14, which

8 defines "occurrence," seems a little bit inconsistent with the

9 instructions that come afterwards that tell the jury that they

10 have to find that there is an occurrence, which is, of course,

11 part of the verdict form, but it never says that Soco has the

12 burden to establish an occurrence.

13        And so the instruction seems a little inconsistent

14 because we just define the terms on 14, but, on the other

15 instructions, such as 15 and 16, we talk about who has the

16 burden with respect to those particular issues in the

17 insurance policy.

18        MR. COZZENS:  Judge, that instruction is included in

19 15 where it says we have the burden of proving property damage

20 and the definition of "property damage."  It includes that it

21 was caused by an occurrence, so it's all there.

22        THE COURT:  On the special verdict form, what is

23 Question No. 1?  I don't have the form.

24        MR. MICKELSON:  Was there an occurrence.  That's

25 Question No. 1.

2088

1          THE LAW CLERK:  (Handing.)

2          MR. MICKELSON:  I'm looking at 15, Your Honor.  It

3    talks about the burden of proving, preponderance of the

4    evidence, that there was property damage during one or more of

5    the policy periods.  It doesn't talk about "occurrence."

6          MR. COZZENS:  It says --

7          THE COURT:  Where would you suggest?  In 16?

8          MR. MICKELSON:  In 14, Your Honor.

9          THE COURT:  No, I know, but where do you want to add

10   a sentence saying Soco has the burden --

11         MR. MICKELSON:  We would suggest in Instruction

12   No. 14 to say, "To obtain insurance coverage under the USF&G

13   and Continental insurance policies, Soco has the burden of

14   proving by a preponderance of evidence that there was an

15   occurrence under the policy."

16         MR. COZZENS:  And that's duplicative of what's in

17   Instruction 15 where it specifically says we have the burden

18   of proving property damage, and then it says that property

19   damage is, quote, "loss of use of tangible property that has

20   not been physically injured or destroyed, provided such loss

21   of use is caused by an occurrence during the policy period."

22   It's already there.

23         THE COURT:  Well, you know, it really -- I think

24   I'll avoid a question if I put that in there.  What's the

25   sentence?

1                MR. MICKELSON:  "To obtain insurance coverage under

2       the USF&G and Continental Insurance policies, Soco has the

3       burden of proving" --

4                THE COURT:  Well, let's see.

5                MR. MICKELSON:  Pardon?

6                THE COURT:  I'm just going to say, "To obtain

7       insurance coverage" --

8                MR. MICKELSON:  -- "Soco has the burden of proving

9       by a preponderance of the evidence that there was an

10      occurrence under the policy."

11               MR. COZZENS:  And where is that being added?

12               MR. MICKELSON:  The last sentence of Instruction

13      No. 14 is where we would suggest it.

14               THE COURT:  I will just start a new paragraph on

15      14 --

16               MR. MICKELSON:  Yes.

17               THE COURT:  -- at the bottom of No. 14.  "To obtain

18      insurance coverage, Soco has the burden of proving by a

19      preponderance of the evidence that" . . .

20               That?

21               MR. MICKELSON:  Oh.  Oh, I'm sorry -- "that there

22      was an occurrence under the terms of the policy."

23               MR. DAVIS:  "Policies."

24               MR. MICKELSON:  "Policies."

25               THE COURT:  How about saying "there was an

2090

1    occurrence as defined in the policies"?

2            MR. JOHNSON:  Okay.

3            MR. MICKELSON:  That would be fine.

4            THE COURT:  Does Soco object?

5            MR. COZZENS:  Yes, just because it's duplicative.

6            THE COURT:  All right.  It's overruled.  We'll get

7    this new one in there, and then we'll start.

8            What I intend to do is read the instructions.  You

9    guys give your first portion.  I have a clock up there that I

10   push.  I'll be keeping time.  And then we'll take a break.

11   We'll start up, you all make your closing argument, you finish

12   yours, and then --

13           MR. JOHNSON:  Your Honor, Mr. Davis graciously

14   agreed, if I buy him a beer, that maybe I could have a little

15   more than half, so if I run too long, Mr. Grossbart is going

16   to let me know.

17           THE COURT:  Yeah, I'll give you any kind of warning

18   you want.

19           MR. DAVIS:  Give him a warning at five minutes.

20   Before he gets warmed up.

21           THE COURT:  Five minutes before the end?

22           MR. DAVIS:  No, five minutes from the beginning.

23   Tell him he's about out of time.

24           MR. JOHNSON:  No, we don't -- Mr. Grossbart will

25   take care of it, Your Honor.

1          MR. DAVIS:  No, that will be fine, Your Honor.

2          MR. GROSSBART:  It won't be more than an hour,

3    total.

4          THE COURT:  Yeah.  I know it won't.

5       (Recess taken from 09:04:51 to 09:10:54.)

6       (Open court.)

7       (Jury not present.)

8          THE COURT:  And I did look for gold stars to give

9    you guys, as you were talking about, for getting this done and

10   for agreeing on a verdict form, but I didn't find any.  But,

11   you know, the record shows that I certainly would have given

12   you one.

13         MR. COZZENS:  Would you have placed them on our

14   forehead, Judge?

15         THE COURT:  Yes.

16      (Jury present.)

17         THE COURT:  Please be seated.

18         I hope the applause that we heard was a positive

19   statement.  Wasn't that applause?

20         THE CLERK:  It was.

21      (Jurors nodded heads affirmatively.)

22         THE COURT:  All right.

23         Members of the jury, now that you've heard all of

24   the evidence, it is my duty to instruct you on the law which

25   applies to this case.  A copy of these instructions will be

1    available in the jury room for you to consult if you find it

2    necessary.  There will be more than one copy for you.

3         (Discussion off the record.)

4              THE COURT:  It's your duty to find the facts from

5    all of the evidence in the case.  To those facts, you will

6    apply the law as I give it to you.  You must follow the law as

7    I give it to you whether you agree with it or not.  You must

8    not be influenced by any personal likes or dislikes, opinions,

9    prejudices, or sympathy.  That means you must decide the case

10   solely on the evidence before you.  You will recall that you

11   took an oath promising to do so at the beginning of the case.

12             In following my instructions, you must follow all of

13   them and not single out some and ignore others.  They are all

14   equally important.  You must not read into these instructions

15   or into anything the Court may have said or done any

16   suggestion as to what verdict you should return.  That is a

17   matter entirely up to you.

18             The evidence from which you are to decide what the

19   facts are consists of:

20             No. 1, the sworn testimony of any witness;

21             No. 2, the exhibits which have been received into

22   evidence; and

23             No. 3, any facts to which the lawyers have agreed or

24   stipulated.

25             In reaching your verdict, you may consider only the

                                2093

1   testimony and exhibits received into evidence.   Certain things

2   are not evidence, and you may not consider them in deciding

3   what the facts are.   I will list them for you:

4           No. 1.   Arguments and statements by lawyers are not

5   evidence.   The lawyers are not witnesses.   What they have said

6   in their opening statements, will say in their closing

7   arguments, and at other times is intended to help you

8   interpret the evidence, but it is not evidence.   If the facts

9   as you remember them differ from the way the lawyers have

10  stated them, your memory of them controls.

11          No. 2.   Questions and objections by lawyers are not

12  evidence.   Attorneys have a duty to their clients to object

13  when they believe a question is improper under the rules of

14  evidence.   You should not be influenced by the objection or by

15  the Court's ruling on it.

16          No. 3.   Some testimony and exhibits have been

17  received only for a limited purpose.   Where I have given a

18  limiting instruction, you must follow it.

19          No. 4.   Anything you may have seen or heard when the

20  court was not in session is not evidence.   You are to decide

21  the case solely on the evidence received at the trial.

22          The burden of proof discussed in these instructions

23  is by a preponderance of the evidence.   When a party has the

24  burden of proof on any claim or affirmative defense by a

25  preponderance of the evidence, it means you must be persuaded

1   by the evidence that the claim or affirmative defense is more

2   probably true than not true.

3        You should base your decision on all of the

4   evidence, regardless of which party presented it.

5        Evidence may be direct or circumstantial.  Direct

6   evidence is direct proof of a fact, such as testimony by a

7   witness about what the witness personally saw or heard or did.

8   Circumstantial evidence is proof of one or more facts from

9   which you could find another fact.  You should consider both

10  kinds of evidence.  The law makes no distinction between the

11  weight to be given to either direct or circumstantial

12  evidence.  It is for you to decide how much weight to give to

13  any evidence.

14       In deciding the facts in this case, you may have to

15  decide which testimony to believe and which testimony not to

16  believe.  You may believe everything a witness says, or part

17  of it, or none of it.

18       In considering the testimony of any witness, you may

19  take into account:

20       No. 1, the opportunity and ability of the witness to

21  see or hear or know the things testified to;

22       No. 2, the witness's memory;

23       No. 3, the witness's manner while testifying;

24       No. 4, the witness's interest in the outcome of the

25  case and any bias or prejudice;

1          No. 5, whether other evidence contradicted the

2   witness's testimony;

3          No. 6, the reasonableness of the witness's testimony

4   in light of all the evidence; and

5          No. 7, any other factors that bear on believability.

6          The weight of the evidence as to a fact does not

7   necessarily depend on the number of witnesses who testify.

8          The parties in this action are corporations, and, as

9   such, can only act -- can act only through natural persons as

10  their agents or employees.  Any act or failure to act of an

11  employee while acting within the scope of his or her authority

12  or employment is in law considered to be the act or failure to

13  act of the corporation or company.  In other words, if an

14  employee acts or fails to act while doing things that he or

15  she had the authority to do for the corporation or while doing

16  things which it is his or her job to do, the act or failure to

17  act is considered to be the act or failure to act of the

18  corporation.

19         Knowledge of an officer or employee is in law is

20  considered to be the knowledge of the corporation.

21         You have heard testimony from persons who, because

22  of education or experience, are permitted to state opinions

23  and the reasons for those opinions.

24         Opinion testimony should be judged just like any

25  other testimony.  You may accept it or reject it and give it

2096

1   as much weight as you think it deserves, considering the

2   witness's education and experience, the reasons given for the

3   opinion, and all the other evidence in the case.

4           Certain charts and summaries have been received into

5   evidence to illustrate information brought out in the trial.

6   Charts and summaries are only as good as the underlying

7   evidence that supports them.  You should, therefore, give them

8   only such weight as you think the underlying evidence

9   deserves.

10          All parties are equal before the law, and a

11  corporation is entitled to the same fair and conscientious

12  consideration by you as any party.

13          Although there are two insurance companies who are

14  parties in this case, USF&G and Continental, you should decide

15  the case as to each insurance company separately.  What that

16  means in this case is that Soco must prove that it is entitled

17  to insurance coverage separately under the USF&G policies and

18  separately under the Continental policies.  Furthermore, USF&G

19  and Continental are entitled to separate consideration of

20  their respective defenses to Soco's claims for coverage under

21  the insurance policies that USF&G and Continental issued.

22          Unless otherwise stated, all instructions given you

23  govern the case as to each insurance company.

24          You should decide the case as to each party

25  separately.  Unless otherwise stated, the instructions apply

1  to all parties.

2          Soco is the successor in interest to predecessor

3  companies that, over the relevant time period of this case,

4  were known as Dyce Sales and Engineering Service Company, Dyce

5  Chemical, Inc., HCI/Dyce Chemical, and Brenntag West, Inc.  As

6  the successor in interest to these predecessor companies, Soco

7  is entitled to all of the rights and subject to all of the

8  obligations of these predecessor companies under the policies

9  issued by USF&G and Continental.  Soco is also subject to all

10 of the legal liabilities of these predecessor companies.  You

11 must view all of the conduct, actions, and statements of these

12 predecessor companies and their employees as if such conduct,

13 actions, and statements were made by Soco directly.

14         The case before you is about whether Soco can prove

15 that a sudden and accidental spill/release of

16 perchloroethylene occurred at its Lockwood, Montana facility

17 in 1975, 1976, 1977, or early 1978 that caused pollution or

18 contamination of the Lockwood solvent Superfund site and

19 whether there is insurance coverage for claims resulting

20 therefrom.

21         You are not going to decide whether or not the

22 pollution or contamination should be cleaned up.  That issue

23 is of no concern to you.  To the extent it is necessary, the

24 Lockwood solvent Superfund site, including Soco's facility,

25 will be cleaned up regardless of the outcome of this case.

1    This fact should not affect your determination as to Soco's,

2    USF&G's, or Continental's rights or obligations under the

3    insurance policies.

4           The parties, Soco, USF&G, and Continental, are here

5    in court to have you, the jury, decide certain facts that are

6    necessary to resolve the questions that determine whether the

7    insurance policies issued by USF&G and Continental in or after

8    1978 provide coverage.

9           Under each comprehensive-liability insurance policy

10   they sold to Dyce, USF&G and Continental agreed to pay all

11   sums Dyce becomes legally obligated to pay as damages because

12   of property damage to which the insurance applies caused by an

13   occurrence.  Each policy defines "property damage" as physical

14   injury to property which occurs during the period of time

15   covered by the policy.  Each policy defines "occurrence" as an

16   accident, including continuous or repeated exposure to

17   conditions, which results in property damage neither expected

18   nor intended from the standpoint of the insured.

19          To obtain insurance coverage, Soco has the burden of

20   proving by a preponderance of the evidence that there was an

21   occurrence as defined in the policies.

22          I will now instruct you on the property damage

23   requirement contained in all of the USF&G and Continental

24   policies.  To obtain insurance coverage from USF&G, Soco has

25   the burden of proving by a preponderance of the evidence that

1  there was property damage during one or more of the USF&G

2  policy periods.  To obtain insurance coverage from

3  Continental, Soco has the burden of proving by a preponderance

4  of the evidence that there was property damage during one or

5  more of the Continental policy periods.  The USF&G and

6  Continental policies define "property damage" as (1) physical

7  injury to or destruction of tangible property which occurs

8  during the policy period, including loss of use thereof at any

9  time resulting therefrom, or (2) loss of use of tangible

10 property that has not been physically injured or destroyed

11 provided such loss of use is caused by an occurrence during

12 the policy period.

13         I will now instruct you on the pollution exclusions

14 contained in all of the USF&G and Continental policies.  The

15 USF&G and Continental policies exclude coverage for property

16 damage arising out of the discharge, dispersal, release, or

17 escape of smoke, vapors, soot, fumes, acids, alkalis, toxic

18 chemicals, liquids or gases, waste materials or other

19 irritants, contaminants or pollutants into or upon the land,

20 the atmosphere, or any watercourse or body of water, but this

21 exclusion does not apply if such discharge, dispersal,

22 release, or escape is sudden and accidental.  Therefore, there

23 is no coverage under the USF&G or Continental policies for

24 property damage caused by Soco's alleged discharge, dispersal,

25 release, or escape of perchloroethylene unless Soco can prove

1   by a preponderance of the evidence that the alleged discharge,

2   dispersal, release, or escape was sudden and accidental.

3          To be sudden, Soco must prove by a preponderance of

4   the evidence that the alleged discharge, dispersal, release,

5   or escape of perchloroethylene was quick or abrupt.

6          To be accidental, Soco must prove by a preponderance

7   of the evidence that the alleged discharge, dispersal,

8   release, or escape of perchloroethylene was unintended and

9   unexpected by Soco West or any of its predecessor companies.

10         Furthermore, Soco must prove by a preponderance of

11   the evidence that the alleged sudden and accidental discharge,

12   dispersal, release, or escape of perchloroethylene involved

13   the discharge, dispersal, release, or escape of

14   perchloroethylene into or upon the land.

15         In order to obtain property damage liability

16   coverage under any USF&G or Continental insurance policy, Soco

17   has the burden of proving that the groundwater damage, if any,

18   which occurred during that policy's time period arose out of a

19   sudden and accidental discharge, dispersal, release, or escape

20   of perchloroethylene.

21         Soco may satisfy its burden by proving that

22   groundwater damage which occurred during a policy period arose

23   out of the sudden and accidental discharge, dispersal,

24   release, or escape of perchloroethylene before that policy

25   period.  The phrase "arose out of" means originated from,

2101

1   flowed from, or grew out of.

2          The comprehensive-liability insurance policy's

3   intent is to insure the acts or omissions of Soco or its

4   predecessors, including intentional acts, excluding only those

5   in which the resulting injury is either expected or intended

6   from the standpoint of Soco or its predecessors.  Whether the

7   resulting injuries were intended or expected must be measured

8   from the standpoint of Soco or its predecessors.

9          The fact that an act is intentional does not

10  necessarily mean the damage resulting from that act was

11  intended.  A person may act intentionally without intending or

12  expecting the consequences of that act.

13         The insurance policies in this case require Soco or

14  its predecessors, in the event of an occurrence as defined in

15  the policy, to provide written notice containing reasonably

16  obtainable information with respect to time, place, and

17  circumstances, and the names and addresses of the injured and

18  of available witnesses to USF&G or Continental as soon as

19  practicable.

20         The phrase "as soon as practicable" means within a

21  reasonable time from the date when a property damage claim

22  against the insured is made or can be reasonably anticipated.

23         USF&G must prove by a preponderance of the evidence

24  that it was materially prejudiced by the time that elapsed

25  between the date when a property damage claim against Soco was

1   made or could be reasonably anticipated and the date Soco

2   provided notice to USF&G.

3          Likewise, Continental must prove by a preponderance

4   of the evidence that it was materially prejudiced by the time

5   that elapsed between the date when a property damage claim

6   against Soco was made or could be reasonably anticipated and

7   the date Soco provided notice to Continental.

8          When you begin your deliberations, you should elect

9   one member of the jury as your foreperson.  That person will

10  preside over the deliberations and speak for you here in

11  court.

12         You will then discuss the case with your fellow

13  jurors to reach agreement if you can do so.  Your verdict must

14  be unanimous.

15         Each of you must decide the case for yourself, but

16  you should do so only after you have considered all of the

17  evidence, disclosed it fully with the other jurors, and

18  listened to the views of your fellow jurors.

19         Do not be afraid to change your opinion if the

20  discussion persuades you that you should.  Do not come to a

21  decision simply because other jurors think it is right.

22         It is important that you attempt to reach a

23  unanimous verdict, but, of course, only if each of you can do

24  so after having made your own conscientious decision.  Do not

25  change an honest belief about the weight and effect of the

2103

 1  evidence simply to reach a verdict.

 2          Some of you have taken notes during the trial.

 3  Whether or not you took notes, you should rely on your own

 4  memory of what was said.  Notes are only to assist your

 5  memory.  You should not be overly influenced by the notes.

 6          If it becomes necessary during your deliberations to

 7  communicate with me, you may send a note through the bailiff,

 8  signed by your presiding juror or by one or more members of

 9  the jury.  No member of the jury should ever attempt to

10  communicate with me except by a signed writing, and I will

11  communicate with any member of the jury on anything concerning

12  the case only in writing or here in open court.  If you send

13  out a question, I will consult with the parties before

14  answering it, which may take some time.  You may continue your

15  deliberations while waiting for the answer to any question.

16  Remember that you are not to tell anyone, including me, how

17  the jury stands, numerically or otherwise, until after you

18  have reached a unanimous verdict or have been discharged.  Do

19  not disclose any vote count in any note to the Court.

20          A verdict form has been prepared for you.  After you

21  have reached unanimous agreement on a verdict, your presiding

22  juror will fill in the form that has been given to you, sign

23  and date it, and advise the Court that you are ready to return

24  to the courtroom.

25          All right.  Soco, you may make the opening portion

2104

1   of your closing argument.

2              That podium, Mr. Banker, will go up.

3              MR. BANKER:   Thank you.

4              Well, good morning.  You're very nearly done.  And

5   for me, this is sort of the fun part of it, to get a chance to

6   talk with you about all of the evidence that you've heard over

7   the last two weeks, and, you know, it's nearly to the point

8   where you get to do the fun part for you, which is to take all

9   of the information that you have gathered and deliberate about

10  what has gone on.

11             You have probably noticed over the last two weeks

12  that we disagree across the middle of the room about what

13  happened here, and it ultimately isn't for us to say what

14  happened.  It's ultimately for you to say what happened based

15  on what you saw and what you observed and the evidence that

16  you heard.  And that's a fundamental part of our system of

17  justice, is to have a jury of impartial jurors help us to

18  resolve this dispute and tell us what happened.

19             You may have noticed, and when I walked in the

20  courtroom today, I was struck by, you know, all of the binders

21  are gone, all the boxes are gone, the tables are cleared off,

22  and we're really down to, you know, just what you saw and what

23  you remember about the testimony.

24             And I do want to thank you for your time and

25  service.  You know, it is a large commitment of time, and it

1   is an important part of what we do here, to have you serve in

2   this capacity.  You know, we can't thank you enough for being

3   here.

4          But all of the information that you have heard has

5   led up to this point, and Soco is now able to discuss the

6   evidence with you.  But there is a lot to cover, so I ask that

7   you bear with me for, you know, just a little bit longer.

8          The evidence shows -- I'd like to pull up

9   Exhibit 5024, the 1977 photo, which you've seen many times.

10         DOCUMENT TECHNICIAN:  (Complied with request.)

11         MR. BANKER:  The evidence shows that it is more

12   likely than not that there was a sudden and accidental release

13   of perc in the loading and unloading area, which we've heard

14   so much talk about, which moved down along that ditch that was

15   outside the berm and out into the northwest corner, causing

16   third-party groundwater damage by calendar year 1978 that Soco

17   neither expected nor intended.

18         Now as you heard at the beginning of the week when

19   Mr. Cozzens was talking to you, this is a puzzle.  Some of the

20   pieces of that puzzle are missing or lost because of the

21   passage of time and the way people's memories fade over time

22   and become less complete.  But that doesn't mean that we can't

23   tell what happened here.  We can still see the picture of this

24   puzzle.  And let's, before we talk about the pieces of that

25   puzzle, let's consider the frame of the puzzle.

1          This is a case where we have insurance companies

2     versus a local business, and you've heard increasingly -- they

3     haven't come right out and said it, but it's been implicit in

4     a lot of what they've said.  They are blatantly accusing us of

5     intentional pollution in order to avoid their contractual

6     obligations.  What you're going to be asked to decide is, Was

7     that what happened or not?

8          Now you heard the testimony from lots of employees

9     of this company, and you heard that it was a good company with

10    good people working at it.  And some of these witnesses spent

11    nearly their entire career working there.  I mean, we're

12    talking 20 and 30 years.  They were proud of what they did

13    there.  They were proud of the work that they did there.

14         You know, you think about Monte Naff, Dick Colver,

15    Dave Warne, and Rod Hallsten.  You've had a chance to see

16    those people come in and talk to you and evaluate their

17    credibility and see what kind of people they were.  And if you

18    think about all of the witnesses that came in to testify in

19    court, whether, you know, in person or on video deposition,

20    the one thing that they all agreed about was that this company

21    was conscientious about chemicals hitting the ground.

22         Now it was a chemical distribution company, and

23    there were, you know, occasionally drips and drabs that hit

24    the ground, and there wasn't much that could be done about

25    that, but, by and large, the company was adamant that, you

1  know, those were to be handled as carefully as possible.  If

2  chemicals hit the ground, they were to be cleaned up, and all

3  of the precautions that could be taken to avoid, you know,

4  those regularly operational things that happened were to be

5  taken.

6         And you remember -- if we could go to the next

7  exhibit, 143?  You remember this Continental inspection report

8  where they said that -- blow that up, second paragraph.

9         DOCUMENT TECHNICIAN:  (Complied with request.)

10         MR. BANKER:  It says the premises are kept clean.

11  Any chemical spills are immediately cleaned up and disposed of

12  in accordance with EPA regulations.  That's Continental, one

13  of the insurance companies in this case, came out to the site

14  in 1982, and that's what they saw.

15         And you heard from Larry Nelson, one of the

16  depositions that we read to you, an underwriting adjuster for

17  USF&G, who said inspectors like him are the eyes and ears of

18  the company, and they wouldn't insure a sloppy company.

19         So all we want here is for the insurers to fulfill

20  their contractual obligation, which, in return for those

21  contractual obligations, they collected premiums from Soco all

22  those years.

23         And if you think back to the first witness in the

24  case -- if we could go to the next exhibit, 3211?

25         DOCUMENT TECHNICIAN:  (Complied with request.)

2108

1          MR. BANKER:  You saw that USF&G had a policy

2     starting in 1978 and continued on for a number of years, up

3     until the point when we get to Exhibit 3321.  You heard about

4     the stipulation that was entered into that defines the terms

5     of the Continental policies from 1982 to 1985.  Between 1978

6     and 1985, USF&G and Continental were Soco's insurers.

7          Now there's another concept I want to sketch out

8     before we talk about the specific pieces of the puzzle, and

9     that is, in looking at the next exhibit, Exhibit 3059,

10    page 121, this is a figure from the record of decision.  We've

11    seen this a number of times in the case.  You've heard that

12    Soco is only seeking coverage for the big green blob out

13    there, the contamination of pure perc in the northwest corner.

14         The other areas that you talked about, that were

15    talked about in this case, in the operations area, the acid

16    tank area, and this small green blob, none of those are

17    important to what's going on in this case.  The northwest

18    corner is what Soco is seeking insurance coverage for.

19         Now you see from the plume there that those other

20    three blobs are contributing to the plume that's going to the

21    northwest, but this isn't a question of whether or not those

22    three blobs to the east are contributing to the northwest

23    corner.  Everybody agrees there is pure-phase perc down in the

24    northwest corner that has to be cleaned up.

25         And you heard when Dr. Powell was testifying, he

1    said, You know, remember, "I looked at the groundwater flow,

2    and the ratio of what those other three blobs are causing

3    compared to the northwest corner is a ratio of 10 to 1."  So

4    the big problem here is the northwest corner, and that's all

5    that Soco is seeking coverage for.

6            Now Soco has brought to you all of the witnesses

7    that had relevant knowledge about this incident that can still

8    testify.  And they don't all have the same memories, but

9    that's not all that surprising given that this was more than

10   30 years ago.  Some of the witnesses disagree on particular

11   points.  But, again, that's not surprising given how long ago

12   this was.  But there is, nevertheless, a remarkable

13   consistency between what they remember and what they talk

14   about and what they described, and when you put that all

15   together and you try to reconcile it, they're talking about

16   the same sequence of events.

17           I'd ask you to pay no attention to the distraction

18   and confusion that the insurers have attempted to sow in this

19   case.  Think about when we had witnesses on the stand.  When

20   Soco was presenting its case in chief and we brought in, for

21   example, Dick Colver, we had Dick Colver on the stand for

22   about 60 minutes, telling his recollection on direct, what he

23   knew about, what he remembered, what he could contribute to

24   this problem.  And then we had like a two or three-hour

25   interrogation from the insurers, and they did that again and

1  again with all of our fact witnesses.  And ask yourselves,

2  What did they elicit in that interrogation?  Did they elicit

3  any useful information, or were they just asking questions for

4  the sake of asking questions?

5         We brought in these witnesses.  We had them talk

6  about the relevant time frame of 1975 to 1978.  Did they bring

7  in a single witness from that time frame?  The only witnesses

8  that they put on in their case in chief were two fact

9  witnesses, were two video depositions from employees who

10 didn't even start until 1987.

11        So Soco was the party that presented to you the

12 people that were there on the ground in the time frame that

13 we're talking about, and we brought them all in.

14        Another thing that I don't want -- and I think you

15 need to ignore is this.  You've heard this theme from them in

16 their opening statement about the changing story.  Remember

17 the 104(e) report that Suzanne Miller did responding to the

18 EPA?  And they've suggested through questioning that, you

19 know, somehow Suzanne Miller wasn't being honest and

20 forthcoming, and somehow Soco wasn't being honest and

21 forthcoming, and that somehow it was an attempt to mislead or

22 confuse the EPA and not take responsibility for this problem.

23        You got a chance to see Suzanne Miller.  You got a

24 chance to hear that she understood she was responding under

25 oath to the EPA under penalty of perjury.  She had a very

1   short time frame to respond to it.  She did the best she could

2   with the available information, and she didn't have a lot of

3   these aerial photographs that we've been looking at over the

4   past two weeks.  She didn't have the photo with the green line

5   that was stipulated that we received from the insurers in

6   2004.

7           So back in the 2000 and 2001 time frame when Suzanne

8   Miller was describing this, she was talking to people who had

9   a contemporaneous memory of the property and the layout of the

10  facility which you saw change a number of times over its

11  history.  And she did the best she could.  She made some

12  mistakes in that report, but we, the people in this room, have

13  been working on this problem for nearly ten years to make the

14  presentation that you've seen today or during these last two

15  weeks of evidence.  You know, compare that to what Suzanne

16  Miller was working with.  She didn't have access to all that

17  information.  She didn't have access to those resources or

18  those people.

19          The two fact witnesses that the insurers called,

20  Mr. Kjos and Mr. Brill, through their depositions, you know,

21  they fall outside the relevant time frame.  They don't even

22  start at the facility until the concrete retainment, the three

23  concrete retainment pond facility reconfiguration is done that

24  started -- that was finished in 1987, which is completely

25  different from the historical operations where you had, you

1   know, back before 1981 when they drained the ditch, when the

2   stormwater ditch was outside of containment and was changed

3   again in 1981 to bring it inside of containment and when you

4   had catch ponds.

5           Kjos and Brill -- you know, and what they talk about

6   in terms of, you know, the drum dumping and whatnot, no one is

7   suggesting in this case that drum dumping is an explanation

8   for what happened down in the northwest corner.  If it was a

9   drum-dumping situation, you would see a chemical mixture down

10  there.  It's not even the relevant time frame.  The relevant

11  time frame is really before 1981.  It's really the 1975 to

12  1978 time frame.

13          What everyone does agree on -- and this is Soco's

14  experts, this is the insurers' experts, this is the EPA.  What

15  everyone does agree -- and I'd like the next exhibit, please,

16  Exhibit DD91.

17          DOCUMENT TECHNICIAN:  (Complied with request.)

18          MR. BANKER:  Everyone agrees that there is pure perc

19  down in the northwest corner.  It doesn't have -- you heard

20  the rich menu of chemicals that are handled at the rest of

21  that site that you see in the operations area where you've got

22  a mixture of different kinds of BTEX chemicals.  When you look

23  at the northwest corner, that's all perc.  Pure perc.  And

24  everybody agrees on that.

25          And everybody agrees that it is more likely than not

1    that it happened before 1987.  You heard that from their

2    experts, and you heard, from our experts, an earlier time

3    frame, but after 1987, after that catch pond went away, no one

4    is even suggesting that chemical escaped down to the northwest

5    corner.

6            So if I could have Exhibit 5042?

7            DOCUMENT TECHNICIAN:  (Complied with request.)

8            MR. BANKER:  This is a 1987 photo.  By 1987, the

9    catch pond is gone, and it's been replaced with those three

10   concrete containment pads.  So we know it was before 1987.

11           If we could look at the next exhibit, Exhibit 5033?

12           DOCUMENT TECHNICIAN:  (Complied with request.)

13           MR. BANKER:  This is a 1981 photo.  By 1981, the

14   stormwater ditch that used to exist outside containment is now

15   inside containment, and so Soco would take you back even a

16   step further and say that all roads here lead to 1978, that it

17   is more likely than not that what happened here, perc escaping

18   outside of containment and making its way in a pure form to

19   the northwest corner, that happened so that property damage

20   was occurring by 1978.

21           Now I do want to comment on one part of that; you

22   know, property damage.  The judge told you at the beginning of

23   the case, in the statement of the case, that there is no

24   dispute that the groundwater contamination that everyone has

25   been talking about here is property damage.  So -- and that

2114

1    isn't even a question that you'll be asked to decide, whether

2    or not groundwater damage is property damage.  That's just

3    accepted and not disputed by anyone here.

4           Now think back to the beginning of the case when you

5    heard the opening arguments and you got the initial

6    instructions from the Court.  The burden of proof is going to

7    be an important concept here, and you've just had instructions

8    about that.  The burden of proof that Soco has to satisfy is

9    more likely than not.  And I think, you know, you heard the

10   analogy, the scales of justice.  In a civil case, the burden

11   of proof starts out -- it's equal, because no one has any

12   particular advantage.  To be more likely than not, all Soco

13   has to do is its side is just a little bit heavier than the

14   other side.  It is a little more likely than not that Soco's

15   evidence explains this problem.

16          And I also want to comment about circumstantial

17   evidence, because you've heard that -- you know, there are no

18   direct witnesses to this.  There are no documents that show

19   this.  There are no photographs that show this.  And that's

20   all true, but what -- and what we have here is a

21   circumstantial evidence case, but that's not a problem.  The

22   Court just told you that circumstantial evidence is as good as

23   direct evidence.  And you have -- you know, what the Court

24   just read to you in Instruction 5, there's not a problem with

25   circumstantial evidence so long as the circumstantial evidence

1    persuades you that a particular fact is more likely than not,

2    and we can have a chain of circumstantial evidence.  So long

3    as each step of that chain is more likely than not, that's

4    okay.

5          So having framed in the outline of that puzzle,

6    let's consider the pieces of the puzzle.

7          I'd like to turn to Exhibit 5024, back to the 1977

8    photo.

9          DOCUMENT TECHNICIAN:  (Complied with request.)

10          MR. BANKER:  As I said at the beginning, it is more

11    likely than not that there was a sudden and accidental release

12    of perc in the loading and unloading area which caused

13    groundwater damage by calendar year 1978 that Soco neither

14    expected nor intended.  Due to the passing of time, no witness

15    testified that they saw the spill or made a report about it,

16    but that doesn't mean it didn't happen.  The one thing

17    everybody agrees about is that down in the northwest corner,

18    there is pure-phase perc, and the question is, How did it get

19    there?

20          Soco is not even arguing that -- you know, you heard

21    when Dr. Dale came in, he said it's impossible for this to

22    have happened without anybody noticing it.  That isn't what

23    Soco is saying.  What Soco is saying is that no one who has

24    testified here today recalls it or has been able to talk to

25    you about it directly.

1          Now that means either that, you know, someone hasn't

2     been identified, who hasn't been able to come to court today,

3     or someone who has come to court doesn't remember it, but it

4     doesn't mean that -- Soco is not suggesting that this could

5     have happened without anybody noticing it at all, because

6     there are features of it.  It would have been a dramatic thing

7     when it happened, but the people who have testified about it

8     here say, "At the time, we were not aware that there had been

9     a spill.  We were aware of other features of this.  We were

10    aware of an inventory discrepancy."  But the fact that no one

11    is able to talk about seeing a spill doesn't mean that no one

12    noticed it.  It just means that no one has been able to come

13    here and talk about it 30 years later.

14         Now what are the pieces of the puzzle?

15         The first is the northwest corner.  The EPA says

16    that there was a surface release in the northwest corner, and

17    I'd like to have Exhibit DD139.

18         DOCUMENT TECHNICIAN:  (Complied with request.)

19         MR. BANKER:  Do you remember when Dr. Powell talked

20    about this?  This was an MIP boring in the northwest corner,

21    MP-100, and they talked about they took a hydraulic drill and

22    went down and were taking electronic readings as they went,

23    and he said the reason why the northwest corner is uniquely

24    interesting and we know it's an area of surface release of

25    pure-phase perc is because right away we start to get hits on

1    that scale, and it goes all the way down to the bottom, and

2    that looks very different from the other sources that they

3    found on different parts of the site.  In particular, it looks

4    very different from the source -- from the MIP boring that

5    they took from the catch pond area where they only found it

6    down near the bedrock.

7           So we know that there's surface release in the

8    northwest corner.  And the EPA says that it's a release of

9    approximately 200 gallons.  And back in the 1999 Lockheed

10   Martin report, they said, well, it was sometime between -- at

11   least sometime between 1989 and 1984, so that sets an initial

12   time frame for it.

13          But, you know, there are other pieces that we've

14   heard since then that have added more detail to that, and we

15   have a rich understanding than what they had in 1999.

16          We also know that down in the northwest corner, the

17   chemical signature is unique.  It shows that it's made up of

18   perc and its breakdown components.  It's not everything else

19   that was going on.  There is no BTEX down there that is worth

20   talking about.

21          What's down in the northwest corner is 15 times the

22   EPA threshold for saying that there's a pure source of perc

23   that can be detected.  And down in the northwest corner, you

24   heard about the three indicators:  the soil, the groundwater,

25   and the MIP logs.  We hit all three down in the northwest

1    corner.   There is no dispute that the northwest corner is pure

2    perc.

3          The second piece of the puzzle that I want to talk

4    about is the pathway.   There was a stormwater ditch between

5    the unloading area and the northwest corner between 1975 and

6    1980.

7          And I'd like to see Exhibit 2533.

8          DOCUMENT TECHNICIAN:   (Complied with request.)

9          MR. BANKER:   Remember, this is the photo, this is

10   the 1975 photo that the parties stipulated that the insurance

11   companies had provided in 2004.   This was the first photo that

12   showed, first historic aerial photo that was available that

13   showed this historic ditch going down in the northwest corner

14   in that time frame.

15         Can I have the next frame of that photo?

16         DOCUMENT TECHNICIAN:   (Complied with request.)

17         MR. BANKER:   Do you remember the green line?   The

18   photo came to us with a green line outlined on it.   There is

19   really no dispute that there was a stormwater drainage ditch

20   that existed between 1975 and 1980.   You've seen it in

21   countless photos.   You've seen, heard lots of testimony about

22   it.   You've heard experts talk about their being able to

23   observe water in that ditch draining from the

24   loading/unloading area.

25         The pathway also consists of this area, and you've

2119

1    heard testimony about how there was a south berm.  You've

2    heard testimony that even if there wasn't a south berm,

3    Mr. Grip was able to see a darkening that would show a

4    darkened area which would provide a pathway to take water out

5    of the unloading area down to the corner, out along the ditch,

6    out to the northwest corner.  And you heard testimony from

7    Mr. Colver and Mr. Naff about, you know, that was how the site

8    drained from 1975 to 1980.

9         What's the next piece of the puzzle?  The next piece

10   of the puzzle is the loading and unloading area.  That is the

11   only place where perc was handled outside of containment, and

12   you heard testimony that perc was transferred through hoses

13   and pumps at approximately 60 gallons a minute.

14        Well, you know, think about how long that is.  Sixty

15   gallons a minute, it would take less than nine minutes for

16   500 gallons to be released.  Less than five minutes if there

17   was pressure from both sides, like Mr. Colver talked about.

18   If you had a coupling fail in a certain position, you'd get

19   pressure both from the pump as well as from the truck.  Well,

20   if someone went to the bathroom or went to smoke a cigarette

21   or went to get a cup of coffee, that's long enough, at

22   60 gallons a minute, for a lot of perc to be released.

23        And you heard a lot about hoses and couplings.  I

24   mean, these hoses and couplings were mechanical devices, and

25   they sometimes had problems.  You heard Mr. Naff talk about he

1    had a situation, you know, he had a situation where he had a

2    hose rupture, and he said, "I was soaked from top to bottom in

3    chemicals from that." So hoses could rupture. Couplings

4    could fail. And if it happened in the loading and unloading

5    area, you know, chemicals were being transferred at such a

6    rate that a lot of chemical could be released very quickly.

7          What's the next piece of the puzzle? The next piece

8    of the puzzle is that Dyce as a company had policies and

9    procedures in place to minimize the chance of perc hitting the

10   ground. They used drip pans underneath the couplings. When

11   they were connecting up to a truck or they were connecting up

12   to a pump, the quick couplings that you saw, there were drip

13   pans to prevent the little drips and drabs from getting out

14   onto the ground. They used dedicated hoses and pumps to avoid

15   cross-contamination. They had unloading policies. They had

16   reporting policies. And they had spill policies. I mean, you

17   heard about how those policies evolved over time. At first

18   they were oral, and then at some point in the '80s they got

19   written down.

20         If we could turn to Exhibit 3102?

21         DOCUMENT TECHNICIAN:  (Complied with request.)

22         MR. BANKER:  This was a document that you saw. It

23   was a 1985 company policy that was talking about how to handle

24   spills.

25         And if we could turn to the next page of that

2121

1    exhibit?

2              DOCUMENT TECHNICIAN:   (Complied with request.)

3              MR. BANKER:   This was the spill and cleanup policy.

4    And down -- if we could blow up the last paragraph there, this

5    was the policy in 1985, and you heard testimony that this was

6    really the policy all along.   This hadn't changed.   Any spill

7    that we have, whether it is a hazardous material or

8    nonhazardous material, shall be handled to prevent its loss

9    into the environment.   So that's where, that's where Dyce was

10   coming from.

11             If we could go to the next page?   And blow up the

12   last paragraph.

13             DOCUMENT TECHNICIAN:   (Complied with request.)

14             MR. BANKER:   It says, "Our policy is that all spills

15   be handled as emergencies and cleaned up as quick as possible

16   so they do not soak into the ground, run into any stream or

17   ditch or water or any kind of sewer."

18             So -- but even though Dyce had these policies, you

19   heard testimony that it was nevertheless possible for truck

20   drivers delivering a bulk load to not always stay with their

21   trucks, and it was possible for Dyce employees, including the

22   temporary employees that they used from time to time, to not

23   always be present at the unloading.

24             So it would have been possible in that time frame

25   for a spill to have occurred without management knowing about

1   it.  And you think about the location of the office.  You

2   heard about how the office was not, you know, in the loading

3   and unloading area.  You heard about the prevailing wind;

4   that, you know, the wind always is blowing.  You heard

5   about -- you know, there was a lot of talk about gravel and

6   concrete and asphalt and how, you know, if there was a perc

7   stain that hit concrete, it wouldn't leave any mark.  If there

8   was a perc stain that hit asphalt, it might react, but it

9   might look like any other stain of the other chemicals that

10   are being handled at the site.

11          And you have the unloading area at the start of the

12   drainage along the south berm to the stormwater ditch between

13   the railroad track and the west berm.  If a release would have

14   happened in the unloading area in between 1975 and 1988, it

15   could have been spilled and gone in minutes.

16          And you heard testimony that employees didn't

17   necessarily report everything despite the policy.  I mean, and

18   think about that.  You've heard testimony that perc was one of

19   the most expensive chemicals that was handled at the facility.

20   What is someone going to think if they have a -- if they're

21   there -- and you heard sometimes employees were on call by

22   themselves at the facility.  If they're there and they have

23   this spill and a coupling fails and 500 gallons of perc

24   escapes and there's no one else around to see it, is that

25   something that's necessarily going to be reported?  What would

1   happen to the person that did that?  You know, that person

2   might have been concerned about whether or not they would lose

3   their job.  That person might have been concerned about, you

4   know, whether there would be consequences to them.  And the

5   fact of the matter is, there never was a report of a spill of

6   perc.

7           But then we come to the next piece of the puzzle,

8   the inventory discrepancy.

9           In the same time frame when the pathway existed from

10  the unloading area and the northwest corner, there was a

11  significant inventory discrepancy of perc that was unique in

12  the history of the company.  And you heard Mr. Hallsten talk

13  about how he thought that was between 250 to 1,000 gallons.

14  You heard Mr. Naff testify about how he thought that was

15  between 500 to 600 gallons, and you heard Dr. Powell testify

16  that, in his opinion, it would have taken at least 500 gallons

17  released in the unloading area to get down through that ditch,

18  given what you would lose and what would evaporate, to have

19  the amount of chemical in the northwest corner that we find

20  there today.

21          Then we come to the question of, Well, when did that

22  inventory discrepancy happen?

23          And no one can say with absolute certainty.  They

24  sketch out a time frame.  Mr. Naff starts by saying, you know,

25  he thinks it's 1975, '76, or '77.  Excuse me; Mr. Hallsten

2124

1    says 1975, '76, or '77.  Mr. Naff says he thinks it could have

2    been in 1975 or 1976.  But on cross-examination, when the

3    insurers were asking questions about it, Mr. Naff said it

4    could have been as late as 1977, and Mr. Hallsten said it

5    could have been as late as 1978.  So that's, that lays out a

6    general time frame, 1975 to 1978.

7             It isn't going to be important for you to decide

8    exactly when this happened so long as you can find it's more

9    likely than not that this happened by 1978.

10            And actually, when you think about it, why were they

11   able to say 1975 to 1978?  Well, the critical testimony on

12   that is it was because Hallsten was on the order desk, but it

13   wasn't the first year he was on the order desk, 1975, when he

14   was training with Monte Naff.  So that more or less rules out

15   1975.  We're looking at 1976, '77, or '78.

16            But even more specifically, both Hallsten and Naff

17   had a recollection that this was part of the quarterly

18   inventory that was taken, and Mr. Naff recalls, he thinks it

19   was the fourth quarter of one of those years.  And

20   Mr. Hallsten says, "I think it was the first quarter of one of

21   those years."  Why do they both have that recollection?  Well,

22   they both have the recollection because of Quentin Dyce.

23            Quentin Dyce was coming back from Arizona, and

24   whether it was Quentin Dyce coming back from Arizona at

25   Christmastime so that it was a fourth-quarter issue, or

1    whether Quentin Dyce was coming back in the spring so that it

2    was a first-quarter issue, again, that's not really that

3    important.

4             The fact of the matter is we've got two witnesses

5    who worked there in the same time frame who have a

6    recollection of a quarterly inventory discrepancy in the same

7    period of a couple years, off by one quarter from each other.

8    When you try to reconcile that testimony, the way to reconcile

9    that testimony is to ask yourself, Is it more likely than not

10   that it happened by calendar year 1978?

11            And the last piece of the puzzle, and this really

12   isn't disputed, is that if there had been a release of perc in

13   the unloading area that went along the outside of the south

14   berm to the stormwater ditch and wound up in the northwest

15   corner as a surface release, it is undisputed that that would

16   have caused groundwater damage within six months or less, and

17   so long as it's down there, it continues to cause groundwater

18   damage.  And you heard that, you know, perc doesn't, doesn't

19   dissolve very well in water.  It just sits down there, so it's

20   been down there for a long time, and it is, you know, it's

21   caused a problem ever since it first got there.

22            Now why is all of this important?  Well, this is

23   important because of insurance.  And think back -- and that's

24   why groundwater damage by 1978 is important.  USF&G insured

25   Soco from 1978 to 1981.  Continental insured Soco from 1982 to

1    1985.

2            Now I do want to take that, this opportunity, to

3    talk a little bit about one of the issues that you're going to

4    be asked to decide on the verdict form, and that is the

5    question of notice and prejudice.

6            You heard instructions that the policies require

7    notice of an occurrence as soon as practicable, which means

8    within a reasonable time from the date when a property damage

9    against Soco -- property damage claim is made against Soco or

10   can be reasonably anticipated.  But you heard Mr. Warne

11   testify that no one ever told him, as the district manager for

12   this facility, that anyone had any problems with the notice

13   that was provided to the insurers, and the notice, you

14   remember from the first witness, Mr. St. George, when we were

15   talking through some of those documents that were put into

16   evidence --

17           MR. JOHNSON:  Your Honor, I object to this.  I

18   object to this.  This goes to an issue that is not for the

19   jury.

20           THE COURT:  It's overruled.

21           MR. BANKER:  You heard Mr. St. George say, when we

22   were dealing with documents on the first day of testimony,

23   that they provided notice to the insurance company in June of

24   2000.  They told the insured that the policy of the company

25   was to tell the insureds about claims that they received

1    within weeks.  So you have notice going to USF&G in

2    Exhibit 231 in June of 2000, and you have notice going to

3    Continental in Exhibit 3886.

4              Can we pull up 3886?

5              DOCUMENT TECHNICIAN:  (Complied with request.)

6              MR. BANKER:  This was a letter that Soco sent to

7    Continental.

8              And if we could pull up Exhibit 231?

9              DOCUMENT TECHNICIAN:  (Complied with request.)

10             MR. BANKER:  This was a letter that was sent to

11   USF&G in the June 2000 time frame.

12             Now the insurers, on the question of notice, would

13   say, I think, "Well, we're not talking about June of 2000.

14   Why didn't Soco give us notice of this problem back in the

15   1970s?"

16             Well, you've got to think very carefully about that

17   language.  Notice of an occurrence, as soon as practicable,

18   means within a reasonable time from the date when a property

19   damage claim against Soco is made or can be reasonably

20   anticipated.

21             Well, you heard Dr. Powell explain that in the

22   1970s, no one was thinking about perc and its danger to

23   groundwater.  That just wasn't part of the awareness back

24   then.  That changed over time, and certainly today, looking

25   back on it from the year 2010, we look back on it and say,

1    "Well, you know, isn't it obvious to us that, you know, perc

2    was a problem, or any chemical was a problem being released

3    into the environment?"  Well, that wasn't obvious back in the

4    1970s before CERCLA and RCRA and all of the federal

5    regulations were passed and put into place.  In that time

6    frame, it was a different situation.

7           So ask.  When was the first time that Soco knew

8    about a property damage claim that was being made against it?

9    Well, it was the *Weiss* action, or, at the earliest, it was

10   when the EPA said, in the Lockheed Martin 1999 report, that

11   Soco was a potential source of contamination.

12          And even when that happened, you heard Mr. Warne

13   talk about, "We didn't really know how that perc would have

14   gotten down there.  We thought at first it might have come

15   from one of the companies that was adjacent to us on the

16   fenceline, because we had no explanation for how perc would

17   have gotten down to the northwest corner in its pure form.  We

18   didn't know.  It took us years of investigation to come up

19   with that."

20          And you also heard talk from Mr. Warne about it

21   wasn't exactly clear, once they understood what the EPA was

22   looking at and the time frame that the EPA was putting this

23   into, it took some time to figure out who the historical

24   insurers were and research that information so that they could

25   be in a position to have a communication with the insurers.

1          So when a claim actually came in -- the Lockheed

2    Martin report in 1999 was not a claim.  The first claim that

3    came in was the *Weiss* action, which was tendered to the

4    insurance companies in June of 2000.  The EPA then, later in

5    2000, sent Soco a PRP letter, potentially responsible party

6    letter, which was also forwarded to the insurers, but that was

7    really the first claim that the EPA had made against Soco.

8          But what about the second question?  You know, I

9    talked to you about notice a little bit.  But what about

10   prejudice?  You know, were the insurers prejudiced between the

11   time that Soco knew or reasonably could have anticipated a

12   claim and reported it to its insurers?

13         Well, there is absolutely no evidence of prejudice

14   from the insurers.  Now they may talk about, "Well, a lot of

15   time has passed and witnesses have died and documents have

16   gone, you know, gone to where they can't be found."  But you

17   didn't have a single witness from these insurance companies

18   who took the stand and testified under oath that somehow they

19   have been prejudiced or materially affected by this.  The fact

20   of the matter is, you know, you can draw whatever inference

21   you want from that.

22         MR. COZZENS:  Paul, five minutes.

23         MR. BANKER:  The prejudice that we're talking about

24   there is the measure of the prejudice between the time that

25   Soco provided -- you know, first could have known or

1    reasonably anticipated a claim.  I would submit that's no

2    earlier than 1999 and probably sometime in 2000.

3              So we have the who, what, where, when, and how:

4              Who?  A Dyce employee or a truck driver.

5              The what?  A large spill of perc.

6              Where?  Outside containment in the unloading area.

7              When?  '75, '76, '77, or the first part of '78, but,

8    in no event, it was by 1978.

9              How?  Most likely during the unloading operation,

10   transferring perc at 60 gallons a minute.

11             And why is all this important?  Well, if groundwater

12   contamination happened by 1978 as a result of a sudden and

13   accidental spill, then the insurers' policies respond.

14             And Soco has ruled out other explanations as less

15   likely through the evidence.  The perc wasn't stolen.  It

16   wasn't intentionally dumped in the northwest corner.  It

17   wasn't steam cleaning of barrels or drum dumping or drips and

18   drabs.  All of those would result in a mix of chemicals that

19   you don't see down there.  And, moreover, there was never any

20   operations or storage down in the northwest corner.  So

21   something unusual had to happen that was outside of the

22   ordinary.

23             So what are the insurers arguing?  Well, the

24   insurers have put up this theory of a catch pond release.  But

25   you've heard lots of testimony that it couldn't have been

2131

1    drained through a pipe.  And what pipe am I talking about?

2    I'm talking about Marvin Johnson's pipe.  You heard testimony

3    from Dr. Powell that that wouldn't work.

4            If you've got 1,000 gallons of perc, that gives you

5    an inch of perc in the bottom of the catch pond.  Marvin

6    Johnson's pipe -- as it went down, didn't get to the bottom of

7    the catch pond necessarily -- would have required such a layer

8    of water on top of it to push it up out of that pipe, there's

9    just no way that could have happened before the water

10   overflowed the berm.  But, moreover, everyone else, and I mean

11   Colver, Naff, Johnston, Warne, they all say there wasn't a

12   pipe in the catch pond.

13           I don't know what Marvin Johnson is remembering all

14   these years later, but I know that the other witnesses don't

15   remember it.  I know that when you heard Mr. Grip testify,

16   it's not visible in the photos.  You can't see this pipe.

17   There's no evidence of this pipe.

18           And remember Doug Johnston?  He took the stand after

19   Marvin Johnson said, "He was my supervisor.  Doug Johnston

20   told me to go out there and drain that pipe."

21           And I asked Doug Johnston, I said, "Was there a

22   pipe?"

23           He said, "No."

24           "Did you ask Marvin Johnson to drain it?"

25           He said, "No."  He said, "The thought sends chills

                              2132

1    down my spine, because that would have been totally

2    inconsistent with having a catch pond in the first place."

3           There is no evidence of draining or any other

4    mechanism that would have gotten chemical out of that catch

5    pond and into the northwest corner.  Any pipe or draining

6    would have resulted in such a mixture of chemicals down there

7    that it just doesn't make sense.

8           And remember that the perc in the catch pond

9    concentration was 10,000 times less than the concentration of

10   perc found in the northwest corner.

11          Now the insurers' experts here have come in ten

12   years after Soco started communicating with the insurance

13   companies and have conjured up an impossible scenario.  In

14   order to believe their experts on this -- if the fact

15   witnesses that Soco has brought in are telling the truth, then

16   the scenario they've conjured up is just simply wrong.

17          Dr. Shanahan, their expert on the northwest corner,

18   talks about -- you know, he admits this would have been more

19   likely than not before 1987, but did you hear him say, well,

20   he wasn't concerned about the facts?  He didn't read the

21   depositions.  The testimony of the factual witnesses wasn't

22   important to him.

23          He spent all of his time talking about everything

24   but the northwest corner, talking about the other areas.  But

25   remember when he talked about that red dot that they found

1    underneath one of the concrete containment ponds, and, on

2    cross-examination, Mr. Lynch asked him, "Wouldn't that same

3    mixture that was found at the red dot be what we'd find in the

4    catch pond?" and he said, "Yes"?  So you'd have that same

5    mixture of chemicals in the catch pond.  If it was released

6    from the catch pond, you would see that same mixture of

7    chemicals down in the northwest corner.

8          Do you remember Ms. Stout and her testimony about

9    how she could see in the shadows where no one else could see?

10   Witnesses testified that there was a berm there.  Mr. Grip

11   testified he couldn't see in the shadows except to the extent

12   that there was a drainage depression.  But, you know, ask

13   yourself.  Is it credible?  You've seen the photographs.

14   You've seen the pictures of the berm.  You've heard the

15   testimony.  Ask yourself.  Is that credible?

16         Remember Dr. Sternberg and how he cut the northwest

17   corner into a quarter of its mass before he did his mass

18   calculations?

19         And Professor Dale?  He admitted to the most

20   impossible scenarios of all.  He even admitted some of the

21   things I'm suggesting are impossible.  All the spills happened

22   at once.  Released onto completely flat ground.  Doesn't

23   react, perc doesn't react to the surface.  It evaporates all

24   at once.  It hits the asphalt and there's no wind.  It's a

25   75-degree day, even though this was a first- or fourth-quarter

1  release.

2          And he got some pictures from a friend who heard

3  something about a perc spill, but he's never seen a perc

4  spill, and he's never even seen a truck unloading.  So ask

5  yourself.  Is that helpful or credible?

6          I would like to talk with you briefly about the

7  verdict form and the questions that you're going to be asked

8  to answer.

9          The first question, "Was groundwater contamination

10  at or near the Soco facility caused by an occurrence?"

11          Well, you've got a couple of instructions on that.

12  It's Instruction 14 and Instruction 15.  I'd submit to you the

13  answer to that question is yes.

14          And, No. 2, "Did groundwater contamination arise out

15  of a 'sudden and accidental' release of perchloroethylene at

16  Soco's Lockwood facility in 1975, 1976, 1977, or early 1978?"

17  I'd submit to you the answer to that is yes, and, on that

18  question, you have Instructions 16 and 17.

19          Question 3, Was the June 2000 notice given to USF&G

20  within a reasonable time after a property damage claim against

21  Soco was made or reasonably anticipated?  I'd submit the

22  answer to that is yes.

23          And, No. 4, "Was USF&G prejudiced by the timing of

24  Soco's notice?"  The answer there, I think, is no.

25          I'm missing a page.  Do you have 5 and 6?

1          THE CLERK:  I do (handing).

2          MR. BANKER:  No. 5, "Was Soco's June 2000 notice to

3    Continental given within a reasonable time?"  This is a mirror

4    image of the USF&G question.  Again, the answer there I'd

5    submit is yes.

6          And, No. 6, "Was Continental prejudiced by the

7    timing of Soco's notice?"  The answer there is no.

8          So what I'd leave you with is I don't think that

9    there's any credible evidence that explains the pure perc in

10   the northwest corner better than a sudden and accidental

11   release of perc in the unloading area that caused property

12   damage which Soco neither expected nor intended by 1978.

13         Think about those scales of justice.  You are the

14   finders of fact in this case.  You will decide what is more

15   likely than not using your evaluation of the evidence, the

16   Court's instructions, and your common sense.  If you find that

17   Soco has tipped the scales of justice in its favor on the

18   issues that you will decide, you should return a verdict for

19   Soco.

20         Thank you.

21         THE COURT:  Thank you.

22         You've used 43 minutes --

23         MR. BANKER:  How many?

24         THE COURT:  -- to be technical, and 17 seconds, so

25   that means you have about 17 minutes left.

1          Now, ladies and gentlemen, we're going to take our

2    last break.  When we come back, the insurers will make their

3    closing arguments, Soco will complete theirs, and then we'll

4    be in recess awaiting your verdict.

5          Let's take a recess.

6          THE LAW CLERK:  All rise.

7      (Recess taken from 10:13:21 to 10:26:20.)

8      (Open court.)

9      (Jury present.)

10         THE COURT:  Please be seated.

11         Mr. Johnson, you may make your closing argument on

12   behalf of USF&G.

13         MR. JOHNSON:  Thank you, Your Honor.

14         Now the first thing I'd like to say is thanks.

15   Thank you for serving on this jury.  Thank you for taking time

16   out of your lives, your busy lives, your work, for your

17   service to the court and to the parties in this case.  Really

18   the fact that citizens such as yourself will take the time to

19   serve on juries, to resolve disputes between other citizens

20   and corporations makes our legal system very valuable and

21   unique.

22         The insurers filed this case right here in Billings

23   to have a Montana jury, you all, decide whether the companies

24   that we speak for are contractually obligated to reimburse

25   Soco for the amounts that Soco must spend to clean up the

2137

1   pollution that Soco is legally responsible for.

2          We don't believe that we are contractually obligated

3   to pay Soco for its cleanup of the environment.  But that

4   decision isn't ours to make.  It is up to you.  It is your

5   decision to make, and I know that you will make it wisely,

6   considering both the credibility of the testimony that you've

7   heard and your own common sense.

8          Okay.  Let me get right to the heart of the case,

9   the alleged spill of hundreds of gallons of perc which

10  purportedly happened, according to Soco's theory of the case,

11  sometime in 1975, 1976, 1977, or early 1978.

12         The policies that Dyce purchased from USF&G and

13  Continental in the late 1970s and early 1980s exclude coverage

14  for pollution.  Let me say that again.  The policies of

15  insurance that Dyce purchased have pollution exclusions in

16  them that exclude any pollution into the environment with one

17  exception:  if the pollution was caused by a discharge that

18  was both sudden and accidental.

19         You already heard the language of the policy which

20  I've just summarized in the instructions, and you'll see the

21  language of the policy when you take the instructions back

22  with you.

23         After all of the evidence presented over the long

24  eight days of trial that we've been here, that's the

25  fundamental issue in this case, whether the spill that Soco

1    theorizes ever really happened.

2           You may recall that in my opening statement, I asked

3    you to pay close attention, to listen during the course of the

4    trial to hear if anyone, anyone at all, testifies that he or

5    she saw a spill of 250 to 1,000 gallons of perc in the 1970s.

6           I promised you, I promised you that you would not

7    hear anyone, anyone at all say that he or she had seen such a

8    spill.  That, of course, turned out to be the case.  No one

9    has testified that he or she had seen the alleged spill.

10          I also promised you that you would not hear anyone

11   testify that he or she observed the spill with any of their

12   other senses.  No one heard it or the shouts of the people

13   that would have clearly been heard if it had happened, and no

14   one smelled it despite the fact that a spill of 250 to

15   1,000 gallons of perc would have clearly had a strong and

16   distinctive odor.  And no one saw any evidence of it after it

17   allegedly occurred.

18          No one saw any evidence of it despite the fact that

19   Dr. Bruce Dale, our expert from Michigan State, said that a

20   spill the size of 250 to 1,000 gallons of perchloroethylene

21   would have been a catastrophic nightmare.  It would have, it

22   would have amounted to tons of perc spreading out in all

23   directions across the loading area, permanently, permanently

24   damaging the asphalt in that area.  Yet no one saw it.  No one

25   heard it.  No one smelled it, and no one saw any evidence of

1    it after it allegedly occurred.

2            In my opening statement, I asked you to look very

3    closely at the exhibits that Soco offers in this case.  I

4    promised you not one document, not a single one, will refer to

5    the alleged spill.  And that, of course, is the case.  There's

6    not one report, not one letter, not one memo that even

7    mentions the spill or even the possibility of a spill.

8            Ladies and gentlemen, I submit that there is only

9    one question -- only one conclusion that you can draw from all

10   of this.  The alleged spill never happened.  It is nothing

11   more than a story that Soco came up with to try to get the

12   insurance companies to pay for the cleanup of the

13   environmental mess that Dyce created.

14           Mr. Banker's suggestion a few minutes ago that

15   someone forgot about it is simply implausible.  So is his idea

16   that someone knows about it, some Dyce employee knows about it

17   but didn't come in to court to testify about it.

18           When Suzanne Miller was asked and Dyce was asked by

19   the EPA to go out and interview employees and former

20   employees, they talked to, I think, at least 19 different

21   people.  Every single one of them denied that such a spill

22   ever occurred.

23           If the alleged spill didn't happen, Soco is simply

24   not entitled to any insurance coverage under the policies that

25   the insurers issued to Dyce.

1          Now we heard about the inventory shortage story.

2    Let me address that for a few minutes.  Whatever you think

3    about the story about the inventory shortage, one thing is

4    absolutely clear.  There is absolutely no evidence linking the

5    inventory shortage to the alleged spill.  Only two witnesses

6    recalled the inventory shortage, Rod Hallsten and Monte Naff,

7    both long-time Dyce employees, but all they did was recall a

8    shortage.  They both testified that they don't know what

9    caused the shortage.  They both said that the issue as to what

10   caused the shortage was turned over to Quentin Dyce, and they

11   both said they didn't know if the shortage was ever resolved,

12   and they both said they never heard about it again from

13   Mr. Dyce.

14         And, most importantly, neither Hallsten nor Naff

15   testified that the inventory shortage they recalled was the

16   result of a major spill of perc.  In fact, like every other

17   Dyce employee who testified in this case and every other Dyce

18   employee who was interviewed for Suzanne Miller's report to

19   the EPA, they both testified that they never saw or even heard

20   about a spill of perc at Dyce.

21         Now let me talk -- let me address a little bit more

22   Mr. Hallsten's testimony.  Hallsten started with the company

23   back, I think, in June of 1974 and is still employed by Soco

24   as its branch manager in Utah 36 years later.  In the late

25   1990s and the early 2000s, Mr. Hallsten, the documents show,

1    and he admits, was fully aware that EPA was investigating

2    whether the perc contamination in the Lockwood -- in Lockwood

3    came from Dyce's Lockwood plant.  But during all that time,

4    during all that investigation, Hallsten never told anybody,

5    never told anybody about the supposed inventory shortage in

6    the mid 1970s.

7            Then, in 2004, the insurers came to Billings, filed

8    this suit to get a jury to tell us that we don't have to pay

9    them a penny to clean up the problem that they created.

10           You'll recall what happened then.  The morning after

11   Dyce's Christmas party in 2004, Tom Mielenhausen, who is

12   Mr. Banker and Mr. Lynch's partner, met with Mr. Hallsten.

13   What was the result of that meeting?  Lo and behold, Hallsten

14   came out of the meeting having recalled a perc inventory

15   shortage of 250 to 1,000 gallons that supposedly happened in

16   the first quarter of either 1975, 1976, or 1977.

17           It was, to say the least, a most convenient

18   recollection.

19           It was a recollection of an event that happened to

20   be right before the policies that USF&G and Continental issued

21   came into being.  It also happened to be in an amount that

22   coincided, Dyce thought, with the amount of perc that was out

23   in the northwest corner.

24           Now Monte Naff is the other witness who recalled the

25   inventory shortage.  Mr. Naff is also a long-time Dyce

2142

1    executive.  He worked for Dyce and its successors for 29

2    years.  Even though he's now retired, he's still being paid by

3    Soco for his time as a consultant, including his time

4    testifying in this case.

5            And, most significantly, the Dyce facility became

6    horribly polluted during the time that Mr. Naff was the

7    general manager there, from 1978 to 1989, during the time that

8    he testified that he pretty much ran the place.  Now just like

9    Hallsten, Naff never came forward with the inventory shortage

10   story during the entire time that the EPA was trying to figure

11   out the source of the Lockwood contamination and how to clean

12   it up.  In fact, Naff said he did not recall an inventory

13   shortage at all until Tom Mielenhausen gave him a copy of

14   Hallsten's deposition in this case.  Then, according to

15   Mr. Naff, his recollection was jogged.

16           Again, a most convenient recollection.

17           Now in trying to determine whether Hallsten and Naff

18   are telling the truth about the inventory shortage, you should

19   keep in mind that the two of them don't agree on even the most

20   basic facts regarding the inventory shortage.

21           Hallsten at first testified that the shortage

22   occurred in the first quarter of 1975, 1976, or 1977, but as

23   Mr. Banker said, he admitted on cross-examination that it

24   could have occurred at any time while he was on the order

25   desk, the entire period from, actually from 1974 until early

2143

1    1978.

2           Naff says he recalls it quite differently.  Naff

3    testified that he thought the shortage was discovered in the

4    last quarter of one of the years Hallsten was on the order

5    desk, especially when Naff was a new employee, because

6    Mr. Dyce was in Billings for the holidays, and Hallsten was

7    afraid of what Mr. Dyce's reaction would be when he returned

8    to town and was told about the shortage.  And Mr. Naff doesn't

9    recall 250 to 1,000 gallons.  He recalls about ten to 12 drums

10   worth, which is about 500 to 600 gallons.

11          All of this testimony is at the heart of Soco's

12   case.  And the two witnesses don't agree on even the most

13   basic facts about the timing or volume of this alleged

14   shortage.  And, of course, there are no other witnesses who

15   recall the inventory shortage, and, of course, no documents

16   that said it ever happened.

17          Perhaps most significantly, Mr. Naff said that when

18   Quentin Dyce was told about the shortage, it was one of the

19   two or three times in their long history together at Dyce that

20   he ever saw Quentin Dyce that upset.  Yet neither Hallsten nor

21   Naff ever heard Quentin Dyce mention it again.

22          Why, why do you think that is?  Do you suppose it's

23   because, when Mr. Dyce examined what happened, he determined

24   that it was a paperwork error?

25          Indeed, we heard Richard Brill, one of the people

1    that you saw who testified on video -- you saw his deposition

2    on Monday -- he said the guys outside would drum perc off the

3    perc bulk tank and then forget to turn the paperwork in

4    reflecting that they did that.  Brill said that there could

5    have been as much as a 1,500-gallon discrepancy between what

6    the office thought was out there in the perc tank and what

7    they actually had.

8            In any event, as I said before, there is absolutely

9    no evidentiary link between this supposed inventory shortage

10   and a spill.  If the inventory shortage actually happened, it

11   was likely a paperwork mistake that was resolved.  Otherwise,

12   both Hallsten and Naff surely would have heard lots about it

13   from Mr. Naff -- from Mr. Dyce.  Excuse me.  That is, of

14   course, if it actually happened.

15           Now let me talk about the expert witnesses who you

16   heard testify in this case.

17           First, there was Peter Shanahan, Dr. Peter Shanahan,

18   our environmental consulting expert who teaches at MIT.

19           Neil, please put up Exhibit 3059, page 121.

20           DOCUMENT TECHNICIAN:  (Complied with request.)

21           MR. JOHNSON:  Of all the stuff that we've shown you

22   during the last eight days, this is the one you probably have

23   seen the most.  I see it when I go to sleep at night.  Maybe

24   you do, too.

25           Dr. Shanahan testified that he agrees with the EPA

1  that there are two perc source areas in the operational area

2  of Dyce:  this one, which is around the drumming shed, and

3  this one, which is -- I'll circle it a little bit -- which is

4  where the historic catch pond used to be.

5          Indeed, if anything, the EPA probably understated

6  the perc source areas when you consider that Soco's own

7  consultant, James Sullivan of ATC, held back data on the perc

8  he discovered under the cement containment ponds that were put

9  in many years later.

10          According to the EPA's record of decision, the ROD,

11  which you've heard, there is a DNAPL perc source under the

12  catch pond.  And there frankly is no mystery as to how it got

13  there.  The evidence is clear that Soco had a severe

14  wastewater management problem, a problem that started in the

15  1970s, continued throughout the 1980s, and even into the

16  1990s.  You'll remember the Montana government report in 1992

17  that said that Dyce did not have control of its waste streams,

18  of its wastewater streams.

19          Chemicals, including perc, were routinely splashed

20  around, spilled, and then hosed into whatever wastewater

21  containment structures were used at the time, including, of

22  course, the catch pond that was in use all the way up until

23  1986.

24          Dr. Shanahan testified that this is a dirty site.

25  Those were his exact words.  This is a dirty site with

1    widespread contamination.  And he told you that the small

2    routine spills of perc would get hosed down by the Dyce

3    employees, down to the catch pond, with the perc carried by

4    the water in little suspended bubbles.  When it got to the

5    catch pond, the perc, being heavier than water, would drop to

6    the bottom, and the BTEX, which was also washed down there,

7    being lighter than water, would sit on top and evaporate.

8            From there, the perc would be discharged from time

9    to time over the years.  How was that done?  Well, nobody has

10   admitted how it was done, but you heard Douglas Johnston, a

11   former Dyce Lockwood site manager, come into court and testify

12   that Dyce could have just taken a hose, if it wanted, it just

13   could have taken a hose out to the catch pond and thrown that

14   hose on the bottom, gone out there with a pump, and sucked the

15   perc right out of the bottom of the catch pond.

16           In the 1970s, before the berm and catch pond were

17   expanded in 1981, that's likely exactly what happened when the

18   pond got too full and had to be emptied from time to time.

19           Please put up 5024.

20           DOCUMENT TECHNICIAN:  (Complied with request.)

21           MR. JOHNSON:  Now this is the September 1977 photo.

22           Neil, please focus in on the man-made ditch area,

23   okay?  Even more.

24           DOCUMENT TECHNICIAN:  (Complied with request.)

25           MR. JOHNSON:  Okay.  That's good.

1          This is the area, obviously the catch pond, and Kris

2   Stout, our historical photographic analyst, told you that --

3   let me get this right -- that that area right above where I

4   just marked is a man-made ditch that first appeared in 1977,

5   and Soco's expert, photographic expert, Mr. Grip, agreed that

6   it appeared to be man-made.

7          Why do you suppose that Dyce cut this ditch right

8   outside the berm?  The flow pattern from that ditch to the

9   contamination in the northwest corner, the pattern of the

10  vegetation starting in 1977 and getting worse every year until

11  the catch pond was expanded in 1981, and Dyce's long history

12  of dumping excess water into the pastures around its facility

13  all support the conclusion that Dyce emptied the pond in the

14  1970s through this ditch.  Then when they reconfigured the

15  catch pond and they reconfigured the berm in the early 1980s,

16  they stuck a pipe into it and emptied the pond that way.

17         He said that we only brought in Kjos and Brill.

18         Well, we didn't bring him into court.  They did.  We

19  didn't think it appropriate.  We played his deposition

20  testimony.  You know who I'm talking about:  Marvin Johnson.

21         Marvin testified that the catch pond was -- he

22  testified nine years ago in his video -- that the catch pond

23  was emptied about 30 times, each time spilling thousands of

24  gallons out into the prairie.  Nobody else admits that.  Why

25  is that?

1          The management guys that they brought in denied it.

2     Why do they deny it?  It's pretty obvious.  These guys

3     polluted Lockwood.  Of course they're going to deny it.  Of

4     course they're going to deny it.

5          Marvin Johnson, though, horribly ill, as you saw,

6     thank God he's come forward to tell the truth.  He's

7     apparently the only one, but he's done it.

8          Now Soco's expert, Dr. Powell, said that he thought

9     there should be more perc under the catch pond, under MP-105

10    that you've heard so much about, but that makes no sense.

11    Soco claims that the pond was lined, and you heard testimony

12    to that effect.  It's likely that the liner mostly but not

13    completely worked.  That allowed some perc to get into the

14    earth below where it was found by the EPA, notwithstanding the

15    fact that by the time the EPA got there, that old catch pond

16    had been dug up not once but twice, first when Dyce

17    reconfigured things in 1981 and later when Dyce put fly ash

18    over it in 1986.

19         The evidence demonstrates that the catch pond was

20    emptied into the northwest pasture because the telltale signs

21    of the white crystals that Dr. Shanahan tracked from the

22    mixing of acid and lime in the catch pond were found in soil

23    samples in the northwest corner.  And, indeed, Kaivos also

24    found acidic soil out that way which he traced to the catch

25    pond.

1           As for Dr. Powell's suggestion that a DNAPL perc

2    deposit slid down the bedrock from higher up in the plume?   I

3    think that's preposterous.   Just how was it that the DNAPL,

4    sliding down the bedrock, knew to get off exactly at the catch

5    pond?   How convenient for him to testify to that.

6           Now Dr. Sternberg's testimony -- you can take it

7    off.

8           DOCUMENT TECHNICIAN:   (Complied with request.)

9           MR. JOHNSON:   Dr. Sternberg's testimony supported

10   Dr. Shanahan's conclusion.   Dr. Sternberg testified that there

11   were only about 80 gallons of perc in the northwest corner

12   soil and groundwater and downstream in the groundwater as it

13   made its way to and then into the Yellowstone River, not the

14   200 to 300 gallons that Dr. Powell estimated using, I think, a

15   most improper way of averaging numbers.

16          Finally, Dr. Powell made much of the fact that there

17   is just perc, not BTEX, in the northwest corner, but

18   Dr. Shanahan explained that whatever BTEX did not evaporate in

19   the catch pond was pumped into the northwest corner and

20   biodegraded there over time.

21          What is telling is Exhibit 279.   Page 7.

22          DOCUMENT TECHNICIAN:   (Complied with request.)

23          MR. JOHNSON:   This is the chemical profile that

24   Dr. Shanahan testified to.   The chemical profile of the sample

25   that was taken under the catch pond, MP-105, is almost

1   identical to the samples that were taken from the heart of the

2   northwest corner, PT-02 and PT-06.

3         Dr. Shanahan also testified that given the testing

4   that was done near the railroad ditch, it's not -- you can

5   take it down, Neil.

6         DOCUMENT TECHNICIAN:  (Complied with request.)

7         MR. JOHNSON:  -- it's not what one would expect if a

8   400- to 500-gallon or more river of perc came cascading down

9   that ditch like a tsunami.

10        Pull up Kristin Stout's demonstrative of MW-101 and

11  BH-F.

12        DOCUMENT TECHNICIAN:  (Complied with request.)

13        MR. JOHNSON:  The question is, if that actually

14  happened, how is it that BH-F, which is right here, is so hot,

15  is so contaminated, but MW-101, which is right here, is not?

16        The pollution, frankly, had to come, the pollution

17  that's measured at BH-F frankly had to come from the catch

18  pond and likely came through that cut in the berm, because, as

19  you recall, the underlying wastewater flowed like that, or, I

20  mean, groundwater flowed like that, and obviously BH-F would

21  get contaminated but this one wouldn't.  But if it came

22  through the ditch, of course, MW-101 would have been

23  contaminated.

24        You can take it down.

25        DOCUMENT TECHNICIAN:  (Complied with request.)

2151

1          MR. JOHNSON:  Finally, if Soco really believed its

2     own spill story, why didn't it simply test the ditch?  BH-F is

3     still, to this day, hot, very contaminated.  If Soco's spill

4     really explained BH-F, then all of the contamination that one

5     would expect to find back up that ditch, back up toward the

6     loading and unloading area, should still be there.

7          Would you pull up 51, Demonstrative 51?  And focus

8     in on this area here.

9          DOCUMENT TECHNICIAN:  (Complied with request.)

10          MR. JOHNSON:  This is Mr. Grip's photo.  He plotted

11     where that old ditch, that old ditch next to the railroad

12     spur, is in the modern plant.  They could have, if they wanted

13     to, tested anywhere along there.  It's their own property.

14     The site is sitting idle.  Just try.  That's all they had to

15     do.  Take a look in the ditch area.  I submit that Soco's

16     failure to do so speaks volumes about what Soco, itself,

17     thinks about its ditch theory.

18          Take it off.

19          DOCUMENT TECHNICIAN:  (Complied with request.)

20          MR. JOHNSON:  Now let me talk about the historical

21     photographic evidence.  You'll remember that I said during my

22     opening statements that a picture is worth a thousand words.

23     Mr. Grip said the same thing on the witness stand yesterday.

24     But he admitted that he couldn't see in the shadows north of

25     the warehouse and the drumming shed in those 1975 and 1977

2152

1    photos, so he really didn't know whether the berm was

2    completed in those years on the south side of the tank farm.

3          If the berm wasn't completed on that south side, the

4    drainage from the loading and unloading area was into the tank

5    farm, not into the ditch next to the railroad spur.  Virtually

6    every witness agreed with that conclusion.

7          In fact, Suzanne Miller, in Dyce's sworn responses

8    to the EPA's 104(e) requests, said exactly that, that any

9    spill in the loading and unloading area in those years would

10   flow down to containment in the catch pond.

11         Now Banker, Mr. Banker suggested that we're bringing

12   Ms. Miller's credibility to question.  We aren't.  We aren't

13   doing that.  She's telling the truth.  She talked to

14   everybody.  Everybody told her if there were a spill in the

15   loading and unloading area, it would go down to containment in

16   the catch pond.  It's only after we filed this suit that the

17   story changed.

18         Now Kristen Stout told you that, using her

19   equipment, she could see that berm, which was under

20   construction in 1984, and that she could see that it was not

21   completed in 1985, and that it was never extended all the way

22   across the south side of the tank farm until 1989.

23         MR. GROSSBART:  '79.

24         MR. JOHNSON:  '79.  Excuse me.  1979.  I got my '80s

25   and my '70s mixed up.

1          It was under construction in 1974.  It was

2    completed -- not completed in 1975, and it was never extended

3    all the way along the south side of the tank farm until 1979.

4          That means that if a spill happened in 1975 to 1978,

5    it would have flowed into the tank farm, not the railroad

6    ditch.  That's what Ms. Stout testified to and exactly what

7    Suzanne Miller told the EPA.

8          Now Mr. Grip also said that he saw a railroad --

9    very shallow depression north of the small warehouse to the

10   railroad ditch, but the basis for his opinion seemed to be

11   nothing more than the brightening of the shadows in that

12   picture.  Here is what he showed us.

13         Show 4841.  Do you have that?

14         DOCUMENT TECHNICIAN:  (Complied with request.)

15         MR. JOHNSON:  This is what he showed you.  These are

16   our markings on there to help orient you.  But he said, well,

17   gee, he saw a pathway, because -- this was a pathway that he

18   saw.  Whoops.  I made it too big.  Right there.  That's the

19   pathway that he saw.  But, you know, this is nothing more --

20   you saw the progression of photos.  This is nothing more than

21   shadows when you continually lighten it.  These are the last

22   and darkest shadows that appear.  I thought it was

23   hocus-pocus, but it's up to you to decide whether or not his

24   testimony can be believed.

25         The photos, on the other hand, tell a compelling

1   story.

2          Take that off, Neil.

3          DOCUMENT TECHNICIAN:  (Complied with request.)

4          MR. JOHNSON:  You'll be able to study them in the

5   jury room.  Let's take a quick look at them one more time.

6          How about 5017?

7          DOCUMENT TECHNICIAN:  (Complied with request.)

8          MR. JOHNSON:  The northwest corner on June 18, 1974,

9   as you can see, has very healthy vegetation.

10          How about 5024?

11          DOCUMENT TECHNICIAN:  (Complied with request.)

12          MR. JOHNSON:  This is September 6, 1977.  The

13   northwest corner still has healthy vegetation, even though if

14   a spill of perc of 250 to 1,000 gallons had occurred in 1975

15   or 1976 or before September of 1977, the northwest corner

16   vegetation would have been killed.  But there is some

17   vegetation near the catch pond which you can see which is

18   having problems, but that's not surprising because of the

19   man-made cut, the man-made ditch that's just outside the berm

20   that leads directly to that devegetated area.

21          Pull up 5028, Neil, please.

22          DOCUMENT TECHNICIAN:  (Complied with request.)

23          MR. JOHNSON:  5028 is the May 1979 photo.  The

24   devegetation has gotten much worse, and it's right on the

25   pathway, right on the pathway from that cut outside the berm.

1                And there, importantly, is devegetation heading to

2        the north on the east side of the northwest corner.  This is

3        the northwest corner.  This is not.  This is east of the

4        northwest corner.  Where did that vegetation -- devegetated

5        area lead to?

6                Neil, please pull up 614, page 6.

7                DOCUMENT TECHNICIAN:  (Complied with request.)

8                MR. JOHNSON:  These are the green blobs, as we've

9        called them, from the EPA's report.  We've superimposed these

10       green blobs from their report over the 1979 photo that you

11       just looked at.  The devegetated area that's to the east of

12       the northwest corner leads directly to that blob.  That green

13       blob confirms that devegetation, that the devegetation there

14       comes from the catch pond discharges of perc.

15               Finally, Neil, put up 5036, which is June -- oh,

16       I've got the number wrong.  How about the June 1981 photo?

17       Can you do that?

18          (Pause.)

19               MR. JOHNSON:  I'll tell you what.  You got it?

20               DOCUMENT TECHNICIAN:  (Complied with request.)

21               MR. JOHNSON:  There it is.

22               June of 1981, June 2 of 1981, the devegetation has

23       obviously gotten worse.

24               And if you'd put 614, page 8, up?

25               DOCUMENT TECHNICIAN:  (Complied with request.)

1          MR. JOHNSON:  You can plainly see, plainly tell, see

2     that the area east, which is still devegetated, gotten worse,

3     leads directly to that green source area of perc, which is

4     east of the northwest corner.

5          Ladies and gentlemen, these photos, when viewed

6     together, plainly tell the story of how the northwest corner

7     and the surrounding areas became contaminated and how the

8     contamination continued long after Soco's imaginary spill of

9     perc.

10         Now let me, let me -- you can take that down, Neil.

11         DOCUMENT TECHNICIAN:  (Complied with request.)

12         MR. JOHNSON:  If, despite all this evidence, you

13    still conclude that there was a sudden and accidental spill of

14    perc in the mid 1970s, then Dyce, under the insurance

15    policies, was required to give USF&G and Continental written

16    notice of it.  Dyce was required, under the policies, to give

17    the insurance companies written notice of an occurrence, that

18    is, an event giving rise to expect a property damage, as soon

19    as practicable.

20         The policies require that the written notice contain

21    reasonably obtainable information with respect to time, place,

22    and circumstances, and the names and addresses of the

23    available witnesses.  If this spill actually had occurred in

24    the mid 1970s, Dyce simply failed to comply with that

25    requirement.  They failed to give notice to the insurers as

1    soon as practicable.

2              They will say, "Well, gee, we didn't know perc was

3    going to hurt the environment, so we didn't know that there

4    were going to be claims because we didn't know that there was

5    going to be damage."

6              Really?

7              You heard Mr. Colver testify that Mr. Dyce told him

8    perc is harmful to the environment.  Perc is harmful to the

9    environment.  They knew, if it got out, that it was going to

10   cause environmental damage which causes, under the terms of

11   the property -- I'm sorry, under the terms of the policies,

12   property damage.

13             Dyce never gave notice of an occurrence, ever.  They

14   only gave notice a quarter of a century after this spill

15   allegedly occurred.  And they only gave notice to the

16   insurance companies when the EPA told them that they were

17   potentially responsible to clean up the site.

18             By that time, the available witnesses had lost much

19   of their memory about what had happened when.  In fact,

20   Mr. Dyce himself had died, a principal person who could have

21   told us whether or not this actually occurred.  He died in

22   1995.  And all, all of the relevant documents concerning the

23   supposed inventory discrepancy, all of the inventory records

24   from back in that time period, and almost all of the other

25   records were thrown out.

1          The judge will instruct -- has instructed you, and

2     you will see it in the instructions, that the insurers must

3     prove prejudice from the late notice.

4          Ladies and gentlemen, the evidence of prejudice is

5     overwhelming.  Witnesses are no longer available or have lost

6     their memory.  The documents are gone.  The Dyce site has been

7     remodeled and reconfigured.

8          And perhaps most importantly, the pollution that

9     would have resulted from this alleged spill, if it actually

10    happened, the pollution that occurred from this was left to

11    fester and spread, costing, now, millions of dollars to clean

12    it up.  If timely notice had been given, it would have been

13    much less expensive to clean it up; that is, if it actually

14    happened.

15         Thank you, again, for your service in this case.

16    Let me turn over the podium to my colleague, Mr. Davis.

17         THE COURT:  You've got 19 minutes.

18         Thank you.

19         MR. DAVIS:  Ladies and gentlemen, I've got good news

20    and good news.  I'm not going to repeat very much of what

21    Mr. Johnson said, and the good news is, even if I tried, Judge

22    Cebull wouldn't let me talk very long.

23         But you know something?  Maybe this gray hair of

24    mine is a little bit of a giveaway I've been doing this for a

25    little while.  I frankly, to pick up on my colleague Rob

2159

1    Johnson's last point, have never heard a lawyer talk his

2    client out of court faster than Mr. Banker did this morning on

3    this notice issue.

4            What did he tell you?  "Yeah, that would have been a

5    dramatic event, this supposed 500-gallon spill."  And

6    that's -- I'll use 500 gallons because their expert,

7    Dr. Powell, said it would take at least 500 gallons for the

8    200 gallons that he's calculated is out in the northwest

9    corner to get there.  The 250 gallons, the lower number

10   Mr. Hallsten gave as a spill, just wouldn't do the trick.

11           So let's work a working hypothesis, to the extent

12   this thing has any validity in your mind, that this has to be

13   about a 500-gallon spill.

14           Mr. Banker said, "Yeah, that would have been a

15   dramatic event, but," he told you, "somebody must have noticed

16   the spill.  We just didn't have them come in here to court to

17   testify."

18           Well, was that somebody some 13-year-old kid riding

19   his bike down Taylor Lane back in 1975, '76, or '77?  No.

20   That somebody had to be a Soco -- or a Dyce employee.  That's

21   who would have noticed it.  That's who would have walked out

22   in the loading area and seen this spill at some point that

23   day.

24           Well, the judge has instructed you, and if you look

25   at Instruction No. 7, what he says is knowledge of an officer

2160

1   or employee is, in law, considered to be the knowledge of the

2   corporation.  So by the Court's instructions, what Mr. Banker

3   told you is Dyce knew back then that there had been a spill,

4   that there had been a spill that left containment, because it

5   never was in containment, and it traveled out into the

6   environment.  And as Mr. Johnson told you, the idea that they

7   didn't know that perchloroethylene was harmful to the

8   environment -- do you remember Mr. Colver told you they knew

9   it dissolved rubber hoses?  I'll come back to that point in a

10  minute.  This was bad stuff.  They knew -- what Mr. Banker

11  told you this morning was that Dyce knew, as a matter of law,

12  that this happened back then.

13          And as far as my client is concerned, prejudice, the

14  prejudice is even more obvious.

15          Can we pull up 143, Neil?

16          DOCUMENT TECHNICIAN:  (Complied with request.)

17          MR. DAVIS:  This is the document, for reasons that

18  totally escape me, they think is such a wonderful document.

19  This is the inspection report that a representative of

20  Continental Insurance Company filled out when he went out

21  there in 1982.

22          Guess what?  Guess when Continental started to

23  insure Dyce?  1982.

24          Page 2, Neil.  Blow up the middle.

25          DOCUMENT TECHNICIAN:  (Complied with request.)

1          MR. DAVIS:  You got it.

2          "No losses reported."  So here they are, telling

3     someone who is going to come out and insure you, "We haven't

4     had any losses.  We're not missing anything.  Go ahead and

5     insure us."

6          The prejudice is obvious.  They wouldn't have gotten

7     the insurance.

8          As I said, my time is limited, and I don't want to

9     talk -- I don't think the case, even though there are

10    questions on that verdict form about notice and prejudice, I

11    don't think you even get there when you go into the jury room.

12         And, again, to reiterate the point that Mr. Johnson

13    made, and I forgot he said it, but Mr. Grip certainly said,

14    "Yeah, one picture is worth a thousand words."  And given the

15    limited time that I have, we'll have to use pictures.

16         And, Neil, would you be so kind as to pull up 5042?

17    And would you blow up the loading area?

18         DOCUMENT TECHNICIAN:  (Complied with request.)

19         MR. DAVIS:  Do you remember back on Friday -- I

20    mean, again, let's put this in context for a minute.

21         Their view is that there was a spill in the loading

22    and unloading area in the mid 1970s.  That's the story they

23    want you to buy, the story that first surfaced when

24    Mr. Hallsten and Mr. Mielenhausen met at Christmas in 2004.

25    That it would have flowed off from the loading and unloading

1    area, down this railroad ditch, and out into containment --

2    and out into the northwest corner.

3          And, again, as you know, we agree.  Mr. Johnson and

4    I agree.  Our clients agree.  That's an imaginary event.  It

5    never happened.

6          But what's so significant about 5042 is what I asked

7    Dr. Powell.  And, remember, there's a concrete apron.  That's

8    how Dr. Grip or Mr. Grip described it yesterday to you, a

9    concrete apron coming off that small barn.  We asked the

10   employees.  That was a ramp running down to get into the small

11   barn.

12         There's, there's the drainage pattern.  It's right

13   there for you to see.  Remember I asked Dr. Powell, "Isn't it

14   going 180 degrees the wrong direction for their theory?"  And

15   it sure as heck is.  Mr. Grip was in the courtroom.  The

16   lawyers were obviously here.  If I was wrong about what this

17   picture shows about the historic drainage pattern -- and,

18   again, it's the same concrete pad, or apron, as Mr. Grip

19   called it.  If I was wrong about which way things might have

20   flowed if there was a spill in the loading and unloading area,

21   you would have heard about it from Mr. Grip yesterday, but you

22   didn't hear Mr. Lynch, when he went through all of the

23   pictures with Mr. Grip, mention or even have him try to

24   explain this, because they knew that while they may try to

25   manufacture some imaginary event, they would just be way over

1    the limit, they would have been way over the limit to try to

2    tell you people black was white, right was left, whatever.

3           That's the historic drainage pattern.  It always

4    was.

5           Sure, if rain comes off the roof of this building

6    and it falls in that little alleyway, it would drain off, back

7    in the '70s, into the ditch.  Did anyone tell you that's where

8    they backed up trucks, to here, in the 1970s, to off-load

9    product?

10          Would you pull up, Neil, 5038?  Blow it up, the

11   loading area.

12          DOCUMENT TECHNICIAN:  (Complied with request.)

13          MR. DAVIS:  I asked Mr. Warne.  "You see the truck

14   there.  Is that where trucks were historically loaded and

15   unloaded?"

16          "Yes, that accurately reflects the loading/unloading

17   area."

18          They didn't tell you that trucks backed up to here.

19   So how the heck does a spill here get over there?  I don't

20   know how many pictures we looked at with Dr. Powell of stains

21   and spills that stayed right here.  It didn't happen.

22          It couldn't happen.  The site, even in their wildest

23   imagination of trying to sell this story about a spill that

24   got out of containment, somehow managed to get around a

25   building, down into a ditch, it couldn't happen, it never did

2164

1   happen, and the pictures prove it conclusively.

2          Pull up 5042 again, Neil.  Blow it up again.

3          DOCUMENT TECHNICIAN:  (Complied with request.)

4          MR. DAVIS:  If I'm wrong, that this doesn't reflect

5   the historic pattern, that there's evidence that you heard in

6   this courtroom, I challenge those lawyers to tell you who told

7   you that that does not reflect the historic pattern?  What

8   witness came up on the witness stand and told you that after I

9   brought it out to Dr. Powell?

10          Not a one.  And they had every opportunity yesterday

11  with Mr. Grip.

12          That's your historic pattern, right there.

13          And as Professor Dale indicated to you, it's

14  impossible to imagine a scenario -- and I mentioned -- I said

15  this.  Mr. Johnson told you in his opening that you wouldn't

16  hear anyone who would tell you that they saw, heard, or

17  smelled a spill.  What I remember telling you in the opening

18  is you won't hear anyone on that witness stand tell you how

19  such an event could have happened in the loading and unloading

20  area, and you didn't.

21          You didn't hear one witness who could tell you,

22  "This is how a spill could happen as we unloaded

23  perchloroethylene," or, "Dyce employees unloaded

24  perchloroethylene in the loading and unloading area in the

25  1970s."  Not a witness.

1          I explored it with Dr. Powell.  "Can you imagine,
2    you know, pumping it off at 60 gallons a minute in the loading
3    and unloading area?"  He agreed with me.  We went through
4    those three scenarios:  either as you're offloading it, as
5    it's just sitting there statically with no one doing anything,
6    or as you're loading it to take it to the drycleaners.  He
7    agreed with me; the only plausible scenario in those three
8    possibilities was the first, unloading.  And he couldn't
9    imagine how that could happen, particularly if you had a
10   1,500-gallon tank and you're getting a shipment of 3,000 or
11   4,000 gallons of perc.
12         As Dr. Dale told you -- I mean, they would fill the
13   perc tank first, and that's where Mr. Hallsten, after he met
14   with Mr. Mielenhausen, when he recalled this inventory
15   shortage, he told you on the witness stand it was.  He told
16   someone to go out and check the perc tank repeatedly, and
17   that's where the alleged inventory shortage was discovered.
18         Well, they would come in and fill the perc tank, and
19   then they would have to, because that only held 1,500 gallons,
20   they had another 1,500 to 2,500 gallons of perc to put
21   somewhere.  They put it into drums.  Those were filled in the
22   drumming shed, that place, that little building that had the
23   stains in front of it or the spill pattern in front of it.
24         And as Dr. Dale told you, that's an inconceivable
25   scenario given the qualities, the chemical properties of perc.

1    That after they go -- somehow spill 500 gallons filling a

2    1,500-gallon tank, some guy is sitting there with a hose and a

3    nozzle, going, "Here's a 55-gallon drum to fill.  Okay."

4    There would be 30 drums or so to fill, standing there in the

5    middle of tons, tons of perchloroethylene.  Dr. Dale told you

6    he couldn't imagine how that could happen.  The guy would be

7    overcome by the fumes.

8         But more critically, if you think about it, is the

9    obvious fact, as Dr. Dale explained to you, there would be

10   unmistakable physical evidence of such an event occurring.

11   Perc is a solvent for asphalt.  Every witness who was asked

12   that question agreed.  And, you recall, if you go look at

13   those 104(e) responses, that's what Suzanne Miller says in

14   them; that the employees all said, if something like that had

15   happened, they would have noticed it because it would have

16   affected the asphalt.

17        And, again, if what Dr. Dale told you wasn't

18   scientific, absolute truth, we would have heard someone else

19   come up on the witness stand to tell you that what he told you

20   is not a scientific fact.  It is.

21        So the asphalt, it would -- what did Mr. Banker say?

22   It would have been a dramatic event?  It would likely be one

23   of the most memorable events besides that hydrochloride acid

24   tank, railcar tank event that they all seem to remember rather

25   vividly.  This would have been one of the most vivid and

1    memorable events in the short history of Dyce Chemical over

2    the last 40 years.

3          Dr. Dale told you the perc would have dissolved the

4    asphalt instantly.  It would have engulfed the whole loading

5    and unloading area, a spill of 500 gallons.  You saw how he

6    put that disk there.

7          Now it's fine for Mr. Banker to say, "Well, he said

8    it was 75 degrees and flat."  Well, it's pretty flat, based on

9    those pictures.

10         And did they give you any explanation how someone

11   could spill 500 gallons in that enclosed loading and unloading

12   area and it not impact all or almost all of the asphalt?  They

13   can't.  They can't because it's impossible.

14         So, again, the asphalt would have been destroyed or

15   damaged.  So much of it would have been washed away, it would

16   have left a bathtub ring on the surrounding buildings.

17         And, most critically -- if we can go back to 5038

18   again, Neil?

19         DOCUMENT TECHNICIAN:  (Complied with request.)

20         MR. DAVIS:  With the truck, remember he showed you

21   the pictures that his friend Elden Dickinson took?  To me, the

22   most significant one was the one with that footprint in it

23   with a 170-gallon spill on the asphalt in Michigan.  When you

24   saw how the fireman had left a footprint in the asphalt,

25   because it would collect in the low areas and turn that into,

2168

1    as Dr. Dale explained to you, a tarry mess, assuming that that

2    happened as they're offloading a truck, how does that truck

3    get out of there?  Number one, as Mr. Colver told you, it

4    attacks rubber.  So assuming the tires haven't been eaten away

5    by the tons of perc that have been spilled, at a minimum there

6    would be deep, deep ruts in that parking lot, parking --

7    unloading area as that truck pulled out.  Yet no one seems to

8    notice it.

9         It went totally unnoticed.  It went totally

10   unnoticed, ladies and gentlemen, because scientifically it

11   could not and did not happen.

12        There was no spill of 500 gallons of perc in the

13   Dyce loading and unloading area in the 1970s.  The physical

14   evidence is conclusive.  It just didn't happen.

15        Let me talk about the jury verdict.

16        Can we put up -- I need page 1, Amanda.  Well,

17   page 2, I guess.  I'm sorry.  I apologize.

18        THE COURT:  You have three minutes.

19        THE CLERK:  (Complied with request.)

20        MR. DAVIS:  Was groundwater contamination at or near

21   the Soco facility caused by an occurrence?  All you have to do

22   is say no.  And as you read the instructions, that's all --

23   that's the only question you need to, that's the only question

24   you should answer.  There was no occurrence.

25        And, again, I refer you back to Instruction 14.  The

1    judge has instructed you on the meaning of "occurrence."  I'll

2    read it to you, since my time is quite limited.  "Each policy

3    defines 'occurrence' as an accident, including continuous or

4    repeated exposure to conditions which results in property

5    damage neither expected nor intended from the standpoint of

6    the insured."

7            First of all, the answer to Question 1 is there was

8    no occurrence because there was no spill in the mid '70s.

9            But even if, for reasons as Mr. Johnson indicated,

10   if you believe this cock and bull story about a 500-gallon

11   spill of perc, it wasn't unexpected.  They had designed the

12   facility in the 1970s very deliberately, if you believe them,

13   for such a spill to occur outside of berms, in an area where

14   it was deliberately designed, by their theory, to flow off the

15   property, down into the northwest corner.

16           Even though they knew they had to provide

17   containment and they were building berms, even though they

18   knew that this stuff was a powerful chemical, even though

19   Mr. Dyce knew they had developed a catch pond to catch things,

20   even though they knew that was the one area where they would

21   be handling chemicals, transferring from one container to

22   another, the operational area, the one area they kept, they

23   now claim that was kept deliberately out of containment was

24   the loading and unloading area where they would expect spills

25   to occur; the one area, if you believe their theory that, "We

1    deliberately designed this facility in the mid '70s so that

2    the area where we handle chemicals was outside of

3    containment," it was expected that spills there would get out

4    into the environment.  So even if you believe it happened, it

5    doesn't qualify as an occurrence because they expected it.

6            So under either scenario, the answer to No. 1 is no.

7            So, again, my time is about up.  Let me close with

8    two points.

9            THE COURT:  You've got 20 seconds.

10           MR. DAVIS:  Thank you for your time.

11           And, No. 2, as has been indicated, they have a

12   chance to get up and say something in response to what

13   Mr. Johnson and I have said.  We have no chance now to respond

14   to what they have to say.  We have to leave this case to your

15   common sense.  And, frankly, as far as the insurers are

16   concerned, we wouldn't have it any other way.

17           Thank you.

18           THE COURT:  Thank you.

19           Mr. Banker, you may complete.  You have 17 minutes.

20           MR. BANKER:  Well, that was certainly interesting to

21   listen to from my perspective.  It made for good theater.

22           But ask yourselves why they're not talking about the

23   most important thing.  What is the perc, pure perc, doing down

24   in the northwest corner if there wasn't a sudden and

25   accidental spill?

1    They haven't presented any explanation for that.

2 The closest that they came to that was Mr. Johnson saying,

3 "Well, they probably put a hose in there and they pumped it

4 out." Okay. What witness took the stand and told you that

5 there was a hose in there, that they pumped it out of the

6 catch pond? Even Marvin Johnson, who talked about the pipe,

7 said, "I never saw a pump or a siphon connected to that hose."

8 The most he said was we turned it on, we opened the valve, and

9 that was that. You've got the scientific testimony that tells

10 you how that pipe wouldn't work.

11    But they talk about, you know, Soco's theory. Soco

12 is not presenting a theory. Soco is presenting an

13 explanation. They've got a theory. The theory is that

14 someone who never testified, never observed, threw a hose into

15 the catch pond and pumped out, and managed to pump out only

16 pure perc. Managed to just stop the pump exactly where the

17 perc was and get no other chemicals down into the northwest

18 corner. That's a theory, and it's not a very good one. It's

19 not supported by any evidence.

20    I was surprised to, once again, hear constant

21 references to Mr. Mielenhausen. You know, we took a look at

22 the transcript in this case, and Mr. Mielenhausen has been

23 referred to more times -- the second most of anyone in this

24 trial. The only one who's been referred to more is

25 Mr. Cozzens who is sitting here.

1          Why do they keep talking about Mr. Mielenhausen?

2    It's not denied that Mr. Mielenhausen is a partner of

3    Mr. Lynch and I.  We work together.  He's a lawyer who worked

4    on this case for a number of years.  He talked to a lot of

5    witnesses.  So did I.  That's our job.  We go out.  We talk to

6    witnesses.  We interview them.  We investigate.

7          The suggestion implicit in all of that, that

8    Mr. Hallsten and Mr. Naff somehow invented a convenient story,

9    Mr. Hallsten and Mr. Naff were here.  They were testifying

10   under oath.  They were asked, "Did you come in here, into

11   federal court to commit perjury and make this story up, or is

12   this your recollection of an inventory discrepancy?"  And they

13   said, "That's my recollection."

14         Now neither one of them said that they ever saw a

15   spill, and that's -- I mean, there is no witness that saw a

16   spill, and this idea that somehow there is knowledge of the

17   corporation that somehow is chargeable to Soco that goes back

18   to the 1970s, no one ever put together that there was a --

19   that the inventory discrepancy was a spill until it was

20   discovered that there was a historic pathway that went through

21   that ditch.

22         So -- you know, and they talk about knowledge, and

23   they talk about it in the context of notice, and when did Soco

24   have to provide notice?  And they'd like to drag that all the

25   way back to the 1970s.

1          Quite frankly, knowing about an inventory

2    discrepancy, as Hallsten and Naff did, is not the same as

3    knowing about a spill.  And knowing about a spill is not the

4    same as knowing about groundwater contamination.  No one knew,

5    in the 1970s or '80s about groundwater contamination down in

6    the northwest corner.

7          The first suggestion that there was groundwater

8    contamination down in the northwest corner didn't come until

9    the Lockheed Martin report in 1999.  There was nothing for --

10   there was no occurrence for Dyce to notify insurance companies

11   about in the 1970s.  These were liability policies, liability

12   insurance policies that protect Soco from claims it made by

13   third parties.

14         If Soco would have called up its insurance companies

15   in the 1970s and said, "We've just had this inventory

16   discrepancy.  Does our policy provide coverage?" the answer

17   would have been, "No.  That's your inventory.  What are you

18   talking about?  Why are you telling us about this?  Of course

19   we don't provide coverage."

20         If Soco would have said, "We had an inventory

21   discrepancy in the 1970s that went down the historic ditch and

22   wound up in the northwest corner," no one would have known at

23   that point that there was damage to groundwater.  Again, the

24   question would have been, "Why are you telling us about this?"

25         So for them to come in here today and somehow

2174

1    suggest that they should have known about this in the 1970s,

2    and, if they would have known about it, they wouldn't have

3    issued insurance policies, and they would have been able to do

4    all these wonderful things and clean it up, and they would

5    have been investigating people and doing all of this to

6    respond to Soco, well, they haven't, to this day, done

7    anything to help clean up down in the northwest corner.  And

8    the suggestion that they would have done something differently

9    is nothing more than pure fantasy.

10           So what we know is that as soon as Soco knew that

11   there was a problem, that there was a potential claim, that

12   the EPA was looking at them, and the *Weiss* plaintiffs came

13   forward and made a claim against Soco, that's the point at

14   which Soco notified its insurance companies.

15           And the prejudice that they talk about, they're

16   using the wrong measure and time frame to think about the

17   prejudice that happened.  Yes, witnesses have passed away.

18   Documents have been lost.  But the fact of the matter is the

19   prejudice time frame that we're talking about is in the 1999

20   to 2000 time frame, and you have had no witness come in here

21   from these companies to explain what was lost between 1999 and

22   2000 that would have made any material difference to them in

23   terms of how they handled this.

24           Now Mr. Davis talked about how this was expected.

25   Okay.  Now think about that.  You heard testimony about why it

1    was that they built a berm in the first place.  The building

2    of the berm in the 1970s time frame was to prevent against

3    tank rupturing and to have the contents of that tank hit the

4    surface water.  That was the state of knowledge at that time

5    frame.

6         There was no expectation that there would be a

7    release in the unloading area that would somehow get out, down

8    into the northwest corner, and be causing damage 30 years

9    later.  So, yes, they built the berm in a certain way, and you

10   even saw, in 1981, as the knowledge and understanding changed,

11   they adopted that so that the ditch was pulled back inside of

12   containment and more of the rainwater was handled.

13        Was there expectation in the 1975 to 1978 time frame

14   that this perc was going to get out, down to the northwest

15   corner, and cause all of the problems that it's caused today?

16   Absolutely not.  And was it intended?  It wasn't intended.

17        Perc was the chemical that Dyce handled.  They

18   brought it in in bulk, and they resold it to make a profit.

19   There is no reason, purpose, or explanation for why perc would

20   be down in the northwest corner if not for an accident.

21        I want to comment, though.  When Mr. Davis was up

22   here and talking about drainage patterns and whatnot, did you

23   catch his sleight of hand, as he talked about drainage in the

24   1970s, that he was only showing you pictures from the 1980s?

25   Why would he do that?

1          And then think back to the testimony of Mr. Colver

2   and Dr. Powell.  They testified about what the drainage

3   pattern was and how the drainage moved through from the

4   loading and unloading area, down along the south berm, into

5   that ditch.  And, you know, you can see, with your own eyes,

6   as you look at the photographs -- and you'll have those

7   photographs available to you in the jury room.  You can see

8   with your own eyes where the drainage pattern came from and

9   where the water was going on that site.

10         When, I believe it was, Mr. Johnson said, you know,

11  that Mr. Colver knew perc was bad for the environment, well,

12  Mr. Colver wasn't able to put that in any particular time

13  frame, and he worked at the site for nearly 30 years.  So at

14  what point did he have a particular understanding about how

15  perc was bad for the environment?  I mean, it would be bad for

16  perc to be spilled down in there, even if it didn't hit

17  groundwater, just in the sense that that was their product

18  that they were selling to other customers.

19         So bad for the environment in what sense?  What was

20  the knowledge in the 1970s?  The only testimony you've had is

21  that the awareness was not there that perc was as dangerous as

22  we now appreciate today.  You can't look at this with a 2010

23  perspective and put it back in the 1975 time frame and impose

24  the same understanding of what was known about.  If a spill

25  happened of perc in the 1970s, it would be much different than

2177

1    a spill of perc in the 2010 time frame.

2            There's been a lot of talk about asphalt in this

3    case, but I think that misses the point.  The point on asphalt

4    is everyone agrees perc interacts with asphalt.  There's a

5    disagreement about how much or how quickly it would affect

6    asphalt and whether or not it would look any different from

7    any of the other chemicals that were handled, and whether or

8    not the difference would be that significant as compared to

9    the other asphalt that was there, but it's not even necessary

10   for the perc to have hit asphalt.

11           You heard testimony in this case that before the

12   hard-line piping was plumbed in in the later 1980s, you had a

13   situation where they were bringing pipes and pumps.  They were

14   using the pump configuration.  They were bringing it in over

15   the top of the berm into the south or to the west of the

16   drumming shed in a situation where it might hit the concrete

17   that was on the concrete apron historically.  It might hit the

18   dirt and gravel in the ditch that was there.  And it might

19   have touched asphalt, but it's not necessary, for an

20   explanation of this, that all of the asphalt in the whole site

21   was affected.  That isn't what was seen.

22           So, you know, the fact that Dr. Powell speculates

23   that that's what he thinks would have happened, using all of

24   his assumptions that are impossible in the real world, ask

25   yourself.  You know, is asphalt even important to the

1    resolution of what happened here?

2              MR. COZZENS:  It was Dr. Dale.

3         (Discussion off the record at counsel table.)

4              MR. BANKER:  Yes.  Sorry.

5              Mr. Johnson suggested that, well, you know, maybe

6    this inventory discrepancy was just maybe a paperwork error.

7    Well, you heard Hallsten, and it was Hallsten's job,

8    Mr. Hallsten's job, when he sat on the order desk.  He was

9    responsible for that inventory.  He was concerned about what

10   was going to happen to him after he reported this inventory

11   discrepancy.  He checked the paperwork errors before he turned

12   it over to Mr. Dyce.

13             So although we don't know actually what the

14   resolution was, we don't know because Quentin Dyce was the

15   person who resolved it, we know that the inventory discrepancy

16   was ultimately written off.  How and what Mr. Dyce did, no one

17   will know.  That information was lost to the passage of time.

18   We talked about that, that there are pieces missing of this

19   puzzle, but there is no question that they ruled out the other

20   possible explanations for the inventory discrepancy before

21   turning it over to Mr. Dyce.

22             Now Mr. Johnson did say that pictures are worth a

23   thousand words at the beginning, and he said it again at the

24   end.  Well, they do, and I'd like to end with looking at about

25   6,000 words in the form of pictures.

1          They spent an awful lot of time talking in this case

2     about devegetation and saying, suggesting to you that, you

3     know, the devegetation must have come from the catch pond.

4     Well, they're not the only people looking at these pictures.

5     We've looked at the pictures.  You've looked at the pictures.

6     And we agree that they're important, that the pictures tell a

7     story.  But I would suggest that the pictures in 1974, 1975,

8     1977, 1978, and 1979, in the devegetation, the gradual

9     increasing devegetation they show are more consistent with a

10    spill of perc in the northwest corner that got there through

11    the green line stormwater ditch.

12         Please pull up Exhibit 5017.

13         DOCUMENT TECHNICIAN:  (Complied with request.)

14         MR. BANKER:  This is one of the ones Mr. Johnson

15    showed you, and he said, "Well, look out there in the

16    northwest corner.  The vegetation is okay in the northwest

17    corner.  There is nothing going on out there."  Well, that is

18    1974.

19         The next picture I want to show you is 5019.  This

20    is a picture that Mr. Johnson didn't show you, but it's 1975.

21    And, again, you look out in the northwest corner, and there's

22    really not anything going on out there in terms of

23    devegetation.

24         Then turn to Exhibit 5024, 1977.  This was one that

25    Mr. Johnson showed you, and he said, "Well, look.  You know,

1    you don't see it in the northwest corner yet, but you're

2    starting to see there's something going on there."  And he

3    says, "Well, that's something coming from the catch pond."

4           Now remember.  This is not Marvin Johnson's catch

5    pond where he testified that there was a pipe, and we've got

6    issues with the pipe.  We've talked about that.  This is the

7    pre-1981 configuration of the catch pond.  No one has

8    testified that there was a pipe in this catch pond, and no

9    witness has come and told you that they were pumping or

10   draining this pond in any way, shape, or form.

11          In 1977, you first see -- you know, and this was

12   something that Mr. Grip testified about, you know, that that's

13   the, you know, the cattle gate area, but it's along a historic

14   pathway that was a cattle trail.  That's the point of least

15   resistance for liquid.  That point connects up with this

16   ditch.  If there was a spill in 1975, '76, or '77, you know,

17   is what we're seeing there consistent with what's going on?

18          Well, let's look at 1978.  This is a photo

19   Mr. Johnson did not show you, Exhibit 5026.

20          DOCUMENT TECHNICIAN:  (Complied with request.)

21          MR. BANKER:  The quality on this photo isn't as good

22   as some of the others, but you can see, along this historic

23   pathway, that devegetation Mr. Johnson was so excited about,

24   it's out here now.  It's getting bigger.

25          And when you move to the last exhibit that's a photo

2181

1   exhibit, 1979, Exhibit 5028, what do we have there?  Well, if

2   there was a spill in 1975, '76, '77, or '78, what you've got

3   in 1979 is northwest corner.  What's happening there?  What's

4   causing it?  Is it caused by the spill in the loading and

5   unloading area, or is it caused by deliberate pumping from the

6   catch pond?

7           And that's really what this comes down to is

8   deciding.  Do you believe Monte Naff and Rod Hallsten and the

9   testimony about the inventory discrepancy and the historic

10  ditch, the green-line ditch that went from the loading and

11  unloading area outside the berm down to the northwest corner,

12  or do you believe the insurers' theory –– I would submit it's

13  a theory –– that Dyce intentionally removed material from the

14  catch pond, pumped it out, somehow managed to get only perc,

15  pumped it down to the northwest corner?

16          You have to ask yourself:  What makes more sense?

17  What is more easily reconciled in terms of more likely than

18  not?

19          So there is one last exhibit I want to show you.

20          Pull up DD87.

21          DOCUMENT TECHNICIAN:  (Complied with request.)

22          MR. BANKER:  Same picture.  What is that green blob

23  there?  Well, that's the green blob that we've seen from the

24  record of decision throughout this case.  It more or less

25  matches the pattern of devegetation in the northwest corner,

1    and that's the missing piece to the puzzle, I submit to you.

2            More likely than not, what happened here was a

3    sudden and accidental release in the 1975, '76, '77, '78 time

4    frame, neither expected -- or that caused property damage,

5    neither expected nor intended by Soco.  Soco is not an

6    intentional polluter.  You've seen the Soco employees come in

7    here and testify.

8            And, you know, the insurance companies care so

9    passionately about this because if it happened the way Soco

10   has explained it and presented it to you, they're going to

11   have to help Soco pay for this problem.

12           THE COURT:  You have a minute.  Pardon me.

13           MR. BANKER:  And, you know, that's why they've

14   invented all of these theories and these explanations that

15   don't make sense and brought in here experts to make

16   unreasonable assumptions.

17           We brought in the fact witnesses.  We showed you

18   each one of them and had a relevant explan- -- you know,

19   relevant memory to this time frame.  We let you observe their

20   credibility.  We let you see who they were as people.  They

21   got to ask questions about them to test their recollection,

22   and, at the end of the day it comes down to this:

23           If you believe the fact witnesses in this case, the

24   only explanation for what is pure perc that's down in the

25   northwest corner is the sudden and accidental release that

1   we've been talking about for the last two weeks.

2            Thank you.

3            THE COURT:  Thank you.

4            Would the bailiffs come forward and be sworn,

5   please?

6        (Oath administered to bailiffs.)

7            THE COURT:  Thank you.

8            Ladies and gentlemen, we're going to be in recess

9   now for your verdict.

10           There is a laptop in there, and there's a big

11  viewing, a big TV.  It's got an icon in the middle of it, I

12  understand, that says "Trial Admitted Exhibits."  You

13  left-double-click on that, and you'll get a list of all of the

14  exhibits.

15           Here in a moment, I am going to send in an index

16  that will tell you just a little brief explanation -- that I

17  presume JoAnn prepared?

18           THE CLERK:  Correct.

19           THE COURT:  And it will tell you, give you a brief

20  explanation of what exhibit, each one is.  So when you call up

21  the exhibit, you'll all be viewing it at the same time.  You

22  don't have to pore through these hundreds of notebooks that

23  you saw floating around in here.

24           We will be in recess for whatever it takes.

25           THE LAW CLERK:  All rise.

2184

1          (Jury not present.)

2              THE COURT:  Counsel, have you seen this index of

3    exhibits?

4              MR. JOHNSON:  No.

5              MR. DAVIS:  No.  I mean, I glanced at it, but I

6    haven't checked it for accuracy.

7              THE COURT:  Well, I think, according to Amanda, she

8    and JoAnn, or you did, they went through the exhibits that

9    were on your --

10             MR. MICKELSON:  CD.

11             THE COURT:  -- CDs, and there were a couple from one

12   or the other that had been admitted for illustrative purposes.

13   Those were taken off.

14             But this is the index of the exhibits I intend to

15   have sent in the jury room, index of exhibits, and I want both

16   sides to agree that's all right.  I mean, it's going to help

17   them immensely, and there is no reason not to do it.

18             So when you agree, walk up to the court reporter and

19   say you agree.  If you disagree, come and get me.

20             MR. JOHNSON:  Thank you, Your Honor.

21             THE COURT:  Thank you.

22         (Judge Cebull left courtroom.)

23         (Discussion off the record.)

24             MR. DAVIS:  Continental agrees with the index,

25   noting, for the record, that we have no idea what's on the CD

1    other than what's been represented.  I mean, you know,

2    normally counsel would check the physical exhibits before they

3    went in the jury room.  Obviously the exhibits, being on the

4    CD, aren't checkable.  That's all.  But we're okay with the

5    index and assume it's generally accurate.  Okay?

6              THE REPORTER:  You're okay with the CD, assuming

7    it's accurate?

8              MR. DAVIS:  Yes.

9         (Discussion off the record.)

10             MR. LYNCH:  Yes, we agree; Soco agrees with the

11   index of exhibits.

12        (Discussion off the record.)

13             MR. JOHNSON:  USF&G agrees that the list of

14   documents of exhibits to be given to the jury is perfectly

15   done and fine with us.

16        (Recess taken from 11:50:30 to 16:22:35.)

17        (Open court.)

18        (Jury present.)

19             THE COURT:  Please be seated.

20             Ladies and gentlemen of the jury, have you reached a

21   unanimous verdict?

22             FOREPERSON:  We have, Your Honor.

23             THE COURT:  Please give it to the bailiff.  He'll

24   give it to me.  I'll make sure that it's in proper form, and

25   then I will hand it to the clerk of court, who will publish

1    the verdict of the jury.  It isn't like you see on TV.

2              FOREPERSON:  That's okay.  I'm all right with that.

3              THE COURT:  Would the clerk please publish the

4    verdict of the jury?

5              THE CLERK:  Yes.

6              Your verdict, ladies and gentlemen of the jury:

7              For the District Court, District of Montana,

8    Billings Division, in Cause No. CV-04-29-BLG-RFC, and in Case

9    CV-08-29-BLG-RFC, *United States Fidelity and Guaranty Company*

10   *and Continental Insurance Company v. Soco West, Incorporated*:

11             Question 1, Was groundwater contamination at or near

12   the Soco facility caused by an occurrence?

13             Answer, Yes.

14             Question 2, Did groundwater contamination arise out

15   of a sudden and accidental release of perchloroethylene at

16   Soco's Lockwood facility in 1975, 1976, 1977, or in early

17   1978?

18             Answer, No.

19             Signed --

20             THE COURT:  Very well.

21             THE CLERK:  Excuse me.  Sorry.

22             Signed by the foreperson, March 18, 2010.

23             THE COURT:  All right, ladies and gentlemen.  Go

24   back to the jury room.  I just need to talk to you for a

25   minute before you leave.

1                Please rise for the jury.

2        (Jury not present.)

3                THE COURT:  Well, we're going to be in recess.

4   You'll get me a judgment, I suppose?

5                MR. MICKELSON:  Yes, Your Honor.

6                MR. GROSSBART:  Yeah, we'd like one.

7                THE COURT:  Well, yeah, you need one to keep the

8   case going.

9                All right.  Thanks.

10               MR. JOHNSON:  When should we get you that judgment,

11  Your Honor?

12               THE COURT:  Yeah, and thanks for expediting it as

13  much as you could and being gentlemen, good lawyers.

14               MR. JOHNSON:  How soon will we need to get you the

15  judgment, Your Honor?

16               THE COURT:  Say again?

17               Oh, you enter the judgment, don't you, or do you?

18               MR. GROSSBART:  The clerk, probably?

19               THE CLERK:  I will enter judgment.

20               MR. JOHNSON:  You're going to enter the judgment?

21               THE CLERK:  Yeah, I can enter it.

22               THE COURT:  Yeah, that's right.  She enters the

23  judgment.

24               MR. JOHNSON:  I don't think you need a form from us.

25               THE COURT:  No, I think if you're going to prepare a

1    bill of costs, you've got so many days under the rules.

2            MR. JOHNSON:  Yeah.

3            MR. DAVIS:  All right.

4            THE COURT:  But that goes to the clerk, too, who

5    taxes it.

6            MR. JOHNSON:  Okay.

7            THE COURT:  And if there's a dispute on that, I'll

8    resolve it, but there shouldn't be a dispute.  The rules are

9    simple about what you can tax and what you can't.

10           All right.  Thank you.

11       (Counsel respond.)

12       (Proceedings were concluded at 16:26:46.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              VOLUME 9 REPORTER'S CERTIFICATE

2         I, JoAnn Corson Bacheller, a Registered Diplomate

3    Reporter and Certified Realtime Reporter, certify that the

4    foregoing transcript is a true and correct record of the

5    proceedings given at the time and place hereinbefore

6    mentioned; that the proceedings were reported by me in machine

7    shorthand and thereafter reduced to typewriting using

8    computer-assisted transcription; that after being reduced to

9    typewriting, a certified copy of this transcript will be filed

10   electronically with the Court.

11        I further certify that I am not attorney for, nor

12   employed by, nor related to any of the parties or attorneys to

13   this action, nor financially interested in this action.

14        IN WITNESS WHEREOF, I have set my hand at Billings,

15   Montana this 27th day of April, 2010.

16

17                          /s/ JoAnn Corson Bacheller

18                          _____
                            JoAnn Corson Bacheller
19                          United States Court Reporter

20

21

22

23

24

25